Ahilan T. Arulanantham (SBN 237841)
arulanantham@law.ucla.edu
Stephany Martinez Tiffer (SBN 341254)
martineztiffer@law.ucla.edu
CENTER FOR IMMIGRATION LAW AND
POLICY, UCLA SCHOOL OF LAW
385 Charles E. Young Dr. East
Los Angeles, CA 90095
Telephone: (310) 825-1029

Emilou MacLean (SBN 319071)
emaclean@aclunc.org
Michelle (Minju) Y. Cho (SBN 321939)
mcho@aclunc.org
Amanda Young (SBN 359753)
ayoung@aclunc.org
ACLU FOUNDATION
OF NORTHERN CALIFORNIA
39 Drumm Street
San Francisco, CA 94111-4805
Telephone: (415) 621-2493
Facsimile: (415) 863-7832

Attorneys for Plaintiffs
*[Additional Counsel Listed on Next Page]*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| NATIONAL TPS ALLIANCE, DENIS MOLINA, JHONY SILVA, MARIA ELENA HERNANDEZ, O.C., SANDHYA LAMA, S.K., TEOFILO MARTINEZ<br><br>            *Plaintiffs*,<br><br>        v.<br><br>KRISTI NOEM, in her official capacity as Secretary of Homeland Security, UNITED STATES DEPARTMENT OF HOMELAND SECURITY, and UNITED STATES OF AMERICA,<br><br>            *Defendants*. | Case No.<br><br>**COMPLAINT**<br><br>**Administrative Procedure Act Case** |

Additional Counsel for Plaintiffs

Jessica Karp Bansal (SBN 277347)
jessica@ndlon.org
Lauren Michel Wilfong (*Pro Hac Vice* pending)
lwilfong@ndlon.org
NATIONAL DAY LABORER ORGANIZING NETWORK
1030 S. Arroyo Parkway, Suite 106
Pasadena, CA 91105
Telephone: (626) 214-5689

Eva L. Bitran (SBN 302081)
ebitran@aclusocal.org
ACLU FOUNDATION
OF SOUTHERN CALIFORNIA
1313 West 8th Street
Los Angeles, CA 90017
Telephone: (213) 977-5236

Erik Crew (*pro hac vice* pending)
ecrew@haitianbridge.org
HAITIAN BRIDGE ALLIANCE
4560 Alvarado Canyon Road, Suite 1H
San Diego, CA 92120
Telephone:  (949) 603-7411

**<u>INTRODUCTION</u>**

1.      This lawsuit challenges Department of Homeland Security ("DHS") Secretary Kristi Noem's decisions to deprive more than 60,000 TPS holders from Honduras, Nepal, and Nicaragua of Temporary Protected Status ("TPS"). TPS is a form of humanitarian protection for individuals from countries designated on account of war, natural disaster, or other extraordinary circumstances. TPS provides eligible beneficiaries with the right to live and work legally in the United States during a period where it is unsafe for them to return to their home countries. The Secretary's termination of TPS for Honduras, Nepal, and Nicaragua is part of an illegal effort to eliminate existing TPS designations, and the legal status and employment authorization TPS provides for eligible beneficiaries, regardless of whether the statutory requirements for TPS termination are met.

2.      Plaintiffs are the National TPS Alliance ("NTPSA"), a member-led organization representing TPS holders across the country; and seven TPS holders from Honduras, Nepal and Nicaragua ("Individual Plaintiffs," and together with NTPSA, "Plaintiffs"). Individual Plaintiffs and NTPSA TPS-holder members from Nepal have all resided lawfully in the United States for at least ten years. Individual Plaintiffs and NTPSA TPS-holder members from Honduras and Nicaragua have all resided lawfully in the United States with TPS for at least twenty-six years. They represent the diverse population of individuals who have relied on TPS to provide the most basic forms of human security—a stable place to live and a chance to work for a living during a time of severe crisis in their home countries. They are laborers, health care workers, artists, and caretakers. They live across the country, with homes, children, extended families, jobs, and deep community ties. If Secretary Noem's TPS terminations go into effect, this population of individuals will be subject to deportation, yet unable to return safely to their home countries; and without legal authorization to live or work in the United States.

3.      The TPS terminations of Honduras, Nepal and Nicaragua were unlawful because they were not based on an objective review of country conditions, as statutorily required, but instead the product of a preordained decision to terminate TPS and search for a rationale to

support the end result. The decisions are thus arbitrary and capricious, contrary to law, and pretextual in violation of the Administrative Procedure Act ("APA").

4.    The Secretary's decisions were also unlawful because they provided only 60-days notice before her termination decisions take effect, leaving TPS holders who have lived lawfully in this country for decades with barely any time to prepare for the end of their legal status and employment authorization. No TPS termination decision in the last twenty years—including during the first Trump Administration—had ever provided so little notice for people who have had TPS for so long. Secretary Noem's termination decisions are the first. The Secretary's failure to provide additional time as part of an orderly transition period is an unacknowledged and unexplained deviation from historical practice that violates the Administrative Procedure Act.

5.    The Secretary's decisions also were motivated at least in part by intentional race- and national-origin-based animus, in contravention of the Fifth Amendment. Although it has become increasingly normalized, the fact remains that Secretary Noem, President Trump, and members of the Trump campaign and administration have consistently used racist invective to describe their TPS decisions involving immigrants from non-white, non-European countries, including those involving the countries at issue here.

6.    For each of these reasons, this Court should set aside the agency's unlawful termination orders.

## JURISDICTION AND VENUE

7.    This Court has jurisdiction under 28 U.S.C. 1331 because this action arises under the Constitution and laws of the United States. This Court has additional remedial authority under the Declaratory Judgment Act[1] and the APA.[2] Article III and the Fifth Amendment independently grant this Court subject matter jurisdiction over Plaintiffs' Fifth Amendment claim.

---

[1] *See* 28 U.S.C. 2201 *et seq.*
[2] 5 U.S.C. 701–706.

8.    The federal government has waived its sovereign immunity and permitted judicial review of agency action under 5 U.S.C. 702.[3] In addition, sovereign immunity does not bar claims against federal officials seeking to prevent violations of federal law (rather than monetary relief).[4]

9.    Venue is proper in the Northern District of California under 28 U.S.C. 1391(e)(1) because at least one Plaintiff resides in this judicial district and each Defendant is an agency of the United States or an officer of the United States sued in his or her official capacity.

## INTRADISTRICT ASSIGNMENT

10.    Assignment is proper in the San Francisco division because the claims of Plaintiffs that reside in this judicial district arise in Alameda and San Mateo Counties.[5]

## THE PARTIES

**Plaintiffs**

11.    **Plaintiff National TPS Alliance (NTPSA)** is a member-led organization whose mission is to defend the TPS program and win a path to permanent residency for TPS holders. NTPSA is fiscally sponsored by the Central American Resource Center - CARECEN - of California, a non-profit organization headquartered in Los Angeles, California, which has worked for more than four decades to provide immigrant integration programs, deliver immigration legal services, and foster civic participation and community engagement on immigration policy, education reform, and workers' rights.

12.    NTPSA organizes actions to raise public awareness about TPS and the contributions TPS holders make to this country, facilitates community and civic engagement by TPS holders, and provides access to timely and accurate TPS-related information and services to its members. Membership in the NTPSA is free and voluntary. Individuals can become NTPSA members either by joining a local NTPSA committee or by submitting an individual membership application.

---

[3] *See Presbyterian Church (U.S.A.) v. United States*, 870 F.2d 518, 525 (9th Cir. 1989).

[4] *See, e.g.*, *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 697–99 & nn.18–19 (1949); *Shields v. Utah Idaho Cent. R.R. Co.*, 305 U.S. 177, 183–84 (1938).

[5] Civil Local Rules 3-2(d) and 3-5(b).

NTPSA's members set the organization's priorities, lead and participate in NTPSA's local committees and working groups, and select and serve on NTPSA's Executive Committee.

13.     NTPSA brings this action on behalf of its members. The vast majority of NTPSA's members are TPS holders, including TPS holders from Afghanistan, Burma (Myanmar), Cameroon, El Salvador, Haiti, Honduras, Lebanon, Nepal, Nicaragua, Sudan, Ukraine, Venezuela, and Yemen; the rest are family members of TPS holders and other individuals who wish to support the TPS community. The NTPSA has approximately 300 Honduran TPS holder members living in 22 states; approximately 900 Nepali members living in 40 states; and approximately 25 Nicaraguan TPS holder members living in seven states. They face irreparable harm from the challenged terminations.

14.     The Individual Plaintiffs are all members of NTPSA. The Nicaraguan and Honduran Individual Plaintiffs have lived in the United States with TPS since at least 1999, when Nicaragua and Honduras were designated for TPS on account of natural disasters in these countries. The Nepali Individual Plaintiffs have lived in the United States with TPS since at least 2015, when Nepal was designated for TPS due to an earthquake.

15.     **Plaintiff Denis Molina** is a Honduran TPS holder. He is 49 years old and lives in Connecticut. He is a father of four U.S. citizen children, two of whom have special needs. He is also a pastor, mechanic, and homeowner. Denis was a plaintiff in *Bhattarai v. Nielsen*, No. 3:19-cv-00731 (N.D. Cal.), which challenged the terminations of TPS for Honduras and Nepal during the first Trump administration.

16.     **Plaintiff Jhony Silva** is a Honduran TPS holder, and has had TPS for almost his entire life. He is 29 years old, lives in Hayward, California, and works as a certified nursing assistant at a hospital cardiology unit. Jhony came to the United States at the age of three, and became a beneficiary of TPS the same year. He is the father of a young U.S. citizen child with special needs who depends on him for care, financial and emotional support, and health insurance.

17.     **Plaintiff Maria Elena Hernandez** is a Nicaraguan TPS holder. She is 67 years old and lives in Florida. She will lose her job, her social security, and her health care if TPS is terminated.

18.    **Plaintiff O.C.** is a Nicaraguan TPS holder. He is 60 years old and lives in San Pablo, California. He has not returned to Nicaragua since he left almost 30 years ago. The termination of TPS will mean that O.C. will lose his health insurance, which he relies on to control his diabetes, and risks being separated from his U.S. citizen family.

19.    **Plaintiff S.K.** is a Nepali TPS holder. She is 33 years old and lives in San Francisco. S.K. is engaged to a U.S. citizen and works in theater. She had intended to go back to school to study data science, but was forced to abandon these plans when TPS was terminated.

20.    **Plaintiff Sandhya Lama** is a Nepali TPS holder. She is 43 years old and lives in Virginia. She is the sole provider for her three U.S. citizen children, one of whom has health needs that requires specialized treatment. None of her children have ever been to Nepal.

21.    **Plaintiff Teofilo Martinez** is a Honduran TPS holder. He is 57 years old and lives in Georgia. He owns his own landscaping business and works as a realtor. He risks losing his realtor's license and his driver's license with the termination of TPS, and faces the prospect of being separated from his life partner and the country he has called home for half his life. Teofilo founded the Georgia chapter of NTPSA, is a member of the NTPSA Executive Committee, and hosts a radio program for TPS holders.

**Defendants**

22.    **Defendant Kristi Noem**, sued in her official capacity, is the Secretary of Homeland Security. As the highest-ranking officer for DHS, Defendant Noem has ultimate statutory authority over all TPS extension, termination, and designation decisions.[6]

23.    **Defendant U.S. Department of Homeland Security** is a cabinet-level department of the Executive Branch of the federal government and is an "agency" within the meaning of 5 U.S.C. 551(1). DHS includes various component agencies, including the U.S. Citizenship and Immigration Services ("USCIS"). DHS, together with all of its component agencies, is responsible for administering and enforcing the TPS program.

---

[6] *See* 8 U.S.C. 1254a(b); 6 U.S.C. 557 (transferring functions from the Attorney General).

24.    **Defendant United States of America** includes all other government agencies and departments responsible for the implementation, administration, and change in policy concerning the TPS program.

## CONGRESS'S STATUTORY SCHEME FOR TPS

25.    Congress created TPS in response to unconstrained executive discretion in humanitarian relief programs. Prior to 1990, the executive used "extended voluntary departure" (EVD) to confer blanket nationality-based humanitarian relief. *See* Lynda J. Oswald, Note, *Voluntary Departure: Limiting the Attorney General's Discretion in Immigration Matters*, 85 MICH. L. REV. 152, 157-60 (1986). Between 1960 and 1989, the Attorney General granted EVD to approximately sixteen countries, with periods of protection ranging from eight months to 15 years.[7] However, this practice lacked "any specific … criteria." *Id.* at 178 n.153 (quoting Letter from William F. Smith, Att'y Gen., to Lawrence J. Smith, Rep. (July 19, 1983)). Arbitrary, overtly political results ensued, creating congressional pressure to reform the system, particularly in the wake of the Attorney General's refusal to grant EVD for Salvadoran refugees. *See Hotel & Rest. Emps. Union v. Smith*, 846 F.2d 1499, 1510-11 (D.C. Cir. 1988) (separate opinion of Mikva, J.).

26.    Congress designed TPS to ensure future decisions would be based on "identifiable conditions" rather than "the vagaries of our domestic politics," 101 Cong. Rec. H25811, 25838 (daily ed. Oct. 25, 1989) (statement of Rep. Sander Levine) (debating Central American Studies and Temporary Relief Act of 1989, immediate precursor to the TPS statute); replace the "ad hoc, haphazard ... procedures" that existed before, *id.* at 25837 (statement of Rep. Richardson); and provide beneficiaries with certainty about "what [their] rights are, how the Justice Department determines what countries merit EVD status [and] how long they will be able to stay," *id*. While establishing criteria to govern blanket humanitarian protection, Congress also statutorily designated El Salvador for TPS, Immigration Act of 1990, Pub. L. 101-649, Title III, § 303 , which Executive Branch officials had refused to do, further demonstrating congressional intent to limit unbridled executive discretion.

---

[7] Bill Frelick & Barbara Kohnen, *Filling the Gap: Temporary Protected Status*, 8 JOURNAL OF REFUGEE STUDIES 339, 362-63 (1995).

Since 1990, the TPS statute has given the Secretary of Homeland Security authority to provide nationality-based humanitarian relief to certain citizens of countries stricken by war, natural disaster, or other catastrophe, if they are already in the United States. 8 U.S.C. 1254a. The statute provides that the Secretary may designate a country for TPS if any of three conditions are met:

A. the [Secretary] finds that there is an ongoing armed conflict within the state and, due to such conflict, requiring the return of aliens who are nationals of that state to that state (or to the part of the state) would pose a serious threat to their personal safety;

B. the [Secretary] finds that—
  i. there has been an earthquake, flood, drought, epidemic, or other environmental disaster in the state resulting in a substantial, but temporary, disruption of living conditions in the area affected,
  ii. the foreign state is unable, temporarily, to handle adequately the return to the state of aliens who are nationals of the state, and
  iii. the foreign state officially has requested designation under this subparagraph; or

C. the [Secretary] finds that there exist extraordinary and temporary conditions in the foreign state that prevent aliens who are nationals of the state from returning to the state in safety, unless the Attorney General finds that permitting the aliens to remain temporarily in the United States is contrary to the national interest of the United States.

