Ahilan T. Arulanantham (SBN 237841)
arulanantham@law.ucla.edu
CENTER FOR IMMIGRATION LAW AND
POLICY, UCLA SCHOOL OF LAW
385 Charles E. Young Dr. East
Los Angeles, CA 90095
Telephone: (310) 825-1029

Emilou H. MacLean (SBN 319071)
emaclean@aclunc.org
Michelle (Minju) Y. Cho (SBN 321939)
mcho@aclunc.org
Amanda Young (SBN 359753)
ayoung@aclunc.org
ACLU FOUNDATION
OF NORTHERN CALIFORNIA
39 Drumm Street
San Francisco, CA 94111-4805
Telephone: (415) 621-2493
Facsimile: (415) 863-7832

Attorneys for Plaintiffs
*[Additional Counsel Listed on Next Page]*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| NATIONAL TPS ALLIANCE, DENIS MOLINA, JHONY SILVA, MARIA ELENA HERNANDEZ, O.C., SANDHYA LAMA, S.K., TEOFILO MARTINEZ,<br><br>*Plaintiffs*,<br><br>v.<br><br>KRISTI NOEM, in her official capacity as Secretary of Homeland Security, UNITED STATES DEPARTMENT OF HOMELAND SECURITY, and UNITED STATES OF AMERICA,<br><br>*Defendants*. | Case No. 3:25-cv-05687<br><br>**PLAINTIFFS' NOTICE OF MOTION AND MOTION TO POSTPONE EFFECTIVE DATE OF AGENCY ACTION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>Date:    TBD<br>Time:    TBD<br>Place:    TBD |

Additional Counsel for Plaintiffs

Jessica Karp Bansal (SBN 277347)
jessica@ndlon.org
Lauren Michel Wilfong (*Pro Hac Vice* pending)
lwilfong@ndlon.org
NATIONAL DAY LABORER ORGANIZING NETWORK
1030 S. Arroyo Parkway, Suite 106
Pasadena, CA 91105
Telephone: (626) 214-5689

Eva L. Bitran (SBN 302081)
ebitran@aclusocal.org
Diana Sanchez
diana.sanchez@aclusocal.org
ACLU FOUNDATION
OF SOUTHERN CALIFORNIA
1313 West 8th Street
Los Angeles, CA 90017
Telephone: (213) 977-5236

Erik Crew (*Pro Hac Vice* pending)
ecrew@haitianbridge.org
HAITIAN BRIDGE ALLIANCE
4560 Alvarado Canyon Road, Suite 1H
San Diego, CA 92120
Telephone: (949) 603-7411

**NOTICE OF MOTION AND MOTION TO POSTPONE EFFECTIVE DATE OF AGENCY ACTION**

PLEASE TAKE NOTICE THAT, on July 29, 2025, or as soon thereafter as this matter may be heard before the district court judge of the United States District Court for the Northern District of California, located at 450 Golden Gate Avenue, San Francisco, CA 94102, assigned to this matter, Plaintiffs move under 5 U.S.C. 705 of the Administrative Procedure Act ("APA") to "postpone the effective date of agency action."

Plaintiffs seek an order postponing the effective date of Defendants' decisions of July 7, 2025 (terminating TPS for Honduras and Nicaragua) and June 6, 2025 (terminating TPS for Nepal).

To preserve the rights of Plaintiffs and other affected individuals, Plaintiffs request that the Court act no later than ***August 5, 2025*** to postpone the effective date of these decisions, and that it postpone them until such time as the Court can resolve at summary judgment or trial whether the above orders are unlawful. Absent postponement of the effective date, the challenged orders will go into effect on August 5, 2025 (Nepal) and on or around September 6, 2025 (Honduras and Nicaragua).

This Motion is based upon this Notice of Motion and Motion; the accompanying Memorandum of Points and Authorities; the supporting declarations and evidence filed concurrently herewith; all prior pleadings and filings in this case; any additional matter of which the Court may take judicial notice; and such further evidence or argument as may be presented before, at, or after the hearing.

Date:  July 8, 2025

Respectfully submitted,

ACLU FOUNDATION
OF NORTHERN CALIFORNIA

*/s/ Jessica Karp Bansal*
Jessica Karp Bansal

Lauren Michel Wilfong (*Pro Hac Vice Pending*)
NATIONAL DAY LABORER ORGANIZING
NETWORK

1

2          Emilou MacLean
           Michelle (Minju) Y. Cho
3          Amanda Young
           ACLU FOUNDATION
4          OF NORTHERN CALIFORNIA

5          Ahilan T. Arulanantham
6          CENTER FOR IMMIGRATION LAW AND
           POLICY, UCLA SCHOOL OF LAW
7
           Eva L. Bitran
8          Diana Sanchez
           ACLU FOUNDATION
9          OF SOUTHERN CALIFORNIA

10

11         Erik Crew (*Pro Hac Vice* Pending)
           HAITIAN BRIDGE ALLIANCE
12
           Attorneys for Plaintiffs
13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

MEMORANDUM OF POINTS AND AUTHORITIES .................................................................1

INTRODUCTION ..........................................................................................................................1

STATEMENT OF THE ISSUE.......................................................................................................2

STATEMENT OF THE RELEVANT FACTS ...............................................................................2

          A.    Congress's Statutory Scheme for TPS...............................................................2

          B.    Pre-2017 TPS Designations for Honduras, Nepal, and Nicaragua ...................5

          C.    The Termination of TPS for Honduras, Nepal, and Nicaragua During the First Trump Administration ....................................................................6

          D.    Defendants' Ongoing Project to End TPS and the Preordained Termination of TPS for Honduras, Nepal, and Nicaragua.............................7

ARGUMENT ................................................................................................................................13

I.      PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS. ....................................13

    A.    This Court Has Jurisdiction to Consider Plaintiffs' Claims...........................13

    B.    The Challenged TPS Terminations Violate the APA. ....................................15

          1.    The terminations were not in accordance with law because they were pre-determined and not based on an objective review of country conditions.....................................................................................15

          2.    The terminations were arbitrary and capricious because they broke with past practice regarding orderly transition periods without explanation..................................................................................17

    C.    The Challenged Terminations Violate the Fifth Amendment.........................19

          1.    Strict scrutiny applies to plaintiffs' Equal Protection claims...........19

          2.    Discriminatory intent was a motivating factor here.........................20

II.     HONDURAN, NEPALI, AND NICARAGUAN TPS HOLDERS FACE PROFOUND AND IRREPARABLE HARM. ....................................................................22

III.   THE BALANCE OF EQUITIES AND PUBLIC INTEREST WEIGH HEAVILY IN FAVOR OF POSTPONEMENT. ..........................................................................24

CONCLUSION..............................................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adarand Constructors, Inc. v. Pena*,
   515 U.S. 200 (1995)..................................................................................................20

*Arce v. Douglas*,
   793 F.3d 968 (9th Cir. 2015) ..................................................................................20

*Ariz. Dream Act Coal. v. Brewer*,
   757 F.3d 1053 (9th Cir. 2014) ................................................................................25

*Ariz. Dream Act Coal. v. Brewer*,
   855 F.3d 957 (9th Cir. 2017) ..................................................................................25

*Ave. 6E Invs., LLC v. City of Yuma, Ariz.*,
   818 F.3d 493 (9th Cir. 2016) ............................................................................20, 21

*Bolling v. Sharpe*,
   347 U.S. 497 (1954)..................................................................................................20

*Bowen v. Michigan Acad. of Fam. Physicians*,
   476 U.S. 667 (1986)..................................................................................................15

*California v HHS*,
   281 F. Supp. 3d 806 (N.D. Cal. 2017) ...................................................................25

*CASA de Maryland, Inc. v. Trump*,
   355 F. Supp. 3d 307 (D. Md. 2018) ...................................................................6, 14

*Centro Presente v. DHS*,
   332 F. Supp. 3d 393 (D. Mass. 2018) ...............................................................6, 14

*Chalk v. United States Dist. Ct.*,
   840 F.2d 701 (9th Cir. 1988) ..................................................................................25

*Dep't of Com. v. New York*,
   588 U.S. 752 (2019)..................................................................................................16

*Dep't of Homeland Sec. v. Regents of the Univ. of California*,
   591 U.S. 1 (2020)................................................................................................15, 20

*HECA v. Trump*,
   Case No. 1:25-cv-01464-BMC, Dkt. 63 (July 1, 2025).........................................14

*Hernandez v. Sessions*,
   872 F.3d 976 (9th Cir. 2017) ..................................................................................23

*Hotel & Rest. Emps. Union v. Smith*,
    846 F.2d 1499 (D.C. Cir. 1988) (separate opinion of Mikva, J.)..............................................2

*ILRC v. Wolf*,
    491 F. Supp. 3d 520 (N.D. Cal. 2020) ....................................................................................23

*Immigrant Assistance Project of AFL-CIO v. I.N.S.*,
    306 F.3d 842 (9th Cir. 2002) ...................................................................................................14

*League of Wilderness Defs./Blue Mountains Biodiversity Project v. Connaughton*,
    752 F.3d 755 (9th Cir. 2014) ...................................................................................................25

*McNary v. Haitian Refugee Center*,
    498 U.S. 479 (1991).................................................................................................................14

*N. Mariana Islands v. United States*,
    686 F. Supp. 2d 7 (D.D.C. 2009) ............................................................................................23

*Nat'l TPS All. v. Noem*,
    No. 25-CV-01766-EMC, 2025 WL 957677 (N.D. Cal. Mar. 31, 2025).....................4, 8, 9, 21

