# DECLARATION OF JOSE A. PALMA JIMENEZ

I, José A. Palma Jimenez, declare:

1. I am Co-Coordinator of the National TPS Alliance (NTPSA). I have worked with the NTPSA in various roles since it was founded in 2017. I served as Co-Coordinator in 2019 and again from June 2023 through the present.

2. As Co-Coordinator, I oversee NTPSA's daily work, including its organizing and advocacy efforts, leadership development, and member relations. I have detailed knowledge about NTPSA's membership, including membership demographics, member needs and priorities, and the role members play in setting NTPSA's mission and advocacy.

3. I make this declaration based on my personal knowledge; files and documents of NTPSA that I have reviewed; and information provided to me by NTPSA leaders who I believe to be reliable, including NTPSA organizers, members of the NTPSA Executive Committee, local Committee Coordinators, and other NTPSA-affiliated staff. These files, documents and information are the type that is generated in the ordinary course of business and that I would customarily rely on in conducting NTPSA business.

**Background on NTPSA**

4. NTPSA is a member-led organization whose mission is to defend the Temporary Protected Status (TPS) program and win a path to permanent residency for TPS holders.

5. NTPSA is a project of, and is fiscally sponsored by, the Central American Resource Center – CARECEN – of California ("CARECEN"), a non-profit organization that has worked for more than four decades to provide immigrant integration programs, deliver immigration legal services, and foster civic participation and community engagement on immigration policy, education reform and workers' rights. CARECEN is incorporated and has its primary address in Los Angeles.

6. The NTPSA is also supported by the National Day Laborer Organizing Network (NDLON), a non-profit organization that improves the lives of day laborers,

migrants, and low-wage workers by building leadership and power among those facing injustice so they can challenge inequality and expand labor, civil, and political rights for all. NDLON provides staffing, mentorship, and other support for the NTPSA. For example, I am employed by NDLON to serve as Co-Coordinator of the NTPSA.

7. Current and former TPS holders, as well as family and other supporters of TPS holders, can become NTPSA members by either joining a local NTPSA committee or submitting an individual membership application. After review and approval, NTPSA notifies individuals whose applications have been accepted. Individuals who are interested in starting a new local NTPSA Committee may do so by sending a letter to the Executive Committee for review and approval.

8. Membership in NTPSA is voluntary and free.

9. NTPSA prioritizes the leadership of TPS holders within our organization and within broader efforts to defend TPS. A slogan we often use is, "Nothing about us without us." We believe that TPS holders need to be at the table for decisions that affect our lives as TPS-holders.

10. I myself am a TPS holder from El Salvador. As a TPS holder, I am able to understand and connect with NTPSA's TPS holder members at a deeply personal level.

11. There are currently 25 local NTPSA committees active in 14 states: Arkansas, California, Florida, Georgia, Illinois, Iowa, Louisiana, Massachusetts, Nebraska, Nevada, New Jersey, New York, North Carolina, Texas, Virginia. Approximately 80 percent of NTPSA's local committee members are TPS holders.

12. NTPSA has approximately 300 Honduran TPS holder members living in California, Colorado, Connecticut, the District of Columbia, Florida, Georgia, Illinois, Indiana, Louisiana, Maine, Maryland, Massachusetts, Minnesota, Nebraksa, Nevada, New Jersey, New York, North Carolina, Ohio, South Carolina, Tennessee, Texas, and Virginia; approximately 900 Nepali TPS holder members living in Albama, Arizona, Arkansas, California, Colorado, Connecticut, Delaware, the District of Columbia, Florida, Georgia, Hawaii, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maine, Maryland,

2

Massachusetts, Michigan, Minnesota, Missouri, Nevada, New Hampshire, New Jersey, New York, North Carolina, North Dakota, Ohio, Oklahoma, Pennsylvania, Rhode Island, South Dakota, Tennessee, Texas, Utah, Virginia, Washington, and Wisconsin; and approximately 25 Nicaraguan TPS holder members living in California, Florida, Georgia, Maryland, Oklahoma, South Carolina, and Texas.

13. The NTPSA was founded in June 2017 at a meeting in Washington D.C. called by NDLON and CARECEN to respond to the imminent termination of TPS for Haiti, that had been announced in May of that year.

14. Several hundred people, including myself, attended the June 2017 meeting. At the meeting, attendees—the vast majority of whom were TPS holders—made the decision to form the National TPS Alliance.

15. Today, the NTPSA is led by an Executive Committee, members of which are selected every two years by NTPSA members. The majority of Executive Committee members are TPS holders. The Executive Committee meets regularly throughout the year and makes decisions by majority vote.

16. The NTPSA also maintains working groups on specific subjects, like leadership development and communications. NTPSA members may volunteer to participate in working groups. Working groups meet regularly throughout the year.

17. In addition, the NTPSA generally holds two in-person gatherings a year: a Leaders Assembly, where member leaders participate and elect members of the Executive Committee; and a Coordinators' Meeting, where local committee coordinators meet to strategize.

