Ahilan T. Arulanantham (SBN 237841)
arulanantham@law.ucla.edu
Stephany Martinez Tiffer (SBN 341254)
martineztiffer@law.ucla.edu
CENTER FOR IMMIGRATION LAW AND
POLICY, UCLA SCHOOL OF LAW
385 Charles E. Young Dr. East
Los Angeles, CA 90095
Telephone: (310) 825-1029

Emilou MacLean (SBN 319071)
emaclean@aclunc.org
Michelle (Minju) Y. Cho (SBN 321939)
mcho@aclunc.org
Amanda Young (SBN 359753)
ayoung@aclunc.org
ACLU FOUNDATION
OF NORTHERN CALIFORNIA
39 Drumm Street
San Francisco, CA 94111-4805
Telephone: (415) 621-2493
Facsimile: (415) 863-7832

*Attorneys* for Plaintiffs
*[Additional Counsel Listed on Next Page]*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| NATIONAL TPS ALLIANCE, DENIS MOLINA, JHONY SILVA, MARIA ELENA HERNANDEZ, O.C., SANDHYA LAMA, S.K., TEOFILO MARTINEZ, <br><br> *Plaintiffs*, <br><br> v. <br><br> KRISTI NOEM, in her official capacity as Secretary of Homeland Security, UNITED STATES DEPARTMENT OF HOMELAND SECURITY, and UNITED STATES OF AMERICA, <br><br> *Defendants*. | Case No. 3:25-cv-05687 <br><br> **EXPERT DECLARATION OF TARA WATSON AND STAN VEUGER** |

Additional Counsel for Plaintiffs

Jessica Karp Bansal (SBN 277347)
jessica@ndlon.org
Lauren Michel Wilfong (*pro hac vice* pending)
lwilfong@ndlon.org
NATIONAL DAY LABORER ORGANIZING NETWORK
1030 S. Arroyo Parkway, Suite 106
Pasadena, CA 91105
Telephone: (626) 214-5689

Eva L. Bitran (SBN 302081)
ebitran@aclusocal.org
ACLU FOUNDATION
OF SOUTHERN CALIFORNIA
1313 West 8th Street
Los Angeles, CA 90017
Telephone: (213) 977-5236

Erik Crew (*pro hac vice* pending)
ecrew@haitianbridge.org
HAITIAN BRIDGE ALLIANCE
4560 Alvarado Canyon Road, Suite 1H
San Diego, CA 92130
Telephone:  (949) 603-7411

**EXPERT DECLARATION ON IMPACTS OF ENDING TPS FOR VENEZUELANS**

1.       We are Tara Watson of the Brookings Institution in Economic Studies and Stan Veuger of the American Enterprise Institute (AEI). If called to testify, we could and would do so as follows:

2.       We have been asked to provide an expert opinion on the impacts of ending Temporary Protected Status (TPS) for Hondurans, Nicaraguans, and Nepalis. We make this declaration based on our personal and professional knowledge, our skill, experience, training, and education, and facts and data regularly relied upon in our field that are currently available to us. If additional information becomes available, or if we believe it would be appropriate to respond to any critique or contrary theories, we will advise Plaintiffs' counsel that we intend to do so and will seek their help in following the appropriate judicial procedures. The opinions in this declaration are our own.

3.       Tara Watson is a Senior Fellow at the Brookings Institution in Economic Studies and directs the Brookings Center for Economic Security and Opportunity.  She is an economist who has written extensively about the economic impacts of immigration to the U.S. and of immigration enforcement. She co-authored "The Border Within: The Economics of Immigration in an Age of Fear," published by University of Chicago Press in 2021. Dr. Watson is also a Research Associate at the National Bureau of Economic Research and a co-editor of the Journal of Human Resources, a leading academic journal in labor economics. She was a professor at Williams College for two decades. She received her Ph.D. in Economics from Harvard University in 2003.

4.       Stan Veuger is a senior fellow in economic policy studies at AEI, the editor of *AEI Economic Perspectives*, and an affiliate of AEI's Center on Opportunity and Social Mobility. He is also an affiliate of Harvard's Center for American Political Studies and a fellow at the IE School of Politics, Economics, and Global Affairs. He will be a visiting lecturer of economics at Harvard University in the fall of 2025 and was a Campbell Visiting Fellow at the Hoover Institution in May 2022. Dr. Veuger's research has been published in leading academic and professional journals, including the *Journal of Monetary Economics*, *The Quarterly Journal of Economics*, and *The Review of Economics and Statistics*. He is the editor, with Michael R. Strain, of *Economic Freedom and Human Flourishing: Perspectives from Political Philosophy* (AEI Press, 2016) and *Preserving Links*

*in the Pandemic: Policies to Maintain Worker-Firm Attachment in the OECD* (AEI Press, 2023). He received a Ph.D. and an A.M. in economics from Harvard. He also holds degrees from Erasmus University Rotterdam, Universitat Pompeu Fabra, University of London, and Utrecht University.

