1  Ahilan T. Arulanantham (SBN 237841)
   arulanantham@law.ucla.edu
2  Stephany Martinez Tiffer (SBN 341254)
   martineztiffer@law.ucla.edu
3  CENTER FOR IMMIGRATION LAW AND
   POLICY, UCLA SCHOOL OF LAW
4  385 Charles E. Young Dr. East
   Los Angeles, CA 90095
5  Telephone: (310) 825-1029

6  Emilou MacLean (SBN 319071)
   emaclean@aclunc.org
7  Michelle (Minju) Y. Cho (SBN 321939)
   mcho@aclunc.org
8  Amanda Young (SBN 359753)
   ayoung@aclunc.org
9  ACLU FOUNDATION
   OF NORTHERN CALIFORNIA
10 39 Drumm Street
   San Francisco, CA 94111-4805
11 Telephone: (415) 621-2493
   Facsimile: (415) 863-7832

Attorneys for Plaintiffs
*[Additional Counsel Listed on Next Page]*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| NATIONAL TPS ALLIANCE, DENIS MOLINA, JHONY SILVA, MARIA ELENA HERNANDEZ, O.C., SANDHYA LAMA, S.K., TEOFILO MARTINEZ,<br><br>Plaintiffs,<br><br>vs.<br><br>KRISTI NOEM, in her official capacity as Secretary of Homeland Security, UNITED STATES DEPARTMENT OF HOMELAND SECURITY, and UNITED STATES OF AMERICA,<br><br>Defendants. | Case No. 3:25-cv-05687<br><br>**EXPERT DECLARATION OF HANNAH POSTEL IN SUPPORT OF PLAINTIFFS' MOTION TO POSTPONE EFFECTIVE DATE OF AGENCY ACTION** |

Expert Declaration of Hannah Postel - Case No. 3:25-cv-05687

Additional Counsel for Plaintiffs

Jessica Karp Bansal (SBN 277347)
jessica@ndlon.org
Lauren Michel Wilfong (*pro hac vice* pending)
lwilfong@ndlon.org
NATIONAL DAY LABORER ORGANIZING NETWORK
1030 S. Arroyo Parkway, Suite 106
Pasadena, CA 91105
Telephone: (626) 214-5689

Eva L. Bitran (SBN 302081)
ebitran@aclusocal.org
ACLU FOUNDATION
OF SOUTHERN CALIFORNIA
1313 West 8th Street
Los Angeles, CA 90017
Telephone: (213) 977-5236

Erik Crew (*pro hac vice* pending)
ecrew@haitianbridge.org
HAITIAN BRIDGE ALLIANCE
4560 Alvarado Canyon Road, Suite 1H
San Diego, CA 92120
Telephone: (949) 603-7411

# EXPERT DECLARATION OF HANNAH POSTEL

1. I, Hannah Postel, am an Assistant Professor of Public Policy at Duke University. If called to testify, I could and would do so as follows:

2. I have been asked to provide an expert opinion on the impact of terminating Temporary Protected Status (TPS) for Hondurans. I make this declaration based on my personal and professional knowledge, my skill, experience, training, and education, and facts and data regularly relied upon in my field that are currently available to me. If additional information becomes available, or if I believe it would be appropriate to respond to any critique or contrary theories, I will advise Plaintiffs' counsel that I intend to do so and will seek their help in following the appropriate judicial procedures. The opinions in this declaration are my own.

3. I am an Assistant Professor of Public Policy at Duke University. I am also a faculty affiliate of the Duke Center for International Development, the Duke University Population Research Institute, and the Stanford Immigration Policy Lab. I hold a Ph.D. in Demography and Social Policy from Princeton University and a B.A. in international politics and economics from Middlebury College. I have received grants from the National Science Foundation and the Russell Sage Foundation, among others. A true and correct copy of my curriculum vitae is attached as Appendix A.

4. My research focuses on the causes and consequences of historical immigration restrictions in the United States, as well as the relationship between economic development and migration in the Global South. I have published this work in leading economics and demography journals including the *American Economic Review* and *Population and Development Review.*

5. I have conducted extensive field research in Latin America, including ongoing research on return migration from the United States to Honduras. I have also served as an expert consultant on migration and development policy for international organizations including the International Organization for Migration.

**I. TPS BACKGROUND**

1

6. Temporary Protected Status (TPS) was created by Congress in 1990 to assist individuals from specifically designated countries that are dealing with ongoing armed conflict, environmental disasters, and/or other extraordinary, temporary conditions. TPS does not apply to new immigrants; only individuals already present in the United States when the government designates their country of origin eligible may receive protection. Individuals must also meet certain conditions including criminal background assessments and pay application fees.

7. TPS designations generally last from 6 to 18 months and provide two key protections: 1) protection from removal/deportation, and 2) authorization to work legally in the United States. TPS does not provide a pathway to permanent residence/citizenship, nor does it allow recipients' family members to join them in the United States.

