Ahilan T. Arulanantham (SBN 237841)
arulanantham@law.ucla.edu
Stephany Martinez Tiffer (SBN 341254)
martineztiffer@law.ucla.edu
CENTER FOR IMMIGRATION LAW AND
POLICY, UCLA SCHOOL OF LAW
385 Charles E. Young Dr. East
Los Angeles, CA 90095
Telephone: (310) 825-1029

Emilou MacLean (SBN 319071)
emaclean@aclunc.org
Michelle (Minju) Y. Cho (SBN 321939)
mcho@aclunc.org
Amanda Young (SBN 359753)
ayoung@aclunc.org
ACLU FOUNDATION
OF NORTHERN CALIFORNIA
39 Drumm Street
San Francisco, CA 94111-4805
Telephone: (415) 621-2493
Facsimile: (415) 863-7832

Attorneys for Plaintiffs
*[Additional Counsel Listed on Next Page]*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| NATIONAL TPS ALLIANCE, DENIS MOLINA, JHONY SILVA, MARIA ELENA HERNANDEZ, O.C., SANDHYA LAMA, S.K., TEOFILO MARTINEZ<br><br>*Plaintiffs*,<br><br>v.<br><br>KRISTI NOEM, in her official capacity as Secretary of Homeland Security, UNITED STATES DEPARTMENT OF HOMELAND SECURITY, and UNITED STATES OF AMERICA,<br><br>*Defendants*. | Case No. 3:25-cv-05687<br><br>**EXPERT DECLARATION OF MELANIE MORTEN** |

Additional Counsel for Plaintiffs

Jessica Karp Bansal (SBN 277347)
jessica@ndlon.org
Lauren Michel Wilfong (*pro hac vice* pending)
lwilfong@ndlon.org
NATIONAL DAY LABORER ORGANIZING NETWORK
1030 S. Arroyo Parkway, Suite 106
Pasadena, CA 91105
Telephone: (626) 214-5689

Eva L. Bitran (SBN 302081)
ebitran@aclusocal.org
ACLU FOUNDATION
OF SOUTHERN CALIFORNIA
1313 West 8th Street
Los Angeles, CA 90017
Telephone: (213) 977-5236

Erik Crew (*pro hac vice* pending)
ecrew@haitianbridge.org
HAITIAN BRIDGE ALLIANCE
4560 Alvarado Canyon Road, Suite 1H
San Diego, CA 92120
Telephone: (949) 603-7411

**EXPERT DECLARATION OF MELANIE MORTEN**

1. I, Melanie Morten, am an Associate Professor of Economics at Stanford University. If called to testify, I could and would do so as follows:

2. I have been asked to provide an expert opinion on the economic impact of terminating Nepal's, Honduras's, and Nicaragua's Temporary Protected Status (TPS). I make this declaration based on my personal and professional knowledge, my skill, experience, training, and education, and facts and data regularly relied upon in my field that are currently available to me. If additional information becomes available, or if I believe it would be appropriate to respond to any critique or contrary theories, I will advise Plaintiffs' counsel that I intend to do so and will seek their help in following the appropriate judicial procedures. The opinions in this declaration are my own.

3. In addition to being an Associate Professor of Economics at Stanford, I serve as a senior fellow at the Stanford Institute for Economic Policy Research (SIEPR), a research associate at the National Bureau for Economic Research, and hold many other academic affiliations. In addition, I am the co-director of the Stanford Guestworker Migration Initiative, which I have directed since 2022. I have a Ph.D. in Economics from Yale University. Before attaining my Ph.D., I completed a bachelor's degree in economics (with honours) from the University of Auckland, New Zealand. I have received fellowships from the National Science Foundation, 3ie, The International Growth Center, and many others. My research has generally focused on the economic determinants and effects of human migration. I am widely published and a frequent speaker on issues of migration, poverty, urbanization and spatial economics. A true and correct copy of my curriculum vitae is attached as Appendix A.

