1   Ahilan T. Arulanantham (SBN 237841)
    arulanantham@law.ucla.edu
2   Stephany Martinez Tiffer (SBN 341254)
    martineztiffer@law.ucla.edu
3   CENTER FOR IMMIGRATION LAW AND
    POLICY, UCLA SCHOOL OF LAW
4   385 Charles E. Young Dr. East
    Los Angeles, CA 90095
5   Telephone: (310) 825-1029

6   Emilou MacLean (SBN 319071)
    emaclean@aclunc.org
7   Michelle (Minju) Y. Cho (SBN 321939)
    mcho@aclunc.org
8   Amanda Young (SBN 359753)
    ayoung@aclunc.org
9   ACLU FOUNDATION
    OF NORTHERN CALIFORNIA
10  39 Drumm Street
    San Francisco, CA 94111-4805
11  Telephone: (415) 621-2493
    Facsimile: (415) 863-7832
12
    Attorneys for Plaintiffs
13  [Additional Counsel Listed on Next Page]

14                  UNITED STATES DISTRICT COURT

15                 NORTHERN DISTRICT OF CALIFORNIA

16                    SAN FRANCISCO DIVISION

17   NATIONAL TPS ALLIANCE, DENIS            Case No. 3:25-cv-05687
     MOLINA, JHONY SILVA, MARIA ELENA
18   HERNANDEZ, O.C., SANDHYA LAMA,
     S.K., TEOFILO MARTINEZ,                 **EXPERT DECLARATION OF STACY
19                                           TOLCHIN IN SUPPORT OF
                 Plaintiffs,                 PLAINTIFFS' MOTION TO POSTPONE
20                                           EFFECTIVE DATE OF AGENCY
           vs.                               ACTION**
21
     KRISTI NOEM, in her official capacity as
22   Secretary of Homeland Security, UNITED
     STATES DEPARTMENT OF HOMELAND
23   SECURITY, and UNITED STATES OF
     AMERICA,
24
                 Defendants.
25

26

27

28

EXPERT DECLARATION OF STACY TOLCHIN - CASE NO. 3:25-CV-05687__

Additional Counsel for Plaintiffs

Jessica Karp Bansal (SBN 277347)
jessica@ndlon.org
Lauren Michel Wilfong (*Pro Hac Vice* pending*)
lwilfong@ndlon.org
NATIONAL DAY LABORER ORGANIZING NETWORK
1030 S. Arroyo Parkway, Suite 106
Pasadena, CA 91105
Telephone: (626) 214-5689

Eva L. Bitran (SBN 302081)
ebitran@aclusocal.org
ACLU FOUNDATION
OF SOUTHERN CALIFORNIA
1313 West 8th Street
Los Angeles, CA 90017
Telephone: (213) 977-5236

Erik Crew (*pro hac vice* pending)
ecrew@haitianbridge.org
HAITIAN BRIDGE ALLIANCE
4560 Alvarado Canyon Road, Suite 1H
San Diego, CA 92120
Telephone: (949) 603-7411

EXPERT DECLARATION OF STACY TOLCHIN - CASE NO. 3:25-CV-05687

**EXPERT DECLARATION OF STACY TOLCHIN**

1.      I, Stacy Tolchin, am an attorney licensed to practice by the State of California. If called to testify, I could and would do so as follows:

2.      I have been asked to provide an expert opinion to explain some of the law governing what protections TPS has afforded to the Nepali, Honduran, and Nicaraguan immigrant communities at issue in this case, and how those protections do and do not overlap with the rights Nepali, Honduran, and Nicaraguan TPS holders may have under other immigration laws. I make this declaration based on my personal and professional knowledge, my skill, experience, training, and education, and facts and data regularly relied upon in my field that are currently available to me. If additional information becomes available, or if I believe it would be appropriate to respond to any critique or contrary theories, I will advise Plaintiffs' counsel that I intend to do so and will seek their help in following the appropriate judicial procedures. The opinions in this declaration are my own.

**Qualifications**

3.      I received my Juris Doctorate from the University of California at Los Angeles in 2001, and have been practicing law for over 23 years.

