Exhibit 25

7/1/25, 12:30 PM
Their Lawsuit Prevented 400,000 Deportations. Now It's Biden's Call. - The New York Times
Case 3:25-cv-05687-TLT   Document 18-25   Filed 07/08/25   Page 2 of 25

# Their Lawsuit Prevented 400,000 Deportations. Now It's Biden's Call.

Trump tried to end a 30-year program that shielded migrants, many fleeing conditions that U.S. foreign policy helped foster. What does America owe them?

**By Marcela Valdes**

Published April 7, 2021   Updated July 26, 2021

*To hear more audio stories from publishers like The New York Times, download Audm for iPhone or Android.*

Cristina Morales got the news that she was going to lose her legal right to live and work in the United States via text. The news devastated Morales. But the texts from her friends arrived while Morales, who was then 37, was at the Catholic school where she ran the after-school program. She believed that part of her job was to create a safe place for children, so she said nothing about her despair at work. "You need to have a happy face," she told me. "No matter how bad you feel."

Morales kept up the pretense in the car with her family on the way home. As her 11-year-old son and 13-year-old daughter sang in the back seat, she swallowed her tears and tried not to look at her husband. Their children had no idea that Morales was not an American citizen. She and her husband didn't talk about her status because they didn't want to taint the kids' lives with fear. Only a handful of people knew that Morales was a beneficiary of a program called Temporary Protected Status (T.P.S.), which allows some immigrants to reside in the United States while their home countries are in crisis. About 411,000 immigrants had T.P.S. in 2020.

More than half of them came from El Salvador, like Morales. The rest emigrated from Haiti, Honduras, Nepal, Nicaragua, Somalia, South Sudan, Sudan, Syria or Yemen.

Less than a year after President Donald Trump took office, his administration began to dismantle the program. Over the course of eight months in 2017 and 2018, the Department of Homeland Security ordered the departure of 98 percent of T.P.S. recipients by canceling the designation for every country except Somalia, South Sudan, Syria and Yemen. In a January 2018 news release, the Department of Homeland Security announced Secretary Kirstjen Nielsen's decision to terminate T.P.S. for El Salvador, stating that "the original conditions" that prompted the designation in 2001 "no longer exist." That's when Morales received the life-changing texts.

We need to be positive, Morales's husband told her that night in January. Maybe it's a misunderstanding. When he led the family in evening prayer, he asked God to keep families together. After their children went to bed, Morales sat on the couch in the study and wept. This is it, she thought, looking around her home. I'm going to lose everything, just like that.

Morales knew what deportation looked like. In Northern California, where she has lived since she was 12, ICE raids were so frequent under President Barack Obama that many members of her church stopped attending Mass, afraid that they might be arrested en route to services. During the 2016 election, kids at school would tell Morales that they were afraid agents were going to come and take their parents.

For years, Morales met with local police and government officials to advocate for the undocumented parishioners in her church. Now, faced with the possibility of her own deportation, she decided it was time to advocate for herself. Days after Nielsen's decision, Morales contacted a local committee of the National T.P.S. Alliance, a grass-roots organization that began advocating for T.P.S. holders during the final months of the Obama administration. Soon she and her daughter, Crista

Ramos, became the lead plaintiffs in Ramos v. Nielsen, a suit with 14 plaintiffs representing T.P.S. holders from El Salvador, Nicaragua, Haiti and Sudan as well as their U.S.-citizen children.

Ramos v. Nielsen kept T.P.S. holders safe from deportation during Trump's presidency. Put together by four organizations — the National Day Laborers Organizing Network, the Central American Resource Center, the National T.P.S. Alliance and the American Civil Liberties Union — this lawsuit won a preliminary injunction in the U.S. District Court for the Northern District of California in fall 2018. The injunction suspended the termination of T.P.S. for six countries. During the discovery process, the plaintiffs' attorneys turned up documents that revealed how Trump officials disregarded the recommendations of America's own foreign ambassadors as well as the advice of senior officials in the State Department. Ending T.P.S. for El Salvador in particular, many of these experts warned, could damage America's national security by undermining efforts to curtail illegal immigration and transnational gangs.

But last September, the Ninth Circuit Court of Appeals decided that the District Court had no jurisdiction to overturn the Trump administration's decision, a ruling that is likely to affect legal cases involving Honduras and Nepal as well. The plaintiffs may continue to litigate that decision. But unless Congress passes legislation that grants T.P.S. holders permanent status or President Biden's administration issues new T.P.S. designations for the six countries, the forced removal of 402,000 T.P.S. holders could begin as soon as October. Because they are the parents of some 273,000 U.S. citizens — most of them under the age of 21, like Morales's children — it could also turn into the largest family-separation operation in American history.

