BRETT A. SHUMATE
Assistant Attorney General
YAAKOV M. ROTH
Principal Deputy Assistant Attorney General
Civil Division
WILLIAM H. WEILAND
Acting Assistant Director
ERIC SNYDERMAN
ANNA DICHTER
LAUREN BRYANT
CATHERINE ROSS
AMANDA B. SAYLOR
JEFFREY M. HARTMAN
C. FRED SHEFFIELD
DANIEL CAPPALLETTI
SHELBY WADE
Trial Attorneys
U.S. Department of Justice, Civil Division
Office of Immigration Litigation
General Litigation and Appeals Section
P.O. Box 868, Ben Franklin Station
Washington, DC 20044

Attorneys for Defendants

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| NATIONAL TPS ALLIANCE, *et al*., <br><br> Plaintiff, <br> v. <br><br> KRISTI NOEM, in her official capacity as Secretary of Homeland Security, *et al*., <br><br> Defendants. | Case No. 3:25-cv-5687 <br><br> **DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION TO POSTPONE EFFECTIVE DATE OF AGENCY ACTION** <br><br> Judge: Hon. Trina L. Thompson <br> Date:  July 29, 2025 <br> Time:  2:00 PM <br> Place: Courtroom 9, 19th Floor, <br>       San Francisco U.S. Courthouse |

## TABLE OF CONTENTS

INTRODUCTION ..................................................................................................................1

BACKGROUND ...................................................................................................................3

I.      STATUTORY BACKGROUND .............................................................................3

II.     FACTUAL BACKGROUND ...................................................................................5

        A.      TPS for Nepal ..............................................................................................5

        B.      TPS for Honduras ........................................................................................6

        C.      TPS for Nicaragua .......................................................................................7

STANDARDS OF REVIEW ................................................................................................8

ARGUMENT .......................................................................................................................8

I.      THIS COURT LACKS JURISDICTION TO GRANT PLAINTIFFS THE RELIEF
        THEY SEEK .............................................................................................................8

        A.      The TPS Statute Bars Plaintiffs' Claims....................................................8

        B.      Section 1252(f)(1) Precludes Plaintiffs' Requested Relief.......................11

II.     PLAINTIFFS HAVE FAILED TO DEMONSTRATE A LIKELIHOOD OF
        SUCCESS ON THE MERITS ................................................................................13

        A.      The Secretary of Homeland Security May Terminate a Country's TPS
                Designation ................................................................................................13

        B.      The Secretary's TPS Termination Determinations Do Not Violate the Fifth
                Amendment Because the Determinations were Related to Immigration Policy
                Objectives and Not Motivated by Racial Animus ......................................16

III.    ANY HARM PLAINTIFFS MAY SUFFER IS BASED ON THE INHERENTLY
        TEMPORARY NATURE OF TEMPORARY PROTECTED STATUS....................20

IV.     THE BALANCE OF THE EQUITIES AND PUBLIC INTEREST WEIGH
        AGAINST INJUNCTIVE RELIEF .........................................................................22

V.      PLAINTIFFS' REQUESTED RELIEF IS OVERBROAD.......................................24

CONCLUSION....................................................................................................................26

# TABLE OF AUTHORITIES

## <u>CASES</u>

Ali v. Fed. Bureau of Prisons,
  552 U.S. 214 (2008) ................................................................................................... 9

All. For the Wild Rockies v. Cottrell,
  632 F.3d 1127 (9th Cir. 2011) ................................................................................. 23

*Amgen, Inc. v. Smith*,
  357 F.3d 103 (D.C. Cir. 2004) ............................................................................. 9, 10

*Biden v. Texas*,
  597 U.S. 785 (2022) ................................................................................................. 12

Cal. Tow Truck Ass'n v. City & County of San Francisco,
  807 F.3d 1008 (9th Cir. 2015) ................................................................................... 9

DCH Reg'l Med. Ctr. v. Azar,
  925 F.3d 503 ............................................................................................................ 10

Dep't of Commerce v. New York,
  588 U.S. 752 (2019) ........................................................................................... 13, 14

Dep't of Homeland Sec. v. Regents of the Univ. of Cal.,
  591 U.S. 1 (2020) ............................................................................................... 18, 19

Dep't of Homeland Security v. D.V.D.,
  145 S. Ct. 2153 (2025) ............................................................................................. 23

Dollar Rent A Car of Washington, Inc. v. Travelers Indem. Co.,
  774 F.2d 1371 (9th Cir. 1985) ................................................................................. 20

*FDA v. Wages and White Lion Invs.*, L.L.C.,
  145 S. Ct. 898 (2025) ............................................................................................... 16

*Fiallo v. Bell*,
  430 U.S. 787 (1977) ........................................................................................... 17, 18

*Galvan v. Press*,
  347 U.S. 522 (1954) ................................................................................................. 17

*Galvez v. Jaddou*,
  52 F.4th 821 (9th Cir. 2022) .................................................................................... 12

*Garland v. Aleman Gonzalez*,
    596 U.S. 543 (2022)...................................................................................... 12, 13

*Gill v. Whitford*,
    585 U.S. 48 (2018)............................................................................................... 24

*Hecht v. Bowles*,
    321 U.S. 321 (1944)............................................................................................. 25

*Hollingsworth v. Perry*,
    558 U.S. 183 (2010)......................................................................................... 1, 23

*Kleindienst v. Mandel*,
    408 U.S. 753 (1972)............................................................................................. 17

Lamar, Archer & Cofrin, LLP v. Appling,
    584 U.S. 709 (2018)............................................................................................... 9

*Lopez v. Brewer*,
    680 F.3d 1068 (9th Cir. 2012) .............................................................................. 8

*Mathews v. Diaz*,
    426 U.S. 67 (1976)............................................................................................... 17

*National TPS Alliance*,
    703 F. Supp. 3d , 2025 WL 957677 (N.D. Cal. Mar. 31, 2025) ............................ 1

*New York*,
    140 S. Ct. 599 (2020)........................................................................................... 25

*Nken v. Holder*,
    556 U.S. 418 (2009)............................................................................................. 23

*Noem v. Doe*, No. 24A1079,
    605 U.S. __ (May 30, 2025) ................................................................................ 23

*Noem v. National TPS Alliance*,
    No. 24A1059, 2025 WL 1427560 (S. Ct. May 19, 2025)......................................... 1

*Patel v. Garland*,
    596 U.S. 328 (2022)........................................................................................... 9, 10

*Ramos v. Wolf*,
    975 F.3d 872 (9th Cir. 2020) ....................................................................... *passim*

S. Yuba River Citizens League v. Nat'l Marine Fisheries Serv.,
    804 F. Supp. 2d 1045 (E.D. Cal. 2011).................................................... 20, 21, 22

*Sampson v. Murray*,
    415 U.S. 61 (1974) ................................................................................................ 8, 25

*Sanchez v. Mayorkas*,
    593 U.S. 409 (2021) ................................................................................................... 4

*Schrill v. Plunkett*,
    760 F. Supp. 1378 (D. Or. 1990) ............................................................................ 22

*Shaughnessy*,
    342 U.S. ................................................................................................................... 17

Skagit County Pub. Hosp. Dist. No. 2 v. Shalala,
    80 F.3d 379 (9th Cir. 1996) ..................................................................................... 10

*Stanley v. Illinois*,
    405 U.S. 645 (1972) ................................................................................................. 22

Starbucks Corp. v. McKinney,
    602 U.S. 339 (2024) ................................................................................................. 25

*Taiebat v. Scialabba*,
    No. 17-civ-0805-PJH, 2017 WL 747460 (N.D. Cal. Feb. 27, 2017) ................. 22, 24

*Trump v. CASA, Inc.*,
    606 U.S. ---, 2025 WL 1773631 (June 27, 2025) .................................................. 3, 24

*Trump v. Hawaii*,
    585 U.S. 667 (2018) ..................................................................................... 3, 16, 17, 18

U.S. Nat'l Bank of Oregon v. Indep. Ins. Agents of Am., Inc.,
    508 U.S. 439 (1993) ................................................................................................. 12

United States R.R. Retirement Bd. v. Fritz,
    449 U.S. 166 (1980) ................................................................................................. 18

Village of Arlington Heights v. Metro. Hous. Dev. Corp.,
    429 U.S. 252 (1977) ..................................................................................... 3, 16, 18

*Washington v. Trump*,
    847 F.3d 1151 (9th Cir. 2017) ................................................................................. 22

*Webster v. Doe*,
    486 U.S. 592 (1988) ................................................................................................. 16

*Winter v. NRDC*,
    555 U.S. 7 (2008) .................................................................................................. 8, 13

