Ahilan T. Arulanantham (SBN 237841)
arulanantham@law.ucla.edu
CENTER FOR IMMIGRATION LAW AND
POLICY, UCLA SCHOOL OF LAW
385 Charles E. Young Dr. East
Los Angeles, CA 90095
Telephone: (310) 825-1029

Emilou H. MacLean (SBN 319071)
emaclean@aclunc.org
Michelle (Minju) Y. Cho (SBN 321939)
mcho@aclunc.org
Amanda Young (SBN 359753)
ayoung@aclunc.org
ACLU FOUNDATION
OF NORTHERN CALIFORNIA
39 Drumm Street
San Francisco, CA 94111-4805
Telephone: (415) 621-2493
Facsimile: (415) 863-7832

Attorneys for Plaintiffs
*[Additional Counsel Listed on Next Page]*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| NATIONAL TPS ALLIANCE, DENIS MOLINA, JHONY SILVA, MARIA ELENA HERNANDEZ, O.C., SANDHYA LAMA, S.K., TEOFILO MARTINEZ, <br><br> *Plaintiffs,* <br><br> v. <br><br> KRISTI NOEM, in her official capacity as Secretary of Homeland Security, UNITED STATES DEPARTMENT OF HOMELAND SECURITY, and UNITED STATES OF AMERICA, <br><br> *Defendants.* | Case No. 3:25-cv-05687-TLT <br><br> **PLAINTIFFS' REPLY IN SUPPORT OF MOTION TO POSTPONE EFFECTIVE DATE OF AGENCY ACTION;** <br><br><br> Date:  July 29, 2025 <br> Time:  2:00 PM <br> Place:  Courtroom 9, 19th Floor, <br> San Francisco, U.S. Courthouse |

1 | Additional Counsel for Plaintiffs

2 | Jessica Karp Bansal (SBN 277347)
jessica@ndlon.org
3 | Lauren Michel Wilfong (*Pro Hac Vice*)
lwilfong@ndlon.org
4 | NATIONAL DAY LABORER ORGANIZING NETWORK
1030 S. Arroyo Parkway, Suite 106
5 | Pasadena, CA 91105
Telephone: (626) 214-5689
6 |
Eva L. Bitran (SBN 302081)
7 | ebitran@aclusocal.org
ACLU FOUNDATION
8 | OF SOUTHERN CALIFORNIA
1313 West 8th Street
9 | Los Angeles, CA 90017
Telephone: (213) 977-5236
10 |
Erik Crew (*Pro Hac Vice*)
11 | ecrew@haitianbridge.org
HAITIAN BRIDGE ALLIANCE
12 | 4560 Alvarado Canyon Road, Suite 1H
San Diego, CA 92120
13 | Telephone: (949) 603-7411

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# **TABLE OF CONTENTS**

**Page(s)**

INTRODUCTION ........................................................................................................................ 1

ARGUMENT .............................................................................................................................. 1

I.    THIS COURT HAS JURISDICTION AND AUTHORITY TO GRANT RELIEF. ............. 1

    **A.**    8 U.S.C. Section 1254a(b)(5)(A) Does Not Bar Plaintiffs' Claims .......................... 1

    **B.**    This Court Has Authority to Postpone Agency Action Under 5 U.S.C. § 705 .......... 4

II.    PLAINTIFFS ARE LIKELY TO PREVAIL ON THE MERITS ........................................ 6

    **A.**    The Terminations Violate the APA Because They Were Predetermined and Not Based on Country Conditions Review .......................................................................... 6

    **B.**    The Terminations Violate the APA Because They Broke With Past Practice Without Acknowledgement or Explanation ............................................................................... 9

    **C.**    Plaintiffs Are Likely to Prevail on the Discrimination Claim. ................................... 10

III.    THE EQUITIES WEIGH HEAVILY IN FAVOR OF POSTPONEMENT. ......................... 12

    **A.**    Plaintiffs Will Suffer Irreparable Harm Absent Court Action .................................... 12

    **B.**    The Balance of Equities and Public Interest Favor Postponement. ............................ 14

IV.    PLAINTIFFS' REQUESTED RELIEF IS NOT OVERBROAD. ....................................... 14

CONCLUSION ........................................................................................................................... 15

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbott Labs v. Gardner*,
  387 U.S. 136 (1967)....................................................................................................1

*Al Otro Lado, Inc. v. Mayorkas*,
  619 F. Supp. 3d 1029 (S.D. Cal. 2022), *aff'd in part, vacated in part sub nom.*, *Al
  Otro Lado v. Exec. Off. for Immigr. Rev.*, 120 F.4th 606 (9th Cir. 2024) ......................5

*Amgen v. Smith*,
  357 F.3d 103 (D.C. Cir. 2004) ...............................................................................2, 3

*Az. Dream Act Coal. v. Brewer*,
  81 F. Supp. 3d 795 (D. Ariz. 2015), *aff'd*, 855 F.3d 957 (9th Cir. 2017).....................15

*Bautista-Perez v. Holder*,
  2010 WL 1345028 (N.D. Cal. Apr. 6, 2010) ..............................................................14

*Biden v. Texas*,
  597 U.S. 785 (2022)....................................................................................................5

*Bowen v. Mich. Acad. of Fam. Physicians*,
  476 U.S. 667 (1986)....................................................................................................2

*Career Colls. & Schs. of Tex. v. Dep't of Educ.*,
  98 F.4th 220 (5th Cir. 2024) .......................................................................................15

*CASA, Inc. v. Noem*,
  No. 25-1484-TDC, 2025 WL 1907378 (D. Md. July 10, 2025)....................................3

*DCH Reg'l Med. Ctr. v. Azar*,
  925 F.3d 503 (D.C. Cir. 2019) ...............................................................................2, 3

*Demore v. Kim*,
  538 U.S. 510 (2003)....................................................................................................4

*Department of Commerce v. New York*,
  588 U.S. 752 (2019)....................................................................................................7

*East Bay Sanctuary Covenant v. Biden*,
  993 F.3d 640 (9th Cir. 2021) ................................................................................5, 15

*F.C.C. v. Fox Television Stations, Inc.*,
  556 U.S. 502 (2009)....................................................................................................9

*FDA v. Wages and White Lion Invs., L.L.C.*,
    145 S. Ct. 898 (2025)..................................................................................................10

