designation will be effective 60 days from this notice's publication date.[16]

However, DHS recognizes that Nicaragua TPS beneficiaries continue to be employment authorized during the 60-day transition period.[17] Accordingly, through this FRN, DHS automatically extends the validity of certain EADs previously issued under the TPS designation of Nicaragua through September 8, 2025. Therefore, as proof of continued employment authorization through September 8, 2025, TPS beneficiaries can show their EADs that have the notation A–12 or C–19 under Category and a ''Card Expires'' date of January 5, 2018, January 5, 2019, April 2, 2019, January 2, 2020, January 4, 2021, October 4, 2021, December 31, 2022, June 30, 2024, and July 5, 2025.

The Secretary has considered putative reliance interests in the Nicaragua TPS designation, especially when considering whether to allow for an additional transition period similar to that allowed under certain previous TPS terminations. Temporary Protected Status, as the name itself makes clear, is an inherently temporary status. TPS designations are time-limited and must be periodically reviewed. *See* INA sec. 244(b)(3), 8 U.S.C. 1254a(b)(3). TPS notices clearly notify aliens of the designations' expiration dates, and whether to allow for an orderly transition period is left to the Secretary's unfettered discretion. *See* INA sec. 244(b)(3), (d)(3); 8 U.S.C. 1254a(b)(3), (d)(3). The statute inherently contemplates advance notice of a termination by requiring timely publication of the Secretary's determination and delaying the effective date of the termination by at least 60 days after publication of a **Federal Register** notice of the termination or, if later, the existing expiration date. *See* INA sec. 244(b)(3), (d)(3); 8 U.S.C. 1254a(b)(3), (d)(3).

**Notice of the Termination of the TPS Designation of Nicaragua**

By the authority vested in me as Secretary under INA section 244(b)(3), 8 U.S.C. 1254a(b)(3), I have reviewed, in consultation with the appropriate U.S. Government agencies, conditions in Nicaragua, in particular (a) whether there continues to be a substantial, but temporary, disruption of living conditions in the area affected resulting from the environmental disaster; and (b) whether Nicaragua continues to be ''unable, temporarily, to handle adequately the return of its nationals. Based on my review, I have determined that Nicaragua no longer continues to meet the conditions for Temporary Protected Status (TPS) under INA section 244(b)(1)(B), 8 U.S.C. 1254a(b)(1)(B).

Accordingly, I order as follows:
(1) Pursuant to INA section 244(b)(3)(B), 8 U.S.C. 1254a(b)(1)(B), and considering INA section 244(d)(3), 8 U.S.C. 1254a(d)(3), the designation of Nicaragua for TPS is terminated effective at 11:59 p.m., local time, on September 8, 2025.

(2) Information concerning the termination of TPS for nationals of Nicaragua (and aliens having no nationality who last habitually resided in Nicaragua) will be available at local USCIS office upon publication of this notice and through the USCIS Contact Center at 1–800–375–5283. This information will be published on the USCIS website at *www.uscis.gov*.

Kristi Noem,
*Secretary of Homeland Security.*
[FR Doc. 2025–12688 Filed 7–7–25; 8:45 am]
**BILLING CODE 9111–97–P**

---

**DEPARTMENT OF HOMELAND SECURITY**

**U.S. Citizenship and Immigration Services**

**[CIS No. 2818–25; DHS Docket No. USCIS–2014–0007]**

**RIN 1615–ZB75**

**Termination of the Designation of Honduras for Temporary Protected Status**

**AGENCY:** U.S. Citizenship and Immigration Services (USCIS), Department of Homeland Security (DHS).

**ACTION:** Notice.

**SUMMARY:** Through this notice, the Department of Homeland Security (DHS) announces that the Secretary of Homeland Security (Secretary) is terminating the designation of Honduras for Temporary Protected Status (TPS). The designation of Honduras is set to expire on July 5, 2025. After reviewing country conditions and consulting with appropriate U.S. Government agencies, the Secretary has determined that conditions in Honduras no longer support its designation for TPS. The Secretary, therefore, is terminating the TPS designation of Honduras as required by statute. This termination is effective September 8, 2025. After September 8, 2025, nationals of Honduras (and aliens having no nationality who last habitually resided in Honduras) who have been granted TPS under Honduras' designation will no longer have TPS.

**DATES:** The designation of Honduras for TPS is terminated effective at 11:59 p.m., local time, on September 8, 2025.

**FOR FURTHER INFORMATION CONTACT:** Humanitarian Affairs Division, Office of Policy and Strategy, U.S. Citizenship and Immigration Services, Department of Homeland Security, (240) 721–3000.

**SUPPLEMENTARY INFORMATION:**

**Table of Abbreviations**

CFR—Code of Federal Regulations
DHS—U.S. Department of Homeland Security
EAD—Employment Authorization Document
FR—Federal Register
FRN—Federal Register Notice
Government—U.S. Government
INA—Immigration and Nationality Act
Secretary—Secretary of Homeland Security
TPS—Temporary Protected Status
USCIS—U.S. Citizenship and Immigration Services
U.S.C.—United States Code

**What is Temporary Protected Status (TPS)?**

The Immigration and Nationality Act (INA) authorizes the Secretary of Homeland Security, after consultation with appropriate agencies of the U.S. Government, to designate a foreign state (or part thereof) for TPS if the Secretary determines that certain country conditions exist. *See* INA sec. 244(b)(1), 8 U.S.C. 1254a(b)(1). The Secretary, in her discretion, may then grant TPS to eligible nationals of that foreign state (or individuals having no nationality who last habitually resided in the designated foreign state). *See* INA sec. 244(a)(1)(A), 8 U.S.C. 1254a(a)(1)(A).

At least 60 days before the expiration of a foreign state's TPS designation or extension, the Secretary, after consultation with appropriate U.S. Government agencies, must review the conditions in the foreign state designated for TPS to determine whether they continue to meet the conditions required for the TPS designation. *See* INA sec. 244(b)(3)(A), 8 U.S.C. 1254a(b)(3)(A). If the Secretary determines that the conditions in the foreign state continue to meet the specific statutory criteria for TPS designation, TPS will be extended for an

---

[16] *See* 8 CFR 244.19 (''Upon the termination of designation of a foreign state, those nationals afforded temporary Protected Status shall, upon the sixtieth (60th) day after the date notice of termination is published in the **Federal Register**, or on the last day of the most recent extension of designation by the [Secretary of Homeland Security], automatically and without further notice or right of appeal, lose Temporary Protected Status in the United States. Such termination of a foreign state's designation is not subject to appeal.'').

[17] *See* INA 244(a)(1)(B), 8 U.S.C. 1254a(a)(1)(B); *see also* 8 CFR 244.13(b).

additional period of 6 months or, in the Secretary's discretion, 12 or 18 months. *See* INA sec. 244(b)(3)(A), (C), 8 U.S.C. 1254a(b)(3)(A), (C). If the Secretary determines that the foreign state no longer meets the conditions for TPS designation, the Secretary must terminate the designation. *See* INA sec. 244(b)(3)(B), 8 U.S.C. 1254a(b)(3)(B). There is no judicial review of "any determination of the [Secretary] with respect to the designation, or termination or extension of a designation, of a foreign state" for TPS. INA sec. 244(b)(5)(A), 8 U.S.C. 1254a(b)(5)(A).

TPS is a temporary immigration benefit granted to eligible nationals of a country designated for TPS under the INA, or to eligible aliens without nationality who last habitually resided in the designated country. During the TPS designation period, TPS beneficiaries are eligible to remain in the United States, may not be removed, and are authorized to work and obtain an Employment Authorization Document (EAD) so long as they continue to meet the requirements of TPS. TPS beneficiaries may also apply for and be granted travel authorization as a matter of discretion. The granting of TPS does not result in or lead to lawful permanent resident status or any other immigration status. To qualify for TPS, beneficiaries must meet the eligibility standards at INA section 244(c)(2), 8 U.S.C. 1254a(c)(2). When the Secretary terminates a country's TPS designation, beneficiaries return to the same immigration status or category that they maintained before TPS, if any (unless that status or category has since expired or been terminated), or any other lawfully obtained immigration status or category they received while registered for TPS, as long as it is still valid on the date TPS terminates.

### Designation of Honduras for TPS

Honduras was initially designated on January 5, 1999, on the basis of an environmental disaster that resulted in substantial, but temporary, disruption of living conditions, at the request of the Honduran government, and because Honduras was unable, temporarily, to handle adequately the return of its nationals. *See Designation of Honduras Under Temporary Protected Status,* 64 FR 524 (Jan. 5, 1999). The designation had been continuously extended since its initial designation until November 6, 2017, when former Acting DHS Secretary Elaine C. Duke announced that she had not made a decision on Honduras's TPS designation by the statutory deadline, resulting in an automatic 6-month extension of the designation, through July 5, 2018.[1]

In 2018, DHS announced the termination of TPS for Honduras[2] to be effective January 5, 2020, finding that the disruption of living conditions from Hurricane Mitch had decreased and were no longer substantial.[3] However, in response to litigation, DHS announced on May 10, 2019, that it would not implement or enforce the decision to terminate the TPS designation for Honduras. DHS instead continued the validity of TPS-related documentation for Honduran beneficiaries through January 5, 2020.[4] On November 4, 2019, to comply with ongoing litigation, DHS further continued and extended TPS-related documentation for Hondurans through January 4, 2021.[5]

While litigation continued, DHS published three additional **Federal Register** notices (FRNs in 2020,[6] 2021,[7]

---

[1] *See* DHS Press Release, *Acting Secretary Elaine Duke Announcement on Temporary Protected Status for Nicaragua and Honduras,* available at: *https://www.dhs.gov/archive/news/2017/11/06/acting-secretary-elaine-duke-announcement-temporary-protected-status-nicaragua-and; see also Extension of the Designation of Honduras for Temporary Protected Status,* 82 FR 59630 (Dec. 15, 2017).

[2] *See* DHS Press Release, *Secretary of Homeland Security Kirstjen M. Nielsen Announcement on Temporary Protected Status for Honduras* (May 4, 2018), available at: *https://www.dhs.gov/archive/news/2018/05/04/secretary-homeland-security-kirstjen-m-nielsen-announcement-temporary-protected.*

[3] *Termination of the Designation of Honduras for Temporary Protected Status,* 83 FR 26074 (June 5, 2018).

[4] Pursuant to an order to stay proceedings in *Bhattarai* v. *Nielsen,* No. 19–cv–00731, pending resolution of related claims being litigated before the Ninth Circuit Court of Appeals in *Ramos* v. *Nielsen,* No. 18–16981, DHS published a notice that it will not implement or enforce the decision to terminate TPS for Honduras. TPS Beneficiaries from Honduras retained TPS, provided that an alien's TPS status is not withdrawn because of ineligibility. *See Bhattarai* v. *Nielsen,* No. 19–cv–00731 (N.D. Cal. Mar. 12, 2019) and *Ramos* v. *Nielsen,* 326 F. Supp. 3d 1075 (N.D. Cal. 2018). *See Continuation of Documentation for Beneficiaries of Temporary Protected Status Designations for Nepal and Honduras,* 84 FR 20647 (May 10, 2019).

[5] To comply with the preliminary injunctions issued in *Ramos* v. *Nielsen* and *Saget* v. *Trump* and the order to stay proceedings in *Bhattarai* v. *Nielsen. See Saget* v. *Trump,* 375 F. Supp. 3d 280 (E.D.N.Y. 2019); *Continuation of Documentation for Beneficiaries of Temporary Protected Status Designations for El Salvador, Haiti, Nepal, Nicaragua, and Sudan,* 84 FR 59403 (Nov. 4, 2019).

[6] On December 9, 2020, DHS automatically extended the validity of TPS-related documentation for nine months through October 4, 2021, for Honduran beneficiaries. *See Continuation of Documentation for Beneficiaries of Temporary Protected Status Designations for El Salvador, Haiti, Nicaragua, Sudan, Honduras, and Nepal,* 85 FR 79208.

[7] On September 10, 2021, DHS published notice for a fifteen-month extension of TPS for aliens from Honduras until December 31, 2022, while the

and 2022[8]) extending the validity of TPS and TPS-related documentation for Honduran beneficiaries.

Finally, on June 21, 2023, DHS published a FRN reconsidering and rescinding the prior administration's termination of Honduras TPS. The rescission was effective June 9, 2023, and the new 18-month extension of TPS for Honduras began on January 6, 2024, and will remain in effect through July 5, 2025.[9]

### Secretary's Authority To Terminate the Designation of Honduras for TPS

At least 60 days before the expiration of a foreign state's TPS designation or extension, the Secretary, after consultation with appropriate U.S. Government agencies, must review the conditions in the foreign state designated for TPS to determine whether the country continues to meet the conditions required for the TPS designation. *See* INA sec. 244(b)(3)(A), 8 U.S.C. 1254a(b)(3)(A). If the Secretary determines that the foreign state no longer meets the conditions for the TPS designation, the Secretary must terminate the designation. *See* INA sec. 244(b)(3)(B), 8 U.S.C. 1254a(b)(3)(B). The termination may not take effect earlier than 60 days after the date the **Federal Register** notice (FRN) of termination is published, or if later, the expiration of the most recent previous extension of the country designation. *See id.* The Secretary may determine the appropriate effective date of the termination and expiration of any TPS-related documentation, such as EADs. *See id.; see also* INA sec. 244(d)(3), 8 U.S.C. 1254a(d)(3) (providing the Secretary the discretionary "option" to allow for a certain "orderly transition" period if she determines it to be appropriate).

preliminary injunction in *Ramos* and the *Bhattarai* orders remain in effect. Extensions were previously set to expire on October 4, 2021. *See Continuation of Documentation for Beneficiaries of Temporary Protected Status Designations for El Salvador, Haiti, Nicaragua, Sudan, Honduras, and Nepal,* 86 FR 50725.

[8] On November 16, 2022, DHS published a FRN extending the validity period of TPS for covered aliens from several countries, including Honduras, June 30, 2024. *See Continuation of Documentation for Beneficiaries of Temporary Protected Status Designations for El Salvador, Haiti, Nicaragua, Sudan, Honduras, and Nepal,* 87 FR 68717.

[9] *Reconsideration and Rescission of Termination of the Designation of Honduras for Temporary Protected Status; Extension of the Temporary Protected Status Designation for Honduras,* 88 FR 40304 (June 21, 2023); *see also Extension of Re-Registration Periods for Extensions of the Temporary Protected Status Designations of El Salvador, Haiti, Honduras, Nepal, Nicaragua, and Sudan,* 88 FR 86665 (Dec. 14, 2023).

HondurasAR000002

## Reasons for the Secretary's Termination of the TPS Designation for Honduras

Consistent with INA section 244(b)(3)(A), 8 U.S.C. 1254a(b)(3)(A), after consulting with appropriate U.S. Government agencies, the Secretary reviewed country conditions in Honduras and considered whether the conditions for the designation of Honduras continue, including whether there is "substantial, but temporary, disruption in living conditions in the area affected" by the environmental disaster and whether Honduras continues to be "unable, temporarily, to handle adequately the return" of its nationals.[10]

Based on her review and consultation with the Department of State, the Secretary has determined the conditions supporting Honduras' January 5, 1999 designation for TPS on the basis of environmental disaster due to Hurricane Mitch are no longer met. While Hurricane Mitch was a sudden catastrophe that caused severe flooding and associated damage,[11] leading to Honduras' TPS designation, the conditions resulting from Hurricane Mitch no longer cause a "substantial, but temporary, disruption in living conditions in the area affected," and Honduras is no longer "unable, temporarily, to handle adequately the return of its nationals."[12] Honduras has made significant progress recovering from the hurricane's destruction and is now a popular tourism[13] and real estate investment destination.[14]

Honduras has witnessed significant changes in the 26 years since Hurricane Mitch's destruction. Reports indicate that 95.7% of Hondurans have access to a basic water source, 83.8% can access basic sanitation, and 93.2% have access

to electricity.[15] The World Bank has been helping Honduras address its most pressing needs and development challenges, including supporting the Honduran government's emergency response and post disaster reconstruction efforts.[16] With international assistance, Honduras has strengthened its disaster management capacity at the municipal and national levels and improved its capacity to promptly and effectively respond to emergencies.[17] Following disaster management improvements, 18 municipalities adopted risk management and emergency plans, and 38 cities improved their livability, sustainability, and capacity, benefiting 1.3 million people.[18]

Further, new infrastructure projects are set to transform Honduras and create jobs. Foreign direct investment in Honduras has jumped to 1.8 billion USD in 2023, a notable rise from the previous year.[19] Honduras is investing in urban infrastructure, focusing on improving informal settlements and expanding land supply.[20]

As evidence of Honduras' readiness to welcome back its nationals, in January 2025, the Honduran government enacted a plan called "Brother, Come Home," an initiative to support Hondurans deported from the United States that reportedly includes providing monetary and food support, along with access to employment programs.[21]

Additionally, Honduras has been regularly accepting the return of its nationals with final removal orders over the last five years.[22] The Secretary has

determined that Honduras' recent ability to accept the return of it nationals has been and continues to be at least "adequate." [23]

DHS estimates that there are approximately 72,000 nationals of Honduras (and aliens having no nationality who last habitually resided in Honduras) who hold TPS under Honduras' designation.[24]

### Effective Date of Termination of the Designation

The TPS statute provides that the termination of a country's TPS designation may not be effective earlier than 60 days after the FRN is published or, if later, the expiration of the most recent previous extension. *See* INA sec. 244(b)(3)(B), 8 U.S.C. 1254a(b)(3)(B).

Although the statute authorizes the Secretary, at her discretionary option, to allow for an extended "orderly transition" period with respect to the expiration of any TPS-related documentation, such as EADs, the Secretary has determined in her discretion that a 60-day transition period is sufficient. A sixty-day orderly period of transition is consistent with the precedent of previous TPS country terminations and makes clear that the United States is committed to clarity and consistency. *See* INA sec. 244(d)(3), 8 U.S.C. 1254a(d)(3). Accordingly, the termination of the Honduras TPS designation will be effective 60 days from this notice's publication date.[25]

---

[10] *See* E.O. 14159, *Protecting the American People Against Invasion*, sec. 16(b), 90 FR 8443, 8446 (Jan. 20, 2025) (directing that the Secretary should "ensur[e] that designations of Temporary Protected Status are consistent with the provisions of section 244 of the INA (8 U.S.C. 1254a), and that such designations are appropriately limited in scope and made for only so long as may be necessary to fulfill the textual requirements of that statute").

[11] National Environmental Satellite, Data, and Information Service, 25 Years Later: Looking Back at the October Monster Named Mitch (Oct. 27, 2023), available at: *https://www.nesdis.noaa.gov/news/25-years-later-looking-back-the-october-monster-named-mitch* (last visited Apr. 14, 2025).

[12] INA 244(b)(3)(A), 8 U.S.C. 1254a(b)(3)(A).

[13] ReportLinker, Honduras Tourism Industry Outlook 2024–2028, available at: *https://www.reportlinker.com/clp/country/6226/726310* (last visited Apr. 14, 2025).

[14] *Brevitas*, Why Honduras is Gaining Popularity for Real Estate Investment and Airbnb Rentals, Aug. 30, 2024, available at: *https://brevitas.com/articles/2024/8/why-honduras-is-gaining-popularity-for-real-estate-investment-and-airbnb-rentals* (last visited Apr. 14, 2025).

[15] BTI Transformation Index, Honduras, 2024, available at: *https://bti-project.org/fileadmin/api/content/en/downloads/reports/country_report_2024_HND.pdf* (last visited Apr. 14, 2025).

[16] BTI Transformation Index, Honduras, 2024, available at: *https://bti-project.org/fileadmin/api/content/en/downloads/reports/country_report_2024_HND.pdf* (last visited Apr. 14, 2025).

[17] World Bank Group, Honduras: Overview, Oct. 7, 2024, available at: *https://www.worldbank.org/en/country/honduras/overview* (last visited Mar. 26, 2025).

[18] World Bank Group, Honduras: Overview, Oct. 7, 2024, available at: *https://www.worldbank.org/en/country/honduras/overview* (last visited Apr. 14, 2025).

[19] The Latin Investor, 14 strong forecasts for real estate in Honduras in 2025, Feb. 6, 2025, available at: *https://thelatininvestor.com/blogs/news/honduras-real-estate-forecasts* (last visited Apr. 14, 2025).

[20] The Latin Investor, 14 strong forecasts for real estate in Honduras in 2025, Feb. 6, 2025, available at: *https://thelatininvestor.com/blogs/news/honduras-real-estate-forecasts* (last visited Apr. 14, 2025).

[21] The Tico Times, Honduras Prepares for Mass Deportations Under Trump, Jan. 26, 2025, available at: *https://ticotimes.net/2025/01/26/honduras-prepares-for-mass-deportations-under-trump* (last visited Apr. 14, 2025).

[22] See *e.g.* "Project Homecoming Charter Flight Brings Self-Deporters to Honduras, Colombia"

referencing the Honduran government's "Hermano, Hermana, Vuelve a Casa" program, which includes a financial repatriation bonus, food vouchers, and assistance in finding employment, DHS press release, May 19, 2025, available at *https://www.dhs.gov/news/2025/05/19/project-homecoming-charter-flight-brings-self-deporters-honduras-colombia* (last accessed June 3, 2025).

[23] The INA does not define "adequately." Certain "[d]ictionaries define 'adequate' as "sufficient for a specific need or requirement," Adequate, Merriam-Webster's Collegiate Dictionary, or as either: (1) "[f]ully satisfying what is required; quite sufficient, suitable, or acceptable in quality or quantity"; or (2) "[s]atisfactory, but worthy of no stronger praise or commendation; barely reaching an acceptable standard; just good enough," Adequate, Oxford English Dictionary (3d ed. 2011)." *Booker v. Sec'y, Fla. Dep't of Corr.*, 22 F.4th 954, 961 (11th Cir. 2022) (Lagoa, J., specially concurring) (URL citation omitted).

[24] As of April 7, 2025, approximately 21,000 of these nationals of Honduras (and aliens having no nationality who last habitually resided in Honduras) have been granted lawful permanent resident status. Data queried by Department of Homeland Security, U.S. Citizenship and Immigration Services, Office of Performance and Quality April 2025.

[25] *See* 8 CFR 244.19 ("Upon the termination of designation of a foreign state, those nationals afforded temporary Protected Status shall, upon the sixtieth (60th) day after the date notice of termination is published in the **Federal Register**, or on the last day of the most recent extension of designation by the [Secretary of Homeland

Continued

However, DHS recognizes that Honduran TPS beneficiaries continue to be employment authorized during the 60-day transition period.[26] Accordingly, through this FRN, DHS automatically extends the validity of certain EADs previously issued under the TPS designation of Honduras through September 8, 2025. Therefore, as proof of continued employment authorization through September 8, 2025, TPS beneficiaries can show their EADs that have the notation A–12 or C–19 under Category and a ''Card Expires'' date of January 5, 2018, July 5, 2018, January 5, 2020, January 4, 2021, October 4, 2021, December 31, 2022, June 30, 2024, and July 5, 2025.

The Secretary has considered putative reliance interests in the Honduras TPS designation, especially when considering whether to allow for an additional transition period similar to that allowed under certain previous TPS terminations. Temporary Protected Status, as the name itself makes clear, is an inherently temporary status. TPS designations are time-limited and must be periodically reviewed. *See* INA sec. 244(b)(3), 8 U.S.C. 1254a(b)(3). TPS notices clearly notify aliens of the designations' expiration dates, and whether to allow for an orderly transition period is left to the Secretary's unfettered discretion. *See* INA sec. 244(b)(3), (d)(3); 8 U.S.C. 1254a(b)(3), (d)(3). The statute inherently contemplates advance notice of a termination by requiring timely publication of the Secretary's determination and delaying the effective date of the termination by at least 60 days after publication of a **Federal Register** notice of the termination or, if later, the existing expiration date. *See* INA sec. 244(b)(3), (d)(3); 8 U.S.C. 1254a(b)(3), (d)(3).

**Notice of the Termination of the TPS Designation of Honduras**

By the authority vested in me as Secretary under INA section 244(b)(3), 8 U.S.C. 1254a(b)(3), I have reviewed, in consultation with the appropriate U.S. Government agencies, (a) conditions in Honduras, (b) whether there continues to be a substantial disruption of living conditions in the areas affected in Honduras; and (c) whether Honduras can handle adequately the return of its nationals. Based on my review, I have determined that Honduras no longer continues to meet the conditions for

Temporary Protected Status (TPS) under INA section 244(b)(1)(B), 8 U.S.C. 1254a(b)(1)(B).

Accordingly, I order as follows:
(1) Pursuant to INA section 244(b)(3)(B), 8 U.S.C. 1254a(b)(1)(B), and considering INA section 244(d)(3), 8 U.S.C. 1254a(d)(3), the designation of Honduras for TPS is terminated effective at 11:59 p.m., local time, on September 8, 2025.

(2) Information concerning the termination of TPS for nationals of Honduras (and aliens having no nationality who last habitually resided in Honduras) will be available at local USCIS office upon publication of this notice and through the USCIS Contact Center at 1–800–375–5283. This information will be published on the USCIS website at *www.uscis.gov*.

**Kristi Noem,**
*Secretary of Homeland Security.*

[FR Doc. 2025–12621 Filed 7–7–25; 8:45 am]

**BILLING CODE 9111–97–P**

---

# DEPARTMENT OF THE INTERIOR

## Bureau of Land Management

[A2407–014–004–065516; #O2412–014–004–047181.1]

## Intent To Amend the Resource Management Plan for the Miles City Field Office, Montana, and Prepare an Associated Environmental Assessment

**AGENCY:** Bureau of Land Management, Interior.

**ACTION:** Notice of intent.

**SUMMARY:** In compliance with the National Environmental Policy Act of 1969, as amended (NEPA), and the Federal Land Policy and Management Act of 1976, as amended, the Bureau of Land Management (BLM) Montana/Dakotas State Director intends to prepare a resource management plan (RMP) amendment with an associated environmental assessment (EA) for the Miles City Field Office. This notice announces the beginning of the scoping period to solicit public comments, identify issues, provide the planning criteria for public review, and solicit coal resource and development potential data.

**DATES:** To be considered, your comments concerning the scope of the analysis, potential alternatives, and identification of relevant information and studies must be received by August 7, 2025.

**ADDRESSES:** You may submit comments on issues, coal data, and planning

criteria related to the Miles City Field Office RMP amendment and associated EA by any of the following methods:

• *Website: https://eplanning.blm.gov/eplanning-ui/project/2039051/510.*
• *Mail:* Miles City Field Office, 111 Garryowen Road, Miles City, MT 59301.

Documents pertinent to this proposal may be examined online at *https://eplanning.blm.gov/eplanning-ui/project/2039051/510* and at the Miles City Field Office.

**FOR FURTHER INFORMATION CONTACT:** Irma Nansel, Planning and Environmental Coordinator, telephone: 406–233–3653; email: *inansel@blm.gov*; address: 111 Garryowen Road, Miles City, MT 59301. Contact Ms. Nansel to have your name added to our mailing list. Individuals in the United States who are deaf, deafblind, hard of hearing, or have a speech disability may dial 711 (TTY, TDD, or TeleBraille) to access telecommunications relay services for contacting Ms. Nansel. Individuals outside the United States should use the relay services offered within their country to make international calls to the point-of-contact in the United States.

**SUPPLEMENTARY INFORMATION:** The BLM Montana/Dakotas State Director intends to prepare an RMP amendment with an associated EA for the Miles City Field Office RMP. This notice announces the beginning of the scoping process and seeks public input on issues and planning criteria and on coal resource and development potential. The RMP amendment may change the existing Miles City Field Office RMP. The planning area is located in Carter, Custer, Daniels, Dawson, Fallon, Garfield, McCone, Powder River, Prairie, Richland, Roosevelt, Rosebud, Sheridan, Treasure, Wibaux, and portions of Big Horn and Valley Counties, Montana, and encompasses approximately 2.7 million surface acres and 11.7 million acres of Federal coal mineral estate.

**Purpose and Need**

The purpose and need of this RMP amendment and EA is to evaluate coal allocations in the planning area and to determine the availability of lands acceptable for further consideration for coal leasing in accordance with Executive Order (''E.O.'') 14154, ''Unleashing American Energy'' (90 FR 8353, Jan. 29, 2025); E.O. 14156, ''Declaring a National Energy Emergency'' (90 FR 8433, Jan. 29, 2025); E.O. 14148, ''Initial Rescissions of Harmful Executive Orders and Actions'' (90 FR 8237, Jan. 28, 2025); and

Security], automatically and without further notice or right of appeal, lose Temporary Protected Status in the United States. Such termination of a foreign state's designation is not subject to appeal.'').

26 *See* INA 244(a)(1)(B), 8 U.S.C. 1254a(a)(1)(B); *see also* 8 CFR 244.13(b).

**Decision Document**

**USCIS Notice: Termination of the Designation of Honduras for Temporary Protected Status**

(1) Approve the notice for publication in the *Federal Register* and (2) Direct ESEC to use the Federal Register Signature Card to electronically sign the notice.



THE SECRETARY OF STATE

WASHINGTON

April 8, 2025

The Honorable
Kristi Noem
Secretary of the U.S. Department of Homeland Security
Washington, DC 20528

Dear Secretary Noem:

On behalf of the U.S. Department of State, I have assessed that permitting nationals of Honduras to remain temporarily in the United States under 8 U.S.C. 1254a is contrary to the national interest of the United States and in any case is no longer appropriate because Honduras no longer continues to meet the conditions for designation under 8 U.S.C. 1254a(b)(1)(B). Accordingly, I recommend that you terminate the designation of Honduras pursuant to 8 U.S.C. 1254a(b)(3)(A)–(B).

On January 22, 2025, I determined that "to advance our national interest," the foreign policy of the United States is that "we must curb mass migration and secure our borders. The State Department will no longer undertake any activities that facilitate or encourage mass migration." Then, on February 21, I further declared, "Securing America's borders and protecting its citizens from external threats is the first priority foreign affairs function of the United States." The designation of Honduras is "contrary to the national interest of the United States" under 8 U.S.C. 1254a(b)(1)(C) because it facilitates and encourages mass migration by causing more than 76,000 Honduran beneficiaries to remain in the United States.

Also, under Executive Order 14150, "the foreign policy of the United States shall champion core American interests and always put America and American citizens first." Designating Honduras under 8 U.S.C. 1254a(b)(1) does not champion core American interests or put America and American citizens first. Honduras has recovered sufficiently from the temporary

HondurasAR000006

disruption in living conditions that resulted from the environmental disaster caused by Hurricane Mitch in 1999 such that Honduras can adequately handle the return of its nationals. Therefore, the conditions under 8 U.S.C. 1254a(b)(1)(B) no longer even apply.

For these reasons, in consultation with you under 8 U.S.C. 1254a(b)(3)(A), I am recommending that you terminate this designation under 8 U.S.C. 1254a(b)(3)(B).

Sincerely,

Marco Rubio

**U.S. Department of Homeland Security**
U.S. Citizenship and Immigration Services
Refugee, Asylum and International Operations Directorate
5900 Capital Gateway Drive
Camp Springs, MD 20588



# Honduras: Temporary Protected Status (TPS) Country of Origin Information (COI) Considerations[1]

## Overview

In its most recent annual report on human rights in Honduras, the U.S. Department of State stated:

> Violence and extortion persisted at high levels, due to competition among gangs. […]

> The government took credible steps to identify and punish officials who may have committed human rights abuses or engaged in corruption, but a weak judicial system and corruption were major obstacles to obtaining convictions.

> Criminal groups, including local and transnational gangs and narcotics traffickers, were significant perpetrators of violent crimes and committed acts of homicide, torture, kidnapping, extortion, human trafficking, intimidation, and other threats and violence directed against human rights defenders, judicial authorities, lawyers, business community members, journalists, bloggers, women, and other vulnerable populations. The government investigated and prosecuted some of these crimes, but impunity was widespread.[2]

Despite an overall decline in homicide rates, Honduras remained "the most violent country in Central America."[3]

## Political Considerations

According to a 2024 country report on Honduras, President Xiomara Castro has had some success while also struggling to address violence and follow through on her commitment to fight corruption:

---

[1] This report covers the reporting period of January 1, 2023 to March 7, 2025.
[2] 2023 Country Report on Human Rights Practices: Honduras, U.S. Dep't. of State (DOS), Apr. 23, 2024, available at: https://www.ecoi.net/en/document/2107723.html (last visited Mar. 10, 2025).
[3] Honduras Humanitarian Needs and Response Plan 2025 – Summary, United Nations Office for the Coordination of Humanitarian Affairs (OCHA), Dec. 23, 2024, available at: https://reliefweb.int/report/honduras/honduras-humanitarian-needs-and-response-plan-2025-summary (last visited Mar. 10, 2025).

Her tenure has seen notable achievements, including the extradition of her predecessor, Juan Orlando Hernández, to the United States on drug trafficking charges and the repeal of the Secrets Law, which allowed officials to conceal corrupt activities. However, she also passed an amnesty law shortly after taking office that could shield powerful figures in her party from prosecutions for corruption, raising questions about her commitment to combating it. Like her predecessors, Castro has struggled to address widespread violence within democratic norms, resorting to suspending certain rights to combat extortion affecting small businesses, which she declared a national emergency.[4]

In September 2024, the National Anti-Corruption Council – a Honduran non-governmental organization (NGO) – publicly asked Xiomara Castro to step down as president "after a video was released in which her brother-in-law allegedly received drug money."[5] Castro ran for president in 2021 on an anti-corruption platform.[6] Honduras' government has characterized "the publication of the video as a political plot."[7] According to a September 2024 article by InSight Crime, analysts have "suggested that while corruption within Libre[8] was not comparable to the entrenched corruption of the National Party,[9] the credibility of Castro's government had been dealt a blow by the scandal currently surrounding the President's family."[10]

Castro's predecessor, Juan Orlando Hernández, who was extradited to the United States shortly after Castro took office in 2022, was convicted on drug trafficking charges in the United States in June 2024 and sentenced to 45 years in prison.[11] The charges included "conspiring to import

---

[4] Bertelsmann Stiftung's Transformation Index (BTI) 2024 Country Report – Honduras, Bertelsmann Stiftung, Mar. 19, 2024, pg. 3, available at: https://bti-project.org/fileadmin/api/content/en/downloads/reports/country_report_2024_HND.pdf.

[5] Honduras' president is asked to resign after corruption scandal she says is a plot to oust her, The Associated Press, updated Sep. 4, 2024, available at: https://apnews.com/article/xiomara-castro-coup-carlos-zelaya-honduras-corruption-60fc69e941f8b8ed55b770da530468bf (last visited Mar. 20, 2025).

[6] Honduras' president is asked to resign after corruption scandal she says is a plot to oust her, The Associated Press, updated Sep. 4, 2024, available at: https://apnews.com/article/xiomara-castro-coup-carlos-zelaya-honduras-corruption-60fc69e941f8b8ed55b770da530468bf (last visited Mar. 20, 2025).

[7] Sam Woolston, Honduras Misses Reform Opportunities Amid Drug Scandal Turmoil, InSight Crime, Sep. 17, 2024, available at: https://insightcrime.org/news/honduras-reform-opportunities-drug-scandal-turmoil/ (last visited Mar. 20, 2025).

[8] Libertad y Refundación (Libre) is Xiomara Castro's political party. See Peter J. Meyer, Honduras: Background and U.S. Relations (Summary), Congressional Research Service, Nov. 30, 2023, available at: https://crsreports.congress.gov/product/pdf/R/R47856/2 (last visited Mar. 20, 2025).

[9] The National Party was the party of Castro's predecessor, Juan Orlando Hernández, who was convicted on drug trafficking charges in the United States in June 2024. See Peter J. Meyer, Honduras: Background and U.S. Relations (Summary), Congressional Research Service, Nov. 30, 2023, available at: https://crsreports.congress.gov/product/pdf/R/R47856/2 (last visited Mar. 20, 2025).

[10] Sam Woolston, Honduras Misses Reform Opportunities Amid Drug Scandal Turmoil, InSight Crime, Sep. 17, 2024, available at: https://insightcrime.org/news/honduras-reform-opportunities-drug-scandal-turmoil/ (last visited Mar. 20, 2025).

[11] Max Mata, Honduras ex-president gets 45 years for drug crimes, BBC News, June 26, 2024, available at: https://www.bbc.com/news/articles/c2ee4j1e0g6o (last visited Mar. 20, 2025).

HondurasAR000009

cocaine into the United States and […] possessing and conspiring to possess 'destructive devices,' including machine guns."[12]

Freedom House stated in its most recent report covering events of 2023 in Honduras that "political violence is widespread and includes harassment, threats, and intimidation directed at candidates, politicians, and voters, especially women."[13] The same report noted, however, that political parties were reportedly "free to operate."[14]

**State of Emergency**

In November 2022, Honduran President Xiomara Castro announced a state of emergency to combat "crimes like extortion, dismantle criminal groups, reduce gang violence, and lessen insecurity facing many Hondurans."[15] According to a December 2024 article by the United States Institute of Peace (USIP), "two years later, Honduras' state of emergency has had little, if any, positive impact."[16]

USIP noted that "Honduras faces a more complex criminal threat than El Salvador[17] with less capacity to meet it," because of the variety of criminal actors present in Honduras.[18] InSight Crime reported in June 2023 that the Honduran government's focus on gangs under the state of emergency "ignores the role of other actors, like drug trafficking organizations and corruption networks."[19] In addition, according to a December 2023 report by Armed Conflict Location &

---

[12] Colin Moynihan, Former President of Honduras Sentenced to 45 Years in Sweeping Drug Case, The New York Times, June 26, 2024, available at: https://www.nytimes.com/2024/06/26/nyregion/honduras-juan-olando-hernando-sentenced-drug-case.html# (last visited Mar. 20, 2025).
[13] Freedom in the World 2024 – Honduras, Freedom House, Feb. 29, 2024, available at: https://www.ecoi.net/en/document/2105027.html (last visited Mar. 7, 2025).
[14] Freedom in the World 2024 – Honduras, Freedom House, Feb. 29, 2024, available at: https://www.ecoi.net/en/document/2105027.html (last visited Mar. 7, 2025).
[15] Helen Montoya, Honduras Makes Few Advances Against Crime During 6-Month State of Exception, InSight Crime, June 5, 2023, available at: https://insightcrime.org/news/honduras-makes-few-advances-against-crime-during-6-month-state-of-exception/ (last visited Mar. 12, 2025).
[16] Dany Díaz Mejía and Mary Speck, Ph.D., Honduras and El Salvador: Two Crackdowns on Crime with Different Outcomes, United States Institutes of Peace (USIP), Dec. 5, 2024, available at: https://www.usip.org/publications/2024/12/honduras-and-el-salvador-two-crackdowns-crime-different-outcomes (last visited Mar. 12, 2025).
[17] El Salvador's state of emergency has been in place since March 2022 and has succeeded "in debilitating gang structures" through "the use of extreme legal measures; a looser interpretation of gang affiliation; and the concentration of political power around the Bukele administration." See: Alex Papadovassilakis, 'Too Many Soldiers': How Bukele's Crackdown Succeeded Where Others Failed, InSight Crime, Dec. 6, 2023, available at: https://insightcrime.org/investigations/too-many-soldiers-how-bukele-crackdown-succeeded-where-others-failed/ (last visited Mar. 20, 2025) .
[18] Dany Díaz Mejía and Mary Speck, Ph.D., Honduras and El Salvador: Two Crackdowns on Crime with Different Outcomes, United States Institutes of Peace (USIP), Dec. 5, 2024, available at: https://www.usip.org/publications/2024/12/honduras-and-el-salvador-two-crackdowns-crime-different-outcomes (last visited Mar. 12, 2025).
[19] Sean Doherty, Honduras Anti-Gang Crackdown Targets Only One Source of Violence, InSight Crime, June 28, 2023, available at: https://insightcrime.org/news/honduras-anti-gang-crackdown-targets-only-one-source-violence/ (last visited Mar. 20, 2025). InSight Crime did not provide definitions of the terms "drug trafficking organizations" and "corruption networks" in this article. In its profile of Honduras, updated in 2024, InSight Crime stated that "the primary gangs present in Honduras are the MS13 and Barrio 18, which operate mainly in urban areas like

HondurasAR000010

Event Data (ACLED), "the state of exception fails to include reforms that focus on the fight against corruption within police and judicial institutions to ensure the end of impunity and the prosecution of the perpetrators of violence."[20]

The state of emergency has been extended in 45-day increments through April 5, 2025.[21] In the January 6, 2025 decree which extended the state of emergency through February 19, 2025,[22] the Honduran government noted that, in 2024, 58 municipalities (20% of all municipalities nationwide) reported no homicides, and 225 municipalities (76% of all municipalities nationwide) reported 0 to 8 homicides.[23] The government also stated that, under the state of emergency, "992 criminal groups were disbanded; 46 people were captured for purposes of extradition;" and "4,774 gang members" were detained.[24]

**Violence**

In its 2024 Homicide Roundup, published in February 2025, InSight Crime noted a continued reduction in homicides in Honduras:

> Homicides in Honduras continued to fall markedly in 2024, with a murder rate of 25.3. Bright spots include the country's two largest cities, Tegucigalpa and San Pedro Sula, where murder rates halved between 2022 and 2024.
>
> The government credits the gains to the country's long-running state of emergency, currently in force in 226 of Honduras' 298 municipalities. However,

---

Tegucigalpa or San Pedro Sula, as well as in rural zones close to the border with El Salvador. Both gangs are dedicated to extortion and small-scale drug trafficking, and exert substantial control within the country's prisons. The MS13 has expanded its role in the regional drug trade, but its operations have yet to rival those of larger drug trafficking groups." InSight Crime also discussed corruption and drug trafficking in Honduras in that same profile: "With every branch of government and its armed forces plagued by corruption, the Central American nation has long played a vital role as a transit point in which criminal groups enjoy official protection. Over the last two decades, political protection has allowed traditional drug trafficking groups to flourish. Testimony provided by drug traffickers and Honduran politicians on trial in the United States has revealed deep-seated connections between organized crime and major political parties. Control of illegal activities in Honduras lies in the hands of local criminal groups connected to the country's political and economic elite." *See* Honduras, InSight Crime, Sep. 6, 2024, available at: https://insightcrime.org/honduras-organized-crime-news/honduras/ (last visited Mar. 10, 2025).
[20] Fighting Gangs Under the State of Exception in Honduras, Armed Conflict Location & Event Data (ACLED), Dec. 5, 2023, available at: https://acleddata.com/2023/12/05/fighting-gangs-under-the-state-of-exception-in-honduras/ (last visited Mar. 20, 2025).
[21] Más de 300 hondureños murieron en 85 masacres bajo el estado de excepción [More than 300 Hondurans died in 85 massacres under the state of emergency], La Prensa (Hon.), Mar. 7, 2025, available at: https://www.laprensa.hn/sucesos/honduras-ola-violencia-masacres-estado-excepcion-NF24748702 (last visited Mar. 7, 2025.)
[22] The subsequent decree extending the state of emergency through April 5, 2025 was not available on the Honduran government's website at the time this paper was prepared.
[23] La Gaceta – Diario Oficial de la República de Honduras [The Gazette – Official Daily Newspaper of the Republic of Honduras], Num. 36,732, Jan. 6, 2025, pg. 2, available at: https://www.sep.gob.hn/en/_files/ugd/ce1f7a_abe2a5995a924ca38d875a3ab31bc57f.pdf.
[24] La Gaceta – Diario Oficial de la República de Honduras [The Gazette – Official Daily Newspaper of the Republic of Honduras], Num. 36,732, Jan. 6, 2025, pg. 3, available at: https://www.sep.gob.hn/en/_files/ugd/ce1f7a_abe2a5995a924ca38d875a3ab31bc57f.pdf.

HondurasAR000011

homicide rates have fallen both in areas with and without the emergency measures, casting doubt on these claims.

Not all regions followed the national trend. Killings in the country's Bay Islands, a tourist hotspot, increased, and the department closed 2024 as the country's most homicidal.[25]

The United Nations Office for the Coordination of Humanitarian Affairs (OCHA) stated in December 2024 that "although national homicide rates have declined, Honduras remains one of Latin America's most violent countries, with the highest rates [of violence] in Central America."[26]

**Attacks on Human Rights Defenders**

In its July 2024 report on human rights in Honduras (covering the period from January 1 through December 31, 2023), the Office of the High Commissioner for Human Rights (OHCHR) noted "a considerable increase in attacks on human rights defenders":

particularly those defending land, territory and the environment, and journalists, without any effective measures being taken by the State to respond to the situation of risk that they face. […]

The Office noted that the number of attacks against journalists and human rights defenders and organizations, including murders, increased significantly in comparison with the previous two years. In view of the increased risk faced by human rights defenders, the failure of the national protection system to respond effectively is of concern, especially its failure to implement suitable protection measures in a timely and effective manner.[27]

In one example of violence against land defenders, two men who had participated in protests and fought against "an illegally sanctioned" iron ore mine in their town were shot and killed "in broad daylight" in Guapinol, Honduras in January 2023.[28] Honduran authorities attributed the deaths "to a botched mugging – even though the assailants fled without taking the victims' moped, cellphones or money," while "UN agencies, rights groups, and the U.S. embassy

---

[25] Marina Cavalari, Juliana Manjarrés and Christopher Newton, InSight Crime's 2024 Homicide Round-Up, InSight Crime, Feb. 26, 2025, available at: https://insightcrime.org/news/insight-crime-2024-homicide-round-up/#h-honduras-26-5 (last visited Mar. 6, 2025).

[26] Honduras Humanitarian Needs and Response Plan 2025 – Summary, United Nations Office for the Coordination of Humanitarian Affairs (OCHA), Dec. 23, 2024, available at: https://reliefweb.int/report/honduras/honduras-humanitarian-needs-and-response-plan-2025-summary (last visited Mar. 10, 2025).

[27] Situation of Human Rights in Honduras, Office of the High Commissioner for Human Rights (OHCHR), pg. 3 and pg. 10, July 23, 2024, available at: https://www.ecoi.net/en/file/local/2115962/g2403549.pdf.

[28] Nina Lakhani, Honduran environmental defenders shot dead in broad daylight, The Guardian, Jan. 11, 2023, available at: https://www.theguardian.com/world/2023/jan/11/honduras-environmental-defenders-shot-dead-guapinol-mine (last visited Mar. 20, 2025).

HondurasAR000012

condemned the killings" as possible retaliation for their work defending the environment after members of the community had received ongoing threats and harassment.[29]

The Washington Office on Latin America (WOLA), along with a host of other organizations and individuals, issued a statement in June 2024, condemning attacks and harassment against indigenous Garifuna[30] leaders "by third-party settlers, including owners of extractivist and palm-oil projects, tourism investors, and drug-traffickers."[31] The Inter-American Commission on Human Rights (IACHR) filed a case against the government of Honduras with the Inter-American Court of Human Rights in November 2023 regarding "violations of the right to collective property of the Garifuna community in the Cochinos Cays, as well as the lack of adequate, effective resources to address that issue."[32] USIP noted in January 2024 that Garifuna have suffered "vicious cycles of human rights abuses," as well as:

> forced displacement, and violence from political and organized crime. In recent years, these threats have only accelerated amid a competition to control the Garifuna's traditional lands in Honduras for the sake of tourist development and resource extraction. With few economic opportunities, a lack of policies to protect their rights, and increasingly impacted by climate change, Garifuna people are migrating in large numbers both within Central America and to the United States.[33]

**Tourism**

Tourism accounted for 10.5% of Honduras' gross domestic product (GDP) in 2023.[34]

In its most recent travel advisory issued on December 10, 2024, with an intended audience of U.S. tourists considering travel to Honduras, the U.S. Department of State (DOS) categorized Honduras as "Level 3: Reconsider Travel," due to crime, with the exception of the department of

---

[29] Nina Lakhani, Honduran environmental defenders shot dead in broad daylight, The Guardian, Jan. 11, 2023, available at: https://www.theguardian.com/world/2023/jan/11/honduras-environmental-defenders-shot-dead-guapinol-mine (last visited Mar. 20, 2025).
[30] The Garifuna are an Afro-indigenous population in Belize, Guatemala, Honduras, and Nicaragua. *See*: Garifuna in Honduras, Minority Rights Group, last updated May 2018, available at: https://minorityrights.org/communities/garifuna-2/ (last visited Mar. 20, 2025).
[31] International Organizations & Individuals Stand in Solidarity with the Garifuna people of Honduras, The Washington Office on Latin America (WOLA), June 13, 2024, available at: https://www.wola.org/2024/06/international-organizations-in-solidarity-with-garifuna-people-honduras/ (last visited Mar. 20, 2025).
[32] IACHR Files Application Before Inter-American Court of Human Rights in Case Concerning Honduras Over Violations of Garifuna Community's Right to Collective Property, Inter-American Commission on Human Rights (IACHR), Dec. 29, 2023, available at: https://www.oas.org/en/iachr/jsForm/?File=/en/iachr/media_center/preleases/2023/327.asp (last visited Mar. 20, 2025).
[33] The Afro-Indigenous Peoples of Honduras: Exclusion, Conflict, and Migration, United States Institute of Peace (USIP), Jan. 24, 2024, available at: https://www.usip.org/events/afro-indigenous-peoples-honduras-exclusion-conflict-and-migration (last visited Mar. 12, 2025).
[34] Tourism – Honduras, World Bank Group, Oct. 31, 2024, available at: https://documents1.worldbank.org/curated/en/099712511202411828/pdf/IDU1f4ac942b1c22c144e01a26f1c28635eea725.pdf.

HondurasAR000013

Gracias a Dios, which DOS categorized as "Level 4: Do not travel."[35] The travel advisory noted additional warnings, while also stating that resort locations in the Bay Islands were "better policed" than the rest of the country:

> Violent crime, such as homicide, armed robbery, and kidnapping, remains common. Violent gang activity, such as extortion, violent street crime, rape, narcotics, and human trafficking, is widespread. Local authorities may lack sufficient resources to respond effectively to serious crime incidents. Around resort areas in the Bay Islands, which include Roatan, Utila, and Guanaja, there is a concentration of resources, and these areas are better policed.

> Demonstrations occur regularly throughout the country and can be about a variety of political or economic issues. Protests, demonstrations, tire burnings, and roadblocks are frequent, unpredictable, and can turn violent. They can shutdown roads and highways, often without prior notice or estimated reopening timelines.

> In December 2022, the Government of Honduras declared a "State of Exception" in response to high levels of extortion and other crimes. The declaration remains in effect and has been modified to include more cities. It allows the police to suspend constitutional rights in 226 of the country's 298 municipalities.

> The Honduran Ministry of Health declared in June 2024 a national emergency in Honduras due to an increase in dengue cases. The Ministry of Health has carried out dengue prevention, control, and surveillance activities, along with the promotion of preventive measures through the media and educational campaigns. It also carried out clean-up operations and campaigns, including the use of chemical and biological agents for vector control.[36]

The United Kingdom's government website also provided information for travelers about tourist destinations in Honduras:

> Petty theft is a problem in cities and tourist areas, including the Bay Islands (Roatán, Utila and Guanaja). Avoid walking around Tegucigalpa, San Pedro Sula and other main towns and cities in mainland Honduras. Be particularly careful at bus stations, airports, isolated beaches, tourist sites and on public transport. […]

> [E]mergency medical facilities on the Bay Islands are extremely limited.[37]

---

[35] Honduras Travel Advisory, U.S. Dep't. of State (DOS), Dec. 10, 2024, available at: https://travel.state.gov/content/travel/en/traveladvisories/traveladvisories/honduras-travel-advisory.html (last visited Mar. 10, 2025).

[36] Honduras Travel Advisory, U.S. Dep't. of State (DOS), Dec. 10, 2024, available at: https://travel.state.gov/content/travel/en/traveladvisories/traveladvisories/honduras-travel-advisory.html (last visited Mar. 10, 2025).

[37] Foreign travel advice – Honduras, Gov.UK, undated, available at: https://www.gov.uk/foreign-travel-advice/honduras/safety-and-security (last visited Mar. 12, 2025).

HondurasAR000014

The Canadian government's travel information page on Honduras noted that "the Bay Islands are generally safe. Violent crime is lower, but petty crime sometimes occurs. Some foreigners have been assaulted on beaches, mainly at night. Home burglaries have also occurred, sometimes in rental accommodations."[38] According to InSight Crime, the homicide rate increased in the Bay Islands in 2024, and that department had the highest homicide rate in the country by the end of 2024.[39]

**Environmental Considerations**

According to a May 2023 report by The World Bank Group, "Honduras is highly vulnerable to extreme natural hazards."[40] OCHA reported in January 2024 that "throughout 2023, Honduras experienced significant effects from the El Niño phenomenon and a drought that affected subsistence farmers' crops. The country was further impacted by heavy rains and the effects of Tropical Storm Pilar."[41] In a December 2024 report, OCHA reiterated that "Honduras is highly vulnerable to storms, floods, and prolonged droughts, particularly in the Dry Corridor, where erratic rainfall affects food production."[42]

A November 2023 article about the effects of Hurricane Mitch 25 years after it hit Honduras in 1998 noted that Tegucigalpa is now "more vulnerable to natural disasters."[43] Tegucigalpa was on "preventative alert" due to rain at the time that article was published.[44] As of November 2023, Tegucigalpa did not have a development plan to account for areas in the city that are particularly vulnerable to the effects of natural disasters, and more than 50% of the city's population lived in those high-risk zones.[45]

---

[38] Honduras Travel Advice, Government of Canada, Mar. 6, 2025, available at: https://travel.gc.ca/destinations/honduras (last visited Mar. 10, 2025).

[39] Marina Cavalari, Juliana Manjarrés and Christopher Newton, InSight Crime's 2024 Homicide Round-Up, InSight Crime, Feb. 26, 2025, available at: https://insightcrime.org/news/insight-crime-2024-homicide-round-up/#h-honduras-26-5 (last visited Mar. 6, 2025).

[40] Country and Climate Development Report – Honduras, The World Bank Group, May 23, 2023, pg. 16, available at: https://reliefweb.int/report/honduras/honduras-country-climate-and-development-report (last visited Mar. 20, 2025).

[41] Honduras: Humanitarian Needs and Response Plan, United Nations Office for the Coordination of Humanitarian Affairs (OCHA), Jan. 23, 2024, pg. 3, available at: https://reliefweb.int/report/honduras/honduras-humanitarian-needs-and-response-plan-january-2024?_gl (last visited Mar. 20, 2025). Tropical Storm Pilar lasted from October 30 to November 1, 2023. *See*: Eric Blake, National Hurricane Center Tropical Cyclone Report: Tropical Storm Pilar, National Oceanic and Atmospheric Association (NOAA), Mar. 8, 2024, pg.15, available at: https://www.nhc.noaa.gov/data/tcr/EP192023_Pilar.pdf.

[42] Honduras Humanitarian Needs and Response Plan 2025 – Summary, United Nations Office for the Coordination of Humanitarian Affairs (OCHA), Dec. 23, 2024, available at: https://reliefweb.int/report/honduras/honduras-humanitarian-needs-and-response-plan-2025-summary (last visited Mar. 10, 2025).

[43] Germán Reyes,Tegucigalpa sigue vulnerable tras 25 años [Tegucigalpa is still vulnerable after 25 years], Agencia EFE (Spa.), Nov. 2, 2023, available at: https://efe.com/medio-ambiente/2023-11-02/la-capital-de-honduras-recuerda-los-danos-del-huracan-mitch/ (last visited Mar. 20, 2025).

[44] Germán Reyes,Tegucigalpa sigue vulnerable tras 25 años [Tegucigalpa is still vulnerable after 25 years], Agencia EFE (Spa.), Nov. 2, 2023, available at: https://efe.com/medio-ambiente/2023-11-02/la-capital-de-honduras-recuerda-los-danos-del-huracan-mitch/ (last visited Mar. 20, 2025).

[45] Germán Reyes,Tegucigalpa sigue vulnerable tras 25 años [Tegucigalpa is still vulnerable after 25 years], Agencia EFE (Spa.), Nov. 2, 2023, available at: https://efe.com/medio-ambiente/2023-11-02/la-capital-de-honduras-recuerda-los-danos-del-huracan-mitch/ (last visited Mar. 20, 2025).

HondurasAR000015

Tropical Depression 9, which later became Hurricane Helene, left significant rainfall throughout Honduras in late September 2024.[46] The WFP reported that "rainfall from Hurricane Helene increased flooding, with [*sic*] triggering flash floods and disrupting access in lowland communities. 25,000 people across 92 communities were directly affected by flooding and livelihood losses."[47]

Honduras was hit by Tropical Storm Sara on November 14, 2024, with damage reported "in 17 of 18 departments and 85 of 298 municipalities,"[48] with "over 238,500 people […] affected due to damages caused to water and sanitation systems."[49] As of November 18, 2024, 1,797 communities remained "cut off" due to "impassable," "affected" "damaged" or "destroyed" roadways.[50] Rainfall levels from Tropical Storm Sara were reportedly similar to levels "during [hurricanes] Eta and Iota in 2020, pushing dams to their limits."[51] OCHA stated in December 2024 that Tropical Storm Sara contributed "to a worsening food crisis, especially in the northern part of the country."[52]

OCHA noted in its January 2024 report that "one of the major consequences" of frequent storms and floods in Honduras "is the destruction of water, sanitation and hygiene (WASH), housing and transport infrastructure."[53]

## Infrastructure

Bertelsmann Stiftung, a private German foundation, reported in 2024 that Honduras "suffers from patchy delivery of public services, including transport, access to adequate water and

---

[46] Fernanda Rodríguez, Fuertes lluvias azotarán Honduras debido a la depresión tropical 9, según César Quintanilla [Strong rains will hit Honduras due to tropical depression 9, according to [expert] César Quintanilla], Televicentro (Hon.), Sep. 24, 2024, available at: https://www.televicentro.com/fuertes-lluvias-honduras-depresion-tropical-9-cesar-quintanilla-2024-09-24 (last visited Mar. 20, 2025).

[47] WFP Honduras Country Brief, World Food Programme (WFP), Oct. 2024, pg. 2, available at: https://docs.wfp.org/api/documents/WFP-0000162847/download/?_ga=2.262854156.1857486660.1734727133-1118873269.1734456483 (last visited Mar. 20, 2025).

[48] Central America: Tropical Storm Sara - Flash Update No. 2, United Nations Offices for the Coordination of Humanitarian Affairs (OCHA), Nov. 18, 2024, available at: https://reliefweb.int/report/honduras/central-america-tropical-storm-sara-flash-update-no-2-18-november-2024 (last visited Mar. 20, 2025).

[49] UNICEF Honduras Humanitarian Situation Report No. 01, United Nations Children's Fund (UNICEF), Nov. 21, 2024, available at: https://reliefweb.int/report/honduras/unicef-honduras-humanitarian-situation-report-no-01-tropical-storm-sara-21-november-2024 (last visited Mar. 20, 2025).

[50] Central America: Tropical Storm Sara - Flash Update No. 2, United Nations Offices for the Coordination of Humanitarian Affairs (OCHA), Nov. 18, 2024, available at: https://reliefweb.int/report/honduras/central-america-tropical-storm-sara-flash-update-no-2-18-november-2024 (last visited Mar. 20, 2025).

[51] Central America: Tropical Storm Sara - Flash Update No. 2, United Nations Offices for the Coordination of Humanitarian Affairs (OCHA), Nov. 18, 2024, available at: https://reliefweb.int/report/honduras/central-america-tropical-storm-sara-flash-update-no-2-18-november-2024 (last visited Mar. 20, 2025)).

[52] Honduras Humanitarian Needs and Response Plan 2025 – Summary, United Nations Office for the Coordination of Humanitarian Affairs (OCHA), Dec. 23, 2024, available at: https://reliefweb.int/report/honduras/honduras-humanitarian-needs-and-response-plan-2025-summary (last visited Mar. 10, 2025).

[53] Honduras: Humanitarian Needs and Response Plan, United Nations Office for the Coordination of Humanitarian Affairs (OCHA), Jan. 23, 2024, pg.10, available at: https://reliefweb.int/report/honduras/honduras-humanitarian-needs-and-response-plan-january-2024?_g1 (last visited Mar. 20, 2025).

HondurasAR000016

sewage systems, education and training."[54] DOS said in its 2024 Investment Climate report for Honduras that "sectors in which U.S. companies frequently encounter problems include infrastructure, telecoms, mining, and energy."[55]

In September 2023, the United Nations Development Programme stated that water shortages were common in Tegucigalpa, the capital of Honduras.[56] The lack of potable water remained "a significant barrier to achieving the [sustainable development goals] in the country," as "over 45% of the population lacks stable access to safe drinking water."[57] The United Nations Committee on the Rights of the Child noted in January 2025 that it was concerned "that thousands of children do not have access to safe water sources or decent sanitation services" in Honduras.[58]

Regarding travel by roadways in Honduras, DOS noted in its December 2024 travel advisory that "driving in Honduras can be dangerous" due to "crime, poor road conditions, and heavy commercial truck traffic."[59] Furthermore, the advisory said that "rockslides are common, especially in the rainy season (May through December) and can cause closure of major highways."[60]

In terms of healthcare infrastructure, the Inter-American Development Bank stated in a September 2023 press release that "the health system in Honduras faces important challenges in access to health services, which especially affect the most vulnerable people. The lack of quality hospital infrastructure is one of the main determinants that limit this access."[61]

**Health Concerns**

---

[54] Bertelsmann Stiftung's Transformation Index (BTI) 2024 Country Report – Honduras, Bertelsmann Stiftung, 2024, pg. 8, available at: https://bti-project.org/fileadmin/api/content/en/downloads/reports/country_report_2024_HND.pdf.

[55] 2024 Investment Climate Statements: Honduras, U.S. Department of State (DOS), available at: https://www.state.gov/reports/2024-investment-climate-statements/honduras/ (last visited Mar. 7, 2025).

[56] Monserrat Xilotl, How forests and young people are solving Honduras's water crisis, United Nations Development Programme, Sep. 7, 2023, available at: https://www.undp.org/stories/how-forests-and-young-people-are-solving-hondurass-water-crisis (last visited Mar. 10, 2025).

[57] United Nations Special Rapporteur on the right to development, Mr Surya Deva; Country visit to Honduras 11-21 November 2024; Preliminary observations and recommendations, UN Office of the High Commissioner for Human Rights (OHCHR), Nov. 21, 2024, available at: https://www.ohchr.org/sites/default/files/documents/issues/development/sr/20241121-eom-honduras-sr-rtd-en.pdf.

[58] Concluding observations on the combined sixth and seventh periodic reports of Honduras [CRC/C/HND/CO/6-7], United Nations Committee on the Rights of the Child (CRC), Jan. 31, 2025, pg. 11, https://www.ecoi.net/en/file/local/2121977/CRC_C_HND_CO_6-7_62285_E.pdf.

[59] Honduras Travel Advisory, U.S. Dep't. of State (DOS), Dec. 10, 2024, available at: https://travel.state.gov/content/travel/en/traveladvisories/traveladvisories/honduras-travel-advisory.html (last visited Mar. 10, 2025).

[60] Honduras Travel Advisory, U.S. Dep't. of State (DOS), Dec. 10, 2024, available at: https://travel.state.gov/content/travel/en/traveladvisories/traveladvisories/honduras-travel-advisory.html (last visited Mar. 10, 2025).

[61] IDB Approves $150 Million to Improve the Health System in Honduras, Inter-American Development Bank, Sep. 27, 2023, available at: https://www.iadb.org/en/news/idb-approves-150-million-improve-health-system-honduras (last visited Mar. 10, 2025).

HondurasAR000017

In June 2024, Honduras "declared a national health emergency after reporting a rise in hospitalizations and deaths from dengue."[62] Honduras' health ministry had "reported 23,037 suspected cases of dengue in the first 20 weeks of the year, […] one of the highest totals in the Americas."[63] By September 2024, the number of reported cases of dengue in Honduras had risen to more than 110,000.[64] Dengue, which "causes flu-like symptoms and can lead to death in extreme cases," is spread by mosquitoes.[65]

**Economy**

In its overview of Honduras, the World Bank Group said that "Honduras has made progress in reducing poverty, although it still ranks as one of the poorest and most unequal countries in Latin America and the Caribbean."[66] The Central Intelligence Agency's (CIA) World Factbook stated in its most recent update in November 2024 that "Honduras is one of the poorest countries in Latin America and has one of the world's highest murder rates. More than half of the population lives in poverty and per capita income is one of the lowest in the region."[67]

The World Food Programme (WFP) classified Honduras as a "lower-middle-income country" in October 2024, noting that, despite "sustained economic growth for the last two decades," problems like "high poverty rates, extensive income inequality, and risks such as crime and climate variability threaten peace and humanitarian aid efforts and hinder mid-to-long-term initiatives, affecting development gains and causing human capital drain through migration."[68]

The World Bank Group discussed GDP and inflation trends in its October 2024 overview of Honduras:

> the real GDP of the Honduran economy grew by approximately 3.6 percent in 2023, reflecting a deceleration when compared to the 4 percent recorded in 2022. […] In 2022, the inflation rate reached 9.1 percent, the highest since 2008, due to the strong impact of rising global food and fuel commodity prices, while the monetary authorities did not raise the key monetary policy interest rate. However, inflation has declined since February 2023 and stood at 5 percent in August 2024,

---

[62] Michael Rios, Honduras declares health emergency as Central America starts peak dengue season, CNN, June 1, 2024, available at: https://www.cnn.com/2024/06/01/health/honduras-health-dengue/index.html (last visited Mar. 20, 2025).

[63] Michael Rios, Honduras declares health emergency as Central America starts peak dengue season, CNN, June 1, 2024, available at: https://www.cnn.com/2024/06/01/health/honduras-health-dengue/index.html (last visited Mar. 20, 2025).

[64] Honduras: MSF responds to dengue emergency in Cortés department, Medecins sans Frontières (MSF) [Doctors without Borders], Sep. 11, 2024, available at: https://www.doctorswithoutborders.org/latest/honduras-msf-responds-dengue-emergency-cortes-department (last visited Mar. 20, 2025).

[65] Michael Rios, Honduras declares health emergency as Central America starts peak dengue season, CNN, June 1, 2024, available at: https://www.cnn.com/2024/06/01/health/honduras-health-dengue/index.html (last visited Mar. 20, 2025).

[66] Honduras: Overview, World Bank Group, Oct. 7, 2024, available at: https://www.worldbank.org/en/country/honduras/overview (last visited Mar. 10, 2025).

[67] Honduras, The World Factbook, Central Intelligence Agency (CIA), last updated Mar. 3, 2025, available at: https://www.cia.gov/the-world-factbook/countries/honduras/ (last visited Mar. 11, 2025).

[68] WFP Honduras Country Brief, World Food Programme (WFP), Oct. 2024, pg. 1, available at: https://www.wfp.org/countries/honduras (last visited Mar. 20, 2025).

HondurasAR000018

0.7 percentage points lower than the previous year and within the central bank's tolerance range. The decrease was driven by declining international food and fuel prices and supported by liquidity absorption measures instituted by the central bank.[69]

In September 2024, Honduras' Supreme Court "declared unconstitutional the legal underpinning of special economic zones exempt from local laws and taxes known as ZEDEs, which have drawn foreign investors lured by the promise of light taxation and regulation."[70] In 2022, the legislature repealed the law that created the ZEDEs, but ZEDEs already in existence at the time the law was repealed had continued to operate because "a related decree that would have repealed constitutional articles related to ZEDEs did not receive the necessary two-thirds support in the legislature."[71]

A report prepared by several advocacy groups and released in September 2024 provided additional background on ZEDEs:

> ZEDEs are territories that enjoy a maximum degree of autonomy in terms of legal, tax and administrative regulation due to the fact that, according to their promoters, this helps attract private investment and promotes a favorable business environment. In that sense, ZEDEs have rules that differ from the general laws of the country, existing within the borders of the state, but outside of national jurisdiction. These projects have been the subject of great debate and controversy in Honduras, as they involve a cession of sovereignty.

> Various social, trade, business, academic and religious organizations and local governments (municipalities) in Honduras argue that the ZEDEs violate the Constitution because they imply a territorial exception to national jurisdiction and a modification of the form of government in these territories, which in fact implies a loss of national sovereignty. ZEDEs are also criticized because their implementation has implied the transgression of human rights due to the displacement of communities and environmental destruction. Thus, although several ZEDEs have been proposed since their approval in 2013, their implementation and progress have been subject to challenges and resistance in different locations.[72]

**Return to Honduras**

---

[69] The World Bank in Honduras: Overview, World Bank Group, Oct. 7, 2024, available at: https://www.worldbank.org/en/country/honduras/overview (last visited Mar. 7, 2025).

[70] Gustavo Palencia, Honduras top court declares self-governing ZEDE zones unconstitutional, Reuters, Sep. 20, 2024, available at: https://www.reuters.com/world/americas/honduras-top-court-declares-self-governing-zede-zones-unconstitutional-2024-09-20/ (last visited Mar. 20, 2025).

[71] Freedom in the World 2024 – Honduras, Freedom House, Feb. 29, 2024, available at: https://www.ecoi.net/en/document/2105027.html (last visited Mar. 20, 2025).

[72] The Corporate Assault on Honduras: Mafia-style investments and the Honduran people's struggle for democracy and dignity, Institute for Policy Studies - Mining and Trade Project (IPS), the Transnational Institute (TNI), TerraJusta, and the Honduras Solidarity Network (HSN), Sep. 2024, pg. 31-32, available at: https://ips-dc.org/wp-content/uploads/2024/10/honduras_isds_full_report.pdf.

HondurasAR000019

The United Nations High Commissioner for Refugees (UNHCR) noted in October 2024 that the high level of violence in Honduras continues to be a factor in both internal and external displacement:

> Honduras continues to rank as the second most violent country in Latin America and first in Central America, forcing many to flee resulting in more than 250,000 IDPs [internally displaced persons] and 300,000 Honduran refugees or asylum-seekers. In 2024, over 32,000 Hondurans have been returned so far, with many leaving the country again. Honduras also remains a main transit country for persons engaged in mixed movements across Central America.[73]

Other factors contributing to "a continual outflow of people" from Honduras, in addition to violence, were "poverty, food insecurity, inequality" and the effects of natural disasters.[74]

In its annual report covering events of 2023, Human Rights Watch reported that "President Castro signed a law to boost government help for communities and individual victims of internal displacement."[75] In January 2025, the Honduran government enacted a plan called "Brother, Come Home," which "includes providing a 'solidarity' monetary bonus -amount unspecified-, food support and access to employment programs for Hondurans who arrive deported from the United States."[76]

**Freedom of Movement**

In its 2023 report on human rights in Honduras, the U.S. Department of State reported that:

> The law provided for freedom of internal movement, foreign travel, emigration, and repatriation, and the government generally respected these rights.
>
> In-country Movement: There were areas where authorities could not assure freedom of movement due to criminal activity and a lack of significant government presence.[77]

---

[73] Forced displacement in and from El Salvador, Guatemala and Honduras (October 2024), United Nations High Commissioner for Refugees (UNHCR), Oct. 14, 2024, available at: https://reliefweb.int/report/honduras/forced-displacement-and-el-salvador-guatemala-and-honduras-october-2024 (last visited Mar. 20, 2025).

[74] Honduras: Humanitarian Needs and Response Plan, United Nations Office for the Coordination of Humanitarian Affairs (OCHA), Mar. 15, 2024, pg. 9, available at: https://reliefweb.int/report/honduras/honduras-humanitarian-needs-and-response-plan-january-2024?_gl (last visited Mar. 20, 2025).

[75] World Report 2024 – Honduras, Human Rights Watch, Jan. 11, 2024, available at: https://www.ecoi.net/en/document/2103221.html (last visited Mar. 20, 2025

[76] Honduras Prepares for Mass Deportations Under Trump, Agence France-Presse (AFP), Jan. 26, 2025, available at: https://ticotimes.net/2025/01/26/honduras-prepares-for-mass-deportations-under-trump (last visited Mar. 12, 2025).

[77] 2023 Country Report on Human Rights Practices: Honduras, U.S. Dep't. of State (DOS), Apr. 23, 2024, available at: https://www.ecoi.net/en/document/2107723.html (last visited Mar. 10, 2025).

HondurasAR000020

PRE-DECISIONAL/DELIBERATIVE

**Attachment A - Temporary Protected Status (TPS) Legal Authority**

Pursuant to section 244(b)(1) of the Immigration and Nationality Act (INA), 8 U.S.C. § 1254a(b)(1), the Secretary of Homeland Security, after consultation with appropriate agencies of the Government, may designate a foreign state (or part thereof) for TPS. The Secretary may then grant TPS to eligible nationals of that foreign state (or in the case of an alien having no nationality who last habitually resided in that state). INA § 244(b)(1) sets forth three possible bases on which the Secretary may designate a foreign state for TPS:

- Ongoing armed conflict in the foreign state and, due to such conflict, requiring the return of aliens who are nationals of that state would pose a serious threat to their personal safety;
- An earthquake, flood, drought, epidemic, or other environmental disaster in a foreign state has resulted in a substantial, but temporary, disruption of living conditions in the area affected, the foreign state is unable to handle adequately the return of aliens who are nationals of the state, *and* the foreign state has officially requested TPS designation; or
- Extraordinary and temporary conditions exist in the foreign state that prevent nationals of the state from returning in safety, unless the Secretary finds that permitting the aliens to remain temporarily in the United States is contrary to the national interest of the United States.

An initial TPS designation is at the discretion of the Secretary but may not be less than 6 months or exceed 18 months. INA § 244(b)(2).

At least 60 days before the expiration of a TPS designation, the Secretary, after consultation with appropriate agencies of the Government, shall review the conditions in a foreign state designated for TPS to determine whether the conditions for the TPS designation continue to be met and, if so, the length of an extension of the TPS designation (6-, 12-, or 18- months). *See* INA § 244(b)(3)(A). If the Secretary determines that the foreign state no longer meets the conditions for the TPS designation, she or he must terminate the designation. *See* INA § 244(b)(3)(B). Although the Secretary must make her or his determination on extension or termination at least 60 days before the expiration of the TPS designation, publication of the required *Federal Register* notice announcing the decision must be "on a timely basis." INA § 244(b)(3)(A). If the Secretary does not make a decision under INA § 244(b)(3)(A) that the foreign state no longer meets the conditions for designation, there is an automatic, minimum six-month extension of a country's TPS designation.
*See* INA § 244(b)(3)(C).

After the Secretary designates a country for TPS, nationals of the country (and persons without nationality who last habitually resided in the country) may apply for TPS, but they must individually demonstrate their eligibility pursuant to the criteria established in INA § 244(c) and the TPS regulations at 8 CFR § 244.1 *et seq*. These criteria include, but are not limited to, requirements that the applicant show continuous physical presence in the United States since the effective date of the country designation and continuous residence since such date as the Secretary determines; admissibility as an immigrant (with limited exceptions); that the applicant

PRE-DECISIONAL/DELIBERATIVE

HondurasAR000021

PRE-DECISIONAL/DELIBERATIVE

Attachment A: TPS Legal Authority
Page 2

is not ineligible under certain mandatory criminal history, terrorism, and national security bars as specified in INA § 244(c)(2)(A)-(B); and that the applicant is registering for TPS in accordance with regulatory procedures in 8 CFR §§ 244.2–244.9.

If granted TPS, the alien receives employment authorization and an Employment Authorization Document, if requested, that is valid for the duration of the TPS designation. TPS is a temporary benefit that does not, by itself, provide aliens with a basis for seeking lawful permanent resident (LPR) status or any other immigration status. However, receipt of TPS benefits will not bar an otherwise eligible alien from adjusting to LPR status or acquiring another lawful immigration status. When a TPS country's designation ends, TPS beneficiaries return to the same immigration status, if any, that they held prior to TPS (unless that status has expired or been terminated) or any other status they may have acquired while registered for TPS.

PRE-DECISIONAL/DELIBERATIVE

U.S. Immigration and Customs Enforcement



## Immigration and Customs Enforcement's Response to USCIS' Request for Individuals Returned to a Number of Countries
March 3, 2025

**Request:**

USCIS Office of Policy and Strategy requests that ICE provide the number of individuals returned to each of the following countries during the time periods listed:

• South Sudan: Sept. 6, 2023 - present
• Afghanistan: Sept. 25, 2023 - present
• Cameroon: Oct. 10, 2023 - present
• Nepal: June 21, 2023 - present
• Honduras: June 21, 2023 - present
• Nicaragua: June 21, 2023 - present
• Haiti: July 1, 2024 - present
• Venezuela: Oct. 3, 2023 - present

**Response:**

Total number of Individuals returned to each country regardless of the Country of Citizenship as of March 2, 2025.

**South Sudan, Sept. 6, 2023 – present:**  1
**Afghanistan, Sept. 25, 2023 – present:**  30
**Cameroon, Oct. 10, 2023 – present:**  26
**Nepal, June 21, 2023 – present:** 126
**Honduras, June 21, 2023 – present:**  71,448
**Nicaragua, June 21, 2023 – present:** 5,271
**Haiti, July 1, 2024 – present:** 370
**Venezuela, Oct. 3, 2023 – present:**  2,624

HondurasAR000023

**U.S. Citizenship and Immigration Services**

Form I-821, Application for Temporary Protected Status
Current TPS Beneficiaries by Country of Designation
As of March 11, 2025

| Country of Designation | Current TPS Beneficiaries | | Total Approved Individuals |
|---|---|---|---|
| | Approved Individuals that are not LPRs | Approved Individuals that are also LPRs | |
| TOTAL | 1,299,814 | 129,090 | 1,428,904 |
| Afghanistan | 8,361 | 3,349 | 11,710 |
| Burma | 3,601 | 152 | 3,753 |
| Cameroon | 4,797 | 210 | 5,007 |
| El Salvador | 170,608 | 60,699 | 231,307 |
| Ethiopia | 4,422 | 172 | 4,594 |
| Haiti | 330,597 | 15,984 | 346,381 |
| Honduras | 51,405 | 21,013 | 72,418 |
| Lebanon | 111 | - | 111 |
| Nepal | 7,202 | 5,453 | 12,655 |
| Nicaragua | 2,912 | 1,108 | 4,020 |
| Somalia | 686 | 74 | 760 |
| South Sudan | 211 | 15 | 226 |
| Sudan | 1,779 | 241 | 2,020 |
| Syria | 3,607 | 2,386 | 5,993 |
| Ukraine | 101,190 | 2,612 | 103,802 |
| Venezuela | 605,476 | 15,878 | 621,354 |
| Yemen | 2,249 | 544 | 2,793 |

**U.S. Citizenship and Immigration Services**

Form I-821, Application for Temporary Protected Status
Current Pending by Country of Designation
As of March 11, 2025

| Country of Designation | Current Pending TPS Applications | | | | Total Pending Applications |
|---|---|---|---|---|---|
| | I-821 Initial Pending Applications from Current Beneficiaries | I-821 Re-registration Pending Applications from Current Beneficiaries | I-821 Initial Pending Applications from non-Current Beneficiaries | I-821 Re-registration Pending Applications from non-Current Beneficiaries | |
| TOTAL | 2,649 | 375,816 | 310,484 | 58,272 | 747,221 |
| Afghanistan | 46 | 213 | 8,965 | 14 | 9,238 |
| Burma | 1 | 76 | 309 | 2 | 388 |
| Cameroon | 6 | 112 | 1,235 | 11 | 1,364 |
| El Salvador | 501 | 82,529 | 954 | 2,620 | 86,604 |
| Ethiopia | 6 | 40 | 433 | - | 479 |
| Haiti | 919 | 139,703 | 200,294 | 3,899 | 344,815 |
| Honduras | 141 | 2,028 | 1,190 | 205 | 3,564 |
| Lebanon | 8 | - | 990 | - | 998 |
| Nepal | 1 | 168 | 66 | 10 | 245 |
| Nicaragua | 13 | 48 | 295 | 17 | 373 |
| Somalia | 7 | 231 | 1,472 | 10 | 1,720 |
| South Sudan | 1 | 8 | 31 | 6 | 46 |
| Sudan | 5 | 543 | 163 | 83 | 794 |
| Syria | 59 | 351 | 873 | 32 | 1,315 |
| Ukraine | 147 | 43,173 | 34,551 | 33,790 | 111,661 |
| Venezuela | 772 | 106,322 | 58,345 | 17,544 | 182,983 |
| Yemen | 16 | 271 | 318 | 29 | 634 |

Table Key:
- Represents zero or rounds to 0.0.

Note(s):
1) The report reflects the most up-to-date estimate available at the time the database is queried.
2) Counts may differ from those reported in previous periods due to system updates and post-adjudication outcomes.
3) Counts may differ from other reports due to updated logic that utilizes more accurate SSN information.
4) Duplicates were removed based on receipt number, A-Number, SSN, and Name-DOB combination.
5) Country of Designation is based on Country of Citizenship or Country of Birth as of application.
6) Counts may include individuals that may have also been approved for lawful permanent resident (LPR) status.
7) Current holders reflect beneficiaries approved without a subsequent denial or TPS withdrawal. USC are not included.
8) An "Unknown" "Country of Designation" indicates current TPS holders where their Country of Citizenship and Country of Birth is not one of the current TPS designated country. These counts may include "stateless" individuals.

Source(s):
Department of Homeland Security, U.S. Citizenship and Immigration Services, Office of Performance and Quality
CLAIM3, ELIS, CIS2, NPD, queried 3/2025, PARS0017253.

Honduras;AR000024

I-131, Application for Travel Documents, Parole Documents, and Arrival/Departure Records

Nicaraguan Advanced Parole for those Traveling to Nicaragua

Receipts

October 1, 2022 to April 3, 2025 (Current)

**U.S. Citizenship and Immigration Services**

| Country | Count |
|---|---|
| Nicaragua | 625 |

**Note(s):**

1) Some petitions/applications/requests approved or denied may have been received in previous reporting periods.

2) This report reflects the most up to date data available at the time the database is queried.

3) Counts may differ from those reported in previous periods due to system updates and post-adjudicative outcomes.

4) For a complete list of USCIS forms and descriptions, visit: **https://www.uscis.gov/forms**

5) Nicaraguan citizenship or nationality is based off of country of citizenship.

6) Counts are reflective of Nicaraguans who indicated they were traveling to Nicaragua.

7) Counts are limited to bnft_typ_cd = 24, 144, and 145.

**Source:**

Department of Homeland Security, U.S. Citizenship and Immigration Services, Office of Performance and Quality

ELIS, queried 4/2025, PAER0017480.

Honduras:AR000025



I-131, Application for Travel Documents, Parole Documents, and Arrival/Departure Records

Honduran Advanced Parole for those Traveling to Honduras

Receipts

October 1, 2022 to April 3, 2025 (Current)

U.S. Citizenship
and Immigration
Services

| Country | Count |
|---|---|
| Honduras | 2,464 |

**Note(s):**

1) Some petitions/applications/requests approved or denied may have been received in previous reporting periods.

2) This report reflects the most up to date data available at the time the database is queried.

3) Counts may differ from those reported in previous periods due to system updates and post-adjudicative outcomes.

4) For a complete list of USCIS forms and descriptions, visit: **https://www.uscis.gov/forms**

5) Honduran citizenship or nationality is based off of country of citizenship.

6) Counts are reflective of Hondurans who indicated they were traveling to Honduras.

7) Counts are limited to bnft_typ_cd = 24, 144, and 145.

**Source:**

Department of Homeland Security, U.S. Citizenship and Immigration Services, Office of Performance and Quality

ELIS, queried 4/2025, PAER0017480.

Honduras.AR000026

HondurasAR000027

I-131, Application for Travel Documents, Parole Documents, and Arrival/Departure Records
Receipts
For Honduran and Nicaraguan Citiziens and/or Nationals
October 1, 2022 to April 3, 2025 (Current)

**U.S. Citizenship and Immigration Services**

| Country | Count |
|---------|-------|
| Honduras | 7,231 |
| Nicaragua | 920 |

**Note(s):**

1) Some petitions/applications/requests approved or denied may have been received in previous reporting periods.

2) This report reflects the most up to date data available at the time the database is queried.

3) Counts may differ from those reported in previous periods due to system updates and post-adjudicative outcomes.

4) For a complete list of USCIS forms and descriptions, visit: **https://www.uscis.gov/forms**

5) Country of travel is not available in CLAIMS3.

6) Country of travel is not available in CLAIMS3.

7) Counts are limited to part_2_1 = D and to citizens or national of Honduras and Nicaragua who filed a I-131.

**Source:**

Department of Homeland Security, U.S. Citizenship and Immigration Services, Office of Performance and Quality

CLAIMS3, queried 4/2025, PAER0017480.



U.S. Department of Homeland Security
U.S. Citizenship and Immigration Services
*Office of Policy and Strategy*
Camp Springs, MD 20588-0009

**Honduras as TPS-Designated Country: Comparison of Country Conditions between Initial and Latest**

**TPS Designation Time Frames**:

- Initial TPS designation Period: January 5, 1999, through July 5, 2000
- Redesignation Period: July 5, 2018, through June 30, 2024; through July 5, 2025

**Reasons for Initial TPS Designation for Honduras**:

According to Federal Register (64 FR 524) and the country condition summary of USCIS's 2023 TPS Report to Congress, Honduras was designated to TPS country because a natural disaster (Hurricane Mitch) that prevented it from being able to adequately handle the return of its nationals.

**Reasons for Extension and Redesignation of TPS for Honduras**:

Since its initial designation in 1999, TPS for Honduras was extended 13 consecutive times under the same statutory basis of environmental disaster until July 5, 2018. On June 21, 2023, DHS rescinded the 2018 termination[1] of the TPS designation of Honduras and simultaneously extended the TPS designation of Honduras for 18 months from January 6, 2024, through July 5, 2025, due to:

- Ongoing natural disasters that impact infrastructure rebuilding
- Public health challenges related to mosquito-borne illnesses
- Violence and social and political concerns

**Summaries of Country Conditions from the FY2023 and FY2024 TPS Report to Congress**

Numerous environmental, political, and social crises since Hurricane Mitch have prevented Honduras from recovering from the hurricane and continue to impair from ensuring the safe return of its nationals.

---

[1] After conducting an independent assessment of the country conditions in Honduras as they existed in 2018 and exist today, Secretary Mayorkas determined that Honduras's 1999 designation should not have been terminated.  The conditions in Honduras that gave rise to its TPS designation in 1999 persisted in 2018 and continue to this day.

1

HondurasAR000028

Although recovery efforts were implemented in the years after Hurricane Mitch, the effects of the hurricane set back Honduras economically and socially by as much as 20 years. Since Honduras was designated for TPS in January 1999, various natural disasters, and related environmental concerns—including hurricanes, tropical storms, flooding and heavy rain, severe drought, and mosquito-borne illnesses—have contributed to loss of life and damages to property and infrastructure and prevented the country from fully recovering from the hurricane. Since Hurricane Mitch, Honduras has been impacted by a "repetitive cycle" of storm-related damage to infrastructure and 16 of the 18 departments in the country recently reported damaged roads, collapsed bridges, devastated crops, flooded houses, and landslides (IOM, 2022). Additionally, since the extension of TPS for Honduras in 2018,[2] violence and social and political concerns have adversely impacted living conditions and hindered recovery from environmental disasters, continue to inflict damage on the population and impact Honduras's ability to adequately handle the return of its nationals (OCHA, 2023).

**Summaries of Country Conditions of Honduras from the Latest Reports of Various Sources**

While Hurricane Mitch was a sudden catastrophe, which contributed significantly to the decision to grant Honduras designation, today's crisis of Honduras is more systemic and long-term. Honduras continues to face longstanding structural challenges, including systemic corruption, political interference in the justice system, insecurity, a very large percentage of the population living in poverty, and lethal attacks against environmental defenders. The administration of President Xiomara Castro has made little progress in fighting corruption and restoring democratic institutions. Honduras continues to struggle with widespread corruption, a compromised judiciary, high levels of violence, and attacks against environmental defenders. Despite some positive developments that suggest a brighter future, it is expected that political stability risks remain elevated in Honduras in 2025 due to a weak policymaking environment and fragile security landscape (Fitch Solution Company, 2024). As such, Honduras is not considered safe for returning nationals, especially those vulnerable to gang violence, political persecution, or economic hardship (Bertelsmann Stiftung's Transformation Index [BTI], 2024; Human Rights Watch [HRW], 2025).

*Political Corruption and Power Consolidation*

Despite campaigning on an anti-corruption platform in 2022, President Xiomara Castro's administration has been marred with corruption, criminal penetration, and nepotism. (CSIS, 2024) According to Ryan C. Berg, director of the Americas Program and head of the Future of Venezuela Initiative at the Center for Strategic and International Studies (CSIS), "Governing the

---

[2] The TPS designation of Honduras was statutorily automatically extended for 6 months (from January 6, 2018, through July 5, 2018) after the Secretary of Homeland Security did not make a determination on Honduras's designation 60 days prior to the previous expiration (January 5, 2018). Subsequently, on June 5, 2018, the Secretary announced a determination to terminate TPS for Honduras, effective January 5, 2020.

2

country is largely a family affair, with only a small circle of trusted individuals appointed to key posts in the presidential cabinet." Castro and her husband, Former President Mel Zelaya, has family members all over the administration, including two of their sons who serve as her private secretary and presidential adviser (CSIS, 2024).

A 2022 State of Emergency declaration was implemented to attempt to address the extortion from gangs and other criminal actors that is pervasive in the country.  While some see this as a desperate attempt to do something to address a problem that is financially ruining small businesses, many others see this as an abuse of government powers that limits the civil liberties of its citizens (BTI, 2024).

In September 2024, President Castro presented to the United Nations Secretary-General António Guterres a second draft agreement to create an International Commission against Corruption and Impunity in Honduras (CICIH). The revised proposal would ensure CICIH's independence and autonomy, allow it to independently prosecute cases, investigate high-profile cases, propose legislative changes, and train personnel to fight corruption. However, progress on establishing the CICIH remains slow (HRW, 2025).

Also in September 2024, the head of an anti-corruption organization demanded that she resign after a video was released in which her brother-in-law, Carlos Zelaya, allegedly received drug money. While President Castro did not resign, Zelaya and a congressional leader, resigned after admitting to meeting with drug traffickers in 2013. Zelaya's son, who was minister of defense, also resigned. A few days before Zelaya's resignation, Castro annulled an extradition treaty with the United States, which had allowed for the extradition of Honduran nationals accused of drug trafficking, including former President Juan Orlando Hernández, who was sentenced to 45 years in prison by a US federal court in March (HRW, 2025).

*Freedom of Expression*

Freedom of expression is not guaranteed.  Honduras created a mechanism in 2015 to protect journalists, human rights defenders, and justice officials. This mechanism, however, has serious flaws: It lacks financial autonomy, qualified staff experienced in human rights issues, and trust from defenders (HRW, 2025). As a result, journalists, particularly those investigating crimes against women and minorities, continue to be threatened and often assassinated. According to the Committee for the Protection of Journalists, since 2001, more than 90 journalists have been killed, while many others have been threatened or forced to leave the country. Some have been persecuted by the government and corrupt officials and have been subjected to criminal proceedings for defending their rights to a sustainable livelihood. The UN Office of the High Commissioner for Human Rights (OHCHR) in Honduras reported that 453 human rights defenders and journalists were harassed, threatened, or intimidated in 2023 and 15 were killed (HRW, 2025). According to the Honduran Human Rights Commissioner, virtually none of these murders and threats ever lead to criminal prosecution or conviction (BTI, 2024; UNHRC, 2024).

3

HondurasAR000030

Environmental human rights defenders have suffered serious abuses and intimidation including homicides and physical and psychological attacks on their well-being. Some have been persecuted by the government and corrupt officials and have been subjected to criminal proceedings for defending their rights to a sustainable livelihood. (UNHRC, 2024).

*Conflict Surrounding Land Rights*

Land rights and natural resource disputes remain a pressing issue in Honduras, with Indigenous peoples, Afro-Honduran communities, and peasants disproportionately affected by violence, illegal land seizures, and forced displacement (Gonzalez, 2024; HRW, 2025). Protesters are met with the same serious human rights abuses and intimidation tactic that face journalists, including allegations that corrupt officials and companies are using crime gangs to intimidate and attack people who are trying to defend their human rights to a healthy and sustainable environment. (UNHRC, 2024).

In September 2024, Honduras' Supreme Court declared unconstitutional the laws permitting the creation of so-called Areas of Employment and Economic Development (ZEDEs), geographic areas in which private companies were granted broad governance powers, including to establish their own courts (VOA, 2024). Human Rights Watch criticized ZEDEs and called for their repeal (VOA, 2024). The court ruled that the ZEDE framework violated human rights. Honduras Próspera Group Inc., a company which owns a ZEDE in Honduras, brought a case against Honduras before the International Centre for Settlement of Investment Disputes (ICSID) for the repeal of the legal framework for special economic zones. Próspera filed for damages of US$10.7 billion, approximately 30 % of Honduras' 2023 GDP. In February 2024, Honduras denounced the ICSID Convention (ICSID, 2024; HRW, 2025).

*Socioeconomic Outlook*

Honduras is struggling with a severe economic crisis, including a weakening currency, high inflation risks, mounting debt, and widespread poverty. It also estimated that nearly 2.8 million Hondurans need humanitarian aid, and growing numbers are forced to move and seek refuge outside the country's borders (OCHA, 2023).

Honduras remains one of the poorest and most unequal countries in the Western Hemisphere, with a Human Development Index (HDI) score of 0.621 in 2021 (down from 0.632 in 2019) and a global rank of 137, a ranking that has improved little over the past decade (BTI, 2024). Inequality is stark – the worst in Latin America, according to the most recent data from Oxfam – and endemic corruption leads to market distortion and the development of deeply entrenched criminal structures, particularly in public procurement. According to the Global Initiative against Transnational Organized Crime 2021 report, the distinction between the state and criminal organizations is somewhere between hazy and nonexistent (BTI, 2024).

According to the World Bank (2024), 95.7% of Hondurans have access to a basic water source, 83.8% can access basic sanitation and 93.2% have access to electricity. However, the electricity

4

is unreliable and expensive, poor infrastructure limits water and sanitation, and the country struggles with corruption, unpredictable tax application and enforcement, high crime, low and education levels, all of which prove disincentives to investment (BTI, 2024). According to government data, in 2023, 64 % of the population lived below the poverty line (down from 73.6 % in 2021), and 41.5 % lived in extreme poverty (down from 53.7 % in 2021). Honduras maintains one of the highest levels of income inequality in Latin America with a Gini index of 48.2 in 2023 and continues to face huge obstacles in developing a market economy that includes most of its citizens. (BTI, 2024; CIA, 2024; HRW, 2025).

Fitch Solutions (2025) forecast positive change in the coming years. Specifically, they predict real GDP growth of 3.1% in Honduras over 2025, an upward revision from our previous forecast, but a slowdown from 3.7% in 2024. Weaker private consumption will be the primary drag on economic growth in 2025, mainly due to higher interest rates and falling remittances. Exports will rebound in 2025 as weather conditions normalize and the production of crops such as coffee, bananas, and palm oil

*Human Rights Violations of Women and Minorities*

Gender inequality levels and discrimination against women and Indigenous peoples across health, education, labor market participation and representation are also higher due to the growing inequalities.  Compared to men, many more women from Honduras live in poverty, confront various levels of gender violence daily, have no income of their own and, on average, earn 65 cents for every dollar a man earns (OXFAM, 2025). The Gender Equality Index has remained virtually unchanged since 2014, with Honduras at 0.431 in 2021 (BTI, 2024). To further compound the problem, women rights defenders live in fear for their lives as they are continuously threatened (UNHRC, 2024).

According to the latest data from the Economic Commission for Latin America and the Caribbean (ECLAC, 2025), Honduras has the highest rate of femicides in Latin America and the Caribbean, with approximately 7 femicides per 100,000 women (HRW, 2025). Recently, following the murder of at least 46 women prisoners on 20 June, the Honduran government restored control and operation of the national penitentiary system to the PMOP" (Amnesty International, 2024).

*Safety and Security*

Honduras is one of the most violent countries in the world, with police reporting 3,035 murders in 2023, a homicide rate of 31 per 100,000 people. Between January and September 2024, preliminary police data indicated 1,854 murders, a 26 % drop compared to the same period in 2023 (HRW, 2025).

Like her predecessors, Castro (current President of Honduras) has struggled to address widespread violence within democratic norms. Ultimately, she declared a national emergency on 3 December 2022, suspending certain rights to combat extortion affecting small businesses,

5

and urging the security forces and the Military Public Order Police (PMOP), a branch of the armed forces, to join in implementing the suspension of constitutional guarantees. This state of emergency which has been extended 16 times, most recently until 16 November 2024, acknowledged an ongoing failure by the state (BTI, 2024). This National Emergency Declaration suspends the rights to freedom of association and peaceful assembly and to be informed of the reason for arrest, among others.  The UN Human Rights Committee expressed concern about the extended use of the emergency without a comprehensive, rights-based security policy, saying it resulted in abuses (HRW, 2025; OHCHR; 2024).

Amnesty International (2024) found that since late 2022, Honduran authorities have used disproportionate measures, to deal with what has been described as the "serious violence of organized crime".  As of August 2024, the Honduran ombudsman had received 660 complaints on actions by security agents related to the state of emergency, including due to excessive use of force" (Amnesty International, 2024).  However, despite calls from various international organizations, and reports of possible cases of human rights violations and crimes under international law by members of the PMOP, including enforced disappearance, torture and excessive use of force, PMOP continues to be involved in the application of security measures.

In June 2024, the government announced new measures aimed at tackling organized crime, including the construction of a mega prison and collective trials for alleged members of gang, which pose a threat to the rights of humane treatment of prisoners and to a fair trial. Persisting structural problems, including overcrowding and inadequate infrastructure challenge the efficacy of this plan. As of September 2024, prisons held over 19,000 detainees, 21% more than their capacity. Official statistics show almost half of the people were in pretrial detention (HRW, 2025).

*Education Rights*

Illiteracy is a significant problem in Honduras. While the country has a good record of enrolling children in primary education (96.53%, according to a recent report by USAID) and literacy rates have remained stable (88.5% in 2019), drop-out rates continue to be high once children enter secondary education, particularly among boys (BTI, 2024). Only 56 % of children between 12 and 14, and 28 % between 15 and 17, were attending school. School attendance rates are significantly lower in rural areas Furthermore, over 31 % of people aged 60 and older and over 13 % of people over 15 years old could not read or write in 2023 (HRW, 2025).

In July 2024, Honduras co-sponsored a UN Human Rights Council (UNHRC) resolution establishing a working group that would draft a new optional protocol to the Convention on the Rights of the Child on the rights to early childhood education, free pre-primary and secondary education (HRW, 2025; Sheppard, 2024; UNHRC, 2024).

*Human Rights, Migration and Internal Displacement*

HondurasAR000033

Gang violence and other factors have also caused the internal displacement of about 247,000 people between 2019 and 2024, government data shows. As of 2023, there were 216,000 Honduran asylum seekers abroad, mostly in the United States and Mexico, with 84,000 others recognized as refugees (HRW, 2025; UNHCR, 2025).

HondurasAR000034

# References

Amnesty International. (Oct. 11, 2024). The government must take immediate steps to address concerns related to security, justice and the penitentiary system. https://www.amnesty.org/en/documents/asa37/8596/2024/en/.

Associated Press (2024, Sept. 4). Honduras' president is asked to resign after corruption scandal she says is a plot to oust her. https://apnews.com/article/xiomara-castro-coup-carlos-zelaya-honduras-corruption-60fc69e941f8b8ed55b770da530468bf.

Bertelsmann Stiftung's Transformation Index (BTI). (2024). BTI 2024 Country Report: Honduras.  https://bti-project.org/en/reports/country-dashboard/HND.

Center for Strategic and International Studies. (2024). "From Bad to Worse: The Xiomara Castro Administration Begins to Weaponize the Honduran State." https://www.csis.org/analysis/bad-worse-xiomara-castro-administration-begins-weaponize-honduran-state.

Central Intelligence Agency. (2024). The World Factbook (Honduras). https://www.cia.gov/the-world-factbook/about/archives/2024/countries/honduras/.

UN Economic Commission for Latin American Countries [ECLAC] (2025) Gender Equality Observatory for Latin America and the Caribbean: Femicide or Feminicide. https://oig.cepal.org/en/indicators/femicide-or-feminicide.

Fitch Solutions (2025). "Upward Revision to Honduras Growth, But Still Expecting A Slowdown." https://www.fitchsolutions.com/bmi/country-risk/upward-revision-honduras-growth-still-expecting-slowdown-06-03-2025.

Fitch Solutions (2024). "Risks To Stability to Linger in Honduras Amid Weak Policymaking and Security Environment." https://www.fitchsolutions.com/bmi/country-risk/risks-stability-linger-honduras-amid-weak-policymaking-and-security-environment-28-08-2024.

Gonzalez, G.M. (2024, Jan 24). 'They are waiting for us to give up': Activists face harassment and killings in campaign to protect rivers in Honduras. https://www.amnesty.org/en/latest/news/2024/01/activists-harassment-killings-protect-rivers-honduras/.

Human Rights Watch. (2025). World Report 2025: Honduras (Events of 2024). https://www.hrw.org/world-report/2025/country-chapters/honduras

International Centre for Settlement of Investment Disputes [ICSID] (2024, Feb 29). Honduras Denounces the ICSID Convention. https://icsid.worldbank.org/news-and-events/communiques/honduras-denounces-icsid-convention.

Office of the United Nations High Commissioner for Human Rights [OHCHR] (2024). Situation of human rights in Honduras: Report of the United Nations High Commissioner for Human Rights. https://docs.un.org/en/A/HRC/55/22.

OXFAM (2025). Honduras. https://www.oxfam.org/en/what-we-do/countries/honduras

HondurasAR000035

Sheppard, Bede (2024, July 10) UN Rights Council Takes Big Step for Treaty on Free Education. https://www.hrw.org/news/2024/07/10/un-rights-council-takes-big-step-treaty-free-education.

United Nations High Commissioner for Refugees: The UN Refugee Agency [UNHCR]. (2024). Global Focus, Global Appeal 2024. El Salvador, Guatemala and Honduras situation (2024 Situation Overview). https://reporting.unhcr.org/el-salvador-guatemala-and-honduras-situation-global-appeal-2024.

United Nations High Commissioner for Refugees [UNHCR] (2025), Refugee Data Finder. https://www.unhcr.org/refugee-statistics/download/?v2url=d7e8ee.

United Nations [UN] Human Rights Council [HRC]. (2024, July 10).  Promotion and protection of all human rights, civil, political, economic, social and cultural rights, including the right to development. https://docs.un.org/en/A/HRC/RES/56/5.

United Nations Office for the Coordination of Humanitarian Affairs [OCHA] (2023). Honduras Humanitarian Needs and Response Plan Summary 2024 (December 2023). https://www.unocha.org/publications/report/honduras/honduras-humanitarian-needs-and-response-plan-summary-2024-december-2023.

USCIS, Department of Homeland Security (March 2024). Temporary Protected Status: Calendar Year 2024 Annual Report (Report to Congress). Unavailable.

USCIS, Department of Homeland Security (March 2023). Temporary Protected Status: Calendar Year 2023 Annual Report (Report to Congress). https://www.uscis.gov/sites/default/files/document/reports/TPS_CY23_Congressional_Report.pdf.

Voices of America (2024, Sept. 21). Corte Suprema de Honduras declara inconstitucionales zonas económicas especiales. https://www.vozdeamerica.com/a/corte-suprema-honduras-declara-inconstitucionales-zonas-economicas-especiales-/7793209.html.

World Bank Group. (2024). The World Bank in Honduras. https://www.worldbank.org/en/country/honduras/overview.

9

**79208**    Federal Register / Vol. 85, No. 237 / Wednesday, December 9, 2020 / Notices

most expensive and substantive part of the finished pump assembly. We found that it imparted the "very essence" of the pump assembly, as it turned the impeller and moved the fluid through the pump.

The question presented is whether the contactless IC is substantially transformed when it is assembled together with the other components. We note that in NFC technology, an NFC chip and an antenna are combined to transmit information across short distances. In this case, the driver's serial ID number is transmitted to the NFC reader for tracking purposes. Therefore, the NFC chip is central to the function of the finished NFC fob.

Similar to the shoe upper in *Uniroyal*, the ribbon in *Grafton Spools*, and the electric motor in HQ H303864, we find that the NFC chip constitutes the "very essence" of the finished NFC fob. After the chip is assembled into the finished fob, its use remains unchanged. Therefore, we find that the country of origin of the NFC fob will be the country where the NFC chip is produced. In most cases, the country of origin will be Taiwan, but when the Ultralight C—contactless ticket IC is unavailable from Taiwan, then the country of origin of the NFC fob will be where the chip is sourced, which in this case is either Thailand or Singapore.

**Holding**

The country of origin of the three telematics devices, the satellite devices, and the NFC reader for purposes of U.S. Government procurement is Canada.

The country of origin of the NFC keyring fob for purposes of U.S. Government procurement is the country of origin of the contactless IC, which is usually Taiwan. However, if the contactless IC is sourced from Thailand or Singapore, then the country of origin for procurement would be Thailand or Singapore as the case may be.

Notice of this final determination will be given in the **Federal Register**, as required by 19 CFR 177.29. Any party-at-interest other than the party which requested this final determination may request, pursuant to 19 CFR 177.31, that CBP reexamine the matter anew and issue a new final determination. Pursuant to 19 CFR 177.30, any party-at-interest may, within 30 days of publication of the **Federal Register** Notice referenced above, seek judicial review of this final determination before the Court of International Trade.

Sincerely,

Alice A. Kipel,

Executive Director Regulations & Rulings, Office of Trade.

[FR Doc. 2020–27022 Filed 12–8–20; 8:45 am]

**BILLING CODE 9111–14–P**

---

**DEPARTMENT OF HOMELAND SECURITY**

**U.S. Citizenship and Immigration Services**

**[CIS No. 2676–20; DHS Docket No. USCIS–2019–0020]**

**RIN 1615–ZB83**

**Continuation of Documentation for Beneficiaries of Temporary Protected Status Designations for El Salvador, Haiti, Nicaragua, Sudan, Honduras, and Nepal**

**AGENCY:** U.S. Citizenship and Immigration Services, Department of Homeland Security.

**ACTION:** Notice.

**SUMMARY:** Through this notice, the Department of Homeland Security (DHS) announces actions to ensure its continued compliance with the preliminary injunction orders of the U.S. District Court for the Northern District of California in *Ramos, et al.* v. *Nielsen, et. al.,* No. 18–cv–01554 (N.D. Cal. Oct. 3, 2018) ("*Ramos*") and the U.S. District Court for the Eastern District of New York in *Saget, et. al.,* v. *Trump, et. al.,* No. 18–cv–1599 (E.D.N.Y. Apr. 11, 2019) ("*Saget*"), and with the order of the U.S. District Court for the Northern District of California to stay proceedings in *Bhattarai* v. *Nielsen,* No. 19–cv–00731 (N.D. Cal. Mar. 12, 2019) ("*Bhattarai*"). A panel of the U.S. Court of Appeals for the Ninth Circuit vacated the injunction in *Ramos* on September 14, 2020. However, because the appellate court has not issued its directive to the district court to make that ruling effective, the injunction remains in place at this time. *See Ramos, et al.,* v. *Wolf, et al.,* No. 18–16981 (9th Cir., September 14, 2020). Beneficiaries under the Temporary Protected Status (TPS) designations for El Salvador, Nicaragua, Sudan, Honduras, and Nepal will retain their TPS while the preliminary injunction in *Ramos* and the *Bhattarai* order remain in effect, provided that an alien's TPS is not withdrawn because of individual ineligibility. Beneficiaries under the TPS designation for Haiti will retain their TPS while either of the preliminary injunctions in *Ramos* or *Saget* remain in effect, provided that an alien's TPS is not withdrawn because of individual ineligibility. This notice further provides information on the

automatic extension of the validity of TPS-related Employment Authorization Documents (EADs); Notices of Action (Forms I–797); and Arrival/Departure Records (Forms I–94), (collectively "TPS-related documentation"); for those beneficiaries under the TPS designations for El Salvador, Haiti, Nicaragua, Sudan, Honduras, and Nepal.

**DATES:** DHS is automatically extending the validity of TPS-related documentation for beneficiaries under the TPS designations for El Salvador, Haiti, Nicaragua, Sudan, Honduras, and Nepal for nine months through October 4, 2021, from the current expiration date of January 4, 2021.

**FOR FURTHER INFORMATION CONTACT:**

• You may contact Maureen Dunn, Chief, Humanitarian Affairs Division, Office of Policy and Strategy, U.S. Citizenship and Immigration Services, U.S. Department of Homeland Security, by mail at 5900 Capital Gateway Dr, Camp Springs, MD 20529–2140; or by phone at 800–375–5283.

• For further information on TPS, please visit the USCIS TPS web page at *www.uscis.gov/tps.*

• If you have additional questions about TPS, please visit *uscis.gov/tools.* Our online virtual assistant, Emma, can answer many of your questions and point you to additional information on our website. If you are unable to find your answers there, you may also call our U.S. Citizenship and Immigration Services (USCIS) Contact Center at 800–375–5283 (TTY 800–767–1833).

• Applicants seeking information about the status of their individual cases may check Case Status Online, available on the USCIS website at *www.uscis.gov,* or visit the USCIS Contact Center at *uscis.gov/contactcenter.*

• Further information will also be available at local USCIS offices upon publication of this notice.

**SUPPLEMENTARY INFORMATION:**

**Table of Abbreviations**

CFR—Code of Federal Regulations
DHS—U.S. Department of Homeland Security
EAD—Employment Authorization Document
EOIR—Executive Office for Immigration Review
FNC—Final Nonconfirmation
Form I–765—Application for Employment Authorization
Form I–797—Notice of Action
Form I–821—Application for Temporary Protected Status
Form I–9—Employment Eligibility Verification
Form I–912—Request for Fee Waiver
Form I–94—Arrival/Departure Record
Government—U.S. Government
INA—Immigration and Nationality Act

IER—U.S. Department of Justice, Civil Rights Division, Immigrant and Employee Rights Section
SAVE—USCIS Systematic Alien Verification for Entitlements Program
Secretary—Secretary of Homeland Security
TNC—Tentative Nonconfirmation
TPS—Temporary Protected Status
TTY—Text Telephone
USCIS—U.S. Citizenship and Immigration Services

## Background on TPS

• TPS is a temporary immigration status granted to eligible nationals of a country designated for TPS under the Immigration and Nationality Act (INA) or to eligible persons without nationality who last habitually resided in the designated country.

• During the TPS designation period, TPS beneficiaries are eligible to remain in the United States, may not be removed, and are authorized to obtain EADs so long as they continue to meet the requirements of TPS.

• TPS beneficiaries may travel abroad temporarily with the prior consent of DHS.

• The granting of TPS does not result in or lead to lawful permanent resident status.

• To qualify for TPS, beneficiaries must meet the eligibility standards at INA section 244(c)(1)–(2), 8 U.S.C. 1254a(c)(1)–(2).

• When the Secretary of Homeland Security (the Secretary) terminates a country's TPS designation, beneficiaries return to one of the following:
○ The same immigration status or category that they maintained before TPS, if any (unless that status or category has since expired or been terminated); or
○ Any other lawfully obtained immigration status or category they received while registered for TPS, as long as it is still valid on the date TPS terminates.

## Purpose of this Action

This notice ensures DHS's continued compliance with various court orders issued by the federal district courts in the *Ramos, Bhattarai,* and *Saget* lawsuits that require DHS to maintain the TPS designations for El Salvador, Haiti, Sudan, Nicaragua, Honduras, and Nepal, as well as the TPS and TPS-related documentation for eligible affected beneficiaries.[1] The U.S. Court

of Appeals for the Ninth Circuit vacated the district court's preliminary injunction in *Ramos* on September 14, 2020, holding that the decision to designate, extend, or terminate TPS is not subject to judicial review. However, the appellate order is not currently effective because the Ninth Circuit has not issued any directive to carry out the order to the federal district court.[2] Therefore, the *Ramos* preliminary injunction remains in effect. In addition, the order of the district court in *Bhattarai* staying proceedings and approving the parties' stipulated agreement to continue TPS and TPS-related documentation for eligible beneficiaries from Nepal and Honduras remains in effect. The *Saget* district court's order prohibiting the termination of TPS for Haiti also remains in effect while the decision is on appeal to the U.S. Court of Appeals for the Second Circuit. Affected TPS beneficiaries from the six countries will retain their status, provided they continue to meet all the individual requirements for TPS eligibility described in INA section 244(c) and 8 CFR 244. As necessary, DHS will publish future information in the **Federal Register** to ensure its compliance with any relevant court orders that may be issued after the date of this notice.

DHS has initially published notices to ensure its compliance with the *Ramos* preliminary injunction on October 31, 2018 and March 1, 2019, and the *Bhattarai* order to stay proceedings on May 10, 2019. *See* 83 FR 54764; 84 FR 7103; and 84 FR 20647. The Department last published a notice to ensure its continued compliance with the combined orders in *Ramos, Bhattarai,* and *Saget* on November 4, 2019. That notice automatically extended certain TPS and TPS-related documentation through January 4, 2021 for all eligible TPS beneficiaries covered by the courts' orders. *See* 84 FR 59403. Through this **Federal Register** notice, DHS announces actions to ensure its continued compliance with the district court orders in these three lawsuits while those orders remain in effect.

The TPS designations for El Salvador, Nicaragua, and Sudan will remain in effect, as required by the *Ramos* district court order, so long as the preliminary injunction remains in effect. The TPS

designation for Haiti will remain in effect, as required by the preliminary injunction orders in both *Ramos* and *Saget,* so long as either of those preliminary injunctions remain in effect. The TPS designations for Honduras and Nepal will remain in effect so long as the *Bhattarai* order staying proceedings and approving the parties' stipulated agreements continues in effect. Affected TPS beneficiaries under the TPS designations for El Salvador, Nicaragua, Sudan, Haiti, Honduras, and Nepal will retain their TPS and their TPS-related documentation will continue to be valid in accordance with the specific orders that affect the TPS designations regarding their individual countries, provided that the affected beneficiaries continue to meet all the individual requirements for TPS. *See* INA section 244(c)(3). *See also* 8 CFR 244.14. DHS will not terminate TPS for any of the affected countries pending final disposition of the *Ramos* appeal, or for Haiti pending both *Ramos* and *Saget* appeals, including through any additional appellate channels in which relief may be sought, or by other orders of the court.

DHS is further announcing it is automatically extending, through October 4, 2021, the validity of certain TPS-related documentation, as specified in this notice, for beneficiaries under the TPS designations for El Salvador, Haiti, Nicaragua, Sudan, Honduras, and Nepal provided that the affected beneficiaries remain individually eligible for TPS.

## Automatic Extension of EADs Issued Under the TPS designations for El Salvador, Haiti, Nicaragua, Sudan, Honduras, and Nepal

Through this **Federal Register** notice, DHS automatically extends the validity of EADs listed in Table 1 below issued to beneficiaries under the TPS designations for El Salvador, Haiti, Nicaragua, Sudan, Honduras, and Nepal. Such aliens may show their EAD to employers to demonstrate they have employment authorization and may wish to also show employers this **Federal Register** notice to explain that their TPS-Related Documentation has been automatically extended through October 4, 2021. This Notice explains how TPS beneficiaries, their employers, and benefit-granting agencies may determine which EADs are automatically extended and how this affects the Form I–9, Employment Eligibility Verification, E-Verify, and USCIS Systematic Alien Verification for Entitlements (SAVE) processes. Additionally, a beneficiary under the

---

[1] *See Ramos, et al.* v. *Nielsen, et. al.,* No. 18–cv–01554 (N.D. Cal. Oct. 3, 2018) (district court granted preliminary injunction against terminations of TPS for El Salvador, Haiti, Sudan, and Nicaragua) ("*Ramos*"); *Saget, et. al.,* v. *Trump, et. al.,* No. 18–cv–1599 (E.D.N.Y. Apr. 11, 2019) (district court granted preliminary injunction against termination of TPS for Haiti) ("*Saget*"); and *Bhattarai, et al.* v.

*Nielsen, et al.,* No. 19–cv–00731 (N.D. Cal. Mar. 12, 2019) (district court stayed proceedings until *Ramos* appeal decided and approved parties' stipulation for continued TPS and issuance of TPS-related documentation to eligible, affected beneficiaries of TPS for Honduras and Nepal during the stay and pendency of the appeal) ("*Bhattarai*").

[2] *See Ramos, et al.,* v. *Wolf, et al.,* No. 18–16981 (9th Cir., September 14, 2020).

TPS designation for any of these countries who has applied for a new EAD but who has not yet received his or her new EAD is covered by this automatic extension, provided that the EAD he or she possesses contains one of the expiration dates listed in Table 1 below.

### TABLE 1—AFFECTED EADs

| If an EAD has a category code of A–12 or C–19 and an expiration date of: | Then the validity of the EAD is extended through: |
|---|---|
| 07/22/2017 | 10/04/2021 |
| 11/02/2017 | 10/04/2021 |
| 01/05/2018 | 10/04/2021 |
| 01/22/2018 | 10/04/2021 |
| 03/09/2018 | 10/04/2021 |
| 06/24/2018 | 10/04/2021 |
| 07/05/2018 | 10/04/2021 |
| 11/02/2018 | 10/04/2021 |
| 01/05/2019 | 10/04/2021 |

### TABLE 1—AFFECTED EADs— Continued

| If an EAD has a category code of A–12 or C–19 and an expiration date of: | Then the validity of the EAD is extended through: |
|---|---|
| 04/02/2019 | 10/04/2021 |
| 06/24/2019 | 10/04/2021 |
| 07/22/2019 | 10/04/2021 |
| 09/09/2019 | 10/04/2021 |
| 01/02/2020 | 10/04/2021 |
| 01/05/2020 | 10/04/2021 |
| 03/24/2020 | 10/04/2021 |
| 01/04/2021 | 10/04/2021 |

**Automatic Extension of Forms I–94 and Forms I–797**

Also through this **Federal Register** notice, DHS automatically extends the validity periods of the Forms I–94 and Forms I–797 listed in Table 2 below previously issued to beneficiaries under the TPS designations for El Salvador, Haiti, Nicaragua, Sudan, Honduras, and Nepal. These extensions apply only if the TPS beneficiary properly filed for re-registration during either the most recent DHS-announced registration period for their country, or any applicable previous DHS-announced re-registration periods for the alien's country,[3] or has a re-registration application that remains pending. This notice does not extend the validity periods of Forms I–94 or Forms I–797 for any TPS beneficiary who failed to file for TPS re-registration during one of the applicable previous DHS-announced re-registration periods, or for whom a re-registration request has been finally denied. In addition, the extensions do not apply for any beneficiary from whom TPS has been withdrawn.

### TABLE 2—AFFECTED FORMS I–94 AND I–797 [4]

| Country | Beginning date of validity: | End date of validity: | Validity of forms I–94 and I–797 extended through: |
|---|---|---|---|
| El Salvador | Sept. 10, 2016 | Mar. 9, 2018 | 10/04/2021 |
| | Mar. 10, 2018 | Sept. 9, 2019 | 10/04/2021 |
| Haiti | Jan. 23, 2016 | July 22, 2017 | 10/04/2021 |
| | July 23, 2017 | Jan. 22, 2018 | 10/04/2021 |
| | Jan. 23, 2018 | July 22, 2019 | 10/04/2021 |
| Honduras | July 6, 2016 | Jan. 5, 2018 | 10/04/2021 |
| | Jan. 6, 2018 | July 5, 2018 | 10/04/2021 |
| | July 6, 2018 | Jan. 5, 2020 | 10/04/2021 |
| Nepal | Dec. 25, 2016 | June 24, 2018 | 10/04/2021 |
| | June 25, 2018 | June 24, 2019 | 10/04/2021 |
| Nicaragua | July 6, 2016 | Jan. 5, 2018 | 10/04/2021 |
| | Jan. 6, 2018 | Jan. 5, 2019 | 10/04/2021 |
| Sudan | May 3, 2016 | Nov. 2, 2017 | 10/04/2021 |
| | Nov. 3, 2017 | Nov. 2, 2018 | 10/04/2021 |

**Application Procedures**

Current beneficiaries under the TPS designations for El Salvador, Haiti, Honduras, Nepal, Nicaragua, and Sudan do not need to pay a fee or file any application, including Application for Employment Authorization (Form I–765), to maintain their TPS benefits through October 4, 2021, provided that they have properly re-registered for TPS during either the most recent DHS-announced registration period for their country, or any applicable previous re-registration period described in Footnote 3.

TPS beneficiaries who have failed to re-register properly for TPS during any of these re-registration periods may still file an Application for Temporary Protected Status (Form I–821), but must demonstrate ''good cause'' for failing to re-register on time, as required by law. See INA section 244(c)(3)(C) (TPS beneficiary's failure to register without good cause in form and manner specified by DHS is ground for TPS withdrawal); 8 CFR 244.17(b) and Form I–821 instructions.

Any currently eligible beneficiary who does not presently have a pending EAD application under the TPS designations for El Salvador, Haiti, Honduras, Nepal, Nicaragua, or Sudan may file Form I–765 with appropriate fee.

**Possible Future Actions**

In order to comply with statutory requirements for TPS while the district courts' orders or any superseding court order concerning the beneficiaries under the TPS designations for El Salvador, Haiti, Honduras, Nepal, Nicaragua, and Sudan are pending, DHS anticipates requiring these beneficiaries to re-register and will announce the re-registration procedures in a future **Federal Register** notice. DHS has the authority to conduct TPS re-registration in accordance with section 244(c)(3)(C) of the INA and 8 CFR 244.17. Through the re-registration process, which is generally conducted every 12 to 18 months while a country is designated

---

[3] El Salvador: July 8–Sept. 6, 2016, or Jan. 18–Mar. 19, 2018; Haiti: Aug. 25–Oct. 26, 2015, May 24–July 24, 2017, or Jan. 18–Mar. 19, 2018; Honduras: May 16–July 16, 2016; Dec. 15, 2017–Feb. 13, 2018 or June 5–Aug. 6, 2018; Nepal: Oct. 26–Dec. 27, 2016 or May 22–July 23, 2018;

Nicaragua: May 16–July 15, 2016 or Dec. 15, 2017–Feb. 13, 2018; Sudan: Jan. 25–March 25, 2016 or Oct. 11, 2017–Dec. 11, 2017.

[4] Your Forms I–94 and I–797 may show a different beginning date of validity than those listed here if you were a late initial filer (LIF) at the time because the forms would have the date of approval of your LIF application for TPS. As long as they bear an end date of validity listed in this chart, then they are automatically extended by this Notice.

for TPS, USCIS determines whether each TPS beneficiary is continuing to maintain individual eligibility for TPS, including but not limited to, the requirements related to disqualifying criminal or security issues. See id.; INA, section 244(c)(2); 8 CFR 244.2, 244.3, and 244.4 (describing individual TPS eligibility requirements, including mandatory criminal and security bars).

The Government has appealed both the *Ramos* and *Saget* preliminary injunctions. A 3-judge panel of the U.S. Court of Appeals for the Ninth Circuit ruled for the Government and vacated the *Ramos* preliminary injunction on September 14, 2020. However, the preliminary injunction remains in effect because the appellate court has not issued its directive (*i.e.,* the mandate) to the district court to implement the panel's decision. Should the Government ultimately prevail in its challenge to the *Ramos* preliminary injunction, the Secretary's determination to terminate TPS for Nicaragua, Sudan, Honduras, and Nepal will take effect no earlier than 120 days from the issuance of any appellate mandate to the district court. The Secretary's determination to terminate TPS for El Salvador will take effect no earlier than 365 days from the issuance of any appellate mandate to the *Ramos* district court. DHS provides this additional time for El Salvador TPS beneficiaries in part because there are almost 100,000 more such beneficiaries than in the combined TPS beneficiary populations of all the other five countries covered by this notice.[5] The additional period of 245 days beyond 120 days permits an orderly transition for beneficiaries of TPS from El Salvador as they return to their homeland. If the Government prevails in its appeals, DHS will also continue to monitor the circumstances of the affected beneficiaries under the other five TPS country designations covered by this notice. *See* INA, 244(d)(3).

TPS for beneficiaries under Haiti's designation may continue pursuant to the *Saget* preliminary injunction. However, should the Government prevail in its challenges to both the *Ramos* preliminary injunction and the *Saget* preliminary injunction, the Secretary's determination to terminate TPS for Haiti will take effect no earlier than 120 days from the issuance of the later of the two appellate mandates to the District Court. To the extent that a **Federal Register** notice has

automatically extended TPS-related documentation beyond 120 days from the issuance of any appellate mandate to the District Court, DHS reserves the right to issue a subsequent **Federal Register** notice announcing an expiration date for the documentation that corresponds to the last day of the 120-day period. Should the Government move to vacate the *Bhattarai* order to stay proceedings in light of an appellate decision affirming the preliminary injunction in *Ramos* that suggests a basis on which to distinguish the determinations to terminate the TPS designations for Honduras and Nepal from the TPS terminations at issue in *Ramos,* TPS will remain in effect for Honduras and Nepal for at least 180 days following an order of the District Court vacating the stay in proceedings.

**Additional Notes**

Nothing in this notice affects DHS's ongoing authority to determine on a case-by-case basis whether a TPS beneficiary continues to meet the eligibility requirements for TPS described in section 244(c) of the INA and the implementing regulations in part 244 of Title 8 of the Code of Federal Regulations.

**Notice of Compliance With the ''Order Enjoining the Implementation and Enforcement of Determinations To Terminate the TPS Designations for El Salvador, Haiti, Nicaragua, and Sudan'' in *Ramos,* the ''Order Enjoining the Implementation of Enforcement of Determination To Terminate the TPS Designation of Haiti'' in *Saget,* and the ''Order To Stay Proceedings and Agreement To Stay the Determinations To Terminate the TPS Designations for Honduras and Nepal'' in *Bhattarai***

The previously announced determinations to terminate the existing designations of TPS for El Salvador, Nicaragua, and Sudan[6] will not be implemented or enforced unless and until the district court's order in *Ramos* is reversed and that reversal becomes final. The previously announced determination to terminate the existing designation of TPS for Haiti will not be implemented or enforced unless and until the district court's orders in *Ramos* and *Saget* are reversed and those reversals become final.[7] As required by

the order to stay proceedings in *Bhattarai,* DHS will not implement or enforce the previously announced determinations to terminate the existing TPS designations for Honduras and Nepal[8] unless and until the district court's order in *Ramos* enjoining implementation and enforcement of the determinations to terminate the TPS designations for El Salvador, Haiti, Nicaragua, and Sudan is reversed and that reversal becomes final for some or all of the affected countries, or by other order of the court. Any termination of TPS-related documentation for beneficiaries under the TPS designations for Haiti, Nicaragua, Sudan, Honduras, and Nepal will go into effect no earlier than 120 days, and no earlier than 365 days for beneficiaries under the TPS designation for El Salvador, following the issuance of any mandate to the district court, as described in the ''Possible Future Action'' section of this **Federal Register** notice.[9]

In further compliance with the still-valid district court orders, DHS is publishing this notice automatically extending the validity of the TPS-related documentation specified in the Supplementary Information section of this notice through October 4, 2021, for eligible beneficiaries under the TPS designations for El Salvador, Haiti, Nicaragua, Sudan, Honduras, and Nepal. DHS will continue to issue notices that will automatically extend TPS-related documentation for all affected beneficiaries under the TPS designations for El Salvador, Honduras, Nicaragua, Nepal, and Sudan, so long as the Ramos preliminary injunction and Bhattarai order to stay proceedings remain in place; for Haiti so long as either the Ramos or Saget preliminary injunctions remain in place; or by other order of the court. However, should compliance with the Ramos, Bhattarai, and/or Saget court orders remain necessary, DHS may announce periodic re-registration procedures for eligible TPS beneficiaries in accordance with the INA and DHS regulations. DHS

---

[5] As of December 31, 2019, the number of TPS beneficiaries covered under the affected designations were: El Salvador 247,412; Haiti 55,218; Nicaragua 4,409; Sudan 771; Honduras 79,290; Nepal 14,549.

[6] *See* Termination of the Designation of El Salvador for Temporary Protected Status, 83 FR 2654 (Jan. 18, 2018); Termination of the Designation of Nicaragua for Temporary Protected Status, 82 FR 59636 (Dec. 15, 2017); Termination of the Designation of Sudan for Temporary Protected Status, 82 FR 47228 (Oct. 11, 2017).

[7] *See* Termination of the Designation of Haiti for Temporary Protected Status, 83 FR 2648 (Jan. 18, 2018).

[8] *See* Termination of the Designation of Honduras for Temporary Protected Status, 83 FR 26074 (June 5, 2018); Termination of the Designation of Nepal for Temporary Protected Status, 83 FR 23705 (May 22, 2018).

[9] An additional provision in the *Bhattarai* Order to Stay Proceedings states that if the preliminary injunction in *Ramos* is upheld, but the Government moves to vacate the *Bhattarai* Order based on reasons for distinguishing the terminations of TPS for Honduras and Nepal from those under the injunction in *Ramos,* TPS will remain in effect for Honduras and Nepal for at least 180 days following an order of the District Court vacating stay of proceedings order.

further continues its commitment to a transition period, as described above.

All TPS beneficiaries must continue to maintain their TPS eligibility by meeting the requirements for TPS in INA section 244(c) and 8 CFR part 244. DHS will continue to adjudicate any pending TPS re-registration and pending late initial applications for affected beneficiaries under the TPS designations for El Salvador, Haiti, Honduras, Nicaragua, Nepal, and Sudan, and continue to make appropriate individual TPS withdrawal decisions in accordance with existing procedures if an alien no longer maintains TPS eligibility. DHS will take appropriate steps to continue its compliance with the orders, and with all statutory requirements.

The Acting Secretary of Homeland Security, Chad F. Wolf, having reviewed and approved this document, has delegated the authority to electronically sign this document to Ian Brekke, who is the Deputy General Counsel for DHS, for purposes of publication in the **Federal Register**.

**Ian Brekke,**
*Deputy General Counsel, U.S. Department of Homeland Security.*

**Approved Forms To Demonstrate Continuation of Lawful Status and TPS-Related Employment Authorization**

• This **Federal Register** notice dated December 9, 2020
  ○ Through operation of this notice, certain TPS-related documentation, including EADs, of affected beneficiaries under the TPS designations for El Salvador, Haiti, Honduras, Nepal, Nicaragua, and Sudan are automatically extended through October 4, 2021.
  ○ A beneficiary granted TPS under the designation for El Salvador, Haiti, Honduras, Nepal, Nicaragua, or Sudan may show his or her EAD that has been automatically extended to his or her employer to demonstrate identity and continued TPS-related employment eligibility to meet Employment

Eligibility Verification (Form I–9) requirements. A beneficiary granted TPS under a designation for one of these countries may also wish to show an employer this **Federal Register** notice, which explains that his or her EAD has been automatically extended.
  ○ Alternatively, such a TPS beneficiary may choose to show other acceptable documents that are evidence of identity and employment eligibility as described in the instructions to Form I–9.
  ○ Finally, such a TPS beneficiary may show a copy of this **Federal Register** notice, along with his or her EAD that has been automatically extended, or Form I–94, or Form I–797, as evidence of his or her lawful status, to law enforcement, Federal, state, and local government agencies, and private entities.

• Employment Authorization Document (EAD)

**Am I eligible to receive an automatic extension of my current EAD using this Federal Register notice?**

Yes. Provided that you currently have a TPS-related EAD with the specified expiration dates below, this notice automatically extends your EAD as stated in Table 3 below.

**TABLE 3—AFFECTED EADs**

| If your EAD has category code of A–12 or C–19 and an expiration date of: | Then this **Federal Register** notice extends your EAD through: |
|---|---|
| 07/22/2017 | 10/04/2021 |
| 11/02/2017 | 10/04/2021 |
| 01/05/2018 | 10/04/2021 |
| 01/22/2018 | 10/04/2021 |
| 03/09/2018 | 10/04/2021 |
| 06/24/2018 | 10/04/2021 |
| 07/05/2018 | 10/04/2021 |
| 11/02/2018 | 10/04/2021 |
| 01/05/2019 | 10/04/2021 |
| 04/02/2019 | 10/04/2021 |
| 06/24/2019 | 10/04/2021 |
| 07/22/2019 | 10/04/2021 |
| 09/09/2019 | 10/04/2021 |
| 01/02/2020 | 10/04/2021 |
| 01/05/2020 | 10/04/2021 |
| 03/24/2020 | 10/04/2021 |
| 01/04/2021 | 10/04/2021 |

**When hired, what documentation may I show to my employer as evidence of employment authorization and identity when completing Form I–9?**

You can find the Lists of Acceptable Documents on the third page of Form I–9 as well as the Acceptable Documents web page at *www.uscis.gov/i-9-central/acceptable-documents.* Employers must complete Form I–9 to verify the identity and employment authorization of all new employees. Within 3 days of hire, employees must present acceptable documents to their employers as evidence of identity and employment authorization to satisfy Form I–9 requirements.

You may present any document from List A (which provides evidence of both your identity and employment authorization) or one document from List B (which provides evidence of your identity) together with one document from List C (which provides evidence of your employment authorization), or you may present an acceptable receipt as described in the Form I–9 instructions. Employers may not reject a document based on a future expiration date. You can find additional information about Form I–9 on the I–9 Central web page at *www.uscis.gov/I-9Central.*

An EAD is an acceptable document under List A. See the section ''How do my employer and I complete Form I–9 using my automatically extended employment authorization for a new job?'' of this **Federal Register** notice for further information. If you present your EAD with one of the expiration dates specified below, you may also provide your employer with a copy of this **Federal Register** notice, which explains that your EAD has been automatically extended for a temporary period of time, through October 4, 2021, as follows:

**TABLE 4—AFFECTED EADs AND FORM I–9**

| You may show your EAD to complete Form I–9 if your EAD has category code of A–12 or C–19 and bears an expiration date of: | Enter this date in Section 1 of Form I–9: | Your employer must reverify your employment authorization by: |
|---|---|---|
| 07/22/2017 | 10/04/2021 | 10/05/2021 |
| 11/02/2017 | 10/04/2021 | 10/05/2021 |
| 01/05/2018 | 10/04/2021 | 10/05/2021 |
| 01/22/2018 | 10/04/2021 | 10/05/2021 |
| 03/09/2018 | 10/04/2021 | 10/05/2021 |
| 06/24/2018 | 10/04/2021 | 10/05/2021 |
| 07/05/2018 | 10/04/2021 | 10/05/2021 |
| 11/02/2018 | 10/04/2021 | 10/05/2021 |
| 01/05/2019 | 10/04/2021 | 10/05/2021 |
| 04/02/2019 | 10/04/2021 | 10/05/2021 |

HondurasAR000041

TABLE 4—AFFECTED EADs AND FORM I–9—Continued

| You may show your EAD to complete Form I–9 if your EAD has category code of A–12 or C–19 and bears an expiration date of: | Enter this date in Section 1 of Form I–9: | Your employer must reverify your employment authorization by: |
|---|---|---|
| 06/24/2019 | 10/04/2021 | 10/05/2021 |
| 07/22/2019 | 10/04/2021 | 10/05/2021 |
| 09/09/2019 | 10/04/2021 | 10/05/2021 |
| 01/02/2020 | 10/04/2021 | 10/05/2021 |
| 01/05/2020 | 10/04/2021 | 10/05/2021 |
| 03/24/2020 | 10/04/2021 | 10/05/2021 |
| 01/04/2021 | 10/04/2021 | 10/05/2021 |

**What documentation may I present to my employer for Form I–9 if I am already employed but my current TPS-related EAD is set to expire?**

Even though your EAD has been automatically extended, your employer may need to re-inspect your automatically extended EAD to check the Card Expires date and Category code if your employer did not keep a copy of your EAD when you initially presented it. In this situation, your employer should update the EAD expiration date in Section 2 of Form I–9. *See* the section, ''What corrections should my current employer make to Form I–9 if my employment authorization has been automatically extended?'' of this **Federal Register** notice for further information. You may show this **Federal Register** notice to your employer to explain what to do for Form I–9 and to show that your EAD has been automatically extended through October 4, 2021 as indicated in the above chart.

The last day of the automatic extension for your EAD is October 4, 2021. Before you start work on October 5, 2021, your employer is required by law to reverify your employment authorization in Section 3 of Form I–9. At that time, you must present any document from List A or any document from List C on Form I–9, Lists of Acceptable Documents, or an acceptable List A or List C receipt described in the Form I–9 instructions to reverify employment authorization.

If your original Form I–9 was a previous version, your employer must complete Section 3 of the current version of Form I–9, and attach it to your previously completed Form I–9. Your employer can check the I–9 Central web page at *www.uscis.gov/I-9Central* for the most current version of Form I–9. Your employer may not specify which List A or List C document you must present and cannot reject an acceptable receipt.

**Can I obtain a new EAD?**

Yes, if you remain eligible for TPS and apply for a new EAD, you can

obtain a new EAD. However, you do not need to apply for a new EAD in order to benefit from this automatic extension. If you are a beneficiary under the TPS designations for El Salvador, Haiti, Nicaragua, Sudan, Honduras, or Nepal and want to obtain a new EAD valid through October 4, 2021, then you must file Form I–765 and pay the associated fee. If you do not want a new EAD, you do not have to file Form I–765 or pay the Form I–765 fee. If you do not want to request a new EAD now, you may file Form I–765 at a later date and pay the fee, provided that you still have TPS or a pending TPS application. You may file the application for a new EAD either before or after your current EAD has expired.

If you are unable to pay the application fee and/or biometric services fee, you may complete a Request for Fee Waiver (Form I–912). For more information on the application forms and fees for TPS, please visit the USCIS TPS web page at *www.uscis.gov/tps.*

If you have a Form I–821 and/or Form I–765 application that is still pending for beneficiaries under the TPS designations for El Salvador, Haiti, Honduras, Nepal, Nicaragua, or Sudan, then you should not file either application again. If your pending Form I–821 is approved, you will be issued Forms I–797 and I–94 through October 4, 2021. Similarly, if you have a pending TPS-related Form I–765 that is approved, your new EAD will be valid through October 4, 2021. Your TPS itself continues as long as the preliminary injunction impacting your country's TPS designation remains in effect and in accordance with any relevant future **Federal Register** notices that DHS may issue respecting your country's TPS designation, or until your TPS is finally withdrawn for individual ineligibility under INA, section 244(c), or the applicable TPS designation is terminated as discussed in the ''Possible Future Action'' section of this **Federal Register** notice.

**Can my employer require that I provide any other documentation to prove my status, such as proof of my citizenship from El Salvador, Haiti, Honduras, Nepal, Nicaragua, or Sudan?**

No. When completing Form I–9, including reverifying employment authorization, employers must accept any documentation that appears on the Form I–9 Lists of Acceptable Documents that reasonably appears to be genuine and that relates to you, or an acceptable List A, List B, or List C receipt. Employers need not reverify List B identity documents. In addition, employers may not request documentation that does not appear on the Lists of Acceptable Documents. Therefore, employers may not request proof of citizenship or proof of re-registration for TPS when completing Form I–9 for new hires or reverifying the employment authorization of current employees. If presented with an EAD that has been automatically extended, employers should accept such a document as a valid List A document, so long as the EAD reasonably appears to be genuine and relates to the employee. Refer to the ''Note to Employees'' section of this **Federal Register** notice for important information about your rights if your employer rejects lawful documentation, requires additional documentation, or otherwise discriminates against you based on your citizenship or immigration status, or your national origin.

**How do my employer and I complete Form I–9 using my automatically extended employment authorization for a new job?**

See the chart in the question above ''When hired, what documentation may I show to my employer as evidence of employment authorization and identity when completing Form I–9?'' to determine if your EAD has been automatically extended.

For Section 1, you should:
a. Check ''An alien authorized to work until'' and enter October 4, 2021, as the

expiration date indicated in the chart; and

b. Enter your USCIS number or A-Number where indicated (your EAD or other document from DHS will have your USCIS number or A-Number printed on it; the USCIS number is the same as your A-Number without the A prefix).

For Section 2, your employer should also use the chart in the question above ''When hired, what documentation may I show to my employer as evidence of employment authorization and identity when completing Form I–9?'' to determine if your EAD has been automatically extended. If it has been automatically extended, the employer should:

a. Write in the document title;

b. Enter the issuing authority;

c. Enter either the employee's A-Number or USCIS number from Section 1 into Section 2's Document Number field on Form I–9; and

d. Write October 4, 2021, as the expiration date indicated in the chart.

Before the start of work on October 5, 2021, employers must reverify the employee's employment authorization in Section 3 of Form I–9.

## What updates should my current employer make to Form I–9 if my employment authorization has been automatically extended?

If you presented a TPS-related EAD that was valid when you first started your job and your EAD has now been automatically extended, your employer may need to re-inspect your current EAD if they do not have a copy of the EAD on file. See the chart in the question above ''When hired, what documentation may I show to my employer as evidence of employment authorization and identity when completing Form I–9?'' to determine if your EAD has been automatically extended. If your employer determines that your EAD has been automatically extended, your employer should update Section 2 of your previously completed Form I–9 as follows:

a. Write EAD EXT and October 4, 2021, as the last day of the automatic extension in the Additional Information field; and

b. Initial and date the correction.

Note: This is not considered a reverification. Employers do not need to complete Section 3 until either this notice's automatic extension of EADs has ended or the employee presents a new document to show continued employment authorization, whichever is sooner. By October 5, 2021, when the employee's automatically extended EAD has expired, employers are required by law to reverify the employee's employment authorization in Section 3. If your original Form I–9 was a previous version, your employer must complete Section 3 of the current version of Form I–9 and attach it to your previously completed Form I–9. Your employer can check the I–9 Central web page at *www.uscis.gov/I–9Central* for the most current version of Form I–9.

## If I am an employer enrolled in E-Verify, how do I verify a new employee whose EAD has been automatically extended?

Employers may create a case in E-Verify for a new employee by providing the employee's A-Number or USCIS number from Form I–9 in the Document Number field in E-Verify.

## If I am an employer enrolled in E-Verify, what do I do when I receive a ''Work Authorization Documents Expiration'' alert for an automatically extended EAD?

E-Verify has automated the verification process for TPS-related EADs that are automatically extended. If you have employees who provided a TPS-related EAD when they first started working for you, you will receive a ''Work Authorization Documents Expiring'' case alert when the auto-extension period for this EAD is about to expire. Before this employee starts work on October 5, 2021 as appropriate, you must reverify his or her employment authorization in Section 3 of Form I–9. Employers should not use E-Verify for reverification.

### Note to All Employers

Employers are reminded that the laws requiring proper employment eligibility verification and prohibiting unfair immigration-related employment practices remain in full force. This **Federal Register** notice does not supersede or in any way limit applicable employment verification rules and policy guidance, including those rules setting forth reverification requirements. For general questions about the employment eligibility verification process, employers may call USCIS at 888–464–4218 (TTY 877–875–6028) or email USCIS at *I9Central@dhs.gov*. USCIS accepts calls and emails in English and many other languages. For questions about avoiding discrimination during the employment eligibility verification process (Form I–9 and E-Verify), employers may call the U.S. Department of Justice's Civil Rights Division, Immigrant and Employee Rights Section (IER) Employer Hotline at 800–255–8155 (TTY 800–237–2515). IER offers language interpretation in numerous languages. Employers may also email IER at *IER@usdoj.gov*.

### Note to Employees

For general questions about the employment eligibility verification process, employees may call USCIS at 888–897–7781 (TTY 877–875–6028) or email USCIS at *I-9Central@dhs.gov*. USCIS accepts calls in English, Spanish, and many other languages. Employers or applicants may also call the IER Worker Hotline at 800–255–7688 (TTY 800–237–2515) for information regarding employment discrimination based upon citizenship, immigration status, or national origin, including discrimination related to Form I–9 and E-Verify. The IER Worker Hotline provides language interpretation in numerous languages.

To comply with the law, employers must accept any document or combination of documents from the Lists of Acceptable Documents if the documentation reasonably appears to be genuine and to relate to the employee, or an acceptable List A, List B, or List C receipt as described in the Form I–9 instructions. Employers may not require extra or additional documentation beyond what is required for Form I–9 completion. Further, employers participating in E-Verify who receive an E-Verify case result of ''Tentative Nonconfirmation'' (TNC) must promptly inform employees of the TNC and give such employees an opportunity to contest the TNC. A TNC case result means that the information entered into E-Verify from an employee's Form I–9 differs from records available to DHS.

Employers may not terminate, suspend, delay training, withhold pay, lower pay, or take any adverse action against an employee because of the TNC while the case is still pending with E-Verify. A ''Final Nonconfirmation'' (FNC) case result is received when E-Verify cannot verify an employee's employment eligibility. An employer may terminate employment based on a case result of FNC. Work-authorized employees who receive an FNC may call USCIS for assistance at 888–897–7781 (TTY 877–875–6028). For more information about E-Verify-related discrimination or to report an employer for discrimination in the E-Verify process based on citizenship, immigration status, or national origin, contact IER's Worker Hotline at 800–255–7688 (TTY 800–237–2515). Additional information about proper nondiscriminatory Form I–9 and E-Verify procedures is available on the IER website at *www.justice.gov/ier* and on the USCIS and E-Verify websites at

*www.uscis.gov/i-9-central* and *www.e-verify.gov.*

## Note Regarding Federal, State, and Local Government Agencies (Such as Departments of Motor Vehicles)

While Federal Government agencies must follow the guidelines laid out by the Federal Government, state and local government agencies establish their own rules and guidelines when granting certain benefits. Each state may have different laws, requirements, and determinations about what documents you need to provide to prove eligibility for certain benefits. Whether you are applying for a Federal, state, or local government benefit, you may need to provide the government agency with documents that show you are a TPS beneficiary, show you are authorized to work based on TPS or other status, and/or that may be used by DHS to determine whether you have TPS or other immigration status. Examples of such documents are:

• Your current EAD;

• Your automatically extended EAD with a copy of this **Federal Register** notice, providing an automatic extension of your currently expired or expiring EAD;

• A copy of your Form I–94 or Form I–797 that has been automatically extended by this notice and a copy of this notice;

• Any other relevant DHS-issued document that indicates your immigration status or authorization to be in the United States, or that may be used by DHS to determine whether you have such status or authorization to remain in the United States.

Check with the government agency regarding which document(s) the agency will accept. Some benefit-granting agencies use the USCIS Systematic Alien Verification for Entitlements Program (SAVE) program to confirm the current immigration status of applicants for public benefits. While SAVE can verify when an alien has TPS, each agency's procedures govern whether they will accept a particular document, such as an EAD or an I–94. If any agency accepts the type of TPS-related document you are presenting, such as an EAD or I–94, the agency should accept your automatically extended TPS-related document. You should:

a. Present the agency with a copy of this **Federal Register** notice showing the extension of TPS-related documentation, in addition to your most recent TPS-related document with your A-Number, USCIS number or I–94 number;

b. Explain that SAVE will be able to verify the continuation of your TPS using this information; and

c. Ask the agency to initiate a SAVE query with your information and follow through with additional verification steps, if necessary, to get a final SAVE response showing the validity of your TPS.

You can also ask the agency to look for SAVE notices or contact SAVE if they have any questions about your immigration status or automatic extension of TPS-related documentation. In most cases, SAVE provides an automated electronic response to benefit-granting agencies within seconds, but, occasionally, verification can be delayed. You can check the status of your SAVE verification by using CaseCheck at *save.uscis.gov/casecheck/*. CaseCheck is a free service that lets you follow the progress of your SAVE verification case using your date of birth and one immigration identifier number (A-Number, USCIS number or Form I–94 number) or Verification Case Number. If any agency has denied your application based solely or in part on a SAVE response, the agency must offer you the opportunity to appeal the decision in accordance with the agency's procedures. If the agency has received and acted upon or will act upon a SAVE verification case and you do not believe the SAVE response is correct, find detailed information on how to make corrections or update your immigration record, make an appointment, or submit a written request to correct records under the Freedom of Information Act on the SAVE website at *www.uscis.gov/save.*

[FR Doc. 2020–27154 Filed 12–7–20; 1:30 pm]

**BILLING CODE 9111–97–P**

---

## DEPARTMENT OF THE INTERIOR

### Fish and Wildlife Service

**[DOI–2020–0009; FF10T03000 190 FXGO16601025020]**

### Privacy Act of 1974; System of Records

**AGENCY:** Fish and Wildlife Service, Interior.

**ACTION:** Rescindment of a system of records notice.

**SUMMARY:** The Department of the Interior (DOI) is issuing a public notice of its intent to rescind two U.S. Fish and Wildlife Service (FWS) Privacy Act systems of records, INTERIOR/FWS–19, Endangered Species Licensee System, and INTERIOR/FWS–34, National

Conservation Training Center Training Server System, from its existing inventory. These systems of records notices have been superseded by a Department-wide system of records notice or a FWS system of records notice. This rescindment will eliminate unnecessary duplicate notices and promote the overall streamlining and management of DOI Privacy Act systems of records.

**DATES:** These changes take effect on December 9, 2020.

**ADDRESSES:** You may send comments identified by docket number [DOI–2020–0009] by any of the following methods:

• *Federal eRulemaking Portal: http:// www.regulations.gov.* Follow the instructions for sending comments.

• *Email: DOI_Privacy@ios.doi.gov.* Include docket number [DOI–2020–0009] in the subject line of the message.

• *U.S. Mail or Hand-Delivery:* Teri Barnett, Departmental Privacy Officer, U.S. Department of the Interior, 1849 C Street NW, Room 7112, Washington, DC 20240.

*Instructions:* All submissions received must include the agency name and docket number [DOI–2020–0009]. All comments received will be posted without change to *http:// www.regulations.gov,* including any personal information provided.

*Docket:* For access to the docket to read background documents or comments received, go to *http:// www.regulations.gov.*

You should be aware your entire comment including your personal identifying information, such as your address, phone number, email address, or any other personal identifying information in your comment, may be made publicly available at any time. While you may request to withhold your personal identifying information from public review, we cannot guarantee we will be able to do so.

**FOR FURTHER INFORMATION CONTACT:** Jennifer Schmidt, Associate Privacy Officer, U.S. Fish and Wildlife Service, 5275 Leesburg Pike, MS: IRTM, Falls Church, VA 22041–3803, *FWS_Privacy@ fws.gov* or (703) 358–2291.

**SUPPLEMENTARY INFORMATION:** Pursuant to the provisions of the Privacy Act of 1974, as amended, the DOI is rescinding the following two FWS system of records notices from its system of records inventory. During a routine review, FWS determined these systems of records notices were superseded by a published Department-wide or FWS system of records notice. Therefore, DOI is rescinding these FWS systems of records notices to avoid duplication of

*Federal Register* / Vol. 84, No. 91 / Friday, May 10, 2019 / Notices

20647

CFR 217.2(a) are eligible to apply for the permit.

The information collected on CBP Form I–68 is provided for by 8 CFR 235.1(g) and Section 235 of Immigration and Nationality Act. CBP Form I–68 is accessible at *http://www.cbp.gov/newsroom/publications/forms?title=68&=Apply.*

CBP has developed a smart phone application known as ROAM that will in certain circumstances allow travelers participating in the I–68 program to report their arrival in the United States through the ROAM application, instead of by telephone. The ROAM app, implementing the I–68 program, will allow CBP officers to remotely conduct traveler interviews with a phone's video chat capability, and replace other technologies used for remote inspections that are obsolete or inefficient.

*CBP Form I–68 Paper Version*

*Estimated Number of Respondents:* 18,000.

*Estimated Number of Annual Responses per Respondent:* 1.

*Estimated Number of Total Responses:* 18,000.

*Estimated Time per Respondent:* 10 minutes.

*Estimated Total Annual Burden Hours:* 2,988.

*ROAM App*

*Estimated Number of Respondents:* 50,000.

*Estimated Number of Annual Responses per Respondent:* 1.

*Estimated Number of Total Annual Responses:* 50,000.

*Estimated Time per Response:* 5 minutes.

*Estimated Total Annual Burden Hours:* 4,150.

Dated: May 6, 2019.

**Seth D. Renkema,**

*Branch Chief, Economic Impact Analysis Branch, U.S. Customs and Border Protection.*

[FR Doc. 2019–09613 Filed 5–9–19; 8:45 am]

**BILLING CODE 9111–14–P**

## DEPARTMENT OF HOMELAND SECURITY

### U.S. Citizenship and Immigration Services

[CIS No. 2641–19; DHS Docket No. USCIS–2018–0005]

RIN 1615–ZB78

### Continuation of Documentation for Beneficiaries of Temporary Protected Status Designations for Nepal and Honduras

**AGENCY:** U.S. Citizenship and Immigration Services, Department of Homeland Security.

**ACTION:** Notice.

**SUMMARY:** Through this Notice, the Department of Homeland Security (DHS) announces actions to ensure its compliance with the order of the U.S. District Court for the Northern District of California to stay proceedings in *Bhattarai* v. *Nielsen,* No. 19–cv–00731 (N.D. Cal. Mar. 12, 2019) (''order to stay proceedings''). The claims raised in *Bhattarai* v. *Nielsen* are similar to, and will be informed by the resolution of, the claims being litigated before the Ninth Circuit Court of Appeals in *Ramos* v. *Nielsen,* No. 18–16981 (9th Cir. filed Oct. 12, 2018). For that reason, DHS will not implement or enforce the decision to terminate Temporary Protected Status (TPS) for Honduras or Nepal pending the resolution of the *Ramos* v. *Nielsen* appeal, or by other order of the court. Beneficiaries under the TPS designations for Nepal and Honduras will retain their TPS, provided that an individual's TPS status is not withdrawn because of ineligibility.

DHS is further announcing it is automatically extending through March 24, 2020, the validity of TPS-related Employment Authorization Documents (EADs), Forms I–797, Notice of Action (Approval Notice), and Forms I–94 (Arrival/Departure Record) (collectively ''TPS-Related Documentation''), as specified in this Notice, for beneficiaries under the TPS designation for Nepal, provided that the affected TPS beneficiaries remain otherwise individually eligible for TPS. The TPS designation for Honduras remains in effect through January 5, 2020. *See* 83 FR 26074 (June 5, 2018). This Notice also provides information explaining DHS's plans to issue subsequent notices that will describe the steps DHS will take to address the TPS status of beneficiaries under the TPS designations for Honduras and Nepal, if continued compliance with the order to stay proceedings during the pendency of the *Ramos* v. *Nielsen* appeal become necessary.

**DATES:** The TPS designations of Nepal and Honduras will remain in effect, as required by the order of the U.S. District Court for the Northern District of California adopting the parties' stipulation to stay proceedings in *Bhattarai* v. *Nielsen,* No. 19–cv–00731 (N.D. Cal. Mar. 12, 2019), pending final disposition of the Government's appeal of the preliminary injunction order in *Ramos* v. *Nielsen* enjoining implementation and enforcement of the determinations to terminate the TPS designations for Sudan, Nicaragua, Haiti, and El Salvador, or by other order of the court. DHS will not terminate TPS for Honduras or Nepal pending final disposition of the *Ramos* appeal, including through any additional appellate channels in which relief may be sought, or by other order of the court. Information on the status of the order to stay proceedings and the *Ramos* v. *Nielsen* appeal is available at *http://uscis.gov/tps.*

Further, DHS is automatically extending the validity of TPS-Related Documentation for those beneficiaries under the TPS designation for Nepal, as specified in this Notice. Those documents will remain in effect for nine months through March 24, 2020, provided the individual's TPS is not withdrawn under INA section 244(c)(3) or 8 CFR 244.14 because of ineligibility, and Nepal's TPS designation remains in effect.

In the event the preliminary injunction in *Ramos* v. *Nielsen* is reversed and that reversal becomes final, DHS will allow for a transition period, as described in the ''Possible Future Action'' section of this Notice.

**FOR FURTHER INFORMATION CONTACT:**

• You may contact Samantha Deshommes, Chief, Regulatory Coordination Division, Office of Policy and Strategy, U.S. Citizenship and Immigration Services, U.S. Department of Homeland Security, by mail at 20 Massachusetts Avenue NW, Washington, DC 20529–2060; or by phone at 800–375–5283.

• For further information on TPS, please visit the USCIS TPS web page at *http://www.uscis.gov/tps.* You can find specific information about this continuation of the TPS benefits for eligible individuals under the TPS designations for Nepal by selecting the ''Nepal'' page from the menu on the left side of the TPS web page.

• If you have additional questions about Temporary Protected Status, please visit *uscis.gov/tools.* Our online

virtual assistant, Emma, can answer many of your questions and point you to additional information on our website. If you are unable to find your answers there, you may also call our U.S. Citizenship and Immigration Services (USCIS) Contact Center at 800–375–5283.

• Applicants seeking information about the status of their individual cases may check Case Status Online, available on the USCIS website at *http://www.uscis.gov*, or call the USCIS Contact Center at 800–375–5283 (TTY 800–767–1833).

• Further information will also be available at local USCIS offices upon publication of this Notice.

**SUPPLEMENTARY INFORMATION:**

**Table of Abbreviations**

BIA—Board of Immigration Appeals
CFR—Code of Federal Regulations
DHS—U.S. Department of Homeland Security
DOS—U.S. Department of State
EAD—Employment Authorization Document
FNC—Final Nonconfirmation
Form I–94—Arrival/Departure Record
FR—Federal Register
Government—U.S. Government
IJ—Immigration Judge
INA—Immigration and Nationality Act
IER—U.S. Department of Justice Civil Rights Division, Immigrant and Employee Rights Section
SAVE—USCIS Systematic Alien Verification for Entitlements Program
Secretary—Secretary of Homeland Security
TNC—Tentative Nonconfirmation
TPS—Temporary Protected Status
TTY—Text Telephone
USCIS—U.S. Citizenship and Immigration Services

*Background on Temporary Protected Status (TPS)*

• TPS is a temporary immigration status granted to eligible nationals of a country designated for TPS under the INA, or to eligible persons without nationality who last habitually resided in the designated country.

• During the TPS designation period, TPS beneficiaries are eligible to remain in the United States, may not be removed, and are authorized to obtain EADs so long as they continue to meet the requirements of TPS.

• TPS beneficiaries may also apply for and be granted travel authorization as a matter of discretion.

• The granting of TPS does not result in or lead to lawful permanent resident status.

• To qualify for TPS, beneficiaries must meet the eligibility standards at INA section 244(c)(1)–(2), 8 U.S.C. 1254a(c)(1)–(2).

• When the Secretary terminates a country's TPS designation, beneficiaries return to one of the following:

○ The same immigration status or category that they maintained before TPS, if any (unless that status or category has since expired or been terminated); or

○ Any other lawfully obtained immigration status or category they received while registered for TPS, as long as it is still valid on the date TPS terminates.

*Purpose of This Action*

Through this **Federal Register** Notice, DHS announces actions to ensure its compliance with the order of the U.S. District Court for the Northern District of California to stay proceedings in *Bhattarai* v. *Nielsen*, No. 19–cv–00731 (N.D. Cal. Mar. 12, 2019). The claims raised in *Bhattarai* v. *Nielsen* are similar to, and will be informed by the resolution, of the claims being litigated before the Ninth Circuit Court of Appeals in *Ramos* v. *Nielsen,* No. 18–16981 (9th Cir. filed Oct. 12, 2018). For that reason, DHS will not implement or enforce the decision to terminate TPS for Honduras or Nepal pending the resolution of the *Ramos* v. *Nielsen* appeal, or by other order of the court. Beneficiaries under the TPS designations for Nepal and Honduras will retain their TPS, provided that an individual's TPS status is not withdrawn under INA section 244(c)(3) because of ineligibility. *See also* 8 CFR 244.14.

DHS is further announcing it is automatically extending through March 24, 2020, the validity of TPS-related EADs, Forms I–797, Notice of Action (Approval Notice), and Forms I–94 (Arrival/Departure Record) (collectively "TPS-Related Documentation"), as specified in this Notice, for beneficiaries under the TPS designation for Nepal, provided that the affected TPS beneficiaries remain otherwise individually eligible for TPS. *See* INA section 244(c)(3). The validity dates of TPS-Related Documentation for beneficiaries under the TPS designation for Honduras is discussed below. This Notice also provides information explaining DHS's plans to issue subsequent notices that will describe the steps DHS will take to address the TPS status of beneficiaries under the TPS designations for Honduras and Nepal in order to continue its compliance with the order to stay proceedings should such compliance be necessary.

*Automatic Extension of EADs*

Through this **Federal Register** Notice, DHS automatically extends through March 24, 2020, the validity of EADs with the category codes "A–12" or "C–19" and one of the expiration dates shown below that have been issued under the TPS designation for Nepal:
06/24/2018
06/24/2019

Additionally, a beneficiary under the TPS designation for Nepal who applied for a new EAD but who has not yet received his or her new EAD is also covered by this automatic extension, provided that the EAD he or she possesses contains one of the expiration dates noted in the chart above. Such individuals may show one of these automatically extended EADs to employers to demonstrate they have employment authorization. Such individuals may also show employers this **Federal Register** Notice, which explains that their EADs have been extended through March 24, 2020. This Notice explains how TPS beneficiaries and their employers may determine which EADs are automatically extended and how this affects the Form I–9, Employment Eligibility Verification, E-Verify, and USCIS Systematic Alien Verification for Entitlements (SAVE) processes.

*Automatic Extension of Forms I–94 (Arrival/Departure Record) and Forms I–797 (Notice of Action (Approval Notice))*

In addition, through this **Federal Register** Notice, DHS automatically extends through March 24, 2020, the validity periods of the following Forms I–94 and Forms I–797, Notice of Action (Approval Notice) previously issued to eligible beneficiaries granted TPS under the designation for Nepal:

| Country | Beginning date of validity: | End date of validity: |
|---|---|---|
| Nepal ...... | Dec. 25, 2016 .............. June 25, 2018 .............. | June 24, 2018. June 24, 2019. |

However, the extension of this validity period applies only if the eligible TPS beneficiary properly filed for TPS re-registration during the most recent DHS-announced registration period for Nepal (May 22, 2018–July 23, 2018), the previous re-registration period (Oct. 26, 2016–Dec. 27, 2016), or has a re-registration application that remains pending. In addition, the extension does not apply if the TPS of any such individual has been finally withdrawn. This Notice does not extend the validity date of any TPS-related Form I–94 or Form I–797, Notice of Action (Approval Notice) issued to a

*Federal Register* / Vol. 84, No. 91 / Friday, May 10, 2019 / Notices

**20649**

TPS beneficiary that contains an end date not on the chart above where the individual has failed to file for TPS re-registration, or where his or her re-registration request has been finally denied.

*Application Procedures*

Current beneficiaries under the TPS designation for Nepal do not need to pay a fee or file any application, including the Application for Employment Authorization (Form I–765), to maintain their TPS benefits through March 24, 2020, if they have properly re-registered for TPS during the most recent DHS-announced registration period for their country, which ran from May 22, 2018 through July 23, 2018, or the previous re-registration period from October 26, 2016 through December 27, 2016. TPS beneficiaries who have failed to re-register properly for TPS during either of these re-registration periods may still file Form I–821 (Application for Temporary Protected Status) but must demonstrate "good cause" for failing to re-register on time, as required by law. *See* INA section 244(c)(3)(C) (TPS beneficiary's failure to register without good cause in form and manner specified by DHS is ground for TPS withdrawal); 8 CFR 244.17(b) and Instructions to Form I–821. Any eligible beneficiary under the TPS designation for Nepal who either does not possess an EAD that is automatically extended by this Notice, or wishes to apply for a new EAD may file Form I–765 with appropriate fee (or fee waiver request). If approved, USCIS will issue an EAD with a March 24, 2020 expiration date. Similarly, USCIS will issue an EAD with a March 24, 2020 expiration date for those with pending EAD applications that are ultimately approved.

*Possible Future Action*

If it becomes necessary to comply with statutory requirements for TPS re-registration during the pendency of the District Court's Order or any superseding court order concerning the beneficiaries under the TPS designations for Nepal and Honduras, DHS may announce re-registration procedures in a future **Federal Register** Notice. *See* section 244(c)(3)(C) of the INA; 8 CFR 244.17.

Following the conclusion of the appeal of the preliminary injunction in *Ramos* v. *Nielsen,* TPS will remain in effect for Honduras and Nepal for a minimum of the later of (a) 120 days from the issuance of any appellate mandate to the District Court, or (b) on the Secretary's previously-announced

effective date for the termination of TPS designations for each individual country, as follows:

• Nepal—N/A; [1]
• Honduras—January 5, 2020.

To the extent that a **Federal Register** Notice has automatically extended TPS-Related Documentation beyond the 120-day period, DHS reserves the right to issue a subsequent **Federal Register** Notice announcing an expiration date for the documentation that corresponds to the last day of the 120-day period. Should the Government move to vacate the stay in proceedings in light of an appellate decision affirming the preliminary injunction in *Ramos* v. *Nielsen* that suggests a basis on which to distinguish the determinations to terminate the TPS designations for Honduras and Nepal TPS from the TPS terminations at issue in *Ramos* v. *Nielsen,* TPS will remain in effect for Honduras and Nepal for at least 180 days following an order of the District Court vacating the stay in proceedings.

*Effect on TPS-Related Documentation for Beneficiaries Under the TPS Designation for Honduras*

If otherwise eligible, beneficiaries under the TPS designation for Honduras who either have been approved for re-registration or have pending TPS re-registration and EAD applications, either have or will receive TPS-Related Documentation that will remain in effect until January 5, 2020. DHS will issue a **Federal Register** Notice approximately 45 days before January 5, 2020, that will announce an automatic extension of TPS-related documentation for beneficiaries under the TPS designation for Honduras. The automatic extension announced in this Notice therefore does not apply to them.[2]

*Additional Notes*

Nothing in this Notice affects DHS's ongoing authority to determine on a case-by-case basis whether TPS beneficiaries continue to meet the individual eligibility requirements for TPS described in section 244(c) of the INA and the implementing regulations in part 244 of Title 8 of the Code of Federal Regulations.

**Notice of Compliance With Court Order To Stay Proceedings and Agreement To Stay the Determinations Terminate the TPS Designations for Nepal and Honduras**

As required by the order of the U.S. District Court for the Northern District of California to stay proceedings in *Bhattarai* v. *Nielsen,* No. 19–cv–00731 (N.D. Cal. Mar. 12, 2019), DHS will not implement or enforce the previously-announced determinations to terminate the existing TPS designations for Nepal and Honduras [3] unless and until the District Court's order in *Ramos* v. *Nielsen* enjoining implementation and enforcement of the determinations to terminate the TPS designations for Sudan, Nicaragua, Haiti, and El Salvador is reversed and that reversal becomes final for some or all of the affected countries, or by other order of the court.

In further compliance with the Order, I am publishing this **Federal Register** Notice automatically extending the validity of the TPS-Related Documentation specified above in the Supplementary Information section of this Notice for nine months through March 24, 2020, for eligible beneficiaries under the TPS designation for Nepal.

Any termination of TPS-Related Documentation for beneficiaries under the TPS designations for Nepal and Honduras will go into effect on the later of: (a) 120 days following the issuance of any mandate to the District Court, or (b) on the Secretary's previously-announced effective date for the termination of TPS designations for each individual country. To the extent that a subsequent **Federal Register** Notice has automatically extended TPS-Related Documentation beyond the 120-day period, DHS reserves the right to issue another **Federal Register** Notice invalidating the documents at the end of the 120-day period. Should the Government move to vacate the stay in proceedings in light of an appellate decision affirming the preliminary injunction in *Ramos* v. *Nielsen* that suggests a basis on which to distinguish the Honduras and Nepal TPS terminations from the TPS terminations at issue in *Ramos* v. *Nielsen,* TPS will remain in effect for Honduras and Nepal for at least 180 days following an order of the court vacating the stay in proceedings.

---

[1] Any 120-day transition period would end later than the Secretary's previously-announced effective date for the termination of TPS designation for Nepal (June 24, 2019).

[2] *See* Termination of the Designation of Honduras for Temporary Protected Status, 83 FR 26074 (June 5, 2018).

[3] *See* Termination of the Designation of Nepal for Temporary Protected Status, 83 FR 23705 (May 22, 2018); Termination of the Designation of Honduras for Temporary Protected Status, 83 FR 26074 (June 5, 2018).

DHS will continue to issue **Federal Register** Notices that will automatically extend by nine months TPS-Related Documentation for all affected beneficiaries under the TPS designations for Nepal and Honduras, so long as the order to stay proceedings remains in place, or by other order of the court, and will continue its commitment to a transition period, as described above.

All TPS beneficiaries must continue to maintain their TPS eligibility by meeting the requirements for TPS in INA section 244(c) and 8 CFR part 244. DHS will continue to adjudicate any pending TPS re-registration and pending late initial applications for affected beneficiaries under the TPS designations for Nepal and Honduras, and continue to make appropriate individual TPS withdrawal decisions in accordance with existing procedures if an individual no longer maintains TPS eligibility. DHS may continue to announce periodic re-registration procedures for eligible TPS beneficiaries in accordance with the INA and DHS regulations. Should the order to stay proceedings remain in effect, DHS will take appropriate steps to continue its compliance with the order, and all statutory requirements.

**Kevin K. McAleenan,**

*Acting Secretary.*

### Approved Forms To Demonstrate Continuation of Lawful Status and TPS-Related Employment Authorization

• *This **Federal Register** Notice May 10, 2019*

○ Through operation of this **Federal Register** Notice, certain EADs of affected beneficiaries under the TPS designation

for Nepal are automatically extended through March 24, 2020.

○ A beneficiary granted TPS under the designation for Nepal may show his or her employer and his or her employer to demonstrate identity and continued TPS-related employment eligibility for purposes of meeting the Employment Eligibility Verification (Form I–9) requirements. A beneficiary granted TPS under the designation for Nepal may also wish to show an employer this **Federal Register** Notice, which explains that his or her EAD has been automatically extended.

○ Alternatively, such a TPS beneficiary may choose to show other acceptable documents that are evidence of identity and employment eligibility as described in the Instructions to Employment Eligibility Verification (Form I–9).

○ Finally, such a TPS beneficiary may show a copy of this Notice, along with his or her specified EAD, Form I–94, or Form I–797, Notice of Action (Approval Notice), as evidence of his or her lawful status, to law enforcement, federal, state, and local government agencies, and private entities.

• *Employment Authorization Document (EAD)*

Am I eligible to receive an automatic extension of my current EAD through March 24, 2020, using this *Federal Register* notice?

Yes. Provided that you currently have a TPS-related EAD for Nepal with the specified expiration dates described below, this **Federal Register** Notice automatically extends your EAD through March 24, 2020, if you:

• Are a national of Nepal (or an alien having no nationality who last

habitually resided in Nepal) who has TPS, and your EAD contains a category code of A–12 or C–19 and one of the expiration dates shown below:

06/24/2018
06/24/2019

When hired, what documentation may I show to my employer as evidence of employment authorization and identity when completing Employment Eligibility Verification (Form I–9)?

You can find the Lists of Acceptable Documents on the third page of Form I–9 as well as the "Acceptable Documents" web page at *https://www.uscis.gov/i-9-central/acceptable-documents.* Employers must complete Form I–9 to verify the identity and employment authorization of all new employees. Within three days of hire, employees must present acceptable documents to their employers as evidence of identity and employment authorization to satisfy Form I–9 requirements.

You may present any document from List A (which provides evidence of both identity and employment authorization) or one document from List B (which provides evidence of your identity) together with one document from List C (which is evidence of employment authorization), or you may present an acceptable receipt for List A, List B, or List C documents as described in the Form I–9 Instructions. Employers may not reject a document based on a future expiration date. You can find additional information about Form I–9 on the I–9 Central web page at *http://www.uscis.gov/I-9Central.*

An EAD is an acceptable document under List A.

| If your EAD has category code of A–12 or C–19 and an expiration date from the column below, you may show your expired EAD along with this **Federal Register** Notice to complete Form I–9: | Enter this date in Section 1 of Form I–9: | Your employer must reverify your employment authorization by: |
|---|---|---|
| June 24, 2018 ................................................. | March 24, 2020 ................................................. | March 25, 2020. |
| June 24, 2019 ................................................. | March 24, 2020 ................................................. | March 25, 2020. |

If you want to use your EAD with one of the specified expiration dates above, and that date has passed, then you may also provide your employer with a copy of this **Federal Register** Notice, which explains that your EAD has been automatically extended for a temporary period of time, through March 24, 2020 (if you are a beneficiary under the TPS designation for Nepal).

What documentation may I present to my employer for Employment Eligibility Verification (Form I–9) if I am already employed but my current TPS-related EAD is set to expire?

Even though your EAD has been automatically extended, your employer is required by law to ask you about your continued employment authorization, and you will need to present your employer with evidence that you are still authorized to work. Once presented, you may correct your

employment authorization expiration date in Section 1 and your employer should correct the EAD expiration date in Section 2 of Form I–9. *See* the subsection titled, "What corrections should my current employer and I make to Employment Eligibility Verification (Form I–9) if my employment authorization has been automatically extended?" for further information. You may show this **Federal Register** Notice to your employer to explain what to do for Form I–9 and to show that your EAD

has been automatically extended through March 24, 2020 (if you are a beneficiary under the TPS designation for Nepal). Your employer may need to re-inspect your automatically extended EAD to check the expiration date and Category code if your employer did not keep a copy of your EAD when you initially presented it.

The last day of the automatic EAD extension for eligible beneficiaries under the TPS designation for Nepal is March 24, 2020. Before you start work on March 25, 2020, your employer is required by law to reverify your employment authorization in Section 3 of Form I–9. At that time, you must present any document from List A or any document from List C on Form I–9 Lists of Acceptable Documents, or an acceptable List A or List C receipt described in the Form I–9 Instructions to reverify employment authorization. If your original Form I–9 was a previous version, your employer must complete Section 3 of the current version of Form I–9, and attach it to your previously completed Form I–9. Your employer can check the I–9 Central web page at *http://www.uscis.gov/I-9Central* for the most current version of Form I–9.

Your employer may not specify which List A or List C document you must present and cannot reject an acceptable receipt.

Can I seek a new EAD?

You do not need to apply for a new EAD in order to benefit from this automatic extension. However, if you are a beneficiary under the TPS designation for Nepal and want to obtain a new EAD valid through March 24, 2020, you must file an Application for Employment Authorization (Form I–765) and pay the Form I–765 fee (or request a fee waiver). If you do not want a new EAD, you do not have to file Form I–765 or pay the Form I–765 fee. If you do not want to request a new EAD now, you may also file Form I–765 at a later date and pay the fee (or request a fee waiver), provided that you still have TPS or a pending TPS application. You may file the application for a new EAD either before or after your current EAD has expired.

If you are unable to pay the application fee and/or biometric services fee, you may complete a Request for Fee Waiver (Form I–912) or submit a personal letter requesting a fee waiver with satisfactory supporting documentation. For more information on the application forms and fees for TPS, please visit the USCIS TPS web page at *http://www.uscis.gov/tps*. Fees for the Form I–821, the Form I–765, and

biometric services are also described in 8 CFR 103.7(b)(1)(i).

If you have a Form I–821 and/or Form I–765 that was still pending as of June 24, 2019, then you should not file either application again. If your pending TPS application under the TPS designation for Nepal is approved, you will be granted TPS through March 24, 2020. Similarly, if you have a pending TPS-related application for an EAD that is approved, it will be valid through the same date.

Can my employer require that I provide any other documentation to prove my status, such as proof of my citizenship from Nepal?

No. When completing Form I–9, including reverifying employment authorization, employers must accept any documentation that appears on the Form I–9 "Lists of Acceptable Documents" that reasonably appears to be genuine and that relates to you, or an acceptable List A, List B, or List C receipt. Employers need not reverify List B identity documents. Employers may not request documentation that does not appear on the "Lists of Acceptable Documents." Therefore, employers may not request proof of citizenship or proof of re-registration for TPS when completing Form I–9 for new hires or reverifying the employment authorization of current employees. If presented with EADs that have been automatically extended, employers should accept such documents as a valid List A document so long as the EAD reasonably appears to be genuine and relates to the employee. Refer to the Note to Employees section of this **Federal Register** Notice for important information about your rights if your employer rejects lawful documentation, requires additional documentation, or otherwise discriminates against you based on your citizenship or immigration status, or your national origin.

How do my employer and I complete Employment Eligibility Verification (Form I–9) using my automatically extended employment authorization for a new job?

If you are a beneficiary under the TPS designation for Nepal, when using an automatically extended EAD to complete Form I–9 for a new job on or before March 24, 2020, you and your employer should do the following:

1. For Section 1, you should:
a. Check "An alien authorized to work until" and enter March 24, 2020, as the "expiration date"; and

b. Enter your Alien Number/USCIS number or A-Number where indicated (your EAD or other document from DHS will have your USCIS number or A-Number printed on it; the USCIS number is the same as your A-Number without the A prefix).

2. For Section 2, your employer should:
a. Determine if the EAD is automatically extended:

An employee's EAD has been automatically extended if it contains a category code of A–12 or C–19 and an expiration date shown below:

06/24/2018.
06/24/2019.

If it has been automatically extended, the employer should:
b. Write in the document title;
c. Enter the issuing authority;
d. Provide the document number; and
e. Write March 24, 2020, as the expiration date.

Before the start of work on March 25, 2020, employers are required by law to reverify the employee's employment authorization in Section 3 of Form I–9. If your original Form I–9 was a previous version, your employer must complete Section 3 of the current version of Form I–9 and attach it to your previously completed Form I–9. Your employer can check the I–9 Central web page at *http://www.uscis.gov/I-9Central* for the most current version of Form I–9.

What corrections should my current employer and I make to Employment Eligibility Verification (Form I–9) if my employment authorization has been automatically extended?

If you presented a TPS-related EAD that was valid when you first started your job and your EAD has now been automatically extended because you are a beneficiary under the TPS designation for Nepal, your employer may need to re-inspect your current EAD if they do not have a copy of the EAD on file. You may, and your employer should, correct your previously completed Form I–9 as follows:

1. For Section 1, you may:
a. Draw a line through the expiration date in Section 1;
b. Write March 24, 2020, above the previous date; and
c. Initial and date the correction in the margin of Section 1.

2. For Section 2, employers should:
a. Determine if the EAD is automatically extended:

An employee's EAD has been automatically extended if it contains a category code of A–12 or C–19 and an expiration date shown below:

06/24/2018.
06/24/2019.

If it has been automatically extended:
b. Draw a line through the expiration date written in Section 2;

c. Write March 24, 2020, above the previous date; and

d. Initial and date the correction in the Additional Information field in Section 2.

*Note:* This is not considered a reverification. Employers do not need to complete Section 3 until either this Notice's automatic extension of EADs has ended or the employee presents a new document to show continued employment authorization, whichever is sooner. By March 25, 2020, when the employee's automatically extended EAD has expired, employers are required by law to reverify the employee's employment authorization in Section 3. If your original Form I–9 was a previous version, your employer must complete Section 3 of the current version of Form I–9 and attach it to your previously completed Form I–9. Your employer can check the I–9 Central web page at *http://www.uscis.gov/I-9Central* for the most current version of Form I–9.

If I am an employer enrolled in E-Verify, how do I verify a *new* employee whose EAD has been automatically extended?

Employers may create a case in E-Verify for these employees by providing the employee's Alien Registration number (A#) or USCIS number as the document number from Form I–9 in the document number field in E-Verify.

If I am an employer enrolled in E-Verify, what do I do when I receive a "Work Authorization Documents Expiration" alert for an automatically extended EAD?

If you have employees who provided a TPS-related EAD with an expiration date that has been automatically extended by this Notice, you should dismiss the "Work Authorization Documents Expiring" case alert. Before this employee starts to work on March 25, 2020, you must reverify his or her employment authorization in Section 3 of Form I–9. Employers should not use E-Verify for reverification.

**Note to All Employers**

Employers are reminded that the laws requiring proper employment eligibility verification and prohibiting unfair immigration-related employment practices remain in full force. This Federal Register Notice does not supersede or in any way limit applicable employment verification rules and policy guidance, including those rules setting forth reverification requirements. For general questions about the employment eligibility verification process, employers may call USCIS at 888–464–4218 (TTY 877–875–6028) or email USCIS at *I-9Central@dhs.gov*. USCIS accepts calls and emails in English and many other languages. For questions about avoiding discrimination during the employment eligibility verification process (Form I–9 and E-Verify), employers may call the U.S. Department of Justice's Civil Rights Division, Immigrant and Employee Rights Section (IER) (formerly the Office of Special Counsel for Immigration-Related Unfair Employment Practices) Employer Hotline at 800–255–8155 (TTY 800–237–2515). IER offers language interpretation in numerous languages. Employers may also email IER at *IER@usdoj.gov*.

**Note to Employees**

For general questions about the employment eligibility verification process, employees may call USCIS at 888–897–7781 (TTY 877–875–6028) or email USCIS at *I-9Central@dhs.gov*. USCIS accepts calls in English, Spanish, and many other languages. Employees or applicants may also call the IER Worker Hotline at 800–255–7688 (TTY 800–237–2515) for information regarding employment discrimination based upon citizenship, immigration status, or national origin, including discrimination related to Employment Eligibility Verification (Form I–9) and E-Verify. The IER Worker Hotline provides language interpretation in numerous languages.

To comply with the law, employers must accept any document or combination of documents from the Lists of Acceptable Documents if the documentation reasonably appears to be genuine and to relate to the employee, or an acceptable List A, List B, or List C receipt as described in the Employment Eligibility Verification (Form I–9) Instructions. Employers may not require extra or additional documentation beyond what is required for Form I–9 completion. Further, employers participating in E-Verify who receive an E-Verify case result of "Tentative Nonconfirmation" (TNC) must promptly inform employees of the TNC and give such employees an opportunity to contest the TNC. A TNC case result means that the information entered into E-Verify from an employee's Form I–9 differs from records available to DHS.

Employers may not terminate, suspend, delay training, withhold pay, lower pay, or take any adverse action against an employee because of the TNC while the case is still pending with E-Verify. A Final Nonconfirmation (FNC) case result is received when E-Verify cannot verify an employee's employment eligibility. An employer may terminate employment based on a case result of FNC. Work-authorized employees who receive an FNC may call USCIS for assistance at 888–897–7781 (TTY 877–875–6028). For more information about E-Verify-related discrimination or to report an employer for discrimination in the E-Verify process based on citizenship, immigration status, or national origin, contact IER's Worker Hotline at 800–255–7688 (TTY 800–237–2515). Additional information about proper nondiscriminatory Form I–9 and E-Verify procedures is available on the IER website at *https://www.justice.gov/ier* and on the USCIS and E-Verify websites at *https://www.uscis.gov/i-9central* and *https://www.e-verify.gov*.

**Note Regarding Federal, State, and Local Government Agencies (Such as Departments of Motor Vehicles)**

While Federal Government agencies must follow the guidelines laid out by the Federal Government, state and local government agencies establish their own rules and guidelines when granting certain benefits. Each state may have different laws, requirements, and determinations about what documents you need to provide to prove eligibility for certain benefits. Whether you are applying for a Federal, state, or local government benefit, you may need to provide the government agency with documents that show you are a TPS beneficiary, show you are authorized to work based on TPS or other status, and/or that may be used by DHS to determine whether you have TPS or other immigration status. Examples of such documents are:

(1) Your current EAD;

(2) Your automatically extended EAD with a copy of this **Federal Register** Notice, providing an automatic extension of your currently expired or expiring EAD;

(3) A copy of your Form I–94, (Arrival/Departure Record), or Form I–797, Notice of Action (Approval Notice), that has been automatically extended by this Notice and a copy of this Notice;

(4) Any other relevant DHS-issued document that indicates your immigration status or authorization to be in the United States, or that may be used by DHS to determine whether you

have such status or authorization to remain in the United States.

Check with the government agency regarding which document(s) the agency will accept.

Some benefit-granting agencies use the SAVE program to confirm the current immigration status of applicants for public benefits. While SAVE can verify when an individual has TPS, each agency's procedures govern whether they will accept an automatically extended TPS-related document. You should present the agency with a copy of this **Federal Register** Notice showing the extension of TPS-related documentation in addition to your recent TPS-related document with your alien or I–94 number. You should explain that SAVE will be able to verify the continuation of your TPS using this information. You should ask the agency to initiate a SAVE query with your information and follow through with additional verification steps, if necessary, to get a final SAVE response showing the TPS. You can also ask the agency to look for SAVE notices or contact SAVE if they have any questions about your immigration status or automatic extension of TPS-related documentation. In most cases, SAVE provides an automated electronic response to benefit-granting agencies within seconds, but, occasionally, verification can be delayed. You can check the status of your SAVE verification by using CaseCheck at the following link: *https://save.uscis.gov/ casecheck/*, then by clicking the "Check Your Case" button. CaseCheck is a free service that lets you follow the progress of your SAVE verification using your date of birth and one immigration identifier number. If an agency has denied your application based solely or in part on a SAVE response, the agency must offer you the opportunity to appeal the decision in accordance with the agency's procedures. If the agency has received and acted upon or will act upon a SAVE verification and you do not believe the response is correct, you may make an InfoPass appointment for an in-person interview at a local USCIS office. Detailed information on how to make corrections, make an appointment, or submit a written request to correct records under the Freedom of Information Act can be found on the SAVE website at *http://www.uscis.gov/ save.*

[FR Doc. 2019–09635 Filed 5–9–19; 8:45 am]

**BILLING CODE 9111–97–P**

# DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT

**[Docket No. FR–6104–N–02]**

## Announcement of the Housing Counseling Federal Advisory Committee; Notice of Public Meeting

**AGENCY:** Office of the Assistant Secretary for Housing—Federal Housing Commissioner, Department of Housing and Urban Development (HUD).

**ACTION:** Notice of Housing Counseling Federal Advisory Committee public meeting.

**SUMMARY:** This gives notice of a Housing Counseling Federal Advisory Committee (HCFAC) meeting and sets forth the proposed agenda. The Committee meeting will be held on Wednesday, May 22, 2019. The meeting is open to the public and is accessible to individuals with disabilities. This notice is being published less than 15 days prior to the meeting date due to unforeseen administrative delays.

**DATES:** The meeting will be held on Wednesday, May 22, 2019 starting at 9:00 a.m. Eastern Daylight Time (EDT) at HUD Headquarters, 451 7th Street SW, Washington, DC 20410 and via teleconference.

**FOR FURTHER INFORMATION CONTACT:** Virginia F. Holman, Housing Specialist, Office of Housing Counseling, U.S. Department of Housing and Urban Development, 600 East Broad Street, Richmond VA 23219; telephone number 540–894–7790 (this is not a toll-free number); email *virginia.f.holman@ hud.gov*. Individuals with speech or hearing impairments may access this number through TTY by calling the toll-free Federal Relay at 1–800–877–8339. Individuals may also email *HCFACCommittee@hud.gov*.

**SUPPLEMENTARY INFORMATION:** HUD is convening the meeting of the HCFAC on Wednesday, May 22, 2019 from 9:00 a.m. to 4:00 p.m. ET. The meeting will be held at HUD Headquarters, 451 7th Street SW, Washington, DC 20410 and via teleconference at 1–800–231–0316, Passcode 1519. This meeting notice is provided in accordance with the Federal Advisory Committee Act, 5. U.S.C. App. 10(a)(2).

## Draft Agenda—Housing Counseling Federal Advisory Committee Meeting—May 22, 2019

I. Welcome
II. Advisory Committee Discussion
III. Public Comment
IV. Next Steps
V. Adjourn

### Registration

The public is invited to attend this one-day meeting in-person or by phone. Advance registration is required to participate. To register to attend, please visit the following link: *https:// pavr.wufoo.com/forms/z41lur 512g70uy/*.

After completing the pre-registration process at the above link, in-person attendees will receive details about the meeting location and how to access the building. Call-in participants will be asked by an operator to provide their names and their organizational affiliations (if applicable) to ensure they are part of the pre-registration list. Callers can expect to incur charges for calls they initiate over wireless lines and HUD will not refund any incurred charges. Callers will incur no charge for calls they initiate over land-line connections to the toll-free phone number. Individuals with speech or hearing impairments may follow the discussion by first calling the toll-free Federal Relay FRS: 1–800–977–8339 and provide the operator with the conference call number: 1–800–231–0316, Passcode: 1519.

### Comments

With advance registration, members of the public will have an opportunity to provide oral and written comments relative to agenda topics for the Committee's consideration. To provide oral comments, please be sure to indicate this on the registration link. The total amount of time for oral comments will be 15 minutes with each commenter limited to two minutes to ensure pertinent Committee business is completed. Written comments must be provided no later than May 15, 2019 to *HCFACCommittee@hud.gov*. Please note, written statements submitted will not be read during the meeting. The Committee will not respond to individual written or oral statements however, it will take all public comments into account in its deliberations.

### Meeting Records

Records and documents discussed during the meeting, as well as other information about the work of this Committee, will be available for public viewing as they become available at: *https://www.facadatabase.gov/FACA/ apex/FACAPublicCommittee?id= a10t0000001gzvQAAQ.Information* on the Committee is also available on HUD Exchange at: *https:// www.hudexchange.info/programs/ housing-counseling/federal-advisory- committee/*.

HondurasAR000051

(3) Enhance the quality, utility, and clarity of the information to be collected; and

(4) Minimize the burden of the collection of information on those who are to respond, including using appropriate automated, electronic, mechanical, or other technological collection techniques or other forms of information technology.

Consistent with the requirements of Executive Order (E.O.) 13771, Reducing Regulation and Controlling Regulatory Costs, and E.O. 13777, Enforcing the Regulatory Reform Agenda, TSA is also requesting comments on the extent to which this request for information could be modified to reduce the burden on respondents.

**Information Collection Requirement**

*Title:* TSA infoBoards.
*Type of Request:* Revision of a collection.
*OMB Control Number:* 1652–0065.
*Form(s):* TSA Forms 1427 and 1430.
*Affected Public:* Individuals with transportation security responsibilities, such as aircraft operators, airport security coordinators, and international transportation security coordinators.
*Abstract:* TSA infoBoards was developed by TSA as part of its broad responsibilities and authorities under the Aviation and Transportation Security Act (ATSA), and delegated authority from the Secretary of Homeland Security, for "security in all modes of transportation . . . including security responsibilities . . . over modes of transportation that are exercised by the Department of Transportation."[1] TSA infoBoards is an information-sharing environment designed to serve stakeholders in the transportation security community and is used to disseminate mission-critical information. It is located in a secure online environment and is accessible from the Homeland Security Information Network (HSIN) and TSA (for TSA staff only). Accessing and using TSA infoBoards is completely

---

[1] *See* Public Law 107–71 (115 Stat. 597, Nov. 19, 2001), codified at 49 U.S.C. 114 (d). The TSA Assistant Secretary's current authorities under ATSA have been delegated to him by the Secretary of Homeland Security. Section 403(2) of the Homeland Security Act (HSA) of 2002, Public Law 107–296 (116 Stat. 2315, Nov. 25, 2002), transferred all functions of TSA, including those of the Secretary of Transportation and the Under Secretary of Transportation of Security related to TSA, to the Secretary of Homeland Security. Pursuant to DHS Delegation Number 7060.2, the Secretary delegated to the Assistant Secretary (then referred to as the Administrator of TSA), subject to the Secretary's guidance and control, the authority vested in the Secretary with respect to TSA, including that in section 403(2) of the HSA.

voluntary; TSA does not require participation.

TSA collects two types of information through TSA infoBoards: (1) User registration information and (2) user's choice of "communities." TSA is revising the collection instrument, TSA Form 1427, TSA infoBoards User Account Request/Renewal, to include an additional instrument, TSA Form 1430, Computer Access Agreement (CAA) External Personnel Only, to correct typographical errors and to update the list of TSA infoBoards names.

*Number of Respondents:* 5,000 users.
*Estimated Annual Burden Hours:* An estimated 10,000 hours annually.

Dated: October 29, 2019.

**Christina A. Walsh,**
*TSA Paperwork Reduction Act Officer, Information Technology.*

[FR Doc. 2019–23969 Filed 11–1–19; 8:45 am]

**BILLING CODE 9110–05–P**

---

**DEPARTMENT OF HOMELAND SECURITY**

**U.S. Citizenship and Immigration Services**

**[CIS No. 2654–19; DHS Docket No. USCIS–2019–0020]**

**RIN 1615–ZB83**

**Continuation of Documentation for Beneficiaries of Temporary Protected Status Designations for El Salvador, Haiti, Honduras, Nepal, Nicaragua, and Sudan**

**AGENCY:** U.S. Citizenship and Immigration Services, Department of Homeland Security.

**ACTION:** Notice.

**SUMMARY:** Through this notice, the Department of Homeland Security (DHS) announces actions to ensure its continued compliance with the preliminary injunction orders of the U.S. District Court for the Northern District of California in *Ramos, et al.* v. *Nielsen, et al.,* No. 18–cv–01554 (N.D. Cal. Oct. 3, 2018) ("*Ramos*") and the U.S. District Court for the Eastern District of New York in *Saget, et al.,* v. *Trump, et al.,* No. 18–cv–1599 (E.D.N.Y. Apr. 11, 2019) ("*Saget*"), and with the order of the U.S. District Court for the Northern District of California to stay proceedings in *Bhattarai* v. *Nielsen,* No. 19–cv–00731 (N.D. Cal. Mar. 12, 2019) ("*Bhattarai*"). Beneficiaries under the Temporary Protected Status (TPS) designations for El Salvador, Honduras, Nepal, Nicaragua, and Sudan will retain their TPS while the preliminary

injunction in *Ramos* remains in effect, provided that an alien's TPS is not withdrawn because of individual ineligibility. Beneficiaries under the TPS designation for Haiti will retain their TPS while either of the preliminary injunctions in *Ramos* or *Saget* remain in effect, provided that an alien's TPS is not withdrawn because of individual ineligibility. This notice further provides information on the automatic extension of the validity of TPS-related Employment Authorization Documents (EADs); Notices of Action (Forms I–797); and Arrival/Departure Records (Forms I–94), (collectively "TPS-related documentation"); for those beneficiaries under the TPS designations for El Salvador, Haiti, Honduras, Nepal, Nicaragua, and Sudan.

**DATES:** DHS is automatically extending the validity of TPS-related documentation for beneficiaries under the TPS designations for El Salvador, Haiti, Honduras, Nepal, Nicaragua, and Sudan, as specified in this notice. Such TPS-related documentation will remain in effect through January 4, 2021, from the current expiration dates of: January 2, 2020 (for beneficiaries under the TPS designations for El Salvador, Haiti, Nicaragua, and Sudan); January 5, 2020 (for beneficiaries under the TPS designation for Honduras); and March 24, 2020 (for beneficiaries under the TPS designation for Nepal).

**FOR FURTHER INFORMATION CONTACT:**
• You may contact Maureen Dunn, Chief, Humanitarian Affairs Division, Office of Policy and Strategy, U.S. Citizenship and Immigration Services, U.S. Department of Homeland Security, by mail at 20 Massachusetts Avenue NW, Washington, DC 20529–2060; or by phone at 800–375–5283.
• For further information on TPS, please visit the USCIS TPS web page at *www.uscis.gov/tps.*
• If you have additional questions about (TPS), please visit *uscis.gov/tools.* Our online virtual assistant, Emma, can answer many of your questions and point you to additional information on our website. If you are unable to find your answers there, you may also call our U.S. Citizenship and Immigration Services (USCIS) Contact Center at 800–375–5283 (TTY 800–767–1833).
• Applicants seeking information about the status of their individual cases may check Case Status Online, available on the USCIS website at *www.uscis.gov,* or call the USCIS Contact Center at 800–375–5283 (TTY 800–767–1833).
• Further information will also be available at local USCIS offices upon publication of this notice.

**SUPPLEMENTARY INFORMATION:**

## Table of Abbreviations

CFR—Code of Federal Regulations
DHS—U.S. Department of Homeland
   Security
EAD—Employment Authorization Document
FNC—Final Nonconfirmation
Form I–765—Application for Employment
   Authorization
Form I–797—Notice of Action
Form I–821—Application for Temporary
   Protected Status
Form I–9—Employment Eligibility
   Verification
Form I–912—Request for Fee Waiver
Form I–94—Arrival/Departure Record
Government—U.S. Government
INA—Immigration and Nationality Act
IER—U.S. Department of Justice Civil Rights
   Division, Immigrant and Employee Rights
   Section
SAVE—USCIS Systematic Alien Verification
   for Entitlements Program
Secretary—Secretary of Homeland Security
TNC—Tentative Nonconfirmation
TPS—Temporary Protected Status
TTY—Text Telephone
USCIS—U.S. Citizenship and Immigration
   Services

## Background on Temporary Protected Status (TPS)

• TPS is a temporary immigration status granted to eligible nationals of a country designated for TPS under the Immigration and Nationality Act (INA) or to eligible persons without nationality who last habitually resided in the designated country.

• During the TPS designation period, TPS beneficiaries are eligible to remain in the United States, may not be removed, and are authorized to obtain EADs so long as they continue to meet the requirements of TPS.

• TPS beneficiaries may also apply for travel authorization as a matter of discretion.

• The granting of TPS does not result in or lead to lawful permanent resident status.

• To qualify for TPS, beneficiaries must meet the eligibility standards at INA section 244(c)(1)–(2), 8 U.S.C. 1254a(c)(1)–(2).

• When the Secretary of Homeland Security (the Secretary) terminates a country's TPS designation, beneficiaries return to one of the following:

○ The same immigration status or category that they maintained before TPS, if any (unless that status or category has since expired or been terminated); or

○ Any other lawfully obtained immigration status or category they received while registered for TPS, as long as it is still valid on the date TPS terminates.

## Purpose of This Action

DHS last published notices to ensure its compliance with the *Ramos* preliminary injunction on March 1, 2019, and the *Bhattarai* order to stay proceedings on May 10, 2019. 84 FR 7103; 84 FR 20647. Through this **Federal Register** notice, DHS announces actions to ensure its continued compliance with the *Ramos* and *Saget* preliminary injunction orders and with the order to stay proceedings in *Bhattarai*.

The TPS designations for El Salvador, Nicaragua, and Sudan will remain in effect, as required by the *Ramos* order, so long as the preliminary injunction remains in effect. The TPS designation for Haiti will remain in effect, as required by the preliminary injunction orders in both *Ramos* and *Saget*, so long as either of those preliminary injunctions remain in effect. The TPS designations for Honduras and Nepal will remain in effect, as required by the *Bhattarai* order to stay proceedings, pending final disposition of the Government's appeal of the preliminary injunction order in *Ramos*. Beneficiaries under the TPS designations for El Salvador, Honduras, Nepal, Nicaragua, and Sudan will retain their TPS while the preliminary injunction in *Ramos* remains in effect, and beneficiaries under the TPS designation for Haiti will retain their TPS while the preliminary injunctions in either *Ramos* or *Saget* remain in effect, provided that an alien's TPS status is not withdrawn under INA section 244(c)(3) because of individual ineligibility. *See also* 8 CFR 244.14. DHS will not terminate TPS for any of the affected countries pending final disposition of the *Ramos* appeal, or for Haiti pending both *Ramos* and *Saget* appeals, including through any additional appellate channels in which relief may be sought, or by other orders of the court.

DHS is further announcing it is automatically extending, through January 4, 2021, the validity of certain TPS-related documentation, as specified in this notice, for beneficiaries under the TPS designations for El Salvador, Haiti, Honduras, Nepal, Nicaragua, and Sudan, provided that the affected beneficiaries remain individually eligible for TPS. This notice also provides information explaining DHS's plans to issue subsequent notices that will describe the steps DHS will take to address the status of beneficiaries under the TPS designations for all the affected countries, if continued compliance with the *Ramos* or *Saget* preliminary injunctions or the *Bhattarai* order to stay proceedings becomes necessary.

## Automatic Extension of EADs Issued Under the TPS Designations for El Salvador, Haiti, Honduras, Nepal, Nicaragua, and Sudan

Through this **Federal Register** notice, DHS automatically extends the validity of EADs listed in Table 1 below issued to beneficiaries under the TPS designations for El Salvador, Haiti, Honduras, Nepal, Nicaragua, and Sudan. Such individuals may show their automatically-extended EAD to employers to demonstrate they have employment authorization, and may wish also to show employers this **Federal Register** Notice to explain that their TPS-Related Documentation has been extended through January 4, 2021. This Notice explains how TPS beneficiaries, their employers, and benefit-granting agencies may determine which EADs are automatically extended and how this affects the Form I–9, Employment Eligibility Verification, E-Verify, and USCIS Systematic Alien Verification for Entitlements (SAVE) processes. Additionally, a beneficiary under the TPS designation for any of these countries who has applied for a new EAD but who has not yet received his or her new EAD is covered by this automatic extension, provided that the EAD he or she possesses contains one of the expiration dates listed in Table 1 below.

### TABLE 1—AFFECTED EADs

| If an EAD has a category code of A–12 or C–19 and an expiration date of: | Then the validity of the EAD is extended through: |
| --- | --- |
| 07/22/2017 .............. | 01/04/2021 |
| 11/02/2017 .............. | 01/04/2021 |
| 01/05/2018 .............. | 01/04/2021 |
| 01/22/2018 .............. | 01/04/2021 |
| 03/09/2018 .............. | 01/04/2021 |
| 06/24/2018 .............. | 01/04/2021 |
| 07/05/2018 .............. | 01/04/2021 |
| 11/02/2018 .............. | 01/04/2021 |
| 01/05/2019 .............. | 01/04/2021 |
| 04/02/2019 .............. | 01/04/2021 |
| 06/24/2019 .............. | 01/04/2021 |
| 07/22/2019 .............. | 01/04/2021 |
| 09/09/2019 .............. | 01/04/2021 |
| 01/02/2020 .............. | 01/04/2021 |
| 01/05/2020 .............. | 01/04/2021 |
| 03/24/2020 .............. | 01/04/2021 |

## Automatic Extension of Forms I–94 and Forms I–797

Also through this **Federal Register** notice, DHS automatically extends the validity periods of the Forms I–94 and Forms I–797 listed in Table 2 below previously issued to beneficiaries under the TPS designations for El Salvador, Haiti, Honduras, Nepal, Nicaragua, and Sudan. These extensions apply only if

HondurasAR000053

the TPS beneficiary properly filed for re-registration during either the most recent DHS-announced registration period for their country, or any applicable previous DHS-announced re-registration periods for his or her country,[1] or has a re-registration application that remains pending. This notice does not extend the validity periods of Forms I–94 or Forms I–797 for any TPS beneficiary who failed to file for TPS re-registration during one of the applicable previous DHS-announced re-registration periods, or for whom a re-registration request has been finally denied. In addition, the extensions do not apply for any beneficiary from whom TPS has been finally withdrawn.

### TABLE 2—AFFECTED FORMS I–94 AND I–797

| Country | Beginning date of validity: | End date of validity: | Validity of Forms I–94 and I–797 extended through: |
|---|---|---|---|
| El Salvador | Sept. 10, 2016 | Mar. 9, 2018 | 01/04/2021 |
|  | Mar. 10, 2018 | Sept. 9, 2019 | 01/04/2021 |
| Haiti | Jan. 23, 2016 | Jul. 22, 2017 | 01/04/2021 |
|  | Jul. 23, 2017 | Jan. 22, 2018 | 01/04/2021 |
|  | Jan. 23, 2018 | July 22, 2019 | 01/04/2021 |
| Honduras | July 6, 2016 | Jan. 5, 2018 | 01/04/2021 |
|  | Jan. 6, 2018 | July 5, 2018 | 01/04/2021 |
|  | July 6, 2018 | Jan. 5, 2020 | 01/04/2021 |
| Nepal | Dec. 25, 2016 | June 24, 2018 | 01/04/2021 |
|  | June 25, 2018 | June 24, 2019 | 01/04/2021 |
| Nicaragua | July 6, 2016 | Jan. 5, 2018 | 01/04/2021 |
|  | Jan. 6, 2018 | Jan. 5, 2019 | 01/04/2021 |
| Sudan | May 3, 2016 | Nov. 2, 2017 | 01/04/2021 |
|  | Nov. 3, 2017 | Nov. 2, 2018 | 01/04/2021 |

### Application Procedures

Current beneficiaries under the TPS designations for El Salvador, Haiti, Honduras, Nepal, Nicaragua, and Sudan do not need to pay a fee or file any application, including Application for Employment Authorization (Form I–765), to maintain their TPS benefits through January 4, 2021, provided that they have properly re-registered for TPS during either the most recent DHS-announced registration period for their country, or any applicable previous re-registration period described in Footnote 1, above.

TPS beneficiaries who have failed to re-register properly for TPS during any of these re-registration periods may still file an Application for Temporary Protected Status (Form I–821), but must demonstrate ''good cause'' for failing to re-register on time, as required by law. *See* INA section 244(c)(3)(C) (TPS beneficiary's failure to register without good cause in form and manner specified by DHS is ground for TPS withdrawal); 8 CFR 244.17(b) and Form I–821 instructions.

Any currently eligible beneficiary who does not presently have a pending EAD application under the TPS designations for El Salvador, Haiti, Honduras, Nepal, Nicaragua, or Sudan may file Form I–765 with appropriate fee.

### Possible Future Action

In order to comply with statutory requirements for TPS while the district courts' orders or any superseding court order concerning the beneficiaries under the TPS designations for El Salvador, Haiti, Honduras, Nepal, Nicaragua, and Sudan are pending, DHS may require these beneficiaries to re-register and announce the re-registration procedures in a future **Federal Register** notice. *See* section 244(c)(3)(C) of the INA; 8 CFR 244.17.

The Government has appealed both the *Ramos* and *Saget* preliminary injunctions. Should the Government prevail in its challenge to the *Ramos* preliminary injunction, the Secretary's determination to terminate TPS for Honduras, Nepal, Nicaragua, and Sudan will take effect no earlier than 120 days from the issuance of any appellate mandate to the district court. The Secretary's determination to terminate TPS for El Salvador will take effect no earlier than 365 days from the issuance of any appellate mandate to the *Ramos* district court. DHS provides this additional time for El Salvador TPS beneficiaries in part because there are almost 100,000 more such beneficiaries than in the combined TPS beneficiary populations of all the other five countries covered by this notice.[2] The additional period of 245 days beyond 120 days permits an orderly transition for beneficiaries of TPS from El Salvador as they return to their homeland. If the Government prevails in its appeals, DHS will also continue to monitor the circumstances of the affected beneficiaries under the other five TPS country designations covered by this notice. *See* INA 244(d)(3).

TPS for beneficiaries under Haiti's designation may continue pursuant to the *Saget* preliminary injunction. However, should the Government prevail in its challenges to both the *Ramos* preliminary injunction and the

---

[1] El Salvador: July 8—Sept. 6, 2016 (corresponding to an end validity date of Mar. 9, 2018) or Jan. 18–Mar. 19, 2018 (corresponding to an end validity date of Sept. 9, 2019); Haiti: Aug. 25—Oct. 26, 2015 (corresponding to an end validity date of July 22, 2017), May 24—July 24, 2017 (corresponding to an end validity date of Jan. 22, 2018), or Jan. 18—Mar. 19, 2018 (corresponding to an end validity date of July 22, 2019); Honduras: May 16—July 15, 2016 (corresponding to an end validity date of Jan. 5, 2018); Dec. 15, 2017—Feb. 13, 2018 (corresponding to an end date of July 5, 2018) or June 5—Aug. 6, 2018 (corresponding to an

end validity date of Jan. 5, 2020); Nepal: Oct. 26—Dec. 27, 2016 (corresponding to an end validity date of June 24, 2018) or May 22—July 23, 2018 (corresponding to an end validity date of June 24, 2019); Nicaragua: May 16—July 15, 2016 (corresponding to an end validity date of Jan. 5, 2018) or Dec. 15, 2017—Feb. 13, 2018 (corresponding to an end validity date of Jan. 5, 2019); Sudan: Jan. 25—Mar. 25, 2016 (corresponding to an end validity date of Nov. 2, 2017) or Oct. 11, 2017—Dec. 11, 2017 (corresponding to an end validity date of Nov. 2, 2018).

[2] As reported to Congress on May 1, 2019 in the DHS Annual Congressional Report on TPS, there were 251,445 TPS beneficiaries from El Salvador at the end of 2018. In contrast, there were 56,114 beneficiaries from Haiti, 80,570 beneficiaries from Honduras, 14,594 beneficiaries from Nepal, 4,508 beneficiaries from Nicaragua, and 805 beneficiaries from Sudan. As reported, there are 94,854 more beneficiaries of TPS from El Salvador than the combined total of all other countries whose terminations are currently enjoined by court order.

*Saget* preliminary injunction, the Secretary's determination to terminate TPS for Haiti will take effect no earlier than 120 days from the issuance of the later of the two appellate mandates to the District Court. To the extent that a **Federal Register** notice has automatically extended TPS-related documentation beyond 120 days from the issuance of any appellate mandate to the District Court, DHS reserves the right to issue a subsequent **Federal Register** notice announcing an expiration date for the documentation that corresponds to the last day of the 120-day period. Should the Government move to vacate the *Bhattarai* order to stay proceedings, TPS will remain in effect for Honduras and Nepal for at least 180 days following an order of the District Court vacating the stay in proceedings.

**Additional Notes**

Nothing in this notice affects DHS's ongoing authority to determine on a case-by-case basis whether a TPS beneficiary continues to meet the eligibility requirements for TPS described in section 244(c) of the INA and the implementing regulations in part 244 of Title 8 of the Code of Federal Regulations.

**Notice of Compliance With the ''Order Enjoining the Implementation and Enforcement of Determinations to Terminate the TPS Designations for El Salvador, Haiti, Nicaragua, and Sudan'' in *Ramos*, the ''Order Enjoining the Implementation of Enforcement of Determination to Terminate the TPS Designation of Haiti'' in *Saget*, and the ''Order to Stay Proceedings and Agreement to Stay the Determinations to Terminate the TPS Designations for Honduras and Nepal'' in *Bhattarai***

The previously-announced determinations to terminate the existing designations of TPS for El Salvador, Nicaragua, and Sudan [3] will not be implemented or enforced unless and until the district court's order in *Ramos* is reversed and that reversal becomes final. The previously-announced determination to terminate the existing designation of TPS for Haiti will not be implemented or enforced unless and until the district court's orders in *Ramos* and *Saget* are reversed and those

reversals become final.[4] As required by the order to stay proceedings in *Bhattarai*, DHS will not implement or enforce the previously-announced determinations to terminate the existing TPS designations for Honduras and Nepal [5] unless and until the district court's order in *Ramos* enjoining implementation and enforcement of the determinations to terminate the TPS designations for El Salvador, Haiti, Nicaragua, and Sudan is reversed and that reversal becomes final for some or all of the affected countries, or by other order of the court. Any termination of TPS-related documentation for beneficiaries under the TPS designations for Haiti, Honduras, Nicaragua, Nepal, and Sudan will go into effect no earlier than 120 days, and no earlier than 365 days for beneficiaries under the TPS designation for El Salvador, following the issuance of any mandate to the district court, as described in the ''Possible Future Action'' section of this **Federal Register** notice.[6]

In further compliance with the orders, DHS is publishing this notice automatically extending the validity of the TPS-related documentation specified in the Supplementary Information section of this notice through January 4, 2021, for eligible beneficiaries under the TPS designations for El Salvador, Haiti, Honduras, Nepal, Nicaragua, and Sudan. DHS will continue to issue notices that will automatically extend TPS-related documentation for all affected beneficiaries under the TPS designations for El Salvador, Honduras, Nicaragua, Nepal, and Sudan, so long as the *Ramos* preliminary injunction and *Bhattarai* order to stay proceedings remain in place; for Haiti so long as either the *Ramos* or *Saget* preliminary injunctions remain in place; or by other order of the court. However, should compliance with the *Ramos, Bhattarai,* and/or *Saget* court orders remain necessary, DHS may announce periodic re-registration procedures for eligible TPS beneficiaries in accordance with the INA and DHS regulations. DHS

further continues its commitment to a transition period, as described above.

All TPS beneficiaries must continue to maintain their TPS eligibility by meeting the requirements for TPS in INA section 244(c) and 8 CFR part 244. DHS will continue to adjudicate any pending TPS re-registration and pending late initial applications for affected beneficiaries under the TPS designations for El Salvador, Haiti, Honduras, Nicaragua, Nepal, and Sudan, and continue to make appropriate individual TPS withdrawal decisions in accordance with existing procedures if an alien no longer maintains TPS eligibility. DHS will take appropriate steps to continue its compliance with the orders, and with all statutory requirements.

Dated: October 29, 2019.

**Kevin K. McAleenan,**

*Acting Secretary.*

**Approved Forms To Demonstrate Continuation of Lawful Status and TPS-Related Employment Authorization**

• This **Federal Register** notice November 4, 2019

○ Through operation of this notice, certain TPS-related documentation, including EADs, of affected beneficiaries under the TPS designations for El Salvador, Haiti, Honduras, Nepal, Nicaragua, and Sudan are automatically extended through January 4, 2021.

○ A beneficiary granted TPS under the designation for El Salvador, Haiti, Honduras, Nepal, Nicaragua, or Sudan may show his or her EAD that has been automatically extended to his or her employer to demonstrate identity and continued TPS-related employment eligibility to meet Employment Eligibility Verification (Form I–9) requirements. A beneficiary granted TPS under a designation for one of these countries may also wish to show an employer this **Federal Register** notice, which explains that his or her EAD has been automatically extended.

○ Alternatively, such a TPS beneficiary may choose to show other acceptable documents that are evidence of identity and employment eligibility as described in the instructions to Form I–9.

○ Finally, such a TPS beneficiary may show a copy of this **Federal Register** notice, along with his or her EAD that has been automatically extended, or Form I–94, or Form I–797, as evidence of his or her lawful status, to law enforcement, Federal, state, and local government agencies, and private entities.

---

[3] *See* Termination of the Designation of El Salvador for Temporary Protected Status, 83 FR 2654 (Jan. 18, 2018); Termination of the Designation of Nicaragua for Temporary Protected Status, 82 FR 59636 (Dec. 15, 2017); Termination of the Designation of Sudan for Temporary Protected Status, 82 FR 47228 (Oct. 11, 2017).

[4] *See* Termination of the Designation of Haiti for Temporary Protected Status, 83 FR 2648 (Jan. 18, 2018).

[5] *See* Termination of the Designation of Honduras for Temporary Protected Status, 83 FR 26074 (June 5, 2018); Termination of the Designation of Nepal for Temporary Protected Status, 83 FR 23705 (May 22, 2018).

[6] An additional provision in the *Bhattarai* Order to Stay Proceedings states that if the Government moves to vacate that Order, TPS will remain in effect for Honduras and Nepal for at least 180 days following an order of the District Court vacating its stay of proceedings order.

HondurasAR000055

- Employment Authorization Document (EAD)

**Am I eligible to receive an automatic extension of my current EAD using this Federal Register notice?**

Yes. Provided that you currently have a TPS-related EAD with the specified expiration dates below, this notice automatically extends your EAD as stated in Table 3 below.

TABLE 3—AFFECTED EADs

| If your EAD has category code of A–12 or C–19 and an expiration date of: | Then this Federal Register notice extends your EAD through: |
|---|---|
| 07/22/2017 ............. | 01/04/2021 |
| 11/02/2017 ............. | 01/04/2021 |
| 01/05/2018 ............. | 01/04/2021 |
| 01/22/2018 ............. | 01/04/2021 |
| 03/09/2018 ............. | 01/04/2021 |
| 06/24/2018 ............. | 01/04/2021 |
| 07/05/2018 ............. | 01/04/2021 |
| 11/02/2018 ............. | 01/04/2021 |
| 01/05/2019 ............. | 01/04/2021 |
| 04/02/2019 ............. | 01/04/2021 |
| 06/24/2019 ............. | 01/04/2021 |
| 07/22/2019 ............. | 01/04/2021 |

TABLE 3—AFFECTED EADs— Continued

| If your EAD has category code of A–12 or C–19 and an expiration date of: | Then this Federal Register notice extends your EAD through: |
|---|---|
| 09/09/2019 ............. | 01/04/2021 |
| 01/02/2020 ............. | 01/04/2021 |
| 01/05/2020 ............. | 01/04/2021 |
| 03/24/2020 ............. | 01/04/2021 |

**When hired, what documentation may I show to my employer as evidence of employment authorization and identity when completing Form I–9?**

You can find the Lists of Acceptable Documents on the third page of Form I–9 as well as the Acceptable Documents web page at *www.uscis.gov/i-9-central/acceptable-documents.* Employers must complete Form I–9 to verify the identity and employment authorization of all new employees. Within 3 days of hire, employees must present acceptable documents to their employers as evidence of identity and employment authorization to satisfy Form I–9 requirements.

You may present any document from List A (which provides evidence of both your identity and employment authorization) or one document from List B (which provides evidence of your identity) together with one document from List C (which provides evidence of your employment authorization), or you may present an acceptable receipt as described in the Form I–9 instructions. Employers may not reject a document based on a future expiration date. You can find additional information about Form I–9 on the I–9 Central web page at *www.uscis.gov/I-9Central.*

An EAD is an acceptable document under List A. See the section ''How do my employer and I complete Form I–9 using my automatically extended employment authorization for a new job?'' of this **Federal Register** notice for further information. If you present your EAD with one of the expiration dates specified below, you may also provide your employer with a copy of this **Federal Register** notice, which explains that your EAD has been automatically extended for a temporary period of time, through January 4, 2021, as follows:

TABLE 4—AFFECTED EADs AND FORM I–9

| You may show your EAD to complete Form I–9 if your EAD has category code of A–12 or C–19 and bears an expiration date of: | Enter this date in Section 1 of Form I–9: | Your employer must reverify your employment authorization by: |
|---|---|---|
| 07/22/2017 ................................................................................................ | 01/04/2021 | 01/05/2021 |
| 11/02/2017 ................................................................................................ | 01/04/2021 | 01/05/2021 |
| 01/05/2018 ................................................................................................ | 01/04/2021 | 01/05/2021 |
| 01/22/2018 ................................................................................................ | 01/04/2021 | 01/05/2021 |
| 03/09/2018 ................................................................................................ | 01/04/2021 | 01/05/2021 |
| 06/24/2018 ................................................................................................ | 01/04/2021 | 01/05/2021 |
| 07/05/2018 ................................................................................................ | 01/04/2021 | 01/05/2021 |
| 11/02/2018 ................................................................................................ | 01/04/2021 | 01/05/2021 |
| 01/05/2019 ................................................................................................ | 01/04/2021 | 01/05/2021 |
| 04/02/2019 ................................................................................................ | 01/04/2021 | 01/05/2021 |
| 06/24/2019 ................................................................................................ | 01/04/2021 | 01/05/2021 |
| 07/22/2019 ................................................................................................ | 01/04/2021 | 01/05/2021 |
| 09/09/2019 ................................................................................................ | 01/04/2021 | 01/05/2021 |
| 01/02/2020 ................................................................................................ | 01/04/2021 | 01/05/2021 |
| 01/05/2020 ................................................................................................ | 01/04/2021 | 01/05/2021 |
| 03/24/2020 ................................................................................................ | 01/04/2021 | 01/05/2021 |

**What documentation may I present to my employer for Form I–9 if I am already employed but my current TPS-related EAD is set to expire?**

Even though your EAD has been automatically extended, your employer is required by law to ask you to verify your continued employment authorization, and you will need to present your employer with evidence that you are still authorized to work. Once presented, your employer should correct the EAD expiration date in Section 2 of Form I–9. *See* the section, ''What corrections should my current

employer make to Form I–9 if my employment authorization has been automatically extended?'' of this **Federal Register** notice for further information. You may show this **Federal Register** notice to your employer to explain what to do for Form I–9 and to show that your EAD has been automatically extended through January 4 2021, as indicated in the above chart. Your employer may need to re-inspect your automatically extended EAD to check the Card Expires date and Category code if your employer did not

keep a copy of your EAD when you initially presented it.

The last day of the automatic extension for your EAD is January 4, 2021. Before you start work on January 5, 2021, your employer is required by law to reverify your employment authorization in Section 3 of Form I–9. At that time, you must present any document from List A or any document from List C on Form I–9, Lists of Acceptable Documents, or an acceptable List A or List C receipt described in the Form I–9 instructions to reverify employment authorization.

**59408**    **Federal Register** / Vol. 84, No. 213 / Monday, November 4, 2019 / Notices

If your original Form I–9 was a previous version, your employer must complete Section 3 of the current version of Form I–9, and attach it to your previously completed Form I–9. Your employer can check the I–9 Central web page at *www.uscis.gov/I-9Central* for the most current version of Form I–9.

Your employer may not specify which List A or List C document you must present and cannot reject an acceptable receipt.

**Can I obtain a new EAD?**

Yes, if you apply and remain eligible for TPS, you can obtain a new EAD. However, you do not need to apply for a new EAD in order to benefit from this automatic extension. If you are a beneficiary under the TPS designations for El Salvador, Haiti, Honduras, Nepal, Nicaragua, or Sudan and want to obtain a new EAD valid through January 4, 2021, then you must file Form I–765 and pay the associated fee. If you do not want a new EAD, you do not have to file Form I–765 or pay the Form I–765 fee. If you do not want to request a new EAD now, you may file Form I–765 at a later date and pay the fee, provided that you still have TPS or a pending TPS application. You may file the application for a new EAD either before or after your current EAD has expired.

If you are unable to pay the application fee and/or biometric services fee, you may complete a Request for Fee Waiver (Form I–912) consistent with applicable form instructions. For more information on the application forms and fees for TPS, please visit the USCIS TPS web page at *www.uscis.gov/tps*. Fees for Form I–821, Form I–765, and biometric services are also described in 8 CFR 103.7(b)(1)(i).

If you have a Form I–821 and/or Form I–765 application that is still pending as of January 2, 2020 (for beneficiaries under the TPS designations for El Salvador, Haiti, Nicaragua, or Sudan); January 5, 2020 (for beneficiaries under the TPS designation for Honduras); or March 24, 2020 (for beneficiaries under the TPS designation for Nepal); then you should not file either application again. If your pending Form I–821 is approved, you will be issued Forms I–797 and I–94 through January 4, 2021. Similarly, if you have a pending TPS-related Form I–765 that is approved, your new EAD will be valid through January 4, 2021.

Your TPS itself continues as long as the preliminary injunction impacting your country's TPS designation remains in effect and in accordance with any relevant future **Federal Register** notices that DHS may issue respecting your country's TPS designation, or your TPS is finally withdrawn for individual ineligibility under INA, section 244(c), or the applicable TPS designation is terminated as discussed in the "Possible Future Action" section of this **Federal Register** notice.

**Can my employer require that I provide any other documentation to prove my status, such as proof of my citizenship from El Salvador, Haiti, Honduras, Nepal, Nicaragua, or Sudan?**

No. When completing Form I–9, including reverifying employment authorization, employers must accept any documentation that appears on the Form I–9 Lists of Acceptable Documents that reasonably appears to be genuine and that relates to you, or an acceptable List A, List B, or List C receipt. Employers need not reverify List B identity documents. Employers may not request documentation that does not appear on the Lists of Acceptable Documents. Therefore, employers may not request proof of citizenship or proof of re-registration for TPS when completing Form I–9 for new hires or reverifying the employment authorization of current employees. If presented with an EAD that has been automatically extended, employers should accept such a document as a valid List A document, so long as the EAD reasonably appears to be genuine and relates to the employee. Refer to the "Note to Employees" section of this **Federal Register** notice for important information about your rights if your employer rejects lawful documentation, requires additional documentation, or otherwise discriminates against you based on your citizenship or immigration status, or your national origin.

**How do my employer and I complete Form I–9 using my automatically extended employment authorization for a new job?**

See the chart in the question above "When hired, what documentation may I show to my employer as evidence of employment authorization and identity when completing Form I–9?" to determine if your EAD has been automatically extended.

For Section 1, you should:

a. Check "An alien authorized to work until" and enter January 4, 2021, as the expiration date indicated in the chart; and

b. Enter your USCIS number or A–Number where indicated (your EAD or other document from DHS will have your USCIS number or A–Number printed on it; the USCIS number is the same as your A–Number without the A prefix).

For Section 2, your employer should also use the chart in the question above "When hired, what documentation may I show to my employer as evidence of employment authorization and identity when completing Form I–9?" to determine if your EAD has been automatically extended. If it has been automatically extended, the employer should:

a. Write in the document title;

b. Enter the issuing authority;

c. Enter either the employee's A–Number or USCIS number from Section 1 in the Document Number field on Form I–9; and

d. Write January 4, 2021, as the expiration date indicated in the chart.

Before the start of work on January 5, 2021, employers are required by law to reverify the employee's employment authorization in Section 3 of Form I–9. If your original Form I–9 was a previous version, your employer must complete Section 3 of the current version of Form I–9 and attach it to your previously completed Form I–9. Your employer can check the I–9 Central web page at *www.uscis.gov/I-9Central* for the most current version of Form I–9.

**What corrections should my current employer make to Form I–9 if my employment authorization has been automatically extended?**

If you presented a TPS-related EAD that was valid when you first started your job and your EAD has now been automatically extended, your employer may need to re-inspect your current EAD if they do not have a copy of the EAD on file. See the chart in the question above "When hired, what documentation may I show to my employer as evidence of employment authorization and identity when completing Form I–9?" to determine if your EAD has been automatically extended. If your employer determines that your EAD has been automatically extended, your employer should correct Section 2 of your previously completed Form I–9 as follows:

a. Write EAD EXT and January 4, 2021, as the last day of the automatic extension in the Additional Information field; and

b. Initial and date the correction.

*Note:* This is not considered a reverification. Employers do not need to complete Section 3 until either this notice's automatic extension of EADs has ended or the employee presents a new document to show continued employment authorization, whichever is sooner. By January 5, 2021, when the employee's automatically extended EAD

has expired, employers are required by law to reverify the employee's employment authorization in Section 3. If your original Form I–9 was a previous version, your employer must complete Section 3 of the current version of Form I–9 and attach it to your previously completed Form I–9. Your employer can check the I–9 Central web page at *www.uscis.gov/I-9Central* for the most current version of Form I–9.

**If I am an employer enrolled in E-Verify, how do I verify a new employee whose EAD has been automatically extended?**

Employers may create a case in E-Verify for a new employee by providing the employee's A–Number or USCIS number from Form I–9 in the Document Number field in E-Verify. Employers should enter January 4, 2021 for the document expiration date.

**If I am an employer enrolled in E-Verify, what do I do when I receive a "Work Authorization Documents Expiration" alert for an automatically extended EAD?**

If you have an employee who provided a TPS-related EAD with an expiration date that has been automatically extended by this **Federal Register** notice, you should dismiss the "Work Authorization Documents Expiring" case alert. Before this employee starts work on January 5, 2021, as appropriate, you must reverify his or her employment authorization in Section 3 of Form I–9. Employers should not use E-Verify for reverification.

**Note to All Employers**

Employers are reminded that the laws requiring proper employment eligibility verification and prohibiting unfair immigration-related employment practices remain in full force. This **Federal Register** notice does not supersede or in any way limit applicable employment verification rules and policy guidance, including those rules setting forth reverification requirements. For general questions about the employment eligibility verification process, employers may call USCIS at 888–464–4218 (TTY 877–875–6028) or email USCIS at *I-9Central@dhs.gov*. USCIS accepts calls and emails in English, Spanish, and many other languages. For questions about avoiding discrimination during the employment eligibility verification process (Form I–9 and E-Verify), employers may call the U.S. Department of Justice's Civil Rights Division, Immigrant and Employee Rights Section (IER) Employer Hotline at 800–255–8155 (TTY 800–237–2515).

IER offers language interpretation in numerous languages. Employers may also email IER at *IER@usdoj.gov*.

**Note to Employees**

For general questions about the employment eligibility verification process, employees may call USCIS at 888–897–7781 (TTY 877–875–6028) or email USCIS at *I-9Central@dhs.gov*. USCIS accepts calls in English, Spanish, and many other languages. Employees or applicants may also call the IER Worker Hotline at 800–255–7688 (TTY 800–237–2515) for information regarding employment discrimination based upon citizenship, immigration status, or national origin, including discrimination related to Form I–9 and E-Verify. The IER Worker Hotline provides language interpretation in numerous languages.

To comply with the law, employers must accept any document or combination of documents from the Lists of Acceptable Documents if the documentation reasonably appears to be genuine and to relate to the employee, or an acceptable List A, List B, or List C receipt as described in the Form I–9 instructions. Employers may not require extra or additional documentation beyond what is required for Form I–9 completion. Further, employers participating in E-Verify who receive an E-Verify case result of "Tentative Nonconfirmation" (TNC) must promptly inform employees of the TNC and give such employees an opportunity to contest the TNC. A TNC case result means that the information entered into E-Verify from an employee's Form I–9 differs from records available to DHS.

Employers may not terminate, suspend, delay training, withhold pay, lower pay, or take any adverse action against an employee because of the TNC while the case is still pending with E-Verify. A "Final Nonconfirmation" (FNC) case result is received when E-Verify cannot verify an employee's employment eligibility. An employer may terminate employment based on a case result of FNC. Work-authorized employees who receive an FNC may call USCIS for assistance at 888–897–7781 (TTY 877–875–6028). For more information about E-Verify-related discrimination or to report an employer for discrimination in the E-Verify process based on citizenship, immigration status, or national origin, contact IER's Worker Hotline at 800–255–7688 (TTY 800–237–2515). Additional information about proper nondiscriminatory Form I–9 and E-Verify procedures is available on the IER website at *www.justice.gov/ier* and on the USCIS and E-Verify websites at

*www.uscis.gov/i-9-central* and *www.e-verify.gov*.

**Note Regarding Federal, State, and Local Government Agencies (Such as Departments of Motor Vehicles)**

While Federal Government agencies must follow the guidelines laid out by the Federal Government, state and local government agencies establish their own rules and guidelines when granting certain benefits. Each state may have different laws, requirements, and determinations about what documents you need to provide to prove eligibility for certain benefits. Whether you are applying for a federal, state, or local government benefit, you may need to provide the government agency with documents that show you are a TPS beneficiary, show you are authorized to work based on TPS or other status, and/or that may be used by DHS to determine whether you have TPS or other immigration status. Examples of such documents are:

• Your current EAD;

• Your automatically extended EAD with a copy of this **Federal Register** notice, providing an automatic extension of your currently expired or expiring EAD;

• A copy of your Form I–94 or Form I–797 that has been automatically extended by this notice and a copy of this notice;

• Any other relevant DHS-issued document that indicates your immigration status or authorization to be in the United States, or that may be used by DHS to determine whether you have such status or authorization to remain in the United States.

Check with the government agency regarding which document(s) the agency will accept.

Some benefit-granting agencies use the USCIS Systematic Alien Verification for Entitlements Program (SAVE) program to confirm the current immigration status of applicants for public benefits. While SAVE can verify when an alien has TPS, each agency's procedures govern whether they will accept a particular document, such as an EAD or an I–94. If an agency accepts the type of TPS-related document you are presenting, such as an EAD or I–94, the agency should accept your automatically extended TPS-related document. You should:

a. Present the agency with a copy of this **Federal Register** notice showing the extension of TPS-related documentation, in addition to your most recent TPS-related document with your A–Number or I–94 number;

b. Explain that SAVE will be able to verify the continuation of your TPS using this information; and

c. Ask the agency to initiate a SAVE query with your information and follow through with additional verification steps, if necessary, to get a final SAVE response showing the validity of your TPS.

You can also ask the agency to look for SAVE notices or contact SAVE if they have any questions about your immigration status or automatic extension of TPS-related documentation. In most cases, SAVE provides an automated electronic response to benefit-granting agencies within seconds, but, occasionally, verification can be delayed. You can check the status of your SAVE verification by using CaseCheck at *save.uscis.gov/casecheck/*, then by clicking the "Check Your Case" button. CaseCheck is a free service that lets you follow the progress of your SAVE verification case using your date of birth and one immigration identifier number. If an agency has denied your application based solely or in part on a SAVE response, the agency must offer you the opportunity to appeal the decision in accordance with the agency's procedures. If the agency has received and acted upon or will act upon a SAVE verification case and you do not believe the response is correct, you may make an InfoPass appointment for an in-person interview at a local USCIS office. Detailed information on how to make corrections or update your immigration record, make an appointment, or submit a written request to correct records under the Freedom of Information Act can be found on the SAVE website at *www.uscis.gov/save*.

[FR Doc. 2019–24047 Filed 11–1–19; 8:45 am]

**BILLING CODE 9111–97–P**

---

**DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT**

**[Docket No. FR–7015–N–09]**

**60-Day Notice of Proposed Information Collection: Public Housing Capital Fund Program**

**AGENCY:** Office of the Assistant Secretary for Public and Indian Housing, PIH, HUD.

**ACTION:** Notice.

**SUMMARY:** HUD is seeking approval from the Office of Management and Budget (OMB) for the information collection described below. In accordance with the Paperwork Reduction Act, HUD is requesting comment from all interested parties on the proposed collection of information. The purpose of this notice is to allow for 60 days of public comment.

**DATES:** *Comments Due Date:* January 3, 2020.

**ADDRESSES:** Interested persons are invited to submit comments regarding this proposal. Comments should refer to the proposal by name and/or OMB Control Number and should be sent to: Colette Pollard, Reports Management Officer, QDAM, Department of Housing and Urban Development, 451 7th Street SW, Room 4176, Washington, DC 20410–5000; telephone 202–402–3400 (this is not a toll-free number) or email at *Colette.Pollard@hud.gov* for a copy of the proposed forms or other available information. Persons with hearing or speech impairments may access this number through TTY by calling the toll-free Federal Relay Service at (800) 877–8339.

**FOR FURTHER INFORMATION CONTACT:** Arlette Mussington, Office of Policy, Programs and Legislative Initiatives, PIH, Department of Housing and Urban Development, 451 7th Street SW, (L'Enfant Plaza, Room 2206), Washington, DC 20410; telephone 202–402–4109, (this is not a toll-free number). Persons with hearing or speech impairments may access this number via TTY by calling the Federal Information Relay Service at (800) 877–8339. Copies of available documents submitted to OMB may be obtained from Ms. Mussington.

**SUPPLEMENTARY INFORMATION:** This notice informs the public that HUD is seeking approval from OMB for the information collection described in Section A.

**A. Overview of Information Collection**

*Title of Information Collection:* Public Housing Capital Fund Program.

*OMB Approval Number:* 2577–0157.

*Type of Request:* Revision of a currently approved collection.

*Form Numbers:* HUD Form 50075.1, HUD–5084, HUD–5087, HUD–51000, HUD–51001, HUD–51002, HUD–51003, HUD–51004, HUD–51915, HUD–51915– A, HUD–51971–I–II, HUD–52396, HUD–52427, HUD–52482, HUD–52483–A, HUD–52484, HUD–52485, HUD–52651– A, HUD–52829, HUD–52830, HUD–52833, HUD–52845, HUD–52846, HUD–52847, HUD–52849, HUD–53001, HUD–53015, HUD–5370, HUD–5370EZ, HUD–5370C, HUD–5372, HUD–5378, HUD–5460, HUD–52828, 50071, 5370–C1, 5370–C2.

*Description of the need for the information and proposed use:* Each year Congress appropriates funds to approximately 3,015 Public Housing Authorities (PHAs) for modernization, development, financing, and management improvements. The funds are allocated based on a complex formula. The forms in this collection are used to appropriately disburse and utilize the funds provided to PHAs. Additionally, these forms provide the information necessary to approve a financing transaction in addition to any Capital Fund Financing transactions. Respondents include the approximately 3,015 PHA receiving Capital Funds and any other PHAs wishing to pursue financing.

This proposed information collection has been revised to include the following changes below:

1. HUD has removed all of the hours for the annual submission of form HUD–50075.2 and reduced the hours for HUD–50075.1. HUD is now collecting that information electronically thru the Energy Performance Information Center (EPIC) system. These hours were transferred to OMB No. 2577–0274 Energy Performance Information Center (EPIC). HUD will continue to use the HUD–50075.1 for the Capital Fund set aside grant programs, Lead Based Paint, Emergency Safety and Security, and Emergency and Disaster. Only those hours remain in 2577–0157.1. As a result, the burden hours were decreased 9,260 hours

2. Due to conversion of Public Housing to the Section 8 thru the Rental Assistance Demonstration (RAD) Program, the number of PHAs receiving Capital Funds has been reduced from 3,100 to 3,015. This has reduced the number of hours by 3,774.

3. The total reduction in burden hours are 13,034.

*Respondents* (*i.e. affected public*): Public Housing Authorities.

| Information collection | Number of respondents | Frequency of response | Responses per annum | Burden hour per response | Annual burden hours | Hourly cost per response | Annual cost |
|---|---|---|---|---|---|---|---|
| HUD–5084 | 3,015 | 1 | 3,015 | 1.5 | 4,522.50 | $34 | $153,765 |
| HUD–5087 | 50 | 1 | 50 | 3 | 150 | 56 | 8,400 |
| HUD–50071 | 10 | 1 | 10 | 0.5 | 5 | 56 | 280 |
| HUD–50075.1 | 300 | 1 | 300 | 2.2 | 660 | 34 | 204,600 |


# DEPARTMENT OF HOMELAND SECURITY

## U.S. Customs and Border Protection

[CBP Dec. 21–13]

## Determination That Maintenance of Finding of March 29, 2021, Pertaining to Certain Disposable Gloves Produced in Malaysia, Is No Longer Necessary

**AGENCY:** U.S. Customs and Border Protection, Department of Homeland Security.

**ACTION:** Determination that merchandise is no longer subject to 19 U.S.C. 1307.

**SUMMARY:** On March 29, 2021, U.S. Customs and Border Protection (CBP), with the approval of the Secretary of Homeland Security, issued a Finding that certain disposable gloves, were mined, produced, or manufactured in Malaysia by Top Glove Corporation Bhd with the use of convict, forced, or indentured labor, and were being, or were likely to be, imported into the United States. CBP has now determined, based upon additional information, that such merchandise is no longer being, or is likely to be, imported into the United States in violation of section 307 of the Tariff Act of 1930, as amended.

**DATES:** This determination applies to any merchandise described in this notice that is imported on or after September 10, 2021.

**FOR FURTHER INFORMATION CONTACT:** Juan M. Estrella, Chief, Operations Branch, Forced Labor Division, Trade Remedy Law Enforcement Directorate, Office of Trade, (202) 325–6087 or *forcedlabor@cbp.dhs.gov.*

**SUPPLEMENTARY INFORMATION:**

### I. Background

Pursuant to section 307 of the Tariff Act of 1930, as amended (19 U.S.C. 1307), "[a]ll goods, wares, articles, and merchandise mined, produced, or manufactured wholly or in part in any foreign country by convict labor or/and forced labor or/and indentured labor under penal sanctions shall not be entitled to entry at any of the ports of the United States, and the importation thereof is hereby prohibited." Under this section, "forced labor" includes "all work or service which is exacted from any person under the menace of any penalty for its nonperformance and for which the worker does not offer himself voluntarily" and includes forced or indentured child labor.

The CBP regulations promulgated under the authority of 19 U.S.C. 1307 are found at sections 12.42 through 12.45 of title 19, Code of Federal Regulations (CFR) (19 CFR 12.42–12.45). Among other things, these regulations allow any person outside of CBP to communicate his or her belief that a certain "class of merchandise . . . is being, or is likely to be, imported into the United States [in violation of 19 U.S.C. 1307]." 19 CFR 12.42(a), (b). Upon receiving such information, the Commissioner "will cause such investigation to be made as appears to be warranted by the circumstances . . . ." 19 CFR 12.42(d). CBP also has the authority to self-initiate an investigation. 19 CFR 12.42(a). If the Commissioner of CBP finds that the information available "reasonably but not conclusively indicates that merchandise within the purview of section 307 is being, or is likely to be, imported," the Commissioner will order port directors to "withhold release of any such merchandise pending [further] instructions." 19 CFR 12.42(e). After issuance of such a withhold release order, the covered merchandise will be detained by CBP for an admissibility determination and will be excluded unless the importer demonstrates that the merchandise was not made using labor in violation of 19 U.S.C. 1307. 19 CFR 12.43–12.44. The importer may also export the merchandise. 19 CFR 12.44(a).

These regulations also set forth the procedure for the Commissioner of CBP to issue a Finding when it is determined that the merchandise is subject to the provisions of 19 U.S.C. 1307. Pursuant to 19 CFR 12.42(f), if the Commissioner of CBP determines that merchandise within the purview of 19 U.S.C 1307 is being, or is likely to be, imported into the United States, the Commissioner of CBP will, with the approval of the Secretary of the Department of Homeland Security (DHS), publish a Finding to that effect in the *Customs Bulletin* and in the **Federal Register**.[1] Under the authority of 19 CFR 12.44(b), CBP may seize and forfeit imported merchandise covered by a Finding.

On July 15, 2020, CBP issued a withhold release order on "disposable gloves" reasonably indicated to be manufactured by forced labor in Malaysia by Top Glove Corporation Bhd (Top Glove). Through its investigation, CBP determined that there was sufficient information to support a Finding that Top Glove was manufacturing disposable gloves with forced labor and that such merchandise was likely being imported into the United States. Pursuant to 19 CFR 12.42(f), CBP issued a Finding to that effect in the **Federal Register** on March 29, 2021 (86 FR 16380).[2]

Since that time, Top Glove has provided additional information to CBP, which CBP believes establishes by satisfactory evidence that the subject disposable gloves are no longer mined, produced, or manufactured in any part with forced labor. 19 CFR 12.42(g).

### II. Determination

Pursuant to 19 U.S.C. 1307 and 19 CFR 12.42(g), it is hereby determined that the articles described below are no longer being mined, produced, or manufactured wholly or in part with the use of convict, forced, or indentured labor by Top Glove in Malaysia.

The subject articles are disposable gloves classified under Harmonized Tariff Schedule of the United States (HTSUS) subheadings 3926.20.1020, 4015.11.0150, 4015.19.0510, 4015.19.0550, 4015.19.1010, 4015.19.1050, and 4015.19.5000, which are mined, produced, or manufactured by Top Glove in Malaysia.

Dated: September 3, 2021.

**AnnMarie R. Highsmith,**
*Executive Assistant Commissioner, Office of Trade.*

[FR Doc. 2021–19535 Filed 9–9–21; 8:45 am]

**BILLING CODE 9111–14–P**

---

# DEPARTMENT OF HOMELAND SECURITY

## U.S. Citizenship and Immigration Services

[CIS No. 2676–21; DHS Docket No. USCIS–2019–0020]

RIN 1615–ZB83

## Continuation of Documentation for Beneficiaries of Temporary Protected Status Designations for El Salvador, Haiti, Nicaragua, Sudan, Honduras, and Nepal

**AGENCY:** U.S. Citizenship and Immigration Services, Department of Homeland Security.

---

[1] Although the regulation states that the Secretary of the Treasury must approve the issuance of a Finding, the Secretary of the Treasury delegated this authority to the Secretary of Homeland Security in Treasury Order No. 100–16 (68 FR 28322). In Delegation Order 7010.3, Section II.A.3, the Secretary of Homeland Security delegated the authority to issue a Finding to the Commissioner of CBP, with the approval of the Secretary of Homeland Security. The Commissioner of CBP, in turn, delegated the authority to make a Finding regarding prohibited goods under 19 U.S.C. 1307 to the Executive Assistant Commissioner, Office of Trade.

[2] The Finding was also published in the *Customs Bulletin and Decisions* (Vol. 55, No. 14, p. 13) on April 14, 2021.

**50726** Federal Register / Vol. 86, No. 173 / Friday, September 10, 2021 / Notices

**ACTION:** Notice of Continuation of Temporary Protected Status and related documentation for Certain TPS beneficiaries.

**SUMMARY:** Through this notice, the Department of Homeland Security (DHS) announces actions to ensure its continued compliance with the preliminary injunction orders of the U.S. District Court for the Northern District of California in *Ramos, et al.* v. *Nielsen, et. al.,* No. 18–cv–01554 (N.D. Cal. Oct. 3, 2018) ("*Ramos*") and the U.S. District Court for the Eastern District of New York in *Saget, et. al.,* v. *Trump, et. al.,* No. 18–cv–1599 (E.D.N.Y. Apr. 11, 2019) ("*Saget*"), and with the order of the U.S. District Court for the Northern District of California to stay proceedings in *Bhattarai* v. *Nielsen,* No. 19–cv–00731 (N.D. Cal. Mar. 12, 2019) ("*Bhattarai*"). Beneficiaries under the Temporary Protected Status (TPS) designations for El Salvador, Nicaragua, Sudan, Honduras, and Nepal will retain their TPS while the preliminary injunction in *Ramos* and the *Bhattarai* orders remain in effect, provided that their TPS is not withdrawn because of individual ineligibility. Beneficiaries under the TPS designation for Haiti will retain their TPS while either of the preliminary injunctions in *Ramos* or *Saget* remain in effect, provided that their TPS is not withdrawn because of individual ineligibility. However, on August 3, 2021, DHS issued a new designation for Haiti TPS, and in order to secure TPS pursuant to the new Haiti designation, eligible individuals must apply before the close of the registration period on Feb. 3, 2023. Eligible individuals are strongly encouraged to apply at the earliest practicable date, to ensure that their TPS continues beyond the court-ordered extensions and without any gaps in status. See Designation of Haiti for Temporary Protected Status. In addition, eligible individuals who do not register for the new TPS designation during the registration period, may be prohibited from filing a late initial registration during any subsequent extension of the designation if they do not meet certain conditions. This notice further provides information on the automatic extension of the validity of TPS-related Employment Authorization Documents (EADs); Notices of Action (Forms I–797); and Arrival/Departure Records (Forms I–94), (collectively "TPS-related documentation"); for those beneficiaries under the TPS designations for El Salvador, Haiti, Nicaragua, Sudan, Honduras, and Nepal.

**DATES:** DHS is automatically extending the validity of TPS-related

documentation for beneficiaries under the TPS designations for El Salvador, Haiti, Nicaragua, Sudan, Honduras, and Nepal through December 31, 2022, from the current expiration date of October 4, 2021.

**FOR FURTHER INFORMATION CONTACT:**

☐ You may contact Andria Strano, Acting Chief, Humanitarian Affairs Division, Office of Policy and Strategy, U.S. Citizenship and Immigration Services, U.S. Department of Homeland Security, by mail at 5900 Capital Gateway Dr, Camp Springs, MD 20529–2140; or by phone at 800–375–5283.

☐ For further information on TPS, please visit the USCIS TPS web page at *www.uscis.gov/tps.*

☐ If you have additional questions about TPS, please visit *uscis.gov/tools.* Our online virtual assistant, Emma, can answer many of your questions and point you to additional information on our website. If you are unable to find your answers there, you may also call our U.S. Citizenship and Immigration Services (USCIS) Contact Center at 800–375–5283 (TTY 800–767–1833).

☐ Applicants seeking information about the status of their individual cases may check Case Status Online, available on the USCIS website at *www.uscis.gov,* or visit the USCIS Contact Center at *uscis.gov/contactcenter.*

☐ Further information will also be available at local USCIS offices upon publication of this notice.

**SUPPLEMENTARY INFORMATION:**

**Table of Abbreviations**

BIA—Board of Immigration Appeals
CFR—Code of Federal Regulations
DHS—U.S. Department of Homeland Security
EAD—Employment Authorization Document
EOIR—Executive Office for Immigration Review
FNC—Final Nonconfirmation
Form I–765—Application for Employment Authorization
Form I–797—Notice of Action
Form I–821—Application for Temporary Protected Status
Form I–9—Employment Eligibility Verification
Form I–912—Request for Fee Waiver
Form I–94—Arrival/Departure Record
Government—U.S. Government
IER—U.S. Department of Justice, Civil Rights Division, Immigrant and Employee Rights Section
INA—Immigration and Nationality Act
SAVE—USCIS Systematic Alien Verification for Entitlements Program
Secretary—Secretary of Homeland Security
TNC—Tentative Nonconfirmation
TPS—Temporary Protected Status
TTY—Text Telephone
USCIS—U.S. Citizenship and Immigration Services

**Background on TPS**

• TPS is a temporary immigration status granted to eligible nationals of a country designated for TPS under the Immigration and Nationality Act (INA) or to eligible persons without nationality who last habitually resided in the designated country.

• During the TPS designation period, TPS beneficiaries are eligible to remain in the United States, may not be removed, and are authorized to obtain EADs so long as they continue to meet the requirements of TPS.

• TPS beneficiaries may travel abroad temporarily with the prior consent of DHS.

• The granting of TPS does not result in or lead to lawful permanent resident status.

• To qualify for TPS, beneficiaries must meet the eligibility standards at INA section 244(c)(1)–(2), 8 U.S.C. 1254a(c)(1)–(2).

• When the Secretary of Homeland Security (the Secretary) terminates a country's TPS designation, beneficiaries return to one of the following:

○ The same immigration status or category that they maintained before TPS, if any (unless that status or category has since expired or been terminated); or

○ Any other lawfully obtained immigration status or category they received while registered for TPS, as long as it is still valid on the date TPS terminates.

**Purpose of This Action**

This notice ensures DHS's continued compliance with various court orders issued by the federal district courts in the *Ramos, Bhattarai,* and *Saget* lawsuits that require DHS to maintain the TPS designations for El Salvador, Haiti, Sudan, Nicaragua, Honduras, and Nepal, as well as the TPS and TPS-related documentation for eligible affected beneficiaries.[1] The U.S. Court of Appeals for the Ninth Circuit vacated the district court's preliminary injunction in *Ramos* on September 14, 2020, holding that the plaintiffs' claims under the Administrative Procedures

---

[1] *See Ramos, et al.* v. *Nielsen, et. al.,* No. 18–cv–01554 (N.D. Cal. Oct. 3, 2018) (district court granted preliminary injunction against terminations of TPS for El Salvador, Haiti, Sudan, and Nicaragua) ("*Ramos*"); *Saget, et. al.,* v. *Trump, et. al.,* No. 18–cv–1599 (E.D.N.Y. Apr. 11, 2019) (district court granted preliminary injunction against termination of TPS for Haiti) ("*Saget*"); and *Bhattarai, et al.* v. *Nielsen, et al.,* No. 19–cv–00731 (N.D. Cal. Mar. 12, 2019) (district court stayed proceedings until *Ramos* appeal decided and approved parties' stipulation for continued TPS and issuance of TPS-related documentation to eligible, affected beneficiaries of TPS for Honduras and Nepal during the stay and pendency of the appeal) ("*Bhattarai*").

Act were not subject to judicial review. However, the appellate order is not currently effective because the Ninth Circuit has not issued its "mandate" to the federal district court to carry out the order, as the plaintiffs' petition for rehearing en banc remains pending.[2] Therefore, the *Ramos* preliminary injunction remains in effect. In addition, the order of the district court in *Bhattarai* staying proceedings and approving the parties' stipulated agreement to continue TPS and TPS-related documentation for eligible beneficiaries from Nepal and Honduras remains in effect. The *Saget* district court order prohibiting the termination of TPS for Haiti also remains in effect while the decision is on appeal to the U.S. Court of Appeals for the Second Circuit. Affected TPS beneficiaries from the six countries will retain their status, provided they continue to meet all the individual requirements for TPS eligibility described in INA section 244(c) and 8 CFR 244. As necessary, DHS will publish future information in the **Federal Register** to ensure its compliance with any relevant court orders that may be issued after the date of this notice.

DHS initially published notices to ensure its compliance with the *Ramos* preliminary injunction on October 31, 2018 and March 1, 2019, and the *Bhattarai* order to stay proceedings on May 10, 2019. *See* 83 FR 54764; 84 FR 7103; and 84 FR 20647. The Department later published a notice to ensure its continued compliance with the combined orders in *Ramos, Bhattarai,* and *Saget* on November 4, 2019. That notice automatically extended certain TPS and TPS-related documentation through January 4, 2021 for all eligible TPS beneficiaries covered by the courts' orders. *See* 84 FR 59403. The Department last published a notice to ensure its continued compliance with these combined court orders on December 9, 2020. That notice again automatically extended certain TPS and TPS-related documentation through October 4, 2021 for all eligible TPS beneficiaries covered by the courts' orders. *See* 85 FR 79208. Through this **Federal Register** notice, DHS announces actions to ensure its continued compliance with the district court orders in these three lawsuits while those orders remain in effect.

The TPS designations for El Salvador, Nicaragua, and Sudan will remain in effect, as required by the *Ramos* district court order, so long as the preliminary injunction remains in effect. The 2011

TPS designation for Haiti will remain in effect, as required by the preliminary injunction orders in both *Ramos* and *Saget,* so long as either of those preliminary injunctions remain in effect. The TPS designations for Honduras and Nepal will remain in effect so long as the *Bhattarai* order staying proceedings and approving the parties' stipulated agreements continues in effect. Affected TPS beneficiaries under the TPS designations for El Salvador, Haiti, Nicaragua, Sudan, Honduras, and Nepal will retain their TPS and their TPS-related documentation will continue to be valid in accordance with the specific orders that affect the TPS designations regarding their individual countries, provided that the affected beneficiaries continue to meet all the individual requirements for TPS. *See* INA section 244(c)(3). *See also* 8 CFR 244.14. DHS will not terminate TPS for any of the affected countries pending final disposition of the *Ramos* appeal, including through any additional appellate channels in which relief may be sought, or by other orders of the court. Following consideration of current country conditions, the Secretary has already newly designated Haiti for TPS for eighteen months, allowing individuals covered by the *Ramos* and *Saget* injunctions as well as other eligible individuals to register for and maintain TPS through February 3, 2023.

DHS is further announcing that it is automatically extending, through December 31, 2022, the validity of certain TPS-related documentation, as specified in this notice, for beneficiaries under the TPS designations for El Salvador, Haiti, Nicaragua, Sudan, Honduras, and Nepal provided that the affected beneficiaries remain individually eligible for TPS.

## Automatic Extension of EADs Issued Under the TPS Designations for El Salvador, Haiti, Nicaragua, Sudan, Honduras, and Nepal

Through this **Federal Register** notice, DHS automatically extends the validity of EADs listed in Table 1 below issued to beneficiaries under the TPS designations for El Salvador, Haiti, Nicaragua, Sudan, Honduras, and Nepal. Such beneficiaries may show their EADs to employers to demonstrate they have employment authorization and may choose to also show employers this **Federal Register** notice to explain that their TPS-Related Documentation has been automatically extended through December 31, 2022. This notice explains how TPS beneficiaries, their employers, and benefit-granting

agencies may determine which EADs are automatically extended and how this affects the Form I–9, Employment Eligibility Verification; E-Verify; and USCIS Systematic Alien Verification for Entitlements (SAVE) processes. Additionally, a beneficiary under the TPS designation for any of these countries who has applied for a new EAD but who has not yet received his or her new EAD is covered by this automatic extension, provided that the EAD he or she possesses contains one of the expiration dates listed in Table 1 below.

### Table 1—Affected EADs

| If an EAD has a category code of A–12 or C–19 and an expiration date of: | Then the validity of the EAD is extended through: |
| --- | --- |
| 07/22/2017 | 12/31/2022 |
| 11/02/2017 | 12/31/2022 |
| 01/05/2018 | 12/31/2022 |
| 01/22/2018 | 12/31/2022 |
| 03/09/2018 | 12/31/2022 |
| 06/24/2018 | 12/31/2022 |
| 07/05/2018 | 12/31/2022 |
| 11/02/2018 | 12/31/2022 |
| 01/05/2019 | 12/31/2022 |
| 04/02/2019 | 12/31/2022 |
| 06/24/2019 | 12/31/2022 |
| 07/22/2019 | 12/31/2022 |
| 09/09/2019 | 12/31/2022 |
| 01/02/2020 | 12/31/2022 |
| 01/05/2020 | 12/31/2022 |
| 03/24/2020 | 12/31/2022 |
| 01/04/2021 | 12/31/2022 |
| 10/04/2021 | 12/31/2022 |

## Automatic Extension of Forms I–94 and Forms I–797

Also through this **Federal Register** notice, DHS automatically extends the validity periods of the Forms I–94 and Forms I–797 listed in Table 2 below previously issued to beneficiaries under the TPS designations for El Salvador, Haiti, Nicaragua, Sudan, Honduras, and Nepal. These extensions apply only if the TPS beneficiary properly filed for re-registration during either the most recent DHS-announced registration period for their country, or any applicable previous DHS-announced re-registration periods for the beneficiary's country,[3] or has a re-registration

---

[2] *See Ramos, et al.,* v. *Wolf, et al.,* No. 18–16981 (9th Cir., September 14, 2020).

---

[3] El Salvador: July 8–Sept. 6, 2016, or Jan. 18–Mar. 19, 2018;

Haiti: Aug. 25–Oct. 26, 2015, May 24–July 24, 2017, or Jan. 18–Mar. 19, 2018;

Honduras: May 16–July 16, 2016; Dec. 15, 2017–Feb. 13, 2018 or June 5–Aug. 6, 2018;

Nepal: Oct. 26–Dec. 27, 2016 or May 22–July 23, 2018;

Nicaragua: May 16–July 15, 2016 or Dec. 15, 2017–Feb. 13, 2018;

Sudan: Jan. 25–March 25, 2016 or Oct. 11, 2017–Dec. 11, 2017.

application that remains pending. This notice does not extend the validity periods of Forms I–94 or Forms I–797 for any TPS beneficiary who failed to file for TPS re-registration during one of the applicable previous DHS-announced re-registration periods, or for whom a re-registration request has been denied. In addition, the extensions do not apply for any beneficiary from whom TPS has been withdrawn.

### TABLE 2—AFFECTED FORMS I–94 AND I–797 [4]

| Country | Beginning date of validity: | End date of validity: | Validity of forms I–94 and I–797 extended through: |
|---|---|---|---|
| El Salvador | Sept. 10, 2016 | Mar. 9, 2018 | 12/31/2022 |
| | Mar. 10, 2018 | Sept. 9, 2019 | 12/31/2022 |
| | Sept. 10, 2021 | Oct. 4, 2021 | 12/31/2022 |
| Haiti | Jan. 23, 2016 | July 22, 2017 | 12/31/2022 |
| | July 23, 2017 | Jan. 22, 2018 | 12/31/2022 |
| | Jan. 23, 2018 | July 22, 2019 | 12/31/2022 |
| | July 23, 2019 | Oct. 4, 2021 | 12/31/2022 |
| Honduras | July 6, 2016 | Jan. 5, 2018 | 12/31/2022 |
| | Jan. 6, 2018 | July 5, 2018 | 12/31/2022 |
| | July 6, 2018 | Jan. 5, 2020 | 12/31/2022 |
| | Jan. 6, 2020 | Oct. 4, 2021 | 12/31/2022 |
| Nepal | Dec. 25, 2016 | June 24, 2018 | 12/31/2022 |
| | June 25, 2018 | June 24, 2019 | 12/31/2022 |
| | June 25, 2019 | Oct. 4, 2021 | 12/31/2022 |
| Nicaragua | July 6, 2016 | Jan. 5, 2018 | 12/31/2022 |
| | Jan. 6, 2018 | Jan. 5, 2019 | 12/31/2022 |
| | Jan. 6, 2019 | Oct. 4, 2021 | 12/31/2022 |
| Sudan | May 3, 2016 | Nov. 2, 2017 | 12/31/2022 |
| | Nov. 3, 2017 | Nov. 2, 2018 | 12/31/2022 |
| | Nov. 3, 2018 | Oct. 4, 2021 | 12/31/2022 |

### Application Procedures

Current beneficiaries covered by the court orders that continue the TPS designations for El Salvador, Haiti, Honduras, Nepal, Nicaragua, and Sudan do not need to pay a fee or file any application, including Application for Employment Authorization (Form I–765), to maintain their TPS benefits through December 31, 2022 under this notice, provided that they have properly re-registered for TPS during either the most recent DHS-announced registration period for their country, or any applicable previous re-registration period described in Footnote 3. However, in order to secure TPS pursuant to the new Haiti designation, eligible individuals must apply before the close of the registration period on Feb. 3, 2023. Eligible individuals for the new TPS Haiti designation are strongly encouraged to apply at the earliest practicable date, to ensure that their TPS continues beyond the court-ordered extensions and without any gaps in status.

In addition, eligible individuals who do not register for the new TPS designation during the registration period, may be prohibited from filing a late initial registration during any subsequent extension of the designation if they do not meet certain conditions. See 8 CFR 244.2(f)(2).

TPS beneficiaries who have failed to re-register properly for TPS during any of these re-registration periods may still file an Application for Temporary Protected Status (Form I–821), but must demonstrate "good cause" for failing to re-register on time, as required by law. See INA section 244(c)(3)(C) (TPS beneficiary's failure to register without good cause in form and manner specified by DHS is ground for TPS withdrawal); 8 CFR 244.17(b) and Form I–821 instructions.[5]

Any currently eligible beneficiary who does not presently have a pending EAD application under the TPS designations for El Salvador, Haiti, Nicaragua, Sudan, Honduras or Nepal may file Form I–765 with appropriate fee in order to obtain a new EAD with a printed expiration date of December 31, 2022.

### Possible Future Actions

In order to comply with statutory requirements for TPS while the district courts' orders or any superseding court order concerning the beneficiaries under the TPS designations for El Salvador, Haiti, Nicaragua, Sudan, Honduras, and Nepal remain in effect, DHS may require these beneficiaries to re-register and will announce the re-registration procedures in a future **Federal Register** notice. DHS has the authority to conduct TPS re-registration in accordance with INA section 244(c)(3)(C) and 8 CFR 244.17. Through the re-registration process, which is generally conducted every twelve to eighteen months while a country is designated for TPS, USCIS determines whether each TPS beneficiary is continuing to maintain individual eligibility for TPS, including but not limited to, the requirements related to disqualifying criminal or security issues. See id.; INA section 244(c)(2); 8 CFR 244.2, 244.3, and 244.4 (describing individual TPS eligibility requirements, including mandatory criminal and security bars).

The Secretary has already newly designated Haiti for TPS for eighteen months through February 3, 2023. 86 FR 41863. Eligible Haitian nationals (and individuals having no nationality who last habitually resided in Haiti) who wish to receive or continue their existing TPS through that date are

---

[5] An applicant for TPS Haiti who applies under the procedures announced in the Notice regarding the new TPS designation of Haiti at 86 FR 41863 (Aug. 3, 2021) is an initial applicant and does not have to demonstrate "good cause" for failing to re-register under prior TPS Haiti designations.

encouraged to submit their applications for TPS by following the instructions in the **Federal Register** notice, Designation of Haiti for Temporary Protected Status, at 86 FR 41863. Failure to submit an application under the new designation of Haiti, however, does not affect the continuation of the validity of the TPS and TPS documents through December 31, 2022 as described in this notice.

The Government has appealed both the *Ramos* and *Saget* preliminary injunctions. The U.S. Court of Appeals for the Ninth Circuit ruled for the Government and vacated the *Ramos* preliminary injunction on September 14, 2020. However, the preliminary injunction remains in effect because the appellate court has not issued its directive (*i.e.,* the mandate) to the district court to implement the panel's decision due to the pendency of the plaintiffs' petition for rehearing en banc. Should the Government ultimately prevail in its challenge to the *Ramos* preliminary injunction, and absent any further change in the TPS designations for Nicaragua, Sudan, Honduras, and Nepal, the Secretary's determination to terminate TPS for those countries would take effect no earlier than 120 days from the issuance of any appellate mandate to the district court. Absent any further change in the TPS designation for El Salvador, the Secretary's determination to terminate TPS for that country will take effect no earlier than 365 days from the issuance of any appellate mandate to the *Ramos* district court. DHS provides this additional time for El Salvador TPS beneficiaries in part because there are almost 100,000 more such beneficiaries than in the combined TPS beneficiary populations of all the other five countries covered by this notice.[6] The additional period of 245 days beyond 120 days would permit an orderly transition for beneficiaries of TPS from El Salvador as they return to their homeland. If the Government prevails in its appeals, DHS will also continue to monitor the circumstances of the affected beneficiaries under the other five TPS country designations covered by this notice. *See* INA section 244(d)(3).

To the extent that a **Federal Register** notice has automatically extended TPS-related documentation beyond 120 days from the issuance of any appellate mandate to the District Court, DHS reserves the right to issue a subsequent **Federal Register** notice announcing an expiration date for the documentation

that corresponds to the last day of the 120-day period for Sudan, Nicaragua, Honduras, and Nepal. Should the Government move to vacate the *Bhattarai* order to stay proceedings in light of an appellate decision affirming the preliminary injunction in *Ramos* that suggests a basis on which to distinguish the determinations to terminate the TPS designations for Honduras and Nepal from the TPS terminations at issue in *Ramos,* TPS will remain in effect for Honduras and Nepal for at least 180 days following an order of the District Court vacating the stay in proceedings.

The Secretary has announced a new 18-month designation of Haiti for TPS, which continues through February 3, 2023. Application procedures for TPS under this new Haiti designation, including for individuals who currently have TPS pursuant to the court orders, are provided in the notice published at 86 FR 41863.

**Additional Notes**

Nothing in this notice affects DHS's ongoing authority to determine on a case-by-case basis whether a TPS beneficiary continues to meet the eligibility requirements for TPS described in INA section 244(c) and the implementing regulations in part 244 of Title 8 of the Code of Federal Regulations.

Notice of Compliance with the "Order Enjoining the Implementation and Enforcement of Determinations to Terminate the TPS Designations for El Salvador, Haiti, Nicaragua, and Sudan" in *Ramos,* the "Order Enjoining the Implementation of Enforcement of Determination to Terminate the TPS Designation of Haiti" in *Saget,* and the "Order to Stay Proceedings and Agreement to Stay the Determinations to Terminate the TPS Designations for Honduras and Nepal" in *Bhattarai*

The previously announced determinations to terminate the existing designations of TPS for El Salvador, Nicaragua, and Sudan[7] will not be implemented or enforced unless and until the district court's order in *Ramos* is reversed and that reversal becomes final. The previously announced determination to terminate the 2011 designation of TPS for Haiti will not be implemented or enforced unless and until the district court's order in *Saget* is reversed and the reversal becomes

final.[8] As required by the order to stay proceedings in *Bhattarai,* DHS will not implement or enforce the previously announced determinations to terminate the existing TPS designations for Honduras and Nepal[9] unless and until the district court's order in *Ramos* enjoining implementation and enforcement of the determinations to terminate the TPS designations for El Salvador, Haiti, Nicaragua, and Sudan is reversed and that reversal becomes final for some or all of the affected countries, or by other order of the court. Any termination of TPS-related documentation for beneficiaries under the TPS designations for Nicaragua, Sudan, Honduras, and Nepal will go into effect no earlier than 120 days, and no earlier than 365 days for beneficiaries under the TPS designation for El Salvador, following the issuance of any mandate to the district court, as described in the "Possible Future Action" section of this **Federal Register** notice.[10]

In further compliance with the still-valid district court orders, DHS is publishing this notice automatically extending the validity of the TPS-related documentation specified in the Supplementary Information section of this notice through December 31, 2022, for eligible beneficiaries under the TPS designations for El Salvador, Haiti, Nicaragua, Sudan, Honduras, and Nepal. DHS will continue to issue notices that will automatically extend TPS-related documentation for all affected beneficiaries under the TPS designations for El Salvador, Nicaragua, Sudan, Honduras and Nepal, so long as the *Ramos* preliminary injunction and *Bhattarai* order to stay proceedings remain in place; for Haiti as long as the *Ramos* or *Saget* preliminary injunctions remain in place; or by other order of the court. However, should compliance with the *Ramos, Bhattarai,* and/or *Saget* court orders remain necessary, DHS may announce periodic re-registration procedures for eligible TPS beneficiaries in accordance with the INA and DHS

---

[6] As of December 31, 2019, the number of TPS beneficiaries covered under the affected designations were: El Salvador 247,412; Haiti 55,218; Nicaragua 4,409; Sudan 771; Honduras 79,290; Nepal 14,549.

[7] *See* Termination of the Designation of El Salvador for Temporary Protected Status, 83 FR 2654 (Jan. 18, 2018); Termination of the Designation of Nicaragua for Temporary Protected Status, 82 FR 59636 (Dec. 15, 2017); Termination of the Designation of Sudan for Temporary Protected Status, 82 FR 47228 (Oct. 11, 2017).

[8] *See* Termination of the Designation of Haiti for Temporary Protected Status, 83 FR 2648 (Jan. 18, 2018).

[9] *See* Termination of the Designation of Honduras for Temporary Protected Status, 83 FR 26074 (June 5, 2018); Termination of the Designation of Nepal for Temporary Protected Status, 83 FR 23705 (May 22, 2018).

[10] An additional provision in the *Bhattarai* Order to Stay Proceedings states that if the preliminary injunction in *Ramos* is upheld, but the Government moves to vacate the *Bhattarai* Order based on reasons for distinguishing the terminations of TPS for Honduras and Nepal from those under the injunction in *Ramos,* TPS will remain in effect for Honduras and Nepal for at least 180 days following an order of the District Court vacating its stay of proceedings order.

regulations. DHS further continues its commitment to a transition period, as described above.

All TPS beneficiaries must continue to maintain their TPS eligibility by meeting the requirements for TPS in INA section 244(c) and 8 CFR part 244. DHS will continue to adjudicate any pending TPS re-registration and pending late initial applications for affected beneficiaries under the TPS designations for El Salvador, Nicaragua, Sudan, Honduras, and Nepal. Nationals of Haiti (and individuals having no nationality who last habitually resided in Haiti) are encouraged to apply under the new designation for Haiti announced at 86 FR 41863.[11] DHS will also continue to make appropriate individual TPS withdrawal decisions in accordance with existing procedures if an individual no longer maintains TPS eligibility. DHS will take appropriate steps to continue its compliance with the orders, and with all statutory requirements.

**Alejandro N. Mayorkas,**
*Secretary, U.S. Department of Homeland Security.*

## Approved Documentation To Demonstrate Continuation of Lawful Status and TPS-Related Employment Authorization

• Documentation automatically extended through this **Federal Register** notice dated September 10, 2021.
  ○ Certain TPS-related documentation, including EADs, of affected beneficiaries under the TPS designations for El Salvador, Haiti, Nicaragua, Sudan, Honduras, and Nepal, that are automatically extended through this **Federal Register** notice through December 31, 2022.
  ○ Regardless of their country of birth, a beneficiary granted TPS under the designation for El Salvador, Haiti, Nicaragua, Sudan, Honduras, or Nepal may show his or her EAD that has been automatically extended to his or her employer to demonstrate identity and continued TPS-related employment eligibility to meet Employment Eligibility Verification (Form I–9) requirements. A beneficiary granted TPS under a designation for one of these countries may also choose to show an employer this **Federal Register** notice, which explains that his or her EAD has been automatically extended.
  ○ As evidence of his or her lawful status, a TPS beneficiary may show his or her EAD that has been automatically extended, or Form I–94, or Form I–797, along with a copy of this **Federal Register** notice, to law enforcement, federal, state, and local government agencies, and private entities.
    • Unexpired EAD.
    • Alternatively, such a TPS beneficiary may choose to show other acceptable documents that are evidence of identity and employment eligibility as described in the instructions to Form I–9.

*Am I eligible to receive an automatic extension of my current EAD using this* **Federal Register** *notice?*

Yes. Provided that you currently have a TPS-related EAD with the specified expiration dates below, this notice automatically extends your EAD as stated in Table 3 below.

### TABLE 3—AFFECTED EADs

| If your EAD has category code of A–12 or C–19 and an expiration date of: | Then this **Federal Register** notice extends your EAD through: |
| --- | --- |
| 07/22/2017 ...................... | 12/31/2022 |
| 11/02/2017 ...................... | 12/31/2022 |
| 01/05/2018 ...................... | 12/31/2022 |
| 01/22/2018 ...................... | 12/31/2022 |
| 03/09/2018 ...................... | 12/31/2022 |
| 06/24/2018 ...................... | 12/31/2022 |
| 07/05/2018 ...................... | 12/31/2022 |
| 11/02/2018 ...................... | 12/31/2022 |
| 01/05/2019 ...................... | 12/31/2022 |
| 04/02/2019 ...................... | 12/31/2022 |
| 06/24/2019 ...................... | 12/31/2022 |
| 07/22/2019 ...................... | 12/31/2022 |
| 09/09/2019 ...................... | 12/31/2022 |
| 01/02/2020 ...................... | 12/31/2022 |
| 01/05/2020 ...................... | 12/31/2022 |
| 03/24/2020 ...................... | 12/31/2022 |
| 01/04/2021 ...................... | 12/31/2022 |

### TABLE 3—AFFECTED EADs— Continued

| If your EAD has category code of A–12 or C–19 and an expiration date of: | Then this **Federal Register** notice extends your EAD through: |
| --- | --- |
| 10/04/2021 ...................... | 12/31/2022 |

*When hired, what documentation may I show to my employer as evidence of employment authorization and identity when completing Form I–9?*

You can find the Lists of Acceptable Documents on the third page of Form I–9 as well as the Acceptable Documents web page at *www.uscis.gov/i-9-central/acceptable-documents*. Employers must complete Form I–9 to verify the identity and employment authorization of all new employees. Within three days of hire, employees must present acceptable documents to their employers as evidence of identity and employment authorization to satisfy Form I–9 requirements.

You may present any documentation from List A (which provides evidence of both your identity and employment authorization) or documentation from List B (which provides evidence of your identity) together with documentation from List C (which provides evidence of your employment authorization), or you may present an acceptable receipt as described in the Form I–9 instructions. Employers may not reject a document based on a future expiration date. You can find additional information about Form I–9 on the I–9 Central web page at *www.uscis.gov/I-9Central*.

An EAD is an acceptable document under List A. See the section ''How do my employer and I complete Form I–9 using my automatically extended employment authorization for a new job?'' of this **Federal Register** notice for further information. If your EAD has one of the expiration dates in Table 4 and states A–12 or C–19 under Category, it has been extended automatically by virtue of this **Federal Register** notice, and you may choose to present it to your employer as proof of identity and employment eligibility for Form I–9 through December 31, 2022, unless your TPS has been withdrawn or your request for TPS has been denied.

---

[11] As noted above, the Department of Homeland Security (DHS) announced that the Secretary of Homeland Security (Secretary) has newly designated Haiti for TPS for eighteen months, effective August 3, 2021 through February 3, 2023. This designation allows eligible Haitian nationals (and individuals having no nationality who last habitually resided in Haiti) who have continuously resided in the United States since July 29, 2021, and who have been continuously physically present in the United States since August 3, 2021 to apply for TPS. TPS beneficiaries whose TPS has been continued pursuant to court orders, as described in 85 FR 79208 (Dec. 9, 2020), should newly apply for TPS following the instructions in **Federal Register** Notice Designation of Haiti for Temporary Protected Status at 86 FR 41863.

TABLE 4—AFFECTED EADs AND FORM I–9

| If your EAD has category code of A–12 or C–19 and an expiration date of: | Enter this date in Section 1 of Form I–9: | Your employer must reverify your employment authorization by: |
|---|---|---|
| 07/22/2017 | 12/31/2022 | 01/01/2023 |
| 11/02/2017 | 12/31/2022 | 01/01/2023 |
| 01/05/2018 | 12/31/2022 | 01/01/2023 |
| 01/22/2018 | 12/31/2022 | 01/01/2023 |
| 03/09/2018 | 12/31/2022 | 01/01/2023 |
| 06/24/2018 | 12/31/2022 | 01/01/2023 |
| 07/05/2018 | 12/31/2022 | 01/01/2023 |
| 11/02/2018 | 12/31/2022 | 01/01/2023 |
| 01/05/2019 | 12/31/2022 | 01/01/2023 |
| 04/02/2019 | 12/31/2022 | 01/01/2023 |
| 06/24/2019 | 12/31/2022 | 01/01/2023 |
| 07/22/2019 | 12/31/2022 | 01/01/2023 |
| 09/09/2019 | 12/31/2022 | 01/01/2023 |
| 01/02/2020 | 12/31/2022 | 01/01/2023 |
| 01/05/2020 | 12/31/2022 | 01/01/2023 |
| 03/24/2020 | 12/31/2022 | 01/01/2023 |
| 01/04/2021 | 12/31/2022 | 01/01/2023 |
| 10/04/2021 | 12/31/2022 | 01/01/2023 |

*What documentation may I present to my employer for Form I–9 if I am already employed but my current TPS-related EAD is set to expire?*

Even though your EAD has been automatically extended, your employer is required by law to ask you about your continued employment authorization. Your employer may need to re-inspect your automatically extended EAD to check the Card Expires date and Category code if your employer did not keep a copy of your EAD when you initially presented it. Once your employer has reviewed the Card Expires date and Category code, your employer should update the EAD expiration date in Section 2 of Form I–9. *See* the section, ''What updates should my current employer make to Form I–9 if my EAD has been automatically extended?'' of this **Federal Register** notice for further information. You may show this **Federal Register** notice to your employer to explain what to do for Form I–9 and to show that your EAD has been automatically extended through December 31, 2022 as indicated in the above chart, but you are not required to do so.

The last day of the automatic extension for your EAD is December 31, 2022. On or before you start work on January 1, 2023, your employer is required by law to reverify your employment authorization in Section 3 of Form I–9. By that time, you must present any document from List A or any document from List C on Form I–9, Lists of Acceptable Documents, or an acceptable List A or List C receipt described in the Form I–9 instructions to reverify employment authorization.

Your employer may not specify which List A or List C document you must present and cannot reject an acceptable receipt.

*Can I obtain a new EAD?*

Yes, if you remain eligible for TPS and apply for a new EAD, you can obtain a new EAD. However, you do not need to apply for a new EAD in order to benefit from this automatic extension. If you are a beneficiary under the TPS designations for El Salvador, Haiti, Nicaragua, Sudan, Honduras, or Nepal and want to obtain a new EAD valid through December 31, 2022, then you must file Form I–765 and pay the associated fee (or obtain a fee waiver). If you do not want a new EAD, you do not have to file Form I–765 or pay the Form I–765 fee. If you do not want to request a new EAD now, you may file Form I–765 at a later date and pay the fee (or request a fee waiver), provided that you still have TPS or a pending TPS application.

If you are unable to pay the application fee and/or biometric services fee, you may request a fee waiver by submitting a Request for Fee Waiver (Form I–912). For more information on the application forms and fees for TPS, please visit the USCIS TPS web page at *www.uscis.gov/tps.*

If you have a Form I–821 and/or Form I–765 application that is still pending under the TPS designations for El Salvador, Haiti, Nicaragua, Sudan, Honduras, or Nepal, then you should not file either application again. If your pending Form I–821 is approved, you will be issued Forms I–797 and I–94 through December 31, 2022. Similarly, if you have a pending TPS-related Form

I–765 that is approved, your new EAD will be valid through December 31, 2022. Your TPS itself continues as long as the preliminary injunction impacting your country's TPS designation remains in effect and in accordance with any relevant future **Federal Register** notices that DHS may issue respecting your country's TPS designation, or until your TPS is finally withdrawn for individual ineligibility under INA section 244(c), or the applicable TPS designation is terminated as discussed in the ''Possible Future Action'' section of this **Federal Register** notice.

*Can my employer require that I provide any other documentation to prove my status, such as proof of my citizenship from El Salvador, Haiti, Nicaragua, Sudan, Honduras, or Nepal?*

No. When completing Form I–9, including reverifying employment authorization, employers must accept any documentation that appears on the Form I–9 Lists of Acceptable Documents that reasonably appears to be genuine and that relates to you, or an acceptable List A, List B, or List C receipt. Employers need not reverify List B identity documents. Therefore, employers may not request proof of citizenship or proof of re-registration for TPS when completing Form I–9 for new hires or reverifying the employment authorization of current employees. If you present an EAD that has been automatically extended, employers should accept it as a valid List A document, so long as the EAD reasonably appears to be genuine and relates to the employee. Refer to the ''Note to Employees'' section of this **Federal Register** notice for important

information about your rights if your employer rejects lawful documentation, requires additional documentation, or otherwise discriminates against you based on your citizenship or immigration status, or your national origin.

*How do my employer and I complete Form I–9 using my automatically extended employment authorization for a new job?*

See Table 4 in the question "When hired, what documentation may I show to my employer as evidence of employment authorization and identity when completing Form I–9?" to determine if your EAD has been automatically extended.

1. For Section 1, you should:
a. Check "An alien authorized to work until" and enter December 31, 2022, as the expiration date; and
b. Enter your USCIS number or A-Number where indicated. (Your EAD or other document from DHS will have your USCIS number or A-Number printed on it; the USCIS number is the same as your A-Number without the A prefix).

2. For Section 2, employers should:
a. Determine if your EAD has been automatically extended by using Table 4 in the question "When hired, what documentation may I show to my employer as evidence of employment authorization and identity when completing Form I–9?"
b. Write in the document title;
c. Enter the issuing authority;
d. Provide the document number; and
e. Write December 31, 2022, as the expiration date.

On or before the start of work on January 1, 2023, employers must reverify the employee's employment authorization in Section 3 of Form I–9.

*What updates should my current employer make to Form I–9 if my employment authorization has been automatically extended?*

If you presented a TPS-related EAD that was valid when you first started your job and your EAD has now been automatically extended, your employer may need to re-inspect your current EAD if they do not have a copy of the EAD on file. See Table 4 in the question "When hired, what documentation may I show to my employer as evidence of employment authorization and identity when completing Form I–9?" to determine if your EAD has been automatically extended.

If your employer determines that your EAD has been automatically extended, your employer should update Section 2 of your previously completed Form I–9 as follows:

a. Write EAD EXT and December 31, 2022, as the last day of the automatic extension in the Additional Information field; and
b. Initial and date the correction.

**Note:** This is not considered a reverification. Employers should not complete Section 3 until either this notice's automatic extension of EADs has ended, or the employee presents a new document to show continued employment authorization, whichever is sooner. By January 1, 2023, when the employee's automatically extended EAD has expired, employers are required by law to reverify the employee's employment authorization in Section 3.

*If I am an employer enrolled in E-Verify, how do I verify a new employee whose EAD has been automatically extended?*

Employers may create a case in E-Verify for a new employee by entering the number from the Document Number field on Form I–9 into the document number field in E-Verify. Employers should enter December 31, 2022, as the expiration date for EADs that have been automatically extended under this **Federal Register** notice.

*If I am an employer enrolled in E-Verify, what do I do when I receive a "Work Authorization Documents Expiration" alert for an automatically extended EAD?*

E-Verify has automated the verification process for TPS-related EADs that are automatically extended. If you have employees who provided a TPS-related EAD when they first started working for you, you will receive a "Work Authorization Documents Expiring" case alert when the auto-extension period for this EAD is about to expire. On or before this employee starts work on January 1, 2023, you must reverify his or her employment authorization in Section 3 of Form I–9. Employers may not use E-Verify for reverification.

*If I already have TPS for Haiti, do I need to apply under the new TPS designation for Haiti?*

TPS beneficiaries under the Haiti designation whose TPS has been continued pursuant to court orders, and as described in this notice, are strongly encouraged to apply for TPS before the close of the registration period on Feb. 3, 2023, following the instructions in the August 3, 2021 **Federal Register** notice regarding the new Designation of Haiti for Temporary Protected Status at 86 FR 41863. Eligible individuals are strongly encouraged to apply at the earliest practicable date, to ensure that their TPS continues beyond the court-ordered extensions and without any gaps in status. Eligible individuals who do not register for the new TPS designation during the registration period may be prohibited from filing a late initial registration during any subsequent extension of the designation if they do not meet certain conditions. See 8 CFR 244.2(f)(2).

If you are found eligible for TPS under the new Haiti designation, your TPS will continue through February 3, 2023, even if the current court orders in *Ramos* and *Saget* that continue TPS are no longer in effect.

**Note to All Employers**

Employers are reminded that the laws requiring proper employment eligibility verification and prohibiting unfair immigration-related employment practices remain in full force. This **Federal Register** notice does not supersede or in any way limit applicable employment verification rules and policy guidance, including those rules setting forth reverification requirements. For general questions about the employment eligibility verification process, employers may call USCIS at 888–464–4218 (TTY 877–875–6028) or email USCIS at *I9Central@ uscis.dhs.gov*. USCIS accepts calls and emails in English and many other languages. For questions about avoiding discrimination during the employment eligibility verification process (Form I–9 and E-Verify), employers may call the U.S. Department of Justice's Civil Rights Division, Immigrant and Employee Rights Section (IER) Employer Hotline at 800–255–8155 (TTY 800–237–2515). IER offers language interpretation in numerous languages. Employers may also email IER at *IER@usdoj.gov*.

**Note to Employees**

For general questions about the employment eligibility verification process, employees may call USCIS at 888–897–7781 (TTY 877–875–6028) or email USCIS at *I-9Central@ uscis.dhs.gov*. USCIS accepts calls in English, Spanish, and many other languages. Employees or applicants may also call the IER Worker Hotline at 800–255–7688 (TTY 800–237–2515) for information regarding employment discrimination based upon citizenship, immigration status, or national origin, including discrimination related to Form I–9 and E-Verify. The IER Worker Hotline provides language interpretation in numerous languages.

To comply with the law, employers must accept any document or combination of documents from the Lists of Acceptable Documents if the documentation reasonably appears to be genuine and to relate to the employee,

or an acceptable List A, List B, or List C receipt as described in the Form I–9 instructions. Employers may not require extra or additional documentation beyond what is required for Form I–9 completion. Further, employers participating in E-Verify who receive an E-Verify case result of ''Tentative Nonconfirmation'' (TNC) must promptly inform employees of the TNC and give such employees an opportunity to contest the TNC. A TNC case result means that the information entered into E-Verify from an employee's Form I–9 differs from records available to DHS.

Employers may not terminate, suspend, delay training, withhold or lower pay, or take any other adverse action against an employee because of the TNC while the case is still pending with E-Verify. A Final Nonconfirmation (FNC) case result is received when E-Verify cannot verify an employee's employment eligibility. An employer may terminate employment based on a case result of FNC. Work-authorized employees who receive an FNC may call USCIS for assistance at 888–897–7781 (TTY 877–875–6028). For more information about E-Verify-related discrimination or to report an employer for discrimination in the E-Verify process based on citizenship, immigration status, or national origin, contact IER's Worker Hotline at 800–255–7688 (TTY 800–237–2515). Additional information about proper nondiscriminatory Form I–9 and E-Verify procedures is available on the IER website at *www.justice.gov/ier* and on the USCIS and E-Verify websites at *www.uscis.gov/i-9-central* and *www.e-verify.gov.*

**Note Regarding Federal, State, and Local Government Agencies (Such as Departments of Motor Vehicles)**

For Federal purposes, TPS beneficiaries presenting an automatically extended EAD as referenced in this **Federal Register** notice do not need to show any other document, such as an I–797C Notice of Action receipt notice or this **Federal Register** notice, to prove that they qualify for this extension. However, while federal government agencies must follow the guidelines laid out by the federal government, state and local government agencies establish their own rules and guidelines when granting certain benefits. Each state may have different laws, requirements, and determinations about what documents you need to provide to prove eligibility for certain benefits. Whether you are applying for a federal, state, or local government benefit, you may need to provide the government agency with

documents that show you are a TPS beneficiary, show you are authorized to work based on TPS or other status, and/or that may be used by DHS to determine whether you have TPS or other immigration status. Examples of such documents are:

• Your current EAD;

• Your automatically extended EAD with a TPS category code of A–12 or C–19 and an expiration date shown in Table 3 in the question ''Am I eligible to receive an automatic extension of my current EAD using this **Federal Register** notice?''; or

• Your Form I–94, Arrival/Departure Record or I–797 as shown in Table 2.

Check with the government agency regarding which document(s) the agency will accept.

Some benefit-granting agencies use the USCIS Systematic Alien Verification for Entitlements Program (SAVE) program to confirm the current immigration status of applicants for public benefits. While SAVE can verify when an individual has TPS, each agency's procedures govern whether they will accept an unexpired EAD, Form I–797, or Form I–94, Arrival/Departure Record. If an agency accepts the type of TPS-related document you are presenting, such as an EAD, the agency should accept your automatically extended TPS-related document, regardless of your country of birth. It may assist the agency if you:

a. Present the agency with a copy of this **Federal Register** notice showing the extension of TPS-related documentation, in addition to your most recent TPS-related document with your A-Number, USCIS number or Form I–94 number;

b. Explain that SAVE will be able to verify the continuation of your TPS using this information; and

c. Ask the agency to initiate a SAVE query with your information and follow through with additional verification steps, if necessary, to receive a final SAVE response verifying your TPS and TPS-related benefits.

You can also ask the agency to look for SAVE notices or contact SAVE if they have any questions about your immigration status or automatic extension of TPS-related documentation. In most cases, SAVE provides an automated electronic response to benefit-granting agencies within seconds, but, occasionally, verification can be delayed.

You can check the status of your SAVE verification by using CaseCheck at *save.uscis.gov/casecheck/*. CaseCheck is a free service that lets you follow the progress of your SAVE verification case

using your date of birth and one immigration identifier number (A-Number, USCIS number, or Form I–94 number) or Verification Case Number). If an agency has denied your application based solely or in part on a SAVE response, the agency must offer you the opportunity to appeal the decision in accordance with the agency's procedures. If the agency has received and acted upon or will act upon a SAVE verification case and you do not believe the SAVE response is correct, the SAVE website, *http://www.uscis.gov/save, has* information on how to correct or update your immigration record, make an appointment, or submit a written request to correct records.

[FR Doc. 2021–19617 Filed 9–9–21; 8:45 am]

**BILLING CODE 9111–97–P**

---

## DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT

**[Docket No. FR–6276–N–01]**

## Rental Assistance Demonstration: Post-Conversion Replacement of Units Under a PBV Housing Assistance Payment Contract

**AGENCY:** Office of the Assistant Secretary for Housing-Federal Housing Commissioner and Office of the Assistant Secretary for Public and Indian Housing, HUD.

**ACTION:** Notice.

**SUMMARY:** This notice establishes the process by which assisted units under a Project Based Voucher (PBV) Section 8 Housing Assistance Payment (HAP) contract originally executed through a conversion under the Rental Assistance Demonstration (RAD) can be replaced in the event that the original units would be unavailable for occupancy due to a proposed demolition and reconstruction of the units, as a result of natural disaster, or other causes.

**DATES:** This notice is effective on September 10, 2021.

**ADDRESSES:** Interested persons are invited to submit questions or comments electronically to *rad@hud.gov.*

**FOR FURTHER INFORMATION CONTACT:** To assure a timely response, please direct requests for further information electronically to the email address *rad@hud.gov.* Written requests may also be directed to the following address: Office of Housing—Office of Recapitalization, Department of Housing and Urban Development, 451 7th Street SW, Room 6230, Washington, DC 20410. The Office of Recapitalization phone number is (202) 708–0001.

The Council will meet in a closed session from 10:15 a.m. to 10:45 a.m. EST to participate in a sensitive discussion with DHS Senior Leadership regarding DHS operations. *Basis for Partial Closure:* In accordance with Section 10(d) of FACA, the Secretary of Homeland Security has determined this meeting must be closed during this session as the disclosure of information relayed would be detrimental to the public interest for the following reasons: The Council will participate in a sensitive operational discussion containing For Official Use Only and Law Enforcement Sensitive information. This discussion will include information regarding threats facing the United States and how DHS plans to address those threats. The session is closed pursuant to 5 U.S.C. 552b(c)(9)(B) because the disclosure of this information could significantly frustrate implementation of proposed agency actions.

Dated: November 9, 2022.

**Michael J. Miron,**
*Committee Management Officer, Department of Homeland Security.*

[FR Doc. 2022–24873 Filed 11–15–22; 8:45 am]

**BILLING CODE 9112–FN–P**

## DEPARTMENT OF HOMELAND SECURITY

### U.S. Citizenship and Immigration Services

**[CIS No. 2728–22; DHS Docket No. USCIS–2019–0020]**

**RIN 1615–ZB83**

### Continuation of Documentation for Beneficiaries of Temporary Protected Status Designations for El Salvador, Haiti, Nicaragua, Sudan, Honduras, and Nepal

**AGENCY:** U.S. Citizenship and Immigration Services, Department of Homeland Security.

**ACTION:** Notice of continuation of Temporary Protected Status and related documentation for certain TPS beneficiaries.

**SUMMARY:** Through this notice, the U.S. Department of Homeland Security (DHS) announces actions to ensure its continued compliance with the preliminary injunction order of the U.S. District Court for the Northern District of California in *Ramos, et al.* v. *Nielsen, et al.,* No. 18–cv–01554 (N.D. Cal. October 3, 2018) ("*Ramos*") and with the order of the U.S. District Court for the Northern District of California to stay proceedings in *Bhattarai* v. *Nielsen,*

No. 19–cv–00731 (N.D. Cal. March 12, 2019) ("*Bhattarai*"). Beneficiaries under the existing Temporary Protected Status (TPS) designations for El Salvador, Nicaragua, Honduras, and Nepal, the 2011 designation of Haiti, and the 2013 designation of Sudan will retain their TPS while the preliminary injunction in *Ramos* and the *Bhattarai* orders remain in effect, provided that their TPS is not withdrawn because of individual ineligibility. They may also apply under the more recent designations of Haiti and Sudan in 2021 and 2022, respectively, and if granted, will retain TPS in accordance with their grants regardless of any potential end to the *Ramos* injunction. Other individuals who have been newly granted TPS under the 2021 designation of Haiti and the 2022 designation of Sudan, but who did not have TPS at the time of those designations, are not covered by this litigation compliance notice. Their TPS grants remain valid in accordance with their individual notices of approval from USCIS. This notice further provides information on the automatic extension of the validity of TPS-related Employment Authorization Documents (EADs); Notices of Action (Forms I–797); and Arrival/Departure Records (Forms I–94), (collectively "TPS-related documentation") for those beneficiaries under the TPS designations for El Salvador, Haiti, Nicaragua, Sudan, Honduras, and Nepal.

**DATES:** DHS is automatically extending the validity of certain TPS-related documentation for beneficiaries under the TPS designations for El Salvador, Haiti, Nicaragua, Sudan, Honduras, and Nepal through June 30, 2024, from the current expiration date of December 31, 2022.

**FOR FURTHER INFORMATION CONTACT:** You may contact Rená Cutlip-Mason, Chief, Humanitarian Affairs Division, Office of Policy and Strategy, U.S. Citizenship and Immigration Services, Department of Homeland Security, by mail at 5900 Capital Gateway Drive, Camp Springs, MD 20746, or by phone at 800–375–5283.

For further information on TPS, please visit the USCIS TPS web page at *https://www.uscis.gov/tps.*

If you have additional questions about TPS, please visit *https://uscis.gov/tools.* Our online virtual assistant, Emma, can answer many of your questions and point you to additional information on our website. If you are unable to find your answers there, you may also call our U.S. Citizenship and Immigration Services (USCIS) Contact Center at 800–375–5283 (TTY 800–767–1833).

Applicants seeking information about the status of their individual cases may check Case Status Online, available on the USCIS website at *https://www.uscis.gov,* or visit the USCIS Contact Center at *https://uscis.gov/contactcenter.*

Further information will also be available at local USCIS offices upon publication of this notice.

**SUPPLEMENTARY INFORMATION:**

**Table of Abbreviations**

BIA—Board of Immigration Appeals
CFR—Code of Federal Regulations
DHS—U.S. Department of Homeland Security
EAD—Employment Authorization Document
EOIR—Executive Office for Immigration Review
FNC—Final Nonconfirmation
Form I–765—Application for Employment Authorization
Form I–797—Notice of Action (Approval Notice)
Form I–821—Application for Temporary Protected Status
Form I–9—Employment Eligibility Verification
Form I–912—Request for Fee Waiver
Form I–94—Arrival/Departure Record
FR—Federal Register
Government—U.S. Government
IER—U.S. Department of Justice, Civil Rights Division, Immigrant and Employee Rights Section
IJ—Immigration Judge
INA—Immigration and Nationality Act
SAVE—USCIS Systematic Alien Verification for Entitlements Program
Secretary—Secretary of Homeland Security
TPS—Temporary Protected Status
TTY—Text Telephone
USCIS—U.S. Citizenship and Immigration Services
U.S.C.—United States Code

**Background on TPS**

• TPS is a temporary immigration status granted to eligible nationals of a foreign state designated for TPS under the Immigration and Nationality Act (INA) or to eligible persons without nationality who last habitually resided in the designated foreign state, regardless of their country of birth.
• During the TPS designation period, TPS beneficiaries are eligible to remain in the United States, may not be removed, and are authorized to work as long as they continue to have TPS. They may apply for and receive EADs as evidence of employment authorization.
• TPS beneficiaries may also apply for and be granted travel authorization as a matter of discretion.
• To qualify for TPS, beneficiaries must meet the eligibility standards at

INA section 244(c)(1)–(2), 8 U.S.C. 1254a(c)(1)–(2).

• When the Secretary terminates a foreign state's TPS designation, beneficiaries return to one of the following:

○ The same immigration status or category that they maintained before TPS, if any (unless that status or category has since expired or been terminated); or

○ Any other lawfully obtained immigration status or category they received while registered for TPS, as long as it is still valid on the date TPS terminates.

**Purpose of This Action**

This notice ensures DHS's continued compliance with various court orders issued by the federal district courts in the *Ramos and Bhattarai* lawsuits that require DHS to maintain the TPS designations for El Salvador, Haiti, Sudan, Nicaragua, Honduras, and Nepal, as well as the TPS and TPS-related documentation for eligible affected beneficiaries.[1] The U.S. Court of Appeals for the Ninth Circuit vacated the district court's preliminary injunction in *Ramos* on September 14, 2020, holding that the decision to designate, extend, or terminate TPS is not subject to judicial review. However, the appellate order is not currently effective because the Ninth Circuit has not issued any directive to carry out the order to the federal district court.[2] Therefore, the *Ramos* preliminary injunction remains in effect. In addition, the order of the district court in *Bhattarai* staying proceedings and approving the parties' stipulated

agreement to continue TPS and TPS-related documentation for eligible beneficiaries from Nepal and Honduras remains in effect. Affected TPS beneficiaries from the six countries will retain their status, provided they continue to meet all the individual requirements for TPS eligibility described in INA section 244(c) and 8 CFR 244. As necessary, DHS will publish future information in the **Federal Register** to ensure its compliance with any relevant court orders that may be issued after the date of this notice.

DHS initially published notices to ensure its compliance with the *Ramos* preliminary injunction on October 31, 2018 and March 1, 2019, and the *Bhattarai* order to stay proceedings on May 10, 2019. *See* 83 FR 54764; 84 FR 7103; and 84 FR 20647. The Department later published a notice to ensure its continued compliance with the combined orders in *Ramos, Bhattarai,* and *Saget*[3] on November 4, 2019. That notice automatically extended certain TPS and TPS-related documentation through January 4, 2021 for all eligible TPS beneficiaries covered by the courts' orders. *See* 84 FR 59403. The Department last published a notice to ensure its continued compliance with these combined court orders on September 10, 2021. That notice again automatically extended certain TPS and TPS-related documentation through December 31, 2022 for all eligible TPS beneficiaries covered by the courts' orders. *See* 86 FR 50725. Through this **Federal Register** notice, DHS announces actions to ensure its continued compliance with the district court orders in *Ramos* and *Bhattarai* while those orders remain in effect.

The TPS designations for El Salvador and Nicaragua, and the 2011 designation of Haiti and the 2013 designation of Sudan will remain in effect, as required by the *Ramos* district court order, so long as the preliminary injunction remains in effect. The TPS designations for Honduras and Nepal will remain in effect so long as the *Bhattarai* order staying proceedings and approving the parties' stipulated agreements continues in effect. Affected TPS beneficiaries under the TPS designations for El Salvador, Haiti, Nicaragua, Sudan, Honduras, and Nepal will retain their TPS and their TPS-related documentation will continue to be valid in accordance with the specific orders that affect the TPS designations

regarding their individual countries, provided that the affected beneficiaries continue to meet all the individual requirements for TPS. *See* INA section 244(c)(3). *See also* 8 CFR 244.14. DHS will not terminate TPS for any of the affected countries pending final disposition of the *Ramos* appeal, including through any additional appellate channels in which relief may be sought, or by other orders of the court. Following consideration of current country conditions, the Secretary has newly designated Haiti and Sudan for TPS for 18 months, allowing eligible individuals covered by the *Ramos* and *Saget* injunctions as well as other eligible individuals to register for and maintain TPS from February 3, 2023 and October 19, 2023, respectively.

On August 3, 2021, DHS issued a **Federal Register** Notice implementing the new designation of Haiti for TPS, and on April 19, 2022, DHS issued a **Federal Register** Notice implementing the new designation of Sudan for TPS. In order to secure TPS pursuant to the new Haiti and Sudan designations, eligible individuals must apply before the close of the registration periods on February 3, 2023 and October 19, 2023, respectively. Eligible individuals are strongly encouraged to apply at the earliest practicable date, to ensure that their TPS continues without any gaps in the event that the *Ramos* and *Bhattarai* court orders cease to be effective. *See* Designation of Haiti for Temporary Protected Status, 86 FR 41863 (August 3, 2021) and Designation of Sudan for Temporary Protected Status, 87 FR 23202 (April 19, 2022).

DHS is further announcing it is automatically extending, through June 30, 2024, the validity of certain TPS-related documentation, as specified in this notice, for beneficiaries under the TPS designations for El Salvador, Haiti, Nicaragua, Sudan, Honduras, and Nepal provided that the affected beneficiaries remain individually eligible for TPS.

**Automatic Extension of EADs Issued Under the TPS Designations for El Salvador, Haiti, Nicaragua, Sudan, Honduras, and Nepal**

Through this **Federal Register** notice, DHS automatically extends the validity of EADs listed in Table 1 below issued to beneficiaries under the TPS designations for El Salvador, Haiti, Nicaragua, Sudan, Honduras, and Nepal. Such beneficiaries may show their EADs to employers to demonstrate they have employment authorization and may choose also to show employers this **Federal Register** notice to explain that their TPS-Related Documentation

---

[1] *See Ramos, et al.* v. *Nielsen, et al.*, No. 18–cv–01554 (N.D. Cal. Oct. 3, 2018) (district court granted preliminary injunction against terminations of TPS for El Salvador, Haiti, Sudan, and Nicaragua) ("*Ramos*"); and *Bhattarai, et al.* v. *Nielsen, et al.*, No. 19–cv–00731 (N.D. Cal. March 12, 2019) (district court stayed proceedings until *Ramos* appeal decided and approved parties' stipulation for continued TPS and issuance of TPS-related documentation to eligible, affected beneficiaries of TPS for Honduras and Nepal during the stay and pendency of the appeal) ("*Bhattarai*"). In 2019, the federal district court for the Eastern District of New York had also enjoined the termination of the 2011 TPS designation for Haiti in *Saget, et al.*, v. *Trump, et al.*, No. 18–cv–1599 (E.D.N.Y. April 11, 2019) ("*Saget*"), and DHS had cited to that order in previous notices continuing the affected beneficiaries' TPS and documentation. *See, e.g.,* 86 FR 50725, 50726 (Sept. 10, 2021). However, the *Saget* case was dismissed upon the court's approval of the parties' joint Stipulation of Dismissal for mootness following the Secretary's new 18-month designation of Haiti for TPS on Aug. 3, 2021, and DHS' continuation of existing beneficiaries' TPS and related documentation under the *Ramos* injunction through Dec. 31, 2022. *See id.,* Order approving Stipulation of Dismissal, dated Oct. 15, 2021.

[2] *See Ramos, et al.,* v. *Wolf, et al.*, No. 18–16981 (9th Cir., Sept. 14, 2020).

[3] As noted, on Oct. 15, 2021, the parties in *Saget* v. *Trump,* entered into a Stipulation of Dismissal as the case was rendered moot due to the Aug. 3, 2021, FRN implementing the new Haiti designation. *See* 86 FR 41863.

has been automatically extended through June 30, 2024. This notice explains how TPS beneficiaries, their employers, and benefit-granting agencies may determine which EADs are automatically extended and how this affects the Form I–9, Employment Eligibility Verification; E-Verify; and USCIS Systematic Alien Verification for Entitlements (SAVE) processes. Additionally, a beneficiary under the TPS designation for any of these countries who has applied for a new EAD but who has not yet received their new EAD is covered by this automatic extension, provided that the EAD he or she possesses contains one of the expiration dates listed in Table 1 below.

#### TABLE 1—AFFECTED EADS

| If an EAD has a category code of A–12 or C–19 and an expiration date of: | Then the validity of the EAD is extended through: |
|---|---|
| 07/22/2017 ...................... | 06/30/2024 |
| 11/02/2017 ...................... | 06/30/2024 |
| 01/05/2018 ...................... | 06/30/2024 |

#### TABLE 1—AFFECTED EADS— Continued

| If an EAD has a category code of A–12 or C–19 and an expiration date of: | Then the validity of the EAD is extended through: |
|---|---|
| 01/22/2018 ...................... | 06/30/2024 |
| 03/09/2018 ...................... | 06/30/2024 |
| 06/24/2018 ...................... | 06/30/2024 |
| 07/05/2018 ...................... | 06/30/2024 |
| 11/02/2018 ...................... | 06/30/2024 |
| 01/05/2019 ...................... | 06/30/2024 |
| 04/02/2019 ...................... | 06/30/2024 |
| 06/24/2019 ...................... | 06/30/2024 |
| 07/22/2019 ...................... | 06/30/2024 |
| 09/09/2019 ...................... | 06/30/2024 |
| 01/02/2020 ...................... | 06/30/2024 |
| 01/05/2020 ...................... | 06/30/2024 |
| 03/24/2020 ...................... | 06/30/2024 |
| 01/04/2021 ...................... | 06/30/2024 |
| 10/04/2021 ...................... | 06/30/2024 |
| 12/31/2022 ...................... | 06/30/2024 |

**Automatic Extension of Forms I–94 and Forms I–797**

Also through this **Federal Register** notice, DHS automatically extends the validity periods of the Forms I–94 and Forms I–797 listed in Table 2 below previously issued to beneficiaries under the TPS designations for El Salvador, Haiti, Nicaragua, Sudan, Honduras, and Nepal. These extensions apply only if the TPS beneficiary properly filed for re-registration during either the most recent DHS-announced registration period for their country,[4] or any applicable previous DHS-announced re-registration periods for the beneficiary's country,[5] or has a re-registration application that remains pending. This notice does not extend the validity periods of Forms I–94 or Forms I–797 for any TPS beneficiary who failed to file for TPS re-registration during one of the applicable previous DHS-announced re-registration periods, or for whom a re-registration request has been denied. In addition, the extensions do not apply for any beneficiary from whom TPS has been withdrawn.

#### TABLE 2—AFFECTED FORMS I–94 AND I–797 [6]

| Country | Beginning date of validity: | End date of validity: | Validity of Forms I–94 and I–797 extended through: |
|---|---|---|---|
| El Salvador ........................ | Sept. 10, 2016 ...................... | March 9, 2018 ...................... | 06/30/2024 |
|  | March 10, 2018 ...................... | Sept. 9, 2019 ...................... | 06/30/2024 |
|  | Sept. 10, 2019 ...................... | Oct. 4, 2021 ...................... | 06/30/2024 |
|  | Oct. 5, 2021 ...................... | Dec. 31, 2022 ...................... | 06/30/2024 |
| Haiti ........................ | Jan. 23, 2016 ...................... | July 22, 2017 ...................... | 06/30/2024 |
|  | July 23, 2017 ...................... | Jan. 22, 2018 ...................... | 06/30/2024 |
|  | Jan. 23, 2018 ...................... | July 22, 2019 ...................... | 06/30/2024 |
|  | July 23, 2019 ...................... | Oct. 4, 2021 ...................... | 06/30/2024 |
|  | Oct. 5, 2021 ...................... | Dec. 31, 2022 ...................... | 06/30/2024 |
| Honduras ........................ | July 6, 2016 ...................... | Jan. 5, 2018 ...................... | 06/30/2024 |
|  | Jan. 6, 2018 ...................... | July 5, 2018 ...................... | 06/30/2024 |
|  | July 6, 2018 ...................... | Jan. 5, 2020 ...................... | 06/30/2024 |
|  | Jan. 6, 2020 ...................... | Oct. 4, 2021 ...................... | 06/30/2024 |
|  | Oct. 5, 2021 ...................... | Dec. 31, 2022 ...................... | 06/30/2024 |
| Nepal ........................ | Dec. 25, 2016 ...................... | June 24, 2018 ...................... | 06/30/2024 |
|  | June 25, 2018 ...................... | June 24, 2019 ...................... | 06/30/2024 |
|  | June 25, 2019 ...................... | Oct. 4, 2021 ...................... | 06/30/2024 |
|  | Oct. 5, 2021 ...................... | Dec. 31, 2022 ...................... | 06/30/2024 |
| Nicaragua ........................ | July 6, 2016 ...................... | Jan. 5, 2018 ...................... | 06/30/2024 |
|  | Jan. 6, 2018 ...................... | Jan. 5, 2019 ...................... | 06/30/2024 |
|  | Jan. 6, 2019 ...................... | Oct. 4, 2021 ...................... | 06/30/2024 |
|  | Oct. 5, 2021 ...................... | Dec. 31, 2022 ...................... | 06/30/2024 |
| Sudan ........................ | May 3, 2016 ...................... | Nov. 2, 2017 ...................... | 06/30/2024 |
|  | Nov. 3, 2017 ...................... | Nov. 2, 2018 ...................... | 06/30/2024 |
|  | Nov. 3, 2018 ...................... | Oct. 4, 2021 ...................... | 06/30/2024 |
|  | Oct. 5, 2021 ...................... | Dec. 31, 2022 ...................... | 06/30/2024 |

---

[4] DHS issued a new designation period for Haiti TPS on Aug. 3, 2021 and Sudan TPS on Apr. 19, 2022. The registration periods end on Feb. 3, 2023 and Oct. 19, 2023, respectively.

[5] El Salvador: July 8–Sept. 6, 2016, or Jan. 18–March 19, 2018;

Haiti: Aug. 25–Oct. 26, 2015, May 24–July 24, 2017, or Jan. 18–March 19, 2018;

Honduras: May 16–July 16, 2016; Dec. 15, 2017–Feb. 13, 2018 or June 5–Aug. 6, 2018;

Nepal: Oct. 26–Dec. 27, 2016 or May 22–July 23, 2018;

Nicaragua: May 16–July 15, 2016 or Dec. 15, 2017–Feb. 13, 2018;

Sudan: Jan. 25–March 25, 2016 or Oct. 11, 2017–Dec. 11, 2017.

[6] Your Forms I–94 and I–797 may show a different beginning date of validity than those listed here if you were a late initial filer (LIF) at the time because the forms would have the date of approval of your LIF application for TPS. As long as they bear an end date of validity listed in this chart, then they are automatically extended by this Notice.

**68720** **Federal Register** / Vol. 87, No. 220 / Wednesday, November 16, 2022 / Notices

## Application Procedures

Current beneficiaries covered by the court orders that continue the TPS designations for El Salvador, Haiti, Honduras, Nepal, Nicaragua, and Sudan do not need to pay a fee or file any application, including Application for Employment Authorization (Form I–765), to maintain their TPS benefits through June 30, 2024 under this notice, provided that they have properly re-registered for TPS during either the most recent DHS-announced registration period for their country,[7] or any applicable previous re-registration period described in Footnote 5. In the case of TPS beneficiaries under the prior Haiti and Sudan designations, re-registering under the applicable previous re-registration period in Footnote 5 is sufficient to qualify for the extension in this notice.

Although there is no need to pay a fee or file an application to qualify for this extension, in order to secure TPS pursuant to the new Haiti or Sudan designations, eligible individuals must apply before the close of the registration period on February 3, 2023 under the new Haiti designation and October 19, 2023 under the new Sudan designation. Eligible individuals for the new TPS Haiti or Sudan designations are strongly encouraged to apply at the earliest practicable date, to ensure that their TPS continues beyond the court-ordered extensions and without any gaps in status.

TPS beneficiaries who have failed to re-register properly for TPS during any of these re-registration periods may still file an Application for Temporary Protected Status (Form I–821) but must demonstrate ''good cause'' for failing to re-register on time, as required by law. *See* INA section 244(c)(3)(C) (TPS beneficiary's failure to register without good cause in form and manner specified by DHS is a ground for TPS withdrawal); 8 CFR 244.17(b) and Form I–821 instructions.[8]

Any currently eligible beneficiary who does not presently have a pending EAD application under the TPS designations for El Salvador, Haiti, Nicaragua, Sudan, Honduras or Nepal may file Form I–765 with the appropriate fee or a fee waiver request in order to obtain a new EAD with a printed expiration date of June 30, 2024. However, applicants under the Haiti 2021 and Sudan 2022 new TPS designations may also file Form I–821 for TPS and, if eligible, receive an EAD with a printed expiration date that correlates with those new designations.

## Possible Future Actions

In order to comply with statutory requirements for TPS while the district courts' orders or any superseding court orders concerning the beneficiaries under the TPS designations for El Salvador, Haiti, Nicaragua, Sudan, Honduras, and Nepal remain in effect, DHS may require these beneficiaries to re-register and will announce the re-registration procedures in a future **Federal Register** notice. DHS has the authority to conduct TPS re-registration in accordance with INA section 244(c)(3)(C) and 8 CFR 244.17. Through the re-registration process, which is generally conducted every 12 to 18 months while a foreign state is designated for TPS, USCIS determines whether each TPS beneficiary is continuing to maintain individual eligibility for TPS, including but not limited to, the requirements related to disqualifying criminal or security issues. *See* id.; INA section 244(c)(2); 8 CFR 244.2, 244.3, and 244.4 (describing individual TPS eligibility requirements, including mandatory criminal and security bars).

The Secretary has already newly designated Haiti for TPS for 18 months through February 3, 2023. *See* 86 FR 41863. Eligible Haitian nationals (and individuals having no nationality who last habitually resided in Haiti) who wish to receive or continue their existing TPS through that date are encouraged to submit their applications for TPS by following the instructions in the **Federal Register** notice, Designation of Haiti for Temporary Protected Status, at 86 FR 41863. Failure to submit an application under the new designation of Haiti, however, does not affect the continuation of the validity of TPS and TPS documents through June 30, 2024 as described in this notice.

Similarly, the Secretary has already newly designated Sudan for TPS for 18 months through October 19, 2023. *See* 87 FR 23202. Eligible Sudanese nationals (and individuals having no nationality who last habitually resided in Sudan) who wish to receive or continue their existing TPS through that date are encouraged to submit their applications for TPS by following the instructions in the **Federal Register** notice, Designation of Sudan for Temporary Protected Status, at 87 FR 23202. Failure to submit an application under the new designation of Sudan, however, does not affect the continuation of the validity of TPS and TPS documents through June 30, 2024 as described in this notice.

The Government appealed both the *Ramos* and *Saget* preliminary injunctions. A three-judge panel of the U.S. Court of Appeals for the Ninth Circuit ruled for the Government and vacated the *Ramos* preliminary injunction on September 14, 2020. However the preliminary injunction remains in effect because the appellate court has not issued its directive (*i.e.,* the mandate) to the district court to implement the panel's decision. The plaintiffs have filed a request for a hearing *en banc* which is pending. The *Saget* case was dismissed as a result of the new TPS designation for Haiti on October 15, 2021.[9]

Should the Government ultimately prevail in its challenge to the *Ramos* preliminary injunction and absent any further change with respect to TPS designations for El Salvador, Nicaragua, Honduras, or Nepal, the Secretary's determination to terminate TPS for any of those countries will take effect no earlier than 365 days from the issuance of any appellate mandate to the district court or upon the expiration of this **Federal Register** notice's extension of TPS-related documents on June 30, 2024, whichever is later.[10]

---

[7] DHS issued a new designation period for Haiti TPS on Aug. 3, 2021 and Sudan TPS on Apr. 19, 2022. The registration periods end on Feb. 3, 2023 and Oct. 19, 2023, respectively.

[8] An applicant for TPS Haiti who applies under the procedures announced in the Notice regarding the new TPS designation of Haiti at 86 FR 41863 (Aug. 3, 2021) is an initial applicant and does not have to demonstrate ''good cause'' for failing to re-register under prior TPS Haiti designations. Similarly, an applicant for TPS Sudan who applies under the procedures announced in the Notice regarding the new TPS designation of Sudan at 87 FR 23202 (April 19, 2022) is an initial applicant and does not have to demonstrate ''good cause'' for failing to re-register under prior TPS Sudan designations.

[9] Order Approving Stipulation of Dismissal, dated Oct. 15, 2021 in *Saget* (cited previously).

[10] The most recent litigation compliance **Federal Register** notice stated that, absent any further change in the TPS designation of El Salvador, the termination of the TPS designation for El Salvador would go into effect no earlier than 365 days after the issuance of any appellate court mandate. Absent any change in the TPS designations of Nicaragua, Honduras, Sudan, or Nepal, that notice further provided that such terminations would go into effect no earlier than 120 days after issuance of the appellate mandate. The notice also provided that, should the government move to vacate the *Bhattarai* order to stay proceedings in light of an appellate decision affirming the preliminary injunction in *Ramos* that suggests a basis on which to distinguish the determinations to terminate the TPS designations for Honduras and Nepal from the TPS terminations at issue in *Ramos,* TPS would remain in effect for Honduras and Nepal for at least 180 days following an order of the district court vacating the stay in proceedings. *See* 86 FR 50725, 50729 (Sept. 10, 2021). DHS has since determined that absent any further action with respect to TPS for Nicaragua, Honduras, or Nepal, it is appropriate to apply the same minimum post-mandate 365-day effective date provision to the terminations of the existing designations for those countries as for El Salvador. This decision remains consistent with the parties' court-approved stipulations for implementing the current district court orders in

The Secretary has announced new 18-month designations of Haiti and Sudan for TPS, which continue through February 3, 2023 and October 19, 2023, respectively. Application procedures for TPS under the new Haiti and Sudan designations, including for individuals who currently have TPS pursuant to the court orders, are provided in the notices published at 86 FR 41863 and 87 FR 23202.

**Additional Notes**

Nothing in this notice affects DHS's ongoing authority to determine on a case-by-case basis whether a TPS beneficiary continues to meet the eligibility requirements for TPS described in INA section 244(c) and the implementing regulations in part 244 of Title 8 of the Code of Federal Regulations.

**Notice of Compliance With the ''Order Enjoining the Implementation and Enforcement of Determinations To Terminate the TPS Designations for El Salvador, Haiti, Nicaragua, and Sudan'' in Ramos and the ''Order To Stay Proceedings and Agreement To Stay the Determinations To Terminate the TPS Designations for Honduras and Nepal'' in Bhattarai**

The previously announced determinations to terminate the existing designations of TPS for El Salvador and Nicaragua, and the 2011 designation of Haiti and the 2013 designation of Sudan [11] will not be implemented or enforced unless and until the district court's order in *Ramos* is reversed and that reversal becomes final. As required by the order to stay proceedings in *Bhattarai*, DHS will not implement or enforce the previously announced determinations to terminate the existing TPS designations for Honduras and Nepal [12] unless and until the district court's order in *Ramos* enjoining implementation and enforcement of the determinations to terminate the TPS

*Ramos* and *Bhattarai*. (As noted, the Secretary has newly designated Sudan as well as Haiti for TPS eliminating the need for this minimum effective date provision for the challenged TPS terminations for those countries.)

[11] *See* Termination of the Designation of El Salvador for Temporary Protected Status, 83 FR 2654 (Jan. 18, 2018); Termination of the Designation of Nicaragua for Temporary Protected Status, 82 FR 59636 (Dec. 15, 2017); Termination of the Designation of Sudan for Temporary Protected Status, 82 FR 47228 (Oct. 11, 2017); and Termination of the Designation of Haiti for Temporary Protected Status, 83 FR 2648 (Jan. 18, 2018).

[12] *See* Termination of the Designation of Honduras for Temporary Protected Status, 83 FR 26074 (June 5, 2018); Termination of the Designation of Nepal for Temporary Protected Status, 83 FR 23705 (May 22, 2018).

designations for El Salvador, Haiti, Nicaragua, and the 2011 designation of Haiti and the 2013 designation of Sudan is reversed and that reversal becomes final for some or all of the affected countries, or by other order of the court. Any termination of TPS-related documentation for beneficiaries under the TPS designations for El Salvador, Nicaragua, the 2011 designation of Haiti, the 2013 designation of Sudan, and the designations of Honduras, and Nepal will go into effect no earlier than either 365 days following the issuance of any mandate to the district court or June 30, 2024, whichever is later, as described in the ''Possible Future Action'' section of this **Federal Register** notice.

In further compliance with the still-valid district court orders, DHS is publishing this notice automatically extending the validity of the TPS-related documentation specified in the Supplementary Information section of this notice through June 30, 2024, for eligible beneficiaries under the TPS designations for El Salvador, Haiti, Nicaragua, Sudan, Honduras, and Nepal. DHS will issue future notices, as necessary, that will continue TPS-related documentation for all affected beneficiaries under the TPS designations for El Salvador, Nicaragua, Sudan, Haiti, Honduras, and Nepal, so long as the *Ramos* preliminary injunction and *Bhattarai* order to stay proceedings remain in place; for Haiti as long as the *Ramos* preliminary injunction remains in place; or by other order of the court. However, should compliance with the *Ramos and/or Bhattarai,* court orders remain necessary, DHS may announce periodic re-registration procedures for eligible TPS beneficiaries in accordance with the INA and DHS regulations. DHS further continues its commitment to a transition period, as described above.

All TPS beneficiaries must continue to maintain their TPS eligibility by meeting the requirements for TPS in INA section 244(c) and 8 CFR part 244. DHS will continue to adjudicate any pending TPS re-registration and pending late initial applications for affected beneficiaries under the TPS designations for El Salvador, Nicaragua, Honduras, and Nepal. Nationals of Haiti and Sudan (and individuals having no nationality who last habitually resided in Haiti or Sudan) are encouraged to apply under the new designations for Haiti and Sudan announced at 86 FR 41863 and 87 FR 23202. DHS will also continue to make appropriate individual TPS withdrawal decisions in accordance with existing procedures if

an individual no longer maintains TPS eligibility. DHS will take appropriate steps to continue its compliance with the orders, and with all statutory requirements.

Alejandro N. Mayorkas,

*Secretary, U.S. Department of Homeland Security.*

**Approved Documentation To Demonstrate Continuation of Lawful Status and TPS-Related Employment Authorization**

• Documentation automatically extended through this **Federal Register** notice dated November 16, 2022.

○ Certain TPS-related documentation, including EADs, of affected beneficiaries under the TPS designations for El Salvador, Haiti, Nicaragua, Sudan, Honduras, and Nepal, that are automatically extended through this **Federal Register** notice through June 30, 2024.

○ Regardless of their country of birth, a beneficiary granted TPS under the designation for El Salvador, Haiti, Nicaragua, Sudan, Honduras, or Nepal may show their EAD that has been automatically extended to their employer to demonstrate identity and continued TPS-related employment eligibility to meet Employment Eligibility Verification (Form I–9) requirements. In addition, a beneficiary granted TPS under a designation for one of these countries may also choose to show an employer this **Federal Register** notice, which explains that their EAD has been automatically extended.

○ As evidence of their lawful status, a TPS beneficiary may show their EAD that has been automatically extended, or Form I–94, or Form I–797, along with a copy of this **Federal Register** notice, to law enforcement, federal, state, and local government agencies, and private entities.

• Unexpired TPS-related EAD.

• Alternatively, a TPS beneficiary may choose to show other acceptable documents that are evidence of identity and employment eligibility as described in the instructions to Form I–9.

**Am I eligible to receive an automatic extension of my current EAD using this Federal Register notice?**

Yes. Regardless of your country of birth, provided that you currently have a TPS-related EAD with the specified expiration dates below, this notice automatically extends your EAD as stated in Table 3 below.

Table 3—Affected EADs

| If your EAD has category code of A–12 or C–19 and an expiration date of: | Then this **Federal Register** notice extends your EAD through: |
|---|---|
| 07/22/2017 | 06/30/2024 |
| 11/02/2017 | 06/30/2024 |
| 01/05/2018 | 06/30/2024 |
| 01/22/2018 | 06/30/2024 |
| 03/09/2018 | 06/30/2024 |
| 06/24/2018 | 06/30/2024 |
| 07/05/2018 | 06/30/2024 |
| 11/02/2018 | 06/30/2024 |
| 01/05/2019 | 06/30/2024 |
| 04/02/2019 | 06/30/2024 |
| 06/24/2019 | 06/30/2024 |
| 07/22/2019 | 06/30/2024 |
| 09/09/2019 | 06/30/2024 |
| 01/02/2020 | 06/30/2024 |
| 01/05/2020 | 06/30/2024 |
| 03/24/2020 | 06/30/2024 |
| 01/04/2021 | 06/30/2024 |
| 10/04/2021 | 06/30/2024 |
| 12/31/2022 | 06/30/2024 |

**When hired, what documentation may I show to my employer as evidence of employment authorization and identity when completing Form I–9?**

You can find the Lists of Acceptable Documents on the Form I–9, Employment Eligibility Verification, as well as the Acceptable Documents web page at *https://www.uscis.gov/i-9-central/acceptable-documents.* Employers must complete Form I–9 to verify the identity and employment authorization of all new employees. Within three days of hire, employees must present acceptable documents to their employers as evidence of identity and employment authorization to satisfy Form I–9 requirements.

You may present any documentation from List A (which provides evidence of both your identity and employment authorization) or documentation from List B (which provides evidence of your identity) together with documentation from List C (which provides evidence of your employment authorization), or you may present an acceptable receipt as

described in the Form I–9 Instructions. Employers may not reject a document based on a future expiration date. You can find additional information about Form I–9 on the I–9 Central web page at *https://www.uscis.gov/I-9Central.*

An EAD is an acceptable document under List A. See the section ''How do my employer and I complete Form I–9 using my automatically extended employment authorization for a new job?'' of this **Federal Register** notice for further information. If your EAD has one of the expiration dates in Table 4 and states A–12 or C–19 under Category, it has been extended automatically by virtue of this **Federal Register** notice, and you may choose to present it to your employer as proof of identity and employment eligibility for Form I–9 through June 30, 2024, unless your TPS has been withdrawn or your request for TPS has been denied. Your country of birth notated on the EAD does not have to reflect one of these TPS designated countries for you to be eligible for this extension.

Table 4—Affected EADs and Form I–9

| If your EAD has category code of A–12 or C–19 and an expiration date of: | Enter this date as the employment authorization expiration date in Section 1 of Form I–9: | Your employer must reverify your employment authorization by: |
|---|---|---|
| 07/22/2017 | 06/30/2024 | 07/01/2024 |
| 11/02/2017 | 06/30/2024 | 07/01/2024 |
| 01/05/2018 | 06/30/2024 | 07/01/2024 |
| 01/22/2018 | 06/30/2024 | 07/01/2024 |
| 03/09/2018 | 06/30/2024 | 07/01/2024 |
| 06/24/2018 | 06/30/2024 | 07/01/2024 |
| 07/05/2018 | 06/30/2024 | 07/01/2024 |
| 11/02/2018 | 06/30/2024 | 07/01/2024 |
| 01/05/2019 | 06/30/2024 | 07/01/2024 |
| 04/02/2019 | 06/30/2024 | 07/01/2024 |
| 06/24/2019 | 06/30/2024 | 07/01/2024 |
| 07/22/2019 | 06/30/2024 | 07/01/2024 |
| 09/09/2019 | 06/30/2024 | 07/01/2024 |
| 01/02/2020 | 06/30/2024 | 07/01/2024 |
| 01/05/2020 | 06/30/2024 | 07/01/2024 |
| 03/24/2020 | 06/30/2024 | 07/01/2024 |
| 01/04/2021 | 06/30/2024 | 07/01/2024 |
| 10/04/2021 | 06/30/2024 | 07/01/2024 |
| 12/31/2022 | 06/30/2024 | 07/01/2024 |

**What documentation may I present to my employer for Form I–9 if I am already employed but my current TPS-related EAD is set to expire?**

Even though we have automatically extended your EAD, your employer is required by law to ask you about your continued employment authorization. Your employer may need to re-inspect your automatically extended EAD to check the ''Card Expires'' date and Category code if your employer did not keep a copy of your EAD when you

initially presented it. Once your employer has reviewed the ''Card Expires'' date and Category code, your employer should update the EAD expiration date in Section 2 of Form I–9. See the section, ''What updates should my current employer make to Form I–9 if my EAD has been automatically extended?'' of this **Federal Register** notice for further information. You may show this **Federal Register** notice to your employer to explain what to do for Form I–9 and to

show that your EAD has been automatically extended through June 30, 2024 as indicated in the above chart, but you are not required to do so.

The last day of the automatic EAD extension is June 30, 2024. Before you start work on July 1, 2024, your employer is required by law to reverify your employment authorization in Section 3 of Form I–9. By that time, you must present any document from List A or any document from List C on Form I–9, Lists of Acceptable Documents, or

an acceptable List A or List C receipt described in the Form I–9 instructions to reverify employment authorization.

Your employer may not specify which List A or List C document you must present and cannot reject an acceptable receipt.

**Can I obtain a new EAD?**

Yes, if you remain eligible for TPS and apply for a new EAD, you can obtain a new EAD. However, you do not need to apply for a new EAD in order to benefit from this automatic extension. If you are a beneficiary under the TPS designations for El Salvador, Haiti, Nicaragua, Sudan, Honduras, or Nepal and want to obtain a new EAD valid through June 30, 2024, then you must file Form I–765, Application for Employment Authorization, and pay the associated fee (or obtain a fee waiver). If you do not want a new EAD, you do not have to file Form I–765 or pay the Form I–765 fee. If you do not want to request a new EAD now, you may file Form I–765 at a later date and pay the fee (or request a fee waiver), provided that you still have TPS or a pending TPS application.

If you are unable to pay the application fee and/or biometric services fee, you may request a fee waiver by submitting a Request for Fee Waiver (Form I–912). For more information on the application forms and fees for TPS, please visit the USCIS TPS web page at *https://www.uscis.gov/tps.*

If you have a Form I–821 and/or Form I–765 application that is still pending under the TPS designations for El Salvador, Haiti, Nicaragua, Sudan, Honduras, or Nepal, then you should not file either application again. If your pending Form I–821 is approved, you will be issued Forms I–797 and I–94 valid through June 30, 2024. Similarly, if you have a pending TPS-related Form I–765 that is approved, your new EAD will be valid through June 30, 2024. Your TPS itself continues as long as the preliminary injunction impacting your country's TPS designation remains in effect and in accordance with any relevant future **Federal Register** notices that DHS may issue respecting your country's TPS designation, or until your TPS is finally withdrawn for individual ineligibility under INA section 244(c), or the applicable TPS designation is terminated as discussed in the "Possible Future Action" section of this **Federal Register** notice.

**Can my employer require that I provide any other documentation to prove my status, such as proof of my citizenship from El Salvador, Haiti, Nicaragua, Sudan, Honduras, or Nepal?**

No. When completing Form I–9, including reverifying employment authorization, employers must accept any documentation you choose to present from the Form I–9 Lists of Acceptable Documents that reasonably appears to be genuine and that relates to you, or an acceptable List A, List B, or List C receipt. Employers need not reverify List B identity documents. Employers may not request proof of citizenship or proof of re-registration for TPS when completing Form I–9 for new hires or reverifying the employment authorization of current employees. If you present an EAD that USCIS has automatically extended, employers should accept it as a valid List A document so long as the EAD reasonably appears to be genuine and to relate to you. Refer to the "Note to Employees" section of this **Federal Register** notice for important information about your rights if your employer rejects lawful documentation, requires additional documentation, or otherwise discriminates against you based on your citizenship or immigration status, or your national origin.

**How do my employer and I complete Form I–9 using my automatically extended EAD for a new job?**

See Table 4 in the question "When hired, what documentation may I show to my employer as evidence of employment authorization and identity when completing Form I–9?" to determine if your EAD has been automatically extended.

1. For Section 1, you should:
a. Check "An alien authorized to work until" and enter June 30, 2024, as the expiration date; and
b. Enter your USCIS number or A-Number where indicated. (Your EAD or other document from DHS will have your USCIS number or A-Number printed on it; the USCIS number is the same as your A-Number without the A prefix).

2. For Section 2, employers should:
a. Determine if your EAD has been automatically extended by using Table 4 in the question "When hired, what documentation may I show to my employer as evidence of employment authorization and identity when completing Form I–9?"
b. Write in the document title;
c. Enter the issuing authority;
d. Provide the document number; and

e. Write June 30, 2024, as the expiration date.

Before the start of work on July 1, 2024, employers must reverify the employee's employment authorization on Form I–9.

**What updates should my current employer make to Form I–9 if my employment authorization has been automatically extended?**

If you presented a TPS-related EAD that was valid when you first started your job and USCIS has automatically extended your EAD, your employer may need to re-inspect your current EAD if they do not have a copy of the EAD on file. See Table 4 in the question "When hired, what documentation may I show to my employer as evidence of employment authorization and identity when completing Form I–9?" to determine if your EAD has been automatically extended. The employer may not rely on the country of birth listed on the card to determine whether you are eligible for this extension. If your employer determines that USCIS has automatically extended your EAD, your employer should update Section 2 of your previously completed Form I–9 as follows:

1. Write EAD EXT and June 30, 2024, as the last day of the automatic extension in the Additional Information field; and

2. Initial and date the correction.

**Note:** This is not considered a reverification. Employers should not reverify an employee until either this notice's automatic extension of EADs has ended, or the employee presents a new document to show continued employment authorization, whichever is sooner. By July 1, 2024, when the employee's automatically extended EAD has expired, employers are required by law to reverify the employee's employment authorization in Section 3.

**If I am an employer enrolled in E-Verify, how do I verify a new employee whose EAD has been automatically extended?**

Employers may create a case in E-Verify for a new employee by entering the number from the Document Number field and the date from the Expiration Date field on Form I–9 into the Document Number and Expiration Date fields in E-Verify. Employers should ensure that they entered June 30, 2024, as the expiration date for EADs that have been automatically extended under this **Federal Register** notice on both the employee's Form I–9 and their E-Verify case.

## If I am an employer enrolled in E-Verify, what do I do when I receive a ''Work Authorization Documents Expiration'' alert for an automatically extended EAD?

E-Verify has automated the verification process for TPS-related EADs that USCIS has automatically extended. If you have employees who provided a TPS-related EAD when they first started working for you, you will receive a ''Work Authorization Documents Expiring'' case alert when the auto-extension period for this EAD is about to expire. Before this employee starts work on July 1, 2024, you must reverify their employment authorization on Form I–9. Employers may not use E-Verify for reverification.

## If I already have TPS for Haiti or Sudan, do I need to apply under the new TPS designation for Haiti or Sudan?

TPS beneficiaries under the Haiti and Sudan designations whose TPS has been continued pursuant to court orders and, as described in this notice, are strongly encouraged to apply for TPS before the close of the registration period on February 3, 2023 and October 19, 2023, respectively, following the instructions in the August 3, 2021 **Federal Register** notice regarding the new Designation of Haiti for Temporary Protected Status at 86 FR 41863 or the April 19, 2022 **Federal Register** notice regarding the new Designation for Sudan for Temporary Protected Status at 87 FR 23202, respectively. Eligible individuals are strongly encouraged to apply at the earliest practicable date, to ensure that their TPS continues beyond the court-ordered extensions and without any gaps in status.

If you are found eligible for TPS under the new Haiti or Sudan designations, your TPS will continue through February 3, 2023 and October 19, 2023, respectively, even if the current court order in *Ramos* that continues TPS is no longer in effect.

### Note to All Employers

Employers are reminded that the laws requiring proper employment eligibility verification and prohibiting unfair immigration-related employment practices remain in full force. This **Federal Register** notice does not supersede or in any way limit applicable employment verification rules and policy guidance, including those rules setting forth reverification requirements. For general questions about the employment eligibility verification process, employers may call USCIS at 888–464–4218 (TTY 877–875–

6028) or email USCIS at *I9Central@ uscis.dhs.gov*. USCIS accepts calls and emails in English and many other languages. For questions about avoiding discrimination during the employment eligibility verification process (Form I–9 and E-Verify), employers may call the U.S. Department of Justice's Civil Rights Division, Immigrant and Employee Rights Section (IER) Employer Hotline at 800–255–8155 (TTY 800–237–2515). IER offers language interpretation in numerous languages. Employers may also email IER at *IER@usdoj.gov*.

### Note to Employees

For general questions about the employment eligibility verification process, employees may call USCIS at 888–897–7781 (TTY 877–875–6028) or email USCIS at *I9Central@ uscis.dhs.gov*. USCIS accepts calls in English, Spanish, and many other languages. Employees or applicants may also call the IER Worker Hotline at 800–255–7688 (TTY 800–237–2515) for information regarding employment discrimination based upon citizenship, immigration status, or national origin, including discrimination related to Form I–9 and E-Verify. The IER Worker Hotline provides language interpretation in numerous languages.

To comply with the law, employers must accept any document or combination of documents from the Lists of Acceptable Documents if the documentation reasonably appears to be genuine and to relate to the employee, or an acceptable List A, List B, or List C receipt as described in the Form I–9 instructions. Employers may not require extra or additional documentation beyond what is required for Form I–9 completion. Further, employers participating in E-Verify who receive an E-Verify case result of ''Tentative Nonconfirmation'' (mismatch) must promptly inform employees of the mismatch and give such employees an opportunity to take action to resolve the mismatch. A Tentative Nonconfirmation case result means that the information entered into E-Verify from an employee's Form I–9 differs from records available to DHS.

Employers may not terminate, suspend, delay training, withhold or lower pay, or take any other adverse action against an employee because of a mismatch while the case is still pending with E-Verify. A Final Nonconfirmation (FNC) case result is received when E-Verify cannot verify an employee's employment eligibility. An employer may terminate employment based on a case result of FNC. Work-authorized employees who receive an FNC may call USCIS for assistance at 888–897–7781

(TTY 877–875–6028). For more information about E-Verify-related discrimination or to report an employer for discrimination in the E-Verify process based on citizenship, immigration status, or national origin, contact IER's Worker Hotline at 800–255–7688 (TTY 800–237–2515). Additional information about proper nondiscriminatory Form I–9 and E-Verify procedures is available on the IER website at *https://www.justice.gov/ ier* and on the USCIS and E-Verify websites at *https://www.uscis.gov/i-9-central* and *https://www.e-verify.gov*.

### Note Regarding Federal, State, and Local Government Agencies (Such as Departments of Motor Vehicles)

For Federal purposes, if you present an automatically extended EAD as referenced in this **Federal Register** notice, you do not need to show any other document, such as a Form I–797C, Notice of Action reflecting receipt of a Form I–765 EAD renewal application or this **Federal Register** notice, to prove that you qualify for this extension. While federal government agencies must follow the guidelines laid out by the federal government, State and local government agencies establish their own rules and guidelines when granting certain benefits. Each state may have different laws, requirements, and determinations about what documents you need to provide to prove eligibility for certain benefits. Whether you are applying for a Federal, State, or local government benefit, you may need to provide the government agency with documents that show you are a TPS beneficiary, show you are authorized to work based on TPS or other status, or may be used by DHS to determine whether you have TPS or other immigration status. Examples of such documents are:

• Your current EAD;
• Your continued EAD with a TPS category code of A–12 or C–19 and an expiration date shown in Table 3 in the question ''Am I eligible to receive an automatic extension of my current EAD using this **Federal Register** notice?'' even if your country of birth noted on the EAD does not reflect one of these TPS designated countries; or
• Your Form I–94, Arrival/Departure Record;
• Your Form I–797, Notice of Action, reflecting approval of your Form I–765; or
• Form I–797 or Form I–797C, Notice of Action, reflecting approval or receipt of a past or current Form I–821.

Check with the government agency requesting documentation regarding which document(s) the agency will

accept. Some Federal, State and local government agencies use the USCIS Systematic Alien Verification for Entitlements Program (SAVE) program to confirm the current immigration status of applicants for public benefits.

While SAVE can verify that an individual has TPS, each agency's procedures govern whether they will accept an unexpired EAD, Form I–797, Form I–797C, or Form I–94, Arrival/ Departure Record. If an agency accepts the type of TPS-related document you present, such as an EAD, the agency should accept your automatically extended TPS-related document, regardless of your country of birth. It may assist the agency if you:

a. Give the agency a copy of this **Federal Register** notice showing the extension of TPS-related documentation, in addition to your most recent TPS-related document with your A-Number or USCIS number;

b. Explain that SAVE will be able to verify the continuation of your TPS using this information; and

c. Ask the agency to initiate a SAVE query with your information and follow through with additional verification steps, if necessary, to get a final SAVE response verifying your TPS.

You can also ask the agency to look for SAVE notices or contact SAVE if they have any questions about your immigration status or automatic extension of TPS-related documentation. In most cases, SAVE provides an automated electronic response to benefit-granting agencies within seconds, but, occasionally, verification can be delayed.

You can check the status of your SAVE verification by using CaseCheck at *https://save.uscis.gov/casecheck/*. CaseCheck is a free service that lets you follow the progress of your SAVE verification case using your date of birth and one immigration identifier number (A-Number, USCIS number, or Form I– 94 number) or Verification Case Number). If an agency has denied your application based solely or in part on a SAVE response, the agency must offer you the opportunity to appeal the decision in accordance with the agency's procedures. If the agency has received and acted upon or will act upon a SAVE verification case and you do not believe the SAVE response is correct, the SAVE website, *http:// www.uscis.gov/save*, has detailed information on how to make corrections or update your immigration record, make an appointment, or submit a written request to correct records.

[FR Doc. 2022–24984 Filed 11–10–22; 5:15 pm]

**BILLING CODE 9111–97–P**

# DEPARTMENT OF HOMELAND SECURITY

## U.S. Citizenship and Immigration Services

[OMB Control Number 1615–0053]

### Agency Information Collection Activities; Revision of a Currently Approved Collection: Request for Certification of Military or Naval Service

**AGENCY:** U.S. Citizenship and Immigration Services, Department of Homeland Security.

**ACTION:** 30-Day notice.

**SUMMARY:** The Department of Homeland Security (DHS), U.S. Citizenship and Immigration Services (USCIS) will be submitting the following information collection request to the Office of Management and Budget (OMB) for review and clearance in accordance with the Paperwork Reduction Act of 1995. The purpose of this notice is to allow an additional 30 days for public comments.

**DATES:** Comments are encouraged and will be accepted until December 16, 2022.

**ADDRESSES:** Written comments and/or suggestions regarding the item(s) contained in this notice, especially regarding the estimated public burden and associated response time, must be submitted via the Federal eRulemaking Portal website at *http:// www.regulations.gov* under e-Docket ID number USCIS–2007–0016. All submissions received must include the OMB Control Number 1615–0053 in the body of the letter, the agency name and Docket ID USCIS–2007–0016.

**FOR FURTHER INFORMATION CONTACT:** USCIS, Office of Policy and Strategy, Regulatory Coordination Division, Samantha Deshommes, Chief, Telephone number (240) 721–3000 (This is not a toll-free number; comments are not accepted via telephone message.). Please note contact information provided here is solely for questions regarding this notice. It is not for individual case status inquiries. Applicants seeking information about the status of their individual cases can check Case Status Online, available at the USCIS website at *http:// www.uscis.gov*, or call the USCIS Contact Center at (800) 375–5283; TTY (800) 767–1833.

**SUPPLEMENTARY INFORMATION:**

## Comments

The information collection notice was previously published in the **Federal Register** on August 15, 2022, at 87 FR 50094 allowing for a 60-day public comment period. USCIS did receive 1 comment in connection with the 60-day notice.

You may access the information collection instrument with instructions, or additional information by visiting the Federal eRulemaking Portal site at: *http://www.regulations.gov* and enter USCIS–2007–0016 in the search box. The comments submitted to USCIS via this method are visible to the Office of Management and Budget and comply with the requirements of 5 CFR 1320.12(c). All submissions will be posted, without change, to the Federal eRulemaking Portal at *http:// www.regulations.gov*, and will include any personal information you provide. Therefore, submitting this information makes it public. You may wish to consider limiting the amount of personal information that you provide in any voluntary submission you make to DHS. DHS may withhold information provided in comments from public viewing that it determines may impact the privacy of an individual or is offensive. For additional information, please read the Privacy Act notice that is available via the link in the footer of *http://www.regulations.gov*.

Written comments and suggestions from the public and affected agencies should address one or more of the following four points:

(1) Evaluate whether the proposed collection of information is necessary for the proper performance of the functions of the agency, including whether the information will have practical utility;

(2) Evaluate the accuracy of the agency's estimate of the burden of the proposed collection of information, including the validity of the methodology and assumptions used;

(3) Enhance the quality, utility, and clarity of the information to be collected; and

(4) Minimize the burden of the collection of information on those who are to respond, including through the use of appropriate automated, electronic, mechanical, or other technological collection techniques or other forms of information technology, *e.g.*, permitting electronic submission of responses.

## Overview of This Information Collection

(1) *Type of Information Collection Request:* Revision of a Currently Approved Collection.

(2) *Title of the Form/Collection:* Request for Certification of Military or Naval Service.

HondurasAR000077

Dated: December 22, 1998.

**Elaine Marquis-Brong,**

*Deputy State Director, Division of Support Services.*

[FR Doc. 99–123 Filed 1–4–99; 8:45 am]

**BILLING CODE 4310–40–M**

---

# DEPARTMENT OF THE INTERIOR

## National Park Service

## National Register of Historic Places; Notification of Pending Nominations

Nominations for the following properties being considered for listing in the National Register were received by the National Park Service before December 25, 1998. Pursuant to section 60.13 of 36 CFR Part 60 written comments concerning the significance of these properties under the National Register criteria for evaluation may be forwarded to the National Register, National Park Service, 1849 C St. NW, NC400, Washington, DC 20240. Written comments should be submitted by January 20, 1999.

**Carol D. Shull,**

*Keeper of the National Register.*

### ARKANSAS

**Benton County**

Wee Pine Knot (Benton County MRA), 319 Spring St., Sulphur Springs, 98001632

**Faulkner County**

Little, J.E., House, 427 Western Ave., Conway, 98001631

### CALIFORNIA

**Los Angeles County**

Warner Brothers Theatre, 478 W. 6th St., San Pedro, 98001633

**Sacramento County**

Winter House, 2324 and 2326 H St., Sacramento, 98001634

### COLORADO

**Arapahoe County**

Geneva House, 2305 W. Berry Ave., Littleton, 98001635

**Denver County**

Arcanum Apartments, 1904 Logan St., Denver, 98001629

### MISSOURI

**Jackson County**

Richards and Conover Hardware Company Building, 5200 W. 5th St., Kansas City, 98001636

**St. Clair County**

Osceola Public School Building, Jct. of Fifth and Pine Sts., Osceola, 98001638

### NEW JERSEY

**Passaic County**

Dundee Canal Industrial Historic District, George St., N along Dundee Canal, approx. 1.2 mi. to headgates opposite E. Clifton Ave., Passaic vicinity, 98001640

**Warren County**

Port Colden Historic District, Roughly along Port Colden Rd., Lock St., NJ 57, and Morris Canal Terrace, Washington Township vicinity, 98001639

### OHIO

**Franklin County**

Nafzger—Miller House, 110 Mill St., Gahanna, 98001641

**Stark County**

Martin, Brooke and Anna E. House (Architecture of Guy Tilden in Canton, 1885—1905, TR), 1627 Market Ave. N., Canton, 98001642

**Warren County**

Waynesville Engine House and Lockup, 260 Chapman St., Waynesville, 98001643

### SOUTH CAROLINA

**Charleston County**

Wilkinson—Boineau House, 5185 SC 174, Adams Run, 98001644

**Pickens County**

Easley High School Auditorium, 112 Russell St., Easley, 98001646

**Sumter County**

Temple Sinai, 11 Church St., Sumter, 98001645

### VIRGINIA

**Arlington County**

Buckingham Historic District, Roughly bounded by N. 5th, N. Oxford, and N. 2nd Sts., and N. Glebe Rd., Arlington, 98001649

**Culpeper County**

Signal Hill, 16190 Germanna Hwy., Culpeper vicinity, 98001650

**Isle Of Wight County**

Oak Creek, 34457 Lee's Mill Rd., Franklin vicinity, 98001648

**Orange County**

Orange Commercial Historic District, Roughly along Madison and Main Sts., Orange, 98001651

[FR Doc. 99–127 Filed 1–4–99; 8:45 am]

**BILLING CODE 4310–70–P**

---

# DEPARTMENT OF JUSTICE

## Immigration and Naturalization Service

**[INS No. 1964–98; AG Order No. 2201–98]**

**RIN 1115–AE26**

## Designation of Honduras Under Temporary Protected Status

**AGENCY:** Immigration and Naturalization Service, Justice.

**ACTION:** Notice.

**SUMMARY:** This notice designates Honduras for the Temporary Protected Status (TPS) program. Under section 244(b)(1) of the Immigration and Nationality Act, as amended (the Act), the Attorney General is authorized to grant TPS in the United States to eligible nationals of designated foreign states or parts of such states (or to eligible aliens who have no nationality and who last habitually resided in such designated states) upon finding that such states are experiencing ongoing armed conflict, environmental disaster, or other extraordinary and temporary conditions.

**EFFECTIVE DATES:** This designation is effective on January 5, 1999 and will remain in effect until July 5, 2000.

**FOR FURTHER INFORMATION CONTACT:** Michael Valverde, Residence and Status Branch, Adjudications, Immigration and Naturalization Service, 425 I Street, NW., Room 3214, Washington, DC 20536, telephone (202) 514–3228.

**SUPPLEMENTARY INFORMATION:**

### What is Temporary Protected Status?

The TPS statute (section 244 of the Immigration and Nationality Act) grants eligible nationals of designated countries temporary immigration status. TPS beneficiaries are granted a stay of removal and work authorization for the designated TPS period and for any extensions of the designation. TPS does not lead to permanent resident status.

### Why Is Honduras Being Designated for the TPS Program?

Hurricane Mitch swept through Central America causing severe flooding and associated damage in Honduras. Based on a thorough review by the Departments of State and Justice, the Attorney General finds that, due to the environmental disaster and substantial disruption of living conditions caused by Hurricane Mitch, Honduras is unable, temporarily, to handle adequately the return of Honduran nationals.

### Who Is Eligible for Honduran TPS?

Nationals of Honduras (or aliens having no nationality who last

HondurasAR000078

habitually resided in Honduras) who have been "continuously physically present" in the United States since January 5, 1999 and have "continuously resided" in the United States since December 30, 1998, may apply for TPS within the registration period which begins on January 5, 1999 and ends on July 5, 1999.

Any national of Honduras who has already applied for, or plans to apply for, asylum, but whose asylum application has not yet been approved, may also apply for TPS. An application for TPS does not preclude or adversely affect an application for asylum or any other immigration benefit. Denial of an application for asylum or any other immigration benefit does not affect an alien's ability to register for TPS, although the grounds of denial may also lead to denial of TPS. For example, an alien who has been convicted of an aggravated felony is not eligible for asylum or TPS.

An alien who is granted TPS is eligible to register for any extension of the TPS program that may be made. However, nationals of Honduras who do not file a TPS application during the initial registration period will have to satisfy the requirements for late initial registration under 8 CFR 244.2(f)(2) in order to be eligible for TPS registration during any extension of designation. The requirements for late initial registration specify (1) that the applicant must have been in valid immigrant or nonimmigrant status during the initial registration period, (2) or had an application for relief from removal or change of status pending or under review during the initial registration period, and (3) must register no later than sixty (60) days from the expiration of such status or pendency of such application.

**How Do I Register for TPS?**

| If | Then |
|---|---|
| You are a national of Honduras (or an alien having no nationality who last habitually resided in Honduras) registering for TPS and employment authorization. | You must complete and file: (1) Form I–821, Application for Temporary Protected Status ($50 filing fee), (2) Form I–765, Application for Employment Authorization ($100 filing fee), and (3) $25 Fingerprint Fee |
| You already have employment authorization or do not require employment authorization. | You must complete and file: (1) Form I–821 with $50 filing fee, (2) Form I–765, Application for Employment with no filing fee, and (3) $25 Fingerprint Fee |
| You are registering for TPS and employment authorization and are requesting a fee waiver. | You must complete and file: (1) Appropriately documented fee waiver request and requisite affidavit (and any other information) in accordance with 8 CFR 244.20, (2) Form I–821, and (3) Form I–765. (4) $25 Fingerprint Fee. There is no fee waiver for the Fingerprint Fee. |

To register for TPS for all conditions described in the above chart, you must include two identification photographs (1½" x 1½") and supporting evidence as provided in 8 CFR 244.9 (evidence of identity and nationality, and proof of residence).

**Where Should I Register for TPS?**

Nationals of Honduras (or eligible aliens who have no nationality and who last habitually resided in Honduras) must register for TPS by submitting an application to the INS Service Center that has jurisdiction over where the applicant lives.

If you live in Connecticut, Delaware, the District of Columbia, Maine, Maryland, Massachusetts, New Hampshire, New Jersey, New York, Pennsylvania, Puerto Rico, Rhode Island, Vermont, Virginia, West Virginia, or in the U.S. Virgin Islands, mail your application to:
Vermont Service Center, ATTN: TPS, 75 Lower Welden Street, St. Albans, VT 05479.

If you live in Arizona, California, Guam, Hawaii or Nevada, mail your application to:
California Service Center, ATTN: TPS, 24000 Avila Road, 2nd Floor, Laguna Niguel, CA 92677–8111.

If you live in Alabama, Arkansas, Florida, Georgia, Kentucky, Louisiana, Mississippi, New Mexico, North Carolina, Oklahoma, South Carolina, Tennessee, or Texas, mail your application to:
Texas Service Center, P.O. Box 850997, Mesquite, TX 75185–0997.

If you live elsewhere in the United States, please mail your application to:
Nebraska Service Center, P.O. Box 87821, Lincoln, NE 68501–7821.

**Notice of Designation of Honduras Under Temporary Protected Status Program**

By the authority vested in me as Attorney General under section 244 of the Immigration and Nationality Act, as amended (8 U.S.C. 1254a), I find, after consultation with the appropriate agencies of the Government, that:

(1) There exists an environmental disaster in Honduras, and, due to this disaster, which has substantially disrupted living conditions, Honduras is unable, temporarily, to handle adequately the return of Honduran nationals (or aliens having no nationality who last habitually resided in Honduras);

(2) Honduras officially has requested that it be granted TPS designation; and

(3) Permitting nationals of Honduras (or aliens having no nationality who last habitually resided in Honduras) to remain temporarily in the United States is not contrary to the national interest of the United States.

Accordingly, it is ordered as follows:

(1) Honduras is designated for TPS under section 244(b)(1)(B) of the Act.

Nationals of Honduras (or aliens having no nationality who last habitually resided in Honduras) who have been "continuously physically present" since January 5, 1999 and have "continuously resided" in the United States since December 30, 1998, may apply for TPS within the registration period which begins on January 5, 1999 and ends on July 5, 1999.

(2) I estimate that there are no more than 100,000 nationals of Honduras (or aliens having no nationality who last habitually resided in Honduras) in the United States who are eligible for TPS.

(3) Except as may otherwise be provided, applications for TPS by nationals of Honduras (or aliens having no nationality who last habitually resided in Honduras) must be filed pursuant to the provisions of 8 CFR part 244. Aliens who wish to apply for TPS must file an Application for Temporary Protected Status, Form I–821, together with an Application for Employment Authorization, Form I–765, during the registration period, which begins on January 5, 1999 and will remain in effect until July 5, 1999.

(4) A fee prescribed in 8 CFR 103.7(b)(1) (fifty dollars ($50)) will be charged for each Application for Temporary Protected Status, Form I–821, filed during the registration period.

(5) A fee prescribed in 8 CFR 103.7(b)(1) (one hundred dollars ($100)) will be charged for each Application for Employment Authorization, Form I–

765, filed by an alien requesting employment authorization. An alien who already has employment authorization or who does not wish to request employment authorization must nevertheless file Form I–765, together with Form I–821, for data gathering purposes. In such cases, however, no fee needs to be submitted with Form I–765.

(6) A fee prescribed 8 CFR 103.7(b)(1) (twenty-five dollars ($25)) for fingerprinting must be submitted with the Form I–821.

(7) Pursuant to section 244(b)(3)(A) of the Act, the Attorney General will review, at least 60 days before July 5, 2000, the conditions in Honduras to determine whether the conditions for designation of Honduras under the TPS program continue to exist. Notice of that determination, including the basis for the determination, will be published in the **Federal Register**. If there is an extension of designation, late initial registration for TPS shall be allowed only pursuant to the requirements of 8 CFR 244.2(f)(2).

### Where Can I Find Information About the TPS Program?

Information concerning the TPS program for nationals of Honduras (or aliens having no nationality who last habitually resided in Honduras) will be available at the Service Internet Website, located at *www.ins.usdoj.gov,* the Application Support Center Information Line, at 1–888–557–5398, and at local Immigration and Naturalization Service offices upon publication of this notice.

Dated: December 31, 1998.

**Janet Reno,**
*Attorney General.*
[FR Doc. 98–34849 Filed 12–31–98; 3:02 pm]
**BILLING CODE 4410–10–P**

---

### DEPARTMENT OF JUSTICE

### Immigration and Naturalization Service

**[INS No. 1965–98; AG Order No. 2202–98]**

**RIN 1115–AE26**

### Designation of Nicaragua Under Temporary Protected Status

**AGENCY:** Immigration and Naturalization Service, Justice.

**ACTION:** Notice.

**SUMMARY:** This notice designates Nicaragua for the Temporary Protected Status (TPS) program. Under section 244(b)(1) of the Immigration and Nationality Act, as amended (the Act), the Attorney General is authorized to grant TPS in the United States to eligible nationals of designated foreign states or parts of such states (or to eligible aliens who have no nationality and who last habitually resided in such designated states) upon finding that such states are experiencing ongoing armed conflict, environmental disaster, or other extraordinary and temporary conditions.

**EFFECTIVE DATES:** This designation is effective on January 5, 1999 and will remain in effect until July 5, 2000.

**FOR FURTHER INFORMATION CONTACT:** Michael Valverde, Residence and Status Branch, Adjudications, Immigration and Naturalization Service, 425 I Street, NW., Room 3214, Washington, DC 20536, telephone (202) 514–3228.

**SUPPLEMENTARY INFORMATION:**

### What Is Temporary Protected Status?

The TPS statute (section 244 of the Immigration and Nationality Act) grants eligible nationals of designated countries temporary immigration status. TPS beneficiaries are granted a stay of removal and work authorization for the designated TPS period and for any extensions of the designation. TPS does not lead to permanent resident status.

### Why Is Nicaragua Being Designated for the TPS Program?

Hurricane Mitch swept through Central America causing severe flooding and associated damage in Nicaragua. Based on a thorough review by the Departments of State and Justice, the Attorney General finds that, due to the environmental disaster and substantial disruption of living conditions caused by Hurricane Mitch, Nicaragua is unable, temporarily, to handle adequately the return of Nicaraguan nationals.

### Who Is Eligible for Nicaraguan TPS?

Nationals of Nicaragua (or aliens having no nationality who last habitually resided in Nicaragua) who have been "continuously physically present" since January 5, 1999 and have "continuously resided" in the United States since December 30, 1998, may apply for TPS within the registration period which begins on January 5, 1999 and ends on July 5, 1999.

Any national of Nicaragua who has already applied for, or plans to apply for, asylum, but whose asylum application has not yet been approved, may also apply for TPS. An application for TPS does not preclude or adversely affect an application for asylum or any other immigration benefit. Denial of an application for asylum or any other immigration benefit does not affect an alien's ability to register for TPS, although the grounds of denial may also lead to denial of TPS. For example, an alien who has been convicted of an aggravated felony is not eligible for asylum or TPS.

An alien who is granted TPS is eligible to register for any extension of the TPS program that may be made. However, nationals of Nicaragua who do not file a TPS application during the initial registration period will have to satisfy the requirements for late initial registration under 8 CFR 244.2(f)(2) in order to be eligible for TPS registration during any extension of designation. The requirements for late initial registration specify:

(1) that the applicant must have been in valid immigrant or nonimmigrant status during the initial registration period, or

(2) had an application for relief from removal or change of status pending or under review during the initial registration period, and

(3) must register no later than sixty (60) days from the expiration of such status or pendency of such application.

### How Do I register for TPS?

| If | Then |
|---|---|
| You are a national of Nicaragua (or an alien having no nationality who last habitually resided in Nicaragua) registering for TPS and employment authorization. | You must complete and file: (1) Form I–821, Application for Temporary Protected Status ($50 filing fee), (2) Form I–765, Application for Employment Authorization ($100 filing fee), and (3) $25 Fingerprint Fee |
| You already have employment authorization or do not require employment authorization. | You must complete and file: (1) Form I–821 with $50 filing fee, (2) Form I–765, Application for Employment with no filing fee, and (3) $25 Fingerprint Fee |



# Presidential Documents

Executive Order 14159 of January 20, 2025

## Protecting the American People Against Invasion

By the authority vested in me as President by the Constitution and the laws of the United States of America, including the Immigration and Nationality Act (INA) (8 U.S.C. 1101 *et seq.*) and section 301 of title 3, United States Code, it is hereby ordered:

**Section 1**. *Purpose.* Over the last 4 years, the prior administration invited, administered, and oversaw an unprecedented flood of illegal immigration into the United States. Millions of illegal aliens crossed our borders or were permitted to fly directly into the United States on commercial flights and allowed to settle in American communities, in violation of longstanding Federal laws.

Many of these aliens unlawfully within the United States present significant threats to national security and public safety, committing vile and heinous acts against innocent Americans. Others are engaged in hostile activities, including espionage, economic espionage, and preparations for terror-related activities. Many have abused the generosity of the American people, and their presence in the United States has cost taxpayers billions of dollars at the Federal, State, and local levels.

Enforcing our Nation's immigration laws is critically important to the national security and public safety of the United States. The American people deserve a Federal Government that puts their interests first and a Government that understands its sacred obligation to prioritize the safety, security, and financial and economic well-being of Americans.

This order ensures that the Federal Government protects the American people by faithfully executing the immigration laws of the United States.

**Sec. 2**. *Policy.* It is the policy of the United States to faithfully execute the immigration laws against all inadmissible and removable aliens, particularly those aliens who threaten the safety or security of the American people. Further, it is the policy of the United States to achieve the total and efficient enforcement of those laws, including through lawful incentives and detention capabilities.

**Sec. 3**. *Faithful Execution of the Immigration Laws.* In furtherance of the policies described in section 2 of this order:

(a) Executive Order 13993 of January 20, 2021 (Revision of Civil Immigration Enforcement Policies and Priorities), Executive Order 14010 of February 2, 2021 (Creating a Comprehensive Regional Framework To Address the Causes of Migration, To Manage Migration Throughout North and Central America, and To Provide Safe and Orderly Processing of Asylum Seekers at the United States Border), Executive Order 14011 of February 2, 2021 (Establishment of Interagency Task Force on the Reunification of Families), and Executive Order 14012 of February 2, 2021 (Restoring Faith in Our Legal Immigration Systems and Strengthening Integration and Inclusion Efforts for New Americans) are hereby revoked; and

(b) Executive departments and agencies (agencies) shall take all appropriate action to promptly revoke all memoranda, guidance, or other policies based on the Executive Orders revoked in section 3(a) of this order and shall employ all lawful means to ensure the faithful execution of the immigration laws of the United States against all inadmissible and removable aliens.

**Sec. 4**. *Civil Enforcement Priorities.* The Secretary of Homeland Security shall take all appropriate action to enable the Director of U.S. Immigration and Customs Enforcement, the Commissioner of U.S. Customs and Border Protection, and the Director of U.S. Citizenship and Immigration Services to set priorities for their agencies that protect the public safety and national security interests of the American people, including by ensuring the successful enforcement of final orders of removal. Further, the Secretary of Homeland Security shall ensure that the primary mission of U.S. Immigration and Customs Enforcement's Homeland Security Investigations division is the enforcement of the provisions of the INA and other Federal laws related to the illegal entry and unlawful presence of aliens in the United States and the enforcement of the purposes of this order.

**Sec. 5**. *Criminal Enforcement Priorities.* The Attorney General, in coordination with the Secretary of State and the Secretary of Homeland Security, shall take all appropriate action to prioritize the prosecution of criminal offenses related to the unauthorized entry or continued unauthorized presence of aliens in the United States.

**Sec. 6**. *Federal Homeland Security Task Forces.* (a) The Attorney General and the Secretary of Homeland Security shall take all appropriate action to jointly establish Homeland Security Task Forces (HSTFs) in all States nationwide.

(b) The composition of each HSTF shall be subject to the direction of the Attorney General and the Secretary of Homeland Security, but shall include representation from any other Federal agencies with law enforcement officers, or agencies with the ability to provide logistics, intelligence, and operational support to the HSTFs, and shall also include representation from relevant State and local law enforcement agencies. The heads of all Federal agencies shall take all appropriate action to provide support to the Attorney General and the Secretary of Homeland Security to ensure that the HSTFs fulfill the objectives in subsection (c) of this section, and any other lawful purpose that fulfills the policy objectives of this order.

(c) The objective of each HSTF is to end the presence of criminal cartels, foreign gangs, and transnational criminal organizations throughout the United States, dismantle cross-border human smuggling and trafficking networks, end the scourge of human smuggling and trafficking, with a particular focus on such offenses involving children, and ensure the use of all available law enforcement tools to faithfully execute the immigration laws of the United States.

(d) The Attorney General and the Secretary of Homeland Security shall take all appropriate action to provide an operational command center to coordinate the activities of the HSTFs and provide such support as they may require, and shall also take all appropriate action to provide supervisory direction to their activities as may be required.

**Sec. 7**. *Identification of Unregistered Illegal Aliens.* The Secretary of Homeland Security, in coordination with the Secretary of State and the Attorney General, shall take all appropriate action to:

(a) Immediately announce and publicize information about the legal obligation of all previously unregistered aliens in the United States to comply with the requirements of part VII of subchapter II of chapter 12 of title 8, United States Code;

(b) Ensure that all previously unregistered aliens in the United States comply with the requirements of part VII of subchapter II of chapter 12 of title 8, United States Code; and

(c) Ensure that failure to comply with the legal obligations of part VII of subchapter II of chapter 12 of title 8, United States Code, is treated as a civil and criminal enforcement priority.

**Sec. 8**. *Civil Fines and Penalties.* (a) The Secretary of Homeland Security, in coordination with the Secretary of Treasury, shall take all appropriate action to ensure the assessment and collection of all fines and penalties

HondurasAR000082

that the Secretary of Homeland Security is authorized by law to assess and collect from aliens unlawfully present in the United States, including aliens who unlawfully entered or unlawfully attempted to enter the United States, and from those who facilitate such aliens' presence in the United States.

(b) Within 90 days of the date of this order, the Secretary of the Treasury and the Secretary of Homeland Security shall submit a report to the President regarding their progress implementing the requirements of this section and recommending any additional actions that may need to be taken to achieve its objectives.

**Sec. 9**. *Efficient Removals of Recent Entrants and Other Aliens*. The Secretary of Homeland Security shall take all appropriate action, pursuant to section 235(b)(1)(A)(iii)(I) of the INA (8 U.S.C. 1225(b)(1)(A)(iii)(I)), to apply, in her sole and unreviewable discretion, the provisions of section 235(b)(1)(A)(i) and (ii) of the INA to the aliens designated under section 235(b)(1)(A)(iii)(II). Further, the Secretary of Homeland Security shall promptly take appropriate action to use all other provisions of the immigration laws or any other Federal law, including, but not limited to sections 238 and 240(d) of the INA (8 U.S.C. 1228 and 1229a(d)), to ensure the efficient and expedited removal of aliens from the United States.

**Sec. 10**. *Detention Facilities*. The Secretary of Homeland Security shall promptly take all appropriate action and allocate all legally available resources or establish contracts to construct, operate, control, or use facilities to detain removable aliens. The Secretary of Homeland Security, further, shall take all appropriate actions to ensure the detention of aliens apprehended for violations of immigration law pending the outcome of their removal proceedings or their removal from the country, to the extent permitted by law.

**Sec. 11**. *Federal-State Agreements*. To ensure State and local law enforcement agencies across the United States can assist with the protection of the American people, the Secretary of Homeland Security shall, to the maximum extent permitted by law, and with the consent of State or local officials as appropriate, take appropriate action, through agreements under section 287(g) of the INA (8 U.S.C. 1357(g)) or otherwise, to authorize State and local law enforcement officials, as the Secretary of Homeland Security determines are qualified and appropriate, to perform the functions of immigration officers in relation to the investigation, apprehension, or detention of aliens in the United States under the direction and the supervision of the Secretary of Homeland Security. Such authorization shall be in addition to, rather than in place of, Federal performance of these duties. To the extent permitted by law, the Secretary of Homeland Security may structure each agreement under section 287(g) of the INA (8 U.S.C. 1357(g)) in the manner that provides the most effective model for enforcing Federal immigration laws in that jurisdiction.

**Sec. 12**. *Encouraging Voluntary Compliance with the Law*. The Secretary of Homeland Security shall take all appropriate action, in coordination with the Secretary of State and the Attorney General, and subject to adequate safeguards, assurances, bonds, and any other lawful measure, to adopt policies and procedures to encourage aliens unlawfully in the United States to voluntarily depart as soon as possible, including through enhanced usage of the provisions of section 240B of the INA (8 U.S.C. 1229c), international agreements or assistance, or any other measures that encourage aliens unlawfully in the United States to depart as promptly as possible, including through removals of aliens as provided by section 250 of the INA (8 U.S.C. 1260).

**Sec. 13**. *Recalcitrant Countries*. The Secretary of State and the Secretary of Homeland Security shall take all appropriate action to:

(a) Cooperate and effectively implement, as appropriate, the sanctions provided by section 243(d) of the INA (8 U.S.C. 1253(d)), with the Secretary of State, to the maximum extent permitted by law, ensuring that diplomatic

efforts and negotiations with foreign states include the foreign states' acceptance of their nationals who are subject to removal from the United States; and

(b) Eliminate all documentary barriers, dilatory tactics, or other restrictions that prevent the prompt repatriation of aliens to any foreign state. Any failure or delay by a foreign state to verify the identity of a national of that state shall be considered in carrying out subsection (a) this section, and shall also be considered regarding the issuance of any other sanctions that may be available to the United States.

**Sec. 14.** *Visa Bonds.* The Secretary of Treasury shall take all appropriate action, in coordination with the Secretary of State and the Secretary of Homeland Security, to establish a system to facilitate the administration of all bonds that the Secretary of State or the Secretary of Homeland Security may lawfully require to administer the provisions of the INA.

**Sec. 15.** *Reestablishment of the VOICE Office and Addressing Victims of Crimes Committed by Removable Aliens.* The Secretary of Homeland Security shall direct the Director of U.S. Immigration and Customs Enforcement (ICE) to take all appropriate and lawful action to reestablish within ICE an office to provide proactive, timely, adequate, and professional services to victims of crimes committed by removable aliens, and those victims' family members. The Attorney General shall also ensure that the provisions of 18 U.S.C. 3771 are followed in all Federal prosecutions involving crimes committed by removable aliens.

**Sec. 16.** *Addressing Actions by the Previous Administration.* The Secretary of State, the Attorney General, and the Secretary of Homeland Security shall promptly take all appropriate action, consistent with law, to rescind the policy decisions of the previous administration that led to the increased or continued presence of illegal aliens in the United States, and align any and all departmental activities with the policies set out by this order and the immigration laws. Such action should include, but is not limited to:

(a) ensuring that the parole authority under section 212(d)(5) of the INA (8 U.S.C. 1182(d)(5)) is exercised on only a case-by-case basis in accordance with the plain language of the statute, and in all circumstances only when an individual alien demonstrates urgent humanitarian reasons or a significant public benefit derived from their particular continued presence in the United States arising from such parole;

(b) ensuring that designations of Temporary Protected Status are consistent with the provisions of section 244 of the INA (8 U.S.C. 1254a), and that such designations are appropriately limited in scope and made for only so long as may be necessary to fulfill the textual requirements of that statute; and

(c) ensuring that employment authorization is provided in a manner consistent with section 274A of the INA (8 U.S.C. 1324a), and that employment authorization is not provided to any unauthorized alien in the United States.

**Sec. 17.** *Sanctuary Jurisdictions.* The Attorney General and the Secretary of Homeland Security shall, to the maximum extent possible under law, evaluate and undertake any lawful actions to ensure that so-called ''sanctuary'' jurisdictions, which seek to interfere with the lawful exercise of Federal law enforcement operations, do not receive access to Federal funds. Further, the Attorney General and the Secretary of Homeland Security shall evaluate and undertake any other lawful actions, criminal or civil, that they deem warranted based on any such jurisdiction's practices that interfere with the enforcement of Federal law.

**Sec. 18.** *Information Sharing.* (a) The Secretary of Homeland Security shall promptly issue guidance to ensure maximum compliance by Department of Homeland Security personnel with the provisions of 8 U.S.C. 1373 and 8 U.S.C. 1644 and ensure that State and local governments are provided with the information necessary to fulfill law enforcement, citizenship, or immigration status verification requirements authorized by law; and

HondurasAR000084

(b) The Attorney General, the Secretary of Health and Human Services, and the Secretary of Homeland Security shall take all appropriate action to stop the trafficking and smuggling of alien children into the United States, including through the sharing of any information necessary to assist in the achievement of that objective.

**Sec. 19.** *Funding Review.* The Attorney General and the Secretary of Homeland Security shall:

(a) Immediately review and, if appropriate, audit all contracts, grants, or other agreements providing Federal funding to non-governmental organizations supporting or providing services, either directly or indirectly, to removable or illegal aliens, to ensure that such agreements conform to applicable law and are free of waste, fraud, and abuse, and that they do not promote or facilitate violations of our immigration laws;

(b) Pause distribution of all further funds pursuant to such agreements pending the results of the review in subsection (a) of this section;

(c) Terminate all such agreements determined to be in violation of law or to be sources of waste, fraud, or abuse and prohibit any such future agreements;

(d) Coordinate with the Director of the Office of Management and Budget to ensure that no funding for agreements described in subsection (c) of this section is included in any appropriations request for the Department of Justice or the Department of Homeland Security; and

(e) Initiate clawback or recoupment procedures, if appropriate, for any agreements described in subsection (c) of this section.

**Sec. 20.** *Denial of Public Benefits to Illegal Aliens.* The Director of the Office of Management and Budget shall take all appropriate action to ensure that all agencies identify and stop the provision of any public benefits to any illegal alien not authorized to receive them under the provisions of the INA or other relevant statutory provisions.

**Sec. 21**. *Hiring More Agents and Officers.* Subject to available appropriations, the Secretary of Homeland Security, through the Commissioner of U.S. Customs and Border Protection and the Director of U.S. Immigration and Customs Enforcement, shall take all appropriate action to significantly increase the number of agents and officers available to perform the duties of immigration officers.

**Sec. 22**. *Severability.* It is the policy of the United States to enforce this order to the maximum extent possible to advance the interests of the United States. Accordingly:

(a) If any provision of this order, or the application of any provision to any person or circumstance, is held to be invalid, the remainder of this order and the application of its other provisions to any other persons or circumstances shall not be affected thereby; and

(b) If any provision of this order, or the application of any provision to any person or circumstance, is held to be invalid because of the failure to follow certain procedures, the relevant executive branch officials shall implement those procedural requirements to conform with existing law and with any applicable court orders.

**Sec. 23**. *General Provisions.* (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party

against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

THE WHITE HOUSE,
*January 20, 2025.*

[FR Doc. 2025–02006
Filed 1–28–25; 11:15 am]
Billing code 3395–F4–P

today, the TSS is an impediment to safe navigation in the area. The TSS identifies separate northbound and southbound travel lanes which accommodated both lanes of vessel traffic in 1969, given the size of vessels operating in the area then. Today, however, vessels with deeper drafts, which are limited to operating in the waters the TSS covers, travel in the area, and they must travel in opposing lanes to avoid the risk of grounding.

The comment, and supporting documents, are available in the public docket and can be viewed at *https://www.regulation.gov.* To view documents, in the "Search" box insert "USCG–2023–0330" and click "Search." Then select "Supporting & Related Material" in the Document Type column.

The Smith Point TSS no longer serves a useful purpose, and the notice of inquiry USCG published in August confirms that there are no concerns from the public about removing it and therefore the USCG has decided to move forward with the removal of the vessel traffic routing measure.

### III. Authority and Action To Be Taken

Under 46 U.S.C. 70001(a)(4), as delegated, USCG may control vessel traffic in areas subject to the jurisdiction of the United States that it determines to be hazardous by, among other means, establishing vessel traffic routing schemes. Based on the analysis of historical vessel traffic patterns and the comment received, the Coast Guard will:

1. Request NOAA remove the Smith Point TSS chart feature from all applicable charts and update the U.S. Coast Pilot to remove the TSS and reflect changes to the on-scene navigational buoy the USCG will deploy.

2. Change the Smith Point Fairway Lighted Buoy SP (LLNR 7490) to Smith Point Lighted Buoy SP, a white and red striped Safe Water Buoy and the light will be changed from a yellow to white with a Morse Code "A" flash characteristic.

Dated: December 8, 2023.

**Shannon N. Gilreath,**

*Rear Admiral, U.S. Coast Guard, Commander, Fifth Coast Guard District.*

[FR Doc. 2023–27440 Filed 12–13–23; 8:45 am]

**BILLING CODE 9110–04–P**

## DEPARTMENT OF HOMELAND SECURITY

### U.S. Citizenship and Immigration Services

[CIS No. 2760–23; DHS Docket No. USCIS–2023–0013]

RIN 1615–ZC06

### Extension of Re-Registration Periods for Extensions of the Temporary Protected Status Designations of El Salvador, Haiti, Honduras, Nepal, Nicaragua, and Sudan

**AGENCY:** U.S. Citizenship and Immigration Services (USCIS), Department of Homeland Security (DHS).

**ACTION:** Notice of extension of re-registration periods for extensions of the Temporary Protected Status designations of El Salvador, Haiti, Honduras, Nepal, Nicaragua, and Sudan.

**SUMMARY:** Through this notice, the Department of Homeland Security (DHS) announces that the Secretary of Homeland Security (Secretary) is extending the re-registration periods for the extensions of the Temporary Protected Status (TPS) designations for El Salvador, Haiti, Honduras, Nepal, Nicaragua, and Sudan from 60 days to the full 18-month designation extension period of each country. Beneficiaries must re-register to receive TPS benefits under the most recent designation extensions for these countries.

**DATES:** The re-registration period for individuals to submit TPS applications under the designation of:

• El Salvador is July 12, 2023, through March 9, 2025;

• Haiti is January 26, 2023, through August 3, 2024;

• Honduras is November 6, 2023, through July 5, 2025;

• Nepal is October 24, 2023, through June 24, 2025;

• Nicaragua is November 6, 2023, through July 5, 2025; and

• Sudan is August 21, 2023, through April 19, 2025.

**FOR FURTHER INFORMATION CONTACT:**

• You may contact Renå Cutlip-Mason, Chief, Humanitarian Affairs Division, Office of Policy and Strategy, U.S. Citizenship and Immigration Services, Department of Homeland Security, by mail at 5900 Capital Gateway Drive, Camp Springs, MD 20746, or by phone at 800–375–5283.

• For further information on TPS, including guidance on the registration process and additional information on eligibility, please visit the USCIS TPS

web page at *https://uscis.gov/tps.* You can find specific information about each country's TPS designation by selecting the name of the country from the menu on the left side of the TPS web page.

• If you have additional questions about TPS, please visit *https://uscis.gov/tools.* Our online virtual assistant, Emma, can answer many of your questions and point you to additional information on our website. If you are unable to find your answers there, you may also call our USCIS Contact Center at 800–375–5283 (TTY 800–767–1833).

• Applicants seeking information about the status of their individual cases may check Case Status Online, available on the USCIS website at *uscis.gov,* or visit the USCIS Contact Center at *https://uscis.gov/contactcenter.*

• Further information will also be available at local USCIS offices upon publication of this notice.

**SUPPLEMENTARY INFORMATION:**

**Table of Abbreviations**

DHS   U.S. Department of Homeland Security
EAD   Employment Authorization Document
Form I–765   Application for Employment Authorization
Form I–821   Application for Temporary Protected Status
FR   Federal Register
INA   Immigration and Nationality Act
Secretary   Secretary of Homeland Security
TPS   Temporary Protected Status
TTY   Text Telephone
USCIS   U.S. Citizenship and Immigration Services

**Purpose of This Action (TPS)**

The re-registration period extensions apply to the following **Federal Register** notices:

*Reconsideration and Rescission of Termination of the Designation of El Salvador for Temporary Protected Status; Extension of the Temporary Protected Status Designation for El Salvador,* 88 FR 40282 (June 21, 2023). The 18-month re-registration period now runs from July 12, 2023, through March 9, 2025.

*Extension and Redesignation of Haiti for Temporary Protected Status,* 88 FR 5022 (January 26, 2023). The re-registration period now runs from January 26, 2023, through August 3, 2024.

*Reconsideration and Rescission of Termination of the Designation of Honduras for Temporary Protected Status; Extension of the Temporary Protected Status Designation for Honduras,* 88 FR 40304 (June 21, 2023). The 18-month re-registration period now runs from November 6, 2023, through July 5, 2025.

*Reconsideration and Rescission of Termination of the Designation of Nepal for Temporary Protected Status; Extension of the Temporary Protected Status Designation for Nepal,* 88 FR 40317 (June 21, 2023). The 18-month re-registration period now runs from October 24, 2023, through June 24, 2025.

*Reconsideration and Rescission of Termination of the Designation of Nicaragua for Temporary Protected Status; Extension of the Temporary Protected Status Designation for Nicaragua,* 88 FR 40294 (June 21, 2023). The 18-month re-registration period now runs from November 6, 2023, through July 5, 2025.

*Extension and Redesignation of Sudan for Temporary Protected Status,* 88 FR 56864 (August 21, 2023). The re-registration period now runs from August 21, 2023, through April 19, 2025.

Through this notice, DHS sets forth updated re-registration periods from 60 days to 18 months for the extensions of the TPS designations for El Salvador,[1] Haiti,[2] Honduras,[3] Nepal,[4] Nicaragua,[5] and Sudan[6] as specified in this notice. *See* section 244 of the Immigration and Nationality Act (INA), 8 U.S.C. 1254a; 8 CFR 244.17. This will allow individuals to submit a re-registration application for TPS and an application for employment authorization documentation (if desired), during the full length of the relevant country's TPS designation extension.

DHS is extending the re-registration periods for a number of reasons, including that certain beneficiaries have not been required to re-register for TPS for several years due to pending litigation and related continuation of their documentation, confusion within

the beneficiary population, and operational considerations for USCIS. Historically, the length of the re-registration period has typically been 60 days.[7] Beneficiaries of TPS have typically re-registered for TPS within a 60-day period on a recurring basis at the end of their country's designation approximately every 12 to 18 months as announced by **Federal Register** notices that extended the designation. However, certain beneficiaries under these TPS designations have not been required to re-register for TPS for several years due to a series of DHS-issued **Federal Register** notices that continued the documentation for beneficiaries of TPS designations for El Salvador, Haiti, Nicaragua, Sudan, Honduras, and Nepal pursuant to ongoing litigation.[8] Those beneficiaries must re-register to receive TPS benefits under the most recent extensions.

After reevaluating the initial 60-day re-registration periods announced for TPS under the designation extensions for El Salvador, Haiti, Nicaragua, Sudan, Honduras, and Nepal, DHS has determined that it will provide the full designation extension periods for applicants to file their re-registration

Form I–821 and Form I–765 to obtain an EAD, if desired. Limiting the re-registration period to 60 days for these particular beneficiaries may place a burden on applicants who are unable to timely file but would otherwise be eligible to re-register for TPS, particularly in light of the ongoing litigation and the resulting overlapping periods of TPS validity announced in several **Federal Register** notices, which may be confusing to some current beneficiaries. This notice allows beneficiaries of these countries who have not been required to re-register for TPS since their last extension to re-register over the full TPS designation period.[9] Prior to the currently required re-registration, beneficiaries under these designations[10] were last required to re-register from July 8, 2016, through September 6, 2016, under El Salvador's designation,[11] from May 16, 2016, through July 15, 2016, under Nicaragua's and Honduras's designations,[12] and from October 26, 2016, through December 27, 2016, under Nepal's designation.[13]

As discussed previously, due to unique circumstances, including protracted litigation, these

---

[1] *Reconsideration and Rescission of Termination of the Designation of El Salvador for Temporary Protected Status; Extension of the Temporary Protected Status Designation for El Salvador,* 88 FR 40282 (June 21, 2023).

[2] *Extension and Redesignation of Haiti for Temporary Protected Status,* 88 FR 5022 (Jan. 26, 2023).

[3] *Reconsideration and Rescission of Termination of the Designation of Honduras for Temporary Protected Status; Extension of the Temporary Protected Status Designation for Honduras,* 88 FR 40304 (June 21, 2023).

[4] *Reconsideration and Rescission of Termination of the Designation of Nepal for Temporary Protected Status; Extension of the Temporary Protected Status Designation for Nepal,* 88 FR 40317 (June 21, 2023).

[5] *Reconsideration and Rescission of Termination of the Designation of Nicaragua for Temporary Protected Status; Extension of the Temporary Protected Status Designation for Nicaragua,* 88 FR 40294 (June 21, 2023).

[6] *Extension and Redesignation of Sudan for Temporary Protected Status,* 88 FR 56864 (Aug. 21, 2023).

[7] DHS has previously provided a re-registration period for longer than 60 days. *See, e.g., Extension and Redesignation of Haiti for Temporary Protected Status,* 76 FR 29000 (May 19, 2011) (providing a 90-day re-registration period for Haiti TPS). Additionally, DHS has previously extended a re-registration period. *See, e.g., Extension of the Re-Registration Period for Haiti Temporary Protected Status,* 79 FR 25141 (May 2, 2014) (providing an extension of the re-registration period for Haiti TPS in order to maximize re-registration opportunities for eligible beneficiaries. At the time, USCIS had received a low proportion of the expected number of re-registration applications, and stakeholders reported that the low number of re-registration applications may have been due to confusion about the re-registration deadline). Similarly, DHS is providing applicants under these designations extended re-registration periods to address the several year gap in the typical re-registration requirements.

[8] TPS termination decisions were announced for El Salvador, Haiti, Nicaragua, Sudan, Honduras, and Nepal in 2017–2018. Lawsuits challenging the terminations were filed in the U.S. District Court for the Northern District of California in *Ramos v. Nielsen,* 326 F. Supp. 3d 1075 (N.D. Cal. 2018), and *Bhattarai v. Nielsen,* No. 19–cv–00731 (N.D. Cal. Mar. 12, 2019), and in the U.S. U.S. District Court for the Eastern District of New York in *Saget v. Trump,* 375 F. Supp. 3d 280 (E.D.N.Y. 2019). DHS has taken actions to ensure its continued compliance with the court orders in *Ramos* and *Bhattarai.* DHS has published periodic notices to continue TPS and extend the validity of TPS-related documentation previously issued to beneficiaries under the TPS designations for El Salvador, Haiti, Nicaragua, Sudan, Honduras, and Nepal. *See* 83 FR 54764 (Oct. 31, 2018); 84 FR 7103 (Mar. 1, 2019); 84 FR 20647 (May 10, 2019) (correction notice issued at 84 FR 23578 (May 22, 2019)); 84 FR 59403 (Nov. 4, 2019); 85 FR 79208 (Dec. 9, 2020); 86 FR 50725 (Sept. 10, 2021) (correction notice issued at 86 FR 52694 (Sept. 22, 2021)); 87 FR 68717 (Nov. 16, 2022).

[9] Re-registrants under TPS Haiti and Sudan, including beneficiaries who initially obtained TPS under the 2021 and 2022 designations of TPS for Haiti and Sudan, may file during the entire designation re-registration period as noted in this notice.

[10] Haiti and Sudan were newly designated for TPS in 2021 and 2022, respectively. Prior to the new designation of TPS for Haiti on August 3, 2021, beneficiaries under the Haiti designation were last required to re-register from May 24, 2017, through July 24, 2017. *See Extension and Redesignation of Haiti for Temporary Protected Status,* 82 FR 23830 (July 23, 2017). Prior to the new designation of TPS for Sudan on April 19, 2022, beneficiaries under the Sudan designation were last required to re-register from January 25, 2016, through March 25, 2016. *See Extension and Redesignation of Sudan for Temporary Protected Status,* 81 FR 4045 (January 25, 2016).

[11] *Extension of the Designation of El Salvador for Temporary Protected Status,* 81 FR 44645 (July 8, 2016).

[12] *Extension of the Designation of Nicaragua for Temporary Protected Status,* 81 FR 30325 (May 16, 2016). *Extension of the Designation of Honduras for Temporary Protected Status,* 81 FR 30331 (May 16, 2016). Following the last extension of TPS for Honduras, former Acting Secretary Elaine Duke did not make a decision on extending or terminating Honduras's TPS designation by the statutory deadline, resulting in an automatic 6-month extension of the designation, through July 5, 2018. *See Extension of the Designation of Honduras for Temporary Protected Status,* 82 FR 59630 (Dec. 15, 2017). If the Secretary makes no decision on extension or termination of a country's TPS designation by at least 60 days before the expiration of the existing TPS designation, then INA sec. 244(b)(3)(C) requires that the designation be extended an additional six months (or 12 or 18 months in the Secretary's discretion).

[13] *Extension of the Designation of Nepal for Temporary Protected Status,* 81 FR 74470 (October 26, 2016).

beneficiaries have been subject to multiple, overlapping periods of potential TPS validity due to the ongoing litigation. They also have not been required to re-register for several years. Therefore, this extended re-registration period allows this population of beneficiaries to more easily comply with the re-registration requirement, which could avoid placing additional burdens on these re-registrants. In addition, permitting re-registration throughout the entirety of the designation extension period could reduce the operational burden on USCIS; reviewing and adjudicating late-filed re-registration applications that may occur as a result of the 60-day period due to lack of awareness of the re-registration requirement that these particular beneficiaries are more likely to experience because of the protracted litigation and subsequent TPS actions to continue documentation, would require additional resources.

**Alejandro N. Mayorkas,**
*Secretary, U.S. Department of Homeland Security.*

[FR Doc. 2023–27342 Filed 12–13–23; 8:45 am]

**BILLING CODE 9111–97–P**

---

## DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT

**[Docket No. FR–7076–N–19]**

**60-Day Notice of Proposed Information Collection: Public Housing Agency (PHA) 5-Year and Annual Plan; OMB Control No.: 2577–0226**

**AGENCY:** Office of the Assistant Secretary for Public and Indian Housing (PIH), HUD.

**ACTION:** Notice.

**SUMMARY:** HUD is seeking approval from the Office of Management and Budget (OMB) for the information collection described below. In accordance with the Paperwork Reduction Act HUD is requesting comment from all interested parties on the proposed collection of information. The purpose of this notice is to allow for 60 days of public comment.

**DATES:** *Comments Due Date:* February 12, 2024.

**ADDRESSES:** Interested persons are invited to submit comments regarding this proposal. Written comments and recommendations for the proposed information collection can be submitted within 60 days of publication of this notice to *www.reginfo.gov/public/do/PRAMain.* Find this particular information collection by selecting ''Currently under 60-day Review—Open for Public Comments'' or by using the search function. Interested persons are also invited to submit comments regarding this proposal by name and/or OMB Control Number and can be sent to: Colette Pollard, Reports Management Officer, REE, Department of Housing and Urban Development, 451 7th Street SW, Room 8210, Washington, DC 20410–5000 or email at *PaperworkReductionActOffice@hud.gov.*

**FOR FURTHER INFORMATION CONTACT:** Colette Pollard, Management Analyst, Reports Management Officer, REE, Department of Housing and Urban Development, 451 7th Street, SW, Washington, DC 20410; email *Colette.Pollard@hud.gov,* telephone 202–402–3400. This is not a toll-free number. HUD welcomes and is prepared to receive calls from individuals who are deaf or hard of hearing, as well as individuals with speech or communication disabilities. To learn more about how to make an accessible telephone call, please visit *https://www.fcc.gov/consumers/guides/telecommunications-relay-service-trs.* Copies of available documents submitted to OMB may be obtained from Ms. Pollard.

**SUPPLEMENTARY INFORMATION:** This notice informs the public that HUD is seeking approval from OMB for the information collection described in Section A.

### A. Overview of Information Collection

*Title of Information Collection:* Public Housing Agency (PHA) 5-Year and Annual Plan.

*OMB Approval Number:* 2577–0226.
*Type of Request:* Revision of currently approved collection.

*Form Number(s):* HUD–50075–5Y, HUD–50075–HCV, HUD–50075–HP, HUD–50075–MTW, HUD–50075–SM, HUD–50075–ST, HUD–50077–CR, HUD–50077–CRT–SM HUD–50077–ST–HCV–HP and HUD–50077–SL.

*Description of the need for the information and proposed use:* The Public Housing Agency (PHA) Plan was created by section 5A of the United States Housing Act of 1937 (42 U.S.C. 1437c–1). There are two different PHA Plans: The Five-Year Plan and the Annual Plan. The Five-Year Plan describes the agency's mission, long-range goals, and objectives for achieving its mission over a five-year period. The Annual PHA Plan is a comprehensive guide to PHA policies, programs, operations, and strategies for meeting local housing needs and goals. This revision addresses updates to the HUD–50075–HCV form and the automation of all the PHA Plan forms including the Moving to Work (MTW) Supplement for PHAs that joined the MTW Demonstration under the 2016 Appropriations Act (*i.e.,* MTW Expansion).

PHA Plans are needed to inform the Department of Housing and Urban Development (HUD), residents, and the public of the PHA's mission and strategy for serving the needs of low income, very low-income, and extremely low- income families in the PHA's jurisdiction. This information helps provide accountability to the local community for how PHAs spend their funding and implement their policies. The PHA Plan submission also includes various certifications to confirm that PHAs will abide by all Federal civil rights laws and that the PHA Plan is consistent with the applicable Consolidated Plan.

PHA plans also allow HUD to monitor the performance of programs and the performance of the public housing agencies that administer them. Since 2000, HUD has taken several steps to reduce the administrative burden of the PHA Plan submission including the use of streamlined plan submissions for certain PHA based on size and performance. Most recently, the Housing and Economic Reform Act (HERA) removed the requirement for qualified PHAs to submit an annual PHA Plan and to only submit the 5-year Plan. A ''qualified PHA'' is one that manages 550 or fewer public housing units and vouchers and is not labeled as a troubled public housing agency. Currently, qualified PHA must only submit an annual certification to confirm that they will abide by all Federal civil rights laws.

In January 2021 HUD requested from OMB that the PHA Plan collection be reinstated with change. These changes included a new section to accommodate the new requirements of the Affirmatively Furthering Fair Housing (AFFH) Rule and the introduction of the MTW Supplement. OMB approved the changes, reinstated the collections and HUD made the new templates available to PHAs on the HUD website as individual word processing files. After publication, HUD made subsequent minor changes to the forms and certifications to remove unnecessary sections, make minor edits and to account for updated or removed regulatory citations. Additionally, HUD took steps to automate the MTW supplement in the Housing Information Portal (HIP).

With this current proposed information collection, HUD intends to

HondurasAR000089

Council on Alcohol Abuse and Alcoholism.

The meeting will be open to the public as indicated below, with attendance limited to space available. Individuals who plan to attend and need special assistance, such as sign language interpretation or other reasonable accommodations, should notify the Contact Person listed below in advance of the meeting.

The meeting will be closed to the public in accordance with the provisions set forth in sections 552b(c)(4) and 552b(c)(6), Title 5 U.S.C., as amended. The grant applications and/or contract proposals and the discussions could disclose confidential trade secrets or commercial property such as patentable material, and personal information concerning individuals associated with the grant applications and/or contract proposals, the disclosure of which would constitute a clearly unwarranted invasion of personal privacy.

*Name of Committee:* National Advisory Council on Alcohol Abuse and Alcoholism.

*Date:* February 8, 2018.

*Closed:* 9:00 a.m. to 9:30 a.m.

*Agenda:* Presentation of the BSC Report: Evaluation of NIAAA Intramural Staff.

*Place:* National Institutes of Health, National Institute on Alcohol Abuse and Alcoholism, Terrace Conference Rooms, 5635 Fishers Lane, Bethesda, MD 20892.

*Closed:* 9:45 a.m. to 10:45 a.m.

*Agenda:* To review and evaluate grant applications and cooperative agreements.

*Place:* National Institutes of Health, National Institute on Alcohol Abuse and Alcoholism, Terrace Conference Rooms, 5635 Fishers Lane, Bethesda, MD 20892.

*Open:* 10:45 a.m. to 3:15 p.m.

*Agenda:* Presentations and other business of the council.

*Place:* National Institutes of Health, National Institute on Alcohol Abuse and Alcoholism, Terrace Conference Rooms, 5635 Fishers Lane, Bethesda, MD 20892.

*Contact Person:* Abraham P. Bautista, Ph.D., Executive Secretary, National Advisory Council, National Institute on Alcohol Abuse & Alcoholism, National Institutes of Health, 5635 Fishers Lane, Room 2085, Rockville, MD 20852, 301–443–9737, *bautista@mail.nih.gov.*

Any interested person may file written comments with the committee by forwarding the statement to the Contact Person listed on this notice. The statement should include the name, address, telephone number and when applicable, the business or professional affiliation of the interested person.

Information is also available on the Institute's/Center's home page: *http://www.niaaa.nih.gov/AboutNIAAA/AdvisoryCouncil/Pages/default.aspx,* where an agenda and any additional information for the meeting will be posted when available.

(Catalogue of Federal Domestic Assistance Program Nos. 93.271, Alcohol Research

Career Development Awards for Scientists and Clinicians; 93.272, Alcohol National Research Service Awards for Research Training; 93.273, Alcohol Research Programs; 93.891, Alcohol Research Center Grants; 93.701, ARRA Related Biomedical Research and Research Support Awards., National Institutes of Health, HHS)

Dated: December 11, 2017.

**David Clary,**

*Program Analyst, Office of Federal Advisory Committee Policy.*

[FR Doc. 2017–27058 Filed 12–14–17; 8:45 am]

**BILLING CODE 4140–01–P**

---

## DEPARTMENT OF HEALTH AND HUMAN SERVICES

### National Institutes of Health

### National Institute on Deafness and Other Communication Disorders; Notice of Meeting

Pursuant to section 10(d) of the Federal Advisory Committee Act, as amended, notice is hereby given of a meeting of the National Deafness and Other Communication Disorders Advisory Council.

The meeting will be open to the public as indicated below, with attendance limited to space available. Individuals who plan to attend and need special assistance, such as sign language interpretation or other reasonable accommodations, should notify the Contact Person listed below in advance of the meeting.

The meeting will be closed to the public in accordance with the provisions set forth in sections 552b(c)(4) and 552b(c)(6), Title 5 U.S.C., as amended. The grant applications and/or contract proposals and the discussions could disclose confidential trade secrets or commercial property such as patentable material, and personal information concerning individuals associated with the grant applications and/or contract proposals, the disclosure of which would constitute a clearly unwarranted invasion of personal privacy.

*Name of Committee:* National Deafness and Other Communication Disorders Advisory Council.

*Date:* January 26, 2018.

*Closed:* 8:30 a.m. to 10:30 a.m.

*Agenda:* To review and evaluate grant applications.

*Place:* National Institutes of Health, Building 31, Conference Room 6, 31 Center Drive, Bethesda, MD 20892.

*Open:* 10:30 a.m. to 2:00 p.m.

*Agenda:* Staff reports on divisional, programmatic, and special activities.

*Place:* National Institutes of Health, Building 31, Conference Room 6, 31 Center Drive, Bethesda, MD 20892.

*Contact Person:* Craig A. Jordan, Ph.D., Director, Division of Extramural Activities, NIDCD, NIH, Room 8345, MSC 9670, 6001 Executive Blvd., Bethesda, MD 20892–9670, 301–496–8693, *jordanc@nidcd.nih.gov.*

Any interested person may file written comments with the committee by forwarding the statement to the Contact Person listed on this notice. The statement should include the name, address, telephone number and when applicable, the business or professional affiliation of the interested person.

In the interest of security, NIH has instituted stringent procedures for entrance onto the NIH campus. All visitor vehicles, including taxicabs, hotel, and airport shuttles will be inspected before being allowed on campus. Visitors will be asked to show one form of identification (for example, a government-issued photo ID, driver's license, or passport) and to state the purpose of their visit.

Information is also available on the Institute's/Center's home page: *http://www.nidcd.nih.gov/about/Pages/Advisory-Groups-and-Review-Committees.aspx,* where an agenda and any additional information for the meeting will be posted when available.

(Catalogue of Federal Domestic Assistance Program Nos. 93.173, Biological Research Related to Deafness and Communicative Disorders, National Institutes of Health, HHS)

Dated: December 12, 2017.

**Sylvia L. Neal,**

*Program Analyst, Office of Federal Advisory Committee Policy.*

[FR Doc. 2017–27110 Filed 12–14–17; 8:45 am]

**BILLING CODE 4140–01–P**

---

## DEPARTMENT OF HOMELAND SECURITY

### U.S. Citizenship and Immigration Services

**[CIS No. 2612–17; DHS Docket No. USCIS–2014–0007]**

**RIN 1615–ZB68**

### Extension of the Designation of Honduras for Temporary Protected Status

**AGENCY:** U.S. Citizenship and Immigration Services, Department of Homeland Security.

**ACTION:** Notice.

---

**SUMMARY:** The designation of Honduras for Temporary Protected Status (TPS) is set to expire on January 5, 2018. At least 60 days before the expiration of a country's TPS designation or extension, the Secretary of Homeland Security (Secretary), after consultation with appropriate Government agencies, must review the conditions in a foreign state designated for TPS to determine whether the conditions for the TPS designation continue to be met. If the

Secretary does not make a determination that a foreign state no longer meets the conditions for designation for TPS at least 60 days before the current expiration of the country's TPS designation, the period of designation is automatically extended for 6 additional months (or, in the Secretary's discretion, 12 or 18 months). The Secretary did not make a determination on Honduras's designation by November 6, 2017, the statutory deadline. Accordingly, the TPS designation of Honduras is automatically extended for 6 months, from January 6, 2018 through July 5, 2018.

TPS beneficiaries are reminded that, prior to July 5, 2018, the Secretary will review the conditions in Honduras and decide whether extension, redesignation, or termination is warranted in accordance with the TPS statute. During this period, beneficiaries are encouraged to prepare for their return to Honduras in the event Honduras's designation is not extended again and if they have no other lawful basis for remaining in the United States, including requesting updated travel documents from the Government of Honduras.

**DATES:** The 6-month extension of Honduras's TPS designation is effective January 6, 2018, and will remain in effect through July 5, 2018. The 60-day re-registration period runs from December 15, 2017 through February 13, 2018.

**FOR FURTHER INFORMATION CONTACT:**

• You may contact Alexander King, Branch Chief, Waivers and Temporary Services Branch, Service Center Operations Directorate, U.S. Citizenship and Immigration Services, Department of Homeland Security, 20 Massachusetts Avenue NW, Washington, DC 20529–2060; or by phone at (202) 272–8377 (this is not a toll-free number). **Note:** The phone number provided here is solely for questions regarding this TPS Notice. It is not for individual case status inquiries.

• For further information on TPS, including guidance on the re-registration process and additional information on eligibility, please visit the USCIS TPS web page at *http://www.uscis.gov/tps*. You can find specific information about this extension of Honduras's TPS by selecting ''Honduras'' from the menu on the left side of the TPS web page.

• Applicants seeking information about the status of their individual cases can check Case Status Online, available on the USCIS website at *http://www.uscis.gov* or call the USCIS

National Customer Service Center at 800–375–5283 (TTY 800–767–1833). Service is available in English and Spanish.

• Further information will also be available at local USCIS offices upon publication of this Notice.

**SUPPLEMENTARY INFORMATION:**

**Table of Abbreviations**

BIA—Board of Immigration Appeals
CFR—Code of Federal Regulations
DHS—Department of Homeland Security
DOS—Department of State
EAD—Employment Authorization Document
FNC—Final Nonconfirmation
FR—Federal Register
Government—U.S. Government
IJ—Immigration Judge
INA—Immigration and Nationality Act
IER—U.S. Department of Justice Civil Rights Division, Immigrant and Employee Rights Section
SAVE—USCIS Systematic Alien Verification for Entitlements Program
Secretary—Secretary of Homeland Security
TNC—Tentative Nonconfirmation
TPS—Temporary Protected Status
TTY—Text Telephone
USCIS—U.S. Citizenship and Immigration Services
U.S.C.—United States Code

The extension allows TPS beneficiaries to maintain TPS through July 5, 2018, so long as they continue to meet the eligibility requirements for TPS. Through this Notice, DHS sets forth procedures necessary for eligible nationals of Honduras (or aliens having no nationality who last habitually resided in Honduras) to re-register for TPS and to apply for renewal of their EADs with USCIS.

For individuals who have already been granted TPS under Honduras's designation, the 60-day re-registration period runs from December 15, 2017 through February 13, 2018. USCIS will issue EADs with a July 5, 2018 expiration date to eligible Honduran TPS beneficiaries who timely re-register and apply for EADs under this extension. Given the timeframes involved with processing TPS re-registration applications, DHS recognizes that not all re-registrants will receive new EADs before their current EADs expire on January 5, 2018. Accordingly, through this Notice, DHS automatically extends the validity of EADs issued under the TPS designation of Honduras for 180 days, through July 4, 2018. This Notice explains how TPS beneficiaries and their employers may determine which EADs are automatically extended and how this affects the Form I–9, Employment Eligibility Verification, and E-Verify processes.

**What is Temporary Protected Status (TPS)?**

• TPS is a temporary immigration status granted to eligible nationals of a country designated for TPS under the Immigration and Nationality Act (INA), or to eligible persons without nationality who last habitually resided in the designated country.

• During the TPS designation period, TPS beneficiaries are eligible to remain in the United States, may not be removed, and are authorized to work and obtain EADs so long as they continue to meet the requirements of TPS.

• TPS beneficiaries may also apply for and be granted travel authorization as a matter of discretion.

• The granting of TPS does not automatically result in or lead to lawful permanent resident status.

• To qualify for TPS, beneficiaries must meet the eligibility standards at INA section 244(c)(2), 8 U.S.C. 1254a(c)(2).

• When the Secretary terminates a country's TPS designation, beneficiaries return to one of the following:

○ The same immigration status or category they maintained before TPS, if any (unless that status or category has since expired or been terminated); or

○ Any other lawfully obtained immigration status or category they received while registered for TPS, as long as it is still valid on the date TPS terminates.

**When was Honduras designated for TPS?**

Honduras was initially designated for TPS on January 5, 1999, on environmental disaster grounds, specifically the devastation caused by Hurricane Mitch. *See* Designation of Honduras Under Temporary Protected Status, 64 FR 524 (Jan. 5, 1999). The last extension of Honduras's designation for TPS was announced on May 16, 2016, based on the determination that the conditions warranting the designation continued to be met. *See* Extension of the Designation of Honduras for Temporary Protected Status, 81 FR 30331 (May 16, 2016).

**Why is the TPS designation for Honduras being extended through July 5, 2018?**

The designation of Honduras for TPS is set to expire on January 5, 2018. At least 60 days before the expiration of a country's TPS designation or extension, the Secretary, after consultation with appropriate Government agencies, must review the conditions in a foreign state designated for TPS to determine

**59632** Federal Register / Vol. 82, No. 240 / Friday, December 15, 2017 / Notices

whether the conditions for the TPS designation continue to be met.[1] If the Secretary does not make a determination that a foreign state no longer meets the conditions for designation for TPS at least 60 days before the current expiration of the country's TPS designation, the period of designation is automatically extended for 6 additional months (or, in the Secretary's discretion, 12 or 18 months). *See* INA section 244(b)(3)(A) and (C). The Secretary did not make a determination on Honduras's designation by November 6, 2017, the statutory deadline, and did not elect to extend the designation beyond the automatic six months. Accordingly, the TPS designation of Honduras is automatically extended for 6 months, from January 6, 2018 to July 5, 2018. DHS estimates that there are approximately 86,000 nationals of Honduras (and aliens having no nationality who last habitually resided in Honduras) who hold TPS under Honduras's designation.

**Notice of Extension of the TPS Designation of Honduras**

Pursuant to INA section 244(b)(3)(A) and (C), the TPS designation for Honduras is automatically extended for 6 months, from January 6, 2018 to July 5, 2018.

Elaine C. Duke,

*Acting Secretary.*

**Required Application Forms and Application Fees To Re-Register for TPS**

To re-register for TPS based on the designation of Honduras, you *must* submit an Application for Temporary Protected Status (Form I–821). You do not need to pay the filing fee for the Form I–821. *See* 8 CFR 244.17. You may be required to pay the biometrics services fee. Please see additional information under the "Biometric Services Fee" section of this Notice.

Through operation of this Notice, your existing EAD issued under the TPS designation of Honduras with an expiration date of January 5, 2018, is automatically extended for 180 days, through July 4, 2018. You do not need to apply for a new EAD in order to benefit from this 180-day automatic extension. However, if you want to obtain a new EAD with an expiration date of July 5, 2018 on its face, you must file an Application for Employment Authorization (Form I–765) and pay the Form I–765 fee in addition to filing your re-registration application (Form I–821). If you do not want to request an EAD now, you may also file Form I–765 at a later date to request an EAD and pay the fee (or request a fee waiver), provided that you still have TPS or a pending TPS application.

If you are seeking an EAD with your re-registration for TPS, please submit both the Form I–821 and Form I–765 together. If you are unable to pay the application fee and/or biometrics fee, you may complete a Request for Fee Waiver (Form I–912) or submit a personal letter requesting a fee waiver with satisfactory supporting documentation. For more information on the application forms and fees for TPS, please visit the USCIS TPS web page at *http://www.uscis.gov/tps.* Fees for the Form I–821, the Form I–765, and biometric services are also described in 8 CFR 103.7(b)(1)(i).

**Biometric Services Fee**

Biometrics (such as fingerprints) are required for all applicants 14 years and older. Those applicants must submit a biometric services fee. As previously stated, if you are unable to pay for the biometric services fee, you may complete a Form I–912 or submit a personal letter requesting a fee waiver with satisfactory supporting documentation. For more information on the biometric services fee, please visit the USCIS website at *http://www.uscis.gov.* If necessary, you may be required to visit an Application Support Center to have your biometrics captured. For additional information on the USCIS biometrics screening process please see the USCIS Customer Profile Management Service Privacy Impact Assessment, available at *www.dhs.gov/privacy.*

**Re-Filing a Re-Registration TPS Application After Receiving a Denial of a Fee Waiver Request**

You should file as soon as possible within the 60-day re-registration period so USCIS can process your application and issue any EAD promptly. Properly filing early will also allow you to have time to re-file your application before the deadline, should USCIS deny your fee waiver request. If, however, you receive a denial of your fee waiver request and are unable to re-file by the re-registration deadline, you may still re-file your Form I–821 with the biometrics fee. This situation will be reviewed to determine whether you established good cause for late TPS re-registration. However, you are urged to re-file within 45 days of the date on any USCIS fee waiver denial notice, if possible. *See* INA section 244(c)(3)(C); 8 U.S.C. 1254a(c)(3)(C); 8 CFR 244.17(b). For more information on good cause for late re-registration, visit the USCIS TPS web page at *http://www.uscis.gov/tps.* Following denial of your fee waiver request, you may also file your Form I–765 with fee either with your Form I–821 or at a later time, if you choose.

**Note:** Although a re-registering TPS beneficiary age 14 and older must pay the biometric services fee (but not the Form I–821 fee) when filing a TPS re-registration application, you may decide to wait to request an EAD. Therefore, you do not have to file the Form I–765 or pay the associated Form I–765 fee (or request a fee waiver) at the time of re-registration, and could wait to seek an EAD until after USCIS has approved your TPS re-registration, if you are eligible. If you choose to do this, to re-register for TPS you would only need to file the Form I–821 with the biometrics fee, if applicable (or request a fee waiver).

**Mailing Information**

Mail your application for TPS to the proper address in Table 1.

TABLE 1—MAILING ADDRESSES

| If . . . | Mail to . . . |
| --- | --- |
| You are applying through the U.S. Postal Service | USCIS, Attn: TPS Honduras, P.O. Box 6943, Chicago, IL 60680–6943. |
| For FedEx, UPS, and DHL deliveries | USCIS, Attn: TPS Honduras, 131 S. Dearborn Street, 3rd Floor, Chicago, IL 60603–5517. |

[1] As of March 1, 2003, in accordance with section 1517 of title XV of the Homeland Security Act of 2002, Public Law 107–296, 116 Stat. 2135, any reference to the Attorney General in a provision of the INA describing functions transferred from the Department of Justice to the Department of Homeland Security (DHS) "shall be deemed to refer to the Secretary" of Homeland Security. *See* 6 U.S.C. 557 (codifying the Homeland Security Act of 2002, tit. XV, section 1517).

HondurasAR000092

If you were granted TPS by an immigration judge (IJ) or the Board of Immigration Appeals (BIA) and you wish to request an EAD or are re-registering for the first time following a grant of TPS by an IJ or the BIA, please mail your application to the appropriate mailing address in Table 1. When re-registering and requesting an EAD based on an IJ/BIA grant of TPS, please include a copy of the IJ or BIA order granting you TPS with your application. This will help us to verify your grant of TPS and process your application.

**Supporting Documents**

The filing instructions on the Form I–821 list all the documents needed to establish eligibility for TPS. You may also find information on the acceptable documentation and other requirements for applying or registering for TPS on the USCIS website at *www.uscis.gov/tps* under ''Honduras.''

**Employment Authorization Document (EAD)**

*How can I obtain information on the status of my EAD request?*

To get case status information about your TPS application, including the status of an EAD request, you can check Case Status Online at *http://www.uscis.gov*, or call the USCIS National Customer Service Center at 800–375–5283 (TTY 800–767–1833). If your Form I–765 has been pending for more than 90 days, and you still need assistance, you may request an EAD inquiry appointment with USCIS by using the InfoPass system at *https://infopass.uscis.gov*. However, we strongly encourage you first to check Case Status Online or call the USCIS National Customer Service Center for assistance before making an InfoPass appointment.

*Am I eligible to receive an automatic 180 day extension of my current EAD through July 4, 2018, using this **Federal Register** notice?*

Yes. Provided that you currently have TPS under the designation of Honduras, this Notice automatically extends your EAD by 180 days if you:

• Are a national of Honduras (or an alien having no nationality who last habitually resided in Honduras); and

• Have an EAD under the designation of TPS for Honduras with a marked expiration date of January 5, 2018, bearing the notation A–12 or C–19 on the face of the card under Category.

Although this Notice automatically extends your EAD through July 4, 2018, you must re-register timely for TPS in accordance with the procedures

described in this Notice if you would like to maintain your TPS.

*When hired, what documentation may I show to my employer as evidence of employment authorization and identity when completing Employment Eligibility Verification (Form I–9)?*

You can find a list of acceptable document choices on the ''Lists of Acceptable Documents'' for Form I–9. Employers must complete Form I–9 to verify the identity and employment authorization of all new employees. Within three days of hire, employees must present acceptable documents to their employers as evidence of identity and employment authorization to satisfy Form I–9 requirements.

You may present any document from List A (which provides evidence of both identity and employment authorization), or one document from List B (which provides evidence of your identity) together with one document from List C (which is evidence of employment authorization), or you may present an acceptable receipt for List A, List B, or List C documents as described in the Form I–9 Instructions. Employers may not reject a document based on a future expiration date. You can find additional detailed information about Form I–9 on USCIS's I–9 Central web page at *http://www.uscis.gov/I-9Central*.

An EAD is an acceptable document under List A. If your EAD has an expiration date of January 5, 2018, and states ''A–12'' or ''C–19'' under ''Category,'' it has been extended automatically for 180 days by virtue of this Notice, and you may choose to present your EAD to your employer as proof of identity and employment authorization for Form I–9 through July 4, 2018, unless your TPS has been withdrawn or your request for TPS has been denied. If you properly filed an EAD renewal application in accordance with this Notice, you may choose to present your EAD to your employer together with the Form I–797C Notice of Action (showing the qualifying eligibility category of either A–12 or C–19) as a List A document that provides evidence of your identity and employment authorization for Form I–9 through July 4, 2018, unless your TPS has been finally withdrawn or your request for TPS has been finally denied. See the subsection titled, ''How do my employer and I complete the Employment Eligibility Verification (Form I–9) using an automatically extended EAD for a new job?'' for further information.

To reduce confusion over this extension at the time of hire, you should explain to your employer that the

validity of your EAD has been automatically extended through July 4, 2018. You may also provide your employer with a copy of this Notice, which explains that your EAD has been automatically extended. As an alternative to presenting evidence showing your EAD has been automatically extended, you may choose to present any other acceptable document from List A, a combination of one selection from List B and one selection from List C, or a valid receipt.

*What documentation may I present to my employer for Employment Eligibility Verification (Form I–9) if I am already employed but my current TPS-related EAD is set to expire?*

Even though your EAD has been automatically extended, your employer is required to ask you about your continued employment authorization by the expiration date listed on your current EAD. You will need to present your employer with evidence that you are still authorized to work. Once presented, you may correct your employment authorization expiration date in Section 1 and your employer should correct the EAD expiration date in Section 2 of Form I–9. See the subsection titled, ''What corrections should my current employer and I make to Employment Eligibility Verification (Form I–9) if my EAD has been automatically extended?'' for further information. You may also show this Notice to your employer to explain what to do for Form I–9.

Your employer may need to reinspect your automatically extended EAD to check the expiration date and Category code to record the updated expiration date on your Form I–9 if your employer did not keep a copy of this EAD when you initially presented it. In addition, if you properly filed Form I–765 to obtain a new EAD, you will receive a Form I–797C. The receipt notice will state that your current ''A–12'' or ''C–19'' coded EAD is automatically extended for 180 days. You may present Form I–797C to your employer along with your EAD to confirm the validity of your EAD has been automatically extended through July 4, 2018, unless your TPS has been finally withdrawn or your request for TPS has been finally denied. You may also show this **Federal Register** notice to your employer to show that the validity of your EAD has been automatically extended until July 4, 2018.

The last day of the automatic EAD extension is July 4, 2018. Before you start work on July 5, 2018, your employer must reverify your employment authorization. At that time,

you must present any document from List A or any document from List C on Form I–9 Lists of Acceptable Documents, or an acceptable List A or List C receipt described in the Form I–9 Instructions to reverify employment authorization.

By July 5, 2018, your employer must complete Section 3 of the current version of the form, Form I–9 07/17/17 N, and attach it to the previously completed Form I–9, if your original Form I–9 was a previous version. Your employer can check the USCIS's I–9 Central web page *http://www.uscis.gov/ I-9Central* for the most current version of Form I–9.

Note that your employer may not specify which List A or List C document you must present and cannot reject an acceptable receipt.

*Can my employer require that I provide any other documentation to prove my status, such as proof of my Honduran citizenship?*

No. When completing Form I–9, including reverifying employment authorization, employers must accept any documentation that appears on the Form I–9 Lists of Acceptable Documents that reasonably appears to be genuine and that relates to you, or an acceptable List A, List B, or List C receipt. Employers need not reverify List B identity documents. Employers may not request documentation that does not appear on the "Lists of Acceptable Documents." Therefore, employers may not request proof of Honduran citizenship or proof of re-registration for TPS when completing Form I–9 for new hires or reverifying the employment authorization of current employees. If presented with EADs that have been automatically extended, employers should accept such documents as a valid List A document so long as the EAD reasonably appears to be genuine and relates to the employee. Refer to the Note to Employees section of this Notice for important information about your rights if your employer rejects lawful documentation, requires additional documentation, or otherwise discriminates against you based on your citizenship or immigration status, or your national origin.

*How do my employer and I complete Employment Eligibility Verification (Form I–9) using my automatically extended EAD for a new job?*

When using an automatically extended EAD to complete Form I–9 for a new job before July 5, 2018, you and your employer should do the following:

1. For Section 1, you should:

a. Check "An alien authorized to work until" and enter July 4, 2018, the automatically extended EAD expiration date as the "expiration date, if applicable, mm/dd/yyyy"; and

b. Enter your Alien Number/USCIS number or A-Number where indicated (your EAD or other document from DHS will have your USCIS number or A-Number printed on it; the USCIS number is the same as your A-Number without the A prefix).

2. For Section 2, employers should:

a. Determine if the EAD is auto-extended for 180 days by ensuring it is in category A–12 or C–19 and has a January 5, 2018 expiration date;

b. Write in the document title;

c. Enter the issuing authority;

d. Provide the document number; and

e. Insert July 4, 2018, the date that is 180 days from the date the current EAD expires.

If you also filed for a new EAD, as proof of the automatic extension of your employment authorization, you may present your expired EAD with category A–12 or C–19 in combination with the Form I–797C Notice of Action showing that the EAD renewal application was filed and that the qualifying eligibility category is either A–12 or C–19. Unless your TPS has been finally withdrawn or your request for TPS has been finally denied, this document combination is considered an unexpired EAD (Form I–766) under List A. In these situations, to complete Section 2, employers should:

a. Determine if the EAD is auto-extended for 180 days by ensuring:

• It is in category A–12 or C–19; and
• The category code on the EAD is the same category code on Form I–797C, noting that employers should consider category codes A–12 and C–19 to be the same category code.

b. Write in the document title;

c. Enter the issuing authority;

d. Provide the document number; and

e. Insert July 4, 2018, the date that is 180 days from the date the current EAD expires.

Before the start of work on July 5, 2018, employers must reverify the employee's employment authorization in Section 3 of Form I–9.

*What corrections should my current employer and I make to Employment Eligibility Verification (Form I–9) if my EAD has been automatically extended?*

If you presented a TPS-related EAD that was valid when you first started your job and your EAD has now been automatically extended, your employer may need to reinspect your automatically extended EAD if your employer does not have a copy of the EAD on file. You and your employer

should correct your previously completed Form I–9 as follows:

1. For Section 1, you may

a. Draw a line through the expiration date in Section 1;

b. Write July 4, 2018 which is the date that is 180 days from the date your current EAD expires above the previous date (January 5, 2018); and

c. Initial and date the correction in the margin of Section 1.

2. For Section 2, employers should:

a. Draw a line through the expiration date written in Section 2;

b. Write July 4, 2018, the date that is 180 days from the date the employee's current EAD expires above the previous date (January 5, 2018); and

c. Initial and date the correction in the Additional Information field of Section 2.

In the alternative, if you properly applied for a new EAD, you may present your expired EAD with category A–12 or C–19 in combination with the Form I–797C Notice of Action. The Form I–797C should show that the EAD renewal application was filed and that the qualifying eligibility category is either A–12 or C–19. To avoid confusion, you may also provide your employer a copy of this Notice. Your employer should correct your previously completed Form I–9 as follows:

For Section 2, employers should:

a. Determine if the EAD is auto-extended for 180 days by ensuring:

• It is in category A–12 or C–19; and
• The category code on the EAD is the same category code on Form I–797C, noting that employers should consider category codes A–12 and C–19 to be the same category code.

b. Draw a line through the expiration date written in Section 2;

c. Write July 4, 2018, the date that is 180 days from the date the employee's current EAD expires above the previous date (January 5, 2018); and

d. Initial and date the correction in the Additional Information field in Section 2.

**Note:** This is not considered a reverification. Employers do not need to complete Section 3 until either the 180-day extension has ended or the employee presents a new document to show continued employment authorization, whichever is sooner. By July 5, 2018, when the employee's automatically extended EAD has expired, employers must reverify the employee's employment authorization in Section 3.

*If I am an employer enrolled in E-Verify, how do I verify a new employee whose EAD has been automatically extended?*

Employers may create a case in E-Verify for a new employee using the EAD with expiration date January 5,

HondurasAR000094

2018, or the Form I–797C receipt information provided on Form I–9. In either case, the number entered as the document number on Form I–9 should be entered into the document number field in E-Verify.

*If I am an employer enrolled in E-Verify, what do I do when I receive a ''Work Authorization Documents Expiration'' alert for an automatically extended EAD?*

E-Verify automated the verification process for employees whose TPS-related EAD was automatically extended. If you have employees who are TPS beneficiaries who started working for you, you will receive a ''Work Authorization Documents Expiring'' case alert when the auto-extension period for this EAD is about to expire. This indicates that you should update Form I–9 in accordance with the instructions above. Before the employee starts to work on July 5, 2018, employment authorization must be reverified in Section 3. Employers should not use E-Verify for reverification.

**Note to All Employers**

Employers are reminded that the laws requiring proper employment eligibility verification and prohibiting unfair immigration-related employment practices remain in full force. This Notice does not supersede or in any way limit applicable employment verification rules and policy guidance, including those rules setting forth reverification requirements. For general questions about the employment eligibility verification process, employers may call USCIS at 888–464–4218 (TTY 877–875–6028) or email USCIS at *I9Central@dhs.gov*. Calls and emails are accepted in English and many other languages. For questions about avoiding discrimination during the employment eligibility verification process (Form I–9 and E-Verify), employers may call the U.S. Department of Justice's Civil Rights Division, Immigrant and Employee Rights Section (IER) (formerly the Office of Special Counsel for Immigration-Related Unfair Employment Practices) Employer Hotline at 800–255–8155 (TTY 800–237–2515). IER offers language interpretation in numerous languages. Employers may also email IER at *IER@usdoj.gov*.

**Note to Employees**

For general questions about the employment eligibility verification process, employees may call USCIS at 888–897–7781 (TTY 877–875–6028) or email USCIS at *I-9Central@dhs.gov*. Calls are accepted in English, Spanish, and many other languages. Employees or applicants may also call the IER Worker Hotline at 800–255–7688 (TTY 800–237–2515) for information regarding employment discrimination based upon citizenship, immigration status, or national origin, including discrimination related to Employment Eligibility Verification (Form I–9) and E-Verify. The IER Worker Hotline provides language interpretation in numerous languages.

To comply with the law, employers must accept any document or combination of documents from the Lists of Acceptable Documents if the documentation reasonably appears to be genuine and to relate to the employee, or an acceptable List A, List B, or List C receipt as described in the (Form I–9) Instructions. Employers may not require extra or additional documentation beyond what is required for (Form I–9) completion. Further, employers participating in E-Verify who receive an E-Verify case result of ''Tentative Nonconfirmation'' (TNC) must promptly inform employees of the TNC and give such employees an opportunity to contest the TNC. A TNC case result means that the information entered into E-Verify from (Form I–9) differs from Federal or state government records.

Employers may not terminate, suspend, delay training, withhold pay, lower pay, or take any adverse action against an employee based on the employee's decision to contest a TNC or because the case is still pending with E-Verify. A Final Nonconfirmation (FNC) case result is received when E-Verify cannot verify an employee's employment eligibility. An employer may terminate employment based on a case result of FNC. Work-authorized employees who receive an FNC may call USCIS for assistance at 888–897–7781 (TTY 877–875–6028). For more information about E-Verify-related discrimination or to report an employer for discrimination in the E-Verify process based on citizenship, immigration status, or national origin, contact IER's Worker Hotline at 800–255–7688 (TTY 800–237–2515). Additional information about proper nondiscriminatory (Form I–9) and E-Verify procedures is available on the IER website at *https://www.justice.gov/ier* and the USCIS website at *http://www.dhs.gov/E-verify*.

**Note Regarding Federal, State, and Local Government Agencies (Such as Departments of Motor Vehicles)**

While Federal Government agencies must follow the guidelines laid out by the Federal Government, state and local government agencies establish their own rules and guidelines when granting certain benefits. Each state may have different laws, requirements, and determinations about what documents you need to provide to prove eligibility for certain benefits. Whether you are applying for a Federal, state, or local government benefit, you may need to provide the government agency with documents that show you are a TPS beneficiary and/or show you are authorized to work based on TPS. Examples of such documents are:

(1) Your current EAD;
(2) A copy of your receipt notice (Form I–797C) for your application to renew your current EAD providing an automatic extension of your currently expired or expiring EAD;
(3) A copy of your Application for Temporary Protected Status Notice of Action (Form I–797) for this re-registration; and
(4) A copy of your past or current Application for Temporary Protected Status Notice of Action (Form I–797), if you received one from USCIS.

Check with the government agency regarding which document(s) the agency will accept. Some benefit-granting agencies use the USCIS Systematic Alien Verification for Entitlements (SAVE) program to confirm the current immigration status of applicants for public benefits. In most cases, SAVE provides an automated electronic response to benefit-granting agencies within seconds, but, occasionally, verification can be delayed.

You can check the status of your SAVE verification by using CaseCheck at the following link: *https://save.uscis.gov/casecheck/*, then by clicking the ''Check Your Case'' button. CaseCheck is a free service that lets you follow the progress of your SAVE verification using your date of birth and one immigration identifier number. If an agency has denied your application based solely or in part on a SAVE response, the agency must offer you the opportunity to appeal the decision in accordance with the agency's procedures. If the agency has received and acted upon or will act upon a SAVE verification and you do not believe the response is correct, you may make an InfoPass appointment for an in-person interview at a local USCIS office. Detailed information on how to make corrections, make an appointment, or

**59636**        **Federal Register** / Vol. 82, No. 240 / Friday, December 15, 2017 / Notices

submit a written request to correct records under the Freedom of Information Act can be found on the SAVE website at *http://www.uscis.gov/save.*

[FR Doc. 2017–27140 Filed 12–14–17; 8:45 am]

**BILLING CODE 9111–97–P**

## DEPARTMENT OF HOMELAND SECURITY

### U.S. Citizenship and Immigration Services

[CIS No. 2613–17; DHS Docket No. USCIS–2014–0006]

RIN 1615–ZB69

### Termination of the Designation of Nicaragua for Temporary Protected Status

**AGENCY:** U.S. Citizenship and Immigration Services, Department of Homeland Security.

**ACTION:** Notice.

**SUMMARY:** The designation of Nicaragua for Temporary Protected Status (TPS) is set to expire on January 5, 2018. After reviewing country conditions and consulting with the appropriate U.S. Government agencies, the Secretary of Homeland Security (Secretary) has determined that conditions in Nicaragua no longer support its designation for TPS and is therefore terminating the TPS designation of Nicaragua. To provide for an orderly transition, this termination is effective on January 5, 2019, which is 12 months following the end of the current designation.

Nationals of Nicaragua (and aliens having no nationality who last habitually resided in Nicaragua) who have been granted TPS and wish to maintain their TPS and receive TPS-based Employment Authorization Documents (EAD) valid through January 5, 2019, must re-register for TPS in accordance with the procedures set forth in this Notice. On January 6, 2019, nationals of Nicaragua (and aliens having no nationality who last habitually resided in Nicaragua) who have been granted TPS under the Nicaragua designation will no longer have TPS.

**DATES:** The designation of Nicaragua for TPS is terminated effective at 11:59 p.m., local time, on January 5, 2019. The 60-day re-registration period runs from December 15, 2017 through February 13, 2018. (**Note:** It is important for re-registrants to timely re-register during this 60-day period and not to wait until their EADs expire.)

**FOR FURTHER INFORMATION CONTACT:**

• You may contact Alexander King, Branch Chief, Waivers and Temporary Services Branch, Service Center Operations Directorate, U.S. Citizenship and Immigration Services, Department of Homeland Security, 20 Massachusetts Avenue NW, Washington, DC 20529–2060; or by phone at (202) 272–8377 (this is not a toll-free number). **Note:** The phone number provided here is solely for questions regarding this TPS Notice. It is not for individual case status inquiries.

• For further information on TPS, including guidance on the re-registration process and additional information on eligibility, please visit the USCIS TPS web page at *http://www.uscis.gov/tps.* You can find specific information about this termination of Nicaragua's TPS by selecting "Nicaragua" from the menu on the left side of the TPS web page.

• Applicants seeking information about the status of their individual cases can check Case Status Online, available on the USCIS website at *http://www.uscis.gov,* or call the USCIS National Customer Service Center at 800–375–5283 (TTY 800–767–1833). Service is available in English and Spanish.

• Further information will also be available at local USCIS offices upon publication of this Notice.

**SUPPLEMENTARY INFORMATION:**

### Table of Abbreviations

BIA—Board of Immigration Appeals
CFR—Code of Federal Regulations
DHS—Department of Homeland Security
DOS—Department of State
EAD—Employment Authorization Document
FNC—Final Nonconfirmation
FR—Federal Register
Government—U.S. Government
IJ—Immigration Judge
INA—Immigration and Nationality Act
IER—U.S. Department of Justice Civil Rights Division, Immigrant and Employee Rights Section
SAVE—USCIS Systematic Alien Verification for Entitlements Program
Secretary—Secretary of Homeland Security
TNC—Tentative Nonconfirmation
TPS—Temporary Protected Status
TTY—Text Telephone
USCIS—U.S. Citizenship and Immigration Services
U.S.C.—United States Code

Through this Notice, DHS sets forth procedures necessary for eligible nationals of Nicaragua (or aliens having no nationality who last habitually resided in Nicaragua) to re-register for TPS and to apply for renewal of their EADs with USCIS. Re-registration is limited to persons who have previously registered for TPS under the designation of Nicaragua and whose applications have been granted.

For individuals who have already been granted TPS under Nicaragua's designation, the 60-day re-registration period runs from December 15, 2017 through February 13, 2018. USCIS will issue new EADs with a January 5, 2019 expiration date to eligible Nicaraguan TPS beneficiaries who timely re-register and apply for EADs. Given the timeframes involved with processing TPS re-registration applications, DHS recognizes that not all re-registrants will receive new EADs before their current EADs expire on January 5, 2018. Accordingly, through this Notice, DHS automatically extends the validity of EADs issued under the TPS designation of Nicaragua for 60 days, through March 6, 2018. Additionally, provided a Nicaraguan TPS beneficiary timely re-registers and properly files an application for an EAD in accordance with this Notice, the validity of his or her EAD will be automatically extended by regulation for up to 180 days from the date the current EAD expires, *i.e.,* through July 4, 2018. *See* 8 CFR 274a.13(d)(1). This Notice explains how TPS beneficiaries and their employers may determine which EADs are automatically extended and how this affects the Form I–9, Employment Eligibility Verification, and E-Verify processes.

What is Temporary Protected Status (TPS)?

• TPS is a temporary immigration status granted to eligible nationals of a country designated for TPS under the Immigration and Nationality Act (INA), or to eligible persons without nationality who last habitually resided in the designated country.

• During the TPS designation period, TPS beneficiaries are eligible to remain in the United States, may not be removed, and are authorized to work and obtain EADs so long as they continue to meet the requirements of TPS.

• TPS beneficiaries may also apply for and be granted travel authorization as a matter of discretion.

• The granting of TPS does not result in or lead to lawful permanent resident status.

• To qualify for TPS, beneficiaries must meet the eligibility standards at INA section 244(c)(2), 8 U.S.C. 1254a(c)(2).

• When the Secretary terminates a country's TPS designation, beneficiaries return to one of the following:

  ○ The same immigration status or category that they maintained before TPS, if any (unless that status or category has since expired or been terminated); or

**Note Regarding Federal, State, and Local Government Agencies (Such as Departments of Motor Vehicles)**

This **Federal Register** Notice does not invalidate the compliance notice DHS issued on November 16, 2022, which extended the validity of certain TPS documentation through June 30, 2024, and does not require individuals to present a Form I–797, Notice of Action. While Federal Government agencies must follow the guidelines laid out by the Federal Government, State and local government agencies establish their own rules and guidelines when granting certain benefits. Each state may have different laws, requirements, and determinations about what documents you need to provide to prove eligibility for certain benefits. Whether you are applying for a Federal, State, or local government benefit, you may need to provide the government agency with documents that show you are a TPS beneficiary, show you are authorized to work based on TPS or other status, or that may be used by DHS to determine if you have TPS or another immigration status. Examples of such documents are:

• Your current EAD with a TPS category code of A–12 or C–19, even if your country of birth noted on the EAD does not reflect the TPS designated country of Nicaragua; or

• Your Form I–94, Arrival/Departure Record or Form I–797, Notice of Action, as shown in the **Federal Register** notice published at 87 FR 68717.

Check with the government agency requesting documentation regarding which document(s) the agency will accept. Some state and local government agencies use SAVE to confirm the current immigration status of applicants for public benefits.

While SAVE can verify that an individual has TPS, each state and local government agency's procedures govern whether they will accept an unexpired EAD, Form I–797, Form I–797C, or Form I–94. It may also assist the agency if you:

a. Give the agency a copy of the relevant **Federal Register** notice listing the TPS-related document, including any applicable auto-extension of the document, in addition to your recent TPS-related document with your A-number, USCIS number or Form I–94 number;

b. Explain that SAVE will be able to verify the continuation of your TPS using this information; and

c. Ask the agency to initiate a SAVE query with your information and follow through with additional verification steps, if necessary, to get a final SAVE response verifying your TPS.

You can also ask the agency to look for SAVE notices or contact SAVE if they have any questions about your immigration status or any automatic extension of TPS-related documentation. In most cases, SAVE provides an automated electronic response to benefit-granting agencies within seconds, but occasionally verification can be delayed.

You can check the status of your SAVE verification by using CaseCheck at https://CaseCheck is a free service that lets you follow the progress of your SAVE verification case using your date of birth and one immigration identifier number (A-number, USCIS number, or Form I–94 number) or Verification Case Number. If an agency has denied your application based solely or in part on a SAVE response, the agency must offer you the opportunity to appeal the decision in accordance with the agency's procedures. If the agency has received and acted on or with a SAVE verification and you do not believe the SAVE response is correct, the SAVE website, *www.uscis.gov/save,* has detailed information on how to correct or update your immigration record, make an appointment, or submit a written request to correct records.

[FR Doc. 2023–13246 Filed 6–20–23; 8:45 am]

**BILLING CODE 9111–97–P**

---

**DEPARTMENT OF HOMELAND SECURITY**

**U.S. Citizenship and Immigration Services**

**[CIS No. 2733–22; DHS Docket No. USCIS–2014–0007]**

**RIN 1615–ZB75**

**Reconsideration and Rescission of Termination of the Designation of Honduras for Temporary Protected Status; Extension of the Temporary Protected Status Designation for Honduras**

**AGENCY:** U.S. Citizenship and Immigration Services (USCIS), Department of Homeland Security (DHS).

**ACTION:** Notice of Reconsideration and Rescission of Termination of the Designation of Honduras for Temporary Protected Status (TPS) and Notice of Extension of TPS Designation for Honduras.

**SUMMARY:** Through this notice, the Department of Homeland Security (DHS) announces that the Secretary of Homeland Security (Secretary) is

rescinding the previous termination of the designation of Honduras for TPS which was published on June 5, 2018 and extending the designation of Honduras for Temporary Protected Status (TPS) for 18 months, beginning on January 6, 2024, and ending on July 5, 2025. This extension allows existing TPS beneficiaries to retain TPS through July 5, 2025, so long as they otherwise continue to meet the eligibility requirements for TPS. Existing TPS beneficiaries who wish to extend their status through July 5, 2025, must re-register during the 60-day re-registration period as described in this notice.

**DATES:** The *Rescission of Termination of the Designation of Honduras for TPS* took effect June 9, 2023.

*Extension of Designation of Honduras for TPS:* The 18-month extension of TPS for Honduras begins on January 6, 2024, and will remain in effect through July 5, 2025. The extension impacts existing beneficiaries of TPS under the designation of Honduras.

*Re-registration:* The 60-day re-registration period for existing beneficiaries runs from November 6, 2023 through January 5, 2024.

**FOR FURTHER INFORMATION CONTACT:**

• You may contact René Cutlip-Mason, Chief, Humanitarian Affairs Division, Office of Policy and Strategy, U.S. Citizenship and Immigration Services, Department of Homeland Security, by mail at 5900 Capital Gateway Drive, Camp Springs, MD 20746, or by phone at 800–375–5283.

• For further information on TPS, including guidance on the registration process and additional information on eligibility, please visit the USCIS TPS web page at *https://www.uscis.gov/tps.* You can find specific information about Honduras's TPS designation by selecting ''Honduras'' from the menu on the left side of the TPS web page.

• If you have additional questions about TPS, please visit *uscis.gov/tools.* Our online virtual assistant, Emma, can answer many of your questions and point you to additional information on our website. If you are unable to find your answers there, you may also call our USCIS Contact Center at 800–375–5283 (TTY 800–767–1833).

• Applicants seeking information about the status of their individual cases may check Case Status Online, available on the USCIS website at *uscis.gov,* or visit the USCIS Contact Center at *https://www.uscis.gov/contactcenter.*

• Further information will also be available at local USCIS offices upon publication of this notice.

**SUPPLEMENTARY INFORMATION:**

## Table of Abbreviations

BIA—Board of Immigration Appeals
CFR—Code of Federal Regulations
DHS—U.S. Department of Homeland Security
DOS—U.S. Department of State
EAD—Employment Authorization Document
FNC—Final Nonconfirmation
Form I–131—Application for Travel Document
Form I–765—Application for Employment Authorization
Form I–797—Notice of Action
Form I–821—Application for Temporary Protected Status
Form I–9—Employment Eligibility Verification
Form I–912—Request for Fee Waiver
Form I–94—Arrival/Departure Record
FR—Federal Register
Government—U.S. Government
IER—U.S. Department of Justice, Civil Rights Division, Immigrant and Employee Rights Section
IJ—Immigration Judge
INA—Immigration and Nationality Act
SAVE—USCIS Systematic Alien Verification for Entitlements Program
Secretary—Secretary of Homeland Security
TPS—Temporary Protected Status
TTY—Text Telephone
USCIS—U.S. Citizenship and Immigration Services
U.S.C.—United States Code

## Purpose of This Action (TPS)

Through this notice, DHS announces the reconsideration and rescission of the termination of the designation of Honduras for TPS and the Secretary's decision to extend the TPS designation for 18 months from January 6, 2024, through July 5, 2025. This notice also sets forth procedures necessary for nationals of Honduras (or individuals having no nationality who last habitually resided in Honduras) to re-register for TPS and to apply for renewal of their EADs with USCIS.

Re-registration is limited to individuals who have previously registered or re-registered for TPS under Honduras' designation, whose applications were granted, and whose TPS has not been withdrawn for individual ineligibility for the benefit. Failure to re-register properly within the 60-day re-registration period may result in the withdrawal of your TPS following appropriate procedures. *See* 8 CFR 244.14.

For individuals who have already been granted TPS under Honduras's designation, the 60-day re-registration period runs November 6, 2023 through January 5, 2024. USCIS will issue new EADs with a July 5, 2025, expiration date to eligible Honduran TPS beneficiaries who timely re-register and apply for EADs.

Individuals who have a Honduras TPS application (Form I–821) and

Application for Employment Authorization (Form I–765) that were still pending as of June 21, 2023 do not need to file either application again. If USCIS approves an individual's pending Form I–821, USCIS will grant the individual TPS through July 5, 2025. Similarly, if USCIS approves a pending TPS-related Form I–765 filed in connection with a Form I–821, USCIS will issue the individual a new EAD that will be valid through the same date. If you have TPS and only a pending Form I–765, you must file the Form I–821 to re-register for TPS or risk having your TPS withdrawn for failure to timely reregister without good cause. There are currently approximately 76,000 beneficiaries under Honduras's TPS designation who may be eligible to continue their TPS under the extension announced in this Notice.

## What is Temporary Protected Status (TPS)?

• TPS is a temporary immigration status granted to eligible nationals of a foreign state designated for TPS under the INA, or to eligible individuals without nationality who last habitually resided in the designated foreign state before arrival in the United States, regardless of their country of birth.

• During the TPS designation period, TPS beneficiaries are eligible to remain in the United States, may not be removed, and are authorized to obtain EADs so long as they continue to meet the requirements of TPS.

• TPS beneficiaries may also apply for and be granted travel authorization as a matter of DHS discretion.

• To qualify for TPS, beneficiaries must meet the eligibility standards at INA section 244(c)(1)–(2), 8 U.S.C. 1254a(c)(1)–(2).

• When the Secretary terminates a foreign state's TPS designation, beneficiaries return to one of the following:

○ The same immigration status or category that they maintained before TPS, if any (unless that status or category has since expired or terminated); or

○ Any other lawfully obtained immigration status or category they received while registered for TPS, as long as it is still valid beyond the date TPS terminates.

## When was Honduras designated for TPS?

Honduras was initially designated for TPS based on an environmental disaster that resulted in a substantial disruption of living conditions, in response to a request by the country's government, and because Honduras temporarily was

unable to handle adequately the return of its nationals. *See Designation of Honduras Under Temporary Protected Status,* 64 FR 524 (Jan. 5, 1999). Since its initial designation in 1999, TPS for Honduras was extended thirteen consecutive times [1] by subsequent Attorneys General and Secretaries of Homeland Security until 2017. That year, former Acting Secretary Elaine Duke did not make a decision on extending or terminating Honduras's TPS designation by the statutory deadline, resulting in an automatic 6-month extension of the designation, through July 5, 2018.[2]

Following the statutorily required review of the country conditions, former Secretary Kirstjen M. Nielsen announced the termination of TPS for Honduras, with an effective date of January 5, 2020; *see* Termination of the Designation of Honduras for Temporary Protected Status;[3] *see also* INA secs. 244(b)(3)(A) and (B), 8 U.S.C. 1254a(b)(3)(A) and (B). As discussed below, this termination has been the

---

[1] *Extension of Designation of Honduras Under Temporary Protected Status Program,* 65 FR 30438 (May 11, 2000); *Extension of the Designation of Honduras Under the Temporary Protected Status Program,* 66 FR 23269 (May 8, 2001); *Extension of the Designation of Honduras Under the Temporary Protected Status Program,* 67 FR 22451 (May 3, 2002); *Extension of the Designation of Honduras Under Temporary Protected Status; Automatic Extension of Employment Authorization Documentation for Hondurans,* 68 FR 23744 (May 5, 2003); *Extension of the Designation of Temporary Protected Status for Honduras; Automatic Extension of Employment Authorization Documentation for Honduras TPS Beneficiaries,* 69 FR 64084 (November 3, 2004); *Extension of the Designation of Temporary Protected Status for Honduras; Automatic Extension of Employment Authorization Documentation for Honduras TPS Beneficiaries,* 71 FR 16328 (March 31, 2006); *Extension of the Designation of Honduras for Temporary Protected Status; Automatic Extension of Employment Authorization Documentation for Honduran TPS Beneficiaries,* 72 FR 29529 (May 29, 2007); *Extension of the Designation of Honduras for Temporary Protected Status,* 73 FR 57133 (Oct. 1, 2008); *Extension of the Designation of Honduras for Temporary Protected Status and Automatic Extension of Employment Authorization Documentation for Honduran TPS Beneficiaries,* 75 FR 24734 (May 5, 2010); *Extension of the Designation of Honduras for Temporary Protected Status and Automatic Extension of Employment Authorization Documentation for Honduran TPS Beneficiaries,* 76 FR 68488 (Nov. 4, 2011); *Extension of the Designation of Honduras for Temporary Protected Status,* 78 FR 20123 (Apr. 3, 2013); *Extension of the Designation of Honduras for Temporary Protected Status,* 79 FR 62170 (Oct. 16, 2014); *Extension of the Designation of Honduras for Temporary Protected Status,* 81 FR 30331 (May 16, 2016).

[2] *See* 82 FR 59630 (Dec. 15, 2017). If the Secretary makes no decision on extension or termination of a country's TPS designation by at least 60 days before the expiration of the existing TPS designation, then INA, section 244(b)(3)(C) requires that the designation be extended an additional six months for 12 or 18 months in the Secretary's discretion).

[3] 83 FR 26074 (June 5, 2018).

subject of litigation and a court order that has prevented the termination from taking effect.

**Litigation Background Regarding Termination of Certain TPS Designations**

In addition to Honduras, in 2017–2018, TPS was also terminated for five additional countries by the Secretary or Acting Secretary: Sudan, Nicaragua, El Salvador, Haiti, and Nepal.[4] Lawsuits challenging the terminations were filed in the U.S. District Court for the Northern District of California in *Ramos* v. *Nielsen,* 326 F. Supp. 3d 1075 (N.D. Cal. 2018), and *Bhattarai* v. *Nielsen,* No. 19–cv–00731 (N.D. Cal. Mar. 12, 2019), and in the U.S. District Court for the Eastern District of New York in *Saget,* v. *Trump,* 375 F. Supp. 3d 280 (E.D.N.Y. 2019).[5] In *Ramos* the district court granted a preliminary injunction enjoining the terminations of TPS for El Salvador, Haiti, Sudan, and Nicaragua and directed DHS to maintain the *status quo* and to continue the TPS and TPS-related documentation of affected TPS beneficiaries under those countries' designations. The U.S. Government appealed, and a three-judge panel vacated the injunction. The appellate court, however, has granted rehearing en banc of the panel decision, vacating the panel's decision.[6] The court's preliminary injunction thus remains in place. In *Bhattarai*—which challenged the determination to terminate TPS for Honduras—the district court has stayed proceedings until the *Ramos* appeal is decided and approved the parties' stipulation for the continuation of TPS and TPS-related documentation for eligible, affected beneficiaries of TPS for Honduras and Nepal during the stay and pendency of the appeal. In *Saget,* the district court granted a preliminary injunction enjoining termination of TPS for Haiti, and the Government appealed.[7] Beneficiaries under the TPS designations for El Salvador, Nicaragua, Sudan, Haiti, Honduras, and Nepal will retain their TPS while the preliminary injunction in *Ramos* remains in effect, and 120 days thereafter, provided that their TPS is not withdrawn because of individual ineligibility.[8]

DHS has taken actions to ensure its continued compliance with the court orders in *Ramos* and *Bhattarai.* DHS has published periodic notices to continue TPS and extend the validity of TPS-related documentation previously issued to beneficiaries under the TPS designations for El Salvador, Haiti, Nicaragua, Sudan, Honduras, and Nepal.[9] The most recent such notice continued TPS and extended the TPS-related documents specified in the notice through June 30, 2024.[10] These extensions of documentation apply where the TPS beneficiary properly filed for re-registration during either the most recent DHS-announced registration period for their country, or any applicable previous DHS-announced re-registration periods for the beneficiary's country, or has a re-registration application that remains pending.[11] Although the notice published at 87 FR 68717 remains valid, individuals who wish to remain eligible for TPS under the extension of TPS for Honduras announced in this notice through July 5, 2025, and any potential future extensions must apply for re-registration in accordance with the procedures announced in this notice.[12] Failure to timely re-register without good cause is a ground for TPS withdrawal. *See INA* section 244(c)(3)(C); 8 U.S.C. 12(c)(3)(C); 8 CFR 244.17.

**What authority does the Secretary have to reconsider and rescind the termination of TPS for Honduras?**

Section 244(b)(1) of the INA, 8 U.S.C. 1254a(b)(1), authorizes the Secretary, after consultation with appropriate agencies of the U.S. Government, to designate a foreign state (or part thereof) for TPS if the Secretary determines that certain country conditions exist.[13] The

[4] *Termination of the Designation of Sudan for Temporary Protected Status,* 82 FR 47228 (Oct. 11, 2017); *Termination of the Designation of Nicaragua for Temporary Protected Status,* 82 FR 59636 (Dec. 15, 2017); *Termination of the Designation of El Salvador for Temporary Protected Status,* 83 FR 2654 (Jan. 18, 2018); *Termination of the Designation of Haiti for Temporary Protected Status,* 83 FR 2648 (Jan. 18, 2018); *Termination of the Designation of Nepal for Temporary Protected Status,* 83 FR 23705 (May 22, 2018). Haiti and Sudan were newly designated for TPS on August 3, 2021, and April 19, 2022, respectively, for 18 months. *See Designation of Haiti for Temporary Protected Status,* 86 FR 41863 (Aug. 3, 2021) and *Designation of Sudan for Temporary Protected Status,* 87 FR 23202 (Apr. 19, 2022).

[5] *See Ramos* v. *Nielsen,* 336 F. Supp. 3d 1075 (N.D. Cal. 2018), *vacated,* 975 F.3d 872 (9th Cir. 2020), *reh'g en banc granted,* 59 F.4th 1010 (Feb. 10, 2023); *Bhattarai* v. *Nielsen,* No. 19–cv–00731 (N.D. Cal. Mar. 12, 2019) (staying proceedings until *Ramos* appeal decided and approved parties' stipulation for continued TPS and issuance of TPS-related documentation to eligible, affected beneficiaries of TPS for Honduras and Nepal during the stay and pendency of the appeal). In 2019, the U.S. District Court for the Eastern District of New York also enjoined the termination of the 2011 TPS designation for Haiti in *Saget* v. *Trump,* 375 F. Supp. 3d 280 (E.D.N.Y. 2019), and DHS cited to that order in previous notices continuing the affected beneficiaries' TPS and documentation. *See, e.g.,* 86 FR 50725, 50726 (Sept. 10, 2021). However, the *Saget* case was dismissed upon the court's approval of the parties' joint Stipulation of Dismissal for mootness following the Secretary's new 18-month designation of Haiti for TPS on August 3, 2021, and DHS' continuation of existing beneficiaries' TPS and related documentation under the Ramos injunction through Dec. 31, 2022. *See id.,* Order approving Stipulation of Dismissal, dated Oct. 15, 2021. Other litigation was filed relating to the terminations of El Salvador, Honduras, and Haiti. A Haiti-related case, *NAACP* v. *U.S. Dept. of Homeland Security,* No. 1:18–cv–00239 (D. Md., Jan. 24, 2018) was dismissed on May 22, 2021, subsequent to the same DHS designation. An El Salvador-related case, *Casa de Maryland* v. *Biden,* No. GJH–18–00845 (D. Md. Mar. 23, 2018) is currently stayed until April 17, 2023. *Centro Presente* v. *Biden,* No. 1:18–cv–10340 (D. Mass. July 23, 2018), relating to El Salvador, Haiti, and Honduras, is currently stayed until April 14, 2023.

[6] *See Ramos* v. *Wolf,* 975 F.3d 872 (9th Cir. 2020), *petition for reh'g en banc granted,* 2023 WL 1880467 (Feb. 10, 2023) (No. 18–16981).

[7] *See Saget, et. al.,* v. *Trump, et. al.,* 375 F.Supp 280 (E.D.N.Y. April 11, 2019) and Order approving Stipulation of Dismissal, dated Oct. 15, 2021.

[8] As noted, Haiti was newly designated for TPS on August 3, 2021, for 18 months. *See Designation of Haiti for Temporary Protected Status,* 86 FR 41863 (Aug. 3, 2021). On April 19, 2022, the Secretary also newly designated Sudan TPS. *See Designation of Sudan for Temporary Protected Status,* 87 FR 23202 (Apr. 19, 2022). Plaintiffs in *Ramos* and *Bhattarai* remain eligible for TPS status based on DHS new and continued designations.

[9] 83 FR 54764 (Oct. 31, 2018); 84 FR 7103 (March 1, 2019); 84 FR 20647 (May 10, 2019) (correction notice issued at 84 FR 23578 (May 22, 2019)); 84 FR 59403 (Nov. 4, 2019); 85 FR 79208 (Dec. 9, 2020); and 86 FR 50725 (Sept. 10, 2021) (correction notice issued at 86 FR 52694 (Sept. 22, 2021). Those designations cover all Haitian and Sudanese nationals who were eligible for TPS under the Haiti and Sudan TPS designations that were terminated in 2018 and 2017, respectively.

[10] *Continuation of Documentation for Beneficiaries of Temporary Protected Status Designations of El Salvador, Haiti, Nicaragua, Sudan, Honduras, and Nepal,* 87 FR 68717 (Nov. 16, 2022).

[11] *Id. See* fn. 1 for acceptable re-registration periods for TPS Honduras beneficiaries.

[12] Through the re-registration process, which is generally conducted every 12 to 18 months while a foreign state is designated for TPS, USCIS determines whether each TPS beneficiary is continuing to maintain individual eligibility for TPS, including but not limited to, the requirements related to disqualifying criminal or security issues. Continuation of Documentation for Beneficiaries of Temporary Protected Status Designations for El Salvador, Haiti, Nicaragua, Sudan, Honduras, and Nepal, 87 FR 68717, 68720 (Nov. 16, 2022) (noting potential future action for Honduras TPS beneficiaries may include a requirement to re-register).

[13] Although the text of INA section 244(b)(1) continues to ascribe this power to the Attorney General, this authority is now held by the Secretary of Homeland Security by operation of the Homeland Security Act of 2002, Public Law 107296, 116 Stat. 2135. Congress transferred this authority from the Attorney General to the Secretary of Homeland Security. *See* Homeland Security Act of 2002, Public Law 107–296, 116 Stat. 2135. *See, e.g.,* 6 U.S.C. 557; *Nielsen* v. *Preap,* 139 S. Ct. 954, 959 n.2 (2019). The Secretary may designate a country (or part of a country) for TPS on the basis of ongoing armed conflict such that returning would pose a serious threat to the personal safety of the country's nationals and habitual residents, environmental disaster (including an epidemic), or extraordinary and temporary conditions in the country that prevent the safe return of the country's nationals. For environmental disaster-based designations, certain other statutory requirements must be met, including that the foreign government must request TPS. A designation based on extraordinary and temporary conditions cannot be made if the Secretary finds that allowing the

decision to designate any foreign state (or part thereof) is a discretionary decision, and there is no judicial review of any determination with respect to the designation, termination, or extension of a designation. *See* INA section 244(b)(5)(A); 8 U.S.C. 1254a(b)(5)(A).

At least 60 days before the expiration of a foreign state's TPS designation, the Secretary, after consultation with appropriate U.S. Government agencies, must review the conditions in the foreign state designated for TPS to determine whether they continue to meet the conditions for the TPS designation. *See* INA section 244(b)(3)(A), 8 U.S.C. 1254a(b)(3)(A). If the Secretary determines that the foreign state no longer meets the conditions for TPS designation, the Secretary must terminate the designation. *See* INA section 244(b)(3)(B), 8 U.S.C. 1254a(b)(3)(B). If the Secretary does not determine that the foreign state no longer meets the conditions for TPS designation, the designation is extended for an additional period of 6 months or, in the Secretary's discretion, 12 or 18 months. *See* INA section 244(b)(3)(A), (C); 8 U.S.C. 1254a(b)(3)(A), (C).

On June 5, 2018, the Secretary of Homeland Security issued notice of her decision that Honduras no longer continued to meet the conditions for TPS designation and terminated TPS for Honduras stating that the conditions supporting Honduras's 1999 designation for TPS on the basis of environmental disaster due to the damage caused by Hurricane Mitch in October 1998 were no longer met. The Secretary also announced an orderly transition period of 18 months, such that the termination was set to go into effect on January 5, 2020. However, as noted above, plaintiffs in *Bhattarai* challenged the termination decisions for Honduras and Nepal. On March 12, 2019, the proceedings were stayed, and the parties stipulated that the termination decision would not go into effect during the pendency of the *Ramos* appeal and for at least 120 days thereafter. The district court also approved the parties' stipulation that TPS and TPS-related documentation of affected beneficiaries of the Honduras and Nepal TPS designations would continue under terms similar to those applied to the *Ramos*-covered beneficiaries. The order to stay proceedings and approval of the stipulation remain in effect.[14] DHS has since issued a series of **Federal Register**

notices continuing TPS and TPS-related documentation for affected TPS beneficiaries, with the most recent notice effective through June 30, 2024.[15] As a result, the termination of the TPS designation for Honduras has never gone into effect, and TPS beneficiaries under that designation have retained their TPS, unless it has been individually withdrawn pursuant to INA section 244(c)(3), 8 U.S.C. 1254a(c)(3).

An agency has inherent (that is, statutorily implicit) authority to revisit its prior decisions within a reasonable period unless Congress has expressly limited that authority.[16] The TPS statute does not limit the Secretary's inherent authority to reconsider any TPS-related determination, and upon reconsideration, to change the determination. *See* INA sections 244(b)(3), (b)(5)(A); 8 U.S.C. 1254a(b)(3), (b)(5)(A).

## Why is the Secretary rescinding the previous termination of the TPS designation for Honduras?

After conducting an independent assessment of the country conditions in Honduras as they existed in 2018 and exist today, the Secretary has determined that Honduras's 1999 designation should not have been terminated. As explained below, the conditions in Honduras that gave rise to its TPS designation in 1999 persisted in 2018 and continue to this day. Accordingly, the Secretary is, upon reconsideration, rescinding the 2018 decision terminating Honduras's TPS

designation and extending that designation for an additional 18 months.

Honduras was initially designated for TPS in 1999[17] following the destruction wrought by Hurricane Mitch, which struck Honduras in October 1998, causing a substantial disruption of living conditions in Honduras.[18] In the Secretary's view, the determination to terminate Honduras's TPS designation erroneously concluded that the conditions giving rise to that designation had been ameliorated by 2018, such that Honduras was able to adequately handle the return of its nationals. Numerous environmental, political, and social crises since Hurricane Mitch, however, have prevented the country from recovering from the hurricane and continue to impair Honduras from ensuring the safe return of its nationals.

Although recovery efforts were implemented in the years after Hurricane Mitch, the effects of Hurricane Mitch set back Honduras economically and socially by as much as 20 years.[19] Since Hurricane Mitch, various hurricanes, tropical storms, and tropical depressions have made landfall in Honduras. These subsequent natural disasters, to which the termination decision gave inadequate attention, significantly impeded Hurricane Mitch-related reconstruction projects.

Hurricane Mitch caused a substantial disruption of living conditions in Honduras, resulting in, among other things, substantial housing, and food shortages. *See* 65 FR 30438 (May 11, 2000). The determination to terminate TPS for Honduras failed to recognize that many of these conditions persisted in 2018, exacerbated by subsequent environmental disasters and other problems. The termination determination did not consider that in the years prior to the determination, approximately 1.3 million people remained in need of humanitarian assistance[20] due in part to Hurricane

---

country's nationals to remain temporarily in the United States is contrary to the U.S. national interest. INA section 244(b)(1).

[14] *Bhattarai* v. *Nielsen*, No. 19–cv–00731 (N.D. Cal. Mar. 12, 2019).

[15] *See* 84 FR 20647(May 10, 2019) (correction notice issued at 84 FR 23578 (May 22, 2019)); 84 FR 59403 (Nov. 4, 2019); 85 FR 79206 (Dec. 9, 2020); and 86 FR 50725 (Sept. 10, 2021) (correction notice issued at 86 FR 52694 (Sept. 22, 2021); and 87 FR 68717 (Nov. 16, 2022). DHS had published previous notices to comply with the earlier preliminary injunction order issued by the Ramos court. *See* 83 FR 54764 (Oct. 31, 2018); 84 FR 7103 (March 1, 2019).

[16] *Ivy Sports Medicine, LLC* v. *Burwell,* 767 F.3d 81, 86 (D.C. Cir. 2014) ("[A]dministrative agencies are assumed to possess at least some inherent authority to revisit their prior decisions, at least if done in a timely fashion. . . . [I]nherent authority for timely administrative reconsideration is premised on the notion that the power to reconsider is inherent in the power to decide.'' (quotation marks and citations omitted)); *NRDC* v. *Regan,* 67 F.4th 397, 401 (D.C. Cir. 2023) ("[A]lthough the power to decide is normally accompanied by the power to reconsider, Congress undoubtedly can limit an agency's discretion to reverse itself.'' (quotation marks omitted); *Macktal* v. *Chao,* 286 F.3d 822, 825–26 (5th Cir. 2002) ("It is generally accepted that in the absence of a specific statutory limitation, an administrative agency has the inherent authority to reconsider its decisions.'') (collecting cases); *Mazaleski* v. *Treusdell,* 562 F.2d 701, 720 (D.C. Cir. 1977) ("We have many times held that an agency has the inherent power to reconsider and change a decision if it does so within a reasonable period of time.'').

[17] *Designation of Honduras Under Temporary Protected Status,* 64 FR 526 (Jan. 5, 1999).

[18] OCHA, Analysis of the medium-term effects of Hurricane Mitch on food security in Central America, Nov. 30, 2001, available at *https://reliefweb.int/report/belize/analysis-medium-term-effects-hurricane-mitch-food-security-central-america.*

[19] Suárez, Ginés, & Sánchez, Walter J., Desastres, riesgo y desarrollo en Honduras: Delineando los vínculos entre el desarrollo humano y la construcción de riesgo en Honduras, Programa de las Naciones Unidas para el Desarrollo (PNUD), p.22, Jan. 2012, available at: *https://criterio.hn/wp-content/uploads/2020/11/INFORME-PNUD-desastres-ambientales-honduras.pdf.*

[20] Central America Sub-Regional Analysis—El Salvador, Guatemala, Honduras: Humanitarian Needs Overview 2016 (Dec 2015), United Nations
Continued

Mitch and subsequent environmental impacts. For example, over 2 million Hondurans—approximately 25% of the population—had been severely affected by drought, and over 460,000 were in need of food assistance.[21] By March 2017, consecutive years of drought had left many subsistence farmers in the Dry Corridor struggling to produce food.[22] In addition to impacting food security, UNOCHA reported that the drought had also "contributed to the spread of mosquito-borne diseases, such as Zika, malaria, dengue and chikungunya." [23] Also contributing to illness was destruction from forest fires which increased by 40% in the first three months of 2017 compared to the same time period the previous year.[24] The termination decision failed to assess adequately or give sufficient weight to these health and safety issues that have persisted since Hurricane Mitch and impeded recovery from the hurricane.

The decision to terminate also did not appropriately consider that despite efforts and foreign assistance after Hurricane Mitch, Honduras was still experiencing a housing deficit. According to a 2016 study by Habitat for Humanity Honduras, Honduras had a housing deficit exceeding 1.3 million units.[25]

Aside from environmental impacts on the recovery from Hurricane Mitch, at the time of the decision to terminate TPS, Honduras continued to face challenges of violent crime, which have likewise made recovery from the hurricane more difficult.[26] In 2016, there were an estimated 174,000 internally displaced people in Honduras.[27] "Internal displacement was generally caused by violence, national and transnational gang activity, human trafficking, and migrant smuggling." [28] Additionally, although Honduras's murder rate had been falling in recent years, Honduras remained "one of the world's deadliest peacetime nations" in 2017 with a murder rate of 59.1 killings per 100,000 people.[29] Extortion remained a critical problem and a major source of violence that impacted almost all segments of society, including bus and taxi companies, small businesses, and ordinary citizens.[30] Together, these factors negatively impacted Honduras's ability to adequately handle the return of its nationals granted TPS.

At the time of the TPS termination decision, the country continued to suffer from impacts of Hurricane Mitch and subsequent environmental events, including humanitarian needs, hunger, disease, housing deficits, and underdeveloped infrastructure, in addition to widespread violence. The enduring impact of Hurricane Mitch in Honduras at the time of the decision to terminate TPS continued to substantially disrupt living conditions. Those enduring conditions impacting Honduras's ability to recover from Hurricane Mitch along with Honduras's challenges with violent crime affected the country's ability to adequately handle the return of its nationals granted TPS residing in the United States. The Secretary has concluded that reconsideration and rescission of the termination of TPS is timely, particularly given that the 2018 termination decision has not yet gone into effect.

**What authority does the Secretary have to extend the designation of Honduras for TPS?**

As noted above, INA section 244(b), 8 U.S.C. 1254a(b), authorizes the Secretary, after consultation with appropriate agencies of the U.S. Government, to designate a foreign state (or part thereof) for TPS if the Secretary determines that certain country conditions exist and instructs the Secretary to periodically review the country conditions underpinning each designation and determine whether they still exist, leading to either termination or extension of the TPS designation. However, if the Secretary does not make a decision as to either extension or termination, then INA section 244(b)(3)(C) requires the automatic extension of the designation for six months (or 12 or 18 months in the Secretary's discretion).

Prior to the now-rescinded termination of the TPS designation for Honduras, the most recent extension of the designation was due to end on July 5, 2018.[31] In light of the Secretary's reconsideration and rescission of the June 5, 2018 notice of termination of the TPS designation for Honduras, there is no longer any standing secretarial determination that Honduras "no longer meets the conditions for designation" under INA section 244(b)(1). Accordingly, with this rescission of the prior termination, pursuant to INA section 244(b)(3)(C), and in the absence of an affirmative decision by any Secretary to extend the designation for 12 or 18 months rather than the

---

Office for the Coordination of Humanitarian Affairs (UNOCHA), p. 6, Jan. 14, 2016, available at: *https://reliefweb.int/report/guatemala/central-america-sub-regional-analysis-el-salvador-guatemala-honduras-humanitarian.*

[21] El Niño: Overview of Impact, Projected Humanitarian Needs, and Reponses, p.18; WFP Honduras—Country Brief, p.1, Jun. 2016, available at: *http://reliefweb.int/sites/reliefweb.int/files/resources/Honduras_CB_June2016OIM.pdf;* UN Envoy: Drought-hit Honduras Needs New Approach to Tackle Extreme Weather, Reuters, Aug. 1, 2016, available at: *http://www.voanews.com/a/un-envoy-drought-hit-honduras-needs-new-approach-to-tackle-extreme-weather/3444720.html.*

[22] Hares, Sophie, Honduran farmers prize rainwater as most precious harvest, Thomson Reuters Foundation, Mar. 22, 2017, available at: *http://reliefweb.int/report/honduras/honduran-farmers-prize-rainwater-most-precious-harvest.*

[23] El Niño: Overview of Impact, Projected Humanitarian Needs, and Reponses, UN Office for the Coordination of Humanitarian Affairs (UNOCHA), p. 23, June 3, 2016, available at: *https://reliefweb.int/report/world/el-ni-o-overview-impact-projected-humanitarian-needs-and-response-02-june-2016.*

[24] En un 40% aumentan incendios en el país, La Tribuna (Hon.), Apr. 2, 2017, available at: *http://reliefweb.int/report/honduras/en-un-40-aumentan-incendios-en-el-pa-s.*

[25] Habitat for Humanity Honduras, Habitat for Humanity, available at: *http://www.habitat.org/*

*where-we-build/honduras* (last visited Apr. 6, 2023).

[26] World Report 2018—Honduras Events of 2017, Human Rights Watch, Jan. 18, 2018, available at: *https://www.hrw.org/world-report/2018/country-chapters/honduras* (last visited: Apr. 6, 2023); Freedom in the World 2018, Honduras, Freedom House, Jan. 2018, available at: *https://freedomhouse.org/country/honduras/freedom-world/2018* (last visited: Apr. 6, 2023).

[27] U.S. Department of State, 2017 Country Reports on Human Rights Practices: Honduras, Apr. 20, 2018, available at: *https://www.state.gov/reports/2017-country-reports-on-human-rights-practices/honduras/* (last visited: Apr. 6, 2023).

[28] *Id.*

[29] Reuters, Honduras murder rate fell by more than 25 percent in 2017: government, Jan. 18, 2018, available at: *https://www.reuters.com/article/us-honduras-violence/honduras-murder-rate-fell-by-more-than-25-percent-in-2017-government-idUSKBN1ER1K9* (last visited: Mar. 17, 2023).

[30] Gurney, Krya, What an Extortion Call in Honduras Sounds Like, InSight Crime, Mar. 4, 2015, available at: *http://www.insightcrime.org/news-analysis/what-an-extortion-call-in-honduras-sounds-like;* Refworld, UNHCR Eligibility Guidelines for Assessing the International Protection Needs of Asylum-Seekers from Honduras, July 27, 2016, available at: *https://www.refworld.org/docid/579767434.html* (last visited: March 17, 2023).

[31] 82 FR 59631 (Dec. 15, 2017).

automatic six months triggered by the statute, the TPS designation for Honduras shall have been extended in consecutive increments of 6 months between the date when the last designation extension was due to end on July 5, 2018, and the effective date of the TPS extension announced in this Notice, January 6, 2024. Coupled with the existing *Bhattarai* order and corresponding **Federal Register** notices continuing the TPS and TPS-related documentation for affected beneficiaries under the designation for Honduras, this means that all such individuals whose TPS has not been finally withdrawn for individual ineligibility are deemed to have retained TPS since July 5, 2018, and may re-register under procedures announced in this notice.

## Why is the Secretary extending the TPS designation for Honduras for TPS for 18 months through July 5, 2025?

DHS has reviewed country conditions in Honduras. Based on the review, including input received from DOS and other U.S. Government agencies, the Secretary has determined that an 18-month TPS extension is warranted because the environmental disaster conditions and substantial disruption of living conditions supporting Honduras's TPS designation remain.

Since Honduras was designated for TPS in January 1999, various natural disasters, and related environmental concerns—including hurricanes, tropical storms, flooding and heavy rain, severe drought, and mosquito-borne illnesses—have contributed to loss of life and damages to property and infrastructure in Honduras and prevented the country from fully recovering from Hurricane Mitch. Additionally, since the extension of TPS for Honduras in 2018,[32] violence and social and political concerns have adversely impacted living conditions and hindered recovery from environmental disasters in Honduras.[33] These subsequent natural disasters, violence and social and political concerns continue to inflict damage on a population that has not fully recovered from Hurricane Mitch and

impact Honduras's ability to adequately handle the return of its nationals granted TPS. Accordingly, the Secretary has concluded that the conditions that gave rise to Honduras's 1999 TPS designation persist, and an extension is therefore warranted. Since Hurricane Mitch, Honduras has been impacted by a "repetitive cycle" of storm-related damage to infrastructure and 16 of the 18 departments in the country recently reported damaged roads, collapsed bridges, devastated crops, flooded houses, and landslides.[34]

In 2019, Honduras experienced a severe drought that "decimated staple-crop harvests of beans and maize by up to 80% in some areas," and led the government to declare a state of emergency.[35] In November 2020, within weeks of each other,[36] hurricanes Eta and Iota, both Category 4 storms,[37] struck Honduras. UNHCR noted that "more than 4 million people were affected by Hurricanes Eta and Iota in Honduras alone,"[38] about "half the country's population."[39] "In 2020, hurricanes Eta and Iota forced more than 55,000 to move into temporary shelters, according to the Red Cross."[40] In rural areas, the storms destroyed fields and slow receding water hindered sowing, impacting the livelihood of

those who depend on seasonal crops. In urban areas, the storms greatly impacted populations already suffering socioeconomic effects of the COVID–19 pandemic, job losses, and increased violence.[41]

Among the storms affecting Honduras recently was Tropical Storm Julia, which "wreaked havoc in 15 of the country's 18 departments."[42]Flooding related to Julia is estimated to have affected over 200,000 Hondurans.[43] Even a "relatively weak" hurricane like Julia reportedly can cause significant destruction in Honduras due to unaddressed damage to infrastructure from previous storms.[44]

Recent tropical storms, flooding, and subsequent landslides across the country in 2022 "affected 188,000 people" and sparked another government declared country-wide state of emergency, after 23,000 people were evacuated from homes and more than 12,300 people moved into housing shelters across eight departments.[45] As of August 2022, "more than 16,000 public educational centers in Honduras lack adequate infrastructure. Some 5,700 centers lack drinking water, and 44% of schools do not have electricity."[46] "Between 1 September and 10 October, 162 municipalities in 15 of the 18 departments in Honduras reported damage to basic and critical infrastructure, including over 3,500 damaged or destroyed houses (COPECO/ Gov't of Honduras 11/10/2022)."[47]

---

[32] The TPS designation of Honduras was statutorily automatically extended for 6 months (from January 6, 2018, through July 5, 2018) after the Secretary of Homeland Security did not make a determination on Honduras's designation 60 days prior to the previous expiration (January 5, 2018). Subsequently, on June 5, 2018, the Secretary published a determination to terminate TPS for Honduras, effective January 5, 2020.

[33] United Nations Office for the Coordination of Humanitarian Affairs, Honduras Humanitarian Needs Overview 2023 (September 2022) (Feb. 8, 2023), *https://reliefweb.int/report/honduras/honduras-humanitarian-needs-overview-2023-september-2022* (last visited Mar. 13, 2023).

[34] Starting from Scratch Over and Over Again: Heavy Rains and Floods Displace Thousands of Hondurans, International Organization for Migration (IOM), Oct. 28, 2022, available at: *https://reliefweb.int/report/honduras/starting-scratch-over-and-over-again-heavy-rains-and-floods-displace-thousands-hondurans* (last visited Apr. 6, 2023).

[35] Moloney, Anastasia, In Honduras, years of drought pressure farmers to leave land, Reuters, Sept. 27, 2019, available at: *https://reliefweb.int/report/honduras/honduras-years-drought-pressure-farmers-leave-land.*

[36] In Honduras, climate change is one more factor sparking displacement, United Nations High Commissioner for Refugees (UNHCR), Nov. 9, 2021, available at: *https://reliefweb.int/report/honduras/honduras-climate-change-one-more-factor-sparking-displacement.*

[37] The National Oceanic and Atmospheric Administration (NOAA) defines category 4 hurricanes as major storms with winds between 130–156 miles per hour which cause catastrophic damage. *See:* Saffir-Simpson Hurricane Wind Scale, National Oceanic and Atmospheric Administration, *https://www.nhc.noaa.gov/aboutsshws.php.* (last visited Jun. 17, 2022).

[38] In Honduras, climate change is one more factor sparking displacement, United Nations High Commissioner for Refugees (UNHCR), Nov. 9, 2021, available at: *https://reliefweb.int/report/honduras/honduras-climate-change-one-more-factor-sparking-displacement.*

[39] Lakhani, Nina, 'We can't live like this': climate shocks rain down on Honduras's poorest, The Guardian, Oct. 28, 2021, available at: *https://www.theguardian.com/environment/2021/oct/28/honduras-climate-crisis-floods-hurricanes-poor-community.*

[40] World Report 2022—Honduras, Human Rights Watch, Jan. 13, 2022, available at: *https://www.hrw.org/world-report/2022/country-chapters/honduras#dbcb23.*

[41] Honduras: Hurricane Eta and Iota—Emergency appeal n° MDR43007 Operation Update no. 2, International Federation of Red Cross and Red Crescent Societies (IFRC), Jan. 21, 2021, available at: *https://reliefweb.int/report/honduras/honduras-hurricane-eta-and-iota-emergency-appeal-n-mdr43007-operation-update-no-2.*

[42] United Nations Office for the Coordination of Humanitarian Affairs, Honduras Humanitarian Needs Overview 2023 (September 2022) (Feb. 8, 2023), *https://reliefweb.int/report/honduras/honduras-humanitarian-needs-overview-2023-september-2022* (last visited Feb. 9, 2023).

[43] *Id.*

[44] Brigida, Anna-Cat, Hurricane Julia pushes displaced Hondurans to consider migration, Al Jazeera, Oct. 18, 2022, available at: *https://www.aljazeera.com/news/2022/10/18/hurricane-julia-pushes-displaced-hondurans-to-consider-migration.*

[45] ACAPS Briefing Note: Honduras—Impact of Floods, ACAPS, p.1, Oct. 27, 2022, available at: *https://reliefweb.int/report/honduras/acaps-briefing-note-honduras-impact-floods-27-october-2022.*

[46] Quartucci, Soledad, Educational Reform in Honduras-The Roots of Challenges and the Way Forward, Latina Republic, Aug. 29, 2022, available at: *https://latinarepublic.com/2022/08/29/educational-reform-in-honduras-the-roots-of-challenges-and-the-way-forward/.*

[47] ACAPS Briefing Note: Honduras—Impact of Floods, ACAPS, p.1, Oct. 27, 2022, available at: *https://reliefweb.int/report/honduras/acaps-briefing-note-honduras-impact-floods-27-october-2022.*

The Food and Agriculture Organization of the United Nations (FAO) noted in April 2022 that "[t]he number of acutely food-insecure people in Honduras has doubled in just over a year, due to the combined impact of COVID–19, poverty and climate-related disasters." [48] The United Nations estimated a similar impact, reporting that in early 2022, 2.8 million people in Honduras were in need of humanitarian assistance. [49] Recent reports indicate that food insecurity is worsening, with at least 2.6 million people in Crisis (IPC Phase 3) [50] or worse levels of food insecurity, which is more than a quarter of the population. [51] Environmental events have been a driving factor for food insecurity by "affecting food production and availability and increasing staple food prices in markets," such that Honduras faced a "Crisis (IPC Phase 3) food insecurity." [52]

In June 2022, *The Guardian* reported that pneumonia was "one of the leading causes of child death in Honduras," and deaths of children "caused by the disease are strongly linked to malnutrition, lack of safe water and sanitation, and inadequate access to healthcare." [53] Honduras reported the highest number of severe dengue fever cases in the Americas in both 2020 [54]

and 2021. [55] In 2020, the risks of major infectious diseases including typhoid fever, dengue fever and malaria were also rated as high. [56] According to the U.S. Embassy in Honduras, "medical care in Honduras varies greatly in quality and availability." [57] Outside of Honduras's two major cities, it is "inadequate to address complex situations," "facilities for advanced surgical procedures are not available," and "ambulance services are limited in major cities and almost non-existent elsewhere." [58]

"Honduras is one of the most unequal, corrupt and violent countries in Latin America, where a handful of politically powerful clans control the economy while more than two-thirds of the population live in poverty." [59] In 2021, Honduras "saw some of its worst political violence in the run-up to November's presidential elections . . . [in which] 68 candidates in various local and national races were killed." [60] The United States indicted the out-going president of Honduras, Juan Orlando Hernandez, (president of Honduras from 2014 through January 2022), [61] on federal drug and arms trafficking charges shortly after he left office, [62] and Honduras extradited him to the United States in April 2022 to face the charges. [63] The current president who

took office on January 27, 2022, inherited the remnants of what U.S. prosecutors have called a "narco state." [64]

In recent years, Honduras has been plagued by staggering levels of crime and violence—ranking as the murder capital of the world in 2012 and 2013. [65] Gangs that originated in the United States are engaged in violent fighting in Honduras. They "have laid siege to communities" and "have plunged the country into a state of crisis"— "govern[ing] much of daily life for residents living in their areas of control, [as] stand-ins for a corrupt and ineffectual government." [66] A UNHCR representative stated in November 2021 that gangs in Honduras "took advantage of the extreme vulnerability of victims of the hurricanes to tighten their control, imposing restrictions on movements [. . .] For many who were displaced by the storms, going back could be dangerous." [67] Honduras was Central America's most deadly country in 2021, with homicides slightly outpacing 2020, and falling below rates in 2019. [68]

In 2020, internally displaced Hondurans "represented almost 80 percent of the internally displaced population in Central America and Mexico." [69] The United Nations Office for the Coordination of Humanitarian Affairs (UNOCHA) reported that

[48] Honduras: Humanitarian Response Plan 2022, Food and Agriculture Organization of the United Nations (FAO), p.1, Apr. 6, 2022, available at: *https://reliefweb.int/report/honduras/honduras-humanitarian-response-plan-2022.*

[49] Global Humanitarian Overview 2022, United Nations Office for the Coordination of Humanitarian Affairs, *https://www.unocha.org/sites/unocha/files/Global%20Humanitarian%20Overview%202022.pdf.*

[50] IPC Acute Food Insecurity is categorized in five distinct phases: (1) Minimal/None, (2) Stressed, (3) Crisis, (4) Emergency, (5) Catastrophe/Famine. For additional information on these classifications, please see the IPC Technical Manual, available at: *https://www.ipcinfo.org/fileadmin/user_upload/ipcinfo/docs/IPC-Manual-2-Interactive.pdf.*

[51] United Nations Office for the Coordination of Humanitarian Affairs, Honduras Humanitarian Needs Overview 2023 (September 2022) (Feb. 8, 2023), *https://reliefweb.int/report/honduras/honduras-humanitarian-needs-overview-2023-september-2022.* (last visited Mar. 13, 2023).

[52] ACAPS Briefing Note: Honduras—Impact of Floods, ACAPS, p.2, Oct. 27, 2022, available at: *https://www.acaps.org/sites/acaps/files/products/files/20221027_acaps_rapid_analysis_team_briefing_note_honduras_flooding.pdf.*

[53] Johnson, Sarah, Fears for Honduran children as poverty worsens pneumonia's toll, The Guardian, June 9, 2022, available at: *https://www.theguardian.com/global-development/2022/jun/09/poverty-drought-impending-famine-now-pneumonia-takes-its-cruel-toll-on-honduran-children-acc.*

[54] Epidemiological Update for Dengue, Chikungunya and Zika in 2020, Pan American Health Organization, updated June 16, 2022, available at: *https://www3.paho.org/data/index.php/en/mnu-topics/indicadores-dengue-en/annual-arbovirus-bulletin-2020.html.*

[55] Epidemiological Update for Dengue, Chikungunya and Zika in 2021, Pan American Health Organization, updated June 16, 2022, available at: *https://www3.paho.org/data/index.php/en/mnu-topics/indicadores-dengue-en/annual-arbovirus-bulletin-2021.html.*

[56] World Fact Book, U.S. Central Intelligence Agency, available at: *https://www.cia.gov/the-world-factbook/countries/honduras/* (last visited June 23, 2022).

[57] Medical Assistance, U.S. Embassy in Honduras, *https://hn.usembassy.gov/u-s-citizen-services/local-resources-of-u-s-citizens-2/doctors/* (last visited Jun. 16, 2022).

[58] Medical Assistance, U.S. Embassy in Honduras, *https://hn.usembassy.gov/u-s-citizen-services/local-resources-of-u-s-citizens-2/doctors/* (last visited Jun. 16, 2022).

[59] Lakhani, Nina, 'We can't live like this': climate shocks rain down on Honduras's poorest, The Guardian, Oct. 28, 2021, available at: *https://www.theguardian.com/environment/2021/oct/28/honduras-climate-crisis-floods-hurricanes-poor-community.*

[60] InSight Crime's 2021 Homicide Round-Up, Insight Crime, Feb. 1, 2022, available at: *https://insightcrime.org/news/insight-crimes-2021-homicide-round-up/.*

[61] Honduras ex-President Hernandez pleads not guilty in U.S. court, Al Jazeera, May 10, 2022, available at: *https://www.aljazeera.com/news/2022/5/10/honduras-ex-president-hernandez-pleads-not-guilty-in-us-court.*

[62] Fernández Simon, Maite, Who is Juan Orlando Hernández and why was he extradited to the U.S.?, The Washington Post, Apr. 21, 2022, available at: *https://www.washingtonpost.com/world/2022/04/21/honduras-juan-orlando-hernandez-extradition/.*

[63] Martin, Maria and Griffiths, Robbie, Ex-Honduran President Hernández is extradited to the U.S. on drug charges, National Public Radio (NPR),

Apr. 21, 2022, available at: *https://www.npr.org/2022/04/21/1093975738/ex-honduran-president-hernandez-will-be-extradited-to-the-u-s-on-drugs-charges.*

[64] Grant, Will, Has Honduras become a 'narco-state'?, BBC News, Apr. 22, 2022, available at: *https://www.bbc.com/news/world-latin-america-56947595.*

[65] Kahn, Carrie, Honduras Claims Unwanted Title Of World's Murder Capital, NPR, July 2, 2013, available at: *http://www.npr.org/sections/parallels/2013/06/13/190683502/honduras-claims-unwanted-title-of-worlds-murder-capital;* Rhodan, Maya, Honduras Is Still the Murder Capital of The World, Time, Feb. 17, 2014, available at: *http://world.time.com/2014/02/17/honduras-is-still-the-murder-capital-of-the-world/;* UNHCR Eligibility Guidelines for Assessing the International Protection Needs of Asylum-Seekers from Honduras, UNHCR, p.10, July 27, 2016, available at: *http://www.refworld.org/docid/579767434.html.*

[66] Azam, Ahmed, Three Weeks Embedded in Honduran Gang Territory, The New York Times, May 7, 2019.

[67] Rubi, María and Gaynor, Tim, In Honduras, climate change is one more factor sparking displacement, United Nations High Commissioner for Refugees (UNHCR), Nov. 9, 2021, available at: *https://reliefweb.int/report/honduras/honduras-climate-change-one-more-factor-sparking-displacement.*

[68] InSight Crime's 2021 Homicide Round-Up, Insight Crime, Feb. 1, 2022, available at: *https://insightcrime.org/news/insight-crimes-2021-homicide-round-up/.*

[69] World Report 2022—Honduras, Human Rights Watch, Jan. 13, 2022, available at: *https://www.hrw.org/world-report/2022/country-chapters/honduras#dbcb23.*

"Honduras registered 937,000 new displacements, ranking it among the top four countries in Latin America and the Caribbean for new disaster-triggered displacements . . . surpass[ing] countries such as South Sudan in the number of new displacements due to disasters and conflicts in 2020." [70] The United Nations High Commissioner for Refugees (UNHCR) reported in July 2022 that "58,000 families abandon their homes in Honduras annually, being internally displaced due to the violence crisis in the country." [71]

In summary, Honduras's slow recovery after Hurricane Mitch and more recent environmental disasters, including hurricanes, tropical storms, flooding and heavy rain, severe drought, and mosquito-borne illness, continue to disrupt living conditions and render Honduras temporarily unable to handle the return of those granted TPS under the 1999 designation and are currently residing in the United States. Additionally, since the 2018 extension of TPS for Honduras,[72] violence, social and political concerns have adversely impacted living conditions and hindered recovery from environmental disasters in Honduras.

Based upon this review and after consultation with appropriate U.S. Government agencies, the Secretary has determined that:

• At the time the Secretary's determination to terminate Honduras's designation for TPS was announced on June 5, 2018, conditions in Honduras continued to support the country's designation for TPS based on environmental disaster grounds; therefore, the termination should be rescinded, and such rescission is timely given that the termination has not yet gone into effect. *See* INA section 244(b)(1)(B), 8 U.S.C. 1254a(b)(1)(B).

• The conditions supporting Honduras's designation for TPS continue to be met. *See* INA section 244(b)(3)(A) and (C), 8 U.S.C. 1254a(b)(3)(A) and (C).

• There has been an earthquake, flood, drought, epidemic, or other environmental disaster in Honduras resulting in a substantial, but temporary, disruption of living conditions in the area affected; Honduras is unable, temporarily, to handle adequately the return of its nationals; and Honduras officially requested designation of TPS. *See* INA section 244(b)(1)(B)(i), 8 U.S.C. 1254a(b)(1)(B)(i);

• The designation of Honduras for TPS should be extended for an 18-month period, beginning on January 6, 2024, and ending on July 5, 2025. *See* INA section 244(b)(3)(C), 8 U.S.C. 1254a(b)(3)(C).

**Notice of the Rescission of TPS Termination and Extension of the TPS Designation of Honduras**

Pursuant to my lawful authorities, including under sections 103(a) and 244 of the INA, I am hereby rescinding the termination of the TPS designation of Honduras announced in the **Federal Register** at 83 FR 26074 (June 5, 2018). Due to this rescission and pursuant to section 244(b)(3)(C) of the INA as well as the court order in *Bhattarai* v. *Nielsen,* No. 19–cv–00731 (N.D. Cal. Mar. 12, 2019), the TPS designation of Honduras has continued to exist since July 5, 2018, without a standing secretarial determination as to whether TPS should be extended or terminated. TPS beneficiaries under the designation, whose TPS has not been finally withdrawn for individual ineligibility, therefore have continued to maintain their TPS since July 5, 2018.

By the authority vested in me as Secretary under INA section 244, 8 U.S.C. 1254a, I have determined, after consultation with the appropriate U.S. Government agencies, the statutory conditions supporting Honduras's designation for TPS on the basis of an environmental disaster continue to be met. *See* INA sections 244(b)(1)(B), 244(b)(3)(A); 8 U.S.C. 1254a(b)(1)(B), 1254a(b)(3)(A). On the basis of this determination, I am extending the existing designation of Honduras for TPS for 18 months, beginning on January 6, 2024, and ending on July 5, 2025. *See* INA section 244(b)(1)(B), (b)(3)(C); 8 U.S.C. 1254a(b)(1)(B), (b)(3)(C). Individuals holding TPS under the designation of Honduras may file to reregister for TPS under the procedures announced in this Notice if they wish to

continue their TPS under this 18-month extension.

Alejandro N. Mayorkas,
*Secretary, U.S. Department of Homeland Security.*

**Eligibility and Employment Authorization for TPS**

**Required Application Forms and Application Fees to Re-Register for TPS:**

To re-register for TPS based on the designation of Honduras, you must submit a Form I–821, Application for Temporary Protected Status during the 60-day re-registration period that runs from November 6, 2023 through January 5, 2024. There is no Form I–821 fee for re-registration. *See* 8 CFR 244.17. You may be required to pay the biometric services fee. If you can demonstrate an inability to pay the biometric services fee, you may request to have the fee waived. Please see additional information under the "Biometric Services Fee" section of this notice.

Individuals who have a Honduras TPS application (Form I–821) that was still pending as of June 21, 2023 do not need to file the application again. If USCIS approves an individual's Form I–821, USCIS will grant the individual TPS through July 5, 2025.

**Required Application Forms and Application Fees To Obtain an EAD**

Every employee must provide their employer with documentation showing they have a legal right to work in the United States. TPS beneficiaries are authorized to work in the United States and are eligible for an EAD which proves their employment authorization. If you have an existing EAD issued under the TPS designation of Honduras that has been auto-extended through June 30, 2024 by the notice published at 87 FR 68717, you may continue to use that EAD through that date. If you want to obtain a new EAD valid through July 5, 2025, you must file an Application for Employment Authorization (Form I–765) and pay the Form I–765 fee (or request a fee waiver, which you may submit on Form I–912, Request for Fee Waiver).

You may, but are not required to, submit Form I–765, Application for Employment Authorization, with your Form I–821 re-registration application. If you do not want a new EAD now, you can request one later by filing your I–765 and paying the fee (or requesting a fee waiver) at that time, provided you have TPS or a pending TPS application. If you have TPS and only a pending Form I–765, you must file the Form I–821 to re-register for TPS or risk having

---

[70] *Honduras: Humanitarian Response Plan (August 2021–December 2022),* United Nations Office for the Coordination of Humanitarian Affairs (UNOCHA), Nov. 19, 2021, available at: *https://reliefweb.int/report/honduras/honduras-humanitarian-response-plan-august-2021-december-2022.*

[71] Honduras External Update—June to July 2022, United Nations High Commissioner for Refugees (UNHCR), Jul. 31, 2022, available at: *https://reliefweb.int/report/honduras/honduras-external-update-june-july-2022.*

[72] The TPS designation of Honduras was statutorily automatically extended for 6 months (from January 6, 2018, through July 5, 2018) after the Secretary of Homeland Security did not make a determination on Honduras's designation 60 days prior to the previous expiration (January 5, 2018). Subsequently, on June 5, 2018, the Secretary published a determination to terminate TPS for Honduras, effective January 5, 2020.

your TPS withdrawn for failure to reregister without good cause.

**Information About Fees and Filing**

USCIS offers the option to applicants for TPS under Honduras's designation to file Form I–821 and related requests for EADs online or by mail. When filing a TPS application, applicants can also request an EAD by submitting a completed Form I–765, with their Form I–821.

*Online filing:* Form I–821 and I–765 are available for concurrent filing online.[73] To file these forms online, you must first create a USCIS online account.[74] However, if you are requesting a fee waiver, you cannot submit the applications online. You will need to file paper versions of the fee waiver request and the form for which you are requesting the fee waiver.

*Mail filing:* Mail your application for TPS to the proper address in Table 1.

**Table 1—Mailing Addresses**

Mail your completed Form I–821, Application for Temporary Protected Status and Form I–765, Application for Employment Authorization, Form I–912, Request for Fee Waiver, if applicable, and supporting documentation to the proper address in Table 1.

TABLE 1—MAILING ADDRESSES

| If you live in: | Then mail your application to: |
|---|---|
| • Alabama ....................................<br>• Alaska<br>• American Samoa<br>• Arizona<br>• Arkansas<br>• California<br>• Colorado<br>• Guam<br>• Hawaii<br>• Idaho<br>• Kentucky<br>• Louisiana<br>• Mississippi<br>• Montana<br>• Nevada<br>• New Mexico<br>• North Carolina<br>• Northern Mariana Islands<br>• Oklahoma<br>• Oregon<br>• Puerto Rico<br>• Tennessee<br>• Texas<br>• Utah<br>• Virgin Islands<br>• Virginia<br>• Washington<br>• West Virginia<br>• Wyoming. | USCIS Phoenix Lockbox.<br>*U.S. Postal Service (USPS):* USCIS, Attn: TPS Honduras, P.O. Box 21800, Phoenix, AZ 85036–1800.<br>*FedEx, UPS, or DHL:* USCIS, Attn: TPS Honduras (Box 21800), 2108 E. Elliot Rd., Tempe, AZ 85284–1806. |
| • Connecticut ...............................<br>• Delaware<br>• District of Columbia<br>• Florida<br>• Georgia<br>• Illinois<br>• Indiana<br>• Iowa<br>• Kansas<br>• Maine<br>• Maryland<br>• Massachusetts<br>• Michigan<br>• Minnesota<br>• Missouri<br>• Nebraska<br>• New Hampshire<br>• New Jersey<br>• New York<br>• North Dakota<br>• Ohio<br>• Pennsylvania<br>• Rhode Island<br>• South Carolina | USCIS Elgin Lockbox.<br>*U.S. Postal Service (USPS):* USCIS, Attn: TPS Honduras, P.O. Box 4091, Carol Stream, IL 60197–4091.<br>*FedEx, UPS, or DHL:* USCIS, Attn: TPS Honduras (Box 4091), 2500 Westfield Drive, Elgin, IL 60124–7836. |

[73] Find information about online filing at "Forms Available to File Online," *https://www.uscis.gov/file-online/forms-available-to-file-online.*

[74] *https://myaccount.uscis.gov/users/sign_up.*

### TABLE 1—MAILING ADDRESSES—Continued

| If you live in: | Then mail your application to: |
|---|---|
| • South Dakota<br>• Vermont<br>• Wisconsin | |

If you were granted TPS by an immigration judge (IJ) or the Board of Immigration Appeals (BIA) and you wish to request an EAD, please mail your Form I–765 application to the appropriate mailing address in Table 1. When you are requesting an EAD based on an IJ/BIA grant of TPS, please include a copy of the IJ or BIA order granting you TPS with your application. This will help us verify your grant of TPS and process your application.

**Supporting Documents**

The filing instructions on the Form I–821 list all the documents needed to establish eligibility for TPS. You may also find information on the acceptable documentation and other requirements for applying (*i.e.*, registering) for TPS on the USCIS website at *https://www.uscis.gov/tps* under ''Honduras.''

**Travel**

TPS beneficiaries may also apply for and be granted travel authorization as a matter of discretion. You must file for travel authorization if you wish to travel outside of the United States. If granted, travel authorization gives you permission to leave the United States and return during a specific period. To request travel authorization, you must file Form I–131, Application for Travel Document, available at *https://www.uscis.gov/i-131.* You may file Form I–131 together with your Form I–821 or separately. When filing the Form I–131, you must:

• Select Item Number 1.d. in Part 2 on the Form I–131; and

• Submit the fee for the Form I–131, or request a fee waiver, which you may submit on Form I–912, Request for Fee Waiver.

If you are filing Form I–131 together with Form I–821, send your forms to the address listed in Table 1. If you are filing Form I–131 separately based on a pending or approved Form I–821, send your form to the address listed in Table 2 and include a copy of Form I–797 for the approved or pending Form I–821.

### TABLE 2—MAILING ADDRESSES

| If you are . . . | Mail to . . . |
|---|---|
| Filing Form I–131 together with a Form I–821, Application for Temporary Protected Status | The address provided in Table 1. |
| Filing Form I–131 based on a pending or approved Form I–821, and you are using the U.S. Postal Service (USPS):<br>    You must include a copy of the receipt notice (Form I–797 or I–797C) showing we accepted or approved your Form I–821. | USCIS, Attn: I–131 TPS, P.O. Box 660167, Dallas, TX 75266–0867. |
| Filing Form I–131 based on a pending or approved Form I–821, and you are using FedEx, UPS, or DHL:<br>    You must include a copy of the receipt notice (Form I–797 or I–797C) showing we accepted or approved your Form I–821. | USCIS, Attn: I–131 TPS, 2501 S State Hwy. 121 Business, Ste. 400, Lewisville, TX 75067. |

**Biometric Services Fee for TPS**

Biometrics (such as fingerprints) are required for all applicants 14 years of age and older. Those applicants must submit a biometric services fee. As previously stated, if you are unable to pay the biometric services fee, you may request a fee waiver, which you may submit on Form I–912, Request for Fee Waiver. For more information on the application forms and fees for TPS, please visit the USCIS TPS web page at *https://www.uscis.gov/tps.* Fees for Form I–765 and biometric services are also described in 8 CFR 103.7(b)(1) (Oct. 1, 2020). If necessary, you may be required to visit an Application Support Center to have your biometrics captured. For additional information on the USCIS biometric screening process, please see the USCIS Customer Profile Management Service Privacy Impact Assessment, available at *https://www.dhs.gov/publication/dhsuscispia-060-customer-profile-management-service-cpms.*

**Refiling a TPS Re-Registration Application After Receiving a Denial of a Fee Waiver Request**

You should file as soon as possible within the 60-day re-registration period so USCIS can process your application and issue your EAD promptly, if one has been requested. Properly filing early will also allow you to have time to refile your application before the deadline, should USCIS deny your fee waiver request. The fee waiver denial notice will contain specific instructions about resubmitting your application. However, you are urged to refile within 45 days of the date on any USCIS fee waiver denial notice, if possible. *See* INA section 244(c)(3)(C); 8 U.S.C. 1254a(c)(3)(C); 8 CFR 244.17(b). For more information on good cause for late re-registration, visit the USCIS TPS web page at *www.uscis.gov/tps.*

**Note:** A re-registering TPS beneficiary age 14 and older must pay the biometric services fee (but not the Form I–821 fee), or request a fee waiver, when filing a TPS re-registration application. As discussed above, if you decide to wait to request an EAD, you do not have to file the Form I–765 or pay the associated Form I–765 fee (or request a fee waiver) at the time of re-registration. You may wait to seek an EAD until after USCIS has approved your TPS re-registration application or at any later date you decide you want to request an EAD. To re-register for TPS, you only need to file the Form I–821 with the biometrics services fee, if applicable, (or request a fee waiver).

**General Employment-Related Information for TPS Applicants and Their Employers**

*How can I obtain information on the status of my TPS application and EAD request?*

To get case status information about your TPS application, as well as the status of your TPS-based EAD request, you can check Case Status Online at

*uscis.gov,* or visit the USCIS Contact Center at *https://www.uscis.gov/contactcenter.* If your Form I–765 has been pending for more than 90 days, and you still need assistance, you may ask a question about your case online at *https://egov.uscis.gov/e-request/Intro.do* or call the USCIS Contact Center at 800–375–5283 (TTY 800–767–1833).

*When hired, what documentation may I show to my employer as evidence of identity and employment authorization when completing Form I–9?*

You can find the Lists of Acceptable Documents on Form I–9, Employment Eligibility Verification, as well as the Acceptable Documents web page at *https://www.uscis.gov/i-9-central/acceptable-documents.* Employers must complete Form I–9 to verify the identity and employment authorization of all new employees. Within three days of hire, employees must present acceptable documents to their employers as evidence of identity and employment authorization to satisfy Form I–9 requirements.

You may present any document from List A (which provides evidence of both identity and employment authorization) or one document from List B (which provides evidence of your identity) together with one document from List C (which provides evidence of employment authorization), or you may present an acceptable receipt as described in the Form I–9 Instructions. Employers may not reject a document based on a future expiration date. You can find additional information about Form I–9 on the I–9 Central web page at *https://www.uscis.gov/I-9Central.* An EAD is an acceptable document under List A.

*If I have an EAD based on another immigration status, can I obtain a new TPS-based EAD?*

Yes, if you are eligible for TPS, you can obtain a new TPS-based EAD, regardless of whether you have an EAD or work authorization based on another immigration status. If you want to obtain a new TPS-based EAD valid through July 5, 2025, then you must file Form I–765, Application for Employment Authorization, and pay the associated fee (unless USCIS grants your fee waiver request).

*Can my employer require that I provide any other documentation such as evidence of my status or proof of my Honduran citizenship or a Form I–797C showing that I registered for TPS for Form I–9 completion?*

No. When completing Form I–9, employers must accept any

documentation you choose to present from the Form I–9 Lists of Acceptable Documents that reasonably appears to be genuine and that relates to you, or an acceptable List A, List B, or List C receipt. Employers need not reverify List B identity documents. Employers may not request proof of Honduran citizenship or proof of registration for TPS when completing Form I–9 for new hires or reverifying the employment authorization of current employees. Refer to the "Note to Employees" section of this **Federal Register** notice for important information about your rights if your employer rejects lawful documentation, requires additional documentation, or otherwise discriminates against you based on your citizenship or immigration status, or your national origin. Employers can refer to the compliance notice that DHS published on November 16, 2022, for information on how to complete the Form I–9 with TPS EADs that DHS extended through June 30, 2024.[75]

**Note to All Employers**

Employers are reminded that the laws requiring proper employment eligibility verification and prohibiting unfair immigration-related employment practices remain in full force. This **Federal Register** notice does not supersede or in any way limit applicable employment verification rules and policy guidance, including those rules setting forth reverification requirements. For general questions about the employment eligibility verification process, employers may call USCIS at 888–464–4218 (TTY 877–875–6028) or email USCIS at *I-9Central@uscis.dhs.gov.* USCIS accepts calls and emails in English and many other languages. For questions about avoiding discrimination during the employment eligibility verification process (Form I–9 and E-Verify), employers may call the U.S. Department of Justice, Civil Rights Division, Immigrant and Employee Rights Section (IER) Employer Hotline at 800–255–8155 (TTY 800–237–2515). IER offers language interpretation in numerous languages. Employers may also email IER at *IER@usdoj.gov.*

**Note to Employees**

For general questions about the employment eligibility verification process, employees may call USCIS at 888–897–7781 (TTY 877–875–6028) or email USCIS at *I-9Central@uscis.dhs.gov.* USCIS accepts calls in

English, Spanish and many other languages. Employees or job applicants may also call the IER Worker Hotline at 800–255–7688 (TTY 800–237–2515) for information regarding employment discrimination based on citizenship, immigration status, or national origin, including discrimination related to Form I–9 and E-Verify. The IER Worker Hotline provides language interpretation in numerous languages.

To comply with the law, employers must accept any document or combination of documents from the Lists of Acceptable Documents if the documentation reasonably appears to be genuine and to relate to the employee, or an acceptable List A, List B, or List C receipt as described in the Form I–9 Instructions. Employers may not require extra or additional documentation beyond what is required for Form I–9 completion. Further, employers participating in E-Verify who receive an E-Verify case result of "Tentative Nonconfirmation" (mismatch) must promptly inform employees of the mismatch and give such employees an opportunity to take action to resolve the mismatch. A mismatch result means that the information entered into E-Verify from Form I–9 differs from records available to DHS.

Employers may not terminate, suspend, delay training, withhold or lower pay, or take any adverse action against an employee because of a mismatch while the case is still pending with E-Verify. A Final Nonconfirmation (FNC) case result is received when E-Verify cannot confirm an employee's employment eligibility. An employer may terminate employment based on a case result of FNC. Work-authorized employees who receive an FNC may call USCIS for assistance at 888–897–7781 (TTY 877–875–6028). For more information about E-Verify-related discrimination or to report an employer for discrimination in the E-Verify process based on citizenship, immigration status, or national origin, contact IER's Worker Hotline at 800–255–7688 (TTY 800–237–2515). Additional information about proper nondiscriminatory Form I–9 and E-Verify procedures is available on the IER website at *https://www.justice.gov/crt/immigrant-and-employee-rights-section* and the USCIS and E-Verify websites at *https://www.uscis.gov/i-9-central* and *https://www.e-verify.gov.*

**Note Regarding Federal, State, and Local Government Agencies (Such as Departments of Motor Vehicles)**

This **Federal Register** Notice does not invalidate the compliance notice DHS issued on November 16, 2022, which

---

[75] Continuation of Documentation for Beneficiaries of Temporary Protected Status Designations for El Salvador, Haiti, Nicaragua, Sudan, Honduras, and Nepal, 87 FR 68717 (Nov. 16, 2022).

extended the validity of certain TPS documentation through June 30, 2024, and does not require individuals to present a Form I–797, Notice of Action. While Federal Government agencies must follow the guidelines laid out by the Federal Government, State and local government agencies establish their own rules and guidelines when granting certain benefits. Each state may have different laws, requirements, and determinations about what documents you need to provide to prove eligibility for certain benefits. Whether you are applying for a Federal, State, or local government benefit, you may need to provide the government agency with documents that show you are a TPS beneficiary, show you are authorized to work based on TPS or other status, or that may be used by DHS to determine if you have TPS or another immigration status. Examples of such documents are:

• Your current EAD with a TPS category code of A–12 or C–19, even if your country of birth noted on the EAD does not reflect the TPS designated country of Honduras; or

• Your Form I–94, Arrival/Departure Record or Form I–797, Notice of Action, as shown in the **Federal Register** notice published at 87 FR 68717.

Check with the government agency requesting documentation regarding which document(s) the agency will accept. Some state and local government agencies use the SAVE program to confirm the current immigration status of applicants for public benefits.

While SAVE can verify that an individual has TPS, each state and local government agency's procedures govern whether they will accept an unexpired EAD, Form I–797, Form I–797C, or Form I–94. It may also assist the agency if you:

a. Give the agency a copy of the relevant **Federal Register** notice listing the TPS-related document, including any applicable auto-extension of the document, in addition to your recent TPS-related document with your A-number, USCIS number or Form I–94 number;

b. Explain that SAVE will be able to verify the continuation of your TPS using this information; and

c. Ask the agency to initiate a SAVE query with your information and follow through with additional verification steps, if necessary, to get a final SAVE response verifying your TPS.

You can also ask the agency to look for SAVE notices or contact SAVE if they have any questions about your immigration status or any automatic extension of TPS-related documentation. In most cases, SAVE provides an automated electronic response to benefit-granting agencies within seconds, but occasionally verification can be delayed.

You can check the status of your SAVE verification by using CaseCheck at *https://save.uscis.gov/casecheck/*. CaseCheck is a free service that lets you follow the progress of your SAVE verification case using your date of birth and one immigration identifier number (A-number, USCIS number, or Form I–94 number) or Verification Case Number. If an agency has denied your application based solely or in part on a SAVE response, the agency must offer you the opportunity to appeal the decision in accordance with the agency's procedures. If the agency has received and acted on or will act on a SAVE verification and you do not believe the SAVE response is correct, the SAVE website, *www.uscis.gov/save*, has detailed information on how to correct or update your immigration record, make an appointment, or submit a written request to correct records.

[FR Doc. 2023–13017 Filed 6–20–23; 8:45 am]

**BILLING CODE 9111–97–P**

---

## DEPARTMENT OF HOMELAND SECURITY

### U.S. Citizenship and Immigration Services

[OMB Control Number 1615–0003]

### Agency Information Collection Activities; Revision of a Currently Approved Collection: Application To Extend/Change Nonimmigrant Status

**AGENCY:** U.S. Citizenship and Immigration Services, Department of Homeland Security.

**ACTION:** 30-Day notice.

**SUMMARY:** The Department of Homeland Security (DHS), U.S. Citizenship and Immigration Services (USCIS) will be submitting the following information collection request to the Office of Management and Budget (OMB) for review and clearance in accordance with the Paperwork Reduction Act of 1995. The purpose of this notice is to allow an additional 30 days for public comments.

**DATES:** Comments are encouraged and will be accepted until July 21, 2023.

**ADDRESSES:** Written comments and/or suggestions regarding the item(s) contained in this notice, especially regarding the estimated public burden and associated response time, must be submitted via the Federal eRulemaking Portal website at *http:// www.regulations.gov* under e-Docket ID number USCIS–2007–0038. All submissions received must include the OMB Control Number 1615–0003 in the body of the letter, the agency name and Docket ID USCIS–2007–0038.

**FOR FURTHER INFORMATION CONTACT:** USCIS, Office of Policy and Strategy, Regulatory Coordination Division, Samantha Deshommes, Chief, Telephone number (240) 721–3000 (This is not a toll-free number; comments are not accepted via telephone message.). Please note contact information provided here is solely for questions regarding this notice. It is not for individual case status inquiries. Applicants seeking information about the status of their individual cases can check Case Status Online, available at the USCIS website at *http:// www.uscis.gov*, or call the USCIS Contact Center at (800) 375–5283; TTY (800) 767–1833.

**SUPPLEMENTARY INFORMATION:**

### Comments

The information collection notice was previously published in the **Federal Register** on January 30, 2023, at 88 FR 5903, allowing for a 60-day public comment period. USCIS did receive 5 comments in connection with the 60-day notice.

You may access the information collection instrument with instructions, or additional information by visiting the USCIS eRulemaking Portal site at: *http://www.regulations.gov* and enter USCIS–2007–0038 in the search box. The comments submitted to USCIS via this method are visible to the Office of Management and Budget and comply with the requirements of 5 CFR 1320.12(c). All submissions will be posted, without change, to the Federal eRulemaking Portal at *http:// www.regulations.gov*, and will include any personal information you provide. Therefore, submitting this information makes it public. You may wish to consider limiting the amount of personal information that you provide in any voluntary submission you make to DHS. DHS may withhold information provided in comments from public viewing that it determines may impact the privacy of an individual or is offensive. For additional information, please read the Privacy Act notice that is available via the link in the footer of *http://www.regulations.gov*.

Written comments and suggestions from the public and affected agencies should address one or more of the following four points:

(1) Evaluate whether the proposed collection of information is necessary for the proper performance of the

HondurasAR000108

Program changes require a revision of the existing collection. These changes include: Updating the title of the collection and updates to the form itself and reflects the potential for increased sponsorship and associated justifications articulated in section 229 of the Homeland Security Act of 2002 and Presidential direction through the 2013 and 2015 Executive Orders.

The form will accommodate an increase in potential sponsorships and be used by additional programs in the same manner to sponsor private sector entities and individuals for security clearances. The additional sponsorships and programs will increase the burden totals by 360 responses, 60 burden hours, and $6,155 annual burden cost. For current programs using the form, the burden estimates have decreased by 200 responses, 33 burden hours and $706 annual burden cost based on actual responses received. As a result, the total burden estimates will increase overall by 160 responses, 27 burden hours, $5,448 annual burden costs.

The changes to the form itself include: Updating the title; adding a program type field, adding justification guidance to the back of the form, and updating the wording of the field titles and instructions to improve clarity. A redlined mockup of the form changes will be included as a supplement to this supporting statement. The changes to the form itself will not change the burden estimates as the only field being added is an open text field to distinguish the justification for the nomination.

The annual government cost for the collection has increased by $91,998, from $150,852 to $242,850, due to updated wage rates.

This ICR was previously published at 83 FR 4670 for 60-day comment, and NPPD is soliciting public comment for another 30 days. OMB is particularly interested in comments that:

1. Evaluate whether the proposed collection of information is necessary for the proper performance of the functions of the agency, including whether the information will have practical utility;

2. Evaluate the accuracy of the agency's estimate of the burden of the proposed collection of information, including the validity of the methodology and assumptions used;

3. Enhance the quality, utility, and clarity of the information to be collected; and

4. Minimize the burden of the collection of information on those who are to respond, including through the use of appropriate automated, electronic, mechanical, or other technological collection techniques or other forms of information technology, *e.g.,* permitting electronic submissions of responses.

*Title of Collection:* Private Sector Clearance Program Request Form.

*OMB Control Number:* 1670–0013.

*Frequency:* Annually.

*Affected Public:* Private and Public Sector.

*Number of Respondents:* 660 respondents.

*Estimated Time per Respondent:* 10 minutes.

*Total Burden Hours:* 110 annual burden hours.

*Total Burden Cost (capital/startup):* $0.

*Total Burden Cost (operating/ maintaining):* $0.

*Total Recordkeeping Burden:* $0.

**David Epperson,**

*Chief Information Officer.*

[FR Doc. 2018–11966 Filed 6–4–18; 8:45 am]

**BILLING CODE 9110–9P–P**

# DEPARTMENT OF HOMELAND SECURITY

## U.S. Citizenship and Immigration Services

**[CIS No. 2623–18; DHS Docket No. USCIS– 2014–0007]**

**RIN 1615–ZB75**

## Termination of the Designation of Honduras for Temporary Protected Status

**AGENCY:** U.S. Citizenship and Immigration Services, U.S. Department of Homeland Security.

**ACTION:** Notice.

**SUMMARY:** The designation of Honduras for Temporary Protected Status (TPS) is set to expire on July 5, 2018. After reviewing country conditions and consulting with appropriate U.S. Government agencies, the Secretary of Homeland Security has determined that because conditions in Honduras no longer support its designation for TPS, termination of the TPS designation of Honduras is required by statute. To provide time for an orderly transition, the Secretary is terminating the designation effective on January 5, 2020, which is 18 months following the end of the current designation.

Nationals of Honduras (and aliens having no nationality who last habitually resided in Honduras) who have been granted TPS and would like to maintain their TPS and receive TPS-based Employment Authorization Documents (EAD) valid through January 5, 2020, must re-register for TPS in accordance with the procedures set forth in this Notice. After January 5, 2020, nationals of Honduras (and aliens having no nationality who last habitually resided in Honduras) who have been granted TPS under the Honduras designation will no longer have TPS.

**DATES:** The designation of Honduras for TPS is terminated effective at 11:59 p.m., local time, on January 5, 2020. The 60-day re-registration period runs from June 5, 2018 through August 6, 2018. (**Note:** It is important for re-registrants to timely re-register during this 60-day period.)

**FOR FURTHER INFORMATION CONTACT:**

• You may contact Samantha Deshommes, Chief, Regulatory Coordination Division, Office of Policy and Strategy, U.S. Citizenship and Immigration Services, U.S. Department of Homeland Security, 20 Massachusetts Avenue NW, Washington, DC 20529– 2060; or by phone at 800–375–5283.

• For further information on TPS, including guidance on the re-registration process and additional information on eligibility, please visit the USCIS TPS web page at *http:// www.uscis.gov/tps.* You can find specific information about this termination of Honduras's TPS by selecting ''Honduras'' from the menu on the left side of the TPS web page.

• If you have additional questions about Temporary Protected Status, please visit *uscis.gov/tools.* Our online virtual assistant, Emma, can answer many of your questions and point you to additional information on our website. If you are unable to find your answers there, you may also call our USCIS Contact Center at 800–375–5283.

• Applicants seeking information about the status of their individual cases may check Case Status Online, available on the USCIS website at *http:// www.uscis.gov,* or call the USCIS Contact Center at 800–375–5283 (TTY 800–767–1833). Service is available in English and Spanish.

• Further information will also be available at local USCIS offices upon publication of this Notice.

**SUPPLEMENTARY INFORMATION:**

## Table of Abbreviations

BIA—Board of Immigration Appeals
CFR—Code of Federal Regulations
DHS—U.S. Department of Homeland Security
DOS—Department of State
EAD—Employment Authorization Document
FNC—Final Nonconfirmation
FR—Federal Register
Government—U.S. Government
IJ—Immigration Judge

INA—Immigration and Nationality Act
IER—U.S. Department of Justice Civil Rights Division, Immigrant and Employee Rights Section
SAVE—USCIS Systematic Alien Verification for Entitlements Program
Secretary—Secretary of Homeland Security
TNC—Tentative Nonconfirmation
TPS—Temporary Protected Status
TTY—Text Telephone
USCIS—U.S. Citizenship and Immigration Services
U.S.C.—United States Code

Through this Notice, DHS sets forth procedures necessary for eligible nationals of Honduras (or aliens having no nationality who last habitually resided in Honduras) to re-register for TPS and to apply for renewal of their EADs with USCIS. Re-registration is limited to persons who have previously registered for TPS under the designation of Honduras and whose applications have been granted.

For individuals who have already been granted TPS under Honduras's designation, the 60-day re-registration period runs from June 5, 2018 through August 6, 2018. USCIS will issue new EADs with a January 5, 2020 expiration date to eligible Honduran TPS beneficiaries who timely re-register and apply for EADs. Given the timeframes involved with processing TPS re-registration applications, DHS recognizes that not all re-registrants will receive new EADs before their current EADs expire on July 5, 2018. Accordingly, through this **Federal Register** notice, DHS automatically extends the validity of EADs issued under the TPS designation of Honduras for 180 days, through January 1, 2019. Additionally, individuals who have EADs with an expiration date of January 5, 2018, and who applied for a new EAD during the last re-registration period but have not yet received their new EADs are also covered by this automatic extension. These individuals may show their EAD indicating a January 5, 2018 expiration date and their EAD application receipt (Notice of Action, Form I–797C) that notes the application was received on or after December 15, 2017, to employers as proof of continued employment authorization through January 1, 2019. This Notice explains how TPS beneficiaries and their employers may determine which EADs are automatically extended and how this affects the Form I–9, Employment Eligibility Verification, and E-Verify processes.

**What is Temporary Protected Status (TPS)?**

• TPS is a temporary immigration status granted to eligible nationals of a country designated for TPS under the INA, or to eligible persons without nationality who last habitually resided in the designated country.

• During the TPS designation period, TPS beneficiaries are eligible to remain in the United States, may not be removed, and are authorized to obtain EADs so long as they continue to meet the requirements of TPS.

• TPS beneficiaries may also apply for and be granted travel authorization as a matter of discretion.

• The granting of TPS does not result in or lead to lawful permanent resident status.

• To qualify for TPS, beneficiaries must meet the eligibility standards at INA section 244(c)(1)–(2), 8 U.S.C. 1254a(c)(1)–(2).

• When the Secretary terminates a country's TPS designation, beneficiaries return to one of the following:

○ The same immigration status or category that they maintained before TPS, if any (unless that status or category has since expired or been terminated); or

○ Any other lawfully obtained immigration status or category they received while registered for TPS, as long as it is still valid beyond the date TPS terminates.

**When was Honduras designated for TPS?**

On January 5, 1999, former Attorney General Janet Reno designated Honduras for TPS based on an environmental disaster within that country, specifically the severe flooding and associated damage from Hurricane Mitch, which struck Honduras in October 1998. *See Designation of Honduras Under Temporary Protected Status,* 64 FR 524 (Jan. 5, 1999). The designation has been continuously extended since its initial designation. Most recently, on November 6, 2017, former Acting Secretary Duke announced that she had not made a decision on Honduras's TPS designation by the statutory deadline, resulting in an automatic 6-month extension of the designation, through July 5, 2018. *See* DHS Press Release, *Acting Secretary Elaine Duke Announcement on Temporary Protected Status for Nicaragua and Honduras* (Nov. 6, 2017), *available at https://www.dhs.gov/news/2017/11/06/acting-secretary-elaine-duke-announcement-temporary-protected-status-nicaragua-and; see also Extension of the Designation of Honduras for Temporary Protected Status,* 82 FR 59630 (Dec. 15, 2017).

**What authority does the Secretary have to terminate the designation of Honduras for TPS?**

Section 244(b)(1) of the INA, 8 U.S.C. 1254a(b)(1), authorizes the Secretary, after consultation with appropriate U.S. Government agencies, to designate a foreign state (or part thereof) for TPS if the Secretary determines that certain country conditions exist.[1] The Secretary may then grant TPS to eligible nationals of that foreign state (or eligible aliens having no nationality who last habitually resided in the designated country). *See* INA section 244(a)(1)(A), 8 U.S.C. 1254a(a)(1)(A).

At least 60 days before the expiration of a country's TPS designation or extension, the Secretary, after consultation with appropriate Government agencies, must review the conditions in the foreign state designated for TPS to determine whether the conditions for the TPS designation continue to be met. *See* INA section 244(b)(3)(A), 8 U.S.C. 1254a(b)(3)(A). If the Secretary determines that the foreign state continues to meet the conditions for TPS designation, the designation must be extended for an additional period of 6 months and, in the Secretary's discretion, may be extended for 12 or 18 months. *See* INA section 244(b)(3)(C), 8 U.S.C. 1254a(b)(3)(C). If the Secretary determines that the foreign state no longer continues to meet the conditions for TPS designation, the Secretary must terminate the designation, but such termination may not take effect earlier than 60 days after the date the **Federal Register** notice of termination is published, or if later, the expiration of the most recent previous extension of the country's TPS designation. *See* INA section 244(b)(3)(B), 8 U.S.C. 1254a(b)(3)(B). The Secretary may determine the appropriate effective date of the termination and the expiration of any TPS-related documentation, such as EADs, for the purpose of providing for an orderly transition. *See id.*; INA section 244(d)(3), 8 U.S.C. 1254a(d)(3).

**Why is the Secretary terminating the TPS designation for Honduras as of January 5, 2020?**

DHS has reviewed conditions in Honduras. Based on the review, which

---

[1] As of March 1, 2003, in accordance with section 1517 of title XV of the Homeland Security Act of 2002, Public Law 107–296, 116 Stat. 2135, any reference to the Attorney General in a provision of the INA describing functions transferred from the Department of Justice to the U.S. Department of Homeland Security (DHS) "shall be deemed to refer to the Secretary" of Homeland Security. *See* 6 U.S.C. 557 (codifying the Homeland Security Act of 2002, tit. XV, section 1517).

considered input received from other appropriate U.S. Government agencies, including the Department of State, the Secretary of Homeland Security has determined that the conditions supporting Honduras's 1999 designation for TPS on the basis of environmental disaster due to the damage caused by Hurricane Mitch in October 1998 are no longer met. Recovery and reconstruction efforts relating to Hurricane Mitch have largely been completed. The social and economic conditions affected by the hurricane have stabilized, and people are able to conduct their daily activities without impediments directly related to damage from the hurricane. Honduras has, however, experienced some negative environmental conditions unrelated to Hurricane Mitch over the intervening years. Despite ongoing challenges relating to coffee rust, coffee bean production is up and Honduras is currently the third largest Arabica producer in the world. In 2017 Honduras was devastated by a pine beetle plague but the Government of Honduras took aggressive steps to stem the invasion. Drought conditions Honduras has previously dealt with are not currently impacting the country, with USAID reporting as of January 2018 that sufficient seasonal rainfall had led to higher agricultural production compared to recent years and an increase in employment opportunities, resulting in improvements in the food security situation in many parts of the country. While some housing issues remain, recent construction figures show sustained growth in 2017, with residential projects growing by 10% with respect to 2016, and commercial projects growing by 18% over the same period. Additionally, Honduras has been regularly accepting the return of its nationals with final removal orders over the last five years. From fiscal year 2013 to fiscal year 2016, DHS removed 120,047 individuals to Honduras. In fiscal year 2017, DHS removed 22,381 Honduran nationals. As of May 2, 2018, in fiscal year 2018 DHS has removed 13,800 Honduran nationals.

Following Hurricane Mitch, Honduras received a significant amount of international aid to assist in its recovery efforts and to fund reconstruction projects. Accordingly, many reconstruction projects have now been completed. Reconstruction programs have helped to address Honduras's ongoing housing shortage and improve infrastructure, in particular, roads and bridges. Schools and health centers damaged by the hurricane have also been repaired or rebuilt and reopened. Additionally, Honduras's economy is

steadily improving. The Honduran economy grew by 3.7% in 2016, and its Gross Domestic Product (GDP) annual growth rate is projected to trend around 4.90% by the end of the first quarter of 2018. The GDP in Honduras averaged $5.69 billion (USD) from 1960 until 2016, reaching an all-time high of $21.52 billion in 2016. The Honduran Government estimated that the country's unemployment rate was 7.4% in 2016.

DHS estimates that there are approximately 86,000 nationals of Honduras (and aliens having no nationality who last habitually resided in Honduras) who hold TPS under Honduras's designation.

**Notice of Termination of the TPS Designation of Honduras**

By the authority vested in the Secretary of Homeland Security under INA section 244(b)(3), 8 U.S.C. 1254a(b)(3), I have determined, after consultation with appropriate U.S. Government agencies, that the conditions for the designation of Honduras for TPS under 244(b)(1)(B) of the INA, 8 U.S.C. 1254a(b)(1)(B), are no longer met.

Accordingly, I order as follows:

(1) Pursuant to sections 244(b)(3)(B) and 244(d)(3) of the Immigration and Nationality Act, the designation of Honduras for TPS is terminated effective at 11:59 p.m., local time, on January 5, 2020, which is 18 months following the end of the current designation, in order to provide for an orderly transition.

(2) Information concerning the termination of TPS for nationals of Honduras (and aliens having no nationality who last habitually resided in Honduras) will be available at local USCIS offices upon publication of this Notice and through the USCIS Contact Center at 1–800–375–5283. This information will be published on the USCIS website at *www.uscis.gov*.

**Kirstjen M. Nielsen,**

*Secretary.*

**Required Application Forms and Application Fees To Re-Register for TPS**

To re-register for TPS based on the designation of Honduras, you *must* submit an Application for Temporary Protected Status (Form I–821). You are not required to pay the filing fee for the Form I–821. *See* 8 CFR 244.17. You may be required to pay the biometric services fee. Please see additional information under the "Biometric Services Fee" section of this Notice.

Through operation of this **Federal Register** notice, your existing EAD issued under the TPS designation of Honduras with the expiration date of July 5, 2018, is automatically extended for 180 days, through January 1, 2019.

However, if you want to obtain a new EAD valid through January 5, 2020, you must file an Application for Employment Authorization (Form I–765) and pay the Form I–765 fee (or request a fee waiver). If you do not want a new EAD, you do not have to file Form I–765 or pay the Form I–765 fee. If you do not want to request a new EAD now, you may also file Form I–765 at a later date and pay the fee (or request a fee waiver), provided that you still have TPS or a pending TPS application.

Additionally, individuals who have EADs with an expiration date of January 5, 2018, and who applied for a new EAD during the last re-registration period but have not yet received their new EADs are also covered by this automatic extension through January 1, 2019. You do not need to apply for a new EAD in order to benefit from this 180-day automatic extension. If you have a Form I–821 and/or Form I–765 that was still pending as of June 5, 2018, then you do not need to file either application again. If your pending TPS application is approved, you will be granted TPS through January 5, 2020. Similarly, if you have a pending TPS-related application for an EAD that is approved, it will be valid through the same date.

Unless you timely re-register and properly file an EAD application in accordance with this Notice, the validity of your current EAD will end on January 1, 2019. You may file the application for a new EAD either prior to or after your current EAD has expired. However, you are strongly encouraged to file your application for a new EAD as early as possible to avoid gaps in the validity of your employment authorization documentation and to ensure that you receive your new EAD by January 1, 2019.

For more information on the application forms and fees for TPS, please visit the USCIS TPS web page at *http://www.uscis.gov/tps*. Fees for the Form I–821, the Form I–765, and biometric services are also described in 8 CFR 103.7(b)(1)(i).

**Biometric Services Fee**

Biometrics (such as fingerprints) are required for all applicants 14 years and older. Those applicants must submit a biometric services fee. As previously stated, if you are unable to pay for the biometric services fee, you may complete a Form I–912 or submit a personal letter requesting a fee waiver with satisfactory supporting documentation. For more information on the biometric services fee, please visit the USCIS website at *http://www.uscis.gov*. If necessary, you may be required to visit an Application Support

Center to have your biometrics captured. For additional information on the USCIS biometrics screening process please see the USCIS Customer Profile Management Service Privacy Impact Assessment, available at *www.dhs.gov/privacy.*

**Refiling a Re-Registration TPS Application After Receiving a Denial of a Fee Waiver Request**

You should file as soon as possible within the 60-day re-registration period so USCIS can process your application and issue any EAD promptly. Properly filing early will also allow you to have time to refile your application before the deadline should USCIS deny your fee waiver request. If, however, you receive a denial of your fee waiver request and are unable to refile by the re-registration deadline, you may still refile your Form I–821 with the biometrics fee. This situation will be reviewed to determine whether you established good cause for late TPS re-registration. However, you are urged to refile within 45 days of the date on any USCIS fee waiver denial notice, if possible. *See* INA section 244(c)(3)(C) (8 U.S.C. 1254a(c)(3)(C)); 8 CFR 244.17(b). For more information on good cause for late re-registration, visit the USCIS TPS web page at *http://www.uscis.gov/tps.* Following denial of your fee waiver request, you may also refile your Form I–765 with fee either with your Form I–821 or at a later time, if you choose.

**Note:** Although a re-registering TPS beneficiary age 14 and older must pay the biometric services fee (but not the Form I–821 fee) when filing a TPS re-registration application, you may decide to wait to request an EAD. Therefore, you do not have to file the Form I–765 or pay the associated Form I–765 fee (or request a fee waiver) at the time of re-registration, and could wait to seek an EAD until after USCIS has approved your TPS re-registration application. If you choose to do this, to re-register for TPS you would only need to file the Form I–821 with the biometrics services fee, if applicable, (or request a fee waiver).

**Mailing Information**

Mail your application for TPS to the proper address in Table 1.

TABLE 1—MAILING ADDRESSES

| If you . . . | Mail your application to: |
|---|---|
| Are re-registering for TPS and you are using the U.S. Postal Service to mail your package; or Were granted TPS by an immigration judge or the Board of Immigration Appeals, and you wish to request an EAD; or You are re-registering for the first time after an immigration judge or the Board of Immigration Appeals granted you TPS and you are using the U.S. Postal Service to mail your package. | U.S. Citizenship and Immigration Services, Attn: TPS Honduras, P.O. Box 6943, Chicago, IL 60680–6943. |
| Are using a non-U.S. Postal Service delivery service to mail your package (for re-registrations). | U.S. Citizenship and Immigration Services, Attn: TPS Honduras, 131 S Dearborn—3rd Floor, Chicago, IL 60603–5517. |

If you were granted TPS by an Immigration Judge (IJ) or the Board of Immigration Appeals (BIA) and you wish to request an EAD or are re-registering for the first time following a grant of TPS by an IJ or the BIA, please mail your application to the appropriate mailing address in Table 1. When re-registering and requesting an EAD based on an IJ/BIA grant of TPS, please include a copy of the IJ or BIA order granting you TPS with your application. This will help us to verify your grant of TPS and process your application.

**Supporting Documents**

The filing instructions on the Form I–821 list all the documents needed to establish eligibility for TPS. You may also find information on the acceptable documentation and other requirements for applying or registering for TPS on the USCIS website at *www.uscis.gov/tps* under ''Honduras.''

**Employment Authorization Document (EAD)**

*How can I obtain information on the status of my EAD request?*

To get case status information about your TPS application, including the status of an EAD request, you can check Case Status Online at *http://www.uscis.gov,* or call the USCIS National Contact Center at 800–375–5283 (TTY 800–767–1833). If your Form I–765 has been pending for more than 90 days, and you still need assistance, you may request an EAD inquiry appointment with USCIS by using the InfoPass system at *https://infopass.uscis.gov.* However, we strongly encourage you first to check Case Status Online or call the USCIS National Contact Center for assistance before making an InfoPass appointment.

*Am I eligible to receive an automatic extension of my current EAD through January 1, 2019, using this **Federal Register** notice?*

Yes. Provided that you currently have a Honduras TPS-based EAD, this **Federal Register** notice automatically extends your EAD through January 1, 2019, if you:

• Are a national of Honduras (or have no nationality and last habitually resided in Honduras); and either,

• Have an EAD with a marked expiration date of July 5, 2018, bearing the notation A–12 or C–19 on the face of the card under Category, or

• Have an EAD with a marked expiration date of January 5, 2018, bearing the notation A–12 or C–19 on the face of the card under Category and you applied for a new EAD during the last re-registration period but have not yet received a new EAD.

Although this **Federal Register** notice automatically extends your EAD through January 1, 2019, you must re-register timely for TPS in accordance with the procedures described in this **Federal Register** notice if you would like to maintain your TPS.

*When hired, what documentation may I show to my employer as evidence of employment authorization and identity when completing Employment Eligibility Verification (Form I–9)?*

You can find a list of acceptable document choices on the ''Lists of Acceptable Documents'' for Form I–9. Employers must complete Form I–9 to verify the identity and employment authorization of all new employees. Within three days of hire, employees must present acceptable documents to their employers as evidence of identity

and employment authorization to satisfy Form I–9 requirements.

You may present any document from List A (which provides evidence of both identity and employment authorization), or one document from List B (which provides evidence of your identity) together with one document from List C (which is evidence of employment authorization), or you may present an acceptable receipt for List A, List B, or List C documents as described in the Form I–9 Instructions. Employers may not reject a document based on a future expiration date. You can find additional detailed information about Form I–9 on USCIS' I–9 Central web page at *http://www.uscis.gov/I–9Central*.

An EAD is an acceptable document under List A. If your EAD has an expiration date of July 5, 2018, or January 5, 2018 (and you applied for a new EAD during the last re-registration period but have not yet received a new EAD), and states A–12 or C–19 under Category, it has been extended automatically for 180 days by virtue of this **Federal Register** notice and you may choose to present this Notice along with your EAD to your employer as proof of identity and employment eligibility for Form I–9 through January 1, 2019, unless your TPS has been withdrawn or your request for TPS has been denied. If you have an EAD with a marked expiration date of July 5, 2018, and you properly filed for a new EAD in accordance with this Notice, you will also receive Form I–797C, Notice of Action that will state your current A–12 or C–19 coded EAD is automatically extended for 180 days. You may choose to present your EAD to your employer together with this Form I–797C as a List A document that provides evidence of your identity and employment authorization for Form I–9 through January 1, 2019, unless your TPS has been withdrawn or your request for TPS has been denied. See the subsection titled, "How do my employer and I complete the Employment Eligibility Verification (Form I–9) using an automatically extended EAD for a new job?" for further information.

To reduce confusion over this extension at the time of hire, you should explain to your employer that your EAD has been automatically extended through January 1, 2019. You may also provide your employer with a copy of this **Federal Register** notice, which explains that your EAD has been automatically extended. As an alternative to presenting evidence of your automatically extended EAD, you may choose to present any other acceptable document from List A, a combination of one selection from List B and one selection from List C, or a valid receipt.

*What documentation may I present to my employer for Employment Eligibility Verification (Form I–9) if I am already employed but my current TPS-related EAD is set to expire?*

Even though your EAD has been automatically extended, your employer is required by law to ask you about your continued employment authorization no later than before you start work on July 6, 2018 (or July 5, if you have an EAD with a marked expiration date of January 5, 2018). You will need to present your employer with evidence that you are still authorized to work. Once presented, you may correct your employment authorization expiration date in Section 1 and your employer should correct the EAD expiration date in Section 2 of Form I–9. See the subsection titled, "What corrections should my current employer and I make to Employment Eligibility Verification (Form I–9) if my employment authorization has been automatically extended?" for further information. You may show this **Federal Register** notice to your employer to explain what to do for Form I–9 and to show that your EAD has been automatically extended through January 1, 2019. Your employer may need to reinspect your automatically extended EAD to check the expiration date and Category code if your employer did not keep a copy of this EAD when you initially presented it. In addition, if you have an EAD with a marked expiration date of July 5, 2018, and you properly filed your Form I–765 to obtain a new EAD, you will receive a Form I–797C, Notice of Action. Form I–797C will state that your current A–12 or C–19 coded EAD is automatically extended for 180 days. You may present Form I–797C to your employer along with your EAD to confirm that the validity of your EAD has been automatically extended through January 1, 2019, unless your TPS has been withdrawn or your request for TPS has been denied. To reduce the possibility of gaps in your employment authorization documentation, you should file your Form I–765 to request a new EAD as early as possible during the re-registration period.

The last day of the automatic EAD extension is January 1, 2019. Before you start work on January 2, 2019, your employer must reverify your employment authorization. At that time, you must present any document from List A or any document from List C on Form I–9 Lists of Acceptable Documents, or an acceptable List A or List C receipt described in the Form I–9 Instructions to reverify employment authorization.

By January 2, 2019, your employer must complete Section 3 of the current version of the form, Form I–9 07/17/17 N, and attach it to the previously completed Form I–9, if your original Form I–9 was a previous version. Your employer can check the USCIS' I–9 Central web page at *http://www.uscis.gov/I–9Central* for the most current version of Form I–9.

Note that your employer may not specify which List A or List C document you must present and cannot reject an acceptable receipt.

*Can my employer require that I provide any other documentation to prove my status, such as proof of my Honduran citizenship?*

No. When completing Form I–9, including reverifying employment authorization, employers must accept any documentation that appears on the Form I–9 "Lists of Acceptable Documents" that reasonably appears to be genuine and that relates to you, or an acceptable List A, List B, or List C receipt. Employers need not reverify List B identity documents. Employers may not request documentation that does not appear on the "Lists of Acceptable Documents." Therefore, employers may not request proof of Honduran citizenship or proof of re-registration for TPS when completing Form I–9 for new hires or reverifying the employment authorization of current employees. If presented with EADs that have been automatically extended, employers should accept such documents as a valid List A document so long as the EAD reasonably appears to be genuine and relates to the employee. Refer to the Note to Employees section of this **Federal Register** notice for important information about your rights if your employer rejects lawful documentation, requires additional documentation, or otherwise discriminates against you based on your citizenship or immigration status, or your national origin.

*How do my employer and I complete Employment Eligibility Verification (Form I–9) using my automatically extended employment authorization for a new job?*

When using an automatically extended EAD to complete Form I–9 for a new job before January 2, 2019, you and your employer should do the following:

1. For Section 1, you should:

a. Check "An alien authorized to work until" and enter January 1, 2019, the

automatically extended EAD expiration date as the "expiration date; and

b. Enter your Alien Number/USCIS number or A-Number where indicated (your EAD or other document from DHS will have your USCIS number or A-Number printed on it; the USCIS number is the same as your A-Number without the A prefix).

2. For Section 2, employers should:

a. Determine if the EAD is auto-extended by ensuring it is in category A–12 or C–19 and has a July 5, 2018 expiration date (or January 5, 2018 expiration date provided you applied for a new EAD during the last re-registration period but have not yet received a new EAD);

b. Write in the document title;

c. Enter the issuing authority;

d. Provide the document number; and

e. Write January 1, 2019, as the expiration date.

Alternatively, if you have an EAD with a marked expiration date of July 5, 2018, and you also filed for a new EAD, as proof of the automatic extension of your employment authorization, you may present your expired or expiring EAD with category A–12 or C–19 in combination with the Form I–797C Notice of Action showing that the qualifying eligibility category is either A–12 or C–19. Unless your TPS has been withdrawn or your request for TPS has been denied, this document combination is considered an unexpired EAD under List A. In these situations, to complete Section 2, employers should:

a. Determine if the EAD is auto-extended through January 1, 2019, by ensuring:

• It is in category A–12 or C–19; and

• The category code on the EAD is the same category code on Form I–797C, noting that employers should consider category codes A–12 and C–19 to be the same category code.

b. Write in the document title;

c. Enter the issuing authority;

d. Provide the document number; and

e. Write January 1, 2019, as the expiration date. Before the start of work on January 2, 2019, employers must reverify the employee's employment authorization in Section 3 of Form I–9.

*What corrections should my current employer and I make to Employment Eligibility Verification (Form I–9) if my employment authorization has been automatically extended?*

If you presented a TPS-related EAD that was valid when you first started your job and your EAD has now been automatically extended, your employer may need to re-inspect your current EAD if they do not have a copy of the

EAD on file. You may, and your employer should, correct your previously completed Form I–9 as follows:

1. For Section 1, you may:

a. Draw a line through the expiration date in Section 1;

b. Write January 1, 2019, above the previous date; and

c. Initial and date the correction in the margin of Section 1.

2. For Section 2, employers should:

a. Determine if the EAD is auto-extended by ensuring:

• It is in category A–12 or C–19; and

• Has a marked expiration date of July 5, 2018; or January 5, 2018, provided your employee applied for a new EAD during the last re-registration period but has not yet received a new EAD.

b. Draw a line through the expiration date written in Section 2;

c. Write January 1, 2019, above the previous date; and

d. Initial and date the correction in the Additional Information field in Section 2.

In the alternative, you may present your expired EAD with category A–12 or C–19 in combination with the Form I–797C Notice of Action if you have an EAD with a marked expiration date of July 5, 2018. The Form I–797C should show that the qualifying eligibility category is either A–12 or C–19. To avoid confusion, you may also provide your employer a copy of this Notice. Your employer should correct your previously completed Form I–9 as follows:

For Section 2, employers should:

a. Determine if the EAD is auto-extended for 180 days by ensuring:

• It is in category A–12 or C–19; and

• The category code on the EAD is the same category code on Form I–797C, noting that employers should consider category codes A–12 and C–19 to be the same category code.

b. Draw a line through the expiration date written in Section 2;

c. Write January 1, 2019, above the previous date; and

d. Initial and date the correction in Section 2.

**Note:** This is not considered a reverification. Employers do not need to complete Section 3 until either the 180-day automatic extension has ended or the employee presents a new document to show continued employment authorization, whichever is sooner. By January 2, 2019, when the employee's automatically extended EAD has expired, employers must reverify the employee's employment authorization in Section 3.

*If I am an employer enrolled in E-Verify, how do I verify a new employee whose EAD has been automatically extended?*

Employers may create a case in E-Verify for a new employee using the EAD bearing the expiration date July 5, 2018. Employers may also create a case in E-Verify for a new employee using the EAD bearing the expiration date January 5, 2018, provided the employee applied for a new EAD during the last re-registration period but has not yet received a new EAD. Employers may also create a case in E-Verify using the Form I–797C receipt information provided on Form I–9 for employees whose EADs have a January 5, 2018 or July 5, 2018 expiration date. In either case, the receipt number entered as the document number on Form I–9 should be entered into the document number field in E-Verify.

*If I am an employer enrolled in E-Verify, what do I do when I receive a "Work Authorization Documents Expiration" alert for an automatically extended EAD?*

E-Verify automated the verification process for employees whose TPS-related EAD was automatically extended. If you have employees who are TPS beneficiaries who provided a TPS-related EAD when they first started working for you, you will receive a "Work Authorization Documents Expiring" case alert when the auto-extension period for this EAD is about to expire. The alert indicates that before this employee starts to work on January 2, 2019, you must reverify his or her employment authorization in Section 3 of Form I–9. Employers should not use E-Verify for reverification.

**Note to All Employers**

Employers are reminded that the laws requiring proper employment eligibility verification and prohibiting unfair immigration-related employment practices remain in full force. This **Federal Register** notice does not supersede or in any way limit applicable employment verification rules and policy guidance, including those rules setting forth reverification requirements. For general questions about the employment eligibility verification process, employers may call USCIS at 888–464–4218 (TTY 877–875–6028) or email USCIS at *I9Central@dhs.gov.* Calls and emails are accepted in English and many other languages. For questions about avoiding discrimination during the employment eligibility verification process (Form I–9 and E-Verify), employers may call the U.S. Department of Justice's Civil Rights

Division, Immigrant and Employee Rights Section (IER) (formerly the Office of Special Counsel for Immigration-Related Unfair Employment Practices) Employer Hotline at 800–255–8155 (TTY 800–237–2515). IER offers language interpretation in numerous languages. Employers may also email IER at *IER@usdoj.gov*.

**Note to Employees**

For general questions about the employment eligibility verification process, employees may call USCIS at 888–897–7781 (TTY 877–875–6028) or email USCIS at *I–9Central@dhs.gov*. Calls are accepted in English, Spanish, and many other languages. Employees or applicants may also call the IER Worker Hotline at 800–255–7688 (TTY 800–237–2515) for information regarding employment discrimination based upon citizenship, immigration status, or national origin, including discrimination related to Employment Eligibility Verification (Form I–9) and E-Verify. The IER Worker Hotline provides language interpretation in numerous languages.

To comply with the law, employers must accept any document or combination of documents from the Lists of Acceptable Documents if the documentation reasonably appears to be genuine and to relate to the employee, or an acceptable List A, List B, or List C receipt as described in the Employment Eligibility Verification (Form I–9) Instructions. Employers may not require extra or additional documentation beyond what is required for Form I–9 completion. Further, employers participating in E-Verify who receive an E-Verify case result of ''Tentative Nonconfirmation'' (TNC) must promptly inform employees of the TNC and give such employees an opportunity to contest the TNC. A TNC case result means that the information entered into E-Verify from an employee's Form I–9 differs from Federal or state government records.

Employers may not terminate, suspend, delay training, withhold pay, lower pay, or take any adverse action against an employee because of the TNC while the case is still pending with E-Verify. A Final Nonconfirmation (FNC) case result is received when E-Verify cannot verify an employee's employment eligibility. An employer may terminate employment based on a case result of FNC. Work-authorized employees who receive an FNC may call USCIS for assistance at 888–897–7781 (TTY 877–875–6028). For more information about E-Verify-related discrimination or to report an employer for discrimination in the E-Verify

process based on citizenship, immigration status, or national origin, contact IER's Worker Hotline at 800–255–7688 (TTY 800–237–2515). Additional information about proper nondiscriminatory Form I–9 and E-Verify procedures is available on the IER website at *https://www.justice.gov/ier* and the USCIS website at *http://www.dhs.gov/E-verify*.

**Note Regarding Federal, State, and Local Government Agencies (Such as Departments of Motor Vehicles)**

While Federal Government agencies must follow the guidelines laid out by the Federal Government, state and local government agencies establish their own rules and guidelines when granting certain benefits. Each state may have different laws, requirements, and determinations about what documents you need to provide to prove eligibility for certain benefits. Whether you are applying for a Federal, state, or local government benefit, you may need to provide the government agency with documents that show you are a TPS beneficiary and/or show you are authorized to work based on TPS. Examples of such documents are:

(1) Your current EAD;

(2) A copy of your Notice of Action (Form I–797C), the notice of receipt, for your application to renew your current EAD providing an automatic extension of your currently expired or expiring EAD;

(3) A copy of your Notice of Action (Form I–797C), the notice of receipt, for your Application for Temporary Protected Status for this re-registration; and

(4) A copy of your Notice of Action (Form I–797), the notice of approval, for a past or current Application for Temporary Protected Status, if you received one from USCIS.

Check with the government agency regarding which document(s) the agency will accept.

Some benefit-granting agencies use the USCIS Systematic Alien Verification for Entitlements (SAVE) program to confirm the current immigration status of applicants for public benefits. In most cases, SAVE provides an automated electronic response to benefit-granting agencies within seconds, but, occasionally, verification can be delayed. You can check the status of your SAVE verification by using CaseCheck at the following link: *https://save.uscis.gov/casecheck/*, then by clicking the ''Check Your Case'' button. CaseCheck is a free service that lets you follow the progress of your SAVE verification using your date of birth and one immigration identifier number. If an

agency has denied your application based solely or in part on a SAVE response, the agency must offer you the opportunity to appeal the decision in accordance with the agency's procedures. If the agency has received and acted upon or will act upon a SAVE verification and you do not believe the response is correct, you may make an InfoPass appointment for an in-person interview at a local USCIS office. Detailed information on how to make corrections, make an appointment, or submit a written request to correct records under the Freedom of Information Act can be found on the SAVE website at *http://www.uscis.gov/save*.

[FR Doc. 2018–12161 Filed 6–4–18; 8:45 am]

**BILLING CODE 9111–97–P**

---

**DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT**

**[Docket No. FR–6108–FA–01]**

**Housing Trust Fund; Fiscal Year (FY) 2018 Allocation Notice**

**AGENCY:** Office of the Assistant Secretary for Community Planning and Development, HUD.

**ACTION:** Notice of fiscal year 2018 funding awards.

**SUMMARY:** The Housing and Economic Recovery Act of 2008 (HERA) established the Housing Trust Fund (HTF) to be administered by HUD. Pursuant to the Federal Housing Enterprises Financial Security and Soundness Act of 1992 (the Act), as amended by HERA, Division A, eligible HTF grantees are the 50 states, the District of Columbia, the Commonwealth of Puerto Rico, American Samoa, Guam, the Commonwealth of Northern Mariana Islands, and the United States Virgin Islands. In accordance with Section 1338 (c)(4)(A) of the Act, this notice announces the formula allocation amount for each eligible HTF grantee.

**FOR FURTHER INFORMATION CONTACT:** Virginia Sardone, Director, Office of Affordable Housing Programs, Room 7164, Department of Housing and Urban Development, 451 Seventh Street SW, Washington, DC 20410–7000; telephone (202) 708–2684. (This is not a toll-free number.) A telecommunications device for hearing- and speech-impaired persons (TTY) is available at 800–877–8339 (Federal Information Relay Service).

**SUPPLEMENTARY INFORMATION:** Section 1131 of HERA Division A amended the Act to add a new section 1337 entitled

6/17/25, 2:41 PM    Acting Secretary Elaine Duke Announcement on Temporary Protected Status for Nicaragua and Honduras | Homeland Security

Case 3:25-cv-05687-TLT    Document 62-1    Filed 07/28/25    Page 116 of 462



U.S. Department of Homeland Security

---

## Archived Content

In an effort to keep DHS.gov current, the archive contains outdated information that may not reflect current policy or programs.

# Acting Secretary Elaine Duke Announcement on Temporary Protected Status for Nicaragua And Honduras

**Release Date:** November 6, 2017

For Immediate Release
Office of the Press Secretary
Contact: 202-282-8010

WASHINGTON— Today, Acting Secretary of Homeland Security Elaine Duke announced her decision to terminate the Temporary Protected Status (TPS) designation for Nicaragua with a delayed effective date of 12 months to allow for an orderly transition before the designation terminates on January 5, 2019. She also determined that additional information is necessary regarding the TPS designation for Honduras, and therefore has made no determination regarding Honduras at this time. As a result of the inability to make a determination, the TPS designation for Honduras will be automatically extended for six months from the current January 5, 2018 date of expiration to the new expiration date of July 5, 2018.

The decision to terminate TPS for Nicaragua was made after a review of the conditions upon which the country's original 1999 designation were based and whether those substantial but temporary conditions prevented Nicaragua from adequately handling the return of their nationals, as required by statute. There was also no request made by the Nicaraguan government to extend the current TPS status. Based on all available information, including recommendations received as part of an inter-agency consultation process, Acting Secretary Duke determined that those substantial but temporary conditions caused in Nicaragua by Hurricane Mitch no longer exist, and thus, under the applicable statute, the current TPS designation must be terminated.

To allow for an orderly transition, the effective date of the termination of TPS for Nicaragua will be delayed 12 months.  This will provide time for individuals with TPS to seek an alternative lawful immigration status in the United States, if eligible, or, if necessary, arrange for their departure. It will also provide time for Nicaragua to prepare for the return and reintegration of their citizens. TPS for Nicaragua will terminate on January 5, 2019.

Regarding Honduras, Acting Secretary Duke concluded that despite receiving input from a broad spectrum of sources, additional time is necessary to obtain and assess supplemental information pertaining to country conditions in Honduras in order to make an appropriately deliberative TPS designation determination.  Based on the lack of definitive information regarding conditions on the ground compared to pre-Hurricane Mitch, the Acting Secretary has not made a determination at this time, thereby automatically extending the current TPS designation for Honduras for six months – through July 5, 2018.

However, given the information currently available to the Acting Secretary, it is possible that the TPS designation for Honduras will be terminated at the end of the six-month automatic extension with an appropriate delay.

Recognizing the difficulty facing citizens of Nicaragua – and potentially citizens of other countries – who have received TPS designation for close to two decades, Acting Secretary Duke calls on Congress to enact a permanent solution for this inherently temporary program.

Nicaraguans and Hondurans with TPS will be required to reapply for Employment Authorization Documents in order to legally work in the United States until the end of the respective termination or extension periods.  Further details about this renewal for TPS will appear in a Federal Register notice.

**Signed Memos:**

Nicaragua (/publication/memo-nicaragua-designation-protected-status)
Honduras (/publication/memo-honduras-designation-protected-status)

# # #

HondurasAR000116

Case 3:25-cv-05687-TLT          Document 62-1          Filed 07/28/25          Page 117 of 462

## Topics

CITIZENSHIP AND IMMIGRATION SERVICES (/TOPICS/CITIZENSHIP-AND-IMMIGRATION-SERVICES)

OFFICE OF THE CITIZENSHIP AND IMMIGRATION SERVICES OMBUDSMAN (/TAXONOMY/TERM/602)

## Keywords

CUSTOMS AND BORDER PROTECTION (CBP) (/KEYWORDS/CUSTOMS-AND-BORDER-PROTECTION-CBP)          BORDER SECURITY (/KEYWORDS/BORDER-SECURITY)

U.S. CITIZENSHIP AND IMMIGRATION SERVICES (USCIS) (/KEYWORDS/US-CITIZENSHIP-AND-IMMIGRATION-SERVICES-USCIS)

Last Updated: 04/10/2025

HondurasAR000117

Case 3:25-cv-05687-TLT    Document 62-1    Filed 07/28/25    Page 118 of 462



U.S. Department of Homeland Security

# Project Homecoming Charter Flight Brings Self-Deporters to Honduras, Colombia

**Release Date:** May 19, 2025

*Illegal Aliens, Using the CBP Home App, Chose to Return Home the Right Way*

WASHINGTON – Today, The Department of Homeland Security (DHS) conducted a voluntary charter flight from Houston, TX, to Honduras and Colombia, bringing 64 participants who opted to self-deport back to their home countries. This charter flight is one of the first actions the Department has taken to fulfill President Trump's recent proclamation to create Project Homecoming.



This was a voluntary charter flight, not an ICE enforcement operation. All participants were offered the same benefits as any illegal alien who self-deports using the CBP Home App. They received travel assistance, a $1,000 stipend, and preserved the possibility they could one day return to the United States legally.



In Honduras, 38 participants were warmly welcomed by their home government and family members. They also benefited from the Honduran government's "Hermano, Hermana, Vuelve a Casa" program, which includes an additional $100 bonus for people over 18, food vouchers, and assistance in finding employment.

HondurasAR000118



In Colombia, 26 participants were welcomed back by their families and representatives of the Colombian Ministry of Foreign Affairs, and Migration Colombia. The Colombian government provided social services from the Family Welfare Institute (ICBF), and the Department of Social Prosperity.



"Today, DHS conducted its first Project Homecoming charter flight of 64 individuals who voluntarily chose to self-deport to their home counties of Honduras and Colombia," said Secretary Kristi Noem. "If you are here illegally, use the CBP Home App to take control of your departure and receive financial support to return home. If you don't, you will be subjected to fines, arrest, deportation and will never be allowed to return. If you are in this country illegally, self-deport NOW and preserve your opportunity to potentially return the legal, right way."

<p style="text-align:center">###</p>

## Topics

BORDER SECURITY (/TOPICS/BORDER-SECURITY)    SECRETARY OF HOMELAND SECURITY (/TOPICS/SECRETARY-HOMELAND-SECURITY)

IMMIGRATION AND CUSTOMS ENFORCEMENT (/TOPICS/IMMIGRATION-AND-CUSTOMS-ENFORCEMENT)

## Keywords

ALIEN (/KEYWORDS/ALIEN)    CUSTOMS AND BORDER PROTECTION (CBP) (/KEYWORDS/CUSTOMS-AND-BORDER-PROTECTION-CBP)    ILLEGAL (/KEYWORDS/ILLEGAL)

SECRETARY KRISTI NOEM (/KEYWORDS/SECRETARY-KRISTI-NOEM)    DEPORTATION (/KEYWORDS/DEPORTATION)    MOBILE APP (/KEYWORDS/MOBILE-APP)

VOLUNTEER (/KEYWORDS/VOLUNTEER)

Last Updated: 05/22/2025

 **Homeland Security**    Environmental Planning and Historic Preservation Decision Support System

## Termination of the Designation of Honduras for Temporary Protected Status  - Project Approved

## Status

- In Preparation (06/03/2025)
- Environmental Review (06/05/2025)
- Legal Review (06/05/2025)
- Senior Environmental Review (06/06/2025)
- Proponent Review (06/06/2025)
- Project Approved (06/06/2025)

## Project Information

### General

**Name:** Termination of the Designation of Honduras for Temporary Protected Status

**DSS ID:** DSS-USCIS-2025-23159

**Security:** Unclassified

**Description:** The Proposed Action is the termination of the designation of Honduras for Temporary Protected Status (TPS). The designation of Honduras will expire on July 5, 2025.  After reviewing country conditions and consulting with appropriate U.S. Government agencies, the Secretary determined Honduras no longer meet the conditions for designation for TPS.  The Secretary, therefore, is terminating the TPS designation of Honduras as required by statute.  This termination is effective sixty (60) days after the date of publication in the Federal Register.  Once the termination is effective, nationals of Honduras (and aliens having no nationality who last habitually resided in Honduras) who have been granted TPS under Honduras's designation will no longer have TPS and will no longer be employment authorized.

DHS estimates that there are approximately 72,000 nationals of Honduras (and aliens having no nationality who last habitually resided in Honduras) who hold TPS under Honduras' designation.

DHS is not aware of any significant impact on the environment, or any change in environmental effect that would result from the promulgation of this notice.  DHS finds the proposed action clearly fits within categorical exclusion A3 established in the Department's NEPA implementing procedures.

This Federal Register notice is estimated to publish in the early summer of 2025.

**Funded through IRA?:** No

**Funded through the IIJA?:** No

Termination of the Designation of Honduras for Temporary Protected Status  (Unclassified)

**Critical Infrastructure?:** No
**Adopting Another Agency CATEX, or CATEX Determination?:** No
**Project Types:**
 · Administrative & Regulatory Activities - Promulgation of rules, issuance of rulings or interpretations, and the development and publication of policies, orders, directives, notices, procedures, manuals, advisory circulars, and other guidance documents. (CATEX A3)
 · Administrative & Regulatory Activities - Other, Use "other" to trigger full review
**Mitigation Required?:** No
**Tiering - PEA/PEIS?:** No
**Adopting EA/EIS?:** No
**Requires EA/EIS?:** No
**Project Priority:** Normal
**Federal Assistance:** No
**Estimated Project Cost:**  (not entered)


## Component

**Component:** USCIS - U.S. Citizenship and Immigration Services
**Tracking Number:** CIS No. 2818-25


## Dates

**FY Funding:** 2025
**Proposed Project Start:** 04/29/1925
**Proposed Project End:** 09/07/2025
**Review Start:** 06/03/2025

## Project Location

- Nationwide

## Team

- Document Preparer, Bryan Williamson, bryan.j.williamson@uscis.dhs.gov
- Collaborator-Document Preparation, Faisal Akhter, faisal.k.akhter@uscis.dhs.gov
- Environmental Reviewer, Sarah Larkin, sarah.larkin@hq.dhs.gov
- Legal Reviewer, Thomas Rollins, thomas.j.rollins@uscis.dhs.gov
- Senior Environmental Reviewer, Jennifer Hass, jennifer.hass@hq.dhs.gov
- Proponent, Mirna Smith, mirna.smith@uscis.dhs.gov


## Categorical Exclusions

- A3 - Promulgation of rules, issuance of rulings or interpretations, and the development and publication of policies, orders, directives, notices, procedures, manuals, advisory circulars, and other guidance documents of the following nature:

(a) Those of a strictly administrative or procedural nature;

Termination of the Designation of Honduras for Temporary Protected Status  (Unclassified)

(b) Those that implement, without substantive change, statutory or regulatory requirements;

(c) Those that implement, without substantive change, procedures, manuals, and other guidance documents;

(d) Those that interpret or amend an existing regulation without changing its environmental effect;

(e) Technical guidance on safety and security matters; or,

(f) Guidance for the preparation of security plans.

## Required Conditions

1. Any change to the Proposed Action that may cause a physical interaction with the human environment will require re-evaluation for compliance with NEPA and other EP&HP requirements before the action can proceed.
2. This review addresses NEPA and other EP&HP requirements as described in DHS Directive 023-01. This review may identify the need for additional federal, state, and/or local permits, approvals, etc. required for the Proposed Action. However, this review may not satisfy those requirements and the Proponent is responsible for ensuring that all other appropriate federal, state, and/or local permits, approvals, etc. have been obtained.

## Decision Documents

- Memorandum For Record (MFR), 5.77kB

## Attachments

- There are no attachments.

## Comments

- Bryan Williamson, The Proposed Action is strictly administrative and procedural in nature and does not have any associated construction or ground disturbing activities. (06/03/2025 04:30:54)
- Bryan Williamson, The Proposed Action is administrative or procedural in nature and does not have any associated construction or ground disturbing activities. (06/03/2025 04:30:44)
- Bryan Williamson, The Proposed Action is strictly administrative or procedural in nature and limited to DHS. (06/03/2025 04:30:35)
- Bryan Williamson, The Proposed Action is administrative or procedural in nature and does not have any associated construction or ground disturbing activities. The Federal action is not anticipated to have any potential to impact Native American graves or objects of cultural patrimony. (06/03/2025 04:30:27)
- Bryan Williamson, The Proposed Action will not limit access to, and ceremonial use of, Indian sacred sites on federal lands, by Indian religious practitioners, and/or adversely affect the physical

Termination of the Designation of Honduras for Temporary Protected Status  (Unclassified)

integrity of such sites. (06/03/2025 04:30:19)

- Bryan Williamson, While the Proposed Action falls within the Department's statutory authority to administer the nation's immigration system, the Proposed Action is independent in nature and is not related to or triggered by any other action with individually insignificant but cumulatively significant impacts. (06/03/2025 04:28:21)

- Bryan Williamson, The Proposed Action is not anticipated to have any direct or indirect impacts that would result in the significant degradation of existing poor environmental conditions. The Proposed Action will not initiate a potentially significant environmentally degrading influence, activity, or effect in areas not already significantly modified from their natural condition.  (06/03/2025 04:28:04)

- Bryan Williamson, The Proposed Action is not significantly greater in scope or size than normally experienced for this category of action. (06/03/2025 04:27:56)

- Bryan Williamson, The Proposed Action is an independent action that will not establish precedent for future action with significant effects. Additionally, future DHS major federal actions will be evaluated in accordance with Directive 023-01 rev 01 and Instruction 023-01-001-01 rev 01 for compliance with the National Environmental Policy Act. (06/03/2025 04:27:47)

- Bryan Williamson, The Proposed Action is administrative or procedural in nature and does not involve any new or unproven technology. (06/03/2025 04:27:39)

- Bryan Williamson, The Proposed Action is not anticipated to affect the quality of the human environment in any way that is likely to be highly controversial in terms of scientific validity, be highly uncertain, or involve unique or unknown environmental risks. (06/03/2025 04:27:26)

- Bryan Williamson, The Proposed Action is not anticipated to result in a violation of Federal, state, or local law or requirement imposed to protect the environment. The Proposed Action is administrative or procedural in nature with no construction or ground disturbing activities. (06/03/2025 04:27:16)

- Bryan Williamson, The Proposed Action is a stand-alone administrative or procedural action with no construction or ground disturbing activities. The Proposed Action is not anticipated to have potentially significant effects on environmentally sensitive areas such as prime or unique agricultural lands, coastal zones, designated wilderness study areas, wild and scenic rivers, 100-year floodplains, wetlands, sole source aquifers, Marine Sanctuaries, National Wildlife Refuges, National Parks, National Monuments, or other protected lands. No significant direct or indirect impacts to environmentally sensitive areas are anticipated as a result of the Proposed Action. (06/03/2025 04:27:06)

- Bryan Williamson, No effect on the resources covered by the Magnuson-Stevens Fishery Conservation and Management Act (essential fish habitat) is anticipated as a result of the Proposed Action. (06/03/2025 04:26:56)

- Bryan Williamson, The Proposed Action is an administrative or procedural action and is not anticipated to have a potentially significant effect on species or habitats protected under ESA, MMPA, MBTA, BGEPA, or MSFCMA. The Proposed Action has no anticipated direct effects to protected species or their habitat.

Termination of the Designation of Honduras for Temporary Protected Status  (Unclassified)

DHS has no reason to believe that any persons present in the United States as a result of the Proposed Action would violate the ESA, MMPA, MBTA, BGEPA, or MSFCMA. (06/03/2025 04:26:42)

## EPHP Review

### Environmental Resources

- Is the Proposed Action a piece of a larger action or connected to another action? -- No
Please explain how you came to this determination. : The Proposed Action is a stand-alone administrative or procedural action to terminate the Temporary Protected Status (TPS) designation of Nicaragua.  The Secretary has determined Nicaragua no longer continues to meet the specific statutory criteria for designation for TPS under INA section 244(b)(1)(B), 8 U.S.C. 1254a(b)(1)(B). Public notice of the Secretary's decision published in the Federal Register will establish the effective date of the termination and the expiration of any TPS-related documentation, such as employment authorization documents (EADs) for the purpose of providing an orderly transition for nationals of Honduras  (and aliens having no nationality who last habitually resided in Nicaragua), who had been granted TPS under Honduras's designation, to return in safety.

  While this Proposed Action complements other USCIS policy efforts, it is not dependent on any other action, nor does it trigger any subsequent action.
- Will the Proposed Action have a potentially significant effect on public health or safety? Areas to consider include, but are not limited to: air quality; noise impacts; hazardous wastes and/or contamination; wastewater; potable water; and changes in modes or safety of transportation. -- No Explain how the proposed action would not have a potentially significant effect on public health or safety. : There are no anticipated potentially significant direct or indirect environmental effects to public health or safety associated with the Proposed Action. The Proposed Action does not include any construction or ground disturbing activities. The Proposed Action is not anticipated to have any significant effects on air quality, noise levels, hazardous wastes and/or contamination, wastewater, potable water, or changes in modes or safety of transportation.
- Will the Proposed Action have a potentially significant effect on species or habitats protected by the Endangered Species Act, Marine Mammal Protection Act, Migratory Bird Treaty Act, Bald and Golden Eagle Protection Act, or Magnuson-Stevens Fishery Conservation and Management Act?  -- No
Attachments:  FWS, NMFS, or Wildlife Agency Consultation:  (No files uploaded yet.)
Comments:
Bryan Williamson, The Proposed Action is an administrative or procedural action and is not anticipated to have a potentially significant effect on species or habitats protected under ESA,

MMPA, MBTA, BGEPA, or MSFCMA. The Proposed Action has no anticipated direct effects to protected species or their habitat.

DHS has no reason to believe that any persons present in the United States as a result of the Proposed Action would violate the ESA, MMPA, MBTA, BGEPA, or MSFCMA.
(06/03/2025 16:26:42)

- What is your Endangered Species Act (ESA) finding and determination? -- No effect
  Explain how the determination was made (e.g., are species present in the area but your proposed action will have no effect? why?). Although not required, recommend attaching any consultation or correspondence conducted.: The Proposed Action is an administrative action and is not anticipated to have potential impacts on species or habitats protected under the Endangered Species Act (ESA). There are no anticipated direct or indirect effects to species protected under the ESA or their habitat as a result of the Proposed Action. As the Proposed Action is administrative or procedural in nature and is not anticipated to have impacts on ESA listed species or habitat, DHS has determined a "no effect" finding is appropriate for this action.
  Attachments: ESA consultation: (No files uploaded yet.)

- What is your Marine Mammal Protection Act (MMPA) finding and determination? -- No effect or negligible effect
  Explain how the determination was made (e.g., are species present in the area but your proposed action will have no effect or negligible effects? why?). Although not required, recommend attaching any consultation or correspondence conducted.: The Proposed Action is an administrative or procedural action and is not anticipated to have potential impacts on species or habitats protected under the Marine Mammal Protection Act (MMPA). There are no anticipated direct or indirect effects to species protected under the MMPA or their habitat as a result of the Proposed Action. As the Proposed Action is administrative or procedural in nature and is not anticipated to have impacts on MMPA protected species or habitat, DHS has determined a "no effect or negligible effect" finding is appropriate for this action.
  Attachments: MMPA consultation: (No files uploaded yet.)

- Would the proposed action adversely affect a species protected under the Bald and Golden Eagle Protection Act or Migratory Bird Treaty Act or habitat for such species? -- No
  Explain how the determination was made (e.g., are species present in the area but your proposed action will have no adverse effect or no significant effect? why?). Although not required, recommend attaching any consultation or correspondence conducted.: The Proposed Action is an administrative or procedural action and is not anticipated to adversely impact species or habitats protected under the Bald and Golden Eagle Protection Act (BGEPA) or Migratory Bird Treaty Act (MBTA). There are no anticipated direct or indirect adverse effects to species protected under the BGEPA or MBTA or their habitat as a result of the Proposed Action.
  Attachments: BGEPA MBTA consultation: (No files uploaded yet.)

- What is your Magnuson-Stevens Fishery Conservation and Management Act (essential fish habitat) finding and determination? -- No effect

  Attachments:  EFH consultation:  (No files uploaded yet.)

  Comments:

  Bryan Williamson, No effect on the resources covered by the Magnuson-Stevens Fishery Conservation and Management Act (essential fish habitat) is anticipated as a result of the Proposed Action. (06/03/2025 16:26:56)

- Will the Proposed Action have a potentially significant effect on an environmentally sensitive area? Examples include, but are not limited to: areas having special designation or recognition such as prime or unique agricultural lands, coastal zones, designated wilderness study areas, wild and scenic rivers, 100-year floodplains, wetlands, sole source aquifers, Marine Sanctuaries, National Wildlife Refuges, National Parks, National Monuments, etc.  -- No resources present

  Comments:

  Bryan Williamson, The Proposed Action is a stand-alone administrative or procedural action with no construction or ground disturbing activities. The Proposed Action is not anticipated to have potentially significant effects on environmentally sensitive areas such as prime or unique agricultural lands, coastal zones, designated wilderness study areas, wild and scenic rivers, 100-year floodplains, wetlands, sole source aquifers, Marine Sanctuaries, National Wildlife Refuges, National Parks, National Monuments, or other protected lands. No significant direct or indirect impacts to environmentally sensitive areas are anticipated as a result of the Proposed Action. (06/03/2025 16:27:06)

- Will the Proposed Action result in the potential violation of a Federal, State, or local law or requirement imposed to protect the environment? -- No

  Comments:

  Bryan Williamson, The Proposed Action is not anticipated to result in a violation of Federal, state, or local law or requirement imposed to protect the environment. The Proposed Action is administrative or procedural in nature with no construction or ground disturbing activities. (06/03/2025 16:27:16)

- Will the Proposed Action have an effect on the quality of the human environment that is likely to be highly controversial in terms of scientific validity, likely to be highly uncertain, or likely to involve unique or unknown environmental risks?  -- No

  Comments:

  Bryan Williamson, The Proposed Action is not anticipated to affect the quality of the human environment in any way that is likely to be highly controversial in terms of scientific validity, be highly uncertain, or involve unique or unknown environmental risks. (06/03/2025 16:27:26)

- Will the Proposed Action employ new or unproven technology that is likely to involve unique or unknown environmental risks, where the effect on the human environment is likely to be highly uncertain, or where the effect on the human environment is likely to be highly controversial in terms of scientific validity?  -- No

Comments:

Bryan Williamson, The Proposed Action is administrative or procedural in nature and does not involve any new or unproven technology. (06/03/2025 16:27:39)

- Will the Proposed Action establish a precedent for future actions that have significant effects? -- No

Comments:

Bryan Williamson, The Proposed Action is an independent action that will not establish precedent for future action with significant effects. Additionally, future DHS major federal actions will be evaluated in accordance with Directive 023-01 rev 01 and Instruction 023-01-001-01 rev 01 for compliance with the National Environmental Policy Act. (06/03/2025 16:27:47)

- Is the Proposed Action significantly greater in scope or size than normally experienced for its particular category of action? -- No

Comments:

Bryan Williamson, The Proposed Action is not significantly greater in scope or size than normally experienced for this category of action. (06/03/2025 16:27:56)

- Will the Proposed Action have the potential to result in the significant degradation of existing poor environmental conditions? Will the Proposed Action initiate a potentially significant environmentally degrading influence, activity, or effect in areas not already significantly modified from their natural condition? -- No

Comments:

Bryan Williamson, The Proposed Action is not anticipated to have any direct or indirect impacts that would result in the significant degradation of existing poor environmental conditions. The Proposed Action will not initiate a potentially significant environmentally degrading influence, activity, or effect in areas not already significantly modified from their natural condition.  (06/03/2025 16:28:04)


- Is the Proposed Action related to other actions with individually insignificant but cumulatively significant impacts?  -- No

Comments:

Bryan Williamson, While the Proposed Action falls within the Department's statutory authority to administer the nation's immigration system, the Proposed Action is independent in nature and is not related to or triggered by any other action with individually insignificant but cumulatively significant impacts. (06/03/2025 16:28:21)

- Are there any other requirements for the protection of the environment that need to be considered for this proposed action?  -- No

## Historic Preservation & Cultural Resources

- Will the proposed action have a potentially significant effect on a district, highway, structure, or object that is listed, or eligible for listing, on the National Register of Historic Places, a historic or cultural resource, traditional or sacred site, or result in the destruction of a significant scientific, cultural, or historic resource? -- No

Please explain how you came to this determination.: The Proposed Action is not anticipated to have a potentially significant effect on a district, highway, structure, or object that is listed, or eligible for listing, on the National Register of Historic Places, a historic or cultural resource, traditional or sacred site, or result in the destruction of a significant scientific, cultural, or historic resource.

• Have you consulted with the appropriate federally-recognized tribe(s), including Native Alaskan Communities, and Native Hawaiian Organizations?  -- No
Please explain why Tribal consultation was not initiated/held. : The Proposed Action is administrative or procedural in nature and does not have any associated construction or ground disturbing activities. The Federal action is not anticipated to have any potential to affect federally-recognized tribe(s), including Native Alaskan Communities, and Native Hawaiian Organizations.
** This question should be carefully checked by the Environmental Reviewer.

• Does the proposed action limit access to, and/or ceremonial use of, Indian sacred sites on federal lands by Indian religious practitioners, and/or adversely affect the physical integrity of such sites?  -- No
Please explain how you came to this determination.: The Proposed Action will not limit access to, and ceremonial use of, Indian sacred sites on federal lands, by Indian religious practitioners, and/or adversely affect the physical integrity of such sites.
Comments:
Bryan Williamson, The Proposed Action will not limit access to, and ceremonial use of, Indian sacred sites on federal lands, by Indian religious practitioners, and/or adversely affect the physical integrity of such sites. (06/03/2025 16:30:19)

• Does the proposed undertaking have the potential to impact Native American graves or objects of cultural patrimony?  -- No
Comments:
Bryan Williamson, The Proposed Action is administrative or procedural in nature and does not have any associated construction or ground disturbing activities. The Federal action is not anticipated to have any potential to impact Native American graves or objects of cultural patrimony. (06/03/2025 16:30:27)

• Will the proposed undertaking occur on non-DHS federal lands or within/on a non-DHS federally owned facility?  -- No
Comments:
Bryan Williamson, The Proposed Action is strictly administrative or procedural in nature and limited to DHS. (06/03/2025 16:30:35)

• Does the proposed undertaking require any ground disturbing activities?  -- No
Comments:
Bryan Williamson, The Proposed Action is administrative or procedural in nature and does not have any associated construction or ground disturbing activities. (06/03/2025 16:30:44)

- Will the proposed undertaking take place entirely within or on an existing building or structure?  -- Yes

  Comments:

  Bryan Williamson, The Proposed Action is strictly administrative and procedural in nature and does not have any associated construction or ground disturbing activities. (06/03/2025 16:30:54)

- Are there any historic properties eligible for or listed on the National Register of Historic Places (NRHP) present within the Area of Potential Effect (APE)?  -- No

  Please explain why no historic properties are located within the APE (i.e., survey was conducted but there were no historic-age resources, survey was conducted but all resources were ineligible, no survey was conducted, etc.).: The Proposed Action is strictly administrative and procedural in nature and does not have any associated construction or ground disturbing activities within the Area of Potential Effect.

- What is the DHS effects determination of the proposed undertaking on historic property(ies)?  -- No Potential to Effect

  This determination is not used often, and typically means the undertaking is a type of activity that does not have the potential to cause effects to historic properties, assuming such historic properties were present.: The Proposed Action is strictly administrative and procedural in nature and does not have any associated construction or ground disturbing activities. The Federal action has no potential to affect historic properties listed or eligible for listing under the National Historic Preservation Act. No survey was conducted as the Proposed Action does not have any associated construction or ground disturbing activities. The Federal action is not anticipated to have any potential to affect historic properties listed or eligible for listing under the National Historic Preservation Act.

  ** This question should be carefully checked by the Environmental Reviewer.

- Has the State Historic Preservation Office (SHPO)/Tribal Historic Preservation Office (THPO) concurred with the DHS Section 106 effect determination?  -- SHPO/THPO concurrence has not been requested

  Please explain why SHPO/THPO concurrence was not requested and how you complied with Section 106.: The Proposed Action is strictly administrative and procedural in nature and does not have any associated construction or ground disturbing activities. The Federal action is not anticipated to have any potential to affect historic properties listed or eligible for listing under the National Historic Preservation Act.

  ** This question should be carefully checked by the Environmental Reviewer.

- Have any other consulting parties provided comments on this undertaking?  -- No

- Is there a Section 106 agreement document associated with this undertaking?  -- No

## Tribal Consultations

**Tribal Consultation Initiated:** No

**Tribal Consultation not initiated explanation:** The Proposed Action is a stand-alone administrative or procedural action to terminate the Temporary Protected Status (TPS) designation of Honduras.  The Secretary has determined Honduras no longer continues to meet the specific statutory criteria for designation for TPS under INA section 244(b)(1)(B), 8 U.S.C. 1254a(b)(1)(B).  Public notice of the Secretary's decision published in the Federal Register will establish the effective date of the termination and the expiration of any TPS-related documentation, such as employment authorization documents (EADs) for the purpose of providing an orderly transition for nationals of Honduras (and aliens having no nationality who last habitually resided in Honduras), who had been granted TPS under Honduras' designation, to return in safety.

The Proposed Action is strictly administrative in nature and is not anticipated to have any associated construction or ground disturbing activities. The Federal action has no potential to substantially, directly affect tribal equities per DHS Tribal policy.

# DHS Record of Environmental Consideration (REC)
## for Categorically Excluded Actions under NEPA

| INTRODUCTION |
|---|
| The purpose of this Record of Environmental Consideration (REC) is to provide a record that the potential for impacts to the quality of the human environment has been considered in the decision to implement the Proposed Action described below, in accordance with the National Environmental Policy Act of 1969 (NEPA) and DHS Directive 023-01 and Instruction Manual 023-01-001-01 on implementation of NEPA.  DHS integrates the NEPA process with review and compliance requirements under other Federal laws, regulations, Executive Orders, and other requirements for the stewardship and protection of the human environment, as reflected in Section II (8) of this REC.  Signature of the DHS Proponent on this REC demonstrates that they have considered the potential for impacts to the human environment in their decision to implement the Proposed Action as required by NEPA, and are committing to any conditions listed in Section IV of this REC that may be required for implementation of the project. When completed, the form is to be signed by the Preparer, the Environmental Approver, and the Action Proponent. The completed REC becomes a part of the administrative record for the Proposed Action. |

| SECTION I - Description of Proposed Action |
|---|
| 1.  Name of Component Authorizing the Proposed Action:<br><br>U.S. Citizenship and Immigration Services |
| 2.  Title of Proposed Action:<br><br>Termination of the Designation of Honduras for Temporary Protected Status |
| 3.  Identifying Number of Proposed Action:<br><br>DSS-USCIS-2025-23159 |
| 4.  Estimated Start Date and Useful Life of Proposed Action:<br><br>Start Date: 04/29/1925 - End Date: 09/07/2025 |
| 5.  Location of Proposed Action:<br><br>Nationwide |
| 6.  Description of Proposed Action:<br><br>The Proposed Action is the termination of the designation of Honduras for Temporary Protected Status (TPS). The designation of Honduras will expire on July 5, 2025.  After reviewing country conditions and consulting with appropriate U.S. Government agencies, the Secretary determined Honduras no longer meet the conditions for designation for TPS.  The Secretary, therefore, is terminating the TPS designation of Honduras as required by statute.  This termination is effective sixty (60) days after the date of publication in the Federal Register.  Once the termination is effective, nationals of Honduras (and aliens having no nationality who last habitually resided in Honduras) who have been granted TPS under Honduras's designation will no longer have TPS and will no longer be employment authorized.<br><br>DHS estimates that there are approximately 72,000 nationals of Honduras (and aliens having no nationality who last habitually resided in Honduras) who hold TPS under Honduras' designation.<br><br>DHS is not aware of any significant impact on the environment, or any change in environmental effect that would result from the promulgation of this notice.  DHS finds the proposed action clearly fits within categorical exclusion A3 established in the Department's NEPA implementing procedures.<br><br>This Federal Register notice is estimated to publish in the early summer of 2025. |

| SECTION II - Analysis of Extraordinary Circumstances |
|---|

7. ☒ Proposed Action is not a piece of a larger action

☐ Proposed Action is a piece of a larger action

Remarks:

**8. For A through K, check the appropriate box and provide an explanation when appropriate. Include a summary of any coordination or consultation that occurred with a resource or regulatory agency, if relevant.**

☐ ☒
Yes No

A. Will the Proposed Action have a potentially significant effect on public health or safety?

Remarks:

☐ ☒
Yes No

B. Will the Proposed Action have a potentially significant effect on species or habitats protected by the Endangered Species Act, Marine Mammal Protection Act, Migratory Bird Treaty Act, Bald and Golden Eagle Protection Act, or Magnuson-Stevens Fishery Conservation and Management Act?

Remarks:

☐ ☒
Yes No

C. Will the Proposed Action have a potentially significant effect on a district, highway, structure, or object that is listed or eligible for listing on the National Register of Historic Places (NRHP)? Will the Proposed Action have a potentially significant effect on a historic or cultural resource, traditionalor sacred site, or result in the destruction of a significant scientific, cultural, or historic resource?

Remarks:

☐ ☒
Yes No

D. Will the Proposed Action have a potentially significant effect on an environmentally sensitive area?

Remarks:

☐ ☒
Yes No

E. Will the Proposed Action result in the potential violation of a Federal, State, or local law or requirement imposed to protect the environment?

Remarks:

☐ ☒
Yes No

F. Will the Proposed Action have an effect on the quality of the human environment that is likely to be highly controversial in terms of scientific validity, likely to be highly uncertain, or likely to involve unique or unknown environmental risks?

Remarks:

☐ ☒
Yes No

G. Will the Proposed Action employ new or unproven technology that is likely to involve unique or unknown environmental risks, where the effect on the human environment is likely to be highly uncertain, or where the effect on the human environment is likely to be highly controversial in terms of scientific validity?

Remarks:

☐ ☒
Yes No

H. Will the Proposed Action establish a precedent for future actions that have significant effects?

Remarks:

☐ ☒
Yes No

I. Is the Proposed Action significantly greater in scope or size than normally experienced for its particular category of action?

Remarks:

Termination of the Designation of Honduras for Temporary Protected Status  (Unclassified)

| ☐ Yes ☒ No | J. Does the Proposed Action have the potential to result in significant degradation of existing poor environmental conditions? Will the Proposed Action initiate a potentially significant environmentally degrading influence, activity, or effect in areas not significantly modified from their natural condition? |
|---|---|

Remarks:

| ☐ Yes ☒ No | K. Is the Proposed Action related to other actions with individually insignificant but cumulatively significant impacts? |
|---|---|

Remarks:

## SECTION III - Categorical Exclusion (CATEX) Determination

9. This action is not expected to result in any significant adverse environmental impacts as described in the National Environmental Policy Act of 1969 (NEPA). The proposed action has been thoroughly reviewed by the U.S. Citizenship and Immigration Services and it has been determined, by the undersigned, that this action is categorically excluded under current DHS CATEX **A3;** from further environmental documentation, in accordance with Section 3 of DHS Directive 023-01, Environmental Planning Program since implementation of this action:

   I.  Clearly fits within one or more of the categories of excludable actions listed in Appendix A of DHS Instruction 023-01-001-01;
   II. Is not a piece of a larger action which has been segmented into smaller parts in order to avoid a more extensive evaluation of the potential for significant environmental impacts;
   III. Does not involve any extraordinary circumstances, as defined in DHS Instruction 023-01-001-01, Section V(B)(2), that would create the potential for a normally excluded action to have a significant environmental effect.

## SECTION IV - Conditions

10. The following conditions are required to implement the Proposed Action:

☒Any change to the Proposed Action that may cause a physical interaction with the human environment will require re-evaluation for compliance with NEPA and other EP&HP requirements before the action can proceed.

☒This review addresses NEPA and other EP&HP requirements as described in DHS Directive 023-01. This review may identify the need for additional federal, state, and/or local permits, approvals, etc. required for the Proposed Action. However, this review may not satisfy those requirements and the Proponent is responsible for ensuring that all other appropriate federal, state, and/or local permits, approvals, etc. have been obtained.

DHS is aware of the November 12, 2024 decision in Marin Audubon Society v. Federal Aviation Administration, No. 23-1067 (D.C. Cir. Nov. 12, 2024). To the extent that a court may conclude that the Council on Environmental Quality (CEQ) regulations implementing NEPA are not judicially enforceable or binding on this agency action, DHS has nonetheless elected to follow those regulations at 40 C.F.R. Parts 1500–1508, in addition to the Department's procedures/regulations implementing NEPA in Instruction 023-01-001, rev. 01, "Implementation of NEPA" to meet the agency's obligations under NEPA, 42 U.S.C. §§ 4321 et seq.

## SECTION V - Signatures

11a. Preparer of this REC

Termination of the Designation of Honduras for Temporary Protected Status  (Unclassified)

| Name: | Digitally signed by Bryan Williamson at 06/03/2025 4:31 PM | Date: |
|---|---|---|
| Bryan Williamson | *Bryan Williamson* | 06/03/2025 |

| 11b. Environmental Approver of this REC | | |
|---|---|---|
| Name: | Digitally signed by Jennifer Hass at 06/06/2025 9:27 AM | Date: |
| Jennifer Hass | *Jennifer Hass* | 06/06/2025 |

| 11c. Action Proponent | | |
|---|---|---|
| Name: | Digitally signed by Mirna Smith at 06/06/2025 9:32 AM | Date: |
| Mirna Smith | *Mirna Smith* | 06/06/2025 |

## Preview of Attachments

The following pages will display this project's attachments that are of these file types:

- .jpg / .jpeg
- .png
- .gif
- .txt
- .pdf

The attachments of compatible file types from this project are:

**Note:**

    All project attachments can be downloaded at the 'File Upload/Manage Attachments' page.

6/17/25, 2:48 PM    Secretary of Homeland Security Kirstjen M. Nielsen Announcement on Temporary Protected Status for Honduras | Homeland Security

Case 3:25-cv-05687-TLT    Document 62-1    Filed 07/28/25    Page 136 of 462



U.S. Department of Homeland Security

## Archived Content

In an effort to keep DHS.gov current, the archive contains outdated information that may not reflect current policy or programs.

# Secretary of Homeland Security Kirstjen M. Nielsen Announcement on Temporary Protected Status for Honduras

**Release Date:** May 4, 2018

The Secretary of Homeland Security Kirstjen M. Nielsen has determined that termination of the Temporary Protected Status (TPS) designation for Honduras is required pursuant to the Immigration and Nationality Act. To allow for an orderly transition, she has determined to delay the effective date of the termination for 18 months. The designation will terminate on January 5, 2020.

The decision to terminate TPS for Honduras was made after a review of the environmental disaster-related conditions upon which the country's original 1999 TPS designation was based and an assessment of whether those originating conditions continue to exist, as required by statute. Based on careful consideration of available information, including recommendations received as part of an inter-agency consultation process, the Secretary determined that the disruption of living conditions in Honduras from Hurricane Mitch that served as the basis for its TPS designation has decreased to a degree that it should no longer be regarded as substantial. Thus, as required under the applicable statute, the current TPS designation must be terminated.

Since 1999, conditions in Honduras that resulted from the hurricane have notably improved. Additionally, since the last review of the country's conditions in October 2016, Honduras has made substantial progress in post-hurricane recovery and reconstruction from the 1998 Hurricane Mitch.

To allow for an orderly transition, the effective date of the termination of TPS for Honduras will be delayed 18 months to provide time for individuals with TPS to arrange for their departure or to seek an alternative lawful immigration status in the United States, if eligible. Honduran citizens in the United States who benefited from TPS may still receive other protections under our immigration system for which they are eligible.

The 18-month delayed effective date will also provide time for Honduras to prepare for the return and reintegration of its citizens. During this timeframe, DHS will work with the Department of State and the Government of Honduras to help educate relevant stakeholders and facilitate an orderly transition. In addition to materials posted online, DHS components will participate in outreach activities such as teleconferences, town halls, and roundtables to ensure that affected populations have a full and accurate understanding of their rights and obligations.

Honduran citizens with current TPS registrations will be required to re-register for TPS and apply for Employment Authorization Documents in order to legally work in the United States until the termination of Honduras' TPS designation becomes effective January 5, 2020.  Further details about this termination for TPS, including the re-registration period, will appear in a Federal Register notice. Honduran TPS beneficiaries should not submit re-registration applications until the re-registration period is announced through the Federal Register notice.

# # #

## Topics

CITIZENSHIP AND IMMIGRATION SERVICES (/TOPICS/CITIZENSHIP-AND-IMMIGRATION-SERVICES)

OFFICE OF THE CITIZENSHIP AND IMMIGRATION SERVICES OMBUDSMAN (/TAXONOMY/TERM/602)

SECRETARY OF HOMELAND SECURITY (/TOPICS/SECRETARY-HOMELAND-SECURITY)

## Keywords

IMMIGRATION (/KEYWORDS/IMMIGRATION)

Last Updated: 04/10/2025

HondurasAR000136



# Temporary Protected Status: Calendar Year 2023 Annual Report

Report to Congress



HondurasAR000137



*Assistant Secretary for Legislative Affairs*
**U.S. Department of Homeland Security**
Washington, DC 20528

May 15, 2024

# Foreword

I am pleased to present the "Temporary Protected Status: Calendar Year 2023 Annual Report" prepared by U.S. Citizenship and Immigration Services.

Pursuant to statutory requirements, this report is provided to the following Members of Congress:

> The Honorable Jim Jordan
> Chairman, House Committee on the Judiciary
>
> The Honorable Jerrold Nadler
> Ranking Member, House Committee on the Judiciary
>
> The Honorable Richard Durbin
> Chair, Senate Committee on the Judiciary
>
> The Honorable Lindsey Graham
> Ranking Member, Senate Committee on the Judiciary

Inquiries relating to this report may be directed to me at (202) 447-5890.

Respectfully,

Zephranie Buetow
Assistant Secretary for Legislative Affairs

ii

# Executive Summary

Under section 244 of the Immigration and Nationality Act (INA), 8 U.S.C. § 1254a, the Secretary of Homeland Security may designate a foreign state (or part thereof) for Temporary Protected Status (TPS) after consulting with appropriate agencies of the U.S. Government.  The Secretary may then grant TPS to eligible nationals of that foreign state or eligible noncitizens having no nationality who last habitually resided in that state.  Section 244(b)(1) of the INA provides the circumstances and criteria under which the Secretary may exercise his or her discretion to designate a foreign state for TPS.[1]  In accordance with section 244(i)(1) of the INA, the Secretary submits this annual report to Congress on the operation of section 244 (the TPS statute) during the previous calendar year.

At the close of Calendar Year (CY) 2023, there were approximately 870,332 TPS beneficiaries.

During CY 2023, the Department of Homeland Security (DHS) announced the following TPS actions:

- On January 3, 2023, DHS announced via *Federal Register* notice (FRN) the extension of the TPS designation for Yemen and redesignation of Yemen for 18 months, effective March 4, 2023, through September 3, 2024.[2]

---

[1] Section 244(b)(1) of the INA provides the following:

The [Secretary of Homeland Security], after consultation with appropriate agencies of the Government, may designate any foreign state (or any part of such foreign state) under this subsection only if--

(A) the [Secretary] finds that there is an ongoing armed conflict within the state and, due to such conflict, requiring the return of aliens who are nationals of that state to that state (or to the part of the state) would pose a serious threat to their personal safety;

(B) the [Secretary] finds that--

(i) there has been an earthquake, flood, drought, epidemic, or other environmental disaster in the state resulting in a substantial, but temporary, disruption of living conditions in the area affected,

(ii) the foreign state is unable, temporarily, to handle adequately the return to the state of aliens who are nationals of the state, and

(iii) the foreign state officially has requested designation under this subparagraph; or

(C) the [Secretary] finds that there exist extraordinary and temporary conditions in the foreign state that prevent aliens who are nationals of the state from returning to the state in safety, unless the [Secretary] finds that permitting the aliens to remain temporarily in the United States is contrary to the national interest of the United States.

A designation of a foreign state (or part of such foreign state) under this paragraph shall not become effective unless notice of the designation (including a statement of the findings under this paragraph and the effective date of the designation) is published in the *Federal Register*.  In such notice, the [Secretary] shall also state an estimate of the number of nationals of the foreign state designated who are (or within the effective period of the designation are likely to become) eligible for temporary protected status under this section and their immigration status in the United States.

[2] *See* 88 FR 94 (January 03, 2023) (18-month extension of the TPS designation for Yemen and its redesignation through September 3, 2024).

iii

- On January 26, 2023, DHS announced via FRN the extension of the TPS designation for Haiti and the redesignation of Haiti for 18 months, effective February 4, 2023, through August 3, 2024.[3]
- On March 13, 2023, DHS announced via FRN the extension of the TPS designation for Somalia and the redesignation of Somalia for 18 months, effective March 18, 2023, through, September 17, 2024.[4]
- On June 21, 2023, DHS announced via FRN the rescission of the 2018 termination of the TPS designation for El Salvador and the extension of the TPS designation for El Salvador, effective September 10, 2023, through March 9, 2025.[5]
- On June 21, 2023, DHS announced via FRN the rescission of the 2018 termination of the TPS designation for Honduras and the extension of the TPS designation for Honduras effective January 6, 2024, through July 5, 2025.[6]
- On June 21, 2023, DHS announced via FRN the rescission of the 2018 termination of the TPS designation for Nepal and the extension of the TPS designation for Nepal, effective December 25, 2023, through June 24, 2025.[7]
- On June 21, 2023, DHS announced via FRN the rescission of the 2017 termination of the TPS designation for Nicaragua and the extension of the TPS designation for Nicaragua effective January 6, 2024, through July 5, 2025.[8]
- On August 21, 2023, DHS announced via FRN the extension of the TPS designation for Sudan and the redesignation of Sudan for 18 months, effective October 20, 2023, through April 19, 2025.[9]
- On August 21, 2023, DHS announced via FRN the extension of the TPS designation for Ukraine and the redesignation of Ukraine for 18 months, effective October 20, 2023, through April 19, 2025.[10]
- On September 6, 2023, DHS announced via FRN the extension of the TPS designation for South Sudan and the redesignation of South Sudan, for 18 months, effective November 4, 2023, through May 3, 2025.[11]

---

[3] *See* 88 FR 5022 (January 26, 2023) (18-month extension of the TPS designation for Haiti and its redesignation through August 3, 2024).

[4] *See* 88 FR 15434 (March 13,2023) (18-month extension of the TPS designation for Somalia and its redesignation through September 17, 2024).

[5] *See* 88 FR 40282 (June 21, 2023) (rescission of termination and 18-month extension of the TPS designation for El Salvador through March 9, 2025).

[6] *See* 88 FR 40304 (June 21, 2023) (rescission of termination and 18-month extension of the TPS designation for Honduras through July 5, 2024).

[7] *See* 88 FR 40317 (June 21, 2023) (rescission of termination and 18-month extension of the TPS designation for Nepal through June 24, 2025).

[8] *See* 88 FR 40294 (June 21, 2023) (rescission of termination and 18-month extension of the TPS designation for Nicaragua through July 5, 2025).

[9] *See* 88 FR 56864 (August 21, 2023) (18-month extension of the TPS designation for Sudan and its redesignation through April 19, 2025).

[10] *See* 88 FR 56872 (August 21,2023) (18-month extension of the TPS designation for Ukraine and its redesignation through April 19, 2025).

[11] *See* 88 FR 60971 (September 6, 2023) (18-month extension of the TPS designation for South Sudan and its redesignation through May 3, 2025).

iv

- On September 25, 2023, DHS announced via FRN the extension of the TPS designation for Afghanistan and the redesignation of Afghanistan for 18 months, effective November 21, 2023, through May 20, 2025.[12]
- On October 3, 2023, DHS announced via FRN the extension of the TPS designation for Venezuela for 18 months, effective March 11, 2024, through September 10, 2025, and separate redesignation of Venezuela for TPS for 18 months, effective October 3, 2023, through April 2, 2025.[13]
- On October 10, 2023, DHS announced via FRN the extension of the TPS designation for Cameroon and the redesignation of Cameroon for 18 months, effective December 8, 2023, through, June 7, 2025.[14]

In addition to the actions listed above, although the Secretary did not announce any new TPS actions regarding Burma (Myanmar), Ethiopia, and Syria in CY 2023, Burma (Myanmar), Ethiopia, and Syria's 18-month designations continued through the year.  U.S. Citizenship and Immigration Services (USCIS) continued to process applications related to the TPS programs for these countries.

---

[12] *See* 88 FR 65728 (September 25, 2023) (18-month extension of the TPS designation for Afghanistan and its redesignation through May 20, 2025).

[13] *See* 88 FR 68130 (October 3, 2023) (18-month extension of the TPS designation for Venezuela through September 10, 2025, and its redesignation through April 2, 2025).

[14] *See* 88 FR 69945 (October 10, 2023) (18-month extension of the TPS designation for Cameroon and its redesignation through June 7, 2025).

HondurasAR000141



# Temporary Protected Status Annual Report
# Calendar Year 2023

## Table of Content

I. Legislative Requirement.................................................................................. 1

II. Background .................................................................................................... 2

III. Data Report ................................................................................................. 3

    Section 3.1 Foreign States with TPS Actions in Calendar Year (CY) 2023........................ 3

    Section 3.2 Number and Prior Immigration Status of TPS Beneficiaries in CY 2023............5

    Section 3.3 Age, Gender, and State of Residence of TPS Beneficiaries in CY 2023............. 7

IV. Analysis/Discussion.................................................................................... 10

    Section 4.1 Legal Authority for the Secretary to Designate a Foreign State for TPS Under INA § 244(b)(1)..................................................................................... 10

    Section 4.2 Legal Authority for the Secretary to Extend or Terminate TPS Designations of Foreign States Under INA § 244(b)(3)........................................................ 10

    Section 4.3 Extensions of Designations Under INA § 244(b)(3)(C)............................11

        El Salvador ................................................................................................. 11

        Honduras .................................................................................................... 12

        Nicaragua ................................................................................................... 14

        Nepal ......................................................................................................... 16

    Section 4.4 Extensions of Designations Under INA § 244(b)(3)(C) and Redesignation Under INA § 244(b)(1) and (c)(I)(A)(i).............................................................. 18

        Afghanistan ................................................................................................ 18

        Cameroon ................................................................................................... 19

        Haiti........................................................................................................... 21

        Somalia ...................................................................................................... 22

vi

South Sudan ................................................................................................................ 23

Sudan .......................................................................................................................... 24

Ukraine ....................................................................................................................... 26

Venezuela .................................................................................................................... 27

Yemen ......................................................................................................................... 27

Section 4.5 Designations under INA § 244(b)(1)……………………………………………28

Section 4.6 Terminations Under INA § 244(b)(3)(B)………………………………………….. 28

Section 4.7 Preliminary Injunction Orders and Order to Stay Proceedings…………………… 29

Preliminary injunction order in *Ramos v. Nielsen* ................................................ 29

The court order in *Bhattarai v. Nielsen* ................................................................. 30

Continued compliance with the court orders .......................................................... 30

Appendix A: TPS Beneficiaries' Immigration Status at Initial Filing by Country....................... 31

Appendix B: Immigration Status Codes ...................................................................... 43

HondurasAR000143

## I.    Legislative Requirement

Section 244(i) of the *Immigration and Nationality Act* (INA) (8 U.S.C. § 1254a(i) provides:

(i) Annual Report and Review. -

(1) Annual report. - Not later than March 1 of each year (beginning with 1992), the [Secretary of Homeland Security], after consultation with the appropriate agencies of the Government, shall submit a report to the Committees on the Judiciary of the House of Representatives and of the Senate on the operation of this section during the previous year. Each report shall include—

(A) a listing of the foreign states or parts thereof designated under this section,

(B) the number of nationals of each such state who have been granted temporary protected status under this section and their immigration status before being granted such status, and

(C) an explanation of the reasons why foreign states or parts thereof were designated under subsection (b)(1) and, with respect to foreign states or parts thereof previously designated, why the designation was terminated or extended under subsection (b)(3).

(2) Committee report. - No later than 180 days after the date of receipt of such a report, the Committee on the Judiciary of each House of Congress shall report to its respective House such oversight findings and legislation as it deems appropriate.

HondurasAR000144

## II.      Background

Section 244(b)(1) of the INA provides the Secretary with the authority to designate a foreign state, or any part of such state, for TPS upon finding, among other things, that such state is experiencing ongoing armed conflict, an environmental disaster, or other extraordinary and temporary conditions.  (*See* Executive Summary, fn. 1, for specific statutory requirements for each type of designation.)  The Secretary may grant TPS to an eligible national of the designated foreign state (or to an eligible noncitizen having no nationality who last habitually resided in such state) who, as described in section 244(c)(1)(A) of the INA and implementing regulations in 8 C.F.R. § 244.2:

- Has been continuously physically present in the United States since the effective date of the most recent designation of the state as published in the FRN for the country designation;
- Has continuously resided in the United States since a date determined by the Secretary and published in the FRN;
- Is admissible as an immigrant except as otherwise provided under section 244(c)(2)(A) of the INA;
- Is not ineligible for TPS under section 244(c)(2)(B) of the INA; and
- Registers during an initial registration period of not less than 180 days, as announced in the FRN, or the applicant meets late initial registration criteria during any subsequent extension of TPS designation pursuant to 8 C.F.R. § 244.2(f)(2).

During the period for which the Secretary designated a foreign state for TPS, registered TPS beneficiaries are eligible to remain in the United States, cannot be removed, and are authorized to work, so long as their TPS was not withdrawn for individual ineligibility.   They may also be granted authorization to travel abroad temporarily with prior consent of the Secretary.  *See* INA §§ 244(a)(1), 244(a)(2), and 244(f)(3).

Granting TPS itself does not lead to lawful permanent resident status.  When the Secretary terminates a foreign state's TPS designation, beneficiaries return to the same immigration status they possessed prior to gaining TPS (unless that status expired or was terminated) or continue to possess any other status they obtained while registered for TPS, if still valid.  Beneficiaries who had no lawful status before obtaining TPS and who have not obtained any other lawful status after TPS return to unlawful status when the TPS designation ends.

HondurasAR000145

## III.    Data Report

## Section 3.1 Foreign States with TPS Actions in Calendar Year (CY) 2023

The following table (Table 1) reflects all foreign states for which a TPS action was taken in CY 2023.  The table shows the most recent effective dates of each designation and/or extension or termination, and the expiration date for each foreign state's TPS designation as of December 31, 2023.

## Table 1: CY 2023 TPS Designations by Country

| Country | Last Action (as of 12/31/23) | Expiration (as of 12/31/23) | Federal Register Notice |
|---|---|---|---|
| Afghanistan | 18-month extension and redesignation | May 20, 2025 | 88 FR 65728 (September 25, 2023) |
| Cameroon | 18-month extension and redesignation | June 7, 2025 | 88 FR 69945 (October 10, 2023) |
| El Salvador | rescission of termination and 18-month extension | March 9, 2025 | 88 FR 40282 (June 21, 2023) |
| Haiti | 18-month extension and redesignation | August 3, 2024 | 88 FR 5022 (January 26, 2023) |
| Honduras | rescission of termination and 18-month extension | July 5, 2025 | 88 FR 40304 (June 21, 2023) |
| Nepal | rescission of termination and 18-month extension | June 24, 2025 | 88 FR 40317 (June 21, 2023) |
| Nicaragua | rescission of termination and 18-month extension | July 5, 2025 | 88 FR 40294 (June 21, 2023) |
| Somalia | 18-month extension and redesignation | September 17, 2024 | 88 FR 15434 (March 13, 2023) |
| South Sudan | 18-month extension and redesignation | May 3, 2025 | 88 FR 60971 (September 06, 2023) |
| Sudan | 18-month extension and redesignation | April 19, 2025 | 88 FR 56864 (August 21, 2023) |
| Ukraine | 18-month extension and redesignation | April 19, 2025 | 88 FR 56872 (August 21, 2023) |
| Venezuela | 18-month extension of the 2021 designation (Venezuela 2021)<br><br>18-month redesignation (Venezuela 2023) | September 10, 2025[15]<br>April 2, 2025[16] | 88 FR 68130 (October 3, 2023) |

[15] Extension of Venezuela's 2021 TPS designation for existing beneficiaries of TPS and those who filed initial applications for TPS under Venezuela 2021 that were still pending.  The extension of Venezuela's 2021 designation runs from March 11, 2024, to September 10, 2025.

[16] Separate redesignation of Venezuela for TPS for individuals who had not yet filed for TPS.  The 2023 redesignation of Venezuela runs from October 3, 2023, through April 2, 2025.

HondurasAR000146

| Yemen | 18-month extension and redesignation | September 3, 2024 | 88 FR 94 (January 3, 2023) |

Data Source:  USCIS website.

The following table (Table 2) reflects the estimated number of TPS beneficiaries under each designated foreign state at the close of the CY 2023.  For comparison and trend analysis purposes, TPS beneficiary data at the close of each year from 2019–2022 are also listed.

**Table 2: TPS Beneficiaries by Year and Country, CY 2019–2023**

| | 2023 | 2022 | 2021 | 2020 | 2019 |
|---|---|---|---|---|---|
| Afghanistan | 5,762 | 578 | - | - | - |
| Burma | 2,224 | 1,291 | 247 | - | - |
| Cameroon | 2,399 | 1,129 | - | - | - |
| El Salvador | 236,270 | 239,139 | 241,699 | 244,921 | 247,412 |
| Ethiopia | 2,083 | - | - | - | - |
| Haiti | 204,759 | 110,638 | 53,558 | 54,365 | 55,218 |
| Honduras | 74,572 | 75,803 | 76,737 | 78,149 | 79,290 |
| Nepal | 13,896 | 14,477 | 14,556 | 14,642 | 14,549 |
| Nicaragua | 4,041 | 4,163 | 4,250 | 4,344 | 4,409 |
| Somalia | 562 | 425 | 436 | 447 | 454 |
| South Sudan | 146 | 102 | 97 | 101 | 96 |
| Sudan | 1,260 | 1,082 | 706 | 738 | 771 |
| Syria | 6,142 | 6,424 | 6,455 | 6,682 | 6,901 |
| Ukraine | 29,739 | 14,647 | - | - | - |
| Venezuela | 284,207 | 182,579 | 29,193 | - | - |
| Yemen | 2,270 | 1,941 | 1,696 | 1,663 | 1,647 |
| Total | 870,332 | 654,418 | 429,630 | 406,052 | 410,747 |

Data Source: Computer Linked Application Information Management System (CLAIMS) and USCIS Electronic Immigration System (USCIS ELIS).
Note:  The counts include TPS holders who have adjusted to lawful permanent resident (LPR) status.

The following figure (Figure 1) reflects the trends in total count of TPS beneficiaries at the close of the CY for each year from 2019–2023.  Compared to CY 2019–2021, which had relatively stable TPS beneficiary population each year, the size of TPS population has increased over the past two years, culminating in CY 2023, which is more than double the number of individuals receiving TPS in 2021.

HondurasAR000147

**Figure 1: TPS Total Beneficiary Count by Year, CY 2019–2023**



Data Source: Computer Linked Application Information Management System (CLAIMS) and USCIS Electronic Immigration System (USCIS ELIS).

**Section 3.2 Number and Prior Immigration Status of TPS Beneficiaries in CY 2023**

Table 3 and Appendix A[17] reflect the self-reported immigration status codes of noncitizens at their initial filing for TPS. Appendix B describes each immigration status code in the first column of the table. Under INA § 244(a)(5), a noncitizen may continue to maintain his or her prior immigration status while holding TPS, provided he or she maintains eligibility for the prior immigration status.

Overall TPS beneficiaries have a range of prior immigration statuses as Table 3 and Appendix A show. Across all TPS countries, a large portion of beneficiaries' prior immigration status were Unknown (497,514; 57.2 percent) and Other (82,973; 9.5 percent). Because this information is self-reported, the prior immigration status of those included in these general categories is uncertain, but they may include noncitizens who entered without inspection; who were stowaways; as well as others who had no immigration status, who had overstayed their visa, who could not recall their immigration status, and who had applications/petitions for status denied prior to obtaining TPS. Other top prior immigration statuses among TPS beneficiaries were asylum seekers (AS, AO, and 999 combined, 178,043; 20.5 percent) and parolees (PAR, OAR, and UHP combined, 27,786; 3.2 percent).[18] Some TPS beneficiaries also appear to have held a Temporary Visitors for Pleasure visa (26,118; 3.0 percent). Slightly more than 1 in 100 TPS

[17] For the purposes of Table 3, Appendices A and B, and the accompanying explanations, "immigration status" may refer to an individual's immigration *status* or *category* at initial filing, or to the *process step* they were undergoing at that time. The variation is due to the self-reported nature of the information.

[18] The two- or three-digit code is an immigration status code assigned to noncitizens. They are defined as: AS = Asylum Applicant with Work Authorization; AO = Asylum Applicant without Work Authorization; 999 = Alien Awaiting Decision of Asylum; PAR = Parolee; OAR = Operation Allied Refugee – Parole; UHP = Ukrainian Humanitarian Parole. For a complete immigration status code description, please see Appendix B.

HondurasAR000148

beneficiaries held an academic student visa (F-1).  A small proportion of TPS beneficiaries held a Temporary Worker in Specialty Occupations visa (1,428; 0.2 percent) or other employment-based visas.

**Table 3: Top 25 Prior Immigration Statuses of TPS Beneficiaries at Initial Filing**

| No. by Frequency | Immigration Status at Filing | Frequency | Percent |
|---|---|---|---|
| 1 | UN (UNKNOWN OR NOT REPORTED) | 497,514 | 57.2 |
| 2 | AS (ASYLUM APPLICNT WITH WORK AUTHORIZATION) | 137,822 | 15.8 |
| 3 | OTHER (OTHER COA HOLDERS) | 82,973 | 9.5 |
| 4 | B2 (TEMPORARY VISITORS FOR PLEASURE) | 26,118 | 3.0 |
| 5 | AO (ASYLUM APPLICANT WITHOUT WORK AUTHORIZATION) | 24,613 | 2.8 |
| 6 | PAR (PAROLEE) | 23,219 | 2.7 |
| 7 | 999 (ALIEN AWAITING DECISION OF ASYLUM) | 15,608 | 1.8 |
| 8 | EWI (ENTRY WITHOUT INSPECTION) | 11,525 | 1.3 |
| 9 | DT (PAROLEE DISTRICT/POE AUTHORIZED) | 10,605 | 1.2 |
| 10 | F1 (ACADEMIC STUDENTS) | 9,113 | 1.1 |
| 11 | OAR (OPERATION ALLIED REFUGE - PAROLE) | 3,489 | 0.4 |
| 12 | IJ (REFERRED TO IMMIGRATION JUDGE) | 3,406 | 0.4 |
| 13 | ABS (ABANDONMENT OF STATUS) | 2,972 | 0.3 |
| 14 | ASY (ASYLEE) | 1,808 | 0.2 |
| 15 | RE (REFUGEE) | 1,688 | 0.2 |
| 16 | PEN (PENDING LPR) | 1,587 | 0.2 |
| 17 | H1B (TEMPORARY WORKERS IN SPECIALTY OCCUPATIONS) | 1,428 | 0.2 |
| 18 | B1 (TEMPORARY VISITORS FOR BUSINESS) | 1,267 | 0.2 |
| 19 | F2 (SPOUSES AND CHILDREN OF F1) | 1,227 | 0.1 |
| 20 | UHP (UKRAINIAN HUMANITARIAN PAROLE) | 1,078 | 0.1 |
| 21 | E2 (TREATY INVESTORS AND THEIR SPOUSES AND CHILDREN) | 1040 | 0.1 |
| 22 | J1 (EXCHANGE VISITORS) | 887 | 0.1 |
| 23 | RE5 (HAITIAN WITH REFUGEE STATUS IN U.S.) | 619 | 0.1 |
| 24 | H4 (SPOUSES AND CHILDREN OF H1, H2, OR H3) | 566 | 0.1 |
| 25 | WT (VISA WAIVER PROGRAM – TEMPORARY VISITORS FOR PLEASURE) | 552 | 0.1 |

Data Source: Computer Linked Application Information Management System (CLAIMS) and USCIS Electronic Immigration System (USCIS ELIS). Prior immigration status is self-reported by TPS beneficiaries on Form I-821, Application for Temporary Protected Status. Class of Admission Code is based upon self-reported information appeared on Form I-821.  At the time of filing for TPS, many applicants report that they cannot recall their immigration status.  Immigration status, or lack of status, does not impact eligibility for TPS.  See INA § 244(a)(5). Percentages do not sum to 100 as only the top 25 classes are included.

A complete table of TPS beneficiaries' immigration status at initial filing by country is shown in Appendix A.  Even though the prior immigration status reported by TPS beneficiaries spans a wide spectrum (more than 200 in terms of status code), it is worth noting that over 99 percent of all TPS beneficiaries held one of the top 25 immigration statuses at initial filing.

HondurasAR000149

**Section 3.3 Age, Gender, and State of Residence of TPS Beneficiaries in CY 2023**

Tables 4 to 6 describe key demographics and state of residence of the TPS beneficiary population.[19]  A typical TPS beneficiary is a 35-54 year old individual residing in one of four large states (Florida, Texas, California, and New York).  The average age of all TPS beneficiaries in CY 2023 is 38.7 years, and the largest number of beneficiaries falls into the age group of 45 to 54 years (27.5 percent).  Younger (under 24 years of age) and older beneficiaries (over 55 years of age) are relatively small in proportion, 14.2 percent and 22.1 percent, respectively.  Slightly more than half of TPS beneficiaries (454,501; 52.2 percent) are male, while 413,689 (47.5 percent) are female.  A small number of TPS beneficiaries (2,077; 0.002 percent) shows their gender identity as unknown/unreported.  More than six in ten TPS beneficiaries (61.7 percent) live in these four states:  Florida (287,895; 33.1 percent), Texas (95,483; 11.0 percent), California (83,513; 9.6 percent), and New York (70,193; 8.1 percent).

**Table 4: TPS Beneficiaries by Age Group**

| Age Group | Frequency | Percent (%) |
|---|---|---|
| Under 18 | 77,766 | 8.9 |
| 18 to 24 years | 46,222 | 5.3 |
| 25 to 34 years | 123,990 | 14.2 |
| 35 to 44 years | 191,290 | 22.0 |
| 45 to 54 years | 239,065 | 27.5 |
| 55 to 64 years | 125,064 | 14.4 |
| 65 and above | 66,921 | 7.7 |
| Unknown | 14 | 0.0 |

Data Source: Computer Linked Application Information Management System (CLAIMS) and USCIS Electronic Immigration System (USCIS ELIS).

**Table 5: TPS Beneficiaries by Gender**

| Gender | Frequency | Percent (%) |
|---|---|---|
| Male | 454,501 | 52.2 |
| Female | 413,689 | 47.5 |
| Unknown/Unreported | 2,142 | 0.3 |

Data Source: Computer Linked Application Information Management System (CLAIMS) and USCIS Electronic Immigration System (USCIS ELIS).

---

[19] TPS beneficiaries' demographic information (age and gender) and state of residence are based on self-reported data on their most recently submitted from I-821, Application for Temporary Protected Status.  As such, state of residence of any TPS beneficiary only reflects the time when the most recent Form I-821 was filed.

HondurasAR000150

**Table 6: TPS Beneficiaries by State of Residence at Filing**

| State/Territory | Beneficiary Count | Percent (%) |
|---|---|---|
| Florida | 287,895 | 33.1 |
| Texas | 95,483 | 11.0 |
| California | 83,513 | 9.6 |
| New York | 70,193 | 8.1 |
| New Jersey | 33,096 | 3.8 |
| Maryland | 32,691 | 3.8 |
| Virginia | 31,034 | 3.6 |
| Massachusetts | 30,260 | 3.5 |
| Georgia | 28,036 | 3.2 |
| North Carolina | 23,385 | 2.7 |
| Indiana | 16,707 | 1.9 |
| Illinois | 14,203 | 1.6 |
| Ohio | 10,699 | 1.2 |
| Pennsylvania | 10,649 | 1.2 |
| Tennessee | 8,861 | 1.0 |
| Utah | 8,021 | 0.9 |
| Washington | 7,404 | 0.9 |
| Colorado | 5,808 | 0.7 |
| Connecticut | 5,630 | 0.7 |
| Nevada | 5,257 | 0.6 |
| South Carolina | 5,118 | 0.6 |
| Minnesota | 4,551 | 0.5 |
| Arkansas | 3,802 | 0.4 |
| Michigan | 3,448 | 0.4 |
| District of Columbia | 3,342 | 0.4 |
| Louisiana | 3,118 | 0.4 |
| Delaware | 3,116 | 0.4 |
| Kentucky | 3,004 | 0.4 |
| Oklahoma | 2,919 | 0.3 |
| Arizona | 2,897 | 0.3 |
| Missouri | 2,788 | 0.3 |
| U.S. Virgin Islands | 2,586 | 0.3 |
| Oregon | 2,362 | 0.3 |
| Alabama | 2,225 | 0.3 |
| Nebraska | 2,161 | 0.3 |
| Iowa | 2,099 | 0.2 |
| Kansas | 2,084 | 0.2 |
| Wisconsin | 1,919 | 0.2 |
| Rhode Island | 1,499 | 0.2 |
| Unknown | 1,172 | 0.1 |
| Mississippi | 715 | 0.1 |
| Puerto Rico | 596 | 0.1 |
| New Hampshire | 559 | 0.1 |
| Idaho | 546 | 0.1 |
| New Mexico | 520 | 0.1 |
| Maine | 412 | 0.1 |
| West Virginia | 370 | 0.0 |
| South Dakota | 360 | 0.0 |
| Alaska | 289 | 0.0 |

8

HondurasAR000151

| State/Territory | Beneficiary Count | Percent (%) |
|---|---|---|
| North Dakota | 258 | 0.0 |
| Hawaii | 215 | 0.0 |
| Montana | 133 | 0.0 |
| Wyoming | 125 | 0.0 |
| Vermont | 93 | 0.0 |
| Federated States of Micronesia | 38 | 0.0 |
| Northern Mariana Islands | 28 | 0.0 |
| Guam | 16 | 0.0 |
| Palau | 7 | 0.0 |
| Armed Forces the Americas | 6 | 0.0 |
| American Samoa | 4 | 0.0 |
| Marshall Islands | 4 | 0.0 |
| Armed Forces Europe | 3 | 0.0 |
| Total | 870,332 | 100.0 |

Data Source: Computer Linked Application Information Management System (CLAIMS) and USCIS Electronic Immigration System (USCIS ELIS).

**Figure 2: TPS Beneficiaries by State of Residence at Filing**



Data Source: Computer Linked Application Information Management System (CLAIMS) and USCIS Electronic Immigration System (USCIS ELIS).

HondurasAR000152

IV.     **Analysis/Discussion**

**Section 4.1 Legal Authority for the Secretary to Designate a Foreign State for TPS Under INA § 244(b)(1)**

Under INA § 244(b)(1), the Secretary, after consultation with appropriate agencies of the U.S. Government, may designate a foreign state (or any part of such foreign state) if conditions in the foreign state meet one or more statutory bases for designation: ongoing armed conflict, environmental disaster, or extraordinary and temporary conditions.[20]  An initial TPS designation is purely discretionary, and the Secretary can decline to make a designation even if he or she determines eligible conditions exist in a foreign state.  The Secretary may designate the foreign state for a period of six, 12, or 18 months.[21]  When the Secretary designates a foreign state for TPS, he or she establishes the dates from which a TPS applicant must have continuously resided in and been continuously physically present in the United States in order to be eligible for TPS under the particular designation.[22]  By establishing these "continuous residence" and "continuous physical presence" dates in accordance with TPS statutes, the Secretary can afford temporary protection to the most appropriate group of noncitizens from the designated country.

**Section 4.2 Legal Authority for the Secretary to Extend or Terminate TPS Designations of Foreign States Under INA § 244(b)(3)**

As required by the INA, the Secretary conducts a periodic review of country conditions affecting each TPS-designated foreign state in consultation with appropriate agencies of the U.S. Government, to determine whether the conditions support extension or termination of the TPS designation, and whether a new designation may be warranted.[23]  At least 60 days prior to the current expiration of a country's TPS designation, the Secretary must review the conditions in the designated foreign state and determine whether the conditions for such designation continue to be met.  If the Secretary determines statutory conditions for designation are no longer met, the TPS statute requires that he or she terminate the designation.  If the Secretary finds, however, that conditions for designation are met (or makes no determination at all), the statute requires the TPS designation be extended for a minimum of six months, or, at the Secretary's discretion, for 12 or 18 months.  USCIS publishes a notice in the *Federal Register* that announces the Secretary's determination of whether to extend, extend and redesignate, or terminate a country's TPS designation.  That notice includes an explanation of the reasons for the determination.

---

[20] *See supra* note 1 (providing text of INA § 244(b)(1)).

[21] *See* INA § 244(b)(2)(B).

[22] *See* INA § 244(c)(1)(A). The continuous residence date is such date as the Secretary may establish.  *Id.* at §(244(c)(1)(A)(i).  However, the continuous physical presence date is the effective date of the most recent designation, which itself is the FRN publication date of the designation or such later date as the Secretary may specify in the notice.  *See Id.* at §244(b)(2)(A); §244(c)(1)(A)(ii).

[23] *See* INA § 244(b)(3)(A)-(C).

10

**Section 4.3 Extensions of Designations Under INA § 244(b)(3)(C)**

This section provides details about TPS actions announced by the Secretary in CY 2023 regarding foreign states for which the most recent action by the Secretary, as of December 31, 2023, was an extension of the state's existing TPS designation.

**El Salvador**

El Salvador was initially designated for TPS on the basis of environmental disaster following two separate massive earthquakes in 2001 that resulted in a substantial, temporary disruption of living conditions in the area affected. Designation was made at the request of the country's government, which was temporarily unable to handle adequately the return of its nationals.[24] After its initial designation, El Salvador's TPS designation was extended 11 consecutive times (for periods of 12 or 18 months at a time) under the same statutory basis of environmental disaster.

Subsequently, DHS announced the termination of TPS for El Salvador with an effective date of September 9, 2019.[25] The termination decision was the subject of litigation and a court order, and, as a result, the termination had not taken effect. On June 21, 2023, DHS published an FRN announcing the rescission of the 2017 termination of the TPS designation of El Salvador and simultaneously extended the TPS designation of El Salvador for 18 months from September 10, 2023, through March 9, 2025.[26]

After conducting an independent assessment of the country conditions in El Salvador as they existed in 2018 and in June 2023, the Secretary determined that El Salvador's 2001 TPS designation should not have been terminated. The conditions in El Salvador that gave rise to its TPS designation in 2001 persisted in 2018 and in June 2023. El Salvador suffered catastrophic damage due to the 2001 earthquakes. Together, the earthquakes killed over 1,150 people,[27] injured over 8,000, and affected more than 1.5 million people[28] (approximately 25 percent of the population[29]). The earthquakes damaged or destroyed over 300,000 homes and 2,647 public schools and demolished critical infrastructure throughout the country.[30] At the time of the determination to terminate the designation of TPS for El Salvador, although some social and economic progress had been made, frequent and significant environmental disasters occurred

---

[24] *Designation of El Salvador Under Temporary Protected Status Program,* 66 FR 14214 (Mar. 9, 2001).

[25] *Termination of the Designation of El Salvador for Temporary Protected Status,* 83 FR 2654 (Jan. 18, 2018).

[26] *Reconsideration and Rescission of Termination of the Designation of El Salvador for Temporary Protected Status; Extension of the Temporary Protected Status Designation for El Salvador,* 88 FR 40282 (June 21, 2023).

[27] *Earthquakes Fast Facts*, CNN Editorial Research, June 22, 2022, available at https://www.cnn.com/2013/07/05/world/earthquakes-fast-facts/index.html (last visited Mar. 6, 2023).

[28] *El Salvador—Earthquakes Final Fact Sheet, Fiscal Year (FY) 2001*, US Agency for International Development Situation Report, Sept. 7, 2001, available at https://reliefweb.int/report/el-salvador/el-salvador-earthquakes-final-fact-sheet-fiscal-year-fy-2001 (last visited Mar. 6, 2023).

[29] *El Salvador Earthquakes: Final Fact Sheet (FY 2001)*; *AFSC El Salvador earthquake response: Two years later – An assessment and report*, American Friends Service Committee, May 15, 2003, available at https://reliefweb.int/report/el-salvador/afsc-el-salvador-earthquake-response-two-years-later-assessment-and-report (last visited Mar. 6, 2023).

[30] *Id.*

HondurasAR000154

after the 2001 earthquakes, causing additional challenges.[31] Recovery from the earthquakes continued to be slow and encumbered by hurricanes and tropical storms, heavy rains and flooding, volcanic and seismic activity, a coffee rust epidemic, a prolonged and severe drought, and an increase in various mosquito-borne diseases, among other things.

The Secretary extended the TPS designation of El Salvador because the conditions supporting El Salvador's 2001 designation for TPS on the basis of environmental disaster remain. Since the disastrous earthquakes in 2001, El Salvador has been encumbered by several significant natural disasters and environmental challenges. El Salvador continues to suffer from the residual effects of the earthquakes, and recovery from these earthquakes has been impeded by El Salvador's ongoing environmental challenges, including its high vulnerability to "more frequent occurrences of floods, droughts, and tropical storms, all of which disproportionally affect poor and vulnerable populations."[32] During the rainy season, which generally runs from June to November, El Salvador is impacted by extreme weather, which damages roads, property, and infrastructure; disrupts supplies, services, and utilities; and even causes loss of life.[33] Through the present, El Salvador continues to experience compounding environmental disasters, hindering recovery and rendering it unable to handle adequately the return of its nationals. El Salvador also continues to experience a frail macroeconomic environment, a high rate of unemployment, violence, and a poor security situation that continues to render the country temporarily unable to adequately handle the return of its nationals. El Salvador is plagued by intense violence involving criminal groups and gang warfare, as well as a deteriorating political crisis, due to the government's aggressive security strategies to combat gang violence.

## Honduras

Honduras was initially designated for TPS based on an environmental disaster (Hurricane Mitch) that resulted in a substantial, temporary disruption of living conditions in the area affected. It was designated in response to a request by the country's government, which was temporarily unable to handle adequately the return of its nationals.[34] Since its initial designation in 1999, TPS for Honduras was extended thirteen consecutive times under the same statutory basis of environmental disaster until 2017.[35] That year, former Acting Secretary Elaine Duke did not

---

[31] *Report: Extending Temporary Protected Status for El Salvador: Country Conditions and U.S. Legal Requirements*, American University, Dec. 2017, available at: https://www.american.edu/centers/latin-american-latino-studies/extending-tps-for-el-salvador.cfm (last visited Mar. 6, 2023); Resolving Land Ownership Issues for a Community Water Project: A Post-Earthquake Development Dispute in Rural El Salvador, April 07, 2010, https://www.tandfonline.com/doi/pdf/10.1080/14649350903538046 (last visited: March 6, 2023).

[32] The World Bank in El Salvador, Overview, The World Bank, Apr. 22, 2022, available at https://www.worldbank.org/en/country/elsalvador/overview (last visited Mar. 6, 2023).

[33] Foreign Travel Advice El Salvador, Gov.UK, Oct. 20, 2022, available at https://www.gov.uk/foreign-travel-advice/el-salvador/print (last visited Mar. 6, 2023).

[34] Designation of Honduras Under Temporary Protected Status, 64 FR 524 (Jan. 5, 1999).

[35] Extension of Designation of Honduras Under Temporary Protected Status Program, 65 FR 30438 (May 11, 2000); Extension of the Designation of Honduras Under the Temporary Protected Status Program, 66 FR 23269 (May 8, 2001); Extension of the Designation of Honduras Under the Temporary Protected Status Program, 67 FR 22451 (May 3, 2002); Extension of the Designation of Honduras Under Temporary Protected Status Program; Automatic Extension of Employment Authorization Documentation for Hondurans, 68 FR 23744 (May 5, 2003); Extension of the Designation of Temporary Protected Status for Honduras; Automatic Extension of Employment Authorization

HondurasAR000155

make a decision on extending or terminating Honduras's TPS designation by the statutory deadline, resulting in an automatic six-month extension of the designation, through July 5, 2018.[36]

Subsequently, DHS announced the termination of TPS for Honduras, with an effective date of January 5, 2020.[37]  The termination decision was the subject of litigation and a court order, and as a result, the termination had not taken effect.  On June 21, 2023, DHS published an FRN announcing the rescission of the 2018 termination of the TPS designation of Honduras and simultaneously extended the TPS designation of Honduras for 18 months from January 6, 2024, through July 5, 2025.

After conducting an independent assessment of the country conditions in Honduras as they existed in 2018 and in June 2023, Secretary Mayorkas determined that Honduras' 1999 designation should not have been terminated.  The conditions in Honduras that gave rise to its TPS designation in 1999 persisted in 2018 and in June 2023.  Numerous environmental, political, and social crises since Hurricane Mitch have prevented the country from recovering from the hurricane and continue to impair Honduras from ensuring the safe return of its nationals.

Although recovery efforts were implemented in the years after Hurricane Mitch, the effects of Hurricane Mitch set back Honduras economically and socially by as much as 20 years.[38]  Since Honduras was designated for TPS in January 1999, various natural disasters and related environmental concerns—including hurricanes, tropical storms, flooding and heavy rain, severe drought, and mosquito-borne illnesses—have contributed to loss of life and damage to property and infrastructure in Honduras and prevented the country from fully recovering from Hurricane Mitch.  Since Hurricane Mitch, Honduras has been impacted by a "repetitive cycle" of storm-related damage to infrastructure and 16 of the 18 departments in the country recently reported

---

Documentation for Honduras TPS Beneficiaries, 69 FR 64084 (November 3, 2004); Extension of the Designation of Temporary Protected Status for Honduras; Automatic Extension of Employment Authorization Documentation for Honduras TPS Beneficiaries, 71 FR 16328 (March 31, 2006); Extension of the Designation of Honduras for Temporary Protected Status; Automatic Extension of Employment Authorization Documentation for Honduran TPS Beneficiaries, 72 FR 29529 (May 29, 2007); Extension of the Designation of Honduras for Temporary Protected Status, 73 FR 57133 (Oct. 1, 2008); Extension of the Designation of Honduras for Temporary Protected Status and Automatic Extension of Employment Authorization Documentation for Honduran TPS Beneficiaries, 75 FR 24734 (May 5, 2010); Extension of the Designation of Honduras for Temporary Protected Status and Automatic Extension of Employment Authorization Documentation for Honduran TPS Beneficiaries, 76 FR 68488 (Nov. 4, 2011); Extension of the Designation of Honduras for Temporary Protected Status, 78 FR 20123 (Apr. 3, 2013); Extension of the Designation of Honduras for Temporary Protected Status, 79 FR 62170 (Oct. 16, 2014); Extension of the Designation of Honduras for Temporary Protected Status, 81 FR 30331 (May 16, 2016).

[36] See 82 FR 59630 (Dec. 15, 2017).  If the Secretary makes no decision on extension or termination of a country's TPS designation by at least 60 days before the expiration of the existing TPS designation, then INA section 244(b)(3)(C) requires that the designation be extended an additional six months (or 12 or 18 months in the Secretary's discretion).

[37] Termination of the Designation of Honduras for Temporary Protected Status, 83 FR 26074 (June 5, 2018).

[38] Suárez, Ginés, & Sánchez, Walter J., Desastres, Riesgo y Desarrollo en Honduras: Delineando los vínculos entre el desarrollo humano y la construcción de riesgo en Honduras, Programa de las Naciones Unidas para el Desarrollo (PNUD), p.22, Jan. 2012, available at https://criterio.hn/wp-content/uploads/2020/11/INFORME-PNUD-desastres-ambientales-honduras.pdf

HondurasAR000156

damaged roads, collapsed bridges, devastated crops, flooded houses, and landslides.[39] Additionally, since the extension of TPS for Honduras in 2018,[40] violence and social and political concerns have adversely impacted living conditions and hindered recovery from environmental disasters in Honduras.[41] These subsequent natural disasters, violence, and social and political concerns continue to inflict damage on a population that has not fully recovered from Hurricane Mitch and impact Honduras's ability to adequately handle the return of its nationals.

## Nicaragua

Nicaragua was initially designated for TPS on the basis of environmental disaster following Hurricane Mitch that resulted in a substantial, temporary disruption of living conditions in the area affected. It was designated at the request of the country's government, which was temporarily unable to handle adequately the return of its nationals.[42] Since its initial designation in 1999, TPS for Nicaragua was extended 13 consecutive times (for periods of 12 or 18 months at a time) under the same statutory basis of environmental disaster.

Subsequently, DHS announced the termination of TPS for Nicaragua, with an effective date of January 5, 2019.[43] The termination decision was the subject of litigation and a court order, and as a result, the termination had not taken effect. On June 21, 2023, DHS published an FRN announcing the rescission of the 2017 termination of the TPS designation of Nicaragua and simultaneously extended the TPS designation of Nicaragua for 18 months from January 6, 2024, through July 5, 2025.[44]

After conducting an independent assessment of the country conditions in Nicaragua as they existed in 2017 and in June 2023, Secretary Mayorkas determined that Nicaragua's 1999 TPS designation should not have been terminated. The conditions in Nicaragua that gave rise to its TPS designation in 1999 persisted in 2017 and in June 2023. Hurricane Mitch, which struck in 1998, killed approximately 2,500 people and 885 were reported missing.[45] The devastation of

---

[39] *Starting from Scratch Over and Over Again: Heavy Rains and Floods Displace Thousands of Hondurans, International Organization for Migration (IOM)*, Oct. 28, 2022, available at: https://reliefweb.int/report/honduras/starting-scratch-over-and-over-again-heavy-rains-and-floods-displace-thousands-honduras (last visited Apr. 6, 2023).

[40] The TPS designation of Honduras was statutorily automatically extended for 6 months (from January 6, 2018, through July 5, 2018) after the Secretary of Homeland Security did not make a determination on Honduras's designation 60 days prior to the previous expiration (January 5, 2018). Subsequently, on June 5, 2018, the Secretary published a determination to terminate TPS for Honduras, effective January 5, 2020.

[41] United Nations Office for the Coordination of Humanitarian Affairs, Honduras Humanitarian Needs Overview 2023 (September 2022) (Feb. 8, 2023), https://reliefweb.int/report/honduras/honduras-humanitarian-needs-overview-2023-september-2022 (last visited Mar. 13, 2023).

[42] *Designation of Nicaragua Under Temporary Protected Status*, 64 FR 526 (Jan. 5, 1999).

[43] *Termination of the Designation of Nicaragua for Temporary Protected Status*, 82 FR 59636 (Dec. 15, 2017).

[44] *Reconsideration and Rescission of Termination of the Designation of Nicaragua for Temporary Protected Status; Extension of the Temporary Protected Status Designation for Nicaragua*, 88 FR 40294 (June 21, 2023).

[45] OCHA, Central America – Hurricane Tropical Storm Mitch OCHA Situation Report No. 14, Nov. 16, 1998, available at https://reliefweb.int/report/belize/central-america-hurricanetropical-storm-mitch-ocha-situation-report-no-14 (last visited Nov. 7, 2022).

HondurasAR000157

the hurricane affected nearly 868,000 people.[46]  Landslides and floods destroyed entire villages and caused extensive damages to the transportation network, housing, medical and educational facilities, water supply and sanitation facilities, and the agricultural sector.[47]  Overall damage estimates ranged from $1.3 to 1.5 billion.[48]  At the time of the decision to terminate the designation of TPS, Nicaragua continued to experience significant challenges due to the destruction of the hurricane.  While the international community and the Government of Nicaragua helped to repair the damage and destruction left behind by Hurricane Mitch and there were notable improvements in some sectors, several sectors including housing and infrastructure remained severely impacted.

The Secretary extended the TPS designation of Nicaragua because the conditions supporting Nicaragua's 1999 designation for TPS on the basis of environmental disaster remain.  Since the disastrous hurricane in 1998, Nicaragua has been encumbered by several significant natural disasters and environmental challenges.

Nicaragua continues to suffer from the residual effects of Hurricane Mitch, and subsequent disasters have caused additional damage and added to the country's fragility.  "In the last 20 years, Nicaragua has been hit by major, extreme weather events such as Hurricanes Mitch in 1998, Beta in 2005, Felix in 2007, and most recently by hurricanes Eta and Iota in November 2020…The economic, social, housing, and infrastructure losses have been devastating for the region[.]"[49]  Nicaragua has also been impacted by other hydrometeorological events[50] and is also one of the countries in the Dry Corridor of Central America.[51]  These environmental shocks have affected conditions throughout Nicaragua, resulting in deaths, damage to homes and infrastructure, and loss of crops throughout the years.[52]  In addition to the numerous

---

[46] OCHA, Central America – Hurricane Tropical Storm Mitch OCHA Situation Report No. 14, Nov. 16, 1998, available at https://reliefweb.int/report/belize/central-america-hurricanetropical-storm-mitch-ocha-situation-report-no-14 (last visited Nov. 7, 2022).

[47] Nicaragua: Huracán Mitch Daños, Costos, Acciones de Rehabilitación del Gobierno y la Cooperación Internacional, Government of Nicaragua, May 28, 1999, available at https://reliefweb.int/report/nicaragua/nicaragua-hurac%C3%A1n-mitch-da%C3%B1os-costos-acciones-de-rehabilitaci%C3%B3n-del-gobierno-y-la (last visited Nov. 18, 2022).

[48] *Nicaragua Overview*, U.S. Agency for International Development (USAID), http://web.archive.org/web/20110606154439/http://www.usaid.gov/pubs/bj2001/lac/ni/ (last visited Nov. 16, 2022). According to a USAID source, overall damages were US$1.5 billion.  The Government of Nicaragua assessed damages at US$1.3 billion. *See* Nicaragua: Huracán Mitch Daños, Costos, Acciones de Rehabilitación del Gobierno y la Cooperación Internacional.

[49] Nicaragua: Preparatory Action for Disaster/Crisis - DREF Plan of Action, Operation N° MDRNI011, International Federation of Red Cross and Red Crescent Societies (IFRC), p.2, Sept. 3, 2021, available at https://reliefweb.int/report/nicaragua/nicaragua-preparatory-action-disastercrisis-dref-plan-action-operation-ndeg-mdrni011 (last visited Feb. 7, 2023).

[50] OCHA, Hydrometeorological and Climate Services Modernisation Plan For Nicaragua—January 2019, World Bank Group, p.2, Jan. 31, 2019, available at https://reliefweb.int/report/nicaragua/hydrometeorological-and-climate-services-modernisation-plan-nicaragua-january-2019 (last visited Feb. 7, 2023).

[51] OCHA, Central America's Dry Corridor: Turning emergency into opportunities, Oct. 19, 2022, available at https://reliefweb.int/report/honduras/central-americas-dry-corridor-turning-emergency-opportunities (last visited Feb. 7, 2023).

[52] Velásquez, Uriel, *Lluvias dejan 14 muertos en Nicaragua [Rains leave 14 dead in Nicaragua]*, El Nuevo Diario (Ni.), Oct. 19, 2018, available at https://web.archive.org/web/20181019114015/https://www.elnuevodiario.com.ni/nacionales/477437-lluvias-dejan-

HondurasAR000158

environmental disasters following the 1998 hurricane, Nicaragua is experiencing political instability and a humanitarian crisis that continue to render the country temporarily unable to adequately handle the return of its nationals. Nicaragua is encumbered by the effects of several significant natural disasters, environmental challenges, political instability, and a resulting humanitarian crisis that adversely impact the country's ability to fully recover and continue to render the country temporarily unable to adequately handle the return of its nationals.

## Nepal

Nepal was initially designated for TPS on June 24, 2015, on the basis of environmental disaster that resulted in a substantial, temporary disruption of living conditions in the area affected. It was designated at the request of the country's government, which was temporarily unable to handle adequately the return of its nationals.[53] TPS for Nepal was extended on October 26, 2016, under the same statutory basis of environmental disaster.[54]

Subsequently, DHS announced the termination of TPS for Nepal, with an effective date of June 24, 2019.[55] The termination decision was the subject of litigation and a court order, and as a result, the termination had not taken effect. On June 21, 2023, DHS published an FRN announcing the rescission of the 2018 termination of the TPS designation of Nepal and simultaneously extended the TPS designation of Nepal for 18 months from December 25, 2023, and ending on June 24, 2025.[56]

After conducting an independent assessment of the country conditions in Nepal as they existed in 2018 and in June 2023, the Secretary determined that Nepal's 2015 TPS designation should not have been terminated. The conditions in Nepal that gave rise to its TPS designation in 2015 persisted in 2018 and in June 2023. Nepal was initially designated for TPS in 2015 on environmental disaster grounds following a magnitude 7.8 earthquake, at the request of the country's government, and because Nepal was unable, temporarily, to handle adequately the

---

14-muertos-nicaragua/; Nicaragua floods: DREF final report (8 July 2018), International Federation of Red Cross and Red Crescent Societies (IFRC), p.1, July 8, 2018, available at https://reliefweb.int/report/nicaragua/nicaragua-floods-dref-final-report-8-july-2018; A comprehensive action plan for the Dry Corridor in Nicaragua, Food and Agriculture Organization of the United Nations (FAO), Nov. 27, 2017, available at https://web.archive.org/web/20200731011949/https://www.fao.org/in-action/agronoticias/detail/en/c/1062713/; Moloney, Anastasia, In Honduras, years of drought pressure farmers to leave land, Reuters, Sept. 27, 2019, available at https://news.trust.org/item/20190927063451-szxlj/; Tórrez García, Cinthya, Trescientos mil nicaragüenses viven en riesgo ante sequía [Three hundred thousand Nicaraguans live at risk of drought], La Prensa (Ni.), Feb. 27, 2018, available at https://web.archive.org/web/20220613192407/https://www.laprensani.com/2018/02/27/nacionales/2383214-trescientos-mil-nicaraguenses-viven-en-riesgo-ante-sequia; Josefsen Hermann, Lise, Caught between floods and drought: Farmers in Nicaragua living in uncertainty, DW, June 12, 2019, available at https://www.dw.com/en/caught-between-floods-and-drought-farmers-in-nicaragua-living-in-uncertainty/a-49021423; NICARAGUA: Dry spell in northern Nicaragua, ACAPS, p.1, July 24, 2019, available at https://www.acaps.org/sites/acaps/files/products/files/20190724_acaps_start_briefing_note_nicaragua_drought.pdf. (All sources listed in this footnote last visited Feb. 7, 2023).

[53] *Designation of Nepal Under Temporary Protected Status*, 80 FR 36346 (June 24, 2015).

[54] *Extension of the Designation of Nepal for Temporary Protected Status*, 81 FR 74470 (Oct. 26, 2016).

[55] *Termination of the Designation of Nepal for Temporary Protected Status*, 83 FR 23705 (May 22, 2018).

[56] *Reconsideration and Rescission of Termination of the Designation of Nicaragua for Temporary Protected Status; Extension of the Temporary Protected Status Designation for Nicaragua*, 88 FR 40317 (June 21, 2023).

HondurasAR000159

return of its nationals.[57]  Approximately 25 to 33 percent of Nepal's population (over 8 million people) in 39 of Nepal's 75 districts was affected by the earthquake.  There were numerous aftershocks since the April 25, 2015, earthquake, with the strongest striking on May 12 and measuring magnitude 7.3.  The May 12 aftershock contributed to additional casualties and resulted in the collapse of some buildings that had suffered damage in the April 25 earthquake. The earthquake and its aftershocks caused over 8,700 fatalities and more than 20,000 injuries, displaced millions of people, and resulted in destruction or significant damage to over 750,000 homes.  The UN estimated that 2.8 million people were in need of humanitarian assistance after the earthquake.  At the time of the decision to terminate the designation of TPS, Nepal continued to experience significant challenges due to the destruction.

The Secretary extended the TPS designation of Nepal because the conditions supporting Nepal's 2015 designation for TPS on the basis of environmental disaster remain.  Since the disastrous earthquake in 2015, Nepal has been encumbered by several significant natural disasters and environmental challenges.

These more recent environmental disasters, including devastating floods, further earthquakes, and landslides, continue to disrupt living conditions and have added to the country's instability. Recent earthquakes have caused considerable damage throughout Nepal and impeded or reversed the progress the country had made since the 2015 earthquake.  As recently as January 24, 2023, another 5.9 magnitude earthquake struck the Bajura district in the Sudurpaschim province.[58] Reports indicate that this earthquake resulted in damage to approximately 400 houses and the displacement of over 40 families.[59]  Further, mapping showed that the landslide hazard in the fourteen worst-affected districts remained significantly higher than on the day of the earthquake in 2015.[60]  While some areas experienced a degree of stabilization, new areas experienced landslides and others continued to develop risk of landslides.[61]  The levels of landslide risk in these areas are expected to remain elevated for at least "several more years."[62]  In October 2022, Nepal experienced widespread damage in many regions as a result of flooding and landslides that occurred after heavy rainfall.[63]  The flooding and numerous landslides resulting from the storm destroyed critical infrastructure, including sections of major highways and market access roads.[64]

---

[57] *Designation of Nepal Under Temporary Protected Status,* 80 FR 36346 (June 24, 2015).
[58] 5.9 M earthquake with epicentre in Bajura recorded, Kathmandu Post, Jan. 24, 2023, available at https://kathmandupost.com/national/2023/01/24/5-9-m-earthquake-with-epicentre-in-bajura-recorded (last visited Oct. 27, 2023).
[59] *Id.*
[60] Nick Rosser, et al., Changing significance of landslide hazard and risk after the 2015 Mw 7.8 Gorkha, Nepal Earthquake, Progress in Disaster Science, April 2021, available at https://www.sciencedirect.com/science/article/pii/S2590061721000193 (last visited Oct. 27, 2023).
[61] *Id.*
[62] *Id.*
[63] Nepal: Disruptions due to flooding and landslides ongoing in multiple regions as of Oct. 11, Crisis24, Oct. 11, 2022, available at https://crisis24.garda.com/alerts/2022/10/nepal-disruptions-due-to-flooding-and-landslides-ongoing-in-multiple-regions-as-of-oct-11 (last visited Oct. 27, 2023).
[64] Sunir Pandey, Flooding affects millions in Bangladesh, India and Nepal, UNICEF, Aug. 21, 2017, available at https://www.unicef.org/stories/flooding-affects-millions-bangladesh-india-and-nepal (last visited Oct. 27, 2023).

HondurasAR000160

These environmental disasters further affect food security, impede post-earthquake recovery in these especially vulnerable areas, and debilitate Nepal's reconstruction efforts.[65]  While food security conditions in Nepal have improved in recent years, "nearly 3.9 million people – approximately 13 percent of the country's population – were experiencing food insecurity as of June 2022."[66]  Nepal has also been severely economically and agriculturally impacted by Russia's war on Ukraine, which has resulted in global food, fuel, and fertilizer shortages.  The war has posed new threats to Nepal's food security and economy, both of which have struggled to stabilize under the impacts of the COVID-19 pandemic, environmental shocks, and above-average global food prices.[67]  The global fertilizer shortage resulting from the Ukraine conflict left Nepal, a country heavily reliant on imports, unable to supply the necessary fertilizers for its farmers.[68]  High inflation rates and recent interest rate hikes by Nepal's central bank compound the effects of an ongoing liquidity crunch, constraining access to finance and hampering economic growth and completion of water projects that would address Nepal's environmental vulnerabilities.[69]

### Section 4.4 Extensions of Designations Under INA § 244(b)(3)(C) and Redesignation Under INA § 244(b)(1) and (c)(I)(A)(i)

This section provides details about TPS actions announced by the Secretary in CY 2023 regarding foreign states for which the most recent action by the Secretary, as of December 31, 2023, was an extension of the state's existing TPS designation and redesignation of the state.

### Afghanistan

Afghanistan was initially designated for TPS on May 20, 2022, based on ongoing armed conflict and extraordinary and temporary conditions that prevented nationals of Afghanistan from

---

[65] Sangam Prasain and Mohan Budhaair, Fertiliser shortage, drought, heat wave threaten Nepal's farming future, Asia News Network, Aug. 31, 2022, available at https://asianews.network/fertiliser-shortage-drought-heat-wave-threaten-nepals-farming-future/ (last visited Oct. 27, 2023); Nepal Development Update, World Bank Group, Oct. 6, 2022, available at https://thedocs.worldbank.org/en/doc/a27ca3a08e77befb785fc6742708a56c-0310012022/original/Nepal-Development-Update-October-2022.pdf (last visited Oct. 27, 2023).

[66] Nepal Assistance Overview, USAID Bureau for Humanitarian Assistance, November 2022, available at https://www.usaid.gov/humanitarian-assistance/nepal (last visited Mar. 17, 2023).

[67] See e.g., Lekhanath Pandey Kathmandu, Ukraine conflict intensifies Nepal's economic woes, DW, April 15, 2022, available at https://www.dw.com/en/ukraine-conflict-intensifies-nepals-economic-woes/a-61488700 (last visited Oct. 27, 2023); Kristine Eck, Nepal in 2021: From Bad to Worse, University of California Press, Feb. 09, 2022, available at https://doi.org/10.1525/as.2022.62.1.19 (last visited Oct. 27, 2023).

[68] Sangam Prasain, et al., Farmers reduce acreage for lack of adequate fertilizer, The Kathmandu Post, July 29, 2022, available at https://kathmandupost.com/money/2022/07/29/farmers-reduce-acreage-for-lack-of-adequate-fertiliser (last visited Oct. 27, 2023); Sangam Prasain, Crippling fertiliser shortage clouds Paddy Day celebrations for thousands of farmers, The Kathmandu Post, June 29, 2022, available at https://kathmandupost.com/money/2022/06/29/crippling-fertiliser-shortage-clouds-paddy-day-celebrations-for-thousands-of-farmers (last visited Oct. 27, 2023); Sangam Prasain and Mohan Budhaair, Fertiliser shortage, drought, heat wave threaten Nepal's farming future, The Kathmandu Post, Aug. 31, 2022, available at https://asianews.network/fertiliser-shortage-drought-heat-wave-threaten-nepals-farming-future/ (last visited Oct. 27, 2023).

[69] Nepal Multidimensional Poverty Index 2021: Report, UNICEF, Sept. 2021, available at https://www.unicef.org/nepal/reports/nepal-multidimensional-poverty-index-2021-report (last visited Oct. 27, 2023).

HondurasAR000161

returning in safety.[70]  On September 25, 2023, DHS extended and redesignated Afghanistan for TPS for 18 months from November 21, 2023, through May 20, 2025, based on ongoing armed conflict and extraordinary and temporary conditions.[71]

As was noted in the last FRN, since the 2021 Taliban takeover, Afghanistan continues to experience serious insecurity and widespread harm due to armed conflict and insurgent actions. Violent armed conflict continues to occur between the Taliban and the Islamic State in Khorasan Province (ISIS-K) and by both groups against the civilian population.[72]  The ongoing security crisis is compounded by a worsening human rights crisis, as Taliban resistance has led to summary killings, disappearances, and repression based on gender, religion, and ethnicity.[73] Women's and girls' rights, including many forms of participation in public and private life, have been severely curtailed, and gender-based violence has increased.[74]

Afghanistan is also facing a dire humanitarian crisis, with 15 million people facing acute food insecurity, as well as limited access to clean water and healthcare, destruction of infrastructure, and economic instability.[75]  The United Nations World Food Programme found that Afghanistan is at "the highest risk of famine in a quarter of a century, with half of all families living in crisis-coping mode" and since August 2022, "nine out of 10 Afghan families cannot afford enough food – the highest in the world."[76]  Additionally, Afghanistan faces a struggling health care system, massive internal displacement, and high rates of inflation, much of which is related to the Taliban takeover.

## Cameroon

Cameroon was initially designated for TPS on June 7, 2022, based on ongoing armed conflict and extraordinary and temporary conditions that prevented nationals of Cameroon from returning

---

[70] *Designation of Afghanistan for Temporary Protected Status*, 87 FR 30976 (May 20, 2022).

[71] *Extension and Redesignation of Afghanistan for Temporary Protected Status*, 88 FR 65728 (Sept. 25, 2023).

[72] International Crisis Group, Afghanistan's Security Challenges under the Taliban, Aug. 12, 2022, available at https://www.crisisgroup.org/asia/south-asia/afghanistan/afghanistans-security-challenges-under-taliban (last visited Oct. 27, 2023); Human Rights Watch, World Report 2023—Afghanistan, Jan. 12, 2023, available at https://www.ecoi.net/en/document/2085369.html (last visited Oct. 27, 2023).

[73] Austrian Centre for Country of Origin and Asylum Research and Documentation, Ecoi.net Featured Topic on Afghanistan: Overview of recent developments and key players in Afghanistan, May 17, 2023, available at https://www.ecoi.net/en/document/2092065.html (last visited Oct. 27, 2023).

[74] UNHCR, A/HRC/52/84: Situation of human rights in Afghanistan—Report of the Special Rapporteur on the situation of human rights in Afghanistan, Richard Bennett, Feb. 09, 2023, available at https://www.ohchr.org/en/documents/country-reports/ahrc5284-situation-human-rights-afghanistan-report-special-rapporteur (last visited Oct. 27, 2023).

[75] Human Rights Watch, Afghanistan: Economic Roots of the Humanitarian Crisis, Mar. 1, 2022, available at https://www.hrw.org/news/2022/03/01/afghanistan-economic-roots-humanitarian-crisis (last visited Oct. 27, 2023); World Food Programme, WFP Afghanistan; Situation Report; 31 July, 2023, July 31, 2023, available at https://reliefweb.int/attachments/bb0a5390-5198-4194-b87d-c8a78cd42e22/20230524%20AFG%20External 20Sitrep.pdf% (last visited Oct. 27, 2023).

[76] ReliefWeb, Funding drought forces UN food agency to cut rations in Afghanistan, Mar. 17, 2023, available at https://reliefweb.int/report/afghanistan/funding-drought-forces-un-food-agency-cut-rations-afghanistan (last visited Oct. 27, 2023).

HondurasAR000162

in safety.[77]  On October 10, 2023, DHS extended and redesignated Cameroon for TPS for 18 months from December 8, 2023, through June 7, 2025.[78]

As was noted in the last FRN, Cameroon continues to struggle with ongoing armed conflict between the Government of Cameroon and nonstate armed groups, specifically Boko Haram and the Islamic State West Africa Province (ISWAP).[79]  This has resulted in killings, kidnappings, internal displacement, and destruction of civilian infrastructure.  Large-scale attacks by Boko Haram have resulted in civilian and soldier deaths and the destruction of hundreds of homes while ISWAP attacks have led to reported abductions and theft of military equipment.[80]  In addition to the ongoing armed conflict, Cameroon continues to face a secessionist insurgency in the northwest and southwest Anglophone regions.  There, separatists continue to engage in human rights abuses against both government forces and civilians, including killings, kidnappings, and destruction of civilian infrastructure.[81]  Reports indicate that Cameroonian government security forces have committed human rights violations in areas where they are engaged in separatist clashes.  These reported violations include extrajudicial killings, torture, and sexual and gender-based violence.[82]

The humanitarian crisis in Cameroon is serious, with one out of every six people in Cameroon needing humanitarian assistance and protection, amounting to 4.7 million people.[83]  An estimated three million people in Cameroon are expected to face acute food insecurity in 2023.[84]  Disease is another contributing factor in the humanitarian crisis, with Cameroon recently experiencing an outbreak of cholera and a global cholera vaccine shortage complicating prevention efforts.[85]  The violence, both as a result of the ongoing armed conflict and the

---

[77] *Designation of Cameroon for Temporary Protected Status*, 87 FR 34706 (June 7, 2022).

[78] *Extension and Redesignation of Cameroon for Temporary Protected Status*, 88 FR 69945 (Oct. 10, 2023).

[79] Cameroon says military deployed after new militant attack kills at least a dozen, VOA, Aug. 3, 2023, available at https://www.voanews.com/a/cameroon-says-military-deployed-after-boko-haram-attack/7210055.html (last visited Oct. 27, 2023); Cameroon asks for more border troops after new Boko Haram attacks, VOA, May 31, 2023, available at https://www.voanews.com/a/cameroon-asks-for-more-border-troops-after-new-boko-haram-attacks/ 7116890.html (last visited Oct. 27, 2023); Children and armed conflict; Report of the Secretary-General [A/77/895– S/2023/363], UN General Assembly, UN Security Council, June 5, 2023, available at https://childrenandarmedconflict.un.org/document/secretary-general-annual-report-on-children-and-armed-conflict-2/; Cameroon: Events of 2022, Human Rights Watch, available at https://www.hrw.org/world-report/2023/country-chapters/cameroon (last visited Oct. 27, 2023).

[80] Cameroon's Large-Scale Boko Haram Attacks Leave Thousands Homeless, VOA News, Apr. 19, 2023, available at https://www.voanews.com/a/cameroon-s-large-scale-boko-haram-attacks-leave-thousands-homeless-/ 7057215.html (last visited Oct. 27, 2023); The situation in Central Africa and the activities of the United Nations Regional Office for Central Africa; Report of the Secretary-General [S/2023/389], U.N. Security Council, May 21, 2023, available at https://www.ecoi.net/en/file/local/2093063/N2313778.pdf.

[81] Cameroon, Global Center for the Responsibility to Protect, May 31, 2023, available at https://www.globalr2p.org/ countries/cameroon/ (last visited Oct. 27, 2023).

[82] *Id.*

[83] Cameroon Humanitarian Needs Overview 2023 (March 2023), Reliefweb, May 11, 2023, available at https://reliefweb.int/report/cameroon/cameroon-humanitarian-needs-overview-2023-march-2023#:~:text= In%202023%2C%20one%20out%20of,%2C%20returnees%2C%20or%20refugees. (last visited Oct. 27, 2023).

[84] Cameroon: Situation Report, OCHA, last updated June 7, 2023, available at https://reports.unocha.org/en/country/ cameroon/ (last visited Oct. 27, 2023).

[85] Cameroon: Increase in cholera cases, 1, ACAPS, June 29, 2023, available at https://www.acaps.org/fileadmin/ Data_Product/Main_media/20230629_ACAPS_Briefing_note_Cameroon_increase_in_cholera_cases.pdf.

HondurasAR000163

secessionist insurgency, have contributed to significant displacement, and more than one million people are currently internally displaced in Cameroon.[86]

## Haiti

Haiti was initially designated for TPS on January 21, 2010, based on extraordinary and temporary conditions that prevented nationals of Haiti from returning in safety.[87] Following the initial designation, TPS for Haiti was extended and redesignated from July 23, 2011, through January 22, 2013, based on extraordinary and temporary conditions.[88] Thereafter, TPS for Haiti was extended four times based on extraordinary and temporary conditions:  (1) from January 23, 2013, through July 22, 2014;[89] (2) from July 23, 2014, through January 22, 2016;[90] (3) from January 23, 2016, through July 22, 2017;[91] and (4) from July 23, 2017, through January 22, 2018.[92] Subsequently, DHS announced the termination of the TPS designation of Haiti effective July 22, 2019.[93]

The termination of Haiti's 2011 TPS designation was the subject of litigation and a court order, and as a result, the termination had not taken effect.[94] DHS newly designated Haiti on the basis of extraordinary and temporary conditions effective August 3, 2021, through February 3, 2023.[95] On January 26, 2023, DHS extended and redesignated Haiti for TPS for 18 months from February 4, 2023, through August 3, 2024.[96]

As was noted in the last FRN, Haiti has been experiencing economic, security, political, and health crises simultaneously.  Haitian gangs have been the primary source of violence and instability in Haiti and have posed an increasing threat as they expand their influence and geographic presence over portions of metropolitan Port-au-Prince.[97] Haitian political and business elites have long cultivated relationships with gang leaders to further their agendas and

---

[86] Cameroon Multi-Country Office: Refugees and Internally Displaced Persons, UNHCR, June 8, 2023, available at https://reliefweb.int/map/cameroon/cameroon-multi-country-office-refugees-and-internally-displaced-persons-figures-available-31-may-2023 (last visited Oct. 27, 2023).

[87] *Designation of Haiti for Temporary Protected Status*, 75 FR 3476 (Jan. 21, 2010).

[88] *Extension and Redesignation of Haiti for Temporary Protected Status*, 76 FR 29000 (May 19, 2011).

[89] *Extension of the Designation of Haiti for Temporary Protected Status*, 77 FR 59943 (Oct. 1, 2012).

[90] *Extension of the Designation of Haiti for Temporary Protected Status*, 79 FR 11808 (Mar. 3, 2014).

[91] *Extension of the Designation of Haiti for Temporary Protected Status*, 80 FR 51582 (Aug. 25, 2015).

[92] *Extension of the Designation of Haiti for Temporary Protected Status*, 82 FR 23830 (May 24, 2017).

[93] *Termination of the Designation of Haiti for Temporary Protected Status*, 83 FR 2648 (Jan. 18, 2018).

[94] *Ramos v. Wolf*, 975 F.3d 872 (9th Cir. 2020), *petition for en banc rehearing* filed Nov. 30, 2020 (No. 18-16981)(district court's preliminary injunction against termination of six countries' TPS, including TPS for Haiti, remains in effect pending 9th Circuit consideration of plaintiffs' request for *en banc* rehearing of appellate panel decision to vacate the district court injunction); *Saget v. Trump*, No. 1:18-cv-1599 (E.D.N.Y. 2019) (injunction issued, but dismissed as moot, Oct. 15, 2021) ); *NAACP v. DHS*, No. 18-cv-00239 (D. Md.); and *Centro Presente v. Trump*, No. 18-cv-10340 (D. Mass).

[95] *Designation of Haiti for Temporary Protected Status*, 86 FR 41863 (Aug. 3, 2021).

[96] *Extension and Redesignation of Haiti for Temporary Protected States*, 88 FR 5022 (Jan. 26, 2023).

[97] Diego Da Rin, *New Gang Battle Lines Scar Haiti as Political Deadlock Persists*, International Crisis Group (July 27, 2022), https://www.crisisgroup.org/latin-america-caribbean/haiti/new-gang-battle-lines-scar-haiti-political-deadlock-persists.

HondurasAR000164

destabilize Haiti.[98]  While elites often operationalize gangs, the gangs typically function as mercenaries responsive to the highest bidder.[99]  Moreover, some gangs earn sufficient funds from kidnapping for ransom operations to function as independent criminal organizations.[100]  At the same time, Haiti is confronting a humanitarian crisis, with many citizens having limited access to safety, healthcare, food, water, and economic opportunity.  These circumstances continue to make return to Haiti dangerous for Haitian nationals living in the United States.

## Somalia

Somalia was initially designated for TPS on September 16, 1991, on the basis of extraordinary and temporary conditions that prevented Somali nationals from safely returning.[101] Somalia's TPS designation has been consecutively extended since its initial designation.  Somalia was redesignated for TPS in 2001 based on extraordinary and temporary conditions.[102]  In 2012, Somalia was redesignated for TPS on the basis of extraordinary and temporary conditions and under the additional basis of ongoing armed conflict.[103]  In 2021, DHS again redesignated Somalia on the basis of ongoing armed conflict and extraordinary and temporary conditions.[104] Most recently, the Secretary extended and redesignated Somalia on the basis of ongoing armed conflict and extraordinary and temporary conditions from March 18, 2023, through September 17, 2024.[105]

As was noted in the last FRN, the insurgent Islamist group al-Shabaab continues to conduct an armed insurgency against the Federal Government of Somalia, resulting in death, injury, and displacement of civilians.[106]  Al-Shabaab has used suicide bombers, mortars, and IEDs to attack civilian and military targets throughout Somalia.[107]  Somali women and girls are

---

[98] Diego Da Rin, *New Gang Battle Lines Scar Haiti as Political Deadlock Persists*, International Crisis Group (July 27, 2022), https://www.crisisgroup.org/latin-america-caribbean/haiti/new-gang-battle-lines-scar-haiti-political-deadlock-persists.

[99] D.C. Beer, *Chapter 3 Haiti: The Gangs of Cité Soleil*, PRISM: National Defense University, May 24, 2016, https://cco.ndu.edu/News/Article/780129/chapter-3-haiti-the-gangs-of-cit-soleil/.

[100] Jennifer Jelly and Tatiana Vasquez, *The Rise of Kidnappings for Ransom in Haiti*, The Counterterrorism Group, Dec. 13, 2021, https://www.counterterrorismgroup.com/post/the-rise-of-kidnappings-for-ransom-in-haiti.

[101] *Designation of Nationals of Somalia for Temporary Protected Status*, 56 FR 46804 (Sept. 16, 1991).

[102] *Extension and Redesignation of Somalia under Temporary Protected Status Program*, 66 FR 46288 (Sept. 4, 2001).

[103] *Extension and Redesignation of Somalia for Temporary Protected Status,* 77 FR 25723 (May 1, 2012).

[104] *Extension and Redesignation of Somalia for Temporary Protected Status*, 86 FR 38744 (July 22, 2021).

[105] *Extension and Redesignation of Somalia for Temporary Protected Status,* 88 FR 15434 (Mar. 13, 2023).

[106] UN Security Council, Report of the Secretary-General on children and armed conflict in Somalia [S/2022/397], May 16, 2022, pg. 3-5, available at https://www.ecoi.net/en/file/local/2076558/N2235204.pdf; National Counterterrorism Center, Counter Terrorism Guide, Terrorist Groups, Al-Shabaab, available at https://www.dni.gov/nctc/groups/al_shabaab.html (last visited Feb. 2, 2023); Claire Klobucista, Jonathan Masters, and Mohammed Aly Sergie, Backgrounder Al-Shabaab, Council of Foreign Relations, Dec. 6, 2022, available at https://www.cfr.org/backgrounder/al-shabaab (last visited Feb. 1, 2023).

[107] Chiara Torelli, Hiiran: 30 killed in three Al Shabaab suicide attacks, Action on Armed Violence, 14 Jan, Jan. 17, 2023, available at https://aoav.org.uk/2023/hiiran-30-killed-in-three-al-shabaab-suicide-attacks-14-jan/ (last visited Feb. 2, 2023).

HondurasAR000165

disproportionately exposed to high levels of conflict-related sexual violence.[108]  ISIS-Somalia also remains active, planning and carrying out suicide bombings, armed assaults, assassinations, and small arms attacks in the Federal Member State of Puntland and in the capital, Mogadishu.[109]

Interrelated climate, health, and food security challenges persist.  The UN reports that 7.1 million people, accounting for 45 percent of the country, face at least "crisis" levels of food security, of which 2.1 million are experiencing even more serious "emergency" shortages that signify acute malnutrition and rising levels of death.[110]  Compounding these challenges is the difficulty of providing critical humanitarian aid to affected communities.  Internally displaced persons (IDPs) and other vulnerable populations have been particularly impacted.

**South Sudan**

South Sudan was initially designated for TPS on October 13, 2011, on the dual bases of ongoing armed conflict and extraordinary and temporary conditions that prevented nationals of South Sudan from safely returning.[111]  Following the initial designation, DHS extended and redesignated South Sudan for TPS in 2013, 2014, and 2016.[112]  In 2017, 2019, and 2020, DHS extended TPS for South Sudan based on ongoing armed conflict and extraordinary and temporary conditions.[113]  In March 2022, DHS extended and redesignated South Sudan for TPS for 18 months based on ongoing armed conflict and extraordinary and temporary conditions.[114]  Most recently, the Secretary extended and redesignated South Sudan on the basis of ongoing armed conflict and extraordinary and temporary conditions from November 4, 2023 through May 3, 2025.[115]

As was noted in the last FRN, the armed conflicts in South Sudan consist of fighting among various factions associated with the government, as well as between government forces and militant groups.[116]  South Sudan faces "often violent political contestations," and the lack of stable government has facilitated ongoing violence that is "nearly always characterized by gross

---

[108] UNSOM, Women in Somalia Live Through Pain of Displacement and Trauma of Conflict-Related Sexual Violence, June 19, 2022, available at https://unsom.unmissions.org/women-somalia-live-through-pain-displacement-and-trauma-conflict-related-sexual-violence (last visited Feb. 2, 2023); U.S. Dept. of State, 2021 Country Reports on Human Rights Practices: Somalia, Apr. 12, 2022, available at https://www.state.gov/reports/2021-country-reports-on-human-rights-practices/somalia/ (last visited Feb. 2, 2023).

[109] U.S. Dept. of State, 2021 Country Reports on Human Rights Practices: Somalia, Apr. 12, 2022, available at https://www.state.gov/reports/2021-country-reports-on-human-rights-practices/somalia/ (last visited Feb. 2, 2023).

[110] UN News, Horn of Africa braces for 'explosion of child deaths' as hunger crisis deepens, June 7, 2022, available at https://news.un.org/en/story/2022/06/1119862 (last visited Jan. 19, 2023).

[111] *Designation of Republic of South Sudan for Temporary Protected Status,* 76 FR 63629 (Oct. 13, 2011).

[112] *Extension and Redesignation of South Sudan for Temporary Protected Status,* 78 FR 1866 (Jan. 9, 2013); *Extension and Redesignation of South Sudan for Temporary Protected Status,* 79 FR 52019 (Sept. 2, 2014); and *Extension and Redesignation of South Sudan for Temporary Protected Status,* 81 FR 4051 (Jan. 25, 2016).

[113] *Extension of South Sudan for Temporary Protected Status,* 82 FR 44205 (Sept. 21, 2017); *Extension of the Designation of South Sudan for Temporary Protected Status,* 84 FR 13688 (Apr. 5, 2019); and *Extension of the Designation of South Sudan for Temporary Protected Status,* 85 FR 69344 (Nov. 2, 2020).

[114] *Extension and Redesignation of South Sudan for Temporary Protected Status,* 87 FR 12190 (Mar. 3, 2022).

[115] *Extension and Redesignation of South Sudan for Temporary Protected Status,* 88 FR 60971 (Sept. 6, 2023).

[116] Human Rights Watch, South Sudan: Events of 2022, https://www.hrw.org/world-report/2023/country-chapters/south-sudan (last visited Aug. 22, 2023).

HondurasAR000166

human rights violations that [have] targeted civilians and caused mass displacements" in parts of the country.[117]  Members of government and opposition forces, associated armed militia groups, and ethnic groups are reported to have committed torture and other ill-treatment in conflict zones.[118]  The "simmering ethnic conflict" in parts of South Sudan has resulted in dire humanitarian consequences, including significant displacement and reports of human rights violations and abuses, including those involving the killing of civilians, arbitrary arrests or unjust detentions, looting and destruction of civilian property, physical abuse, forced recruitment, and gender-based violence.[119]

Floods in South Sudan have destroyed crops, homes, schools, health care centers, and boreholes for water access, and efforts to provide relief have been stymied by violence, inaccessibility, and gaps in resources and infrastructure.[120]  As of March 2023, approximately 7.8 million South Sudanese were projected to face "Crisis" levels of acute food insecurity, or worse, between April and July 2023.[121]  An estimated 9.4 million of South Sudan's total population of more than 12 million people was in need of humanitarian assistance,[122] with multiple factors complicating the provision of relief.

## <u>Sudan</u>

Sudan was initially designated for TPS on November 4, 1997, on the dual bases of ongoing armed conflict and extraordinary and temporary conditions that prevented nationals of Sudan from safely returning.[123]  Sudan's designation was extended and/or it was redesignated numerous times from its initial designation in 1997.  Subsequently, DHS announced the termination of Sudan's TPS designation, with an effective date of November 2, 2018.[124]  The termination decision was the subject of litigation and a court order, and as a result, the termination had not taken effect.  DHS newly designated Sudan on the basis of extraordinary and temporary conditions effective April 19, 2022, through October 19, 2023.[125] On August 21, 2023, DHS

---

[117] U.N. Human Rights Council, Report of the Commission on Human Rights in South Sudan, pg. 3, U.N. Doc. A/HRC/52/26, Jan. 31, 2023, https://www.ohchr.org/sites/default/files/documents/hrbodies/hrcouncil/sessions-regular/session52/A-HRC-52-26-AdvanceEditedVersion.pdf.
[118] U.S. Dept. of State, 2022 Country Reports on Human Rights: South Sudan, pg. 5, Mar. 20, 2023, https://www.state.gov/wp-content/uploads/2023/03/415610_SOUTH-SUDAN-2022-HUMAN-RIGHTS-REPORT.pdf.
[119] U.S. Dept. of State, 2022 Country Reports on Human Rights: South Sudan, pg. 27, Mar. 20, 2023, https://www.state.gov/wp-content/uploads/2023/03/415610_SOUTH-SUDAN-2022-HUMAN-RIGHTS-REPORT.pdf.
[120] UNOCHA, South Sudan: Flooding Situation Report No. 1, pg. 1, Oct. 12, 2022, https://reliefweb.int/report/south-sudan/south-sudan-flooding-situation-report-no-1-31-october-2022 (last visited May 19, 2023).
[121] U.S. Agency for International Development (USAID), South Sudan – Complex Emergency Fact Sheet #3, Fiscal Year 2023, pg. 2, Mar. 31, 2023, https://reliefweb.int/report/south-sudan/south-sudan-complex-emergency-fact-sheet-3-fiscal-year-fy-2023 (last visited May 19, 2023).  The "Crisis" level of food security is the third level on the five level Integrated Food Security Phase Classification (IPC) scale, which ranges from "Minimal" (IPC 1) to "Famine" or "Catastrophe" (IPC 5).
[122] U.S. Agency for International Development (USAID), South Sudan – Complex Emergency Fact Sheet #3, Fiscal Year 2023, pg. 1, Mar. 31, 2023, https://reliefweb.int/report/south-sudan/south-sudan-complex-emergency-fact-sheet-3-fiscal-year-fy-2023 (last visited May 19, 2023).
[123] *Designation of Sudan Under Temporary Protected Status*, 62 FR 59737 (Nov. 4, 1997).
[124] *Termination of the Designation of Sudan for Temporary Protected Status*, 82 FR 47228 (Oct. 11, 2017).
[125] *Designation of Sudan for Temporary Protected Status*, 87 FR 23202 (Apr. 19, 2022).

HondurasAR000167

extended and redesignated Sudan for TPS for 18 months from October 20, 2023, through April 19, 2025.

Based on DHS' review of the current country conditions in Sudan, the Secretary determined that an 18-month TPS extension is warranted because conditions supporting Sudan's TPS designation remain due to the ongoing armed conflict and continuing extraordinary and temporary conditions.  As was noted in the last FRN, Sudan is enduring an ongoing armed conflict and a humanitarian crisis in which millions of individuals are exposed to violence, illness, and forced displacement.  On April 15, 2023, violent armed conflict between the Sudanese Armed Forces (SAF) and the Rapid Support Forces (RSF)[126] erupted in Sudan, killing hundreds of people and driving more than 700,000 persons to flee to other countries.[127]

The armed conflict that erupted on April 15, 2023, started in the capital, Khartoum, but has spread across Sudan.[128]  Fighting between the SAF and the RSF has included the use of tanks, artillery, rockets, and, in the case of the SAF, air-delivered munitions, which has resulted in harm to civilians in Khartoum and elsewhere.[129]  The UN Assistant Secretary for Humanitarian Affairs reported that the humanitarian crisis in Sudan was "quickly turning into a catastrophe."[130]

"Even before the current fighting began, humanitarian needs across Sudan had reached record levels, with 15.8 million people – about a third of the total population – requiring humanitarian assistance this year [2023].  The latest violence has led to acute shortages of food, water, medicines and fuel, while the price of essential items, including transport, have skyrocketed."[131]

---

[126] Rapid Support Forces (RSF) is a paramilitary force established in 2013 by former President al-Bashir.  It was "fashioned out of Janjaweed militias and was assembled in response to anti-government rebel movements in Darfur."  It has also been accused of "a myriad of human rights abuses in Darfur and elsewhere."  The Rapid Support Forces and the Escalation of Violence in Sudan, ACLED, July 2, 2019, acleddata.com/2019/07/02/the-rapid-support-forces-and-the-escalation-of-violence-in-sudan/ (last visited May 10, 2023).  "In January 2015, the Rapid Support Forces, which had been operating under the command of the National Intelligence Security Services, became part of the regular government forces through a constitutional amendment.  In April 2015, the RSF were placed under the command of the Presidency.  In January 2017, the Parliament passed the Rapid Support Forces Act, integrating those forces into the Sudan Armed Forces."  Report of the Secretary – General on children and armed conflict in Sudan, UN Security Council, March 6, 2017, pg. 3, https://reliefweb.int/report/sudan/report-secretary-general-children-and-armed-conflict-sudan-s2017191-enar (last visited July 24, 2023).

[127] Aidan Lewis, *What is happening in Sudan? Fighting in Khartoum explained,* updated July 13, 2023, https://www.reuters.com/world/africa/whats-behind-sudans-crisis-2023-04-17/ (last visited July 24, 2023); Dozens of civilians are dead as rival military factions batter for control of Sudan, National Public Radio, April 17, 2023, https://www.npr.org/2023/04/16/1170289462/sudans-army-and-rsf-are-doing-battle-leaving-56-civilians-dead (last visited April 17, 2023).

[128] Human Rights Watch, Sudan: Explosive Weapons Harming Civilians, May 4, 2023, https://www.hrw.org/news/2023/05/04/sudan-explosive-weapons-harming-civilians (last visited May 10, 2023).

[129] Human Rights Watch, Sudan: Explosive Weapons Harming Civilians, May 4, 2023, https://www.hrw.org/news/2023/05/04/sudan-explosive-weapons-harming-civilians (last visited May 10, 2023).

[130] Assistant Secretary-General for Humanitarian Affairs and Deputy Emergency Relief Coordinator Ms. Joyce Msuya: Briefing to the Security Council on the Humanitarian Situation in Sudan, UNOCHA, April 25, 2023, https://reliefweb.int/report/sudan/assistant-secretary-general-humanitarian-affairs-and-deputy-emergency-relief-coordinator-ms-joyce-msuya-briefing-security-council-humanitarian-situation-sudan-new-york-25-april-2023 (last visited April 26, 2023).

[131] UN News, Background to a crisis: In Sudan, the stakes are high for the whole of Africa, April 28, 2023, https://news.un.org/en/story/2023/04/1136187?gclid=CjwKCAjwge2iBhBBEiwAfXDBR2pyoM7HB8ImtmbdANXbBou4gGeMYaruPqrxoL9aal25EC8sI52TpRoCnwwQAvD_BwE (last visited May 10, 2023).

HondurasAR000168

Prior to the recent conflict, there were 3.8 million internally displaced persons (IDPs) in Sudan, and this figure has increased since the conflict began in April 2023.[132]  Living conditions for IDPs remain dire, as "IDPs and [vulnerable] residents were displaced multiple times; they were traumatized, physically abused, injured; or lost family members, personal belongings, shelters, villages and access to land, water points and firewood collection."[133]  UNOCHA reported in November 2022 that the majority of IDPs continue to reside in temporary sites, and are unable to return to their homes or previous displacement sites due to security concerns.[134]

### Ukraine

Ukraine was initially designated for TPS on April 19, 2022, on the basis of an ongoing armed conflict and extraordinary and temporary conditions in Ukraine that prevented nationals of Ukraine from returning in safety.[135]  On August 21, 2023, DHS extended and redesignated Ukraine for TPS for 18 months from October 20, 2023, through April 19, 2025, based on ongoing armed conflict and extraordinary and temporary conditions.[136]

On February 24, 2022, Russia massively expanded its unprovoked military invasion of Ukraine, marking the largest conventional military action in Europe since World War II.[137]  As was noted in the last FRN, there is widespread fear and flight of Ukrainian nationals as Russia's forces have continued to engage in significant, sustained bombardment of major cities across the country, including attacks on Ukraine's capital, Kyiv.[138]  Members of Russia's forces have also committed war crimes and the crimes against humanity of murder, torture, rape, and, alongside other Russian officials, deportation of population.[139]  This ongoing armed conflict poses a serious threat to the safety of nationals returning to Ukraine.  Extraordinary and temporary

---

[132] International Organization for Migration (IOM), DTM Sudan – Situation Report (16), Aug 8, 2023, https://dtm.iom.int/reports/dtm-sudan-situation-report-16 (last visited Aug. 9, 2023).
[133] Humanitarian Needs Overview Sudan 2023, UNOCHA, November 2, 2022, Pg. 31, https://reliefweb.int/report/sudan/sudan-humanitarian-needs-overview-2023-november-2022 (last visited April 7, 2023).
[134] Humanitarian Needs Overview Sudan 2023, UNOCHA, November 2, 2022, Pg. 31, https://reliefweb.int/report/sudan/sudan-humanitarian-needs-overview-2023-november-2022 (last visited April 7, 2023).
[135] *Designation of Ukraine for Temporary Protected Status*, 87 FR 23211 (April 19, 2022).
[136] *Extension and Redesignation of Ukraine for Temporary Protected Status*, 88 FR 56872 (Aug. 21, 2023).
[137] "Russia invades Ukraine on multiple fronts in 'brutal act of war', " *PBS*, Feb. 24, 2022, available at https://www.pbs.org/newshour/world/russia-invades-ukraine-on-multiple-fronts-in-brutal-act-of-war (last visited Mar. 1, 2022); Natalia Zinets and Aleksandar Vasovic, "Missiles rain down around Ukraine," *Reuters*, Feb. 24, 2022, available at https://www.reuters.com/world/europe/putin-orders-military-operations-ukraine-demands-kyiv-forces-surrender-2022-02-24/ (last visited Mar. 1, 2022).
[138] Amnesty Int'l, Amnesty International Report 2022/23: The State of the World's Human Rights, Ukraine, 2022, Mar. 27, 2023, available at https://www.ecoi.net/en/document/2089403.html (last visited May 8, 2023); ACLED – Armed Conflict Location & Event Data Project, War in Ukraine: One Year On, Nowhere Safe, Mar. 1, 2023, available at https://acleddata.com/2023/03/01/war-in-ukraine-one-year-on-nowhere-safe/ (last visited May 8, 2023).
[139] Antony J. Blinken, U.S. Sec'y of State, Virtual Remarks on Russia's Accountability for the Crimes in Ukraine, U.S. Dept. of State (Mar. 31, 2023) available at: https://www.usembassy.gov/secretary-antony-j-blinken-virtual-remarks-on-russias-accountability-for-the-crimes-in-ukraine/ (last visited May 4, 2023); Amnesty Int'l, Amnesty International Report 2022/23: The State of the World's Human Rights, Ukraine, at 377 – 82, available at https://www.ecoi.net/en/document/2089403.html  (last visited May 4, 2023); https://ua.usembassy.gov/crimes-against-humanity-in-ukraine/; https://www.state.gov/war-crimes-by-russias-forces-in-ukraine/.

HondurasAR000169

conditions, including destroyed infrastructure, lack of access to healthcare, and displacement continue to prevent Ukrainian nationals from returning to their homes in safety.

## Venezuela

Venezuela was initially designated for TPS on the basis of extraordinary and temporary conditions that prevented nationals of Venezuela from returning in safety.[140]  The TPS designation was extended for 18 months on September 8, 2022.[141]  On October 3, 2023, DHS extended TPS for Venezuela 18 months, from March 11, 2024, through September 10, 2025, and separately redesignated Venezuela for TPS for 18 months, from October 3, 2023, through April 2, 2025.[142]

As was noted in the last FRN, Venezuela continues to face a severe humanitarian emergency due to a political and economic crisis, as well as human rights violations and abuses and high levels of crime and violence, that impacts access to food, medicine, healthcare, water, electricity, and fuel, and has led to high levels of poverty.  Additionally, Venezuela experienced heavy rainfall in the spring and summer of 2023 which triggered flooding and landslides.  Given the current conditions in Venezuela, these issues contribute to the country's existing challenges.

Venezuela is experiencing "an unprecedented political, economic, and humanitarian crisis."[143] "Venezuela is suffering one of the worst humanitarian crises in the history of the Western Hemisphere," which has been characterized by "[h]igh levels of poverty, food insecurity, malnutrition, and infant mortality, together with frequent electricity outages and the collapse of health infrastructure."[144]  Though there were some positive developments in Venezuela in 2022 "as the economy stabilized and showed signs of economic growth," the effects of these changes were not felt across the Venezuelan population and did not offset the impact of the large-scale economic contraction which resulted in significant humanitarian challenges that continue today and will take time to address.[145]

## Yemen

Yemen was initially designated for TPS on September 3, 2015, based on ongoing armed conflict that prevented nationals of Yemen from returning to Yemen in safety.[146]  In 2017, DHS extended

---

[140] *Designation of Venezuela for Temporary Protected Status and Implementation of Employment Authorization for Venezuelans Covered by Deferred Enforced Departure*, 86 FR 13574 (Mar. 9, 2021).
[141] *Extension of the Designation of Venezuela for Temporary Protected Status*, 87 FR 55024 (Sept. 8, 2022).
[142] *Extension and Redesignation of Venezuela for Temporary Protected Status*, 88 FR 68130 (Oct. 3, 2023).
[143] Clare Ribando Seelke, Rebecca M. Nelson, Rhoda Margesson, & Phillip Brown, Venezuela: Background and U.S. Relations, Congressional Research Service (CRS), p.1, Dec. 6, 2022, available at https://crsreports.congress.gov/product/pdf/R/R44841 (last visited Jul. 7, 2023).
[144] Michael Penfold & Cynthia J. Arnson, Overcoming Barriers to Humanitarian Aid in Venezuela, Wilson Center, p.1, Mar. 2023, available at https://www.wilsoncenter.org/sites/default/files/media/uploads/documents/OVERCOMING%20BARRIERS%20TO%20HUMANITARIAN%20AID%20IN%20VENEZUELA_0.pdf (last visited Aug. 10, 2023).
[145] United Nations Office for the Coordination of Humanitarian Affairs (OCHA), Venezuela Humanitarian Fund Annual Report 2022, p.6, Jun. 14, 2023, available at https://www.unocha.org/publications/report/venezuela-bolivarian-republic/venezuela-humanitarian-fund-annual-report-2022 (last visited Aug. 10, 2023).
[146] *Designation of Republic of Yemen for Temporary Protected Status*, 80 FR 53319 (Sept. 3, 2015).

HondurasAR000170

the TPS designation of Yemen and redesignated Yemen for TPS on the dual bases of ongoing armed conflict and extraordinary and temporary conditions.[147]  DHS extended Yemen's TPS designation in 2018[148] and 2020[149] because the statutory bases of ongoing armed conflict and extraordinary and temporary conditions persisted.  DHS extended and redesignated Yemen for TPS based on ongoing armed conflict and extraordinary and temporary conditions in 2021.[150] On January 3, 2023, DHS extended and redesignated Yemen for TPS for 18 months from March 4, 2023, through September 3, 2024, based on ongoing armed conflict and extraordinary and temporary conditions.[151]

The Secretary extended and redesignated Yemen for TPS because the ongoing armed conflict deepened Yemen's difficult economic and humanitarian situation.  As was noted in the last FRN, the armed conflict directly affects the physical security of the civilian population, including from attacks involving artillery, missiles, mortars, rockets, and landmines.[152]  Over 4 million people have been internally displaced within Yemen, 286,000 of them in 2021 alone;[153] children account for half of the IDP population, approximately 2 million.[154]  Terrorist organizations operating inside of Yemen also pose a danger to civilians.[155]  The Secretary determined that the ongoing armed conflict and stream of challenges that flow from it have not been resolved. Civilians continue to be killed and displacement is substantial and widespread.  Deteriorating humanitarian conditions and protracted internal conflict continue to adversely affect Yemen's civilian population.

## Section 4.5 Designations under INA § 244(b)(1)

The Secretary did not newly designate any countries for TPS in CY 2023.

## Section 4.6 Terminations Under INA § 244(b)(3)(B)

The Secretary did not terminate the TPS designations of any foreign states, or parts thereof, in CY 2023.  See discussion below on DHS's compliance with court orders that relate to certain TPS termination decisions made by a former Secretary or a former Acting Secretary in previous years.

---

[147] *Extension and Redesignation of Republic of Yemen for Temporary Protected Status*, 82 FR 859 (Jan. 4, 2017).

[148] *Extension of the Designation of Yemen for Temporary Protected Status*, 83 FR 40307 (Aug. 14, 2018).

[149] *Extension of the Designation of Yemen for Temporary Protected Status*, 85 FR 12313 (Mar. 2, 2020).

[150] *Extension and Redesignation of Yemen for Temporary Protected Status*, 86 FR 36295 (July 9, 2021).

[151] *Extension and Redesignation of Yemen for Temporary Protected Status*, 88 FR 94 (Jan. 3, 2023).

[152] World Report 2022 – Yemen Events of 2021, Human Rights Watch World Report, available at: https://www.hrw.org/world-report/2022/country-chapters/yemen?gclid=EAIaIQobChMIo86n6cvx-QIVL3FvBB3bpQduEAAYASAAEgI9C_D_BwE (last visited Oct. 21, 2022).

[153] Yemen Fact Sheet, United Nations High Commissioner for Refugees (UNHCR), June 2022, available at: https://reporting.unhcr.org/document/3030 (last visited Oct. 21, 2022).

[154] UNICEF Yemen Humanitarian Situation Report: January - December 2021, Reliefweb, Mar. 16, 2022, available at: https://reliefweb.int/report/yemen/unicef-yemen-humanitarian-situation-report-january-december-2021-enar (last visited Oct. 21, 2022).

[155] Yemen's Tragedy: War, Stalemate, and Suffering, Council on Foreign Relations, Oct. 21, 2022, available at: https://www.cfr.org/backgrounder/yemen-crisis (last visited Dec. 6, 2022).

HondurasAR000171

**Section 4.7 Preliminary Injunction Orders and Order to Stay Proceedings**

This section provides details about TPS actions announced by DHS in CY 2023, to ensure continued compliance with the preliminary injunction orders of the U.S. District Court for the Northern District of California in *Ramos, et al. v. Nielsen, et al.*, 336 F. Supp. 3d 1075 (N.D. Cal. 2018) and with the order of the U.S. District Court for the Northern District of California to stay proceedings in *Bhattarai v. Nielsen*, No. 19-cv-00731 (N.D. Cal. Mar. 12, 2019).

<u>**Preliminary injunction order in *Ramos v. Nielsen***</u>

In its October 3, 2018, order, the U.S. District Court for the Northern District of California enjoined DHS from implementing or enforcing the determinations to terminate TPS for El Salvador, Haiti, Nicaragua, and Sudan pending resolution of the case on the merits.[156] As a result, DHS could not effectuate the termination of TPS for these countries while the order was in effect. The order also required DHS to continue the validity of documentation showing lawful status and work authorization for affected, eligible TPS beneficiaries from those countries. DHS published seven FRNs, on October 31, 2018,[157] March 1, 2019,[158] November 4, 2019,[159] December 9, 2020,[160] September 10, 2021,[161] November 16, 2022,[162] and December 14, 2023,[163] to comply with the court's order. On September 16, 2021, a panel of the U.S. Court of Appeals for the 9th Circuit vacated the *Ramos* preliminary injunction. *Ramos, et al. v. Nielsen, et al.*, No. 18-16981 (9th Cir., Sept. 14, 2020). The plaintiffs filed a request seeking *en banc* review of the panel's decision, and on February 16, 2021, the 9th Circuit stayed plaintiffs' request for rehearing *en banc* for a 60-day period. The stay was extended while the case was placed in mediation. The parties were unable to reach a settlement through mediation and on October 26, 2022, the case was returned to the 9th Circuit Court of Appeals, effectively lifting the stay on Plaintiff's request for a rehearing *en banc*. On February 10, 2023, the petition for rehearing *en banc* was granted. On June 29, 2023, the Ninth Circuit granted the Secretary's motion for voluntary dismissal of the appeal of the injunction. *Ramos v. Wolf*, No. 18–16981 (9th Cir., June 29, 2023). The *Ramos* case was then remanded back to district court, where the parties agreed to consolidate the case with *Bhattarai*. Per that stipulation, Plaintiffs filed an amended class action complaint on August 24, 2023. On December 28, 2023, the district court granted the Secretary's motion to dismiss *Ramos*.[164]

---

[156] *Ramos v. Nielsen*, No. 18-cv-01554 (N.D. Cal. Oct. 3, 2018).

[157] *See* 83 FR 54764 (October 31, 2018) (compliance with the preliminary injunction order of the U.S. District Court for the Northern District of California in *Ramos v. Nielsen*, No. 18-cv-01554 (N.D. Cal. Oct. 3, 2018)).

[158] *See* 84 FR 7103 (Mar. 1, 2019) (compliance with the preliminary injunction order of the U.S. District Court for the Northern District of California in *Ramos v. Nielsen*, No. 18-cv-01554 (N.D. Cal. Oct. 3, 2018)).

[159] *See* 84 FR 59403 (Nov. 4, 2019) (compliance with the preliminary injunction order of the U.S. District Court for the Northern District of California in *Ramos v. Nielsen*, No. 18-cv-01554 (N.D. Cal. Oct. 3, 2018)).

[160] 86 FR 50725 (Sept. 10, 2021).

[161] *See* 86 FR 50725 (Sept. 10, 2021) (compliance with the preliminary injunction order of the U.S. District Court for the Northern District of California in *Ramos v. Nielsen*, No. 18-cv-01554 (N.D. Cal. Oct. 3, 2018)).

[162] *See* 87 FR 68717 (Nov. 16, 2022) (compliance with the preliminary injunction order of the U.S. District Court for the Northern District of California in *Ramos v. Nielsen*, No. 18-cv-01554 (N.D. Cal. Oct. 3, 2018)).

[163] *See* 88 FR 86665 (Dec. 14, 2023) (compliance with the preliminary injunction order of the U.S. District Court for the Northern District of California in *Ramos v. Nielsen*, No. 18-cv-01554 (N.D. Cal. Oct. 3, 2018)).

[164] *Ramos v. Nielsen*, 18-cv-01554 (N.D. Cal. Dec. 28, 2023).

HondurasAR000172

## The court order in *Bhattarai v. Nielsen*

On May 1, 2019, DHS announced actions to ensure compliance with the order of the U.S. District Court for the Northern District of California to stay proceedings in *Bhattarai*.[165]  The claims raised in *Bhattarai* were similar to, and could be impacted by, the resolution of the claims being litigated in *Ramos v. Nielsen, et al.*, 336 F. Supp. 3d 1075 (N.D. Cal. 2018).  For that reason, DHS stipulated that it would not implement or enforce the decision to terminate TPS for Honduras or Nepal[166] pending the resolution of the *Ramos* appeal, or by other order of the court. Beneficiaries under the TPS designations for Honduras and Nepal would retain their TPS, provided that a noncitizen's TPS is not withdrawn because of ineligibility.  On August 2, 2023, *Bhattarai* was consolidated with *Ramos*.

## Continued compliance with the court orders

DHS complied with the various court orders described above by publishing appropriate FRNs that continued TPS for eligible beneficiaries and continued their TPS-related employment authorization and status documentation while the litigation proceeded.  In 2023, a combined FRN continued DHS compliance with all the relevant court orders in *Ramos* and *Bhattarai*:

- 87 FR 68717 (November 16, 2022)

This FRN explained that beneficiaries under the TPS designations for El Salvador, Haiti, Honduras, Nepal, Nicaragua, and Sudan would retain their TPS while the various court orders that covered each country remained in effect, provided that a noncitizen's TPS was not withdrawn because of individual ineligibility.  The FRN automatically extended TPS and TPS-related documentation, such as Employment Authorization Documents, through June 30, 2024, for affected beneficiaries who maintain their individual TPS eligibility.

---

[165] *See* 84 FR 20647 (May 10, 2019) (compliance with the order of the U.S. District Court for the Northern District of California to stay proceedings in *Bhattarai v. Nielsen*, No. 19-cv-00731 (N.D. Cal. Mar. 12, 2019)).  The *Federal Register* notices published on November 4, 2019, December 9, 2020, and September 10, 2021, also addressed the continuation of TPS and TPS-related documentation for eligible beneficiaries of TPS for Nepal.  *See* 84 FR 59403 (November 4, 2019); 85 FR 79208 (December 9, 2020).

[166] *See* Termination of the Designation of Nepal for Temporary Protected Status, 83 FR 23705 (May 22, 2018); Termination of the Designation of Honduras for Temporary Protected Status, 83 FR 26074 (June 5, 2018).

HondurasAR000173

**Appendix A: TPS Beneficiaries' Immigration Status at Initial Filing by Country**

Table No. 1:  Afghanistan, Burma, Cameroon, El Salvador, Ethiopia, Haiti, Honduras, Nepal

| Immigration Status at Filing | Afghanistan | Burma | Cameroon | El Salvador | Ethiopia | Haiti | Honduras | Nepal |
|---|---|---|---|---|---|---|---|---|
| A1 | 0 | 0 | 0 | 7 | 4 | 50 | 2 | 3 |
| A12 | 0 | 2 | 2 | 260 | 0 | 138 | 22 | 1 |
| A17 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 |
| A2 | 0 | 0 | 10 | 8 | 2 | 38 | 3 | 6 |
| A3 | 0 | 0 | 0 | 1 | 0 | 2 | 3 | 1 |
| A32 | 0 | 0 | 0 | 0 | 0 | 7 | 0 | 0 |
| A33 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 0 |
| AA2 | 0 | 0 | 1 | 0 | 0 | 3 | 0 | 0 |
| AA3 | 0 | 0 | 0 | 0 | 0 | 3 | 0 | 0 |
| AA6 | 0 | 0 | 0 | 0 | 0 | 4 | 0 | 0 |
| AA8 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 0 |
| ABD | 0 | 0 | 1 | 0 | 0 | 6 | 0 | 0 |
| ABS | 0 | 1 | 38 | 7 | 9 | 2,517 | 2 | 1 |
| AO | 8 | 8 | 26 | 0 | 81 | 2,491 | 0 | 0 |
| AS | 177 | 190 | 478 | 104 | 300 | 25,849 | 19 | 1,176 |
| AS1 | 2 | 0 | 0 | 0 | 1 | 11 | 0 | 0 |
| AS2 | 0 | 0 | 0 | 0 | 0 | 5 | 0 | 0 |
| AS3 | 0 | 0 | 0 | 0 | 0 | 9 | 0 | 0 |
| AS6 | 0 | 0 | 1 | 0 | 1 | 140 | 0 | 1 |
| AS7 | 0 | 0 | 0 | 0 | 0 | 12 | 0 | 1 |
| AS8 | 0 | 0 | 0 | 0 | 0 | 32 | 0 | 0 |
| ASR | 0 | 0 | 1 | 0 | 0 | 7 | 0 | 0 |
| ASY | 3 | 1 | 12 | 44 | 10 | 1,365 | 0 | 2 |
| AY | 0 | 0 | 3 | 0 | 1 | 172 | 0 | 0 |
| B1 | 0 | 17 | 15 | 13 | 22 | 600 | 29 | 13 |
| B11 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 |
| B12 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 |
| B16 | 0 | 0 | 0 | 0 | 0 | 3 | 0 | 0 |
| B1B | 0 | 1 | 0 | 0 | 0 | 1 | 0 | 0 |
| B2 | 3 | 101 | 62 | 133 | 189 | 9,522 | 211 | 79 |
| B21 | 0 | 0 | 0 | 0 | 0 | 3 | 0 | 0 |
| B22 | 0 | 0 | 0 | 0 | 0 | 3 | 0 | 0 |
| B23 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 |
| B24 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 |
| B25 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 |
| B26 | 0 | 0 | 0 | 0 | 1 | 4 | 0 | 0 |
| B27 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 0 |
| B31 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 |
| B32 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 |
| B36 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 0 |

31

| Immigration Status at Filing | Afghanistan | Burma | Cameroon | El Salvador | Ethiopia | Haiti | Honduras | Nepal |
|---|---|---|---|---|---|---|---|---|
| BC1 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 |
| BCC | 0 | 0 | 0 | 0 | 0 | 41 | 0 | 0 |
| BCD | 0 | 0 | 0 | 0 | 0 | 5 | 0 | 0 |
| BX2 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 |
| C1 | 0 | 1 | 0 | 0 | 0 | 36 | 11 | 2 |
| C2 | 0 | 0 | 0 | 0 | 0 | 3 | 0 | 0 |
| C21 | 0 | 0 | 0 | 0 | 0 | 4 | 0 | 0 |
| C22 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 0 |
| C24 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 |
| C26 | 0 | 0 | 0 | 0 | 0 | 3 | 0 | 0 |
| C27 | 0 | 0 | 0 | 0 | 0 | 3 | 0 | 0 |
| C29 | 0 | 0 | 1 | 0 | 0 | 1 | 0 | 0 |
| C3 | 0 | 0 | 0 | 0 | 0 | 9 | 0 | 0 |
| C31 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 |
| C32 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 |
| C33 | 0 | 0 | 1 | 0 | 0 | 1 | 0 | 1 |
| C4 | 0 | 0 | 0 | 2 | 0 | 58 | 0 | 0 |
| CB1 | 0 | 0 | 0 | 1 | 0 | 1 | 0 | 0 |
| CB2 | 0 | 0 | 0 | 0 | 0 | 5 | 0 | 0 |
| CB7 | 0 | 0 | 0 | 0 | 0 | 4 | 0 | 0 |
| CF1 | 0 | 1 | 0 | 0 | 0 | 2 | 0 | 0 |
| CF2 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 1 |
| CH6 | 0 | 0 | 0 | 0 | 0 | 179 | 0 | 0 |
| CP | 1 | 0 | 0 | 1 | 0 | 96 | 2 | 1 |
| CR1 | 0 | 1 | 2 | 0 | 1 | 48 | 0 | 0 |
| CR2 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 0 |
| CR6 | 0 | 0 | 0 | 0 | 0 | 17 | 0 | 0 |
| CR7 | 0 | 0 | 0 | 0 | 0 | 6 | 0 | 0 |
| CS2 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 0 |
| CW1 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 6 |
| CW2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 4 |
| CX1 | 0 | 0 | 0 | 1 | 0 | 1 | 0 | 0 |
| CX6 | 0 | 0 | 0 | 0 | 0 | 4 | 0 | 0 |
| D | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 |
| D1 | 0 | 0 | 0 | 1 | 0 | 6 | 1 | 0 |
| DA | 0 | 0 | 1 | 137 | 2 | 215 | 51 | 6 |
| DAS | 0 | 0 | 1 | 0 | 0 | 1 | 0 | 0 |
| DE | 0 | 0 | 0 | 1 | 0 | 5 | 0 | 0 |
| DED | 0 | 0 | 0 | 0 | 0 | 11 | 0 | 0 |
| DHR | 0 | 0 | 0 | 0 | 0 | 71 | 0 | 0 |

HondurasAR000175

| Immigration Status at Filing | Afghanistan | Burma | Cameroon | El Salvador | Ethiopia | Haiti | Honduras | Nepal |
|---|---|---|---|---|---|---|---|---|
| DT | 13 | 0 | 8 | 1 | 0 | 8,168 | 0 | 0 |
| DT1 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 0 |
| DT2 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 |
| DT3 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 |
| DV1 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 |
| E1 | 0 | 0 | 0 | 6 | 0 | 1 | 2 | 0 |
| E11 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 |
| E2 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 1 |
| E31 | 0 | 0 | 0 | 0 | 0 | 6 | 0 | 0 |
| E36 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 |
| E37 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 |
| E56 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 |
| EB1 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 0 |
| EB2 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 |
| EB3 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 |
| EF | 0 | 0 | 0 | 0 | 0 | 3 | 0 | 0 |
| EP | 0 | 0 | 0 | 0 | 0 | 16 | 0 | 0 |
| ERF | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 0 |
| ERP | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 0 |
| EW8 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 |
| EWI | 1 | 0 | 16 | 3,971 | 2 | 3,023 | 3,622 | 126 |
| F1 | 49 | 860 | 234 | 5 | 850 | 812 | 21 | 1,970 |
| F11 | 0 | 0 | 1 | 0 | 0 | 9 | 0 | 0 |
| F16 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 |
| F2 | 3 | 45 | 9 | 1 | 28 | 50 | 3 | 399 |
| F21 | 0 | 0 | 0 | 0 | 0 | 7 | 0 | 0 |
| F22 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 |
| F24 | 0 | 0 | 0 | 0 | 0 | 4 | 0 | 0 |
| F25 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 |
| F26 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 |
| F27 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 |
| F29 | 0 | 1 | 0 | 0 | 0 | 1 | 0 | 0 |
| F31 | 0 | 0 | 0 | 0 | 0 | 8 | 0 | 0 |
| F33 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 |
| F36 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 0 |
| F41 | 0 | 1 | 1 | 0 | 0 | 14 | 0 | 0 |
| F46 | 0 | 0 | 0 | 0 | 0 | 3 | 0 | 0 |
| F48 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 |
| FX1 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 0 |
| FX3 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 |

33

| Immigration Status at Filing | Afghanistan | Burma | Cameroon | El Salvador | Ethiopia | Haiti | Honduras | Nepal |
|---|---|---|---|---|---|---|---|---|
| G1 | 0 | 2 | 0 | 1 | 2 | 6 | 1 | 4 |
| G2 | 0 | 0 | 1 | 0 | 0 | 1 | 0 | 0 |
| G4 | 1 | 0 | 5 | 0 | 6 | 6 | 0 | 5 |
| G5 | 0 | 0 | 0 | 0 | 0 | 4 | 0 | 2 |
| GB | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 |
| GT | 0 | 0 | 0 | 0 | 0 | 2 | 1 | 0 |
| H1B | 0 | 39 | 5 | 10 | 32 | 176 | 6 | 555 |
| H2 | 0 | 0 | 0 | 15 | 0 | 5 | 7 | 0 |
| H2A | 0 | 0 | 0 | 10 | 0 | 13 | 2 | 2 |
| H2B | 0 | 0 | 0 | 23 | 0 | 26 | 15 | 5 |
| H3 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 0 |
| H4 | 1 | 5 | 5 | 2 | 10 | 6 | 4 | 218 |
| HA6 | 0 | 0 | 0 | 0 | 0 | 16 | 0 | 0 |
| HA8 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 0 |
| HA9 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 0 |
| HB6 | 1 | 0 | 0 | 0 | 0 | 87 | 0 | 0 |
| HB8 | 0 | 0 | 0 | 0 | 0 | 6 | 0 | 0 |
| HC6 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 |
| HD6 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 |
| HH6 | 0 | 0 | 0 | 0 | 0 | 50 | 0 | 0 |
| I1 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 |
| IB0 | 0 | 0 | 1 | 0 | 0 | 3 | 0 | 0 |
| IB1 | 0 | 0 | 0 | 0 | 0 | 12 | 1 | 0 |
| IB2 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 |
| IB5 | 0 | 0 | 1 | 0 | 1 | 1 | 0 | 0 |
| IB6 | 0 | 0 | 1 | 0 | 0 | 1 | 0 | 0 |
| IJ | 0 | 2 | 10 | 0 | 7 | 93 | 0 | 1 |
| IR0 | 0 | 0 | 2 | 1 | 0 | 14 | 0 | 0 |
| IR1 | 0 | 0 | 6 | 3 | 0 | 103 | 0 | 1 |
| IR2 | 0 | 0 | 0 | 0 | 0 | 10 | 0 | 0 |
| IR5 | 0 | 0 | 0 | 1 | 1 | 5 | 0 | 0 |
| IR6 | 0 | 0 | 1 | 0 | 1 | 36 | 0 | 0 |
| IR7 | 0 | 0 | 1 | 0 | 0 | 2 | 0 | 0 |
| IW1 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 0 |
| J1 | 38 | 92 | 14 | 3 | 27 | 69 | 4 | 24 |
| J2 | 12 | 8 | 5 | 0 | 17 | 26 | 1 | 22 |
| J2S | 0 | 0 | 0 | 0 | 2 | 8 | 0 | 0 |
| K1 | 0 | 1 | 0 | 0 | 3 | 87 | 0 | 0 |
| K2 | 0 | 0 | 0 | 0 | 0 | 33 | 1 | 0 |
| K3 | 0 | 0 | 2 | 3 | 0 | 47 | 2 | 1 |

HondurasAR000177

| Immigration Status at Filing | Afghanistan | Burma | Cameroon | El Salvador | Ethiopia | Haiti | Honduras | Nepal |
|---|---|---|---|---|---|---|---|---|
| K4 | 0 | 0 | 0 | 0 | 0 | 11 | 0 | 0 |
| L1 | 0 | 0 | 0 | 1 | 1 | 1 | 0 | 0 |
| L1A | 0 | 1 | 0 | 2 | 0 | 1 | 0 | 2 |
| L1B | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| L2 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 1 |
| L2S | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 |
| LB2 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 |
| M1 | 0 | 1 | 0 | 0 | 1 | 2 | 1 | 0 |
| M83 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 |
| N1 | 0 | 0 | 0 | 20 | 0 | 9 | 8 | 2 |
| N57 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 |
| N8 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 |
| O1 | 0 | 0 | 0 | 1 | 1 | 4 | 0 | 1 |
| O2 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 |
| O3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| OAR | 3,488 | 0 | 0 | 0 | 0 | 1 | 0 | 0 |
| OP | 0 | 0 | 0 | 1 | 0 | 3 | 2 | 0 |
| OTHER | 64 | 391 | 130 | 9,344 | 26 | 13,090 | 1,314 | 188 |
| P1 | 0 | 0 | 0 | 1 | 10 | 2 | 0 | 0 |
| P1A | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 |
| P2 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 |
| P3 | 0 | 0 | 1 | 0 | 0 | 17 | 0 | 0 |
| P4 | 0 | 0 | 0 | 0 | 6 | 0 | 0 | 0 |
| PAR | 1,441 | 6 | 47 | 336 | 5 | 16,299 | 165 | 43 |
| PEN | 0 | 0 | 0 | 1 | 0 | 31 | 0 | 2 |
| PH6 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 |
| Q1 | 0 | 0 | 0 | 5 | 0 | 1 | 0 | 0 |
| R1 | 0 | 12 | 3 | 1 | 4 | 27 | 0 | 4 |
| R2 | 0 | 7 | 5 | 0 | 0 | 11 | 0 | 1 |
| R86 | 0 | 0 | 0 | 0 | 0 | 5 | 0 | 0 |
| RAD | 0 | 0 | 0 | 0 | 0 | 5 | 0 | 0 |
| RE | 3 | 0 | 7 | 20 | 0 | 1,596 | 16 | 0 |
| RE1 | 0 | 0 | 0 | 0 | 0 | 41 | 0 | 0 |
| RE5 | 0 | 0 | 0 | 0 | 0 | 618 | 0 | 0 |
| RE6 | 0 | 0 | 0 | 0 | 0 | 27 | 0 | 0 |
| RE7 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 |
| REF | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 |
| REP | 0 | 0 | 0 | 0 | 0 | 13 | 0 | 0 |
| RHT | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 0 |
| S1 | 0 | 0 | 0 | 2 | 0 | 9 | 2 | 0 |

HondurasAR000178

| Immigration Status at Filing | Afghanistan | Burma | Cameroon | El Salvador | Ethiopia | Haiti | Honduras | Nepal |
|---|---|---|---|---|---|---|---|---|
| SL6 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 |
| SQ1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| SR1 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 |
| ST | 0 | 0 | 0 | 1 | 0 | 18 | 3 | 0 |
| SU6 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| T1 | 0 | 0 | 0 | 5 | 0 | 2 | 1 | 0 |
| T2 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 |
| T3 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 |
| T4 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| T5 | 0 | 0 | 0 | 1 | 0 | 0 | 1 | 0 |
| TC1 | 0 | 0 | 1 | 0 | 0 | 5 | 0 | 0 |
| TD | 0 | 0 | 0 | 1 | 0 | 5 | 0 | 0 |
| TRM | 0 | 0 | 0 | 0 | 0 | 5 | 0 | 0 |
| U1 | 0 | 0 | 1 | 10 | 0 | 3 | 3 | 1 |
| U2 | 0 | 0 | 0 | 1 | 0 | 2 | 0 | 0 |
| U4 | 0 | 0 | 0 | 3 | 0 | 0 | 3 | 0 |
| UN | 439 | 414 | 1,093 | 221,709 | 329 | 110,645 | 68,995 | 8,994 |
| V1 | 0 | 0 | 0 | 1 | 0 | 7 | 0 | 0 |
| V2 | 0 | 0 | 0 | 0 | 0 | 6 | 0 | 0 |
| W16 | 0 | 0 | 0 | 0 | 0 | 6 | 0 | 0 |
| W26 | 0 | 0 | 0 | 0 | 0 | 3 | 0 | 0 |
| WB | 0 | 0 | 0 | 1 | 0 | 7 | 1 | 1 |
| WT | 0 | 0 | 0 | 20 | 0 | 51 | 6 | 2 |
| XB3 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 |
| Z11 | 0 | 0 | 1 | 0 | 0 | 2 | 0 | 0 |
| Z66 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 |
| Z83 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 |
| 999 | 9 | 11 | 121 | 0 | 84 | 5,109 | 0 | 7 |

Data Source: Computer Linked Application Information Management System (CLAIMS) and USCIS Electronic Immigration System (USCIS ELIS).  Prior immigration status is self-reported by TPS beneficiaries on Form I-821, Application for Temporary Protected Status.

Notes: Class of Admission Code is based upon self-reported information appeared on TPS application form.  At the time of filing for TPS, many applicants report that they cannot recall their immigration status.  Immigration status, or lack of status, does not impact eligibility for TPS.  See INA § 244(a)(5).

HondurasAR000179

Table No. 2: Nicaragua, Somalia, South Sudan, Sudan, Ukraine, Venezuela, Yemen

| Immigration Status at Filing | Nicaragua | Somalia | South Sudan | Sudan | Syria | Ukraine | Venezuela | Yemen |
|---|---|---|---|---|---|---|---|---|
| A1 | 0 | 0 | 10 | 8 | 2 | 13 | 34 | 6 |
| A12 | 0 | 0 | 0 | 0 | 0 | 5 | 89 | 1 |
| A2 | 0 | 1 | 2 | 3 | 0 | 20 | 4 | 7 |
| A3 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 |
| A32 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 |
| A38 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 |
| AA8 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 0 |
| ABS | 0 | 0 | 0 | 3 | 2 | 54 | 333 | 5 |
| AO | 0 | 2 | 0 | 6 | 11 | 72 | 21,898 | 10 |
| AS | 3 | 63 | 12 | 171 | 937 | 1,901 | 106,200 | 241 |
| AS1 | 0 | 0 | 0 | 1 | 1 | 1 | 183 | 0 |
| AS2 | 0 | 0 | 0 | 0 | 2 | 8 | 82 | 0 |
| AS3 | 0 | 0 | 0 | 0 | 2 | 2 | 103 | 0 |
| AS6 | 0 | 1 | 0 | 0 | 1 | 6 | 177 | 1 |
| AS7 | 0 | 0 | 0 | 0 | 0 | 5 | 118 | 0 |
| AS8 | 0 | 0 | 0 | 1 | 1 | 4 | 156 | 0 |
| ASR | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 |
| ASY | 0 | 4 | 1 | 9 | 1 | 28 | 326 | 2 |
| AY | 0 | 0 | 0 | 1 | 3 | 12 | 77 | 0 |
| B1 | 24 | 0 | 1 | 12 | 30 | 183 | 298 | 8 |
| B11 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 |
| B12 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 |
| B2 | 93 | 4 | 4 | 59 | 397 | 4,678 | 10,491 | 91 |
| B21 | 0 | 0 | 0 | 0 | 0 | 4 | 1 | 0 |
| B22 | 0 | 0 | 0 | 0 | 0 | 0 | 6 | 0 |
| B24 | 0 | 0 | 0 | 0 | 0 | 1 | 3 | 0 |
| B26 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 |
| B27 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 |
| B29 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 |
| B31 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 |
| C1 | 2 | 0 | 0 | 0 | 0 | 6 | 2 | 0 |
| C2 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 0 |
| C21 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 0 |
| C24 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 |
| C26 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 0 |
| C33 | 0 | 0 | 0 | 0 | 0 | 0 | 37 | 0 |
| C4 | 1 | 0 | 0 | 0 | 0 | 0 | 1 | 0 |
| C57 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 |
| CF1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 |
| CF2 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 |

37

| Immigration Status at Filing | Nicaragua | Somalia | South Sudan | Sudan | Syria | Ukraine | Venezuela | Yemen |
|---|---|---|---|---|---|---|---|---|
| CP | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 0 |
| CR1 | 0 | 0 | 0 | 0 | 0 | 5 | 4 | 0 |
| CR6 | 0 | 0 | 0 | 0 | 0 | 2 | 110 | 2 |
| CR7 | 0 | 0 | 0 | 0 | 0 | 0 | 21 | 0 |
| CU6 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 |
| CU7 | 0 | 0 | 0 | 0 | 0 | 0 | 18 | 0 |
| CX2 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 |
| CX6 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 |
| CX8 | 0 | 0 | 0 | 0 | 0 | 0 | 9 | 0 |
| D1 | 0 | 0 | 0 | 0 | 0 | 2 | 1 | 0 |
| DA | 4 | 0 | 0 | 2 | 2 | 21 | 22 | 0 |
| DAS | 0 | 0 | 0 | 0 | 0 | 1 | 10 | 0 |
| DE | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 |
| DED | 0 | 0 | 0 | 0 | 0 | 0 | 63 | 0 |
| DT | 1 | 0 | 0 | 0 | 0 | 2,352 | 61 | 1 |
| DT2 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 |
| DV1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 |
| DV6 | 0 | 0 | 0 | 0 | 0 | 0 | 12 | 0 |
| DV7 | 0 | 0 | 0 | 0 | 0 | 0 | 7 | 0 |
| DV8 | 0 | 0 | 0 | 0 | 0 | 0 | 5 | 0 |
| E1 | 0 | 0 | 0 | 0 | 0 | 1 | 3 | 0 |
| E10 | 0 | 0 | 0 | 0 | 0 | 0 | 8 | 0 |
| E11 | 0 | 0 | 0 | 0 | 0 | 0 | 5 | 0 |
| E14 | 0 | 0 | 0 | 0 | 0 | 0 | 4 | 0 |
| E15 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 |
| E16 | 0 | 0 | 0 | 0 | 0 | 0 | 5 | 0 |
| E18 | 0 | 0 | 0 | 0 | 0 | 0 | 5 | 0 |
| E19 | 0 | 0 | 0 | 0 | 0 | 0 | 5 | 0 |
| E2 | 0 | 0 | 0 | 0 | 1 | 35 | 1,000 | 0 |
| E21 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 0 |
| E22 | 0 | 0 | 0 | 0 | 0 | 1 | 4 | 0 |
| E23 | 0 | 0 | 0 | 0 | 0 | 0 | 8 | 0 |
| E26 | 0 | 0 | 0 | 0 | 0 | 2 | 21 | 0 |
| E27 | 0 | 0 | 0 | 0 | 0 | 1 | 20 | 0 |
| E28 | 0 | 0 | 0 | 0 | 0 | 0 | 14 | 0 |
| E3 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 |
| E30 | 0 | 0 | 0 | 0 | 0 | 0 | 19 | 0 |
| E31 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 |
| E32 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 |
| E34 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 |
| E36 | 0 | 0 | 0 | 0 | 0 | 0 | 9 | 0 |
| E37 | 0 | 0 | 0 | 0 | 0 | 0 | 14 | 0 |

HondurasAR000181

| Immigration Status at Filing | Nicaragua | Somalia | South Sudan | Sudan | Syria | Ukraine | Venezuela | Yemen |
|---|---|---|---|---|---|---|---|---|
| E39 | 0 | 0 | 0 | 0 | 0 | 0 | 17 | 0 |
| E3D | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 |
| EB1 | 0 | 0 | 0 | 0 | 0 | 2 | 12 | 0 |
| EB2 | 0 | 0 | 0 | 0 | 0 | 10 | 70 | 0 |
| EB3 | 0 | 0 | 0 | 0 | 0 | 0 | 6 | 0 |
| EB5 | 0 | 0 | 0 | 0 | 0 | 0 | 4 | 0 |
| EF | 0 | 0 | 0 | 0 | 0 | 0 | 5 | 0 |
| EP | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 |
| ERF | 0 | 0 | 0 | 0 | 0 | 1 | 4 | 0 |
| ERP | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 |
| EW0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 0 |
| EW8 | 0 | 0 | 0 | 0 | 0 | 0 | 5 | 0 |
| EW9 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 |
| EWI | 170 | 9 | 0 | 3 | 21 | 78 | 466 | 4 |
| F1 | 3 | 9 | 19 | 130 | 138 | 837 | 2,931 | 245 |
| F11 | 0 | 0 | 0 | 0 | 0 | 1 | 2 | 0 |
| F16 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 |
| F2 | 1 | 0 | 0 | 13 | 23 | 98 | 513 | 41 |
| F21 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 |
| F24 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 0 |
| F26 | 0 | 0 | 0 | 0 | 0 | 0 | 5 | 0 |
| F27 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 0 |
| F29 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 |
| F37 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 |
| F41 | 0 | 0 | 0 | 0 | 0 | 1 | 2 | 0 |
| F46 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 0 |
| FX2 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 |
| FX6 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 0 |
| FX7 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 |
| G1 | 0 | 0 | 0 | 7 | 4 | 0 | 4 | 6 |
| G2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 11 |
| G4 | 0 | 0 | 0 | 1 | 1 | 6 | 45 | 3 |
| G5 | 1 | 0 | 0 | 0 | 0 | 0 | 3 | 0 |
| GB | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 0 |
| GMT | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 |
| H1B | 0 | 0 | 0 | 37 | 141 | 88 | 333 | 6 |
| H2 | 2 | 0 | 0 | 0 | 0 | 1 | 3 | 0 |
| H2A | 0 | 0 | 0 | 0 | 0 | 51 | 0 | 0 |
| H2B | 1 | 0 | 0 | 0 | 0 | 268 | 1 | 0 |
| H4 | 0 | 0 | 0 | 14 | 49 | 67 | 178 | 7 |

HondurasAR000182

| Immigration Status at Filing | Nicaragua | Somalia | South Sudan | Sudan | Syria | Ukraine | Venezuela | Yemen |
|---|---|---|---|---|---|---|---|---|
| HC9 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 |
| I1 | 0 | 0 | 0 | 0 | 0 | 2 | 1 | 0 |
| I53 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 |
| I58 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 |
| IB0 | 0 | 0 | 0 | 0 | 0 | 2 | 1 | 0 |
| IB1 | 0 | 0 | 0 | 0 | 0 | 1 | 4 | 0 |
| IB5 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 |
| IB6 | 0 | 0 | 0 | 0 | 0 | 0 | 6 | 0 |
| IB7 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 |
| IH9 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 |
| IJ | 0 | 0 | 0 | 2 | 9 | 50 | 3,231 | 1 |
| IR0 | 0 | 0 | 0 | 0 | 0 | 1 | 39 | 0 |
| IR1 | 0 | 1 | 0 | 0 | 0 | 8 | 28 | 0 |
| IR5 | 0 | 0 | 0 | 0 | 0 | 0 | 8 | 0 |
| IR6 | 0 | 0 | 0 | 0 | 1 | 1 | 54 | 0 |
| IR7 | 0 | 0 | 0 | 0 | 0 | 0 | 8 | 0 |
| IW1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 |
| IW6 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 |
| J1 | 4 | 0 | 2 | 33 | 60 | 312 | 184 | 21 |
| J2 | 0 | 0 | 0 | 11 | 22 | 32 | 89 | 11 |
| J2S | 0 | 0 | 0 | 0 | 0 | 1 | 3 | 0 |
| K1 | 0 | 0 | 0 | 1 | 9 | 17 | 4 | 0 |
| K2 | 0 | 0 | 0 | 0 | 4 | 6 | 2 | 0 |
| K3 | 0 | 0 | 0 | 0 | 1 | 6 | 16 | 0 |
| K4 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 1 |
| L1 | 0 | 0 | 0 | 0 | 0 | 6 | 40 | 1 |
| L1A | 0 | 0 | 0 | 0 | 1 | 8 | 53 | 1 |
| L1B | 0 | 0 | 0 | 1 | 1 | 33 | 26 | 0 |
| L2 | 0 | 0 | 0 | 0 | 2 | 36 | 188 | 1 |
| L2S | 0 | 0 | 0 | 0 | 2 | 15 | 10 | 1 |
| LB2 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 |
| M1 | 0 | 0 | 0 | 5 | 2 | 4 | 7 | 4 |
| M83 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 |
| N53 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 |
| O1 | 0 | 0 | 0 | 0 | 1 | 30 | 177 | 0 |
| O2 | 0 | 0 | 0 | 0 | 0 | 8 | 45 | 0 |
| O3 | 0 | 0 | 0 | 0 | 1 | 14 | 180 | 0 |
| OP | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 |
| OTHER | 102 | 30 | 33 | 106 | 727 | 4,982 | 52,128 | 318 |
| P1 | 0 | 0 | 0 | 1 | 0 | 11 | 97 | 0 |

HondurasAR000183

| Immigration Status at Filing | Nicaragua | Somalia | South Sudan | Sudan | Syria | Ukraine | Venezuela | Yemen |
|---|---|---|---|---|---|---|---|---|
| P1A | 0 | 0 | 1 | 0 | 0 | 0 | 7 | 0 |
| P3 | 0 | 0 | 0 | 0 | 1 | 3 | 2 | 0 |
| P4 | 0 | 0 | 0 | 0 | 0 | 4 | 55 | 0 |
| PAR | 5 | 11 | 0 | 10 | 71 | 4,131 | 641 | 8 |
| PEN | 0 | 2 | 0 | 0 | 0 | 14 | 1,537 | 0 |
| R1 | 1 | 0 | 0 | 0 | 0 | 17 | 64 | 0 |
| R2 | 2 | 0 | 0 | 0 | 2 | 19 | 54 | 1 |
| RE | 4 | 0 | 0 | 0 | 3 | 7 | 31 | 1 |
| RE1 | 0 | 0 | 0 | 0 | 0 | 5 | 0 | 0 |
| RE5 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 |
| RE6 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 0 |
| REF | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| REP | 0 | 0 | 0 | 0 | 0 | 0 | 5 | 0 |
| SD6 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 |
| SD7 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 |
| SD8 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 0 |
| SL6 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 |
| SR1 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 0 |
| SR2 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 |
| SR6 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 0 |
| SU6 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 |
| T2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| T3 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 |
| T51 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 0 |
| T52 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 |
| T53 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 |
| TD | 0 | 0 | 0 | 1 | 0 | 2 | 8 | 0 |
| TN | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 |
| TR6 | 0 | 0 | 0 | 0 | 0 | 1 | 4 | 0 |
| TRM | 0 | 0 | 0 | 0 | 0 | 1 | 2 | 0 |
| U1 | 0 | 0 | 1 | 0 | 0 | 1 | 5 | 0 |
| U2 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 |
| UHP | 0 | 0 | 0 | 0 | 0 | 1,078 | 0 | 0 |
| UN | 3,616 | 414 | 59 | 589 | 3,384 | 7,478 | 68,066 | 1,164 |
| V1 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 |
| V2 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 0 |
| W26 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 |
| WB | 0 | 0 | 0 | 0 | 2 | 0 | 21 | 0 |
| WT | 0 | 0 | 0 | 0 | 4 | 20 | 447 | 2 |
| XB3 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 |

HondurasAR000184

| Immigration Status at Filing | Nicaragua | Somalia | South Sudan | Sudan | Syria | Ukraine | Venezuela | Yemen |
|---|---|---|---|---|---|---|---|---|
| Z15 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 |
| Z57 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 |
| 999 | 0 | 11 | 2 | 18 | 62 | 412 | 9,728 | 34 |

Data Source: Computer Linked Application Information Management System (CLAIMS) and USCIS Electronic Immigration System (USCIS ELIS). Prior immigration status is self-reported by TPS beneficiaries on Form I-821, Application for Temporary Protected Status.

Notes: Class of Admission Code is based upon self-reported information appeared on TPS application form. At the time of filing for TPS, many applicants report that they cannot recall their immigration status. Immigration status, or lack of status, does not impact eligibility for TPS. See INA § 244(a)(5).

42

## Appendix B: Immigration Status Codes[167]

| Code | Description |
|------|-------------|
| A1 | AMBASSADORS, PUBLIC MINISTERS, CAREER DIPLOMATIC OR CONSULAR OFFICERS AND THEIR FAMILIES |
| A12 | CHILDREN OF A11 OR A16, NEW ARRIVALS |
| A17 | CHILDREN OF A11 OR A16, ADJUSTMENTS |
| A2 | OTHER FOREIGN GOVERNMENT OFFICIALS OR EMPLOYEES AND THEIR FAMILIES |
| A3 | ATTENDANTS, SERVANTS, OR PERSONAL EMPLOYEES OF A1 AND A2 AND THEIR FAMILIES |
| A32 | SPOUSES OF A31 OR A36, NEW ARRIVALS |
| A33 | CHILDREN OF A31 OR A36, SUBJECT TO COUNTRY LIMITS, NEW ARRIVALS |
| AA2 | SPOUSES OF AA1 OR AA6, NEW ARRIVALS |
| AA3 | CHILDREN OF AA1 OR AA6, NEW ARRIVALS |
| AA6 | NATIVES OF CERTAIN ADVERSELY AFFECTED FOREIGN STATES, ADJUSTMENTS |
| AA8 | CHILDREN OF AA1 OR AA6, ADJUSTMENTS |
| ABD | ABANDONMENT OF RESIDENCY |
| ABS | ABANDONMENT OF STATUS |
| AO | ASYLUM APPLICANT W/O WORK AUTHORIZATION |
| AS | ASYLUM APPLICANT W/ WORK AUTHORIZATION |
| AS1 | APPROVED PRIMARY ASYLEE |
| AS2 | APPROVED SPOUSE ASYLEE |
| AS3 | APPROVED CHILD ASYLEE |
| AS6 | ASYLEES |
| AS7 | SPOUSES OF AS6 |
| AS8 | CHILDREN OF AS6 |
| ASR | ASYLUM STATUS REVOKED |
| ASY | ASYLEES |
| AY | ASYLEES |
| B1 | TEMPORARY VISITORS FOR BUSINESS |
| B11 | UNMARRIED SONS/DAUGHTERS OF U.S. CITIZENS, NEW ARRIVALS, SELF PETITIONING |
| B12 | CHILDREN OF B11 OR B16, NEW ARRIVALS |
| B16 | UNMARRIED SONS/DAUGHTERS OF U.S. CITIZENS, ADJUSTMENTS, SELF PETITIONING |
| B1B | PERSONAL/DOMESTIC SERVANT OF U.S. CITIZENS |
| B2 | TEMPORARY VISITORS FOR PLEASURE |
| B21 | SPOUSES OF ALIEN RESIDENTS, SUBJECT TO COUNTRY LIMITS, NEW ARRIVALS, SELF PETITIONING |
| B22 | CHILDREN OF ALIEN RESIDENTS, SUBJECT TO COUNTRY LIMITS, NEW ARRIVALS, SELF PETITIONING |
| B23 | CHILDREN OF B21, B22, B26, OR B27, SUBJECT TO COUNTRY LIMITS, NEW ARRIVALS |
| B24 | UNMARRIED SONS/DAUGHTERS OF ALIEN RESIDENTS, SUBJECT TO COUNTRY LIMITS, NEW ARRIVALS, SELF PETITIONING |
| B25 | CHILDREN OF B24 OR B29, SUBJECT TO COUNTRY LIMITS, NEW ARRIVALS |

---

[167] This reference table of Immigration Status Codes includes both current codes and previously used historical codes, which are reflected in this document, Section 3.2: Number and Prior Immigration Status of TPS Beneficiaries During CY 2023. CLAIMS data, which USCIS reviewed to compile this TPS CY 2023 Congressional Report, contains references to both current and historical data codes.

HondurasAR000186

| Code | Description |
|------|-------------|
| B26 | SPOUSES OF ALIEN RESIDENTS, SUBJECT TO COUNTRY LIMITS, ADJUSTMENTS, SELF PETITIONING |
| B27 | CHILDREN OF ALIEN RESIDENTS, SUBJECT TO COUNTRY LIMITS, ADJUSTMENTS, SELF PETITIONING |
| B29 | UNMARRIED SONS/DAUGHTERS OF ALIEN RESIDENTS, SUBJECT TO COUNTRY LIMITS, ADJUSTMENTS, SELF PETITIONING |
| B31 | MARRIED SONS/DAUGHTERS OF U.S. CITIZENS, NEW ARRIVALS, SELF PETITIONING |
| B32 | SPOUSES OF B31 OR B36, NEW ARRIVALS |
| B33 | CHILDREN OF B31 OR B36, SUBJECT TO COUNTRY LIMITS, NEW ARRIVALS |
| B36 | MARRIED SONS/DAUGHTERS OF U.S. CITIZENS, ADJUSTMENTS, SELF PETITIONING |
| BC1 | BROADCAST (IBCB OF BBG) EMPLOYEES, NEW ARRIVALS |
| BCC | BORDER CROSSER CARD(I-586) APPROVED |
| BCD | BORDER CROSSING CARD DENIED |
| BX2 | CHILDREN OF ALIEN RESIDENTS, EXEMPT FROM COUNTRY LIMITS, NEW ARRIVALS, SELF PETITIONING |
| C1 | ALIENS IN CONTINUOUS AND IMMEDIATE TRANSIT THROUGH THE U.S. |
| C2 | ALIENS IN TRANSIT TO THE UNITED NATIONS |
| C21 | SPOUSES OF ALIEN RESIDENTS, SUBJECT TO COUNTRY LIMITS, NEW ARRIVALS, CONDITIONAL |
| C22 | CHILDREN OF ALIEN RESIDENTS, SUBJECT TO COUNTRY LIMITS, NEW ARRIVALS, CONDITIONAL |
| C24 | UNMARRIED CHILDREN OF ALIEN RESIDENTS, SUBJECT TO COUNTRY LIMITS, NEW ARRIVALS, CONDITIONAL |
| C26 | SPOUSES OF ALIEN RESIDENTS, SUBJECT TO COUNTRY LIMITS, ADJUSTMENTS, CONDITIONAL |
| C27 | CHILDREN OF ALIEN RESIDENTS, SUBJECT TO COUNTRY LIMITS, ADJUSTMENTS, CONDITIONAL |
| C29 | UNMARRIED CHILDREN OF ALIEN RESIDENTS, SUBJECT TO COUNTRY LIMITS, ADJUSTMENTS, CONDITIONAL |
| C3 | FOREIGN GOVERNMENT OFFICIALS, THEIR SPOUSES, CHILDREN, AND ATTENDANTS IN TRANSIT |
| C31 | MARRIED SONS/DAUGHTERS OF U.S. CITIZENS, NEW ARRIVALS, CONDITIONAL |
| C32 | SPOUSES OF C31 OR C36, NEW ARRIVALS, CONDITIONAL |
| C33 | CHILDREN OF C31 OR C36, SUBJECT TO COUNTRY LIMITS, NEW ARRIVALS, CONDITIONAL |
| C4 | TRANSIT WITHOUT A VISA |
| C57 | SPOUSES OF C51 OR C56, ADJUSTMENTS, CONDITIONAL |
| CB1 | SPOUSES OF LEGALIZED ALIENS, NEW ARRIVALS, CONDITIONAL |
| CB2 | CHILDREN OF CB1 OR CB6, NEW ARRIVALS, CONDITIONAL |
| CB7 | CHILDREN OF CB1 OR CB6, ADJUSTMENTS, CONDITIONAL |
| CF1 | SPOUSES, ENTERED AS FIANCE(E), ADJUSTMENTS, CONDITIONAL |
| CF2 | CHILDREN OF CF1, ADJUSTMENTS, CONDITIONAL |
| CH6 | CUBAN HAITIAN ENTRANTS, ADJUSTMENTS (P.L. 99-603) |
| CP | PAROLEE (PUBLIC INTEREST-HEADQUARTERS) |
| CR1 | SPOUSES, NEW ARRIVALS, CONDITIONAL |
| CR2 | CHILDREN, NEW ARRIVALS, CONDITIONAL |
| CR6 | SPOUSES, ADJUSTMENTS, CONDITIONAL |
| CR7 | CHILDREN, ADJUSTMENTS, CONDITIONAL |
| CS2 | CATHOLIC SOCIAL SERVS-NO EMP/AUTH |
| CU6 | CUBAN REFUGEES (P.L. 89-732 OF 1966) |

HondurasAR000187

| Code | Description |
|------|-------------|
| CU7 | NON-CUBAN SPOUSES OR CHILDREN OF CUBAN REFUGEES |
| CW1 | CNMI-ONLY TRANSITIONAL WORKERS |
| CW2 | SPOUSES AND CHILDREN OF CW1 |
| CX1 | SPOUSES OF ALIEN RESIDENTS, EXEMPT FROM COUNTRY LIMITS, NEW ARRIVALS, CONDITIONAL |
| CX2 | CHILDREN OF ALIEN RESIDENTS, EXEMPT FROM COUNTRY LIMITS, NEW ARRIVALS, CONDITIONAL |
| CX6 | SPOUSES OF ALIEN RESIDENTS, EXEMPT FROM COUNTRY LIMITS, ADJUSTMENTS, CONDITIONAL |
| CX8 | CHILDREN OF CX2 OR CX7, EXEMPT FROM COUNTRY LIMITS, ADJUSTMENTS, CONDITIONAL |
| D | CREWMEMBER (SEA OR AIR) |
| D1 | 29 DAYS OR LESS ON VES OR |
| DA | ADVANCE PAROLE-DISTRICT AUTHORIZED |
| DAS | DEFERRED ACTION STATUS |
| DE | DEFERRED INSPECTION |
| DED | DEFERED ENFORCED DEPARTURE |
| DHR | DENIAL HAITIAN REFUGEE APPLICATION |
| DT | PAROLEE (DISTRICT/POE AUTHORIZED) |
| DT1 | NATIVES OF TIBET WHO CONTINUOUSLY RESIDED IN NEPAL OR INDIA (DISPLACED TIBETAN), NEW ARRIVALS |
| DT2 | SPOUSES OF DT1 OR DT6, NEW ARRIVALS |
| DT3 | CHILDREN OF DT1 OR DT6, NEW ARRIVALS |
| DV1 | PRINCIPALS, NEW ARRIVALS |
| DV2 | SPOUSES OF DV1 OR DV6, NEW ARRIVALS |
| DV6 | PRINCIPALS, ADJUSTMENTS |
| DV7 | SPOUSES OF DV1 OR DV6, ADJUSTMENTS |
| DV8 | CHILDREN OF DV1 OR DV6, ADJUSTMENTS |
| E1 | TREATY TRADERS AND THEIR SPOUSES AND CHILDREN |
| E10 | CHILDREN OF E11, E12, E13, E16, E17, OR E18, ADJUSTMENTS |
| E11 | ALIENS WITH EXTRAORDINARY ABILITY, NEW ARRIVALS |
| E14 | SPOUSES OF E11, E12, E13, E16, E17, OR E18, NEW ARRIVALS |
| E15 | CHILDREN OF E11, E12, E13, E16, E17, OR E18, NEW ARRIVALS |
| E16 | ALIENS WITH EXTRAORDINARY ABILITY, ADJUSTMENTS |
| E18 | MULTINATIONAL EXECUTIVES OR MANAGERS, ADJUSTMENTS |
| E19 | SPOUSES OF E11, E12, E13, E16, E17, OR E18, ADJUSTMENTS |
| E2 | TREATY INVESTORS AND THEIR SPOUSES AND CHILDREN |
| E21 | PROFESSIONALS HOLDING ADVANCED DEGREES, NEW ARRIVALS |
| E22 | SPOUSES OF E21 OR E26, NEW ARRIVALS |
| E23 | CHILDREN OF E21 OR E26, NEW ARRIVALS |
| E26 | PROFESSIONALS HOLDING ADVANCED DEGREES, ADJUSTMENTS |
| E27 | SPOUSES OF E21 OR E26, ADJUSTMENTS |
| E28 | CHILDREN OF E21 OR E26, ADJUSTMENTS |
| E3 | AUSTRALIAN FREE TRADE AGREEMENT PRINCIPALS, SPOUSES AND CHILDREN |
| E30 | CHILDREN OF E31, E32, E36, OR E37, ADJUSTMENTS |
| E31 | SKILLED WORKERS, NEW ARRIVALS |

HondurasAR000188

| Code | Description |
|------|-------------|
| E32 | PROFESSIONALS WITH BACCALAUREATE DEGREES, NEW ARRIVALS |
| E34 | SPOUSES OF E31, E32, E36, OR E37, NEW ARRIVALS |
| E36 | SKILLED WORKERS, ADJUSTMENTS |
| E37 | PROFESSIONALS WITH BACCALAUREATE DEGREES, ADJUSTMENTS |
| E39 | SPOUSES OF E31, E32, E36, OR E37, ADJUSTMENTS |
| E3D | SPOUSE OR CHILD OF E3 |
| E56 | EMPLOYMENT CREATION, ADJUSTMENTS |
| EB1 | EXTRAORD ABILITY, RESEARCHERS |
| EB2 | PROF ADV DEGREES, EXCEPTIONAL |
| EB3 | PROF, SKILLED, OTHER WORKERS |
| EB5 | REG CTR APPLICANTS, IMMIG INV |
| EF | EXPEDITED REM. PEND. CREDIBLE FEAR |
| EP | EXPEDITED REMOVAL PENDING OTHER |
| ERF | EXPEDITED REM. PEND. CREDIBLE FEAR |
| ERP | EXPEDITED REMOVAL PENDING OTHER |
| EW0 | CHILDREN OF EW3 OR EW8, ADJUSTMENTS |
| EW8 | NEEDED UNSKILLED WORKERS, ADJUSTMENTS |
| EW9 | SPOUSES OF EW3 OR EW8, ADJUSTMENTS |
| EWI | ENTRY WITHOUT INSPECTION |
| F1 | ACADEMIC STUDENTS |
| F11 | UNMARRIED SONS/DAUGHTERS OF U.S. CITIZENS, NEW ARRIVALS |
| F16 | UNMARRIED SONS/DAUGHTERS OF U.S. CITIZENS, ADJUSTMENTS |
| F2 | SPOUSES AND CHILDREN OF F1 |
| F21 | SPOUSES OF ALIEN RESIDENTS, SUBJECT TO COUNTRY LIMITS, NEW ARRIVALS |
| F22 | CHILDREN OF ALIEN RESIDENTS, SUBJECT TO COUNTRY LIMITS, NEW ARRIVALS |
| F24 | UNMARRIED SONS/DAUGHTERS OF ALIEN RESIDENTS, SUBJECT TO COUNTRY LIMITS, NEW ARRIVALS |
| F25 | CHILDREN OF F24 OR F29, SUBJECT TO COUNTRY LIMITS, NEW ARRIVALS |
| F26 | SPOUSES OF ALIEN RESIDENTS, SUBJECT TO COUNTRY LIMITS, ADJUSTMENTS |
| F27 | CHILDREN OF ALIEN RESIDENTS, SUBJECT TO COUNTRY LIMITS, ADJUSTMENTS |
| F29 | UNMARRIED SONS/DAUGHTERS OF ALIEN RESIDENTS, SUBJECT TO COUNTRY LIMITS, ADJUSTMENTS |
| F31 | MARRIED SONS/DAUGHTERS OF U.S. CITIZENS, NEW ARRIVALS |
| F33 | CHILDREN OF MARRIED SONS/DAUGHTERS OF U.S. CITIZENS, NEW ARRIVALS |
| F36 | MARRIED SONS/DAUGHTERS OF U.S. CITIZENS, ADJUSTMENTS |
| F37 | SPOUSES OF MARRIED SONS/DAUGHTERS OF U.S. CITIZENS, ADJUSTMENTS |
| F41 | BROTHERS/SISTERS OF U.S. CITIZENS, NEW ARRIVALS |
| F46 | BROTHERS/SISTERS OF U.S. CITIZENS, ADJUSTMENTS |
| F48 | CHILDREN OF BROTHERS/SISTERS OF U.S. CITIZENS, ADJUSTMENTS |
| FX1 | SPOUSES OF ALIEN RESIDENTS, EXEMPT FROM COUNTRY LIMITS, NEW ARRIVALS |
| FX2 | CHILDREN OF ALIEN RESIDENTS, EXEMPT FROM COUNTRY LIMITS, NEW ARRIVALS |
| FX3 | CHILDREN OF FX1, FX2, FX7, OR FX8, EXEMPT FROM COUNTRY LIMITS, NEW ARRIVALS |
| FX6 | SPOUSES OF ALIEN RESIDENTS, EXEMPT FROM COUNTRY LIMITS, ADJUSTMENTS |
| FX7 | CHILDREN OF ALIEN RESIDENTS, EXEMPT FROM COUNTRY LIMITS, ADJUSTMENTS |

HondurasAR000189

| Code | Description |
|------|-------------|
| G1 | PRINCIPALS OF RECOGNIZED FOREIGN GOVERNMENTS |
| G2 | OTHER REPRESENTATIVES OF RECOGNIZED FOREIGN GOVERNMENTS |
| G4 | INTERNATIONAL ORGANIZATION OFFICERS OR EMPLOYEES |
| G5 | ATTENDANTS, SERVANTS, OR PERSONAL EMPLOYEES OF REPRESENTATIVES |
| GB | GUAM VISA WAIVER PROGRAM – TEMPORARY VISITORS FOR BUSINESS TO GUAM |
| GMT | GUAM - COMMONWEALTH OF NORTHERN MARIANA ISLANDS (CNMI) VISA WAIVER PROGRAM - TEMPORARY VISITORS FOR PLEASURE TO GUAM OR NORTHERN MARIANA ISLANDS |
| GT | GUAM VISA WAIVER PROGRAM – TEMPORARY VISITORS FOR PLEASURE TO GUAM |
| H1B | TEMPORARY WORKERS IN SPECIALTY OCCUPATIONS |
| H2 | NONIMMIGRANT WORKER |
| H2A | AGRICULTURAL WORKERS |
| H2B | NONAGRICULTURAL WORKERS |
| H3 | TRAINEES |
| H4 | SPOUSES AND CHILDREN OF H1, H2, OR H3 |
| HA6 | HAITIAN ASYLUM APPLICANTS |
| HA8 | CHILDREN OF HA6 |
| HA9 | UNMARRIED SONS/DAUGHTERS OF HA6 |
| HB6 | HAITIAN PAROLEES |
| HB8 | CHILDREN OF HB6 |
| HC6 | HAITIAN CHILDREN WITHOUT PARENTS |
| HC9 | UNMARRIED SONS/DAUGHTERS OF HC6 |
| HD6 | HAITIAN CHILDREN ORPHANED IN THE UNITED STATES |
| HH6 | PAROLEES ADJUSTING UNDER THE HELP HAITI ACT OF 2010, ADJUSTMENTS |
| I1 | REPRESENTATIVES OF FOREIGN INFORMATION MEDIA AND SPOUSES AND CHILDREN |
| I53 | CHILDREN OF I51 OR I56, NEW ARRIVALS, CONDITIONAL |
| I58 | CHILDREN OF I51 OR I56, ADJUSTMENTS, CONDITIONAL |
| IB0 | PARENTS BATTERED OR ABUSED, OF U.S. CITIZENS, ADJUSTMENTS, SELF PETITIONING |
| IB1 | SPOUSES, NEW ARRIVALS, SELF PETITIONING |
| IB2 | CHILDREN, NEW ARRIVALS, SELF PETITIONING |
| IB5 | PARENTS BATTERED OR ABUSED, OF U.S. CITIZENS, NEW ARRIVALS, SELF PETITIONING |
| IB6 | SPOUSES, ADJUSTMENTS, SELF PETITIONING |
| IB7 | CHILDREN, ADJUSTMENTS, SELF PETITIONING |
| IH9 | CHILDREN TO BE ADOPTED UNDER THE HAGUE CONVENTION, ADJUSTMENTS |
| IJ | REFERRED TO IMMIGRATION JUDGE |
| IR0 | PARENTS OF ADULT U.S. CITIZENS, ADJUSTMENTS |
| IR1 | SPOUSES, NEW ARRIVALS |
| IR2 | CHILDREN, NEW ARRIVALS |
| IR5 | PARENTS OF ADULT U.S. CITIZENS, NEW ARRIVALS |
| IR6 | SPOUSES, ADJUSTMENTS |
| IR7 | CHILDREN, ADJUSTMENTS |
| IW1 | SPOUSES, WIDOWS OR WIDOWERS, NEW ARRIVALS |
| IW6 | SPOUSES, WIDOWS OR WIDOWERS, ADJUSTMENTS |
| J1 | EXCHANGE VISITORS |
| J2 | SPOUSES AND CHILDREN OF J1 |

HondurasAR000190

| Code | Description |
|------|-------------|
| K1 | FIANCÉ(E)S OF U.S. CITIZENS |
| K2 | CHILDREN OF K1 |
| K3 | SPOUSES OF U.S. CITIZENS, VISA PENDING |
| K4 | CHILDREN OF U.S. CITIZENS, VISA PENDING |
| L1 | INTRACOMPANY TRANSFEREES |
| L2 | SPOUSES AND CHILDREN OF L1 |
| L2S | SPOUSE OF L-1 |
| LB2 | CHILDREN OF LB1 OR LB6, NEW ARRIVALS |
| M1 | VOCATIONAL STUDENTS |
| M2 | SPOUSES AND CHILDREN OF M1 |
| M83 | REFUGEE ESCAPEES PREVIOUSLY ADMITTED FOR LAWFUL PERMANENT RESIDENT STATUS, ADJUSTMENTS |
| N1 | NATO ADMISSION |
| O1 | WORKERS WITH EXTRAORDINARY ABILITY OR ACHIEVEMENT |
| O2 | WORKERS ACCOMPANYING AND ASSISTING IN PERFORMANCE OF O1 WORKERS |
| O3 | SPOUSES AND CHILDREN OF O1 AND O2 |
| OAR | OPERATION ALLIED REFUGEE - PAROLE |
| OP | PAROLEE-OVERSEAS OR SUBOFFICE AUTH |
| OTHER | OTHER |
| P1 | INTERNATIONALLY RECOGNIZED ATHLETES OR ENTERTAINERS |
| P1A | ATHLETE AT SPECIFIC COMPETITION |
| P2 | ARTISTS OR ENTERTAINERS IN RECIPROCAL EXCHANGE PROGRAMS |
| P3 | ARTISTS OR ENTERTAINERS IN CULTURALLY UNIQUE PROGRAMS |
| P4 | SPOUSES AND CHILDREN OF P1, P2, OR P3 |
| PAR | PAROLEE |
| PEN | PENDING LPR |
| PH6 | PAROLEES, POLISH/HUNGARIAN |
| Q1 | WORKERS IN INTERNATIONAL CULTURAL EXCHANGE PROGRAMS |
| R1 | WORKERS IN RELIGIOUS OCCUPATIONS |
| R2 | SPOUSES AND CHILDREN OF R1 |
| R86 | REFUGEE PAROLEES (P.L. 95-412 OF 1978) |
| RAD | REFUGEE APPLICANT DENIED |
| RE | REFUGEE |
| RE1 | REFUGEE |
| RE5 | HAITIAN WITH REFUGEE STATUS IN U.S. |
| RE6 | OTHER REFUGEES (P.L. 96-212 REFUGEE ACT OF 1980) |
| REF | REFUGEE |
| REP | REFUGEES PENDING |
| S1 | TEMP SAW 3 YEARS PRIOR MAY 1, 1986 |
| SD6 | MINISTERS, ADJUSTMENTS |
| SL6 | JUVENILE COURT DEPENDENTS, ADJUSTMENTS |
| SQ1 | CERTAIN IRAQIS AND AFGHANS EMPLOYED BY U.S. GOVERNMENT, NEW ARRIVALS |
| SR1 | RELIGIOUS WORKERS, NEW ARRIVALS |
| SR2 | SPOUSES OF SR1 OR SR6, NEW ARRIVALS |

HondurasAR000191

| Code | Description |
|------|-------------|
| SR6 | RELIGIOUS WORKERS, ADJUSTMENTS |
| ST | STOWAWAY |
| SU2 | SPOUSES OF SU6, NEW ARRIVALS |
| SU6 | ADJUSTMENT OF U1 NONIMMIGRANT |
| T1 | VICTIM OF A SEVERE FORM OF TRAFFICKING IN PERSONS |
| T2 | SPOUSE OF T1 |
| T3 | CHILD OF T1 |
| T5 | UNMARRIED SIBLING UNDER AGE 18 OF T1 |
| T51 | EMPLOYMENT CREATION, TARGETED AREA, NEW ARRIVALS, CONDITIONAL |
| T52 | SPOUSES OF T51 OR T56, NEW ARRIVALS, CONDITIONAL |
| T53 | CHILDREN OF T51 OR T56, NEW ARRIVALS, CONDITIONAL |
| TC1 | COND. SPOUSE OF USC-DENIED |
| TD | SPOUSES AND CHILDREN OF TN |
| TN | NORTH AMERICAN FREE TRADE AGREEMENT (NAFTA) PROFESSIONAL WORKERS |
| TR6 | CONDITIONALSPOUSE OF USC-DENIED |
| TRM | CONDITIONAL RESIDENT STATUS TERMINATED |
| U1 | VICTIM OF CRIMINAL ACTIVITY |
| U2 | SPOUSE OR U1 |
| U4 | PARENT OF U1 UNDER 21 YEARS OF AGE |
| UHP | UKRAINIAN HUMANITARIAN PAROLE |
| UN | UNKNOWN OR NOT REPORTED |
| V1 | SPOUSES OF PERMANENT RESIDENTS, VISA PENDING |
| V2 | CHILDREN OF PERMANENT RESIDENTS, VISA PENDING |
| W16 | ENTERED WITHOUT INSPECTION BEFORE 1/1/82 |
| W26 | ENTERED AS NONIMMIGRANT AND OVERSTAYED VISA BEFORE 1/1/82 |
| WB | VISA WAIVER PROGRAM – TEMPORARY VISITORS FOR BUSINESS |
| WT | VISA WAIVER PROGRAM – TEMPORARY VISITORS FOR PLEASURE |
| XB3 | PRESUMED LAWFULLY ADMITTED FOR PERMANENT RESIDENCE |
| Z11 | PREFERENCE OR NON-PREFERENCE IMMIGRANTS (OTHER THAN CREWMEN) |
| Z15 | SALVADORAN, GUATEMALAN AND FORMER SOVIET BLOC COUNTRY NATIONALS (NACARA SECTION 203, P.L. 105-100 OF 1997) |
| Z57 | CREWMEN WHO ENTERED ON OR BEFORE JUNE 30, 1964, AND ARE PREFERENCE OR NON-PREFERENCE IMMIGRANTS |
| Z66 | ENTERED 6/29/40 - 1/1/72, SECTION 249, P.L. 89-236, ADJUSTMENTS |
| Z83 | FOREIGN GOVERNMENT OFFICIAL WHO IS IMMEDIATE RELATIVE OF U.S. CITIZEN OR SPECIAL IMMIGRANT |
| 999 | ALIEN AWAITING DECISION OF ASYLUM |

Data Source: This reference table of Immigration Status Codes includes both current codes and previously used historical codes, which are reflected in this document, Section 3.2: Number and Prior Immigration Status of TPS Beneficiaries During CY 2023.  CLAIMS data, which USCIS reviewed to compile this TPS CY 2023 Congressional Report, contains references to both current and historical data codes.

HondurasAR000192



# Temporary Protected Status:

# Calendar Year 2024 Annual Report

Report to Congress



HondurasAR000193

*Assistant Secretary for Legislative Affairs*
**U.S. Department of Homeland Security**
Washington, DC 20528

## Homeland Security

[Month_Date-Year]

# Foreword

I present the "Temporary Protected Status: Calendar Year 2024 Annual Report" prepared by U.S. Citizenship and Immigration Services.

Pursuant to statutory requirements, this report is provided to the following Members of Congress:

> The Honorable Jim Jordan
> Chairman, House Committee on the Judiciary

> The Honorable Jamie Raskin
> Ranking Member, House Committee on the Judiciary

> The Honorable Charles E. Grassley
> Chair, Senate Committee on the Judiciary

> The Honorable Richard Durbin
> Ranking Member, Senate Committee on the Judiciary

Inquiries relating to this report may be directed to me at (202) 447-5890.

Respectfully,

Bradley F. Hayes
Assistant Secretary for Legislative Affairs

HondurasAR000194

# Executive Summary

Under section 244 of the Immigration and Nationality Act (INA), 8 U.S.C. § 1254a, the Secretary of Homeland Security may designate a foreign state (or part thereof) for Temporary Protected Status (TPS) after consulting with appropriate agencies of the U.S. Government.   The Secretary may then grant TPS to eligible nationals of that foreign state or eligible aliens having no nationality who last habitually resided in that state.   Section 244(b)(1) of the INA provides the circumstances and criteria under which the Secretary may exercise his or her discretion to designate a foreign state for TPS.[1]   In accordance with section 244(i)(1) of the INA, the Secretary submits this annual report to Congress on the operation of section 244 (the TPS statute) during the previous calendar year.

At the close of Calendar Year (CY) 2024, there were approximately 1,396,586 TPS beneficiaries. Of the current TPS countries, the oldest initial TPS designation was made over 33 years ago on September 16, 1991, for Somalia; the second oldest initial designation was made for both Nicaragua and Honduras on January 5, 1999.

During CY 2024, former Department of Homeland Security (DHS) Secretary Mayorkas announced the following TPS actions:

- On January 29, 2024, DHS announced via Federal Register Notice (FRN) the extension and redesignation of TPS for Syria for 18 months, effective April 1, 2024,

---

[1] Section 244(b)(1) of the INA provides the following:

> The [Secretary of Homeland Security], after consultation with appropriate agencies of the Government, may designate any foreign state (or any part of such foreign state) under this subsection only if--
>
> > (A) the [Secretary] finds that there is an ongoing armed conflict within the state and, due to such conflict, requiring the return of aliens who are nationals of that state to that state (or to the part of the state) would pose a serious threat to their personal safety;
> > (B) the [Secretary] finds that--
> > > (i) there has been an earthquake, flood, drought, epidemic, or other environmental disaster in the state resulting in a substantial, but temporary, disruption of living conditions in an area affected,
> > > (ii) the foreign state is unable, temporarily, to handle adequately the return to the state of aliens who are nationals of the state, and
> > > (iii) the foreign state officially has requested designation under this subparagraph; or
> > (C) the [Secretary] finds that there exist extraordinary and temporary conditions in the foreign state that prevent aliens who are nationals of the state from returning to the state in safety, unless the [Secretary] finds that permitting the aliens to remain temporarily in the United States is contrary to the national interest of the United States.

> A designation of a foreign state (or part of such foreign state) under this paragraph shall not become effective unless notice of the designation (including a statement of the findings under this paragraph and the effective date of the designation) is published in the *Federal Register*.   In such notice, the [Secretary] shall also state an estimate of the number of nationals of the foreign state designated who are (or within the effective period of the designation are likely to become) eligible for temporary protected status under this section and their immigration status in the United States.

HondurasAR000195

through September 30, 2025.[2]

- On March 25, 2024, DHS announced via FRN the extension and redesignation for TPS for Burma (Myanmar) for 18 months, effective May 26, 2024, through November 25, 2025.[3]

- On April 15, 2024, DHS announced via FRN the extension and redesignation of TPS for Ethiopia for 18 months, effective June 13, 2024, through December 12, 2025.[4]

- On June 28, 2024, DHS announced via FRN the extension and redesignation of TPS for Haiti for 18 months, effective August 4, 2024, through February 3, 2026.[5]

- On July 8, 2024, DHS announced via FRN the extension and redesignation of TPS for Yemen for 18 months, effective September 4, 2024, through March 3, 2026.[6]

- On July 19, 2024, DHS announced via FRN the extension and redesignation of TPS for Somalia for 18 months, effective September 18, 2024, through March 17, 2026.[7]

- On October 17, 2024, DHS announced the designation of Lebanon for TPS for 18 months, effective November 27, 2024, through May 27, 2026.[8]

This report represents, by and large, the decisions of a previous administration. DHS Secretary Noem is committed to exercising her authority regarding Temporary Protected Status in a manner that aligns with and does not exceed the guidelines set in the statute.

---

[2] *See* 89 FR 5562 (Jan. 29, 2024).
[3] *See* 89 FR 20682 (Mar. 25, 2024).
[4] *See* 89 FR 26172 (Apr. 15, 2024).
[5] *See* 89 FR 54484 (July 1, 2024).
[6] *See* 89 FR 56765 (July 10, 2024).
[7] *See* 89 FR 59135 (July 22, 2024).
[8] *See* 89 FR 93641 (Nov. 27, 2024).

HondurasAR000196



# Temporary Protected Status Annual Report
# Calendar Year 2024

## Table of Contents

I.    Legislative Requirement ..........................................................................................................1

II.    Background ...............................................................................................................................2

III.    Data Report ..............................................................................................................................3

    Section 3.1 Foreign States with TPS Actions in Calendar Year (CY) 2024............................3

    Section 3.2 Number and Prior Immigration Status of TPS Beneficiaries in CY 2024............5

    Section 3.3 Age, Sex,[9] and State of Residence of TPS Beneficiaries in CY 2024 .................7

IV.    Analysis/Discussion ..............................................................................................................11

    Section 4.1 Legal Authority for the Secretary to Designate a Foreign State for TPS Under
    INA § 244(b)(1) ....................................................................................................................11

    Section 4.2 Legal Authority for the Secretary to Extend or Terminate TPS Designations of
    Foreign States Under INA § 244(b)(3) .................................................................................11

    Section 4.3 Extensions of Designations Under INA § 244(b)(3)(C)....................................12

    Section 4.4 Extensions of Designations Under INA § 244(b)(3)(C) and Redesignation Under
    INA § 244(b)(1) ...................................................................................................................12

        Burma (Myanmar) ......................................................................................................12

        Ethiopia ......................................................................................................................13

        Haiti............................................................................................................................13

---

[9] This report utilizes historical filing data of Form I-821, Application for Temporary Protected Status, for CY2023-24, which asked about an applicant's *gender*. In compliance with Executive Order 14168, "Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government," all references to *gender* in this report, regardless of historical wording, have been replaced with *sex*.

HondurasAR000197

Somalia ...................................................................................................... 15

Syria .......................................................................................................... 15

Yemen ........................................................................................................ 16

Section 4.5 Designations under INA § 244(b)(1) .......................................... 18

Lebanon ..................................................................................................... 18

Section 4.6 Terminations Under INA § 244(b)(3)(B) ................................... 18

Appendix A: TPS Beneficiaries' Immigration Status at Initial Filing by Country ........................ A-1

Appendix B: Immigration Status Codes of TPS Beneficiaries .......................................... B-1

HondurasAR000198

## I.    Legislative Requirement

Section 244(i) of the *Immigration and Nationality Act* (INA) (8 U.S.C. § 1254a(i) provides:

(i) Annual Report and Review. -

(1) Annual report. - Not later than March 1 of each year (beginning with 1992), the [Secretary of Homeland Security], after consultation with the appropriate agencies of the Government, shall submit a report to the Committees on the Judiciary of the House of Representatives and of the Senate on the operation of this section during the previous year.  Each report shall include—

(A) a listing of the foreign states or parts thereof designated under this section,

(B) the number of nationals of each such state who have been granted temporary protected status under this section and their immigration status before being granted such status, and

(C) an explanation of the reasons why foreign states or parts thereof were designated under subsection (b)(1) and, with respect to foreign states or parts thereof previously designated, why the designation was terminated or extended under subsection (b)(3).

(2) Committee report. - No later than 180 days after the date of receipt of such a report, the Committee on the Judiciary of each House of Congress shall report to its respective House such oversight findings and legislation as it deems appropriate.

HondurasAR000199

## II.    Background

Section 244(b)(1) of the INA provides the Secretary with the authority to designate a foreign state, or any part of such state, for TPS upon finding, among other things, that such state is experiencing ongoing armed conflict, an environmental disaster, or other extraordinary and temporary conditions.  (*See* Executive Summary, fn. 1, for specific statutory requirements for each type of designation.)   The Secretary may grant TPS to an eligible alien from the designated foreign state (or to an eligible alien having no nationality who last habitually resided in such state) who, as described in section 244(c)(1)(A) of the INA and implementing regulations in 8 C.F.R. § 244.2:

- Has been continuously physically present in the United States since the effective date of the most recent designation of the state as published in the FRN for the country designation;
- Has continuously resided in the United States since a date determined by the Secretary and published in the FRN;
- Is admissible as an immigrant except as otherwise provided under section 244(c)(2)(A) of the INA;
- Is not ineligible for TPS under section 244(c)(2)(B) of the INA; and
- Registers during an initial registration period of not less than 180 days, as announced in the FRN, or the applicant meets late initial registration criteria during any subsequent extension of TPS designation pursuant to 8 C.F.R. § 244.2(f)(2).

During the temporary period for which the Secretary designated a foreign state for TPS, registered TPS beneficiaries are eligible to remain in the United States, cannot be removed, and are authorized to work, so long as their TPS was not withdrawn for individual ineligibility.  They may also be granted authorization to travel abroad temporarily with prior consent of the Secretary. *See* INA §§ 244(a)(1), 244(a)(2), and 244(f)(3).

Granting TPS itself does not lead to lawful permanent resident status.[10]  When the Secretary terminates a foreign state's TPS designation, aliens return to the same immigration status they possessed prior to gaining TPS (unless that status expired or was terminated) or continue to possess any other status they obtained while registered for TPS, if still valid.   Aliens who had no lawful status before obtaining TPS and who have not obtained any other lawful status after TPS return to no lawful status when the TPS designation ends.

---

[10] *See* INA 240A(b).

2

III.    **Data Report**

**Section 3.1 Foreign States with TPS Actions in Calendar Year (CY) 2024**

The following table (Table 1) reflects all foreign states for which a TPS action was taken in CY 2024.  The table shows the most recent effective dates of each designation and/or extension or termination, and the expiration date for each foreign state's TPS designation as of December 31, 2024.

**Table 1: CY 2024 TPS Designations by Country**

| Country | Last Action (as of 12/31/24) | Expiration (as of 12/31/24) | Federal Register Notice |
|---|---|---|---|
| Burma (Myanmar) | 18-month extension and redesignation | November 25, 2025 | 89 FR 20682 (March 25, 2024) |
| Ethiopia | 18-month extension and redesignation | December 12, 2025 | 89 FR 26172 (April 15, 2024) |
| Haiti | 18-month extension and redesignation | February 3, 2026 | 89 FR 54484 (July 1, 2024) |
| Lebanon | 18-month initial designation | May 27, 2026 | 89 FR 93641 (November 27, 2024) |
| Somalia | 18-month extension and redesignation | March 17, 2026 | 89 FR 59135 (July 22, 2024) |
| Syria | 18-month extension and redesignation | September 30, 2025 | 89 FR 5562 (January 29, 2024) |
| Yemen | 18-month extension and redesignation | March 3, 2026 | 89 FR 56765 (July 10, 2024) |

Data Source: USCIS website.

The following table (Table 2) reflects the estimated number of TPS beneficiaries under each designated foreign state at the close of the CY 2024.  For comparison and trend analysis purposes, TPS beneficiary data at the close of each year from 2019–2023 are also listed.

HondurasAR000201

**Table 2: TPS Beneficiaries by Year and Country, CY 2019–2024**

| Country | 2024 | 2023 | 2022 | 2021 | 2020 | 2019 |
|---|---|---|---|---|---|---|
| Afghanistan | 11,680 | 5,762 | 578 | - | - | - |
| Burma | 3,715 | 2,224 | 1,291 | 247 | - | - |
| Cameroon | 4,068 | 2,399 | 1,129 | - | - | - |
| El Salvador | 232,029 | 236,270 | 239,139 | 241,699 | 244,921 | 247,412 |
| Ethiopia | 4,393 | 2,083 | - | - | - | - |
| Haiti | 332,968 | 204,759 | 110,638 | 53,558 | 54,365 | 55,218 |
| Honduras | 72,880 | 74,572 | 75,803 | 76,737 | 78,149 | 79,290 |
| Nepal | 12,905 | 13,896 | 14,477 | 14,556 | 14,642 | 14,549 |
| Nicaragua | 4,033 | 4,041 | 4,163 | 4,250 | 4,344 | 4,409 |
| Somalia | 739 | 562 | 425 | 436 | 447 | 454 |
| South Sudan | 222 | 146 | 102 | 97 | 101 | 96 |
| Sudan | 1,940 | 1,260 | 1,082 | 706 | 738 | 771 |
| Syria | 5,932 | 6,142 | 6,424 | 6,455 | 6,682 | 6,901 |
| Ukraine | 102,832 | 29,739 | 14,647 | - | - | - |
| Venezuela | 603,541 | 284,207 | 182,579 | 29,193 | - | - |
| Yemen | 2,709 | 2,270 | 1,941 | 1,696 | 1,663 | 1,647 |
| Total | 1,396,586 | 870,332 | 654,418 | 429,630 | 406,052 | 410,747 |

Data Source:  Computer Linked Application Information Management System (CLAIMS) and USCIS Electronic Immigration System (USCIS ELIS).
Note:  The counts include TPS holders who have adjusted to lawful permanent resident (LPR) status.

The following figure (Figure 1) reflects the trends in total count of TPS beneficiaries at the close of the CY for each year from 2019–2024.  Compared to CY 2019–2021, which had relatively stable TPS beneficiary population each year, the size of TPS population has increased over the past three years, culminating in CY 2024, which is almost triple the number of aliens receiving TPS in 2021.  This is likely driven by the significant increases in approved initial TPS applications for aliens from Afghanistan, Ethiopia, Haiti, Ukraine, and Venezuela.

HondurasAR000202

**Figure 1. TPS Total Beneficiary Count by Year, CY 2020-2024**



Data Source: Computer Linked Application Information Management System (CLAIMS) and USCIS Electronic Immigration System (USCIS ELIS).

**Section 3.2 Number and Prior Immigration Status of TPS Beneficiaries in CY 2024**

Table 3 and Appendix A[11] reflect the self-reported immigration status codes of aliens at their initial filing for TPS. Appendix B describes each immigration status code in the first column of the table. Under INA § 244(a)(5), an alien may continue to maintain his or her prior immigration status while holding TPS, provided he or she maintains eligibility for the prior immigration status.

Overall TPS beneficiaries have a range of prior immigration statuses as Table 3 and Appendix A show. Across all TPS countries, a large portion of aliens' prior immigration status were Unknown (508,545; 36.4 percent). Because this information is self-reported, the prior immigration status of those included in these general categories is uncertain, but they may include aliens who entered without inspection; who were stowaways; as well as others who had no immigration status, who had overstayed their visa, who could not recall their immigration status, and who had applications/petitions for status denied prior to obtaining TPS. Nearly 15 percent (208,138) of TPS applicants in 2024 appear to be re-registering for TPS. Other top prior immigration statuses among TPS beneficiaries were asylum seekers (AS, AO, ASY and 999 combined, 326,959; 23.4 percent), or parolees (DT, PR, PAR, OAR, PWA, CH and

---

[11] For the purposes of Table 3, Appendices A and B, and the accompanying explanations, "immigration status" may refer to an individual's immigration *status* or *category* at initial filing, or to the *process step* they were undergoing at that time. The variation is due to the self-reported nature of the information.

HondurasAR000203

HHP/VHP/UHP combined, 251,935; 18.0 percent).  Some TPS beneficiaries also appear to have held a Temporary Visitors for Pleasure visa (21,889; 1.6 percent).

**Table 3: Top 25 Prior Immigration Statuses of TPS Beneficiaries at Initial Filing**

| No. by Frequency | Immigration Status at Filing | Frequency | Percent |
|---|---|---|---|
| 1 | UN (UNKNOWN OR NOT REPORTED) | 508,545 | 36.4 |
| 2 | TPS (PREVIOUS TPS BENEFICIARIES RE-REGISTERING FOR TPS) | 208,138 | 14.9 |
| 3 | AS (ASYLUM APPLICANT WITH WORK AUTHORIZATION) | 206,945 | 14.8 |
| 4 | 999 (ALIEN AWAITING DECISION OF ASYLUM) | 71,192 | 5.1 |
| 5 | HHP (HAITIAN PAROLEES) | 55,272 | 4.0 |
| 6 | DT (PAROLEE DISTRICT/POE AUTHORIZED) | 51,298 | 3.7 |
| 7 | AO (ASYLUM APPLICANT WITHOUT WORK AUTHORIZATION) | 43,802 | 3.1 |
| 8 | PAR (PAROLEE) | 43,042 | 3.1 |
| 9 | UHP (UKRAINIAN HUMANITARIAN PAROLE) | 41,020 | 2.9 |
| 10 | VHP (VENEZUELAN PAROLEES) | 29,751 | 2.1 |
| 11 | B2 (TEMPORARY VISITORS FOR PLEASURE) | 21,889 | 1.6 |
| 12 | EWI (ENTRY WITHOUT INSPECTION) | 16,985 | 1.2 |
| 13 | NHP (NICARAGUAN HUMANITARIAN PAROLE) | 12,071 | 0.9 |
| 14 | F1 (ACADEMIC STUDENTS) | 9,031 | 0.6 |
| 15 | CH (HUMANITARIAN PAROLEE) | 7,400 | 0.5 |
| 16 | OAR (HUMANITARIAN PAROLEE) | 7,345 | 0.5 |
| 17 | ABS (ABANDONMENT OF STATUS) | 6,578 | 0.5 |
| 18 | PWA (ALIEN PRESENT WITHOUT ADMISSION OR PAROLE) | 5,739 | 0.4 |
| 19 | ASY (ASYLEE) | 5,020 | 0.4 |
| 20 | PR (PAROLEE) | 4,736 | 0.3 |
| 21 | OTHER (OTHER) | 4,324 | 0.3 |
| 22 | IMM (IMMIGRANT) | 3,232 | 0.2 |
| 23 | IJ (REFERRED TO IMMIGRATION JUDGE) | 3,081 | 0.2 |
| 24 | PEN (PENDING LPR) | 2,891 | 0.2 |
| 25 | RE (REFUGEE) | 1,804 | 0.1 |

Data Source:  Computer Linked Application Information Management System (CLAIMS) and USCIS Electronic Immigration System (USCIS ELIS).  Prior immigration status is self-reported by TPS beneficiaries on Form I-821, Application for Temporary Protected Status.  Class of Admission Code is based upon self-reported information appeared on Form I-821.   At the time of filing for TPS, many applicants report that they cannot recall their immigration status.   Immigration status, or lack of status, does not impact eligibility for TPS.   *See* INA § 244(a)(5).  Percentages do not sum to 100 as only the top 25 classes are included.

A complete table of TPS beneficiaries' immigration status at initial filing by country is shown in Appendix A.   Even though the prior immigration status reported by TPS beneficiaries spans a wide spectrum (more than 200 in terms of status code), it is worth noting that over 98 percent of all TPS beneficiaries held one of the top 25 immigration statuses at initial filing.

HondurasAR000204

**Section 3.3 Age, Sex, and State of Residence of TPS Beneficiaries in CY 2024**

Tables 4 to 6 describe key demographics and state of residence of the TPS beneficiary population.[12]   The largest number of aliens falls into the age group of 35 to 54 years (approximately 43 percent).   Younger (under 24 years of age) and older aliens (over 55 years of age) are relatively small in proportion, 18.4 percent and 18.5 percent, respectively.  It is noteworthy that the share of younger aliens (age 24 and under) has increased from 14.2 percent to 19.1 percent from a year ago, while the share of older aliens (age 55 and above) has decreased from 22.1 percent to 17.5 percent, signaling more younger aliens have entered the TPS beneficiary population.

**Table 4: TPS Beneficiaries by Age Group**

| Age Group | 2024 | | 2023 | |
|---|---|---|---|---|
| | Frequency | Percent (%) | Frequency | Percent (%) |
| Under 18 | 160,232 | 11.5 | 77,766 | 8.9 |
| 18 to 24 years | 105,777 | 7.6 | 46,222 | 5.3 |
| 25 to 34 years | 284,584 | 20.4 | 123,990 | 14.2 |
| 35 to 44 years | 300,157 | 21.5 | 191,290 | 22.0 |
| 45 to 54 years | 300,770 | 21.5 | 239,065 | 27.5 |
| 55 to 64 years | 156,881 | 11.2 | 125,064 | 14.4 |
| 65 and above | 88,169 | 6.3 | 66,921 | 7.7 |
| Unknown | 16 | 0.0 | 14 | 0.0 |

Data Source:  Computer Linked Application Information Management System (CLAIMS) and USCIS Electronic Immigration System (USCIS ELIS).

Slightly more than half of TPS beneficiaries (671,509; 52.7 percent) are male, while 599,543 or 47.1 percent) are female.  A small number of TPS beneficiaries (2,980; 0.02 percent) shows their sex as unreported.  This is indicative that, despite the significant increase in the frequency of TPS registration from 2023 to 2024, the proportion of each sex remains relatively stable.

**Table 5: TPS Beneficiaries by Sex**

| Sex | 2024 | | 2023 | |
|---|---|---|---|---|
| | Frequency | Percent | Frequency | Percent |
| Male | 671,509 | 52.7 | 454,501 | 52.2 |
| Female | 599,543 | 47.1 | 413,689 | 47.5 |
| Unreported | 2,980 | 0.2 | 2,142 | 0.3 |

Data Source:  Computer Linked Application Information Management System (CLAIMS) and USCIS Electronic Immigration System (USCIS ELIS).

Every state had more TPS beneficiaries in 2024 than in 2023, though the percent of TPS beneficiaries in each state has fluctuated.  For example, although the number of TPS beneficiaries in Florida has increased by nearly 200,000 TPS beneficiaries, the proportion of all TPS

---

[12] TPS beneficiaries' demographic information (age and sex) and state of residence are based on self-reported data on their most recently submitted from I-821, Application for Temporary Protected Status.   As such, state of residence of any TPS beneficiary only reflects the time when the most recent Form I-821 was filed.

HondurasAR000205

beneficiaries that live in Florida has dropped from 33.1 percent to 30.1 percent.

**Table 6: TPS Beneficiaries by State of Residence at Filing**

| State/Territory | 2024 | | 2023 | |
| --- | --- | --- | --- | --- |
| | Beneficiary Count | Percent (%) | Beneficiary Count | Percent (%) |
| Florida | 421,012 | 30.1 | 287,895 | 33.1 |
| Texas | 160,708 | 11.5 | 95,483 | 11.0 |
| New York | 111,634 | 8.0 | 70,193 | 8.1 |
| California | 100,101 | 7.2 | 83,513 | 9.6 |
| Georgia | 52,175 | 3.7 | 28,036 | 3.2 |
| New Jersey | 50,586 | 3.6 | 33,096 | 3.8 |
| Massachusetts | 47,642 | 3.4 | 30,260 | 3.5 |
| Illinois | 47,110 | 3.4 | 14,203 | 1.6 |
| Maryland | 39,008 | 2.8 | 32,691 | 3.8 |
| Virginia | 37,091 | 2.7 | 31,034 | 3.6 |
| North Carolina | 35,787 | 2.6 | 23,385 | 2.7 |
| Indiana | 34,082 | 2.4 | 16,707 | 1.9 |
| Ohio | 25,990 | 1.9 | 10,699 | 1.2 |
| Pennsylvania | 24,050 | 1.7 | 10,649 | 1.2 |
| Tennessee | 20,261 | 1.5 | 8,861 | 1.0 |
| Utah | 20,123 | 1.4 | 8,021 | 0.9 |
| Washington | 18,760 | 1.3 | 7,404 | 0.9 |
| Colorado | 16,743 | 1.2 | 5,807 | 0.7 |
| South Carolina | 10,799 | 0.8 | 5,118 | 0.6 |
| Connecticut | 10,160 | 0.7 | 5,630 | 0.7 |
| Minnesota | 8,910 | 0.6 | 4,551 | 0.5 |
| Michigan | 8,565 | 0.6 | 3,448 | 0.4 |
| Nevada | 6,919 | 0.5 | 5,257 | 0.6 |
| Arizona | 6,812 | 0.5 | 2,897 | 0.3 |
| Kentucky | 6,049 | 0.4 | 3,004 | 0.4 |
| Oregon | 5,856 | 0.4 | 2,362 | 0.3 |
| Alabama | 5,701 | 0.4 | 2,225 | 0.3 |
| Oklahoma | 5,692 | 0.4 | 2,919 | 0.3 |
| Missouri | 5,478 | 0.4 | 2,788 | 0.3 |
| Wisconsin | 5,204 | 0.4 | 1,919 | 0.2 |
| Delaware | 4,917 | 0.4 | 3,116 | 0.4 |
| Louisiana | 4,567 | 0.3 | 3,118 | 0.4 |
| Arkansas | 4,444 | 0.3 | 3,802 | 0.4 |
| Iowa | 4,261 | 0.3 | 2,099 | 0.2 |
| Washington, D.C. | 4,189 | 0.3 | 3,342 | 0.4 |
| Kansas | 4,011 | 0.3 | 2,084 | 0.2 |
| Nebraska | 3,273 | 0.2 | 2,161 | 0.3 |
| U.S. Virgin Islands | 3,042 | 0.2 | 2,586 | 0.3 |

8

HondurasAR000206

| | | | | |
|---|---|---|---|---|
| Rhode Island | 2,541 | 0.2 | 1,499 | 0.2 |
| Mississippi | 1,191 | 0.1 | 715 | 0.1 |
| Idaho | 1,175 | 0.1 | 546 | 0.1 |
| New Mexico | 1,135 | 0.1 | 520 | 0.1 |
| New Hampshire | 965 | 0.1 | 559 | 0.1 |
| North Dakota | 888 | 0.1 | 258 | 0.0 |
| Puerto Rico | 849 | 0.1 | 596 | 0.1 |
| Maine | 750 | 0.1 | 412 | 0.1 |
| South Dakota | 703 | 0.1 | 360 | 0.0 |
| West Virginia | 588 | 0.0 | 370 | 0.0 |
| Alaska | 510 | 0.0 | 289 | 0.0 |
| Hawaii | 401 | 0.0 | 215 | 0.0 |
| Montana | 401 | 0.0 | 133 | 0.0 |
| Wyoming | 242 | 0.0 | 125 | 0.0 |
| Vermont | 220 | 0.0 | 93 | 0.0 |
| Northern Mariana Islands | 27 | 0.0 | 28 | 0.0 |
| Guam | 13 | 0.0 | 16 | 0.0 |
| Armed Forces - Europe | 3 | 0.0 | 3 | 0.0 |
| Armed Forces - America | 2 | 0.0 | 6 | 0.0 |
| Unknown/Unidentified[13] | 2,270 | 0.0 | 1,226 | 0.0 |
| Total | 1,396,586 | 100.0 | 870,332 | 100.0 |

Data Source:  Computer Linked Application Information Management System (CLAIMS) and USCIS Electronic Immigration System (USCIS ELIS).

Nearly six in ten TPS beneficiaries (56.8 percent) live in these four states:  Florida (421,012; 30.1 percent), Texas (160,708; 11.5 percent), New York (111,634; 8.0 percent), and California (100,101; 7.2 percent).

---

[13] Including unidentifiable and misreported entries.

HondurasAR000207

**Figure 2: TPS Beneficiaries by State of Residence at Filing**



Data Source:  Computer Linked Application Information Management System (CLAIMS) and USCIS Electronic Immigration System (USCIS ELIS).

10

HondurasAR000208

## IV.          Analysis/Discussion

Section 4.1 Legal Authority for the Secretary to Designate a Foreign State for TPS Under INA § 244(b)(1)

Under INA § 244(b)(1), the Secretary, after consultation with appropriate agencies of the U.S. Government, may designate a foreign state (or any part of such foreign state) if conditions in the foreign state meet one or more statutory bases for designation: ongoing armed conflict, environmental disaster, or extraordinary and temporary conditions.[14]   An initial TPS designation is purely discretionary, and the Secretary can decline to make a designation even if he or she determines eligible conditions exist in a foreign state.   The Secretary may designate the foreign state for a period of six, 12, or 18 months.[15]   When the Secretary designates a foreign state for TPS, he or she establishes the dates from which a TPS applicant must have continuously resided in and been continuously physically present in the United States in order to be eligible for TPS under the particular designation.[16]   By establishing these "continuous residence" and "continuous physical presence" dates in accordance with TPS statutes, the Secretary can afford temporary protection to the most appropriate group of aliens from the designated country.

## Section 4.2 Legal Authority for the Secretary to Extend or Terminate TPS Designations of Foreign States Under INA § 244(b)(3)

As required by the INA, the Secretary conducts a periodic review of country conditions affecting each TPS-designated foreign state in consultation with appropriate agencies of the U.S. Government, to determine whether the conditions support extension or termination of the TPS designation, and whether a new designation may be warranted.[17]   At least 60 days prior to the current expiration of a country's TPS designation, the Secretary must review the conditions in the designated foreign state and determine whether the conditions for such designation continue to be met.   If the Secretary determines statutory conditions for designation are no longer met, the TPS statute requires that he or she terminate the designation.   If the Secretary finds, however, that conditions for designation are met (or makes no determination at all), the statute requires the TPS designation b e extended for a minimum of six months, or, at the Secretary's discretion, for 12 or 18 months.   USCIS publishes a notice in the *Federal Register* that announces the Secretary's determination of whether to extend, extend and redesignate, or terminate a country's TPS designation.   That notice includes an explanation of the reasons for the determination.

---

[14] *See supra* note 1 (providing text of INA § 244(b)(1)).
[15] *See* INA § 244(b)(2)(B).
[16] *See* INA § 244(c)(1)(A).   The continuous residence date is such date as the Secretary may establish.   *Id.* at § 244(c)(1)(A)(ii).   However, the continuous physical presence date is the effective date of the most recent designation, which itself is the FRN publication date of the designation or such later date as the Secretary may specify in the notice.   *See Id.* at §244(b)(2)(A); §244(c)(1)(A)(i).
[17] *See* INA § 244(b)(3)(A)-(C).

HondurasAR000209

**Section 4.3 Extensions of Designations Under INA § 244(b)(3)(C)**

Former Secretary Mayorkas did not solely extend the designation of any countries for TPS in CY 2024.

**Section 4.4 Extensions of Designations Under INA § 244(b)(3)(C) and Redesignation Under INA § 244(b)(1)**

This section provides details about TPS actions announced by former Secretary Mayorkas in CY 2024 regarding foreign states for which the most recent action by the Secretary, as of December 31, 2024, was an extension of the state's existing TPS designation and redesignation of the state for TPS. The conditions described reflect former Secretary Mayorkas's rationale for undertaking these extensions and redesignations, and do not necessarily represent the views of Secretary Noem.

**Burma (Myanmar)**

Burma was originally designated for TPS on May 25, 2021, on the basis of extraordinary and temporary conditions that prevented nationals of Burma from returning in safety.[18] DHS extended and redesignated Burma on the same basis in 2022.[19] On March 25, 2024, DHS again extended and redesignated Burma for TPS for 18 months, from May 25, 2024, through November 25, 2025, based on extraordinary and temporary conditions.[20]

As former Secretary Mayorkas noted in the most recently published FRN, the February 1, 2021, military coup that overthrew Burma's democratically elected civilian government gave rise to violence that Former Secretary Mayorkas assessed continued to put persons in Burma at risk. Former Secretary Mayorkas assessed that Burma also faced challenges in the provision of food, access to health care, and economic stability. Around 12.9 million people in Burma were considered to be either moderately or severely food insecure.[21]

In addition to violence, Former Secretary Mayorkas assessed that human trafficking to profit from international scams is a concern in Burma. Sources estimate that at least 120,000 people across the country may be held in situations where traffickers exploit them in forced criminality to carry out online scams.[22]

---

[18] *See Designation of Burma (Myanmar) for Temporary Protected Status,* 86 FR 28132 (May 25, 2021).
[19] *See Extension and Redesignation of Burma (Myanmar) for Temporary Protected Status,* 87 FR 58515 (Sept. 27, 2022).
[20] *See Extension and Redesignation of Burma (Myanmar) for Temporary Protected Status,* 89 FR 20682 (Mar. 25, 2024).
[21] UNOCHA, *Myanmar Humanitarian Update No. 34,* Nov. 10, 2023, available at https://reliefweb.int/report/myanmar/myanmar-humanitarian-update-no-34-10-november-2023 (last visited Nov. 28, 2023).
[22] U.N. Office of the High Commissioner for Human Rights, *Online Scam Operations and Trafficking into Forced Criminality in Southeast Asia: Recommendations for a Human Rights Response,* Aug. 25, 2023, available at https://bangkok.ohchr.org/wp-content/uploads/2023/08/ONLINE-SCAM-OPERATIONS-2582023.pdf.

HondurasAR000210

## Ethiopia

Ethiopia was initially designated for TPS on December 12, 2022, based on ongoing armed conflict and extraordinary and temporary conditions that prevented nationals of Ethiopia from returning in safety.[23]  On April 15, 2024, former Secretary Mayorkas extended and redesignated Ethiopia for TPS for 18 months from June 13, 2024, through December 12, 2025, based on ongoing armed conflict and extraordinary and temporary conditions.[24]

As former Secretary Mayorkas noted in the most recently published FRN, violent clashes between the Ethiopian federal government and the Oromo Liberation Front-Shane (also known as the Oromo Liberation Army) increased in May 2023 in the regional state of Oromia following failed peace talks, rivaling the levels of violence in 2022.[25]
Former Secretary Mayorkas assessed that Ethiopia continued to face a massive displacement of persons for numerous reasons, to include violence and climate events.[26]  As of June 2023, there were an estimated 4.3 million displaced persons in Ethiopia.[27]   Additionally, throughout 2023, Former Secretary Mayorkas assessed that food insecurity continued to be a major concern in Ethiopia due to multiple challenges, including ongoing conflict, drought-like conditions, and a pause in international food assistance due to food aid diversion and corruption.[28] Finally, Former Secretary Mayorkas reported that Ethiopia faced four outbreaks of communicable diseases in 2023: cholera, measles, malaria and dengue.[29]  Cholera, malaria, and measles continued to be problems in 2024.[30]

## Haiti

Haiti was initially designated for TPS on January 21, 2010, based on extraordinary and temporary conditions that prevented nationals of Haiti from returning in safety.[31]  After its initial designation, Haiti's TPS designation was extended and redesignated from July 23, 2011, through January 22, 2013, based on extraordinary and temporary conditions.[32]  Thereafter, TPS for Haiti

---

[23] *See Designation of Ethiopia for Temporary Protected Status*, 87 FR 76074 (Dec. 12, 2022).

[24] *See Extension and Redesignation of Ethiopia for Temporary Protected Status*, 89 FR 26172 (Apr.15, 2024).

[25] ACLED-Ethiopia Peace Observatory, *EPO May 2023 Monthly: Violence Returns to Oromia Despite Attempted Peace Talks*, June 22, 2023, https://epo.acleddata.com/ 2023/ 06/ 22/ epo-may-2023-monthly-violence-returns-to-oromia-despite-attempted-peace-talks/ (last visited Dec. 18, 2023).

[26] IOM, *Ethiopia National Displacement Report 16—Site Assessment Round 33 and Village Assessment survey Round 16: November 2022-June 2023*, available at https://dtm.iom.int/reports/ethiopia-national-displacement-report-16-november-2022-june-2023 (last visited Jan. 29, 2024).

[27] *Id.*

[28] Associated Press, *U.S. will resume food aid to millions in Ethiopia after monthslong pause over massive corruption*, Nov. 15, 2023, available at https://www.pbs.org/ newshour/ world/ u-s-will-resume-food-aid-to-millions-in-ethiopia-after-monthslong-pause-over-massive-corruption#:~:text= USAID%20and%20the%20U.N.%E2%80%99s%20World%20Food%20Program%20suspended,country%20for%20interrupting%20their%20oversight%20of%20aid%20delivery (last visited Dec. 19, 2023); World Food Programme, *WFP Ethiopia Country Brief*, September 2023, available at https://docs.wfp.org/ api/ documents/ WFP-0000154798/ download/ ?_ ga= 2.168713697.1310415555.1702745002-257522247.1691073788 (last visited Dec. 16, 2023).

[29] World Health Organization, *Northern Ethiopia—Public Health Situation Analysis*, Sept. 22, 2023, pg. 2, https://reliefweb.int/ report/ ethiopia/ northern-ethiopia-public-health-situation-analysis-phsa-25-august-2023 (last visited on Dec. 19, 2023).

[30] UNOCHA, *Ethiopia Situation Report,* last updated Feb. 16, 2024, available at https://reports.unocha.org/ en/ country/ ethiopia (last visited Feb. 28, 2024).

[31] *See Designation of Haiti for Temporary Protected Status,* 75 FR 3476 (Jan. 21, 2010).

[32] *See Extension and Redesignation of Haiti for Temporary Protected Status*, 76 FR 29000 (May 19, 2011).

HondurasAR000211

was extended four times based on extraordinary and temporary conditions: (1) from January 23, 2013, through July 22, 2014;[33] (2) from July 23, 2014, through January 22, 2016;[34] (3) from January 23, 2016, through July 22, 2017;[35] and (4) from July 23, 2017, through January 22, 2018.[36]

Subsequently, DHS announced the termination of TPS for Haiti with an effective date of July 22, 2019.[37] The termination decision was the subject of litigation and a court order, and, as a result, the termination did not take effect. The Secretary newly designated Haiti for TPS based on extraordinary and temporary conditions for a period of 18 months, from August 3, 2021, through February 3, 2023.[38] Thereafter, TPS for Haiti was extended and redesignated from February 4, 2023, through August 3, 2024.[39] Most recently, former Secretary Mayorkas extended and redesignated Haiti's TPS designation from August 4, 2024, through February 3, 2026.[40] On February 24, 2025, Secretary Noem decided to partially vacate the June 4, 2024, decision of former Secretary Mayorkas, reducing the designation period from 18 months to 12 months.[41]

In the FRN published on July 1, 2024, former Secretary Mayorkas found that Haiti continued to experience simultaneous security, political, economic, and health crises in 2024. Haitian gangs are the primary source of violence and instability in Haiti.[42] An ongoing political impasse left Haiti without a functioning democratically elected national government and hindered Haiti's ability to respond to the gang-driven violence. Former Secretary Mayorkas found that Haiti continued to struggle through a humanitarian crisis. It is one of the poorest countries in the world, and it remains the poorest in Latin America and the Caribbean.[43] Several recent environmental disasters also contributed to the extraordinary and temporary conditions in Haiti.[44]

As discussed by Secretary Noem in the February 24, 2025, FRN, the July 1, 2024, notice cites some country conditions reports that are relatively proximate to the June 4, 2024, decision;

---

[33] *See Extension of the Designation of Haiti for Temporary Protected Status,* 77 FR 59943 (Oct. 1, 2012).

[34] *See Extension of the Designation of Haiti for Temporary Protected Status,* 79 FR 11808 (Mar. 3, 2014).

[35] *See Extension of the Designation of Haiti for Temporary Protected Status,* 80 FR 51582 (Aug. 25, 2015).

[36] *See Extension of the Designation of Haiti for Temporary Protected Status,* 82 FR 23830 (May 24, 2017).

[37] *See Termination of the Designation of Haiti for Temporary Protected Status,* 83 FR 2648 (Jan. 18, 2018).

[38] *See Designation of Haiti for Temporary Protected Status,* 86 FR 41863 (Aug. 3, 2021).

[39] *See Extension and Redesignation of Haiti for Temporary Protected Status,* 88 FR 5022 (Jan. 26, 2023).

[40] *See Extension and Redesignation of Haiti for Temporary Protected Status,* 89 FR 54484 (Jul. 1, 2024).

[41] *See Partial Vacatur of 2024 Temporary Protected Status Decision for Haiti,* 90 FR 10511 (Feb. 24, 2025)

[42] Edith M. Lederer, *Gang violence in Haiti is escalating and spreading with a significant increase in killings, UN says,* The Associated Press, Sept. 27, 2023, available at https://apnews.com/ article/ haiti-gang-violence-un-report-killings-5d3f7ff272b7303852869dfc67692a23 (last visited Apr. 29, 2024); ACAPS, *Haiti: Humanitarian impact of gang violence,* June 2, 2023, available at https://www.acaps.org/fileadmin/Data_Product/Main_media/20230602_acaps_briefing_note_haiti_humanitarian_imp act_of_gang_violence.pdf.

[43] World Bank, *The World Bank in Haiti Overview (last updated Oct. 26, 2023),* available at https://www.worldbank.org/ en/ country/ haiti/ overview (last visited Apr. 29, 2024).

[44] UNICEF, *Massive earthquake leaves devastation in Haiti (last updated Oct. 4, 2021),* available at https://www.unicef.org/ emergencies/ massivEdite-earthquake-devastation-haiti (last visited Apr. 29, 2024); Luke Taylor, `*We have no time to heal': floods followed by earthquake heap more trauma on Haiti,* The Guardian, Jul. 11, 2023, available at https://www.theguardian.com/ global-development/ 2023/ jul/ 11/ we-have-no-time-to-heal-floods-followed-by-earthquake-heap-more-trauma-on-haiti (last visited Apr. 29, 2024); UN News, *Haiti: UN deeply saddened as latest earthquake kills three,in wake of floods,* Jun. 6, 2023, available at https://news.un.org/ en/ story/ 2023/ 06/ 1137407 (last visited Apr. 29, 2024)..

HondurasAR000212

however, several others date back to early 2023, 2022, or even earlier.[45] As well, certain sources upon which DHS relied upon at that time indicated that significant developments were taking place in 2024 that might result in an improvement in conditions. For example, as stated in the July 1, 2024, FRN, the United Nations had recently authorized a Multinational Security Support (MSS) mission to deploy in Haiti and support the Haitian National Police in capacity building, combatting gang violence, and provide security for critical infrastructure.[46]

## Somalia

Somalia was initially designated for TPS on September 16, 1991, on the basis of extraordinary and temporary conditions that prevented Somalis from returning in safety.[47] Somalia's designation for TPS has been consecutively extended since its initial designation. Additionally, Somalia was redesignated for TPS in 2001, again based on extraordinary and temporary conditions.[48] In 2012, Somalia was again redesignated for TPS on the basis of extraordinary and temporary conditions and on the additional basis of ongoing armed conflict.[49] Somalia was extended and redesignated on these same bases in 2021 and 2023.[50] Most recently, DHS extended and redesignated Somalia for TPS for 18 months from September 18, 2024, through March 17, 2026, based on former Secretary Mayorkas' determination that ongoing armed conflict and extraordinary and temporary conditions prevented safe return of Somalian nationals.[51]

As was noted in the most recently published FRN, which reflected former Secretary Mayorkas' decision, the terrorist group Al-Shabaab continues to pose a significant threat to Somalia's security.[52] .[53] .[54]

## Syria

Syria was initially designated for TPS on March 29, 2012, based on extraordinary and temporary conditions that prevented nationals of Syria from returning in safety.[55] DHS extended and

---

[45] *See, e.g.,* 89 FR 54888, 54490 (relying on Apr. 2021 report by Harvard Law School, July 2022 report by the International Crisis Group, and Sept. 2021 report by the Council on Foreign Relations).

[46] *See e.g. 89 FR 54490 & nn. 77-79 (citing United Nations Security Council, Resolution 2699 (Oct. 2, 2023)).*

[47] *See Designation of Nationals of Somalia for Temporary Protected Status*, 56 FR 46804 (Sept. 16, 1991).

[48] *See Extension and Redesignation of Somalia under Temporary Protected Status Program,* 66 FR 46288 (Sept. 4, 2001).

[49] *See Extension and Redesignation of Somalia for Temporary Protected Status,*77 FR 25723 (May 1, 2012).

[50] *See Extension and Redesignation of Somalia for Temporary Protected Status,* 86 FR 38744 (Jul. 22, 2021); *See Extension and Redesignation of Somalia for Temporary Protected Status,* 88 FR 15434 (Mar. 13, 2023).

[51] *See Extension and Redesignation of Somalia for Temporary Protected Status,* 89 FR 59135 (Jul. 22, 2024)

[52] UN News, *As African Union Mission in Somalia Draws Down, Al-Shabaab Remains Threat to Country, Region, Special Representative Tells Security Council,* Oct. 19, 2023, available at https://press.un.org/en/2023/sc15457.doc.htm (last visited May 24, 2024).

[53] UN Security Council, *Letter dated 29 September 2023 from the Chair of the Security Council Committee pursuant to resolution 751 (1992) concerning Al-Shabaab addressed to the President of the Security Council (S/2023/724),* Oct. 2, 2023, pg. 3, available at https://www.ecoi.net/en/file/local/2100037/N2325555.pdf.

[54] UNICEF, *Somalia,* Jan. 2024, pg. 2, available at https://www.unicef.org/media/154536/file/2024-HAC-Somalia-revised-January.pdf.

[55]*See Designation of Syrian Arab Republic for Temporary Protected Status,*77 FR 19026 (Mar. 29, 2012).

HondurasAR000213

redesignated Syria for TPS three times based on ongoing armed conflict and extraordinary and temporary conditions: (1) from October 1, 2013, to March 21, 2015;[56] (2) from April 1, 2015, to September 30, 2016;[57] and from October 1, 2016 to March 31, 2018.[58] Thereafter, DHS extended TPS for Syria from April 1, 2018, to September 30, 2019[59] and again on October 1, 2019, to March 31, 2021,[60] based on ongoing armed conflict and extraordinary and temporary conditions. DHS extended and redesignated TPS for Syria based on ongoing armed conflict and extraordinary and temporary conditions from March 31, 2021, to September 30, 2022,[61] and from October 1, 2022, to March 31, 2024.[62] Most recently, DHS extended and redesignated Syria for TPS for 18 months, from April 1, 2024, through September 30, 2025, based on former Secretary Mayorkas' determination that armed conflict and extraordinary and temporary conditions remained ongoing, preventing Syrian nationals from returning in safety.[63]

As was noted in the January 29, 2024, FRN, which reflected former Secretary Mayorkas' decision, the ongoing civil war in Syria was in its thirteenth year and has involved destruction of infrastructure and civilian casualties.
On February 6, 2023, earthquake and subsequent aftershock that hit southern Turkey near the Syrian border. Former Secretary Mayorkas assessed these also contributed to the worsening humanitarian situation and economic deterioration.[64] The earthquake killed 8,476 people in Syria.[65] The earthquake also impacted Syria's economy, infrastructure, and health sector.[66]

The government of Bashar al-Assad was overthrown on December 8, 2024, by a coalition of armed opposition groups, including Hay'et Tahrir al-Sham (HTS) and factions of the Syrian National Army (SNA), marking an end to over 50 years of Baath Party rule in Syria[67]. The fall of the long-time dictatorial ruler is bringing in Syria both challenges and opportunities.

### Yemen

Yemen was initially designated for TPS on September 3, 2015, based on ongoing armed conflict

---

[56] *See Extension and Redesignation of Syria for Temporary Protected Status*, 78 FR 36223 (June 17, 2013).

[57] *See Extension and Redesignation of the Syrian Arab Republic for Temporary Protected Status,* 80 FR 245 (Jan. 5, 2015).

[58] *See Extension and Redesignation of Syria for Temporary Protected Status*, 81 FR 50533 (Aug. 1, 2016).

[59] *See Extension of the Designation of Syria for Temporary Protected Status*, 83 FR 9329 (Mar. 5, 2018).

[60] *See Extension of the Designation of Syria for Temporary Protected Status*, 83 FR 9329 (Mar. 5, 2018).

[61] *See Extension and Redesignation of Syria for Temporary Protected Status*, 86 FR 14946 (Mar. 19, 2021).

[62] *See Extension and Redesignation of Syria for Temporary Protected Status*, 87 FR 46982 (Aug. 1, 2022).

[63] *See Extension and Redesignation of Syria for Temporary Protected Status*, 89 FR 5562 (Jan, 29. 2024).

[64] Erol Yayboke, *Shattered Relief: A 7.8-Magnitude Earthquake Strikes Turkey and Syria*, CSIS, Feb. 7, 2023, available at https://www.csis.org/ analysis/ shattered-relief-78-magnitude-earthquake-strikes-turkey-and-syria (last visited Oct. 10, 2023).

[65] International Blue Crescent, *Kahramanmaraş Earthquakes Situation Report,* Apr. 6, 2023, p. 2, available at https://reliefweb.int/ report/ turkiye/ devastating-earthquakes-southern-turkiye-and-northern-syria-april-6th-2023-situation-report-20-entr (last visited Oct. 10, 2023).

[66] *Id.*

[67] Associate Press, Syrian government falls in stunning end to 50-year rule of Assad family, Dec. 8, 2024, available at https://apnews.com/article/syria-assad-sweida-daraa-homs-hts-qatar-7f65823bbf0a7bd331109e8dff419430 (last visited May 13, 2025).

HondurasAR000214

that prevented nationals of Yemen from returning in safety.[68]  On January 4, 2017, DHS extended and redesignated Yemen for TPS for 18 months from March 4, 2017, through September 3, 2018, based on ongoing armed conflict and extraordinary and temporary conditions.[69]  DHS extended the TPS designation for Yemen from September 4, 2018, through March 3, 2020,[70] and again from March 4, 2020, through September 3, 2021.[71]  On July 9, 2021, DHS extended and redesignated Yemen for TPS for 18 months from September 4, 2021, through March 3, 2023, based on ongoing armed conflict and extraordinary and temporary conditions.[72]  DHS then extended and redesignated Yemen for TPS twice more: from March 4, 2023, through September 3, 2024,[73] and most recently from September 4, 2024, through March 3, 2026.[74]

As was noted in the FRN published on July 10, 2024, which reflected former Secretary Mayorkas' decision, Yemen was in its tenth year of a protracted conflict that has resulted in food insecurity, limited access to water and medical care, and  the destruction of part of Yemen's infrastructure.[75] Former Secretary Mayorkas determined that    Yemen was redesignated for TPS based on the former Secretary's assessment that an ongoing armed conflict prevented Yemeni nationals from returning in safety.

---

[68] *See Designation of the Republic of Yemen for Temporary Protected Status*, 80 FR 53319 (Sept. 3, 2015).

[69] *See Extension and Redesignation of the Republic of Yemen for Temporary Protected Status*, 82 FR 859 (Jan. 4, 2017).

[70] *See Extension of the Designation of Yemen for Temporary Protected Status*, 83 FR 40307 (Aug. 14, 2018).

[71] See *Extension of the Designation of Yemen for Temporary Protected Status*, 85 FR 12313 (Mar. 2, 2020).

[72] *See Extension and Redesignation of Yemen for Temporary Protected Status*, 86 FR 36295 (July 9, 2021).

[73] *See Extension and Redesignation of Yemen for Temporary Protected Status*, 88 FR 94 (Jan. 3, 2023).

[74] *See Extension and Redesignation of Yemen for Temporary Protected Status*, 89 FR 56765 (Jul. 10, 2024).

[75] United Nations High Commissioner for Refugees, *Yemen Crisis Explained,* Mar. 21, 2024, available at https://www.unrefugees.org/ news/ yemen-crisis-explained (last visited Mar. 25, 2024); Human Rights Watch, *"Death is More Merciful Than This Life" Houthi and Yemeni Government Violations of the Right to Water in Taizz,* Dec. 11, 2023, available at https://www.hrw.org/ report/ 2023/ 12/ 11/ death-more-merciful-life/ houthi-and-yemeni-government-violations-right-water (last visited Apr. 12, 2024).

HondurasAR000215

## Section 4.5 Designations under INA § 244(b)(1)

This section provides details about TPS actions announced by former Secretary Mayorkas in CY 2024 regarding foreign states for which the most recent action by the Secretary, as of December 31, 2024, was a new designation of TPS of the state.  The conditions described reflect former Secretary Mayorkas's rationale for undertaking these new designations, and do not necessarily represent the views of Secretary Noem.

### Lebanon

Lebanon was initially designated for TPS on November 27, 2024, based on Secretary Mayorkas' determination that ongoing armed conflict and extraordinary and temporary conditions that prevented nationals of Lebanon from returning in safety.[76]  Lebanon was designated for TPS for a period of 18 months, beginning on November 27, 2024, and ending on May 27, 2026.

As was noted in the most recently published FRN, which reflected Former Secretary Mayorkas' view and judgement, since October 7, 2023, there had been an escalation of hostilities across the Lebanon-Israel border between Hezbollah[77] and the Israel Defense Forces.  By September 2024, the conflict between Israel and Hezbollah had significantly escalated, causing civilian casualties and displacement.[78]   Access to sufficient food, water, and healthcare decreased,[79] due largely to the destruction or closure of relevant facilities during the conflict.[80]

## Section 4.6 Terminations Under INA § 244(b)(3)(B)

Former Secretary Mayorkas did not terminate the TPS designations of any foreign states, or parts thereof, in CY 2024.

---

[76] *See Designation of Lebanon for Temporary Protected Status*, 89 FR 93641 (Nov. 27, 2024).

[77] Hezbollah (also spelled "Hizballah") was designated as a foreign terrorist organization in 1997.  See U.S. Dep't of State, Country Reports on Terrorism 2022, Nov. 30, 2023, p. 276, available at https://www.state.gov/ wp-content/ uploads/ 2023/ 11/ Country_ Reports_ on_ Terrorism_ 2022-v3.pdf.

[78] Melanie Lidman, Bassam Hatoum, and Bassem Mroue, *Israel expands its bombardment in Lebanon as thousands flee widening war,* AP, October 5, 2024, available at https://apnews.com/article/mideast-wars-lebanon-hezbollah-hamas-5-october-2024-a8b70daeccc57a86fc6d939c604f2caf (last visited Oct. 31, 2024).

[79] OCHA, *Today's top news: Israel and Occupied Palestinian Territory, Lebanon, Sudan*, Oct. 7, 2024, available at https://www.unocha.org/news/todays-top-news-israel-and-occupied-palestinian-territory-lebanon-sudan (last visited Oct. 31, 2024); World Food Programme, *Lebanon,* available at https://www.wfp.org/countries/lebanon (last visited Oct. 31, 2024).

[80] OCHA, *Today's top news: Israel and Occupied Palestinian Territory, Lebanon, Sudan*, Oct. 7, 2024, available at https://www.unocha.org/news/todays-top-news-israel-and-occupied-palestinian-territory-lebanon-sudan (last visited Oct. 31, 2024).

HondurasAR000216

**Appendix A: TPS Beneficiaries' Immigration Status at Initial Filing by Country**

Table No. 1:  Afghanistan, Burma, Cameroon, El Salvador, Ethiopia, Haiti, Honduras, Nepal

| Immigration Status at Initial Filing | Afghanistan | Burma | Cameroon | El Salvador | Ethiopia | Haiti | Honduras | Nepal |
|---|---|---|---|---|---|---|---|---|
| A1 | 0 | 0 | 5 | 6 | 3 | 35 | 1 | 3 |
| A11 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 |
| A12 | 0 | 4 | 4 | 569 | 2 | 487 | 155 | 5 |
| A16 | 0 | 0 | 8 | 0 | 0 | 1 | 0 | 0 |
| A17 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 |
| A2 | 0 | 1 | 0 | 6 | 3 | 37 | 2 | 5 |
| A3 | 0 | 0 | 0 | 1 | 0 | 7 | 3 | 2 |
| A32 | 0 | 0 | 0 | 0 | 0 | 4 | 0 | 0 |
| A33 | 0 | 0 | 0 | 0 | 0 | 5 | 0 | 0 |
| A37 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 0 |
| AA1 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 |
| AA2 | 0 | 0 | 0 | 0 | 0 | 3 | 0 | 0 |
| AA3 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 0 |
| AA6 | 1 | 0 | 0 | 0 | 0 | 4 | 0 | 0 |
| AA7 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 |
| AA8 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 0 |
| ABD | 0 | 0 | 0 | 0 | 0 | 7 | 0 | 0 |
| ABS | 7 | 9 | 30 | 16 | 11 | 3,007 | 7 | 0 |
| AO | 14 | 21 | 67 | 0 | 123 | 2,968 | 0 | 3 |
| AR | 1 | 0 | 1 | 0 | 0 | 58 | 0 | 0 |
| AS | 445 | 245 | 835 | 122 | 649 | 23,697 | 20 | 974 |
| AS1 | 2 | 0 | 0 | 0 | 1 | 31 | 0 | 2 |
| AS2 | 0 | 0 | 1 | 0 | 0 | 6 | 0 | 2 |
| AS3 | 0 | 0 | 0 | 0 | 2 | 11 | 0 | 1 |
| AS6 | 0 | 0 | 3 | 0 | 3 | 213 | 0 | 1 |
| AS7 | 1 | 0 | 0 | 0 | 2 | 16 | 0 | 2 |
| AS8 | 0 | 0 | 3 | 0 | 2 | 38 | 0 | 0 |
| ASD | 0 | 2 | 31 | 3 | 19 | 139 | 0 | 3 |
| ASR | 0 | 0 | 0 | 0 | 0 | 11 | 0 | 0 |
| ASY | 7 | 14 | 34 | 45 | 42 | 2,139 | 0 | 13 |
| AY | 0 | 3 | 6 | 1 | 5 | 236 | 0 | 3 |
| B1 | 0 | 30 | 40 | 13 | 61 | 490 | 29 | 10 |
| B11 | 0 | 0 | 0 | 1 | 0 | 3 | 0 | 0 |
| B12 | 0 | 0 | 0 | 1 | 0 | 2 | 0 | 0 |
| B16 | 0 | 0 | 0 | 1 | 0 | 4 | 0 | 0 |
| B17 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 |
| B1A | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 |
| B1B | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| B2 | 1 | 261 | 174 | 123 | 354 | 5,928 | 211 | 73 |

A1

The Wayback Machine - https://web.archive.org/web/20241220043500/https://www.cia.gov/the-world-factbook/...

HondurasAR000218

# Explore All Countries

# Honduras

**Central America and the Caribbean**

Page last updated: December 15, 2024



## INTRODUCTION

**Background**

## GEOGRAPHY

**Location**

**Geographic coordinates**

**Map references**

**Area**

comparison ranking: total 103

**Area - comparative**

Honduras:AR000219

## Area comparison map:



**Land boundaries**

**Coastline**

**Maritime claims**

**Climate**

**Terrain**

**Elevation**

**Natural resources**

**Land use**

**Irrigated land**

**Major lakes (area sq km)**

**Population distribution**

**Natural hazards**

**Geography - note**

## PEOPLE AND SOCIETY

**Population**

comparison rankings: female 96; male 97; total 96

**Nationality**

**Ethnic groups**

**Languages**

# Spanish audio sample:

**Religions**

**Demographic profile**

HondurasAR000220

**Age structure**

**2023 population pyramid:**



**Dependency ratios**

**Median age**

comparison ranking: total 168

**Population growth rate**

comparison ranking: 74

**Birth rate**

comparison ranking: 68

**Death rate**

comparison ranking: 185

**Net migration rate**

comparison ranking: 165

**Population distribution**

**Urbanization**

**Major urban areas - population**

**Sex ratio**

**Mother's mean age at first birth**

**Maternal mortality ratio**

comparison ranking: 85

**Infant mortality rate**

comparison ranking: total 90

**Life expectancy at birth**

comparison ranking: total population 152

**Total fertility rate**

comparison ranking: 76

**Gross reproduction rate**

HondurasAR000221

**Contraceptive prevalence rate**

**Drinking water source**

**Current health expenditure**

**Physician density**

**Hospital bed density**

**Sanitation facility access**

**Obesity - adult prevalence rate**

comparison ranking: 89

**Alcohol consumption per capita**

comparison ranking: total 119

**Children under the age of 5 years underweight**

comparison ranking: 65

**Currently married women (ages 15-49)**

**Child marriage**

**Education expenditures**

comparison ranking: 34

**Literacy**

**School life expectancy (primary to tertiary education)**

## ENVIRONMENT

**Environment - current issues**

**Environment - international agreements**

**Climate**

**Land use**

**Urbanization**

**Revenue from forest resources**

comparison ranking: 54

**Revenue from coal**

comparison ranking: 172

**Air pollutants**

Honduras;AR000222

Waste and recycling

Major lakes (area sq km)

Total water withdrawal

Total renewable water resources

## GOVERNMENT

Country name

Government type

Capital

Administrative divisions

Independence

National holiday

Legal system

Constitution

International law organization participation

Citizenship

Suffrage

Executive branch

Legislative branch

Judicial branch

Political parties

International organization participation

Diplomatic representation in the US

Diplomatic representation from the US

Flag description

National symbol(s)

National anthem

National heritage

## ECONOMY

Honduras AR000223

**Economic overview**

**Real GDP (purchasing power parity)**

comparison ranking: 110

**Real GDP growth rate**

comparison ranking: 89

**Real GDP per capita**

comparison ranking: 163

**GDP (official exchange rate)**

**Inflation rate (consumer prices)**

comparison ranking: 138

**Credit ratings**

**GDP - composition, by sector of origin**

comparison rankings: services 105; industry 89; agriculture 66

**GDP - composition, by end use**

**Agricultural products**

**Industries**

**Industrial production growth rate**

comparison ranking: 183

**Labor force**

comparison ranking: 91

**Unemployment rate**

comparison ranking: 124

**Youth unemployment rate (ages 15-24)**

comparison ranking: total 119

**Population below poverty line**

**Gini Index coefficient - distribution of family income**

comparison ranking: 15

**Average household expenditures**

**Household income or consumption by percentage share**

**Remittances**

Honduras AR000224

**Budget**

**Public debt**

comparison ranking: 133

**Taxes and other revenues**

comparison ranking: 138

**Current account balance**

comparison ranking: 146

**Exports**

comparison ranking: 116

**Exports - partners**

**Exports - commodities**

**Imports**

comparison ranking: 101

**Imports - partners**

**Imports - commodities**

**Reserves of foreign exchange and gold**

comparison ranking: 95

**Debt - external**

comparison ranking: 43

**Exchange rates**

## ENERGY

**Electricity access**

**Electricity**

comparison rankings: transmission/distribution losses 147; imports 105; exports 99; consumption 111; installed generating capacity 107

**Electricity generation sources**

**Coal**

**Petroleum**

**Carbon dioxide emissions**

Honduras:AR000225

comparison ranking: total emissions 107

**Energy consumption per capita**

comparison ranking: 135

## COMMUNICATIONS

**Telephones - fixed lines**

comparison ranking: total subscriptions 100

**Telephones - mobile cellular**

comparison ranking: total subscriptions 102

**Telecommunication systems**

**Broadcast media**

**Internet country code**

**Internet users**

comparison ranking: total 99

**Broadband - fixed subscriptions**

comparison ranking: total 97

## TRANSPORTATION

**National air transport system**

**Civil aircraft registration country code prefix**

**Airports**

comparison ranking: 40

**Heliports**

**Railways**

comparison ranking: total 100

**Roadways**

comparison ranking: total 126

**Waterways**

comparison ranking: 93

**Merchant marine**

Honduras:AR000226

comparison ranking: total 43

**Ports**

## MILITARY AND SECURITY

**Military and security forces**

**Military expenditures**

comparison ranking: 92

**Military and security service personnel strengths**

**Military equipment inventories and acquisitions**

**Military service age and obligation**

**Military - note**

## TRANSNATIONAL ISSUES

**Refugees and internally displaced persons**

**Illicit drugs**

The Wayback Machine - https://web.archive.org/web/20250626192236/https://www.cia.gov/the-world-factbook/...

HondurasAR000227

# Explore All Countries

# Honduras

*Central America and the Caribbean*

Page last updated: June 25, 2025



## INTRODUCTION

**Background**

## GEOGRAPHY

**Location**

**Geographic coordinates**

HondurasAR000228

Map references

Area

comparison ranking: total 103

Area - comparative

**Area comparison map:**

Land boundaries

Coastline

Maritime claims

Climate

Terrain

Elevation

Natural resources

Land use

Irrigated land

Major lakes (area sq km)

Population distribution

Natural hazards

Geography - note

## PEOPLE AND SOCIETY

Population

comparison rankings: total 96; female 96; male 97

Nationality

Ethnic groups

HondurasAR000229

**Languages**

# Spanish audio sample:

**Religions**

**Age structure**

# 2024 population pyramid:

**Dependency ratios**

**Median age**

comparison ranking: total 168

**Population growth rate**

comparison ranking: 74

**Birth rate**

comparison ranking: 68

**Death rate**

comparison ranking: 185

**Net migration rate**

comparison ranking: 165

**Population distribution**

**Urbanization**

**Major urban areas - population**

**Sex ratio**

**Mother's mean age at first birth**

**Maternal mortality ratio**

comparison ranking: 85

**Infant mortality rate**

comparison ranking: total 90

**Life expectancy at birth**

HondurasAR000230

comparison ranking: total population 152

**Total fertility rate**

comparison ranking: 76

**Gross reproduction rate**

**Contraceptive prevalence rate**

**Drinking water source**

**Health expenditure**

**Physician density**

**Hospital bed density**

**Sanitation facility access**

**Obesity - adult prevalence rate**

comparison ranking: 89

**Alcohol consumption per capita**

comparison ranking: total 119

**Tobacco use**

comparison ranking: total 113

**Children under the age of 5 years underweight**

comparison ranking: 60

**Currently married women (ages 15-49)**

**Child marriage**

**Education expenditure**

comparison ranking: Education expenditure (% GDP) 110

**Literacy**

**School life expectancy (primary to tertiary education)**

## ENVIRONMENT

**Environment - current issues**

**Environment - international agreements**

**Climate**

**Land use**

HondurasAR000231

Urbanization

Air pollutants

Waste and recycling

Major lakes (area sq km)

Total water withdrawal

Total renewable water resources

## GOVERNMENT

Country name

Government type

Capital

Administrative divisions

Legal system

Constitution

International law organization participation

Citizenship

Suffrage

Executive branch

Legislative branch

Judicial branch

Political parties

Diplomatic representation in the US

Diplomatic representation from the US

International organization participation

Independence

National holiday

Flag description

National symbol(s)

National colors

National anthem

Honduras AR000232

**National heritage**

## ECONOMY

**Economic overview**

**Real GDP (purchasing power parity)**

comparison ranking: 111

**Real GDP growth rate**

comparison ranking: 92

**Real GDP per capita**

comparison ranking: 163

**GDP (official exchange rate)**

**Inflation rate (consumer prices)**

comparison ranking: 142

**GDP - composition, by sector of origin**

comparison rankings: services 109; industry 85; agriculture 65

**GDP - composition, by end use**

**Agricultural products**

**Industries**

**Industrial production growth rate**

comparison ranking: 180

**Labor force**

comparison ranking: 95

**Unemployment rate**

comparison ranking: 122

**Youth unemployment rate (ages 15-24)**

comparison ranking: total 124

**Population below poverty line**

**Gini Index coefficient - distribution of family income**

comparison ranking: 15

**Average household expenditures**

**Household income or consumption by percentage share**

**Remittances**

**Budget**

**Public debt**

comparison ranking: 133

**Taxes and other revenues**

comparison ranking: 135

**Current account balance**

comparison ranking: 147

**Exports**

comparison ranking: 118

**Exports - partners**

**Exports - commodities**

**Imports**

comparison ranking: 101

**Imports - partners**

**Imports - commodities**

**Reserves of foreign exchange and gold**

comparison ranking: 86

**Debt - external**

comparison ranking: 58

**Exchange rates**

## ENERGY

**Electricity access**

**Electricity**

comparison rankings: transmission/distribution losses 150; imports 106; exports 100; consumption 114; installed generating capacity 106

**Electricity generation sources**

**Coal**

**Petroleum**

Honduras/AR000233

HondurasAR000234

**Carbon dioxide emissions**

comparison ranking: total emissions 107

**Energy consumption per capita**

comparison ranking: 136

## COMMUNICATIONS

**Telephones - fixed lines**

comparison ranking: total subscriptions 97

**Telephones - mobile cellular**

comparison ranking: total subscriptions 103

**Broadcast media**

**Internet country code**

**Internet users**

**Broadband - fixed subscriptions**

comparison ranking: total 100

## TRANSPORTATION

**Civil aircraft registration country code prefix**

**Airports**

comparison ranking: 40

**Heliports**

comparison ranking: 95

**Railways**

**Merchant marine**

comparison ranking: total 43

**Ports**

## MILITARY AND SECURITY

**Military and security forces**

**Military expenditures**

**Military and security service personnel strengths**

Honduras AR000235

**Military equipment inventories and acquisitions**

**Military service age and obligation**

**Military - note**

## TRANSNATIONAL ISSUES

**Refugees and internally displaced persons**

**Illicit drugs**



# Honduras: Background and U.S. Relations

November 30, 2023

**Congressional Research Service**

https://crsreports.congress.gov

R47856

**CRS REPORT**
Prepared for Members and
Committees of Congress

**Congressional Research Service**
Informing the legislative debate since 1914

SUMMARY

R47856

November 30, 2023

**Peter J. Meyer**
Specialist in Latin
American and Canadian
Affairs

# Honduras: Background and U.S. Relations

Honduras, a Central American nation of 9.8 million people, has had close ties with the United States for many years. The country served as a base for U.S. operations designed to counter Soviet influence in Central America during the 1980s, and it continues to host a U.S. military presence and cooperate on various security concerns today. Trade and investment linkages are also long-standing and have grown stronger since the implementation of the Dominican Republic-Central America-United States Free Trade Agreement (CAFTA-DR) in 2006. Instability in Honduras—including a 2009 coup and outflows of migrants and asylum-seekers since 2014—has led U.S. policymakers to focus greater attention on conditions in the country and their implications for the United States over the past decade.

## Domestic Situation

President Xiomara Castro of the leftist Liberty and Re-foundation (LIBRE) party was inaugurated to a four-year term in January 2022. She inherited a difficult situation. Honduras experienced democratic backsliding and erosion of the rule of law under her predecessor, Juan Orlando Hernández (2014-2022), who was extradited to the United States to face drug trafficking charges in April 2022. Socioeconomic conditions also had deteriorated in the two years preceding Castro's election due to the effects of the Coronavirus Disease 2019 (COVID-19) pandemic and two tropical storms.

A broad coalition propelled Castro to office based on her pledges to address these challenges. Progress has been uneven over the past two years. Castro has enacted some anti-corruption and economic reforms, but her lack of a working majority in the unicameral congress, in which her party won 50 of 128 seats, has stymied other policy changes. In some areas, Castro has reversed positions since taking office. On public security, for example, she has abandoned her pledge to reduce the military's role in law enforcement and has repeatedly extended an emergency decree that suspends certain constitutional rights in an attempt to combat extortion and other security challenges.

As their agenda has stalled, Castro and LIBRE have called their supporters into the streets to exert popular pressure on the Honduran congress while simultaneously seeking to delegitimize the political opposition and civil society critics. LIBRE legislators also have engaged in some controversial, and potentially illegal, maneuvers to secure control of the congress and other government bodies, including the office of the attorney general. These tactics have contributed to the erosion of Castro's support base, the establishment of a larger and more unified opposition bloc, and increasing concerns among domestic and foreign observers about the Honduran government's trajectory. According to a September 2023 CID Gallup poll, 36% of Hondurans approved of Castro's performance in office.

## U.S. Policy

The Biden Administration's policy toward Honduras is guided by the U.S. Strategy for Addressing the Root Causes of Migration in Central America, a whole-of-government effort designed to promote economic prosperity, strengthen governance, and improve security in Honduras and the rest of the region. U.S. agencies allocated at least $437.4 million in foreign assistance to Honduras to support implementation of the strategy from FY2021 to FY2023. The Biden Administration has sought to collaborate closely with Castro on efforts to improve living conditions in Honduras and address challenges such as drug trafficking and irregular migration. Nevertheless, bilateral relations have been strained by some policy disagreements. Administration officials and some Members of Congress have expressed particular concerns about the Castro administration's efforts to forge closer ties with the People's Republic of China, economic reforms that could negatively affect U.S. businesses and investors, and government actions that could further weaken Honduras's democratic institutions.

The 118th Congress may continue shaping U.S. policy toward Honduras through its legislative and oversight efforts. Congress is currently considering the Biden Administration's $136.5 million FY2024 foreign assistance request for Honduras. The House-passed (H.R. 4665/H.Rept. 118-146) and Senate-reported (S. 2438/S.Rept. 118-71) versions of the Department of State, Foreign Operations, and Related Programs Appropriations Act, 2024, would not specify funding levels for Honduras. Both bills would maintain some restrictions on aid for the Honduran government, however, and S. 2438 would maintain a prohibition on Foreign Military Financing for Honduras. Other legislative measures could affect U.S.-Honduras migration ties. For example, the Secure the Border Act of 2023 (H.R. 2), passed by the House in May 2023, would direct the Secretary of State to "seek to negotiate" an asylum cooperation agreement with the Honduran government.

HondurasAR000237

# Contents

Introduction ........................................................................................................................... 1
Political and Economic Environment ..................................................................................... 3
    2009 Coup and Aftermath ............................................................................................... 3
    Castro Administration (2022-Present) ............................................................................ 4
        Corruption and the Rule of Law ............................................................................... 5
        Socioeconomic Conditions ....................................................................................... 7
        Security and Human Rights Conditions .................................................................... 8
U.S.-Honduran Relations ...................................................................................................... 9
    U.S. Assistance ............................................................................................................... 11
    Migration ........................................................................................................................ 14
    Security Cooperation ...................................................................................................... 16
        U.S. Military Presence ............................................................................................. 16
        Counternarcotics ...................................................................................................... 17
        Citizen Security ........................................................................................................ 17
    Commercial Ties ............................................................................................................. 18
        Trade and Investment Flows .................................................................................... 19
        Labor Rights Concerns ............................................................................................. 20
        Investment Concerns ................................................................................................ 21
Outlook ................................................................................................................................. 22

# Figures

Figure 1. Honduras at a Glance ............................................................................................. 2
Figure 2. Homicide Rate in Honduras: 2004-2022 ............................................................... 8
Figure 3. U.S. Border Patrol Enforcement Encounters with Honduran Nationals at the
    Southwest Border: FY2009-FY2023 ............................................................................. 14
Figure 4. U.S. Trade with Honduras: 2005-2022 ................................................................. 19

# Tables

Table 1. U.S. Assistance to Honduras: FY2021-FY2024 Request ............................................ 12

# Contacts

Author Information ................................................................................................................. 22

HondurasAR000238

# Introduction

Honduras, located in the "Northern Triangle" of Central America (along with El Salvador and Guatemala), faces considerable domestic challenges (see **Figure 1** for a map). Democratic institutions are fragile, economic growth rates and social policies are insufficient to reduce widespread poverty, and the country experiences some of the highest violent crime rates in the world. These interrelated challenges have produced periodic instability in Honduras and have contributed to relatively high levels of displacement and emigration over the past decade.

U.S. policymakers have devoted increased attention to conditions in Honduras and its Central American neighbors as irregular migration from the region has strained U.S. resources at the Southwest border. Specific policy approaches have shifted from one U.S. presidential Administration to another, however, potentially limiting the impact of U.S. efforts. In FY2016, the Obama Administration worked with Congress to increase U.S. foreign assistance to Honduras as part of a whole-of-government strategy intended to improve economic, security, and governance conditions in Central America. The Trump Administration then suspended most U.S. assistance to Honduras from March 2019 until June 2020, resulting in U.S. agencies modifying or canceling many activities less than two years into implementation. During the aid suspension, the Trump Administration negotiated an agreement with the Honduran government that would allow the United States to transfer some asylum-seekers to Honduras in an apparent attempt to deter irregular migration and alleviate pressure on the U.S. immigration system. The Biden Administration terminated that agreement, prior to implementation, in early 2021.[1]

The Biden Administration is seeking to scale up U.S. assistance programs in Honduras as part of its U.S. Strategy for Addressing the Root Causes of Migration in Central America, developed pursuant to the United States-Northern Triangle Enhanced Engagement Act (P.L. 116-260, Division FF, Subtitle F; 22 U.S.C. §2277) and Executive Order 14010.[2] The Administration has proposed allocating $4 billion of assistance to Central America over four years, including at least $136.5 million for Honduras in FY2024. It has viewed Honduran President Xiomara Castro as a potential ally in efforts to address underlying drivers of migration. However, some of the Honduran government's policies have raised questions about its commitment to strengthening democratic institutions, combatting corruption, fostering inclusive economic growth, and partnering with the United States.

Whereas some Members of the 118th Congress have welcomed the Biden Administration's efforts to expand cooperation with Honduras, others have expressed skepticism about the effectiveness of U.S. assistance activities and concerns about the Castro administration's policies. As Congress appropriates foreign assistance, considers other legislation, and engages in oversight of U.S. policy, it may assess developments in Honduras and the extent to which the Honduran government is cooperating with the United States on migration, security, and commercial matters, among other issues.

---

[1] For background, see CRS In Focus IF10371, *U.S. Strategy for Engagement in Central America: An Overview*; CRS Report R44812, *U.S. Strategy for Engagement in Central America: Policy Issues for Congress*; and CRS Legal Sidebar LSB10402, *Safe Third Country Agreements with Northern Triangle Countries: Background and Legal Issues*.

[2] White House, *U.S. Strategy for Addressing the Root Causes of Migration in Central America*, July 2021, https://www.whitehouse.gov/wp-content/uploads/2021/07/Root-Causes-Strategy.pdf; and Executive Order 14010, "Creating a Comprehensive Regional Framework to Address the Causes of Migration, To Manage Migration Throughout North and Central America, and To Provide Safe and Orderly Processing of Asylum Seekers at the United States Border," 86 *Federal Register* 8267-8271, February 5, 2021.

## Figure 1. Honduras at a Glance



| Leadership | *President:* Xiomara Castro (Liberty and Re-foundation Party) |
|---|---|
| | *President of the Honduran National Congress:* Luis Redondo (Savior of Honduras Party) |
| | *President of the Supreme Court:* Rebeca Ráquel Obando |
| Geography | *Area:* 43,243 square miles (slightly larger than Virginia) |
| People | *Population:* 9.8 million (2023 est.) |
| | *Racial/Ethnic Identification:* 91.3% mixed or European descent, 8.6% Indigenous or African descent (2013) |
| | *Religious Identification:* 38.5% Evangelical Christian, 36.8% Catholic, 22.5% unaffiliated, 2.2% other or unknown (2023) |
| | *Literacy Rate:* 88.2% (2022) |
| | *Life Expectancy:* 77.1 years (2022) |
| Economy | *Gross Domestic Product (GDP):* $34.0 billion (2023 est.) |
| | *GDP per Capita:* $3,245 (2023 est.) |
| | *Top Exports:* apparel, insulated wire, coffee, bananas, palm oil, and shrimp (2022) |
| | *Poverty/Extreme Poverty Rates:* 73.6%/53.7% (2021) |

**Sources:** Population, ethnicity, literacy, life expectancy, and poverty data from Instituto Nacional de Estadística; religious identification data from Equipo de Reflexión, Investigación y Comunicación; export data from Trade Data Monitor; GDP estimates from International Monetary Fund. Map created by CRS.

**Note:** Some studies have estimated that the Indigenous and Afro-Honduran population is much larger than official statistics indicate. A 2007 census conducted by Indigenous organizations, for example, found that Hondurans of Indigenous and African descent accounted for 20% of the Honduran population.

# Political and Economic Environment

Honduras has struggled with political instability and authoritarian governance for much of its history. The country adopted its current constitution in 1982 as it transitioned back to civilian rule after two decades of military control. The constitution established a representative democracy with a separation of powers among an executive branch led by the president, a legislative branch consisting of a 128-seat unicameral national congress, and a judicial branch headed by the supreme court. In practice, the legislative process tends to be executive-driven and the judiciary is subject to intimidation, corruption, and politicization.

Honduras's poverty rate and level of income inequality are among the highest in Latin America.[3] Historically, the country's economic performance closely tracked the prices of agricultural commodities, such as bananas and coffee. Although agriculture remains important, accounting for 13% of gross domestic product (GDP) and 26% of total employment, the Honduran economy has diversified since the late 1980s.[4] Successive Honduran administrations privatized state-owned enterprises, lowered taxes and tariffs, and offered incentives to attract foreign investment, spurring growth in the *maquila* (offshore assembly for reexport) sector—particularly in the apparel, garment, and textile industries. Those policy changes also fostered the development of nontraditional agricultural exports, such as seafood and palm oil. Nevertheless, Honduras has not generated sufficient employment to absorb the country's growing labor supply, resulting in about 80% of Hondurans working in the unregulated informal sector, without job protections or benefits.[5]

## 2009 Coup and Aftermath

Honduras's traditional two-party system, dominated by the centrist (now center-right) Liberal Party (PL) and the conservative National Party (PN), has fractured over the past 15 years. The leadership of both traditional parties supported a 2009 coup, in which the military, backed by the supreme court and congress, detained then-President Manuel Zelaya and flew him into exile.[6] Zelaya took office in 2006 as a moderate member of the PL but alienated some within the political and economic elite by implementing populist policies and pushing for a constituent assembly to draft a new constitution. Some traditional PL voters abandoned the party after the coup to support the leftist Liberty and Re-foundation (LIBRE) party that Zelaya launched upon his return from exile in 2011 and continues to lead.

The PL's post-coup split benefitted the PN, which controlled the presidency and congress from 2010 until January 2022. Three consecutive terms in power allowed the PN to consolidate its influence over other, nominally independent, government institutions. In 2012, the PN-controlled congress, led by Juan Orlando Hernández, replaced four supreme court justices in a maneuver that some Honduran and international legal experts argued violated the independence of the judiciary.[7] The justices installed in 2012 issued a ruling in 2015 that struck down the constitution's explicit ban on presidential reelection, enabling Hernández, who was elected

---

[3] U.N. Economic Commission for Latin America and the Caribbean, *Social Panorama of Latin America and the Caribbean, 2022*, November 2022, pp. 85-91.

[4] Economist Intelligence Unit, "Data Tool," accessed September 26, 2023; and Instituto Nacional de Estadística (INE), Encuesta Permanente de Hogares de Propósitos Múltiples," March 2023.

[5] International Labor Organization, "ILOSTAT," accessed September 26, 2023.

[6] For more information, see CRS Report R41064, *Honduran Political Crisis, June 2009-January 2010*.

[7] See, for example, *El Heraldo*, "Se Conculcó Principio de Independencia," December 18, 2012; and *U.N. News*, "Dismissal of Honduran Supreme Court Judges an Attack on Democracy—UN Expert," January 29, 2013.

president in 2013, to seek a second term. The PN also manipulated appointments to the electoral body that oversaw Hernández's disputed 2017 reelection, which Organization of American States (OAS) observers characterized as a "low-quality electoral process" plagued by an "abundance of irregularities and deficiencies."[8] In addition to eroding democratic institutions, Hernández and the PN allegedly engaged in various corruption schemes, ranging from embezzling social assistance funds to facilitating drug trafficking in exchange for bribes and campaign contributions.[9] The U.S. Department of Justice indicted Hernández on drug-trafficking and firearms charges the day he left office; he was extradited to the United States in April 2022.[10]

## Castro Administration (2022-Present)

Hondurans voted for a change in direction during November 2021 general elections. With nearly 69% of eligible Hondurans turning out to vote, LIBRE's Xiomara Castro defeated the PN's Nasry Asfura, 51.1% to 36.9%, in the presidential race; the PL's Yani Rosenthal placed third with 10.0% of the vote. LIBRE also won a plurality in congress, with 50 out of 128 seats, followed by the PN (44), the PL (22), the anti-corruption-focused Savior of Honduras Party (PSH, 10), and two minor parties (1 seat each).[11] Upon her January 2022 inauguration, Castro became Honduras's first female president. She is married to former President Zelaya and emerged as a political leader in her own right following her husband's ouster.

Castro came to office backed by a broad coalition that seemingly viewed her candidacy as the best chance to defeat the PN and begin rebuilding Honduras's democratic institutions and rule of law. During her campaign, she drew support from sectors of the PL and entered into an alliance with PSH presidential candidate Salvador Nasralla, who withdrew from the race to serve as her running mate. Castro incorporated some PL and PSH figures into her Cabinet, along with a mix of former Zelaya administration officials, LIBRE activists, and academics. That coalition has crumbled, however, as some of the more moderate and non-LIBRE-aligned officials have left the administration due to a lack of influence over government policy and personnel. Nasralla, who remains one of three presidential designates (similar to a vice president), is now among the leaders of an opposition bloc that includes the PN, PL, and PSH. Meanwhile, Castro's family has taken on a prominent role in her administration, with Zelaya frequently standing in for the president and holding government meetings, her eldest son serving as her private secretary, another son serving as an adviser, and her nephew serving as defense secretary.[12]

Castro also has struggled to forge a governing coalition in the Honduran congress. Upon the start of the new congress in January 2022, a dispute over the body's leadership led to a split in LIBRE and resulted in two parallel congresses operating for nearly two weeks. The country's elected deputies ultimately reached an agreement that ended the dual congresses, but the full body has never officially approved the Castro-aligned leadership team, leading some analysts to argue congressional decisions could be subject to legal challenges.[13] In November 2023, a dispute over

---

[8] *La Prensa*, "Disuelven la CRSP y Eligen a Magistrados del TSE 6 Meses Antes," January 20, 2014; and Organization of American States (OAS), Electoral Observation Mission, General Elections, Honduras, *Final Report*, 2018, p.4.

[9] Jeff Ernst, "A Pandora's Box of Corruption in Honduras," *Univision*, August 6, 2019.

[10] U.S. District Court, Southern District of New York, *United States of America v. Juan Orlando Hernández*, S7 15 Cr. 379 (PKC), Superseding Indictment, January 27, 2022 (hereinafter: SDNY, January 2022).

[11] Consejo Nacional Electoral, "Elecciones Generales de Honduras 28 de Noviembre 2021 - Escrutinio General," 2021.

[12] Leonardo Aguilar and Jennifer Avila, "The Zelaya Clan Returns to Power in Honduras," *Contra Corriente*, May 27, 2022.

[13] Lilian Bonilla, "La Pausa a Crisis en CN No Despeja entre Legalidad y Legitimidad," *Proceso Digital*, February 22, 2022.

the appointment of a new attorney general threatened to once again split the congress into rival factions (see "Corruption and the Rule of Law"). Prior to the conflict over the attorney general, the Castro administration won legislative support for portions of its agenda but was unable to advance some anti-corruption and economic reforms, as discussed below.

Castro has sought to overcome congressional opposition by calling on her supporters to take to the streets to demonstrate popular support for her agenda. At the same time, her administration repeatedly has sought to portray civil society opposition and criticism as illegitimate. In May 2023, for example, Castro responded to protests against her proposed tax reform by convening the national defense and security council and ordering an investigation into the protests.[14] On other occasions, groups of LIBRE activists known as *colectivos* have physically attacked protesters and opposition legislators.[15] The director of Honduras's National Anti-corruption Council—a government-established but independent civil society organization—temporarily fled Honduras in mid-2023 after receiving threats over a report criticizing nepotism and clientelism in the Castro administration. Some journalists and civil society activists are reportedly "self-censoring due to fear of criticism, harassment, and retribution by the government and its supporters."[16]

CID Gallup found that the percentage of Hondurans who approve of Castro's performance in office fell from 62% in October 2022 to 36% in September 2023.[17] Among those surveyed in another poll, conducted by a Honduran research group in early 2023, 60.1% asserted that the Castro administration was not fulfilling its campaign promises and 67.6% asserted that Castro had listened "little" or "not at all" to the demands of the Honduran population during her first year in office.[18]

## Corruption and the Rule of Law

Castro's electoral campaign focused heavily on rooting out corruption, which some analysts argue became more deeply entrenched in the Honduran political system in the decade following the 2009 coup.[19] Castro has requested the establishment of a U.N.-backed anti-corruption commission, similar to the OAS-backed Mission to Support the Fight Against Corruption and Impunity in Honduras (MACCIH) that worked with Honduran institutions to enact legal reforms and to investigate and prosecute more than 80 legislators, Cabinet ministers, and other government officials from 2016 to 2019.[20] Then-President Hernández allowed MACCIH's mandate to expire in early 2020 as investigators were probing his congressional allies and members of his administration.

---

[14] Katerin Galo, "Presidenta Castro Ordena Investigar Protestas en Contra de Ley de Justicia Tributaria," *El Criterio*, May 11, 2023.

[15] See, for example, *El Heraldo*, "Colectivos de Libre Agreden a Rashid Mejía y Otra Integrante de la Organización 'Una Sola Voz por Honduras," July 21, 2023; *El Heraldo*, "Repudiable Violencia Ejercida por los Colectivos de Libre en el CN," October 31, 2023; and Kelly Ortez, "Colectivos del Partido Libre: Grupo de Presión que Pretende Imponer Voluntad y Evitar el Uso de la Fuerza Armada," *El Criterio*, August 12, 2023.

[16] U.S. Department of State, *2022 Country Reports on Human Rights Practices: Honduras*, March 20, 2023, p. 9.

[17] CID Gallup (@cidgallup), results posted on X (formerly known as Twitter), October 13, 2022, and October 24, 2023.

[18] Equipo de Reflexión, Investigación y Comunicación (ERIC) *Sondeo de Opinión Pública, Edición Número 12: Boletín 2023*," May 2023 (hereinafter: ERIC, 2023).

[19] Sarah Chayes, *When Corruption Is the Operating System: The Case of Honduras*, Carnegie Endowment for International Peace, May 30, 2017; and Daniel Sabet, *When Corruption Funds the Political System: A Case Study of Honduras*, Woodrow Wilson International Center for Scholars, August 2020.

[20] For more information, see CRS Insight IN11211, *Corruption in Honduras: End of the Mission to Support the Fight Against Corruption and Impunity in Honduras (MACCIH)*.

Nearly halfway through Castro's term, the anti-corruption commission has yet to be established. Although U.N. delegations have visited Honduras on several occasions to explore the feasibility of a commission, the Honduran government has yet to fully comply with a December 2022 memorandum of understanding with the United Nations.[21] The Honduran congress has adopted some legal reforms called for in the agreement—such as strengthening anti-money laundering laws and the investigative powers of public prosecutors—but it has yet to adopt others, such as a plea-bargaining law. Other obstacles reportedly include a 2019 law that limits investigations into legislators' actions and a 2022 amnesty law, which ostensibly was intended to benefit those who faced political persecution after the 2009 coup but instead has resulted in courts dropping or reversing corruption charges and convictions against several former Zelaya administration officials.[22]

The appointment of new leadership in the office of the attorney general (*Ministerio Público*) is also likely to factor into the U.N. decisionmaking process. The Honduran congress was supposed to select a new attorney general and deputy attorney general to serve five-year terms by September 1, 2023. To date, however, the congress has been unable to arrive at the two-thirds majorities required to appoint any of the five finalists proposed by an outside nominating board.

On October 31, 2023, the last day of the congressional session, the Castro-aligned congressional leadership directorate appointed nine legislators—including seven LIBRE deputies—to a permanent committee that is constitutionally empowered to carry out certain legislative branch tasks during congressional recesses. On November 1, 2023, that permanent committee appointed a new attorney general and assistant attorney general to serve on an interim basis. Opposition legislators, comprising a majority of the congress, and some analysts denounced those moves and argued they did not comply with the procedures established by the law and constitution.[23] The opposition legislators voted to repeal the interim appointments and extend the congressional session, raising the prospect of dueling congresses and an attorney general operating under questionable legality and legitimacy.[24] Both LIBRE and opposition parties have urged their supporters to take the streets, resulting in some violent clashes.

A similar deadlock occurred during the selection process for the 15 justices serving on the supreme court for the 2023-2030 term. The congress ultimately reached an agreement in mid-February 2023—a week after the previous supreme court term expired—to divide the seats among LIBRE (6), the PN (5), and the PL (4).[25] In July 2023, the U.S. State Department asserted that a PL legislator and the president of the PL undermined democratic practices in Honduras by "manipulating the outcome" of the supreme court selection process for "personal and political

---

[21] Memorándum de Entendimiento entre el Gobierno de la República de Honduras, Representado por Eduardo Enrique Reina García, Secretario de Relaciones Exteriores y Cooperación Internacional de Honduras y la Secretaría de las Naciones Unidas, Representada por Miroslav Jenča, Subsecretaría General para Europa, Asia Central y las Américas por el que se Inician los Trabajos Relativos al Establecimiento de un Mecanismo Internacional, Imparcial, Independiente y Autónomo contra la Corrupción y la Impunidad en Honduras, *Poder Popular* (Honduran government publication), vol. 1, no. 33, December 19, 2022.

[22] Daniel Girón, "Derogar Dos Pactos de Impunidad y Aprobar Ley de Colaboración Eficaz: lo que Falta para Instalación de la CICIH," *El Criterio*, August 15, 2023.

[23] Leonardo Aguilar, "Fiscal General y Fiscal Adjunto Interinos son Juramentados por Comisión Permanente en Medio de Conflicto Político," *Contra Corriente*, November 1, 2023; and Daniel Girón, "Ambigüedad Legal Envuelve Elección Interina de Johel Zelaya y Mario Morazán en el Ministerio Público," *El Criterio*, November 1, 2023.

[24] Aimée Cárcamo and Rubén Escobar, *La Agudización de la Polarización y un Escenario de Incertidumbre Desfavorable para la Instalación de la CICIH*, Centro de Estudios para la Democracia, November 23, 2023.

[25] María Celeste Maradiaga and Leonardo Aguilar, "Tripartidismo de Honduras Elige Nueva CSJ," *Contra Corriente*, February 17, 2023.

gain."[26] Pursuant to the United States-Northern Triangle Enhanced Engagement Act (22 U.S.C. §2277a), such individuals generally are ineligible for admission into the United States.

## Socioeconomic Conditions

President Castro inherited a difficult socioeconomic situation. The Honduran economy contracted by nearly 9% in 2020 due to the effects of the Coronavirus Disease 2019 (COVID-19) pandemic and two tropical storms. Although the economy rebounded with 12.5% GDP growth in 2021, living standards have been slower to recover.[27] As of mid-2021, 73.6% of Honduran households were living in poverty (unable to afford necessities) and 53.7% were living in extreme poverty (unable to satisfy nutritional needs).[28]

President Castro self-identifies as a *democratic socialist*, but her administration generally has adhered to market-oriented economic policies. In September 2023, the International Monetary Fund (IMF) Executive Board commended the Honduran government's "implementation of prudent economic policies" and approved two financing arrangements, worth a combined $822 million, to support economic and institutional reforms in Honduras over the next three years.[29] The IMF program includes a gradual fiscal adjustment that aims to increase funding for social programs and public investment projects while preserving debt sustainability. The program also includes monetary and exchange rate policies to slow inflation and safeguard international reserves, as well as reforms intended to strengthen governance and the energy sector.

Some private sector stakeholders have opposed portions of Castro's economic agenda. For example, international investors have filed claims with the International Centre for Settlement of Investment Disputes at the World Bank over two Honduran government reforms: the April 2022 repeal of the legal framework for the country's controversial "Employment and Economic Development Zones" (ZEDEs by the Spanish acronym) and a May 2022 law that declared electricity a public good and authorized the government to renegotiate contracts with power generation companies to reduce high electricity costs and address alleged irregularities.[30] (For further discussion, see "Investment Concerns.") Sectors of the Honduran and international business community also have expressed concerns about the Castro administration's proposed tax reforms, which were designed with IMF assistance and would reduce widespread tax exemptions and eliminate numerous special corporate income tax regimes.[31]

The IMF projects that GDP growth in Honduras will slow from 4.0% in 2022 to 2.9% in 2023, primarily due to weakening global conditions.[32] It is unclear how the Castro administration's policies have affected living standards in Honduras because the National Statistics Institute has

---

[26] U.S. Department of State, *Report to Congress on Foreign Persons who have Knowingly Engaged in Actions that Undermine Democratic Processes or Institutions, Significant Corruption, or Obstruction of Investigations into Such Acts of Corruption in El Salvador, Guatemala, Honduras, and Nicaragua*, July 18, 2023, pp. 7-8.

[27] International Monetary Fund (IMF), "World Economic Outlook Database, October 2023," October 5, 2023.

[28] Instituto Nacional de Estadística (INE), "LXXII Encuesta Permanente de Hogares de Propósitos Multiples," July 2021.

[29] IMF, *2023 Article IV Consultation and Requests for an Arrangement Under the Extended Fund Facility and an Arrangement Under the Extended Credit Facility—Press Release; Staff Report; and Statement by the Executive Director for Honduras*, IMF Country Report No. 23/337, September 2023, p. 2. (Hereinafter, IMF Country Report No. 23/337, September 2023.)

[30] Célia Pousset, "Honduras No Reconoce Jurisdicción del CIADI ¿Cómo Se Defenderá Frente a Seis Demandas Internacionales Millonarias?," *Contra Corriente*, August 9, 2023.

[31] Cámara de Comercio Hondureño Americana (AmCham Honduras), "Comunicado de Cámara de Comercio Hondureño Americana," March 16, 2023; and IMF Country Report No. 23/337, September 2023, pp. 15 and 58.

[32] IMF Country Report No. 23/337, September 2023, p. 11.

not released poverty data since Castro took office; the agency asserts that it is in the process of reassessing the country's poverty measurement.[33]

## Security and Human Rights Conditions

The Castro administration came to office amid a complex security situation. Honduras has long struggled with high levels of violent crime, much of which is attributable to transnational criminal organizations and gangs seeking to control illicit markets. Drug trafficking organizations appear to have gained increased influence over Honduran politics in the decade following the 2009 coup, allegedly financing political campaigns and coopting the highest levels of the Honduran government.[34] Although Honduras's homicide rate declined by more than 51% between 2012 and 2021, it remains high by regional and global standards (see **Figure 2**).[35]

**Figure 2. Homicide Rate in Honduras: 2004-2022**



**Source:** CRS presentation of data from Universidad Nacional Autónoma de Honduras, Observatorio de la Violencia, *Boletín Enero-Diciembre 2022*, no. 68, August 2023.

During her campaign, Castro pledged to combat organized crime while ending the military's role in law enforcement and advancing community-oriented policing. Although she initially transferred command and control over Honduran prisons from the military to the police, she reversed course in June 2023 in the aftermath of a prison riot that killed 46 female inmates.[36] Castro also has assigned increased domestic security responsibilities to the military police force (*Policía Militar del Orden Público*) and other sectors of the armed forces under a *state of exception* to combat extortion that entered into force in December 2022. The emergency decree, most recently extended until January 1, 2024, suspends certain constitutional rights, such as freedom of movement and association, and allows warrantless searches and arrests in 158 of

---

[33] INE, "Encuesta Permanent de Hogares de Propósitos Múltiples," 2023.

[34] SDNY, January 2022.

[35] Peter Appleby et al., "InSight Crime's 2022 Homicide Round-Up," *InSight Crime*, February 8, 2023.

[36] Office of the U.N. High Commissioner for Human Rights (OHCHR), "Honduras: Militarization of Public Security," July 7, 2023.

Honduras's 298 municipalities.[37] Of the 4,033 individuals detained during the first six months of the state of exception, 3,280 (81%) reportedly were released due to a lack of evidence.[38] Honduras's National Human Rights Commissioner received 193 complaints of alleged abuses by the Honduran security forces during that time period.[39]

According to Honduran government data, homicides declined by 16.3% in the first 10 months of 2023 compared with the same period of 2022.[40] Gender-based violence appears to have intensified, however, with the number of women killed during that time period reportedly increasing by 38.6%.[41] Violence against human rights defenders and journalists also has increased. From January through September 2023, the Office of the U.N. High Commissioner for Human Rights reportedly documented 297 incidents of threats, intimidation, harassment, and/or physical attacks against 372 human rights defenders and journalists, 16 of whom were killed.[42] In comparison, the U.N. office documented 173 incidents against 242 human rights defenders and journalists, including 14 killings, in all of 2022.[43] The majority of the victims have been land, territorial, and environmental rights defenders, including a disproportionately high number of Indigenous and Afro-Hondurans. A Honduran government protection mechanism for human rights defenders, journalists, and justice sector personnel reportedly lacks the leadership, technical competence, and funding needed to function effectively.[44]

# U.S.-Honduran Relations

Honduras traditionally has been a close ally of the United States. The country has hosted a U.S. military presence since the 1980s, when Honduras served as a staging area for U.S. operations to support the *Contra* insurgency against Nicaragua's leftist *Sandinista* government (see "U.S. Military Presence," below). The United States and Honduras also began to forge closer commercial ties during the 1980s, which were reinforced by the 2006 implementation of the Dominican Republic-Central America-United States Free Trade Agreement (CAFTA-DR, see "Commercial Ties," below). Although the 2009 coup strained bilateral relations—prompting the Obama Administration to impose diplomatic and economic sanctions on Honduras—cooperation quickly resumed after a newly elected Honduran government took office in 2010.[45]

Over the past decade, successive U.S. presidential Administrations have maintained close ties with the Honduran government, welcoming its apparent willingness to collaborate on high-level U.S. priorities. U.S. agencies obligated more than $1.3 billion of foreign assistance to Honduras from FY2011 to FY2021; this assistance was intended to help the country address economic,

---

[37] *Proceso Digital*, "Honduras: Extiende por 45 Días Más Estado de Excepción Parcial," November 20, 2023.

[38] Daniel Girón, "Víctimas de Homicidios Múltiples en 2023 ya son Más que 2022, pese a la Vigencia del Estado de Excepción," *El Criterio*, October 26, 2023.

[39] Comisionado Nacional de los Derechos Humanos, "193 Denuncias de la Población Contra Policías y Militares por Abusos Durante el Estado de Excepción," June 15, 2023.

[40] Gobierno de Honduras, Secretaria de Seguridad, Sistema Estadístico Policial en Línea (SEPOL), "Situacion Comparativa de Casos de Homicidios a Nivel Nacional (Datos Preliminares)," accessed November 29, 2023.

[41] Centro de Derechos de Mujeres, "Violencias Contra las Mujeres en Honduras – 2023," accessed November 29, 2023.

[42] Jorge Burgos, "De Enero a Septiembre de 2023 Han Sido Asesinados 15 Defensores y Un Periodista: OACNUD," *El Criterio*, October 21, 2023.

[43] Oficina del Alto Comisionado de las Naciones Unidas para los Derechos Humanos (OACNUD), *Informe Sobre la Situación de los Derechos Humanos en Honduras*, March 1, 2023, pp. 20-23.

[44] OACNUD, "Declaración de Irene Khan, Relatora Especial para la Libertad de Opinión y Expresión," October 27, 2023.

[45] For background, see CRS Report R41064, *Honduran Political Crisis, June 2009-January 2010*.

security, and governance challenges and thereby mitigate transnational concerns, such as drug trafficking and irregular migration.[46] Illicit narcotics and migrants have continued to flow from Honduras to the U.S. border, however, and some analysts argue that U.S. support for President Hernández, including the muted U.S. response to the erosion of Honduras's democratic institutions during his tenure, propped up a corrupt regime and exacerbated the very challenges U.S. assistance was intended to address.[47]

The Biden Administration has sought to build on prior U.S. efforts in Honduras through implementation of the U.S. Strategy for Addressing the Root Causes of Migration in Central America, released in July 2021. The Administration has viewed President Castro as a potential ally in that effort. Vice President Kamala Harris attended Castro's inauguration, and the two leaders agreed to launch a strategic dialogue among U.S. and Honduran agencies to coordinate bilateral actions. During the first U.S.-Honduran strategic dialogue, held in January 2023, "both governments decided to actively cooperate to address insecurity and economic inequality to support sustainable development, mitigate climate change, address food security, and humanely manage migration."[48] The Biden Administration has allocated foreign assistance to Honduras to advance those shared priorities (see "U.S. Assistance").

Despite ongoing cooperation in many areas, U.S.-Honduran relations occasionally have been strained over the past two years. The Castro administration has bristled at U.S. officials publicly expressing concerns about some Honduran government actions and policies, such as the interim appointments to the office of attorney general, and has accused the U.S. government of hypocrisy for not speaking out more during the Hernández administration.[49] In July 2022, the Castro administration rejected as "politically-motivated and interventionist" the State Department's inclusion of two LIBRE legislators and a Castro adviser in an annual list of corrupt and undemocratic actors.[50] Those officials are among 46 Hondurans from across the political spectrum identified by the State Department pursuant to the United States-Northern Triangle Enhanced Engagement Act (22 U.S.C. §2277a) since July 2021. Such individuals generally are ineligible for admission into the United States; however, those sanctions and the underlying authority to impose them are scheduled to expire on December 27, 2023, pending congressional action.[51]

The U.S. and Honduran governments also have diverged on several foreign policy matters. The Castro administration has pursued closer ties with Cuba, Nicaragua, and Venezuela and has criticized U.S. sanctions against those countries' authoritarian governments.[52] The Biden

---

[46] ForeignAssistance.gov, "Country Summary data," updated September 29, 2023.

[47] See, for example, Paul J. Angelo and Will Freeman, "Biden's Democracy Promotion Faces a Major Test in Honduras," *Univision*, November 26, 2021; and Gustavo Irías, "A Plea for Democracy in Honduras," *Newsweek*, November 23, 2021.

[48] U.S. Department of State, "Joint Statement on the U.S.-Honduras Strategic and Human Rights Dialogues," January 10, 2023.

[49] See, for example, *El Heraldo*, "'Sorprende que Estados Unidos se Oponga a Todas las Reformas', Dice Canciller Eduardo Enrique Reina," May 18, 2023; and *Latin American Weekly Report*, "Honduras: Attorney General Appointment Strains US Relations," November 9, 2023.

[50] The report alleges that the three officials engaged in significant corruption while holding previous positions. U.S. Department of State, *Report to Congress on Foreign Persons who Have Knowingly Engaged in Actions that Undermine Democratic Processes or Institutions, Significant Corruption, or Obstruction of Investigations Into Such Acts of Corruption in El Salvador, Guatemala, Honduras, and Nicaragua*, July 20, 2022; and Gobierno de Honduras, Secretaría de Relaciones Exteriores y Cooperación Internacional, "Nota Aclaratoria," July 20, 2022.

[51] For more information, see CRS In Focus IF12486, *Central America: Expiration of Targeted Sanctions Authority*.

[52] See, for example, Xiomara Castro, "Mensaje ante los Pueblos del Mundo de la Presidenta Constitucional de la (continued...)

Administration's decision to exclude those governments from the Ninth Summit of the Americas in Los Angeles in June 2022 led Castro to skip the meeting and send her foreign minister instead. The Castro administration also has sought to maintain a position of "neutrality" regarding Russia's invasion of Ukraine; Honduras was one of 35 countries worldwide to abstain on an October 2022 U.N. General Assembly Resolution (ES-11/4) condemning Russia's attempted illegal annexation of Ukrainian territory.[53]

In March 2023, the Castro administration broke diplomatic relations with Taiwan in favor of the People's Republic of China (PRC or China). Castro had pledged to make that change during the election and reportedly announced the diplomatic shift after requests for increased financial support from Taiwan went unanswered.[54] The Biden Administration recognized the shift as a "sovereign decision" while cautioning the Honduran government that "China often makes promises in exchange for recognition that ultimately remain unfulfilled."[55] China's leader Xi Jinping hosted Castro for a state visit in June 2023, during which the leaders signed at least 17 agreements on topics including infrastructure; investment; media collaboration; and science, technology, and innovation.[56] Honduras and China also have launched negotiations regarding a potential free-trade agreement.

## U.S. Assistance

The Biden Administration allocated at least $126.4 million in foreign assistance to Honduras for FY2021, at least $169.2 million for FY2022, and an estimated $141.8 million for FY2023 (see **Table 1**). This funding has allowed U.S. agencies to begin scaling up their programming once again in the aftermath of the Trump Administration's 14-month suspension of most aid to Honduras in response to continued irregular migration to the United States. According to the Government Accountability Office (GAO), the aid suspension adversely affected 81% of U.S. Agency for International Development (USAID) projects and 39% of State Department Bureau of International Narcotics Control and Law Enforcement (INL) projects in the Northern Triangle.[57] In Honduras, the number of beneficiaries of USAID programs fell from 1.5 million in March 2019 to 640,000 in January 2021.[58] Since the restoration of U.S. assistance, USAID has sought to maximize the impact of its activities on irregular migration by concentrating its resources in 40 municipalities from which more than 60% of Honduran irregular migrants originate.[59]

República de Honduras, Xiomara Castro, en su Participación en la 78 Sesión de la Asamblea General de la Organización de las Naciones Unidas 'ONU'," September 20, 2023.

[53] Pamela Pino, "Canciller Reina Sobre Abstención de Honduras en la ONU: La Posición Conforme a las Guerras Debe ser de Neutralidad," *El Heraldo*, October 13, 2022.

[54] Karen DeYoung, "As China Arrives with a Splash in Honduras, the U.S. Wrings Its Hands," *Washington Post*, October 2, 2023.

[55] Eric Jacobstein, Deputy Assistant Secretary of State for Western Hemisphere Affairs, testimony before the U.S. Congress, House Committee on Foreign Affairs, Subcommittee on the Western Hemisphere, *The U.S.-Honduras Bilateral Relationship: Analyzing the Socialist Government of President Xiomara Castro de Zelaya*, 118th Cong., 1st sess., October 25, 2023 (hereinafter: Jacobstein, October 2023).

[56] *Poder Popular* (Honduran government publication), "Parte de los Convenios Suscritos entre Honduras y China," vol. 2, no. 55 (June 14, 2023), p. 7.

[57] The Trump Administration also reprogrammed $396.2 million of FY2018 assistance for the Northern Triangle, including $69.5 million of bilateral assistance for Honduras, to other countries. U.S. Government Accountability Office (GAO), *Northern Triangle of Central America: The 2019 Suspension and Reprogramming of U.S. Funding Adversely Affected Assistance Projects*, GAO-21-104366, September 2021, p. 14.

[58] CRS communication with U.S. Agency for International Development (USAID), March 2021.

[59] USAID, *USAID Honduras' Place-Based Geo-Targeting Approach*, May 2022, p. 2.

U.S. assistance supports a wide range of development activities in Honduras. Those activities include good governance programs intended to strengthen institutions and encourage civil society engagement and oversight, agriculture programs intended to increase food security and rural income generation, and education programs intended to improve education quality and provide opportunities for youth. Other bilateral U.S. assistance activities focus on business and workforce development; natural resource management; climate change adaptation and mitigation; and global health security threat prevention, preparation, and response. Central America Regional Security Initiative (CARSI) assistance supports law enforcement operations, justice sector reform, and crime and violence prevention programs (see "Citizen Security").

**Table 1. U.S. Assistance to Honduras: FY2021-FY2024 Request**

Allocations in millions of current U.S. dollars

| Foreign Assistance Account | FY2021 | FY2022 | FY2023 (estimate) | FY2024 (request) |
|---|---|---|---|---|
| **Bilateral Assistance** | **74.0** | **117.9** | **141.8** | **136.5** |
| Development Assistance | 65.0 | 95.0 | 126.7 | 129.7 |
| Global Health Programs | 8.3 | 12.5 | 14.7 | 6.0 |
| Economic Support Fund | — | 10.0a | — | — |
| International Military Education and Training | 0.8 | 0.4 | 0.4 | 0.8 |
| **Central America Regional Security Initiative** | **52.4** | **51.3** | **NA** | **NA** |
| Economic Support Fund | 28.1 | 31.7 | NA | NA |
| International Narcotics Control and Law Enforcement | 24.3 | 19.6 | NA | NA |
| **Total** | **126.4** | **169.2** | **141.8** | **136.5** |

**Sources:** U.S. Department of State, *Congressional Budget Justification, Department of State, Foreign Operations, and Related Programs, Supplementary Tables, Fiscal Year 2024*, April 2023; U.S. Department of State, *Congressional Budget Justification, Department of State, Foreign Operations, and Related Programs, Supplementary Tables, Fiscal Year 2023*, May 2022; U.S. Department of State, FY2023 allocation data, September 26, 2023; U.S. Department of State, Congressional Notification 23-315, August 21, 2023; U.S. Agency for International Development (USAID), CN #190, July 13, 2023; U.S. Department of State, Congressional Notification 22-286, August 16, 2022; and USAID, CN #8, November 16, 2021.

**Notes:** Humanitarian assistance and aid provided through other U.S. agencies, such as the Department of Defense, are not included in this table. Figures may not sum to totals due to rounding. NA = not yet available.

a.  Honduras received $10.0 million in Economic Support Fund assistance in FY2022 that was appropriated in the Additional Ukraine Supplemental Appropriations Act, 2022 (P.L. 117-128).

The United States also provides humanitarian assistance to help Honduras recover from natural disasters and stabilize vulnerable populations. This has included $66.1 million in FY2021, $53.6 million in FY2022, and at least $17.5 million in FY2023 for basic needs such as food, water,

shelter, and protection.[60] Additionally, the United States has donated more than 7.2 million COVID-19 vaccine doses to Honduras since June 2021.[61]

Congress has placed restrictions on some U.S. assistance to Honduras annually since FY2012. For example, the Department of State, Foreign Operations, and Related Programs Appropriations Act, 2023 (P.L. 117-328, Division K), prohibits Foreign Military Financing for Honduras. It also requires the State Department to withhold 45% of Economic Support Fund and international security assistance (e.g., International Narcotics Control and Law Enforcement and International Military Education and Training aid) to support the central government of Honduras until the Secretary of State certifies that the Honduran government has met certain criteria. Those criteria include combatting corruption, strengthening the rule of law, protecting human rights, improving border security, and improving the foreign investment environment.[62] The State Department has yet to certify that the Castro administration has met the congressional criteria required to release funds appropriated in FY2022 or FY2023.[63] In August 2023, USAID reprogrammed $1.3 million of FY2022 CARSI assistance, initially planned for the Honduran government, to support civil society organizations working on school safety, violence prevention, and investigative reporting.[64]

The Biden Administration requested $136.5 million for Honduras in FY2024. Congress has not yet concluded action on FY2024 appropriations but enacted continuing resolutions (P.L. 118-15 and P.L. 118-22) that fund most foreign aid programs at the same level and under the same conditions as FY2023 from October 1, 2023 until February 2, 2024. The FY2024 foreign assistance appropriations measures approved by the House (H.R. 4665/H.Rept. 118-146) and reported in the Senate (S. 2438/S.Rept. 118-71) would not specify funding levels for Honduras. Both bills would maintain withholding requirements on aid for the Honduran government, with some modifications compared with prior years. S. 2438 also would maintain the prior-year prohibition on Foreign Military Financing for Honduras.

The House Appropriations Committee has expressed some skepticism about U.S. assistance for Honduras and cooperation with the Honduran government. H.Rept. 118-146 would direct the Secretary of State to submit a report to certain congressional committees "defining how the Department of State and USAID evaluate the successes and failures of the Government of Honduras in democratic governance, rule of law, economic freedom, and human rights." The report would be required to include "assessments of how relationships between Honduras and Venezuela, Cuba, Nicaragua, Russia, and the PRC impact United States national security interests" and "a cost-benefit analysis on whether United States assistance to Honduras from fiscal year 2020 through fiscal year 2022 has yielded material results."

---

[60] USAID, "El Salvador, Guatemala, and Honduras – Regional Response," Fact Sheet #12, Fiscal Year 2021, September 30, 2021; USAID, "El Salvador, Guatemala, and Honduras – Regional Response," Fact Sheet #5, Fiscal Year 2022, September 30, 2022; and USAID, Bureau for Humanitarian Assistance, "Honduras Assistance Overview," February 2023.

[61] U.S. Department of State, "COVID-19 Vaccine Deliveries," accessed November 29, 2023, https://www.state.gov/countries-areas/honduras/#covid_map_link.

[62] The full criteria are listed in §7045(a)(2) of P.L. 117-328.

[63] The State Department last issued a certification for Honduras in August 2022, releasing certain assistance appropriated in FY2021. U.S. Department of State, "Certification Pursuant to Section 7045(A)(2)(A) of the Department of State, Foreign Operations, and Related Programs Appropriations Act, 2021," 87, No. 167 *Federal Register* 53042, August 30, 2022.

[64] USAID, CN #236, August 16, 2023.

## Migration

Difficult living conditions and instability in Honduras have contributed to high levels of irregular migration to the United States over the past decade. In FY2023, U.S. Border Patrol encountered nearly 181,000 Honduran nationals crossing the Southwest border into the United States between ports of entry without authorization.[65] These individuals were either placed into removal proceedings under Title 8 of the *U.S. Code*, where they could potentially seek asylum or related relief, or expelled from the United States under Title 42 for public health reasons. About 43% of the Hondurans encountered in FY2023 were traveling with family members, 39% were single adults, and 18% were unaccompanied minors. Border Patrol encounters with Honduran migrants declined for a second consecutive year in FY2023 after reaching a record high in FY2021 (see **Figure 3**).

**Figure 3. U.S. Border Patrol Enforcement Encounters with Honduran Nationals at the Southwest Border: FY2009-FY2023**



**Sources:** CRS presentation of data from U.S. Customs and Border Protection (CBP), "U.S. Border Patrol Nationwide Apprehensions by Citizenship and Sector in FY2007-FY2019," January 2020; and CBP, "Nationwide Encounters," October 21, 2023, https://www.cbp.gov/newsroom/stats/nationwide-encounters.

**Note:** Figures for FY2020-FY2023 include Title 42 public health expulsions in addition to Title 8 apprehensions.

As of 2022 (most recent year available), an estimated 844,000 individuals born in Honduras resided in the United States.[66] Surveys suggest many more Hondurans are considering emigrating. A poll conducted in early 2023 found that 48.4% of Hondurans surveyed had thought about emigration and 46.9% had a relative who left Honduras in the past year, with the vast majority (92.4%) emigrating to the United States. Most Hondurans cited the lack of economic

---

[65] An additional 35,000 Honduran nationals were encountered at ports of entry by the U.S. Customs and Border Protection (CBP) Office of Field Operations. CBP, "Nationwide Encounters," October 21, 2023.

[66] U.S. Census Bureau, "Place of Birth for the Foreign-Born Population in the United States," B05006. According to one estimate, the unauthorized Honduran immigrant population in the United States totaled 564,000 in 2021. See Jennifer Van Hook, Julia Gelatt, and Ariel G. Ruiz Soto, "A Turning Point for the Unauthorized Immigrant Population in the United States," Migration Policy Institute, September 2023.

opportunities in Honduras (66.1%), violence and insecurity (5.8%), or a combination of economic and security conditions (25.3%) as the primary drivers of migration.[67]

In addition to efforts to address the root causes of migration (see "U.S. Assistance"), the Biden Administration is implementing a Collaborative Migration Management Strategy, which seeks to reduce irregular migration to the United States by working with regional partners to deter potential migrants, strengthen border controls, and expand access to legal migration and protection pathways.[68] In accordance with that strategy, the Administration has reserved some temporary worker visas for Hondurans, reestablished the Central American Minors in-country refugee processing program, and created a new Family Reunification Parole process that allows vetted individuals to be paroled into the United States on a case-by-case basis.[69]

The Castro administration has taken some complementary steps to combat migrant smuggling and improve reintegration services for migrants who have voluntarily returned, or been removed (*deported*), to Honduras.[70] Between January and October 2023, nearly 48,000 Honduran migrants returned or were removed to Honduras, including nearly 32,000 from the United States.[71] The Honduran government has struggled to contend with growing numbers of irregular migrants transiting through the country, leaving such migrants vulnerable to extortion, human trafficking, and other human rights abuses. Nearly 443,000 irregular migrants passed through Honduras during the first 10 months of 2023, up from 189,000 in all of 2022 and 18,000 in all of 2021. Venezuela (189,000), Haiti (74,000), Cuba (65,000) and Ecuador (39,000) were the top source countries for those transiting Honduras.[72]

The Castro administration also has advocated for the rights of Honduran migrants in the United States, who, together with rest of the Honduran diaspora, sent an estimated $8.5 billion of remittances to Honduras in 2022 (equivalent to 26.9% of Honduras's GDP).[73] For example, the Castro administration has requested Temporary Protected Status (TPS)—which provides work authorization and humanitarian relief from removal—for Hondurans residing in the United States. An estimated 57,000 Hondurans who arrived in the United States prior to 1999 currently benefit from a TPS designation that was issued in the aftermath of Hurricane Mitch in 1998 and extended by consecutive U.S. administrations.[74] The Trump Administration sought to terminate the TPS designation for Honduras as of January 2020, but that decision was put on hold due to a legal

---

[67] Another 1.0% cited family reunification, 0.2% cited educational opportunities, and 1.6% cited other factors or did not respond. ERIC, 2023.

[68] White House, *Collaborative Migration Management Strategy,* July 2021, https://www.whitehouse.gov/wp-content/uploads/2021/07/Collaborative-Migration-Management-Strategy.pdf.

[69] U.S. Department of Homeland Security, "Fact Sheet: U.S. Has Expanded Labor Visa Opportunities," July 31, 2023; U.S. Citizenship and Immigration Services (USCIS), "Central American Minors (CAM) Program," June 23, 2023; and USCIS, "Family Reunification Parole Processes," October 18, 2023.

[70] See, for examples, *La Tribuna*, "Más de 25 'Coyotes' Condenados por Traficar con Hondureños y Extranjeros," August 15, 2022; *La Tribuna*, "Gobierno Invierte Siete Millones en Proyectos para Migrantes Retornados," August 14, 2023;

[71] Gobierno de Honduras, Instituto Nacional de Migración (INM), "Estadísticas Migratorias," accessed November 14, 2023, https://inm.gob.hn/estadisticas.html (hereinafter: INM, 2023).

[72] INM, 2023.

[73] World Bank Group, *Remittances Remain Resilient but Are Slowing*, Migration and Development Brief 38, June 2023, p. 21.

[74] CRS Report RS20844, *Temporary Protected Status and Deferred Enforced Departure*, by Jill H. Wilson.

challenge and was rescinded by the Biden Administration. In June 2023, the Biden Administration extended TPS for existing Honduran beneficiaries through July 5, 2025.[75]

Migration has been a subject of considerable debate in the 118th Congress, with Members introducing various legislative measures that could impact Honduras or Honduran migrants. For example, the Secure the Border Act of 2023 (H.R. 2), passed by the House in May 2023, would direct the Secretary of State to "seek to negotiate" agreements with the Honduran government similar to the asylum cooperation agreement that the Trump Administration negotiated in 2020 and the Biden Administration terminated prior to implementation in 2021.[76] Such agreements would include U.S. support to enhance asylum capacity in Honduras and Honduran government commitments to allow foreign nationals of other countries seeking asylum to enter Honduras and have their claims processed in accordance with domestic laws and international agreements.

## Security Cooperation

The United States and Honduras have cooperated closely on security issues since the 1980s, when Honduras served as a base for U.S. operations intended to counter Soviet influence in Central America. Honduras continues to host a U.S. troop presence, though current bilateral security efforts primarily focus on combatting drug trafficking and improving citizen safety.

### U.S. Military Presence

Honduras has hosted a U.S. military presence, now known as Joint Task Force (JTF)-Bravo, at Soto Cano Air Base (also known as Palmerola Air Base) in Comayagua since 1983. The Department of Defense (DOD) originally established JTF-Bravo to perform a "temporary mission" supporting military training exercises and U.S. counterinsurgency and intelligence operations in Central America intended to counter the threat posed by the leftist governments of Cuba and Nicaragua.[77] In 1995, following the end of the Cold War, the GAO assessed that the U.S. military presence in Honduras was no longer critical to U.S. government activities or policy objectives in the region, which had shifted to focus on democracy and economic growth. It recommended that DOD withdraw the remaining U.S. personnel from Soto Cano.[78] JTF-Bravo remained in Honduras, however, and is now the longest standing task force in the U.S. military.[79]

Comprised of more than 600 U.S. military personnel and more than 600 U.S. and Honduran civilians, JTF-Bravo provides rapid response capabilities for U.S. government operations throughout Latin America and the Caribbean.[80] It conducts various missions, including operations intended to counter transnational organized crime, provide disaster relief and humanitarian assistance, and build partner nations' capacities to foster security in the region.

---

[75] U.S. Department of Homeland Security (DHS), "DHS Rescinds Prior Administration's Termination of Temporary Protected Status Designations for El Salvador, Honduras, Nepal, and Nicaragua," press release, June 13, 2023.

[76] For background information, see CRS Legal Sidebar LSB10402, *Safe Third Country Agreements with Northern Triangle Countries: Background and Legal Issues*; and DHS, "Agreement Between the Government of the United States of America and the Government of the Republic of Honduras for Cooperation in the Examination of Protection Claims," 85 *Federal Register* 25462-25468, May 1, 2020.

[77] GAO, *Honduras: U.S. Military Presence at Soto Cano Air Base*, GAO/NSIAD-89-107BR, March 1989, p. 1; and Capt. Beau Downey, *A History of Joint Task Force-Bravo*, U.S. Southern Command, Joint Task Force-Bravo, February 2020.

[78] GAO, *Honduras: Continuing U.S. Military Presence at Soto Cano Base is Not Critical*, GAO/NSIAD-95-39, February 8, 1995.

[79] U.S. Southern Command, Joint Task Force-Bravo, "Joint Task Force-Bravo," Fact Sheet, October 25, 2021.

[80] U.S. Department of State, "U.S. Relations with Honduras," Bilateral Relations Fact Sheet, March 1, 2023.

The Biden Administration requested $90.5 million to support U.S. operations at Soto Cano in FY2024. This total includes $39.9 million for military personnel, $9.2 million for operations and maintenance, and $41.3 million for the construction of new fuel facilities within the area of Soto Cano exclusively reserved for U.S. forces.[81] Both the House- and Senate-passed versions of the National Defense Authorization Act for Fiscal Year 2024 (H.R. 2670 and S. 2226) would authorize the funding requested for military construction at Soto Cano. H.R. 2670, as passed by the House in July 2023, also would require the Secretary of Defense to submit a report to Congress on the status of Defense Security Cooperation Agency policies to record and track alleged incidents of misuse of U.S.-provided equipment in Honduras.[82]

## Counternarcotics

The U.S. government engages in close counternarcotics cooperation with Honduras, which is a major transshipment point for illicit narcotics due to its location between cocaine producers in South America and consumers in the United States. Small-scale coca cultivation also takes place in Honduras.[83] The Drug Enforcement Administration and several other U.S. agencies have provided extensive support to specially vetted Honduran units and task forces that investigate drug trafficking, money laundering, and other transnational crime. The U.S. Department of Defense has provided additional counternarcotics assistance to Honduran security forces intended to enable them to better control their national territory. Some observers have questioned the effectiveness of these efforts in light of the U.S. indictment of former President Hernández, which alleges that Honduras operated as a "narco-state" for much of the past decade, with the highest levels of the Honduran government using the country's security forces to protect drug traffickers.[84]

The State Department asserts that "the Honduran government has maintained its efforts against drug trafficking in coordination with U.S. law enforcement agencies" under President Castro but that such efforts have been hampered by Honduras's lack of a comprehensive counternarcotics strategy, insufficient funding, limited communications capabilities, and corruption.[85] Honduran authorities eradicated 140 hectares of coca plants and destroyed 15 cocaine laboratories in the first nine months of 2022, up from 30 hectares and seven laboratories in the same period of 2021. Cocaine seizures declined significantly, however, falling from 17.8 metric tons in 2021 to 4.9 metric tons in the first nine months of 2022.[86]

## Citizen Security

Many Hondurans contend with criminal threats on a daily basis, ranging from petty theft to extortion and forced gang recruitment. The U.S. government has sought to assist Honduras in addressing these challenges, often using funds appropriated through CARSI (see **Table 1**).

---

[81] U.S. Department of Defense, Office of the Under Secretary of Defense (Comptroller)/Chief Financial Officer, *Defense Operation & Maintenance Overview Book*, *Fiscal Year 2024 Budget Estimates*, May 2023, p. 194; and U.S. Department of Defense, *Fiscal Year 2024 Budget Estimates, Military Construction, Family Housing, Defense-Wide*, March 2023, pp. 62-65.

[82] For additional background on such incidents and policies, see GAO, *Northern Triangle: DOD and State Need Improved Policies to Address Equipment Misuse*, GAO-23-105856, November 2022.

[83] U.S. Department of State, Bureau for International Narcotics and Law Enforcement Affairs, *International Narcotics Control Strategy Report, Volume I, Drug and Chemical Control*, March 2023, pp. 142-144 (hereinafter: INCSR, 2023).

[84] SDNY, January 2022.

[85] INCSR, 2023.

[86] Ibid.

U.S. agencies collaborate with various Honduran justice sector institutions. USAID provides capacity-building support to Honduran police, prosecutors, and courts focused on addressing high-priority crimes, including homicide, gender-based violence, and extortion. It also provides technical assistance to the Honduran government and nongovernmental organizations involved in juvenile justice and rehabilitation efforts.[87] INL provides equipment, training, and advisory support to Honduran police and prosecutors, including vetted units and task forces focused on transnational gangs, extortion, and violent crimes, among other issues. A special victims investigation unit, for example, focuses on crimes against vulnerable populations, such as the LGBTQI+ community.[88]

Other U.S.-funded activities focus on crime and violence prevention. USAID works with the Honduran government and local groups to improve school safety, strengthen services for youth, and identify and implement solutions to prevent gender-based violence. It also partners with the private sector to develop employment opportunities for at-risk youth.[89] INL funds gang resistance programming for schoolchildren and supports anti-gender-based violence training and public awareness projects.[90]

## Commercial Ties

The United States is Honduras's most important commercial partner, serving as the country's top export market and its primary source of investment, tourism, and remittances. In 1984, Honduras became one of the first beneficiaries of Caribbean Basin Initiative trade preference programs, unilateral U.S. preferential trade arrangements that provide duty-free treatment to certain U.S. imports of goods from beneficiary countries in the region.[91] In the late 1980s, Honduras benefitted from production-sharing arrangements with U.S. apparel companies for duty-free entry into the United States of certain apparel products assembled in Honduras. As a result, *maquiladoras*, or export-assembly companies, flourished. The passage of the Caribbean Basin Trade Partnership Act (P.L. 106-200) in 2000, which provided Caribbean Basin nations with North America Free Trade Agreement (NAFTA)-like preferential tariff treatment, further boosted the *maquila* sector.

Commercial relations have continued to expand since CAFTA-DR (P.L. 109-53) entered into force in 2006, significantly liberalizing trade in goods and services. CAFTA-DR replaced unilateral, temporary U.S. trade preferences with permanent tariff reductions and trade rules.[92] It eliminated tariffs on all U.S. consumer and industrial goods exported to Honduras. Most U.S. agricultural exports also enter Honduras duty-free, and nearly all remaining tariffs on U.S. agricultural products are scheduled to phase out by 2025.[93] The Castro administration has called for a renegotiation of some of the agricultural provisions of CAFTA-DR, however, to maintain

---

[87] USAID, CN#190, July 13, 2023.

[88] U.S. Department of State, Congressional Notification 23-315, August 21, 2023.

[89] USAID, CN#190, July 13, 2023.

[90] U.S. Department of State, Congressional Notification 23-315, August 21, 2023.

[91] For more information, see CRS Report R47432, *Caribbean Trade Preference Programs*, by Liana Wong and M. Angeles Villarreal.

[92] For more information, see CRS In Focus IF10394, *Dominican Republic-Central America-United States Free Trade Agreement (CAFTA-DR)*, by M. Angeles Villarreal.

[93] United States Trade Representative (USTR), *2023 National Trade Estimate Report on Foreign Trade Barriers*, March 31, 2023, p. 191.

certain tariffs intended to protect Honduran producers and ensure the country does not become completely dependent on imports for staples such as rice, beans, and corn.[94]

### Trade and Investment Flows

Although the value of U.S.-Honduran merchandise trade declined in 2020 due to the economic effects of the COVID-19 pandemic, trade has grown by nearly 75% since then to reach a record-high $14.0 billion in 2022 (see **Figure 4**). U.S. imports from Honduras amounted to $6.1 billion in 2022, with apparel, insulated wire, coffee, and fruit accounting for the vast majority. The same year, U.S. exports to Honduras totaled nearly $8.0 billion, led by mineral fuels, apparel inputs, cereals, and machinery.[95] As a result, the U.S. trade surplus with Honduras reached $1.9 billion in 2022.

**Figure 4. U.S. Trade with Honduras: 2005-2022**



**Source:** CRS presentation of U.S. Department of Commerce, Census Bureau data obtained through *Trade Data Monitor*, accessed July 2023.

U.S. foreign direct investment in Honduras increased by 67% between 2005, the year before CAFTA-DR and its investment chapter entered into force, and 2022. In 2022, U.S. direct investment in Honduras on a historical-cost basis amounted to nearly $1.4 billion, with 44% of the total invested in the manufacturing sector.[96] Vice President Harris has sought to foster increased investment in Honduras and other Central American countries through the Central America Forward initiative (formerly known as the *Call to Action*). The U.S. International Development Finance Corporation also supports such efforts; in FY2023, it approved a loan of up to $80.0 million to Banco Atlántida to expand lending to small- and medium-sized enterprises in

---

[94] Agence France Presse, "Honduras Pide a EEUU Renegociar Tratado para Proteger a sus Agricultores," January 31, 2023.

[95] U.S. Census Bureau and INE data, as presented by *Trade Data Monitor*, accessed July 2023.

[96] U.S. Department of Commerce, Bureau of Economic Analysis, "Balance of Payments and Direct Investment Position Data," accessed September 26, 2023.

Honduras.[97] However, U.S. investment promotion policies must contend with private sector concerns about the investment climate in Honduras (see "Investment Concerns").

## Labor Rights Concerns

Some observers in the United States and Honduras have expressed concerns about the enforcement of the labor rights provisions of CAFTA-DR.[98] In 2012, the AFL-CIO joined with 26 Honduran trade unions and civil society organizations to file a petition with the U.S. Department of Labor asserting that the Honduran government had failed to meet its obligations to effectively enforce its laws relating to freedom of association, the right to organize and bargain collectively, child labor, and the right to acceptable working conditions. They identified specific violations in the port, apparel, agriculture, and auto manufacturing sectors.[99]

After a nearly three-year investigation, the Department of Labor issued a public report in 2015 stating that it had found evidence of labor law violations in nearly all of the cases included in the petition. The report stated that the department "has serious concerns regarding the protection of internationally recognized labor rights in Honduras, including concerns regarding the Government of Honduras's enforcement of its labor laws."[100] In December 2015, U.S. and Honduran officials signed a monitoring and action plan designed to address the legal, institutional, and practical challenges to labor law enforcement in Honduras.[101]

According to the United States Trade Representative, "Honduras has made some significant progress in implementing the [monitoring and action plan] over the past seven years, including passing a comprehensive new labor inspection law in January 2017, issuing an implementing regulation for the law in July 2019, adopting a child labor referral mechanism in August 2019, and convening numerous tripartite meetings with private sector and labor stakeholders."[102] The U.S. Department of Labor also has funded a series of projects intended to reduce child labor, strengthen labor law enforcement, and improve labor rights in Honduras.[103] Nevertheless, according the U.S. State Department, workers continued to face difficulties in exercising their rights to form and join unions and to engage in collective bargaining, and the Honduran government "did not effectively enforce the law" in 2022.[104] The 2015 monitoring and action plan was to end "no later than" September 30, 2023.[105]

---

[97] U.S. International Development Finance Corporation, "DFC Approves More Than $3 Billion Across Priority Sectors in the Third Quarter of FY23," press release, June 30, 2023.

[98] The labor rights provisions of CAFTA-DR are available at https://ustr.gov/sites/default/files/uploads/agreements/cafta/asset_upload_file320_3936.pdf.

[99] AFL-CIO et al., *Public Submission to the Office of Trade & Labor Affairs (OTLA) Under Chapters 16 (Labor) and 20 (Dispute Settlement) of the Dominican Republic-Central America Free Trade Agreement (DR-CAFTA)*, March 26, 2012.

[100] U.S. Department of Labor, *Public Report of Review of U.S. Submission 2012-01 (Honduras)*, February 27, 2015.

[101] U.S. Department of Labor, "U.S. and Honduras Sign Landmark Labor Rights Agreement," press release, December 9, 2015. The Labor Rights and Monitoring Action Plan is available at https://ustr.gov/sites/default/files/files/agreements/FTA/CAFTA-DR/Honduras_Monitoring%20and%20Action%20Plan.pdf.

[102] USTR, *2023 Trade Policy Agenda and 2022 Annual Report*, May 2023, p. 7.

[103] For information on the projects, see U.S. Department of Labor, Bureau of International Labor Affairs, "ILAB in Honduras," https://www.dol.gov/agencies/ilab/country/ilab-honduras.

[104] U.S. Department of State, *Country Reports on Human Rights Practices, Honduras*, March 20, 2023.

[105] USTR, *2023 Trade Policy Agenda and 2022 Annual Report*, May 2023, p. 7.

## Investment Concerns

Over the past two years, private sector stakeholders have expressed increased concerns about the investment climate in Honduras. According to the U.S. State Department, "investors report that the fast pace of legal and regulatory changes, persistent government messaging blaming the private sector for the country's poverty and corruption, and lack of rigorous cost-benefit analysis underpinning economic policymaking has created a climate of uncertainty" and caused "significant disruptions" for U.S. companies operating in Honduras.[106]

The Honduran government's April 2022 repeal of the laws implementing and regulating ZEDEs has attracted particular attention from some Members of Congress.[107] ZEDEs were specially designated areas where investors were granted administrative autonomy to enact their own laws, set up their own judicial systems, and carry out other duties usually reserved for governments. The investment framework, established in 2013, was broadly unpopular in Honduras. The National Anti-Corruption Council argued it was an unconstitutional violation of Honduran sovereignty that was adopted through illegal means, and the country's primary business association warned that investments in ZEDEs would be high risk and would lack legal certainty.[108] Members of the Honduran congress unanimously supported the repeal.

Honduras Próspera Inc. (Próspera), a U.S.-based corporation, reportedly had invested $100 million in a ZEDE as of August 2023.[109] Próspera argues that the repeal of the ZEDE framework violated the Honduran government's obligations under the investment provisions of CAFTA-DR.[110] Using the agreement's investor-state dispute settlement (ISDS) mechanism, Próspera has filed a $10.8 billion claim (equivalent to 34% of Honduras's 2022 GDP) at the International Centre for Settlement of Investment Disputes.[111]

Some Members of Congress have called on the Biden Administration to protect the interests of U.S. investors involved in the Próspera ZEDE. For example, the report accompanying the House-passed FY2024 Department of State, Foreign Operations, and Related Programs Appropriations Act (H.Rept. 118-146 to H.R. 4665) would direct the Secretary of State to submit a report to the House and Senate Committees on Appropriations on "expropriation attempts by the Government of Honduras on investments by United States citizens in Prospera ZEDE" that outlines "steps and options for representing the interests of impacted investors and owners."[112]

Other Members of Congress have criticized Próspera's claim as an "attempt to bully the Honduran government" into allowing the company to continue operating under the abolished

---

[106] U.S. Department of State, *2023 Investment Climate Statements: Honduras*, July 27, 2023.

[107] The Honduran government has not yet repealed underlying constitutional provisions authorizing "Employment and Economic Development Zones" (ZEDEs by the Spanish acronym) and, to date, three previously established ZEDEs have continued to operate in Honduras.

[108] Consejo Nacional Anticorrupción, *Los Pecados Capitales de las ZEDE*, June 2021; and Consejo Hondureño de la Empresa Privada, "Certificación – Análisis Jurídico de las ZEDE en Honduras," June 3, 2021.

[109] Próspera, "Próspera Announces over $100M Invested in Honduras, Still Accepting Additional $10M Investment," press release, August 3, 2023.

[110] The investment provisions of CAFTA-DR are available at https://ustr.gov/sites/default/files/uploads/agreements/cafta/asset_upload_file328_4718.pdf.

[111] Próspera, "$10.775 Billion Claim Filed Against Government of Honduras," press release, December 20, 2022; and International Centre for Settlement of Investment Disputes, *Honduras Próspera Inc., St. John's Bay Development Company LLC, and Próspera Arbitration Center LLC v. Republic of Honduras (ICSID Case No. ARB/23/2)*, https://icsid.worldbank.org/cases/case-database/case-detail?CaseNo=ARB/23/2.

[112] Also see Letter from Bill Hagerty and Benjamin L. Cardin, United States Senators, to Honorable Antony J. Blinken, Secretary of State, October 13, 2022.

framework and for forcing the Honduran government to "potentially spend millions of dollars defending itself for responding to the will of its people."[113] They have called on the Biden Administration to intervene in the case in support of the Honduran government.

CAFTA-DR's ISDS mechanism allows a non-disputing party to make oral and written submissions to the arbitration tribunal regarding the interpretation of the agreement. During an October 2023 congressional hearing, a State Department official asserted that the United States "is not taking a position on the merits of the dispute," and that the State Department "has encouraged both sides to reach a consensual resolution."[114]

# Outlook

The January 2022 inauguration of President Castro and a new congress presented Honduras with an opportunity to begin rebuilding democratic institutions and the rule of law after more than 12 years of backsliding following the 2009 coup. To date, however, the Castro administration and Honduran legislators from across the political spectrum have demonstrated more interest in obtaining control over Honduran institutions than in strengthening them. The inability or unwillingness of the country's political leaders to forge consensus has exacerbated societal polarization and limited the Honduran government's ability to address challenges, including widespread poverty, corruption, and insecurity.

Over the past decade, the United States has increased foreign assistance to Honduras in an attempt to improve living conditions and address underlying drivers of irregular migration to the U.S. border. Although annual U.S. Border Patrol encounters with Honduran migrants have declined since reaching a record high in FY2021, these are difficult and long-term endeavors, and sustained improvements will likely require concerted efforts by the Honduran government and the international community over many years. The 118th Congress is likely to continue assessing the political will of the Honduran government to enact reforms and collaborate on U.S. priorities as it considers foreign assistance appropriations and other legislation that may shape bilateral ties.

## Author Information

Peter J. Meyer
Specialist in Latin American and Canadian Affairs

---

[113] See, for example, Letter from Elizabeth Warren, United States Senator et al., to Honorable Katherine Tai, U.S. Trade Representative, and Honorable Antony Blinken, Secretary of State, May 2, 2023.

[114] Jacobstein, October 2023.

# Disclaimer

This document was prepared by the Congressional Research Service (CRS). CRS serves as nonpartisan shared staff to congressional committees and Members of Congress. It operates solely at the behest of and under the direction of Congress. Information in a CRS Report should not be relied upon for purposes other than public understanding of information that has been provided by CRS to Members of Congress in connection with CRS's institutional role. CRS Reports, as a work of the United States Government, are not subject to copyright protection in the United States. Any CRS Report may be reproduced and distributed in its entirety without permission from CRS. However, as a CRS Report may include copyrighted images or material from a third party, you may need to obtain the permission of the copyright holder if you wish to copy or otherwise use copyrighted material.

# ecoi.net

Document #2107723

## USDOS – US Department of State (Author)

## 2023 Country Report on Human Rights Practices: Honduras

### EXECUTIVE SUMMARY

The human rights situation in Honduras was problematic, due to the prolonged *estado de excepción* (state of emergency) and an increase in gender-based violence. The Office of the UN High Commissioner for Human Rights raised concerns regarding illegal detentions, excessive use of force, and abuses committed during warrantless home searches committed in the context of the estado de excepción. Violence and extortion persisted at high levels, due to competition among gangs.

Significant human rights issues included credible reports of: arbitrary or unlawful killings; torture or cruel, inhuman, or degrading treatment or punishment by government agents; harsh and life-threatening prison conditions; arbitrary arrest or detention; serious problems with the independence of the judiciary; serious restrictions on freedom of expression and media freedom, including threats against media members by criminal elements; serious government corruption; extensive gender-based violence, including domestic violence, sexual violence, and femicide; and crimes involving violence or threats of violence targeting lesbian, gay, bisexual, transgender, queer, or intersex persons.

The government took credible steps to identify and punish officials who may have committed human rights abuses or engaged in corruption, but a weak judicial system and corruption were major obstacles to obtaining convictions.

HondurasAR000262

6/17/25, 4:48 PM    U.S. Department of State (USDOS): Country Reports on Human Rights Practices 2021: Honduras [...] Document #2107723 - ...

Case 3:25-cv-05687-TLT    Document 62-1    Filed 07/28/25    Page 263 of 462

Criminal groups, including local and transnational gangs and narcotics traffickers, were significant perpetrators of violent crimes and committed acts of homicide, torture, kidnapping, extortion, human trafficking, intimidation, and other threats and violence directed against human rights defenders, judicial authorities, lawyers, business community members, journalists, bloggers, women, and other vulnerable populations. The government investigated and prosecuted some of these crimes, but impunity was widespread.

## Section 1.

## Respect for the Integrity of the Person

### A. ARBITRARY DEPRIVATION OF LIFE AND OTHER UNLAWFUL OR POLITICALLY MOTIVATED KILLINGS

There were reports that the government or its agents committed one arbitrary or unlawful killing within the National Penal Institute. No further information was publicly available regarding the incident.

The Public Ministry reported eight killings of human rights activists as of September. For example, unknown assailants shot and killed Aly Domínguez on January 7 and Oquelí Domínguez on June 15. Both men were members of the Municipal Committee in Defense of Common and Public Goods of Tocoa, in the department of Colón. Their family was one of the most prominent environmental defenders of the Guapinol River and surrounding area, in the northern part of the country. The government continued to investigate the killings.

In July, the government signed an agreement establishing a tripartite commission to investigate human rights abuses in the Bajo Aguan area and provide reparations to victims.

Criminal groups, such as drug traffickers and local and transnational gangs including MS-13 and the 18th Street gang, committed killings.

### B. DISAPPEARANCE

There were no reports of disappearances by or on behalf of government authorities.

### C. TORTURE AND OTHER CRUEL, INHUMAN, OR DEGRADING TREATMENT OR PUNISHMENT, AND OTHER RELATED ABUSES

Although the law prohibited such practices, there were credible reports of abuses by members of the security forces.

HondurasAR000263

Case 3:25-cv-05687-TLT    Document 62-1    Filed 07/28/25    Page 264 of 462

The National Human Rights Commission (CONADEH) reported 66 cases of alleged torture or cruel and inhuman treatment of detainees and prisoners by security forces through August, while the Public Ministry received five such reports through July. The quasi-governmental National Committee for the Prevention of Torture, Cruel, Inhuman, or Degrading Treatment (CONAPREV) received 41 complaints of the use of torture or cruel and inhuman treatment through September.

Corruption, a lack of investigative resources, and judicial delays led to widespread impunity, including for members of security forces.

## Prison and Detention Center Conditions

Prison conditions were harsh and at times life threatening due to gross overcrowding, malnutrition and lack of medical care, and abuse by prison officials. The government's failure to control criminal activity and pervasive gang-related violence contributed significantly to insecurity.

**Abusive Physical Conditions:** Prisons were severely overcrowded. CONAPREV reported that as of March 31, the prison population was more than 19,500, in a system designed for approximately 13,000 inmates.

Prisoners suffered from malnutrition, lack of adequate sanitation and medical care, and, in some prisons, lack of adequate ventilation and lighting.

CONADEH and CONAPREV reported more than 100 cases of alleged torture or cruel and inhuman treatment of detainees and prisoners by security forces.

The government failed to control pervasive gang-related violence and criminal activity within the prisons. Many prisons lacked sufficient security personnel. Prisoners had access to weapons and other contraband, inmates attacked other inmates with impunity, and inmates and their associates outside prison threatened prison officials and their families.

On June 21, members of the 18th Street gang attacked members of a rival gang, MS-13, in the Tamara women's prison, San Pedro Sula. Forty-six women were killed. Following the attack, President Castro transferred control of the prison system to the military police.

**Administration:** The judicial system was legally responsible for monitoring prison conditions. The government tasked CONAPREV with visiting prisons and making recommendations for protecting the rights of prisoners.

HondurasAR000264

**Independent Monitoring:** After the government ordered an emergency military takeover of prisons following a deadly riot in June in the women's prison, the government generally permitted prison visits by independent local and international human rights observers, including the International Committee of the Red Cross, with some exceptions.

## D. ARBITRARY ARREST OR DETENTION

The law prohibited arbitrary arrest and detention and provided for the right of any person to challenge the lawfulness of their arrest or detention in court. While no official statistics were provided, there were allegations of arbitrary detention and unlawful arrest as a result of the imposed estado de excepción.

### Arrest Procedures and Treatment of Detainees

By law, police could make arrests only with a warrant unless they made the arrest during the commission of a crime, there was strong suspicion that a person had committed a crime and might otherwise evade criminal prosecution, or they encountered a person in possession of evidence related to a crime. The law required police to inform persons of the grounds for their arrest and bring detainees before a competent judicial authority within 24 hours. It stipulated that a prosecutor had 24 additional hours to decide if there was probable cause for indictment, whereupon a judge had 24 more hours to decide whether to issue a temporary detention order. Such an order could be effective for up to six days, after which the judge was required to hold a pretrial hearing to examine whether there was probable cause to continue pretrial detention. The law allowed bail for persons charged with some felonies and gave prisoners the right of prompt access to family members. The law allowed the release of other suspects pending formal charges, on the condition that they periodically reported to authorities, although management of this reporting mechanism was often weak. The government generally respected these provisions.

Persons suspected of any of 21 specific felonies remained in custody, pending the conclusion of judicial proceedings against them. Some judges ruled that such suspects could be released on the condition they report periodically to authorities. The law granted prisoners the right to prompt access to a lawyer of their choice and, if indigent, to government-provided counsel, although the public defender mechanism was weak, and authorities did not always abide by these requirements.

**Arbitrary Arrest:** CONADEH and the Public Ministry did not report any statistics on cases of illegal detention or arbitrary arrest. Nongovernmental organizations (NGOs) reported three cases of arbitrary

HondurasAR000265

arrest. There were also allegations of arbitrary detention and unlawful arrest as a result of the imposed estado de excepción.

Guapinol defender Arnol Aleman was detained for 26 hours, despite having a provisional release letter.

**Pretrial Detention:** Judicial inefficiency, corruption, and insufficient resources delayed proceedings in the criminal justice system, and lengthy pretrial detention was a serious problem. For crimes with minimum sentences of six years' imprisonment, the law authorized pretrial detention of up to two years. The prosecution could request an additional six-month extension, but many detainees remained in pretrial detention much longer, including for more time than the maximum period of incarceration for their alleged crime. The law did not authorize pretrial detention for crimes with a maximum sentence of five years or less.

The law mandated that authorities release detainees whose cases had not yet come to trial and whose time in pretrial detention already had exceeded the maximum prison sentence for their alleged crime. Nonetheless, many prisoners remained in custody after completing their full sentences, and sometimes even after an acquittal, because officials failed to process their releases expeditiously.

## E. DENIAL OF FAIR PUBLIC TRIAL

The law provided for an independent judiciary, but the justice system was poorly staffed, inadequately equipped, often ineffective, and subject to intimidation, corruption, politicization, and patronage. Low salaries and a lack of internal controls rendered judicial officials susceptible to bribery. Powerful special interests, including criminal groups, exercised influence on the outcomes of some court proceedings.

### Trial Procedures

The law provided for the right to a fair and public trial; however, the judiciary was often slow to enforce this right.

Credible observers noted problems in trial procedures, such as a lack of admissible evidence, judicial corruption, witness intimidation, and an ineffective witness protection program.

### Political Prisoners and Detainees

There were no reports of political prisoners or detainees.

## F. TRANSNATIONAL REPRESSION

Not applicable.

HondurasAR000266

6/17/25, 4:48 PM    US Department of State (United States), Country Reports on Human Rights Practices for 2024: Honduras - Document #2107723 - ...

Case 3:25-cv-05687-TLT    Document 62-1    Filed 07/28/25    Page 267 of 462

## G. PROPERTY SEIZURE AND RESTITUTION

Not applicable.

## H. ARBITRARY OR UNLAWFUL INTERFERENCE WITH PRIVACY, FAMILY, HOME, OR CORRESPONDENCE

Although the law generally prohibited such actions, a legal exception allowed government authorities to enter a private residence to prevent a crime or in case of an emergency. On December 6, the Office of the UN High Commissioner for Human Rights expressed concerns regarding illegal detentions, excessive use of force, and abuses committed during warrantless home searches committed in the context of the estado de excepción.

## Section 2.

## Respect for Civil Liberties

## A. FREEDOM OF EXPRESSION, INCLUDING FOR MEMBERS OF THE PRESS AND OTHER MEDIA

The law provided for freedom of expression, including for members of the press and other media, with some restrictions, and the government generally respected this right. Although many press outlets were politically aligned, the press and prevailing democratic norms combined to promote freedom of expression, including for media members.

**Freedom of Expression:** Senior government representatives criticized civil society and members of the international community for comments perceived as critical of the government. Civil society groups reported these statements had a chilling effect on freedom of expression.

**Violence and Harassment:** Journalists and other members of civil society reported they self-censored due to fear of criticism, harassment, and retribution by the government and its supporters. Others reported direct acts of intimidation or threats of violence from government officials or supporters for being critical of the government. For example, National Police agents intimidated journalist Orlin Martinez, claiming he was an informant for criminal groups. Civil society organizations criticized the government's failure to investigate threats and incidents of violence adequately.

**Censorship or Content Restrictions for Members of the Press and Other Media, Including Online Media:** Media members and NGOs stated the press self-censored due to fear of retaliation from criminal groups, drug trafficking organizations, or criticism by government officials. Media also

HondurasAR000267

engaged in self-censorship to avoid losing lucrative advertising contracts with the government.

**Libel/Slander Laws:** Libel and slander were criminal offenses. No cases were reported during the year.

**Nongovernmental Impact:** Some journalists and other members of civil society reported threats from members of criminal groups. It was unclear how many of these threats were related to the victims' professions or activism. For example, on January 30, unknown assailants shot and killed television media editor Carlos Barahona in Tegucigalpa. On December 22, unknown assailants shot and killed social communicator Javier Ramírez Amador in the city of Danlí. Ramírez worked for Channel 24 primetime television and the Public Prosecutor's Office and had been receiving police protection since May under the National Protection Mechanism. The police officer protecting Ramírez was also shot during the attack. NGOs believed the killing was reprisal for Ramirez's work investigating criminal activities. The government continued to investigate the killing.

Several anonymous social media sites criticized journalists (as well as activists and civil society organizations) who were critical of the government or of opposition party policies.

## Internet Freedom

The government did not restrict or disrupt access to the internet or censor online content.

## B. FREEDOMS OF PEACEFUL ASSEMBLY AND ASSOCIATION

The constitution provided for the freedoms of peaceful assembly and association, but the government did not always respect the right of peaceful assembly, due to a continued estado de excepción beginning in November 2022, in which these rights were suspended.

## Freedom of Peaceful Assembly

On May 9, citizens marched in a peaceful protest in the southern city of Choluteca against tax law reforms proposed by the governing LIBRE party. In response, the Castro administration convened a meeting of the National Defense and Security Council, condemned the protest, and ordered an investigation, claiming the protesters had been coerced by business owners into participating in the protest. The government promised to prosecute those involved, based on the allegation the march organizers coerced protesters to participate. As of September, police and other justice sector officials had yet to publicly identify any of the protest leaders as having committed a crime.

6/17/25, 4:48 PM
Case 3:25-cv-05687-TLT Document 62-1 Filed 07/28/25 Page 269 of 462
U.S. Department of State (USA), Country Reports on Human Rights Practices 2023: Honduras | Document #2107723 - …

In another instance, in July supporters of the ruling party chased peaceful protesters while throwing objects at them to disrupt their demonstration. The government also reportedly used its control of the Honduran Transportation Institute to arbitrarily enforce intercity bus travel rules in August to reduce numbers of protesters at another opposition-led protest in Tegucigalpa.

## C. FREEDOM OF RELIGION

See the Department of State's *International Religious Freedom Report* at https://www.state.gov/religiousfreedomreport/.

## D. FREEDOM OF MOVEMENT AND THE RIGHT TO LEAVE THE COUNTRY

The law provided for freedom of internal movement, foreign travel, emigration, and repatriation, and the government generally respected these rights.

**In-country Movement:** There were areas where authorities could not assure freedom of movement due to criminal activity and a lack of significant government presence.

## E. PROTECTION OF REFUGEES

The government cooperated with the Office of the UN High Commissioner for Refugees (UNHCR) and other humanitarian organizations in providing protection and assistance to refugees, returning refugees, or asylum seekers, and other persons of concern.

**Access to Asylum:** The law provided for granting asylum or refugee status. The government had a nascent system to provide legal protection to refugees. Its operations to receive and process cases relied on substantial support from UNHCR. UNHCR's support focused on providing training to officers of the National Institute for Migration, supporting decisions on submitted claims, and improving reception conditions for asylum seekers.

**Abuse of Refugees and Asylum Seekers:** Transiting migrants, forcibly displaced populations, and asylum seekers with pending cases were vulnerable to abuse and sexual exploitation by criminal organizations. Women, children, and lesbian, gay, bisexual, transgender, queer, or intersex (LGBTQI+) individuals were especially vulnerable to abuse. Transiting migrants, refugees, and other vulnerable populations faced acute security risks in border zones.

## F. STATUS AND TREATMENT OF INTERNALLY DISPLACED PERSONS (IDPS)

The Internal Displacement Monitoring Center estimated that between 2004 and 2018 (most recent data available), there were approximately 247,000 IDPs due to violence in the country. Gang activity, including attacks on and exploitation of nonmembers, was the primary contributor to violence-related internal displacement. Official data on forced displacement, especially displacement due to violence, was limited in part because gangs controlled many of the neighborhoods where individuals were forced from their homes and communities. NGOs reported IDPs were at increased risk of victimization and exploitation by criminal groups.

The government maintained the Interinstitutional Commission for the Protection of Persons Displaced by Violence and created the Directorate for the Protection of Persons Internally Displaced by Violence within the Ministry of Human Rights. Despite incremental progress, government capacities to respond to the needs of IDPs was limited.

In March President Castro enacted the Law for the Prevention, Care, and Protection of Internally Displaced People, created to provide a legal framework to protect the rights of IDPs.

For further information about IDPs in the country, please see the materials of the Internal Displacement Monitoring Center at https://www.internal-displacement.org .

## Section 3.

## Freedom to Participate in the Political Process

The law provided citizens the right to choose their government in free and fair periodic elections held by secret ballot and based on nearly universal and equal suffrage. The law did not permit active members of the military or civilian security forces to vote. The constitution prohibited practicing clergy from running for office or participating in political campaigns.

## ELECTIONS AND POLITICAL PARTICIPATION

**Abuses or Irregularities in Recent Elections:** The most recent national elections, held in November 2021, were generally considered to be fair and free of abuses and irregularities. Some NGOs and political parties reported irregularities, but international observers reported they were not systematic and not widespread enough to affect the outcome of the presidential election.

## Section 4.

## Corruption in Government

HondurasAR000270

The law provided for criminal penalties for corruption by officials, but authorities did not implement the law effectively, and officials continued to engage in corrupt practices with impunity. There were numerous reports of government corruption.

**Corruption:** On May 23, the Special Prosecutor's Office for the Protection of Children reported it had received official complaints filed against the former director of the Directorate for Children, Adolescents, and the Family, Dulce Villanueva, for irregular adoption proceedings and alleged collection of bribes. On May 26, President Castro accepted her resignation.

For additional information regarding corruption in the country, please see the Department of State's *Investment Climate Statement* for the country, and the Department of State's *International Narcotics Control Strategy Report,* which includes information on financial crimes.

## Section 5.

## Governmental Posture Towards International and Nongovernmental Monitoring and Investigation of Alleged Abuses of Human Rights

A wide variety of domestic and international human rights groups generally operated without government restriction to monitor or investigate human rights conditions or cases and publish their findings. Government officials were somewhat cooperative and responsive to the views of these groups, but some human rights organizations criticized government officials for lack of access and responsiveness.

**Retribution against Human Rights Defenders:** The Public Ministry reported eight killings of human rights and environmental activists as of September. For example, on January 7, Aly Domínguez and Jairo Bonilla were shot and killed by unknown assailants. Domínguez and Bonilla were cofounders of a grassroots resistance protesting a controversial open-pit iron oxide mining project that was polluting a river that runs through the Bajo Aguán valley in northern part of the country. On June 15, Oqueli Domínguez, Aly's brother, was shot and killed in similar circumstances. The government continued to investigate the killings.

**Government Human Rights Bodies:** A semiautonomous commission for human rights, CONADEH, investigated complaints of human rights abuses. NGOs and other civil society groups generally considered the commission independent but at times ineffective.

6/17/25, 4:48 PM                    U.S. Department of State (2021-2024) Country Report on Human Rights Practices: Honduras Document #2107723 - …

Case 3:25-cv-05687-TLT   Document 62-1   Filed 07/28/25   Page 272 of 462

The Ministry of Human Rights served as an advocate for human rights within the government. The Public Ministry's Office of the Special Prosecutor for Human Rights handled cases involving charges of human rights abuses by government officials. The Public Ministry also had a Special Prosecutor's Office for the Protection of Human Rights Defenders, Journalists, Social Communicators, and Justice Officials. There was also a Human Rights Commission in the national congress. The Ministries of Security and of Defense both had human rights offices that coordinated human rights-related activities with the Ministry of Human Rights.

## Section 6.

## Discrimination and Societal Abuses

### WOMEN

**Rape and Domestic Violence:** The law criminalized all forms of rape, including spousal rape and domestic or intimate partner rape and other forms of domestic and sexual violence, as well as so-called corrective rape of LGBTQI+ persons. The government considered rape a crime of public concern, and the state prosecuted suspected rapists even if survivors did not press charges. The penalties for rape ranged from nine to 13 years' imprisonment. The law was not effectively enforced; weak public institutional structures contributed to the inadequate enforcement.

The law did not specifically criminalize domestic violence but provided penalties of up to 12 years in prison for violence against a family member, depending on the severity of the assault and aggravating circumstances. If a victim's physical injuries did not reach the severity required to categorize the violence as a criminal act, the legal penalty for a first offense was a sentence of one to three months of community service.

Survivors of domestic violence were entitled to certain protective measures, such as removing the abuser from the home and prohibiting the abuser from visiting the victim's workplace or other frequently visited locations. Persons who disobeyed the prohibition could be detained for up to 24 hours as a preventive measure. The law provided a maximum sentence of three years in prison for disobeying a restraining order connected with the crime of violence against a woman.

Civil society groups reported women often did not report domestic violence or withdrew charges because they feared, or were economically dependent on, the aggressor. In addition, women experienced delays in accessing justice due to police who failed to process complaints in a timely manner or judicial system officials who deferred scheduling hearings.

HondurasAR000272

Case 3:25-cv-05687-TLT   Document 62-1   Filed 07/28/25   Page 273 of 462

**Other Forms of Gender-based Violence or Harassment:** The Ministry of Security reported 229 violent women deaths from January to June, a nearly 49 percent increase compared with the same period in 2022. The Human Rights Observatory of the Center for Women's Rights registered 341 violent deaths of women as of October 31.

The law criminalized sexual harassment, including in employment. The law stipulated penalties of one to three years in prison and possible suspension of offenders' professional licenses, but the government did not effectively enforce the law.

**Discrimination:** Although the law accorded women and men the same legal rights and status, including property rights in divorce cases, many women did not fully enjoy such rights due to barriers in access to justice and lack of information regarding legal protections. Most women in the workforce engaged in lower-status and lower-paying informal occupations, such as domestic service, without the benefit of legal protections. The law did not mandate equal pay for equal work. The law prohibited employers from requiring pregnancy tests as a prerequisite for employment. The law stated a woman's employment should be appropriate to her physical state and capacity. Many employers discriminated against women. For example, it was common in job announcements that only male applicants should apply.

**Reproductive Rights:** There were no reports of coerced abortion or involuntary sterilization on the part of government authorities.

The government did not provide government-sponsored access to sexual and reproductive health services for survivors of sexual violence, and emergency contraception and postexposure prophylaxis were not available as part of clinical management of rape. President Castro signed an executive order in March allowing the sale, distribution, and use of emergency contraception, but it was not widely available. The government's ability to provide health-care services to survivors of sexual violence was limited. Survivors relied on assistance from NGOs such as Doctors Without Borders.

In 2019 (most recent data available), 94 percent of births were attended by skilled health-care personnel; however, NGOs reported significant gaps in obstetric care, especially in rural areas. The United Nations reported the adolescent birth rate was 89 births per 1,000 girls ages 15 to 19. UN human rights experts stated the difficulty of access to contraception, particularly in rural areas, contributed to a high rate of adolescent pregnancy.

HondurasAR000273

6/17/25, 4:48 PM
Case 3:25-cv-05687-TLT · Document 62-1 · Filed 07/28/25 · Page 274 of 462
U.S. Department of State (Democracy and Reproductive Human Rights Practice) Honduras Democrat #2107723 - …

The Ministry of Health estimated that there were 86 maternal deaths per year and that the vast majority of the leading causes were preventable.

## SYSTEMIC RACIAL OR ETHNIC VIOLENCE AND DISCRIMINATION

The law criminalized discrimination based on race and ethnicity and included crimes committed against individuals due to race or ethnicity as aggravating circumstances to increase penalties for other criminal offenses. NGOs reported the government did not effectively combat discrimination or promote equal access to government services and employment opportunities.

The government's National Policy to Combat Racism and Racial Discrimination sought to promote equality and combat discrimination related to the country's two Afro-descendent groups, with a focus on social and political participation; access to education, health care, justice, and employment opportunities; and rights to ancestral lands and natural resources. NGOs reported the government did not make sufficient efforts to comply with Inter-American Court of Human Rights rulings, specifically cases related to territorial rights for Garífuna communities.

## INDIGENOUS PEOPLES

Indigenous groups had limited representation in the national government and consequently little direct input into decisions affecting their lands, cultures, traditions, and the allocation of natural resources.

Indigenous communities continued to report threats and acts of violence against them and against community and environmental activists. Violence was often rooted in a broader context of conflict regarding land and natural resources, corruption, lack of transparency and community consultation, other criminal activity, and limited state ability to protect the rights of vulnerable communities.

Ethnic minority rights leaders, international NGOs, and farmworker organizations claimed the government failed to redress actions taken by security forces, government agencies, private individuals, and businesses to dislodge Indigenous persons from lands over which they claimed ownership based on land reform law or ancestral land titles.

Persons from Indigenous and Afro-descendant communities experienced discrimination in employment, education, housing, and health services.

As of September, there was no conclusion after evidence hearings in June regarding the November 2022 killing of Marcos Pineda Aguilar during a

police raid in the community of El Encinal, department of La Paz. National Police agents allegedly killed the victim, a member of the Civic Council of Popular and Indigenous Organizations of Honduras. The hearings relied on police testimony.

## CHILDREN

**Birth Registration:** Failure to register births resulted in denial of public services, including access to health services or school enrollment.

**Child Abuse:** The law established prison sentences of up to two and one-half years for child abuse. The government did not enforce the law effectively.

**Child, Early, and Forced Marriage:** The minimum legal age of marriage was 18. The government did not enforce the law effectively. International NGOs reported 34 percent of girls and 12 percent of boys were married before age 18, with the practice more prevalent in rural areas. Most unions were informal rather than a formal marriage.

**Sexual Exploitation of Children:** The law prohibited the sale, grooming, or use of children for commercial sexual exploitation, including sex trafficking. The commercial sexual exploitation of children, especially in sex trafficking, was a problem, and the government made efforts to enforce the law, but its measures were not effective. The country was a destination for child sex tourism, particularly in the tourist area of the Bay Islands. The legal age of consent was 18. The law prohibited the use of children younger than 18 for exhibitions or performances of a sexual nature or in the production of pornography.

## ANTISEMITISM

The Jewish community numbered approximately 150 members. There were no known reports of antisemitic incidents.

## TRAFFICKING IN PERSONS

See the Department of State's *Trafficking in Persons Report* at https://www.state.gov/trafficking-in-persons-report/.

## ACTS OF VIOLENCE, CRIMINALIZATION, AND OTHER ABUSES BASED ON SEXUAL ORIENTATION, GENDER IDENTITY OR EXPRESSION, OR SEX CHARACTERISTICS

**Criminalization:** No laws existed to criminalize consensual same-sex conduct between adults, cross-dressing, or other sexual or gender characteristic-related behavior. NGOs reported concern that the Public Ministry and government bodies lacked investigative processes to deal

HondurasAR000275

6/17/25, 4:48 PM
Case 3:25-cv-05687-TLT   Document 62-1   Filed 07/28/25   Page 276 of 462
U.S. Department of State (DOS): 2023 Country Reports on Human Rights Practices: Honduras Document #2107723 - …

with cases of violence and hate crimes against LGBTQI+ persons, because investigative units did not receive training on gender and sexual diversity issues. There was also a general lack of investigative personnel, contributing to a large number of unresolved cases.

**Violence and Harassment:** NGOs reported police or other government agents incited, perpetrated, condoned, or tolerated violence against LGBTQI+ individuals. Impunity for such crimes was high. LGBTQI+ organizations reported they were the target of hate speech from media, public officials, and religious organizations. The Public Ministry reported seven killings of LGBTQI+ persons as of September, while NGOs reported 47 violent deaths and 83 hate crimes against LGBTQI+ persons as of November.

On January 29, the Special Prosecutor's Office for Crimes Against Life coordinated a raid in Roatán to capture Erick Gerardo del Arca, for the alleged rape and killing of Manuel Enrique Cruz, a member of the LGBTQI+ community.

In June police detained Miguel Ángel Cabrera Oviedo and Antonio Josué Medina Vargas for the February 19 killing of Maryuri Lizeth Pineda, a member of the LGTBQI+ community.

On May 18, a member of the National Police assigned to Intibucá Departmental Police Unit 13 of the municipality of Gracias, department of Lempira, reported Deputy Commissioner Jessica Aguilar for harassment regarding his sexual orientation.

**Discrimination:** The law prohibited discrimination based on sexual orientation and gender identity characteristics and included crimes committed against individuals because of their sexual orientation or gender identity as aggravating circumstances to increase penalties for criminal offenses. Nevertheless, discrimination against LGBTQI+ persons persisted. As of August, CONADEH received 25 reports of discrimination based on sexual orientation. Same-sex couples and households headed by same-sex couples were not eligible for the same legal protections available to opposite-sex married couples.

LGBTQI+ rights groups asserted government agencies and private employers engaged in discriminatory hiring practices. Transgender women were particularly vulnerable to employment and education discrimination; many could find employment only as sex workers, increasing their vulnerability to violence and extortion.

**Availability of Legal Gender Recognition:** The law prohibited transgender persons from changing their name and legal gender status. Other forms of legal gender recognition, such as nonbinary or intersex, were not available.

**Involuntary or Coercive Medical or Psychological Practices:** There were no documented cases of "conversion therapy," but NGOs reported there were known cases of conversion therapies. There were no reports medically unnecessary and irreversible "normalization" surgeries were performed on children or on nonconsenting adult intersex persons.

**Restrictions of Freedom of Expression, Association, or Peaceful Assembly:** There were no restrictions of freedom of expression, association, or peaceful assembly regarding LGBTQI+ matters or events.

## PERSONS WITH DISABILITIES

The law required that persons with disabilities have access to buildings, but few buildings were accessible, and the government did not effectively implement laws or programs to provide such access.

According to government estimates, children with disabilities attended school at a lower rate than the general population. The Institute for National Statistics put net enrollment for primary school at 77 percent in 2021, but the National Center for Social Sector Information stated that in 2020, 43 percent of persons with disabilities received no formal education.

The government had an Office for Persons with Disabilities located within the Ministry of Development and Social Inclusion, but its ability to provide services to persons with disabilities was limited.

## OTHER SOCIETAL VIOLENCE OR DISCRIMINATION

Persons with HIV and AIDS continued to be targets of discrimination, including in employment and occupation, and they suffered disproportionately from gender-based violence.

## Section 7.

## Worker Rights

## A. FREEDOM OF ASSOCIATION AND THE RIGHT TO COLLECTIVE BARGAINING

The law granted workers the right to form and join unions of their choice, bargain collectively, and strike. It prohibited employer retribution against

HondurasAR000277

employees for engaging in trade union activities. The law placed restrictions on these rights, such as requiring that a recognized trade union represent at least 30 workers, prohibiting foreign nationals from holding union offices, and requiring that union officials work in the same substantive area of the business as the workers they represented. The law prohibited members of the armed forces and police, as well as certain other public employees, from forming labor unions. The Ministry of Labor and Social Security also required that union leaders be employed under permanent contracts, limiting the ability of seasonal agricultural workers to exercise their right to freedom of association.

The law required an employer to begin collective bargaining once workers established a union, and it specified that if more than one union existed at a company, the employer had to negotiate with the largest.

The law allowed only local unions to call strikes, prohibited labor federations and confederations from calling strikes, and required that a two-thirds majority of both union and nonunion employees at an enterprise approve a strike. The law prohibited workers from legally striking until direct negotiations and government-accompanied mediation and conciliation had failed. The Ministry of Labor had the power to declare a work stoppage illegal and grant employers the ability to discipline employees consistent with their internal regulations, including by firing strikers. In addition, the law limited strikes in sectors the government designated as essential services but did not necessarily meet the criteria for essential services. The law required workers in public health care, social security, staple food production, and public utilities (municipal sanitation, water, electricity, and telecommunications) to provide basic services during a strike. The law also required that public-sector workers involved in the refining, transportation, and distribution of petroleum products submit their grievances to the Ministry of Labor. The law permitted strikes by workers in export-processing zones and free zones for companies that provided services to industrial parks, but it required that strikes not impede the operations of other factories in such parks.

The government did not effectively enforce the law. Employers frequently refused to comply with Ministry of Labor orders that required them to reinstate workers who had been dismissed for participating in union activities. The Ministry of Labor could order a company to reinstate workers, but the ministry lacked the personnel and transportation resources to verify compliance. By law, the ministry could fine companies that violated the right to freedom of association. The law permitted fines, and the penalty was commensurate with those for other laws involving denials of civil rights, such as discrimination. Penalties were sometimes

HondurasAR000278

applied against violators, but the failure of the government to collect fines facilitated continued violations. During the year, the government issued the highest penalty ever against an employer in a long outstanding case of violation of freedom of association and other labor law violations.

Workers had difficulty exercising the right to form and join unions and to engage in collective bargaining. Public-sector trade unionists raised concerns regarding government interference in trade union activities, including its ignoring or suspending collective agreements and its dismissals of union members and leaders.

Some employers either refused to engage in collective bargaining or made it very difficult to do so. Some companies also delayed appointing or failed to appoint representatives for required Ministry of Labor-led mediation, a practice that prolonged the mediation process and impeded the right to strike. Unions also raised concerns that employers used temporary contracts to prevent unionization and to avoid providing full benefits.

The government investigated violence and threats of violence against union leaders. Impunity for such crimes was high.

On June 24, unknown assailants shot and killed 13 persons in Choloma, department of Cortés. Most of the victims were not union members; however, union leaders and maquila workers in Choloma, including the president of the Gildan San Miguel Workers' Union, were among the victims. The shooting was preceded by an announcement that Gildan Activewear planned to shut down its factory in Choloma, which led to threats against the union leaders from local gang members, who blamed the union for the closure and loss of employment. The company noted the closure was strictly due to market conditions, reiterated its commitment to freedom of association and collective bargaining, and continued to engage with the union. In June authorities arrested three suspects in relation to the shooting – Javier Antonio Colindres Hernández, José Andrés Hernández Gutiérrez, and an unnamed minor member of the Barrio 18 gang. It was unclear whether the shooting was related to union activity.

## B. PROHIBITION OF FORCED OR COMPULSORY LABOR

See the Department of State's annual *Trafficking in Persons Report* at https://www.state.gov/trafficking-in-persons-report/.

## C. PROHIBITION OF CHILD LABOR AND MINIMUM AGE FOR EMPLOYMENT

See the Department of Labor's *Findings on the Worst Forms of Child Labor* at https://www.dol.gov/agencies/ilab/resources/reports/child-

HondurasAR000279

6/17/25, 4:48 PM    U.S. Department of State (United States); Report on Human Rights Practices (Honduras): Document #2107723 - ...

Case 3:25-cv-05687-TLT    Document 62-1    Filed 07/28/25    Page 280 of 462

labor/findings/ .

## D. DISCRIMINATION (SEE SECTION 6)

## E. ACCEPTABLE CONDITIONS OF WORK

**Wage and Hour Laws:** The law provided for a minimum wage for most sectors. There were 45 categories of monthly minimum wage, based on the industry and the size of a company's workforce; minimum wages were above the poverty line. The minimum wage law did not cover domestic workers, the vast majority of whom were women.

The law prescribed a maximum eight-hour shift per day for most workers, a 44-hour workweek, and at least one 24-hour rest period for every six days of work. It also provided for paid national holidays and annual leave. The law required overtime pay, banned excessive compulsory overtime, limited overtime to four hours a day for a maximum workday of 12 hours, and prohibited the practice of requiring workers to complete work quotas before leaving their place of employment.

In some industries, including agriculture, domestic service, and security, employers did not respect maternity rights or pay minimum wage, overtime, or vacation. In these sectors, employers frequently paid workers for the standard 44-hour workweek irrespective of any additional hours they worked. In the security and domestic service sectors, workers were frequently forced to work more than 60 hours per week but were paid only for 44 hours. Employers frequently penalized agricultural workers for taking legally authorized days off. Employers paid the minimum wage inconsistently in other sectors. Civil society continued to raise problems with minimum wage violations, highlighting agricultural companies in the south as frequent violators.

On July 25, the Ministry of Labor modified a 2018 agreement on Honduran Maquiladora Textile Sector and other Free Zone Companies to increase the minimum wage for maquila workers by 10 percent.

**Occupational Safety and Health:** Occupational safety and health (OSH) standards were appropriate for the main industries in the country, and OSH experts actively identified unsafe conditions, in addition to responding to workers' OSH complaints. By law, workers could remove themselves from situations that endangered their health or safety without jeopardizing continued employment. Under the inspection law, the Ministry of Labor had the authority to temporarily shut down workplaces where there was an imminent danger of fatalities. Enforcement of OSH standards was particularly weak in the construction, garment assembly, and agricultural sectors, as well as in the informal economy.

HondurasAR000280

Case 3:25-cv-05687-TLT   Document 62-1   Filed 07/28/25   Page 281 of 462

**Wage, Hour, and OSH Enforcement:** The Ministry of Labor was responsible for enforcing wage, hour, and OSH laws, but it did so inconsistently and ineffectively. Penalties for violations of OSH law were commensurate with penalties for similar crimes but rarely applied against violators and rarely collected.

The law permitted fines for wage and hour violations; these were commensurate with the penalties for similar crimes, such as fraud. The government sometimes applied penalties against violators, but failure to collect fines facilitated wage and hour violations. The Ministry of Labor had an insufficient number of inspectors to enforce the wage, hour, and OSH laws effectively. Inspectors had the authority to make unannounced inspections and initiate sanctions.

While all formal workers were entitled to social security, there were reports that both public- and private-sector employers failed to pay into the social security system. The Ministry of Labor could levy a fine against companies that failed to pay social security obligations, but the amount was not sufficient to deter violations.

According to 2021 Ministry of Labor data, approximately 75 percent of workers worked in the informal economy. The government did not enforce the labor laws in this sector since these workers were not protected by the labor code.

---

ecoi.net description:

Annual report on human rights in 2023

Country:
Honduras

Source:
USDOS – US Department of State      (Author)

Published:
23 April 2024

Original link:
https://www.state.gov/reports/2023-country-reports-on-human-rights-practices/honduras/

Case 3:25-cv-05687-TLT   Document 62-1   Filed 07/28/25   Page 282 of 462

**Document type:**

Periodical Report

**Language:**

English

**Available on ecoi.net since:**

23 April 2024

**Document ID:**

2107723

---

Austrian Red Cross          Wiedner Hauptstraße          Contact
Austrian Centre for         32, 1041 Wien                Imprint & Disclaimer
Country of Origin and       T +43 1 589 00 583           F.A.Q.
Asylum Research and         F +43 1 589 00 589           Data Protection Notice
Documentation               info@ecoi.net
(ACCORD)

---

ecoi.net is run by the Austrian Red Cross (department ACCORD) in cooperation with Informationsverbund Asyl &
Migration. ecoi.net is funded by the Asylum, Migration and Integration Fund, the Austrian Ministry of the Interior
and Caritas Austria. ecoi.net is supported by ECRE & UNHCR.









HondurasAR000282

An official website of the United States Government Here's how you know

Passports

Visa

**U.S. DEPARTMENT** *of* **STATE**

Home > Reports > Bureau of Economic and Business Affairs > 2024 Investment Climate Statements > Honduras

# 2024 Investment Climate Statements: Honduras

**IN THIS SECTION /
EXECUTIVE SUMMARY**

# Executive Summary

Although Honduras enjoys a wide range of competitive advantages that would make it attractive to domestic and international private investment, investors report that significant uncertainty due to government policies and legislation has led to limited opportunities. Many entrepreneurs and business owners, including more than 200 U.S. companies, operate enterprises in Honduras, but in recent months increasing numbers of companies report they are experiencing challenges operating in the country. The overall perception of business leaders is that the investment climate became more challenging over the reporting period, primarily due to uncertainty. The ruling party's public government plan asserts capitalism does not work for the majority and seeks to change the economic system by strengthening and growing the role of the State in economy.

HondurasAR000283

Cookie Settings

U.S. and international companies have persistently noted difficulties in operations due to the Central Ban and often onerous process governing the sale of dollars. Existing businesses report they have struggled to access sufficient U.S. dollars to pay their invoices and, in some cases, have been unable to access dollars for debt payments or return of profits. The Central Bank has met with many of these companies and made special arrangements for the availability of dollars in some of the most critical cases, but companies report this is not sustainable in the medium term. These companies also told the Embassy that they remain concerned about making new investments due to the uncertainty surrounding the implementation of pending legislation. Companies have voiced concerns regarding politically motivated threats of criminal prosecution and expropriation of private assets, unreliable and expensive electricity, non-tariff measures against U.S. imports, and increasingly frequent armed land invasions. As a result of the Honduran government's desire to maintain a consistent exchange rate with the dollar, the Central Bank of Honduras has repeatedly used reserves to convert lempiras to U.S. dollars for imports, drawing down national reserves from more than six months of import coverage to slightly more than four over the course of two years.

Uncertainty over the legislative framework for taxation and energy investment remain challenges for future investors. The government's efforts to reduce the difference between electricity generated and electricity billed have faced challenges in improving the condition of the state-owned utility company, which operates at an even larger monthly loss than it did a year ago and is [many] months behind on payments to energy producers. Private companies continue to report difficulties getting connected to the grid or getting permits to generate their own electricity, and no significant new tenders have been awarded during the year. The Government of Honduras (GOH) has introduced new energy contracts in Congress, which the government assesses will result in better energy distribution.

Honduras' convenient proximity to massive U.S. markets and membership in the Dominican Republic-Central American Free Trade Agreement (CAFTA-DR) create incentives for potential manufacturers to establish enterprises within Honduras. In addition, natural resources, productive agricultural zones, and a pool of skilled laborers position Honduras well to some investments. Many Hondurans have a strong cultural affinity to the United States, which often creates a competitive advantage for U.S. products and employers on the local market. The Castro Administration has also taken steps to streamline

certain aspects of port operations and business-registration processes, which investors hope will translate into both improved import-export opportunities and a reduction in the informal economy. The government has also increased support to small-scale farmers, creating export opportunities in the coffee and agriculture sector. In September 2023, Honduras concluded an agreement with the International Monetary Fund (IMF), leading to the disbursement of a first tranche of about $117 million. According to the IMF, real economic growth was 3.5 percent in 2023 and is expected to be 3.6 percent in 2024.

The Honduran government has embarked on an ambitious infrastructure project to establish a logistics corridor connecting deep water ports in the Pacific and Atlantic via rail, which the U.S. government is supporting through technical studies. If properly supported by institution-building, regulatory reform, and constructive engagement with the private sector, this initiative has the potential to create thousands of jobs, drive inclusive economic growth, and attract domestic and international capital.

# 1. Openness To, and Restrictions Upon, Foreign Investment

## Policies Towards Foreign Direct Investment

Honduras is generally open to foreign investment. The legal framework for investment includes the Honduran constitution and the 2011 Law for the Promotion and Protection of Investments, as well as the investment chapter of the CAFTA-DR. The Honduran constitution establishes that treaties are automatically considered domestic law and in case of a conflict between a treaty and an existing law, the treaty supersedes the law. The Honduran constitution requires all foreign investment to complement, but not substitute, national investment. The 2011 Law guarantees national treatment and most favored nation

HondurasAR000285

HondurasAR000286

treatment for U.S. investments in most sectors of the Honduran economy and includes enhanced benefits in the areas of insurance and arbitration for domestic and foreign investors.

The National Investment Council (CNI), the Ministry of Investment Promotion, the Ministry of Economic Development, the Ministry of Finance, and the Ministry of Strategic Planning all have an interest in attracting foreign investment and an ambitious job creation mandate. None of the agencies, however, have broad authority to "fast track" foreign investment projects, meaning companies often report being left navigating various government ministries with overlapping mandates and no clear interagency coordination. CNI was formed and operates under the Law for Protection and Promotion of Investments. Critics complain that lack of clarity and overlapping responsibilities among these entities undermine the government's ability to effectively promote Honduras as a profitable destination for foreign capital. Representatives from the Honduran government have expressed a desire to consolidate investment promotion activities within one Ministry or develop a separate autonomous entity comprised of both government and private sector elements to promote investment in the country. Any reforms will require approval from the Honduran Congress, which is unlikely in the near term. The GOH has not established a strategic investment policy with FDI objectives, which industry claims undermines efforts to attract new investment.

The Castro administration has made public statements that it recognizes the importance of foreign investment to bring new opportunities, generate employment and stimulate economic growth. At the same time, some senior officials in the Castro administration have made public statements that are negative towards the private sector, and as a result, the business community reports that in addition to uncertainty over future policies, this public rhetoric has increased uncertainty, undermining the investment climate.

Many representatives from the international investment community cite some examples of policies that have made the investment climate in Honduras less attractive, including the repeal of the hourly employment law in April 2022, under which all Honduran employees must now be salaried, eliminating flexible hiring practices vital for seasonal work; a May 2022 energy law, which contains provisions that energy producers understand to authorize the expropriation of energy

investments if the government is not able to renegotiate power-purchasing agreements; and the GOH's decision to withdraw from the International Centre for the Settlement of Investment Disputes (ICSID) Convention, effective on August 25, 2024. The status of the country's special economic "ZEDE" zones remains unclear, with the legislative framework no longer in force but the constitutional framework remaining in place, which investors say has contributed to uncertainty in the government's commitment to investment protections.

# Limits on Foreign Control and Right to Private Ownership and Establishment

Honduras' Investment Law does not limit foreign ownership of businesses, except for those specifically reserved for Honduran investors, including small firms with capital less than $6,300 and the domestic air transportation industry. For all investments, at least 90 percent of a company's labor force must be Honduran, and companies must pay at least 85 percent of their payrolls to Hondurans. Majority ownership by Honduran citizens is required for companies in the commercial fishing sector, forestry, local transportation, radio, television, or benefiting from the Agrarian Reform Law. There is no screening or approval process specific to foreign direct investments in Honduras. Foreign investors are subject to the same requirements for environmental and other regulatory approvals as domestic investors.

According to the law, investors can establish, acquire, and dispose of enterprises at market prices under freely negotiated conditions without government intervention, but some foreign business operators report difficulty closing businesses. Private enterprises generally compete fairly with public enterprises on market access, credit, and other business operations. Foreign investors have the right to own property, subject to certain restrictions established by the Honduran constitution and several laws relating to property rights. Investors may acquire, profit, use, and dispose of property ownership with the exception of land within 40 kilometers of international borders and shorelines. Honduran law does permit, however, foreign individuals to purchase properties close to shorelines in designated "tourism zones."

HondurasAR000287

There is currently no process for the government to screen inbound foreign direct investment. There is also no formal process for the government to identify strategic projects that would require additional review before approving foreign investment.

# Other Investment Policy Reviews

The World Trade Organization (WTO) conducted its fourth trade policy review of Honduras in July 2023 (https://www.wto.org/english/tratop_e/tpr_e/tp543_e.htm). The Inter-American Development Bank supported a study of designing a new investment promotion system for Honduras in 2023, though it is unclear if the GOH will adopt any of the study's conclusions.

# Business Facilitation

The GOH has worked to simplify administrative procedures for establishing a company in recent years, including by offering many processes online. For example, the Ministry for Economic Development launched a single window portal for registering a firm to operate within a free trade zone. The effort was completed with input from the private sector groups representing Honduras' manufacturing sector and utilizing a model developed by the UN Development Program. The GOH also participates in the WTO Investment Facilitation for Development Agreement, alongside more than 100 WTO members, which aims to improve the global investment and business climate and to make investing easier in all sectors. However, investors report that procedural red tape and/or the solicitation of bribes to obtain government approval for investment activities remains common, especially at the local level.

The GOH maintains several online business registration portals. Small- and medium-sized enterprises may use (**https://honduras.eregulations.org/**) which provides information on registering a business, including fees, agencies, and required documents. Unless the proposed tax reform bill passes, eliminating Free Trade Zones (ZOLIs) for new investment,

HondurasAR000288

companies seeking to operate in the ZOLIs may use the following portal: **https://sigob.org/hn/SDE/ciudadano/#/inicio** . GOH procurement notices, conducted by the Oficina Normativa de Contratación y Adquisiciones del Estado de Honduras (ONCAE) can be found at: **https://honducompras.gob.hn.**    GOH officials have expressed interest in expanding the digitalization of business, import, permitting and licensing, and taxation processes across the government to increase efficiency and transparency.

## Outward Investment

Honduras does not promote or incentivize outward investment. The government also does not restrict domestic investors from investing abroad.

## 2. Bilateral Investment and Taxation Treaties

A Bilateral Investment Treaty (BIT) between the United States and Honduras entered into force in 2001. The U.S.-Honduras Treaty of Friendship, Commerce and Consular Rights (1928) provided for Most Favored Nation treatment for investors of either country. CAFTA-DR supersedes most provisions of these agreements.

Provisions for investment are included in free trade agreements between Honduras and the United States, Canada, Chile, Costa Rica, El Salvador, Guatemala, Mexico, Nicaragua, Panama, Peru, the Dominican Republic, Colombia, South Korea, and the European Union. These agreements supersede many of the provisions of Honduras' separate Bilateral Investment Treaties with these countries. The GOH and the People's Republic of China are actively negotiating a Free Trade Agreement (FTA) and signed an early harvest arrangement on February 7, 2024.

Honduras also has separate Bilateral Investment Treaties with Cuba, Ecuador, France, Germany, Spain, Kuwait, the United Kingdom, the Netherland, the Republic of Korea and Switzerland. Honduras maintains a Preferential Commercial Agreement with Venezuela.

Following the GOH's decision to recognize the People's Republic of China in March 2023, Honduran exporters to Taiwan reported that GOH rescinded their certificates of origin, which are needed for importing into Taiwan under the FTA between Honduras and Taiwan.

Honduras and the United States signed a Tax Information Exchange Agreement in 1990. In 2014, Honduras and the United States signed the Foreign Account Tax Compliance Act. Honduras is a member of the OECD Inclusive Framework on Base Erosion and Profit Shifting and is party to the Inclusive Framework's October 2021 agreement on the global minimum corporate tax. The official tax authority for Honduras is the Servicio de Administración de Rentas, or SAR.

# 3. Legal Regime

# Transparency of the Regulatory System

The GOH had made progress towards developing digital single windows to consolidate the application and approval process, for example, for firms registering in a free trade zone. These steps have reportedly allowed for greater transparency in the regulatory system. Both U.S. and Honduran firms, however, cite concerns regarding transparent policies and effective laws to foster market-based competition. This lack of clarity allegedly stems from overly complex and sometime overlapping authorities given to multiple GOH entities to approve permits for foreign investors. Ongoing issues relating to corruption also hinder transparent investment opportunities, according to investors. Honduras lacks an indexed legal code so lawyers and judges must maintain their own libraries of law publications. While the majority of regulations are at the national level,

municipal level regulations also exist. These entities vary considerably in terms of how they respond to foreign investments and their requirements for permitting.

Foreign investments in the mining, energy, healthcare, telecommunications, air transportation, agriculture, forestry, and education sectors generally require approval from the GOH via permits. Some U.S. investors have reported long waiting periods for environmental permits and other regulatory and legislative approvals. Sectors in which U.S. companies frequently encounter problems include infrastructure, telecoms, mining, and energy. Generally, companies report that regulatory requirements are complex and lengthy and vulnerable to rent-seeking and perceived corruption due to weak institutions. Regulatory approvals require congressional intervention if the time exceeds a presidential term of four years. Current regulations are available at the Honduran government's eRegulations website (**http://honduras.eregulations.org/**   ).

There is no legal requirement for the government to solicit public comment on proposed regulatory changes or legal reforms. It is generally understood that a legal or regulatory change does not take effect until the GOH publishes approved regulations in the official government Gazette, which represents the centralized location for legislative and regulatory actions. Public comments received by regulators are not published. The government does not promote or require companies' environmental, social, and governance (ESG) disclosure to facilitate transparency and/or help investors and consumers distinguish between high- and low-quality investments.  While Honduras has a system for developing government regulations, investors report that these regulations are not always developed transparently and with input from the private sector or civil society groups.

CAFTA-DR requires that host governments publish proposed regulations that could affect businesses or investments. Honduras made significant progress in 2019 and 2020 in relation to the publication and availability of information under CAFTA-DR. Honduras notified Article 1 technical provisions, per CAFTA-DR requirements, and the Customs Administration (ADUANAS) and Sanitary Regulatory Agency (ARSA) have improved publication of regulations through their official online portals.

HondurasAR000291

# International Regulatory Considerations

Honduras is a member of the Central American System of Integration (SICA in Spanish), along with Costa Rica, El Salvador, Guatemala, Nicaragua, Panama, Belize, and the Dominican Republic. Under SICA's Secretariat for Economic Integration (SIECA in Spanish), Honduras and Guatemala negotiated a customs union in 2017. SIECA is also supporting the expansion of this customs union to include El Salvador. Article 335 of the Honduran Constitution states that "The State shall order its external economic relations on the basis of fair international cooperation, Central American economic integration, and respect for the treaties and agreements it signs, insofar as they are not opposed to the national interest." As a member of the WTO, Honduras notifies all draft technical regulations to the WTO Committee on Technical Barriers to Trade (TBT).

# Legal System and Judicial Independence

Honduras has a civil law system. The Honduran Commercial Code, enacted in 1950, regulates business operations and falls under the jurisdiction of the Honduran civil court system. The Civil Procedures Code, which entered into force in 2010, introduced the use of open, oral arguments for adversarial procedures. The Civil Procedures Code provides for protection of commercial transactions, property rights, and land tenure. It also established a process for the enforcement of rulings issued by foreign courts.

Commercial law and contractual law are regulated through the 1950 Commercial Code and the 1909 Civil Code. There are civil courts where commercial cases are tried. There are also arbitration chambers where issues regarding contracts with an arbitration clause may be resolved.

There are frequent reports of corruption within the judicial branch both in local courts, and cases before the Supreme Court. The President of the Supreme Court has family ties to the President of Honduras, and commentators and NGOs have noted that such ties lead to questions about the court's independence. U.S. firms report favoritism, external pressure, and the

HondurasAR000292

solicitation of bribes within the judicial system. Resolving an investment or commercial dispute in the local Honduran courts is often a lengthy process. Foreign investors report dispute resolution typically involves multiple appeals and decisions at different levels of the Honduran judicial system. Each decision can take months or years, and it is usually not possible for the parties to predict the time required to obtain a decision. An electronic case management system has recently been introduced with US Government support to increase transparency and reduce corruption. This system is gradually being rolled out to the different courts. Final decisions from Honduran courts or from arbitration panels often require subsequent enforcement from lower courts to take effect, requiring additional time. Foreign investors sometimes prefer to resolve disputes with suppliers, customers, or partners out of court when possible. Investors report a very high-quality mechanism for alternate dispute resolution. Legislative decree (N°51-2011) Law for Promotion and Protection of Investments promotes solving disputes between investors through mediation, conciliation, and arbitration prior to using the judicial system.

# Laws and Regulations on Foreign Direct Investment

Honduras' **Law of Promotion and Incentives to Investment**    requires all local and foreign direct investment be registered with the National Investment Council. Article 22 of the law guarantees recognition of rulings resulting from arbitration procedures. It declares that it is legal for parties to a contract to submit to foreign legislation and provides for a regime for prevention of conflicts. Article 29 of this law establishes that arbitration is recognized as the most efficient mechanism for conflict resolution and grants the parties access to arbitration even when the contracts that may have been signed do not contain an arbitration clause. Upon registration, the Investment Office issues certificates affirming international arbitration rights under CAFTA-DR. A qualified investor who believes the government has not honored a substantive obligation under CAFTA-DR may pursue resolution through CAFTA-DR's dispute settlement mechanism, as detailed in the Investment Chapter. The claim's proceedings and documents are generally made available to the public.

The Government of Honduras requires authorization for both foreign and domestic investments in the following areas:

Basic health services

HondurasAR000293

Telecommunications

Generation, transmission, and distribution of electricity

Air transport

Fishing, hunting, and aquaculture

Exploitation of forestry resources

Agricultural and agro-industrial activities exceeding land tenancy limits established by the Agricultural Modernization Law of 1992 and the Land Reform Law of 1974

Insurance and financial services

Investigation, exploration, and exploitation of mines, quarries, petroleum, and related substances.

The Government of Honduras offers one-stop business set-up at its *My Business Online* website, which helps domestic and international investors submit initial business registry information and provides step-by-step instructions (**https://www.miempresaenlinea.org/**   ). However, formalizing a business still requires visiting a municipal chamber of commerce window for registration and permits, a process reportedly vulnerable to rent-seeking and corruption.

# Competition and Antitrust Laws

The Commission for the Defense and Promotion of Competition (CDPC) is the Honduran government agency that reviews proposed transactions for competition-related concerns. Honduras' Competition Law established the CDPC in 2005 as part of the effort to implement CAFTA-DR. The Honduran Congress appoints the members of the CDPC, which functions as an independent regulatory commission.

Honduras AR000294

HondurasAR000295

Laws that grant sole companies exclusive distribution rights for imported goods have created artificial monopolies in Honduras, hindering the availability and raising the price of imported goods in the Honduran market.

## Expropriation and Compensation

The Honduran government has the authority to expropriate property for purposes of land reform or public use. The National Agrarian Reform Law provides that idle land fit for farming can be expropriated and awarded to indigent and landless persons via the Honduran National Agrarian Institute. In 2013, the Honduran government passed legislation regarding recovery and reassignment of concessions on underutilized assets. Both local and foreign firms have expressed concerns that the law does not specify what the government considers "underutilized." The government has not published implementing regulations for the law nor indicated plans to use the law against any private sector firm.

The May 2022 energy law contains provisions (articles 4 through 6) that authorize the GOH to terminate contracts or acquire power plants for an undefined "fair price" either when the GOH and the power plant owner are unable to agree on a renegotiated Power Purchase Agreement in certain sectors or when the GOH determines, among other factors, that doing so will be in the public interest "for reasons of national security." In May 2024, the GOH initiated an ongoing but temporary "intervention" under the 2022 energy law of BELCO, a private Honduran power producer, by taking control of operations to reduce energy prices and improve customer service. Honduran legal experts and energy producers are concerned that if a temporary intervention becomes permanent, the GOH could use the 2022 energy law as broad authority to expropriate private power plants. The WTO's 2023 trade policy review assesses that this law "could lead to even greater uncertainty among private generators and undermine investment in the generation sector."

Government expropriation of land owned by U.S. companies is reportedly rare. CAFTA-DR's Investment Chapter Section 10.7 states no party may expropriate or nationalize a covered investment either directly or indirectly, with a limited public purpose exception that require, among other things, prompt and adequate compensation. Under the Agrarian Reform Law, the Honduran government must compensate expropriated land partly in cash and partly in 15-, 20-, or 25-year government

bonds. The portion to be paid in cash cannot exceed $1,000 if the expropriated land has at least one building and it cannot exceed $500 if the land is in use but has no buildings. If the land is not in use, the government will compensate entirely in 25-year government bonds.

Land invasions by squatters on both Honduran and foreign-owned land are increasingly common, especially in agricultural areas. These invasions have grown more frequent and severe in 2023, frequently leading to violent confrontations. Owners of disputed land have found pursuing legal avenues costly, time consuming, and ineffective at enforcing property rights.

# Dispute Settlement

Honduras has ratified the convention on the Recognition and Enforcement of Foreign Arbitral Awards (1958 New York Convention) and the Inter-American Convention on International Commercial Arbitration (the Panama Convention).

The World Bank announced that it had received a notice from Honduras on February 24, 2024 that it was denouncing the Convention of the Settlement of Investment Disputes between States and Nationals of Other States (ICSID Convention). Per Article 71 of the Convention, Honduras' denunciation will take effect on August 25, 2024—making Honduras the only country in Central America to have left ICSID. Honduras' withdrawal will not affect rights and obligations under or arising out of Honduras's consent to jurisdiction before Honduras' notice of denunciation.

## Investor-State Dispute Settlement

CAFTA-DR provides dispute settlement procedures between the United States and Honduras. The agreement's Investment Chapter dispute settlement mechanism also allows an investor who believes the government has not honored a substantive obligation under CAFTA-DR to request a binding international arbitration. Proceedings and documents submitted to substantiate the claim are generally made available to the public. The agreement provides basic protections, such as non-

Honduras/AR000296

HondurasAR000297

discriminatory treatment, limits on performance requirements, the free transfer of funds related to an investment, protection from expropriation other than in conformity with customary international law, a minimum standard of treatment, and the ability to hire key managerial personnel regardless of nationality.

Over the past 10 years, there have also been a number of commercial disputes brought by U.S. persons or firms that remain unresolved. While many of these cases remain in litigation, others are pending final agreements between the Honduran government (GOH) and U.S. parties. The GOH office of the *Procurador General of Honduras* (Solicitor General) has been willing to meet with U.S. persons and firms to negotiate a resolution to these outstanding cases, but U.S. parties report that negotiations are often slow and delayed, or even unilaterally terminated by GOH authorities. Administrative processes and judicial procedures can also reportedly take significant time. The GOH has also recognized damages awarded to an investor and has worked through the Solicitor General's office to establish payment mechanisms.

## International Commercial Arbitration and Foreign Courts

Honduras' Conciliation and Arbitration Law, established in 2000, outlines procedures for arbitration and defines the procedures under which they take place. The Investment Law permits investors to request arbitration directly, reportedly a swifter and more cost-effective means of resolving disputes between commercial entities. Arbitrators and mediators may have specialized expertise in technical areas involved in specific disputes. Local courts recognize and enforce foreign arbitral awards issued against the government. Judgments from foreign courts are also recognized and enforceable under local courts.

The following organizations provide more localized information:

Tegucigalpa Chamber of Industry and Commerce – Center for Conciliation and Arbitration

Cortes Chamber of Industry and Commerce – Center for Conciliation and Arbitration

The Atlantida Chamber of Industry and Commerce – Center for Conciliation and Arbitration

The Honduran Bar Association – Center for Conciliation and Arbitration

Numerous U.S. and other international investors say they strongly prefer taking advantage of international or local alternative dispute resolution mechanisms because the Honduran judicial system can be inefficient, lacks transparency, and is subject to political influence and/or corruption. International donors have been working with the Honduran judiciary and prosecutors to try to improve the capabilities, effectiveness, and transparency of the justice system.

# Bankruptcy Regulations

Companies that default in payment of their obligations in Honduras can declare bankruptcy. A Honduran court must ratify a bankruptcy for it to take effect. These cases are regulated by the country's Commercial Code.

The judicial ruling that declares the bankruptcy of the company establishes the value of the assets, the recognition and classification of the credits, the procedure for the sale of assets and the schedule for the payment of the obligations, in the case that it is not possible for the company to continue its operations. The ruling must be published in the Gazette. The liquidation of companies is always a judicial matter, except in the case of banking institutions which are liquidated by the National Banking and Insurance Commission.

Any creditor or a company itself may initiate the liquidation procedure, which is generally a civil matter. The judge appoints a liquidator to execute the procedure. A mechanism that a company may exercise to prevent bankruptcy is to request a suspension of payments from the judge. If approved by the judge and the creditors, the company may be able to reach an agreement with its creditors that allows the same administrative board to maintain control of the company.

A company may be prosecuted for fraudulently declaring bankruptcy in the case that the administrative board or shareholders withdraw their assets before the declaration, alter accounting books making it impossible to determine the real

HondurasAR000298

situation of the company, or favor certain creditors granting them benefits that they would not be entitled to otherwise.

# 4. Industrial Policies

## Investment Incentives

Honduras has historically offered numerous tax incentive programs that, depending on the type of business, exempt income, sale, and/or municipal taxes in addition to customs duties. These incentives reportedly are generally applied uniformly to investors when they comply with the necessary requirements.

## Foreign Trade Zones/Free Ports/Trade Facilitation

The Honduran government historically has offered four primary tax-advantaged structures to incentivize investment in Honduras: the Free Trade Zone (ZOLI), the Free Tourism Zone (ZOLT), the Industrial Zone for Export Processing (ZIP), and the Temporary Import Law (RIT). The GOH is no longer granting ZOLT and ZIP licenses, according to the Honduran National Investment Council. The proposed new tax law may impact these zones if passed into law. In their place, an early version of the current draft law proposes to create two tax-exonerated structures: Free-Trade Zones (Zonas Francas) for firms that export their products, and the "Incentive Regime for Investment Development" (RINDE in Spanish) for firms producing for the domestic market. This law has been revised since the early version and as of June 2024 those changes are unclear.

ZOLIs and ZIPs allow foreign investors tariff and tax incentives for export-only manufacturing. The following cities have been designated as free zones: Puerto Cortes, Omoa, Choloma, Tela, La Ceiba, and Amapala. The government historically allowed the establishment of ZIPs anywhere in the country. Currently, there are ZIPs located in Choloma, Buffalo, La Lima, San Pedro

HondurasAR000299

Sula, Tegucigalpa, and Villanueva. Companies operating in ZIPs are exempt from paying import duties and other charges on goods and capital equipment. The RIT allows exporters to introduce raw materials, parts, and capital equipment (except vehicles) into Honduras exempt from surcharges and customs duties if a manufacturer incorporates the input into a product for export (up to five percent can be sold locally). Additional information on these incentive programs is available from the National Investment Council (**https://www.cni.hn/** ).

In April 2022, the Castro administration and Honduran Congress repealed the legislative framework that established Honduras' Zones for Employment and Economic Development (ZEDEs), the largely autonomous economic zones created by the Honduran National Congress in 2013. The Constitutional basis for the ZEDEs, however, remains in force and ZEDEs continue to operate, although with substantially increased regulatory uncertainty. In December 2022, the owners of one ZEDE brought a claim under the CAFTA-DR at ICSID alleging that the government's actions, including the repeal of the ZEDE law, were in breach of obligations under the CAFTA-DR and other instruments. This claim is currently pending.

Honduras ratified the World Trade Organization's (WTO) Trade Facilitation Agreement (TFA) in July 2016, agreeing to expedite the movement, release, and clearance of goods, including goods in transit. The TFA also sets out measures for effective cooperation between customs and other appropriate authorities on trade facilitation and customs compliance issues. According to the WTO/TFA database, Honduras' current rate of implementation of TFA Category A notification commitments stands at 58.4 percent. The Honduran government has received significant technical assistance from the U.S. government to meet compliance requirements in publication, notification, advance rulings, border agency cooperation, and establishing a national trade facilitation committee. Honduras, Guatemala, and El Salvador operate a trilateral customs union to foster and increase efficient cross-border trade, but implementation challenges persist. Honduras uses digitized import permits for agricultural products to reduce costs and dispatch times. Honduras and Guatemala also use an online pre-arrival screening protocol to reduce border times and transit costs for goods.

With U.S. support, the GOH has advanced several initiatives to facilitate trade and reduce dispatch times and costs at key land and sea borders. Use of high-spec tablets by Aduanas (Customs) at Puerto Cortes has reduced dispatch times by over 30

HondurasAR000300

percent and generated over $15 million in savings for private sector operators. Expansion of high-spec tablet use is envisioned to El Amatillo (land border with El Salvador) La Mesa as well (San Pedro Sula airport Customs). A streamlined inspections manual to be adopted by Aduanas and the National Health and Agrifood Safety Entity (SENASA), as well as additional IT developments to integrate Aduanas and SENASA inspection systems, will further compound time and cost reductions at key land and border crossings. Honduran government agencies charged with inspecting and clearing agricultural, processed food, and medicinal products have also made progress towards expediting the import clearance process and have introduced online portals for obtaining import permits, through U.S. assistance.

Many U.S. companies that operate in Honduras take advantage of the commercial framework established by CAFTA-DR. Substantial intra-industry trade now occurs in textiles and electrical machinery, alongside continued trade in traditional Honduran exports such as coffee and bananas.

# Performance and Data Localization Requirements

The Honduran government encourages foreign investors to hire locally and to make use of domestic content, especially in manufacturing and agriculture. Article 137 of the Honduran Constitution requires that at least 90 percent of employees be Honduran citizens and that those employees receive no less than 85 percent of total payroll. The government looks favorably on investment projects that contribute to employment growth, either directly or indirectly. U.S. investors in Honduras have not reported instances in which the government has imposed performance or localization requirements on investments.

The Honduran government and courts can require foreign and domestic investors that operate in Honduras to turn over data for use in criminal investigations or civil proceedings. Honduran law enforcement, prosecutors, and civil courts have the authority to make such requests.

HondurasAR000301

# 5. Protection of Property Rights

## Real Property

Land title procedures in Honduras are reportedly particularly challenging for U.S. investors, given the overlapping authorities within the GOH and a paper-based titling process where archived files are often difficult to locate and authenticate, thereby making is difficult to confirm the true title holder. Title insurance is available in Honduras, though not widely purchased. U.S. investors should take steps to only work with accredited legal and real estate professionals when conducting property transactions.

Land invasions in Honduras have continued to increase year on year, reaching a crisis point in certain rural areas of the country. Some American companies struggle with land invasions by armed criminal groups and report poor response from local authorities and law enforcement to these incursions.

Resolution of property disputes in court reportedly takes years. There are claims of widespread corruption in land sales, deed filing, and dispute resolution, including claims against attorneys, real estate companies, judges, and local officials. Although Honduras has made some progress, the property registration system is perceived as unreliable and a constraint on investment. In addition, investors note that a lack of implementing regulations leads to long delays in the awarding of titles in some regions.

Previous estimates are that approximately 80 percent of the privately held land in the country is either untitled or improperly titled. The national property registry is managed by the Property Institute, although property survey information is managed by the Survey Institute. These two registries have not always aligned, leading to legal disputes regarding property. Steps are

HondurasAR000302

currently being taken to reconcile both lists. However, if a person has uninterrupted and peaceful possession of a property for more than 20 years, he or she may, without just title, request the acquisitive prescription of said property in court.

Honduran law recognizes secured interests in movable and real property. The Chamber of Commerce and Industry of Tegucigalpa (CCIT), the Chamber of Commerce and Industry of Cortes (CCIC), and the Chamber of Commerce and Industry of the South (CCIS) all manage their own merchant records. The right for CCIT, CCIC, CCIS to administer their own merchant registries is derived from a concession in Honduras' secured transactions law.

# Intellectual Property Rights

Honduras is mentioned but not listed in United States Trade Representative's 2024 Special 301 Report. Honduras is not mentioned in USTR's 2023 Review of Notorious Markets for Counterfeiting and Piracy.

The legislative framework for the protection of intellectual property (IP) rights, which includes the Honduran copyright law and its industrial property law, is reportedly generally adequate, but industry experts say the laws are poorly enforced. Honduras has enacted legislation to implement its obligations under the Agreement on Trade-Related Aspects of Intellectual Property Rights (TRIPS) of the World Trade Organization (WTO). Honduran law protects data exclusivity for a period of five years and protects process patents, but does not recognize second-use patents. The Property Institute and Public Ministry handle IP protection and enforcement. No new IP related laws or regulations have been enacted in the past year and the government is currently not pursuing any new reforms.

CAFTA-DR Chapter 15 on Intellectual Property Rights further provides for the protection and enforcement of a range of IP rights, which are consistent with U.S. and international standards. There are also provisions on deterrence of piracy and counterfeiting. Additionally, CAFTA-DR provides authorities the ability to confiscate pirated goods and investigate intellectual property cases on their own initiative.

HondurasAR000303

HondurasAR000304

There are concerns regarding intellectual property (IP) protection and enforcement in Honduras, including with respect to online and software piracy, cable signal piracy, and the distribution and sale of counterfeit and pirated goods. The United States will continue to urge Honduras to fully enforce its IP laws. Additionally, the United States continues to urge Honduras to provide greater clarity regarding the scope of protection for geographical indications (GIs), particularly ensuring that all producers are able to use common food names, including any that are elements of a compound GI.

The Honduran legal framework provides deterrence against piracy and counterfeiting by requiring the seizure, forfeiture, and destruction of counterfeit and pirated goods and the equipment used to produce them. The law also provides for statutory damages for copyright and trademark infringement, to ensure monetary damages are awarded even when losses associated with an infringement are difficult to assign.

Honduras continues to have one of the highest rates of signal piracy in Latin America and the Caribbean, with lack of enforcement being an ongoing problem. Digital piracy is reportedly widespread and frequently ignored in Honduras, especially by telecommunications companies. There are also concerns that a major state-owned cable provider in the country offered unlicensed programming and is using that pirated content to expand its market share. The Special Prosecutor for IP will not investigate a case unless it receives a complaint from a rights holder. Rights holders allegedly do not submit complaints because they do not want to navigate the bureaucratic process or fear they will lose business. In addition, sentencing for IP crimes remains ineffective to deter future violations. IP violators typically receive a three-to-six-year sentence and an approximately $2,000 fine. If a sentence is less than five years, however, the convicted party can choose to pay a larger fine and not serve any jail time.

# 6. Financial Sector

## Capital Markets and Portfolio Investment

There are no government restrictions on foreign investors' access to local credit markets, though the local banking system generally extends only limited amounts of credit.

A limited number of credit instruments are available in the local market. The only security exchange operating in the country is the Central American Securities Exchange (BCV) in Tegucigalpa, but investors should exercise caution before buying securities listed on it. Supervised by the National Banking and Insurance Commission (CNBS), the BCV theoretically offers instruments to trade bankers' acceptances, repurchase agreements, short-term promissory notes, Honduran government private debt conversion bonds, and land reform repayment bonds. In practice, however, the BCV is almost entirely composed of short- and medium-term government securities and no formal secondary market for these bonds exists.

A few banks have offered fixed rate and floating rate notes with maturities of up to three years, but outside of the banks' issuances, the private sector does not sell debt or corporate stock on the exchange. Any private business is eligible to trade its financial instruments on the BCV, and firms that participate are subject to a rigorous screening process, including public disclosure and ratings by a recognized rating agency. Historically, most traded firms have had economic ties to the other business and financial groups represented as shareholders of the exchange. Reportedly, as a result, risk management practices are lax and public confidence in the institution is limited.

The Honduran Public-Private Partnership, CONFIANZA, has operated since 2015 and provides loan guarantees to regional banks to facilitate financing to micro-, small-, and medium-sized enterprises in Honduras. CONFIANZA administers six funds for specific sectors of the economy and partners with over 40 financial institutions in Honduras.

# Money and Banking System

The Honduran financial system is comprised of commercial banks, state-owned banks, savings and loans institutions, and financial companies. There are currently 15 commercial banks, and 9 financial groups operating in Honduras. While access to credit remains limited in Honduras, especially for historically underserved populations, the financial sector is a source of economic stability in the country. Honduras has a professional Central Bank and banking regulator, the *Comisión Nacional de*

HondurasAR000305

HondurasAR000306

*Bancos y Seguros.* However, these institutions reportedly lack independence and operate in a politicized context. There is no offshore banking or homegrown blockchain technology in Honduras.

# Foreign Exchange and Remittances

## Foreign Exchange

In principle, the Investment Law guarantees foreign investors access to foreign currency needed to transfer funds associated with their investments in Honduras, including:

Imports of goods and services necessary to operate

Payment of royalty fees, rents, annuities, and technical assistance

Remittance of dividends and capital repatriation

However, in practice investors' access to dollars is restricted by the Central Bank. Artificially low interest rates compared to the region and a fixed exchange rate created a large demand for dollars and have led to currency controls by the Central bank. Businesses continue to report difficulty securing sufficient foreign exchange and many U.S. companies cite the ongoing difficulty in buying dollars from the Central Bank as the central issue preventing them from investing further in the country. Companies are required to present invoices, and many complain that they are only granted a small percentage of the total needed each day. Almost all companies are unable to receive any currency exchange for the payment of royalty fees, rents, annuities, or the remittance of dividends and capital repatriation. A survey released by the Honduran Business Council (COHEP) in March 2024 revealed that of the 358 businesses surveyed, ranging from micro-enterprises to very large companies, 98 percent reported facing difficulties in securing sufficient U.S. dollars to carry out their commercial operations.

## Remittance Policies

Although the Investment Law guarantees investors the right to remit their investment returns and, if they liquidate their investments, to remit the principal capital invested, strict currency controls currently make this impossible. The Central Bank does not provide currency exchange for this purpose. These exchange transactions are subject to the same foreign exchange process and regulation as other transactions.

## Sovereign Wealth Funds

Honduras does not have a sovereign wealth fund.

# 7. State-Owned Enterprises

Most state-owned enterprises are in telecommunications, electricity, water utilities, mail services, hospitals, railroads, banking, and commercial ports. There is no published list of Honduran SOEs. The main state-owned Honduran telephone company, Hondutel, has private contracts with eight foreign and domestic carriers. The GOH has yet to establish a legal framework for foreign companies to obtain licenses and concessions to provide long distance and international calling. As a result, investors remain unsure if they can become fully independent telecommunication service providers.

The state-owned National Electric Energy Company (ENEE) is the single largest contributor to the country's fiscal deficit. ENEE loses over $30 million every month and its debt amounts to more than 10 percent of Honduran GDP. With the May 2022 energy law, electricity subsector experts say that dispatch decisions have become much less transparent since the elimination of the systems operator, a disincentive for new investment. The electrical subsector reportedly faces serious structural problems, including high electricity system losses, a transmission system in need of upgrades, vulnerability of

HondurasAR000307

HondurasAR000308

generation costs to volatile international oil prices, an electricity tariff that does not reflect actual costs, and the high costs of long-term power purchase agreements (PPAs), which have often been awarded directly to companies with political connections instead of via a fair and transparent tendering and procurement process. Many businesses have installed on-site power generation systems to supplement or substitute for power from ENEE due to frequent blackouts and high tariffs.

Honduran law grants municipalities the right to manage water distribution and to grant concessions to private enterprises. Major cities with public-private concessions include San Pedro Sula, Puerto Cortes, and Choloma. The state water authority National Autonomous Aqueduct and Sewer Service (SANAA) manages Tegucigalpa's water distribution. Persistent water shortages are another constraint on private enterprise in Honduras, especially during the spring dry season.

The Honduran National Port Company (ENP) is the state-owned organization that oversees management of the country's government-operated maritime ports, including Puerto Cortes, La Ceiba, Puerto Castilla, and San Lorenzo. Private companies Central American Port Operators and Maritime Ports of Honduras have 30-year concessions to operate container and bulk shipping facilities at Honduras' principal port Puerto Cortes.

Two SOE banks include the National Agriculture Development Bank (BANADESA) and the Honduran Bank for Production and Housing (BANHPROVI).

## Privatization Program

The Honduran government is not seeking to privatize state-owned enterprises and, in fact, has approved legal reforms to give the government broader authority to take over private enterprises, specifically via the May 2022 energy reform law.

# 8. Responsible Business Conduct

Honduras;AR000309

Awareness of the importance of Responsible Business Conduct (RBC) is growing among both producers and consumers in Honduras. An increasing number of local and foreign companies operating in Honduras include conduct-related responsibility practices in their business strategies. The Honduran Corporate Social Responsibility Foundation (FUNDAHRSE) has become a strong proponent in its efforts to promote transparency in the business climate and provides the Honduran private sector, particularly small- and medium-sized businesses, with the skills to engage in responsible business practices. FUNDAHRSE's approximately 110 members can apply for the foundation's "Corporate Social Responsibility Enterprise" seal for exemplary responsible business conduct involving work in areas related to health, education, environment, codes of ethics, employment relations, and responsible marketing.

RBC related to the environment and outreach to local communities is especially important to the success of investment projects in Honduras. Several major foreign investment projects in Honduras have allegedly stalled due to concerns about environmental impact, land rights issues, lack of transparency, and problematic consultative processes with local communities, particularly indigenous communities. Although the International Labor Organization Convention 169 on Indigenous and Tribal Peoples was ratified by the GOH in 1995 and Honduras voted in favor of UN's Indigenous People's rights in 2007, advocates claim there is still much to do in the area. For example, there is still a need for foreign investors to build trust with local communities, while employing international best practices and standards to reduce the risk of conflict and promote sustainable and equitable development.

Examples of international best practices include the following:

Voluntary Principles on Security and Human Rights Initiative

The UN Guiding Principles on Business and Human Rights

The Organization for Economic Co-operation and Development Guidelines for Multinational Enterprises.

# Climate Issues

GOH has a National Adaptation and Climate Strategy and a Biodiversity Strategy. The Castro Administration has manifested their willingness to support conservation and climate adaptation efforts. Early in 2022, the administration reactivated the Environmental Cabinet composed of Ministries of Environment, Forestry, Agriculture, Energy, Economic Development and Finance and the Protected Areas and Wildlife Institute. The purpose of this body is to coordinate interagency efforts to address climate change, biodiversity conservation and Forestry Management.

The GOH has not established policies to reach net-zero carbon emissions by 2050. However, in collaboration with the support of the UN, GOH conducted sectoral studies to determine Nationally Determined Contributions (NDC) and drafted a greenhouse gasses mitigation strategy. While sectoral studies provided recommendations and targets for NDCs, most of these recommendations have not been translated into official policy. The NDC document reports that the contributions and goals were established in consultation and with the participation of the private sector and says that the private sector will contribute to reaching the goals but does not identify specific actions.

Early in 2022, the GOH suspended the ecotax to support efforts to administer protected areas, which generally adds additional taxes on imported cars.

At this time, the GOH has not implemented public procurement policies that include environmental and green growth considerations such as resource-use efficiency, pollution abatement, or climate resilience.

# 9. Corruption

U.S. businesses and citizens report corruption in the public sector and the judiciary is a significant constraint to investment in Honduras. Historically, corruption has been pervasive in government procurement, issuance of government permits, customs, real estate transactions (particularly land title transfers), performance requirements, and the regulatory system.

HondurasAR000310

One emblematic example of how corruption can create unfair conditions for international investors is the case of Victor Bendeck, a private businessman and former member of the Central American Parliament, who engaged in significant corruption through a series of fraudulent business activities in the banking, real estate, and other sectors and by using his influence with government officials for his personal gain.

The Castro administration continues to negotiate with the UN on establishing a UN-led International Commission against Impunity and Corruption in Honduras (CICIH).

The United States Foreign Corrupt Practices Act (FCPA) deems it unlawful for a U.S. person, and certain foreign issuers of securities to make corrupt payments to foreign public officials for the purpose of obtaining or retaining business for directing business to any person. The FCPA also applies to foreign firms and persons who take any act in furtherance of such a corrupt payment while in the United States. For more information, see the FCPA Lay-Person's Guide: https://www.justice.gov/criminal-fraud .

Honduras ratified the UN Anticorruption Convention in December 2005. The UN Convention requires countries to establish criminal penalties for a wide range of acts of corruption. The UN Convention covers a broad range of issues from basic forms of corruption such as bribery and solicitation, embezzlement, trading in influence, and the concealment and laundering of the proceeds of corruption. The UN Convention contains transnational business bribery provisions that are functionally similar to those in the Organization for Economic Cooperation and Development Anti-Bribery Convention.

Honduras ratified the Inter-American Convention against Corruption (OAS Convention) in 1998. The OAS Convention establishes a set of preventive measures against corruption; provides for the criminalization of certain acts of corruption, including transnational bribery and illicit enrichment; and contains a series of provisions to strengthen the cooperation between its states' parties in areas such as mutual legal assistance and technical cooperation.

HondurasAR000311

| Measure | Year | Index/Ranking |
|---|---|---|
| TI Corruption Index | 2023 | 23/100, 154 of 180 |
| MCC Government Effectiveness | FY 2023 | -0.33 (19 percent) |
| MCC Rule of Law | FY 2023 | -0.62 (6 percent) |
| MCC Control of Corruption | FY 2023 | -0.60 (6 percent) |

# 10. Political and Security Environment

Crime and violence rates remain high and add cost and disincentive to investments. Demonstrations occur regularly in Honduras and political uncertainty poses a challenge to ongoing stability. "*Colectivo*" groups, affiliated with the ruling party, have disrupted business activities, including at medical centers. In a couple of cases, the groups have become violent.

Although violent crime remains a persistent problem, Honduras has reduced homicides to less than 40 per 100,000 inhabitants. Cases of violence, extortion, and kidnapping are still common, particularly in urban areas where gang presence is more pervasive. The GoH has had in place a state of exception since December 2022 suspending constitutional rights in 17 of Honduras' 18 departments. Drug traffickers continue to use Honduras as a transit point for cocaine and other narcotics en route to the United States and Europe, which fuels local turf battles in some areas and injects illicit funds into judicial proceedings and local governance structures to distort justice. The business community historically had been a target of kidnapping for ransom, but the number of such kidnappings dropped from 92 in 2013 to 15 in 2021, primarily through the work of the USG-supported Honduran National Police National Anti-Kidnapping Unit. Although violent crime rates are trending downward, corruption and white-collar crime, including money laundering, negatively affect economic prosperity and stability for the business community.

HondurasAR000312

# 11. Labor Policies and Practices

The Honduran Labor Law prescribes a maximum eight-hour workday, 44-hour workweek, and at least one 24-hour rest period per week. The Labor Code provides for paid national holidays and annual leave. Most employment sectors also receive two one-month bonuses as part of the base salary, known as the 13th and 14th month salary, issued in mid-December and mid-June, respectively. New hires receive a prorated amount based on time-in-service during their first year of employment. The Labor Code requires companies to pay one month's salary to employees terminated without cause. Companies do not owe severance to employees who resign or are terminated for cause. Employees terminated for cause can contest the basis for the termination in court to claim severance. There are no government-provided unemployment benefits in Honduras, although unemployed individuals may have access to their accumulated pension funds.

The Secretariat of Labor and Social Security (SETRASS) is responsible for registering collective bargaining agreements. The Labor Code prohibits the employment of persons under the age of 14. Minors between the ages of 14 and 18 must receive special permission from SETRASS to work. The majority of the violations of the labor-related provisions of the children's code occur in the agricultural sector and informal economy.

Honduras has a significant informal economy but has sought to incentivize informal firms to take steps to formalize, including offering a consolidated registration process at no-cost to business owners. Many informal business owners, though, indicate that the reduction of tax incentives from five years to three and the overly complex tax system continue to dissuade more companies from formalizing.

While Honduran labor law closely mirrors International Labor Organization standards, the U.S. Department of Labor has raised serious concerns regarding the effective enforcement of Honduran labor laws. Labor organizations allege the SETRASS fails to enforce labor laws, including laws on the right to form unions, reinstating employees unjustly fired for union activities,

HondurasAR000313

child labor, minimum wages, hours of work, and occupational safety and health. A 2015 U.S. Department of Labor report provided recommendations to address labor concerns in Honduras and called for a monitoring and action plan (MAP) to improve labor law enforcement in Honduras following a 2012 submission brought under the labor chapter of CAFTA-DR. The U.S. government is in talks with the GOH on a way forward with the MAP.

As mentioned above, in April 2022, President Castro signed the repeal of the Hourly Employment Law. Labor groups had alleged that some employers used hourly contracts to avoid responsibility for severance, provide employee benefits, and prevent union formation. The repeal did not stipulate the process for transitioning employees from hourly to salaried, but it did prevent the termination of employees.

The U.S. Department of State Country Report on Human Rights Practices describes a number of labor and human rights compliance issues that affect the Honduran labor market: https://www.state.gov/reports/2023-country-reports-on-human-rights-practices/honduras/. These include employers' anti-union discrimination, refusal to engage in collective bargaining, and employer control of unions.

# 12. U.S. International Development Finance Corporation (DFC), and Other Investment Insurance or Development Finance Programs

In 2022, the DFC provided a $7 million loan portfolio guarantee to Lafise Bank to back on-lending to Honduran small and medium-sized enterprises (SMEs) that support gender equity and inclusion as well as companies in the health care industry. Lafise utilized 82 percent of the guarantee as of March 2024, providing a $11.4 million in credit to 168 SMEs. Additionally, the

HondurasAR000314

DFC contributed $181,500 in technical assistance to Honduran based AgroMoney, a lender to small and medium sized firms in the agricultural sector.

# 13. Foreign Direct Investment Statistics

**Table 2: Key Macroeconomic Data, U.S. FDI in Host Country/Economy**

| Economic Data | Host Country Statistical source* | | USG or international statistical source | | USG or International Source of Data:  BEA; IMF; Eurostat; UNCTAD, Other |
|---|---|---|---|---|---|
| | Year | Amount | Year | Amount | |
| Host Country Gross Domestic Product (GDP) ($M USD) | N/A | N/A | 2022 | $31.72 | www.worldbank.org/en/country |

| Foreign Direct Investment | Host Country Statistical source* | | USG or international statistical source | | USG or international Source of data:  BEA; IMF; Eurostat; UNCTAD, Other |
|---|---|---|---|---|---|
| U.S. FDI in partner country ($USD, stock positions) | N/A | N/A | 2022 | $1.4 billion | BEA data available at https://apps.bea.gov/international/factsheet/ |
| Host country's FDI in the United States ($USD, stock positions) | N/A | N/A | 2022 | -$91.0 billion | BEA data available at https://www.bea.gov/international/direct-investment-and-multinational-enterprises-comprehensive-data UNCTAD data available at |
| Total inbound stock of FDI as % host GDP | N/A | N/A | 2022 | 3.4% | https://unctad.org/topic/investment/world-investment-report |

* Source for Host Country Data:  N/A

HondurasAR000315

Honduras.AR000316

**Table 3: Sources and Destination of FDI**

Direct Investment from/in Counterpart Economy Data

From Top Five Sources/To Top Five Destinations (US Dollars, Millions)

| Inward Direct Investment | | | Outward Direct Investment | | |
|---|---|---|---|---|---|
| Total Inward | $18,567 | 100% | Total Outward | $2,877 | 100% |
| USA | $4,408 | 24% | Panama | $1,402 | 49% |
| Panama | $3,349 | 18% | El Salvador | $616 | 21% |
| Guatemala | $1,920 | 10% | Guatemala | $424 | 15% |
| Colombia | $1,549 | 8% | Costa Rica | $226 | 8% |
| Mexico | $1,382 | 7% | Colombia | $103 | 4% |

"0" reflects amounts rounded to +/- USD 500,000.

Source:  IMF Coordinated Direct Investment Survey (CDIS)

# 14. Contact for More Information

U.S. Embassy Tegucigalpa

Avenida La Paz

Tegucigalpa M.D.C.

Honduras

Honduras:AR000317

TAGS

Bureau of Economic and Business Affairs    Bureau of Western Hemisphere Affairs    Honduras

Investment Climate

Reports

White House

USA.gov

Office of the Inspector General

Archives

Contact Us

America 250

Honduras AR000318

# Honduras Travel Advisory

Travel Advisory
December 10,
2024

Honduras - Level 3:
Reconsider Travel



*Reconsider travel to Honduras due to **crime**. Read the entire Travel Advisory.*

Do not travel to:

- Gracias a Dios Department, most eastern department, due to **crime**.

**Country Summary**: Violent crime, such as homicide, armed robbery, and kidnapping, remains common. Violent gang activity, such as extortion, violent street crime, rape, narcotics, and human trafficking, is widespread. Local authorities may lack sufficient resources to respond effectively to serious crime incidents. Around resort areas in the Bay Islands, which include Roatan, Utila, and Guanaja, there is a concentration of resources, and these areas are better policed.

Demonstrations occur regularly throughout the country and can be about a variety of political or economic issues. Protests, demonstrations, tire burnings, and roadblocks are frequent, unpredictable, and can turn violent. They can shutdown roads and highways, often without prior notice or estimated reopening timelines.

In December 2022, the Government of Honduras declared a "State of Exception" in response to high levels of extortion and other crimes. The declaration remains in effect and has been modified to include more cities. It allows the police to suspend constitutional rights in 226 of the country's 298 municipalities.

The Honduran Ministry of Health declared in June 2024 a national emergency in Honduras due to an increase in dengue cases. The Ministry of Health has carried out dengue prevention, control, and surveillance activities, along with the promotion of preventive

measures through the media and educational campaigns. It also carried out clean-up operations and campaigns, including the use of chemical and biological agents for vector control.

Please review the U.S. Centers for Disease Control and Prevention ⬈ (CDC) website and CDC Global Dengue ⬈ for further information.

Read the country information page for additional information on travel to Honduras.

If you decide to travel to Honduras:

- Avoid demonstrations.

- Be aware of your surroundings.

- Avoid walking or driving at night.

- Do not physically resist any robbery attempt.

- Be extra vigilant when visiting banks or ATMs.

- Do not display signs of wealth, such as wearing expensive watches or jewelry.

- Do not take public transportation, including white car taxis. U.S. government personnel and their family members are prohibited from using these forms of transportation.

- Monitor local media for breaking events and be prepared to adjust your plans.

- Visit our website for Travel to High-Risk Areas.

- Enroll in the Smart Traveler Enrollment Program (STEP) to receive Alerts and make it easier to locate you in an emergency.

- Follow the Department of State on Facebook ⬈ and X/Twitter ⬈.

- Review the Country Security Report for Honduras.

- Prepare a contingency plan for emergency situations. Review the Traveler's Checklist.

- Visit the CDC page for the latest Travel Health Information ⬈ related to your travel.

**Gracias a Dios Department – Level 4: Do Not Travel**

U.S. government personnel and family members are restricted from traveling to Gracias a Dios, the most eastern department. The department is an isolated region with high levels of criminal activity. Narcotics trafficking is widespread, and large portions of the department are particularly vulnerable to drug trafficking organizations. Infrastructure is weak, government services are limited, and police and military presence is scarce.

Visit our website for <u>Travel to High-Risk Areas</u>

**National Environmental Satellite,
Data, and Information Service**

DEPARTMENT OF COMMERCE

# 25 Years Later: Looking Back at the October Monster Named Mitch

*October 27, 2023*



⤓  **Download Image**

Mitch began as a tropical storm over the southwestern Caribbean Sea on October 22
1998, and strengthened to a hurricane by the 24th. Mitch then rapidly strengthened,
becoming a monster Category 5 hurricane with a central pressure of 905 mb on the
26th. To this day, Mitch still ranks as the second-strongest O   **Help improve this site**



HondurasAR000322

6/17/25, 3:58 PM    25 Years Later: Looking Back at the October Monster Named Mitch | National Environmental Satellite, Data, and Informat…

Case 3:25-cv-05687-TLT    Document 62    Filed 07/28/25    Page 323 of 462

record and remains tied for the eighth-most intense of *any* Atlantic hurricane on record.

Mitch made landfall in Honduras as a much weaker Category 1 hurricane, but it battered the offshore islands with high winds, waves and storm surge. The greatest impact, however, was from the widespread heavy rain and severe flooding in Honduras, Nicaragua, Guatemala and El Salvador that left thousands dead or missin and caused tremendous property, infrastructure and crop damage in Central America.

After making landfall, Mitch eventually moved back into the Gulf of Mexico and headed toward Florida, making another landfall as a tropical storm. Two people diec in the Florida Keys, when a fishing boat capsized. Mitch caused an additional $40 million in damage in the Sunshine State.

By the time Hurricane Mitch was finally declared extratropical on November 5, it had become the second-deadliest Atlantic tropical cyclone in history, ranking below the 1780 "Great Hurricane" in the Lesser Antilles. Mitch was responsible for at least 10,000 deaths and thousands more missing, predominantly from the massive flooding that Mitch's rainfall caused in Central America.

One positive development came out of the devastation Mitch left behind, however. I response to the tragic event, the U.S. government worked with the governments and national meteorological agencies in the region to install a satellite receiver in Costa Rica, which was then made available to all Central American countries via the internet.

Later, in collaboration with the World Meteorological Organization, NOAA NESDIS expanded the ability of countries in the Americas to access critical weather data and imagery from NOAA's GOES and Joint Polar Satellite System (JPSS) through a near real-time, global network of satellite-based data dissemination systems called GEONETCast Americas

Below are images from NOAA satellites as Mitch unleashed its fury in the Atlantic Basin. All imagery is open source and available to repurpose with credit to *NOAA*.

HondurasAR000323

6/17/25, 3:58 PM    25 Years Later: Looking Back at the October Monster named Mitch | NESDIS National Environmental Satellite, Data, and Informat…

Case 3:25-cv-05687-TLT    Document 62-1    Filed 07/28/25    Page 324 of 462

*Infrared satellite image of Hurricane Mitch on October 26, 1998, from NOAA's GOES-8 satellite.*

⬇ **Download Image**

HondurasAR000324

Case 3:25-cv-05687-TLT    Document 62-1    Filed 07/28/25    Page 325 of 462

*2 km-resolution visible satellite image of Hurricane Mitch on October 26, 1998, from NOAA's GOES-8 satellite.*

⬇ **Download Image**

*Full disk infrared satellite image of the Western Hemisphere from October 26, 1998 (with Hurricane Mitch spinning in the Caribbean) from NOAA's GOES-8 satellite.*

⬇ **Download Image**

HondurasAR000326

6/17/25, 3:58 PM    25 Years Later: Looking Back at the October Monster Named Mitch | NOAA National Environmental Satellite, Data, and Informat…

Case 3:25-cv-05687-TLT    Document 62-1    Filed 07/28/25    Page 327 of 462

*High resolution visible satellite animation of Hurricane Mitch on October 26, 1998, from NOAA's GOES-8 satellite.*

⬇ **Download Image**

HondurasAR000327

6/17/25, 3:58 PM    25 Years Later: Looking Back at the October Monster Named Mitch | National Environmental Satellite, Data, and Informat…

Case 3:25-cv-05687-TLT    Document 62-1    Filed 07/28/25    Page 328 of 462

*Multispectral colorized satellite image of Hurricane Mitch on October 27, 1998, from the NOAA-15 polar-orbiting satellite.*

⬇ **Download Image**

HondurasAR000328

*Water vapor imagery of Hurricane Mitch spinning near Central America from October 28-30, 1998, from NOAA's GOES-8 satellite.*

⤓ **Download Image**

HondurasAR000329

6/17/25, 3:58 PM 25 Years Later: Looking Back at the October Monster Named Mitch | NESDIS | National Environmental Satellite, Data, and Informat…

Case 3:25-cv-05687-TLT Document 62-1 Filed 07/28/25 Page 330 of 462

*1 km-resolution visible satellite image of Hurricane Mitch from October 28-30, 1998, from NOAA's GOES-8 satellite.*

⬇ **Download Image**

See Mitch's devastation from the ground in NOAA's Photo Library archive and learn more about how NOAA's current fleet of satellites monitors and tracks hurricanes in our guide to understanding satellite imagery of hurricanes

# Recent News

HondurasAR000330

6/17/25, 3:58 PM    25 Years Later: Looking Back at the October Monster Named Mitch | NESDIS | National Environmental Satellite, Data, and Informat…

Case 3:25-cv-05687-TLT    Document 62-1    Filed 07/28/25    Page 331 of 462

## NOAA Satellites Monitor Canadian Wildfires and Smoke

June 5, 2025

## NOAA's Satellites Track Saharan Dust Blowing Across the Atlantic

June 4, 2025

## 50 Years of Monitoring the Stormy Seas: Hurricane Tracking with NOAA's GOES Satellites

June 3, 2025

## Seeing Tomorrow's Floods Today: The Role of NOAA Satellites in Inundation Mapping

June 2, 2025

HondurasAR000331

 

# NATIONAL HURRICANE CENTER
# TROPICAL CYCLONE REPORT

## TROPICAL STORM PILAR
## (EP192023)

### 28 October – 5 November 2023

Eric Blake
National Hurricane Center
8 March 2024



GOES-16 GEOCOLOR IMAGE OF TROPICAL STORM PILAR AT 0000 UTC 1 NOVEMBER 2023 NEAR PEAK INTENSITY.
IMAGE COURTESY OF NOAA/NESDIS STAR.

Pilar was a tropical storm that took an unusual east-northeastward track, approaching Central America from the west, but then turned westward and moved away from land without making landfall. Still, heavy rains from the tropical storm overspread Central America, and 4 deaths were noted from flooding.

HondurasAR000332

# Tropical Storm Pilar

## 28 OCTOBER – 5 NOVEMBER 2023

## SYNOPTIC HISTORY

Pilar formed from the remnants of Atlantic Tropical Depression Twenty-One.  After the system dissipated over Nicaragua on 24 October, the wave moved slowly westward. A broad low re-formed over the far eastern Pacific on 25 October, but its development was slowed over the next few days by persistent easterly shear.  The low was close to becoming well defined on 27 October, with a mid-level circulation noted and plentiful convection, but surface observations indicated it was still broad.  After another burst of central convection overnight, scatterometer data indicate that the circulation became well defined enough to be considered a tropical depression near 1200 UTC 28 October, about 250 n mi southwest of San Salvador, El Salvador.  Little motion occurred for over a day as ridging to the north of the system weakened and steering currents collapsed.  However, by late on 29 October, the depression started moving slowly east-northeastward due to a deep-layer trough over the northwestern Caribbean Sea and an enhanced equatorial ridge to the south.  This pattern led to a slight reduction in shear and allowed deep convection to form over the center, which tightened the system's low-level circulation.  The depression is estimated to have become Tropical Storm Pilar near 0000 UTC 30 October based on scatterometer data near 35 kt and satellite estimates while centered about 220 n mi west-southwest of San Salvador.  The "best track" chart of Pilar's path is given in Fig. 1, with the wind and pressure histories shown in Figs. 2 and 3, respectively. The best track positions and intensities are listed in Table 1[1].

Pilar erratically intensified during the next couple of days, tempered by moderate easterly wind shear.  The tropical storm reached a peak intensity of 55 kt, as suggested by Dvorak estimates and scatterometer data, around 0000-0600 UTC 1 November about 80 n mi offshore of El Salvador.  However, the synoptic pattern around Pilar was quickly changing with a strong cold front approaching from the northwestern Caribbean Sea.  This feature and its associated mid-level ridge caused the tropical storm to turn sharply northward and westward, remaining offshore of Central America.  An influx of drier air also caused Pilar to weaken some, though it was tempered by its faster forward speed and increased synoptic pressure gradient.  Pilar reached a brief second peak intensity of 55 kt while interacting with a larger-scale gap wind flow, as shown by high-resolution scatterometer data, while moving quickly west-southwestward a few hundred miles south-southwest of the Gulf of Tehuantepec.  Another intrusion of drier air caused the system to weaken on 3 November, though Pilar maintained an intensity of about 40 kt the next day while remaining in a low-to-moderate shear environment, over warm SSTs and in the

---

[1]  A digital record of the complete best track, including wind radii, can be found on line at ftp://ftp.nhc.noaa.gov/atcf. Data for the current year's storms are located in the *btk* directory, while previous years' data are located in the *archive* directory.

marginally humid airmass. The tropical storm resumed its decay on 5 November due to an increase in southwesterly shear, and the low- and mid-level circulations detached by midday. Pilar lost all of its deep convection by 1800 UTC that day, marking its transition to a post-tropical low, and it weakened below gale-force 6 h later. The remnant low moved westward on 6 November and northwestward on 7 November, with satellite imagery showing the low opening up into a trough of low pressure by 1800 UTC 7 November, when it was located several hundred miles southwest of the southern tip of Baja California Sur.


# METEOROLOGICAL STATISTICS

Observations in Pilar (Figs. 2 and 3) include subjective satellite-based Dvorak technique intensity estimates from the Tropical Analysis and Forecast Branch (TAFB) and the Satellite Analysis Branch (SAB), objective Advanced Dvorak Technique (ADT) estimates and Satellite Consensus (SATCON) estimates from the Cooperative Institute for Meteorological Satellite Studies/University of Wisconsin-Madison. Data and imagery from NOAA polar-orbiting satellites including the Advanced Microwave Sounding Unit (AMSU), the NASA Global Precipitation Mission (GPM), the European Space Agency's Advanced Scatterometer (ASCAT), and Defense Meteorological Satellite Program (DMSP) satellites, among others, were also useful in constructing the best track of Pilar.

Selected surface observations from land stations and data buoys are given in Table 2, and ship reports of winds of tropical storm force associated with Pilar are given in Table 3.

## Winds and Pressure

Pilar's first peak intensity of 55 kt was based on SAB Dvorak estimates, with supporting data from scatterometer and a Synthetic Aperture Radar (SAR) pass. High-resolution (UHR) ASCAT data from 1605 UTC 31 October (Fig. 4) provided by NOAA NESDIS during the post-analysis suggests Pilar's winds were in the 50–55 kt range. While there is some uncertainty about the reliability of the UHR data, the improvement on conventional satellite data from the time of the ASCAT pass to 0000 UTC 1 November suggested that 55 kt was best supported by the data. Additionally, a SAR pass at 0011 UTC November 1 also showed winds of at least 55 kt in all 4 quadrants of the storm. Pilar's second 55-kt peak intensity on 2 November was based on ASCAT data, with low-resolution data supporting at least 50 kt, and high-resolution ASCAT data of up to 55-kt winds (Fig. 4). Note this is higher than conventional satellite estimates, probably because of the enhanced gradient on the northern side of the storm due to a concurrent Gulf of Tehuantepec gap wind event. The estimated minimum pressure of 995 mb was based on the Knaff-Zehr-Courtney pressure wind relationship.

While there were no sustained tropical-storm-force winds recorded over land, a pair of observation sites in El Salvador had wind gusts over 50 kt (Table 2), and it is probable that some sustained tropical-storm-force winds were recorded at higher elevations, likely from a combination of Pilar and a strong cold front.

HondurasAR000334


### Rainfall and Flooding

Pilar brought a widespread area of 3 to 6 inches of rain to El Salvador, with maximum totals near 9 inches across the southeastern portion of that country (Fig. 5). The maximum rainfall (8.89 inches or 225.9 mm) was reported near Beneficio La Carrera. This rainfall caused many mud slides across El Salvador and flooded rivers. Very heavy rains also occurred in Honduras, but no totals are available.

## CASUALTY AND DAMAGE STATISTICS

There were 4 direct[2] deaths in association with Pilar, all from flooding. Three deaths were noted in El Salvador and one in Honduras, with three other injuries reported in Honduras.

Heavy rainfall from Pilar caused flooding in portions of Guatemala, El Salvador and Honduras. Media reports indicate that many rivers flooded, which displaced hundreds of families from their homes, and caused notable crop damage. In El Salvador, over 100 trees were knocked down, presumably due to the saturated soils making the trees susceptible to the gusty winds, and about a couple of dozen homes were damaged.

In Honduras, the government reported that thousands of people were evacuated, and about 700 homes were flooded from Pilar, with 5 destroyed, along with roads washed away and bridges damaged. However, most of these impacts were actually related to the strong cold front, and Pilar's moisture seemingly played a small role (most of the damage was from 3 – 5 November, well after Pilar departed). No official monetary estimates of the damage are available, although the firm AON estimated a total loss of $45 million (USD) from the storm.

## FORECAST AND WARNING CRITIQUE

The genesis of Pilar was well anticipated (Table 4). The potential for tropical cyclone development was first mentioned in the Tropical Weather Outlook (TWO) about 108 h before Pilar became a tropical cyclone, with good lead time considering that Atlantic Tropical Depression Twenty-One had not yet dissipated. The chances rose into the high (>60%) category for the 7-day forecast about 3 days before genesis. The system entered the 2-day outlook in the low (< 40%) tercile a little over 3 days before formation, and was in the high category for almost 2 full days before genesis. The location of genesis was also well forecast as all of the 7-day Graphical TWOs issued prior to formation captured Pilar's genesis location (Fig. 6).

---

[2] Deaths occurring as a direct result of the forces of the tropical cyclone are referred to as "direct" deaths. These would include those persons who drowned in storm surge, rough seas, rip currents, and freshwater floods. Direct deaths also include casualties resulting from lightning and wind-related events (e.g., collapsing structures). Deaths occurring from such factors as heart attacks, house fires, electrocutions from downed power lines, vehicle accidents on wet roads, etc., are considered "indirect" deaths.



A verification of NHC official track forecasts for Pilar is given in Table 5a.  The NHC track forecast errors were greater than the 5-yr means at all times, perhaps not surprising due to the unusual track and high OCD5 errors (which also suggest that this was a difficult storm to forecast).  A homogeneous comparison of the official track errors with selected guidance models is given in Table 5b.  There were some outstanding track models for Pilar, including the ECMWF and UKMET models.  The HAFS model suite had one of its poorer track performances of the season, especially HAFS-B (HFBI).

A verification of NHC official intensity forecasts for Pilar is given in Table 6a.  Contrary to track, the NHC official intensity forecast errors were lower than the 5-year means at all time periods, though the OCD5 errors were not all lower than the means.  A homogeneous comparison of the official intensity errors with selected guidance models is given in Table 6b.  Overall, the NHC forecast outperformed the intensity aids for a majority of the forecast times, correctly predicting that the environment would not allow Pilar to become a hurricane.  Interestingly, some of the poorer track models, like the HAFS suite, had some of the lowest intensity errors for this storm, while the HWRF/HMON models, which had a good track performance, had high intensity errors.

Coastal watches and warnings associated with Pilar are given in Table 7.  Tropical Storm Watches were issued for the Pacific coasts of El Salvador, Honduras and a portion of Nicaragua – a rare occurrence in the historical record.



Table 1.        Best track for Tropical Storm Pilar, 28 October – 5 November 2023.

| Date/Time (UTC) | Latitude (°N) | Longitude (°W) | Pressure (mb) | Wind Speed (kt) | Stage |
|---|---|---|---|---|---|
| 28 / 1200 | 10.4 | 92.6 | 1005 | 30 | tropical depression |
| 28 / 1800 | 10.2 | 92.6 | 1005 | 30 | " |
| 29 / 0000 | 10.4 | 92.8 | 1004 | 30 | " |
| 29 / 0600 | 10.7 | 92.9 | 1004 | 30 | " |
| 29 / 1200 | 10.7 | 92.7 | 1004 | 30 | " |
| 29 / 1800 | 10.7 | 92.6 | 1004 | 30 | " |
| 30 / 0000 | 10.8 | 92.3 | 1003 | 35 | tropical storm |
| 30 / 0600 | 10.9 | 92.0 | 1003 | 35 | " |
| 30 / 1200 | 11.0 | 91.7 | 1002 | 40 | " |
| 30 / 1800 | 11.1 | 91.4 | 1000 | 45 | " |
| 31 / 0000 | 11.2 | 91.1 | 999 | 45 | " |
| 31 / 0600 | 11.2 | 90.6 | 999 | 45 | " |
| 31 / 1200 | 11.2 | 90.2 | 999 | 45 | " |
| 31 / 1800 | 11.4 | 89.8 | 998 | 50 | " |
| 01 / 0000 | 11.7 | 89.4 | 995 | 55 | " |
| 01 / 0600 | 12.1 | 89.6 | 995 | 55 | " |
| 01 / 1200 | 12.4 | 90.1 | 997 | 50 | " |
| 01 / 1800 | 12.4 | 91.1 | 999 | 45 | " |
| 02 / 0000 | 12.4 | 92.1 | 999 | 45 | " |
| 02 / 0600 | 12.4 | 93.3 | 999 | 45 | " |
| 02 / 1200 | 12.2 | 94.6 | 998 | 50 | " |
| 02 / 1800 | 11.6 | 96.3 | 996 | 55 | " |
| 03 / 0000 | 11.0 | 98.2 | 998 | 50 | " |
| 03 / 0600 | 10.6 | 100.2 | 1000 | 45 | " |

HondurasAR000337



| Date/Time (UTC) | Latitude (°N) | Longitude (°W) | Pressure (mb) | Wind Speed (kt) | Stage |
|---|---|---|---|---|---|
| 03 / 1200 | 10.3 | 102.2 | 1000 | 45 | " |
| 03 / 1800 | 10.2 | 104.0 | 1002 | 40 | " |
| 04 / 0000 | 10.1 | 105.7 | 1002 | 40 | " |
| 04 / 0600 | 10.1 | 107.1 | 1002 | 40 | " |
| 04 / 1200 | 10.1 | 108.5 | 1002 | 40 | " |
| 04 / 1800 | 10.2 | 109.8 | 1002 | 40 | " |
| 05 / 0000 | 10.3 | 111.0 | 1002 | 40 | " |
| 05 / 0600 | 10.4 | 112.0 | 1002 | 40 | " |
| 05 / 1200 | 10.5 | 113.0 | 1003 | 40 | " |
| 05 / 1800 | 10.5 | 113.9 | 1004 | 35 | low |
| 06 / 0000 | 10.6 | 114.4 | 1005 | 30 | " |
| 06 / 0600 | 10.6 | 114.7 | 1006 | 25 | " |
| 06 / 1200 | 10.6 | 115.0 | 1006 | 25 | " |
| 06 / 1800 | 10.7 | 115.3 | 1007 | 25 | " |
| 07 / 0000 | 11.0 | 116.2 | 1007 | 25 | " |
| 07 / 0600 | 12.1 | 117.0 | 1007 | 25 | " |
| 07 / 1200 | 13.4 | 117.7 | 1007 | 25 | " |
| 07 / 1800 | | | | | dissipated |
| 01 / 0000 | 11.7 | 89.4 | 995 | 55 | minimum pressure and max winds |

HondurasAR000338


Table 2.     Selected surface observations for Tropical Storm Pilar, 28 October – 5 November 2023, all in El Salvador.

| Location | Minimum Sea Level Pressure | | Maximum Surface Wind Speed | | | Total rain (in) |
|---|---|---|---|---|---|---|
| | Date/ time (UTC) | Press. (mb) | Date/ time (UTC)[a] | Sustained (kt) | Gust (kt) | |
| La Unión Airport (MSLU) | | 1008 | | | | 6.58 |
| La Aramuaca Airport, San Miguel (MSAC) | | 1004 | | | | 1.97 |
| El Salvador Intl Airport (MSLP) | | 1007 | 1/0400 | 25 | 31 | 3.99 |
| El Imposible | | | | | 53 | |
| Puerto Parada | | | | | 61 | |
| Beneficio La Carrera | | | | | | 8.89 |
| Volcán de San Miguel | | | | | | 8.41 |
| La Cañada La Unión | | | | | | 7.70 |
| Perquín Morazán | | | | | | 7.02 |
| Chiltiupán, La Libertad | | | | | | 5.72 |
| Zoologico, San Salvador | | | | | | 5.64 |

[a]  Date/time is for sustained wind when both sustained and gust are listed.


Table 3.        Selected ship reports with winds of at least 34 kt for Tropical Storm Pilar, 28
October – 5 November 2023.

| Date/Time (UTC) | Ship call sign | Latitude (°N) | Longitude (°W) | Wind dir/ speed (kt) | Pressure (mb) |
|---|---|---|---|---|---|
| **01 / 0900** | D5HF5 | 15.1 | 95.6 | 050 / 35 | 1014.3 |
| **02 / 0600** | VRMC7 | 14.3 | 94.3 | 030 / 40 | 1010.0 |
| **02 / 0700** | VRMC7 | 14.3 | 94.3 | 010 / 40 | 1010.0 |
| **02 / 0800** | VRMC7 | 14.4 | 94.4 | 360 / 43 | 1010.0 |
| **02 / 1800** | VRMC7 | 14.9 | 95.9 | 050 / 42 | 1012.0 |
| **02 / 1900** | VRMC7 | 14.9 | 95.9 | 050 / 42 | 1011.0 |
| **02 / 2000** | VRMC7 | 14.9 | 96.1 | 050 / 40 | 1011.0 |
| **02 / 2100** | VRMC7 | 14.9 | 96.3 | 050 / 35 | 1010.0 |
| **03 / 0100** | 5LDS2 | 14.4 | 94.8 | 050 / 38 | 1018.6 |



Table 4.    Number of hours in advance of formation associated with the first NHC Tropical Weather Outlook forecast in the indicated likelihood category.  Note that the timings for the "Low" category do not include forecasts of a 0% chance of genesis.

| | Hours Before Genesis | |
|---|---|---|
| | **48-Hour Outlook** | **168-Hour Outlook** |
| Low (<40%) | 78 | 108 |
| Medium (40%-60%) | 60 | 84 |
| High (>60%) | 42 | 72 |



Table 5a.    NHC official (OFCL) and climatology-persistence skill baseline (OCD5) track forecast errors (n mi) for Tropical Storm Pilar, 28 October – 5 November 2023. Mean errors for the previous 5-yr period are shown for comparison.  Official errors that are smaller than the 5-yr means are shown in boldface type.

| | Forecast Period (h) | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 12 | 24 | 36 | 48 | 60 | 72 | 96 | 120 |
| OFCL | 24.4 | 39.9 | 51.8 | 75.2 | 109.1 | 144.6 | 232.2 | 306.0 |
| OCD5 | 46.2 | 111.8 | 203.6 | 318.7 | 449.2 | 575.5 | 762.5 | 779.2 |
| Forecasts | 30 | 28 | 26 | 24 | 22 | 20 | 16 | 12 |
| OFCL (2018-22) | 22.1 | 34.0 | 45.4 | 56.0 | 70.9 | 78.7 | 100.5 | 117.8 |
| OCD5 (2018-22) | 36.7 | 73.4 | 114.0 | 156.9 | 193.2 | 244.5 | 317.0 | 376.0 |


Table 5b.  Homogeneous comparison of selected track forecast guidance models (in n mi) for Tropical Storm Pilar, 28 October – 5 November 2023.  Errors smaller than the NHC official forecast are shown in boldface type.  The number of official forecasts shown here will generally be smaller than that shown in Table 5a due to the homogeneity requirement.

| Model ID | Forecast Period (h) | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 12 | 24 | 36 | 48 | 60 | 72 | 96 | 120 |
| OFCL | 26.1 | 42.3 | 55.4 | 78.2 | 111.8 | 151.2 | 251.7 | 326.2 |
| OCD5 | 47.4 | 116.7 | 213.6 | 325.1 | 459.6 | 591.6 | 816.0 | 872.8 |
| GFSI | 37.3 | 63.2 | 79.9 | 105.5 | 147.8 | 204.5 | 320.5 | 430.3 |
| EMXI | 28.4 | **39.8** | **45.7** | **54.7** | **67.7** | **85.1** | **144.2** | **228.2** |
| HMNI | 30.2 | 51.9 | 63.0 | **72.1** | **86.9** | **104.8** | **166.4** | **257.6** |
| HWFI | 31.2 | 49.0 | 61.7 | 84.9 | 118.7 | 153.6 | **232.7** | **316.6** |
| HFAI | 36.5 | 55.4 | 71.1 | 97.5 | 140.8 | 198.1 | 345.0 | 436.2 |
| HFBI | 37.2 | 58.1 | 77.7 | 115.8 | 172.8 | 252.5 | 493.0 | 718.2 |
| EGRI | **24.5** | **38.2** | **48.5** | **68.9** | **89.8** | **104.1** | **116.0** | **129.1** |
| CMCI | 33.9 | 54.0 | 68.3 | 86.1 | 121.3 | 168.0 | 283.4 | 347.1 |
| NVGI | 30.7 | 57.3 | 87.8 | 122.7 | 154.2 | 166.0 | **166.6** | **259.8** |
| CTCI | 35.3 | 57.3 | 70.2 | 88.2 | 125.6 | 167.9 | **250.5** | 343.7 |
| AEMI | 35.4 | 62.6 | 81.4 | 106.1 | 148.9 | 201.2 | 296.5 | 377.4 |
| HCCA | 28.8 | 44.5 | 55.8 | **76.4** | **105.5** | **148.9** | 266.9 | 369.5 |
| TVCE | 29.5 | 45.9 | **52.8** | **70.9** | **104.4** | **145.0** | **247.1** | 347.9 |
| TVCX | 28.5 | 44.7 | **52.0** | **67.9** | **99.5** | **138.2** | **237.8** | 336.0 |
| GFEX | 31.8 | 49.0 | 56.3 | **72.5** | **100.7** | **139.9** | **228.6** | 327.4 |
| TVDG | 27.8 | 44.7 | **51.1** | **67.5** | **99.6** | **139.1** | **232.7** | **325.6** |
| TABD | 38.4 | 79.9 | 120.5 | 163.0 | 214.0 | 261.8 | 333.8 | 394.3 |
| TABM | 37.0 | 78.6 | 124.9 | 170.3 | 223.8 | 276.6 | 377.6 | 455.3 |
| TABS | 33.6 | 65.4 | 104.2 | 147.5 | 207.2 | 284.4 | 467.5 | 638.7 |
| Forecasts | 27 | 25 | 23 | 22 | 20 | 18 | 14 | 10 |


Table 6a.    NHC official (OFCL) and climatology-persistence skill baseline (OCD5) intensity forecast errors (kt) for Tropical Storm Pilar, 28 October – 5 November 2023.  Mean errors for the previous 5-yr period are shown for comparison.  Official errors that are smaller than the 5-yr means are shown in boldface type.

| | Forecast Period (h) | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 12 | 24 | 36 | 48 | 60 | 72 | 96 | 120 |
| OFCL | **3.8** | **5.4** | **6.9** | **7.3** | **5.5** | **3.8** | **6.2** | **7.1** |
| OCD5 | 5.9 | 13.3 | 20.0 | 24.4 | 15.0 | 13.9 | 14.3 | 14.5 |
| Forecasts | 30 | 28 | 26 | 24 | 22 | 20 | 16 | 12 |
| OFCL (2018-22) | 5.4 | 8.9 | 11.0 | 12.8 | 14.3 | 15.8 | 17.0 | 17.6 |
| OCD5 (2018-22) | 6.9 | 12.1 | 15.9 | 18.6 | 18.7 | 21.0 | 22.3 | 22.1 |


Table 6b.    Homogeneous comparison of selected intensity forecast guidance models (in kt) for Tropical Storm Pilar, 28 October – 5 November 2023.  Errors smaller than the NHC official forecast are shown in boldface type.  The number of official forecasts shown here will generally be smaller than that shown in Table 6a due to the homogeneity requirement.

| Model ID | Forecast Period (h) | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 12 | 24 | 36 | 48 | 60 | 72 | 96 | 120 |
| OFCL | 4.0 | 5.6 | 7.2 | 7.3 | 5.5 | 3.8 | 6.3 | 6.4 |
| OCD5 | 6.1 | 13.5 | 20.2 | 24.4 | 15.0 | 13.9 | 15.1 | 13.9 |
| HWFI | 5.1 | 7.3 | 9.2 | 11.8 | 12.2 | 11.2 | 10.3 | 11.0 |
| HMNI | 4.8 | 6.2 | **7.1** | 9.8 | 11.6 | 12.7 | 15.3 | 14.0 |
| HFAI | 4.9 | 8.2 | 8.1 | **6.6** | 6.5 | 6.1 | 9.8 | 9.1 |
| HFBI | 5.9 | 8.6 | **7.0** | **6.1** | 6.3 | 8.4 | 9.0 | 9.5 |
| CTCI | 6.0 | 8.1 | 9.5 | 11.0 | 9.4 | 7.9 | 8.9 | 6.6 |
| DSHP | 5.0 | 6.2 | 7.4 | 8.5 | 9.9 | 7.8 | 12.5 | 17.0 |
| LGEM | 4.9 | 6.2 | 8.4 | 10.2 | 11.5 | 10.6 | 9.5 | 10.2 |
| ICON | 4.3 | **5.5** | **6.6** | 8.5 | 9.1 | 8.4 | 7.0 | **5.9** |
| IVCN | 4.4 | 6.3 | **5.9** | **7.2** | 7.4 | 7.2 | 6.7 | **5.7** |
| IVDR | 4.7 | 6.6 | **5.9** | **7.2** | 7.6 | 7.3 | 7.5 | **6.0** |
| HCCA | 5.0 | 6.3 | 9.2 | 7.5 | 6.9 | 7.3 | 16.1 | 14.4 |
| GFSI | 5.5 | 6.9 | **6.8** | 9.5 | 10.1 | 8.9 | 10.5 | 13.1 |
| EMXI | **3.6** | **5.3** | **6.6** | 7.3 | 7.2 | 7.6 | 12.3 | 10.0 |
| Forecasts | 29 | 27 | 25 | 24 | 22 | 20 | 15 | 11 |

HondurasAR000345


Table 7.        Coastal wind watch and warning summary for Tropical Storm Pilar, 28 October –
5 November 2023.

| Date/Time (UTC) | Action | Location |
|---|---|---|
| 29 / 2100 | Tropical Storm Watch issued | Pacific coast of El Salvador |
| 30 / 0300 | Tropical Storm Watch issued | Puerto Sandino to Nicaragua/Honduras Border |
| 30 / 0300 | Tropical Storm Watch issued | Pacific coast of Honduras |
| 1 / 1500 | Tropical Storm Watch discontinued | Puerto Sandino to Nicaragua/Honduras Border |
| 1 / 1500 | Tropical Storm Watch discontinued | Pacific coast of Honduras |
| 1 / 2100 | Tropical Storm Watch discontinued | All |

Honduras/AR000347





Figure 1.    Best track positions for Tropical Storm Pilar, 28 October – 5 November 2023.



Honduras:AR000348

Figure 2.    Selected wind observations and best track maximum sustained surface wind speed curve for Tropical Storm Pilar, 28 October –5 November 2023. Advanced Dvorak Technique estimates represent the Current Intensity at the nominal observation time. SATCON intensity estimates are from the Cooperative Institute for Meteorological Satellite Studies. Dashed vertical lines correspond to 0000 UTC.



Honduras.AR000349

Figure 3.    Selected pressure observations and best track minimum central pressure curve for Tropical Storm Pilar, 28 October – 5 November 2023.    Advanced Dvorak Technique estimates represent the Current Intensity at the nominal observation time. SATCON intensity estimates are from the Cooperative Institute for Meteorological Satellite Studies. KZC P-W refers to pressure estimates derived using the Knaff-Zehr-Courtney pressure-wind relationship.    Dashed vertical lines correspond to 0000 UTC.





Figure 4.    Ultra-high resolution scatterometer data during Pilar, both with maximum winds in the 50-55 kt range.    Left panel is from 1605 UTC 31 October and the right panel is from 1617 UTC 2 November.  Images courtesy NOAA NESDIS.

Honduras/AR000350







Honduras/AR000351

Figure 5.    Rainfall (mm) from Pilar and its associated moisture over El Salvador from 28 October to 2 November 2023. Figure courtesy of the El Salvador Ministry of Environment.



Figure 6.    Composites of 7-day tropical cyclone genesis areas depicted in NHC's Tropical Weather Outlooks prior to the formation of Pilar for (a) all probabilistic genesis categories, (b) the low (<40%) category, (c) medium (40–60%) category, and (d) high (>60%) category. The location of genesis is indicated by the black star.

HondurasAR000352





**The Afro-Indigenous Peoples of Honduras: Exclusion, Conflict, and Migration**

United States Institute of Peace ⊘
100K subscribers

Subscribe

1,062 views  Streamed live on Jan 24, 2024  UNITED STATES INSTITUTE OF PEACE
Para ver este evento en español, visite: https://youtube.com/live/giAH1T1lvJeA?...

Since first arriving to Central America in 1797, the Afro-Indigenous Garifuna communities have played an important role in the region's cultural and socioeconomic development. However, the Garifuna have long suffered high rates of extreme poverty — as well as vicious cycles of human rights abuses, forced displacement, and violence from political and organized crime. In recent years, these threats have only accelerated amid a competition to control the Garifuna's traditional lands in Honduras for the sake of tourist development and resource extraction. With few economic opportunities, a lack of policies to protect their human rights, and increasingly impacted by climate change, Garifuna people are migrating in large numbers both within Central America and to the United States.

On January 24, USIP and El Faro English held a conversation on the marginalization and displacement of the Garifuna population in Honduras. The discussion examined how discrimination, climate change, and conflicts over land rights help drive migration to the United States and explored policy options that can help protect human rights and curb migration.

For more information about this event, please visit: https://www.usip.org/events/afro-indi...

Speakers:

Mary Speck, introductory remarks
Senior Advisor, Latin America, U.S. Institute of Peace

José Luis Sanz, moderator
Correspondent, El Faro English

Ricardo Zúniga
Senior Expert, Latin America, U.S. Institute of Peace

Honduras.AR000353



▶ YouTube

United States Institute of Peace ⊘
100K subscribers

**Subscribe**

1,062 views · Streamed live on Jan 24, 2024  UNITED STATES INSTITUTE OF PEACE
Para ver este evento en español, visite: https://youtube.com/live/gMHI1T1lvJeA?...

Since first arriving to Central America in 1797, the Afro-Indigenous Garifuna communities have played an important role in the region's cultural and socioeconomic development. However, the Garifuna have long suffered high rates of extreme poverty – as well as vicious cycles of human rights abuses, forced displacement, and violence from political and organized crime. In recent years, these threats have only accelerated amid a competition to control the Garifuna's traditional lands in Honduras for the sake of tourist development and resource extraction. With few economic opportunities, a lack of policies to protect their rights, and increasingly impacted by climate change, Garifuna people are migrating in large numbers both within Central America and to the United States.

On January 24, USIP and El Faro English held a conversation on the marginalization and displacement of the Garifuna population in Honduras. The discussion examined how discrimination, climate change, and conflicts over land rights help drive migration to the United States and explored policy options that can help protect human rights and curb migration.

For more information about this event, please visit: https://www.usip.org/events/afro-indi...

Speakers:

Mary Speck, introductory remarks
Senior Advisor, Latin America, U.S. Institute of Peace

José Luis Sanz, moderator
Correspondent, El Faro English

Ricardo Zúniga
Senior Expert, Latin America, U.S. Institute of Peace

Andrew Selee
President, Migration Policy Institute

Julio Guity-Guevara
Managing Director, SUDECO Inc

Martha Colón
President, Central American Black Organization

Subscribe to our YouTube channel: https://www.youtube.com/subscription...

Connect with us!

Twitter: ⬤ / usip
Facebook: ⬤ / usinstituteofpeace
Instagram: ⬤ / usipeace
LinkedIn: ⬤ / united-states-institute-of-peace
Newsletters: http://www.usip.org/sign-up/usip-updates
Podcasts: https://www.usip.org/podcasts

The United States Institute of Peace is a national, nonpartisan, independent institute, founded by Congress and dedicated to the proposition that a world without violent conflict is possible, practical and essential for U.S. and global security. In conflict zones abroad, the Institute works with local partners to prevent, mitigate, and resolve violent conflict. To reduce future crises and the need for costly interventions, USIP works with governments and civil societies to build local capacities to manage conflict peacefully. The Institute pursues its mission by linking research, policy, training, analysis and direct action to support those who are working to build a more peaceful, inclusive world. Learn more about USIP: https://www.usip.org/about

## Transcript

Follow along using the transcript.

**Show transcript**

United States Institute of Peace
100K subscribers

▶ Videos    About    ✗ Twitter    Facebook    Instagram    LinkedIn

License    Creative Commons Attribution license (reuse allowed)

Show less

## 0 Comments

Add a comment...

HondurasAR000354

EFE Noticias



Cientos de personas intentan rescatar bienes entre los restos, el 8 de noviembre de 1998, tras el violento paso del huracán "Mitch", en el barrio la Concordia, Tegucigalpa (Honduras). EFE/Albert Marín/La Nación

EFE Noticias



# 1998

2 noviembre 2023

RESUMEN DE LA NOTICIA

00:00      powerbeans      00:45

Por Germán Reyes |

# Tegucigalpa sigue vulnerable tras 25 años

Tegucigalpa (EFE).- A 25 años del paso del huracán Mitch por Honduras, su capital, Tegucigalpa, que sufrió severos daños, es una ciudad más vulnerable a los desastres naturales y está en alerta verde o preventiva) por las lluvias que se están registrando en el país.

«Hoy, 25 años después del Mitch, encontramos que no somos una ciudad resiliente, no somos un país resiliente porque no hemos logrado salir todavía de ese pasado», dijo a EFE el alcalde de Tegucigalpa, Jorge Aldana, quien era un joven voluntario cuando el fenómeno, convertido en tormenta tropical, comenzó a causar destrozos en Tegucigalpa el 30 de octubre de 1998.

# La ciudad no estaba preparada para una gran emergencia



 EFE Noticias

El alcalde señaló que ahora se puede hablar de una historia de Tegucigalpa antes del Mitch y después del Mitch, y otra sobre qué ha pasado 25 años después de ese fenómeno que dejó al descubierto «la dura realidad de que no teníamos una institucionalidad fuerte, ni una ciudad preparada para una emergencia, ni desastres de ese tipo».



Fotografía de la Penitenciaría Central de Honduras, la principal del país, la cual sufrió daños causados por el paso del huracán Mitch, el 30 de octubre de 1998, en Tegucigalpa (Honduras). EFE/Estali Irias/El Heraldo

El huracán Mitch, que llegó a alcanzar vientos de hasta 340 kilómetros por hora, fue un fenómeno errático. Cuando se creía que pasaría muy lejos de la costas de Honduras, su ojo se estacionó durante un día en la isla de Guanaja, en el Caribe hondureño, demoliéndola, y luego avanzó hacia tierra firme.

## El paso del huracán Mitch

 EFE Noticias 

río Choluteca que divide a Tegucigalpa y Comayagüela, la muerte de muchas personas y millonarias pérdidas materiales, entre otros daños graves.

Entre las víctimas mortales figuran el entonces alcalde capitalino César Castellanos en un accidente de un helicóptero de la Fuerza Aérea Hondureña (FAH) el 1 de noviembre de 1998, cuando Tegucigalpa sufría la peor desgracia de su historia.



Tegucigalpa: 25 años del huracán Mitch, la catástrofe que marcó a H...

Con el alcalde, que cumplía años el 1 de noviembre, también murieron Arturo Calona, jefe del departamento de Ingeniería de la municipalidad; el piloto, mayor José Miranda y el camarógrafo Geovany Sánchez.

Castellanos se dirigía a inspeccionar los daños en la ciudad cuando el helicóptero en que viajaba se precipitó a tierra poco minutos después de haber despegado del Aeropuerto Internacional Toncontín.

## 800.000 habitantes en zonas de riesgo

Tegucigalpa, otrora pueblo minero, con una geografía irregular y cruzada por varias fallas geológicas, también ha sufrido en los últimos 25 años un alto crecimiento



HondurasAR000358

 EFE Noticias

Mitch «no aprendimos a planificar el futuro de la ciudad», que siempre creció de manera desordenada.

De la población capitalina actual, unas 800.000 personas, que representan más del 50 %, viven en zonas de riesgo, lo que revela que «la sociedad que tenemos es de las más vulnerables del mundo y por eso nos toca a nosotros empezar a tomar medidas, no solamente cuando se presenta la emergencia, sino cuando planificamos el futuro», enfatizó el alcalde capitalino.



Vista de un sector de Tegucigalpa donde prevalece la nubosidad y las lluvias. EFE/STR

En su opinión, si después del Mitch se hubiera generado un plan de ordenamiento territorial, conociendo las debilidades del suelo de la ciudad, «no se estarían pagando las consecuencias que hoy estamos pagando».

## Plan de ordenamiento busca resiliencia

HondurasAR000359

 EFE Noticias

«Es un tema de poner orden, de crear una ciudad que pueda ser resiliente», recalcó Aldana, para quien la comunidad también debe hacer más porque es parte del mismo desarrollo de la ciudad.

Medio Ambiente, Otras noticias América

Meteorología

SI QUIERES PUBLICAR ESTE CONTENIDO, VISITA EFE SERVICIOS



 EFE Noticias                                    

 El éxito de la selección argentina de fútbol, un fenómeno que va más allá de la cancha

 Mavenir firma transacción de recapitalización de deuda para impulsar su crecimiento continuo

 ¡Amazon Access, la nueva forma de pagar, transferir y recibir dinero desde la app de compras de Amazon México!

 Con innovadoras técnicas ante plagas, banano de Ecuador busca reforzar su liderazgo global

Cuenta atrás

## Últimas entradas

EE.UU. exige tener las redes sociales «públicas» a quienes pidan visa de estudiante

Israel concluye más ataques sobre veinte objetivos para el desarrollo nuclear y militar en Irán

El ICE detiene a 84 migrantes, incluyendo a «criminales» de México, en un hipódromo de Luisiana

 EFE Noticias

 Brasil anuncia que está libre de gripe aviar tras concluir período de cuarentena sanitaria

 El huracán Erick se intensifica a categoría 2 al acercarse a las costas del sur de México

# EFE

**efe.com**

Web corporativa

EFE Verifica

EFE Escuela

## WEBS TEMÁTICAS

## PLATAFORMAS

## OTRAS WEBS ASOCIADAS

 EFE Noticias



AVISO LEGAL    /    POLÍTICA DE PRIVACIDAD    /    TARIFAS PUBLICITARIAS



 

© 2025 Agencia EFE, S.A. Avd. de Burgos, 8-B. 28036 Madrid. España Tel: +34 91 346 7100. Todos los derechos reservados

We use cookies and other data collection technologies to provide the best experience for our customers. You may request that your data not be shared with third parties here: Do Not Sell My Data.

HondurasAR000363

# AMNESTY
## INTERNATIONAL

AI Index: AMR 37/8596/2024
7 October 2024

**ORAL STATEMENT**
**Item 10: ID on technical cooperation in Honduras**
**Penitentiary system, security and justice: enhancement of technical cooperation and capacity-building to protect human rights in Honduras**
The government must take immediate steps to address concerns related to security, justice and the penitentiary system

UN Human Rights Council
57th session
9 September – 11 October 2024

Mr. President,

We recognise OHCHR's willingness to continue its engagement on security, justice and the penitentiary system in Honduras despite financial challenges, at the same time we also encourage the government to demonstrate genuine political will, without which technical assistance would be ineffective.

Amnesty International has found that since late 2022, Honduran authorities have used disproportionate measures, to deal with what has been described as the "serious violence of organised crime". On 3 December 2022, the government announced a state of emergency urging the security forces and the Military Public Order Police (PMOP), a branch of the armed forces, to join in implementing the suspension of constitutional guarantees.[1] This state of emergency has been extended 16 times, most recently until 16 November 2024. In June 2024, the government announced new measures aimed at tackling organised crime, including the construction of a megaprison and collective trials for alleged members of gang, which pose a threat to the rights of humane treatment of prisoners and to a fair trial.[2]

The government of Honduras came to power in January 2022 pledging to establish a roadmap to demilitarise public security. However, despite calls from various international organisations, and reports of possible cases of human rights violations and crimes under international law by members of the PMOP, including enforced disappearance, torture and excessive use of force,[3] PMOP continues to be involved in the application of security measures. Recently, following the murder of at least 46 women prisoners on 20 June, the Honduran government restored control and operation of the national penitentiary system to the PMOP.[4]

As of August 2024, the Honduran ombudsman had received 660 complaints on actions by security agents related to the state of emergency, including due to excessive use of force.[5]

Human rights violations committed by the security forces, specially by the military, often go unpunished. Suspected perpetrators have still not been brought to justice for violations committed in the repression of protests that followed the elections on November 2017 in Honduras.

The government of Honduras must take immediate steps to review measures relating to the state of emergency in

---

[1] Amnesty International, Honduras: Government emulates human rights violations policies of Bukele's government in El Salvador to tackle public security challenges (AMR 37/6939/2023), June 29, 2023, available at: https://www.amnesty.org/en/documents/amr37/6939/2023/en/
[2] Agreement cnds-003/2024: https://x.com/gobprensaHN/status/1801887940328476725?lang=es
[3] OHCHR, Annual report: Situation of human rights in Honduras (A/HRC/52/24), 24 August 2024, available here: https://documents.un.org/doc/undoc/gen/g23/039/78/pdf/g2303978.pdf
[4] Amnesty International, Honduras: Government emulates human rights violations policies of Bukele's government in El Salvador to tackle public security challenges (previously cited).
[5] El Heraldo, "Pese a las críticas, extienden por décima quinta vez el estado de excepción", 26 August 2024, available here: https://www.elheraldo.hn/sucesos/pese-a-criticas-extienden-por-decimo-quinta-vez-estado-de-excepcion-honduras-KH21042855

1



# AMNESTY
## INTERNATIONAL

line with the principles of necessity, proportionality and temporality; ensure an orderly withdrawal of military forces from public security engagement; continue the process of strengthening the National Police; and address the structural causes of violence, such as inequality and discrimination.

High Commissioner, how can your office assist the government in ensuring prompt, impartial, independent and effective investigations of suspected abuse of force by public officials?

Thank you,

2

HondurasAR000365

Which language would you like to use this site in?     CLOSE

ENGLISH     ESPAÑOL     FRANÇAIS     العربية     简中     繁中



© PBI Honduras

NEWS

27 January 2024

# 'They are waiting for us to give up': Activists face harassment and killings in campaign to protect rivers in Honduras

*By Graciela Martínez González, campaigner at Amnesty International*

*When Honduras President Xiomara Castro took office in January 2022 with a **promise** to protect national parks and end open pit mining, members of communities in the municipality of Tocoa who lived in a protected area in the north of the country, were hopeful. Two years on, most of them are terrified, harassed and demanding justice for the killings of their loved ones who were fighting to protect the local rivers, on which the survival of their community depends. This is their story.*

HondurasAR000366

"With water, there is life. Without it, we die", environmental activist Reynaldo Domínguez says as he fights back the tears. The phrase, which he has been repeating like a mantra for years, summarizes a long struggle his community has been leading to save the Guapinol and San Pedro rivers, which serve water to hundreds of people in the Bajo Aguán region in northern Honduras.

Members of the community say that an iron mine established in the area in 2018 is having a negative impact on both rivers and affecting the agriculture and fishing they depend on. Since then, they have reported suffering harassment and attacks by Honduran authorities and the company that runs the mining project.

"Things have been getting increasingly worse," Juana Zúñiga, environmental defender and leader of the Guapinol Community Council, says. "There is a lot of fear in the community. People are scared to walk the streets after all the attacks we have suffered but we know we have to be strong and continue, there's no other choice."

———————

The story of the Guapinol community and their struggle dates back to 2012, when the Honduran congress declared the area where both rivers met, in the Botaderos Mountain, a National Park. The idea was for the park – which in 2016 was named Carlos Escaleras Mejía after a **farmer** who dedicated his life to defending the local land and water – to be protected from the effects of heavy industries, including mining. Authorities designated areas that were meant to be free of activities that impact the environment and "buffer zones" where mining could take place only after a series of evaluations, including an environmental impact assessment.

The provisions, which looked good on paper, did not last. A year after the area was declared protected, Congress decided to decrease the core zone of the protected area. This opened the door for the Honduran National Institute of Geology and Minerals to grant permits for mining exploitation in this area. In 2014, a first concession was awarded to a mining company.

# "

# With water, there is life. Without it, we die.

### Reynaldo Domínguez

Local communities say they were not properly informed or consulted about the concession and the impacts it would have on their lives.

"The company says that there is no contamination in the river but the exams we organized with independent experts show that there is. It's very concerning. It's forcing us to displace entire communities who cannot drink from that water," Reynaldo says.

Juana Zúñiga, who everybody calls Monchi, says fishing in the river been affected. "It's very worrying and makes us incredibly sad. We had never seen anything like this."

Seeing their home threatened, members of the community quickly organized. In 2015, they formed the Municipal Committee for the Defence of the Common and Public Property of the municipality of Tocoa and, in 2018, the Guapinol Community Council. They started requesting information and filing complaints with Congress, local courts and government agencies, which were mostly dismissed or ignored.

After feeling that no one was listening, the community led a number of actions, including a protest camp. Over time, they faced **increasingly brutal** repression. On 27 October 2019, security forces violently evicted the camp, according to various reports.

The Public Prosecutor sought an arrest warrant against 31 members of the Guapinol community in 2019. They were charged with **deprivation of liberty and aggravated arson** allegedly committed against the mining company and one of its contractors. The Public Ministry also charged the defenders with organized crime, but the evidence was weak, and a National Court finally dismissed it the same year. Eight of the community leaders spent more than two years in prison. Reynaldo was one of them. Amnesty International declared them "**prisoners of conscience**", saying there was no evidence to justify the criminal charges and that they had been prosecuted solely for exercising their human rights. They were **released** in February 2022.

This should have been good news, but things only got worse.

————————

Defending natural resources in Honduras is not an easy task. The country is one of the most dangerous in the world for environmental defenders working to protect the land and other natural resources, according to **figures** from Global Witness. In 2022, the Office of the United Nations High Commissioner for Human Rights **documented** 11 killings of human rights defenders in Honduras, six of whom were striving to protect land and environmental rights. These figures dramatically increased  last year, with eight land, territory and environmental defenders **killed** as of May 2023.

The Bajo Aguán region, where the Tocoa communities are fighting to protect their water resources, has faced a historic conflict related to land tenure, with **over 160 community members** killed there since 2010.

Honduras has a long and troubled history with environmental exploitation and corruption that has led to the establishment of international mechanisms of investigation. Seven years ago, Berta Cáceres, the renowned human rights defender and indigenous Lenca leader, was **assassinated** for campaigning against the construction of a hydroelectric dam on the Gualcarque river, in the community of Río Blanco in western Honduras.

Despite this context, Honduras has not yet signed the **Escazú Agreement**, the first regional environmental treaty in Latin America and the Caribbean. Its purpose is to set new standards for protection of the environment and human rights that guarantee access to information,

HondurasAR000368

citizen participation and access to justice on environmental issues in the region, including the protection of environmental defenders.

––––––––––––

The pattern of harassment and repression against Reynaldo and his community took a tragic turn in early 2023.

On 7 January, Reynaldo's brother, Aly Magdaleno Domínguez Ramos, and Jairo Bonilla Ayala **were killed** when they were returning home from work on a moped. Five months later, Reynaldo's other brother, Oquelí, was also **shot dead** in broad daylight. The three had been some of the most prominent community members working to protect local rivers.

Reynaldo says the killings were devastating for the community. The killings forced him and his family to leave the community. Staying home was no longer safe.

"They were all so important for the community. When all of this started, we promised ourselves that we would stand strong together, that we would always fight together to protect the rivers," he says, before lamenting the state of the investigation.

"The authorities don't care. They haven't done anything, they haven't arrested anybody, the investigation has completely stalled. This is Honduras, no investigation ever moves forward. They are waiting for us to give up before they just close the whole case. They are sending the message that they can make us all disappear and that nothing will happen."

Members of the community have reported other attacks. After authorities in Honduras continued to **fail to protect** the community, in October 2023 **the Interamerican Commission of Human Rights granted precautionary measures** to 30 people: members of the Municipal Committee and their lawyers from the legal collective Justice for the People (**Bufete Jurídico Justicia para los Pueblos**). The Honduran government has also failed to respond to a letter sent by Amnesty International in November 2023 urging the authorities to effectively investigate the attacks against human rights defenders and protect their communities.

## "

## The authorities don't care. They haven't done anything, they haven't arrested anybody.

### Reynaldo Domínguez

Edy Tábora, Honduran lawyer and co-founder of Justicia para los Pueblos, has litigated cases of attacks against environmental defenders. He says there hasn't been any progress in investigations into the aggressions against community members and that the lack of proper oversight over these projects is concerning.

"There is a development model based in the exploitation of natural resources that does not take into consideration the full participation of the communities. A model that is only after earnings and does not take into consideration people's suffering and the criminalization of communities."

While members of local communities continue with their fight, parts of the mining project continue to operate. On 9 December, hundreds of Tocoa inhabitants showed up to a town hall meeting t**o reject a petroleum coke thermoelectric project**, part of the wider mining project. Erick Tejada, Minister of Energy and manager of the Honduran state power company Empresa Nacional de Energia Electrica, **promised to respect the decision of the communities of Tocoa**.

In the face of so much pain, Reynaldo and Monchi are convinced that the fight is worth it.

"We feel like we're trapped and living in fear for everything that has been happening. We never thought all of this was going to happen. I continue to fight for the rivers because this is my community, our land, and I have been protecting it for 60 years. I'm a man who believes in the collective and I will always continue to fight for Guapinol to be what it used to be," says Reynaldo. "Development doesn't have to be harmful. Our fight is for everybody because this planet is everybody's home, and we must protect it."

Monchi agrees.

"I would ask the president to listen to us and to follow her promise to end open mining. I continue fighting for my daughters, for what we have achieved. It's all worth it to protect our river," she says. "As long as God gives us life we will continue to fight."

---

**AMERICAS**      **BLOG POST**      **CENTRAL AMERICA AND THE CARIBBEAN**      **HONDURAS**

**HUMAN RIGHTS DEFENDERS AND ACTIVISTS**      **INDIGENOUS PEOPLE**      **KILLINGS AND DISAPPEARANCES**      **NEWS**

**RIGHT TO WATER**

---

**NEWS**

---

# Related Content

COUNTRY

## Honduras

NEWS

## Honduras: The state must guarantee truth, justice and reparation for the family of Berta Cáceres

CAMPAIGNS

Nikole: "I come from the world of technology where there are very few women"

NEWS

El Salvador: Ratification of the constitutional reform deepens the risk of human rights abuses

NEWS

Honduras: The presidential candidates have a unique opportunity to commit to human rights

## ABOUT US

Contact Us

How We're Run

Modern Slavery Act Statement

Finances

# RESOURCES

Media Centre

Human Rights Education

Human Rights Courses

Annual report archive

# GET INVOLVED

Join

Take Action

Volunteer

# LATEST

News

Campaigns

Research

# WORK WITH US

If you are talented and passionate about human rights then Amnesty International wants to hear from you.

JOBS & INTERNSHIPS

Privacy Policy    |    Accessibility    |    Cookie Statement    |    Permissions    |    Refunds of Donations

© 2025 Amnesty International

FOLLOW US ON:



www.amnesty.org

AMNESTY INTERNATIONAL – PUBLIC STATEMENT

AMR3769392023SPANISHDate 29 June 2023      Index AMR 37/6939/2023

# HONDURAN GOVERNMENT EMULATES HUMAN RIGHTS VIOLATION POLICIES OF BUKELE'S GOVERNMENT IN EL SALVADOR TO TACKLE PUBLIC SECURITY CHALLENGES

**It is with concern that Amnesty International notes Xiomara Castro's government's reaction to the ongoing rise in murders in Honduras and the killing of at least 46 women in a prison in June. The use of militarised security forces and the suspension of rights in the Central American region in such circumstances has led to human rights violations such as deaths in state custody, arbitrary imprisonment, ill-treatment, violations of due process, discrimination, restrictions on the exercise of freedom of expression and even crimes under international law such as torture and persons being taken away by force.**

Xiomara Castro's government came to power in January 2022 promoting a human rights agenda and pledging to establish a roadmap to demilitarise public security. Despite calls from various international organisations, and reports of possible cases of human rights violations and crimes under international law by members of the Military Public Order Police (PMOP or Military Police), the latter continues to control or cooperate in the application of security measures.

The murders recorded in Honduras in recent weeks are an indication of the enormous challenges the country continues to face in the matter of public security. Addressing this situation will require effective and comprehensive measures on the part of Xiomara Castro's government. However, in order to be sustainable, these measures must always be taken within the bounds of international human rights standards.

## STATES OF EMERGENCY, CURFEWS AND THE MILITARISATION OF PUBLIC SECURITY

Since late 2022, Honduran authorities have used disproportionate measures, suspending constitutional guarantees, to deal with the "serious violence of organised crime". On 3 December the government announced a state of emergency urging the security forces and the Military Public Order Police (PMOP) to join in implementing the suspension of constitutional guarantees. This state of emergency has been extended several times, most recently until 5 July 2023.

During his visit in May and June 2023 the UN Special Rapporteur on extrajudicial, summary or arbitrary executions, Morris Tidball-Binz, noted with particular concern the state of emergency in which cases of excessive use of force have been recorded. He also noted with concern that the PMOP continues to engage in public security tasks, as a result of which deaths have been recorded in the context of arrests and raids in different areas of the country.

By 31 May 2023 the National Commissioner for Human Rights in Honduras (CONADEH) had in fact received 193 complaints relating to the state of emergency, including 22 against the PMOP, for the disproportionate use of force during arrests and detentions, acts of intimidation and threats during raids to obtain information, including shooting to intimidate and frighten people, lack of clarity from the authorities about the grounds for detention, and failing to permit family members to enter and see detained persons.

Despite this, after the murder of at least 46 women prisoners at the National Women's Penitentiary for Social Adaptation (PNFAS) in Támara, near Tegucigalpa, on 20 June, the Honduran government returned control and operation of the national penitentiary system to the PMOP. The Honduran government's order to demilitarise prisons and transfer control of these and the National Penitentiary Institute (INP) to the National Police lasted only a few months.

Shortly afterwards, following the death of at least 13 people in Choloma (near San Pedro Sula, in the north of the country) on 24 June and other murders in the region, the Honduran government decreed a curfew in Choloma and San Pedro Sula on 25 June. The curfew is under the control of the PMOP, in cooperation with the Ministry of Security, the Ministry of Defence and the Armed Forces.

The PMOP has been in existence for a decade, since Congress, then presided over by Juan Orlando Hernández, approved creation of the Military Police as part of consolidation of a militarised security strategy to supposedly deal with

HondurasAR000374

the high levels of violence in Honduras. This was intended to be a temporary security force (for five years) composed of members of the Honduran Armed Forces. Six years later, in 2019, with Hernández as president, the Honduran government ordered action by the National Penitentiary System, through the National Inter-Institutional Security Force Action Committee (FUSINA), which is of a military nature.

In 2020, in a joint communiqué, the IACHR and OHCHR condemned the militarisation of prisons and recommended that Honduras ensure the proper implementation of protocols to prevent riots and restore security conditions in prisons, without the excessive use of force.

On the other hand, international organisations and agencies have reported excessive use of force by security and militarised forces, including the PMOP, both to repress protests and to enforce curfews and lockdowns in response to the COVID-19 pandemic.

The case law of the Inter-American Court of Human Rights (IACHR) establishes that States must always exercise maximum restraint over the use of the armed forces for public order tasks, since among other things the training of military personnel is oriented towards armed conflict, their watchword being to defeat the enemy, and their manner of operation is inconsistent with policing functions under the control of civil authorities. In this respect both the Inter-American Commission on Human Rights (IACHR) and the Office of the United Nations High Commissioner for Human Rights (OHCHR) have repeatedly recommended that the Honduran state should gradually and progressively demilitarise public security, with respect for human rights.

On the other hand, the repression of protests by the security forces, including the PMOP, during the 2017 electoral process in Honduras resulted in more than two dozen people being killed, injured and imprisoned, most of them during the curfew. The IACHR sets strong limitation on the use of armed forces in actions affecting the right to personal liberty. The detention or arrest of persons must be governed by the requirements of strict proportionality when restricting a right, and must in turn meet strict criteria of exceptionality and due diligence when safeguarding conventional guarantees.

Finally, the IACHR has established that the use of the armed forces in public security tasks should be limited to the fullest extent and should be applied in an extraordinary, complementary, regulated and supervised manner. Human rights violations committed by the security forces, and by the military in particular, often go unpunished. In the case of the violations committed in the context of the repression of protests in the 2017 election in Honduras, the suspected perpetrators have still not been brought to justice.

## PRISONS CONDITIONS

Honduras has a long history of poor health and security in prisons. In fact, the fire in the prison at Támara is not the first of this size in Honduran prisons. More than 100 people died in the San Pedro Sula prison fire in May 2004. The IACHR declared Honduras responsible for these deaths in the 2012 Pacheco Teruel judgment. In the same year (shortly before the case reached the IACHR) 360 people died during a fire at the Comayagua Farm Prison on 14 February 2012.

In its latest annual report, the OHCHR noted that the number of violent deaths in prisons continues to remain high. According to the Office, "such deaths were the result of a system of self-governance by persons deprived of liberty, with the acquiescence of the authorities, resulting in the lack of effective control of prison centres, violation of the personal integrity and discrimination of detainees, including due to extortion within the centres". On the other hand, as of December 2022, the OHCHR pointed out that the National Penitentiary System has an overcrowding rate of 34.2% and at least 51.6% of the prison population has yet to receive a final sentence.

In its 2022 report the IACHR recognised that the State of Honduras has made some progress in reducing prison overcrowding and that it has adopted measures aimed to reduce the use of pre-trial detention. However, it points out that there is still a need to take additional steps to ensure pre-trial detention in accordance with international standards in this field and to promote the application of alternative measures.

## CONCLUSIONS AND RECOMMENDATIONS

Amnesty International expresses its continuing concern about human rights violations committed during states of emergency or curfews in Honduras, in particular with regard to the involvement in public security tasks of militarised forces such as the PMOP, an institution that rights bodies and organizations have frequently denounced for excessive use of force during protests and curfews and states of emergency.

Based on the above context and human rights standards, Amnesty International calls upon the Honduran authorities to:



HondurasAR000375

- Take immediate steps to ensure an orderly withdrawal of militarised forces from public security work and to continue the process of strengthening the capabilities of the National Police.

- Redouble efforts to combat the structural causes of violence, such as inequality and discrimination. The State must take all necessary steps to ensure the full enjoyment of economic, social and cultural rights.

- Review the appropriateness of the recently implemented measures relating to the state of emergency and curfews, ensuring the principles of necessity and proportionality, and comply with all procedures, including official notifications to the Organisation of American States and the United Nations.

- Have effective safeguards in place to prevent any violation of rights in the contexts of states of emergency or curfews, including ensuring the rights of individuals to access to legal assistance, due process and fair treatment, and ensure that there is no discrimination on grounds prohibited by international law

- Ensure prompt, impartial, independent and effective investigations by the ordinary courts whenever abuse of force by public officials is suspected, including cases resulting in death, arbitrary detention and cruel, inhuman or degrading treatment; and to take steps to ensure full cooperation by the armed forces in these investigations - always through the ordinary civilian courts.

- Guarantee the life and integrity of detainees and the entire population, and investigate the events in the prison at Támara and all killings so that the survivors and victims' families know the truth and obtain justice and redress.

AMNESTY
INTERNATIONAL

ADVERTISEMENT

WORLD NEWS

# Honduras' president is asked to resign after corruption scandal she says is a plot to oust her



LIVE: **Trump administration**     **Israel-Iran**     **Ali Khamenei**     **Brad Lander**     **Indonesian volcano erupts**



FILE - President of Honduras Xiomara Castro delivers a speech during the first meeting of the Global Gateway Board Coalition in Paris, Oct. 10, 1999. (Julien de Rosa, Pool via AP, File)



Trump muses about turning the G7 back into the G8 — or even the G9 with China

BY <u>ASSOCIATED PRESS</u>

Updated 7:54 PM EDT, September 4, 2024

TEGUCIGALPA (AP) — The head of an anti-corrup...
that Honduran President Xiomara Castro resign a...
in-law allegedly received drug money.

HondurasAR000377

"This request is based on the serious accusations of drug trafficking that have been presented against your family, whom you have appointed to work in the State," said Gabriela Castellanos, director of the non-governmental organization the National Anti-Corruption Council, in a public letter to Castro.

The demand comes after a rocky week for Castro, who won the presidency on an anti-corruption campaign.

The day before the letter was sent, a video recorded in 2013 was released purportedly showing drug traffickers currently imprisoned in the United States offering more than $525,000 to the president's brother-in-law and congressional leader, Carlos Zelaya.

In this video published in an investigation by journalists at InsightCrime, Zelaya said "half of it will go to the commander," referring to his brother, former president Manuel Zelaya, Castro's husband and main adviser who was overthrown in a 2009 coup d'état.

## RELATED STORIES



HondurasAR000378

**Prison sentence for Argentina's ex-President Cristina Fernández upheld**



**US sends 68 migrants back to Honduras and Colombia in first voluntary deportation**





**Brazil's military police kill leader of a drug trafficking group in a Rio favela**

Castro's brother-in-law Zelaya acknowledged days earlier that he had met with the leader of the drug trafficking organization "Los Cachiros," who offered to support his party's campaign that year; 2013 was the same year Castro made her first unsuccessful run for president.

But Zelaya told the press he was unaware the people who attended the meeting were related to drug trafficking.

Castro's brother-in-law Carlos Zelaya was among a few family members who resigned from their positions in government after he admitted to having met with a drug-trafficking group in 2013. Zelaya claimed he didn't know the people he met with were narcos at the time.

"I fell into a trap, I take responsibility for my actions," Zelaya told press.

Zelaya and his son, the former minister of defense, both resigned from their positions as a result.

HondurasAR000380

Shortly before Zelaya's revelation, Castro had knocked down a longstanding extradition treaty between Honduras and the United States, which analysts and disillusioned Hondurans said was not a coincidence.

Under the treaty, dozens of Hondurans accused of drug trafficking were extradited to face justice in the U.S., including the country's ex-president who was recently sentenced to 45 years in prison by a New York court.

The video of Zelaya was met by anger and frustration by many Hondurans, who harbored hope when they elected Castro in 2021 that she would be a different president than the corrupt leaders that have long ruled the Central American nation.

But her popularity has slowly faded in recent years as gang violence rages, the economy and high unemployment continue to plague Hondurans and many feel they haven't seen the change promised them.

After the video of Zelaya's meeting with the narco group was broadcast, Castro claimed in statements over radio and television that "dark forces" in Honduras and abroad were working to carry out a coup d'état against her.

"The plan to destroy my socialist and democratic government and the upcoming election is underway," she said. She offered few other details in her accusations.

Analyst and former presidential candidate Olban Valladares described her claims of a plot to oust her as "absurd," adding that Castro "insists on using rhetoric that has already been worn out."



## MOST READ



1    Canadian Indigenous leader says he was 'filled with rage' before 'intense' conversation with Trump

2    Israel warns 300,000 people in Tehran to evacuate as Trump

3    The world's most-visited museum shuts down with staff

4    Jury finds MyPillow founder defamed former employee

5    Man killed while protesting in 'No Kings' rally was a 'Proje

HondurasAR000382

# SUGGESTED FOR YOU





**50-Year Legend Calls Exact Month Stocks Will Crash Next**

Advertisement: Chaikin Analytics



**Is It Worth Paying a Financial Advisor 1%?**

Advertisement: SmartAsset



**Stretch Every Retirement 12 Dividend Paying Stoc...**

Advertisement: Wealthy Retirement



**Financial Planning That Adapts to Life's Changes - See How It Works**

Advertisement: Edelman Financial Engines





About ACLED     Data     Analysis     Special Projects     Subscribe

# Fighting Gangs Under the State of Exception in Hondu

5 December 2023

ENGLISH

On 6 December 2022, Honduran President Xiomara Castro implemented a state of exception in several neighborhoods of Honduras' capital, Tegucigalpa, and the second-largest city, San Pedro Sula, as part of a plan to fight criminal groups and extortion. Amid mounting pressure to address insecurity and the government's decreasing popularity, Castro's implementation of the state of exception came less than a year into her mandate.[1] As a result of numerous extensions, the state of exception has reached a year mark and has been implemented in 158 of the country's 298 municipalities. The government also took measures setting provisions for the delegation of public security to military forces, including the management of the country's prisons, in contrast to the president's electoral promises to stem organized crime with anti-corruption measures and a community police approach.[2]

Over the years, criminal groups have wielded considerable influence across Honduras, a country that geographically constitutes a key transit point for transnational drug trafficking. They have penetrated state institutions, as evidenced by frequent cases of collusion between organized crime and high-level politicians, most notoriously Castro's predecessor Juan Orlando Hernández, who was indicted on drugs and weapons charges in the United States.[3] Despite some alleged progress in the fight against crime since Castro was sworn in as the new president of Honduras on 27 January 2022 – with a drop in homicides in 2022 compared to 2021 that the government has attributed to its security measures[4] – violence and extortion have persisted at high levels, prompting the government to boast steadfastness against rampant crime.

A year after the implementation of the state of exception on 6 December 2022, this report explores the evolution of violence likely related to gang activity between January and November 2023. ACLED data show that the security measures implemented thus far have yielded mixed results. Armed clashes and violence targeting civilians have continued unabated throughout 2023 due to persisting competition among gangs, especially in the country's overcrowded prisons where violence has surged. Gangs continue to extort transportation workers in order to generate revenues, albeit the rate of these events has slowed down in 2023 compared to 2022. The geography of the violence points to gang violence moderately increasing and spreading beyond the crime hotspots of Tegucigalpa and San Pedro Sula. This finding substantiates claims that criminal groups have expanded to other strategic areas for drug trafficking and production, a phenomenon potentially exacerbated by state of exception measures and increased pressure on gangs in the most populous urban areas due to frequent law enforcement operations.

## Security Measures Fail to Curtail Inter-Gang Violence

At the start of 2023, the Honduran government reported that homicides decreased in 2022 compared to the year prior and directly attributed this drop to its new security strategy.[5] The government also alleged that the state of exception and deployment of police and military forces led in the first half of 2023 to over 1,000 gang members arrested, criminal groups dismantled, drugs and weapons seized, and a decrease in homicide levels in multiple municipalities.[6]

Reflecting some of these developments, between January and November 2023, Castro's security measures arguably drove a rise in armed clashes between state forces and armed groups, which were 45% higher compared to the same period in 2022. Most recorded violent incidents expectedly took place in the urban areas close to Tegucigalpa and San Pedro Sula, respectively in San Francisco Morazán and Cortés departments, where the government deployed 20,000 police officers in December 2022 to support anti-gang operations (*see map below*).[7]

## Clashes Involving Gangs and Unidentified Armed Groups
### 1 January - 24 November 2023



Although the government launched several security operations to confront armed groups across the country, ACLED data suggest that the security measures have thus far failed to meaningfully restrain clashes between armed groups. Such violence remains at similar levels compared to the previous year largely as a result of a surge in prison riots. In 2023, prison riots have reached some of the highest levels since ACLED began coverage of Honduras in 2018, even after the government began decreeing emergency measures in the penitentiary system and its demilitarization as early as March 2022. [8]

Criminal groups have garnered significant power within the penitentiary system, with imprisoned members running illicit operations on the outside. [9] In April, simultaneous riots in four prisons involving incarcerated members of criminal groups resulted in several injuries and the killing of one inmate. Gang rivalries and detention conditions have often been identified as the main causes of prison violence, a phenomenon exacerbated by overcrowding, poor management, and corruption among officials. However, a local organization has stressed that the April 2023 string of riots may have been linked to unaddressed prisoners' demands, including the separation of rival gang members into different cells, and complaints that former detainees have been harassed during the state of exception by the anti-gang police forces (DIPAMCO) created by Castro's government in 2022. [10] Despite the introduction of new measures to curb corruption and violence, [11] another 46 women were killed on 20 June after members of the Barrio-18 gang attacked rivals inside a women's prison in Támara, Francisco Morazán.

In response to the crisis of the penitentiary system, President Castro ordered that the Military Police of Public Order would coordinate Honduras' prison security system from 1 July, after it was previously demilitarized in March 2022. [12] Castro also announced a project to build a high-security prison on the Swan Islands, which could deprive prisoners of contact with their relatives and lawyers. [13] Both moves further contribute to the remilitarization of public security and heightened concerns about the violations of prisoners' rights as relatives reported beatings and degrading treatments inflicted on inmates. [14]

### Risks for Civilians Persist Despite Moderate Progress in Combating Extortion

Amid persisting clashes between armed groups, civilians continue to endure the deadly effects of criminal groups' activity. The successive security measures adopted in the framework of the state of exception have yielded mixed results for the protection of civilians from gang-related violence. The number of reported civilian deaths has decreased by 7% despite a 14% decrease in civilian targeting by gangs and unidentified armed groups between January and November 2023, with nearly 500 reported fatalities against at least 520 in 2022 (*see graph below*). The Observatory of Violence of the National Autonomous University of Honduras has linked the high lethality of violence to

HondurasAR000386

a recrudescence of multiple-victim homicides in 2023, often attributed to feuds between criminal groups.[15] They have allegedly been reorganizing their network following the extradition of former President Hernández and the handover of power to Castro's government, which ended the National Party's 12-year rule.[16] Notably, on 24 June, alleged members of the Barrio 18 (B-18) gang killed at least 13 people in Choloma, Cortés, which has been attributed to an act of reprisal following the deadly gang-led incursion in the Támara prison days earlier.[17] In contrast, government data suggest a 17% drop in the number of homicides in the first semester of 2023 compared to the previous year.[18] However, the disaggregated results of the government data for the first half of 2023 indicate that the decline significantly affected homicides linked to interpersonal violence rather than homicides attributed to gangs and extortion activities only.[19] Hence, even when considering the government's reported statistics, it could be misleading to exclusively link the drop in homicides to a significant decrease in gang violence.

During the initial announcement of the state of exception in November 2022, the government identified extortion as a major driver of violence in the country.[20] Amid an overall decrease in violence targeting civilians, ACLED data show falling numbers of abductions and shootings targeting transport workers – a decline that could more clearly be related to the security measures to fight gang activity. Transportation workers are at particularly heightened risk as the group most targeted by gang violence; they account for 16% of attacks and abductions in 2023. Gangs have long relied on extorting transportation workers as a significant source of income, in particular, by threatening or killing those who refuse to pay the 'war tax.'[21]

To avoid law enforcement operations, gangs have even infiltrated taxi and bus driver collectives, using middlemen and creating networks for collecting extortion fees.[22] While measures deployed as part of the state of exception have thus far shown limited results in significantly reducing overall violence levels likely related to gang activity, between January and November 2023, ACLED records a 35% decrease in violence targeting taxi and bus drivers compared to the same period in 2022 (*see graph below*).

HondurasAR000387

These findings show some encouraging progress in the fight against extortion. Nonetheless, the Asociación para una Sociedad más Justa, a local non-governmental organization, has emphasized that most promised measures to fight extortion remain to be implemented and that most arrests are often not related to acts of extortion. [23] The decrease in violence targeting workers, especially in the transport sector, was also not uniform across Honduras. Gains were primarily apparent in Tegucigalpa, where early security measures were deployed in neighborhoods that displayed high criminality levels and gang presence. In contrast, in San Pedro Sula, violence targeting these groups has slightly increased in 2023. Transportation unions even reported that in addition to Honduras' main criminal organizations B-18 and Mara Salvatrucha (MS-13), new gangs have begun to extort workers from their sector, thus stressing the security plan's limits in tackling extortion in certain areas. [24] Some have also argued that the decrease in violence and extortion in certain urban areas might have been related to agreements between criminal groups, rather than additional security measures. [25]

While the decrease in violence targeting transportation workers could signal mild progress in curbing extortion-related violence, the durability of these results remains to be seen. This trend is notably contrasted by persisting violence targeting these groups in San Pedro Sula, amid testimonies contesting that improved security is imputable to the government measures.

## Shifting Beyond Traditional Epicenters of Organized Crime

Francisco Morazán and Cortés departments are traditional hotspots of organized crime, where criminal groups fight for control of key drug trafficking routes and coastal access points. [26] Within these departments, violence is generally concentrated in areas that are densely populated with high economic activity, particularly the national capital Tegucigalpa, Francisco Morazán, and San Pedro de Sula, Cortés. [27]

Although Tegucigalpa and San Pedro Sula continue to be among the most violent municipalities in the country in 2023, ACLED records a drop in violent events and reported fatalities following the establishment of the state of exception. In comparison with 2022, reported fatalities resulting from violence likely related to gang activity (excluding clashes with state forces) dropped by 23% and 40% in Tegucigalpa and San Pedro Sula, respectively. In San Pedro Sula, local actors have attributed the decrease in homicides in certain

neighborhoods to greater collaboration between police and the community and agreements between organized crime groups rather than the implementation of the state of exception.

While the lethality of the violence has decreased in Tegucigalpa and San Pedro Sula, the trend does not seem to be mirrored in other municipalities of the departments. Between January and November 2023, civilian targeting and inter-gang clashes have remained consistent with 2022 levels in other municipalities of Francisco Morazán, with several violent incidents recorded in cities south of the capital. Meanwhile, in Cortés, it has grown by 39% – even in those under the state of exception measures (*see map below*). This finding suggests that the additional law enforcement pressure in urban centers has likely led to criminal groups' activities newly spreading to or intensifying in rural areas and the fringe of urban centers, a trend that has been observed as early as 2014.[28] In Choloma, Cortés, violence increased and grew even deadlier, as illustrated by the B-18 mass shooting of 13 people on 24 June. The attack prompted the government to order additional operations and a special curfew in Choloma and San Pedro Sula cities to recover areas taken over by criminal groups.[29] Violence also similarly increased in Omoa, Cortés, a strategic drug trafficking location to access Puerto Cortés port and the Guatemala border.

Yet, violence is not limited to departments home to Honduras' large urban centers. In 2023, other departments have also experienced increasing levels of civilian targeting and clashes likely related to gangs, relative to 2022. In Intibucá department, the number of violent incidents and related fatalities surpassed that of 2022 in its entirety, amid reports that members of MS-13 have crossed into the

department from El Salvador to escape Salvadoran anti-gang operations.[30] Similarly, in Santa Barbara, violence has surpassed 2022 levels, likely caused by a turf war around the control of the main road connecting San Pedro Sula and the Guatemalan border, the expansion of extortion activities, as well as armed clashes in El Pozo prison in Ilama.[31]

Elsewhere, in Colón department, reported civilian targeting and clashes between armed groups in 2023 have also exceeded levels recorded in 2022. Some of the violence in this department has occurred as part of the Bajo Aguán environmental conflict. Organized crime groups, in collusion with political elites, have targeted activists opposed to mining projects and their negative impact on water resources.[32] Notably, on 15 June, armed men killed an environmental defender in Guapinol, Colón, months after the killing of his brother, who was also an environmental activist. Moreover, ACLED records similar violent events in the municipalities under the state of exception, such as Tocoa and Trujillo. Between January and November 2023, armed men killed at least 11 land defenders and environmental activists in the country, which surpasses levels recorded in previous years – suggesting that state of exception measures have had a limited impact on political assassination as well.

Armed violence in Honduras has begun spreading beyond its traditional hotbeds, despite efforts to strengthen the capacity and presence of state forces across the country. Criminal organizations have notably operated across the state with known operations in the coastal city of La Ceiba, Atlántida, in the Mosquitia forest area in Gracias a Dios department, in the coca-growing departments of Colón and Olancho, and also departments bordering Guatemala along strategic drug trafficking routes. Recognizing criminal groups' wider reach, the government has announced military police operations in Atlántida, Copán, and Yoro, and the deployment of additional military forces in Colón, Olancho, El Paraíso, and Gracias a Dios in April 2023.[33] However, the effort is contrasted by reports that residents have not felt increased state forces' presence in targeted areas, and that law enforcement's lack of resources and personnel, especially in rural areas, have likely limited the efficiency of security measures.[34]

## Addressing Impunity and Root Causes of Violence

The government's implementation and progressive expansion of its state of exception has coincided with a drop in violence in some of the most violent areas of Honduras, including Tegucigalpa and San Pedro Sula. However, at the countrywide level, Castro's state of exception has not yielded uniform results in curbing gang violence. Rather, inter-gang violence has continued posing threats to civilians and the violence has spread beyond the main areas targeted by the security measures. Overall, these data indicate that the state of exception has failed to adequately respond to the underlying drivers of this violence.

The security measures, multiple extensions of the country's state of emergency, and associated restriction of civil rights, including the freedom of assembly and movement, have raised concerns that the policies could set fertile grounds for human rights violations.[35] Law enforcement operations have notably been criticized for using excessive force and arresting individuals without concrete evidence of their participation in extortion crimes.[36] In June, the Comisionado Nacional de los Derechos Humanos reported 193 complaints of police and military force abuse during the state of emergency, including the use of physical force to obtain information, police surveillance outside of civilians' property, and the firing of shots during raids to intimidate.[37] Additionally, the transfer of control of the prison system to the military police in late June and the proposed construction of a high-security prison have also been interpreted as a sign that Honduras could harden the security measures. The proposal is reminiscent of the construction of the largest prison in the Americas, in El Salvador – denounced for breaching international standards on prisoner rights. There are fears that Castro's government might pursue a *mano dura* policy (or 'iron fist') in line with the war on gangs of Salvadoran president Nayib Bukele, reneging on its commitment to upholding human rights and implementing adequate monitoring and complaint mechanisms for victims of violence.

Seemingly overlooking the root causes of gang violence, the state of exception fails to include reforms that focus on the fight against corruption within police and judicial institutions to ensure the end of impunity and the prosecution of the perpetrators of violence. Castro's government pledged to establish an anti-corruption body, the International Commission on Corruption and Impunity, to investigate and prosecute crimes, although reform requirements of Honduras' national law have stalled its installation.[38] Additionally, recent disagreements between Castro's LIBRE party and the opposition over the election of officials to the Public Prosecutor's Office could further jeopardize anti-corruption efforts.[39] In fact, the dubious legal grounds under which the new Attorney General and Deputy Attorney General have been appointed have raised concerns in the U.S., the country's main foreign partner and potential donor of the anti-impunity body, weakening trust in Castro's government's commitment towards transparency and the rule of law.[40] Corruption within state institutions continues to reduce the state's ability to effectively tackle gangs, including cases covering the participation of anti-gang forces in extortion and extrajudicial executions – some allegedly in collusion with criminal actors. Therefore, any long-lasting effects of Castro's efforts in reducing violence are cemented in the government's ability to effectively dismantle networks linking political actors with criminal groups – which have thus far allowed the latter to operate unpunished.

ESPAÑOL

Visuals in this report were produced by **Ana Marco**.

### Sandra Pellegrini

Sandra is ACLED's Latin America & the Caribbean Senior Analyst. In this capacity, she conducts and coordinates analysis, oversees the accuracy of conflict trends in the region, and serves as the main point of contact for partnerships and external engagement for Latin America and the Caribbean. Sandra has been with the organization since 2018, first starting as a researcher and supporting the expansion of ACLED's coverage in Latin America, Eastern Europe and Central Asia. Prior to joining ACLED, Sandra has worked with international organizations in the field of conflict prevention and minority rights, and held several positions in the non-governmental organizations sector with experience in Bolivia, Chile, Haiti, and Honduras. Sandra holds an International Master in Russian, Central and East European Studies from the University of Glasgow and a Master of International Relations from KIMEP University Almaty. Her areas of research include political violence in Latin America, non-state actors, and organized crime dynamics.

### Aleksander Pappalardo

Aleksander is a Central America Researcher at ACLED and has been with the organization since September 2021. Aleksander holds a Master's degree in International Development from Sciences Po Paris and a MSc in Economics and Management of Government and International Organizations from Bocconi University. He also holds a BSc in International Business Administration and a BA in Philosophy from Erasmus University in Rotterdam. He has worked and is still involved in research, consulting and data analytics for different INGOs. His research interest are related to the local impacts of global and regional socio-economic policies and environmental challenges.

Category:    Analysis    5 December 2023

Regions:    Latin America and the Caribbean

Tags:    Honduras



**Share**

## Related

Political competition and infighting among Tripoli's armed groups reach beyond Libya's capital

10 July 2025

Q&A | What does the Wagner Group's exit from Mali mean for Russian activity in Africa?

10 July 2025

Q&A | Twelve days that shook the region: Inside the Iran-Israel war

4 July 2025

SPECIAL PROJECTS

Cabo Ligado

Ethiopia Peace Observatory

Horn of Africa

Ukraine Conflict Monitor

US Crisis Monitor

Yemen Conflict Observatory

RESOURCES

FAQs

Knowledge Base

Codebook

API Guide

Term of Use

Cookie Policy

Privacy Statement

CONNECT

Careers

Events

About

Contact

Press & Media

STAY INFORMED

Sign up to our newsletter to get the latest updates delivered straight to your inbox.

Subscribe

ACLED (Armed Conflict Location & Event Data) is an independent, impartial, international non-profit organization collecting data on violent conflict and protest in all countries and territories in the world. ACLED is a registered non-profit organization with 501(c)(3) status in the United States.

© 2025 ACLED. All Rights Reserved.

BTI 2024 Country Report

# Honduras



This report is part of the **Bertelsmann Stiftung's Transformation Index (BTI) 2024**. It covers the period from February 1, 2021 to January 31, 2023. The BTI assesses the transformation toward democracy and a market economy as well as the quality of governance in 137 countries. More on the BTI at https://www.bti-project.org.

Please cite as follows: Bertelsmann Stiftung, BTI 2024 Country Report — Honduras. Gütersloh: Bertelsmann Stiftung, 2024.

This work is licensed under a Creative Commons Attribution 4.0 International License.

**Contact**

Bertelsmann Stiftung
Carl-Bertelsmann-Strasse 256
33111 Gütersloh
Germany

**Sabine Donner**
Phone    +49 5241 81 81501
sabine.donner@bertelsmann-stiftung.de

**Hauke Hartmann**
Phone    +49 5241 81 81389
hauke.hartmann@bertelsmann-stiftung.de

**Sabine Steinkamp**
Phone    +49 5241 81 81507
sabine.steinkamp@bertelsmann-stiftung.de

HondurasAR000395

**Key Indicators**

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Population | M | | 10.4 | HDI | | 0.621 | GDP p.c., PPP | $ | 6741 |
| Pop. growth[1] | % p.a. | | 1.5 | HDI rank of 189 | | 137 | Gini Index | | 48.2 |
| Life expectancy | years | | 70.1 | UN Education Index | | 0.518 | Poverty[3] | % | 26.4 |
| Urban population | % | | 59.6 | Gender inequality[2] | | 0.431 | Aid per capita | $ | 60.0 |

Sources (as of December 2023): The World Bank, World Development Indicators | UNDP, Human Development Report 2021-22. Footnotes: (1) Average annual growth rate. (2) Gender Inequality Index (GII). (3) Percentage of population living on less than $3.65 a day at 2017 international prices.

# Executive Summary

While 2021 and 2022 posed significant challenges for Honduras, there are some tentative positive developments that suggest a brighter future for the country. However, it's important to note that progress remains fragile and could easily be reversed.

In terms of political transformation, the 2021 general election marked substantial progress and a shift toward renewed democracy. The presidential elections, although not without flaws, were viewed as credible and fair, and the decisive victory of the opposition candidate was accepted by the losing candidate and his party. This represented the first peaceful transfer of power since the military coup in 2009.

Xiomara Castro, elected president, ran on a platform of change and anti-corruption. Her tenure has seen notable achievements, including the extradition of her predecessor, Juan Orlando Hernández, to the United States on drug trafficking charges and the repeal of the Secrets Law, which allowed officials to conceal corrupt activities. However, she also passed an amnesty law shortly after taking office that could shield powerful figures in her party from prosecutions for corruption, raising questions about her commitment to combating it. Like her predecessors, Castro has struggled to address widespread violence within democratic norms, resorting to suspending certain rights to combat extortion affecting small businesses, which she declared a national emergency. The declaration of a state of exception at the end of 2022, which remains in effect, acknowledged an ongoing failure by the state. Despite concerns, such measures enjoy broad public support.

In the economic sphere, although the country rebounded from the effects of the COVID-19 pandemic, Honduras continues to be one of the poorest and most unequal countries in the Western Hemisphere. It has also become increasingly clear that it is on the frontline of climate change, yet ill-prepared for climate change's consequences. Consequently, the new government faces the challenging task of balancing competing demands for environmental action and economic growth that would benefit the predominantly impoverished population. Castro has faced criticism from

HondurasAR000396

environmental groups for prioritizing economic interests over environmental concerns. Additionally, she has been criticized for not doing enough to strengthen the rights of women, particularly in relation to reproductive rights, and the rights of Indigenous populations and other minorities.

Considering the political instability in various parts of the Americas, including the United States, it is uncertain whether the achievements of the past two years will remain intact. As Castro approaches the midway point of her term at the end of 2023, there is still much work to be done, and the focus may shift toward preparations for the 2025 elections.

# History and Characteristics of Transformation

Two interconnected aspects, economics and politics, have shaped Honduras's process of transformation and have evolved in complex ways over an extended period. Economically, Honduras remains one of the poorest and most unequal countries in the Western Hemisphere. However, there have been significant shifts in the macroeconomic policies pursued by successive governments. Since the end of the Cold War, the country's economic landscape has diversified, transitioning from an agriculture-based economy to one centered around manufacturing and the production of low-cost consumer goods, commonly known as maquilas. Concurrently, Honduras has increasingly engaged with the global economy and played an active role in promoting regional economic integration through the Central American Common Market and international trade agreements within the framework of the Central American Integration System (SICA).

Natural disasters, such as Hurricane Mitch in 1998, partly drove these economic changes. The substantial international aid required for reconstruction required regional and international cooperation. However, international assistance also came with demands for reform. Structural adjustment programs developed by the International Monetary Fund did not lead to more equitable economic development. In fact, socioeconomic inequalities deepened over time, often exacerbated by reforms in social service provisions and reductions in benefits, which nearly every government from President Rafael Leonardo Callejas (1991 – 1994) to President Hernández (2014 – 2022) implemented.

Politically, Honduras experienced a period of relative stability from 1982, when the first democratically elected president (Roberto Suazo Córdova) took office, until 2009, when elected President Manuel Zelaya was ousted in a military coup. The period between 2009 and 2021 witnessed a significant decline in the country's democratic quality, notably the erosion of reforms initiated in 1994 by President Carlos Roberto Reina and in 1998 by President Carlos Flores to limit the military's power. Since 2009, the military has expanded its role both economically and politically, while increasing involvement in domestic security. This process has garnered broad public support and media endorsement, often framed as addressing the severe public security

challenges the country has faced since the 1990s. Despite the military's assumption of domestic security responsibilities, the level of violence in the country has remained largely unchanged.

Since 2009, the violent suppression of opposition protests and civil society activities has increased. Journalists critical of the government routinely face threats, intimidation, arrests, injuries and even death. Honduras has become one of the most perilous countries globally for environmental activists and defenders of Indigenous and minority rights. Deliberate government policies have led to significant democratic backsliding since 2009. This was most overtly demonstrated during President Hernández's rule through the fraudulent 2017 presidential elections and the de facto termination of the Organization of American States (OAS) anti-corruption mission MACCIH (Misión de Apoyo contra la Corrupción y la Impunidad en Honduras) in 2020. The latter action effectively undermined the independence of the judiciary.

The BTI combines text analysis and numerical assessments. The score for each question is provided below its respective title. The scale ranges from 1 (worst) to 10 (best).

# Transformation Status

## I. Political Transformation

### 1 | Stateness

The monopoly on the use of force continues to be contested in the country by a variety of groups ranging from street gangs, such as the MS-13 and the 18th Street Gang, to more organized international drug trafficking groups. These groups are linked to state institutions at both the local and national levels. Criminal investigations expose them, particularly ones by the U.S. Department of Justice, which has indicted and convicted several high-profile Honduran political and economic actors of international drug trafficking, including former President Juan Orlando Hernández, who was extradited to the United States a few weeks after leaving office and is currently awaiting trial. While criminal investigations into high-profile, powerful state actors should be welcomed, the fact that most of these are undertaken by the U.S. Department of Justice, rather than the authorities in Honduras, underlines the state's weakness.

Street gangs pose a significant practical challenge to establishing a monopoly on the use of force. There has been some progress in reducing violence. The National University Violence Observatory recorded a murder rate of 41.7 for every 100,000 inhabitants in 2021. Yet, Honduras remains the deadliest country in Central America. The MS-13 and the 18th Street gangs have between 35,000 and 40,000 members, according to estimates by Insight Crime and the Association for a More Just Society (AJS), the Honduran Chapter of Transparency International.

The new president has promised to take a more holistic approach to addressing the root causes of the gangs' standing in the areas they control. However, alongside a newly created community police, she has continued to deploy military police. She also declared a state of emergency to deal with extortion and other crimes.

Violence does not equally impact all groups in society. Poor people are far more likely to be victims of violence, including violence committed by the state itself. According to Human Rights Watch, environmental activists and journalists critical of the government are especially targeted, making Honduras one of the most

Question
Score



Monopoly on the use of force

6

'06 ——————— '24   10

1

dangerous countries in the world for members of these groups. Once again, this is an issue that the new president has promised to tackle. Yet, the lack of control the state has over some regions of the country means there may be a gap between rhetoric and practical achievements.

The nation-state is recognized by the majority of the population as legitimate. However, deep mistrust continues to exist between it and significant parts of the population. In many ways, the convincing victory of Xiomara Castro in the 2021 presidential elections – so convincing that it was impossible for the losing National Party to contest it in any meaningful way – showed that there was a desire for change on the part of the majority of the population.

State identity

8



However, it will be difficult to address many of the structural inequalities and problems that exist in Honduras, at least in the short term. For instance, Indigenous people and people of African descent, in particular, continue to be systematically disadvantaged and discriminated against in education, the labor market, and access to basic social and state services. This is also reflected in the under-representation of these groups in politics, though the last elections, apart from electing the country's first female president, also resulted in more women in Congress. Now, 27% of seats are held by women, according to the Institute for Democracy and Electoral Assistance.

The structure of the new government, at least on paper, suggests increased focus on issues that have, historically, impeded the development of state identity across the country as a whole, even though there are challenges to gender equality in politics. According to the Economic Commission for Latin America and the Caribbean (ECLAC), through its Gender Equality Observatory, in Honduras only 30% of staff in government ministerial cabinets are women.

Castro has a Ministry of Transparency and Fight Against Corruption and has promised a more transparent system for appointing judges, including to the Supreme Court. She has appointed a Minister for Human Rights, Natalie Roque, a long-standing activist in this area. She has also promised more consultation with local and Indigenous communities on questions of economic development.

Whether these measures will, in the short term, succeed in diminishing the mistrust between the state and population, and therefore consolidating state identity, is open to question, particularly because Castro's control over Congress is relatively fragile and considerable vested interests are against significant structural changes in the way politics and economics in the country works.

There is no state religion, and, according to the constitution (Article 77), the Honduran state is secular. The Catholic Church is the only legally recognized church. In recent years, however, evangelical churches have attracted a growing number of followers. According to the State Department's 2021 Report on International Religious Freedom, Evangelicals now represent the country's biggest religious denomination. These groups exert considerable social influence on the population, especially in the poorer communities of the country. In terms of public security, for instance, they continue to be critical mediators between gangs and the government and often represent the only viable means for gang members to leave criminal life and return to society through engagement with, and within, the church.

Evangelical churches exercise considerable influence over government policy when it comes to certain social questions. One particular flashpoint is women's rights. The new president had promised a less conservative policy, for instance, on access to contraception. During the review period, however, she did not make any changes, meaning that even access to emergency contraception was illegal until the ban was lifted in March 2023. Many civil society activists blame the influence of religious organizations for this lack of progress. There remains a clear divergence between the constitutional provision for Honduras being a secular state and the practical influence of religious organizations, which is considerable.

Honduras's public administration suffers from serious inefficiencies and corruption. The state is strongly "corporatist" and based on a network of personal relationships that reach from the highest to lowest echelons of the state. This sustains corruption and does nothing to improve efficiency. More than half of all Hondurans claim to have witnessed corruption in their interactions with public officials between 2019 and 2021. In the population's perception, access to basic public services is either not available or depends on committing acts of corruption. The new government has promised to increase transparency in the public sector, both in relation to appointments and showing how public money is spent. Yet it remains to be seen whether, and when, these promises will be fulfilled.

In terms of law enforcement and access to justice, Honduras's security and judicial institutions are centralized, and access to these institutions in rural areas is compromised by criminal structures and the private security industry. According to the World Bank, 95.7% of Hondurans have access to a basic water source, 83.8% can access basic sanitation and 93.2% have access to electricity. Women and other vulnerable communities are most affected by the lack of access to basic services, justice and security.

The country also suffers from patchy delivery of public services, including transport, access to adequate water and sewage systems, education and training. This became apparent during the pandemic when the provision of health services was uneven, while accountability was essentially suspended by the declared state of emergency.

No interference of religious dogmas
8

'06        '24  10
9                8

                                        1

Basic administration
5

'06        '24  10

6                5

                                        1

HondurasAR000401

The state continues to have only a rudimentary presence in significant parts of the country, with the result that the provision of many essential public services cannot be guaranteed. This, in turn, fuels the mistrust that exists between the population and the state.

## 2 | Political Participation

Xiomara Castro from the Liberty and Refoundation Party (LIBRE) emerged triumphant in the 2021 general election with about 51% of the vote, becoming Honduras' first female president. Voter turnout, at around 68%, was significantly higher than in 2017, according to the Honduran Election Authority. The election resulted in a peaceful transfer of power and marks significant progress in restoring a functioning democracy, though much work remains to be done.

<div style="float:right">

Free and fair elections

7



</div>

The losing candidate, a member of the Honduran National Party (PNH), which is former President Hernández's party, made no serious attempt to challenge the election results, despite deep polarization in the country. Power was transferred peacefully for the first time since the 2009 coup. In the previous post-coup elections, in 2013 and 2017, there was strong evidence pointing to serious irregularities. In contrast, international observers, including from the European Union and the United States, confirmed the essentially fair nature of the 2021 elections. The election's credibility was partly due to the commitment of the National Electoral Council (CNE), in particular, members from the Honduran Liberal Party (PLH) and LIBRE in opposition to the incumbent PNH. The 2021 voter register was overall reliable, despite around 400,000 people failing to receive new ID cards – which were distributed between 2020 and 2021 as part of a new nationwide effort – by election day.

Still, Honduran elections continue to be marked by violence. As in every election since 2009, several candidates were assassinated before the general election. Furthermore, the campaign was, once again, marked by sometimes-extreme rhetoric about what an opposition victory would mean. Throughout the campaign period, state media consistently demonstrated bias against opposition parties and failed to provide them with equitable air time. However, fears that the electoral commission – which was full of Hernández allies – would attempt to undermine the vote proved to be largely unfounded.

HondurasAR000402

The new Honduran government continues to face old challenges, such as difficulty governing effectively in the face of deeply entrenched vested political and economic interests.

First, the state's administrative capacity is a significant constraint. The government frequently fails to implement political decisions, which also applies in terms of its geographic reach. In large parts of the country, the state's presence is rudimentary, and its ability to act is severely limited. This is illustrated by its failure to put an end to the numerous extortion rackets criminal gangs run, particularly in Tegucigalpa and San Pedro Sula. In some parts of these cities, it is impossible to run a small business without having to pay a "war tax" to street gangs, as confirmed by a 2022 InSight Crime study. The situation has become so severe that the new government imposed a state of emergency, following El Salvador's initiative, suspending many civil liberties in order to "control" this problem.

Second, the role of the military in Honduran politics is important and often decisive. Castro has to strike a difficult balance between "de-militarizing" the government and the state and keeping the military on her side, which is especially relevant since her husband, former President Manuel Zelaya, was ousted by a military coup in 2009. She named her husband's nephew, José Manuel Zelaya, defense minister. For now, this ministry has a larger budget than the Security Ministry, which includes the civil National Police. Simultaneously, Castro has to make good on her promise to reform the state, which includes the effective restoration of civil rule, to which the military is subordinate. The fact that the military is a key economic actor in the country makes this task difficult. Furthermore, the military has assumed key tasks in the public security sector. Castro promised to remove the military from the provision of public security, but due to the declared state of emergency it is still an important actor. The Military Police, created by the previous president, Juan Orlando Hernández, is still on the streets.

Similar observations hold for both religious and economic actors. For instance, Castro has been criticized for her slow progress on improving women's rights when it comes to access to abortion and tackling domestic violence. The influences of both the Catholic and Evangelical Churches are strong, restricting her ability to act. Moreover, the government's lack of a stable majority in Congress makes passing legislation subject to constant negotiations.

In the economic sphere, the new government has scrapped the self-governing "investment zones." While doing so was a key campaign promise, some economic elites have strongly criticized the move, arguing that it will deter investment and leave existing zones in a state of legal limbo.

In short, the political and economic landscape makes governance a constant challenge, creating the risk that the president will not be able to implement her political program.

Effective power to govern

4



'06          '24  10

1

Association and assembly rights are guaranteed in the constitution, which is formally widely respected and extensively used. During the Hernández Presidency, many groups – from teachers to peasants to health care workers to students – actively protested, particularly against the privatization of public services and rural economic development projects.

Yet, under the cloak of restrictions imposed to manage the COVID-19 pandemic, the state cracked down on protests with even more ferocity and violence than in previous years. Peasant and Indigenous groups, in particular, faced the almost constant threat of violence, either directly from the state or with its tacit support, especially if those groups actively opposed what the government considered economic development projects. Honduras continues to be one of the most dangerous countries on earth for environmental activists, as shown by the Annual Report of Human Rights Watch. The same goes for defenders of LGBTQ+ rights and critical journalists.

The new government has promised to improve protections for the right to association and protest. Nevertheless, due to the limited reach and capacity of the state, as well as widespread corruption, these promises have not yet led to an environment where anyone, regardless of the group to which they belong, can peacefully protest without fear of intimidation, violence or even death.

Furthermore, under the guise of combating extortion and organized crime, the current government has imposed a state of exception in parts of the country, suspending political and civil rights in the process.

The Honduran constitution formally guarantees freedom of expression. Honduras has, in terms of the number of outlets and ideological breadth, a vibrant media landscape. In practice, however, freedom of expression is not guaranteed. Journalists, particularly those investigating environmental crimes or crimes against Indigenous people, continue to be threatened and often assassinated. According to the Committee for the Protection of Journalists, since 2001, more than 90 journalists have been killed, while many others have been threatened or forced to leave the country. According to the Honduran Human Rights Commissioner, virtually none of these murders and threats ever lead to criminal prosecution or conviction.

Moreover, while there is Freedom of Information Legislation in place, according to the Human Rights Advocacy Group WOLA (Washington Office on Latin America), the law is poorly implemented, and the previous government made considerable amounts of information inaccessible, citing "national security" concerns. Therefore, in practice, access to information remains difficult.

While the restrictions on civil liberties – for instance, suspending Article 72 of the constitution guaranteeing freedom of expression – have been lifted, the new government has followed previous administrations' tradition of suspending civil liberties in the name of dealing with emergencies. This is apparent in the recent declaration of a state of emergency to address the problem of extortion. The government has effectively assumed extraordinary powers to limit the civil liberties of its citizens.

Association / assembly rights

4

'06                    '24  10



1

Freedom of expression

4

'06                    '24  10

1

**3 | Rule of Law**

The separation of powers is formally established in the Honduran constitution. In practice, enforcing this separation has always been challenging and, after the military coup in 2009, increased substantially. Successive governments actively promoted the cessation of this separation as a matter of policy. Both the Supreme Court and the Supreme Electoral Tribunal were effectively under the control of the government and no longer functioned as independent institutions. Emergencies such as natural disasters and, more significantly, the COVID-19 pandemic only added to the breakdown in the separation of powers, since declaring a state of emergency formally suspends the normal functioning of the state.

Since the new government came into power, there have been mixed messages with regards to restoring the separation of powers. On the one hand, the government has promised to reform the appointment system for Supreme Court justices with the aim of promoting transparency in the process. Plans to reconstitute internationally sponsored anti-corruption and reform commissions, for instance, for the national police, also suggest a determination to tackle deep-seated corruption that has significantly contributed to the breakdown of the separation of powers.

On the other hand, declaring a state of emergency to deal with endemic extortion suggests that the promise of restoring basic democratic norms might not be met considering the enormous pressure to "do something"' about a problem that is driving many small businesses to the edge of ruin. Similar measures in neighboring El Salvador led to soaring approval ratings for incumbent President Bukele. Under the new government, 'deal-making' with the National Congress to get legislative proposals approved has continued at pace, often with little to no transparency.

Perhaps one of the most lasting legacies of the post-coup era in Honduras is the total breakdown of judicial independence. Courts essentially became instruments to protect the ruling National Party and its political leaders, including the presidents. In packing the Supreme Court and the Electoral Tribunal with loyalists, former President Hernández succeeded in overturning the ban on presidential re-election and confirming his disputed win in the 2017 presidential election.

His successor, Castro, has made restoring political and judicial accountability one of the main planks of her presidency. She oversaw the extradition of Hernández to the United States and took steps to welcome a new UN-backed anti-corruption commission to the country, one of the main tasks of which will be to propose reforms to restore judicial independence in the face of endemic corruption. However, concrete steps toward reinstating the judiciary's and prosecutors' independence have not been implemented as of now. The pivotal test will be in 2023, when we will see if the actions align with the rhetoric regarding transparency and independence.

Separation of powers

4

'06                    '24  10



Independent judiciary

3

'06                    '24  10

Castro's commitment to transparency and judicial independence will face its most significant test in 2023, when Congress will be tasked with nominating new Supreme Court Justices and a new Attorney General. She has pledged to ensure transparency throughout this process and to uphold the independence of these newly appointed judges.

For years, there has been a concerted effort on the part of the political class in both the executive and the legislature to destroy what little remained of judicial independence and, with it, the prosecution of office abuse.

The new government came into office with the promise it would take firm action against abuses of power. As a first step, it announced the recreation of an internationally backed commission against corruption. The original, OAS-backed commission was suspended by President Hernández in 2020, after it uncovered several large-scale corruption schemes involving top-level politicians and members of the economic elite. It remains to be seen whether Castro will keep her word. Civil society groups point to recent legislative actions as setting worrying precedents. In her first six months in office, Castro's government managed to get an Amnesty Law through Congress, which, critics say, will make it much harder to prosecute public officials' abuses of power. While Castro has denied that this law is intended to shield public officials from criminal prosecution, civil society groups argue that the law can be used to prevent the prosecution of abuses of power.

Furthermore, it remains dangerous for the media to cover office abuse. According to Reporters without Borders, Honduras became more dangerous for journalists from 2021 to 2022.

Honduras is party to all major regional and international conventions on civil and human rights and has incorporated these rights into the constitution, backed by an array of laws overseen by national agencies. The existence of a codified guarantee of these rights has, however, not been sufficient to guarantee them in practice. While the new government has promised to do more to protect the civil rights of minority groups, such as Indigenous people and members of the LGBTQ+ community, in practice, violations of their rights continue. The security forces commonly violate civil rights. Legislative action and a lack of political will mean that public agents are often politically shielded from prosecution. Moreover, the private security sector is significantly under-regulated.

Freedom House, in its report on civil rights in Honduras in 2022, states that individuals and groups working in defense of the rights of Indigenous people and members of the LGBTQ+ community face significant intimidation and violence, both from the state and non-state groups defending certain economic interests. So do environmentalists. The Intern-American Commission on Human Rights cataloged the murder of at least 75 human rights defenders between 2014 and the end of 2021. Over two dozen defenders of LGBTQ+ rights were killed in 2021 alone. According to the

Prosecution of
office abuse

3

'06 ——————— '24  10



Civil rights

4

'06 ——————— '24  10

Honduran Center for LGBTI Development and Cooperation (CDC), sexual minority groups continue to face systematic discrimination in the job market, access to social services and justice. Most crimes against members of this community go unpunished.

### 4 | Stability of Democratic Institutions

The performance of democratic institutions in Honduras continues to raise serious concern. Since the 2009 coup, there has been a deliberate attempt to destroy mechanisms of oversight and control. The new government has pledged to restore these mechanisms. For instance, it pledged to reconstitute an anti-corruption mission under international supervision to continue the work of the Mission to Support the Fight Against Corruption and Impunity in Honduras (MACCIH), which the previous administration disbanded. The new president also pledged to reform the judicial appointment system, particularly for the Supreme Court, to make the system more transparent and restore the independence of the judiciary. Whether this will occur in practice remains to be seen.

Notably, the new government has not reversed some of the reforms introduced by its predecessor. For instance, some of the changes Congress approved to the country's criminal court, which hinder the investigation of large-scale criminal groups, continue to be in force, although others have been reversed. Similarly, the decision in December 2022 to impose a state of emergency to address endemic extortion of businesses by criminal gangs has suspended some accountability mechanisms, especially with regards to the police.

Independent of the current government, one key area of progress is the strengthening of the electoral process and the institutions overseeing it. Both the National Electoral Council and Electoral Justice Court, created in 2018/19 and operational in the 2021 elections, helped to restore some level of trust in the fairness of national elections. Observers consider them one of the key reasons for the relatively peaceful, transparent nature of the electoral process, as well as acceptance of the electoral results.

The key actors in Honduras – whether political or economic elites or churches – are formally committed to democratic institutions and their functioning. Restoring a functioning democracy was a key plank in the new government's election campaign. In this respect, it is noteworthy that the new president was elected based on her appeal to a broad electoral coalition and with the support of other parties that are not traditional allies of the president's party, LIBRE. However, some actions since then have raised concerns about this public commitment to restoring democracy.

The decision to impose a state of exception in the country to deal with extortion is, at best, an admission of the state's weakness in the face of organized criminal actors. At worst, it represents a return to the authoritarianism that has been the hallmark of



Performance of democratic institutions

4



Commitment to democratic institutions

4

Honduran politics for many years. These tactics are evidenced in neighboring countries, such as El Salvador, where cracking down on criminal actors is hugely popular with the public even when it undermines democratic institutions.

Furthermore, the president's relations with Congress are often tense and have been since she assumed office. Thus, democratic institutions are often seen as transactional or even expendable when they do not serve particular political objectives.

### 5 | Political and Social Integration

The party system in Honduras has undergone major changes, which were confirmed and accelerated by the 2021 elections. One notable shift is the ongoing decline of the two long-standing parties, the PNH and PLH, which have historically maintained their influence through clientelist practices and patronage. The PNH not only lost the presidency but also relinquished its position as the largest party in Congress, experiencing a loss of 17 seats and securing only 44 out of 128 seats. Simultaneously, the PLH's decline persisted, as it came in third in the presidential election with just 10% of the vote and lost five congressional seats, leaving it with only 22.

The 2021 elections also confirmed LIBRE's ascent as a major political force, clinching victory in both the presidential and congressional races. However, it might be premature to label this as a definitive, enduring shift for two main reasons. First, at the presidential level, the opposition coalesced around a single candidate, enabling Castro to capture the majority of anti-National Party votes. The sustainability of this electoral coalition in 2025, when LIBRE will be the incumbent party, remains uncertain. Second, at the congressional level, LIBRE is not a cohesive ideological bloc, and internal tensions have complicated Castro's relationship with Congress.

While it is evident that the party system has evolved in recent years, it is too early to conclude that it has stabilized. Further fluctuations in the political landscape are possible. Moreover, internal divisions persist, particularly within the LIBRE party, contributing to challenges and fractures in the relationship between the government and Congress. The polarization of left-wing and right-wing rhetoric, a relatively new phenomenon in Honduras, is intensifying. Additionally, conflicts within the party coalition resulted in a rupture when selecting the president of Congress in January 2022.

Honduras has a vibrant and active third sector. Prior to the 2021 elections, interest groups – particularly human rights groups, environmental groups and students – were key actors in protests against government policy and corruption.

Yet, there is still a considerable discrepancy between the degree of representation of interest groups and their ability to work freely. So, while groups defending the environment, for instance, have gained some prominence (albeit still under the threat of violence from entrenched economic interests), other groups continue to face

Party system

5



Interest groups

5



enormous difficulties. The government has been criticized for not moving fast enough on many of its promises regarding improving rights for minority groups, such as women and sexual minorities. Often, the government is caught between the demands of these interest groups and traditional actors, such as economic elites, which have significant representation in Congress and considerable influence over the government. While there has been steady progress in implementing some of the electoral promises made to interest groups, the government runs the risk of not fulfilling civil society's expectations, which may have been unrealistic.

According to Latinobarómetro 2021, all social indicators in Latin America have worsened in the last couple of years, including in Honduras. The COVID-19 pandemic negatively affected social conditions in Honduras considerably, as have several severe weather events since 2020. This had led to a steady erosion of trust in democracy and its institutions. According to the Latinobarómetro 2021 report, only 30.1% of Hondurans prefer democracy to any other kind of government, the lowest approval rate in the region. The regional average is 49%.



Approval of democracy

4

There were also two positive developments: First, in 2019, Congress approved a new electoral law that incorporated several reforms, including improvements to the voter registration process and new oversight bodies. Second, voter turnout in the 2021 elections was considerably higher than in previous elections. At just over 69%, turnout was almost 12% higher than for the 2017 elections. This suggests both a desire for change and increased trust in the electoral process, which is critical to the consolidation of democracy. It is thus possible that approval of democracy may be increasing, though it is too early to tell. It would be wise to wait for confirmation of this trend during the next elections.

It is important to note that some actions the government has taken – such as imposing a state of exception to deal with organized crime – are undemocratic yet enjoy a high level of public support. This suggests that support for democracy includes the rather narrow definition of holding regular elections but not the broad, normative definition, at least when it comes to questions of personal security.

Honduran society continues to grapple with stark disparities, whether they are economic, social or political in nature. These disparities have eroded trust between the populace and the government over several decades. Consequently, exacerbated by the impacts of the COVID-19 pandemic and severe weather events since 2020, civil society organizations have stepped in to assume significant roles in addressing the pressing needs of the population, especially at the local level and in underserved communities. Their efforts have encompassed providing essential food and clean drinking water, as well as offering emergency assistance to individuals unable to work due to the pandemic. In these specific communities, there exists a robust bond among citizens characterized by a sense of solidarity.



Social capital

5

However, when we look at interactions between different communities, such as impoverished neighborhoods and middle- to upper-class districts, the dynamic often revolves around a provider-consumer relationship. A large portion of the less affluent population engages in informal employment, frequently serving the wealthier communities, as outlined by the International Labour Organization (ILO). This arrangement created significant social tensions during the pandemic, particularly when lockdown measures disrupted these informal relationships in many instances.

According to the 2021 Latinobarómetro survey, 15% of Hondurans expressed trust in the majority of people, surpassing the regional average of 12%. Nevertheless, this represented only a marginal 1% improvement from the 2018 Latinobarómetro edition.

## II. Economic Transformation

### 6 | Level of Socioeconomic Development

Honduras remains one of the poorest and most unequal countries in the Western Hemisphere, with a Human Development Index (HDI) score of 0.621 in 2021 (down from 0.632 in 2019) and a global rank of 137, a ranking that has improved little over the past decade.

Inequality in Honduras is deeply entrenched and systemic, affecting all aspects of society. This has had a significant impact on a substantial portion of the population, especially those who work in the informal economy, which has made them vulnerable to economic and social challenges during the pandemic. There are some signs of socioeconomic progress in recent years, although this is usually measured against the exceptionally challenging year of 2020 during the pandemic. In 2019, Honduras had a Gini index of 48.2, indicating high income inequality. The overall loss in HDI due to inequality was 22.9%, placing Honduras only ahead of Brazil (23.6%), Guatemala (26.6%) and Haiti (38.9%) among Latin American and Caribbean countries.

While GDP rebounded to pre-pandemic levels, with the economy growing by 12.5% in 2021, according to the World Bank, the persistence of extreme poverty is concerning. Approximately 48% of the population continues to live in poverty, with 22.9% in extreme poverty. More worrisome are certain trends that suggest structural inequality is worsening over the long term. For example, USAID data reveals that, even before the pandemic, 35% of adolescents in Honduras were not enrolled in secondary education, making it the worst-performing country in the region in this regard.

Question
Score

Socioeconomic
barriers

3

'06                    '24   10



Historically, Indigenous people and women have experienced systemic discrimination, facing a higher likelihood of living in poverty and being unemployed. Women in Honduras earn only around 65 cents for every dollar men earn, according to Oxfam. The Gender Equality Index has remained virtually unchanged since 2014, with Honduras at 0.431 in 2021.

| Economic indicators | | 2019 | 2020 | 2021 | 2022 |
|---|---|---|---|---|---|
| GDP | $ M | 25089.9 | 23827.9 | 28488.7 | **31717.7** |
| GDP growth | % | 2.7 | -9.0 | 12.5 | **4.0** |
| Inflation (CPI) | % | 4.4 | 3.5 | 4.5 | **9.1** |
| Unemployment | % | 5.6 | 10.7 | 7.9 | **7.1** |
| Foreign direct investment | % of GDP | 3.8 | 1.0 | 2.8 | **3.4** |
| Export growth | % | 2.4 | -20.8 | 21.5 | **5.8** |
| Import growth | % | -2.4 | -18.5 | 33.0 | **4.8** |
| Current account balance | $ M | -660.9 | 665.9 | -1317.5 | **-1015.0** |
| Public debt | % of GDP | 43.8 | 51.7 | 49.8 | **49.1** |
| External debt | $ M | 9744.8 | 11025.5 | 11850.1 | **-** |
| Total debt service | $ M | 891.0 | 1523.1 | 1180.1 | **-** |
| Net lending/borrowing | % of GDP | - | -4.4 | - | **-** |
| Tax revenue | % of GDP | - | 14.8 | - | **-** |
| Government consumption | % of GDP | 13.5 | 15.0 | 14.6 | **14.2** |
| Public education spending | % of GDP | 5.9 | 6.0 | 5.8 | **5.4** |
| Public health spending | % of GDP | 2.9 | 3.4 | 3.4 | **-** |
| R&D expenditure | % of GDP | 0.1 | - | - | **-** |
| Military expenditure | % of GDP | 1.6 | 1.5 | 1.5 | **1.5** |

Sources (as of December 2023): The World Bank, World Development Indicators | International Monetary Fund (IMF), World Economic Outlook | Stockholm International Peace Research Institute (SIPRI), Military Expenditure Database.

**7 | Organization of the Market and Competition**

Honduras has a functioning market economy that, on paper, is relatively well organized and provides a legal and institutional framework for fair competition and the protection of the consumer.

Yet, the country continues to face huge obstacles in developing a market economy that includes the majority of its citizens. Inequality is stark – the worst in Latin America, according to the most recent data from Oxfam – and endemic corruption leads to market distortion and the development of deeply entrenched criminal structures, particularly in public procurement. According to the Global Initiative against Transnational Organized Crime 2021 report, the distinction between the state and criminal organizations is somewhere between hazy and nonexistent. This, in turn, distorts the functioning of the market and complicates foreign investment. So, while there is no formal impediment to foreign ownership, in practical terms, the criminal structures that infiltrate the market economy make foreign ownership very risky.

One key challenge for the country is to expand its formal economy. Recent data is unavailable. In 2021, the International Labor Organization (ILO) noted that self-employment and informal employment accounted for 56.5% of total employment in Honduras and is characterized by low wages and high instability, a situation that the pandemic exacerbated. Part of the problem is the extremely complicated procedure for opening a business in Honduras. Not only is the process extremely bureaucratic and open to corruption, but the country also continues to confront serious logistical challenges, for instance, in transport and energy. These structural challenges have worsened due to climate disasters in recent years. Overall, the key challenge in Honduras to the smooth functioning of its market is the lack of certainty and predictability. High risk translates into high costs that deter investment.

The competition policy in Honduras follows a pattern familiar in virtually all areas of its regulatory policy: On paper, the country has a relatively well-defined framework that allows for fair economic competition. Key to this framework is the Comisión para la Defensa y Promoción de la Competencia (CDPC), whose main responsibilities are application of the law as it relates to regulating market competition and advocacy for creating a competitive market environment. The CDPC also represents Honduras in the International Competition Network, an informal grouping of competition authorities devoted to improving competition law and its enforcement.

However, two issues impact the functioning of this framework, one structural and one political. Structurally, the country suffers from poor enforcement of the framework's laws and rules. In its 2021 Investment Climate Statement, the U.S. Department of State bemoaned the "unreliable and expensive electricity, corruption, unpredictable tax application and enforcement, high crime, low education levels, and poor infrastructure," all of which prove disincentives to investment.



Market organization

5

'06          '24   10



Competition policy

6

'06          '24   10

Politically, the change in government has brought some uncertainty about the overall direction of competition policy. While the previous government was very proactive in liberalizing competition policy – including in the delivery of public services – the new government has abandoned plans to privatize public services and special investment zones. This has led to tensions with Honduran economic elites and the United States. Domestically, however, these policies have considerable public support. Plans to privatize parts of the health and education system were one of the key causes of a wave of protests against the previous government of President Hernández in 2019 and 2020.

It is unclear whether Castro is politically strong enough to follow through on all her promises to roll back neoliberal economic policies. Some of her early actions suggest that political realities may temper her commitment. For instance, while Castro promised to repeal laws that enshrined impunity for some forms of corruption, she has not gone as far as organizations fighting for more transparency would have liked. For instance, legislation Congress passed in 2019 and 2020 that made it harder to investigate allegations of corruption is still on the books.

Honduras became a member of the WTO in 1995, signifying its relatively open economy. However, as per the 2022 Index of Economic Freedom, there was a slight decrease in the economy's openness compared to 2020. While the same report indicates that the country has improved its regulatory efficiency, thus promoting foreign direct investment, the overall measure of 'trade freedom' experienced a minor decline, primarily due to measures implemented in response to the COVID-19 pandemic.

Liberalization of foreign trade

8



The United States remains the primary market for Honduran exports, although the proportion of total exports going to the United States has decreased to less than half, according to data from the OEC Trade Consultancy. Meanwhile, Honduras, as a member of the Central American Integration System (SICA), actively pursues trade liberalization agreements. Examples include the agreement with the European Union signed in 2012 and the agreement with the United Kingdom in January 2021. Textiles comprise the majority of Honduras' exports, accounting for 40% of total exports, followed by agricultural products.

There have been concerns, notably from United States authorities, regarding what is perceived as a reversal in trade liberalization by the new government, with the discontinuation of special investment zones cited as one example. The government, however, argues that such initiatives are rooted in workers' rights and do not reflect a shift toward a more protectionist economic and competition policy. Non-tariff barriers (NTBs) have not seen an increase, and the average Most-favored nation (MFN) tariff applied in 2021 remained stable at 5.8%, according to data from the WTO.

The Honduran banking system continued to be relatively stable during the COVID-19 pandemic and the economic challenges it brought. According to the World Bank, the bank capital to assets ratio declined from 11.2 in 2019 to 10.4 in 2021, a reflection of the pandemic, but a sign of stability overall. The percentage of non-performing loans held by banks in the country crept up only slightly to 2.7%, compared to pre-pandemic figures. In its 2021 review, the IMF commended Honduras for continuing to improve the resilience of the banking sector by implementing internationally agreed safeguards, creating "strong buffers" against a possible banking crisis, including through increased transparency of financial activity.



Banking system

7

The new government has pledged to promote the financial inclusion of all segments of the population. To this end, the Banking and Insurance Commission (CNBS) has been given key new regulatory tasks, such as administering the opening and supervision of basic savings accounts. Institutions such as the World Bank and the IMF see the CNBS' continued supervision of providers of financial services as an example of good governance.

## 8 | Monetary and fiscal stability

The economic crisis the COVID-19 pandemic caused made maintaining monetary stability harder for a government that has made the maintenance of monetary, and fiscal, stability its overriding policy goal in order to attract external investment.



Monetary stability

7

Overall, the country emerged from the pandemic in a relatively stable position. Inflation in 2021, after the end of lockdown, was 4.5%, only slightly above the rate in 2019, the last year before the pandemic. However, the country closed 2022 with 9.8% inflation. This is not just a result of the pandemic but of a series of natural disasters that have befallen Honduras since the end of 2019, which coincided with the pandemic. In 2021, the IMF provided $125.8 million to help Honduras meet its fiscal needs. The IMF states that Honduras needs to undertake further reforms to its monetary policy regime, including strengthening the political and operational independence of the central bank, objectives that the new government has not questioned. Control of inflation will continue to be the main policy objective going forward. However, due to the largely informal nature of the economy, monetary instruments for inflation control have limited utility in Honduras.

Another central plank of reforms the IMF proposed – restructuring the public sector – has not been embraced, however. The new government has not committed itself to further privatizations, and any reversal on this would create significant political difficulties and most likely lead to public protests and social instability.

The central bank continues to use the Electronic Foreign Exchange Trading System mechanism to adjust exchange rates. The exchange rate has remained generally stable, despite the challenges the pandemic and change of government posed.

According to ECLAC, the real effective exchange rate index (2015=100) hovered around 100 in the 2010s, showing a slight appreciation from 2020 to 2022 (96.9, 94.4 and 94.5, respectively).

The maintenance of fiscal stability has been an overriding policy objective for successive Honduran governments, reaffirmed as part of the country's loan agreement with the IMF in 2019, which committed Honduras to further fiscal consolidation, for instance, through the cutting of public expenditures and privatization of public services.

Fiscal stability
6



Two factors have undermined this objective: First, the COVID-19 pandemic required public expenditures, especially in light of the natural disasters that occurred beginning at the end of 2019. These twin crises made millions of people dependent on the state for their very survival. The second factor is the macroeconomic orientation of the new government. Here, signals are sometimes contradictory. While, for instance, the new president has signaled she will increase public spending, she has actively engaged with the IMF to seek a new debt deal and reduce debt payments. At the same time, she has publicly opposed tax increases. It is not yet clear which direction the government will ultimately choose.

COVID-19, natural disasters and the fallout from Russia's full-scale invasion of Ukraine have severely reduced the room for maneuver in terms of fiscal policy. In 2020, public debt shot up to 52.4% of GDP, almost 10 percentage points higher than in 2019. It has fallen back slightly since (50.2% in 2021). The cost of debt servicing almost doubled between 2019 and 2020. The current account balance also moved from a surplus of $666 million (2020) to a deficit of $1.3 billion in 2021 and $1.0 billion in 2022.

Even so, Castro inherited an economy that rebounded strongly from the nadir of the pandemic in 2020, which will bring in higher tax revenues, even accounting for the large informal sector. Critically, remittances to Honduras from abroad have also rebounded, almost doubling from their 2020 low point, which will stimulate domestic consumption. Despite these positive signs, the overall fiscal environment remains uncertain.

**9 | Private Property**

Honduras has a consolidated body of laws addressing property rights. However, there is a discrepancy between the existence of these rights on paper and their application and enforcement in practice, which are unsatisfactory. This weakness is linked both to the administrative capacity of the state and to the country's pervasive inequality. The overall inefficiency of the justice system, which is not only not accessible to all but is likewise characterized by corruption and chronic delay, is also a major obstacle. Disputes over property rights take, on average, a little over two and a half years to resolve, though it is likely that this has worsened as a result of the pandemic (more recent data is not yet available). Significant sections of the population cannot afford to defend their property rights through official judicial channels.

There are six steps to registering private property in Honduras. The national property register is administered centrally by the Tegucigalpa Chamber of Commerce and Industry. However, the system continues to suffer from structural weaknesses, which means that, for many, property rights cannot be guaranteed. Research by Transparency International found that it can take up to six years for a property to be legalized when, officially, it should take six months.

In poor areas, in particular, parallel property markets continue to exist, controlled by gangs and other criminal groups. At the same time, in rural areas, land conflicts between peasants and companies continue, with the government accused of not fulfilling its promises to reform land ownership in these regions.

Successive Honduran governments have promoted private enterprise as an engine for economic growth. Thus, legally, the protection of private enterprise and the rules according to which it must operate are well established. Yet, three problems continue to hamper the performance of the private sector. First, the privatization of public services has given rise to enormous corruption scandals and been fiercely resisted by a majority of the public. Second, the state has huge problems guaranteeing the application of laws to protect private businesses so they can operate smoothly. The presence of the state is frequently not strong enough to guarantee property rights. Corruption also eats away at the state's ability and capacity to protect private property. Third, and related, small businesses in particular are subject to almost constant threats from criminal gangs. Extortion is endemic, especially in and around urban centers. This problem has reached such proportions that the new government declared a state of emergency, giving the state and the police, in particular, extraordinary powers to deal with what the state describes as a threat to both the economic well-being and security of the population at large and especially to small business owners.

While the new government has not proposed changing its focus on the private sector to generate wealth, there has been a noticeable shift, at least rhetorically, as to what this means in practice. Protection of the environment has been elevated as a



Property rights

6

'06 — '24   10

Private enterprise

7

'06 — '24   10

government policy objective, if necessary, at the expense of mega-infrastructure projects that were the hallmark of its predecessor. Such projects, according to new government guidelines, will only proceed with the consent and active participation of the local communities most directly affected by them.

### 10 | Welfare Regime

A rather rudimentary welfare system funded through general taxation covers individuals engaged in formal employment. The system primarily offers pensions, albeit very modest ones, along with some limited sick leave and incapacity benefits. Distinct welfare structures exist for public and private sector employees. In the public sector, institutions such as the Institute of Retirement and Pensions for government workers and civil servants of the executive branch (INJUPEMP) and the Institute of Teachers Welfare (INPREMA) manage benefits like pensions and sick pay. Because employment in these sectors is formal, the system generally functions reasonably well, though there have been several reforms in the last 15 years, including increased employee contributions.

Social safety nets

4

'06          '24  10



1

Conversely, in the private sector, most plans receive contributions from both employers and employees, with specific details contingent on the chosen pension plan. However, due to the prevalence of informal employment in Honduras, a large segment of the population is outside the state's safety net. Informality is a particularly acute issue for women and those working in the agricultural sector.

The health care system has encountered substantial challenges in recent years, exacerbated by the pandemic. These difficulties arose following a prolonged period of austerity, during which health care spending declined from 9% of GDP in 2009 (the year of the military coup) to slightly under 7% in 2019, according to the World Bank. Additionally, similar to many other public services in the country, corruption has weakened the health care and social security systems. Widespread protests against this corruption and the resulting deterioration in service quality played a pivotal role in the defeat of the National Party (PNH) in the 2021 elections.

The new government has pledged to boost investment in the general welfare system, including social protection for women engaged in informal employment. Nevertheless, the fiscal capacity for significant reforms or a substantial increase in spending on such services is exceedingly limited.

Honduras has a reasonably well-developed legal framework for guaranteeing equal rights. These include passing important legislation, including the Law on Equal Opportunities and requirements for a minimum 30% participation of women in all popularly elected institutions. Yet, achieving equal opportunities in practice remains a distant dream for many groups in Honduran society, from women to Indigenous people to sexual minorities. It is, therefore, a notable fact that Honduras elected its first female president in 2021. She has promised to change the penal code to increase sentences for crimes against women and other hate crimes. Equally, female representation in Congress has steadily crept upward, reaching 27% in the 2021 elections, according to data from Honduras' National Congress.

As has been the case for many years, girls continue to stay in school longer than boys, representing the majority of pupils in secondary education. They also have a slightly higher literacy rate than boys. Despite higher educational attainment, however, women still face enormous difficulties entering the formal labor market, with only 35.4% of women in employment in 2021, according to the World Bank. More worryingly, this represents a drop of over 3% since 2018, which did not increase when COVID-19 restrictions ended.

The Indigenous population likewise suffers from a lack of equal opportunity. The new government has promised action to clamp down on discriminatory practices and to protect Indigenous land from economic exploitation, such as mining. However, civil society representatives have protested fiercely that little has been done to stop the destruction of Indigenous land. Furthermore, as has historically been the case, violence against this population is commonplace and continues to go largely unpunished. The same can be said about the LGBTQ+ community. According to the 2022 Human Rights Watch Report, Honduras remains one of the most dangerous countries in the world for sexual minorities. Both the state and other groups, such as street gangs, commit violent acts against members of the LGBTQ+ community, which virtually never lead to criminal prosecution, less so convictions.

## 11 | Economic Performance

Honduras was hard hit by the COVID-19 pandemic and simultaneous devastating natural disasters. Since a significant part of the country's economy is informal, the impact, particularly on the poorest members of society, was severe. GDP overall, as well as per capita, fell; unemployment rose from 5.7% in 2019 to about 8.5% in 2021, and FDI almost collapsed from 6.0% of GDP (2018) to 1.0% in 2020.

However, the country bounced back strongly from the pandemic once the state of emergency and social restrictions were lifted. In 2021, GDP per capita, at $6,253, had surpassed its pre-pandemic level. After a 9% drop in 2020, total GDP grew by 12.5% in 2021, according to the World Bank. The IMF expects growth of 3.5% for 2023. With this increased economic activity and an associated growth in tax revenues, it was possible to reduce overall public debt to just over 50% of GDP in 2022.



Equal opportunity
4

'06            '24  10

4

1



Output strength
6

'06            '24  10

1

Significant challenges still remain. The first is to incorporate more people into the formal labor market, which would significantly increase revenues, increase domestic consumption and provide more people with far more material security. Second, while the growth in GDP per capita is welcome, this has not overcome structural inequality. A return to pre-pandemic levels is a return to a less-than-perfect place. Prior to the pandemic, GDP per capita growth had been anemic for several years. In order to address these challenges, the economic base needs to broaden both domestically and internationally. Also noteworthy in this respect is inflation. While it remained relatively stable during the pandemic, closing 2020 at 3.5%, according to the World Bank, it has since increased, with the Honduran central bank expecting to end 2022 with 10.3% inflation.

## 12 | Sustainability

Under the previous government, Honduras pursued an environmental policy that put economic development clearly ahead of environmental concerns. Mining developments on Indigenous lands and tropical forests were common, as were many other mega-infrastructure projects like dams. This often led to tensions with, and violence against, local communities that were implacably opposed to such megaprojects. These conflicts often culminated in the murders of prominent rights activists, Honduras having been, for many years, one of the most dangerous countries in the world for environmental activities, according to reports by Human Rights Watch, among other organizations.



Environmental
policy
3
'06            '24  10

4                2
                 1

While President Castro promised an economic development policy that is more sustainable and environmentally friendly than her predecessors with close consultation with affected communities, she has been accused of favoring economic interests at the expense of the environment. Examples include the continuation of controversial mining projects and a supposedly temporary subsidy and tax relief for diesel fuel, introduced in 2022. According to the U.S. State Department, the government has not established concrete policies to reach a net-zero emissions goal by 2050 and to mitigate greenhouse gases. Sectoral studies have, however, been undertaken in collaboration with the United Nations to determine nationally determined contributions, and recommendations were made to limit greenhouse gases. In 2022, the Castro Administration established an Environmental Cabinet comprised of the Ministries of Environment, Forestry, Agriculture, Energy, Economic Development and Finance and the Protected Areas and Wildlife Institute to coordinate interagency efforts to address climate change, conservation of biodiversity and forestry management. Steps were also taken to implement climate-related policies, including a National Adaption and Climate Strategy and a Biodiversity Strategy. Still, the government has not implemented public procurement policies that take into consideration resource efficacy, climate resilience and pollution reduction.

HondurasAR000419

Education expenditure has been low. According to the World Bank, during and since the pandemic, the country has not reached the level of expenditure, which, at its height in 2014, was 7.1% of GDP. Education policy has historically represented a challenge for Honduras. In the U.N. Education Index, Honduras ranked 96th out of 134 BTI countries and scored 0.518, the third lowest in the region, only ahead of Guatemala and Haiti. While the country has a good record of enrolling children in primary education (96.53%, according to a recent report by USAID) and literacy rates have remained stable (88.5% in 2019), drop-out rates continue to be high once children enter secondary education, particularly among boys. According to the same report, 700,000 children up to 17 years of age are outside formal education, considerably higher than in 2019, the last year before the pandemic, when 577,841 children did not receive a formal education. While this problem is not new, the pandemic brought it into sharp focus when in-person teaching was suspended. There are concerns about the long-term effects of this interruption in education, particularly for people living in slums or rural areas without access or with only intermittent access to the internet.

Structural problems in education also have an impact on R&D. The country does not produce enough highly qualified people with higher education degrees; nor does it invest sufficiently in research and development. According to the Global Innovation Index 2022, Honduras ranks 113th out of 132 countries in terms of innovation capacity, continuing a downward trend since before the pandemic. As in previous years, a lack of available, reliable data makes assessing this area of public policy extremely difficult. For instance, the most recent data on R&D available from the World Bank dates from 2017.

Education policy / R&D



# Governance

## I. Level of Difficulty

Honduras continues to be hampered by a number of deeply entrenched, persistent structural difficulties, all of which the pandemic and recent natural disasters have exacerbated. So long as these structural constraints persist, the country will not be able to fulfill its potential, which is considerable, bearing in mind its favorable geographic position.

To begin with, Honduras suffers from deficient infrastructure. The recent natural disasters have, once again, revealed a lack of resilience when it comes to the provision of water, energy, etc. Millions of people are not connected to official networks and rely on precarious "wildcat" connections. Even the official network is not able to withstand severe weather events. It is not uncommon for the country's main business hub, San Pedro Sula, to have no electricity. Without concerted, continuous action, this vulnerability is likely to persist and even worsen, as Honduras is one of the countries most vulnerable to the effects of climate change, according to a series of reports by the United Nations and other organizations.

A consistent lack of long-term planning on the part of the government has been cited as a persistent problem. This is exacerbated by the structure of the country's economy, which is extremely vulnerable to external shocks, such as a downturn in commodity prices or the decline of demand from the United States, for instance, for manufactured textile products. The country continues to be exposed to factors beyond its direct, immediate control, though the importance of the United States as a market for Honduran exports has declined somewhat over the last few years.

The second key difficulty in Honduras is the general level of insecurity, along with high levels of violence. While the level of violent crime has remained below the peak of 2014, there was an uptick in the homicide rate between 2020 and 2021, reversing a downward trend that had lasted several years. In 2021, the homicide rate was 38.6 per 100,000 people, making Honduras, once again, the most violent country in Central America.

Furthermore, highly organized crime groups, which often have deep connections to state agencies, challenge governance capacity. Sophisticated criminal structures, endemic corruption and highly effective extortion networks all continue to hollow out the state and make long-term planning, strategic decision-making and decisions



Structural
constraints

7

'06        '24    10

6  7

1

about investment more difficult than would otherwise be the case. A good example of these problems is Comayagua International Airport. The country's new main international airport was both much needed and plagued by the corruption allegations common in Honduran public-private partnership projects, involving businessman Lenir Pérez and the government of former President Hernández.

Honduras has a long tradition of an active civil society in many issue areas, with the environment and civil rights receiving particular attention since the military coup of 2009. Yet, civil society groups have not always acted cordially among themselves, for instance, over the question whether and to what extent they should work with or against the government to effect change. This has led to internal divisions and subsequent losses in political effectiveness and influence. This split is, among other factors, the result of different experiences of the consequences of activism. There is general suspicion of the state, borne out by years of experience of interacting with it. Thus, many groups define themselves primarily in opposition to it, reinforcing the deep mistrust that exists between the population and the state.

Civil society is vibrant and visible, but quite diffuse. Its degree of organization continues to be generally weak.

Honduras faces an apparently contradictory situation: on the one hand, there is no risk of conflict with any of its neighbors. On the other hand, the country continues to suffer from endemic levels of interpersonal violence and the presence of criminal groups from the local to the international level, which the state seems unable to confront in an effective and sustainable manner.

The last couple of years have seen another increase in homicides, according to the National Violence Observatory. The exact reasons for this are a matter of intense debate. On the one hand, they indicate the state's confrontational approach to gangs. On the other hand, increasing numbers of homicides have historically emerged from territorial disputes between rival gangs and other criminal groups and/or the splintering of existing groups into rival factions. Civilians are frequently caught in the crossfire of violent confrontations or become the victims of attempts by one group or another to establish control over a given area. The country also suffers from numerous conflicts between landless peasants and landowners in rural areas, including recent conflicts in Bajo Aguán. Human rights organizations routinely call attention to the human rights abuses of peasants there. Targeted assassinations of environmental campaigners are common.

While the new government has promised a more holistic approach to fighting violent crime, iron-fist policies remain very popular among the general public and therefore politically difficult to reverse.



Civil society traditions

6

'06          '24 10

1

Conflict intensity

6

'06          '24 10

1

On a positive note, there are tentative signs that one key driver of conflict in the country has lost potency. While there was some violence during the 2021 elections, a peaceful transition of power took place. With a broad coalition backing Castro during the elections and her clear victory confirmed by the electoral body, the likelihood of challenging the results, and thus post-election conflicts and violence, were significantly diminished. It is, however, unclear whether the broad coalition supporting the president and her government is sustainable over the long term and thus whether the current lull in political violence will endure.

## II. Governance Performance

### 14 | Steering Capability

Honduras has undergone a fundamental shift in political priorities over the last two years. The previous government of President Hernández had two consistent policy priorities: economic liberalization and an iron-fist public security policy, which were pursued at almost any price. While the iron-fist security policy received broad public support, economic liberalization and mega-infrastructure projects encountered fierce opposition, which the government ignored.

President Castro's government came to power under a banner of change, which included both what was done and how. In terms of what, the government promised to intensify its fight against corruption, pursue economic growth in the context of environmental sustainability, and promote and protect women's and minority rights. In terms of how, the new government promised to engage far more with the communities and groups most directly impacted by its policies.

Winning a "change" election after 12 years of one-party rule, the current government faces the problem of sky-high expectations in almost every sphere of public policy, the economy, public services and the fight against corruption. These expectations are pressing in a post-pandemic context, where needs are enormous yet the room for political and fiscal maneuvering is tiny. The government thus has an urgent need to prioritize, but doing so inevitably leads to tensions and disappointment. The emergence of these tensions was already apparent during the first year of Castro's government. Due to the volatility of Congress and the consequences of the pandemic and severe weather events, the government has focused mainly on economic recovery. The issues of rights and environmental protection, by contrast, have not received as much attention as many government supporters might have hoped. Some environmental activists and women's rights groups have publicly voiced their disappointment with what they regard as slow progress on these issues.



Question
Score

Prioritization
5

One key issue is the poor central coordination of policy across the administration. The OECD's review of Honduras states that policy coordination is weak and many initiatives are poorly planned, poorly executed and overlapping. The creation of the Secretariat of Strategic Planning improved things somewhat, but the government still lacks a clear multi-year planning framework, as well as a clear timetable for implementing initiatives. Organizations such as Transparency International have also noted that the lack of transparency in government action and finances impedes delivery.

Honduras continues to suffer from significant difficulties implementing agreed-upon policies and initiatives. It lacks the administrative capacity to implement policies consistently across time and space. In fact, in many regions – both rural and parts of some of the bigger cities – the state essentially has no physical presence, making policy implementation impossible, a situation that worsened as a result of the COVID-19 pandemic.

Implementation

3

'06 _____ '24 10



With the pandemic, the government has been in almost permanent crisis mode, worsened still by the fact that ex-President Hernández spent his last year in office (2021) focusing almost entirely on his political survival. The new government has also found it difficult to engage in strategic thinking. It is too often swayed by public opinion, such as when it declared a state of emergency to deal with organized crime or failed to create the promised Community Police and instead strengthened the role of the military police.

Policy learning in Honduras has consistently been weak, influenced by both social and political factors. Socially, a significant portion of the population has historically lived in poverty, and a succession of highly authoritarian governments discouraged long-term thinking and planning. Politically, the primary objective of any government, as well as the state as a whole, has been the preservation of the existing power structure rather than the pursuit of long-term and strategic change. As a result, policy learning has not been incentivized in a culture that predominantly prioritizes short-term gains. These trends intensified during the final years of the previous government, which grew increasingly authoritarian. Decision-making became highly centralized around a president whose primary focus was self-preservation and maintaining control.

Policy learning

5

'06 _____ '24 10



The Castro government has promised to be more engaged with civil society and those on the ground directly impacted by its policies. There has been more consultation with communities impacted by economic development initiatives. However, many civil society groups have complained that their data are ignored in favor of vested interests, whether in economic development or women's rights. The composition of the government is more representative of the county as a whole than previously, which should, in theory, allow for more inclusive policymaking.

HondurasAR000424

During her first year, Castro made some progress toward transparency, promising not only a reform of judiciary appointments, including Supreme Court justices, but also repealing the Secrets Law for classifying public documents on national security and defense. The year 2023 will be key to seeing if these promises will be realized. There are other issues. The state remains too centralized. Control, where it exists, is often exercised by international organizations that produce regular assessments of "delivery plans." However, since these assessments are linked to specific, limited programs (such as public sector reforms), the sustainability of progress cannot be guaranteed.

### 15 | Resource Efficiency

There is no efficient use of resources in Honduras. Three factors are largely responsible for this problem. First, the Honduran state is corrupt, to the extent that some analysts argue that corruption is the country's operating system. Senior politicians and even entire state institutions are implicated in corruption and large-scale international crime. For instance, shortly after the end of the review period, former President Hernández was detained and later extradited to the United States to face drug charges.

Linked to this is a second problem, the lack of effective oversight of the administration, or indeed any branch of the state, by any other branch of the state. Oversight has always been a problem, precisely because corruption is so widespread that it exists in those branches of the state that should provide oversight of government activities.

This is linked to a third point, the state's lack of capacity when it comes to fulfilling its functions across the country's entire territory. The Honduran state does not have control over all Honduran territory. It is also involved in criminal activities, from which many of its civil and public servants and politicians benefit. Thus, here is no incentive for change.

A fourth problem is clientelism. Most of the civil service in Honduras does not hold permanent positions. With every change in government, a significant portion of the bureaucracy is occupied by new staff. As a result, retaining power becomes a primary objective and short-term thinking dominates. The fact that Honduras is a unitary state does not help. The president appoints the governors of the country's provinces. Consequently, rather than serving to counterbalance the center, local government is, in many ways, an extension of it and patronage is hugely important.

Notwithstanding, Honduras does have a fairly high level of fiscal stability (see "fiscal stability").

Efficient use of assets

3




In Honduras, the process of centralization around the executive has lasted many years. There are two reasons for this: First, centralization was a declared objective of the former President Hernández, who argued it would increase control over and efficiency in policy implementation. Second, the political control centralization allowed for (who gets what and how much) strengthened corrupt networks and shut out critics' viewpoints, especially when it came to environmental and economic development policies.

Policy coordination
5
'06        '24  10

During her election campaign, the new president, Castro, promised to involve local communities far more in policymaking and implementation. It is too early to say whether this has improved policy coordination and policymaking. However, there has been criticism that critical voices are still ignored in favor of decisions made at the center, for instance, in energy and environmental policies. The recent creation of the Secretariat of Strategic Planning in the executive seems to continue the trend toward centralization, though Castro argues it will help with policy coherence and prevent overlap, a criticism international donors and organizations frequently make.

The strain on public services, such as the health system, during the pandemic and the extraordinary measures taken to deal with it also reinforced centralizing tendencies in the state, as major crises tend to do. It is thus unclear whether durable changes in terms of policy coordination will, or indeed can, be implemented in the near future.

What remained of the anti-corruption initiatives in Honduras collapsed during the last few years of the Hernández presidency, such as disbanding the internationally supported MACCIH at the beginning of 2020. The new government has adopted a noticeably different tone. One of Castro's first key acts after assuming the presidency was to organize and permit the extradition of her predecessor to the United States to face charges of international drug trafficking. The president also promised to reconstitute an anti-corruption commission with international oversight and signed a memorandum of understanding with the United Nations about this matter in December 2022. She additionally promised to make the justice system more transparent and efficient to allow it to pursue servants of the state who engage in corrupt practices. As a first step, she repealed the 2014 Secrets Law, which had made it virtually impossible to declassify documents about national security and defense. In addition, the government is in negotiations with Congress over a plea bargain law to make it easier for whistleblowers to come forward.

Anti-corruption policy
3
'06        '24  10



Other issues, however, remain: public procurement is mired in corruption, the control system is weak, particularly at the local level, access to the justice system is not guaranteed and the independence of courts is uncertain. Regarding this matter, 2023 could prove a pivotal year, as the government has promised to present justice system reforms, including ones to increase the transparency of judicial nominations.

Civil society groups have criticized the government, stating that Castro's proposals to deal with corruption in the criminal justice system do not go far enough. Groups like the Association for a More Just Society have also said that the government has not been as transparent about its own actions as promised.

While the new administration may intend to address corruption – which in itself would represent progress – there are serious concerns about the capacity of the Honduran state and the political capacity of the government to transform these intentions into practical, sustainable actions.

### 16 | Consensus-Building

The year 2021 presented something of a watershed in Honduran politics in that the opposition was able to unite around a single candidate to remove from power the Honduran National Party, which had governed Honduras since the military coup in 2009. This unity, and progress in general, remain fragile, however.

Consensus on goals
5
'06          '24  10



1

In 2021, there was consensus around what the opposition was against, not necessarily what it supported. Since then, it has proven difficult to maintain consensus around a positive policy agenda, particularly due to the number of parties represented in Congress and the fragile control the administration has over it, compromising its ability to pass far-reaching legislation. As a result, America's Quarterly argues that the government's first year in office has been marked by steady rather than spectacular progress.

Nevertheless, the peaceful transfer of power after the 2021 elections and the relative political stability since the new government assumed office in early 2022 are signs that the consensus around the stabilization of democracy is holding, at least for the time being.

There are no serious challenges to the consensus around a market economy, even with a more leftist government now in power. On the one hand, Castro's governing coalition includes parties that would not support any move away from a market economy model. On the other hand, existing economic interests, actors and power structures are so deeply entrenched that any attempt to uproot them and radically change course on economic policy would lead almost inevitably to political instability and perhaps military intervention. This is what occurred in 2009 after what amounted to little more than a mild leftward turn in economic policy by the husband of the current president.

Outwardly anti-democratic actors have lost influence in the Honduran political sphere. Arguably, the Hernández government itself was a key, perhaps the key, anti-democratic actor, having systematically eroded the system of democratic checks and balances during its eight years in power.

It was thus encouraging that the opposition came together during the 2021 elections under a banner of change, with the aim of saving democracy. It was also encouraging that the elections delivered a clear mandate for change, which was both ratified and accepted by society as a whole, so that a peaceful transfer of power could take place.

Yet, significant challenges remain. The state does not have control over all its territory. Several regions of the country are controlled, or at least infiltrated by, criminal gangs and other criminal organizations like drug cartels. In such areas, the democratic rights of citizens are not guaranteed. Equally, the state does not treat all its citizens equally. Minorities and the poor face serious, systemic discrimination, for instance, from the police.

While there is no explicit challenge to democracy at this moment, the system itself remains fragile.

Social class is the main cleavage in Honduran society. Poverty and extreme poverty remain widespread. These cleavages are the key drivers of social tensions and conflict.

There are two basic types of conflict: One is between criminal gangs and organizations over territory in poor communities and businesses that they extort and/or lucrative drug trafficking routes north into Mexico and the United States. While the new government has committed to tackling these issues, it confronts two key problems: Structurally, not only does the state lack the capacity to address these issues country-wide, but endemic corruption at all levels, involving gangs, other criminal organizations, the police and other state actors, maintains the conflict at relatively low levels of intensity and the cleavages that sustain it in place.

Public support for apparently simple solutions like iron-fist security policies or, recently, declaring a state of exception and the associated suspension of civil rights to deal with crime makes these the go-to policies for governments of all political stripes, even though empirical evidence does not suggest they actually work.

A second type of conflict, largely in rural areas, is between landowners and peasant movements fighting for land and basic working rights. There was an expectation that the new government might negotiate a truce, but this has not occurred. In fact, the killing of environmental activists has continued unabated, and peasant movements have been highly critical of government economic development policies, which, they say, ignore Indigenous populations and peasants.

Anti-democratic actors

5

'06          '24  10

Cleavage / conflict management

5

'06          '24  10

Under the previous government, formal public consultation did not exist. Policies were developed and decided by a small group of people around the president in the economic sphere, often with the input of economic actors or business associations. Civil society was extremely active, but mainly protesting rather than acting as a partner in policy development. The country was one of the most dangerous in the world for environmental campaigners and investigative journalists, according to organizations such as Human Rights Watch and the Committee for the Protection of Journalists.

The 2022 change of government altered the dynamics of interactions between the state and civil society. Castro came to power promising to develop a constructive relationship and engagement with civil society groups, particularly, though not exclusively, in questions of environmental protection and economic development. Yet, on many issues, relations have continued to be strained. Women's rights groups, for instance, have criticized slow progress in relation to emergency contraception, while environmental groups have been highly critical of some mining projects that have continued, to the detriment of protecting the environment. While there is clearly evidence that the new government takes a different stand with regard to engaging with civil society groups, it is unlikely that relations will be entirely cordial.

The very fact that it was possible to form a broad electoral coalition to elect Castro as president and to do so with a clear and absolute majority suggests that there is a wish for beginning a process of reconciliation after years of bitter political, economic and social division. Moreover, while far from perfect, the elections of 2021 were also more peaceful than those of 2017 and 2013, according to the United States and EU observer missions.

In February 2022, the president issued the Amnesty for Political Prisoners Act, an executive order that grants general, broad and unconditional amnesty to people arrested and charged for protesting against the 2009 military coup. The state also recognized its responsibility for the murder of trans woman Vicky Hernández in June 2009. Still, whether these changes are durable is open to question. On the one hand, expectations that the government will improve the lives of the population as a whole are huge. It is unclear whether these expectations can be met and what happens if they cannot. On the other hand, there is no guarantee that the consensus for the need for change that allowed the broad electoral coalition to emerge in 2021 will sustain itself in the next electoral cycle. The relative calm the country currently enjoys is thus fragile.

Public consultation
4



Reconciliation
5

### 17 | International Cooperation

Honduras continues to be one of the largest recipients of international aid in Latin America. According to data from the World Bank, in 2020, the country received $1.43 billion in official development assistance. The new government is in negotiations for a further loan from the IMF, following those granted in 2019 and 2020. Such support was made all the more urgent by the impact of the COVID-19 pandemic and the natural disasters Honduras has endured in recent years.

The country has bounced back strongly from the pandemic since 2021. This suggests that the aid was put to good use to stimulate economic activity, though it is difficult to establish a direct line of causality between support received and economic growth. Plus, there are still worries as to whether such aid can be used effectively in a strategic sense to make the country more resilient and crisis-proof, especially because, according to the United Nations, it is among the countries most exposed to the impacts of climate change. Several donors, such as the European Union, outline considerable conditionality in their agreements with Honduras as an attempt to guarantee sustainability. In their most recent reports, the IMF and World Bank state that there is some progress on issues such as public sector reform. However, some analysts argue that successive governments have used aid to deal with emergencies but not for strategic or sustainable goals. Certainly, the new government has not published any detailed plans aside from those aiming to establish an inclusive economy to benefit more of its population.

Honduras is active in the international community and its associated organizations and is party to major international agreements on climate change, human rights, labor standards, etc. Historically, the country has faced serious difficulties ensuring compliance with such agreements in practice, whether as a result of capacity issues or a lack of political will.

The international community's engagement with the Honduran government declined during the last years of the Hernández administration, as his focus shifted toward his domestic political survival. The new government has tried to show that Honduras is back on the international stage. In her speech to the U.N. General Assembly, President Castro stressed her commitment to environmental protection and fighting climate change, as well as her desire to address corruption. These commitments are both an attempt to attract badly needed international assistance and to show that Honduras is a serious international partner on the international stage that can be trusted. Negotiations with the United Nations about establishing an international anti-corruption commission can be seen in this light.

Yet, serious challenges persist, particularly in relation to the Unites States – Honduras' most important ally, with a giant military base in the country. Tensions with the United States remain over the question of migration, and the United States

Effective use of support

7







Credibility

5



has also criticized Castro's economic policy, which, according to the United States, directly negatively impacts U.S. economic interests.

There have been no concrete, durable policy achievements to back up the promises made by the new administration.

Honduras continues to have a close level of cooperation with its immediate neighbors, particularly El Salvador and Guatemala, due to the very similar problems faced by all three states. In many ways, the three have little choice but to cooperate, seeing that they are often part of the same agreements with their main strategic partner, the United States, which treats them generally as one country. One example is the Alliance for Prosperity in the Northern Triangle. Recently, the U.S. Strategy for Central America has aimed to foster cooperation among the northern triangle countries, leveraging foreign assistance as a political tool to promote and advance U.S. national security interests.

Honduras is also a member of all regional organizations, being particularly active in the Central American Integration System (SICA) and the OAS. The new government has signaled that it will use these forums to promote its objectives in new priority areas, particularly in relation to climate change and the environment.

Regional cooperation

8



# Strategic Outlook

The strategic outlook for Honduras remains challenging, although there have been some improvements compared to two years ago. The economy has recovered well from the impact of the COVID-19 pandemic, and there are indications that the government is making efforts to address significant strategic issues, particularly those related to the environment and transparency.

To make progress on these issues, the current government should urgently establish structures and processes that facilitate intensive policy consultation and decentralized policymaking. This approach would involve active participation in the policymaking process by local residents' associations and other national and international NGOs, which can help with coordination. The government has an opportunity to advance these issues, given the significant goodwill toward the new president on the international stage. The international community generally sees President Castro as a positive change from the increasingly discredited Hernández administration, especially following the former president's indictment in the United States. It is now incumbent upon the government to demonstrate a sincere commitment to engaging on issues of common interest, whether related to anti-corruption efforts or environmental concerns. Recent natural disasters in Honduras make evident the pressing nature of these issues.

To achieve lasting change, efforts to ensure government accountability must be intensified. Some notable progress has already been made in this regard. Crucially, the new government is in negotiations to establish a new anti-corruption commission under international supervision. Additionally, the repeal of the Secrets Law and the commitment to new procedures for appointing Supreme Court justices indicate the government's determination to combat corruption. Maintaining this trajectory and staying committed to anti-corruption efforts will facilitate the implementation of further reforms in other areas. The state will thus become better equipped to respond to the needs of the general population.

The extradition of former President Hernández early in President Castro's term served as a significant milestone, signaling the government's intention to confront the culture of impunity that has prevailed in Honduras for decades. However, the fact that prominent political and economic figures are extradited to the United States also underscores the inadequacy of the Honduran justice system when it comes to addressing major domestic crimes.

It is crucial for the international community to play a role and support the new government's reform efforts. For example, the United Nations should establish, support and sustain a reconstituted anti-corruption commission, as planned by the current administration. Additionally, the international community should assist in material reconstruction efforts following natural disasters and help rebuild and reinforce local political structures that facilitate community participation. Local actors proved to be essential to providing emergency aid and services during recent natural disasters and the COVID-19 pandemic. Such structures are vital for rebuilding trust between the state and population, a trust largely absent since the 2009 military coup.

HondurasAR000432



BMI
a FitchSolutions Company

**ARTICLE**

# Risks To Stability To Linger In Honduras Amid Weak Policymaking And Security Environment

Country Risk / Latin America / Wed 28 Aug, 2024

***Please Note:*** *BMI is enhancing its risk analysis with a new scoring system following its acquisition of GeoQuant, a market-leading provider of political risk data. From March 27 2024, risk scores are inverted: zero now represents the lowest risk and 100 represents the highest risk. This allows for clearer, industry-standard assessments. For further details, please refer to our updated methodology document.*

**Key View**

- We expect political stability risks to remain elevated in Honduras over the coming quarters due to a weak policymaking environment and fragile security landscape.

- A legislative minority will limit the government's ability to pass key reforms ahead of the general election due in November 2025, while moderating growth will pose a headwind to social stability.

- Risks to our forecast are weighted towards higher-than-expected political risks, particularly if growth slows by more than expected or the security situation worsens.

**We expect political risks to remain elevated in Honduras over the coming quarters due to the country's challenging socioeconomic backdrop, relatively weak security environment and worsening policymaking environment.** Resilient economic activity, declining inflation, and a falling homicide rate have supported a modest improvement in stability since late-2022, as evidenced by gradual

Honduras/AR000433

decline in our headline political risk index (PRI) from 64.7 (out of 100) in October 2023 to 60.0 in June 2024 (a lower score indicates lower risk). However, the PRI has since ticked back up to 60.7 due to higher scores in the governance and society sub-components (*see chart below*), and we believe the left-leaning Xiomara Castro administration will face further political and social challenges in the period leading up to the general election scheduled for November 2025.

**Security risk remains a key threat to stability in Honduras, with a component score of 64.4 out of 100 among the highest in Central America (second to Guatemala) and above the wider Latin American average of 52.3** (*see chart below*). Though there have been some improvements in recent years, and the government reporting that homicides fell by 30.3% y-o-y over the first seven months of 2024, the overall murder rate is likely to remain the highest in the region in the near term, with the Inter-American Commission on Human Rights (IACHR) affirming in May 2024 that Honduras remained the most violent country in Central America. In June 2024 the Castro government announced new "radical actions" to combat gang violence in line with the hardline model adopted by Nayib Bukele in neighbouring El Salvador, including collective trials and the construction of a "mega prison" to house up to 20,000 inmates. Like El Salvador, Honduras has also remained in a prolonged State of Emergency that was initially introduced as a localised and temporary measure in November 2022 but has since been extended and expanded to cover most of the country's territory. The measure has been criticised by human and civil rights groups, and while data is limited, there is little evidence that the approach has been as popular or effective as in El Salvador. Indeed, one report by the Association for a More Just Society (ASJ) noted that while the national murder rate fell, the population affected by extortion had risen from 9% in 2022 to 11% in 2023. Another study by the Armed Conflict Location and Event Data Project (ACLED), released in December 2023, concluded that the state of emergency had yielded mixed results in its first year of implementation, with organized violence spreading beyond traditional hotspots.

**Legislative Minority To Undermine Government Policymaking**

Since taking office in January 2022, Castro's presidency has been marked by persistent tensions between the executive and legislative branches of government, which has delayed key reforms and sometimes paralysed policymaking altogether (as was the case in H2 2023 amid a deadlock over the election of a new attorney general). The situation improved somewhat in H1 2024 as agreements between Castro's Libertad y Refundación (LIBRE) party, which lacks a majority in the National Congress, and the main opposition parties enabled overdue appointments to key institutional bodies, including the High Court of Auditors (*Tribunal Superior de Cuentas*, TSC) and the Electoral Justice Court (*Tribunal de Justicia Electoral*, TJE). However, the policymaking environment is set to worsen again in H2 2024 following the recent expulsion of 10 lawmakers from LIBRE, leaving the ruling party with just 40 out of 128 seats in

Honduras/AR000434

Congress, 25 short of a majority (*see graphic below*). This came shortly after Castro's vice president Salvador Nasralla, leader of the Partido Salvador de Honduras (PSH) that formed an alliance with LIBRE after the last election, resigned from government and joined the opposition Liberal Party (PL). **The updated arithmetic in Congress reduces the likelihood that Castro will be able to push through flagship reforms** such as establishing an international anti-corruption commission and the so-called "Tax Justice Law", which was first announced in April 2023. Moreover, we believe the space for cross-party consensus is likely to narrow further in the latter stages of Castro's term as parties prepare for primary elections in March 2025 and a general election due in November 2025.

**Society risk has also ticked up in recent months, with the component score in our PRI rising from 47.4 out of 100 in June to 49.2 in August** (though still below the score of 55.2 at end-2022). Risks to social stability have eased in line with the steady decline in inflation from a peak of 10.9% y-o-y in mid-2022 to an average of 4.8% y-o-y over H1 2024 (*see chart below*), which has helped reduce pressure on household purchasing power. Economic growth has also remained largely resilient over recent quarters, supported by robust remittance inflows from the US. However, we maintain the view that growth will moderate in H2 2024 and 2025 in line with weaker external demand and remittances, making it harder to tackle longstanding structural issues such as high unemployment and poverty. In addition, delays in the release of funds under the three-year IMF deal signed in September 2023 threatens to put pressure on public finances and restrict government spending.

**Risks To Outlook**

Risks to political stability remain weighted towards greater volatility, as we believe Honduras is sensitive to a weakening in its economy, which would likely raises risks of social instability and drive a deterioration in its security environment. If the US economy decelerates more quickly than we currently expect, thereby weighing on remittance incomes, we could see a renewed uptick in outbound migration north to the US. Moreover, we believe that the risks to policymaking and policy continuity will likely rise as we get closer to the 2025 general election.

HondurasAR000435

ok)   **Tech Cre (/articles/tag/tech-cre)**   **News (/articles/tag/news)**   Deal B

# Why Honduras is Gaining Popularity for Real Estate Investment and Airbnb Rentals (https://brevitas.com/blog/why-honduras-is-gaining-popularity-for-real-estate-investment-and-airbnb-rentals)

08/30/2024

Industry Insights (/articles/tag/article.industry-insights)

International Outlook (/articles/tag/article.international-outlook)



HondurasAR000436

Case 3:25-cv-05687-TLT    Document 62-1    Filed 07/28/25    Page 437 of 462

(https://brevitas.com/blog/why-honduras-is-gaining-popularity-for-real-estate-investment-and-airbnb-rentals)

In recent years, Honduras has emerged as a growing hotspot for real estate investment, particularly in the Airbnb rental market. With its strategic location, developing economy, and attractive tax policies, it's gaining the attention of foreign investors. In this blog, we will dive deep into why Honduras is on the radar for real estate investors and Airbnb entrepreneurs, covering everything from the country's cities and economy to its safety, climate risks, tax policies, and the process for Americans to invest in property.

## Strategic Location and Key Cities

Honduras is located in the heart of Central America, bordered by Guatemala, El Salvador, and Nicaragua, and with access to both the Pacific Ocean and the Caribbean Sea. Its Caribbean coastline is a key attraction for real estate investors, with areas like Roatán, Utila, and La Ceiba drawing attention for beachfront properties.

**Roatán**, one of the Bay Islands, is particularly famous for its coral reefs, beaches, and status as a top scuba diving destination. This has led to a booming Airbnb rental market, with tourists flocking to the island for short-term stays. Meanwhile, **Tegucigalpa**, the capital, and **San Pedro Sula**, the country's economic hub, offer opportunities for commercial real estate and urban residential investments.

These cities are supported by Honduras' increasing connectivity, with international airports in Tegucigalpa and San Pedro Sula offering direct flights to North America, making the country easily accessible for international investors and tourists alike.

## Economy and Exports

Honduras' economy is diverse, with agriculture, manufacturing, and services sectors all contributing significantly. The country is one of the world's leading producers of coffee, bananas, and palm oil, while it has also become a hub for textile and apparel manufacturing. The maquila (free trade zone) sector, which benefits from tax incentives, plays a key role in the country's export economy.

For investors, this diversification provides economic stability and growth prospects, which is crucial when considering long-term property investments. As tourism grows, especially in areas like Roatán, Honduras is positioning itself as a rising star in the Central American real estate market.

HondurasAR000437

Case 3:25-cv-05687-TLT   Document 62-1   Filed 07/28/25   Page 438 of 462

# Future Prospects: Why Honduras Could Be a LATAM Hotspot

Honduras is actively working to improve its infrastructure and attract foreign investment. The government has focused on developing tourism and increasing security, with an eye on making areas like the Bay Islands and the northern coast even more attractive for foreigners. Given the proximity to the U.S., the relatively low cost of living, and the potential for high Airbnb occupancy rates in popular tourist destinations, Honduras could be the next big thing in Latin American real estate.

## Tax Situation for Investors

For real estate investors, the tax situation in Honduras is relatively favorable. Property taxes are low, typically around 0.25% of the property's assessed value. Moreover, foreign investors are not subject to any restrictions when purchasing property, and there are incentives for those investing in tourism-related businesses.

Rental income, including from Airbnb, is subject to a 15% value-added tax (VAT), but there are various ways to structure your investment to minimize tax liabilities. Investors should consult with a local tax advisor to understand how to optimize tax benefits.

## Safety Concerns: Is It Safe to Invest?

Safety is a key concern for any potential investor in Honduras. The country has made strides in improving security, particularly in tourist areas like Roatán and the Bay Islands. However, crime rates in urban areas like Tegucigalpa and San Pedro Sula remain high, and potential investors should be aware of the risks in those areas.

That said, the government has made significant efforts to improve safety in key investment zones, and the real estate market continues to thrive in tourist-friendly areas. As always, due diligence and understanding the specific risks of the area where you plan to invest is essential.

## Climate Risks in Honduras

Honduras is prone to natural disasters, including hurricanes and tropical storms, particularly on the Caribbean coast. Investors should factor in these risks when considering properties in vulnerable areas, especially if they are planning to invest in beachfront real estate. Flooding and landslides can also be concerns in certain parts of the country.

However, climate risks are common across many parts of the world, and properties can be insured against such events. Investors should ensure they purchase adequate property and liability insurance to protect against potential natural disasters.

HondurasAR000438

## Investing as an American: Residency and Legal Considerations

For Americans, investing in Honduras is relatively straightforward. Foreigners, including U.S. citizens, can own property outright, including beachfront and island properties, with no restrictions. This makes Honduras particularly attractive for those looking to invest in vacation homes or rental properties.

Residency is another benefit for those looking to spend extended time in the country. Honduras offers various residency options, including the "Residency by Investment" program, where investors can gain residency by making a minimum real estate investment of around $50,000. This makes it easier for property owners to live in Honduras for extended periods, which is especially useful for those managing Airbnb properties.

## Airbnb Rentals: A Growing Opportunity

The rise of platforms like Airbnb has made it easier than ever for investors to generate income from short-term rentals, and Honduras is no exception. In hotspots like Roatán and La Ceiba, tourists are increasingly turning to Airbnb for accommodation. Given the country's growing popularity as a tourist destination, Airbnb rentals can offer investors an attractive return on investment.

However, it's important to manage properties effectively to maximize returns. Investors may consider hiring local property managers to handle day-to-day operations, especially if they do not reside in Honduras full-time.

## Property Tax and Ownership Costs

One of the major benefits of investing in real estate in Honduras is the low property tax rate, which typically hovers around 0.25% of the assessed value. This makes it an attractive destination for investors looking to minimize ongoing costs.

In addition to property tax, investors should factor in maintenance costs, property management fees (if hiring a local manager for Airbnb rentals), and insurance. Overall, the cost of owning property in Honduras is relatively low compared to other Latin American countries, making it an ideal choice for those looking for high returns on a modest investment.

## Is It Possible to Get Scammed?

Like any foreign market, there are risks associated with real estate transactions in Honduras, including the potential for fraud. Investors should be cautious when dealing with local brokers and agents and always work with reputable law firms to conduct thorough due diligence before purchasing property.

HondurasAR000439

Case 3:25-cv-05687-TLT    Document 62-1    Filed 07/28/25    Page 440 of 462

Common scams include inflated property prices, unclear titles, and bogus land sales. Ensuring that you work with a licensed attorney to verify the property's title and conduct a full title search is essential. Additionally, it's advisable to use escrow services to handle the transfer of funds to protect yourself from potential scams.

## Conclusion: Why Honduras is the Next Real Estate and Airbnb Hotspot

Honduras is gaining popularity for a variety of reasons: its stunning beaches, favorable tax policies, affordable property prices, and growing tourism industry. With its strategic location in Central America, it's an increasingly attractive destination for real estate investors and Airbnb entrepreneurs alike. For Americans, the lack of property ownership restrictions, low taxes, and opportunities for residency make Honduras an excellent option for diversifying their real estate portfolios.

Despite some safety and climate risks, the potential rewards of investing in Honduras, particularly in tourist-heavy areas, are significant. As the country continues to grow and attract foreign investment, Honduras is positioning itself as one of the next hotspots for real estate in Latin America.

Back To Articles > (/articles)

## Latest Articles

 Common Questions About NNN Lease Terms & Structures

(https://brevitas.com/blog/common-questions-about-nnn-lease-terms-structures)

 Decoding the Relationship Between 10-Year Treasury Bonds and Mortgage Rates

(https://brevitas.com/blog/decoding-the-relationship-between-10-year-treasury-bonds-and-mortgage-rates)

 Investing in Knoxville: Tennessee's Most Underrated Real Estate Market

(https://brevitas.com/blog/investing-in-knoxville-tennessee-s-most-underrated-real-estate-market)

HondurasAR000440

*The content provided on Brevitas.com, including all blog articles, is intended for informational and educational purposes only. It does not constitute financial, legal, investment, tax, or professional advice, nor is it a recommendation or endorsement of any specific investment strategy, asset, product, or service. The information is based on sources deemed reliable, but accuracy or completeness cannot be guaranteed. Readers are advised to conduct their own independent research and consult with qualified financial, legal, or tax professionals before making investment decisions. Investments in real estate and related assets involve risks, including possible loss of principal, and past performance does not guarantee future results. Brevitas expressly disclaims any liability or responsibility for any loss, damage, or adverse consequence that may arise from reliance on the information presented herein.*

HondurasAR000441





Dengue is a virus that is spread mainly through the Aedes aegypti mosquito. Lauren Bishop/Amy E. Lockwood, MS/CDC/File

**(CNN)** — Honduras has declared a national health emergency after reporting a rise in hospitalizations and deaths from dengue, the health ministry announced on Friday.



**RELATED ARTICLE**
Dengue cases top 5.2 million in the Americas as outbreak passes yearly record, PAHO says

The government has instructed health officials to take all necessary actions, including applying

HondurasAR000443

prevention and control measures and identifying funds to manage the outbreak.

The Honduran health ministry has reported 23,037 suspected cases of dengue in the first 20 weeks of the year. That's one of the highest totals in the Americas, according to data collected by the Pan American Health Organization (PAHO).

The entire region has already reported more than 8.65 million cases in the first five months of 2024 – almost twice as many as the more than 4.5 million cases reported in all of 2023, which was a record at the time.

The southern cone of the Americas has accounted for most of the cases in the first half of 2024, with Brazil registering 7.2 million alone. But now, the southern region is seeing a significant decrease in infections, while Central America and the Caribbean are starting to enter their peak dengue seasons, according to PAHO.

ADVERTISING



"Honduras has entered the epidemic zone due to the increase in cases in all departments of the country, as well as the number of patient admissions in all hospitals in the country due to this disease," the Honduran health ministry said Friday.

**GET CNN HEALTH'S WEEKLY NEWSLETTER**

Sign up here to get **The Results Are In with Dr. Sanjay Gupta** every Tuesday from the CNN Health team.

Honduras has reported the second-most cases in the Central American Isthmus and Mexico Subregion this year, trailing only Mexico, which has counted more than 69,000.

PAHO and the World Health Organization recommend that countries in those areas "adopt the necessary measures to prepare the response to the increase in dengue, including the organization of health services to ensure adequate clinical management, prevention of complications, and avoid saturation of specialized care services."

Dengue is a mosquito-borne virus that is spread mainly through the Aedes aegypti mosquito, also known to carry several other viruses, such as yellow fever, chikungunya, and Zika, according to the US Centers for Disease Control and Prevention (CDC). It causes flu-like symptoms and can lead to death in extreme cases.

## Up next

Supreme Court allows Trump to remove migrants to South Sudan and other turmoil-filled countries

6 minute read



While North Korea denied Covid-19 cases, the virus was widespread and barely treated, report says

6 minute read



Armed rebels take control of Heineken facilities in DR Congo's war-hit east

2 minute read



Indonesia volcano spews ash more than 6 miles into sky, dozens of Bali flights canceled

3 minute read



## Most read

**1** Trump claims a forever peace in the land of forever war — but it could be fleeting

**2** 145 people pricked with syringes at France street music festival

**3** Marjorie Taylor Greene says Trump voters wanted 'no more foreign wars' and Iran strikes expose MAGA divide

HondurasAR000445

**4**   Venice's most guarded secret: Inside the Bezos-Sanchez wedding plans

**5**   A majority of Americans disapproves of Trump's Iran airstrikes, CNN poll finds

**6**   Marine Corps veteran says he feels betrayed after his father was arrested by masked federal agents in Southern California

**7**   Sotomayor accuses Supreme Court of 'rewarding lawlessness' by Trump administration in fiery dissent

**8**   Iranian retaliation, a sudden ceasefire and lingering nuclear questions: Wild swings in the Middle East

**9**   Central Park hits temp record last seen on this date in 1888 as heat wave hits eastern US

**10**   Brad Pitt gets candid about recovery: 'I needed rebooting'

## NEWS & BUZZ

 Trump claims a forever peace in the land of forever war — but it could be …

 145 people pricked with syringes at France street music festival

 Marjorie Taylor Greene says Trump voters wanted 'no more foreign …

Search CNN…

HondurasAR000446

Subscribe

Sign in

Live TV

Listen

Watch

US

World

Politics

Business

Markets

Health

Entertainment

Tech

Style

Travel

Sports

Science

Climate

Weather

Ukraine-Russia War

Israel-Hamas War

Watch

Listen

CNN Underscored

Games

HondurasAR000447

About CNN

## Health

**FOLLOW CNN**



Terms of Use    Privacy Policy    Do Not Sell Or Share My Personal Information    Ad Choices    Accessibility & CC    About

Subscribe    Newsletters    Transcripts    Help Center

© 2025 Cable News Network. A Warner Bros. Discovery Company. All Rights Reserved.
CNN Sans ™ & © 2016 Cable News Network.

HondurasAR000449

HondurasAR000450

HondurasAR000451

HondurasAR000452

# From Bad to Worse: The Xiomara Castro Administration Begins to Weaponize the Honduran State



Photo: ORLANDO SIERRA/AFP via Getty Images

Commentary by **Ryan C. Berg**
Published November 4, 2024

The United States once had big aspirations for the government of Xiomara Castro in Honduras. Elected on an anti-corruption platform and promising change, the Biden administration hoped for the antithesis to Juan Orlando Hernández, the former National Party president who now sits in U.S. prison after his conviction on drug trafficking charges. The Biden administration saw the Castro government as promising change through a progressive platform in a tough region where the United States typically has few good partners. Further, the Biden administration sought common ground with the Castro government, including Honduras, in some of its core regional initiatives. Despite hesitation, for instance, Castro received an invitation to Biden's Summit for Democracy in 2021. Vice President Kamala Harris attended Castro's inauguration and tried to forge leader-to-leader ties.

HondurasAR000453

Yet a spate of corruption scandals, a diplomatic switch from Taiwan to the People's Republic of China (PRC), policies that disincentivize nearshoring and threaten the property rights of foreign direct investment made through the country's special economic zones (ZEDEs in Spanish), and a nepotistic governance style have all soured bilateral ties. As Honduras looks ahead to the 2025 elections for both the presidency and the Congress, President Castro appears to be weaponizing aspects of the Honduran state and focusing in on her opponents. For the next U.S. administration, Honduras will likely be a significant challenge in Central America to be solved, rather than a partner to leverage as the answer to tough problems—at least until Honduras itself holds elections in November 2025.

## Criminal Penetration

A recent video showing a member of the ruling Castro-Zelaya family discussing campaign contributions from criminal organizations to Xiomara's husband Mel Zelaya's previous presidential campaign has placed President Castro under intense scrutiny. Ironically, the Castro administration swept to power on an anti-corruption message. Castro juxtaposed her administration to the prosecution and eventual conviction of her predecessor, Juan Orlando Hernández. As the video in question well demonstrates, the rumors are likely true—the Castro-Zelaya family appears embedded in some of the same criminal networks as its predecessor.

President Castro's response has exacerbated bilateral tensions. Upon release of the video, Castro abruptly and unilaterally departed from the 100-year-old extradition treaty with the United States. While Castro claims the timing was purely coincidental, coming so quickly after the video's release gave many Hondurans the impression that ulterior motives were clearly at play. Furthermore, it opened Castro to powerful claims of hypocrisy—the president was delighted to see her predecessor Hernández extradited while closing the door on such a fate for anyone in her extended family, freshly accused of involvement in drug trafficking and bribery. As part of her defense, Castro maintained that the United States was "interfering" in its domestic affairs, and even hinted at a purported coup plot unfolding against her. All of this was factually untrue.

Meanwhile, the Castro administration has made itself an outlier by aligning with Latin America's dictatorships in Cuba, Nicaragua, and Venezuela. In particular, alignment between Caracas and Tegucigalpa has been on full display of late: former defense minister José Manuel Zelaya (Xiomara's nephew) cavorting with Maduro's sanctioned defense minister Vladimir Padrino López during a recent visit to Venezuela. President Castro also immediately recognized Venezuelan dictator Nicolás Maduro's <u>brazen election theft</u>. This has brought to light the historic role of Honduras as a <u>key airbridge</u> for the criminal regime in Caracas to traffic narcotics into the United States. Many of these suspected flights head out over the Caribbean before banking left and landing for refueling at one of the numerous clandestine airstrips in Honduras' territory.

## The Uncertainty of Foreign Direct Investment and the Battle Against ZEDEs

Since President Castro's election, her administration has had a testy relationship with the country's private sector. Castro came to office campaigning against the country's special economic zones, known as <u>Zones of Employment and Economic Development</u> (or ZEDEs, by its Spanish acronym), which established economic development zones with significant capacity to <u>self-govern and attract private investment</u> through regulatory platforms aimed at growth. Since their inception, Castro has chafed at the autonomy ZEDE operators have in developing regulatory standards used to attract investment. She has labeled the ZEDEs criminal, a threat to <u>sovereignty</u>, and undesirable by dint of their connection to her predecessor's administration.

In order to shutter the ZEDEs, Castro shepherded legislation through Honduras' Congress to <u>repeal their ability to operate</u>. Since the law enabling the formation of ZEDEs was itself a constitutional amendment, Honduras' Congress needed to pass the same legislation ordering the closure of ZEDEs in two consecutive legislative years to have the same character. After Congress failed to pass the legislation a second time, thus failing to undo the amendment, President Castro turned to her administration's influence over the Supreme Court to press the ZEDEs.

Recently, the country's Supreme Court <u>ruled</u> that the legal foundation of the ZEDEs is unconstitutional. The Castro administration has paired this ruling with legislation meant to remove <u>immunity protections</u> from members of Congress–potentially

HondurasAR000455

applied retroactively. This means that under one interpretation, members of Congress –mostly Castro's opposition, National Party members–who voted for the legislation authorizing ZEDEs more than 10 years ago, <u>could be found guilty</u> of treason for having voted in favor of the unconstitutional special economic zones. Castro has presented the removal of immunity protections as an effort to curb corruption and increase transparency in the legislature.

Unsurprisingly, Western companies are observing the Castro administration's attacks on the ZEDEs as a bellwether for the country's ability to attract investment, especially nearshoring investment. While the ZEDEs remain in operation–one ZEDE has galvanized over <u>100 million</u> USD in investment–the Castro administration's incessant actions have had a chilling effect on overall foreign direct investment (FDI) in Honduras. With a youthful population and a potential <u>demographic dividend</u>, Honduras must generate more robust economic growth to meet the expansion of its working-age population. Without greater FDI, the country stands little chance of meeting that challenge, exacerbating outmigration and furthering <u>reliance on remittances</u> as a percentage of the country's GDP (at present, that number stands at 25 percent). Given the country's difficulty in attracting FDI historically, ZEDEs were meant to increase the attractiveness of investing in Honduras. A lack of Western FDI will likely necessitate a further <u>doubling down</u> on the relationship with China for economic development.

## The Advance of PRC Influence

In <u>previous pieces of CSIS analysis</u>, the Americas Program assessed that economic policies that drove out Western investment and made Honduras less attractive for Western-linked FDI would also make the country more likely to drop diplomatic recognition of Taiwan and turn to the PRC for alternative sources of development. This is exactly what transpired in 2023.

Instead of working with Taiwan to identify bankable projects, President Castro has been accused of trying to extort Taiwan. Normally, the country gives around 100 million USD to Honduras annually. Sources recall that President Castro asked Taiwan to double its aid and forgive around <u>600 million USD</u> in past loans. In total, Castro's government stands accused of requesting about <u>2.5 billion USD</u> in additional

HondurasAR000456

assistance. When Taiwan balked at these figures, in March 2023, Honduras <u>announced</u> a diplomatic switch to the PRC. The Castro administration gave Taiwan 30 days to vacate its embassy.

Rather than work to crowd in private investment and <u>attract</u> Western capital for infrastructure projects, the Castro government opted to accede to the PRC's Belt and Road Initiative instead. Furthermore, Chinese companies, including state-owned enterprises like Huawei, are busy <u>expanding their influence</u> throughout Honduras. As China grows its influence in Central America, the biggest remaining danger is that neighboring Guatemala <u>changes</u> its diplomatic recognition, too. Guatemala is the largest country still recognizing Taiwan diplomatically in terms of population size.

## Nepotistic Governing Style

President Castro has governed with a familiar set of individuals around—her family. Governing the country is largely a family affair, with only a small circle of trusted individuals appointed to key posts in the presidential cabinet. Castro's husband and former president Mel Zelaya also has family members all over the administration. President Castro has two sons who serve as her private secretary and presidential adviser. Multiple Zelayas and Castros serve in the country's congress, including Mel Zelaya's brother and Xiomara's daughter. And there is also the erstwhile Secretary of Defense who resigned shortly after his visit to Venezuela.

## Conclusion

At this point, there seems little disposition in Tegucigalpa to work collaboratively with Washington. In fact, as domestic scandals have accumulated, President Castro has doubled down on nationalism and her paranoid fulminations against the United States. Particularly problematic are her attacks on the private sector, promises to expropriate U.S. investment in the country's special economic zones, and diplomatic closeness with the region's authoritarian axis of Cuba, Nicaragua, and Venezuela. Given that Mexico under the Morena Party exhibits some of these same characteristics, and Nicaragua is already a full-blown dictatorship in the Central American isthmus, the United States will need a more robust strategy for pursuing its interests in Honduras. For now, the best strategy may well be a defensive one focused on guaranteeing the ability of the U.S. private sector to operate in Honduras,

HondurasAR000457

protecting investments made under the Central America-Dominican Republic Free Trade Agreement, and urging greater transparency in Honduran dealings with the PRC.

*Ryan C. Berg is director of the Americas Program and head of the Future of Venezuela Initiative at the Center for Strategic and International Studies in Washington, D.C.*

---

*Commentary* is produced by the Center for Strategic and International Studies (CSIS), a private, tax-exempt institution focusing on international public policy issues. Its research is nonpartisan and nonproprietary. CSIS does not take specific policy positions. Accordingly, all views, positions, and conclusions expressed in this publication should be understood to be solely those of the author(s). © 2024 by the Center for Strategic and International Studies. All rights reserved.

---

**Tags**

Americas, Trade and International Business, International Development, and Governance and Rule of Law

---

Center for Strategic and International Studies

1616 Rhode Island Avenue, NW

Washington, DC 20036

Tel: 202.887.0200

Fax: 202.775.3199

MEDIA INQUIRIES

**H. Andrew Schwartz**

Chief Communications Officer

202.775.3242

ASchwartz@csis.org

**Sofia Chavez**

Media Relations Manager, External Relations

202.775.7317

HondurasAR000458

SChavez@csis.org

See Media Page for more interview, contact, and citation details.

©2025 Center for Strategic & International Studies. All Rights Reserved.

**The New York Times** | https://www.nytimes.com/2024/06/26/nyregion/honduras-juan-olando-hernando-sentenced-drug-case.html

# Former President of Honduras Sentenced to 45 Years in Sweeping Drug Case

Juan Orlando Hernández connived with traffickers as his country became a base of operations for cocaine shipments to the United States.

**By Colin Moynihan**

June 26, 2024

During the eight years that Juan Orlando Hernández was president of Honduras, the tiny country was a conduit for hundreds of tons of cocaine that flowed north into the United States.

Mr. Hernández's political fortunes were tied to the gangs that transported those drugs, according to federal prosecutors in Manhattan. The traffickers fueled his rise, subsidizing Mr. Hernández's campaigns in return for promises of protection, even as the two-term president presented himself as a U.S. ally in the war against drugs, prosecutors said.

Now Mr. Hernández will spend 45 years in prison. He was sentenced on Wednesday in Federal District Court in Manhattan after being convicted in March of conspiring to import cocaine into the United States and of possessing and conspiring to possess "destructive devices," including machine guns.

HondurasAR000460

HondurasAR000461

Judge P. Kevin Castel called Mr. Hernández "a two-faced politician hungry for power" who had masqueraded as an antidrug crusader while partnering with traffickers. He said the sentence would send a message to figures who believed their "fine appearance and elegant manner" might protect them.

"I wish for the victims of the crimes in this case that there is a small degree of closure," the judge added.

Just before being sentenced, Mr. Hernández spoke for nearly an hour, insisting that he had been the target of a political conspiracy.

"It's as if I had been thrown into a deep river with my hands bound" he said, adding: "This was a political persecution."

The defense had asked that Mr. Hernández, 55, receive the minimum term of 40 years, saying that would effectively be a life sentence.

But prosecutors asked the judge to make sure Mr. Hernández would die behind bars, citing his abuse of power, connections to violent traffickers and "the unfathomable destruction" caused by cocaine.

The sentence on Wednesday was among several stemming from indictments dating back to 2015 that mapped a sprawling conspiracy.

In 2021, Mr. Hernández's brother, Juan Antonio Hernández, a former Honduran congressman accused of brokering bribes to his sibling, was sentenced to life in prison. The next year, the same sentence was imposed on Geovanny Fuentes Ramírez, a trafficker accused of bribing politicians and torturing and murdering a law enforcement official.

Some government witnesses who testified during former President Hernández's trial acknowledged behaving just as brutally.

One, Amilcar Alexander Ardon Soriano, a trafficker and former mayor of the municipality of El Paraíso, testified that he had participated in torture and murdered two people, and was responsible for the deaths of more than 50 others.

Another, Devis Leonel Rivera Maradiaga, a former leader of a Honduran gang, admitted being involved in the deaths of 78 people, including two journalists and the country's antidrug czar.

Defense lawyers suggested those witnesses had lied about Mr. Hernández to escape lengthy prison sentences and as retribution for what the lawyers said had been his vigorous pursuit of traffickers while in office. Mr. Hernández made a similar case directly to the judge in a letter that quoted Edmund Burke, Martin Luther King Jr. and the Bible.

Prosecutors countered that Mr. Hernández's arguments "reflect an alternate reality." They wrote that he had protected "his drug trafficking co-conspirators from prosecution and extradition, giving safe harbor to violent, massive cocaine traffickers as they used Honduras as a springboard for pumping cocaine into the United States."

The verdict in Mr. Hernández's trial came after weeks of evidence that he had received millions of dollars from drug organizations in Honduras, Mexico and elsewhere. In addition to statements by former traffickers, that evidence included testimony from a Honduran investigator and notebooks with Mr. Hernández's initials that prosecutors said detailed drug transactions.

By early 2022, when Mr. Hernández was detained in Honduras less than a month after leaving office, he had become deeply unpopular there. His successor as president, Xiomara Castro, accused him of turning the country into a "narco-dictatorship" and officials in the United States said that Mr. Hernández had used drug money during both of his presidential campaigns to bribe election officials and manipulate the vote.

HondurasAR000462