*Id.* 1254a(b)(1). While a country is designated for TPS, beneficiaries receive employment authorization and protection from immigration detention and removal. *Id.* 1254a(a)(1), (d)(4). The statute affords protection to qualifying individuals regardless of whether they meet the requirements for asylum or other immigration relief. *Id.* 1254a(b)(1).

27.    Congress established a clear statutory framework to govern the process of TPS decision-making. The Secretary must consult with "appropriate" agencies, after which she "may designate" a country based on armed conflict, environmental disaster, or other extraordinary conditions. 8 U.S.C. 1254a(b)(1). For the Secretary to designate a country for TPS on account of "extraordinary and temporary conditions," the Secretary must also find that the temporary presence of those foreign nationals in the United States is not "contrary to the national interest of the United States." *Id.* 1254a(b)(1)(c). Designations can last only between six and eighteen months, effective upon notice in the Federal Register or "such later date as [the Secretary] may specify." *Id.* 1254a(b)(2). The Secretary also has discretion, commonly exercised, to redesignate countries for TPS to allow later-arriving nationals to apply. The Secretary has substantial

discretion over initial designations. So long as she determines certain country conditions exist, she may choose whether and when to designate a country for TPS.

28. In contrast, the statute strictly limits agency discretion *after* a country is designated, both as to the timing of the review process and what criteria the Secretary must use in deciding whether to extend or instead terminate TPS protection. *See* GAO Report 16-18, 27 (differentiating between discretion afforded before and after initial designation). "At least 60 days before" the end of a designation, "after consultation with appropriate agencies," the Secretary "shall review the conditions in the foreign state" and "determine whether the conditions for such designation … continue to be met." 8 U.S.C. 1254a(b)(3)(A). The review process typically begins months before the 60-day deadline. GAO Report 20-21. As part of the process, both USCIS and the State Department generally prepare country conditions memoranda and recommendations for the Secretary. *Id.* 15-16; *see also Ramos v. Nielsen*, 336 F. Supp. 3d 1075, 1082 (N.D. Cal. 2018) (describing process). USCIS's recommendation is called a Decision Memo.

29. Once the Secretary makes her decision, the statute requires that she "shall provide on a timely basis for the publication of notice of each such determination (including the basis for the determination, and, in the case of an affirmative determination, the period of extension of designation under subparagraph (C)) in the Federal Register." 8 U.S.C. 1254a(b)(3)(A).

30. Unless the Secretary timely determines and publishes notice of her decision that the country "no longer continues to meet the conditions for designation," the designation "is extended" automatically for 6 months or "in [her] discretion ... a period of 12 or 18 months." 8 U.S.C. 1254a(b)(3)(C). The statute "essentially provides extension as a default." *Nat'l TPS All.*, 2025 WL 957677, at *32. In contrast, if the Secretary does timely determine conditions for designation are no longer met, she "shall terminate the designation." 8 U.S.C. 1254a(b)(3)(B). The statute does not permit consideration of other grounds for termination. Termination "shall not be effective earlier than 60 days after the date the notice is published or, if later, the expiration of the most recent previous extension." 8 U.S.C. 1254a(b)(3)(B).

31. In addition, the Secretary has discretion to further postpone the effective date of the termination "in order to provide for an orderly transition." *Id.* 1254a(d)(3). In each of the twelve

TPS terminations announced over the past two decades, the agency has provided at least a six-month orderly transition period and, more commonly, a twelve- or eighteen-month period. *See* Appendix 1 (four six-month periods, four twelve-month periods, and four eighteen-month periods). In the 35-year history of the TPS program, only four TPS designations have been terminated without any orderly transition period. Each of those terminations occurred more than twenty years ago, and involved designations that had only been in place for three years or less prior to termination. *Id.*

32.    Once the Secretary has designated a particular country for TPS, individuals from that country (or persons without nationality who last habitually resided in that country) may apply for immigration status under the program. To be eligible for TPS, individuals from a designated country must meet stringent requirements. These requirements include, among other things, continuous physical presence in the United States from the most recent date of designation; continuous residence in the United States from a (potentially earlier) date designated by the Secretary; satisfaction of the criteria for admissibility as an immigrant; lack of disqualifying criminal history (where more than one misdemeanor or a single felony is disqualifying); and submission of an application, extensive documentation, and fees. 8 U.S.C. 1254a(c)(1); 8 C.F.R. 244.2, 244.4, 244.9. Further, an individual is not eligible for TPS if "there are reasonable grounds for regarding [them] as a danger to the Security of the United States." *Id.* 1254a(c)(2)(B)(ii)(citing 8 U.S.C. 1158).

33.    Congress ensured that individuals who are ultimately granted protected status could enjoy the freedom to live and work in the United States without fear of deportation. Under the statute's clear directives, an individual who receives and maintains TPS "shall [be] authorize[d]" to engage in employment in the United States; "shall not be detained" by the Secretary of Homeland Security on the basis of immigration status; and "shall not [be] remove[d]" from the United States by the Department of Homeland Security. 8 U.S.C. 1254a(a)(1), (d)(4).

## PRE-2017 TPS DESIGNATIONS FOR HONDURAS, NICARAGUA, AND NEPAL

34.    Defendants consistently extended TPS for Honduras, Nicaragua, and Nepal from their original designations until the first Trump administration.

35.     Honduras was originally designated for TPS on January 5, 1999, after Hurricane Mitch "swept through Central America causing severe flooding and associated damage in Honduras." 64 Fed. Reg. 524 (Jan. 5, 1999). The hurricane "resulted in the loss of thousands of lives, displacement of thousands more, collapse of physical infrastructure, and severe damage to [Honduras's] economic system." 75 Fed. Reg. 24,734 (May 5, 2010). Between 1999 and 2017, multiple Attorneys General and DHS Secretaries extended TPS for Honduras in regular periodic reviews based on persisting damage from the hurricane, as well as subsequent natural disasters and economic and political crises. *See, e.g.,* 81 Fed. Reg. 30,331 (May 16, 2016) ("Since the last extension of Honduras' TPS designation, Honduras has experienced a series of environmental disasters that have exacerbated the persisting disruptions caused by Hurricane Mitch and significantly compromised the Honduran state's ability to adequately handle the return of its nationals."); 75 Fed. Reg. 24,734, 24,735 (May 5, 2010) (discussing political crisis and deteriorating economy).

36.     Like Honduras, Nicaragua was designated for TPS on January 5, 1999, after Hurricane Mitch caused severe damage to the country. Multiple Attorneys General and DHS Secretaries subsequently extended Nicaragua's TPS status based on myriad social, economic, and infrastructural challenges, 72 Fed. Reg. 29,534 (May 29, 2007); environmental disasters that occurred after Hurricane Mitch, 67 Fed. Reg. 22,454, 22,454 (May 3, 2002); a fractured economic foundation, "chronic poverty," and problems of governance and political tension. 75 Fed. Reg. 24,737, 24,738 (May 5, 2010); 76 Fed. Reg. 68,493, 68,495 (Nov. 4, 2011).

37.     Nepal was first designated for TPS on June 24, 2015, after a 7.8 magnitude earthquake and a number of significant aftershocks struck the country, killing nearly 9,000 people, injuring more than 20,000 people, displacing millions, and destroying or significantly damaging over 750,000 homes. 80 Fed. Reg. 36,346, 36,347 (Jun. 24, 2015). Nepal's designation was extended for 18 months on October 26, 2016. 81 Fed. Reg. 74470 (noting that most damaged buildings had not yet been repaired and over 18,000 people remained displaced).

## THE TERMINATION OF TPS FOR HONDURAS, NEPAL, AND NICARAGUA DURING THE FIRST TRUMP ADMINISTRATION

38.     Between 2017 and 2018, during the first Trump Administration, DHS announced terminations of TPS designations for six countries: Sudan, Haiti, Nicaragua, El Salvador, Honduras, and Nepal. *Ramos v. Nielsen*, 709 F. Supp. 3d 871, 876–80 (N.D. Cal. 2023). If the terminations had taken effect, they would have ended TPS protection for approximately 400,000 people, making up 98 percent of all TPS holders at the time.[8] In each case, the Secretary announced either a 12- or 18-month orderly transition period, which would have delayed the effective date of termination.

39.     Litigation and congressional investigations subsequently revealed that the termination decisions were not based on an objective review of country conditions as required by statute—and as had been the past practice over multiple Administrations, both Democratic and Republican—but rather were part of a "predetermined presidential agenda to end TPS." *Ramos v. Nielsen*, 336 F. Supp. 3d 1075, 1094-1099 (N.D. Cal. 2018) (quoting then-DHS Secretary Duke's assurance to the White House that terminating Nicaragua's TPS would "send a clear signal that TPS in general is coming to a close")[9], S. Rep. No. 116-15 (Nov. 7, 2019) at https://www.congress.gov/116/cprt/SPRT38237/CPRT-116SPRT38237.pdf (finding that termination decision was influenced by considerations related to upcoming elections and disregarded risks to national security and safety of returnees).

40.     In the first Trump administration, DHS Secretaries faced unrelenting pressure from the White House to reach its "desired result of terminating TPS" and responded by ordering pre-textual terminations of TPS designations for nearly everyone who held the status. *Ramos*, 336 F. Supp. 3d at 1101. For example, in terminating TPS for Nepal, career officials were instructed "not to devote research" to crises not directly related to the earthquake and when drafts did not

---

[8] Marcela Valdes, *Their Lawsuit Prevented 400,000 Deportations. Now It's Biden's Call*, N.Y. TIMES, April 7, 2021, at https://www.nytimes.com/2021/04/07/magazine/immigration-el-salvador.html.

[9] The procedural history of the Ramos litigation is recounted in *Ramos v. Nielsen*, 709 F. Supp. 3d 871, 876–80 (N.D. Cal. 2023).

1   "adequately support the proposal to terminate," career officials omitted or deemphasized ongoing

2   problems in the country.

3       41.    The courts considering challenges to these decisions consistently found that DHS

4   had radically changed the way it approached TPS decisions, justifying terminations by considering

5   a much narrower range of country conditions than had been considered in the past. *See Ramos*,

6   336 F. Supp. 3d at 1097–98;[10] *Centro Presente v. DHS*, 332 F. Supp. 3d 393, 417 (D. Mass.

7   2018); *CASA de Maryland, Inc. v. Trump*, 355 F. Supp. 3d 307, 312-313 (D. Md. 2018); *Saget v.*

8   *Trump*, 375 F. Supp. 3d 280, 346 (E.D.N.Y. 2019).

9       42.    After analyzing "a wealth of record evidence" regarding the terminations of TPS for

10   El Salvador, Haiti, Nicaragua, and Sudan, a court in this district found that "DHS made a

11   deliberate choice to base the TPS decision solely on whether the originating conditions or

12   conditions directly related thereto persisted, regardless of other current conditions no matter how

13   bad …The evidence … suggests this change may have been made in order to implement and

14   justify a pre-ordained result." *Ramos*, 336 F. Supp. 3d at 1097–98; *see also Centro Presente v.*

15   *DHS*, 332 F. Supp. 3d at 416 (denying motion to dismiss and explaining "there is no justification,

16   explicit or otherwise, for Defendants' switch to focusing on whether the conditions that caused the

17   initial designation had abated rather than a fuller evaluation of whether the country would be able

18   to safely accept returnees"). After a four-day bench trial regarding the termination of TPS for

19   Haiti, a court in the Eastern District of New York came to the same conclusion, finding that the

20   termination "was preordained and pretextual, and it was made in part due to political influence,"

21   in violation of the TPS statute's requirement that decisions be based on country conditions. *Saget*

22   *v. Trump*, 375 F. Supp. 3d at 346.

23       43.    As a result of injunctions issued in *Ramos* and *Saget*, and subsequent stipulated

24   orders in *Ramos* and *Bhattarai v. Nielsen,* Case No. 19-cv-731 (N.D. Cal) (filed Feb. 10, 2019),

25   providing that TPS designations would remain in effect pending a final decision in the *Ramos*

---

[10] The district court's decision was reversed on appeal in a 2-1 ruling on jurisdictional grounds, but a majority of active judges voted to rehear the case in banc so the panel decision was vacated. *See Ramos v. Wolf*, 975 F.3d 872 (9th Cir. 2020), *reh'g en banc granted, opinion vacated*, 59 F.4th 1010 (9th Cir. 2023).

appeal, the terminations did not go into effect. *Ramos*, 709 F. Supp. 3d at 878. On June 21, 2023, DHS rescinded the TPS terminations for four of the countries at issue in the *Ramos* and *Bhattarai* litigation—Honduras, Nicaragua, and Nepal, as well as El Salvador, and extended their TPS designations.[11] Those decisions also extensively critiqued the flawed country conditions analyses in the termination decisions issued under the first Trump administration.[12] *See* 88 Fed. Reg. 40304, 40320 (Jun. 21, 2023) ("[T]he conditions in Honduras that gave rise to its TPS designation in 1999 persisted in 2018 and persist to this day."); 88 Fed. Reg. 40294 (Jun. 21, 2023) (same for Nicaragua); 88 Fed. Reg. 40317 (Jun. 21, 2023) (same for Nepal).

44.     Under the most recent TPS extensions prior to the challenged terminations, June 24, 2025 was the expiration date for Nepal's designation; and July 5, 2025 was the expiration date for Honduras and Nicaragua. 88 Fed. Reg. 40317 (2023 TPS extension for Nepal); 88 Fed. Reg. 40320 (2023 TPS extension for Honduras); 88 Fed. Reg. 40294 (2023 TPS extension for Nicaragua).

## DEFENDANTS' ONGOING PROJECT TO END TPS AND THE PREORDAINED TERMINATION OF TPS FOR HONDURAS, NEPAL, AND NICARAGUA

45.     Upon taking office for the second time, the Trump Administration resumed its efforts to terminate virtually all TPS designations, notwithstanding the TPS statute's mandate that designations must be extended unless conditions in the country no longer meet the conditions for designation. The decisions to terminate TPS for Honduras, Nepal, and Nicaragua were made long before Secretary Noem considered conditions in any of those countries.

46.     On January 20, 2025, the day he took office, President Trump issued an Executive Order titled "Protecting the American People Against Invasion."[13] The "invasion" referenced in the order was the purported "unprecedented flood of illegal immigration into the United States."

---

[11] DHS issued new extensions for the other two countries, Haiti and Sudan, on May 21, 2021 and April 19, 2022, respectively. Those decisions effectively overturned the terminations for those countries.

[12] DHS also newly designated Haiti and Sudan for TPS. 86 Fed. Reg. 41863 (Aug. 3, 2021); 87 Fed. Reg. 23202 (Apr. 19, 2022).

[13] E.O. 14159, sec. 16(b), 90 Fed. Reg. 8443, 8446 (Jan. 20, 2025).