*Noem v. Nat. TPS All.*,
    No. 24A1059, 2025 WL 1427560 (U.S. May 19, 2025) ............................................................9

*Organized Vill. of Kake v. U.S. Dep't of Agric.*,
    795 F.3d 956 (9th Cir. 2015) ............................................................................................18, 19

*Padilla v. Kentucky*,
    559 U.S. 356 (2010).................................................................................................................24

*Proyecto San Pablo v. I.N.S.*,
    189 F.3d 1130 (9th Cir. 1999) .................................................................................................14

*Ramos v. Nielsen*,
    336 F. Supp. 3d 1075 (N.D. Cal. 2018) ...................................................................4, 6, 20, 22

*Ramos v. Nielsen*,
    709 F. Supp. 3d 871 (N.D. Cal 2023) ................................................................................6, 7

*Ramos v. Wolf*,
    975 F.3d 872 (9th Cir. 2020), ...........................................................................................6, 7, 14

*Reno v. Catholic Soc. Servs., Inc.*,
    509 U.S. 43 (1993)...................................................................................................................14

*Saget v. Trump*,
    375 F. Supp. 3d 280 (E.D.N.Y. 2019) ...........................................................................7, 14, 15

*Stanley v. Illinois*,
    405 U.S. 645 (1972).................................................................................................................24

*Trump v. Hawaii*,
    585 U.S. 667 (2018) ......................................................................................20

*Tummino v. Torti*,
    603 F. Supp. 2d 519 (E.D.N.Y. 2009) ...........................................................16

*United States v. Carrillo-Lopez*,
    68 F.4th 1133 (9th Cir. 2023) ......................................................................20

*United States v. Virginia*,
    518 U.S. 515 (1996) ......................................................................................20

*Vargas v. Meese*,
    682 F. Supp. 591 (D.D.C. 1987) ...................................................................24

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
    429 U.S. 252 (1977) ..........................................................................20, 21, 22

*Washington v. Davis*,
    426 U.S. 229 (1976) ......................................................................................20

*Washington v. Trump*,
    847 F.3d 1151 (9th Cir. 2017) ......................................................................24

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ..........................................................................................23

**Statutes**

5 U.S.C. 702 ............................................................................................................13

8 U.S.C. 1254a ..........................................................................................................3

8 U.S.C. 1254a(b)(1) .................................................................................................3

8 U.S.C. 1254a(b)(1)(B) ..........................................................................................17

8 U.S.C. 1254a(b)(1)(C) ..........................................................................................10

8 U.S.C. 1254a(b)(3)(A) ......................................................................................4, 15

8 U.S.C. 1254a(b)(3)(B) ............................................................................................4

8 U.S.C. 1254a(b)(5)(A) ....................................................................................14, 15

8 U.S.C. 1254a(d)(3) ...............................................................................................13

28 U.S.C. 1331 ........................................................................................................13

35 U.S.C. 1254a(d)(4) ...............................................................................................3

Pub. L. 101-649, Title III, § 303 (1990) ..........................................................................3

**Other Authorities**

101 Cong. Rec. H25811 (daily ed. Oct. 25, 1989).................................................2, 3

64 Fed. Reg. 524 (Jan. 5, 1999) ....................................................................................5

67 Fed. Reg. 22,454 (May 3, 2002) ..............................................................................5

72 Fed. Reg. 29,534 (May 29, 2007) ............................................................................5

75 Fed. Reg. 24,734 (May 5, 2010) ..............................................................................5

75 Fed. Reg. 24,737 (May 5, 2010) ..............................................................................5

76 Fed. Reg. 68,493 (Nov. 4, 2011)..............................................................................5

80 Fed. Reg. 36,346 (June 24, 2015) ............................................................................5

81 Fed. Reg. 30,331 (May 16, 2016) ............................................................................5

81 Fed. Reg. 74470 (Oct. 26, 2016) ..............................................................................6

86 Fed. Reg. 41,863 (Aug. 3, 2021)..............................................................................7

87 Fed. Reg. 23202 (Aug. 19, 2022)............................................................................7

88 Fed. Reg. 40294 (Jun. 21, 2023)........................................................................7, 13

88 Fed. Reg. 40304 (June 21, 2023) ............................................................................13

88 Fed. Reg. 40317 (June 21, 2023) ......................................................................7, 12

88 Fed. Reg. 65728 (Sept. 25, 2023) ..........................................................................11

88 Fed. Reg. 69945 (Oct. 10, 2023) ............................................................................11

90 Fed. Reg. 24,151 (Jun. 6, 2025)..............................................................................16

90 Fed. Reg. 5961 (Jan. 17, 2025)...............................................................................10

90 Fed. Reg. 8805 (Feb. 3, 2025) ..................................................................................8

90 Fed. Reg. 9040 (Feb. 5, 2005).................................................................................10

90 Fed. Reg. at 9042 ....................................................................................................10

90 Fed. Reg. 20309 (May 13, 2025) ............................................................................11

90 Fed. Reg. 23697 (June 4, 2025) ..............................................................................11

90 Fed. Reg. 24151 (June 6, 2025) ........................................................................... *passim*

90 Fed. Reg. 28760 (July 1, 2025) ........................................................................12

Bill Frelick & Barbara Kohnen, *Filling the Gap: Temporary Protected Status* ............................2

E.O. 14159, sec. 16(b), 90 Fed. Reg. 8443, 8446 (Jan. 20, 2025) ............................................8, 19

Lynda J. Oswald, Note, *Voluntary Departure: Limiting the Attorney General's Discretion in Immigration Matters*, 85 Mich. L. Rev. 152, 157-60 (1986)................................2

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## MEMORANDUM OF POINTS AND AUTHORITIES

## INTRODUCTION

This case challenges Defendants' unlawful decisions to terminate Temporary Protected Status ("TPS") for over 60,000 individuals from Honduras, Nepal, and Nicaragua who have lived lawfully in the United States for at least 26 years (Honduras and Nicaragua) or 10 years (Nepal) during ongoing crises in their countries. The terminations violate the Administrative Procedure Act ("APA") because they were not based on an objective review of country conditions, as required by statute, but are instead the product of this administration's preordained, political decision to terminate nearly all TPS designations across the board. To support their preordained termination decisions, Defendants declined to consider entire categories of country conditions that had formed the basis for prior TPS extensions for each country— including staggering crime and violence in Honduras, a political and humanitarian crisis in Nicaragua, and widespread food insecurity in Nepal—and focused instead exclusively on areas where modest improvements could be identified. Further, in an unacknowledged and unexplained break with decades of past practice, Defendants arbitrarily provided affected TPS holders just *60 days* to prepare for the loss of status despite their many years of legal status in the United States.

The decisions are unlawful for an additional reason that they were motivated by race- and national origin-based animus. Although it has become increasingly normalized, the fact remains that Secretary Noem, President Trump, and members of the Trump campaign and administration have consistently used racist invective to describe TPS holders and their TPS decisions involving immigrants from non-white, non-European countries, including the countries at issue here.

Prompt action from this Court is necessary to preserve the rights of tens of thousands of TPS holders who would otherwise suffer irreparable harm. These include TPS holders like Plaintiff Jhony Silva, a 29-year-old Certified Nursing Assistant from Honduras, who has lived in this country lawfully since he was three years old; Plaintiff Sandhya Lama, 43-year old single mother of three U.S. citizen children from Nepal who first came to the United States as a student in in 2008 and has held TPS for over 10 years; and Plaintiff Maria Elena Hernandez, a 67-year old union representative from Nicaragua who has held TPS for 26 years and worked as a cleaner at the same university for

1

1   nearly 20 years. Stripping plaintiffs and other TPS holders of status will separate more than 41,000

2   U.S. citizen children from their parents and cost the economy billions of dollars. A decision

3   declaring the terminations unlawful after they have already gone into effect could never undo the

4   damage done to families and communities. Under these circumstances, the balance of equities and

5   public interest overwhelmingly favor preserving the status quote.

6                                   **STATEMENT OF THE ISSUE**

7           Should the Court postpone the terminations of the TPS designations for Honduras, Nepal,

8   and Nicaragua in light of Plaintiffs' showing of unlawful conduct and manifest irreparable harm?

9                               **STATEMENT OF THE RELEVANT FACTS**

10          **A.      Congress's Statutory Scheme for TPS**

11          Congress created TPS in response to unconstrained executive discretion in humanitarian

12  relief programs. Prior to 1990, the executive used "extended voluntary departure" (EVD) to confer

13  blanket nationality-based humanitarian relief. *See* Lynda J. Oswald, Note, *Voluntary Departure:*

14  *Limiting the Attorney General's Discretion in Immigration Matters*, 85 Mich. L. Rev. 152, 157-60

15  (1986). Between 1960 and 1989, the Attorney General granted EVD to approximately sixteen

16  countries, with periods of protection ranging from 8 months to fifteen years.[1] However, this practice

17  lacked "any specific … criteria." *Id.* at 178 n.153 (quoting Letter from Att'y Gen. W.F. Smith to

18  Rep. L.J. Smith (July 19, 1983)). Arbitrary, overtly political results ensued, creating congressional

19  pressure to reform the system, particularly in the wake of the Attorney General's refusal to grant

20  EVD for Salvadoran refugees. *See Hotel & Rest. Emps. Union v. Smith*, 846 F.2d 1499, 1510-11

21  (D.C. Cir. 1988) (separate opinion of Mikva, J.).