18. NTPSA operates under a democratic model. Local committees and working groups develop work plans and proposals and send them to the Executive Committee for review and approval via majority vote.

19. When individual members join the NTPSA, they are invited to make suggestions about what they would change about the TPS program. The NTPSA reviews those answers to help determine what projects, campaigns, and other work to take on.

NTPSA also continuously gathers feedback from individual members to further shape NTPSA's work.

20. The NTPSA engages in advocacy to defend TPS and win a path to permanent status for TPS holders; organizes actions to raise public awareness about TPS and the contributions TPS holders make to this country; facilitates community and civic engagement by TPS holders; and provides access to timely and accurate TPS-related information and services to its members.

21. For example, in 2018, the NTPSA organized a "Journey for Justice" in which approximately 50 TPS holders, their families, and other civil rights leaders embarked on a journey by bus across the United States to oppose the TPS terminations for El Salvador, Haiti, Honduras, Nepal, Nicaragua and Sudan that were announced in 2017 and 2018. The bus was welcomed by faith and community groups in towns and cities across the country, where riders met with the local community to build support for TPS holders. In 2021, NTPSA organized a similar Journey for Justice, which emphasized both the continuing threat to TPS and the role many TPS holders played in supporting the country through the pandemic as food and healthcare workers. I personally participated in both journeys.

22. The NTPSA has also organized numerous marches, hunger strikes, and teach-ins to defend TPS and call for a path to permanent residency for TPS holders. For example, in 2021, members of the NTPSA held a 43-day rolling hunger strike in Liberty Plaza in Washington, D.C. to call for permanent residency for TPS holders. Throughout the hunger strike, the NTPSA held weekly press conferences, conducted teach-ins, hosted live musical performances, and handed out educational materials.

23. The NTPSA has also kept the TPS community informed about developments in the TPS program via meetings and webinars; social media postings; and a weekly radio show called Radio Alianza TPS.

24. The NTPSA played a key role in explaining the developments in the *Ramos v. Mayorkas* and *Bhattarai v. Mayorkas* litigation, which challenged the 2017 and 2018 terminations of TPS for El Salvador, Haiti, Nicaragua, and Sudan (in *Ramos*) and for

Honduras and Nepal (in *Bhattarai*), to its members. Throughout the six-year litigation, the NTPSA kept members informed about developments via meetings, conference calls, and written advisories. It also coordinated rallies and press conferences at key hearings, including outside the oral arguments that took place at the Ninth Circuit and *en banc* Ninth Circuit hearings.

25. The NTPSA is also a Plaintiff in *Nat'l TPS All. v. Noem*, No. 25-CV-01766-EMC, 2025 WL 957677, at *42 (N.D. Cal. Mar. 31, 2025), which challenges the vacatur, partial vacatur, and termination of TPS for Venezuela and Haiti.

26. Since President Trump took office in January 2025, NTPSA has continued to organize with the TPS community, including by holding virtual meetings to keep the community updated about the current status of TPS designations. Those meetings regularly have hundreds, and sometimes thousands, of attendees. In addition, between May 23 and May 26, 2025, NTPSA coordinated approximately ten in person "asambleas" (assemblies) of TPS holders across the country, including in New Jersey, Massachusetts, and California.

**Impact of Losing TPS on NTPSA's Honduran, Nepali, and Nicaraguan Members**

27. NTPSA's Honduran, Nepali, and Nicaraguan TPS holder members face serious harm from losing their TPS status.

28. Our TPS holder members from Honduras, Nepal, and Nicaragua are individuals who in some cases have lived in the United States for more than twenty-five years. If they lose their TPS, they are worried about what will happen to their families, businesses, houses—to the lives they have created in this country.

29. Many of our Honduran, Nepali, and Nicaraguan TPS holder members have children born in the US. If they lose their lawful status, that affects their entire family, including their U.S. citizen children. In many cases, our members do not feel it is a viable option to bring their children to their countries of origin. They worry for their children's safety, given the ongoing crises in those countries. They also worry for their futures, because the health and educational systems in those countries are very different from those in this country.

30. Many of our Honduran and Nicarguan TPS holder members came to the U.S. when they were in their twenties. They are now in their 40s or 50s. Here in the U.S., they are at the best age their professional life. They now have the training and experience they need to advance at work. In many cases, they have been with the same companies for a long time, and are loved by their collegues and employers. Among these members, there is a deep concern that they will not be able to find work if they are forced to return to their countries, because in Central America it is very hard for anyone over the age of 40 to find work at all, let alone a good job.