## I.    Background on TPS

5.    The statement here reflects our perspective as independent scholars and does not necessarily reflect the views of our respective employers or any other institution.

6.    As described by the American Immigration Council, Temporary Protected Status (TPS) is a temporary immigration status. It was created by Congress in 1990 and is available to nationals of specifically designated countries that are confronting an ongoing armed conflict, environmental disaster, or other extraordinary and temporary conditions. Individuals must be in the United States at the time the U.S. government designates the status for their country of origin, must meet certain eligibility conditions including an assessment of any criminal history, and must pay an application fee. The status provides freedom from risk of deportation and a work permit. TPS designations last 6, 12, or 18 months however may be extended an indefinite number of times. As of September 30, 2024, there were approximately 1,095,100 people with TPS living in the United States, with additional TPS designations since that date. There were 17 countries designated for TPS as of January 2025, including Honduras, Nicaragua, and Nepal (American Immigration Council 2025, https://www.americanimmigrationcouncil.org/research/temporary-protected-status-overview).

7.    When TPS is terminated, individuals revert to the immigration status they would have in the absence of TPS. Some individuals may have secured a different status while on TPS – for example, through a successful asylum case or by securing permanent residency through a family member – but many TPS recipients will become unauthorized upon termination. This means they will lose permission to work and lack protection from deportation. If TPS holders who entered the U.S. without inspection choose to leave the United States upon termination, they may be subject to a ten-year bar on re-entry even if they would otherwise be eligible for a pathway to legal permanent residence.

## II.    Background on Honduras, Nicaragua, and Nepal

8.    In late 1998, hurricane Mitch struck Honduras and Nicaragua, causing catastrophic damage including thousands of deaths in each country. On January 5 of the following year, both countries were designated for TPS. The designation has been extended since. Beneficiaries need to have been continually present in the United States since January 5, 1999. As of September 2024, there were 52,585 TPS beneficiaries from Honduras and 2,935 from Nicaragua (National Immigration Forum 2025, https://immigrationforum.org/article/temporary-protected-status-fact-sheet/).

9.    Honduras is among the poorest counties in the Western Hemisphere, with widespread poverty and rampant violent crime (US Department of State 2025, https://travel.state.gov/content/travel/en/traveladvisories/traveladvisories/honduras-travel-advisory.html). It is highly dependent on remittances.

10.    Nicaragua is also among the poorest countries in the Western Hemisphere. The election in 2006 of Sandinista leader Daniel Ortega kicked off a period of rapid deterioration of democratic institutions and the rule of law. The Sandinista regime controls all branches of government and has consolidated its power by closing down independent media outlets, arresting dissidents, sending opposing voices into exile, expelling Catholic clergy, and stripping dissidents of their citizenship (Freedom House 2025, https://freedomhouse.org/country/nicaragua/freedom-world/2025 ).

11.    In April 2015, a major earthquake struck Nepal. Its epicenter was close to the capital city of Kathmandu and a large share Nepal's population was affected by the earthquake. In June of the same year, Nepal was designated for TPS. The designation has been extended repeatedly since. Beneficiaries need to have been continually present in the United States since June 24, 2015. DHS estimates that there are approximately 12,700 nationals of Nepal who hold TPS under Nepal's designation. Of those, approximately 5,500 have become lawful permanent residents of the United States (Federal Register 2025, https://www.federalregister.gov/documents/2025/06/06/2025-10363/termination-of-the-designation-of-nepal-for-temporary-protected-status).

12.    Nepal is a lower-middle income country that is heavily dependent on income from remittances and highly exposed to natural disasters (World Bank 2025, https://www.worldbank.org/en/country/nepal/overview).

### III.    Five Categories of Harm Arising from Eliminating TPS for Honduras, Nicaragua, and Nepal

13.    In our expert assessment, terminating TPS for Hondurans, Nicaraguans, and Nepalis has harmful consequences along five dimensions: (1) public safety; (2) public health; (3) immigration policy; (4) economics; and (5) foreign policy and national security.

14.    *Public safety.*  It is well documented that immigrants are much less likely to commit crimes than U.S.-born Americans (Santiago Pérez et al. 2024, https://www.aeaweb.org/articles?id=10.1257/aeri.20230459). In addition, because they have been in the country a long time, nearly all TPS beneficiaries from Honduras and Nicaragua, and many TPS beneficiaries from Nepal, are at an age where criminal activity in the general population becomes rare. TPS recipients have also passed a criminal background check and have a clear incentive to stay out of legal trouble to maintain their status. TPS is reserved for those without any felony or two misdemeanors, and unavailable to individuals believed to have committed "serious nonpolitical crimes" outside the United States even without a conviction. (8 U.S.C. § 1254a(c)(2)(B)(i); https://www.ilrc.org/sites/default/files/2023-04/The%20Impact%20of%20Crimes%20on%20Eligibility%20for%20TPS.pdf). There is no reason to expect that driving the law-abiding TPS population underground by stripping them of lawful status would improve crime rates. In fact, given evidence that fear of immigration enforcement reduces willingness to cooperate with police in immigrant communities (Jacome 2022, https://elisajacome.github.io/Jacome/Jacome_PEP_JUE.pdf), it is likely that this action would worsen public safety.