8. According to the American Immigration Council, approximately 1.1 million people held TPS as of September 30, 2024. Since that date, the Trump administration has terminated TPS for up to 350,000 Venezuelans and announced forthcoming termination for an additional 21,000 people. (American Immigration Council, 2025).

9. With the termination of TPS, individuals revert to whatever immigration status they would have absent temporary protection. While some recipients may have secured different legal status during their TPS period—through successful asylum cases or permanent residency via family members—many become unauthorized upon termination, losing both work permission and deportation protection. If TPS holders who entered the U.S. without inspection choose to leave upon termination, they may be subject to a ten-year bar on re-entry, even if they are otherwise eligible for legal permanent residence pathways.

## II. TPS FOR HONDURANS

10. Honduras was originally designated for TPS on January 5, 1999. This followed nationwide devastation from Hurricane Mitch in October 1998, which killed over 5,600 Hondurans and left 1.4 million homeless. The initial designation extended protection to nearly 105,000 Hondurans (DHS, 2018).

11. Honduras has maintained TPS continuously for over 25 years, making it the longest-standing TPS population in the United States. The designation has been extended thirteen consecutive times based on not only Hurricane Mitch's lasting effects but also subsequent natural disasters including hurricanes, tropical storms, flooding, and severe drought. Additionally, in the most recent extension (June 2023), DHS cited violence and sociopolitical concerns that have adversely impacted living conditions and hindered recovery from environmental disasters (DHS, 2023). All Honduran TPS holders have resided in the U.S. for 25 years or more, by definition. As of September 30, 2024, approximately 52,585 Hondurans held TPS (National Immigration Forum, 2025).

12. TPS serves a distinct protective function for Hondurans that cannot be replaced by other immigration pathways. While asylum protects against targeted individual persecution, TPS for Honduras addresses widespread environmental disasters and generalized violence that threaten the safety of most Honduran citizens. At the end of 2023, Hondurans had the second largest backlog in asylum cases, with at least 95,584 individuals still with pending cases (Transactional Records Access Clearinghouse, 2024). In fiscal year 2024, pending Honduran asylum cases had been waiting an average of 1,289 days since their Notice to Appear was filed—over three and a half years—with no resolution in sight (ibid).

**III. US ECONOMIC IMPACTS**

13. Research demonstrates the significant economic contributions of TPS holders to the United States. An analysis by the Immigrant Legal Resource Center found that TPS holders from El Salvador, Honduras, and Haiti earned $4.5 billion annually and contributed $691 million per year to Social Security and Medicare in 2015 (Baran et al., 2017). By 2021, economic contributions had grown substantially; 354,000 TPS holders from 12 countries earned $10.3 billion annually and contributed $2.2 billion in federal and state taxes (American Immigration Council, 2023). Workers with TPS earn 13% more than those without legal status, and women with TPS are 17% more likely to be employed compared to unauthorized workers (Orrenius and Zavodny, 2015).

14. Honduran TPS holders demonstrate strong economic integration and workforce participation. 85% of Honduran TPS holders participate in the labor force—substantially higher than the overall U.S. population (63%). Only 4% of Honduran TPS holders are unemployed, matching the

3

national average. Honduran TPS households have a median income of $40,000, with 76% of households having incomes above the poverty level. The largest populations reside in Texas (8,500), Florida (7,800), North Carolina (6,200), and California (5,900) (Warren and Kerwin, 2017).

15. Hondurans contribute to essential industries across the United States, with the largest concentrations in construction (13,700), child day care services (3,900), landscaping services (3,700), and restaurants and food services (3,300). Nearly one-quarter (22%) of Honduran TPS households have mortgages, indicating homeownership and community investment. Additionally, 85% speak at least some English, with 44% speaking English well, very well, or only English (ibid).

16. Honduran TPS holders have deep family ties in the United States. They have 53,500 U.S.-born children who are American citizens, and 23% of the total population arrived as children under age

17. Historical evidence shows that ending long-standing temporary immigration programs often fails to achieve stated objectives. My research on the termination of the Mexican *bracero* program examined what happened when the United States ended a temporary worker program for approximately half a million Mexican agricultural workers. The program had operated for over two decades. I found that excluding Mexican workers in 1965 did not increase wages or employment for U.S.-born workers. Instead, farms mechanized (Clemens, Lewis, and Postel 2018). This demonstrates that immigration restrictions targeting established temporary populations can have unintended consequences that differ from policymakers' expectations.

18. Terminating TPS for Hondurans would impose significant economic costs on the United States. If Hondurans lose TPS status, they will either be deported or remain in the country without legal authorization. If deported, they will no longer contribute to the U.S. economy. If they remain and work without authorization, they may earn less and contribute less economically than they would with TPS status. Additionally, employers would face substantial costs replacing trained workers.

19. The government would also incur substantial deportation expenses. Baran et al. (2017) estimate a per-immigrant deportation cost of $10,070. Adjusted for inflation to 2025 using the Bureau

of Labor Statistics CPI calculator, this cost rises to $13,700 per person. Deporting approximately 52,585 Honduran TPS holders could therefore cost taxpayers an estimated $720 million.