4. TPS holders have the legal right to work in the U.S., with employment rates estimated between 81% and 96%. They earn income, pay federal and local taxes, and contribute to Social Security and Medicare. Those who own homes also contribute through property taxes. Estimates of the economic contribution of TPS holders are typically based on data from the American Community Survey (ACS), an annual survey conducted by the U.S. Census Bureau. The Census Bureau describes the ACS as "the premier source for detailed population and housing information about our nation." (https://www.census.gov/programs-surveys/acs). While the ACS does

1

not directly ask about TPS status, researchers can estimate eligibility by analyzing respondents' nationality, year of immigration, and other factors to exclude those likely to have a different legal status. Researchers then use employment and earnings data from these individuals to estimate their overall economic contribution. I have reviewed the literature that estimates the economic benefits of TPS derived from the ACS, including the methodologies used in these studies, and summarize the findings below.

    a. An analysis by the American Immigration Council used data from the 2021 ACS to estimate the economic impact of more than 354,000 TPS holders from 12 countries. TPS holders from Nepal, Nicaragua, and Honduras are included in this study as all three countries had active TPS status in 2021. The study found that 94.6% of TPS holders were employed, earning a total of $10.3 billion per year and paying $2.2 billion annually in federal and state taxes. Additionally, 41% of TPS holders owned homes, contributing further through property taxes. (American Immigration Council, 2023). Adjusted to 2025 dollars using the Bureau of Labor Statistics CPI calculator, these numbers are $12.5 billion in earnings and $2.7 billion in federal and state taxes.

    b. An analysis by the Immigrant Legal Resource Center, using data from the 2015 ACS, estimated that approximately 300,000 TPS holders from El Salvador, Honduras, and Haiti earned a total of $4.5 billion annually. They contributed $691 million per year to Social Security and Medicare taxes. (Baran et al., 2017). Adjusted to 2025 dollars using the Bureau of Labor Statistics CPI calculator, these numbers are $6.1 billion in earnings and $940 million in Social Security and Medicare taxes annually. Honduran migrants are included in this estimate. Nepali and Nicaraguan migrants are not included in this estimate. However, this number is indicative of the positive economic impact of TPS holders writ large.

    c. An analysis of the 2010 and 2015 ACS found that the labor force participation rate for TPS holders from El Salvador, Haiti, and Honduras ranged from 81% to 88%. Median household income for TPS residents was $50,000 for Salvadorans, $40,000 for Hondurans, and $45,000 for Haitians (adjusted to 2025 dollars using the Bureau of Labor Statistics CPI calculator, these numbers are $68,000, $54,000 and $61,000 respectively). 30% of the TPS holders have a mortgage, indicating home ownership (Warren & Kerwin, 2017). Honduran migrants are included in this estimate. Nepali and Nicaraguan migrants are not included in this estimate. However, this number is indicative of the positive economic impact of TPS holders writ large.

5. If Nepalis, Hondurans, and Nicaraguans lose TPS status, they will no longer have the legal right to work in the U.S. They will either be deported or stay in the country without legal authorization. If deported, they will no longer contribute to the U.S. economy. If they stay and work without authorization, they may earn less and contribute less economically than they would with TPS status. Research shows that migrants with TPS have better job opportunities and wages relative to migrants with no immigration status. A study by Orrenius & Zavodny (2015) found that migrant men with TPS earn 13% more than migrant men without it, and migrant women with TPS are 17% more likely to have jobs compared to migrant women without TPS. If losing TPS has the opposite effect of gaining it, this means that people who lose their status may earn less or struggle to find work. As a result, even if they are not deported, their reduced earnings and employment rates would lead to lower overall economic output for the U.S.

6. TPS allows workers to hold formal jobs and pay payroll taxes, thus contributing to the U.S. economy. Without legal work status, more Nepali, Honduran, and Nicaraguan TPS holders who have not yet been deported may turn to informal jobs. Informal workers often do not pay payroll taxes (and deported workers certainly pay no taxes). This would reduce funding for Social Security and Medicare, which can have a broader economic impact. For example, in Los Angeles County in 2005, informal employment led to an estimated $2 billion in unpaid payroll taxes compared to if those workers had been formally employed. (Flaming et al., 2005).