4.      I am admitted to practice before the United States Supreme Court; the United States Court of Appeals for the Ninth, Tenth, Fifth, and Second Circuits; and the United States District Court for the Northern District of California, Eastern District of California, Central District of California, Southern District of California, Court of Federal Claims, and District of New Mexico.

5.      My business address is Law Offices of Stacy Tolchin, 776 E. Green St. Suite 210, Pasadena, CA 91101.  I practice throughout the state of California.

6.      I am a recipient of the American Immigration Lawyers' Association Southern California Chapter 2019 Annual Pro Bono Award, the University of California at Los Angeles Law School's 2018 Alumni Public Service Award, the National Lawyers Guild of Southern California 2017 annual award, the American Immigration Lawyers Association's 2009 Jack Wasserman Award for Excellence in Immigration Litigation, the 2009 American Civil Liberties Union of Southern California Equal Justice Advocacy Award, the 2008 National Immigration Law Center Annual Award, the 2007 "Unsung Hero" Award for the National Lawyers Guild of the Bay Area, and was recognized in 2003

1  by the Arab-American Anti-Discrimination Committee of San Francisco. I was also named to "Super

2  Lawyers" from 2012-2024.

3        7.    I am a former member of the Board of Directors of the National Immigration Project

4  for the National Lawyers Guild, a member of the National Lawyers Guild, the Los Angeles County

5  Bar Association immigration section, and the American Immigration Lawyers Association.

6        8.    I specialize in immigration-related litigation before the federal courts. Cases I have

7  litigated include: *Alvarado-Herrera v. Garland*, 993 F.3d 1187 (9th Cir. 2021) (establishing the legal

8  standard for the "reasonable fear" screening test before an immigration judge); *Arce v. United States*,

9  899 F.3d. 796 (9th Cir. 2018) (establishing that the federal courts have authority to consider damages

10  actions under the Federal Tort Claims Act in cases involving unlawful deportations); *Bonilla v. Lynch*,

11  840 F.3d 575 (9th Cir. 2016) (establishing federal court jurisdiction to review motions to sua sponte

12  reopen based on changes in law); *Mendiola v. Holder*, 576 F. App'x 828 (10th Cir. 2014) (petition for

13  review in Tenth Circuit challenging removal of a lawful permanent resident based on change in law);

14  *Bains v. Holder*, 584 F. App'x 574 (9th Cir. 2014) (petition for review challenging removal order based

15  on changed circumstances arising in India); *Duran Gonzales v. U.S. Dep't of Homeland Sec.*, 712 F.3d

16  1271 (9th Cir. 2013) (class action litigation involving applications for lawful permanent residency

17  where the applicants had been previously deported); *Huerta v. Holder*, 484 F. App'x 172 (9th Cir.

18  2012) (petition for review based on ineffective assistance of counsel); *Padilla-Padilla v. Gonzales*,

19  463 F.3d 972 (9th Cir. 2006) (challenge to Board of Immigration Appeals' failure to follow its internal

20  regulations); *Silaya v. Mukasey*, 524 F.3d 1066 (9th Cir. 2008) (finding that victim of gang-rape in the

21  Philippines had suffered past persecution based on her father's political opinion); *Husyev v. Mukasey*,

22  528 F.3d 1172 (9th Cir. 2008) (finding that courts have jurisdiction to review agency's failure to follow

23  asylum regulations); *Hassine v. Johnson*, 2014 WL 5035173 (E.D. Cal. 2014) (petition for de novo

24  naturalization case and award of attorneys' fees); *Zavala v. Ridge*, 310 F. Supp. 2d 1071 (N.D. Cal.

25  2004) (Department of Homeland Security's "automatic stay" regulation that keeps non-citizens in

26  custody while their immigration cases are pending, even after an immigration judge has ordered their

27  release, is facially unconstitutional); *Singh v. Still*, 470 F. Supp. 2d 1064 (N.D. Cal. 2007) (successful

28  petition for writ of mandamus challenging Department of Homeland Security's unreasonable delay in

1   the adjudication of applications for permanent residency); *Shahwan v. Chertoff*, C 05 4218 MMC

2   (N.D. Cal. 2005) (granting petition for writ of habeas corpus where petitioner was not informed when

3   he traveled on "advance parole" that he would be ineligible for a bond hearing before an immigration

4   judge); and *Araujo v. INS*, 301 F. Supp. 2d 1095  (N.D. Cal. 2004) (Federal Tort Claims Act action

5   finding that the United States government was liable for damages to a non-citizen for unlawful

6   deportation).