For 20 years, the T.P.S. program allowed Morales to be a taxpaying, homeowning legal resident. But it also made her every achievement precarious. "The Trump administration terrorized those with T.P.S. and DACA, threatening massive deportation," Morales said during a Zoom meeting with leaders of the National T.P.S. Alliance in February, referring to both her own program and the Deferred Action for Childhood Arrivals policy, which protects undocumented people who

arrived as minors. If Biden and the Democrats can't provide permanent solutions for these two groups — whose regular background checks make them the most-vetted immigrants in America — Morales wonders how anyone can trust them to help the millions of other immigrants whose fates currently hang in the balance.

**We often speak** of immigration as if it were one unified issue. But though Democrats hold the presidency and Congress, they will find it exceptionally difficult to solve the many problems of our byzantine system. In the United States, immigration has a separate legal system with separate courts and separate laws, where some of the fundamental principles of our normal judicial system — like independent judges, the right to legal representation and the right to a trial by jury — simply do not exist. Immigration policy is decided by several different parts of the federal bureaucracy, including the Justice Department, the State Department and the Department of Homeland Security. Immigration enforcement involves an enormous apparatus that may include federal Border Patrol officers, ICE agents and local police departments, as well as detention centers that range in quality from canvas tents to refurbished prisons. Immigration is a legal issue, a labor issue, a security issue and a foreign-policy issue.

To speak of reforming this entire system with one comprehensive bill is mystifying, but that's exactly what several major national immigration rights organizations have been doing for decades. That certainly seemed to be the new administration's strategy when, hours after Biden was inaugurated as president, it released a four-page "fact sheet" detailing a bold plan for comprehensive immigration reform. Among its dozens of provisions, the plan would allow undocumented people to apply for a kind of temporary legal status, would make it easier for students with advanced STEM degrees to remain in the United States, would shield workers who report labor violations from deportation and would make many T.P.S. holders immediately eligible for legal permanent residency.

The fact sheet read like an immigration advocate's wish list, yet all the T.P.S. activists I spoke with in January greeted it with more skepticism than joy. No comprehensive immigration-reform bill involving legalization has made it through Congress since 1986, and the repeated failure of such bills left T.P.S. holders

vulnerable when Trump won the presidency in 2016. "T.P.S. holders have been held hostage to the idea of comprehensive immigration reform," said Pablo Alvarado, a founder of the National T.P.S. Alliance and a longtime immigration rights activist. In the 1990s and 2000s, when Salvadoran T.P.S. holders spoke of their desire for permanent residency, they knew that their history as political refugees made them almost as sympathetic as undocumented minors. But national organizations based in Washington, hoping for a bill that might help all undocumented immigrants, urged them not to advocate for themselves. "We were told you have to wait because we're going for the whole enchilada," Alvarado said.

Homeland Security may use T.P.S. to grant foreign residents temporary legal status when they cannot return home safely because of an armed conflict, a natural disaster or any other kind of humanitarian crisis. For each country, the department issues a new decision every six to 18 months about whether its T.P.S. designation will be prolonged. If it is, beneficiaries like Morales can apply to renew their T.P.S. cards by paying another fee and going through another background check. T.P.S. sets a precise window for eligibility: When Morales received her status in 2001, only Salvadorans already living in the United States when several earthquakes struck El Salvador could receive the benefit. A Salvadoran who arrived a month later could not.

Most T.P.S. holders have lived for decades in a kind of immigration purgatory. In a 2006 paper about the "liminal legality" of T.P.S. holders, the U.C.L.A. sociologist Cecilia Menjívar explains that "the process itself is fraught with anxiety — especially around expiration and renewal time — because any wrong step, missed deadline, lack of information or an error on a form may result in denial and deportation." Most T.P.S. holders, she said in a 2017 report, work in construction, painting, cleaning, driving, cooking and child care. Nearly 90 percent have jobs, and 90 percent file income taxes every year. In effect, T.P.S. holders are what DACA recipients will look like if they're kept in immigration purgatory another 15 years.