# **STATUTES**

1 U.S.C. § 204(a) ................................................................................................ 12

5 U.S.C. § 701(a)(1) ........................................................................................... 9

5 U.S.C. § 705 ................................................................................... 2, 8, 12, 25

6 U.S.C. § 557 ..................................................................................................... 4

8 U.S.C. Ch. 12 .................................................................................................. 12

8 U.S.C. § 1103 ................................................................................................... 4

8 U.S.C. § 1252(f)(1) ................................................................................... 2, 11

8 U.S.C. § 1254a ........................................................................................ 11, 12

8 U.S.C. § 1254a(b) ................................................................................... 1, 2, 4

8 U.S.C. § 1254a(b)(1) ............................................................................... 14, 16

8 U.S.C. § 1254a(b)(1)(C) ................................................................................ 20

8 U.S.C. § 1254a(b)(2) ............................................................................... 4, 5, 8

8 U.S.C. § 1254a(b)(2)(B) ................................................................................ 21

8 U.S.C. § 1254a(b)(3)(B) ................................................................... 13, 15, 21

8 U.S.C. § 1254a(b)(5)(A) .......................................................................  2, 8, 16

Pub. L. No. 101-649 ............................................................................................ 4

U.S.C. § 705 ...................................................................................................... 25

U.S.C. § 1254a(b)(1)(C) ..................................................................................... 9

# **REGULATIONS**

*Designation of Honduras Under [TPS]*
64 Fed. Reg. 524. .............................................................................................. 6

*Designation of Nepal for [TPS]*
80 Fed. Reg. 36,346. .......................................................................................... 5

*Designation of Nicaragua Under [TPS]*
64 Fed. Reg. 526. ............................................................................................... 7

*Extension of the Designation of Nepal for [TPS]*
  81 Fed. Reg. 74,470. ........................................................................................ 5

*Reconsideration and Rescission of Termination of the Designation of Nepal for [TPS]; Extension of the
  [TPS] Designation for Nepal*
  88 Fed. Reg. 40,317 ........................................................................................... 5

*Reconsideration and Rescission of Termination of the Designation of Honduras [TPS]; Extension of the
  [TPS] Designation for Honduras*
  88 Fed. Reg. 40,304 ........................................................................................... 6

*Reconsideration and Rescission of Termination of the Designation of Nicaragua for [TPS]; Extension of
  the [TPS] Designation for Nicaragua*
  88 Fed. Reg. 40,294 ........................................................................................... 7

*Termination of Designation of Angola Under the TPS Program*
  68 Fed. Reg. 3,896 ........................................................................................... 15

*Termination of Designation of Lebanon Under TPS Program*
  58 Fed. Reg. 7,582 ........................................................................................... 15

*Termination of the Designation of Honduras for [TPS]*
  83 Fed. Reg. 26,074 ........................................................................................... 6

*Termination of the Designation of Honduras for [TPS]*
  90 Fed. Reg. 30,089 ................................................................................... *passim*

*Termination of the Designation of Nepal for [TPS]*
  90 Fed. Reg. 24,151 ................................................................................... *passim*

*Termination of the Designation of Nicaragua for [TPS]*
  90 Fed. Reg. 30,086. ................................................................................. *passim*

*Termination of the Designation of Honduras for [TPS]*
  83 Fed. Reg. 26,074. ......................................................................................... 6

*Termination of the Designation of Nicaragua for [TPS]*
  82 Fed. Reg. 59,636. ......................................................................................... 7

## <u>Other Authorities</u>

Executive Order 14,159 .............................................................................. 13, 24

# INTRODUCTION

Defendants Kristi Noem, in her official capacity as Secretary of Homeland Security, the U.S. Department of Homeland Security (DHS), and the United States of America, respectfully submit this opposition to Plaintiffs' Motion to Postpone Effective Date of Agency Action. (Mot.), ECF No. 17.

In *Noem v. National TPS Alliance*, No. 24A1059, 2025 WL 1427560 (S. Ct. May 19, 2025) ("*NTPSA I*"), the Supreme Court granted the government's application for a stay of a district court order in a similar lawsuit, *National TPS Alliance*, 703 F. Supp. 3d 807, 2025 WL 957677, at *47 (N.D. Cal. Mar. 31, 2025). In granting a stay, the Supreme Court necessarily concluded that the government would likely prevail on its arguments, including its argument that courts lack jurisdiction to review the Secretary's Temporary Protected status (TPS) determinations. *See Hollingsworth v. Perry*, 558 U.S. 183, 190 (2010). The Court also necessarily concluded that the balance of equities and the public interest favor the government. *See id.* Those conclusions apply in the same way in this similar case, and the Court should deny plaintiff's motion.

In 1990, Congress created the Temporary Protected Status (TPS) program to provide, on a discretionary basis, temporary status to aliens who cannot safely return in the short-term to their home nation, or whose country is temporarily unable to handle adequately the return of its nationals, because of a natural disaster, armed conflict, or other "extraordinary and temporary conditions in the foreign state." 8 U.S.C. § 1254a(b). The Secretary of Homeland Security may designate a country for TPS only if the Secretary determines that certain statutory criteria justifying the designation are met. When a country is designated, eligible aliens from that country who are present in the United States on the effective date of the designation and register with the federal government are temporarily protected from removal and receive authorization to work in the United States. Consistent with the temporary nature of TPS, Congress dictated that the Secretary must regularly review a country's TPS designation and must terminate that designation if she determines that the conditions giving rise to the designation are no longer met. Congress

further provided that "[t]here is no judicial review of any determinations of the [Secretary] with respect to the designation, or termination or extension of a designation, of a foreign state" for TPS under § 1254a(b). 8 U.S.C. § 1254a(b)(5)(A).

Exercising her clear and unreviewable statutory authority, Secretary Noem terminated the TPS designations for Nepal, Honduras, and Nicaragua. *Termination of the Designation of Nepal for [TPS]*, 90 Fed. Reg. 24,151 (June 6, 2025) ("Nepal Termination"); *Termination of the Designation of Honduras for [TPS]*, 90 Fed. Reg. 30,089 (July 8, 2025) ("Honduras Termination"); *Termination of the Designation of Nicaragua for [TPS]*, 90 Fed. Reg. 30,086 (July 8, 2025) ("Nicaragua Termination"). Notwithstanding the Secretary's clear authority and Congress's decision to commit determinations about terminations to her discretion alone, Plaintiffs, the National TPS Alliance and certain TPS recipients bring this suit challenging the terminations and asserting claims under the APA and the equal protection guarantees of the Due Process Clause of the Fifth Amendment. Plaintiffs ask this court to postpone the effective date of Secretary Noem's termination determinations for Nepal, Honduras, and Nicaragua. The Court should reject those extraordinary requests.

To start, the Court lacks jurisdiction to issue the requested relief. The TPS statute broadly prohibits judicial review of "any determination of the Secretary with respect to" designations, terminations, or extensions of TPS. 8 U.S.C. § 1254a(b)(5)(A). The Secretary's decisions to terminate TPS are precisely the determinations shielded from judicial review under § 1254a. *Id.* And although Plaintiffs style their request for relief as a motion to postpone the effective date of the Secretary's determination under 5 U.S.C. § 705, a provision Plaintiffs tellingly ignore—8 U.S.C. § 1252(f)(1)—bars such relief. Section 1252(f)(1) provides: "Regardless of the nature of the action or claim or of the identity of the party or parties bringing the action, no court (other than the Supreme Court) shall have jurisdiction or authority to *enjoin or restrain* the operation of the provisions of part IV of this subchapter … other than with respect to the application of such provisions to an individual alien against whom proceedings … have been initiated." 8 U.S.C.

§ 1252(f)(1) (emphasis added). Section 1254a is one such covered provision, and an order preventing the Secretary's determination from having any legal effect is thus precisely the sort of order "enjoin[ing] or restrain[ing]" the Secretary that § 1252(f)(1) prohibits.

Plaintiffs' claims lack merit in any event. The Secretary's TPS determinations do not run afoul of the TPS statute, and each determination comports with all procedural requirements. As the Federal Register Notices (FRNs) for each termination clearly demonstrate, the Secretary considered statutorily authorized factors in reaching the conclusions that termination of TPS for Nepal, Honduras, and Nicaragua are appropriate. Plaintiffs' APA claims fare no better, because they fail to identify any specific evidence indicating that the Secretary was motivated by discriminatory animus. To the contrary, the evidence demonstrates that Secretary Noem's termination decisions are immigration policies rationally related to government objectives and are not motivated by racially discriminatory intent. That is true regardless of whether the Court applies the deferential standard recognized in *Trump v. Hawaii*, 585 U.S. 667 (2018), as applicable to such claims in the immigration context, or the balancing sometimes applied in other contexts set forth in *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252 (1977).