*Fiallo v. Bell*,
    430 U.S. 787 (1977).....................................................................................................11

*Florida v. United States*,
    660 F. Supp. 3d 1239 (N.D. Fla. 2023).........................................................................5

*Garland v. Aleman Gonzalez*,
    596 U.S. 543 (2022)...................................................................................................4, 5

*Gebhardt v. Nielsen*,
    879 F.3d 980 (9th Cir. 2018) ........................................................................................4

*Harmon v. Thornburgh*,
    878 F.2d 484 (D.C. Cir. 1989) ....................................................................................15

*Immigrant Defs. L. Ctr. v. Mayorkas*,
    2023 WL 3149243 (C.D. Cal. Mar. 15, 2023)...............................................................5

*Jennings v. Rodriguez*,
    583 U.S. 281 (2018).......................................................................................................4

*Kidd v. Mayorkas*,
    734 F. Supp. 3d 967 (C.D. Cal. 2024) ..........................................................................5

*Kleindienst v. Mandel*,
    408 U.S. 753 (1972).....................................................................................................11

*Lands Council v. Powell*,
    395 F.3d 1019 (9th Cir. 2005) ......................................................................................6

*Leiva-Perez v. Holder*,
    640 F.3d 962 (9th Cir. 2011) ......................................................................................13

*Leschniok v. Heckler*,
    713 F.2d 520 (9th Cir. 1983) ......................................................................................13

*Mathews v. Diaz*,
    426 U.S. 67 (1976).......................................................................................................11

*McNary v. Haitian Refugee Center*,
    498 U.S. 479 (1991).......................................................................................................2

*Merrill v. Milligan*,
    142 S. Ct. 879 (2022) (Kavanaugh, J., concurring) .....................................................14

iv

*Monsanto Co. v. Geertson Seed Farms*,
    561 U.S. 139 (2010)...................................................................................................5

*Nat'l TPS All. v. Noem*,
    773 F. Supp. 3d. 807 ....................................................................................2, 5, 11

*Noem v. National TPS Alliance*,
    No. 24A1059, 2025 WL 1427560 (S. Ct. May 19, 2025)............................................14

*Patagonia Corp. v. Bd. of Governors of Fed. Rsrv. Sys.*,
    517 F.2d 803 (9th Cir. 1975) ....................................................................................14

*Patel v. Garland*,
    596 U.S. 328 (2022)...................................................................................................4

*Ramos v. Nielsen*,
    321 F. Supp. 3d 1083 (N.D. Cal. 2018) ........................................................ *passim*

*Ramos v. Nielsen*,
    336 F. Supp. 3d 1075, 1087 (N.D. Cal. 2018) ...........................................................13

*Ramos v. Wolf*,
    975 F.3d 872 (9th Cir. 2020) .................................................................. 3, 10-11, 12

*Ramos v. Wolf*,
    59 F.4th 1010 (9th Cir. 2023) ...............................................................................3, 12

*Regents of the Univ. of Cal. v. DHS*,
    908 F.3d 476 (9th Cir. 2018) *rev'd in part, vacated in part*, 591 U.S. 1 (2020) .........................10

*Reno v. Am.-Arab Anti-Discrimination Comm.*,
    525 U.S. 471 (1999)...................................................................................................4

*Saget v. Trump*,
    375 F. Supp. 3d 280 (E.D.N.Y. 2019) ......................................................................7

*Sanchez v. Mayorkas*,
    593 U.S. 409 (2021)...................................................................................................14

*Skagit County Public Hospital District No. 2 v. Shalala*,
    80 F.3d 379 (9th Cir. 1996) ......................................................................................3

*Stanley v. Illinois*,
    405 U.S. 645 (1972)...................................................................................................13

*Texas v. Biden*,
    646 F. Supp. 3d 753 (N.D. Tex. 2022) ......................................................................5

*Texas v. United States*,
    40 F.4th 205 (5th Cir. 2022) ...................................................................................5

*Town of Orangetown v. Ruckelshaus*,
    740 F.2d 185 (2d. Cir. 1984).................................................................................7

*Trump v. CASA, Inc.*,
    __ S. Ct. __, Nos. 24A884 – 86, 2025 WL 1773631 (June 27, 2025)............................15

*Trump v. Hawaii*,
    585 U.S. 667 (2018).............................................................................................11

*Village of Arlington Heights v. Metropolitan Housing Development Corporation*,
    429 U.S. 252 (1977).................................................................................10, 11, 12

*Washington v. Trump*,
    847 F.3d 1151 (9th Cir. 2017) ............................................................................13

**Statutes**

5 U.S.C. § 705..........................................................................................................4, 14, 15

8 U.S.C. § 1254a(c)(1).......................................................................................1, 2, 3, 4, 7

8 U.S.C. § 1158..................................................................................................................7

8 U.S.C. § 1252............................................................................................................4, 5

Administrative Procedure Act.........................................................................................15

**Other Authorities**

88 Fed. Reg. 40294 (Jun. 21, 2023)...................................................................................8

88 Fed. Reg. 40304 (Jun. 21, 2023)...................................................................................9

88 Fed. Reg. 40317 (Jun. 21, 2023)...................................................................................9

90 Fed. Reg. 8443 (Jan. 20, 2025) (Exec. Order 14, 159)........................................6, 7, 12

90 Fed. Reg. 9040 (Feb. 5, 2025) ...................................................................................7, 8

90 Fed. Reg. 20309 (May 13, 2025)...................................................................................8

90 Fed. Reg. 24151 (Jun. 6, 2025).....................................................................................9

90 Fed. Reg. 30086 (Jul. 8, 2025)......................................................................................8

90 Fed. Reg. 30089 (Jul. 8, 2025)......................................................................................9

1

## INTRODUCTION

2  Defendants would have this Court close its doors to tens of thousands of people who have lived

3  here lawfully for years (and in most cases, decades)—allowing them to be stripped of immigration

4  status, torn from their families, and banished from the country they have called home without even

5  considering their claims. But every district court to consider Defendants' jurisdictional arguments

6  regarding the limits on review of TPS terminations has rejected them. Nor does the Supreme Court's

7  unreasoned emergency stay in a different case dictate the Court's decision here.

8  Defendants focus intently on denying this Court's authority to consider Plaintiffs' claims or

9  grant them relief and barely engage with the merits—perhaps because their actions are indefensible.