*Id.* The Invasion E.O. directed the DHS Secretary to "promptly take all appropriate action, consistent with law, to rescind the policy decisions of the previous administration that led to the increased or continued presence of illegal aliens in the United States," including by reviewing "designations of Temporary Protected Status." *Id.* Although TPS holders are by definition lawfully present—and, in the case of the TPS holders impacted by the terminations challenged here, have been for a minimum of either ten years (Nepal) or twenty-six years (Honduras and Nicaragua)—the Invasion E.O. mandated that TPS designations be "appropriately limited in scope" in order to ameliorate the "continued presence of illegal aliens in the United States." *Id.*

47.     Secretary Noem was confirmed on January 25, 2025. Immediately after her confirmation, DHS began to implement the preordained decision to terminate TPS designations, beginning with Venezuela.

48.     Within three days of taking office, Secretary Noem announced her decision to vacate the prior Administration's extension of Venezuela's 2023 TPS designation. *Nat'l TPS All. v. Noem*, No. 25-CV-01766-EMC, 2025 WL 957677, at *6 (N.D. Cal. Mar. 31, 2025). This was the first-ever vacatur of a TPS extension in the 35-year history of the TPS program, and it paved the way for the termination of TPS that followed immediately after. In the Federal Register, Secretary Noem justified the vacatur as necessary to resolve ministerial issues with the consolidated filing process established by the prior extension, which had supposedly engendered confusion. 90 Fed. Reg. 8805 (Feb. 3, 2025). But a court in this district later found that justification was pretextual. "[C]onfusion was not [Secretary Noem's] concern so much as the desire to totally undo Secretary Mayorkas's decision." *Nat'l TPS All.*, 2025 WL 957677, at *36.[14] Internal communications show that officials began planning for termination even before the vacatur was finalized, and DHS policymakers referred to the vacatur notice as a "termination" notice.

---

[14] The Court in *NTPSA* found Plaintiffs are likely to succeed on their claims that Secretary Noem's decision violated the APA and was unconstitutionally motivated by racism, and granted their motion to postpone its effective date pending the outcome of the litigation. The Court's postponement order was subsequently stayed by the U.S. Supreme Court in a two-paragraph decision that provides no reasoning and has no precedential effect. *Noem v. Nat. TPS All.*, No. 24A1059, 2025 WL 1427560, at *1 (U.S. May 19, 2025).

49.     Then, on February 1, 2025—just three days after announcing the vacatur notice—Secretary Noem announced her decision to terminate TPS for Venezuelans who had benefitted from the 2023 designation. *Nat'l TPS All.*, 2025 WL 957677, at *7. As with the initial vacatur decision, DHS's termination of TPS for Venezuela was pre-ordained, with the Secretary and her subordinates searching for evidence to support the desired outcome. Where a periodic review process typically takes months, here it took hours. The same day the Secretary signed the vacatur decision, DHS expected USCIS to produce a Decision Memorandum ("Decision Memo") recommending termination.

50.     Secretary Noem's decision was not based on the statutorily required country conditions review. Rather, the extremely limited review the agency conducted was designed to find support for a termination decision that had already been made. USCIS's research unit, RAIO, which is typically responsible for drafting an objective country conditions report in connection with any TPS periodic review process, did not provide any country conditions reports for the vacatur. For the termination, they provided only a limited country conditions analysis focused on "positive improvements."

51.     Even before the vacatur had been approved, DHS gave RAIO just days to produce a list of updated country conditions sources for Venezuela to populate a slanted country conditions report. The head of RAIO then ordered his team to prepare a report "focus[ing] on any improvements in Venezuela[.]" Before the vacatur decision was signed, he circulated the "updated … sources" with "positive improvements highlighted." He listed the few positive improvements the researchers could find: "incremental improvement in [] life expectancy," an unimplemented "plan [] to provide improvements for teachers and the educational system," "moderate economic recovery," and the grant of a U.S. "permit for Chevron to operate in Venezuela."

52.     USCIS's January 9 Decision Memo from the prior administration had made clear—three weeks earlier—that the situation in Venezuela remained dire. USCIS's January 31 Decision Memo was comparatively brief and included only information on "positive improvements." When researchers could not identify improvements in a particular area—such as political repression and human rights, or food insecurity—USCIS simply excised that topic from the Secretary's

15

consideration. The January 31 Decision Memo also downplays the severity of the crisis—ignoring the "complex, serious and multidimensional humanitarian crisis" which "has disrupted every aspect of life in Venezuela," elaborated in the January 9 Decision Memo, and instead celebrating small changes.

53.    A side-by-side comparison between the January 31 Decision Memo prepared for Secretary Noem and the January 9 Decision Memo for Secretary Mayorkas reveals jarring omissions and (wholly unexplained) inconsistencies:

| Topic | January 9 Memo | January 31 Memo |
|---|---|---|
| Food Insecurity | "Venezuela suffers the second-highest level of hunger in South America, with some 5.1 million people … not getting enough to eat. The U.N. Special Rapporteur on the right to food reported that '[f]ood insecurity, malnutrition and deterioration in livelihoods is cited as the primary cause for the mass migration out of the country." | Not addressed. |
| Health Crisis | "The collapse of Venezuela's healthcare system is one of the most severe aspects of its humanitarian crisis." <br><br> Describes deteriorated healthcare infrastructure, persistent shortages of medicine, **worsening health indicators**, and **"re-emergence" of** vaccine-preventable and previously eradicated diseases, like diphtheria and **measles**. | Heading changed from "Health Crisis" to "Public Health" <br><br> Notes "incremental **improvement in life expectancy** … from 2000 to 2024;" <br><br> States that U.N. vaccination program "contributed to declaring Venezuela **free of measles** in November 2023." |
| Political Repression & Human Rights | "Conditions have grown worse due to harsher crackdowns by Maduro and his representatives on the opposition and their use of thoroughly flawed elections to seize full control of state institutions." | Not addressed. |
| Access to Basic Services (Including Electricity, Water, & Fuel) | Describes ongoing shortages of fuel and natural gas; "growing challenges to access water and sanitation since the …. quality of water has deteriorated;" and daily power outages. | No mention of fuel, natural gas, or sanitation. <br><br> States that power outages have "diminished" in the last six months. |

16
COMPLAINT

54.    Armed with selective country conditions information culled to support a preordained termination, USCIS initially recommended the Secretary terminate Venezuela's designation on the ground that, while "[c]onditions in Venezuela remain challenging . . . notable improvements indicate that the conditions that precipitated the initial TPS designation no longer continue." The final draft of the Decision Memo suggested another basis for termination: "USCIS believes that it may be contrary to the national interest of the United States to permit Venezuela TPS beneficiaries to remain in the United states . . . [g]iven the noted criminal activity of some Venezuelan nationals …." Ultimately, the Secretary based her decision primarily on national interest grounds, asserting that—because Venezuela was designated for TPS on the grounds of extraordinary and temporary conditions (rather than natural disaster or war)—she did not need to find improved conditions in order to terminate its TPS. 90 Fed. Reg. at 9042 ("even assuming the relevant conditions in Venezuela remain both 'extraordinary' and 'temporary,' termination of the 2023 Venezuela TPS designation is required because it is contrary to the national interest to permit the Venezuelan nationals . . . to remain temporarily in the United States."). *See also* 8 U.S.C. 1254a(b)(1)(C) (permitting designation based on "extraordinary and temporary conditions in the foreign state that prevent aliens who are nationals of the state from returning to the state in safety, unless the [Secretary] finds that permitting the aliens to remain temporarily in the United States is contrary to the national interest of the United States").[15] The Venezuela termination was the first termination in the history of the TPS program based on national interest grounds.

55.    In terminating TPS for Venezuela, DHS also sought other information to fill in the holes of a Federal Register notice which had been all but drafted at the start of the manufactured periodic review process. Even before Secretary Noem decided to vacate TPS for Venezuela, DHS sought "to tell the data story" in support of the "project involving termination of TPS status."

---

[15] In contrast, national interest is not a relevant consideration when designating countries for TPS based on natural disaster and armed conflict. 8 U.S.C. 1254a(b)(1)(A)-(B). While the TPS statute makes national interest relevant to a decision whether to *designate* a country for TPS based on extraordinary and temporary conditions, Plaintiffs disagree with the Secretary's position that she may *terminate* a TPS designation on national interest grounds. *See* Pls' Mot. for Summary Judgment, *NTPSA I*, Case No. 3:25-cv-01766-EMC (June 3, 2025), Dkt. 165 at 17-19. However, that dispute is not relevant to this litigation.

Specifically, DHS sought data supporting a conclusion that TPS is "a pull factor" for migration. They found no such evidence. The research found instead that "factors within Venezuela fueled the emigration crisis." Despite the absence of evidence, Secretary Noem included the claim in the Federal Register notice anyway, citing it to support a determination that termination was required because extension would be contrary to the national interest. 90 Fed. Reg. 9040-01 at 9042 (Feb. 5, 2025); *id.* at 9043 ("The anticipated designation or extension for TPS and resulting benefit to access EAD have been pull factors driving Venezuelan nationals to the United States.").

56.     The preordained decision-making to eliminate TPS designations was initially directed towards Venezuela. Other countries followed.

57.     On February 20, 2025, two weeks after the Venezuela termination, DHS announced the second-ever vacatur of an extension in the history of the TPS program, this time for Haiti. The partial vacatur notice purported to retroactively shorten the expiration dates of all documents issued under the prior Secretary's extension by six months. As with Venezuela, the review process for Haiti began not by assessing country conditions or consulting with other agencies, but with agency personnel drafting the partial vacatur notice. The press statement reiterated what Secretary Noem asserted at her confirmation hearing—that "[f]or decades the TPS system has been exploited and abused."[16] DHS used as an "example" of the "exploit[ation]" of the system that "Haiti has been designated for TPS since 2010"; and that "more Haitian nationals, even those who entered the U.S. illegally" have benefited from "each extension."[17] DHS also stated that, by partially vacating the lawfully granted extension, it was "returning integrity to the TPS system," and "returning TPS to its original status: temporary." The release announced that Secretary Noem "vacated a decision by the previous administration to extend Haiti's [TPS] by 18 months" as "part of President Trump's promise to rescind policies that were magnets for illegal immigration and inconsistent with the law." *Id.* It stated that "Biden and Mayorkas attempted to tie the hands of the Trump administration by extending Haiti's Temporary Protected Status by 18 months." *Id.* The

---

[16] Secretary Noem Rescinds Previous Administration's Extension of Haiti's Temporary Protected Status (Feb. 20, 2025), at https://www.dhs.gov/news/2025/02/20/secretary-noem-rescinds-extension-haitis-temporary-protected-status [hereinafter, "Haiti Termination Press Release"].

[17] TPS extensions do not expand protection to new arrivals, only redesignations have that effect.

press statement referenced the rescission of the previous administration's extension of TPS for

Venezuela, explicitly linking the two vacaturs as part of the same project to change "the TPS

system."

58.    DHS did not consult with the State Department or prepare any country conditions

report as part of its decision-making process for the Haiti Partial Vacatur.

59.    The justifications provided by Secretary Noem in the Federal Register for the partial

vacatur of TPS for Haiti had no basis in the TPS statute and were inconsistent with the history of

TPS decision-making. The partial vacatur cannot be explained in terms of the reasons provided by

Secretary Noem in the Federal Register. Those reasons—that Secretary Mayorkas did not explain

why he chose an 18-month period or why he concluded that extension and redesignation were not

contrary to the national interest, and that he cited both contemporaneous and slightly older country

conditions reports—could be invoked to vacate all previous TPS extensions, because they are not

flaws but rather standard features of TPS decisions. 90 Fed. Reg. 10,511-01 at 10,513-14 (Feb. 24,

2025).

60.    On May 12, 2025, DHS announced the termination of TPS for Afghanistan. Again,

despite an ongoing State Department warning against any travel to the country "due to civil unrest,

crime, terrorism, risk of wrongful detention, kidnapping, and limited health facilities,"[18] Secretary

Noem announced the termination of TPS for Afghanistan, citing "notable improvements" "such

that requiring the return of Afghan nationals to Afghanistan does not pose a threat to their personal

safety." 90 Fed. Reg. 20309 (May 13, 2025). She highlighted that "[t]he Taliban government is

promoting tourism to shift its global image" and "tourists are sharing their experiences on social

media, highlighting the peaceful countryside, welcoming locals, and the cultural heritage" *Id.* She

also noted, as a sign that the situation had improved, that "none of the [armed] groups have been

assessed to pose a real threat to Taliban rule;" that the United Nations Assistance Mission to

Afghanistan reduced the use of improved explosive devices; and that only 24 million (rather than

29 million) Afghan nationals relied on humanitarian assistance. *Id.* She also failed to address

_____

[18] https://travel.state.gov/content/travel/en/international-travel/International-Travel-Country-Information-Pages/Afghanistan.html

entire categories of conditions previously identified as bases for Afghanistan's TPS designation and prior extensions, including human rights abuses and the welfare of women and girls. *Compare* 88 Fed. Reg. 65728 (Sep. 25, 2023) (describing "worsening" human rights "crisis," "unprecedented deterioration of women's rights," and "[g]ender based violence, including sexual violence against women and girls [that] occurs regularly") *with* 90 Fed. Reg. 20309 (May 13, 2025) (not mentioning human rights or the rights of women and girls).

61.    Secretary Noem cited the Invasion E.O. in making her national interest assessment, and determined that extending TPS would be contrary to the national interest. She provided no support for this conclusion aside from the Invasion E.O. and an assertion—without providing numbers, details, or any confirmation of any wrongdoing—that "DHS records indicate that there are Afghan nationals who are TPS recipients who have been the subject of administrative investigations for fraud, public safety, and national security" and that she had "t[a]k[en] account of those cases in making her determination." *Id.* When announcing the decision to terminate Afghanistan's TPS, Secretary Noem explained: "This administration is returning TPS to its original temporary intent … Reviewing TPS designations is a key part of restoring integrity in our immigration system."[19]

62.    The termination of TPS for Cameroon followed shortly thereafter, on June 4, 2025. 90 Fed. Reg. 23,697 (Jun. 4, 2025). The Secretary found TPS holders could safely return to the country even though "two major armed conflicts" "remain active." *Id.* Again, she failed to address entire categories of conditions previously cited as a basis for Cameroon's TPS designation and subsequent extensions, including human rights abuses, food insecurity, a cholera epidemic, and ongoing mass displacement. *Compare* 88 Fed. Reg. 69,945 (Oct. 10, 2023) (addressing each category) *with* 90 Fed. Reg. 23,697 (not addressing any conditions in those categories). As with all other prior TPS decisions of this administration, Secretary Noem cited the Invasion E.O. in

---

[19] DHS Terminating Temporary Protected Status for Afghanistan (May 12, 2025), at https://www.uscis.gov/newsroom/news-releases/dhs-terminating-temporary-protected-status-for-afghanistan [hereinafter, "Afghanistan Termination Press Release."]. The termination of TPS for Afghanistan and Cameroon has since been challenged. *See CASA, Inc. v. Noem*, No. 25-cv-1484 (D. Md. 2025).

finding that extending TPS for Cameroon was "contrary to the national interest." 90 Fed. Reg. 23,697. She provided no justification aside from the Invasion E.O. and President's Trump's "policy imperatives" related to his "immigration and border-related executive orders and proclamations." *Id.*

63.    On June 6, 2025, Defendants terminated TPS for Nepal. 90 Fed. Reg. 24,151 (Jun. 6, 2025). After reciting the statutory standard for country conditions review, Secretary Noem cited to the President's Invasion E.O. instruction that she "ensur[e] that designations of Temporary Protected Status are … appropriately limited in scope and made for only so long as may be necessary to fulfill the textual requirements of the statute." *Id.* at 24,152 n.10. Repeating the pattern developed in the prior terminations—and aided, no doubt, by the new selective country conditions research system put in place for periodic reviews under this administration—she then identified "notable improvements" that justified ending Nepal's designation while ignoring entire categories of conditions that had previously been considered. 90 Fed. Reg. 24151 (Jun. 6, 2025). *Compare* 88 Fed. Reg. 40317 (Jun. 21, 2023) (discussing widespread food insecurity and lack of access to sanitation) *with* 90 Fed. Reg. 24151 (Jun. 6, 2025) (not addressing those conditions).