22          Congress designed TPS to ensure future decisions would be based on "identifiable

23  conditions" rather than "the vagaries of our domestic politics," 101 Cong. Rec. H25811, 25838

24  (daily ed. Oct. 25, 1989) (statement of Rep. Sander Levine) (debating Central American Studies and

25  Temporary Relief Act of 1989, immediate precursor to the TPS statute); replace the "ad hoc,

26  haphazard ... procedures" that existed before, *id.* at 25837 (statement of Rep. Richardson); and

27

28  [1] Bill Frelick & Barbara Kohnen, *Filling the Gap: Temporary Protected Status*, 8 Journal of Refugee
    Studies 339, 362-63 (1995) Ex. 28

1  provide beneficiaries with certainty about "what [their] rights are, how the Justice Department

2  determines what countries merit EVD status [and] how long they will be able to stay," *id*. While

3  establishing criteria to govern blanket humanitarian protection, Congress also statutorily designated

4  El Salvador for TPS, Pub. L. 101-649, Title III, § 303 (1990), which Executive Branch officials had

5  refused to do, further demonstrating congressional intent to limit unbridled executive discretion.

6       Since 1990, the TPS statute has given the Secretary of Homeland Security authority to

7  provide nationality-based humanitarian relief to certain citizens of countries stricken by war, natural

8  disaster, or other catastrophe, if they are already in the United States. 8 U.S.C. 1254a. The statute

9  provides that the Secretary may designate a country for TPS if any of three conditions are met:

10    A.  the [Secretary] finds that there is an ongoing armed conflict within the state and, due to such
           conflict, requiring the return of aliens who are nationals of that state to that state (or to the

11         part of the state) would pose a serious threat to their personal safety;

12    B.  the [Secretary] finds that—
                    i.  there has been an earthquake, flood, drought, epidemic, or other

13                      environmental disaster in the state resulting in a substantial, but temporary,
                        disruption of living conditions in the area affected,

14                 ii.  the foreign state is unable, temporarily, to handle adequately the return to the
                        state of aliens who are nationals of the state, and

15                iii.  the foreign state officially has requested designation under this subparagraph;
                        or

16
      C.  the [Secretary] finds that there exist extraordinary and temporary conditions in the foreign

17         state that prevent aliens who are nationals of the state from returning to the state in safety,
           unless the Attorney General finds that permitting the aliens to remain temporarily in the

18         United States is contrary to the national interest of the United States.

19  *Id*. 1254a(b)(1). While a country is designated for TPS, beneficiaries receive employment

20  authorization and protection from immigration detention and removal. *Id*. 1254a(a)(1), (d)(4). The

21  statute affords protection to qualifying individuals regardless of whether they meet the requirements

22  for asylum or other immigration relief. *Id*. 1254a(b)(1).

23       Congress established a clear statutory framework to govern the process of TPS decision-

24  making. The Secretary must consult with "appropriate" agencies, after which she "may designate" a

25  country based on armed conflict, environmental disaster, or other extraordinary conditions. 8 U.S.C.

26  1254a(b)(1). Designations can last only between 6-18 months, effective upon notice in the Federal

27  Register or "such later date as [the Secretary] may specify." *Id*. 1254a(b)(2). The Secretary also has

28  discretion, commonly exercised, to redesignate countries for TPS to allow later-arriving nationals to

1    apply. The Secretary has substantial discretion over initial designations. So long as she determines

2    certain country conditions exist, she may choose whether and when to designate a country for TPS.

3    In contrast, the statute strictly limits agency discretion *after* a country is designated, both as

4    to the timing of the review process and what criteria the Secretary must use in deciding whether to

5    extend or instead terminate TPS protection.[2] "At least 60 days before" the end of a designation,

6    "after consultation with appropriate agencies," the Secretary "shall review the conditions in the

7    foreign state" and "determine whether the conditions for such designation … continue to be met." 8

8    U.S.C. 1254a(b)(3)(A). The review process typically begins months before the 60-day deadline.

9    GAO Report 20-21. As part of the process, both USCIS and the State Department generally prepare

10   country conditions memoranda and recommendations for the Secretary. *Id.* 15-16; *see also Ramos v.*

11   *Nielsen*, 336 F. Supp. 3d 1075, 1082 (N.D. Cal. 2018) (describing process). USCIS's

12   recommendation takes the form of a "Decision Memo." *Id.*

13          Unless the Secretary determines that the country "no longer continues to meet the conditions

14   for designation," the designation "is extended" automatically for 6 months or "in [her] discretion ... a

15   period of 12 or 18 months." *Id.* 1254a(b)(3)(C). The statute "essentially provides extension as a

16   default." Nat'l TPS All., 2025 WL 957677, at *32. In contrast, if the Secretary does timely

17   determine conditions for designation are no longer met, she "shall terminate the designation." *Id.*

18   1254a(b)(3)(B). Termination "shall not be effective earlier than 60 days after the date the notice is

19   published or, if later, the expiration of the most recent previous extension." 8 U.S.C. 1254a(b)(3)(B).

20          In addition, the Secretary has discretion to further postpone the effective date of the

21   termination "in order to provide for an orderly transition." *Id.* 1254a(d)(3). Prior to the current

22   administration, in each of the twelve TPS terminations announced over the past two decades, the

23   agency has provided at least a six-month orderly transition period and, more commonly, a twelve- or

24   eighteen-month period. *See* Appendix 1 (four six-month periods, four twelve-month periods, and

25   four eighteen-month periods since 2004). In the 35-year history of the TPS program (again, prior to

26

27   _____

     [2] Declaration of Jessica Bansal in Support of Plaintiffs Motion to Postpone ("Bansal Decl."), Exh. 1
28   (Government Accountability Office, Temporary Protected Status: Steps Taken to Inform and
     Community Secretary of Homeland Security's Decisions (Apr. 2020) ("GAO Report") at 16-18, 27.

1  the current administration), only four TPS designations have been terminated without any orderly

2  transition period. Each of those terminations occurred more than twenty years ago, and involved

3  designations that had only been in place for three years or less prior to termination. *Id.*

4  **B.  Pre-2017 TPS Designations for Honduras, Nepal, and Nicaragua**

5  TPS for all three of the countries at issue here was consistently extended from their original

6  designations until the first Trump administration. Honduras was originally designated for TPS on

7  January 5, 1999, after Hurricane Mitch "swept through Central America causing severe flooding and

8  associated damage in Honduras." 64 Fed. Reg. 524 (Jan. 5, 1999). The hurricane "resulted in the loss

9  of thousands of lives, displacement of thousands more, collapse of physical infrastructure, and

10  severe damage to [Honduras's] economic system." 75 Fed. Reg. 24,734 (May 5, 2010). Between

11  1999 and 2017, multiple Attorneys General and DHS Secretaries extended TPS for Honduras in

12  regular periodic reviews based on persisting damage from the hurricane, as well as subsequent

13  natural disasters and economic and political crises. *See, e.g.* 81 Fed. Reg. 30,331 (May 16, 2016)

14  ("Since the last extension of Honduras' TPS designation, Honduras has experienced a series of

15  environmental disasters that have exacerbated the persisting disruptions caused by Hurricane Mitch

16  ...."); 75 Fed. Reg. 24,734, 24,735 (May 5, 2010) (discussing political and economic crises).

17  Like Honduras, Nicaragua was designated for TPS on January 5, 1999, following Hurricane

18  Mitch. Multiple Attorneys General and DHS Secretaries subsequently extended Nicaragua's TPS

19  status based on social, economic, and infrastructural challenges, 72 Fed. Reg. 29,534 (May 29,

20  2007); post-Mitch environmental disasters, 67 Fed. Reg. 22,454 (May 3, 2002); a fractured

21  economic foundation, "chronic poverty," and problems of governance and political tension. 75 Fed.

22  Reg. 24,737, 24,738 (May 5, 2010); 76 Fed. Reg. 68,493, 68,495 (Nov. 4, 2011).

23  Nepal was first designated for TPS on June 24, 2015, after a 7.8 magnitude earthquake and a

24  number of significant aftershocks killed nearly 9,000 people, injured more than 20,000 people,

25  displaced millions, and destroyed or significantly damaged over 750,000 homes. 80 Fed. Reg.

26  36,346, 36,347 (June 24, 2015). Nepal's designation was extended for 18 months on October 26,

27  2016. 81 Fed. Reg. 74470 (Oct. 26, 2016) (noting that most damaged buildings had not yet been

28  repaired and over 18,000 people remained displaced).

### C. The Termination of TPS for Honduras, Nepal, and Nicaragua During the First Trump Administration

Between 2017 and 2018, during the first Trump Administration, DHS announced terminations of TPS designations for six countries: Sudan, Haiti, Nicaragua, El Salvador, Honduras, and Nepal. *Ramos v. Nielsen*, 709 F. Supp. 3d 871, 876–80 (N.D. Cal 2023). If the terminations had taken effect, they would have ended TPS protection for approximately 400,000 people, making up 98 percent of all TPS holders at the time. Bansal Decl. Ex. 25.

Litigation and congressional investigations subsequently revealed the termination decisions were not based on an objective review of country conditions as required by statute—and as had been the past practice over multiple administrations, both Democratic and Republican—but rather were part of a "predetermined presidential agenda to end TPS." *Ramos*, 336 F. Supp. 3d at 1094-1099 (quoting then-DHS Secretary Duke's assurance to the White House that terminating Nicaragua's TPS would "send a clear signal that TPS in general is coming to a close"); Bansal Decl. Ex. 2 (finding that termination decision was influenced by considerations related to upcoming elections and disregarded risks to national security and safety of returnees); *id.* Exs. 3 and 4 (showing that, in terminating Nepal's TPS, career officials were instructed "not [to] devote research" to crises not directly related to the earthquake and when drafts did not "adequately support the proposal to terminate," career officials omitted or deemphasized ongoing problems in the country). The courts considering challenges to these decisions consistently found that DHS had radically changed the way it approached TPS decisions, justifying terminations by considering a much narrower range of country conditions than had been considered in the past. *See Ramos*, 336 F. Supp. 3d at 1097–98;[3] *Centro Presente v. DHS*, 332 F. Supp. 3d 393, 417 (D. Mass. 2018); *CASA de Maryland, Inc. v. Trump*, 355 F. Supp. 3d 307, 312-313 (D. Md. 2018); *Saget v. Trump*, 375 F. Supp. 3d 280, 346 (E.D.N.Y. 2019).