31. All of the Individual Plaintiffs in this lawsuit are members of the NTPSA. To further illustrate the harms that NTPSA members face from the loss of their TPS status, I share below the stories of some of the other individual NTPSA members whom I and other NTPSA-affiliated staff have tried to support during this difficult time:

a. J.M. is a 57-year-old Honduran TPS holder. As a young man, he received a scholarship to study fashion in the U.S.. After he completed the program, he returned to Honduras. But as a gay man, J.M. was discriminated against in his religious town in Honduras. He returned to the U.S. to seek safety and freedom to be himself, as well as the ability to support his family back home. He has lived in New York City for the last 27 years. In NYC, he became involved in LGBTQ immigrant rights activism. This experience gave him the power to stand up for himself, and led him to later get involved with the NTPSA. When J.M. received TPS for the first time in 1999, it enabled him to go to college. He graduated with a degree in business administration in order to strengthen his skills to work in the fashion industry. He went on to work for companies like Macys, Bloomingdales, and Lord and Taylor. He even worked for a famous fashion designer for several years. J.M. has diabetes and requires daily medication to manage it. J.M. previously got health insurance through his job, which covered his otherwise expensive care, and now receives Medicaid because he is considered lawfully present as a TPS holder. The fear of losing TPS has consumed J.M. He recently lost his job because he was so stressed about TPS that he made a mistake at work. He has interviewed for other

positions, but no one will hire him because his work authorization expires imminently. Without TPS, J.M. would lose the ability to work, which in turn would make him lose his housing. He would also lose access to healthcare, without which his diabetes could quickly worsen. J.M. fears return to Honduras, where he has not been in almost 30 years, where he fears he would not be able to find work due to his age, and where he faced harm due to his sexual orientation.

        b.      M.A. is a 75-year-old Honduran TPS holder living in Minnesota. Several of her adult children also have TPS, and she is a loving grandmother to 13 U.S. citizen grandchildren. M.A. recently retired, after decades of working two jobs at a time, cleaning homes, working at hotels, and caring for children and veterans. She now takes care of her grandchildren. M.A. first came to the U.S. in the 1990s, fleeing an abusive husband and an (unrelated) attempt on her life and the lives of her children. She fears returning to Honduras, where she feels her life remains in danger, as well as the life of her children, where her husband continues to put them in danger. She also fears separation from her grandchildren, who are filled with anxiety at the prospect of losing their grandmother and parents. But she also cannot imagine bringing her grandchildren to Honduras, where they would not have the same opportunities and where she fears for their safety.

        c.      R.A. is a 26-year old Nepali TPS holder living in Texas. She has lived in the US since she was 16. During the pandemic, while still in college, R.A. worked as a patient coordinator at UC San Francisco hospital, screening plaintiffs for symptoms of COVID and transporting people with potential COVID infections to a quarantine area. She has since graduated with degrees in biological science, behavioral and social science, and science and mathematics. She now works as a labor and delivery nurse, and her employer has sponsored her for an EB-3 green card for skilled workers. A condition of her application is that she maintain lawful status and employment authorization until the application is granted. R.A. is worried that, with the impending termination of TPS, she stands to lose everything, including her opportunity for a green card. She was recently

diagnosed with depression and her mental health is suffering.

        d.     G.M. is a 46-year-old Honduran TPS holder living in Massachusetts. He first came to the US in the late 1990s as a teenager. G.M. is a loving husband and father and a hard worker who has always paid his taxes. He has two U.S. citizen children, ages 2 and 22. His 22-year-old son has filed a family petition on his behalf and G.M. has been told that his case should be adjudicated in the next year, given average processing times. He is very concerned what will happen if he loses his TPS now, while his family petition is still pending. If TPS ends, he wouldn't be able to work to support his young U.S. citizen daughter. G.M. fears for his safety in Honduras. Without TPS, G.M. also faces the painful threat of family separation from his two U.S. citizen children, including his young daughter. He feels that bringing her to Honduras would rob her of her birthright and put her in danger. But leaving her here without her father is likewise not an option. As a member of NTPSA, G.M. has travelled to Washington D.C. several times to advocate for TPS holders.

        e.     J.L. is a 60-year-old Nicaraguan TPS holder who has lived in Texas for almost 30 years. He was lawfully admitted to the U.S. on a tourist visa in 1996. J.L. has worked for the last 20 years as a manufacturing technician in a semiconductor factory. He has a pacemaker and takes daily medication to manage his heart failure. J.L. lives in terror that TPS could end. After living here for so many years, he feels ingrained in this country. Without TPS he would lose his job, means of survival, his chance at retirement, his driver's license which he relies on for daily life, and his access to healthcare which he receives through his workplace. He would also live under the constant threat of detention and deportation to Nicaragua, where he fears he could not receive adequate medical care, and would face political persecution. J.M. is a subject matter expert in his company and there are not other employees currently at the company who can do his job. Without him, his company would suffer a major setback.

32.     If this lawsuit were successful, it would further the interests of the NTPSA's members.

I declare under penalty of perjury that the foregoing is true and correct, and that this declaration was executed at Los Angeles, California this 1st day of July, 2025.

_____
José A. Palma Jimenez