15.    Moreover, if the administration devotes substantial resources to apprehending the affected individuals for deportation, adding new individuals to the pool of those eligible for potential removal will likely divert resources from other enforcement priorities, such as unlawfully present immigrants with serious criminal records. By definition, those with TPS status do not have such backgrounds because of the screening requirements discussed above. Diverting resources from apprehending migrants with serious criminal records to apprehending former TPS holders will not enhance public safety.

16.    *Public health.* Terminating TPS would have adverse consequences for public health. Due to the well-documented "chilling effects" of enforcement, immigrants and their families at risk of deportation are less likely to seek healthcare for fear of being apprehended at medical facilities (Young et al. 2024, https://pmc.ncbi.nlm.nih.gov/articles/PMC1007961; Watson 2014 https://www.aeaweb.org/

articles?id=10.1257/pol.6.3.313). Immigration enforcement has been linked to declining willingness to get vaccinated among undocumented immigrants (Sudhinaraset et al. 2022, https://www.sciencedirect.com/science/article/pii/S2211335522001152?via%3Dihub), with consequences for the broader community. Fear of enforcement is linked to adverse mental health for immigrants and their families, including U.S.-born children (MPI 2020 https://www.migrationpolicy.org/news/how-fear-immigration-enforcement-affects-mental-health-latino-youth).

17.    *Immigration policy.* The Trump administration has a stated goal of reducing the unauthorized population in the United States, a goal shared by many Americans across the political spectrum. This action will do the opposite, by taking a group with a temporary legal status and rendering them without status. The action will do little to impact the overall number of immigrants living in the United States right away because Honduran, Nicaraguan, and Nepali TPS holders will be disinclined to return to the country they fled given the adverse conditions that persist in those countries. In addition, by definition TPS designees from these countries have been in the United States at least 10 years (Nepal) or 26 years (Honduras and Nicaragua), meaning that they are likely to be well integrated into American society and have U.S. citizen family members. Moreover, TPS holders with asylum claims pending in immigration court will not be deportable until after their asylum hearings, so recategorizing them as "unauthorized" will only increase the total number of unauthorized migrants until their cases make their way through the heavily backlogged asylum dockets.

18.    Additionally, as noted above, adding new individuals to the pool of those eligible for potential removal will likely divert from other enforcement priorities such as unlawfully present immigrants with serious criminal records.

19.    Finally, we do not see any reason that the extension of an existing TPS designation would act as an immigration magnet. TPS status is not available to those arriving after 1999 for

Honduras and Nicaragua and after 2015 for Nepal. A reasonable migrant would not believe that a TPS designation for new Honduran, Nepalese, or Nicaraguan immigrants is likely to be issued by this Administration. TPS status does not allow individuals to sponsor relatives for migration.

20.    *Economics.* Economists largely agree that immigration is good for the U.S. economy overall, promoting GDP growth and, if anything, raising wages for the average U.S-born worker (https://www.nationalacademies.org/our-work/economic-and-fiscal-impact-of-immigration). Immigrants complement the work done by many U.S. workers, helping to make them more productive, and encourage companies to maintain production in the United States (Olney and Pazolli 2021 https://direct.mit.edu/rest/article-abstract/103/1/177/97762/The-Impact-of-Immigration-on-Firm-Level-Offshoring). Immigrants are over-represented in innovation and entrepreneurship (https://www.forbes.com/sites/stuartanderson/2024/05/23/immigrant-entrepreneurs-bring-jobs-and-innovation-new-research-shows/).

21.    The proposed TPS termination and subsequent deportation would remove TPS holders from the workforce, eliminating their productivity and tax contributions while harming their employers, employees, business associates, and customers. The U.S. economy would grow more slowly as a result.

22.    *Foreign policy and national security.* The proposed terminations would increase the unauthorized population by changing the status of tens of thousands of people living in the United States overnight, undermining the economic and social stability that TPS provides.

23.    In addition, deporting Honduran, Nicaraguan, and Nepali TPS holders may require cooperation with those three countries' governments. This is particularly problematic in the case of Nicaragua, given the nature of the Sandinista regime. Cooperating with a dictator like Daniel Ortega to send immigrants to a place known for severe human rights abuses may weaken the standing of the United States in the international community and adversely affect national security.

24.    We conclude that the harms of terminating TPS for Honduran, Nicaraguan, and Nepali migrants far outweigh any purported benefits.

1         I declare under penalty of perjury under the laws of the United States of America that the

2    foregoing is true and correct to the best of my knowledge.

3

4    Executed this 30th day of June, 2025, in Washington, DC.

5    /s/ _____

6    Tara Watson

7    /s/ _____

8    Stan Veuger