**IV. HONDURAS COUNTRY CONTEXT**

20. In June 2023, DHS extended TPS for Honduras through July 2025, finding that extraordinary conditions preventing safe return continue to exist. "Repetitive cycles" of storm-related damages have damaged roads, collapsed bridges, devastated crops, flooded houses, and caused landslides in 16 of 18 departments. In the extension, DHS cited ongoing food insecurity affecting millions of Hondurans, inadequate medical infrastructure, and persistent violence that continues to hinder recovery from environmental disasters. DHS also noted that Honduras reported the highest number of severe dengue fever cases in the Americas in 2020 and 2021, and found that medical care "varies greatly in quality and availability" outside major cities (DHS, 2023).

21. Environmental disasters continue displacing Hondurans, with nearly 250,000 internally displaced and another 183,000 migrating internationally (UNHCR, 2021; UNICEF, 2020). The homicide rate remains 25.3 murders per 100,000 people—more than four times the global average (InSight Crime, 2024; UNSD, 2024). More than 60 percent of Hondurans live in poverty, with 19 percent of children under 5 suffering from malnutrition (WFP, 2024).

22. My research on return migration shows why Honduras cannot safely accommodate TPS holders. Between 2016 and 2024, over 500,000 Hondurans were returned to their country, primarily from the United States and Mexico (SEDESOL, 2025). These returnees face significant challenges including low educational attainment, limited formal work experience, lack of access to public services, and high levels of stigmatization. Recent cases highlight the deadly risks returnees face: two recently deported Hondurans were killed in less than a week in early 2025 (La Tribuna, 2025). Many returnees avoid returning to their home municipalities due to these security concerns (SEDESOL, 2025). My earlier research documented that violence remains a significant but often underreported factor driving migration from Honduras (Clemens and Postel, 2017).

23. TPS holders would face severe challenges returning after decades in the United States. They would encounter ongoing violence and environmental instability without current networks or resources in Honduras. Based on this evidence, I conclude that the harms of terminating TPS for Honduran immigrants far outweigh any purported benefits.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge.

Executed this 2nd day of July, 2025, in Durham, North Carolina.

/s/ *[signature]*

Hannah Postel

**References**

American Immigration Council. (2017). *Temporary Protected Status in the United States: Beneficiaries from El Salvador, Honduras, and Haiti.*

American Immigration Council. (2023). *The Contributions of Temporary Protected Status Holders to the U.S. Economy*.

American Immigration Council. (2025). *Temporary Protected Status: An Overview.*

Baran, A., Magaña-Salgado, J., & Wong, T. K. (2017). *Economic Contributions by Salvadoran, Honduran, and Haitian TPS Holders*. Immigrant Legal Resource Center.

Clemens, M.A., and Postel, H.M. (2017). *Foreign Policy Is Migration Policy: Lessons from the Drivers of Central American Child Migration.* Center for Global Development.

Clemens, M. A., Lewis, E. G., and Postel, H. M. (2018). Immigration Restrictions as Active Labor Market Policy: Evidence from the Mexican Bracero Exclusion. *The American Economic Review*, *108*(6), 1468-1487.

Department of Homeland Security. (2018). Termination of the designation of Honduras for Temporary Protected Status. *Federal Register*, *83*(108), 26074-26084.

Department of Homeland Security. (2023). Reconsideration and rescission of termination of the designation of Honduras for Temporary Protected Status; Extension of the Temporary Protected Status designation for Honduras. *Federal Register*, *88*(119), 40304-40350.

InSight Crime. (2024). *InSight Crime's 2024 Homicide Round-Up*.

La Tribuna. (2025). *Matan a dos migrantes retornados en menos de una semana.* https://www.latribuna.hn/2025/02/07/matan-a-dos-migrantes-retornados-en-menos-de-una-semana/

National Immigration Forum. (2025). *Temporary Protected Status (TPS): Fact Sheet.*

Orrenius, P. M., & Zavodny, M. (2015). The Impact of Temporary Protected Status on Immigrants' Labor Market Outcomes. *American Economic Review*, *105*(5), 576–580.

Pew Research Center. (2023). *Facts on Hispanics of Honduran origin in the United States, 2021*.

Secretaría de Desarrollo Social (SEDESOL), Observatorio de Desarrollo Social. (2024). Sistema de Información del Registro de Atención al Migrante Retornado (SIAMIR) [Database].

Transactional Records Access Clearinghouse. (2024). *Immigration Court Asylum Backlog.*

UNSD (UN Statistical Division). (2024). *Goal 16: Peace, justice and strong institutions.*

UNHCR. (2021). *In Honduras, climate change is one more factor sparking displacement.*

UNICEF. (2020). *Miles de niños, niñas y adolescentes aún se encuentran en albergues temporales como resultado del Huracán Eta.*

Warren, R., & Kerwin, D. (2017). A Statistical and Demographic Profile of the US Temporary Protected Status Populations from El Salvador, Honduras, and Haiti. *Journal on Migration and Human Security*, *5*(3), 577–592.

World Food Programme. (2024). *Honduras Annual Country Report 2024.*