7. Additional economic costs to ending TPS are costs to firms for needing to replace workers who were previously legally employed, and costs to the government to deport individuals. The report by the Immigrant Legal Resource Center (Baran et al., 2017) estimates the economic cost of these two additional channels as follows:
   a. The report estimates that replacing laid-off TPS employees would cost firms $967 million. Adjusted to 2025 dollars using the Bureau of Labor Statistics CPI calculator this number is $1.3 billion.
   b. Ending TPS would also impose costs on the government due to deportation expenses. The report uses a per-immigrant deportation cost of $10,070. Adjusted for inflation to 2025 using the Bureau of Labor Statistics CPI calculator, this cost rises to $13,700 per person. According to the Congressional Research Service, as of December 2024 there were approximately 63,000 approved individuals with TPS from Nepal, Nicaragua,

and Honduras (Wilson, 2024). Deporting approximately 63,000 Nepali, Honduran, and Nicaraguan TPS holders could therefore cost taxpayers an estimated $863 million.

8. More broadly, the National Academies of Sciences published a 2017 report on the economic and fiscal impacts of immigration. (National Academies of Sciences, Engineering, and Medicine, 2017). Since TPS holders are immigrants, the report's findings—though not specific to TPS—are likely relevant. The report found little evidence that immigration negatively affects the wages and employment of U.S.-born workers. It found evidence of positive effects, including lower prices for U.S.-born workers. The findings of the report are summarized below.

    a. The report found very little to no evidence of negative effects of immigration on wages and employment of U.S.-born ("native") workers. The report summarizes that "the impact of immigration on the wages of natives overall is very small" (National Academies of Sciences, Engineering, and Medicine, 2017, p. 5), and that there is "little evidence that immigration significantly affects the overall employment levels of native-born workers." (*Id.*).

    b. An increase in immigration may also reduce the prices of some goods and services, which is a benefit to US consumers. Overall, the report concluded that "the contributions of immigrants to the labor force reduce the prices of some goods and services, which benefits consumers in a range of sectors including child care, food preparation, house cleaning and repair, and construction." (*Id.*, p. 316).

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge.

Executed this 7th day of July, 2025, in Stanford, California.

                                                  */s/*_____
                                                  Melanie Morten

**CIVIL LOCAL RULE 5.1 ATTESTATION**

I hereby attest that I have on file all holographic signatures corresponding to any signatures indicated by a conformed signature (/S/) within this e-filed document.

                          */s/ Jessica Karp Bansal*
                          Jessica Karp Bansal

References Cited

American Immigration Council. (2023). *The Contributions of Temporary Protected Status Holders to the U.S. Economy*.

Baran, A., Magaña-Salgado, J., & Wong, T. K. (2017). *Economic Contributions by Salvadoran, Honduran, and Haitian TPS Holders*. Immigrant Legal Resource Center.

Flaming, D., Haydamack, B., & Joassart, P. (2005). Hopeful Workers, Marginal Jobs. LA's Off-The-Books Labor Force. *Economic Roundtable*.

National Academies of Sciences, Engineering, and Medicine. (2017). *The Economic and Fiscal Consequences of Immigration* (F. D. Blau & C. Mackie, Eds.; p. 23550). National Academies Press. https://doi.org/10.17226/23550

Orrenius, P. M., & Zavodny, M. (2015). The Impact of Temporary Protected Status on Immigrants' Labor Market Outcomes. *American Economic Review*, *105*(5), 576–580. https://doi.org/10.1257/aer.p20151109

Wilson, J. H. (2024). *Temporary Protected Status and Deferred Enforced Departure* (RS20844; CRS Report). Congressional Research Service. https://www.congress.gov/crs-product/RS20844