7           9.      I have deep expertise and extensive practice experience in immigration law, including

8   in the law governing the Temporary Protected Status (TPS) statute, 8 U.S.C. 1254a, and its interaction

9   with various other provisions of the immigration law, including the law governing asylum, detention,

10  and other related areas of immigration law. I have represented many individuals who had (or had

11  previously held) TPS in removal proceedings. I also successfully represented a class of TPS holders

12  who challenged policies related to their eligibility to adjust status after having traveled on authorized

13  TPS travel in *Gomez v. Jaddou*, Case 1:21-cv-09203-ALC (S.D.N.Y), which resulted in a change in

14  USCIS policy that recognized TPS recipients who returned to the United States with authorized travel

15  were "admitted."

16  **Overview**

17          10.     Until the decisions challenged in this case, Temporary Protected Status was available,

18  broadly speaking, to Nepali, Honduran, and Nicaraguan nationals who had resided here continuously

19  since on or before January 5, 1999 (Honduras and Nicaragua) and June 24, 2015 (Nepal), unless they

20  had a felony or two or more misdemeanor convictions. I understand that the decisions to terminate

21  TPS for Nepal, Honduras and Nicaragua are the subject of this lawsuit.

22          11.     As I explain herein, although many Nepali, Honduran, and Nicaraguan TPS holders

23  may also be eligible for protection from removal and work authorization through other avenues, only

24  a small minority will actually receive relief, and it is very likely that many Nepali, Honduran, and

25  Nicaraguan TPS holders would *not* be protected to the same degree by any other statute. In fact, many

26  of them would not be protected at all from loss of employment and removal were they to lose TPS.

27

28

EXPERT DECLARATION OF STACY TOLCHIN - CASE NO. 3:25-CV-05687

**Protections Under the TPS Statute**

12.    The TPS statute provides a very clear form of immigration status, and robust protection to live and work in the United States, to people who hold TPS. Congress has explicitly forbidden the removal of anyone who has TPS. Subsection (a)(1)(A) of the statute provides that the federal immigration enforcement authorities "shall not remove the alien from the United States during the period in which such status is in effect."

13.    Congress has also mandated that TPS holders receive employment authorization. Subsection (a)(1)(B) of the statute provides that federal immigration authorities "shall authorize the alien to engage in employment in the United States and provide the alien with . . . [a] work permit."

14.    Furthermore, although in general the federal government has broad powers to detain (that is, to jail) non-citizens charged with being deportable under the immigration laws, Congress has expressly forbidden the detention of people who have TPS. Subsection (d)(4) of the TPS statute provides "An alien provided temporary protected status under this section shall not be detained by the Attorney General on the basis of the alien's immigration status in the United States."

15.    The TPS statute makes these protections broadly available to people who meet the primary eligibility criteria—which are that one has to be a Nepali, Honduran, or Nicaraguan national who has continuously resided in the United States since on or before January 5, 1999 for Honduras and Nicaragua, or June 24, 2015 for Nepal. For someone who meets those criteria, the statute provides the robust protection from detention and deportation and access to work authorization described above, so long as the individual does not have a felony or two (or more) misdemeanor convictions, and has not engaged in certain other highly unusual conduct (concerning the persecution of others and other rare circumstances).

**Asylum and Other Forms of Protection**

16.    Some Nepali, Hondurans, and Nicaraguans who currently have TPS could be eligible for asylum and related protections under 8 U.S.C. 1158, but that is not true for all of them, and the asylum statute's protections are weaker than those under TPS for several reasons. Further, only a minority of Nepali, Honduran, and Nicaraguan asylum applications are approved. Applicants whose asylum applications are not approved are automatically placed in removal proceedings.