When Donald Trump was elected, his administration enacted its own kind of immigration reform with remarkable efficiency. Under the guidance of his first attorney general, Jeff Sessions, and his senior adviser Stephen Miller, officials

changed more than 1,000 rules, interpretations and directives throughout the immigration system, making it harder for immigrants to enter legally and easier for them to be removed. Democrats sometimes seem less knowledgeable about the intricate details of immigration policy. When members of the T.P.S. Alliance went to Capitol Hill in 2017 to lobby for the American Dream and Promise Act, which would have allowed permanent residency to both DACA and T.P.S. recipients, they discovered that most members of Congress had never heard of T.P.S. "The ones who knew the least about T.P.S. weren't the Republicans," Alvarado noted. "It was the Democrats. The Republicans had it very clear. They wanted to terminate T.P.S. together with Trump."

While some components of our immigration system, like H-1B and farmworker visas, are primarily designed to help American businesses, others spring from less mercenary impulses. DACA, T.P.S. and political asylum all fit into this altruistic category, and all drew special ire from Trump officials, who viewed them as forms of "amnesty" that attracted undesirable immigrants. They deliberately tried to roll back 40 years of immigration policy. "All the policies that are being adopted by the Trump administration," Lucas Guttentag, a professor of law at Stanford and Yale, told me last year, "and its dismantling of the Southern-border asylum system, are in complete disregard of the human suffering and of the legal rights that apply." In recent months, as thousands of Central Americans have traveled to America's Southern border, hoping that Biden's administration might let them in, some members of Congress have begun to suggest that any immigration reform must wait until this migration pattern ends. But this rhetorical ultimatum elides the responsibility Americans have for this humanitarian crisis. Many of these would-be immigrants are trying to escape genuinely life-threatening conditions, and they have an internationally recognized right to apply for asylum and to have their claims considered. In many cases, the violence that they flee has its roots in more than a decade of American foreign policy.

In fact, T.P.S. was created precisely because the asylum process failed in the United States during the 1980s. For Representative Jim McGovern, a Democrat from Massachusetts, the argument for granting T.P.S. holders permanent residency

extends beyond any benefit they provide to America. "We have a moral obligation to the people of El Salvador," he told me. As a congressional staff member in the 1980s, McGovern worked on the creation the original T.P.S. statute. Unlike many politicos, he remembers that T.P.S. was a response to America's foreign policy in El Salvador and to its discrimination against Salvadoran refugees in the United States.

Some 2.3 million Hispanic Americans now trace their roots to El Salvador, more than to any other place except Mexico and the U.S. territory Puerto Rico. Many people point to the Immigration and Nationality Act of 1965 as the catalyst for this immigration. But according to testimony given by a Census Department official before Congress in 1985, Salvadorans did not begin to leave their country en masse until April 1980, 15 years after that act was passed. According to the Pew Research Center, in 1980 there were an estimated 92,000 foreign-born Salvadorans living in the United States. By 1990, that number had rocketed to 459,000. Why did hundreds of thousands of Salvadorans move to the United States in a single decade? The answer to this question is the history of T.P.S.



Morales's daughter, Crista Ramos, 17, photographed in San Pablo, Calif. Along with her mother, she is a lead plaintiff in Ramos v. Nielsen.  Alessandra Sanguinetti/Magnum, for The New York Times

Case 3:25-cv-05687-TLT    Document 18-25    Filed 07/08/25    Page 10 of 25

**In February 1980,** the archbishop of San Salvador, Óscar Romero, wrote a letter to President Jimmy Carter, asking him not to move forward with a nearly $50 million aid package that would send U.S. military advisers and equipment to the civilian-military junta then governing El Salvador. "The contribution of your government," Romero wrote, "instead of promoting greater justice and peace in El Salvador will without doubt sharpen the injustice and repression against the organizations of the people which repeatedly have been struggling to gain respect for their most fundamental human rights."

During the 1970s, as the conflict between El Salvador's various leftist groups and its conservative oligarchy escalated, paramilitary forces began assassinating anyone who seemed to pose a political threat: labor leaders, human rights workers, schoolteachers, peasants, clergy. In 1979 and 1980, political murders hit 800 a month in a country with the same population as Tennessee. Because Jesuits often sided with El Salvador's poor and some kept records of human rights violations, they were hated by the country's ultraright. One paramilitary slogan was: "Be a patriot! Kill a priest." A month after Romero wrote his letter to Carter, the 62-year-old archbishop was murdered by a sniper during Mass.

Ignoring Romero's objection, the Carter administration went ahead with aid for El Salvador in 1980. When President Ronald Reagan took office the following year, he made support of El Salvador's junta a foreign-policy priority. Both administrations feared that without such support, El Salvador would go the way of Nicaragua, which overthrew the Somoza-family dictatorship and installed a socialist civilian-military government in 1979.