Finally, Plaintiffs seek an overbroad, universal remedy the Court lacks authority to issue under the equitable principles the Supreme Court recognized in *Trump v. CASA, Inc.*, 606 U.S. ---, 2025 WL 1773631 (June 27, 2025). The Administrative Procedure Act does not displace those principles, and Plaintiffs do not need universal relief to redress their alleged injuries. Accordingly, should the Court grant relief to Plaintiffs, it should limit its order to the individual Plaintiffs (or, at absolute most, to NTPSA's members).

## **BACKGROUND**

## I.    STATUTORY BACKGROUND

The Immigration Act of 1990 established a program for temporary, discretionary shelter in the United States for aliens from countries experiencing ongoing armed conflict, environmental disaster, or

"extraordinary and temporary conditions" that temporarily prevent the aliens' safe return (or, for environmental disasters, temporarily render the country unable to adequately handle its nationals' return. Pub. L. No. 101-649, 104 Stat. 4978. The statute authorizes the Secretary, "after consultation with appropriate agencies of the Government," to designate countries for TPS if she finds:

> (A) … that there is an ongoing armed conflict within the state and, due to such conflict, requiring the return of aliens who are nationals of that state to that state (or to the part of the state) would pose a serious threat to their personal safety;
> (B) … that—
>> (i) there has been an earthquake, flood, drought, epidemic, or other environmental disaster in the state resulting in a substantial, but temporary, disruption of living conditions in the area affected,
>> (ii) the foreign state is unable, temporarily, to handle adequately the return to the state of aliens who are nationals of the state, and
>> (iii) the foreign state officially has requested designation under this subparagraph; or
> (C) … there exist extraordinary and temporary conditions in the foreign state that prevent aliens who are nationals of the state from returning to the state in safety, unless the [Secretary] finds that permitting the aliens to remain temporarily in the United States is contrary to the national interest of the United States.

8 U.S.C. § 1254a(b).[1] When the Secretary designates a country for TPS, eligible aliens who are granted TPS may not be removed from the United States and are authorized to work for the duration of the country's TPS designation, so long as they remain in valid temporary protected status. *Id.* § 1254a(a), (c); *see Sanchez v. Mayorkas*, 593 U.S. 409, 412 (2021). Initial designations, and any extensions thereof, may not exceed eighteen months. 8 U.S.C. § 1254a(b)(2), (3)(C). The Secretary must consult with appropriate agencies and review each designation before it ends to determine whether the conditions for the country's designation continue to be met. *Id.* § 1254a(b)(3)(A). If she finds that the foreign state "no longer continues to meet the conditions for designation," she "shall terminate the designation" by publishing notice in the Federal Register of the determination and the termination's basis. *Id.* § 1254a(b)(3)(B). If she "does not determine" that the foreign state "no longer meets the conditions for designation," then the

---

[1] Congress transferred these powers from the Attorney General to the Secretary of Homeland Security. 8 U.S.C. § 1103; 6 U.S.C. § 557.

1  TPS designation "is extended for an additional period of 6 months (or, in the discretion of the [Secretary],

2  a period of 12 or 18 months)." *Id.* § 1254a(b)(3)(C). Finally, the statute makes TPS determinations

3  unreviewable by providing that "[t]here is no judicial review of any determination of the [Secretary] with

4  respect to the designation, or termination or extension of a designation, of a foreign state under this

5  subsection." *Id.* § 1254a(b)(5)(A).

6  **II.    FACTUAL BACKGROUND**

7      **A.  TPS for Nepal**

8          On June 24, 2015, the Secretary designated Nepal for TPS for a period of 18 months due to

9  "substantial, but temporary, disruption of living conditions" resulting from an earthquake. *Designation of*

10  *Nepal for [TPS]*, 80 Fed. Reg. 36,346 (June 24, 2015). TPS was extended for an additional 18 months on

11  October 26, 2016. *Extension of the Designation of Nepal for [TPS]*, 81 Fed. Reg. 74,470 (Oct. 26, 2016).

12  In 2018, DHS announced the termination of TPS for Nepal; however, litigation resulted in the continued

13  extension of TPS documentation for TPS recipients from Nepal for several years. *See Nepal Termination*,

14  90 Fed. Reg. at 24,152. In 2023, DHS reconsidered the 2018 decision to terminate TPS and again extended

15  TPS for recipients from Nepal, "beginning on December 25, 2023, and ending on June 24, 2025."

16  *Reconsideration and Rescission of Termination of the Designation of Nepal for [TPS]; Extension of the*

17  *[TPS] Designation for Nepal*, 88 Fed. Reg. 40,317, 40,317 (June 21, 2023).

18          On June 6, 2025, DHS published notice in the Federal Register that TPS for Nepal would be

19  terminated effective on August 5, 2025. *Nepal Termination*, 90 Fed. Reg. at 21,152. As the FRN explained,

20  Secretary Noem considered whether there continues to be a substantial, but temporary, disruption of living

21  conditions in Nepal and whether Nepal is able to adequately handle the return of Nepalese nationals. *Id.*

22  The Secretary highlighted notable improvements to disaster preparedness and response, including the

23  construction of disaster-resilient housing, infrastructure, and community systems. *Id.* at 21,512-13. The

24  Secretary considered Nepal's significant reconstruction efforts, including statistics demonstrating that

88.36% of houses destroyed by the earthquake and 81.43% of damaged health facilities had been rebuilt. *Id.* As a result, the Secretary determined that "there is no longer a disruption of living conditions and Nepal is able to handle adequately the return of its nationals." *Id.* at 21,512. Finally, the Secretary considered Nepal's improving fiscal conditions. *Id.* at 21,513.

### B.  TPS for Honduras

In 1999, Attorney General Janet Reno designated Honduras for TPS for 18 months due to "environmental disaster and substantial disruption of living conditions caused by Hurricane Mitch." *Designation of Honduras Under [TPS]*, 64 Fed. Reg. 524 (Jan. 5, 1999). TPS was repeatedly extended until 2018, when the Secretary terminated it. *Termination of the Designation of Honduras for [TPS],* 83 Fed. Reg. 26,074 (June 5, 2018). After the 2018 termination announcement, litigation resulted in the continued extension of TPS documentation for Honduran TPS recipients for several years. *See Honduras Termination*, 90 Fed. Reg. at 30,090. In 2023, DHS reconsidered the 2018 decision to terminate TPS and extended TPS for Honduras through July 5, 2025. *Reconsideration and Rescission of Termination of the Designation of Honduras [TPS]; Extension of the [TPS] Designation for Honduras*, 88 Fed. Reg. at 40,304 (June 21, 2023). On July 8, 2025, DHS published notice in the Federal Register that TPS for Honduras would be terminated effective September 8, 2025. *Honduras Termination*, 90 Fed. Reg. at 30,091. As explained in the FRN, Secretary Noem "determined the conditions supporting Honduras' January 5, 1999 designation for TPS on the basis of environmental disaster due to Hurricane Mitch are no longer met." *Id.* The Secretary noted improvements to access to basic water sources, sanitation, and electricity as well as strengthened disaster management capacity. *Id.* Further, significant hurricane recovery has transformed Honduras into a popular destination for tourists and real estate investors. *Id.* The Secretary observed that assistance from the World Bank has improved emergency response and post-disaster reconstruction efforts and that new projects are transforming Honduras's infrastructure and creating new jobs. *Id.*