10  Defendants have no response to the wealth of evidence supporting Plaintiffs' first APA claim, which

11  shows that Defendants pay lip service to country conditions assessment, but in fact have adopted a

12  general policy of terminating TPS *irrespective of country conditions*, in direct violation of the TPS

13  statute. Nor do they have any coherent answer to Plaintiffs' second APA claim, which rests on the

14  uncontested fact that the agency has *never before*—in the 35-year history of the TPS program—

15  terminated a designation of longer than three years without providing *any* orderly transition period.

16  Finally, as to Plaintiffs' race discrimination claim under the Constitution, substantial evidence

17  establishes that the decision to strip immigration status at issue here was motivated by racial animus—

18  including the racist belief that non-white immigrants are "invading" the United States and therefore

19  must be expelled at all costs. Accordingly, this Court should grant Plaintiffs' Motion and postpone the

20  effective date of the terminations of TPS for Honduras, Nepal, and Nicaragua pending a final decision

21  on the merits.

22

## ARGUMENT

23  ## I.  THIS COURT HAS JURISDICTION AND AUTHORITY TO GRANT RELIEF.

24  ### A.  8 U.S.C. Section 1254a(b)(5)(A) Does Not Bar Plaintiffs' Claims

25  Defendants rely on Section 1254a(b)(5)(A) to dispute jurisdiction, but lack the "clear and

26  convincing evidence" required to show Congress barred Plaintiffs' claims. *Ramos v. Nielsen*, 321 F.

27  Supp. 3d 1083, 1102 (N.D. Cal. 2018) (citing *Abbott Labs v. Gardner*, 387 U.S. 136, 141 (1967)). The

28

statute bars review only of "any determination . . . with respect to the designation, or termination or extension" of TPS. *Id.* It does not bar review of constitutional claims, APA claims that challenge the collateral processes by which such determinations are made, or claims challenging aspects of TPS decision making that are not part of the "designation, or termination, or extension" decision.

First, the Supreme Court has adopted a stringent clear statement rule for provisions attempting to strip jurisdiction over constitutional claims. *Bowen v. Mich. Acad. of Fam. Physicians*, 476 U.S. 667, 680-81 (1986) (rejecting "extreme" position foreclosing constitutional claims). At minimum, a statute must mention constitutional claims. This one does not.

Second, the statute does not bar Plaintiffs' APA claims. Those claims challenge defects in the agency's decisionmaking process that are collateral to any "determination" under the statute. *See Ramos*, 321 F. Supp. 3d at 1101-05 (rejecting Defendants' argument that Section 1254a(b)(5)(A) bars challenges to "generally applicable process, practice, or legal interpretation employed by the Secretary in making [TPS] determinations").

Defendants' broader reading cannot be reconciled with *McNary v. Haitian Refugee Center*, 498 U.S. 479 (1991), or the other Supreme Court and Ninth Circuit cases that interpret statutes limiting judicial review of "determinations" in the immigration context. Mot.14 (Dkt. 17). Those cases preserve review of claims that challenge collateral decisionmaking processes, like Plaintiffs' claims here. This Court is bound by those controlling decisions, as other district courts have uniformly concluded in TPS challenges. *Id.* at 13; *see also Nat'l TPS All. v. Noem*, 773 F. Supp. 3d. 807, 829-31 ("NTPSA I").

Defendants ignore this controlling immigration authority and instead rely on cases interpreting statutes about Medicare. Opp. 10 (Dkt. 45) (citing *Amgen v. Smith*, 357 F.3d 103 (D.C. Cir. 2004) and *DCH Reg'l Med. Ctr. v. Azar,* 925 F.3d 503 (D.C. Cir. 2019)). Those cases do not interpret the word "determination" in the context of a statute regulating jurisdiction over immigration. Moreover, the jurisdiction stripping provision at issue in *Amgen* explicitly precluded review over not only payment "adjustments" but also "[t]he development of the [payment] classification system" itself; it is thus unsurprising that the court held it lacked authority to review the manner in which the agency made a

payment adjustment decision. 357 F.3d at 111 (D.C. Cir. 2004). *DCH Regional Medical Center* is similarly inapposite. The court there recognized that it might have had authority to review the manner by which the agency calculated payments if the regulatory scheme had provided a general rule for calculating payments that was applied to individual hospitals. *Id.* at 506. The TPS statute *does* provide a general rule for making country conditions determinations that is applied to individual country decisions, so *DCH* provides little guidance. Defendants also cite *Skagit County Public Hospital District No. 2 v. Shalala*, but that case held that a challenge to the process the agency used to arrive at its decision *was* generally reviewable, but had been mooted by a change in the process. 80 F.3d 379, 386 (9th Cir. 1996).

Defendants also rely on the vacated *Ramos* panel decision, Opp. 10-11, but that decision was vacated upon a grant of rehearing en banc. *Ramos v. Wolf*, 59 F.4th 1010 (9th Cir. 2023) (vacating the decision Defendants cite). In other words, a majority of the Ninth Circuit rejected it. Even if the *Ramos* panel decision were good law, it is distinguishable: Plaintiffs do not challenge "substantive considerations underlying the Secretary's specific TPS determinations," but instead her failure to follow the procedures required by statute—in particular her failure to conduct any genuine review of country conditions. *Ramos v. Wolf*, 975 F.3d 872, 893, 890-91 (9th Cir. 2020). Another district court recently reached the same conclusion. *See CASA, Inc. v. Noem*, No. 25-1484-TDC, 2025 WL 1907378, at *10 (D. Md. July 10, 2025) ("claims . . . challenging a general policy or practice to terminate TPS designations on a preordained basis in order to reduce the number of non-white immigrants in the United States . . . are not barred by § 1254a(b)(5)(A)").

Defendants also attempt to evade the controlling authority regarding immigration statutes restricting review of "determinations" by pointing to other words in this statute. Defendants suggest the appearance of "any" before "determination" and the phrase "with respect to" grant them a get-out-of-court-free card. Not so. "Any" cannot expand the meaning of "determination." "[T]he statute's reference to 'any determination' does not subsume 'any' general policies or practices. Rather, the word 'any' must be understood in its grammatical context." *Ramos*, 321 F. Supp. 3d at 1104 (collecting cases). Also courts have consistently read other open-ended terms in jurisdiction-stripping statutes

1  narrowly. *See, e.g., Jennings v. Rodriguez*, 583 U.S. 281, 293–94 (2018) (construing reference to

2  claims "arising from" detention narrowly, because "when confronted with capacious phrases like

3  'arising from,' we have eschewed 'uncritical literalism'") (plurality) (citation omitted); *see also id*.