64.    In a break with past practice, Secretary Noem provided that the TPS termination for Nepal would take effect in 60 days—the minimum period permitted under the TPS statute. 8 U.S.C. 1254a(b)(3)(B). Rather than displaying awareness of DHS's longstanding past practice of providing at least a six-month orderly transition period when ending a TPS designation of substantial length, the Secretary denied that there *was* any such practice. *See* 90 Fed. Reg. at 24154 n. 24. While "recogniz[ing]" in a footnote "that certain previous TPS terminations allowed for an extended transition," she went on to note that "certain other TPS designations were terminated without allowing for an extended transition period," indicating her view that the agency *had* no particular practice. *Id.* This is incorrect. Rather, DHS had a clear practice over the past twenty years of providing at least a six-month orderly transition period for *any* TPS termination, and even before that had provided at least a six-month transition for any country designated for TPS for more than three years.

65.    On June 27, 2025, Defendants also terminated Haiti's TPS designation. 90 Fed. Reg. 28760 (July 1, 2025). Because Haiti, like Venezuela, was designated for TPS on the grounds of extraordinary and temporary conditions, the Secretary believed she could justify termination based solely on a finding that extension is not in the national interest. And that is what she did— claiming that crisis-level conditions actually *required* termination because continuing TPS for a country facing total societal collapse is contrary to the U.S. national interest. *Id.* 90 Fed. Reg. at 28762-64 (acknowledging "Widespread gang violence … sustained by the country's lack of functional governmental authority" has "destabilized Haiti," and that "'Haiti in the grip of a severe humanitarian and human rights crisis,'" but nonetheless terminating Haiti). The Press Release proclaims that "country conditions have improved to the point where Haitians can return home in safety." *See* https://www.uscis.gov/newsroom/news-releases/dhs-terminates-haiti-tps-encourages-haitians-to-obtain-lawful-status. The agency's simultaneous promulgation of two directly contradictory explanations demonstrates the pretextual nature of both.

66.    On July 7, 2025, Defendants terminated TPS for Honduras and Nicaragua.[20]

67.    DHS "pre-published" its termination decisions in the Federal Register on July 7, 2025, two days *after* the expiration of the most recent previous extension for each country. The untimely publication left Honduran and Nicaraguan TPS holders with no way to prove their ongoing TPS or work authorization between July 5, 2025 (the expiration of each country's most recent previous extension) and July 7, 2025. As a result, numerous TPS holders from these countries were unlawfully fired or suspended from their jobs, despite the fact that the earliest a TPS termination can take effect is 60 days after publication of notice of the termination, and the statute *requires* DHS to authorize TPS holders to work as long as their TPS remains in effect. 8 U.S.C. 1254a(a)(1)(B).

---

[20] *See* USCIS, CIS No. 2818-25, Termination of the Designation of Honduras for Temporary Protected Status, at https://public-inspection.federalregister.gov/2025-12621.pdf (Jul. 7, 2025) (hereinafter, "Honduras Termination Notice"); USCIS, CIS No. 2819-25, Termination of the Designation of Nicaragua for Temporary Protected Status, at https://public-inspection.federalregister.gov/2025-12688.pdf (July 7, 2025) (hereinafter, "Nicaragua Termination Notice").

68.     The Honduras termination notice cites to the Invasion E.O. for the proposition that "the Secretary should … ensur[e] that designations of Temporary Protected Status … are appropriately limited in scope and made for only so long as may be necessarily to fulfill the textual requirements of that statute." Honduras Termination Notice at n. 10. Again repeating the pattern developed in the prior terminations, Secretary Noem identified certain positive indicators—such as increasing tourism and real estate investment—while ignoring major categories of conditions that had previously been considered, including "political violence" and "staggering levels of crime" with "[g]angs that originated in the United States … la[ying] siege to communities and … plung[ing] the country into a state of crisis." 88 Fed. Reg. 40304 (June 21, 2023) (internal quotation marks and citations omitted). *See* Honduras Termination Notice (not addressing political violence or crime).

69.     The Nicaragua termination notice similarly relies on the Invasion E.O. Nicaragua Termination Notice n.4. It recognizes that "certain conditions for the TPS designation of Nicaragua may continue," but nonetheless terminates Nicaragua's designation on the ground that "notable improvements … allow Nicaragua to adequately handle the return of its nationals." *Id.* The termination notice fails to acknowledge or consider numerous categories of conditions that were the basis of prior extensions, including "political instability," a "deteriorat[ing]" "human rights situation," and a related "humanitarian crisis." 88 Fed. Reg. at 40300. *See* Nicaragua Termination Notice (failing to address the political or humanitarian situation).

70.     In finding that Honduras and Nicaragua can "handle adequately the return" of their nationals, 8 U.S.C. 1254a(b)(1)(B), Secretary Noem adopted a new definition of "adequate," defining the term to mean "[s]atisfactory, but worthy of no stronger praise or recommendation; barely reaching an acceptable standard; just good enough." *See* Honduras Termination Notice at n. 23; Nicaraguan Termination Notice at n. 14.

71.     Despite the fact that Honduras and Nicaragua have each been designated for TPS for 26 years, Secretary Noem declined to provide any "orderly transition," 8 U.S.C. 1254a(d)(3), period beyond the statutory 60-day minimum. Again, she failed to acknowledge DHS's longstanding past practice of providing at least a six-month orderly transition period when ending

a TPS designation of substantial length. Instead, she wrongly claimed that "[a] sixty-day orderly transition period is consistent with the precedent of previous TPS country terminations," apparently referring only to her own termination decisions over the past several months.

## THE TRUMP ADMINISTRATION PUBLICLY COMMITTED TO END TPS PROTECTIONS AND DESTROY THE TPS PROGRAM

### Secretary Noem, President Trump, and Vice President Vance Committed to Terminate TPS

72.    Secretary Noem, President Trump and Vice President Vance have repeatedly characterized TPS itself as illegal, and committed to terminate TPS long before the Secretary had any opportunity to consider the factors required by the statute. Secretary Noem's TPS decisions treat the program itself, and those protected by it, as illegal. Their approach demands an ends-oriented periodic review process, where all paths lead to termination.

73.    Both prior to and since assuming her position running DHS, Secretary Noem has communicated her view that TPS, as it has been used, is illegal. At her confirmation hearing, Secretary Noem stated that "[TPS] has been abused and manipulated by the Biden Administration, and that will no longer be allowed . . . and these extensions going forward the way that they are. The program was intended to be temporary[.]"[21]

74.    In a February 2, 2025 "Meet the Press" appearance the day the Venezuela vacatur was published, Secretary Noem said, "The TPP *[sic]* program has been abused and it doesn't have integrity right now."[22]

75.    Secretary Noem also defined TPS holders as law violators just by virtue of having this humanitarian status. In announcing her decision to end TPS for Venezuela, Secretary Noem

---

[21] C-SPAN, *Homeland Security Secretary Nominee Gov. Kristi Noem Testifies at Confirmation Hearing* (Jan. 15, 2025) Dkt. 37-12 at 104.

[22] NBC, *Meet the Press*, YOUTUBE (Feb. 2, 2025) at approx. 16:25, *available at* https://www.youtube.com/watch?v=FpeMXrvxHco.

said the termination "stopped" former Secretary Mayorkas from letting Venezuelan TPS holders "stay here and violate our laws for another 18 months."[23]

76.    She made similar statements in connection with Haiti. In her February 20, 2025, press statement announcing the partial vacatur of TPS for Haiti, Secretary Noem elaborated, with emphasis, that "TPS is a type of immigration status available to nationals of certain designated countries that allows aliens, **even if they entered the country illegally**, the ability to reside **temporarily** in the U.S."[24] The press statement reiterated what Secretary Noem asserted at her confirmation hearing—her belief that "[f]or decades the TPS system has been exploited and abused." DHS used as an "example" of the "exploit[ation]" of the system that "Haiti has been designated for TPS since 2010"; and that "more Haitian nationals, even those who entered the U.S. illegally" have benefited from "each extension." (Here, she presumably meant each "redesignation," because an extension does not allow additional Haitian nationals to benefit.) DHS also stated that, by partially vacating the lawfully granted extension, it was "returning integrity to the TPS system," and "returning TPS to its original status: temporary." The press statement also referenced the rescission of the previous administration's extension of TPS for Venezuela, apparently linking these two vacaturs to the same goal.

77.    President Trump, Vice President Vance, and Trump surrogates have likewise championed the view that TPS designations are "illegal"—or, in the Vice President's words, "a magic amnesty wand."[25] They have made clear their intent to target TPS and/or TPS designations for termination.

---

[23] *DHS Sec. Noem Announces End to Temporary Protected Status for Venezuelan Migrants*, FOX AND FRIENDS (Jan. 29, 2025) at approx. 1:00, *available at* https://www.foxnews.com/video/6367942790112?msockid=30416397acd261bf24f1707bad686037.

[24] Press Release, DHS, Secretary Noem Rescinds Previous Administration's Extension of Haiti's TPS (Feb. 20, 2025), https://www.dhs.gov/news/2025/02/20/secretary-noem-rescinds-extension-haitis-temporary-protected-status (emphasis in original).

[25] *See* Chris Cameron, *Vance Vows an End to Programs for Legal Immigrants*, N.Y. TIMES (Oct. 22, 2024), *available at* https://www.nytimes.com/2024/10/22/us/politics/vance-trump-legal-immigrants.html; Miriam Jordan & Hamed Aleaziz, *Trump Immigration Targets: Ukrainians, Venezuelans, Haitians*, N.Y. TIMES (Nov. 15, 2024), *available at* https://www.nytimes.com/2024/11/15/us/trump-immigrants-temporary-protected-status.html.

78.     President Trump, while campaigning, said that he would personally revoke TPS and that he did not consider it legal. President Trump responded to an interviewer's question as to whether Haitian TPS holders in Springfield, Ohio were "legal or illegal" and whether he would "revoke TPS status" by saying: "You have to remove the people; you cannot destroy our country . . . In my opinion, it's not legal. . . . Absolutely I would revoke [TPS]."[26]

79.     Though TPS holders in Springfield, Ohio were welcomed by local officials and employers, and legally authorized to live and work in the United States through the TPS program, President Trump decried TPS as a "little trick," asserting Haitian migrants "are illegal immigrants as far as I'm concerned. They're destroying the towns. . . . [T]hey'll end up destroying the state!"[27] He asserted he would "do large deportations in Springfield, Ohio," despite having acknowledged that the Haitians in Springfield about which he was speaking were TPS holders.[28]

80.     Vice President Vance, during the campaign, expressed a goal of ending TPS: "We're going to stop doing mass grants of Temporary Protected Status. Of course, you're going to have people fleeing from tyranny, but that happens on a case-by-case basis, not by waving the magic government wand."[29] Given that TPS is, by statute, designed to *be* a mass grant for all eligible individuals (unlike asylum and other forms of fear-based immigration relief), this statement can only be understood as an attack on TPS itself.

---

[26] Damita Menezes & Ali Bradley, *Trump on Springfield Haitian Migrants: 'They Have to Be Removed,'* NewsNation (Oct. 2, 2024) at approx. 12:00, *available at* https://www.newsnationnow.com/politics/2024-election/trump-springfield-haitian-migrants-removed/; Maggie Astor, Trump Says He Would Try Again to Revoke Haitian Immigrants' Protections, N.Y. TIMES (Oct. 3, 2024), https://www.nytimes.com/2024/10/03/us/politics/trump-haitian-immigrants-legal-status.html.

[27] Edith Olmstead, *Trump Is Now Threatening All Immigrants, "Illegal" or Not,* THE NEW REPUBLIC (Oct. 9, 2024), *available at* https://newrepublic.com/post/186961/donald-trump-racist-attacks-springfield-ohio-lie ("[L]ook at Springfield, where 30,000 illegal immigrants are dropped, and it was, they may have done it through a certain little trick, but they are illegal immigrants as far as I'm concerned.").

[28] Alexandra Ulmer et al., *Trump Pledges to Deport Haitians in Ohio City if Elected,* REUTERS, Sep. 14, 2024, *available at* https://www.reuters.com/world/us/biden-says-attacks-haitian-immigrants-have-stop-2024-09-13/.

[29] Chris Cameron, *Vance Vows an End to Programs for Legal Immigrants,* N.Y. TIMES (Oct. 22, 2024), *available at* https://www.nytimes.com/2024/10/22/us/politics/vance-trump-legal-immigrants.html.

81.     Vice President Vance expressed this view repeatedly. In a September 2024 CNN interview, he disputed the anchor's characterization of TPS holders as being in the United States legally. The future vice president called TPS designations a "magic amnesty wand . . . giving [migrants] legal status. . . . That is not to say they are here legally. That is a terrible indictment of [Vice President Kamala Harris's] amnesty policies." The anchor responded that Mr. Vance "might not agree with the [TPS] policy," but "it is the law." Mr. Vance replied that Vice President Harris "granted amnesty at a mass level."[30]

82.     At a campaign rally a couple of days later, Mr. Vance doubled down, assailing what he called a "media and Kamala Harris fact check" about Haitian TPS holders. He stated:

> The media loves to say that the Haitian migrants, hundreds of thousands of them, by the way . . . they are here legally. And what they mean is that Kamala Harris used two separate programs, mass parole and temporary protective status. She used two programs to wave a wand and to say we're not going to deport those people here. Well, if Kamala Harris waves the wand illegally and says these people are now here legally, I'm still going to call them an illegal alien. An illegal action from Kamala Harris does not make an alien legal.[31]

83.     According to the New York Times, Stephen Miller, President Trump's Deputy Chief of Staff and chief architect of his immigration policy platform, and other top advisers flagged the revocation of TPS as a priority for the incoming administration, again without consideration of country conditions or the merit of any individual designation.[32]

84.     Project 2025, "the 2025 Presidential Transition Project," a product of current and former Trump political appointees, also called for the "[r]epeal [of] TPS designations"—without

---

[30] Interview of Senator J.D. Vance, CNN (Sep. 16, 2024) at approx. 5:00, http://youtube.com/watch?v=djpTr5r0zMQ.