After analyzing "a wealth of record evidence" regarding the terminations for El Salvador, Haiti, Nicaragua, and Sudan, a court in this district found "DHS made a deliberate choice to base the

---

[3] The district court's decision was reversed on appeal in a 2-1 ruling on jurisdictional grounds, but a majority of active judges voted to rehear the case en banc so the panel decision was vacated. *See Ramos v. Wolf*, 975 F.3d 872 (9th Cir. 2020), *reh'g en banc granted, opinion vacated*, 59 F.4th 1010 (9th Cir. 2023

TPS decision solely on whether the originating conditions or conditions directly related thereto persisted, regardless of other current conditions no matter how bad …. The evidence … suggests this change may have been made in order to implement and justify a pre-ordained result." *Ramos*, 336 F. Supp. 3d at 1097–98. After a four-day bench trial regarding Haiti, a federal court in New York reached the same conclusion, finding the termination "was preordained and pretextual, and it was made in part due to political influence." in violation of the APA. *Saget*, 375 F. Supp. 3d at 346.

As a result of injunctions issued in *Ramos* and *Saget*, and subsequent stipulated orders in *Ramos* providing that TPS designations would remain in effect pending a final decision in the *Ramos* appeal, the terminations did not go into effect. *Ramos*, 709 F. Supp. 3d at 878. On June 21, 2023, DHS rescinded the TPS terminations for Honduras, Nicaragua, and Nepal, and extended their designations.[4] Those decisions extensively critiqued the flawed country conditions analysis in the termination decisions issued under the first Trump administration. *See* 88 Fed. Reg. 40320 ("[T]he conditions in Honduras that gave rise to its TPS designation in 1999 persisted in 2018 and persist to this day."); 88 Fed. Reg. 40294 (Jun. 21, 2023) (same for Nicaragua); 88 Fed. Reg. 40317 (Jun. 21, 2023) (same for Nepal).

### D. Defendants' Ongoing Project to End TPS and the Preordained Termination of TPS for Honduras, Nepal, and Nicaragua

The second Trump administration quickly resumed its efforts to end TPS, notwithstanding the statute's mandate that designations be extended unless the country no longer meets the conditions for designation. Indeed, the termination decisions for Honduras, Nepal, and Nicaragua were made long before Secretary Noem considered conditions in any of those countries. At her confirmation hearing, Secretary Noem testified that "[TPS] has been abused and manipulated by the Biden Administration and that will no longer be allowed . . . and these extensions going forward the way that they are, the program was intended to be temporary[.]" Bansal Decl. Ex. 14. Secretary Noem's insinuation that existing TPS extensions would be terminated was consistent with statements made by President Trump and Vice President Vance during the campaign. *Id.* Ex. 19; Ex. 20 (top advisers identified the revocation of TPS as a priority for the incoming administration).

---

[4] DHS also newly designated Haiti and Sudan for TPS. 86 Fed. Reg. 41,863 (Aug. 3, 2021); 87 Fed. Reg. 23202 (Aug. 19, 2022).

On January 20, the day he took office, President Trump issued an Executive Order titled "Protecting the American People Against Invasion"[5] ("Invasion E.O."). The "invasion" referenced was the purported "unprecedented flood of illegal immigration into the United States." *Id.* The Order directed the DHS Secretary to "promptly take all appropriate action, consistent with law, to rescind the policy decisions of the previous administration that led to the increased or continued presence of illegal aliens in the United States," including by reviewing "designations of Temporary Protected Status." *Id.* Although TPS holders are by definition lawfully present—and, in the case of the TPS holders impacted by the terminations challenged here, have been for a minimum of ten years (Nepal) or 26 years (Honduras and Nicaragua)—the Order mandated TPS designations be "appropriately limited in scope" to ameliorate the "continued presence of illegal aliens in the United States." *Id.*

Secretary Noem was confirmed on January 25, 2025. She immediately began to implement the preordained decision to terminate TPS, starting with Venezuela. Within three days of taking office, she announced the vacatur of the prior administration's Venezuela's TPS extension. *Nat'l TPS All. v. Noem*, No. 25-CV-01766-EMC, 2025 WL 957677, at *6 (N.D. Cal. Mar. 31, 2025). This was the first-ever vacatur of an extension in the 35-year history of the TPS program.

In the Federal Register, Secretary Noem justified the vacatur as necessary to resolve ministerial issues with the consolidated filing process established by the prior extension, which had supposedly engendered confusion. 90 Fed. Reg. 8805 (Feb. 3, 2025). But a court in this district later found that justification was pretextual. "[C]onfusion was not [Secretary Noem's] concern so much as the desire to totally undo Secretary Mayorkas's decision." *Nat'l TPS All.*, 2025 WL 957677, at *36.[6] Internal communications show that officials began planning for termination even before the vacatur was finalized, and DHS policymakers referred to the vacatur notice as a "termination" notice. Bansal Decl., Ex. 5 (NTPSA2_000677) (Jan. 27 12:51 pm email from DHS Assistant Secretary Tony Pham seeking data to support "project involving termination of TPS status"). *See also id.* Ex. 6 (senior

---

[5] E.O. 14159, sec. 16(b), 90 Fed. Reg. 8443, 8446 (Jan. 20, 2025).
[6] The Court in *NTPSA* found Plaintiffs are likely to succeed on their claims that Secretary Noem's decision violated the Administrative Procedure Act and was unconstitutionally motivated by racism, and granted their motion to postpone its effective date pending the outcome of the litigation. The Court's postponement order was subsequently stayed by the U.S. Supreme Court in a two-paragraph decision that provides no reasoning and has no precedential effect. *Noem v. Nat. TPS All.*, No. 24A1059, 2025 WL 1427560, at *1 (U.S. May 19, 2025).

8

1    DHS officials referred to vacatur notice as a "termination" notice).

2        On February 1, 2025—just three days after announcing the vacatur notice—Secretary Noem

3    announced her decision to terminate TPS for Venezuela. *Nat'l TPS All.*, 2025 WL 957677, at *7.

4    Her decision was not based on the statutorily required country conditions review. As agency records

5    show, the extremely limited review the agency conducted—which took place over mere hours, rather

6    than the months the review process normally takes, *see supra* Background A—was designed to find

7    support for a termination decision that had already been made: Researchers were told to "focus on

8    any improvements in Venezuela." Bansal Decl. Ex. 7 (NTPSA2_000933) (Jan. 28 12:42 pm)

9    (circulating "updated … sources" with "positive improvements highlighted."). *See also id.* Ex. 5

10   (NTPSA2_000677) (Jan. 27 12:51 pm: "This is a project involving termination of TPS status and we

11   need to tell the data story if can be."). When researchers could not identify improvements in a

12   particular area—such as political repression and human rights, or food insecurity—USCIS simply

13   excised that topic from the Secretary's consideration. *Compare id.* Ex. 8 (NTPSA2_000074)

14   (January 9, 2025 Biden-era Decision Memo) (addressing political repression and human rights, and

15   food insecurity), *with* Ex. 9 (NTPSA2_000004) (January 31, 2025 Trump-era Decision Memo) (no

16   section on political repression and human rights, or food insecurity).

17       Armed with selective country conditions information culled to support a preordained

18   termination, USCIS initially recommended the Secretary terminate Venezuela's designation on the

19   ground that, while "[c]onditions in Venezuela remain challenging . . . notable improvements indicate

20   that the conditions that precipitated the initial TPS designation no longer continue." Bansal Decl. Ex.

21   27. The final draft of the Decision Memo suggested another basis for termination: "USCIS believes

22   that it may be contrary to the national interest of the United States to permit Venezuela TPS

23   beneficiaries to remain in the United States . . . [g]iven the noted criminal activity of some

24   Venezuelan nationals …." Bansal Decl. Ex. 9 (NTPSA2_000004). Ultimately, the Secretary based

25   her decision primarily on national interest grounds, believing that—because Venezuela was

26   designated for TPS based on extraordinary and temporary conditions (rather than natural disaster or

27   war)—she did not *need* to find improved conditions in order to terminate. 90 Fed. Reg. 9040 at 9042

28   (Feb. 5, 2005) ("even assuming the relevant conditions … remain both 'extraordinary' and

9

'temporary,' termination of the 2023 Venezuela TPS designation is required because it is contrary to the national interest to permit the Venezuelan nationals . . . to remain temporarily in the United States."). *See also* 8 U.S.C. 1254a(b)(1)(C).[7] At the same time, she also concluded that "notable improvements … allow for [Venezuelan] nationals to be safely returned to their home country," 90 Fed. Reg. at 9042—in direct contrast to Secretary Mayorkas's contrary conclusion just three weeks earlier. 90 Fed. Reg. 5961, 5966 (Jan. 17, 2025) (finding that "extraordinary and temporary conditions … continue to prevent Venezuelan nationals from returning in safety"). The Venezuela termination was the first termination in the history of the TPS program based on national interest grounds.