4

1       17.     To establish eligibility for asylum, an applicant must show a "well-founded fear" of

2 "persecution" "on account of" one of five distinct grounds: "race, religion, nationality, membership in

3 a particular social group, or political opinion." Each of these is a term of art with technical legal

4 meaning that restricts the availability of asylum in different ways. For example, a Nepali, Honduran,

5 or Nicaraguan who leaves because their children have become malnourished as the grocery stores in

6 their area no longer sell basic goods (or because they cannot afford to buy them) likely cannot establish

7 persecution on account of a protected ground. Even those who flee extortion and violence by organized

8 criminal entities typically cannot establish eligibility for asylum because they cannot show that the

9 harm is on account of a protected ground and for other reasons.

10      18.     In addition, because asylum is so legally complex, many applicants hesitate to apply

11 without legal assistance, but legal representation is often expensive and if they fail to apply within one

12 year of their arrival, or generally six months after falling out of any non-immigrant status, they are

13 presumptively ineligible for asylum. 8 U.S.C. 1158(a)(2)(B).

14      19.     Even if someone has affirmatively applied for asylum, that alone does not guarantee

15 protection from removal or even work authorization. The government takes the position that it can

16 detain and begin removal proceedings against someone with a pending application, so long as the

17 application has not been granted (and they have no other valid legal status). Work permits are available

18 no earlier than six months after someone files for asylum, and the agency is not legally required to

19 provide them. 8 U.S.C. 1158(d)(2).

20      20.     The government also now takes the view that it may remove people to third countries

21 "without adequate notice and a 'meaningful opportunity' to present a claim under the Convention,"

22 even if they have a fear of return to their home country and may be subject to a fear-based form of

23 relief. *Dep't of Homeland Sec. v. D.V.D.*, No. 24A1153, 2025 WL 1732103, at *2 (U.S. June 23, 2025).

24 The government has sought to remove to South Sudan and Libya individuals who are not citizens of

25 those countries and have no ties to them. While this issue is being litigated, the Supreme Court has

26 allowed such third-country removals to move forward. *Id.* (staying a preliminary injunction which had

27 prohibited the defendants from removing the plaintiffs and putative class members to a third country

28

without "written notice of the third country" and "a meaningful opportunity ... to submit an application" for relief under the Convention Against Torture).

21.     It is of course possible that any given Nepali, Honduran, or Nicaraguan TPS holder may have some other pathway to lawful status, such as through marriage, sponsorship by their employer, or other methods. For example, Nepali, Honduran, and Nicaraguan TPS holders are eligible to change status to other non-immigrant statuses, such as H-1B, a non-immigrant status for foreign professionals, provided they meet the eligibility requirements for the other non-immigrant statuses. But these pathways to lawful status are rare for individuals who arrived in the last several years. Further, if a TPS holder's TPS ends and they fall out of lawful status, then they will not be eligible to change status to a different non-immigrant status.

22.     To summarize, notwithstanding the availability of asylum and other forms of relief under the immigration laws, many thousands of Nepali, Honduran, and Nicaraguan TPS holders—likely the vast majority—will lose their lawful immigration status and work authorization if the TPS vacatur and termination at issue in this case go into effect. That legal change will immediately render them potentially subject to arrest and detention under the immigration laws. Those who can present a claim for relief will remain jailed until presented to an Immigration Judge, before whom they would have to attempt to establish eligibility for asylum or another fear-based form of relief under the narrow criteria described above. Even if they are able to establish a fear of return to their home country, they face the risk of a third-country removal. Individuals who are eligible for another form of relief may become ineligible, even if consideration of that form of relief is already in process, in light of eligibility requirements for some forms of non-immigrant statuses that individuals maintain a legal immigration status during the course of their application.

1     I declare under penalty of perjury under the laws of the United States of America that the

2   foregoing is true and correct to the best of my knowledge.

3

4   Executed this 7th day of July, 2025, in Pasadena, California.

5

6

7

8   _____
    Stacy Tolchin
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

EXPERT DECLARATION OF STACY TOLCHIN - CASE NO. 3:25-CV-05687