By 1992, the United States had sent more than $4 billion to the government of El Salvador, despite reports of torture, rape, killings and massacres. To military forces in El Salvador, the message was clear: Violating human rights would not affect their standing with the Reagan and George H.W. Bush administrations. As Mark Danner documents in his 1994 book, "The Massacre at El Mozote," U.S. military trained Salvadoran battalions and equipped them with bullets, M16s and military helicopters. This assistance abetted a 12-year civil war that began shortly before Romero's assassination and killed at least 75,000 people. Thousands more were

forcibly disappeared. Testimony to the United Nations' Truth Commission for El Salvador attributed a vast majority of the violence to Salvadoran government and paramilitary forces.

Many of the Salvadorans fleeing their country during the war sought refuge in the United States, where they were routinely denied political asylum. These rejections may have violated the Refugee Act of 1980, which brought the United States in line with United Nations protocols and which states that all applicants for asylum must be considered equally. In practice, however, applications made by immigrants from Soviet client states like Romania, Czechoslovakia and Poland were frequently approved during the mid-1980s, while more than 97 percent of Salvadorans were rejected. (Would-be migrants from Guatemala, where the United States supported another military government, fared even worse.)

Maureen Sweeney, a law professor at the University of Maryland, remembers seeing hundreds of young men from El Salvador and Guatemala while she worked at the Texas Center for Immigrant Legal Assistance during the 1980s. She estimates that the center represented hundreds of asylum claims in two years and won only three. "We didn't win a single Salvadoran claim," she told me. "We didn't win a single Guatemalan claim." It didn't matter if these immigrants had been tortured, if their relatives had been killed. Immigration judges denied their claims and ordered their deportations. "The idea that that looked anything like due process, even in terms of the time, is just kind of ludicrous," Sweeney said.

The State Department had a strong motivation for thwarting Salvadoran claims: The Foreign Assistance Act of 1961 forbids the United States to fund any foreign government that "engages in a consistent pattern of gross violations of internationally recognized human rights." So the Reagan administration instead portrayed Salvadoran refugees as "economic migrants." This description not only gave officials a rationale for deporting Salvadorans; it also obscured the role that the administration played in funding the violence that drove Central Americans to the United States.

Case 3:25-cv-05687-TLT   Document 18-25   Filed 07/08/25   Page 12 of 25

Faced with this perversion of the asylum process, some churches and synagogues in the American Southwest decided to help Salvadorans and Guatemalans enter and remain in the United States illegally. By 1984, this sanctuary movement included 185 religious institutions in the Southwest, Midwest and Eastern United States. The movement faced a serious setback, however, that same year, when more than half a dozen of its American supporters were charged with transporting and harboring illegal aliens in Texas and Arizona.

The lawsuit American Baptist Churches et al. v. Thornburgh began as an attempt to block this crackdown by claiming that the decision to offer sanctuary inside churches was "a matter of religious faith and practice." Before its filing, the case expanded to include other important arguments, including the claim that U.S. Attorney General Dick Thornburgh was discriminating against asylum applicants from El Salvador and Guatemala. Three times over the next three years, the Reagan administration tried to have the lawsuit dismissed, but in 1989, the discrimination claim was allowed to proceed to trial. "It opened the doors to us getting huge amounts of discovery," said Marc Van Der Hout, the lead lawyer for the case. With subpoenas and sufficient time, he said, prosecutors might have located evidence that the United States was denying asylum with the express purpose of maintaining military aid to El Salvador.

Even before that legal case was filed, Salvadoran immigrants began visiting the offices of Representative Joe Moakley. A native of South Boston, Moakley entered Congress in 1973 with little interest in foreign affairs. "He used to joke a foreign-policy issue to him was driving from South Boston to East Boston for an Italian sandwich," Representative Jim McGovern, an aide to Moakley throughout the 1980s, told me. McGovern often sat with Moakley as Salvadorans recounted horrific stories of persecution and discrimination. Moved and outraged by these accounts, Moakley took up their cause.

In 1983, after efforts to pressure Reagan officials proved futile, Moakley began introducing amendments to various House bills trying to suspend the deportations of Salvadorans. "The institutions of government that should have been functioning in response to this kind of humanitarian situation weren't responding," said Joy

Olson, who rallied support for Moakley's efforts as an employee of Church World Service, which organized international humanitarian aid. But Moakley's legislative actions were repeatedly blocked.

Then on Nov. 16, 1989, six Jesuit priests were dragged from their home and murdered in San Salvador. Their bodies were riddled with bullets, and some were left near a garden wall sprayed with blood, suggesting they were killed execution-style with assault rifles. Their cook and her 16-year-old daughter were also killed. Days after the murders, Congress approved another $85 million in military aid to El Salvador, despite opposition from America's largest religious federation, the National Council of Churches.