### C.  TPS for Nicaragua

Also in 1999, Attorney General Reno designated Nicaragua for TPS for 18 months after an environmental disaster substantially disrupted living conditions, rendering Nicaragua temporarily unable to handle adequately the return of its nationals. *Designation of Nicaragua Under [TPS]*, 64 Fed. Reg. 526 (Jan. 5, 1999). TPS was extended until 2017, when the Acting Secretary terminated it. *See Termination of the Designation of Nicaragua for [TPS],* 82 Fed. Reg. 59,636 (Dec. 15, 2017). After the termination announcement, litigation resulted in the continued extension of TPS documentation for TPS recipients from Nicaragua for several years. *See Nicaragua Termination*, 90 Fed. Reg. at 30,087. In 2023, DHS reconsidered the 2018 decision to terminate TPS resulting in another extension of TPS for recipients from Nicaragua through July 8, 2025. *Reconsideration and Rescission of Termination of the Designation of Nicaragua for [TPS]; Extension of the [TPS] Designation for Nicaragua*, 88 Fed. Reg. at 40,294 (Jun. 21, 2023). On July 8, 2025, DHS published notice in the Federal Register that TPS for Nicaragua would be terminated effective on September 8, 2025. *Nicaragua Termination*, 90 Fed. Reg. at 30,086. As explained in the FRN, Secretary Noem, after consulting with the appropriate U.S. government agencies and reviewing country conditions information, determined that "the conditions supporting Nicaragua's January 5, 1999 designation for TPS on the basis of environmental disaster due to Hurricane Mitch are no longer met." *Id.* at 30,088. Secretary Noem found Nicaragua has made significant progress in recovering from the hurricane's destruction, including improvements to infrastructure, road and bridge construction, schools, and healthcare access. *Id.* Secretary Noem noted growth in Nicaragua's tourism, ecotourism, agriculture, and renewable energy industries and advances in farming and agriculture technology. *Id.* The FRN identifies improvements in housing and food security, as well as restoration of the healthcare sector. *Id.* Finally, Secretary Noem observed that Nicaragua's macroeconomic structure has stabilized, with a record high foreign reserve, sustainable debt load, and well-capitalized banking structure. *Id.*

It is worth noting that Temporary Protected Status, as the name suggests, was always meant to be

a temporary solution for exigent circumstances.  See Black's Law Dictionary, 2024 (defining temporary as "[l]asting for a time only; existing or continuing for a limited time; transitory.").  Congress set the upper limit for an initial TPS designation as "not to exceed eighteen months."  8 U.S.C. § 1254a(b)(2), (3)(C). In the case of Honduras and Nicaragua, this temporary exigency was a hurricane that occurred in November 1998, more than a quarter-century ago.  In the case of Nepal, it was an earthquake that occurred more than a decade ago. As the country conditions reports in each countries' case prove, each country has long overcome the initial unprecedented natural disaster that justified the initial designation in the first place. If the "temporary" in TPS is to have any meaning, it is imperative to both designate and terminate countries' TPS, consistent with the intent of the statute.

## STANDARDS OF REVIEW

The standards of review for relief under 5 U.S.C. § 705 and for preliminary injunctions are the same. *See Sampson v. Murray*, 415 U.S. 61, 80 (1974). A preliminary injunction is "an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012). To get relief, a party must show "he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. NRDC*, 555 U.S. 7, 20 (2008).

## ARGUMENT

I.    **THIS COURT LACKS JURISDICTION TO GRANT PLAINTIFFS THE RELIEF THEY SEEK**

   **A.  The TPS Statute Bars Plaintiffs' Claims**

The TPS statute plainly provides that "[t]here is no judicial review of any determination of the [Secretary] with respect to the designation, *or termination* or extension of a designation, of a foreign state" for TPS. 8 U.S.C. § 1254a(b)(5)(A) (emphasis added). The statute thus makes clear that TPS termination determinations are committed to the Secretary's unreviewable authority. Accordingly, APA challenges to

1  such determinations are prohibited. *See* 5 U.S.C. § 701(a)(1); *Amgen, Inc. v. Smith*, 357 F.3d 103, 113

2  (D.C. Cir. 2004) ("If a no-review provision shields particular types of administrative action, a court may

3  not inquire whether a challenged agency decision is arbitrary, capricious, or procedurally defective.").

4       As Plaintiffs acknowledge, the statutory language of § 1254a(b)(5)(A) clearly applies to "any

5  determination" made "with respect to the designation, or termination, or extension" of TPS. Mot. at 13.

6  The categorical review bar in § 1254a(b)(5)(A) makes clear that Congress did not intend to permit anyone,

7  including an alien or organization of aliens, to obtain review of the Secretary's determinations regarding

8  whether termination of a designation was proper. This includes the way the Secretary weighs how the

9  designation impacts the administration of the program and the security conditions within the United States.

10  8 U.S.C. § 1254a(b)(1)(C), *see Ramos v. Wolf*, 975 F.3d 872, 891 (9th Cir. 2020), *vacated*, 59 F.4th 1010,

11  1011 (9th Cir. 2023) (the statute "generally precludes direct review of the secretary's country-specific

12  TPS determinations").

13       The word "any," modifying "determination" in § 1254a(b)(5)(A), indicates a broad sweep. *See,*

14  *e.g.*, *Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 219 (2008). The phrase "with respect to" in §

15  1254a(b)(5)(A) is likewise broad in scope, as that phrase "is generally understood to be synonymous with

16  the phrase 'relating to'" or "'related to.'" *Cal. Tow Truck Ass'n v. City & County of San Francisco*, 807

17  F.3d 1008, 1021 (9th Cir. 2015). The Supreme Court recently considered the phrase "any judgment

18  regarding the granting of relief" under enumerated provisions of the Immigration and Nationality Act

19  (INA). *Patel v. Garland*, 596 U.S. 328 (2022). There, the Supreme Court pointed out that it "has repeatedly

20  explained, the word 'any' has an expansive meaning." *Id*. at 338 (quotations omitted). The phrase "with

21  respect to" is the equivalent of "regarding" or "concerning." *Lamar, Archer & Cofrin, LLP v. Appling*,

22  584 U.S. 709, 717 (2018); *see also Patel*, 596 U.S. at 339. The use of these phrases "in a legal context

23  generally has a broadening effect, ensuring that the scope of a provision covers not only its subject but

24

also matters relating to that subject." *Patel*, 596 U.S. at 339 (emphasizing that such language precludes judicial review not only of the agency's determination but also "any judgment relating to" it).

Within this framework, the terminations at issue fall well within the statute's "any determination ... with respect to a termination" language. For this reason, § 1254a(b)(5)(A) eliminates this Court's jurisdiction to review any APA claim regarding the terminations including those raised by Plaintiffs regarding the substance of the FRNs and facts that the Secretary considered. *See* Mot. at 14. Plaintiffs should not be allowed to recast their claim as collateral to a TPS determination (while seeking the same underlying relief) so as to benefit from the APA's substantive provisions while avoiding its strictures.

Plaintiffs argue that they can evade the statutory bar because their claims challenge "collateral legal defects" in the process by which Secretary Noem reached her termination decision. Mot. 14. That reasoning is meritless. "If a no-review provision shields particular types of administrative action, a court may not inquire whether a challenged agency decision is arbitrary, capricious, or procedurally defective." *Amgen Inc. v. Smith*, 357 F.3d 103, 113 (D.C. Cir. 2004); *see also Skagit County Pub. Hosp. Dist. No. 2 v. Shalala*, 80 F.3d 379, 386 (9th Cir. 1996) (preclusion provision applies when "procedure is challenged only in order to reverse the individual [unreviewable] decision"). To hold otherwise "would eviscerate the statutory bar, for almost any challenge to [a determination] could be recast as a challenge to its underlying methodology." *DCH Reg'l Med. Ctr. v. Azar*, 925 F.3d 503. 505-507 (D.C. Cir. 2019).

Indeed, the Ninth Circuit had previously rejected plaintiff's theory of judicial review, at least as their APA claims. The "TPS statute," it held, "precludes review of non-constitutional claims that fundamentally attack the Secretary's specific TPS determinations, as well as the substance of her discretionary analysis in reaching those determinations." *Ramos v. Wolf*, 975 F.3d 872, 891 (9th Cir. 2020), *reh'g en banc granted, opinion vacated*, 59 F.4th 1010 (9th Cir. 2023).[2] It was not enough, the

---

[2] That panel decision was vacated so that the case could be heard en banc, *see* 59 F.4th 1010 (9th Cir. 2023), and became moot when, after a change in administration, the government revisited its decisions about the TPS designation and terminations at issue.

1  Ninth Circuit explained, for respondents to "insist that their APA claim does not challenge the specific

2  TPS determination" or to "simply couch[] their claim as a collateral 'pattern or practice' challenge." *Id.*

3  at 893. An APA challenge claiming that a Secretary failed to "adequately explain" her decision or had

4  "depart[ed] from past practice" is "essentially an attack on the substantive considerations underlying the

5  Secretary's specific TPS determinations, over which the statute prohibits review." *Id.*

6       Plaintiffs press that type of APA challenge to the Secretary's determinations related to TPS

7  terminations. The upshot of their claims is that country-specific TPS determinations were flawed because

8  the Secretary failed to consider statutory criteria in making the determinations, improperly departed from

9  past practice, and improperly based her determinations on animus. Mot. at 1 and 20-22. And their claims

10  regarding the effective dates of the terminations also plainly target determinations regarding TPS

11  terminations, because choosing the effective date for a termination requires a determination that relates to

12  the termination. Plaintiffs' challenges to country-specific TPS determinations thus fall squarely within the

13  bar on reviewing TPS determinations. Plaintiffs' flawed view would shrink the TPS statute's broad

14  judicial-review bar to the vanishing point.