4  (collecting cases involving "affected," "related to," and "in connection with"); *Demore v. Kim*, 538

5  U.S. 510, 516 (2003) (provision stating "No court may set aside any action or decision . . . regarding

6  the detention . . . of any alien" not broad enough to cover claim that agency lacked statutory and

7  constitutional authority to detain) (citation omitted).

8      Defendants cite the Supreme Court's reliance on the "broadening effect" of the words "any"

9  and "regarding" in *Patel v. Garland*, 596 U.S. 328, 338-39 (2022), but the statute there did not contain

10 the word "determination," and the Court relied on other context clues not present here. *Id.* (citing

11 amendment history of 8 U.S.C. § 1252(a)(2)(D)). When Congress wants to write "categorical review

12 preclusion language" into law, Opp. 13, it knows how to do so, *see, e.g., Gebhardt v. Nielsen*, 879

13 F.3d 980, 984–85 (9th Cir. 2018) (statute specifying decisions were in Secretary's "sole and

14 unreviewable discretion" barred review of all but constitutional claims). The TPS statute does not

15 contain any such broad language.

16     Finally, Plaintiffs' other APA claim concerns the Secretary's decision under *subsection (d)* of

17 the TPS statute to provide no "orderly transition" period for TPS holders affected by her termination

18 decisions. 8 U.S.C. § 1254a(d)(3). The TPS statute's jurisdiction stripping provision concerns only

19 determinations under *subsection (b),* and so cannot reach Plaintiffs' challenge to a decision under

20 subsection (d). *See id.* § 1254a(b)(5)(A) (limiting judicial review of determinations "*under this*

21 *subsection*," i.e. subsection (b)).

## B.    This Court Has Authority to Postpone Agency Action Under 5 U.S.C. § 705.

23     Defendants are wrong that postponement of the challenged agency action under §705 of the

24 APA constitutes an injunction barred under 8 U.S.C. § 1252(f)(1).  That statute "generally prohibits

25 lower courts from entering *injunctions* that order federal officials to take or to refrain from taking

26 actions to enforce, implement, or otherwise carry out" certain immigration statutes. *Garland v. Aleman*

27 *Gonzalez*, 596 U.S. 543, 550 (2022) (emphasis added); *Reno v. Am.-Arab Anti-Discrimination Comm.*,

28

1  525 U.S. 471, 481 (1999) (Section 1252(f) is "nothing more or less than a limit on injunctive relief").

2  Every court to consider the question—including the Fifth Circuit, another court in this district

3  in a recent case concerning TPS, and at least five other district courts—has ruled that APA relief is

4  *not* functionally the same as an injunction. *Texas v. United States*, 40 F.4th 205, 219–20 (5th Cir.

5  2022) (holding Section 1252(f)(1) "did not apply to vacatur" and, thus, DHS is "unlikely to

6  demonstrate" a lack of "jurisdiction to vacate unlawful agency action"); *NTPSA I*, 773 F. Supp. 3d at

7  825-30; *Kidd v. Mayorkas*, 734 F. Supp. 3d 967, 987 (C.D. Cal. 2024) (Section 1252(f) inapplicable

8  because vacating ICE policy neither "compels nor restrains further agency decision-making") (citation

9  omitted); *Florida v. United States*, 660 F. Supp. 3d 1239, 1284–85 (N.D. Fla. 2023) (Section

10  "1252(f)(1) does not strip [the Court] of the authority to vacate either of the challenged policies under

11  the APA."); *Al Otro Lado, Inc. v. Mayorkas*, 619 F. Supp. 3d 1029, 1045–46 (S.D. Cal. 2022) (Section

12  1252(f)(1) does not prevent "'set[ting] aside' or 'vacating' a policy based upon an APA violation"),

13  *aff'd in part, vacated in part sub nom.*, *Al Otro Lado v. Exec. Off. for Immigr. Rev.*, 120 F.4th 606 (9th

14  Cir. 2024); *Immigrant Defs. L. Ctr. v. Mayorkas*, 2023 WL 3149243, at *14 (C.D. Cal. Mar. 15, 2023)

15  (Section 1252(f)(1) "did not bar" vacatur); *Texas v. Biden*, 646 F. Supp. 3d 753, 768 (N.D. Tex. 2022)

16  (same).

17  Defendants cite *Biden v. Texas*, 597 U.S. 785 (2022) for support, Opp. 12, but in fact *Biden*

18  explicitly reserved the question whether its ruling applied to relief under the APA; *id.* at 801 n.4. On

19  remand in that case, the district court rejected Defendants' view. *Texas*, 646 F. Supp. 3d at 768 (citing

20  *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010)).

21  As all of these decisions show, if this Court were to grant Plaintiffs' motion, its order would

22  act directly on the agency action itself; it therefore "would not 'order federal officials to take or to

23  refrain from taking actions to enforce, implement, or otherwise carry out the specified statutory

24  provisions' at issue." *Id.* at 769 (citing *Garland*, 596 U.S. at 550). Instead, it would directly prevent

25  the agency action from taking effect. That is why "[w]hen a reviewing court determines that agency

26  regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to

27  the individual petitioners is proscribed." *East Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 681

28

1    (9th Cir. 2021).

2    **II.    PLAINTIFFS ARE LIKELY TO PREVAIL ON THE MERITS**

3         **A.    The Terminations Violate the APA Because They Were Predetermined and Not
              Based on Country Conditions Review.**

4

5         As Plaintiffs explained in their opening brief, Defendants have adopted a general policy of

6    terminating TPS *without regard to country conditions.* They have applied that policy to terminate TPS

7    not just for Honduras, Nepal, and Nicaragua, but four other countries as well. *See* Mot. 7-13, 15-17.

8    Those decisions violated the TPS statute, which requires the government to engage in an objective

9    review of country conditions when deciding whether or not to extend TPS.