[31] Speech by Senator J.D. Vance at Raleigh, North Carolina Campaign Event, C-Span (Sep. 18, 2024) at approx. 41:00, https://www.c-span.org/program/campaign-2024/senator-jd-vance-campaigns-in-raleigh-north-carolina/649012.

[32] Charlie Savage *et al.*, *Sweeping Raids, Giant Camps and Mass Deportations: Inside Trump's 2025 Immigration Plans*, N.Y. TIMES (Nov. 11, 2023), *available at* https://www.nytimes.com/2023/11/11/us/politics/trump-2025-immigration-agenda.html ("People who were granted temporary protected status because they are from certain countries deemed unsafe, allowing them to lawfully live and work in the United States, would have that status revoked.").

1    elaboration as to any consideration of country conditions or any other review criteria or

2    processes.[33]

3    **SECRETARY NOEM AND PRESIDENT TRUMP EXPRESSED DISCRIMINATORY**

4    **ANIMUS TOWARDS NON-WHITE, NON-EUROPEAN TPS HOLDERS**

5          85.    Secretary Noem's termination decisions were motivated in significant part by

6    animus against non-white, non-European TPS holders based on their perceived race, ethnicity, and

7    national origin. The animus is evidenced by numerous statements made by Secretary Noem,

8    President Trump and other Trump administration officials. A limited number of those statements

9    are described herein. They leave no doubt as to the speaker's discriminatory motives against non-

10   white immigrants in general.

11   **Secretary Noem's Racist Statements Against Non-White, Non-European Immigrants**

12         86.    Secretary Noem has described irregular immigration across the U.S.-Mexico border

13   as an "invasion happening on purpose … to remake the foundation of this country,"[34] echoing the

14   racist "replacement theory." The "replacement theory" is the idea that non-white immigrants will

15   "replace" the white race, and in doing so undermine the country's perceived white foundation,

16   history and culture.[35]

17         87.    Secretary Noem's termination orders rely explicitly on President Trump's Executive

18   Order, "Protecting the American People Against Invasion." That Order describes immigrants,

19   including lawfully present TPS holders, as invaders committing "vile and heinous acts against

20   innocent Americans."

21

22

23

24   [33] Paul Dans & Steven Groves, eds., "Mandate for Leadership: The Conservative Promise," at
     150, *available at* https://static.project2025.org/2025_MandateForLeadership_FULL.pdf.

25   [34] South Dakota Gov. Kristi Noem Calls on Nikki Haley to Exit 2024 Race, CBS NEWS (Mar. 5,
26   2024) at approx. 3:58, https://www.cbsnews.com/video/kristi-noem-calls-on-nikki-haley-to-exit-
     2024-race/.

27   [35] *See The 'Great Replacement' Theory, Explained*, NATIONAL IMMIGRATION FORUM,
     https://immigrationforum.org/wp-content/uploads/2021/12/Replacement-Theory-Explainer-
28   1122.pdf.

88.    "Invasion" is a "code word" often used to "express[] that Racial/Ethnic Minorities spread something harmful within communities, institutions, or other societal domains."[36]

89.    Secretary Noem has repeatedly described non-white, non-European immigrants as "dirt bags."[37]

90.    Secretary Noem has sought to disparage immigrants in general and TPS holders in particular as "criminals."

91.    For example, during her tenure, DHS has criticized the TPS program for allegedly facilitating the entrance of "half a million poorly vetted migrants into this country—from MS-13 gang members to known terrorists and murderers," even though TPS is available only to individuals who are already present in the United States and anyone with more than a single misdemeanor conviction is ineligible for protection.[38]

92.    In "many" comments between February 2024 through the present, Secretary Noem has "equated Venezuelan immigrants and/or TPS holders with gang members, criminals, mentally unstable persons, and the like." *Nat'l TPS All.*, 2025 WL 957677, at *39-*45 (finding Plaintiffs likely to succeed on their claim that the Secretary's decision to vacate and terminate Venezuela's TPS designation was motivated by animus in violation of the Constitution).

93.    Secretary Noem has repeatedly justified terminating TPS for thousands of TPS beneficiaries on the basis of alleged criminal activity by small numbers of individuals. For example, in terminating TPS for approximately 348,187 Haitians, she identified the actions of one

---

[36] Pfeiffer, Deirdre and Hu, Xiaoqian, Deconstructing Racial Code Words (April 19, 2024). Forthcoming in 58(2) Law & Society Review (2024)., Arizona Legal Studies Discussion Paper No. 24-14, Available at SSRN: https://ssrn.com/abstract=4801114 or http://dx.doi.org/10.2139/ssrn.4801114.

[37] @Sec_Noem, X (Jan. 28, 2025, 7:35 AM), *available at* https://x.com/Sec_Noem/status/1884264039158800547 ("Getting the dirt bags off the streets."); *DHS Secretary Kristi Noem Joins Federal Agents on Immigration Raids in New York*, CBS MORNINGS (Jan. 29, 2025) at approx. 1:10, *available at* https://www.youtube.com/watch?v=tODarHnNiNs ("These guys are dirtbags. They have come in and perpetuated violence in this country."). The CBS reporter who accompanied Secretary Noem on New York City raids she references reported that nearly half of those arrested had no criminal history.

[38] @DHSgov (May 19, 2025), https://x.com/DHSgov/status/1924575437344186612.

1  individual convicted of numerous violent crimes as "underscor[ing] the broader risk posed by

2  rising Haitian migration."[39]

3         94.    Similary, Secretary Noem has described Honduran "migration management" as a

4  means to "save American lives and get criminals off our streets!"[40]

5  **President Trump's Racist Statements Against Non-White, Non-European Immigrants**

6         95.    From his candidacy for his first term as president through the present, President

7  Trump has repeatedly denigrated people perceived to be non-white, non-European immigrants. He

8  has specifically targeted TPS holders generally.

9         96.    President Trump has repeatedly described immigrants in the United States as an

10  "invasion," repeatedly conflating migrants with "criminals, gang members and terrorists."[41]

11        97.    President Trump, while campaigning in 2023, repeatedly decried non-white, non-

12  European immigrants for "poisoning the blood of our country."[42]

13        98.    In October 2024, during an interview with conservative radio host Hugh Hewitt,

14  President Trump further emphasized the genetic inferiority of non-white, non-European

15  immigrants. He said, "How about allowing people to come to an open border . . . many of them

16  murdered far more than one person, and they're now happily living in the United States. You

17  know now a murderer, I believe this, it's in their genes. And we got a lot of bad genes in our

---

[39] USCIS, Termination of the Designation of Haiti for Temporary Protected Status, at https://federalregister.gov/d/2025-12224.

[40] @Sec_Noem (Mar. 20, 2025), https://x.com/Sec_Noem/status/1902870288921927870 (framing Honduran "migration management" as a means to "save American lives and get criminals off our streets!).

[41] *See, e.g.*, Donald Trump, *Donald Trump: This Is How I Will End Joe Biden's Border Disaster on Day One*, DES MOINES REGISTER (Jan. 3, 2024), *available at* https://www.desmoinesregister.com/story/opinion/columnists/caucus/2024/01/03/donald-trump-joe-biden-border-disaster/72093156007/; TIME, *Read the Full Transcripts of Donald Trump's Interviews with TIME*, Apr. 2024, *available at* https://time.com/6972022/donald-trump-transcript-2024-election/ ("This is an invasion of our country. An invasion like probably no country has ever seen before. They're coming in by the millions.").

[42] *Donald Trump on Illegal Immigrants 'Poisoning the Blood of Our Country'*, C-SPAN (Dec. 16, 2023), *available at* https://www.c-span.org/clip/campaign-2024/donald-trump-on-illegal-immigrants-poisoning-the-blood-of-our-country/5098439; Raheem Kassam, Raheem Kassam Interviews Donald Trump, YouTube (Sep. 2023) at approx. 1:34 to 1:45, *available at* https://www.youtube.com/watch?v=v283kLQbe1M&t=89s.

country right now." In contrast, when addressing a predominately white crowd at a campaign rally in Minnesota, he told them that they have "good genes."[43]

99.    At a rally one week before the 2024 election, President Trump described the country as "occupied" by criminal migrants. "We're not going to have a country any longer. That's who we're allowing in. The United States is now an occupied country, but it will soon be an occupied country no longer . . . November 5, 2024 . . . will be Liberation Day in America. . . . I will rescue every city and town that has been invaded and conquered."[44]

100.    In his Republican Convention speech in July 2024, President Trump said, "The greatest invasion in history is taking place right here in our country. They are coming in from every corner of the earth, not just from South America, but from Africa, Asia, Middle East. They're coming from everywhere. They're coming at levels that we've never seen before. It is an invasion indeed, and this administration does absolutely nothing to stop them."[45]

101.    President Trump has often compared immigrants to snakes that will bite and kill anyone foolish enough to shelter them.[46] He has also described non-white, non-European

---

[43] Jack Traylor et al., *Trump Suggests Immigrants Have 'Bad Genes' in Latest Disparagement of Migrants*, NBC NEWS (Oct. 7, 2024), https://www.nbcnews.com/politics/donald-trump/trumpsuggests-immigrants-bad-genes-latest-disparagement-migrants-rcna174271.

[44] Speech by Donald Trump at Madison Square Garden Presidential Campaign Rally (Oct. 27, 2024) at approx. 16:13, *available at* https://www.youtube.com/watch?v=bzVT4YEYsuI.

[45] "Read the Trasncript of Donald J. Trump's Convention Speech," *New York Times*, July 19, 2024, https://www.nytimes.com/2024/07/19/us/politics/trump-rnc-speech-transcript.html.

[46] *See, e.g.*, Dara Lind, *"The Snake": Donald Trump Brings Back His Favorite Anti-Immigrant Fable at CPAC*, VOX (Feb. 23, 2018), *available at* www.vox.com/policy-and-politics/2018/2/23/17044744/trump-snake-speech-cpac; *see also* Julie Hirschfeld Davis, *Trump Calls Some Unauthorized Immigrants 'Animals' in Rant*, N.Y. TIMES (May 16, 2018), *available at* www.nytimes.com/2018/05/16/us/politics/trump-undocumented-immigrants-animals.html; *see also* John Bennett, *"Dumping Ground": Trump Echoes Conservative "Project 2025" at First Rally as Felon*, ROLL CALL (Jun. 10, 2024), *available at* https://rollcall.com/2024/06/10/dumping-ground-trump-echoes-conservative-project-2025-at-first-rally-as-a-felon/ ("[W]e're taking in people that are a disaster for our country. So it's all happening at our border…. And we're not going to let it happen, we're not going to let them ruin our country, we're not going to let them destroy our country. . . . The whole country is being turned into an absolute dumping ground[.].")

immigrants as "animals."[47] For example, President Trump said about some undocumented immigrants during a March 2024 rally, "I don't know if you call them people. In some cases they're not people, in my opinion, but I'm not allowed to say that[.]"[48]

102.    During an interview on Fox News, President Trump falsely claimed that "jails and mental institutions from other countries and gang members right off the streets of the toughest cities of the world are being brought to the United States of America and emptied out into our country."[49] There is no basis for this claim.

103.    In the same interview, President Trump underscored his prejudice by stating that "you can look at" "some" migrants "and you can say 'could be trouble, could be trouble.'"[50]

104.    President Trump has also repeatedly "retweeted" avowed white nationalists, such as @WhiteGenocideTM, as well as publicly dined with prominent, self-declared white supremacists, thereby endorsing their racist views and amplifying their racist message.[51]

105.    During his first term in office, President Trump also conflated large groups of immigrants, and sometimes even all of them, with members of the MS-13 gang.[52] In his first State

---

[47] Miriam Valverde, *In Context: Donald Trump's comments about immigrations, 'animals,'* POLITIFACT (May 17, 2018), *available at* https://www.politifact.com/truth-o-meter/article/2018/may/17/context-donald-trumps-comments-about-immigrants-an/ (relying on MS-13 to claim that undocumented immigrants "aren't people. These are animals.").

[48] Ariana Figueroa, *Trump Promises Mass Deportations of Undocumented People. How Would That Work?*, MISSOURI INDEPENDENT (Aug. 23, 2024), *available at* https://missouriindependent.com/2024/08/23/trump-promises-mass-deportations-of-undocumented-people-how-would-that-work/.

[49] FOX NEWS, *President Donald Trump: We Will Bring Our Country Back*, YOUTUBE (Jan. 22, 2025) at approx. 18:26, *available at* https://www.youtube.com/watch?v=mQUmy6gkwWg.

[50] *Id.*

[51] Benjy Sarlin, *Donald Trump Retweets Apparent Neo-Nazi Supporter*, NBC NEWS (Jan. 22, 2016), *available at* https://www.nbcnews.com/politics/2016-election/donald-trump-tweets-apparent-neo-nazi-supporter-n502136; Eric Lichtblau, *Trump amplifies racist lies, giving neo-Nazis 'real power.' Where are GOP leaders?* USA TODAY (Sep. 23, 2024), *available at* https://www.usatoday.com/story/opinion/2024/09/23/trump-far-right-haitian-immigrants-springfield/75301951007/.

[52] Terry Gross, *Trump Uses MS-13 To 'Sell Draconian Overhauls of Border Issues,' Journalist Says*, NPR (Feb. 15, 2018), *available at* https://www.npr.org/2018/02/15/585937834/trump-uses-ms-13-to-sell-draconian-overhauls-of-border-issues-journalist-says.

of the Union address, he suggested that the Deferred Action for Childhood Arrivals ("DACA")

program, recipients of which are immigrants first brought to the United States as children many

years ago, contributed to the spread of MS-13.[53]

106.    During his prior administration, President Trump repeatedly denigrated immigrants

from countries designated for TPS. Most infamously, he referred to countries designated for TPS

as "shithole" countries in a conversation with legislators about TPS, saying "Why do we need

more Haitians?" He asked officials to "take them out" of the immigration proposal. He expressed

a preference, instead, for immigrants from countries "such as Norway."[54]

107.    During his recent campaign, President Trump defended these remarks, reiterating

comparisons between "nice countries, you know like Denmark, Switzerland" and "Norway," and

"unbelievable places and countries, countries that are a disaster," when speaking about

immigrants.[55]

108.    President Trump has sought to dehumanize immigrants, including TPS holders in

particular, through other statements. For months, he repeated and amplified the false claim that

Haitian TPS holders were "eating the dogs" and "eating the cats," "eating the pets of the people

that live" in Springfield, Ohio.[56] President Trump called Haitians in Springfield with lawful TPS

status "illegal migrant[s]" who "descended upon a town of 58,000 people, destroying their way of

---

[53] Liz Robbins, *Why was MS-13 Targeted in Trump's Speech?*, N.Y. TIMES (Jan. 31, 2018), *available at* https://www.nytimes.com/2018/01/31/nyregion/ms-13-gang-trump.html.

[54] Josh Dawsey, *Trump Derides Protections for Immigrants from 'Shithole' Countries*, WASH. POST (Jan. 12, 2018), *available at* https://www.washingtonpost.com/politics/trump-attacks-protections-for-immigrants-from-shithole-countries-in-oval-office-meeting/2018/01/11/bfc0725c-f711-11e7-91af-31ac729add94_story.html?utm_term=.06cbc70bfaec.