After terminating Venezuela's designation, Secretary Noem continued with her preordained decision to terminate TPS designations. On February 20, 2025, she announced the second-ever vacatur of an extension in the history of the TPS program, this time for Haiti. DHS's press statement reiterated what Secretary Noem asserted at her confirmation hearing—that "[f]or decades the TPS system has been exploited and abused." Bansal Decl. Ex. 11. DHS used as an "example" of the "exploit[ation]" of the system that "Haiti has been designated for TPS since 2010"; and that "more Haitian nationals, even those who entered the U.S. illegally" have benefited from "each extension."[8] DHS also stated that, by partially vacating the lawfully granted extension, it was "returning integrity to the TPS system," and "returning TPS to its original status: temporary." *Id.* The press statement referenced the rescission of the previous administration's extension of TPS for Venezuela, explicitly linking the two vacaturs as part of the same project to change "the TPS system." *Id.*

On May 12, 2025, DHS announced the termination of TPS for Afghanistan. Again, despite an ongoing State Department warning against any travel to the country "due to civil unrest, crime, terrorism, risk of wrongful detention, kidnapping, and limited health facilities," Bansal Decl. Ex. 12,

---

[7] The other two bases for a TPS designation—natural disaster and armed conflict—do not reference the national interest. Plaintiffs read the TPS statute to permit consideration of national interest only when the Secretary is deciding whether to designate a country for TPS based on extraordinary and temporary conditions, and not when she is deciding whether to extend or terminate an existing TPS designation based on extraordinary and temporary conditions. *See* Pls' Mot. for Summary Judgment, NTPSA I, Case No. 3:25-cv-01766-EMC (June 3, 2025), Dkt. 165 at 17-19. However, that dispute is not relevant to this litigation.

[8] This makes no sense, because TPS extensions do not expand protection to new arrivals.

10

1    Secretary Noem ignored dire conditions to focus on "notable improvements," before concluding

2    "that requiring the return of Afghan nationals to Afghanistan does not pose a threat to their personal

3    safety." 90 Fed. Reg. 20309 (May 13, 2025). She highlighted that "[t]he Taliban government is

4    promoting tourism to shift its global image" and "tourists are sharing their experiences on social

5    media, highlighting the peaceful countryside, welcoming locals, and the cultural heritage" *Id.* She

6    also noted, as a sign that the situation had improved, that only 24 million (rather than 29 million)

7    Afghan nationals relied on humanitarian assistance. *Id.* She failed to address entire categories of

8    conditions previously identified as bases for Afghanistan's TPS designation and prior extensions,

9    including human rights abuses and the welfare of women and girls. *Compare* 88 Fed. Reg. 65728

10   (Sept. 25, 2023) (describing "worsening" human rights "crisis," "unprecedented deterioration of

11   women's rights," and "sexual violence against women and girls [that] occurs regularly"), *with* 90

12   Fed. Reg. 20309 (May 13, 2025) (not mentioning human rights or the rights of women and girls).

13          The termination of TPS for Cameroon followed shortly thereafter, on June 4, 2025. 90 Fed.

14   Reg. 23697 (June 4, 2025). The Secretary found TPS holders could safely return to the country even

15   though "two major armed conflicts" "remain active." *Id.* Again, she failed to address entire

16   categories of conditions previously cited as a basis for Cameroon's TPS designation and subsequent

17   extensions, including human rights abuses, food insecurity, a cholera epidemic, and ongoing mass

18   displacement. *Compare* 88 Fed. Reg. 69945 (Oct. 10, 2023) (addressing each category), *with* 90 Fed.

19   Reg. 23697 (June 4, 2025) (not addressing any conditions in those categories).

20          On June 6, 2025, Secretary Noem terminated TPS for Nepal. 90 Fed. Reg. 24151 (June 6,

21   2025). After reciting the statutory standard for country conditions review, she cited to the Invasion

22   E.O. instruction that she "ensur[e] that designations of Temporary Protected Status are …

23   appropriately limited in scope and made for only so long as may be necessary to fulfill the textual

24   requirements of the statute." *Id.* at 24152 n.10. Repeating the pattern developed in the prior

25   terminations—and aided, no doubt, by the new selective country conditions research system put in

26   place for this administration's termination decisions—she then identified "notable improvements"

27   that justified ending Nepal's designation while ignoring entire categories of conditions that had

28   previously been considered. 90 Fed. Reg. 24151 (June 6, 2025). *Compare* 88 Fed. Reg. 40317 (June

11

21, 2023) (discussing widespread food insecurity and lack of access to sanitation) *with* 90 Fed. Reg. 24151 (June 6, 2025) (not addressing those conditions).

On June 27, 2025, DHS also terminated Haiti's TPS designation. 90 Fed. Reg. 28760 (July 1, 2025). Because Haiti, like Venezuela, was designated for TPS on the grounds of extraordinary and temporary conditions, the Secretary believed she could justify termination based solely on a finding that extension is not in the national interest. So, of course, that is what she did—claiming that crisis-level conditions actually *required* termination because continuing TPS for a country facing total societal collapse is contrary to the U.S. national interest. *Id.*[9] 90 Fed. Reg. at 28762-64 (acknowledging "Widespread gang violence … sustained by the country's lack of functional governmental authority" has "destabilized Haiti." "'Haiti is in the grip of a severe humanitarian and human rights crisis,'" but nonetheless terminating Haiti).

On July 7, 2025, Defendants terminated TPS for Honduras and Nicaragua. *See* Bansal Decl. Ex. 29 (Honduras Termination Notice); *Id.* Ex. 30 (Nicaragua Termination Notice). Both termination notices explicitly rely on the Invasion E.O., despite the fact that TPS holders from these countries have been living lawfully in the United States for at least 26 years. *See* Ex. 29 at n. 10; Ex. 30 n.4. The idea that they could constitute an invasion is irrational in this context. Again repeating the pattern developed in the prior terminations, Secretary Noem identified certain positive indicators of improvement in conditions while ignoring major categories of conditions that had previously been considered. For example, the most recent previous extension of Honduras's TPS designation contained an extensive discussion of the widespread "political violence" and "staggering levels of crime" in the country, explaining that "[g]angs that originated in the United States …[were] la[ying] siege to communities and … plung[ing] the country into a state of crisis." 88 Fed. Reg. 40304, 40310 (June 21, 2023) (cleaned up). The Honduras Termination Notice fails to address political violence or crime. Ex. 29.

As to Nicaragua, that country's most recent previous TPS extension recognized that "[i]n

[9] USCIS's Press Release, in contrast, proclaimed that "country conditions have improved to the point where Haitians can return home in safety." Bansal Decl. Ex. 13. The agency's simultaneous promulgation of two directly contradictory explanations demonstrates the pretextual nature of both.

addition to the numerous environmental disasters following the 1998 hurricane, Nicaragua is experiencing political instability and a humanitarian crisis that continue to render the country temporarily unable to adequately handle the return of its nationals." 88 Fed. Reg. 40294, 40300 (Jun. 21, 2023). The Federal Register notice described the political and humanitarian challenges at length, including "extrajudicial killings, … torture, political imprisonment, and suspension of the press" which had "led to thousands of citizens going into exile." *Id.* In contrast, the Termination Notice's country conditions analysis spans two paragraphs focused solely on infrastructure, tourism, and foreign investment—and does not address the political or humanitarian situation *at all*.

Despite the fact that Honduras, Nepal, and Nicaragua had each been designated for TPS for over ten years, Secretary Noem declined to provide any "orderly transition," 8 U.S.C. 1254a(d)(3), period beyond the statutory 60-day minimum.

## ARGUMENT

## I.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS.

### A.    This Court Has Jurisdiction to Consider Plaintiffs' Claims

This Court has jurisdiction over Plaintiffs' claims under the Administrative Procedure Act's general provision for judicial review of agency action, 5 U.S.C. 702; the general grant of federal question jurisdiction, 28 U.S.C. 1331; and, as to the constitutional claim, under the Constitution.

Defendants will likely argue the TPS statute's jurisdiction-limiting provision bars Plaintiffs' claims, but it does not. That provision provides: "There is no judicial review of any *determination* of the Attorney General with respect to the designation, or termination or extension of a designation, of a foreign state under this subsection." 8 U.S.C. 1254a(b)(5)(A) (emphasis added). "[D]etermination" is a term of art in the jurisdiction-stripping context. Here it bars review over the Secretary's country conditions assessments. Both the Supreme Court and the Ninth Circuit have consistently read that term to preserve review over claims like those Plaintiffs raise, which allege defects in the decisionmaking process. Every district court to consider the scope of Section 1254a(b)(5)(A) in the TPS context has agreed. *See HECA v. Trump*, Case No. 1:25-cv-01464-BMC, Dkt. 63 (July 1, 2025), *Ramos*, 321 F. Supp. 3d at 1101-08; *Centro Presente*, 332 F. Supp. 3d at 405-409*; CASA de Maryland, Inc.*, 355 F. Supp. 3d at 319-322; *Saget*, 375 F. Supp. 3d at 330-33.

13

1    In four separate immigration cases, the Supreme Court and this Court have read jurisdiction

2    stripping statutes that constrain review over "determinations" to not preclude claims challenging

3    agency action that is collateral to the determinations themselves. As *McNary v. Haitian Refugee*

4    *Center*, the first of these cases, explained, "the reference to 'a determination' describes a single act

5    rather than a group of decisions or a practice or procedure employed in making decisions …." 498

6    U.S. 479, 492 (1991) (challenge to adjudication procedures did not require review of a

7    "determination"). Congress "could easily have used broader language" had it wanted to bar "all

8    causes … arising under" the statute, or "on all questions of law and fact" in such suits, rather than

9    merely review of a "determination." *Id.* at 492–94; *see also Reno v. Catholic Soc. Servs., Inc.*, 509

10   U.S. 43, 56–58 (1993) ("*CSS*") (applying *McNary* to find jurisdiction over challenges to practice

11   governing legalization applications); *Immigrant Assistance Project of AFL-CIO v. I.N.S.*, 306 F.3d

12   842, 862–63 (9th Cir. 2002) ("*IAP*") (challenge to rule interpreting the statute cognizable); *Proyecto*

13   *San Pablo v. I.N.S.*, 189 F.3d 1130, 1138 (9th Cir. 1999) (challenge to pre-adjudication practices

14   cognizable).