Though government officials in El Salvador first blamed Marxist guerrillas for the murders, Moakley led a congressional investigation that linked the killings to the Salvadoran military high-command and to soldiers of a Salvadoran battalion named Atlacatl who were trained at Fort Benning in Georgia. The murders turned many Americans against U.S. aid to El Salvador for the first time.

A year later, Moakley attached a provision to an immigration act making its way through Congress, proposing to grant Salvadorans temporary protection from deportation. "Anybody who's telling me that El Salvador is a safe place is living in La La Land," McGovern recalls Moakley saying. "You're having priests that are killed in cold blood. Students are being targeted. Labor unions are being targeted." By then, Moakley wielded power as chairman of the House Committee on Rules. Dropping an expletive or two, he told opponents that he would not bring the Immigration Act of 1990 to a vote in the House unless his amendment to create Temporary Protected Status for Salvadorans was attached.

In the end, Moakley's provision didn't just protect Salvadorans; it created an entirely new way for the federal government to allow migrants from specific countries to avoid deportation. Unlike asylum, which requires individuals to prove a well-founded fear of persecution based on their race, religion, nationality, political beliefs or membership in a particular social group, T.P.S. allows the government to help an entire class of people whose living conditions have become untenable. In

Case 3:25-cv-05687-TLT Their Lawsuit Prevented 100,000 Deportations. Now It's Blown Up. - The New York Times Document 18-25 Filed 07/08/25 Page 14 of 25

this way, T.P.S. is a better tool for addressing enormous waves of forced migration, like the recent Venezuelan exodus fleeing both political repression and widespread hunger. The Immigration Act designated Salvadorans living in the United States in 1990 as eligible for T.P.S. — the only group specifically named for this benefit. Other countries would have to be considered on a case-by-case basis using recommendations made by the State Department.

The same year that T.P.S. became law, federal officials reached out to Van Der Hout through an intermediary, he says, to see if they could settle A.B.C. v. Thornburgh. When Van Der Hout received the call, he nearly fell off his chair. While the U.S. government never admitted to discriminating against Salvadorans and Guatemalans, in the settlement it did acknowledge that it could not decide asylum cases based on foreign-policy considerations. And it agreed to reconsider all the asylum applications of Salvadorans and Guatemalans living in the United States.



Morales holding documents from her T.P.S. filings since 2001.  Alessandra
Sanguinetti/Magnum, for The New York Times

**Born in 1980,** Morales grew up in the midst of the Salvadoran civil war. She
remembers her grandmother hiding cousins on a roof to keep them from being
conscripted by soldiers and guerrillas. She remembers staying in a house where
the television was kept on the floor, so they could watch it from under the bed
during gunfights outside. She remembers her grandfather throwing rocks into
fields to check for land mines.

Case 3:25-cv-05687-TLT   Document 18-25   Filed 07/08/25   Page 16 of 25

But most of all, Morales remembers the violence of her own father. His beatings drove her mother to abandon the family when Morales was about 7. In her mother's absence, the care of her younger brother and sister fell onto Morales. So did most of her father's abuse. A few years later, he sweet-talked her mother into returning, but the honeymoon lasted only a few months. When Morales was 11, she says, her father sneaked up behind her mother while she was cooking, prepared to stab her in the back with a pocketknife. Morales jumped between them. "I said to him that before getting her, he was going to have to get me," she recalled. Enraged, her father threw her against a wall, hard enough to knock her out. Morales's mother didn't go to the police to help. After the civil war ended in 1992, a broad amnesty allowed war criminals to hold onto government jobs, eroding trust in Salvadoran institutions. Instead, she left the children with their grandmother and fled for the United States, where she found work cleaning American houses and caring for American children. Morales's father, meanwhile, tracked down his kids in San Salvador and began stalking them. The situation made Morales suicidal: She considered throwing herself into a ravine; she asked God to take her away in her sleep. That's when she decided to follow her mother to California.

"When I came here," she told me, her voice thick with emotion, "I felt like God gave me a second chance." Living with her mother, Morales attended school regularly for the first time in her life. She funneled painful childhood memories into poetry. In her final year at San Rafael High School, she turned one of these verses into a short film about domestic abuse called "Silent Shadows." It screened in 1999 at Marin County's Latino Film Festival and aired on HBO Family in 2001. The film's success could have paved Morales's way to college, but without legal documents, she says, she could not follow up on an offer to attend a nearby college. Instead, she took care of her mother's new baby.