15       **B.  Section 1252(f)(1) Precludes Plaintiffs' Requested Relief**

16       Additionally, the relief Plaintiffs seek would have the effect of enjoining or restraining DHS's

17  implementation of the TPS provisions in section 244 of the INA, 8 U.S.C. § 1254a. But 8 U.S.C.

18  § 1252(f)(1) bars such relief. It provides: "Regardless of the nature of the action or claim or of the identity

19  of the party or parties bringing the action, no court (other than the Supreme Court) shall have jurisdiction

20  or authority to enjoin or restrain the operation of the provisions of part IV of this subchapter … other than

21  with respect to the application of such provisions to an individual alien against whom proceedings … have

22  been initiated." 8 U.S.C. § 1252(f)(1) (emphasis added). Section 1254a is one of the statutory provisions

23  § 1252(f)(1) covers. Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), div.

24  C, Pub. L. No. 104-208, §§ 306, 308, 110 Stat. 3009-546. Although in the U.S. Code, § 1254a appears in

Part V, the U.S. Code is inconsistent with the INA, wherein the TPS provisions in Section 244 appear in Chapter 4. *Id.* When there is a conflict, the INA prevails. *See Galvez v. Jaddou*, 52 F.4th 821, 830 (9th Cir. 2022) ("[T]he text of the United States Code 'cannot prevail over the Statutes at Large when the two are inconsistent.'"); *see also U.S. Nat'l Bank of Oregon v. Indep. Ins. Agents of Am., Inc.*, 508 U.S. 439, 448 (1993) ("Though the United States Code is 'prima facie' evidence that a provision has the force of law, 1 U.S.C. § 204(a), it is the Statutes at Large that provides the 'legal evidence of laws,' [1 U.S.C.] § 112...."). INA § 244 lies within chapter 4 of title II of the INA, as amended. Historical editor's codification notes lend further support to this interpretation.

> Renumbering and transfer ... of the sections of the Immigration and Nationality Act that are set out as sections 1251 to 1254a of this title, together with the amendment of the table of contents of the Immigration and Nationality Act ... suggests a Congressional intent to move these renumbered and transferred sections into chapter 4 of title III of the Act ... without actually making such chapter change pursuant to specific directory language. Such a Congressional intent ... would serve to restructure this subchapter by moving sections 1251 through 1254a of this title into Part IV of this subchapter as shown above and have Part V begin with section 1255 of this title.

8 U.S.C. Ch. 12, Subch. II, Pt. V, Refs & Ammos.

Section 1252(f)(1) thus eliminates the lower courts' authority to issue orders enjoining or restraining implementation of 8 U.S.C. § 1254a. Section 705 would "restrain" the Secretary's implementation of the TPS statute by nullifying her TPS terminations while this litigation proceeds. Section 1252(f)(1) thus prohibits that relief. It "generally prohibits" lower courts from entering orders that require "federal officials to take or *to refrain from taking* actions to enforce, implement, or otherwise carry out the specified statutory provisions." *Biden v. Texas*, 597 U.S. 785, 797 (2022) (quoting *Garland v. Aleman Gonzalez*, 596 U.S. 543, 544 (2022)) (emphasis added); *see* Black's Law Dictionary (12th ed. 2024) (defining injunction as "[a] court order commanding or preventing an action"). As the Supreme Court held in *Aleman Gonzalez*, to "restrain" means to "check, hold back, or prevent (a person or thing) from some course of action," to "inhibit particular actions," or to "stop (or perhaps compel)" action. 596 U.S. at 549 (quoting 5 Oxford English Dictionary 756 (2d ed. 1989)). An order postponing the effective

date of implementation or enforcement of termination determinations would thus "restrain" federal officials. *Id.* at 550.

Plaintiffs may respond that § 1252(f)(1) bars only injunctions. But that argument ignores the text of § 1252(f)(1) and fails to give effect to all of its words.

## II.    PLAINTIFFS HAVE FAILED TO DEMONSTRATE A LIKELIHOOD OF SUCCESS ON THE MERITS

### A.  The Secretary of Homeland Security May Terminate a Country's TPS Designation

Even if judicial review were available, Plaintiffs' APA claims would fail on their merits. The Secretary has been entrusted with broad authority in administering the TPS statute, and while § 1254a requires the Secretary to review conditions within foreign states designated for TPS periodically, any subsequent action turns on the Secretary's discretionary findings about whether the conditions for such designation continue to exist. 8 U.S.C. § 1254a(b)(3)(A)-(C). Additionally, if the Secretary, after conducting an in-depth review, determines that the conditions for TPS designation no longer exist, she must terminate the designation. 8 U.S.C. § 1254a(b)(3)(B). Here, the Secretary took the steps required by the TPS statute – Plaintiffs simply disagree with the outcome.

Plaintiffs' suggestion that Secretary Noem's determinations were predetermined and not based on an objective review of country conditions is belied by even a cursory inspection of the FRNs announcing the terminations. *See Nepal Termination*, 90 Fed. Reg. at 24,151; *Honduras Termination*, 90 Fed. Reg. at 30,089; *Nicaragua Termination*, 90 Fed. Reg. 30,087 (July 8, 2025). First, Plaintiffs point to the FRNs' references to Executive Order 14,159, Mot. at 16, to suggest that the Secretary's determination is the result of a "preordained political decision." *Id.* at 15. Although the Secretary did indeed acknowledge considering, among other things, the Administration's immigration policy prerogatives, "[i]t is hardly improper for an agency head to come into office with policy preferences and ideas, discuss them with affected parties, sound out other agencies for support, and work with staff attorneys to substantiate the legal basis for a preferred policy." *Dep't of Commerce v. New York*, 588 U.S. 752, 78 (2019). As the

Supreme Court explains, "a court may not set aside an agency's policymaking decision solely because it may have been influenced by political considerations or prompted by an Administration's priorities.... Such decisions are routinely informed by unstated considerations of politics, the legislative process, public relations, interest groups, foreign relations, and national security concerns (among others)." *Id*. at 782; *see Ramos*, 975 F.3d at 897-98 ("It is expected—perhaps even critical to the functioning of government—for executive officials to conform their decisions to the administration's policies.").

Second, Secretary Noem analyzed the current conditions in her terminations of the TPS designations for Nepal, Honduras, and Nicaragua to determine whether the conditions that gave rise to the initial TPS designations persisted. Plaintiffs argue that the TPS determinations for Nepal, Honduras, and Nicaragua failed to meet the statutory requirements because the decisions cite "positive improvements" in the review of country conditions. Mot. at 16-17. However, the approach Secretary Noem used in evaluating the three TPS designations at issue follows a natural reading of the statute. The statute ties a country's initial TPS designation to specific events or conditions – i.e., an "ongoing armed conflict," "an earthquake, flood, drought, epidemic, … other environmental disaster," or other "extraordinary and temporary conditions." 8 U.S.C. § 1254a(b)(1). The statute emphasizes that the conditions that give rise to the TPS designation must be "temporary" and "extraordinary." *See id*. § 1254a(b)(1)(B)(i) (the Secretary may designate a country for TPS if she finds, among other things, that an environmental disaster causes a "substantial, but temporary, disruption of living conditions"); *id*. § 1254a(b)(1)(C) (the Secretary may designate a country for TPS if she finds that "extraordinary and temporary conditions in the foreign state that prevent aliens who are nationals of the state from returning to the state in safety"). Thus, when the statute mandates that the Secretary periodically evaluate whether "the conditions for [a country's TPS] designation … continue to be met," *id*. § 1254a(b)(3)(A), it follows that the Secretary is to evaluate whether the "extraordinary and temporary" conditions caused by the event that gave rise to the TPS designation continue to exist. Secretary Noem's determinations were consistent with this requirement. *See*

*Nepal Termination*, 90 Fed. Reg. at 24,151 (finding conditions supporting Nepal's June 24, 2015 designation for TPS on the basis of the earthquake are no longer met); *Honduras Termination*, 90 Fed. Reg. at 30,089 (finding that the conditions supporting Honduras' January 5, 1999 designation for TPS on the basis of environmental disaster due caused by Hurricane Mitch over 2 decades ago are no longer met); *Nicaragua Termination*, 90 Fed. Reg. at 30,087 (finding that the conditions supporting Nicaragua's January 5, 1999 designation for TPS on the basis of environmental disaster caused by Hurricane Mitch over two decades ago are no longer met.). Nothing in the statute suggests that periodic evaluation of a TPS designation must incorporate intervening country conditions unrelated to the reason for the initial designation. Mot. at 17. In any event, the Secretary's determinations reflected that, whatever intervening changes had occurred since the initial designation, the current country conditions did not meet the statutory criteria for designation and the respective countries can adequately handle the return of its nationals.