10        Defendants assert that Plaintiffs' predetermination claim fails because the Federal Register

11   Notices announcing the challenged TPS terminations discuss country conditions. Opp. 13.  On their

12   view, that lip service is enough to satisfy the statute, even if no meaningful review took place. But this

13   Court should not ignore the voluminous unrebutted evidence that Defendants decided to terminate *in*

14   *advance*, regardless of what an objective country conditions review would find.[1]  President Trump and

15   Vice President Vance promised during their campaign to "revoke" TPS. Declaration of Jessica Bansal

16   in Support of Plaintiffs' Reply ("Bansal Decl.") Ex. 1; Dkt. 18-19. Once in office, President Trump

17   operationalized that promise via Executive Order 14,159, 90 Fed. Reg. 8443 (Jan. 20, 2025) ("Invasion

18   E.O."). Defendants argue the Secretary's citation to the Invasion E.O. in her TPS termination decisions

19   shows only that she considered "the Administration's immigration policy prerogatives." Opp. 13. But

20   the Invasion E.O. is much more than general policy statement. It expresses President Trump's view

21   that "many" immigrants, including TPS holders, "present significant threats to national security and

22   public safety" and are "committing vile and heinous acts against innocent Americans." 90 Fed. Reg.

23   8443 (Jan. 20, 2025). It makes no attempt to reconcile that view with the fact that any individual who

24   has been convicted of more than one misdemeanor or who can be regarded as "a danger to the security

25   ───────────────

26   [1] To the extent Defendants suggest this Court lacks authority to consider evidence beyond the
     Federal Register Notices themselves, they are wrong. Even at later stages of APA litigation, courts
27   may consider extra-record evidence where the plaintiffs "make a showing of agency bad faith" or "to
     determine whether the agency failed to adequately "consider[] all relevant factors" or "explain[] its
28   decision." *Lands Council v. Powell*, 395 F.3d 1019, 1030 (9th Cir. 2005).

1    of the United States" is ineligible for TPS. 8 U.S.C. 1254a(c)(1); *Id.* 1254a(c)(2)(B)(ii) (citing 8 U.S.C.

2    § 1158)). The Invasion E.O. goes on to express President Trump's view that extensions of TPS

3    designations during the Biden Administration "increase[] or continue[]" the "presence of illegal

4    aliens," despite the fact that individuals with TPS are lawfully present. 90 Fed. Reg. 8443, 8446.

5    Finally, it directs Secretary Noem to "align" TPS designations with "the policies set out by this order."

6    *Id.*

7         Secretary Noem, for her part, has interpreted the Invasion E.O. as a "directive" to "fix" the

8    TPS program. Dkt. 44-2. She has accepted the Invasion E.O.'s faulty premise that TPS holders are

9    illegal, and that TPS designations are therefore illegitimate. *See, e.g.,* 90 Fed. Reg. 9040, 9042 (Feb.

10   5, 2025) ("TPS has allowed a significant population of inadmissible or illegal aliens without a path to

11   lawful immigration status to settle in the interior of the United States"); Dkt. 18-11 (describing vacatur

12   of Haiti's TPS as "part of President Trump's promise to rescind policies that were magnets for illegal

13   immigration and inconsistent with the law"). Accordingly, for the Secretary, "fix[ing]" TPS means

14   ending it. *See* Dkt. 18-11 (revoking TPS for Haiti returned "integrity" to the TPS program); Dkt. 18-

15   24 (same for Afghanistan); Dkt. 18-13 (same for Haiti); Bansal Decl. Ex. 2 (same for Nicaragua); *see*

16   *also* Dkt. 18-31 (implying prior extensions of Honduras's TPS designation over the past two decades

17   were improper because "Temporary Protected Status was designed to be just that—temporary").

18        Relying on *Department of Commerce v. New York*, 588 U.S. 752 (2019), Defendants argue "a

19   court may not set aside an agency's policymaking decision solely because it may have been influenced

20   by political considerations or prompted by an Administration's priorities." Opp. 14. (quoting *Dep't of*

21   *Commerce*, 588 U.S. at 78). But the government *lost* the *Dept' of Commerce* case. The Supreme Court

22   struck down that agency action because "agencies [must] offer genuine justifications for important

23   decisions," and the reasons the agencies offered were a pretext for their true unlawful purpose. *Id.* at

24   756. The same is true here. The Secretary's efforts to conform her TPS decisions to the Invasion E.O.

25   "cause[d] the agency's action to be influenced by factors not relevant under the controlling statute."

26   *Town of Orangetown v. Ruckelshaus*, 740 F.2d 185, 188 (2d. Cir. 1984). *See also Saget v. Trump*, 375

27   F. Supp. 3d 280, 346-48 (E.D.N.Y. 2019) (holding that DHS Secretary during first Trump

28

1    administration "violated the TPS statute because she did not conduct the periodic review in accordance

2    with the dictates of the statute—her decision was preordained and pretextual, and it was made in part

3    due to political influence").

4         Defendants never seriously contest the overwhelming evidence showing that the recent TPS

5    decisions are *not* based on an objective country conditions review. Even now, the State Department

6    warns against travel to both Honduras and Nicaragua. Bansal Decl. Exs. 3-4. In the last few months

7    Defendants have repeatedly found that foreign nationals can safely return to countries the State

8    Department deems *too dangerous* for U.S. citizens to even visit. *Compare* 90 Fed. Reg. 9040 (Feb. 5,

9    2025) (finding "notable improvements" "allow for [Venezuelan] nationals to be safely returned to

10   their home country"), *and* 90 Fed. Reg. 20309 (May 13, 2025) (finding "notable improvements in the

11   security and economic situation such that requiring the return of Afghan nationals to Afghanistan does

12   not pose a threat to their personal safety"), *and* Dkt. 18-13 ("conditions have improved to the point

13   where Haitians can return home in safety") *with* Bansal Decl. Ex. 5 ("Do not travel to Venezuela due

14   to the high risk of wrongful detentions, terrorism, kidnapping, the arbitrary enforcement of local laws,

15   crime, civil unrest, poor health infrastructure."); Dkt. 18-12 ("Do not travel to Afghanistan due to civil

16   unrest, crime, terrorism, risk of wrongful detention, kidnapping, and limited health facilities."); Bansal

17   Decl. Ex. 6 ("Do not travel to Haiti due to kidnapping, crime, terrorist activity, civil unrest, and limited

18   health care.").

19        Defendants have arrived at these implausible conclusions by ignoring entire categories of

20   country conditions that formed the basis for prior TPS designations and extensions. *See* Mot. 9-12.