[55] Maggie Haberman & Michael Gold, *Trump, at Fund-Raiser, Says He Wants Immigrants from 'Nice' Countries*, N.Y. TIMES (Apr. 7, 2024), *available at* https://www.nytimes.com/2024/04/07/us/politics/trump-immigrants-nice-countries.html ("These are people coming in from prisons and jails. They're coming in from just unbelievable places and countries, countries that are a disaster.").

[56] *See, e.g.*, CBS NEWS, *Simulcast – ABC News Presidential Debate*, C-SPAN (Sep. 10, 2024) at approx. 29:26, *available at* https://www.c-span.org/program/campaign-2024/simulcast-abc-news-presidential-debate/648383.

life."[57] Shortly after these statements, there were several bomb threats against hospitals, government buildings, and schools in Springfield.[58]

109.   President Trump has contended that Venezuelans have "destroyed the fabric of our country."[59] President Trump has used dehumanizing language and repeatedly called Venezuelan immigrants "animals." For instance, in 2024 he asserted that, "[e]very day, Americans . . . are living in fear all because [former Vice President] Kamala Harris decided to empty the slums and prison cells of Caracas [Venezuela] and many other places . . . . And we have to live with these animals, but we're not going to live with them for long, you watch."[60] He also stated that he was "talking a lot about Venezuela because Aurora [Colorado] is really infected by Venezuela."[61] Local political and law enforcement officials rejected these assertions. One analysis by Axios of

---

[57] Sam Levine, *'They've Destroyed the Place': Trump Repeats Racist, Anti-immigrant Lies*, The Guardian (Sep. 13, 2024), https://www.theguardian.com/us-news/2024/sep/13/trump-repeats-lies-haitian-immigrants; *see also* Damita Menezes & Ali Bradley, *Trump on Springfield Haitian Migrants: 'They Have to Be Removed,'* NEWSNATION (Oct. 2, 2024) at approx. 12:45, *available at* https://www.newsnationnow.com/politics/2024-election/trump-springfield-haitian-migrants-removed/ ("Springfield is such a beautiful place. Have you seen what's happened to it? It's been overrun. You can't do that to people. . . . I'd revoke [TPS], and I'd bring [the migrants] back to their country.").

[58] Edward Helmore, *More bomb threats hit Springfield, Ohio, after Trump elevates false claims about Haitians*, THE GUARDIAN (Sep. 14, 2024), *available at* https://www.theguardian.com/us-news/2024/sep/14/more-bomb-threats-hit-springfield-ohio-after-trump-elevates-false-claims-about-haitians.

[59] *See also* CBS NEWS, *Simulcast – ABC News Presidential Debate*, C-SPAN (Sep. 10, 2024) at approx. 33:40, *available at* https://www.c-span.org/program/campaign-2024/simulcast-abc-news-presidential-debate/648383 ("They allowed people to come in, drug dealers, to come into our country, and they're now in the United States. And told by their countries like Venezuela don't ever come back or we're going to kill you. . . . There's never been anything done like this at all. They've destroyed the fabric of our country. Millions of people let in.").

[60] FOX 4 DALLAS-FORT WORTH, *Trump Rally in Aurora, Colorado: FULL SPEECH*, YOUTUBE (Oct. 12, 2024) at approx. 41:05, *available at* https://www.youtube.com/watch?v=_xguaneoZ5A; *see also* NBC NEWS, *Meet the Press*, YOUTUBE (Dec. 8, 2024) at approx. 8:52, *available at* https://www.youtube.com/watch?v=-UsHJWEAj_I ("Did you know that Venezuela their prisons are . . . at the lowest point in terms of emptiness that they've ever been? They're taking their people out of those prisons by the thousands and they're drop—."); Fox News, Donald Trump Delivers Remarks at Rally in Reading, PA, YOUTUBE (Oct. 9, 2024) at approx. 29:55, 30:07, *available at* https://www.youtube.com/live/QuoT6T3fbU0?t=1791s (similar).

[61] FOX 4 DALLAS-FORT WORTH, *Trump Rally in Aurora, Colorado: FULL SPEECH*, YOUTUBE (Oct. 12, 2024) at approx. 43:15, *available at* https://www.youtube.com/watch?v=_xguaneoZ5A.

109 of President Trump's speeches, debates, and interviews found that he called Venezuelan migrants "criminals" at least seventy times between September 1, 2023 to October 2, 2024.[62]

110.    In March 2025, the Trump administration dramatically escalated its rhetoric and actions against Venezuelans, relying on purported TdA membership as justification for deporting more than 200 Venezuelans to a Salvadoran terrorist detention center, in apparent violation of a court order.[63] The administration cited the Alien Enemies Act—a 1798 law that facilitates deportation during wartime—despite the lack of armed conflict between Venezuela and the United States. In a March 15, 2025 "Proclamation"—"Invocation of the Alien Enemies Act Regarding the Invasion of the United States by Tren de Aragua"—President Trump asserted that TdA members "are conducting irregular warfare and undertaking hostile actions against the United States" and proclaimed them "Alien Enemies" subject to immediate and summary apprehension, detention and removal if they are not U.S. citizens or lawful permanent residents.[64] President Trump applauded the deportations on social media, using dehumanizing language. He posted a video of deported Venezuelans being roughly hustled off a plane in El Salvador in the dark of night, bent over, amid a massive security presence, describing the Venezuelans as "monsters."[65]

111.    President Trump has a long history of making false statements associating Venezuelan refugees with criminality. He has falsely stated that Venezuelan "prisons are . . . at the

---

[62] Russell Contreras, Delano Massey, & Erin Davis, *Trump keeps calling Venezuelan and Congolese migrants criminals*, AXIOS (Oct. 5, 2024), *available at* https://www.axios.com/2024/10/05/trump-migrants-venezuelan-congolese-rhetoric.

[63] *President Trump Delivers Justice to Terrorists, Security for Americans*, THE WHITE HOUSE (Mar. 17, 2025), *available at* https://www.whitehouse.gov/articles/2025/03/president-trump-delivers-justice-for-terrorists-security-for-americans/#:~:text=America%20First%20Legal%3A%20%E2%80%9CPresident%20Trump,the%20country's%20maximum%2Dsecurity%20prison ("America First Legal: "President Trump has deported 238 criminals in the violent Venezuelan gang Tren de Aragua to El Salvador to be imprisoned in CECOT, the country's maximum-security prison."); Trump Administration Deports Hundreds of Immigrants Even as a Judge Orders their Removals Be Stopped, A.P. (Mar. 17, 2025), *available at* https://apnews.com/article/trump-venezuela-el-salvador-immigration-dd4f61999f85c4dd8bcaba7d4fc7c9af.

[64] Donald J. Trump, Proclamation: Invocation of the Alien Enemies Act Regarding the Invasion of the United States by Tren de Aragua, Mar. 15, 2025, https://www.whitehouse.gov/presidential-actions/2025/03/invocation-of-the-alien-enemies-act-regarding-the-invasion-of-the-united-states-by-tren-de-aragua/.

[65] @realDonaldTrump, TRUTH SOCIAL (Mar. 16, 2025), *available at* https://truthsocial.com/@realDonaldTrump/posts/114173862724361939.

lowest point in terms of emptiness that they've ever been" because Venezuela was "taking their people out of those prisons by the thousands" and sending them to the United States.[66]

112.   President Trump has also made disparaging remarks about Latin American countries and people, frequently relying on crude and derogatory stereotypes to stoke fear about immigration.

113.   President Trump has also made disparaging remarks about certain South Asian countries and people, frequently relying on crude and derogatory stereotypes to stoke fear about immigration. For example, during his first term, while studying a map of the region in preparation for a meeting with the Prime Minister of India, President Trump deliberately "mispronounced Nepal as 'nipple' and laughingly referred to Bhutan as 'button.'"[67] The President is also "known to fake an Indian accent to imitate Indian Prime Minister Narendra Modi during Oval Office meetings.[68]

114.   The Trump Administration has not shown similar opposition to immigrant populations perceived as white. On the contrary, on February 7, 2025 President Trump signed Executive Order No. 14204, *Addressing Egregious Actions of the Republic of South Africa*, which directs Secretary Noem (among others) to:

> [T]ake appropriate steps, consistent with law, to prioritize humanitarian relief, including admission and resettlement through the United States Refugee Admissions Program, for Afrikaners in South Africa who are victims of unjust racial discrimination.

115.   The White House referred to Afrikaner activists who lobbied for the Trump Administration's support as "civil rights leaders."[69] Trump's Executive Order to protect white

---

[66] NBC NEWS, *Meet the Press*, YOUTUBE (Dec. 8, 2024) at approx. 8:42, *available at* https://www.youtube.com/watch?v=-UsHJWEAj_I.

[67] Daniel Lippman, *Trump's diplomatic learning curve: Time zones, 'Namibia' and 'Nipple'*, POLITICO (Aug. 13, 2018), https://www.politico.com/story/2018/08/13/trump-world-knowledgediplomatic-774801.

[68] Cristina Maza, *Trump Fakes Indian Accent When Speaking About Indian Prime Minister Modi, Report Claims*, NEWSWEEK (Jan. 22, 2018), https://www.newsweek.com/trump-racist-presidentimitates-modis-indian-accent-meetings-787071.

[69] John Eligon, *Trump Tries to Use White South Africans as Cautionary Tale*, NY TIMES (Mar. 15, 2025), *available at* https://www.nytimes.com/2025/03/15/world/africa/south-africa-whites-trump.html.

South Africans yet again makes clear that his administration strongly prefers white immigrants over those perceived as non-white.

116.   Together, all of President Trump's repeated statements denigrating immigrants perceived to be non-white, and targeting TPS holders in particular, have not functioned merely as hateful rhetoric. They have also worked as a call to action for those serving him.

117.   Secretary Noem's reliance on President Trump's objectives in justifying her TPS termination decisions demonstrated her adoption of President Trump's animus as well as her response to pressure from President Trump and the White House to reach a quick decision to end TPS protections. Indeed, when publicizing the Venezuela TPS vacatur in a January 29, 2025 interview, Secretary Noem explained that the vacatur reflected President Trump's "desire" to make sure TPS was "used properly," adding that "when the President gives a directive, the Department of Homeland Security will follow it."[70]

118.   The TPS terminations challenged in this case each explicitly cite President Trump's immigration policy agenda as justifications. 90 Fed. Reg. 24151, at 24152 n.10; Honduras Termination Notice at n.10; Nicaragua Termination Notice at n. 4.

**Statements of Trump Surrogates**

119.   Like President Trump, prominent officials who exerted influence to ensure that DHS's decision-making process on TPS favored termination also harbor racial animus against immigrants perceived as non-white. These officials have been motivated by their racial animosity to intervene in and influence the TPS decision-making process towards termination.

120.   For example, Vice President Vance has repeatedly amplified unfounded rumors about Haitian immigrants eating pets. Despite the lack of corroborating evidence, he declared that

---

[70] @Sec_Noem, X (Jan. 29, 2025),
https://x.com/sec_noem/status/1884752724194963594?s=46&t=DFMGDqrcqeJ4X9klKmN2s
(statement appears in posted video clip from CNN interview).

1   if he "ha[s] to create stories" about Haitian migrants "so that the American media actually pays

2   attention to the suffering of the American people, then that's what I'm going to do."[71]

3       121.   Additionally, Vice President Vance disparaged Haitian TPS holders with

4   longstanding stereotypes[72] of immigrants as dangerous criminals and spreaders of disease. He

5   accused Haitians in Springfield of triggering "a massive rise in communicable diseases, rent

6   prices, car insurance rates, and crime," stating "[t]his is what happens when you drop 20,000

7   people into a small community."[73]  He specifically stated that Haitians caused "TB and HIV" to

8   be "on the rise."[74]

9       122.   Stephen Miller, Deputy Chief of Staff to the President, has long expressed support

10  for White Nationalism, "promoted white nationalist literature," and "pushed racist immigration

11  stories" to the media.[75] Miller lauded historical immigration laws that imposed quotas based on

---

[71] Kit Maher & Chris Boyette, *JD Vance Defends Baseless Rumor About Haitian Immigrants Eating Pets*, CNN (Sep. 15, 2024), *available at* https://www.cnn.com/2024/09/15/politics/vance-immigrants-pets-springfield-ohio-cnntv/index.html; *see also Republicans Spread Baseless Slurs about 'Cat-Eating Migrants' in Ohio City*, THE GUARDIAN (Sep. 9, 2024), *available at* https://www.theguardian.com/us-news/article/2024/sep/09/republicans-haitian-migrants-pets-wildlife-ohio.

[72] *Nat'l TPS All. v. Noem*, No. 25-CV-01766-EMC, Dkt. 22 ¶¶ 20, 22, 23, 25 (N.D. Cal. Feb. 20, 2025) (expert declaration of Professor Elliott Young tracing the historical use of these tropes).

[73] J.D. Vance (@JDVance), X (Sep. 13, 2024), *available at* https://x.com/jdvance/status/1834584115825226087?s=46; *see also* WCNC, *JD Vance Has Heated Exchange Over Claims Migrants Are Eating Pets in Ohio*, YOUTUBE (Sep. 11, 2024), https://www.youtube.com/watch?v=LqjLoSNkyDs ("That small migrant community has caused a lot of problems. It's led to higher rates of communicable diseases, that's a verifiable fact. It's led to animals disappearing, many of my constituents have said that has been happening.").

[74] J.D. Vance (@JDVance), X (Sep. 10, 2024), *available at* https://x.com/jdvance/status/1833505359513661762?s=46.

[75] Michael Edison Hayden, *Stephen Miller's Affinity for White Nationalism Revealed in Leaked Emails*, SOUTHERN POVERTY LAW CENTER (Nov. 12, 2019), *available at* https://www.splcenter.org/hatewatch/2019/11/12/stephen-millers-affinity-white-nationalism-revealed-leaked-emails.

racist assumptions.[76] For years, Miller promoted the ideas that non-white immigrants were uniquely violent and targeted Americans with that violence.[77]

123.    Miller has been described as an "early architect[] of the Trump administration's immigration policies," and has prioritized curtailing both legal and illegal immigration.[78] When he was the senior advisor to the President during Trump's first term in office, Miller repeatedly called DHS officials to urge termination of TPS.[79]

**The Trump Administration's Previous Racist Attempts to End TPS**

124.    This is not the first time that an administration guided by President Trump has embarked on an unlawful campaign to destroy TPS in violation of the APA and Equal Protection Clause.

125.    During President Trump's first term, every federal district court to consider the question found "evidence that President Trump harbors an animus against non-white, non-European aliens which influenced his (and thereby the Secretary's) decision to end the TPS designation[s]" for El Salvador, Haiti, Sudan, and Nicaragua in 2017 and 2018.[80]

---

[76] Adam Serwer, *Trump's White-Nationalist Vanguard*, THE ATLANTIC (Nov. 19, 2019), *available at* https://www.theatlantic.com/ideas/archive/2019/11/stephen-miller-alarming-emails/602242/ ("A cache of Miller's emails . . . show Miller praising racist immigration restrictions from a century ago, while bitterly lamenting the law that repealed them.").