15   *McNary* and its progeny confirm this Court has jurisdiction. Under the principle they

16   establish, a claim does not challenge a "determination" unless it seeks relief that would *dictate the*

17   *substantive outcome* of the underlying agency decision. Here, nothing in the relief Plaintiffs seek

18   would bar the Secretary from making a termination decision, provided she follows the requisite

19   procedures and acts with permissible motives. In addition, Plaintiffs' third APA claim focuses on the

20   length of the orderly transition period, which is addressed in subsection (d) of the statute, whereas

21   the jurisdiction-stripping provision concerns determinations made under subsection (b). 8 U.S.C.

22   1254a(b)(5)(A) (prohibiting review of certain determinations "under this subsection"). Plaintiffs'

23   claims thus do not challenge any determination made in a designation, extension, or termination

24   decision, but rather only collateral legal defects in the Secretary's TPS decision-making process.

25   Were there any doubt, however it would be resolved in Plaintiffs' favor by the strong presumption

26   favoring judicial review of agency action. *Dep't of Homeland Sec. v. Regents of the Univ. of*

27   *California*, 591 U.S. 1, 16 (2020) (internal quotation marks omitted). Finally, Plaintiffs'

28   constitutional claim is cognizable for the additional reason that Section 1254a(b)(5)(A) does not

14

mention constitutional claims. The Supreme Court has *never* read a stripping provision to entirely foreclose review of a colorable constitutional claim. Reading this statute to accomplish that result could well render it unconstitutional. *See Bowen v. Michigan Acad. of Fam. Physicians*, 476 U.S. 667, 680–81 (1986) (rejecting "extreme" position interpreting statute to foreclose constitutional claims).

**B.    The Challenged TPS Terminations Violate the APA.**

**1.    *The terminations were not in accordance with law because they were pre-determined and not based on an objective review of country conditions.***

The TPS statute requires that the Secretary review TPS designations prior to the expiration of each extension period to determine whether TPS protections will remain available to, or instead be withdrawn from, immigrants whom DHS previously found could not safely return to their home countries. The Secretary's decision must be based on the conditions in the country designated for TPS. Specifically, the Secretary "shall review the conditions" and "shall determine whether the conditions for such designation … continue to be met." 8 U.S.C. 1254a(b)(3)(A). TPS decisions that are "preordained," "pretextual," or based on "political influence" violate the APA because they are not based on country conditions and therefore "not in accordance with the law." *Saget*, 375 F. Supp. 3d at 345-46 (quoting 5 U.S.C. § 706(2)(A)). As the Supreme Court has explained, "[t]he reasoned explanation requirement of administrative law … is meant to ensure that agencies offer genuine justifications for important decisions, reasons that can be scrutinized by courts and the interested public. Accepting contrived reasons would defeat the purpose of the enterprise." *Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019). *See also Tummino v. Torti*, 603 F. Supp. 2d 519, 544 (E.D.N.Y. 2009) (where "political pressure was intended to and did cause the agency's action to be influenced by factors not relevant under the controlling statute," reviewing courts must set aside the action in question) (quoting *Town of Orangetown v. Ruckelshaus*, 740 F.2d 185, 188 (2d Cir.1984)).

The evidence here shows that the Secretary's decisions to terminate TPS for Nepal, Honduras, and Nicaragua were based on a preordained, political decision to terminate TPS wholesale, rather than the objective country conditions review the statute requires. Instead of making

1    individualized decisions for each country, under the current administration Defendants have

2    approached all TPS decisions as part of one overarching, political effort to "return[] integrity to *the*

3    *TPS system*" which Defendants described as having "been abused and exploited by illegal aliens for

4    decades." Bansal Decl. Ex. 11 (emphasis added) (linking Haiti and Venezuela decisions by noting

5    that "[l]ast month, Secretary Noem similarly rescinded the previous Administration's Venezuela

6    TPS extension"); *id.* Ex. 24 ("[r]eviewing TPS designations is a key part of restoring integrity in our

7    immigration system"). Indeed, Secretary Noem repeatedly described her termination decisions as

8    necessary to "return[] TPS to its original temporary intent." *Id.* Ex. 24. *See also id.* Ex. 13 ("This

9    decision … ensures that Temporary Protective Status is actually temporary"); Ex. 11 ("President

10    Trump and I are returning TPS to its original status: temporary"); Ex. 31 ("Temporary Protected

11    Status was designed to be just that—temporary").

12        In each of her TPS decisions, including those challenged here, Secretary Noem cited to the

13    Invasion E.O., explicitly linking her decisions to the President's instructions to "limit[]" TPS, and

14    his view that ending TPS would somehow address the "continued presence of illegal aliens in the

15    United States."[10] *See also* Bansal Decl. Ex. 16 (Secretary Noem explained her decision to vacate

16    TPS for Venezuela as reflecting President Trump's "desire" to make sure TPS was "used properly,"

17    adding that "when the President gives a directive, the Department of Homeland Security will follow

18    it"). Even if people who hold lawful TPS status could somehow be described as "illegal aliens,"

19    (which they cannot), whether or how a TPS decision will affect the undocumented population is not

20    a proper consideration under the TPS statute. Particularly here, because the countries at issue in this

21    case were designated for TPS based on natural disasters, the only relevant considerations when

22    deciding whether to extend or terminate their TPS designations are whether there continues to be "a

23    substantial, but temporary, disruption of living conditions" and whether the country continues to be

24    "unable, temporarily, to handle adequately the return" of its nationals. 8 U.S.C. 1254a(b)(1)(B).

25        But Defendants have not conducted the statutorily mandated country conditions review

26    necessary to answer those questions. Instead, in order to justify their predetermined decision to

27    terminate all existing TPS designations, Defendants have distorted the country conditions review

28    ---
[10] *See* 90 Fed. Reg. 24,151, 25, 152 n.10 (Jun. 6, 2025); Ex. 29 n.10; Ex. 30, n.4.

1  process to focus solely on "positive improvements." *See* Bansal Decl. Ex. 7 (NTPSA2_000933).

2  This has resulted in country conditions assessments that directly contradict those of the U.S. State

3  Department and, in the case of Venezuela, the assessment that DHS itself made just three weeks

4  earlier. *Supra* Background D. Entire categories of country conditions have been disregarded

5  wherever they do not suit DHS's predetermined conclusion to terminate TPS. *Id. See also* 90 Fed.

6  Reg. 24151 (June 6, 2025) (addressing only improvements in Nepal); Ex. 29, Honduras Termination

7  Notice (same for Honduras); Ex. 30, Nicaragua Termination Notice (same for Nicaragua). In

8  contrast, where dire country conditions can be used *in the interest* of a termination decision (as in the

9  case of Haiti), they have been acknowledged. Over the last six months, relying on this sham country

10 conditions review, Defendants have stripped lawful immigration status and work authorization for

11 over one million people, including the over 60,000 TPS holders from Honduras, Nepal and

12 Nicaragua whose rights are at issue here.

13      Because the challenged decisions were based not on an objective country conditions review,

14 but instead on extra-statutory considerations and a predetermined, political decision to end TPS

15 across the board, they violate the APA.

16      **2.      *The terminations were arbitrary and capricious because they broke with***

17              ***past practice regarding orderly transition periods without explanation.***

18      Prior to the current administration, no TPS termination in the 35-year history of the TPS

19 program that ended a TPS designation that had been in place for longer than three years provided

20 affected TPS holders with less than six-months notice *See* Appendix 1.  Over the past two decades

21 (again, prior to the current administration) all terminations of a designation of *any length* provided at

22 least a six-month transition period, and more commonly a 12- or 18-month transition period. *Id.*

23 (four six-month transition periods, four 12-month periods, and four 18-month periods). Although the

24 TPS holders affected by these terminations have been living lawfully in this country for at least ten

25 years (Nepal) and twenty-six years (Honduras, Nicaragua), the Secretary has given them only 60

26 days to pack up their lives and leave.

27      Of course, agencies are free to change existing policies. But when—as here—an agency

28 breaks with a long-standing past practice, it must "display awareness that it *is* changing position"

1    and provide "good reasons" for the new policy. *Organized Vill. of Kake v. U.S. Dep't of Agric.*, 795

2    F.3d 956, 966 (9th Cir. 2015) (quoting *FCC v. Fox Television*, 556 US 502 (2009)). DHS has done

3    neither. Indeed, rather than "display[ing] awareness" of DHS's longstanding past practice of

4    providing at least a six-month orderly transition period when ending a TPS designation of substantial

5    length, the Secretary denied that there *was* any such practice. As to Nepal, while "recogniz[ing]" in a

6    footnote "that certain previous TPS terminations allowed for an extended transition," she went on to

7    note that "certain other TPS designations were terminated without allowing for an extended

8    transition period," indicating her view that the agency *had* no particular practice. *See* 90 Fed. Reg. at

9    24154 n. 24. With respect to Honduras and Nicaragua, she wrongly claimed that "[a] sixty-day

10   orderly transition period is consistent with the precedent of previous TPS country terminations,"

11   apparently referencing only her own termination decisions over the past several months. *See* Ex. 29;

12   Ex. 30.

13            The Secretary also failed to provide a "good reason" for providing only 60 days for TPS

14   holders to leave, particularly given the massive break with past practice inherent in that decision.