Like many undocumented minors, Morales didn't fully realize how vulnerable she was until she graduated from high school in 1999. "I had to learn the other side of being here: visible, but invisible," she told me. At 12, she thought coming to the United States meant finding freedom and safety. She didn't realize that entering illegally would thwart her dreams to study, to work, to live an independent life. "I

didn't want to be in the shadows," she said, but for two years she had no other option. Though T.P.S. helped thousands of Salvadorans who were living in the United States in 1990, Morales, who entered in 1993, was not eligible for the benefit.



Morales celebrating her first communion in 1995. From Cristina Morales

Then in January 2001, an earthquake measuring 7.7 on the Richter scale hit El Salvador. An aftershock measuring 5.7 hit the country two days later, and another 5.7 quake struck the following month. The quakes damaged nearly 278,000 homes and displaced more than a million people. In response to these natural disasters, President George W. Bush, who had just been elected with a campaign promising "compassionate conservatism," granted El Salvador a new T.P.S. designation. Morales and her mother applied soon after they heard the news on television. With her new T.P.S. card, Morales landed a job at Macy's and moved into her own apartment. Eventually she married her high school sweetheart, who worked in construction. They had a daughter, then a son. They bought a house. They organized their lives around work, school, church and soccer.

Morales didn't mind the T.P.S. procedures: paying several hundred dollars and getting her fingerprints scanned at an immigration office every 18 months or so. To her, it all felt worth the privilege of living legally inside the United States. "Renewing for me, it was the best thing in the world," she said. Every time she got her new work permit in the mail, she thought to herself, OK, I'm good, I'm making it.

When Trump won the presidential election in 2016, Morales told herself that she would be OK. She first received T.P.S. status under Bush, a Republican president, so how bad could things get for her under another Republican?

"The Trump administration was trying to figure out a way to end T.P.S. for all the people who had had it for any length of time," said Ahilan Arulanantham, a lawyer working on the Ramos case. The administration's solution was to apply a new interpretation to the 1990 Immigration Act. For nearly three decades, both Republicans and Democrats had weighed the effects of disasters and crises that occurred after a country was designated for T.P.S. when deciding whether to extend the benefit another six to 18 months. But Trump officials wanted to terminate T.P.S. regardless of whether living conditions in countries like El Salvador or Sudan were safe. So they decided that only conditions connected to the original T.P.S. decision needed to show improvement.

With this new interpretation, it didn't matter that El Salvador had the highest homicide rate in the world outside a war zone in 2015. It didn't matter that Salvadoran parents often kept their children home from school, for fear that their boys would be dragooned into gangs and their girls would be assaulted. It didn't matter that the American Embassy in San Salvador sent a diplomatic cable in July 2017 suggesting that, given the country's dismal record of job creation, repatriated T.P.S. holders, or their children, could be pushed into criminal employment. The 1990 T.P.S. decision for El Salvador expired in 1992. So all that mattered was whether the country's infrastructure had recovered from the destruction caused by the quakes that spurred the 2001 designation.

In November, three days before the acting secretary of homeland security, Elaine Duke, needed to announce her decision on T.P.S. for Honduras and Nicaragua, she attended a meeting at the White House. Its purpose, according to its agenda, was "to coordinate the conditions and process for terminating temporary protected status (T.P.S.) for aliens from El Salvador, Honduras, Nicaragua and Haiti," all countries with designations connected to natural disasters. In a briefing paper for this meeting — one of a trove of documents unearthed by the Ramos suit — the White House stated its new reading of the law. The statute, it said, required a decision on whether to extend the status "based on an evaluation of the conditions that initially warranted granting T.P.S."

"This is not how any prior administration had read the statutes," Arulanantham noted. "They had consistently looked at whether it was safe period, not whether it was safe with respect to something." In a letter that Secretary of State Rex Tillerson sent to Duke a few days before the meeting, he acknowledged that neither El Salvador nor Honduras could ensure the safety of repatriated T.P.S. recipients or their U.S.-citizen children. He even observed that ending T.P.S. could hurt American interests by angering Central American leaders. "They may take retaliatory actions counter to our longstanding national security and economic interests," he wrote, "like withdrawing their counternarcotics and anti-gang cooperation with the United States, reducing their willingness to accept the return of their deported citizens or refraining from efforts to control illegal migration." Yet Tillerson still claimed that the four countries no longer met "the legal requirements necessary for extension" — a remarkable assertion given that country condition reports appended to his letter contradicted this conclusion.