Plaintiffs' argument that the Secretary's determinations deviate from past practice *sub silentio* is also without merit. Though Plaintiffs argue that a 60-day transitional period prior to the expiration of a TPS statute is arbitrary and capricious, the TPS statute plainly permits termination on that timeline. 8 U.S.C. § 1254a(b)(3)(B) (termination "shall not be effective earlier than 60 days after the date the notice is published or, if later, the expiration of the most recent previous extension"). Here, notice of the Secretary's determination terminating TPS for Nepal was published in the Federal Register on June 6, 2025, with an effective date of August 5, 2025, 60 days later. *Nepal Termination*, 90 Fed. Reg. at 24,151. Similar, notices of the Secretary's determinations terminating TPS for Honduras and Nicaragua were published in the Federal Register on July 8, 2025, with an effective date of September 8, 2025. *Honduras Termination*, 90 Fed. Reg. at 30,089; *Nicaragua Termination*, 90 Fed. Reg. at 30,087. Those determinations were also in keeping with prior practice. *See Nepal Termination*, 90 Fed. Reg. at 24,154 (citing *Termination of Designation of Angola Under the TPS Program*, 68 Fed. Reg. 3,896 (Jan. 27, 2003); *Termination of Designation of Lebanon Under TPS Program*, 58 Fed. Reg. 7,582 (Feb. 8, 1993)).

1    Plaintiffs certainly have not identified any "hard-and-fast commitment" by DHS to afford a longer post-

2    termination period, let one alone a firm "earlier [agency] position" on setting such periods in which a TPS

3    recipient could conceivably have a legitimate reliance interest.  *FDA v. Wages and White Lion Invs.*,

4    L.L.C., 145 S. Ct. 898, 918-27 (2025).

5        In short, the termination decisions reflect the results of a careful analysis undertaken by a Cabinet

6    official in consultation with other Cabinet officials and their agencies, the upshot of which was that the

7    conditions giving rise to the country's TPS designation no longer persisted. Plaintiffs have not shown that

8    the Secretary deviated from this statutory framework or adopted a "new policy" in her decision-making

9    process. Mot. at 17.

10       **B. The Secretary's TPS Termination Determinations Do Not Violate the Fifth Amendment**
11       **Because the Determinations were Related to Immigration Policy Objectives and Not**
         **Motivated by Racial Animus**

12       Nor can Plaintiffs bypass the explicit bar on judicial review by framing their claim as a

13    constitutional challenge.[3] *See* 8 U.S.C. § 1254a(b)(5)(A); *supra* § I.A. Even if this Court determines it has

14    jurisdiction to consider Plaintiffs' constitutional claim here, the Secretary's determinations terminating

15    TPS for Nepal, Honduras, and Nicaragua did not violate the Fifth Amendment. Plaintiffs erroneously

16    contend that "discriminatory intent was at least one motivating factor" for Secretary Noem's termination

17    determinations and that strict scrutiny under *Vill. of Arlington Heights*, 429 U.S. at 265, should apply.

18    Mot. at 20. The appropriate standard for any review, however, is set forth in *Hawaii*, 585 U.S. at 703-05.

19    There, in determining that rational-basis review applied, the Supreme Court explained that "the upshot of

20    [its] cases in this context is clear: 'Any rule of constitutional law that would inhibit the flexibility' of the

21    President 'to respond to changing world conditions should be adopted only with the greatest caution,' and

22    our inquiry into matters of entry and national security is highly constrained." *Id*. at 704.

23

24    _____
[3] Section 1254a(b)(5)(A) provides a far clearer bar on review than the statutory provision at issue in
*Webster v. Doe*, 486 U.S. 592, 603-04 (1988).

1      Secretary Noem emphatically denies any racism, ethnic animus, or other improper motivation for

2   her decisions. Instead, Secretary Noem's termination determinations appropriately align with

3   administration immigration policies related to Government objectives of border security and foreign

4   policy. The Supreme Court "ha[s] long recognized the power to expel or exclude aliens as a fundamental

5   sovereign attribute exercised by the Government's political departments largely immune from judicial

6   control." *Fiallo v. Bell*, 430 U.S. 787, 792 (1977). Because decisions in these matters implicate "relations

7   with foreign powers" and involve "classifications … defined in the light of changing political and

8   economic circumstances," such judgments "are frequently of a character more appropriate to either the

9   Legislature or the Executive." *Mathews v. Diaz*, 426 U.S. 67, 81 (1976); *see also Galvan v. Press*, 347

10  U.S. 522, 531 (1954) ("Policies pertaining to the entry of aliens and their right to remain here are peculiarly

11  concerned with the political conduct of government."). The Supreme Court has accordingly made clear

12  that decisions by the political branches about which classes of aliens to exclude or expel will generally be

13  upheld against constitutional challenges so long they satisfy deferential rational-basis review. *Hawaii*, 585

14  U.S. at 704-05; *see also Kleindienst v. Mandel*, 408 U.S. 753, 769-70 (1972) (judicial review of "[p]olicies

15  pertaining to the entry of aliens and their right to remain here" is limited to whether the Executive gave a

16  "facially legitimate and bona fide" reason for its action); *Mathews*, 426 U.S. at 82 (a "narrow standard of

17  review" applies to "decisions made by Congress or the President in the area of immigration and

18  naturalization"); *Shaughnessy*, 342 U.S. at 588-89. Although cases such as *Hawaii*, *Mandel*, and *Fiallo*

19  involved policies directed at aliens seeking to enter the country, those decisions equally support applying

20  rational-basis review in the specific context of these TPS determinations to aliens already present in the

21  United States. *See Hawaii*, 585 U.S. at 703 (noting that rational-basis review will apply "across different

22  contexts and constitutional claims"). TPS decisions involve unique country-specific determinations that

23  both "implicate relations with foreign powers" and "involve classifications defined in the light of changing

24  political and economic circumstances," *Id*. at 702, precisely the situation in which the Supreme Court has

1  repeatedly applied rational-basis review. *See id.*; *Fiallo*, 430 U.S. at 799.

2      Secretary Noem's termination determinations easily pass rational-basis review. In enacting the

3  TPS statute, Congress provided for the availability of a temporary status to aliens who cannot safely return

4  to their home countries because of, *inter alia*, extraordinary and temporary conditions in those countries.

5  Secretary Noem's termination decisions are "plausibly related" to the Government's border security,

6  foreign relations interests, and the objectives of the TPS program. *Hawaii*, 585 U.S. at 704-05; *see also*

7  *United States R.R. Retirement Bd. v. Fritz*, 449 U.S. 166, 179 (1980). After consulting with other

8  appropriate governmental agencies, Secretary Noem determined that the conditions that prompted the TPS

9  designation of Nepal, Honduras, and Nicaragua were no longer present. *Honduras Termination*, 90 Fed.

10  Reg. at 30,091; *Nicaragua Termination*, 90 Fed. Reg. at 30,088; *Nepal Termination*, 90 Fed. Reg. at

11  24,152-53. Secretary Noem's determinations are fully consistent with Congress's goal of providing TPS

12  to eligible aliens until the Secretary determines that the conditions for the country's TPS designation no

13  longer continue to exist. Thus, under the rational basis test, Plaintiffs' equal protection claim fails.

14      Even under the heightened standard in *Arlington Heights*, Plaintiffs' Equal Protection Claim is

15  likely to fail because they cannot establish racially discriminatory intent—because there was none. Under

16  the *Arlington Heights* standard, Plaintiffs must prove that a racially "discriminatory purpose has been a

17  motivating factor in the [government's] decision" to show a violation of the Equal Protection guarantee

18  of the Fifth Amendment Due Process Clause. 429 U.S. at 265-266. In 2020, the Ninth Circuit analyzed an

19  almost identical claim and held that under the *Arlington Heights* standard, plaintiffs failed to present "even

20  serious questions on the merits of their claim that the Secretaries' TPS terminations were improperly

21  influenced by the President's" alleged racial animus. *Ramos*, 975 F.3d at 897 (internal quotations omitted);

22  *see also Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 34-35 (2020) (rejecting a

23  similar equal protection claim where plaintiffs did not show racial animus or disparate impact). Although

24  the 2020 *Ramos* decision has since been vacated on other grounds, its analysis remains instructive.