21   For example, the State Department warns travelers to reconsider visiting Nicaragua "due to arbitrary

22   enforcement of laws, the risk of wrongful detention, and limited healthcare availability." Bansal Decl.

23   Ex. 4. Prior TPS extensions for Nicaragua regularly took these conditions into account. *See, e.g.,* 88

24   Fed. Reg. 40294, 40300 (Jun. 21, 2023) (extending TPS for Nicaragua based in part on "political

25   instability," including arbitrary law enforcement and wrongful detention). The termination decision

26   does not mention them. 90 Fed. Reg. 30086 (Jul. 8, 2025). Similarly, while the State Department urges

27   travelers to reconsider traveling to Honduras due to crime, including "widespread" "[v]iolent gang

28

activity, such as extortion, violent street crime, rape, narcotics, and human trafficking," Bansal Decl. Ex. 3 , and prior TPS extensions for Honduras were based in part on the "staggering levels of crime" in the country, 88 Fed. Reg. 40304, 40310 (Jun. 21, 2023), the termination decision fails to address crime at all, 90 Fed. Reg. 30089 (Jul. 8, 2025). As to Nepal, while prior extensions were based in part on widespread food insecurity and lack of access to sanitation, 88 Fed. Reg. 40317 (Jun. 21, 2023), the termination notice mentions neither, 90 Fed. Reg. 24151 (Jun. 6, 2025).

A consistent pattern of reviewing only good conditions while ignoring bad ones suggests pretext rather than objective decisionmaking, as the TPS statute and the APA require.

### B. The Terminations Violate the APA Because They Broke With Past Practice Without Acknowledgement or Explanation.

Plaintiffs' second APA claim contends that Defendants inexplicably broke with past practice in ordering people who have lived here lawfully *for years*—more than 26 years for people from Honduras and Nicaragua—to leave in just *two months*. This violated the APA because Defendants did not acknowledge or explain why they broke with the agency's long-standing practice of providing at least a six-month orderly transition period—and, more recently, a 12- or 18-month period—when terminating a TPS designation that lasted more than three years. Mot. 17-19. *See* Dkt. 28 (chart listing all TPS terminations, along with the orderly transition period provided).

Defendants devote less than one page to defending that horrific decision. Opp. at 15-16. They assert the Secretary's failure to provide any orderly transition period does not violate the APA because it does not violate the TPS statute, which sets a 60-day minimum notice period for terminations. *Id.* But the APA imposes its own requirements, apart from the TPS statute itself. Among them, "[t]he APA constrains an agency's ability to change its practices or policies without acknowledging the change or providing an explanation." *Ramos*, 336 F. Supp. 3d at 1089–90. As the Supreme Court has explained, "the requirement that an agency provide reasoned explanation for its action would ordinarily demand that it display awareness that it is changing position. An agency may not, for example, depart from a prior policy sub silentio …. And of course the agency must show that there are good reasons for the new policy." *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). There is simply no good reason to require people who have lived here so long to leave with so little

9

1    notice.

2         Defendants suggest DHS's prior practice regarding orderly transition periods was

3    insufficiently "firm" to require explaining the change. Opp. at 16. But "[t]his constraint on changes to

4    agency policy is not limited to formal rules or official policies. It applies to practices implied from the

5    agency conduct." *Ramos*, 336 F. Supp. 3d at 1090 (citations omitted); *see also FDA v. Wages and*

6    *White Lion Invs., L.L.C.,* 145 S. Ct. 898, 918 (2025) ("we have held that an agency changed its position

7    when it . . . 'abandon[ed a] decades-old *practice* '") (emphasis added) (citation omitted).

8         Defendants do not, and cannot, contest the clear past practice established here. Every prior

9    Administration, Democrat and Republican alike, including the first Trump Administration, provided

10   an orderly transition period when terminating a TPS designation of any substantial length. *See* Dkt.

11   28. Defendants' failure to do so here is cruel. *See* Dkt. 17-4, Declaration of Maria Elena Hernandez ¶

12   17 ("To have only 60 days to wrap up my affairs, after thirty years here, with the loss of status,

13   employment authorization, healthcare, and social security, as well as the risk of detention and

14   deportation, on the other side of the 60 days, is unfathomable."). It is also unlawful.

15        **C.    Plaintiffs Are Likely to Prevail on the Discrimination Claim.**

16        Plaintiffs also argue that the TPS terminations here are unlawful because the agency's action

17   is motivated by racial animus in violation of the Fifth Amendment's non-discrimination component.

18   Defendants scarcely defend against the mountain of evidence establishing that this administration's

19   TPS decisionmaking is motivated by racism. The Court can grant relief on this claim as well.

20        First, claims that a government policy is unconstitutional because it discriminates based on

21   race, ethnicity, or national origin receive heightened scrutiny under *Village of Arlington Heights v.*

22   *Metropolitan Housing Development Corporation*, 429 U.S. 252 (1977). *See Regents of the Univ. of*

23   *Cal. v. DHS*, 908 F.3d 476, 518-20 (9th Cir. 2018) (applying *Arlington Heights* to race discrimination

24   challenge to rescission of Deferred Action for Childhood Arrivals), *rev'd in part, vacated in part*, 591

25   U.S. 1, 34 (2020) (plurality) (same). Every judge to consider what standard applies to discrimination

26   challenges in TPS cases—including the otherwise-divided panel in the Ninth Circuit's *Ramos*

27   decision—has agreed that *Arlington Heights* supplies the correct standard. *See, e.g.*, *Ramos*, 975 F.3d

28

10

1  at 896 (vacated panel majority); *see also id.* 925 (Christen, J., dissenting).

2       Defendants nevertheless argue that deferential review under *Trump v. Hawaii*, 585 U.S. 667

3  (2018), governs Plaintiffs' claim. But as Defendants acknowledge, *Hawaii*'s deferential standard

4  applies to claims that would constrain the "President" from acting on matters relating to "entry and

5  national security." *Id.* at 704; Opp. 16. Here, in contrast, Plaintiffs challenge a decision of an

6  administrative agency (not the President), TPS holders are already here, and the agency did not act for

7  reasons of national security. Thus, whereas *Hawaii* involved a Presidential Proclamation made in the

8  name of national security to restrict entry of noncitizens outside the U.S., this case involves *agency*

9  action pursuant to statute regarding the rights of people lawfully present within the country—many

10 for decades. *NTPSA I*, 773 F. Supp. 3d at 856-57 (reasoning *Hawaii* does not govern review of TPS

11 discrimination claim). The termination notices for Nepal, Honduras, and Nicaragua do not invoke any

12 national security interests, and Defendants' briefing does not point to any.