[77] Nicole Narea, *Stephen Miller Sought to Link Immigrants to Crime and Terrorism in Private Emails to Breitbart,* VOX (Nov. 25, 2019), *available at* https://www.vox.com/policy-and-politics/2019/11/12/20961458/stephen-miller-white-supremacist-anti-immigrant-emails-breitbart-southern-poverty-law-center.

[78] THE CHARLIE KIRK SHOW, *Sweeping Raids, Mass Deportations: Donald Trump's 2025 Plan to Fix the Border* (Nov. 14, 2023), *available at* https://thecharliekirkshow.com/podcasts/the-charlie-kirk-show/sweeping-raids-mass-deportations-donald-trumps-202; *see also* Lauren Villgran, *Who is Stephen Miller, Architect of Donald Trump's Mass Deportation Plans?*, USA TODAY (Nov. 25, 2024), *available at* https://www.usatoday.com/story/news/politics/elections/2024/11/21/stephen-miller-trumps-mass-deportation-architect/76260908007/; Elliot Spagat, *Trump Picks a Pair of Experienced Advisers Motivated to Carry Out His Immigration Crackdown*, ASSOCIATED PRESS NEWS (Nov. 12, 2024), *available at* https://apnews.com/article/immigration-deportation-homan-miller-trump-border-abb1a75497d11c978c369cb20016eecb.

[79] *See Ramos*, 336 F. Supp. 3d. at 1098.

[80] *Ramos*, 336 F. Supp. 3d at 1100; *see also Centro Presente*, 332 F. Supp. 3d at 415 ("find[ing] that the combination of a disparate impact on particular racial groups, statements of animus by people plausibly alleged to be involved in the decision-making process, and an allegedly unreasoned shift in policy sufficient to allege plausibly that a discriminatory purpose was a

126.   The evidence adduced in those cases further illustrates that the conduct challenged here is part of a premeditated effort to terminate TPS without regard to applicable law or standards, and to further a racist agenda.[81]

127.   Political appointees during the first Trump administration also sought to paint TPS holders as criminals and to manufacture evidence to support this impossible claim—to justify the termination of designations, and the undermining of the TPS program. A federal district court found that Acting Secretary Duke decided to terminate TPS for Haiti for the sake of "agenda adherence" to the "America first" platform, without regard to her consideration of country conditions under the TPS statute.[82] Acting Secretary Duke specifically sought out a rationale to "separate" out Haiti.[83] Additionally, subordinates of then-DHS Secretary John Kelly covertly sought data on the number of Haitian TPS holders who committed crimes and relied on public assistance, despite the fact that virtually any criminal record is disqualifying for TPS.[84] Secretary Kelly and other DHS and USCIS personnel tried to use these data to demonstrate that extending TPS to Haitians would not be in the "national interest."[85] A federal district court found that "[t]he information sought by the Secretary [Kelly] coincides with racial stereotypes – *i.e.*, that non-whites commit crimes and are on the public dole."[86]

---

motivating factor in a decision" to terminate TPS for Haiti, El Salvador and Honduras); *Saget*, 375 F. Supp. 3d at 372 (finding that "evidence of White House . . . animus toward non-white immigrants, including Haitians specifically, raises at the very least serious questions going to the merits of Plaintiffs' equal protection claim" challenging the termination of TPS for Haiti).

[81] *See, e.g.*, *Ramos*, 336 F. Supp. 3d at 1101, 1104 (describing how, i.e., "[t]he record evidence indicates that, after receiving Decision Memos from career DHS employees, higher-level DHS employees – i.e., the political appointees – were 'repackaging' the memos in order to get to the President/White House's desired result of terminating TPS"; and how "Acting Secretary Duke expressly acknowledged that the terminations of TPS designations were 'a strong break with past practice,' . . . – designed to fit the President's objectives on immigration which would put 'America first.'"); *Saget*, 375 F. Supp. 3d at 322.

[82] *Saget*, 375 F. Supp. 3d at 343, 347–48, 359–62.

[83] *Id.*

[84] *Ramos*, 336 F. Supp. 3d at 1104–05; *Saget*, 375 F. Supp. 3d at 307–09.

[85] 8 U.S.C. 1254a(c)(2)(B); *id.*  1254a(b)(1)(C); *Saget*, 375 F. Supp. 3d at 353.

[86] *Ramos*, 336 F. Supp. 3d at 1105.

128.   During President Trump's first term in office, the pressure from President Trump and the White House into the DHS Secretary's TPS decision-making was less evident and public than here. The federal district court nonetheless found that "Acting Secretary Duke's writings suggest that she, in her role at DHS, was largely carrying out or conforming with a predetermined presidential agenda to end TPS."[87] There, Acting Secretary Duke, in separate personal writings, expressed that her TPS decision-making was based on "an America first view," a term that invoked then-President Trump's racist views preferring immigration from majority-white European countries.[88] Here, by contrast, Secretary Noem has included President Trump's "America First" objectives expressly in the published Federal Register Notice terminating TPS.

## THE TERMINATION OF TPS STATUS WOULD IMPOSE EXTRAORDINARY AND IRREPARABLE HARM ON TPS HOLDERS, THEIR FAMILIES, AND THEIR COMMUNITIES

129.   Defendants' terminations of TPS for Honduras, Nepal and Nicaragua will strip TPS status from approximately 61,000 TPS holders.[89] This includes 51,000 from Honduras, 7,200 from Nepal, and 2,900 from Nicaragua.[90] All have lived in the United States with legal status for at least a decade; most for more than 25 years. The scale of the harm wrought by Defendants' actions to eliminate humanitarian protection for Honduran, Nepali, and Nicaraguan TPS holders will be massive if not reversed.

**Loss of Legal Status, Employment Authorization and Drivers Licenses**

130.   The termination of TPS for individuals who have had this status for ten years or more would result in the detention and deportation of long-time residents who are deeply embedded in their communities. TPS holders are facing the imminent loss of legal status, and as a

---

[87] *Id.* at 1099.

[88] *Id.* at 1099–1100, 1104; Brief of Amici Curiae, The Anti-Defamation League, et. al, *Ramos v. Mayorkas,* Case No. 18-16981, ECF No. 31 at 21 (9th Cir. Feb. 7, 2019).

[89] National Immigration Forum, "Temporary Protected Status (TPS): Fact Sheet," Mar. 14, 2025, https://immigrationforum.org/article/temporary-protected-status-fact-sheet/.

[90] Honduras Termination Notice n. 24 & accompanying text; 90 Fed. Reg. at 24,153 (Nepal); Nicaragua Termination Notice n. 15 & accompanying text.

result, are already being forced to make the impossible choice whether to return to a country in crisis, remain in the United States without lawful immigration status, or uproot themselves again to try to find refuge in some third country.

131.   Some TPS holders may currently be seeking other legal avenues to remain in this country (such as asylum or adjustment of status). However, due to the yearslong asylum backlog, affirmative asylum applications remain long-pending, and do not guarantee an individual protection from either detention or deportation in the interim. Defendants' actions also threaten detention and deportation for TPS holders who do not presently have alternative paths to legal status, even though TPS was established expressly to serve this population—individuals who cannot safely return but may not fit the specific legal requirements of asylum. The loss of TPS in some instances also limits the possibility of acquiring a permanent legal status for which an individual would otherwise be eligible, but for which present legal status is a prerequisite.[91] TPS holders who lose their status may also face a years-long statutory bar to re-entry whether they depart on their own or are deported.[92]

132.   TPS holders who may be entitled to a fear-based form of immigration relief—such as withholding of removal or protection pursuant to the Convention Against Torture—face the prospect of deportation to unsafe countries. The government has sought to remove people to third countries "without adequate notice and a 'meaningful opportunity' to present a claim under the Convention," even if they may be subject to a fear-based form of relief. *Dep't of Homeland Sec. v. D.V.D.*, No. 24A1153, 2025 WL 1732103, at *2 (U.S. Jun. 23, 2025). While this issue is being litigated, the Supreme Court has allowed such third-country removals to move forward, including to South Sudan. *Id.*

133.   TPS holders also face the prospect of losing employment authorization. This may result in their summary dismissal from their place of work, jeopardizing their and their families'

---

[91] *See* Temporary Protected Status: An Overview, AMERICAN IMMIGRATION COUNCIL (Jan. 2025), *available at* https://www.americanimmigrationcouncil.org/sites/default/files/research/temporary_protected_status_-_an_overview_1-16-2025.pdf (noting some TPS recipients may be eligible to adjust status).
[92] 8 U.S.C. 1182(a)(9)(A)(ii), (B)(i)(II).

financial stability. Without stable employment, some TPS holders risk losing their homes or other material assets, leading to further economic harm. Many TPS holders also face the imminent loss of their drivers' licenses and, with them, their mobility and freedom of movement, because in many states drivers' licenses are limited to those with legal status.[93] Moreover, because the Secretary's termination decision goes into effect so quickly, TPS holders have been afforded almost no time to make alternative arrangements for themselves and their families, including by applying for other forms of immigration relief, employment authorization, or drivers' licenses for which they are eligible.

**Other Harms to TPS Holders: Family Separation, Loss of Health Care, Psychological Harm, and Stigma**

134.   The loss of legal status renders TPS holders vulnerable to separation from U.S. citizen children and other loved ones. There are many Honduran, Nepali, and Nicaraguan TPS holders in mixed-status families—with children, spouses, partners, elderly parents, and other family members who are U.S. citizens or Green Card holders. These TPS holders face the risk of being forced to leave their family members behind, or bringing their U.S. citizen children (or other family members) to a country that is unsafe and in dire straits, and where the children have never lived and, in many cases, have never even visited.

135.   TPS holders and their families will be deprived of employer-sponsored health insurance and in some cases public health care. Despite having paid into Social Security for decades, in many cases, TPS holders also face the loss of this crucial benefit.

136.   Meanwhile, the fear of deportation inflicts severe psychological harm on TPS holders and their loved ones. TPS holders have been experiencing tremendous emotional and psychological harm since the challenged decisions. This has resulted in heightened anxiety, trauma, insomnia, and depression, in some cases severe enough to result in acts of self-harm. The

---

[93] *See, e.g.*, California DMV, REAL ID Checklist, *available at* https://www.dmv.ca.gov/portal/driver-licenses-identification-cards/real-id/real-id-checklist/ (listing documents showing immigration status as requirements for REAL ID driver's licenses).

psychological harms resulting from Defendants' actions will only increase as the effective date approaches.

137.    TPS holders have also suffered the additional constitutional harm of being subject to an administrative action motivated by racial, ethnic, or national-origin discrimination. Many describe the emotional pain of being subjected to racist attacks by high-ranking U.S. government officials. Some also live in fear of leaving the house, speaking their native language, or disclosing their nationality due to the racist targeting of non-white migrants.

**Harm to Plaintiffs**

138.    **Plaintiff National TPS Alliance** has over 1,000 Honduran, Nepali, and Nicaraguan TPS holder members. These members are anxious and desperate. If the United States will not allow them to stay, they do not know where they will go or what they will do. Among them:

a)    **R.A.** is 26 years old and a native of Nepal. She currently works as a labor and delivery nurse at a hospital in Austin, Texas. She specializes in caring for patients with high-risk pregnancies, and her employer has filed paperwork to sponsor her for a green card based on her specialized training and skills. However, R.A. must maintain lawful status and work authorization while her application is pending in order to be approved for her green card. As TPS is her only form of work authorization and immigration status, she is at risk of losing both her current status as well as the opportunity to obtain her green card. R.A. has lived in the United States since she was 16 years old, graduating from high school, community college, and nursing school. At the height of the COVID pandemic, prior to the availability of any vaccines, she was a front-line worker at a hospital, screening patients for possible COVID infections and escorting them to quarantine units. R.A.'s mother also resides in the United States and is a TPS holder.

b)    **G.M.** is a 46-year-old Honduran TPS holder living in Massachusetts. He first came to the U.S. in the late 1990s as a teenager. G.M. is a loving husband and father and a hard worker who has always paid his taxes. He has two U.S. citizen children, ages 2 and 22. His 22-year-old son has filed a family petition on his behalf and G.M. has been told that his case should be adjudicated in the next year, given average processing times. He is very concerned about

44

what will happen if he loses his TPS now, while his family petition is still pending. If TPS ends, he would not be able to work to support his young U.S. citizen daughter. G.M. fears for his safety in Honduras. Without TPS, G.M. also faces the painful threat of family separation from his two U.S. citizen children, including his young daughter. He feels that bringing her to Honduras would rob her of her birthright and put her in danger. But leaving her here without her father is likewise not an option. As a member of NTPSA, G.M. has travelled to Washington D.C. several times to advocate for TPS holders.

c) **M.A.** is a 75-year-old Honduran TPS holder living in Minnesota. Several of her adult children also have TPS, and she is a loving grandmother to 13 U.S. citizen grandchildren. M.A. recently retired, after decades of working two jobs at a time, cleaning homes, working at hotels, and caring for children and veterans. She now takes care of her grandchildren. M.A. first came to the U.S. in the 1990s, fleeing an abusive husband and an (unrelated) attempted on her life and the lives of her children. She fears returning to Honduras, where she feels her and her children's lives remain in danger, as her husband continues to put them in danger. She also fears separation from her grandchildren, who are filled with anxiety at the prospect of losing their grandmother and parents. But she also cannot imagine bringing her grandchildren to Honduras, where they would not have the same opportunities and where she fears for their safety.

d) **Patricia Carbajal** is 46 years old and a citizen of Honduras. She is a single mother to an 11-year-old U.S. citizen daughter. Patricia relies on TPS, which she has held since 1998, for work authorization and protection from deportation and detention. She is employed by a labor union and works in the construction industry. Several of Patricia's immediate family members also reside in the U.S. and rely on TPS, including her sister and her elderly mother. She also has a brother who is a green card holder. Without TPS, Patricia will be unable to support herself and her daughter, but she is terrified of returning to Honduras with her child.

e) **J.M.** is a 57-year-old Honduran TPS holder. As a young man, he received a scholarship to study fashion in the U.S. After he completed the program, he returned to Honduras but

45

came back to the U.S. after facing discrimination as a gay man in Honduras. He has lived in New York City for the last 27 years. TPS enabled J.M. to go to college where he graduated with a degree in business administration. He went on to work for various clothing companies and a famous fashion designer. The fear of losing TPS has consumed J.M. He recently lost his job because he was so stressed about TPS that he made a mistake at work. No one will hire him now because his work authorization expires imminently. Without TPS, J.M. would lose the ability to work, which in turn would make him lose his housing. He would also lose access to healthcare, which he relies on for daily medication to control his diabetes. J.M. previously got health insurance through his job, and now receives Medicaid because he is lawfully present as a TPS holder. J.M. fears return to Honduras, where he has not been in almost 30 years, where he fears he would not be able to find work due to his age, and where he faced harm due to his sexual orientation.

f)  **J.L.** is a 60-year-old Nicaraguan TPS holder who has lived in Texas for almost 30 years. He was lawfully admitted to the U.S. on a tourist visa in 1996. J.L. has worked for the last 20 years as a manufacturing technician in a semiconductor factory. He has a pacemaker and takes daily medication to manage his heart failure. J.L. lives in terror that TPS could end. Without TPS he would lose his job, his means of survival, his chance at retirement, his driver's license which he relies on for daily life, and his access to healthcare which he receives through his workplace. He would also live under the constant threat of detention and deportation to Nicaragua, where he fears he could not receive adequate medical care, and would face political persecution.

g)  **Rajbin Shrestha** is a Nepali TPS holder who has lived in the United States since 1997, for 28 years. He and his wife have both had TPS since 2015. Much of his family in Nepal lost their homes, or had their homes severely damaged, in the 2015 earthquake, for which Nepal was designated for TPS. R.S. is a father of three U.S. citizen children, aged 6, 16, and 17. TPS allowed R.S. to go back to school for IT training, and get the job he now has as an IT analyst at a New Jersey-based real estate company. R.S. and his wife would not be able to support their family without TPS. He owns a home and would not be able to pay the

mortgage and manage their assets without TPS. His children have never visited Nepal and don't speak the language, so they have a lot of anxiety, fear, and uncertainty about what would happen if the family were forced to go to Nepal. R.S. also supports his father and mother, who are a U.S. citizen and green card holder respectively, and they would not be able to remain in the United States without the support of R.S.

h) **A.C.** is a 54-year-old Honduran TPS holder who has lived in the United States since 1997, and has had TPS since 1999. He lives in Louisiana and was involved in the rebuilding of New Orleans after the devastation of Hurricane Katrina. He has worked in gardening, metal work, in the offshore drilling industry, and in construction, including ship construction and repair. He also has been completing his pilot training with dreams of becoming a commercial pilot, particularly a charter pilot for hospitals, helping people get the emergency medical care that they need. Without TPS, he would lose his work authorization and protection from detention and deportation, driver's license, and the career he has been building towards for years.