15   *Organized Vill. of Kake,* 795 F.3d at 966. As to Honduras and Nicaragua, the only reason she

16   provided for selecting a 60-day period was that it would be "consistent with the precedent of

17   previous TPS country terminations and makes clear that the United States is committed to clarity and

18   consistency." *See* Ex. 29; Ex. 30. But, as described above, over the past two decades prior to the

19   current administration the "precedent of previous TPS country terminations," *id.,* was to provide at

20   least a six-month orderly transition period for *any* TPS termination. So this represents the opposite of

21   clarity and consistency. And even before that, the agency had provided at least a six-month transition

22   for any country designated for TPS for more than three years. *See supra* Background A; Appendix 1.

23   Because the Secretary's explanation was objectively wrong as a factual description of the agency's

24   past practice, it cannot constitute a "good reason" for her break with past practice.

25            As to Nepal, Secretary Noem offered two reasons for selecting a 60-day notice period, but

26   neither holds water. Fist, she asserted that the 60-day period was appropriate given her finding that

27   Nepal no longer meets the conditions for extension. But that reason would apply to any termination.

28   It says nothing about the rationale for providing such a short transition period. Second, she asserted

that a 60-day orderly transition for Nepal was "in accord with" Section 16(b) of the Invasion E.O. *See* 90 Fed. Reg. at 24153. That provision directs her to "take all appropriate action, consistent with law, to rescind the policy decisions of the previous administration that led to the increased or continued presence of illegal aliens in the United States," including by "ensuring that designations of [TPS] ... are appropriately limited in scope and made for only so long as may be necessary to fulfil the textual requirements of the statute."

The Secretary's citation to the Invasion E.O. to explain the 60-day wind down suggests she believes TPS holders are "illegal aliens," which by definition they are not. It also suggests that she has relied on the Invasion E.O. to establish a new categorical rule: always provide the shortest period of TPS protection possible. To the extent this can be read as a "reason" for breaking with past practice regarding orderly transitions, it is not a "good" one. To the contrary, it makes no sense. Denying an orderly transition period does not reduce the "presence of illegal aliens in the United States"—if anything, it increases the undocumented population by de-documenting lawfully present immigrants before they have time to get their affairs in order.

### C. The Challenged Terminations Violate the Fifth Amendment.

The Fifth Amendment's Due Process Clause "contains an equal protection component" prohibiting federal government officials from discriminating on the basis of race, ethnicity, or national origin. *Washington v. Davis*, 426 U.S. 229, 239 (1976); *Bolling v. Sharpe*, 347 U.S. 497, 499 (1954).[11] Courts' "approach to Fifth Amendment equal protection claims has always been precisely the same as to equal protection claims under the Fourteenth Amendment." *United States v. Carrillo-Lopez*, 68 F.4th 1133, 1139 (9th Cir. 2023), *cert. denied*, 144 S. Ct. 703 (2024) (internal quotation marks omitted).

#### 1. Strict scrutiny applies to plaintiffs' Equal Protection claims.

Courts apply strict scrutiny to assess allegations of official decisions motivated, even in part, by a discriminatory purpose. *Arce v. Douglas*, 793 F.3d 968, 977 (9th Cir. 2015). The limited

---

[11] The doctrinal and factual analysis is the same whether this claim is viewed as about race, ethnicity, or national origin discrimination. *See, e.g.*, *United States v. Virginia*, 518 U.S. 515, 532 n.6 (1996) (strict scrutiny applies to classifications based on national origin); *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 223–24 (1995) (strict scrutiny applies to classifications by ethnicity).

1    exception for deferential review adopted in *Trump v. Hawaii*, 585 U.S. 667 (2018) does not apply to

2    TPS. *Ramos v. Nielsen*, 336 F. Supp. 3d 1075, 1105–06 (N.D. Cal. 2018) (rejecting deferential

3    review as to TPS); *cf. Regents*, 591 U.S. at 34 (plurality) (applying *Arlington Heights* for equal

4    protection claim about DACA).

5          To prove an Equal Protection violation, plaintiffs must offer "[p]roof of racially

6    discriminatory intent or purpose." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S.

7    252, 265 (1977). It suffices if "direct or circumstantial evidence" indicates a "discriminatory

8    purpose" was merely one "motivating factor," not the "sole purpose." *Ave. 6E Invs., LLC v. City of

9    Yuma, Ariz.*, 818 F.3d 493, 504 (9th Cir. 2016). Courts "[c]onsider the totality of the evidence,"

10    *Carrillo-Lopez*, 68 F.4th at 1140, and evidence of discriminatory intent can include the sequence of

11    events leading to a decision, departures from normal procedures or substantive conclusions, the

12    background of a decision, and disparate impact. *Arlington Heights*, 429 U.S. at 266–67. The

13    "administrative history may be highly relevant, especially where there are contemporary statements

14    by" decisionmakers. *Id.* at 268. Even when decisionmakers did not "expressly refer[] to race or

15    national origin," their use of "code words," "racially-loaded" comments, or "veiled" references can

16    "demonstrate discriminatory intent"; such statements can still "send a clear message and carry the

17    distinct tone of racial motivations and implications" and "convey[] the message that members of a

18    particular race are disfavored." *Ave. 6E*, 818 F.3d at 505–07 (internal quotation marks omitted).

19    Extensive social science corroborates the common-sense conclusion that racial animus often is

20    conveyed via code-word and stereotypes. *See* Bansal Decl. Ex. 21 at 22 (documenting use of

21    racialized stereotypes about "depraved criminal[s] and rapist[s]"); Ex. 22 at 308 (explaining the use

22    of "code words" to justify the "oppression of Racial/Ethnic Minorities and immigrants").

23          **2.    *Discriminatory intent was a motivating factor here.***

24          Even without discovery, Plaintiffs already have compelling direct and circumstantial

25    evidence of discriminatory intent under *Arlington Heights*. First, Secretary Noem's own statements

26    confirm her decisions sprung at least in part from racial animus. Indeed, one court in this district has

27    already found a likelihood that Secretary Noem's decisions regarding Venezuela's TPS designation

28    were motivated at least in part by animus. *Nat'l TPS All.,* 2025 WL 957677, at *36. The Secretary's

statements make clear that her animus is not limited to Venezuelan immigrants, but extends to all non-white, non-European TPS holders. *See, e.g.,* Young Decl. ¶¶ 17-28 (describing stigmatization of Central American and other Latino immigrants). Indeed, the Secretary has described irregular immigration across the U.S.-Mexico border as an "invasion happening on purpose … to remake the foundation of this country," echoing the racist "replacement theory." Bansal Decl. Ex. 15; Ex. 26. *See also* Young Decl. ¶ 18 (discussing replacement theory). She and DHS have also painted entire immigrant populations, including Honduran immigrants specifically and TPS holders generally, as criminal. *See id.* Ex. 17 (framing Honduran "migration management" as a means to "save American lives and get criminals off our streets!"); Ex. 18 ("The Biden Administration exploited Temporary Protected Status to let half a million poorly vetted migrants into this country—from MS-13 gang members to known terrorists and murderers."). "Acting on the basis of a negative group stereotype and generalizing such stereotype to the entire group is a classic example of racism." *Nat'l TPS All.,* 2025 WL 957677, *40; Young Decl. ¶¶ 27-28. Further, Secretary Noem's termination orders rely explicitly on President Trump's Invasion E.O That Order describes immigrants, including lawfully present TPS holders, as invaders committing "vile and heinous acts against innocent Americans." *See* Invasion E.O.; *see also* Bansal Decl. Ex. 22 (describing use of "invasion" as a "code word" used to "express[] that Racial/Ethnic Minorities spread something harmful within communities, institutions, or other societal domains").

Second, the "specific sequence of events" leading to the challenged terminations, including Secretary Noem's "[d]epartures from the normal procedural sequence" and "[s]ubstantive departures," further "afford evidence that improper purposes are playing a role." *Arlington Heights*, 429 U.S. at 267. As described above, *see supra* Pt. II.A, these decisions involved dramatic departures from the normal procedural and substantive decision-making processes.

Third, the "historical background of the decision[s]" shows they are the latest in "a series of official actions taken for invidious purposes." *Id.* As one court in this district and several others found, during the first Trump administration the White House relentlessly pressured DHS Secretaries to terminate TPS for virtually all recipients. *See supra* Background C. This reflected President Trump's view that TPS beneficiaries were "people from shithole countries," as opposed to

people from countries "such as Norway"—remarks he continues to defend. *Ramos*, 336 F. Supp. 3d at 1098, 1100 (concluding after extensive discovery that Trump "has expressed animus against non-white, non-European immigrants" and, through surrogates in the White House, sought to influence DHS decision-makers); Bansal Decl. Ex. 23 (comparisons between "nice countries . . . like Denmark, Switzerland" and "Norway" and "unbelievable places and countries").

Fourth, the disparate "impact of the official action," and "whether it bears more heavily on one race," is relevant in assessing discriminatory intent. *Id.* at 266 (internal quotation marks omitted). Here, Secretary Noem's decision to vacate and terminate TPS for tens of thousands of Hondurans, Nepalis, and Nicaraguans with that status "bears more heavily" on people perceived in this country as non-white. Every one of the *Arlington Heights* factors thus demonstrates Secretary Noem's termination decisions were motivated at least in part by discriminatory animus against Honduran, Nepali, and Nicaraguan immigrants, violating the anti-discrimination guarantee of the Fifth Amendment, and establishing a likelihood of prevailing on the merits.