Handwritten notes taken by Duke during the meeting suggest that Attorney General Jeff Sessions may have told her and other officials that they needed to "bite the bullet" on T.P.S. terminations because "no one has the guts to pull the trigger." The urgency of pulling that trigger was suggested in the briefing paper's conclusion: It was important to end T.P.S. for El Salvador, Honduras, Nicaragua

and Haiti, it suggested, because extending the protection "would also lengthen the period during which beneficiaries would deepen their connections to the United States."

Prosecutors in the Ramos case argue that by suddenly departing from decades of "consistent interpretation and corresponding practice" without explanation, D.H.S. violated the Administrative Procedure Act, which states that agencies cannot silently or secretly depart from earlier policy and that public accounting of new policies is especially required when they contradict previous practice. "Despite multiple discovery requests," the prosecutors wrote, the Trump administration was "unable to identify or produce a single document" showing that earlier administrations required current country conditions to be "directly tied" to the specific conditions that initiated a country's T.P.S. designation.

Duke told me that she knew the new reading was a departure from previous practice, but she did not believe that precedent was a good basis for making decisions in immigration because too many previous actions had distorted the statutes. They are "not effective," she said. "So to counter the ineffectiveness of the statutes, some people chose to interpret into them the outcomes that they desire."

When McGovern confronted Nielsen about T.P.S. for Salvadorans shortly after she was confirmed as the new secretary of D.H.S., Nielsen said that lawyers advised her that she could not legally renew it. "Your lawyers are wrong," McGovern recalls saying. He told Nielsen that he wanted to talk to the lawyers who were advising D.H.S. But he said no lawyers ever got in touch. (Nielsen did not respond to multiple requests for comment.)

"It became very clear to me this was a political decision to end it," McGovern told me. "It had nothing to do with the law." Because the Ninth Circuit Court of Appeals decided the District Court did not have jurisdiction to overturn the Trump-era interpretation of the T.P.S. statute, the new reading will remain intact. In other words, T.P.S. status has become even more precarious, and future designations

Case 3:25-cv-05687-TLT   Document 18-25   Filed 07/08/25   Page 21 of 25

may shift according to political whim, without any judicial review. This means that even the Biden administration's new T.P.S. designations for Venezuela and Myanmar could be easily terminated by a future administration.



Morales with Crista in 2004.  From Cristina Morales

**A few years ago,** McGovern took his daughter to El Salvador and visited the memorial at El Mozote, where in 1981 the Atlacatl soldiers slaughtered unarmed men, women and children. "The hamlet was known throughout the zone as a stronghold of the Protestant evangelical movement," Danner notes in his history of the atrocity. Because evangelicals were anti-Communist, the townspeople thought they had nothing to fear from the Salvadoran Army. They were wrong. When reports of the massacre first appeared in The New York Times and The Washington Post, Reagan officials dismissed the news as Marxist propaganda.

But forensic anthropologists, who entered the area after the peace accords were signed, unearthed hundreds of skeletons. One hundred and thirty-six children died in a church sacristy, which had been raked with bullets and then set on fire. "There's a list of the names of people who died and their ages," McGovern said.

Case 3:25-cv-05687-TLT    Document 18-25    Filed 07/08/25    Page 22 of 25

"Some of the ages are 0 — because they were infants that were murdered, right?" Most of the cartridge cases recovered from the sacristy had stamps indicating that they were made for the United States government in Lake City, Mo.

"We hurt the people of El Salvador," McGovern said. "I think we have a duty to make it right." In his office in Washington, McGovern keeps a poster showing the six murdered Jesuits and a photograph of a Salvadoran mural depicting Archbishop Romero, whom Pope Francis canonized in 2018. "Helping those with T.P.S. regularize their status and become citizens would be a step in the right direction," he said. In March, Representative Lucille Roybal-Allard of California introduced a new version of the American Dream and Promise Act, which would grant conditional permanent legal status to DACA and T.P.S. recipients. But as Central American migrants gather at our Southern border, the chances of passing any bill that includes permanent legalizations are waning. It now looks unlikely that Congress will make any real progress in reforming the system, yet again leaving millions of immigrants vulnerable to the shifting agendas of America's presidents.