In *Ramos*, Ninth Circuit held that an equal protection claim failed "due to the glaring lack of evidence tying the President's alleged discriminatory intent to the specific TPS terminations – such as evidence that the President personally sought to influence the TPS terminations, or that any administration officials involved in the TPS decision-making process were themselves motivated by" racial animus. 975 F.3d at 897. The court reasoned that while there was evidence that the President "expressed racial animus against 'non-white, non-European immigrants'" and "the White House influenced the TPS termination decisions," there was "no evidence linking the President's animus to the TPS terminations." *Id*. Moreover, the panel explained, "[i]t is expected – perhaps even critical to the functioning of the government – for executive officials to conform their decisions to the administration's policies" and the "mere fact that the White House exerted pressure on the Secretaries' TPS decisions does not itself support the conclusion that the President's alleged racial animus was a motivating factor in the TPS decisions." *Id*. at 898. Finally, the court addressed the plaintiffs' arguments that the circumstantial evidence and historical background did not demonstrate that racial animus was a motivating factor for the TPS terminations. *Id*. at 898-99.

Plaintiffs disregard the Ninth Circuit's reasoning in *Ramos*, reiterating arguments similar to those the court rejected in that case. As in *Ramos*, here, Secretary Noem provided reasoned explanations for her decision to terminate TPS for Nepal, Honduras, and Nicaragua. *See Honduras Termination*, 90 Fed. Reg. at 30,091; *Nicaragua Termination*, 90 Fed. Reg. at 30,088; *Nepal Termination*, 90 Fed. Reg. at 24,152-53. Plaintiffs have not demonstrated that she harbored racial animus in making the termination determinations at issue. Plaintiffs selectively quote a patchwork of sources from various times and speakers, arguing that they support a generalized inference that Secretary Noem's decisions "sprung at least in part from racial animus" against all non-white aliens. Mot. at 20. They also assert that the circumstantial evidence and historical background of the TPS determinations show that "improper purposes are playing a role." *Id*. at 21. But Plaintiffs fail to establish any direct link between the evidence they provide, much of which pertains to individuals from countries other than Nepal, Honduras, or

Nicaragua, and Secretary Noem's determinations. *See, e.g.*, Mot. at 9-11. For example, Plaintiffs point to remarks made by President Trump – not Secretary Noem – about a country not at issue in this litigation, several years before the termination decisions were published here. *See* Mot. at 21-22. In reality, the Secretary, in consultation with the Department of State, has merely made evidence-based findings to terminate the TPS designations at issue, and spoken in favor of immigration policy that focuses on America's economic and security interests, not racial or ethnic animus. An immigration policy that seeks to further American strategic and foreign policy interests cannot be the basis of an equal protection claim and is in fact contemplated by the TPS statute. *See* 8 U.S.C. § 1254a(b)(1)(C).

## III.    ANY HARM PLAINTIFFS MAY SUFFER IS BASED ON THE INHERENTLY TEMPORARY NATURE OF TEMPORARY PROTECTED STATUS

"An essential element to the granting of a preliminary injunction is a showing of irreparable injury to the moving party in its absence." *Dollar Rent A Car of Washington, Inc. v. Travelers Indem. Co.*, 774 F.2d 1371, 1375 (9th Cir. 1985). Not just any showing of irreparable harm will suffice. A party "is only entitled to an injunction that prevents [the] irreparable harm" that is "likely to occur." *S. Yuba River Citizens League v. Nat'l Marine Fisheries Serv.*, 804 F. Supp. 2d 1045, 1054 (E.D. Cal. 2011) (a party's "showing [of irreparable harm] is required in order to justify the specific measures that [the party] request[s]"). Plaintiffs have failed to make the requisite showing here.

First, Plaintiffs contend that their allegations of APA and Fifth Amendment violations *per se* constitute irreparable harm. Mot. at 22. However, the alleged harms only occur if Defendants violated Plaintiffs' constitutional or statutory rights. As explained above, Plaintiffs are not likely to succeed on those claims. *See* § II.

Second, Plaintiffs allege numerous injuries resulting from the termination determinations that are inherent in the temporary nature of TPS. For example, Plaintiffs allege that, if they lose their TPS, "[m]any will … be at immediate risk of detention and deportation," "will be in a state of limbo – undocumented and without legal authorization to live and work in the United States," or that "TPS holders who may be

1    eligible for other forms of immigration relief may be deprived of the chance to pursue them." Mot. at 23.

2    Plaintiffs further allege that the loss of TPS could result in their separation from family members in the

3    United States or having to bring their U.S. citizen children to an unknown country. *Id.* While Plaintiffs

4    focus on the burden that TPS beneficiaries may face should the terminations be permitted to go into effect,

5    the underlying cause of this harm flows from the statute (*temporary* protected status) itself. *See* 8 U.S.C.

6    § 1254a(b)(1)(B)(i) ("substantial, but temporary"), (b)(1)(B)(ii) ("unable, temporarily"), (b)(1)(C)

7    ("extraordinary and temporary"), (g) ("remain in the United States temporarily"). As explained in the

8    statute, a country's TPS designation must be reviewed at least every 18 months, and there is no guarantee

9    of renewal. 8 U.S.C. § 1254a(b)(2)(B). A TPS beneficiary is therefore always subject to the uncertainties

10   and concerns that Plaintiffs allege here—as Plaintiffs presumably know, given that these TPS designations

11   were previously terminated. Indeed, Plaintiffs claimed harms entirely rely on the premise that they have

12   been allowed to temporarily remain in the United States indefinitely, and should be allowed to continue

13   to do so. *See* ECF No. 1, ¶¶ 18, 129-30, 138-45; Mot. at 22-23. But they make no showing why, in the

14   intervening decades, they have been unable to achieve permanent immigration status. Whatever the

15   reason, the TPS statute was never intended to provide permanent protections, and Plaintiffs' claims that

16   they now have to take steps to either demonstrate their right to remain in the United States or depart, is no

17   basis for their claim that this Court should postpone the effect of the Secretary's exercise of the discretion

18   provided to her by Congress to terminate a country's TPS designation.

19       As Congress designed the TPS statute to provide "temporary" status, *see* 8 U.S.C.

20   1254a(b)(3)(B)(i), (ii), (C), and (g), and the Secretary's termination decision provided the requisite 60-

21   day notice that the TPS designations at issue would terminate, any potential risk of familial separation is

22   not an irreparable harm arising from the termination of TPS, but rather is inherent in the very scheme

23   Congress designed. See 8 U.S.C. 1254a(b)(3)(B). The cases Plaintiffs cite in support of their argument

24   that the separation of families constitutes irreparable harm as a matter of law are inapposite because the

irreparable harms cited in those cases were not assessed against the backdrop of the regular reconsideration and inevitable termination of a temporary status. Mot. at 24. For example, *Stanley v. Illinois*, 405 U.S. 645, 647 (1972), does not address whether the separation of families is an irreparable harm in the context of a temporary status that must come to an eventual end. *Stanley*, 405 U.S. at 647 ("granting a stay of removal in the context of persecution-based relief, but recognizing that "a noncitizen must show that there is a reason specific to his or her case, as opposed to a reason that would apply equally well to all aliens and all cases, that removal would inflict irreparable harm."); *see also Washington v. Trump*, 847 F.3d 1151, 1169 (9th Cir. 2017) (finding that the potential irreparable harm of separating families did not justify a stay).

And even if Plaintiffs identify other concrete harms, those harms will not be remedied by the requested relief. The assurance Plaintiffs seek can only be truly achieved through permanent legal status or legislative action, not interim relief by this Court. Consequently, Plaintiffs have failed to show a likelihood of irreparable harm that could be remedied by this Court, and their request for a preliminary injunction should be denied. *See Taiebat v. Scialabba*, No. 17-civ-0805-PJH, 2017 WL 747460, at *5 (N.D. Cal. Feb. 27, 2017) (denying preliminary injunction where "plaintiff [could not] establish that the mandatory injunction he seeks would address the alleged harm"); *see also S. Yuba River Citizens League*, 804 F. Supp. 2d at 1057 ("[T]he court declines to order an interim measure that will provide no benefit . . . in the interim period."); *Schrill v. Plunkett*, 760 F. Supp. 1378, 1384 (D. Or. 1990) ("Granting plaintiffs' requested injunctive relief would not prevent the alleged" harm), *aff'd*, 932 F.2d 973 (9th Cir. 1991).