13       Like *Hawaii*, the other cases on which Defendants rely to argue for a more deferential standard

14 of review all arise in radically different contexts. Opp. 17 (citing *Fiallo v. Bell*, 430 U.S. 787, 791-92

15 (1977) (gender discrimination claim challenging Congress's "exceptionally broad" power to legislate

16 "the *admission* of [noncitizens]") (emphasis added); *Mathews v. Diaz*, 426 U.S. 67 (1976) (challenge

17 to statute applying length-of-residency requirement to noncitizens otherwise eligible for Medicare,

18 and raising no racial animus claim); *Kleindienst v. Mandel*, 408 U.S. 753, 769-70 (1972) (no

19 discrimination claim; noncitizen was abroad)).

20       Under *Arlington Heights*, Plaintiffs are likely to prevail for the reasons explained in their

21 opening brief. *See* Mot. 20-21. Tellingly, Defendants do not attempt to argue that President Trump

22 does not harbor animus against nonwhite, non-European immigrants. The evidence to the contrary is

23 overwhelming. Mot. 20-22. *See also* Bansal Decl. Ex. 7 (decrying migration of "murderers" and

24 "prisoner[s]" "from Africa, from Asia, not just South America"); Bansal Decl. Ex. 8 (stating that "very

25 bad people" from "Congo and Africa," "from Asia," "from the Middle East," and "from South

26 America" have entered the United States "so illegally."); Bansal Decl. Ex. 9 ("[t]hey're poisoning the

27 blood of our country . . . . [N]ot just in South America, not just [the] three or four countries that we

28

1  think about, but all over the world. They're coming into our country from Africa, from Asia, all over

2  the world").

3  Instead, Defendants again rely on the Ninth Circuit's vacated *Ramos* opinion, claiming it

4  forecloses Plaintiffs' discrimination arguments. Op. at 19. But, again, a majority of the Ninth Circuit

5  rejected that decision en banc. *Ramos*, 59 F.4th 1010. In any event, the facts here are stronger for two

6  reasons. First, substantial evidence establishes the Secretary herself was motived by animus. *See* Mot.

7  20-21. Second, the facts with regard to President Trump's influence on the Secretary's termination

8  decisions are stronger than they were in *Ramos*, because the termination notices directly rely on the

9  Invasion E.O. to explain the Secretary's motivation to terminate TPS. Mot. 10-11. Thus, unlike in

10  *Ramos*, the evidence here shows that not only did the President "personally s[eek] to influence the

11  TPS terminations," his animus was adopted by the Secretary. *Ramos*, 975 F.3d at 897.

12  Although *Arlington Heights* supplies the correct standard, Plaintiffs would prevail even under

13  the deferential *Hawaii* standard. Defendants argue the termination decisions were rationally related to

14  "border security, foreign relations interests, and the objectives of the TPS program." Opp. 18. But for

15  the reasons explained, *supra* Pt. II.A, these reasons are not plausible as to TPS holders who have lived

16  here for decades with no criminal history. The decisions explicitly rely on the E.O. to "protect"

17  Americans from an "invasion" of unauthorized immigrants as their justification. But Honduran and

18  Nicaraguan TPS holders have lived lawfully in the U.S. for at least *26 years*, and Nepali TPS holders

19  for at least 10 years; and by definition lack a criminal record. Mot. at 1, 12. Expelling them does not

20  "protect" us from an "invasion" or anything else.

21  **III.    THE EQUITIES WEIGH HEAVILY IN FAVOR OF POSTPONEMENT.**

22  **A.    Plaintiffs Will Suffer Irreparable Harm Absent Court Action.**

23  The equities in this case overwhelmingly favor Plaintiffs, as they will immediately be at risk

24  of detention and deportation to unsafe countries, and torn away from their homes and families, if this

25  Court does not intervene. Mot. 22–25. Defendants do not dispute this. Nor do they dispute that

26  Plaintiffs and other TPS holders will immediately lose their longstanding ability to live, work, go to

27  school, and receive medical insurance and social security in the United States. *Id.*; Opp. 21-22.

28

1    For obvious reasons, courts consistently recognize such harms as irreparable. *See* Mot. 23-24.

2    Defendants nonetheless contest the seemingly-obvious fact that stripping long-time lawful residents

3    of their right to live and work here will cause irreparable harm. They cite *Washington v. Trump*, 847

4    F.3d 1151, 1169 (9th Cir. 2017), but it found the *opposite* of what they cite it for. *Compare* Opp. 22

5    (describing *Washington* as "finding that the potential irreparable harm of separating families did not

6    justify a stay"); *with Washington*, 847 F.3d at 1169 (maintaining TRO and holding that "separat[ing]

7    families" is a "substantial injur[y] and even irreparable harm[]"). Defendants also purport to quote

8    *Stanley v. Illinois*, 405 U.S. 645, 647 (1972), Opp. 22, but the quoted language is not in *Stanley* . It

9    comes from *Leiva-Perez v. Holder*, 640 F.3d 962, 969 (9th Cir. 2011), which says that harm from

10   deportation is not automatically irreparable because noncitizens can be returned to the United States

11   after removal if they prevail on appeal. But Defendants do not argue that TPS holders removed during

12   this action would be able to return to the United States and regain their TPS status if Plaintiffs later

13   prevail. In any event, Plaintiffs' immediate harms also include loss of employment authorization, loss

14   of health insurance and social security benefits, and potentially detention. Mot. 22-24.

15   With no response to the overwhelming evidence or the law, Defendants resort to two arguments

16   rooted in misunderstandings of immigration law. First, they say that harm to TPS holders is "inherent"

17   in the "temporary nature" of TPS. *Id.* at 20-22. That makes no sense. The TPS statute did not require

18   Defendants to terminate Plaintiffs' status. *See infra* 6-12. That TPS designations may be terminated

19   when permitted by the statute does not mean TPS holders suffer no injury when TPS is revoked

20   unlawfully. Indeed, Defendants made the same argument in *Ramos v. Nielsen*, and the district court

21   rejected it, explaining that "the shortening of [] time in the United States and acceleration of [] removal

22   if relief is not granted may constitute irreparable injury." 336 F. Supp. 3d 1075, 1087 (N.D. Cal. 2018);

23   *see also Leschniok v. Heckler*, 713 F.2d 520, 523–24 (9th Cir. 1983) (rejecting argument that unlawful

24   termination of disability benefits did not cause irreparable harm because termination put plaintiffs "in

25   the same situation as the many others the Secretary terminates").