139. **Plaintiff Denis Molina** is a Honduran who has had TPS since 1999. He is 49 years old and lives in Connecticut. Denis is deeply embedded in his community. He has worked in construction and as a mechanic; served as a pastor at the same church for more than 20 years; and has owned his own home for more than a decade. Denis has four U.S. citizen children, ranging from ages one to 20 years old. His first wife died of cancer at the age of 33, leaving Denis to raise their two children alone for years before he remarried in 2020. Denis' oldest son has autism and developed serious behavioral problems after the early death of his mother; and Denis' four-year-old son was also recently diagnosed with autism and attends a special program to support his development. Denis fears that if he loses TPS, he will no longer be able to support his family of six. He cannot safely return to Honduras either, given the volatile political and economic situation there. He also does not want to bring his children to Honduras, a country they do not know. But cannot imagine being separated from them either, particularly since his two eldest children already lost their mother at a young age. His two children with developmental disabilities would be particularly vulnerable and without the support they rely upon in the United States.

140. **Plaintiff Jhony Silva** is a Honduran who has had TPS for nearly his entire life. He is 29 years old. He came to the United States at the age of three, and became a beneficiary of TPS the same year. His parents had TPS for approximately 25 years but recently obtained green cards through Johnny's U.S. citizen sister. Jhony's son was born in 2016 and he shares joint custody with his son's mother. His son was diagnosed with autism and has developmental delays. He receives special services at school. Jhony works as a certified nursing assistant in a hospital cardiology unit. Without TPS, Jhony will lose his job, which is his only source of income. He would no longer be able to support his son, and both he and his son would lose their health insurance. He would also not be able to provide financial support for his parents, which he has been doing; and would be forced to abandon his dreams of becoming a nurse. If forced to return to Honduras, Jhony would be returning to a country he has not been to since he was a toddler. He would be separated from his entire family, all of whom live in the United States and are citizens or green card holders.

141. **Plaintiff Maria Elena Hernandez** is a Nicaraguan TPS holder who has lived in the United States for almost thirty years. She is 67 years old and lives in Florida with her U.S. citizen brother and sister-in-law. She has worked as a cleaner at the same university for almost 18 years. She relies on TPS for legal status and employment authorization. At 65, she also began to rely on social security for supplemental income, which she has paid into for decades. Without TPS, Maria Elena would be at risk of detention and deportation; would lose her employment, social security, and government-issued identification; and face the prospect of separation from her U.S. citizen family in the United States. She would also be deprived of her employment-sponsored health care or Medicaid, which she relies on for daily treatment for two chronic conditions.

142. **Plaintiff O. C.** is a Nicaraguan TPS holder who has had TPS since Nicaragua was designated in 1999. He is 60 years old and lives in San Pablo, California. He established a janitorial business after attaining TPS status, and maintained that business for several years. For the last seven years, he has worked for a food preparation company. He lives with his U.S. citizen sister and brother-in-law. Without TPS, he would not be able to pay rent, or make car payments or

buy groceries. He would also lose his employment-sponsored health insurance upon which he relies to control his diabetes. He has not been to Nicaragua since he left almost 30 years ago.

143.    **Plaintiff Sandhya Lama** is a Nepali who has had TPS since 2015. She lives in Falls Church, Virginia, and works as a CXO Multi-Site Lead at Amazon. Sandhya is 43 years old and is a single mother to three U.S. citizen children, aged 16, nine, and two. She relies on TPS for work authorization and protection against deportation. With the loss of TPS, Sandhya fears being forced to uproot her children from the United States to bring them to Nepal, a country they have never even visited. She knows that bringing them to Nepal would deprive them of opportunities. Her 16-year-old daughter also has severe allergies for which she needs specialized medical treatment that she would not be able to access in Nepal. She would not be able to continue to support her family without employment authorization.

144.    **Plaintiff S.K.** is a Nepali who has had TPS since 2015. TPS is her only protection from detention and deportation, and her only source of work authorization. She has worked as a theater manager in San Francisco. She faces the risk of separation from her U.S. citizen fiancé, as well as a U.S. citizen cousin, in the event that the termination of TPS goes into effect and she is forced to return to Nepal. She abandoned her plans to go back to school to study data science after the announcement of the termination of TPS for Nepal.

145.    **Plaintiff Teofilo Martinez** is a Honduran who has had TPS since 1999. He is 57 years old and lives in Georgia. He works primarily as a realtor and landscaper, and owns his own landscaping business. He also has a soccer instruction license. Without TPS, he would lose his job as a realtor. He would also lose his driver's license, realtor's license, and soccer instruction license. He would not be able to travel safely, which would prevent him from his active work as a leader in the NTPSA. He does not feel that he can safely return to Honduras, which is economically volatile and which has a very high crime rate. He fears being separated from his life partner if he is forced to return to Honduras, as she is not from Honduras and would not be able to return with him.

**Harm to Communities and the Public**

146.   TPS holders are an integral part of the economic and social fabric of U.S. communities, and they give back to the country in countless ways. TPS holders are health care providers, factory workers, engineers, agricultural workers, childcare providers, educators, and students. They are active in civic life and volunteer at schools, neighborhood and work organizations, and religious institutions. They pay federal, state, and local taxes, and support government social welfare programs.

147.   Defendants' actions will inflict massive harm to communities and the country, not just to individual TPS holders and their families. Deportations of TPS members would directly tear apart families, schools, and communities while burdening U.S. citizen children with financial instability, housing and food insecurity, and disruptions in their schooling.

148.   TPS allows individuals to work and be self-sufficient. Summarily withdrawing tens of thousands of people from the workforce will strain the social safety net and have economic repercussions on citizen and noncitizen communities alike, depleting economies and workforces.

149.   Eliminating tens of thousands of TPS holders' work authorizations would deprive individuals and their families of employer-sponsored health insurance, increase the number of people who rely on public health insurance and increase public expenditures on emergency care provided to uninsured patients.

150.   The fear of detention and deportation can cause members of affected communities— including those born in the United States—to refrain from important activities such as driving, attending religious services, participating in afterschool activities, and seeking medical care. The fear of deportation can also undermine law enforcement and detrimentally affect public safety by making victims and witnesses reluctant to come forward, testify, and even to seek safety in a domestic violence shelter.

151.   TPS for Honduras, Nepal and Nicaragua is serving the purpose intended by Congress—providing nationality-based humanitarian immigration relief regardless of whether individuals meet the narrow eligibility requirements for other forms of humanitarian protection, such as asylum. The extended amount of time that these TPS holders have lived in the United

States, and the ties that they have built with families and communities, makes the loss of legal status particularly devastating.

## CLAIMS FOR RELIEF

## FIRST CLAIM
## VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT

152.    Plaintiffs reallege and incorporate by reference each and every allegation contained in the preceding paragraphs.

153.    The Administrative Procedure Act (APA), 5 U.S.C. 701 *et seq.*, ensures that federal agencies are accountable to the public by providing a "right of review" to any "person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action." 5 U.S.C. 702. Judicial review is generally limited to "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. 704.

154.    The APA empowers the federal courts to "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "in excess of statutory jurisdiction, authority, or limitations," or "without observance of procedure required by law." 5 U.S.C. 706(2)(A), (C), (D). The right of review under the APA includes a right to judicial review of "legal question[s] of statutory authority,"[94] and review of "executive agency action for procedural correctness."[95]

155.    Defendants' termination of the TPS designations for Honduras, Nepal, and Nicaragua constitute "final agency action for which there is no other adequate remedy in a court," pursuant to 5 U.S.C. 704, because the Defendants' termination results in the TPS holders' loss of TPS "automatically and without further notice or right of appeal."[96]

156.    Defendants' terminations of the TPS designations for Honduras, Nepal, and Nicaragua were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," because, among other things:

---

[94] *In re Border Infrastructure Env't Litig.*, 915 F.3d 1213, 1222 (9th Cir. 2019).

[95] *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513 (2009).

[96] 8 C.F.R. 244.19.

a)  They were not based on a review of country conditions, as required by 8 U.S.C. 1254a(b)(3), but were instead based on a preordained, political decision to terminate TPS wholesale; consideration of extra-statutory factors; and a selective review of country conditions designed to identify only improvements and ignore entire categories of conditions that did not support Defendants' preordained termination decisions;

b)  The research, consultation, and review process leading up to the decisions deviated dramatically from past practice without explanation;

c)  To the extent Defendants engaged in any process, it was so deficient as to amount to no process at all, defeating the purpose of the TPS statute;

d)  The decisions occurred under circumstances and a timeline that reflect that they were pretextual;

e)  The decisions assumed that TPS designations, including the designations of TPS for Honduras, Nepal, and Nicaragua, are themselves illegal;

f)  The decisions assumed that TPS holders are present in the United States illegally.

157.   Plaintiffs (including NTPSA members) will suffer irreparable injury from the unlawful termination.

## SECOND CLAIM

## VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT

158.   Plaintiffs reallege and incorporate by reference each and every allegation contained in the preceding paragraphs.

159.   To engage in procedurally appropriate decision-making, an agency must ordinarily "display awareness that it *is* changing position."[97] Agencies "may not . . . depart from a prior policy *sub silentio* or simply disregard rules that are still on the books."[98] And the APA requires a

_____

[97] *Id.* at 515.

[98] *Id.*

"more detailed justification . . . for disregarding facts and circumstances that underlay . . . the prior policy."[99]

160. Defendants termination of the TPS designations for Nepal, Honduras, and Nicaragua with only 60-days notice was arbitrary, capricious, and contrary to law in violation of the APA because it represented an unacknowledged and unexplained departure from decades of decision-making practices and ordinary procedures. By abandoning the long-standing agency practice of providing for orderly transition periods, and at least a six-month orderly transition period when terminating TPS designations that have been in place for more than three years, Defendants have engaged in procedurally flawed decision-making in violation of the APA.

161. Plaintiffs (including NTPSA members) will suffer irreparable injury from the unlawful terminations.

**THIRD CLAIM**

**VIOLATION OF THE EQUAL PROTECTION GUARANTEE OF THE**

**DUE PROCESS CLAUSE OF THE FIFTH AMENDMENT**

162. Plaintiffs reallege and incorporate by reference each and every allegation contained in the preceding paragraphs.

163. The Fifth Amendment contains an implicit guarantee of equal protection that prohibits any official action that motivated in part by a racially discriminatory intent or purpose. Classifications based on race, ethnicity, or national origin receive exacting scrutiny, and even facially neutral policies and practices will be held unconstitutional when they reflect a pattern unexplainable on grounds other than race.[100]

164. Defendants' decisions to vacate the terminate the TPS designations of Honduras, Nepal, and Nicaragua are unconstitutional because they were motivated, at least in part, by intentional discrimination based on race, ethnicity, or national origin.

---

[99] *Id.* at 515–16.

[100] *Bolling v. Sharpe*, 347 U.S. 497, 499 (1954); *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265–66 (1977).

165.   Plaintiffs (including NTPSA members) will suffer irreparable injury resulting from the illegal terminations.

**PRAYER FOR RELIEF**

Plaintiffs ask this Court to grant the following relief:

166.   Declare that Defendants' terminations of TPS for Honduras, Nepal, and Nicaragua were unlawful under the APA and unconstitutional under the Due Process Clause of the Fifth Amendment and;

167.   Declare that the decision to provide only 60-days notice before the terminations of TPS for Honduras, Nepal, and Nicaragua take effect was unlawful under the APA;

168.   "Set aside" the terminations of TPS for Honduras, Nepal, and Nicaragua as beyond Defendants' authority and/or unlawful under the APA;

169.   Postpone or stay the terminations of TPS for Honduras, Nepal, and Nicaragua from taking effect or being put into effect;

170.   Enjoin and restrain all Defendants, and their officers, agents, servants, employees, attorneys, and all other persons who are in active concert or participation with any of them from enforcing the terminations of TPS for Honduras, Nepal, and Nicaragua;

171.   Order Defendants to take all steps necessary to ensure that the TPS designations for Honduras, Nepal, and Nicaragua remain in full force and effect;

172.   Grant an award of attorneys' fees and costs; and

173.   Grant any other and further relief that this Court may deem fit and proper.

Date:  July 7, 2025

Respectfully submitted,

NATIONAL DAY LABORER
ORGANIZING NETWORK

 /s/      * Jessica Karp Bansal
Jessica Karp Bansal
Lauren Michel Wilfong (pro hac vice
pending)

ACLU FOUNDATION
OF NORTHERN CALIFORNIA

 /s/      Emilou MacLean

Emilou MacLean
Michelle (Minju) Y. Cho
Amanda Young* *admission pending*

CENTER FOR IMMIGRATION LAW AND
POLICY, UCLA SCHOOL OF LAW

 /s/      *Ahilan T. Arulanantham*
Ahilan T. Arulanantham
Stephany Martinez Tiffer

ACLU FOUNDATION OF SOUTHERN
CALIFORNIA

 /s/      *Eva L. Bitran*
Eva L. Bitran

HAITIAN BRIDGE ALLIANCE

*/s/ Erik Crew*
Erik Crew (*pro hac vice* pending)

Attorneys for Plaintiffs

---

* Filer attests that all signatories listed, and on whose behalf the filing is submitted, concur in the filing's content and have authorized the filing.