## II. HONDURAN, NEPALI, AND NICARAGUAN TPS HOLDERS FACE PROFOUND AND IRREPARABLE HARM.

The factors bearing on whether to grant postponement under Section 705 "substantially overlap with the factors for a preliminary injunction," *ILRC v. Wolf*, 491 F. Supp. 3d 520, 529 (N.D. Cal. 2020), which focus on the likelihood of "irreparable harm in the absence of preliminary relief," *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Plaintiffs face substantial irreparable harm here. First, for the reasons discussed, Defendants have violated Plaintiffs' constitutional and statutory rights, which itself constitutes irreparable harm. *Hernandez v. Sessions*, 872 F.3d 976, 994 (9th Cir. 2017) ("the deprivation of constitutional rights 'unquestionably constitutes irreparable injury'") (quoting *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012)); *N. Mariana Islands v. United States*, 686 F. Supp. 2d 7, 17 (D.D.C. 2009) (party "experiences actionable harm when 'depriv[ed] of a procedural protection to which he is entitled' under the APA") (quoting *Sugar Cane Growers Coop. of Fla. v. Veneman*, 289 F.3d 89, 94–95 (D.C. Cir. 2002)).

Defendants' actions will also upend the lives of tens of thousands of TPS holders who will imminently lose immigration status and work authorization after having lived lawfully in this

country for many years—working, paying taxes, and contributing to their communities in countless ways. *See* Palma Jimenez Decl. ¶¶ 28-30. Plaintiff Jhony Silva, a young father and certified nursing assistant at Stanford Hospital's cardiology unit, has had TPS since he was a toddler. Silva Decl. ¶¶ 2-8, 10. Plaintiff Maria Elena Hernandez is 67 years old, and stands to lose status shortly after she began drawing on the social security she has contributed to for decades. Hernandez Decl. ¶¶ 2, 7-8. Many will also be at immediate risk of detention and deportation to countries that are unsafe. *See* Tolchin Decl. ¶¶ 11-22; Frank Decl. ¶¶ 13-27; Wong Decl. ¶ 32. Those not arrested will be in a state of limbo—undocumented and without legal authorization to live and work, but with nowhere to go. *See, e.g.,* Molina Decl. ¶ 13; Silva Decl. ¶¶ 13-15. TPS holders who may be eligible for other forms of immigration relief may be deprived of the chance to pursue them, either because the alternative form of relief depends on an individual maintaining lawful immigration status, or because the individual may be subject to detention or deportation while they wait, and then barred from re-entry if deported. *See, e.g.,* R.A. Decl. ¶¶ 10-11; Lama Decl. ¶ 2; Palma Jimenez Decl. ¶ 31(d); Tolchin Decl. ¶¶ 19, 21; Postel Decl. ¶¶ 9, 12. These injuries are severe and irreparable. *See Padilla v. Kentucky*, 559 U.S. 356, 373 (2010) (describing "[t]he severity of deportation" as "the equivalent of banishment or exile" (citation omitted)); *Vargas v. Meese*, 682 F. Supp. 591, 595 (D.D.C. 1987) (recognizing denial of "the benefits of protection from deportation and work authorization, as well as the right to travel outside this country without forfeiting these benefits" is irreparable harm).

Many TPS holders also face harmful choices concerning family separation. Because they have lived here for many years, they often have American children who have never been to their parents' country of origin. These TPS holders face the impossible choice of either separating from their U.S. citizen children, or bringing their children with them to an unknown and unsafe country. More than 41,000 American children likely face the prospect of separation from their Honduran, Nepali, and Nicaraguan TPS holder parents. See Wong Decl. ¶¶ 11-12, 18-19, 24-25 (census data estimates more than 41,000 U.S. citizen children of Honduran, Nepali and Nicaraguan TPS holders); Frank Decl. ¶¶ 9-10. Plaintiff Sandhya Lama, for example, is the single mother of, and sole provider for, three U.S. citizen children aged between two and 16. None of them have been to Nepal, and one has serious health problems. Lama Decl. ¶¶ 2, 13-15. Plaintiff Denis Molina is the father of four U.S.

23

1   citizen children between the ages of one and 20, including two with special needs. Molina Decl. ¶¶

2   2, 9, 14-15. *See also* Silva Decl. ¶¶ 8-9, 16; Shrestha Decl. ¶¶ 5-6, 10-14; Carbajal Decl. ¶ 9

3   (describing their American children). Family separation constitutes irreparable harm. *See, e.g.*,

4   *Stanley v. Illinois*, 405 U.S. 645, 647 (1972); *Washington v. Trump*, 847 F.3d 1151, 1169 (9th Cir.

5   2017).

6          The terminations will also inflict severe economic harm on TPS holders who will lose the

7   ability to support themselves and their families, pursue higher education, or maintain their homes or

8   other material assets, *see, e.g.,* Palma Jimenez Decl. ¶ 31; S.K. Decl. ¶ 9 (abandoned plans to pursue

9   her education); A.C. Decl. ¶¶ 9-11 (risks being unable to secure a pilot's license after four years of

10  training). The "loss of opportunity to pursue one's chosen profession constitutes irreparable harm."

11  *Ariz. Dream Act Coal. v. Brewer*, 855 F.3d 957, 978 (9th Cir. 2017). TPS holders will also lose

12  drivers' licenses, Tolchin Decl. ¶ 23, which limits the ability to work and do basic tasks. Others will

13  lose access to essential health care. *See, e.g.,* Palma Jimenez Decl. ¶ 31(e); Hernandez Decl. ¶ 12.

14  Lost freedom of movement and access to health care are irreparable harms. *Ariz. Dream Act Coal. v.

15  Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014) (loss of driver's licenses as irreparable). Lastly,

16  Defendants' terminations are inflicting severe emotional harm on TPS holders and their family-

17  members, including U.S. citizen children. *See, e.g.,* R.A. Decl. ¶ 12 (labor and delivery nurse

18  recently diagnosed with depression and taking anti-depressants for the first time because of fears of

19  loss of status). These emotional and psychological injuries indisputably constitute irreparable harm.

20  *See, e.g.*, *Chalk v. United States Dist. Ct.*, 840 F.2d 701, 709–10 (9th Cir. 1988).

21  **III.    THE BALANCE OF EQUITIES AND PUBLIC INTEREST WEIGH HEAVILY IN
        FAVOR OF POSTPONEMENT.**

22          The final two considerations—the balance of equities and public interest—merge when the

23  government is a party. *League of Wilderness Defs./Blue Mountains Biodiversity Project v.

24  Connaughton*, 752 F.3d 755, 766 (9th Cir. 2014). Here, courts consider the impact of the relief on

25  nonparties as well. *Id.* Where plaintiffs establish a likelihood that Defendants' policy violates the

26  Constitution or the APA, they "establish[] that both the public interest and the balance of the equities

27  favor" interim relief. *Brewer*, 957 F.3d at 1069; *California v HHS*, 281 F. Supp. 3d 806. 831–32

28

1    (N.D. Cal. 2017) (the "public interest is served when administrative agencies comply with their

2    obligations under the APA").

3        Other public interests and equities strongly support Plaintiffs' motion. Lost employment, and

4    tax and Social Security contributions, would cost the economy billions of dollars annually. Morten

5    Decl. ¶¶ 4-7 (TPS holders with high labor force participation); Wong Decl. ¶¶ 13-15, 20-21, 26-27

6    (Honduran, Nepali, and Nicaraguan TPS holders earn approximately $1.75 billion annually and

7    provide approximately $129 million annually in Social Security and Medicare contributions);

8    Watson & Veuger Decl. ¶¶ 20-21; Postel Decl. ¶¶ 13-15. Defendants' actions would create tens of

9    thousands of undocumented people and damage the public interest in the economic and other

10   benefits that come with lawful immigration status. *See e.g.,* Watson & Veuger Decl. ¶¶ 14-16

11   (adverse health and public safety consequences). In contrast, Defendants will suffer no material

12   harm. If this Court orders postponement to preserve the status quo, Defendants' ability to enforce the

13   relevant decisions will merely be delayed.

14   <u>**CONCLUSION**</u>

15       The Court should postpone the effective date of the challenged decisions.

16

17    Date:  July 8, 2025                      Respectfully submitted,

18                                           NATIONAL DAY LABORER ORGANIZING
                                          NETWORK

19                                           */s/Jessica Karp Bansal*

20                                           Jessica Karp Bansal
                                          Lauren Michel Wilfong (*Pro Hac Vice* pending)

21                                           Emilou MacLean

22                                           Michelle (Minju) Y. Cho
                                          Amanda Young

23                                           ACLU FOUNDATION
                                          OF NORTHERN CALIFORNIA

24

25                                           Ahilan T. Arulanantham
                                          CENTER FOR IMMIGRATION LAW AND
                                          POLICY, UCLA SCHOOL OF LAW

26

27                                           Eva L. Bitran
                                          Diana Sanchez

28                                           ACLU FOUNDATION
                                          OF SOUTHERN CALIFORNIA

Erik Crew (*Pro Hac Vice pending*)
HAITIAN BRIDGE ALLIANCE

Attorneys for Plaintiffs

PLAINTIFFS' NOTICE OF MOTION & MOTION TO POSTPONE
CASE NO. 3:25-CV-05687

## CERTIFICATE OF SERVICE

I hereby certify that on July 8, 2025, I caused the foregoing to be electronically filed with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to all counsel of record.

NATIONAL DAY LABORER ORGANIZING NETWORK

*/s/ Jessica Karp Bansal*
Jessica Karp Bansal