In 2018, nearly two million undocumented immigrants in the United States were from Central America, more than from any other region except Mexico. Many people have heard about the violence, the lawlessness and the destitution that provoke these people to enter the United States. But few remember America's role in creating these conditions during the Cold War. In Guatemala in 1954, the United States overthrew a democratically elected president who tried to implement labor and land reforms. In Nicaragua, it funded a covert war against a socialist government and lined a harbor with mines. In Honduras, it spent more than $1 billion in military aid and tacitly supported death squads. In Panama, it established a neocolonial Canal Zone and set up a school, the U.S. Army School of the Americas, that trained some 60,000 Latin American military officers to use torture and execution techniques. It's telling that Costa Rica — located about an hour from El Salvador by plane, and more than twice El Salvador's size — is not a significant

source of immigration to the United States; it's the most prosperous nation in Central America. Unlike its neighbors, Costa Rica avoided military intervention by the United States.

In a 1904 message to Congress, President Theodore Roosevelt explicitly justified U.S. intervention anywhere in Latin America on the grounds that a "civilized nation," like the United States, should exercise "an international police power." El Salvador might have recovered from its experience with this power if President Bill Clinton had not signed the Illegal Immigration Reform and Immigrant Responsibility Act in 1996. This popular bill fast-tracked the deportation of criminals, and these removals sent violent offenders to El Salvador, a country that had not yet recovered the rule of law. The deportations helped transform a California heavy-metal gang, MS-13, into a transnational criminal syndicate that terrorizes much of the country.

"There has never been anything of a legal nature that recognizes U.S. culpability for these conditions," said Karen Musalo, an international-law professor at University of California, Hastings. "And there seems to be, frankly, a total amnesia about it." Biden's administration has suggested that the United States spend $4 billion "to address the underlying causes of migration" from Central America. But history suggests that money alone is no solution. In the wrong hands, with the wrong incentives, money is part of the problem.

In late March, a few days after the anniversary of Romero's assassination, some 40 members of the National T.P.S. Alliance gathered in a corner of Freedom Plaza in Washington to pay homage to the Salvadoran saint. Most of the plaza was taken over by dozens of skateboarders that Saturday. The noise of their boards hitting stone steps and low granite walls formed a soundtrack of indifference as the sun set and Elsy Flores Ayala, another plaintiff in the Ramos case, read in Spanish from Isaiah 53:

> He was pierced for our transgressions,
> He was crushed for our iniquities;
> The punishment that brought us peace was on him.

7/1/25, 12:30 PM    Their Lawsuit Prevented Their Deportations. Now It's Their Call. - The New York Times

Case 3:25-cv-05687-TLT    Document 18-25    Filed 07/08/25    Page 24 of 25

The White House stood a couple of blocks away. The sound of military helicopters arriving and departing from its grounds occasionally interrupted the service.

A week earlier, members of the alliance began a 43-day hunger strike that worked like a relay. A few members would sit in the plaza and stop eating for two or three days, then they'd go back to work and others would take their places. Cristina Morales is flying in early this month for her turn. The alliance hopes that these efforts will pressure the Senate to pass the American Dream and Promise Act, which was passed by the House on March 18, or at least draw mainstream media attention to their cause. But few people seem to be paying attention. T.P.S. is too confusing, too historically complicated. Talking about its details, I often watched people's eyes glaze over.

But for some of those watching the outdoor screening of the movie "Romero" that chilly spring night, history still felt visceral. Antonio Vasquez, 56, attended Romero's funeral as a teenager. He walked 10 miles from his house to pay his respects because, he said, Romero "was the voice of the people." When he arrived at the funeral, he joined a huge, peaceful crowd. Then a bomb went off, and gunfire started. People fell near him, and he ran in terror until he reached his own neighborhood. His wife, Maribel, another T.P.S. holder, sat next to their 9-year-old daughter watching the movie. She attended Romero's funeral with her uncle because her own father was murdered — hanged and decapitated after abduction from his home. "El Salvador never recovered from that war," Vasquez said. His brother, a 70-year-old small business owner, told him not to think of returning. He can barely make a living; the gangs extort his profits. "It's sad for me," Vasquez said. After 20 years as a law-abiding taxpayer, he still had to worry about being sent back. "I've spent my energy here," he said, "my youth, my life."

---

## 'We hurt the people of El Salvador. I think we have a duty to make it right.'

---

**Marcela Valdes** is a staff writer for The New York Times Magazine. She specializes in writing about

7/1/25, 12:30 PM          Their Lawsuit Prevented 140,000 Deportations. Now It's Broken Still. - The New York Times

Case 3:25-cv-05687-TLT     Document 18-25     Filed 07/08/25     Page 25 of 25

Latino and Latin American politics and culture.

---

A version of this article appears in print on , Page 25 of the Sunday Magazine with the headline: A Forgotten Promise