## IV.    THE BALANCE OF THE EQUITIES AND PUBLIC INTEREST WEIGH AGAINST INJUNCTIVE RELIEF

Notwithstanding Plaintiffs' failure to establish irreparable harm, Plaintiffs have not shown that the remaining equitable factors tip in their favor, particularly in light of the Supreme Court's recent stay in *NTPSA I*. There the Supreme Court granted the government's application for a stay of a district court order

similar to the one Plaintiffs seek here in lawsuit in which plaintiffs made similar arguments as to irreparable harm. The Supreme Court's stay of that order underscores the strength of the government's position here. When the Supreme Court evaluates whether to stay a lower court's order, it considers the likelihood of success on the merits, irreparable harm should the stay be denied, and the equities and public interest. *Hollingsworth v. Perry*, 558 U.S. 183, 190 (2010). The analysis in this case should end here, because in ruling in the government's favor in a case premised on similar legal theories, the Supreme Court considered these factors and concluded that they tipped in the government's favor. Similarly, the Supreme Court recently stayed an injunction suspending the Government's termination of a parole program, again concluding that the harms the Government faces from nationwide injunctions barring it from implementing immigration policies outweigh harms to opposing parties. *See Noem v. Doe*, No. 24A1079, 605 U.S. __, 1 (May 30, 2025); *see id.* at __ (slip op., at 5-8) (Jackson, J., dissenting) (criticizing the majority's balancing of the equities in the Government's favor); *see also U.S. Dep't of Homeland Security v. D.V.D.*, 145 S. Ct. 2153 (2025) (granting stay of immigration-related preliminary injunction for nationwide class).

As the Supreme Court has explained in the immigration context, the questions of harm to the defendant and the public interest "merge." *Nken v. Holder*, 556 U.S. 418, 435 (2009). The government and the public share an interest in ensuring that the process established by Congress—under which the Secretary of Homeland Security has unreviewable authority to carefully weigh the statutory factors governing TPS designations—is followed as Congress intended. Here, as Secretary Noem observed, the conditions for the TPS determinations for Nepal, Honduras, and Nicaragua no longer continue to be met. *Nepal Termination*, 90 Fed. Reg. at 24,151; *Honduras Termination*, 90 Fed. Reg. at 30,089; *Nicaragua Termination*, 90 Fed. Reg. at 30,086. Ultimately, just as in *NTPSA I* and closely akin to *Noem v. Doe*, the relief Plaintiffs seek would frustrate the Secretary's substantive judgment that even a six-month extension of TPS was contrary to the government's established interests. *See All. For the Wild Rockies v. Cottrell*,

1    632 F.3d 1127, 1138 (9th Cir. 2011) ("We will not grant a preliminary injunction unless those public

2    interests outweigh other public interests that cut in favor of *not* issuing the injunction"). The harm here is

3    particularly pronounced because the Secretary, in accordance with E.O. 14159, ensured that such TPS

4    designations are "appropriately limited in scope and made for only so long as may be necessary to fulfill

5    the textual requirements of that statute. *See Nepal Termination*, 90 Fed. Reg.at 30091 n.10; *Honduras*

6    *Termination*, 90 Fed. Reg. at 24152 n.10; *Nicaragua Termination*, 90 Fed. Reg. 30088 n.4. Delay of the

7    Secretary's decisions threatens to undermine these United States' foreign policy and national interests,

8    particularly where Congress has given the Secretary, in consultation with the appropriate agencies, the

9    broad discretion to assess conditions in foreign countries and reach determinations regarding TPS. It is in

10    the public interest that where the Secretary follows the statutory requirements, the Court should deny the

11    extraordinary remedy of preliminary injunctive relief.

12    **V.    PLAINTIFFS' REQUESTED RELIEF IS OVERBROAD**

13      Even if preliminary relief were warranted here, Plaintiffs have no basis to request universal relief

14    benefitting non-parties. Universal preliminary injunctions are unlawful: Under settled constitutional and

15    equitable principles, the Court may not issue relief that is broader than necessary to remedy actual harm

16    shown by specific Plaintiffs. *CASA, Inc.,* 2025 WL 1773631; *Gill v. Whitford*, 585 U.S. 48, 73 (2018). In

17    *CASA*, the Supreme Court addressed "universal injunctions"—remedies that bar the defendant from

18    enforcing "a law or policy against *anyone*"—issued under the Judiciary Act of 1789. 2025 WL 1773631,

19    at *4. Because "[n]either a universal injunction nor any analogous form of relief was available … at the

20    time of the founding," *id.* at *6, the "universal injunction … falls outside the bounds of a federal court's

21    equitable authority under the Judiciary Act." *Id.* at *8. At most, a court granting equitable relief "may

22    administer complete relief *between the parties*." *Id*. at *11 (cleaned up).

23      Those limitations on courts' equitable authority apply just as squarely to § 705 relief as to APA

24    relief. Nothing in § 705 rebuts the presumption that traditional equitable rules apply to relief ordered under

§ 705, so § 705, like the Judiciary Act of 1789, does not authorize universal relief. The text of § 705 does not contain the sort of clear statement required for a departure from traditional equitable principles. To the contrary, § 705's language embraces principles of equity, authorizing "all necessary and appropriate process" and making clear that "irreparable harm," a traditional equitable inquiry, is a key consideration. 5 U.S.C. § 705. *See Starbucks Corp. v. McKinney*, 602 U.S. 339, 345 (2024) (interpreting similar statutory text to incorporate traditional equitable principles); *Hecht v. Bowles*, 321 U.S. 321, 330 (1944) (courts should not "lightly imply" a "major departure" from the "long tradition" of equity when interpreting a remedial statute). The Supreme Court and commentators alike have thus recognized that § 705 "was primarily intended to reflect" the "existing law," not to "fashion new rules," unmoored from principles of equity, governing remedies. *Sampson v. Murray*, 415 U.S. 61, 80 n.15 (1974); Louis L. Jaffe, *Judicial Control of Administrative Action* 662 (1965) (§ 705 merely "relates the power granted under the All Writs statute to the review of administrative orders" rather than changing existing law on remedies); Tom C. Clark, *Attorney General's Manual on the Administrative Procedure Act* 106 (1947) (§ 705 "is an equitable power, to be exercised 'upon such conditions as may be required.'"); *see also* H.R. Rep. No. 1980, 79th Cong., 2d Sess. 43 (1946) (explaining that the authority granted by what is now § 705 "is equitable" and "would normally, if not always, be limited to the parties complainant"). In sum, there is no basis to read § 705 to depart from these equitable principles. *See CASA*, 2025 WL 177631, at *7 (recognizing that requests for relief that extend beyond the parties are inconsistent with the "party-specific principles" that "permeate the Court's understanding of equity.").

Universal relief here would circumvent the requirement to limit relief to the parties. Plaintiffs, who do not raise class claims in their Complaint and have not moved to certify a class under Rule 23, have made no effort to explain why they should be entitled to such sweeping relief. Granting universal relief in this situation would further encourage forum shopping and could effectively nullify the decisions of other district courts or circuit courts nationwide. *See DHS v. New York*, 140 S. Ct. 599, 601 (2020) (Gorsuch,

1    J., concurring); *see also Ramos*, 975 F.3d. at 902-06 (Nelson, J., concurring).

2                                              **CONCLUSION**

3            This Court lacks jurisdiction to review Secretary Noem's determinations to terminate the TPS

4    designations for Nepal, Honduras, and Nicaragua and to grant Plaintiffs' requested relief. Even if this

5    Court were to find that neither of the two clear jurisdictional bars applies, Plaintiffs' claims fail on the

6    merits and the remaining factors do not support issuance of equitable relief – certainly not universal relief.

7    Dated: July 14, 2025                              Respectfully submitted,

8
                                                        BRETT A. SHUMATE
9                                                       Assistant Attorney General

10                                                      YAAKOV M. ROTH
                                                        Principal Deputy Assistant Attorney General
11                                                      Civil Division

12                                                      WILLIAM H. WEILAND
                                                        Senior Litigation Counsel
13
                                                        ERIC SNYDERMAN
14                                                      ANNA DICHTER
                                                        LAUREN BRYANT
15                                                      CATHERINE ROSS
                                                        JEFFREY M. HARTMAN
16                                                      C. FRED SHEFFIELD
                                                        DANIEL CAPPALLETTI
17                                                      SHELBY WADE
                                                        Trial Attorneys
18
                                                        /s/ *Amanda B. Saylor*
19                                                      AMANDA B. SAYLOR (FL 1034081)
                                                        Trial Attorney
20                                                      U.S. Department of Justice, Civil Division
                                                        Office of Immigration Litigation
21                                                      General Litigation and Appeals Section
                                                        P.O. Box 868, Ben Franklin Station
22                                                      Washington, DC 20044
                                                        Tel: (202) 598-6837
23                                                      Amanda.B.Saylor@usdoj.gov

24                                                      *Attorneys for the Defendants*