26   Second, Defendants blame Plaintiffs for their harm, as though they could have easily obtained

27   permanent lawful residence if they had just tried harder. But they cite nothing for that suggestion, and

28

it is false. Opp. 21. TPS status does not itself provide a path to permanent residence. *See generally Sanchez v. Mayorkas*, 593 U.S. 409 (2021). Some TPS holders may be able to obtain lawful status through other mechanisms, and when possible many have done so. But because of the vagaries of U.S. immigration law, many others have no clear pathway to lawful status aside from their TPS—even if they have lived here for decades. Those who cannot obtain permanent residence are still harmed by an unlawful termination of the legal status they already have. *See Bautista-Perez v. Holder*, 2010 WL 1345028, at *9 (N.D. Cal. Apr. 6, 2010) ("Plaintiffs clearly benefit from TPS, which confers a temporary immigration status and entitles them to work authorization.").

### B.    The Balance of Equities and Public Interest Favor Postponement.

Defendants ask the Court to prejudge the equities based on the Supreme Court's emergency stay in *Noem v. National TPS Alliance,* No. 24A1059, 2025 WL 1427560 (S. Ct. May 19, 2025) ("NTPSA II"). Opp. at 22-23. But that unreasoned emergency stay says little about the equities even in that case, let alone here. *See Merrill v. Milligan*, 142 S. Ct. 879, 879 (2022) (Kavanaugh, J., concurring) ("To reiterate: The Court's stay order is not a decision on the merits"). The *NTPSA II* emergency stay order did not adopt any rule, let alone the one Defendants advocate: that "harms the government faces from nationwide injunctions barring it from implementing immigration policies outweigh harms to opposing parties." Opp. 23. That would end all preliminary relief in immigration cases and effectively nullify § 705—which authorizes courts to "postpone the effective date of an agency action" to "prevent irreparable injury." Congress has not done that. *See Patagonia Corp. v. Bd. of Governors of Fed. Rsrv. Sys.*, 517 F.2d 803, 813 (9th Cir. 1975) ("Interpretations that nullify statutory provisions . . . are, and should be, disfavored.").

Otherwise, Defendants agree with Plaintiffs that "[t]he government and the public share an interest in ensuring that the process established by Congress . . . is followed as Congress intended." Opp. 23. Because Defendants did not follow that process, these factors favor postponement.

### IV.    PLAINTIFFS' REQUESTED RELIEF IS NOT OVERBROAD.

Because Plaintiffs ask this Court to postpone agency action under Section 705 of the APA, the Court should order relief against the agency action itself. Such action necessarily benefits non-parties,

1    because "[w]hen a reviewing court determines that agency regulations are unlawful, the ordinary result

2    is that the rules are vacated—not that their application to the individual petitioners is proscribed." *East*

3    *Bay Sanctuary Covenant*, 993 F.3d at 681; *see also Harmon v. Thornburgh*, 878 F.2d 484, 495 n.21

4    (D.C. Cir. 1989) (same). As the Fifth Circuit recently explained, "[n]othing in the text of Section 705,

5    nor of Section 706, suggests that either preliminary or ultimate relief under the APA needs to be limited

6    to [the associational plaintiff] or its members." *Career Colls. & Schs. of Tex. v. Dep't of Educ.*, 98

7    F.4th 220, 255 (5th Cir. 2024).

8         That traditional APA rule applies with particular force here. *See East Bay*, 993 F.3d at 681

9    (recognizing the "need for uniformity in immigration policy"); *Az. Dream Act Coal. v. Brewer*, 81 F.

10   Supp. 3d 795, 810 (D. Ariz. 2015), *aff'd*, 855 F.3d 957 (9th Cir. 2017) ("Requiring . . . officials . . . to

11   distinguish between . . . recipients who are members of the [plaintiff] and those who are not is

12   impractical" and holding relief "should apply to all DACA recipients").

13        Defendants suggest the Supreme Court altered this longstanding rule in *Trump v. CASA, Inc.*,

14   __ S. Ct. __, Nos. 24A884 – 86, 2025 WL 1773631 (June 27, 2025), but *CASA* was explicit that its

15   holding was limited to cases involving universal *injunctions*: "Nothing we say today resolves the

16   distinct question whether the Administrative Procedure Act authorizes federal courts to vacate federal

17   agency action." *Id.* at *8 n. 10; *id.* at *21 (Kavanaugh, concurring) ("[g]oing forward, . . . district

18   courts may . . . preliminarily set[] aside . . . an agency rule under the APA."). Section 705 permits

19   courts to "issue all necessary and appropriate process to *postpone the effective date* of an agency

20   action." 5 U.S.C. § 705 (emphasis added). That is all Plaintiffs seek here. Congress clearly authorized

21   courts to take that action, and nothing in *CASA* says otherwise.

22                                          **<u>CONCLUSION</u>**

23        For the reasons described herein and in Plaintiffs' Motion to Postpone, the Court should

24   postpone the effective date of the challenged decisions pending a final decision in this case.

25

26

27

28

Date:  July 18, 2025

Respectfully submitted,

NATIONAL DAY LABORER ORGANIZING
NETWORK
 */s/Jessica Karp Bansal*
Jessica Karp Bansal
Lauren Michel Wilfong (*Pro Hac Vice*)

Emilou MacLean
Michelle (Minju) Y. Cho
Amanda Young
ACLU FOUNDATION
OF NORTHERN CALIFORNIA

Ahilan T. Arulanantham
CENTER FOR IMMIGRATION LAW AND
POLICY, UCLA SCHOOL OF LAW

Eva L. Bitran
Diana Sanchez
ACLU FOUNDATION
OF SOUTHERN CALIFORNIA

Erik Crew (*Pro Hac Vice*)
HAITIAN BRIDGE ALLIANCE

Attorneys for Plaintiffs

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on July 18, 2025, I caused the foregoing to be electronically filed with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to all counsel of record.

NATIONAL DAY LABORER ORGANIZING NETWORK

*/s/ Jessica Karp Bansal*
Jessica Karp Bansal