-3-

The Embassy of the United States of America avails itself of this opportunity to express to the Ministry of Foreign Relations and International Cooperation of the Republic of Honduras the assurances of its highest consideration.

Unquote.

The Secretariat has the honor to confirm that the Government of the Republic of Honduras accepts the proposal contained in note No. 2025-0419, dated June 25, 2025. Accordingly, that note and this note shall constitute an agreement between the Government of the Republic of Honduras and the Government of the United States to amend the Agreement (the "Amendment") and that this Amendment shall enter into force on the date of this note.

The Secretariat of State of Foreign Affairs and International Cooperation of the Republic of Honduras avails itself of the opportunity to renew to the Embassy of the United States of America the assurances of its high and distinguished consideration.

Tegucigalpa M.D.C., June 25, 2025

[Initialed]

[Ministry stamp]

[FR Doc. 2025–12631 Filed 7–7–25; 8:45 am]

BILLING CODE 9110–9M–C

## DEPARTMENT OF HOMELAND SECURITY

### U.S. Citizenship and Immigration Services

[CIS No. 2819–25; DHS Docket No. USCIS–2014–0006]

RIN 1615–ZB69

### Termination of the Designation of Nicaragua for Temporary Protected Status

**AGENCY:** U.S. Citizenship and Immigration Services (USCIS),

Department of Homeland Security (DHS).

**ACTION:** Notice.

**SUMMARY:** Through this notice, the Department of Homeland Security (DHS) announces that the Secretary of Homeland Security (Secretary) is terminating the designation of Nicaragua for Temporary Protected Status (TPS). The designation of Nicaragua is set to expire on July 5, 2025. After reviewing country conditions and consulting with appropriate U.S. Government agencies,

the Secretary determined that Nicaragua no longer continues to meet the conditions for designation for TPS. The Secretary, therefore, is terminating the TPS designation of Nicaragua as required by statute. This termination is effective September 8, 2025. After September 8, 2025, nationals of Nicaragua (and aliens having no nationality who last habitually resided in Nicaragua) who have been granted TPS under Nicaragua's designation will no longer have TPS.

**DATES:** The designation of Nicaragua for TPS is terminated, effective at 11:59 p.m., local time, on September 8, 2025.

**FOR FURTHER INFORMATION CONTACT:** Humanitarian Affairs Division, Office of Policy and Strategy, U.S. Citizenship and Immigration Services, Department of Homeland Security, (240) 721–3000 (not a toll-free call).

**SUPPLEMENTARY INFORMATION:**

**Table of Abbreviations**

CFR—Code of Federal Regulations
DHS—U.S. Department of Homeland Security
EAD—Employment Authorization Document
FR—Federal Register
FRN—Federal Register Notice
Government—U.S. Government
INA—Immigration and Nationality Act
Secretary—Secretary of Homeland Security
TPS—Temporary Protected Status
USCIS—U.S. Citizenship and Immigration Services
U.S.C.—United States Code

**What is Temporary Protected Status (TPS)?**

The Immigration and Nationality Act (INA) authorizes the Secretary of Homeland Security, after consultation with appropriate agencies of the U.S. Government, to designate a foreign state (or part thereof) for TPS if the Secretary determines that certain country conditions exist. *See* INA sec. 244(b)(1), 8 U.S.C. 1254a(b)(1). The Secretary, in her discretion, may grant TPS to eligible nationals of that foreign state (or aliens having no nationality who last habitually resided in the designated foreign state). *See* INA sec. 244(a)(1)(A), 8 U.S.C. 1254a(a)(1)(A).

At least 60 days before the expiration of a foreign state's TPS designation or extension, the Secretary—after consultation with appropriate U.S. Government agencies—must review the conditions in the foreign state designated for TPS to determine whether they continue to meet the conditions required for the TPS designation. *See* INA sec. 244(b)(3)(A), 8 U.S.C. 1254a(b)(3)(A). If the Secretary determines that the conditions in the foreign state continue to meet the

specific statutory criteria for TPS designation, TPS will be extended for an additional period of 6 months or, in the Secretary's discretion, 12 or 18 months. *See* INA sec. 244(b)(3)(A), (C), 8 U.S.C. 1254a(b)(3)(A), (C). If the Secretary determines that the foreign state no longer meets the conditions for TPS designation, the Secretary must terminate the designation. *See* INA sec. 244(b)(3)(B), 8 U.S.C. 1254a(b)(3)(B). There is no judicial review of ''any determination of the [Secretary] with respect to the designation, or termination or extension of a designation, of a foreign state'' for TPS. INA sec. 244(b)(5)(A), 8 U.S.C. 1254a(b)(5)(A).

TPS is a temporary immigration benefit granted to eligible nationals of a country designated for TPS under the INA, or to eligible aliens without nationality who last habitually resided in the designated country. During the TPS designation period, TPS beneficiaries are eligible to remain in the United States, may not be removed, and are authorized to work and obtain an Employment Authorization Document (EAD) so long as they continue to meet the requirements of TPS. TPS beneficiaries may also apply for and be granted travel authorization as a matter of discretion. The granting of TPS does not result in or lead to lawful permanent resident status or any other immigration status. To qualify for TPS, beneficiaries must meet the eligibility standards at INA section 244(c)(2), 8 U.S.C. 1254a(c)(2). When the Secretary terminates a country's TPS designation, beneficiaries return to the same immigration status or category that they maintained before TPS, if any (unless that status or category has since expired or been terminated), or any other lawfully obtained immigration status or category they received while registered for TPS, as long as it is still valid on the date TPS terminates.

**Designation of Nicaragua for TPS**

Nicaragua was initially designated for TPS over 25 years ago based on a determination that an environmental disaster resulted in a substantial, but temporary, disruption of living conditions in the area affected. The Nicaraguan government officially requested the designation, and Nicaragua was unable, temporarily, to handle adequately the return of its nationals. *See Designation of Nicaragua Under Temporary Protected Status,* 64 FR 526 (Jan. 5, 1999). Since its initial designation in 1999, TPS for Nicaragua was extended 13 consecutive times (for periods of 12 or 18 months at a time) under the same statutory basis of

environmental disaster. The last such extension was due to expire on January 5, 2018.[1]

Following the statutorily required review of the country conditions, former Acting Secretary Elaine C. Duke announced the termination of TPS for Nicaragua, with an effective date of January 5, 2019. *See Termination of the Designation of Nicaragua for Temporary Protected Status,* 82 FR 59636 (Dec. 15, 2017); *see also* INA secs. 244(b)(3)(A) and (B); 8 U.S.C. 1254a(b)(3)(A) and (B). The termination decision was the subject of litigation and court orders, and, as a result, the termination did not take effect. In compliance with court orders, DHS published periodic notices to continue TPS and extend the validity of TPS-related documentation previously issued to beneficiaries under the TPS designation for Nicaragua.[2]

Finally, on June 21, 2023, DHS published a FRN reconsidering and rescinding the prior administration's termination of Nicaragua TPS. The rescission was effective June 9, 2023, and the new 18-month extension of TPS for Nicaragua began on January 6, 2024, and will remain in effect through July 5, 2025.[3]

**Secretary's Authority To Terminate the Designation of Nicaragua for TPS**

At least 60 days before the expiration of a foreign state's TPS designation or extension, the Secretary, after consultation with appropriate U.S. Government agencies, must review the conditions in the foreign state designated for TPS to determine whether the country continues to meet the conditions required for the TPS designation. *See* INA sec. 244(b)(3)(A), 8 U.S.C. 1254a(b)(3)(A). If the Secretary determines that the foreign state no longer meets the conditions for TPS designation, the Secretary must terminate the designation. *See* INA sec. 244(b)(3)(B), 8 U.S.C. 1254a(b)(3)(B). The termination shall not take effect earlier than 60 days after the date the

---

[1] Extension of the Designation of Nicaragua for Temporary Protected Status, 81 FR 30325 (July 6, 2016).

[2] 83 FR 54764 (Oct. 31, 2018); 84 FR 7103 (Mar. 1, 2019); 84 FR 20647 (May 10, 2019) (correction notice issued at 84 FR 23578 (May 22, 2019)); 84 FR 59403 (Nov. 4, 2019); 85 FR 79208 (Dec. 9, 2020); 86 FR 50725 (Sept. 10, 2021) (correction notice issued at 86 FR 52694 (Sept. 22, 2021)); and 87 FR 68717 (Nov. 16, 2022).

[3] Reconsideration and Rescission of Termination of the Designation of Nicaragua for Temporary Protected Status; Extension of the Temporary Protected Status Designation for Nicaragua, 88 FR 40294 (June 21, 2023); *see also* Extension of Re-Registration Periods for Extensions of the Temporary Protected Status Designations of El Salvador, Haiti, Honduras, Nepal, Nicaragua, and Sudan, 88 FR 86665 (Dec. 14, 2023).

Federal Register notice (FRN) of termination is published, or if later, the expiration of the most recent previous extension of the country designation. *See id.* The Secretary may determine the appropriate effective date of the termination and expiration of any TPS-related documentation, such as EADs, issued or renewed after the effective date of termination. *See id.; see also* INA sec. 244(d)(3), 8 U.S.C. 1254a(d)(3) (providing the Secretary the discretionary "option" to allow for a certain "orderly transition" period if she determines it to be appropriate).

## Reasons for the Secretary's Termination of the TPS designation for Nicaragua

Consistent with INA section 244(b)(3)(A), 8 U.S.C. 1254a(b)(3)(A), after consulting with appropriate U.S. Government agencies, the Secretary reviewed country conditions in Nicaragua and considered whether Nicaragua no longer continues to meet the conditions for designation, including whether there is "substantial, but temporary, disruption in living conditions in the area affected" by the environmental disaster and whether Nicaragua continues to be "unable, temporarily, to handle adequately the return" of its nationals, INA 244(b)(1)(B), 1254(a)(b)(1)(B).[4] Overall, certain conditions for the TPS designation of Nicaragua may continue; however, there are notable improvements that allow Nicaragua to adequately handle the return of its nationals.

Based on the Department's review, the Secretary has determined the conditions supporting Nicaragua's January 5, 1999 designation for TPS on the basis of environmental disaster due to Hurricane Mitch are no longer met. While Hurricane Mitch was a sudden catastrophe that caused severe flooding and associated damage[5] leading to Nicaragua's TPS designation, the conditions resulting from Hurricane Mitch no longer cause a substantial, but temporary, disruption in living conditions in the area affected, and

Nicaragua is no longer unable, temporarily, to adequately handle the return of its nationals. Nicaragua has made significant progress recovering from the hurricane's destruction with the help of the international community[6] and is now a growing tourism, ecotourism, agriculture, and renewable energy leader.[7]

Since the original 1999 TPS designation, Nicaragua has seen improvements in its infrastructure with projects focusing on road construction, school infrastructure, and health access. Nicaragua has successfully completed projects on roads (U.S. $131.8 million), education (U.S. $69 million), and land administration (U.S. $50 million).[8] Nicaragua has constructed key bridges to mitigate flooding, as well as developed over 200 km (approximately 124 miles) of roads.[9] Decades-long projects have improved land administration and management, and further investment projects have helped with housing, food insecurity, and restoring the health sector.[10]

Nicaragua has become a worldwide tourist destination, while also promoting sustainability and revitalizing local communities.[11] Technological innovation is empowering local farmers and fishers, making the agriculture industry more competitive and profitable. In its 2024 investment climate statement for Nicaragua, the U.S. Department of State reported, ". . . Nicaragua continues to show stable macroeconomic fundamentals, including a record-high $5 billion in foreign reserves, a sustainable debt load, and a well-capitalized banking sector."[12]

Additionally, Nicaragua has been regularly accepting the return of its nationals with final removal orders over the last five years.[13] The Secretary has determined that Nicaragua's recent ability to accept the return of its nationals has been and continues to be at least "adequate."[14]

DHS estimates that there are approximately 4,000 nationals of Nicaragua (and aliens having no nationality who last habitually resided in Nicaragua) who hold TPS under Nicaragua's designation.[15]

## Effective Date of Termination of the Designation

The TPS statute provides that the termination of a country's TPS designation may not be effective earlier than 60 days after the FRN is published or, if later, the expiration of the most recent previous extension. *See* INA sec. 244(b)(3)(B), 8 U.S.C. 1254a(b)(3)(B).

Although the statute authorizes the Secretary, at her discretionary option, to allow for an extended "orderly transition" period with respect to the expiration of any TPS-related documentation, such as EADs, the Secretary has determined a 60-day transition period is sufficient. A sixty-day orderly period of transition is consistent with the precedent of previous TPS country terminations and makes clear that the United States is committed to clarity and consistency. *See* INA sec. 244(d)(3), 8 U.S.C. 1254a(d)(3). Accordingly, the termination of the Nicaragua TPS

---

[4] See also E.O. 14159, *Protecting the American People Against Invasion,* sec. 16(b), 90 FR 8443, 8446 (Jan. 20, 2025) (directing that the Secretary should "ensur[e] that designations of Temporary Protected Status are consistent with the provisions of section 244 of the INA (8 U.S.C. 1254a), and that such designations are appropriately limited in scope and made for only so long as may be necessary to fulfill the textual requirements of that statute").

[5] National Environmental Satellite, Data, and Information Service, 25 Years Later: Looking Back at the October Monster Named Mitch (Oct. 27, 2023), available at: *https://www.nesdis.noaa.gov/news/25-years-later-looking-back-the-october-monster-named-mitch* (last visited Apr. 14, 2025).

[6] ProVention Consortium, Learning from Recovery after Hurricane Mitch: Experience from Nicaragua (Jan. 26, 2010), available at: *https://www.preventionweb.net/files/12455_LearningfromMitchsummary1.pdf* (last visited Apr. 14, 2025).

[7] The Business Magnate, Nicaragua's Lucrative Industries: Driving Economic Growth and Development, available at: *https://thebusinessmagnate.com/nicaraguas-lucrative-industries-driving-economic-growth-and-development/* (last visited Apr. 14, 2025).

[8] World Bank Group, The World Bank in Nicaragua: Overview, Oct. 8, 2024, available at: *https://www.worldbank.org/en/country/nicaragua/overview* (last visited Apr. 14, 2025).

[9] World Bank Group, The World Bank in Nicaragua: Overview, Oct. 8, 2024, available at: *https://www.worldbank.org/en/country/nicaragua/overview* (last visited Apr. 14, 2025).

[10] World Bank Group, The World Bank in Nicaragua: Overview, Oct. 8, 2024, available at: *https://www.worldbank.org/en/country/nicaragua/overview* (last visited Apr. 14, 2025).

[11] Outlook Travel Mag, Tourism Insights, Oct. 4, 2024, available at: *https://www.outlooktravelmag.com/travel-guides/central-america/nicaragua/nicaragua-tourism-insights* (last visited Apr. 14, 2024).

[12] U.S. Department of State, 2024 Investment Climate Statements: Nicaragua, 2024, available at:

*https://www.state.gov/reports/2024-investment-climate-statements/nicaragua/* (last visited Mar. 19, 2025).

[13] Divergentes, Ortega-Murillo Regime: A Willing and Efficient Partner for U.S. Deportation Policies, Mar. 6, 2025, available at: *https://www.divergentes.com/ortega-murillo-regime-a-willing-and-efficient-partner-for-u-s-deportation-policies/#:~:text=Unlike%20its%20dictatorial%20counterparts%E2%80%94Cuba,of%20Homeland%20Security%20(DHS)* (last visited June 2025).

[14] The INA does not define "adequately." Certain "[d]ictionaries define 'adequate' as "sufficient for a specific need or requirement," Adequate, Merriam-Webster's Collegiate Dictionary, or as either: (1) "[f]ully satisfying what is required; quite sufficient, suitable, or acceptable in quality or quantity"; or (2) "[s]atisfactory, but worthy of no stronger praise or recommendation; barely reaching an acceptable standard; just good enough," Adequate, Oxford English Dictionary (3d ed. 2011)." *Booker* v. *Sec'y, Fla. Dep't of Corr.,* 22 F.4th 954, 961 (11th Cir. 2022) (Lagoa, J., specially concurring) (URL citation omitted).

[15] As of March 11, 2025, approximately 1,100 of these nationals of Nicaragua (and aliens having no nationality who last habitually resided in Nicaragua) are also approved as Lawful Permanent Residents. Data queried by Department of Homeland Security, U.S. Citizenship and Immigration Services, Office of Performance and Quality March 2025.

NicAR000003

designation will be effective 60 days from this notice's publication date.[16]

However, DHS recognizes that Nicaragua TPS beneficiaries continue to be employment authorized during the 60-day transition period.[17] Accordingly, through this FRN, DHS automatically extends the validity of certain EADs previously issued under the TPS designation of Nicaragua through September 8, 2025. Therefore, as proof of continued employment authorization through September 8, 2025, TPS beneficiaries can show their EADs that have the notation A–12 or C–19 under Category and a "Card Expires" date of January 5, 2018, January 5, 2019, April 2, 2019, January 2, 2020, January 4, 2021, October 4, 2021, December 31, 2022, June 30, 2024, and July 5, 2025.

The Secretary has considered putative reliance interests in the Nicaragua TPS designation, especially when considering whether to allow for an additional transition period similar to that allowed under certain previous TPS terminations. Temporary Protected Status, as the name itself makes clear, is an inherently temporary status. TPS designations are time-limited and must be periodically reviewed. *See* INA sec. 244(b)(3), 8 U.S.C. 1254a(b)(3). TPS notices clearly notify aliens of the designations' expiration dates, and whether to allow for an orderly transition period is left to the Secretary's unfettered discretion. *See* INA sec. 244(b)(3), (d)(3); 8 U.S.C. 1254a(b)(3), (d)(3). The statute inherently contemplates advance notice of a termination by requiring timely publication of the Secretary's determination and delaying the effective date of the termination by at least 60 days after publication of a **Federal Register** notice of the termination or, if later, the existing expiration date. *See* INA sec. 244(b)(3), (d)(3); 8 U.S.C. 1254a(b)(3), (d)(3).

**Notice of the Termination of the TPS Designation of Nicaragua**

By the authority vested in me as Secretary under INA section 244(b)(3), 8 U.S.C. 1254a(b)(3), I have reviewed, in consultation with the appropriate U.S. Government agencies, conditions in Nicaragua, in particular (a) whether there continues to be a substantial, but temporary, disruption of living conditions in the area affected resulting from the environmental disaster; and (b) whether Nicaragua continues to be "unable, temporarily, to handle adequately the return of its nationals. Based on my review, I have determined that Nicaragua no longer continues to meet the conditions for Temporary Protected Status (TPS) under INA section 244(b)(1)(B), 8 U.S.C. 1254a(b)(1)(B).

Accordingly, I order as follows:

(1) Pursuant to INA section 244(b)(3)(B), 8 U.S.C. 1254a(b)(1)(B), and considering INA section 244(d)(3), 8 U.S.C. 1254a(d)(3), the designation of Nicaragua for TPS is terminated effective at 11:59 p.m., local time, on September 8, 2025.

(2) Information concerning the termination of TPS for nationals of Nicaragua (and aliens having no nationality who last habitually resided in Nicaragua) will be available at local USCIS office upon publication of this notice and through the USCIS Contact Center at 1–800–375–5283. This information will be published on the USCIS website at *www.uscis.gov.*

**Kristi Noem,**
*Secretary of Homeland Security.*
[FR Doc. 2025–12688 Filed 7–7–25; 8:45 am]
**BILLING CODE 9111–97–P**

---

**DEPARTMENT OF HOMELAND SECURITY**

**U.S. Citizenship and Immigration Services**

**[CIS No. 2818–25; DHS Docket No. USCIS–2014–0007]**

**RIN 1615–ZB75**

**Termination of the Designation of Honduras for Temporary Protected Status**

**AGENCY:** U.S. Citizenship and Immigration Services (USCIS), Department of Homeland Security (DHS).

**ACTION:** Notice.

**SUMMARY:** Through this notice, the Department of Homeland Security (DHS) announces that the Secretary of Homeland Security (Secretary) is terminating the designation of Honduras for Temporary Protected Status (TPS). The designation of Honduras is set to expire on July 5, 2025. After reviewing country conditions and consulting with appropriate U.S. Government agencies, the Secretary has determined that conditions in Honduras no longer support its designation for TPS. The Secretary, therefore, is terminating the TPS designation of Honduras as required by statute. This termination is effective September 8, 2025. After September 8, 2025, nationals of Honduras (and aliens having no nationality who last habitually resided in Honduras) who have been granted TPS under Honduras' designation will no longer have TPS.

**DATES:** The designation of Honduras for TPS is terminated effective at 11:59 p.m., local time, on September 8, 2025.

**FOR FURTHER INFORMATION CONTACT:** Humanitarian Affairs Division, Office of Policy and Strategy, U.S. Citizenship and Immigration Services, Department of Homeland Security, (240) 721–3000.

**SUPPLEMENTARY INFORMATION:**

**Table of Abbreviations**

CFR—Code of Federal Regulations
DHS—U.S. Department of Homeland Security
EAD—Employment Authorization Document
FR—Federal Register
FRN—Federal Register Notice
Government—U.S. Government
INA—Immigration and Nationality Act
Secretary—Secretary of Homeland Security
TPS—Temporary Protected Status
USCIS—U.S. Citizenship and Immigration Services
U.S.C.—United States Code

**What is Temporary Protected Status (TPS)?**

The Immigration and Nationality Act (INA) authorizes the Secretary of Homeland Security, after consultation with appropriate agencies of the U.S. Government, to designate a foreign state (or part thereof) for TPS if the Secretary determines that certain country conditions exist. *See* INA sec. 244(b)(1), 8 U.S.C. 1254a(b)(1). The Secretary, in her discretion, may then grant TPS to eligible nationals of that foreign state (or individuals having no nationality who last habitually resided in the designated foreign state). *See* INA sec. 244(a)(1)(A), 8 U.S.C. 1254a(a)(1)(A).

At least 60 days before the expiration of a foreign state's TPS designation or extension, the Secretary, after consultation with appropriate U.S. Government agencies, must review the conditions in the foreign state designated for TPS to determine whether they continue to meet the conditions required for the TPS designation. *See* INA sec. 244(b)(3)(A), 8 U.S.C. 1254a(b)(3)(A). If the Secretary determines that the conditions in the foreign state continue to meet the specific statutory criteria for TPS designation, TPS will be extended for an

---

[16] *See* 8 CFR 244.19 ("Upon the termination of designation of a foreign state, those nationals afforded temporary Protected Status shall, upon the sixtieth (60th) day after the date notice of termination is published in the **Federal Register**, or on the last day of the most recent extension of designation by the [Secretary of Homeland Security], automatically and without further notice or right of appeal, lose Temporary Protected Status in the United States. Such termination of a foreign state's designation is not subject to appeal.").

[17] *See* INA 244(a)(1)(B), 8 U.S.C. 1254a(a)(1)(B); *see also* 8 CFR 244.13(b).

NicAR000004

**Decision Document**

**USCIS Notice: Termination of the Designation of Nicaragua for Temporary Protected Status**

(1) Approve the notice for publication in the *Federal Register* and (2) Direct ESEC to use the Federal Register Signature Card to electronically sign the notice.

2024014251

SENSITIVE BUT UNCLASSIFIED

## (U) Department Of State Recommendation Regarding Temporary Protected Status (TPS) for Nicaragua
## November 19, 2024

I.     **(U) Statutory Basis for Designation**

**(U) Have the conditions under which the foreign state was designated for Temporary Protected Status ceased to exist?**

(U) No.

**A. (U) Armed conflict**

1. **Is the foreign state involved in an ongoing, internal, armed conflict?**

   (U) No

2. **If so, would the return of nationals of the foreign state to that state (or to the part of the state) pose a serious threat to their personal safety?**

   (U) N/A

**B. (U) Environmental Disaster**

1. **(U) Does there continue to be a substantial, but temporary, disruption of living conditions in the foreign state affected by an earthquake, flood, drought, epidemic, or other environmental disaster?**

   (U) The regions most devastated by Hurricane Mitch – the mountainous north and isolated Caribbean coast – remain the poorest and least developed in the country.  Subsequent environmental events including frequent hurricanes significantly

SENSITIVE BUT UNCLASSIFIED

NicAR000006

2024014251

SENSITIVE BUT UNCLASSIFIED
-2-

compounded the initial devastation and disruption of living conditions caused by Hurricane Mitch. Hurricane Julia in October 2022, Hurricane Nate in 2017, Tropical Storm Otto in 2016, Tropical Storm Matthew in 2010, Hurricane Ida in 2009, and Tropical Storm Alma and Tropical Depression 16 in 2008 all significantly affected Nicaragua's infrastructure and ability to recover fully from the devastation caused in 1999. Ida destroyed around 80 percent of the schools and houses in the Caribbean coast of Nicaragua, affecting the lives of around 6,000 people. Alma, for example, caused over 160,000 evacuations from homes and left more than 25,000 people homeless. These environmental events have hampered recovery from and exacerbated the damage caused by Hurricane Mitch.

(U) In 2020, Hurricanes Iota and Eta hit Nicaragua barely two weeks apart and within landfall of 15 miles of each other, followed in 2022 by Hurricane Julia, which caused an estimated $400 million in damages. These more-recent hurricanes caused significant damage to many of the same areas devastated by Mitch, triggering landslides that displaced thousands of people and caused dozens of fatalities. Hurricane Julia caused damage to more than 8,000 homes and left more than one million people without power and more than 200,000 without access to drinking water; the South Caribbean Coast Autonomous Region was hardest hit, the same region previously devastated by Hurricane Mitch. According to the World Food Program (WFP), these hurricanes affected highly vulnerable Indigenous communities, where poverty rates reach 40 percent. The hurricanes adversely affected nearly three million people in this country of just 6.6 million. Populations located in the North Caribbean Autonomous Region were particularly hit hard by Hurricane Mitch and hit almost yearly by subsequent tropical storms and cyclones. This year in November, Tropical Storm Sara killed two individuals, flooded approximately 1,800 homes and six schools, and impacted 5,000 people in Nicaragua.

SENSITIVE BUT UNCLASSIFIED

SENSITIVE BUT UNCLASSIFIED
-3-

## 2. Is the foreign state unable, temporarily, to handle adequately the return to the state nationals of the state?

(U) Yes, Nicaragua remains unable to adequately handle the return of its nationals. Nicaragua has not fully recovered from Hurricane Mitch, experienced additional environmental devastation since then including the impacts of Hurricane Julia as recently as October 2022, and poverty remains high, especially in areas that bore the brunt of the storm. Nicaragua is prone to numerous environmental shocks, including droughts, floods, and landslides. The country regularly experiences tropical storms or cyclones during the Atlantic hurricane season, which results in flooding, landslides, destruction of crops and infrastructure, and disruption of livelihoods. Additionally, Nicaragua's western coastline – located along Central America's Dry Corridor – is susceptible to periodic drought, followed by heavy, irregular rainfall, which can trigger flooding and landslides. These recurrent natural disasters continue to exacerbate food insecurity among rural and urban communities in Nicaragua, which the government has been unable to address effectively. Over the last decade, food insecurity increased from 30 to 38 percent, according to WFP data. The government also shut down via public announcement in its state-run periodical, The Gaceta, more than 5,500 NGOs since 2018, including 2,650 since November 2022, reducing the number of organizations that would have assisted with disaster response and recovery efforts or could have helped the government handle the return of Nicaraguan TPS beneficiaries. Conditions in the country remain extremely challenging, and those conditions temporarily prevent Nicaragua from being able to adequately accept the return of TPS recipients.

(SBU) Weak and poorly constructed infrastructure in the affected areas continues to pose a significant barrier to wide-scale recovery. Many roads are unpaved and become impassable in heavy rains

SENSITIVE BUT UNCLASSIFIED
-4-

and floods.  Authorities have not properly rehabilitated most rural roads in the northern mountainous regions and the Caribbean coast since Hurricane Mitch and suffered additional damage from frequent flooding.  Roads are usually repaired superficially during the dry season but become impassable during the rainy season, particularly in the isolated Caribbean coast region.  The World Bank considers Nicaragua's infrastructure as the lowest quality infrastructure in Central America.  According to the State Department's 2023 Human Rights Report, "poor roads hindered access to healthcare for many" on the Caribbean Coast.  The Government of Nicaragua has not invested sufficiently in public works and other programs necessary for long-term socioeconomic development, which has impeded recovery and its ability to adequately handle the return of its nationals.

(SBU) Nicaragua is the second poorest country in the Western Hemisphere behind Haiti; GDP per capita in 2023 was just $2,620.  The cost of living far exceeds the average wages.  Inflation reached a high of 12 percent November 2022, according to official figures.  The price of a basket of typical consumer goods and services – a key measure of inflation's impact on the general population – was near a record high of $560 per month as of August 2024, more than double the average minimum wage of $230 per month.  According to the Central Bank, purchasing power decreased 20 percent since 2018.  Thousands of families rely on remittances to survive.  Though official unemployment is low, about 40 percent of the population is underemployed.  As of October 2024, the WFP reported that more than 1.4 million people face undernourishment.  According to Transparency International's 2023 Corruption Perceptions Index, Nicaragua is ranked 172 out of 180 countries, a drop from its ranking of 167 of 180 countries in 2022.  These significant economic challenges make it unlikely that the Nicaraguan government would be able to offer effective social

SENSITIVE BUT UNCLASSIFIED

SENSITIVE BUT UNCLASSIFIED
-5-

services and support to thousands of returnees who would likely overwhelm the labor market and further increase unemployment.

**3. Does the foreign state continue to support the TPS designation for its nationals in the United States?**

(U) Yes.

## C. Extraordinary and Temporary Conditions

**1. Has the foreign state experienced extraordinary and temporary conditions that prevent nationals of the state from returning to the state in safety?**

(U) Yes.  President Ortega and Vice President Murillo have dramatically increased politically motivated efforts to deprive citizens of nationality, as well as efforts to de facto de-nationalize citizens and render said individuals stateless, and to force their citizens to leave the country.  The State Department's Human Rights Report (HRR) chapters on Nicaragua in 2022 and 2023 document other significant human rights issues making it unsafe for nationals to return to Nicaragua.  According to the HRRs, there are credible reports that regime authorities engaged in unlawful or arbitrary killings, including extrajudicial killings; forced disappearances; torture and other cruel, inhuman, or degrading treatment or punishment by prison guards and abuses by parapolice; maintenance of harsh and life-threatening prison conditions; and arbitrary arrest and detentions.  The scope of this repression, together with the total capture of civil society, elimination of any opposition inside the country prevents Nicaraguans from being able to return to Nicaragua in safety.

(SBU) These developments are layered on top of a violent subjugation of Nicaraguan society since 2018.  Civil unrest erupted

SENSITIVE BUT UNCLASSIFIED
-6-

in April 2018 when police and paramilitary violently suppressed peaceful protests.  The violence left 355 people dead, more than 2,000 injured, and forced thousands into hiding or to flee the country.  In November 2021, President Ortega manipulated presidential elections to award himself a fourth consecutive term, alongside his wife as Vice President.  In the process, Ortega and Murillo barred participation of all genuine opposition political parties, jailed opposition figures and presidential candidates, and blocked legitimate international observation efforts.  In November 2022, Ortega-Murillo's Sandinista party gave itself control of all 153 municipalities in sham local elections, solidifying domination of the country by Ortega and Murillo as a single-party authoritarian state.  In November of 2024, Ortega and Murillo directed the National Assembly to change Nicaragua's constitution to extend presidential term limits from five to six years and to elevate Vice President Murillo's post to "co-president," further concentrating power in their hands.  According to exiled Nicaraguan NGO, Nicaragua Nunca Más, more than 800,000 Nicaraguans have fled for neighboring countries since 2018 due to the political crisis and state violence.  The same report indicates that 200,000 of these Nicaraguans fled the country between June 2023 and October 2024.

(U) Regime authorities continue to engage in human rights abuses.  A 2024 UN Group of Human Rights Experts on Nicaragua (GHREN) report on violations of freedom of religion or belief documents prison authorities' participation in acts amounting to torture and inhumane treatment of prisoners of conscience for the purpose of obtaining information, punishing, intimidating or coercing victims based on the perception that victims opposed the government.  In one illustrative example in the report, a formerly imprisoned priest described prison authorities pulling his nails from his fingers and inserting needles into his hands.  The 2022 and 2023 HRRs also document credible reports of punishment of family members –

SENSITIVE BUT UNCLASSIFIED

2024014251

including arbitrary arrests and unsubstantiated charges – for offenses allegedly committed by their relatives; serious restrictions on free expression and media; substantial interference with the rights of peaceful assembly and freedom of association; serious government restrictions on and harassment of domestic and international human rights organizations; lack of investigation of and accountability for gender-based violence, including femicides; trafficking in persons; crimes involving violence or threats of violence targeting members of ethnic minorities and Indigenous communities; crimes involving violence or threats of violence targeting lesbian, gay, bisexual, transgender, queer, and intersex persons; and the worst forms of child labor.  Anyone returned to Nicaragua and who is perceived to oppose the government, regardless of political or apolitical affiliation, likely would face a combination of these human rights issues on the ground.

(U) Since November 2022, and according to political prisoner watchdog organization Mecanismo, Nicaraguan authorities unjustly detained at least 248 individuals perceived to threaten the Ortega-Murillo regime's grip on power, in addition to those it had previously unjustly detained in the previous 18 months.  While the Ortega-Murillo regime maintains a revolving door of unjustly detained political prisoners, it has shifted from unjustly detaining peaceful protestors and members of the political opposition to unjustly arresting ordinary citizens, Catholic clergy and lay people, evangelical leaders, lower profile journalists, and workers of charitable organizations.  In April 2023, police arrested more than 55 individuals—ordinary Catholic parishioners, a journalist, and community figures—for their participation in peaceful religious processions and activities related to Holy Week (Easter) celebrations.  In mid-November 2024, Mecanismo reported that the Ortega-Murillo regime unjustly held at least 46 individuals, even after four political prisoner releases since February 2023. Ortega and Murillo conditioned releases on the prisoners'

NicAR000012

agreement to accept forced relocation to another country in exchange for freedom, resulting in a total of 385 individuals sent to the United States, the Holy See, and Guatemala.

(U) The Ortega-Murillo regime established a practice of moving to strip Nicaraguans of their citizenship and subsequently seizing their assets as property of the state.  In February 2023, the Ortega-Murillo regime released 222 political prisoners to the United States and moved to revoke the Nicaraguan nationality of each, including a prominent Nicaraguan Catholic bishop who remained unjustly detained.  Days later, Ortega and Murillo moved to revoke the Nicaraguan nationality of an additional 94 perceived dissidents, some of whom remain in Nicaragua but many of whom already had fled the country.  Nicaraguan authorities repeated this effort at mass revocation of citizenship in September 2024, when they released 135 political prisoners (almost all of whom authorities arrested after the February 2023 release of political prisoners) to Guatemala and subsequently moved to revoke their citizenship.  Beyond erasing the names of these 452 individuals in the civil registries, the Ortega-Murillo regime began to seize assets and reappropriate properties of these individuals as assets of the state.

(U) In addition to formally moving to stripping citizens of nationality, the Ortega-Murillo regime also began to exercise a policy of large-scale de facto denationalization.  According to GHREN, Nicaraguan authorities denied citizen services to Nicaraguans in Nicaragua, as well as overseas, who were seeking to obtain birth certificates, passports, passport renewals, and other civil registry documents.  Lack of access to birth certificates and other civil registry documents puts many Nicaraguans, particularly children, at higher risk of exploitation and abuse.  Without documents to prove their age, nationality, marital status, or other identifying statuses, Nicaraguans face dangers of losing

NicAR000013

SENSITIVE BUT UNCLASSIFIED
-9-

access to or facing discriminatory treatment in public health care services and education. Girls without birth certificates in Nicaragua lack protections from child marriage, where 10 percent of girls marry before age 15, despite the minimum legal age of marriage being 18 (16 with parental permission).

(U) Throughout the last 18 months, the Ortega-Murillo regime's authorities increased efforts to force perceived dissidents to leave the country. According to Martha Patricia Molina, author of "Nicaragua: A Persecuted Church" and recipient of the State Department's award for International Religious Freedom, Ortega and Murillo expelled or barred re-entry of or forced to leave more than 259 religious actors, spanning Catholic clergy, nuns, and Catholic lay workers since 2022, most of them Nicaraguan citizens. Nicaraguan authorities also expelled several Evangelical pastors, also Nicaraguan citizens. The Ortega-Murillo regime's decimation of the civic spaces has prompted additional waves of departures of individuals, likely due to the risk of unjust arrest, enforced disappearance, or violence. In the past two years, Nicaraguan authorities forced the closure of more than 2,650 NGOs, private sector business chambers, religiously affiliated organizations and institutions, and private universities, adding to the more than 3,000 NGOs shuttered between 2018 and November 2022. The Ortega-Murillo regime also increased restrictions on press freedom. Throughout the last 18 months, Nicaraguan authorities and affiliates retaliated against the members of independent press, radio, and television stations by blocking transmissions, impeding the import of ink and paper, committing violence against journalists and unjustly detaining them, and shutting down media organizations and seizing their property. Since 2021, almost all independent news and media outlets have relocated to outside of the country, leaving Nicaragua devoid of non-state print news and triggering an exodus of independent journalists from Nicaragua.

(U) Beginning in 2022, the Ortega-Murillo regime dramatically increased its repression of freedom of religion or belief, beginning with a wave of unjust detentions of Catholic clergy and a national ban on religious processions.  The State Department's International Religious Freedom Reports for 2022 and 2023 document a significant uptick in reported anti-church activities, including unjust detentions and sentencing of clergy and laypeople; reported cruel; degrading and inhumane treatment of Catholic clergy while unjustly detained; forced expulsion and denied re-entry into the country for religious actors; state-sponsored abductions; burglary of Catholic religious items and lay property; unlawful entry into, desecration (including an alleged 2020 arson of Managua's cathedral), seizure and reappropriation; of Catholic churches and buildings; death threats; verbal insults; and surveillance and intimidation of parishioners during and after attendance of religious services.

(U) Since 2022, Ortega and Murillo enacted and amended a wide range of legislation to increase total control, codify their repressive practices, and target opponents, making Nicaragua an increasingly unsafe destination for returning nationals.  The National Assembly approved new terrorism, anti-money laundering, telecom, non-profit organization, and foreign agent laws to criminalize independent activities and increase information control, surveillance, and censorship.  The National Assembly continues to pass legislation that enables the judiciary and other government actors to abuse the justice system to prosecute civil society actors and ordinary citizens perceived to engage in dissent as so-called terrorists, assassins, and "coup mongers" in the words of the regime.  As of September 2024, civil society organizations may only operate legally if they form partnerships with the Ministry of Interior, negating any independence from the state.  The World Justice Forum 2024 Rule of Law Index ranked Nicaragua 137 out of 142 countries for adherence to the rule of law.

SENSITIVE BUT UNCLASSIFIED
-11-

(SBU) On November 28, the Nicaraguan National Assembly approved a repressive migration reform that amends the Penal Code to impose prison sentences of two to six years on Nicaraguans who enter or leave the country irregularly with the intent to harm national integrity, independence, sovereignty, or self-determination.  Additionally, the reform legalizes the revocation of acquired nationality for those convicted of treason and allows for the expulsion of non-residents and residents involved in activities against the recently reformed Nicaraguan Constitution.

2. **Would permitting nationals of the foreign state to remain temporarily in the United States be contrary to the national interest of the United States?**

(U) No.

## II. (SBU) Discretionary Factors

**(SBU) What, if any, additional information relevant to this decision should be brought to the attention of the Department of Homeland Security?**

(SBU) The Ortega-Murillo regime's repression of Nicaraguans increased dramatically.  The Ortega-Murillo regime engages in and tolerates particularly severe violations of religious freedom for which the Secretary of State designated Nicaragua as a Country of Particular Concern (CPC) in November 2022 and re-designated as a CPC on December 29, 2023, after designating Nicaragua a Special Watch List country for three consecutive years since 2019.  On November 27, 2018, pursuant to the International Emergency Economic Powers Act, the President declared a national emergency with respect to the situation in Nicaragua.  According to the

SENSITIVE BUT UNCLASSIFIED

declaration, "[t]he violent response by the Government of Nicaragua to the protests that began on April 18, 2018, and the Ortega-Murillo regime's continued systematic dismantling and undermining of democratic institutions [and] its use of violence and repressive tactics against civilians" were contributing factors to justify declaration of an "unusual and extraordinary threat to national security and foreign policy of the United States." On November 22, President Biden continued for one year the national emergency declared in E.O. 13851 with respect to the situation in Nicaragua.

Nicaraguan authorities systematically barred re-entry into the country to Nicaraguan citizens. According to the GHREN, authorities prevented some 110 Nicaraguans from re-entering the country in 2023, representing a 500 percent increase in the practice since 2022. The GHREN reported at least 12 Nicaraguans barred from re-entry between January and March 2024. In all cases, victims included "journalists, priests, academics, lawyers, human rights defenders, and family members of released former political prisoners." The GHREN further clarifies that "many of the individuals whom authorities prohibited from returning to Nicaragua were previous victims of harassment, threats against them or their families, and other human rights violations." Even if authorities permitted their return, they fit the profiles of individuals that continue to face risks of unjust detention, enforced disappearance, harassment, and other abuses of human rights in Nicaragua and would remain subject to such risks.

## III. (SBU) Recommendation

(SBU) For the reasons described herein, the Department recommends an extension of Nicaragua's TPS designation for 18 months based on environmental disaster and redesignation of TPS for Nicaragua based on extraordinary and temporary conditions.

THE SECRETARY OF STATE
WASHINGTON


The Honorable
Alejandro N. Mayorkas
Secretary of the Department of Homeland Security
Washington, DC  20528

Dear Secretary Mayorkas:

The Department of State assesses ongoing environmental disaster and extraordinary and temporary conditions currently exist in Nicaragua, preventing Nicaraguan nationals in the United States (or noncitizens having no nationality who last habitually resided in Nicaragua) from returning to Nicaragua in safety.  The Department of State supports the extension of Temporary Protected Status (TPS) for 18 months based on environmental disaster and the redesignation of Nicaragua based on extraordinary and temporary conditions.

The Department of State recommends the extension of Temporary Protected Status (TPS) for 18 months based on environmental disaster.  The effects of Hurricane Mitch, which prompted the January 5, 1999, designation of Nicaragua for TPS, continue to disrupt living conditions in Nicaragua.  The hurricane brought extensive rainfall and severe flooding to Nicaragua, leaving two million people to suffer the storm's direct effects. Total damage was estimated at $1.5 billion.  Subsequent environmental events including frequent hurricanes significantly compounded the initial devastation and disruption of living conditions caused by Hurricane Mitch and affected Nicaragua's infrastructure and ability to recover.

The Department of State also recommends the redesignation of Nicaragua based on extraordinary and temporary conditions.  President Ortega and Vice President Murillo have dramatically increased repression of civil society actors, and there are credible reports of large-scale human rights abuses.

-2-

There are credible reports that regime authorities have engaged in unlawful or arbitrary killings, including extrajudicial killings; forced disappearances; torture and other cruel, inhuman, or degrading treatment or punishment by prison guards and abuses by parapolice; and arbitrary arrest and detentions, imperiling the safety of nationals if returned to Nicaragua.

In November 2021, Ortega manipulated presidential elections to award himself a fourth consecutive term, and in the process, barred participation of all genuine opposition political parties, jailed opposition figures and presidential candidates, and blocked legitimate international observation efforts. In November 2022, Ortega-Murillo's Sandinista party gave itself control of all 153 municipalities in sham local elections, solidifying domination of the country by Ortega and Murillo as a single-party authoritarian state. Since then, the Ortega-Murillo regime dramatically increased politically motivated efforts to deprive citizens of nationality, de facto denaturalize citizens, and force Nicaraguan citizens to leave the country. For example, Nicaraguan authorities undertook an effort at mass revocation of citizenship in September 2024, when they released 135 political prisoners (almost all of whom authorities arrested after the February 2023 release of political prisoners) to Guatemala and subsequently moved to revoke their citizenship.

Furthermore, in November 2024, the Ortega-Murillo regime directed the National Assembly to change Nicaragua's constitution to extend presidential term limits from five to six years and to elevate Murillo's post to "co-president," further concentrating power over Nicaragua's governing institutions. On November 28, the Nicaraguan National Assembly approved a repressive migration reform that amends the Penal Code to impose prison sentences of two to six years on Nicaraguans who enter or leave the country irregularly with the intent to harm national integrity, independence, sovereignty, or self-determination. The reform also legalizes the revocation of acquired nationality for those convicted of treason and allows for the expulsion of non-residents and residents involved in activities against the recently reformed Nicaraguan Constitution.

NicAR000019

-3-

The scope of this repression, together with the total capture of civil society and elimination of opposition inside the country, prevents Nicaraguans from being able to return to Nicaragua in safety.

Given the volatility of the current situation, including the ongoing effects of environmental disasters and large-scale human rights abuses, I recommend you extend TPS for 18 months based on environmental disaster and redesignate Nicaragua based on extraordinary and temporary conditions.

To help inform your decision, the Department has prepared the attached country conditions assessment.

Sincerely,

Antony J. Blinken

Enclosure:
    As stated.

**U.S. Department of Homeland Security**
U.S. Citizenship and Immigration Services
Refugee, Asylum and International Operations Directorate
5900 Capital Gateway Drive
Camp Springs, MD 20588



# Nicaragua: Temporary Protected Status (TPS)
## Country of Origin Information (COI)
## Considerations[1]

### Overview

Nicaragua is a low-income country of approximately seven million people that has a food-deficit even though approximately 30% of the population is employed in the agricultural sector.[2] According to the World Food Programme (WFP), Nicaragua "is constantly exposed to hazards such as droughts, floods, hurricanes, storms, volcanic eruptions and slow-onset events, which are aggravated by environmental degradation."[3] The most recent tropical storm to strike Nicaragua was Tropical Storm Sara on November 14, 2024, which impacted 50 municipalities, affecting 5,000 people and resulting in the flooding of hundreds of homes.[4] While Nicaragua was struck by Hurricane Mitch, a category 5 storm, in October 1998 and was one of the hardest hit countries in the region, at the time of this reporting, no information regarding any potentially ongoing impacts of the 1998 Hurricane Mitch was accessible or known to be available.

According to a report from February 2024, "The rule of law collapsed [in 2018] as the government moved to put down the movement, with rights monitors reporting killings, extrajudicial detentions, disappearances, and torture."[5] On the sixth anniversary of the outbreak of social protests in Nicaragua, the Inter-American Commission on Human Rights (IACHR) reported in mid-April 2024 that "state repression against dissident voices has persisted under different guises and levels of intensity," with Nicaragua having become "a police state" and the country's "political, social and human rights crisis" continuing "to deepen."[6] In mid-September

---

[1] The reporting period for this report is February 8, 2023, to March 19, 2025.
[2] Nicaragua, World Food Programme, available at: https://www.wfp.org/countries/nicaragua (last visited April 10, 2025).
[3] Nicaragua country strategic plan (2024–2029), World Food Programme (WFP), May 13, 2024, pg. 3, available at: https://docs.wfp.org/api/documents/WFP-0000157532/download/?_ga=2.122183627.1775531770.1731961750-1448719734.1731961750 (last visited Mar. 21, 2025).
[4] Marlon González, La tormenta tropical Sara se disipa y deja cuatro muertos y un remanente de lluvias en Centroamérica, The Associated Press, updated Nov. 18, 2024, available at: https://apnews.com/article/tormenta-tropical-sara-honduras-muertos-lluvias-centroamerica-6280188f0024cb3fb29fd01c31c699f1 (last visited Mar. 21, 2025); La tormenta tropical Sara deja cuatro muertos en Honduras y Nicaragua, Agence France-Presse (AFP), Nov. 19, 2024, available at: https://www.swissinfo.ch/spa/tormenta-tropical-sara-deja-cuatro-muertos-en-honduras-y-nicaragua/88215935 (last visited Mar. 21, 2025).
[5] Freedom in the World 2024 – Nicaragua, Freedom House, Feb. 29, 2024, available at: https://freedomhouse.org/country/nicaragua/freedom-world/2024 (last visited Mar. 21, 2025).
[6] Nicaragua: Six years after social protests, IACHR urges reestablishment of democracy, end to repression and impunity, Inter-American Commission on Human Rights (IACHR), Apr. 18, 2024, available at: https://www.oas.org/en/IACHR/jsForm/?File=/en/iachr/media_center/PReleases/2024/075.asp (last visited Mar. 21, 2025).

TPS Considerations: The Republic of Nicaragua Apr. 10, 2025

1

NicAR000021

2024, the Group of Human Rights Experts on Nicaragua stated that the human rights situation in the country had "dramatically worsened since last year, with the Government continuing to facilitate, coordinate and execute serious human rights violations and abuses."[7]  In February 2025, the Group of Human Rights Experts on Nicaragua stated that the Nicaraguan government had "dismantled the last remaining checks on its power, systematically executing a strategy to cement total control of the country through severe human rights violations."[8]  It also noted that "the regime of President Daniel Ortega and Rosario Murillo, has deliberately transformed the country into an authoritarian State where no independent institutions remain, opposition voices are silenced, and the population – both inside and outside Nicaragua – faces persecution, forced exile, and economic retaliation."[9]

## Environmental Conditions

The WFP reported in mid-May 2024, "Between 1998 and 2020, 38 extreme hydrometeorological events were recorded" in Nicaragua, "including El Niño and La Niña phenomena, which caused floods or droughts resulting in heavy material losses."[10]  Nicaragua was struck by Hurricane Mitch, a category 5 storm, in October 1998 and was one of the hardest hit countries in the region, suffering "3,800 dead."[11]At the time of this reporting, no information regarding any potentially ongoing impacts of the 1998 Hurricane Mitch was accessible or known to be available.

Nicaragua has historically "been impacted by tropical cyclones."[12]  The country's "Caribbean coast, which has a large number of Indigenous and Afro-descendant communities, is frequently hit by hurricanes and tropical storms."[13]  On November 14, 2024, Tropical Storm Sara "made landfall […] near the Honduras-Nicaragua border."[14]  Tropical Storm Sara impacted 50

---

[9] Nicaragua's deepening repression: UN experts call for urgent global action, Group of Human Rights Experts on Nicaragua, Office of the High Commissioner for Human Rights (OHCHR), Feb. 26, 2025, available at: https://www.ohchr.org/en/press-releases/2025/02/nicaraguas-deepening-repression-un-experts-call-urgent-global-action (last visited Mar. 19, 2025).
[10] Nicaragua country strategic plan (2024–2029), World Food Programme (WFP), May 13, 2024, pg. 3, available at: https://docs.wfp.org/api/documents/WFP-0000157532/download/?_ga=2.122183627.1775531770.1731961750-1448719734.1731961750 (last visited Mar. 21, 2025).
[11] Luis Guillermo Solís, Central America Is Still Recovering from Hurricane Mitch, Americas Quarterly, May 3, 2022, available at: https://www.americasquarterly.org/article/central-america-is-still-recovering-from-hurricane-mitch/ (last visited Apr. 10, 2025).
[12] Nicaragua: Anticipatory Actions for Tropical Storms, DREF N° MDRNI012 - Final Report, International Federation of Red Cross and Red Crescent Societies (IFRC), Apr. 6, 2023, pg. 1, available at: https://reliefweb.int/report/nicaragua/nicaragua-anticipatory-actions-tropical-storms-dref-ndeg-mdrni012-final-report (last visited Mar. 21, 2025).
[13] Nicaragua country strategic plan (2024–2029), World Food Programme (WFP), May 13, 2024, pg. 3, available at: https://docs.wfp.org/api/documents/WFP-0000157532/download/?_ga=2.122183627.1775531770.1731961750-1448719734.1731961750 (last visited Mar. 21, 2025).
[14] Central America: Tropical Storm Sara - Flash Update No. 2 (as of 18 November 2024), United Nations Office for the Coordination of Humanitarian Affairs (OCHA), Nov. 18, 2024, pg. 1, available at: https://reliefweb.int/report/honduras/central-america-tropical-storm-sara-flash-update-no-2-18-november-2024 (last visited Mar. 21, 2025).

NicAR000022

municipalities in Nicaragua, and two deaths were reported.[15]  In addition, 5,000 people were affected and "some 1,800 homes flooded due to the flooding of 25 rivers."[16]

Nicaragua was impacted by Hurricane Julia—a category 1 storm—in early October 2022.[17]  Per the WFP, Hurricane Julia "directly and indirectly" impacted "nearly 4 million people (60 percent of the population) and 60 percent of the territory," and "resulted in economic losses amounting to approximately 2.4 percent of Nicaragua's GDP."[18]  The International Federation of Red Cross and Red Crescent Societies (IFRC) reported in April 2023 that Julia "left major damage" in Nicaragua:

> [...] Julia caused heavy rainfall, which in turn caused several rivers to overflow, including the Artiwas, Wasminona and Okonwas rivers in the municipality of Rosita, the Malacatoya and Fonseca rivers, Siquia, Mico and Rama, among others, putting the population at risk and damaging social infrastructure such as housing, roads and telecommunications in the South Atlantic Autonomous Region (RAAS), Central Zelaya and Boaco, interruption of electricity and drinking] water services, obstruction of roads due to falling trees, among others.

> According to preliminary data released by SINPARED, Julia left major damage. Around 20,000 people were evacuated from the areas of greatest impact and risk, some 15,000 houses were affected to varying degrees, of which almost 700 were totally destroyed and more than 8,000 were affected, mainly with damage to their roofs.  There were also reports of 98 health units affected in their infrastructure, including a regional hospital. [...]

> One of the areas most affected was the municipality of El Rama in the South Caribbean, where three rivers converge: Siquia, Mico and Rama, adding to the more than 70 rivers that overflowed nationwide as a result of the rains, leaving villages under water and entire families lost all their belongings. [19]

---

[15] Marlon González, La tormenta tropical Sara se disipa y deja cuatro muertos y un remanente de lluvias en Centroamérica, The Associated Press, updated Nov. 18, 2024, available at: https://apnews.com/article/tormenta-tropical-sara-honduras-muertos-lluvias-centroamerica-6280188f0024cb3fb29fd01c31c699f1 (last visited Mar. 21, 2025).

[16] La tormenta tropical Sara deja cuatro muertos en Honduras y Nicaragua, Agence France-Presse (AFP), Nov. 19, 2024, available at: https://www.swissinfo.ch/spa/tormenta-tropical-sara-deja-cuatro-muertos-en-honduras-y-nicaragua/88215935 (last visited Mar. 21, 2025).

[17] Nicaragua: Anticipatory Actions for Tropical Storms, DREF N° MDRNI012 - Final Report, International Federation of Red Cross and Red Crescent Societies (IFRC), Apr. 6, 2023, pg. 2, available at: https://reliefweb.int/report/nicaragua/nicaragua-anticipatory-actions-tropical-storms-dref-ndeg-mdrni012-final-report (last visited Mar. 21, 2025).

[18] Letícia Gonçalves, Kathryn Milliken, Nicholas Grainger, and Eliseo Arauz, Sovereign disaster risk financing: Linking insurance & other disaster risk finance tools to social protection system in Central America and the Caribbean, World Food Programme (WFP), Aug. 2023, pg. 4, available at: https://www.wfp.org/publications/sovereign-disaster-risk-financing-linking-insurance-other-disaster-risk-finance-tools (last visited Mar. 21, 2025).

[19] Nicaragua: Anticipatory Actions for Tropical Storms, DREF N° MDRNI012 - Final Report, International Federation of Red Cross and Red Crescent Societies (IFRC), Apr. 6, 2023, pg. 2, available at: https://reliefweb.int/report/nicaragua/nicaragua-anticipatory-actions-tropical-storms-dref-ndeg-mdrni012-final-report (last visited Mar. 21, 2025).

NicAR000023

In its country report covering 2023, the WFP noted, "Although Hurricane Julia hit the Caribbean coast in October 2022, the scale of damages caused to infrastructure and livelihoods required assistance throughout 2023."[20]

The Dry Corridor in Nicaragua "covers 44 municipalities primarily dedicated to agricultural activities, mainly the production of basic grains for the national market and self-consumption."[21] According to the WFP, "The area is characterized by irregular rainfall distribution with alternating drought and heavy rains generating landslides and floods."[22]  The WFP reported in August 2023 that the Dry Corridor was "one of the regions with the highest prevalence of food insecurity in the country."[23]

The WFP stated in mid-May 2024 that El Niño was "currently active."[24]  In mid-October 2023, OCHA reported, "In Nicaragua, an estimated 50 per cent of crops have already been affected by drought conditions brought on by El Niño."[25]

## Social and Political Considerations

In its annual report on human rights in Nicaragua (covering 2023), the U.S. Department of State noted that during the year: "Significant human rights issues included credible reports of: arbitrary or unlawful killings, including extrajudicial killings; enforced disappearance; torture or cruel, inhuman, or degrading treatment or punishment by prison guards and parapolice […]."[26] The U.S. Department of State further noted in its 2023 report:

> Parapolice – nonuniformed, armed, and masked units with marginal tactical training and
> loose hierarchy that acted in coordination with government security forces and reported

[20] Nicaragua Annual Country Report 2023 - Country Strategic Plan 2019 – 2024, World Food Programme (WFP), Apr. 2, 2024, pg. 3, available at: https://reliefweb.int/report/nicaragua/nicaragua-annual-country-report-2023-country-strategic-plan-2019-2024 (last visited Mar. 21, 2025).

[21] Nicaragua country strategic plan (2024–2029), World Food Programme (WFP), May 13, 2024, pg. 3, available at: https://docs.wfp.org/api/documents/WFP-0000157532/download/?_ga=2.122183627.1775551770.1731961750-1448719734.1731961750 (last visited Mar. 21, 2025).

[22] Nicaragua country strategic plan (2024–2029), World Food Programme (WFP), May 13, 2024, pg. 3, available at: https://docs.wfp.org/api/documents/WFP-0000157532/download/?_ga=2.122183627.1775551770.1731961750-1448719734.1731961750 (last visited Mar. 21, 2025).

[23] Letícia Gonçalves, Kathryn Milliken, Nicholas Grainger, and Eliseo Arauz, Sovereign disaster risk financing: Linking insurance & other disaster risk finance tools to social protection system in Central America and the Caribbean, World Food Programme (WFP), Aug. 2023, pg. 4, available at: https://www.wfp.org/publications/sovereign-disaster-risk-financing-linking-insurance-other-disaster-risk-finance-tools (last visited Mar. 21, 2025).

[24] Nicaragua country strategic plan (2024–2029), World Food Programme (WFP), May 13, 2024, pg. 3, available at: https://docs.wfp.org/api/documents/WFP-0000157532/download/?_ga=2.122183627.1775551770.1731961750-1448719734.1731961750 (last visited Mar. 21, 2025).

[25] Latin America & The Caribbean Weekly Situation Update (As of 10 October 2023), United Nations Office for the Coordination of Humanitarian Affairs (OCHA), Oct. 10, 2023, pg. 2, available at: https://reliefweb.int/report/nicaragua/latin-america-caribbean-weekly-situation-update-10-october-2023 (last visited Mar. 21, 2025).

[26] 2023 Country Reports on Human Rights Practices: Nicaragua, U.S. Department of State, Apr. 23, 2024, available at: https://www.state.gov/reports/2023-country-reports-on-human-rights-practices/nicaragua/ (last visited Apr. 9, 2025).

NicAR000024

directly to the Nicaraguan National Police – and individuals linked to the government of President Daniel Ortega Saavedra carried out a campaign of harassment, intimidation, and violence toward perceived enemies of the regime, such as former political prisoners and their families, farmworker activists, prodemocracy opposition groups, human rights defenders, private-sector leaders, and clergy, other religious actors, and church-affiliated civil society groups. Authorities did not investigate or prosecute these actions.[27]

The following sources discuss the consolidation of the branches of government by President Daniel Ortega. According to the IACHR, Nicaragua's "democratic system has been eroded" since 1999 via "a series of legal reforms and other political actions that gradually led the Head of the Executive Branch to establish partisan control of all democratic institutions, silence political opposition, concentrate public power, and reduce the environment for civic participation of civil society."[28]  In its annual report covering 2024, Freedom House noted that the "election of Sandinista leader Daniel Ortega" in 2006 "began a period of democratic deterioration marked by the consolidation of all branches of government under his party's control, the limitation of fundamental freedoms, and unchecked corruption in government."[29]

Per the IACHR, the outbreak of social protests which started on April 18, 2018, "spontaneously exposed the social discontent that had built up over several years, in the face of the institutional processes that had gradually restricted citizen expression, co-opted public institutions and led to a concentration of state power in the hands of the executive branch."[30]  The Nicaraguan state responded to this "expression of social dissent" with "the use of violence."[31]  The IACHR reported in mid-April 2024—on the sixth anniversary of the outbreak of social protests in the country, "The repressive and violent state response resulted in the deaths of at least 355 people, injuries to more than 2,000 people and the arbitrary detention of more than 2,000 people."[32]

---

[27] 2023 Country Reports on Human Rights Practices: Nicaragua, U.S. Department of State, Apr. 23, 2024, available at: https://www.state.gov/reports/2023-country-reports-on-human-rights-practices/nicaragua/ (last visited Apr. 9, 2025).

[28] Closure of civic space in Nicaragua, Inter-American Commission on Human Rights (IACHR), Sep. 23, 2023, pg. 11, available at: https://www.oas.org/en/iachr/reports/pdfs/2023/Cierre_espacio_civico_Nicaragua_ENG.pdf (last visited Mar. 21, 2025).

[29] Freedom in the World 2025 - Nicaragua, Freedom House, Feb. 26, 2025, available at: https://freedomhouse.org/country/nicaragua/freedom-world/2025 (last visited Mar. 21, 2025).

[30] Annual Report 2023 - Chapter IV.B - Nicaragua, Inter-American Commission on Human Rights (IACHR), Apr. 25, 2024, pg. 675, available at: https://www.oas.org/en/iachr/docs/annual/2023/chapters/IA2023_Cap_4B_Nicaragua_ENG.PDF (last visited Mar. 21, 2025).

[31] Annual Report 2023 - Chapter IV.B - Nicaragua, Inter-American Commission on Human Rights (IACHR), Apr. 25, 2024, pg. 675, available at: https://www.oas.org/en/iachr/docs/annual/2023/chapters/IA2023_Cap_4B_Nicaragua_ENG.PDF (last visited Mar. 21, 2025).

[32] Nicaragua: Six years after social protests, IACHR urges reestablishment of democracy, end to repression and impunity, Inter-American Commission on Human Rights (IACHR), Apr. 18, 2024, available at: https://www.oas.org/en/IACHR/jsForm/?File=/en/iachr/media_center/PReleases/2024/075.asp (last visited Mar. 21, 2025).

NicAR000025

In late February 2025, the Group of Human Rights Experts on Nicaragua reported that it had "identified four main phases of repression since April 2018."[33]  As the Group of Human Rights Experts on Nicaragua noted:

> The first phase (2018-2020) was characterized by a violent and disproportionate crackdown on widespread legitimate protests, revealing a repressive impulse and an initial lack of preparedness to address social discontent and demands […].  The second phase (2021) was defined by intensified targeted repression, especially arbitrary detentions and groundless prosecutions, to ensure President Ortega's re-election […].  In the third phase (2022), the Government redoubled efforts to eliminate all remnants of political opposition in the lead up to the November municipal elections […].
>
> The fourth phase (2023-present) is characterized by measures aimed at eliminating all criticism and cementing the executive's absolute control over all State entities and the population.  Authorities expelled or barred hundreds of Nicaraguans from entering the country and arbitrarily deprived hundreds of their nationality.  The authorities further dismantled civic space by cancelling the legal status of hundreds more non-profit organizations.  They accelerated the confiscation of assets of real or perceived opponents, their relatives, non-profit organizations and private universities.  The systematic targeted repression of perceived opponents continued, including surveillance, harassment, arbitrary detentions, unfair trials and enforced disappearances.  The authorities formalized their control through constitutional and legislative reforms.  This culminated with a broad constitutional reform, in force since February 2025, which undermined fundamental rights protection and put almost unlimited powers in the hands of the presidency.[34]

In mid-April 2024, the IACHR referenced "Nicaragua's transformation into a police state, where the Executive has installed a regime of terror, through the control and surveillance of the citizenry and repression through state and parastatal security institutions."[35]  When discussing its most recent annual report (covering 2023), the IACHR referred to "the radicalization of state repression…through the continued prohibition of protests and demonstrations, the dismantling of media outlets, the massive closure of civil society organizations, universities and study centers, and the persecution and criminalization of members of the Catholic Church."[36]

---

[33] Report of the Group of Human Rights Experts on Nicaragua, Group of Human Rights Experts on Nicaragua, Feb. 24, 2025, pg. 2, available at: https://www.ohchr.org/sites/default/files/documents/hrbodies/hrcouncil/grhe-nicaragua/a-hrc-58-26-auv-en.pdf (last visited Mar. 19, 2025).

[34] Report of the Group of Human Rights Experts on Nicaragua, Group of Human Rights Experts on Nicaragua, Feb. 24, 2025, pg. 2-3, available at: https://www.ohchr.org/sites/default/files/documents/hrbodies/hrcouncil/grhe-nicaragua/a-hrc-58-26-auv-en.pdf (last visited Mar. 19, 2025).

[35] Nicaragua: Six years after social protests, IACHR urges reestablishment of democracy, end to repression and impunity, Inter-American Commission on Human Rights (IACHR), Apr. 18, 2024, available at: https://www.oas.org/en/IACHR/jsForm/?File=/en/iachr/media_center/PReleases/2024/075.asp (last visited Mar. 21, 2025).

[36] Nicaragua: Six years after social protests, IACHR urges reestablishment of democracy, end to repression and impunity, Inter-American Commission on Human Rights (IACHR), Apr. 18, 2024, available at: https://www.oas.org/en/IACHR/jsForm/?File=/en/iachr/media_center/PReleases/2024/075.asp (last visited Mar. 21, 2025).

6

Likewise, in an early September 2024 report—covering the period from June 15, 2023, to June 15, 2024—the Office of the High Commissioner for Human Rights (OHCHR) reported on Government of Nicaragua efforts "that further the shrinking of civic and democratic space and expand the control of the Government over all public institutions, including administrative, judicial, political, academic and cultural institutions."[37]  Moreover, the Group of Human Rights Experts on Nicaragua stated in early September 2024, "Arbitrary detentions, torture and ill-treatment, and the instrumentalization of criminal law to eliminate any opposition, real, potential or perceived as such, continue," with victims "forced to choose between prison and leaving the country."[38]  The U.S. State Department also stated that in 2023:

> There were numerous reports that the government or its agents committed arbitrary or unlawful killings, including extrajudicial killings, during the year. Human rights organizations and independent media alleged some killings were politically motivated, an allegation difficult to confirm because the government refused to conduct official inquiries.[39]

In late February 2025, the Group of Human Rights Experts on Nicaragua reported that, in January 2025, Nicaragua's National Assembly:

> unanimously approved, in second reading, a far-reaching constitutional reform which legalizes and consolidates the executive's monopoly on power.  This reform formalizes the de facto dissolution of separation, independence and mutual control between branches of the State.  It creates two "Co-Presidents" who constitute the presidency.[40]

Commenting on this constitutional reform—which went into effect on February 18, 2025—*The Associated Press* noted in late February 2025 that "it effectively put all branches of government under the power of the presidency, and also officially made Ortega and Murillo 'co-presidents,' which would guarantee presidential succession for Murillo and their family."[41]  The media outlet

---

[37] Human rights situation in Nicaragua, Office of the High Commissioner for Human Rights (OHCHR), Sep. 2, 2024, pg. 2, available at: https://reliefweb.int/report/nicaragua/situation-human-rights-nicaragua-report-united-nations-high-commissioner-human-rights-advance-edited-version-ahrc5720 (last visited Mar. 21, 2025).

[38] Nicaragua's people defenseless in face of grave human rights violations, UN Group of Experts says, Group of Human Rights Experts on Nicaragua, Office of the High Commissioner for Human Rights (OHCHR), Sep. 10, 2024, available at: https://www.ohchr.org/en/press-releases/2024/09/nicaraguas-people-defenseless-face-grave-human-rights-violations-un-group (last visited Mar. 21, 2025).

[39] 2023 Country Reports on Human Rights Practices: Nicaragua, U.S. Department of State, Apr. 23, 2024, available at: https://www.state.gov/reports/2023-country-reports-on-human-rights-practices/nicaragua/ (last visited Apr. 9, 2025).

[40] Report of the Group of Human Rights Experts on Nicaragua, Group of Human Rights Experts on Nicaragua, Feb. 24, 2025, pg. 4, available at: https://www.ohchr.org/sites/default/files/documents/hrbodies/hrcouncil/grhe-nicaragua/a-hrc-58-26-auv-en.pdf (last visited Mar. 19, 2025).

[41] Nicaraguan government is cementing total control of the state and violating rights, UN experts warn, The Associated Press, Feb. 26, 2025, available at: https://apnews.com/article/united-nations-nicaragua-democracy-ortega-murillo-constitution-75b7e8a05ea68c783999007754657810 (last visited Mar. 19, 2025).

7

also reported that the reform "expanded the presidential term to six years from five in a move that further consolidated the family's firm grip on power."[42]

According to OHCHR, "There has been a systematic effort to dismantle civil society organizations" in Nicaragua.[43] The IACHR stated in a late September 2023 report, "The cancellation of the legal status of thousands of Nicaraguan civil society organizations illustrates the most drastic pattern of the State's attacks on pluralism, as well as its intention to completely close civic and democratic space in Nicaragua."[44] The Special Monitoring Mechanism for Nicaragua (MESENI)'s objective is to "Monitor the human rights situation in Nicaragua, in accordance with the scope and mandate of the IACHR itself."[45] In late August 2024, the IACHR reported, "Since the beginning of the human rights crisis in Nicaragua, the Special Follow-up Mechanism for Nicaragua (MESENI) has recorded the closure of more than 5,000 civil society organizations by the State, including more than 1,200 religious foundations."[46] The IACHR also noted that, as of August 22, 2024, over 1,600 organizations had their legal status cancelled during the year, with most of these organizations also experiencing "the confiscation and illegitimate appropriation of assets."[47]

According to Human Rights Watch, "Indigenous and Afro-descendant peoples" in Nicaragua "face discrimination, reflected in disproportionate poverty rates, illegal encroachment on their traditional territories, and persistent violence."[48] In mid-April 2024, the IACHR stated that it had:

> been denouncing the intensification of repression against indigenous and Afro-descendant critics of the government, as well as the holding of regional elections in the Caribbean Coast in a serious context of armed attacks against these communities, the dispossession of their territories and natural resources, police

---

[42] Nicaraguan government is cementing total control of the state and violating rights, UN experts warn, The Associated Press, Feb. 26, 2025, available at: https://apnews.com/article/united-nations-nicaragua-democracy-ortega-murillo-constitution-75b7e8a05ea68c783999007754657810 (last visited Mar. 19, 2025).

[43] Human rights situation in Nicaragua, Office of the High Commissioner for Human Rights (OHCHR), Sep. 2, 2024, pg. 3, available at: https://reliefweb.int/report/nicaragua/situation-human-rights-advance-edited-version-ahrc5720 (last visited Mar. 21, 2025).

[44] Closure of civic space in Nicaragua, Inter-American Commission on Human Rights (IACHR), Sep. 23, 2023, pg. 29, available at: https://www.oas.org/en/iachr/reports/pdfs/2023/Cierre_espacio_civico_Nicaragua_ENG.pdf (last visited Mar. 21, 2025).

[45] Special Monitoring Mechanism for Nicaragua (MESENI), Inter-American Commission on Human Rights (IACHR), available at: https://www.oas.org/en/IACHR/jsForm/?File=/en/iachr/meseni/default.asp#:~:text=On%20June%2024%2C%2020218%2C%20at,Gross%20Human%20Rights%20Violations%20in (last visited Apr. 10, 2025).

[46] IACHR condemns massive closure of civil society and religious organizations in Nicaragua, Inter-American Commission on Human Rights (IACHR), Aug. 22, 2024, available at: https://www.oas.org/en/IACHR/jsForm/?File=/en/iachr/media_center/PReleases/2024/189.asp (last visited Mar. 21, 2025).

[47] IACHR condemns massive closure of civil society and religious organizations in Nicaragua, Inter-American Commission on Human Rights (IACHR), Aug. 22, 2024, available at: https://www.oas.org/en/IACHR/jsForm/?File=/en/iachr/media_center/PReleases/2024/189.asp (last visited Mar. 21, 2025).

[48] World Report 2024 - Nicaragua, Human Rights Watch, Jan. 11, 2024, available at: https://www.hrw.org/world-report/2024/country-chapters/nicaragua (last visited Mar. 21, 2025).

NicAR000028

siege, militarization, arrests of indigenous leaders, the proven absence of an independent electoral system and other facts that put their ethnic and cultural survival at risk.[49]

In its annual report covering 2023, the IACHR stated that it had "received reports of new attacks against different peoples of the Caribbean coast by armed settlers acting with the acquiescence of state authorities, which were part of a systematic pattern."[50]  Likewise, OHCHR reported in early September 2024 that it "continued to receive reports of violence in territories inhabited by Indigenous Peoples and people of African descent."[51]

In early October 2023, Nicaragua's Supreme Electoral Council arbitrarily cancelled the legal status of Yapti Tasba Masraka Nanih Asla Takanka (YATAMA), an Indigenous and Afrodescendent political party.[52]  The Nicaraguan police had previously "detained two of YATAMA's main leaders" in late September 2023.[53]  In early March 2024, "regional elections were held in the North and South Caribbean Coast Autonomous Regions, where most of the Indigenous and Afrodescendent population of Nicaragua resides."[54]  OHCHR reported in early September 2024 that the "right to take part in the conduct of public affairs was severely restricted throughout the electoral process."[55]

### Freedom of Religion

In its annual report on religious freedom in Nicaragua (covering 2023), the U.S. Department of State noted that the U.S. Secretary of State designated Nicaragua "a Country of Particular

---

[49] Nicaragua: Six years after social protests, IACHR urges reestablishment of democracy, end to repression and impunity, Inter-American Commission on Human Rights (IACHR), Apr. 18, 2024, available at: https://www.oas.org/en/IACHR/jsForm/?File=/en/iachr/media_center/PReleases/2024/075.asp (last visited Mar. 21, 2025).

[50] Annual Report 2023 - Chapter IV.B - Nicaragua, Inter-American Commission on Human Rights (IACHR), Apr. 25, 2024, pg. 680, available at: https://www.oas.org/en/iachr/docs/annual/2023/chapters/IA2023_Cap_4B_Nicaragua_ENG.PDF (last visited Mar. 21, 2025).

[51] Human rights situation in Nicaragua, Office of the High Commissioner for Human Rights (OHCHR), Sep. 2, 2024, pg. 11, available at: https://reliefweb.int/report/nicaragua/situation-human-rights-nicaragua-report-united-nations-high-commissioner-human-rights-advance-edited-version-ahrc5720 (last visited Mar. 21, 2025).

[52] Human rights situation in Nicaragua, Office of the High Commissioner for Human Rights (OHCHR), Sep. 2, 2024, pg. 2, available at: https://reliefweb.int/report/nicaragua/situation-human-rights-nicaragua-report-united-nations-high-commissioner-human-rights-advance-edited-version-ahrc5720 (last visited Mar. 21, 2025); Nicaragua: IACHR warns international community about lack of conditions for free and fair elections in autonomous regions of the Caribbean Coast, Inter-American Commission on Human Rights (IACHR), Feb. 23, 2024, available at: https://www.oas.org/en/iachr/jsForm/?File=/en/iachr/media_center/preleases/2024/040.asp (last visited Mar. 21, 2025).

[53] World Report 2024 - Nicaragua, Human Rights Watch, Jan. 11, 2024, available at: https://www.hrw.org/world-report/2024/country-chapters/nicaragua (last visited Mar. 21, 2025).

[54] Human rights situation in Nicaragua, Office of the High Commissioner for Human Rights (OHCHR), Sep. 2, 2024, pg. 2, available at: https://reliefweb.int/report/nicaragua/situation-human-rights-nicaragua-report-united-nations-high-commissioner-human-rights-advance-edited-version-ahrc5720 (last visited Mar. 21, 2025).

[55] Human rights situation in Nicaragua, Office of the High Commissioner for Human Rights (OHCHR), Sep. 2, 2024, pg. 2, available at: https://reliefweb.int/report/nicaragua/situation-human-rights-nicaragua-report-united-nations-high-commissioner-human-rights-advance-edited-version-ahrc5720 (last visited Mar. 21, 2025).

NicAR000029

Concern for having engaged in or tolerated particularly severe violations of religious freedom."[56]
In a March 2025 report on religious freedom, the United States Commission on International
Religious Freedom, stated:

> The government continued to employ a variety of tactics to intimidate Christian
> worshipers and impede their peaceful religious practices. It arbitrarily prohibited many
> religious observances and processions, including deploying approximately 4,000 police
> officers to Catholic churches around the country in March to prevent public Holy Week
> processions.[57]

In mid-February 2024, *The Associated Press* reported on the "ongoing crackdown" in Nicaragua
"on the Catholic Church in particular but not sparing evangelicals."[58] In a late September 2023
report, the IACHR discussed religious freedom in Nicaragua, noting:

> The closure of civic and democratic space in Nicaragua has included restrictions on
> freedom of religion through the prohibition of religious celebrations,
> criminalization of religious services, closure of religious media, confiscation of
> property and bank accounts, expulsion of religious orders, and other acts of
> repression and retaliation against members of the Catholic Church due to their role
> as mediators in the National Dialogue in 2018, and their critical role in denouncing
> human rights violations.[59]

In mid-August 2024, the IACHR reported that the Nicaraguan state had closed over 1,200
religious foundations since the start of the country's human right crisis in 2018.[60] As OHCHR
reported, in August 2023, the Nicaraguan government "cancelled arbitrarily the legal status of
Universidad Centroamericana, a Jesuit university, where many Nicaraguan human rights
defenders have pursued their education, and confiscated its assets, facilities and bank accounts,
stating that it was a terrorist training centre."[61] Human Rights Watch noted in its annual report
covering 2023, "Authorities also banned the 2023 Easter processions and closed the Jesuit

---

[56] 2023 Report on International Religious Freedom: Nicaragua, U.S. Department of State, June 26, 2024, available
at: https://www.state.gov/reports/2023-report-on-international-religious-freedom/nicaragua/ (last visited Apr. 9,
2025).
[57] United States Commission on International Religious Freedom 2025 Annual Report, U.S. Commission on
International Religious Freedom (USCIRF), Mar. 25, 2025, pp. 26-27, available at:
https://www.uscirf.gov/sites/default/files/2025-03/2025%20USCIRF%20Annual%20Report.pdf  (last visited Apr. 9,
2025)
[58] Giovanna Dell'Orto, Nicaragua's crackdown on Catholic Church spreads fear among the faithful, there and in
exile, The Associated Press, updated Feb. 11, 2024, available at:https://apnews.com/article/nicaragua-catholic-
church-crackdown-exile-vatican-us-ortega-ddcbe3f439ea0773dc9e1db88a7bb952 (last visited Apr. 2, 2025).
[59] Closure of civic space in Nicaragua, Inter-American Commission on Human Rights (IACHR), Sep. 23, 2023, pg.
8, available at: https://www.oas.org/en/iachr/reports/pdfs/2023/Cierre_espacio_civico_Nicaragua_ENG.pdf (last
visited Mar. 21, 2025).
[60] IACHR condemns massive closure of civil society and religious organizations in Nicaragua, Inter-American
Commission on Human Rights (IACHR), Aug. 22, 2024, available at:
https://www.oas.org/en/IACHR/jsForm/?File=/en/iachr/media_center/PReleases/2024/189.asp&utm_content=countr
y-nic&utm_term=class-mon (last visited Mar. 21, 2025).
[61] Human rights situation in Nicaragua, Office of the High Commissioner for Human Rights (OHCHR), Sep. 2,
2024, pg. 5, available at: https://reliefweb.int/report/nicaragua/situation-human-rights-nicaragua-report-united-
nations-high-commissioner-human-rights-advance-edited-version-ahrc5720 (last visited Mar. 21, 2025).

10

religious order in August, confiscating its properties.  They also continued to expel foreign priests and nuns."[62]

### Return to Nicaragua

Nicaragua's net migration rate for 2024 was estimated to be 1.8 migrants per 1,000 population.[63]  In late December 2023, *Reuters* reported that "1.5 million Nicaraguans now live outside their home country, or about 22% of the country's population, according to U.N. data analyzed by Dialogo Interamericano researcher Manuel Orozco."[64] In mid-April 2024, the IACHR stated that "the continuation of arbitrary detentions, the permanent threat of criminalization, and a climate of persecution and surveillance against the civilian population" in Nicaragua had "forced thousands of people to move to other countries."[65]  In late February 2024, the Group of Human Rights Experts on Nicaragua reported that, per the United Nations High Commissioner for Refugees (UNHCR), "between 2018 and June 2023, 935,065 people had left Nicaragua; among them 874,641 were asylum seekers and 60,424 had obtained refugee status."[66]  The Group of Human Rights Experts on Nicaragua also stated, "The number of Nicaraguans having fled the country since 2018 corresponds to almost one in eight of the Nicaraguan population."[67]

Nicaraguan authorities have "arbitrarily stripped" certain individuals of their nationality, "rendering stateless those who did not possess other nationalities."[68]  In February 2023, the Nicaraguan government "stripped 317 people of their nationality, including 222 political prisoners the government expelled to the US, labeling them as 'traitors' and confiscating their assets."[69]  The 317 individuals included "the country's main social, political and religious leaders; former officials and diplomats; renowned human rights defenders; and journalists and

---

[62] World Report 2024 - Nicaragua, Human Rights Watch, Jan. 11, 2024, available at: https://www.hrw.org/world-report/2024/country-chapters/nicaragua (last visited Mar. 21, 2025).

[63] The World Factbook, Central Intelligence Agency (CIA), Apr. 9, 2025, available at: https://www.cia.gov/the-world-factbook/countries/nicaragua/ (last visited: April 10, 2025).

[64] Remittances from Nicaraguan migrants mark new record, passing $4 billion, Reuters, Dec. 27, 2023, available at: https://www.westlaw.com/Document/Iac36a2a0a51011ee86eeb734a53a11cd/View/FullText.html?transitionType=Default&contextData=(sc.Default)&VR=3.0&RS=cblt1.0 (last visited Mar. 19, 2025).

[65] Nicaragua: Six years after social protests, IACHR urges reestablishment of democracy, end to repression and impunity, Inter-American Commission on Human Rights (IACHR), Apr. 18, 2024, available at: https://www.oas.org/en/IACHR/jsForm/?File=/en/iachr/media_center/PReleases/2024/075.asp (last visited Mar. 21, 2025).

[66] Report of the Group of Human Rights Experts on Nicaragua, Group of Human Rights Experts on Nicaragua, Feb. 28, 2024, pg. 7, available at: https://www.ohchr.org/sites/default/files/A_HRC_55_27_AdvanceUneditedVersion1_0.pdf (last visited Mar. 21, 2025).

[67] Report of the Group of Human Rights Experts on Nicaragua, Group of Human Rights Experts on Nicaragua, Feb. 28, 2024, pg. 7, available at: https://www.ohchr.org/sites/default/files/A_HRC_55_27_AdvanceUneditedVersion1_0.pdf (last visited Mar. 21, 2025).

[68] Human rights situation in Nicaragua, Office of the High Commissioner for Human Rights (OHCHR), Sep. 2, 2024, pg. 10, available at: https://reliefweb.int/report/nicaragua/situation-human-rights-nicaragua-report-united-nations-high-commissioner-human-rights-advance-edited-version-ahrc5720 (last visited Mar. 21, 2025).

[69] World Report 2024 - Nicaragua, Human Rights Watch, Jan. 11, 2024, available at: https://www.hrw.org/world-report/2024/country-chapters/nicaragua (last visited Mar. 21, 2025).

NicAR000031

workers of the main media outlets."[70] Furthermore, in early September 2024, Nicaragua released from prison 135 people—who, per the IACHR, were considered government opponents and had been arbitrarily detained—and expelled them from the country.[71] Five days after their release, "the Nicaraguan Supreme Court revoked the Nicaraguan nationality of these individuals and ordered the confiscation of their assets."[72]

The IACHR has reported on the existence of "an arbitrary policy to prevent the free entry or exit of the country of the population."[73]  In its annual report covering 2023, the IACHR stated:

> In 2023, the Commission observed the tightening of an arbitrary policy that prevented the free entry into or exit from the country, which consisted of the arbitrary withdrawal and retention of passports, as well as the refusal to issue passports as a mechanism to prevent people from leaving the country.  The Commission has also documented cases of Nicaraguans not being allowed to return to their country, which led them to undergo forced displacement and to seek the regularization of their migratory status or the access to international protection mechanisms in other countries.  Some people who were arbitrarily prevented by the State from returning to their country of origin reported that they were unable to renew expired passports or access other identity documents because they were outside the country and because of the State's refusal to issue said documentation.  These policies resulted in the forced separation of many Nicaraguan families.[74]

In its late February 2024 report, the Group of Human Rights Experts on Nicaragua discussed entry bans for Nicaraguans, noting, "The Group documented 145 cases of Nicaraguans banned from entering the country.  The denial of entering one's own country is a pattern of violation

[70] Annual Report 2023 - Chapter IV.B - Nicaragua, Inter-American Commission on Human Rights (IACHR), Apr. 25, 2024, pg. 676, available at:
https://www.oas.org/en/iachr/docs/annual/2023/chapters/IA2023_Cap_4B_Nicaragua_ENG.PDF (last visited Mar. 21, 2025).
[71] IACHR condemns arbitrary revocation of nationality of 135 recently released prisoners in Nicaragua, Inter-American Commission on Human Rights (IACHR), Sep. 13, 2024, available at:
https://www.oas.org/en/IACHR/jsForm/?File=/en/iachr/media_center/PReleases/2024/217.asp&utm_content=country-nic&utm_term=class-mon (last visited Mar. 21, 2025); Gabriela Selser, Nicaragua strips citizenship from 135 prisoners released to Guatemala, The Associated Press, updated Sep. 10, 2024, available at:
https://apnews.com/article/nicaragua-daniel-ortega-citizenship-political-prisoners-expropriation-c37c6e65cc4c6c97596d37d77709de68 (last visited Mar. 21, 2025).
[72] IACHR condemns arbitrary revocation of nationality of 135 recently released prisoners in Nicaragua, Inter-American Commission on Human Rights (IACHR), Sep. 13, 2024, available at:
https://www.oas.org/en/IACHR/jsForm/?File=/en/iachr/media_center/PReleases/2024/217.asp&utm_content=country-nic&utm_term=class-mon (last visited Mar. 21, 2025).
[73] Nicaragua: Six years after social protests, IACHR urges reestablishment of democracy, end to repression and impunity, Inter-American Commission on Human Rights (IACHR), Apr. 18, 2024, available at:
https://www.oas.org/en/IACHR/jsForm/?File=/en/iachr/media_center/PReleases/2024/075.asp (last visited Mar. 21, 2025).
[74] Annual Report 2023 – Chapter IV.B - Nicaragua, Inter-American Commission on Human Rights (IACHR), Apr. 25, 2024, pg. 679, available at:
https://www.oas.org/en/iachr/docs/annual/2023/chapters/IA2023_Cap_4B_Nicaragua_ENG.PDF (last visited Mar. 21, 2025).

12

that Nicaraguan authorities have increasingly relied on, especially since 2023."[75]  In its early September 2024 report, OHCHR noted, "During the reporting period […] OHCHR documented 62 cases of Nicaraguan nationals (33 women and 29 men) who were denied entry into their own country."[76]  OHCHR also posited that "the total number of persons facing that situation could be higher due to significant underreporting."[77]

In its late February 2025 report, the Group of Human Rights Experts on Nicaragua stated:

> During this reporting period, the Group has continued to document cases of Nicaraguans who were prohibited entry into the country. […] The Group obtained information confirming that the instructions to deny Nicaraguans entry into their own country came from the General Directorate for Migration and Alien Affairs, following direct orders from the Vice-Minister of the Interior.  In November 2024, the National Assembly adopted Act No. 1228, which gives the Directorate competence to restrict entry into the country to nationals deemed a threat to sovereignty or public order.[78]

### Freedom of Movement

When discussing freedom of movement in its annual report covering 2024, Freedom House reported, "The 2018 repression against protesters, the 2021 crackdown on political opponents, and continued surveillance and harassment at the hands of police and paramilitary groups have created a climate of fear and mistrust that discourages free movement.  Poor infrastructure limits free movement in some majority-Indigenous areas."[79]  In its annual report on human rights in Nicaragua (covering 2023), the U.S. Department of State noted that in many cases, "police restricted the movement of political opponents outside their homes, although the individuals did not have pending charges against them or judicially imposed restrictions on their movement."[80]  In its late February 2025 report, the Group of Human Rights Experts on Nicaragua discussed the surveillance of the population:

> During this reporting period, the Group was able to identify the existence of a wide

---

[75] Report of the Group of Human Rights Experts on Nicaragua, Group of Human Rights Experts on Nicaragua, Feb. 28, 2024, pg. 7, available at:
https://www.ohchr.org/sites/default/files/A_HRC_55_27_AdvanceUneditedVersion1_0.pdf (last visited Mar. 19, 2025).
[76] Human rights situation in Nicaragua, Office of the High Commissioner for Human Rights (OHCHR), Sep. 2, 2024, pg. 10, available at: https://reliefweb.int/report/nicaragua/situation-human-rights-nicaragua-report-united-nations-high-commissioner-human-rights-advance-edited-version-ahrc5720 (last visited Mar. 21, 2025).
[77] Human rights situation in Nicaragua, Office of the High Commissioner for Human Rights (OHCHR), Sep. 2, 2024, pg. 10, available at: https://reliefweb.int/report/nicaragua/situation-human-rights-nicaragua-report-united-nations-high-commissioner-human-rights-advance-edited-version-ahrc5720 (last visited Mar. 21, 2025).
[78] Report of the Group of Human Rights Experts on Nicaragua, Group of Human Rights Experts on Nicaragua, Feb. 24, 2025, pg. 9, available at: https://www.ohchr.org/sites/default/files/documents/hrbodies/hrcouncil/grhe-nicaragua/a-hrc-58-26-auv-en.pdf (last visited Mar. 19, 2025).
[79] Freedom in the World 2025 - Nicaragua, Freedom House, Feb. 26, 2025, available at:
https://freedomhouse.org/country/nicaragua/freedom-world/2025 (last visited Mar. 21, 2025).
[80] 2023 Country Reports on Human Rights Practices: Nicaragua, U.S. Department of State, Apr. 23, 2024, available at: https://www.state.gov/reports/2023-country-reports-on-human-rights-practices/nicaragua/ (last visited Apr. 9, 2025).

NicAR000033

surveillance and intelligence structure that responds to orders from the President and Vice-President. The structure is mainly composed of members of the National Army, the National Police, the Ministry of the Interior, the Nicaraguan Telecommunications and Post Institute (TELCOR), the Ministry of Health, and pro-government armed groups, and uses computer centres installed in every municipality. All public institutions are also linked to this structure through their political secretaries who identify the public officials and other persons to investigate. The Government uses this information (channelled mainly through the Centre of Police Information and Intelligence, the National Information Committee, the Financial Analysis Unit and the structure of the FSLN) to identify opponents, monitor their activities, harass or geolocate them. This structure also determines who to arrest, expel, prevent from returning or arbitrarily strip of nationality.[81] […]

People under surveillance are forced to report daily – under threat of arrest – to a designated police station either in person or by sending WhatsApp messages with photos, details on their whereabouts and the people they intend to meet. The Group identified cases in which Nicaraguans continued to be harassed when abroad and pressured to send photographs from their countries of residence. This surveillance is not limited to people considered opponents; the entire population is monitored by the intelligence structure through the Ministry of Health that conducts a population census that includes questions about the location of family members and their political affiliations.[82]

## Economy

In its 2024 investment climate statement for Nicaragua, the U.S. Department of State reported, "Despite repression and growing poverty, Nicaragua continues to show stable macroeconomic fundamentals, including a record-high $5 billion in foreign reserves, a sustainable debt load, and a well-capitalized banking sector."[83] The U.S. Department of State also reported:

Inflation decreased to 6 percent year-on-year in December 2023. The price of a basket of typical consumer goods and services – a key measure of inflation's impact on the general population – rose to a record high of $540 per month in December 2023, more than double the minimum wage of $240. The formal sector still has some 120,000 fewer jobs than its 2017 peak, and Nicaraguan families now earn 20 percent less on average in real terms than in 2017. Following an unprecedent wave of hundreds of thousands of Nicaraguan migrants emigrating to the United States in 2022 and 2023, remittances rose to a new record of $4.7 billion

---

[81] Report of the Group of Human Rights Experts on Nicaragua, Group of Human Rights Experts on Nicaragua, Feb. 24, 2025, pg. 5, available at: https://www.ohchr.org/sites/default/files/documents/hrbodies/hrcouncil/grhe-nicaragua/a-hrc-58-26-auv-en.pdf (last visited Mar. 19, 2025).

[82] Report of the Group of Human Rights Experts on Nicaragua, Group of Human Rights Experts on Nicaragua, Feb. 24, 2025, pg. 13, available at: https://www.ohchr.org/sites/default/files/documents/hrbodies/hrcouncil/grhe-nicaragua/a-hrc-58-26-auv-en.pdf (last visited Mar. 19, 2025).

[83] 2024 Investment Climate Statements: Nicaragua, U.S. Department of State, 2024, available at: https://www.state.gov/reports/2024-investment-climate-statements/nicaragua/ (last visited Mar. 19, 2025).

NicAR000034

in 2023 – or about 30 percent of Nicaragua's GDP – driving local consumption spending and generating significant government tax revenue.[84]

In its 2024 country report on Nicaragua, the private German foundation Bertelsmann Stiftung noted, "Poverty and extreme poverty rates remain very high by Western Hemisphere standards. Access to basic resources and services has and continues to be extremely skewed, with economic – and political – power concentrated in relatively few hands, despite the Sandinista Front government's policy efforts to expand social programs."[85]

In early October 2024, the World Bank Group reported that Nicaragua:

> remains one of the region's poorest countries.  While trade openness has increased, Nicaragua's exports consist mainly of low-complexity products. In addition, the country is highly vulnerable to external shocks and natural hazards. […]
>
> The employment rate reached 66.9 percent in the second half of 2023, close to pre-pandemic levels, due to sustained growth, lower inflation, and increased remittances.  The employment rate for women (54.9 percent in June 2024) has increased in recent years but remains well below that for men (75.9).  Poverty (US$3.65/day 2017 PPP) is estimated to have declined to 12.5 percent in 2023 from 13.1 percent in 2022.[86]

In a mid-January 2025, International Monetary Fund (IMF) staff provided an assessment of Nicaragua's economic performance:

> The Nicaraguan economy is experiencing robust growth.  Real GDP growth accelerated to around 4½ percent in 2023 and the first half of 2024, from about 3.8 percent in 2022, on the back of robust domestic demand, while inflation is moderating.  Prudent macroeconomic policies and record-high remittances sustained this performance, a decrease in the estimated poverty ratio, and also led to twin surpluses, a steady decline in debt, and the accumulation of strong buffers.  Gross international reserves reached US$5.7 billion, or 7.2 months of imports, by end-October 2024.  The economy remains open and resilient, after confronting multiple large shocks, and on a backdrop of transfers of private property to the state, international sanctions, and reorientation of official financing.[87]

**Infrastructure**

---

[84] 2024 Investment Climate Statements: Nicaragua, U.S. Department of State, 2024, available at: https://www.state.gov/reports/2024-investment-climate-statements/nicaragua/ (last visited Mar. 19, 2025).
[85] BTI 2024 Country Report - Nicaragua, Bertelsmann Stiftung, 2024, pg. 28, available at: https://bti-project.org/fileadmin/api/content/en/downloads/reports/country_report_2024_NIC.pdf (last visited Mar. 19, 2025).
[86] Nicaragua - Overview, World Bank Group, last updated Oct. 8, 2024, available at: https://www.worldbank.org/en/country/nicaragua/overview (last visited Mar. 20, 2025).
[87] Nicaragua - Staff Report for the 2024 Article IV Consultation, International Monetary Fund (IMF), Jan. 14, 2025, pg. 1, available at: https://www.imf.org/en/Publications/CR/Issues/2025/02/07/Nicaragua-2024-Article-IV-Consultation-Press-Release-Staff-Report-and-Statement-by-the-561751 (last visited Mar. 20, 2025).

NicAR000035

Bertelsmann Stiftung stated in its 2024 country report on Nicaragua that "the reach of infrastructure" was one of the "major challenges" which "serve as obstacles to the provision of basic services."[88]  The report also commented that "an expanding infrastructure network, especially with regard to the road system, has not expanded fast enough to accommodate a growing population or to connect the historically marginalized Atlantic Coast regions with the capital, Managua or the more densely populated Pacific regions more generally."[89]  In a travel advisory published on December 13, 2024, the U.S. Department of State reported that "Poor infrastructure can limit the Embassy's emergency assistance to U.S. citizens."[90]  It also noted:

> Managua has a sole private hospital that is JCAHO (Joint Commission on Accreditation of Healthcare Organizations) accredited and certified, with labs and radiology services available, though it has a very limited number of specialists for acute emergencies.  Medical services outside Managua are limited, including for victims of crime.  Government hospitals are understaffed and some hospitals throughout the country may not be able to assist in emergencies.  Tap water is not reliably potable.  Drink only purified bottled water.[91]

### Tourism

In its travel advisory published on December 13, 2024, the U.S. Department of State classified Nicaragua as "Level 3: Reconsider Travel."[92]  Specifically, it recommended, "Reconsider travel to Nicaragua due to arbitrary enforcement of laws, the risk of wrongful detention, and limited healthcare availability.  Exercise increased caution in Nicaragua due to crime."[93]  The U.S. Department of State also noted that the Nicaraguan government "targets individuals and organizations for political purposes," and, during the past year, "has subjected U.S. citizens to arbitrary entry and exit bans, expulsions, arrests, revocations of Nicaraguan citizenship, and other actions."[94]

---

[88] BTI 2024 Country Report - Nicaragua, Bertelsmann Stiftung, 2024, pg. 8, available at: https://bti-project.org/fileadmin/api/content/en/downloads/reports/country_report_2024_NIC.pdf (last visited Mar. 19, 2025).

[89] BTI 2024 Country Report - Nicaragua, Bertelsmann Stiftung, 2024, pg. 28, available at: https://bti-project.org/fileadmin/api/content/en/downloads/reports/country_report_2024_NIC.pdf (last visited Mar. 19, 2025).

[90] Nicaragua Travel Advisory, U.S. Department of State, Dec. 13, 2024, available at: https://travel.state.gov/content/travel/en/traveladvisories/traveladvisories/nicaragua-travel-advisory.html (last visited Mar. 19, 2025).

[91] Nicaragua Travel Advisory, U.S. Department of State, Dec. 13, 2024, available at: https://travel.state.gov/content/travel/en/traveladvisories/traveladvisories/nicaragua-travel-advisory.html (last visited Mar. 19, 2025).

[92] Nicaragua Travel Advisory, U.S. Department of State, Dec. 13, 2024, available at: https://travel.state.gov/content/travel/en/traveladvisories/traveladvisories/nicaragua-travel-advisory.html (last visited Mar. 19, 2025).

[93] Nicaragua Travel Advisory, U.S. Department of State, Dec. 13, 2024, available at: https://travel.state.gov/content/travel/en/traveladvisories/traveladvisories/nicaragua-travel-advisory.html (last visited Mar. 19, 2025).

[94] Nicaragua Travel Advisory, U.S. Department of State, Dec. 13, 2024, available at: https://travel.state.gov/content/travel/en/traveladvisories/traveladvisories/nicaragua-travel-advisory.html (last visited Mar. 19, 2025).

16

PRE-DECISIONAL/DELIBERATIVE

**Attachment A - Temporary Protected Status (TPS) Legal Authority**

Pursuant to section 244(b)(1) of the Immigration and Nationality Act (INA), 8 U.S.C. § 1254a(b)(1), the Secretary of Homeland Security, after consultation with appropriate agencies of the Government, may designate a foreign state (or part thereof) for TPS. The Secretary may then grant TPS to eligible nationals of that foreign state (or in the case of an alien having no nationality who last habitually resided in that state). INA § 244(b)(1) sets forth three possible bases on which the Secretary may designate a foreign state for TPS:

- Ongoing armed conflict in the foreign state and, due to such conflict, requiring the return of aliens who are nationals of that state would pose a serious threat to their personal safety;
- An earthquake, flood, drought, epidemic, or other environmental disaster in a foreign state has resulted in a substantial, but temporary, disruption of living conditions in the area affected, the foreign state is unable to handle adequately the return of aliens who are nationals of the state, *and* the foreign state has officially requested TPS designation; or
- Extraordinary and temporary conditions exist in the foreign state that prevent nationals of the state from returning in safety, unless the Secretary finds that permitting the aliens to remain temporarily in the United States is contrary to the national interest of the United States.

An initial TPS designation is at the discretion of the Secretary but may not be less than 6 months or exceed 18 months. INA § 244(b)(2).

At least 60 days before the expiration of a TPS designation, the Secretary, after consultation with appropriate agencies of the Government, shall review the conditions in a foreign state designated for TPS to determine whether the conditions for the TPS designation continue to be met and, if so, the length of an extension of the TPS designation (6-, 12-, or 18- months). *See* INA § 244(b)(3)(A). If the Secretary determines that the foreign state no longer meets the conditions for the TPS designation, she or he must terminate the designation. *See* INA § 244(b)(3)(B). Although the Secretary must make her or his determination on extension or termination at least 60 days before the expiration of the TPS designation, publication of the required *Federal Register* notice announcing the decision must be "on a timely basis." INA § 244(b)(3)(A). If the Secretary does not make a decision under INA § 244(b)(3)(A) that the foreign state no longer meets the conditions for designation, there is an automatic, minimum six-month extension of a country's TPS designation.
*See* INA § 244(b)(3)(C).

After the Secretary designates a country for TPS, nationals of the country (and persons without nationality who last habitually resided in the country) may apply for TPS, but they must individually demonstrate their eligibility pursuant to the criteria established in INA § 244(c) and the TPS regulations at 8 CFR § 244.1 *et seq*. These criteria include, but are not limited to, requirements that the applicant show continuous physical presence in the United States since the effective date of the country designation and continuous residence since such date as the Secretary determines; admissibility as an immigrant (with limited exceptions); that the applicant

PRE-DECISIONAL/DELIBERATIVE

PRE-DECISIONAL/DELIBERATIVE

Attachment A: TPS Legal Authority
Page 2


is not ineligible under certain mandatory criminal history, terrorism, and national security bars as specified in INA § 244(c)(2)(A)-(B); and that the applicant is registering for TPS in accordance with regulatory procedures in 8 CFR §§ 244.2–244.9.

If granted TPS, the alien receives employment authorization and an Employment Authorization Document, if requested, that is valid for the duration of the TPS designation. TPS is a temporary benefit that does not, by itself, provide aliens with a basis for seeking lawful permanent resident (LPR) status or any other immigration status. However, receipt of TPS benefits will not bar an otherwise eligible alien from adjusting to LPR status or acquiring another lawful immigration status. When a TPS country's designation ends, TPS beneficiaries return to the same immigration status, if any, that they held prior to TPS (unless that status has expired or been terminated) or any other status they may have acquired while registered for TPS.

NicAR000038

U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT



**Immigration and Customs Enforcement's Response to USCIS' Request for Individuals Returned to a Number of Countries**
March 3, 2025

**Request:**

USCIS Office of Policy and Strategy requests that ICE provide the number of individuals returned to each of the following countries during the time periods listed:

• South Sudan: Sept. 6, 2023 - present
• Afghanistan: Sept. 25, 2023 - present
• Cameroon: Oct. 10, 2023 - present
• Nepal: June 21, 2023 - present
• Honduras: June 21, 2023 - present
• Nicaragua: June 21, 2023 - present
• Haiti: July 1, 2024 - present
• Venezuela: Oct. 3, 2023 - present

**Response:**

Total number of Individuals returned to each country regardless of the Country of Citizenship as of March 2, 2025.

**South Sudan, Sept. 6, 2023 – present:**  1
**Afghanistan, Sept. 25, 2023 – present:**  30
**Cameroon, Oct. 10, 2023 – present:**  26
**Nepal, June 21, 2023 – present:** 126
**Honduras, June 21, 2023 – present:**  71,448
**Nicaragua, June 21, 2023 – present:** 5,271
**Haiti, July 1, 2024 – present:** 370
**Venezuela, Oct. 3, 2023 – present:**  2,624

NicAR000039



Form I-821, Application for Temporary Protected Status
Current Beneficiaries by Country of Designation
As of March 11, 2025

| Country of Designation | Current TPS Beneficiaries | | |
| --- | --- | --- | --- |
| | Approved Individuals that are not LPRs | Approved Individuals that are also LPRs | Total Approved Individuals |
| TOTAL | 1,299,814 | 129,090 | 1,428,904 |
| Afghanistan | 8,361 | 3,349 | 11,710 |
| Burma | 3,601 | 152 | 3,753 |
| Cameroon | 4,797 | 210 | 5,007 |
| El Salvador | 170,608 | 60,699 | 231,307 |
| Ethiopia | 4,422 | 172 | 4,594 |
| Haiti | 330,997 | 15,584 | 346,581 |
| Honduras | 51,405 | 21,013 | 72,418 |
| Lebanon | 111 | - | 111 |
| Nepal | 7,202 | 5,453 | 12,655 |
| Nicaragua | 2,912 | 1,108 | 4,020 |
| Somalia | 686 | 74 | 760 |
| South Sudan | 211 | 15 | 226 |
| Sudan | 1,779 | 241 | 2,020 |
| Syria | 3,807 | 2,186 | 5,993 |
| Ukraine | 101,190 | 2,612 | 103,802 |
| Venezuela | 605,476 | 15,878 | 621,354 |
| Yemen | 2,249 | 544 | 2,793 |

Form I-821, Application for Temporary Protected Status
Current Pending by Country of Designation
As of March 11, 2025

| Country of Designation | Current Pending TPS Applications | | | | |
| --- | --- | --- | --- | --- | --- |
| | I-821 Initial Pending Applications from Current Beneficiaries | I-821 Re-registration Pending Applications from Current Beneficiaries | I-821 Initial Pending Applications from non-Current Beneficiaries | I-821 Re-registration Pending Applications from non-Current Beneficiaries | Total Pending Applications |
| TOTAL | 2,649 | 375,816 | 310,684 | 58,272 | 747,221 |
| Afghanistan | 46 | 213 | 8,965 | 14 | 9,238 |
| Burma | 1 | 76 | 309 | 2 | 388 |
| Cameroon | 6 | 112 | 1,235 | 11 | 1,364 |
| El Salvador | 501 | 82,529 | 954 | 2,620 | 86,604 |
| Ethiopia | 6 | 40 | 433 | - | 479 |
| Haiti | 919 | 139,703 | 200,294 | 3,899 | 344,815 |
| Honduras | 141 | 2,028 | 1,190 | 205 | 3,564 |
| Lebanon | 8 | - | 990 | - | 998 |
| Nepal | 1 | 168 | 66 | 10 | 245 |
| Nicaragua | 13 | 48 | 295 | 17 | 373 |
| Somalia | 7 | 231 | 1,472 | 10 | 1,720 |
| South Sudan | 1 | 8 | 31 | 6 | 46 |
| Sudan | 5 | 543 | 163 | 83 | 794 |
| Syria | 59 | 551 | 871 | 32 | 1,513 |
| Ukraine | 147 | 43,173 | 34,551 | 33,790 | 111,661 |
| Venezuela | 772 | 106,322 | 58,345 | 17,544 | 182,983 |
| Yemen | 16 | 271 | 318 | 29 | 634 |

**Table Key:**
~ Represents zero or rounds to 0.0.

**Note(s):**
1) The report reflects the most up-to-date estimate available at the time the database is queried.
2) Counts may differ from those reported in previous periods due to system updates and post-adjudicative outcomes.
3) Counts may differ from other reports due to updated logic that utilizes more accurate SSN information.
4) Duplicates were removed based on receipt number, A-Number, SSN, and Name-DOB combination.
5) Country of Designation is based on Country of Citizenship or Country of Birth as of application.
6) Counts may include individuals that may have also been approved for lawful permanent resident (LPR) status.
7) Current holders reflect beneficiaries approved without a subsequent denial or LPR withdrawal. LPRs are not included.
8) An "Unknown" "Country of Designation" indicates current TPS holders where their Country of Citizenship and Country of Birth is not one of the current TPS countries and not a former TPS designated country. These counts may include "stateless" individuals.

**Source(s):**
Department of Homeland Security, U.S. Citizenship and Immigration Services, Office of Performance and Quality
CLARA3, EDS, CIS2, NPD; queried 3/2025, PAEND17253.

NicAR000040



I-131, Application for Travel Documents, Parole Documents, and Arrival/Departure Records
Nicaraguan Advanced Parole for those Traveling to Nicaragua
Receipts
October 1, 2022 to April 3, 2025 (Current)

| Country | Count |
|---|---|
| Nicaragua | 625 |

**Note(s):**

1) Some petitions/applications/requests approved or denied may have been received in previous reporting periods.

2) This report reflects the most up to date data available at the time the database is queried.

3) Counts may differ from those reported in previous periods due to system updates and post-adjudicative outcomes.

4) For a complete list of USCIS forms and descriptions, visit: **https://www.uscis.gov/forms**

5) Nicaraguan citizenship or nationality is based off of country of citizenship.

6) Counts are reflective of Nicaraguans who indicated they were traveling to Nicaragua.

7) Counts are limited to bnft_typ_cd = 24, 144, and 145.

**Source:**

Department of Homeland Security, U.S. Citizenship and Immigration Services, Office of Performance and Quality

ELIS, queried 4/2025, PAER0017480.

NicAR000041

NicAR000042

I-131, Application for Travel Documents, Parole Documents, and Arrival/Departure Records

Honduran Advanced Parole for those Traveling to Honduras

Receipts

October 1, 2022 to April 3, 2025 (Current)

**U.S. Citizenship and Immigration Services**

| Country | Count |
|---------|-------|
| Honduras | 2,464 |

**Note(s):**

1) Some petitions/applications/requests approved or denied may have been received in previous reporting periods.

2) This report reflects the most up to date data available at the time the database is queried.

3) Counts may differ from those reported in previous periods due to system updates and post-adjudicative outcomes.

4) For a complete list of USCIS forms and descriptions, visit: **https://www.uscis.gov/forms**

5) Honduran citizenship or nationality is based off of country of citizenship.

6) Counts are reflective of Hondurans who indicated they were traveling to Honduras.

7) Counts are limited to bnft_typ_cd = 24, 144, and 145.

**Source:**

Department of Homeland Security, U.S. Citizenship and Immigration Services, Office of Performance and Quality

ELIS, queried 4/2025, PAER0017480.

NicAR000043

I-131, Application for Travel Documents, Parole Documents, and Arrival/Departure Records Receipts
For Honduran and Nicaraguan Citizens and/or Nationals
October 1, 2022 to April 3, 2025 (Current)

U.S. Citizenship and Immigration Services

| Country | Count |
|---------|-------|
| Honduras | 7,231 |
| Nicaragua | 920 |

**Note(s):**

1) Some petitions/applications/requests approved or denied may have been received in previous reporting periods.

2) This report reflects the most up to date data available at the time the database is queried.

3) Counts may differ from those reported in previous periods due to system updates and post-adjudicative outcomes.

4) For a complete list of USCIS forms and descriptions, visit: **https://www.uscis.gov/forms**

5) Country of travel is not available in CLAIMS3.

7) Counts are limited to part_2_1 = D and to citizens or national of Honduras and Nicaragua who filed a I-131.

**Source:**

Department of Homeland Security, U.S. Citizenship and Immigration Services, Office of Performance and Quality CLAIMS3, queried 4/2025, PAER0017480.



U.S. Department of Homeland Security
U.S. Citizenship and Immigration Services
*Office of Policy and Strategy*
Camp Springs, MD 20588-0009

**Nicaragua as TPS-Designated Country: Comparison of Country Conditions between Initial and Latest**

**TPS Designation Time Frames**:

- Initial TPS Designation Period: January 5, 1999 – July 5, 2000
- Current Designation Period: January 6, 2024 – July 5, 2025

**Reasons for Initial TPS Designation for Nicaragua**:

According to Federal Register (64 FR 526) and the country condition summary of USCIS's 2023 TPS Report to Congress, Nicaragua was designated to TPS country because a natural disaster (Hurricane Mitch) that prevented it from being able to adequately handle the return of its nationals.

**Reasons for Extension and Redesignation of TPS for Nicaragua**:

Since its initial designation in 1999, TPS for Nicaragua was extended 13 consecutive times under the same statutory basis of environmental disaster until January 5, 2019. On June 21, 2023, DHS rescinded the 2017 termination of the TPS designation of Nicaragua and simultaneously extended the TPS designation of Honduras for 18 months from January 6, 2024, through July 5, 2025 due to (88 FR 40294):

- Ongoing significant natural disasters and a resulting humanitarian crisis
- Environmental challenges
- Political instability

**Summaries of Country Conditions of Nicaragua from the Latest Reports of Various Sources**

Nicaragua is generally considered politically unstable with ebbs and flows in its economy, regularly occurring natural disasters, and human rights violations (UN OHCHR, 2024). The country is experiencing political instability and a humanitarian crisis that continue to render the country temporarily inadequate to handle the return of its nationals. Nicaragua is encumbered by the effects of several significant natural disasters, environmental challenges, political instability, and a resulting humanitarian crisis that adversely impact the country's ability to fully recover. While the international community and the Government of Nicaragua helped to repair the damage and destruction left behind by Hurricane Mitch and there were

1

notable improvements in some sectors, several sectors including housing and infrastructure remained severely impacted (US NESDIS, 2023).

*Governmental Oppression, Corruption, and Accountability*

In November 2024, Ortega proposed a constitutional overhaul that would expand presidential powers and limit fundamental rights. The changes would establish a "co-presidency" with Murillo and empower them to "coordinate" other branches of power. It also appears designed to provide legal cover to many of the government's systematic human rights violations, such as depriving so-called "traitors" of their Nicaraguan nationality and censoring the press (HRW, 2025; Amnesty International, 2024).

Together, Ortega and Murillo have intensified repression within and beyond the borders of Nicaragua. They have expanded the use of forced exile and citizenship revocation as ways to target critics (HRW, 2025). A United Nations Human Rights Office of the High Commissioner (UN OHCHR) expert panel conducted a study of human rights in Nicaragua from 2022 through 2023 (UNOHRC, 2024). They found that Nicaragua is a place of surveillance, human rights violations, abuses, and crimes against opponents of President Daniel Ortega's government. They described the situation in Nicaragua as without any checks and balances. The panel reported reasonable grounds to believe that Nicaraguan authorities have committed crimes against humanity, including censorship, intimidation, expulsions of nationals/citizenship revocation, disappearances of arrested people, murder, imprisonment, torture, rape, and other forms of sexual violence. (UN OHCHR, 2024; HRW, 2025). The Nicaraguan government's censorship includes shutdown of universities and non-governmental organizations (NGOs)and censoring the press (HRW, 2025).

In October 2022, an Argentine prosecutor opened a criminal investigation, for alleged crimes against humanity, into Ortega and Murillo under the principle of universal jurisdiction, which allows national courts to prosecute individuals for serious international crimes regardless of where they occurred or the nationalities of those involved. In December 2024, an Argentine judge ordered the international capture of the president of Nicaragua, Daniel Ortega, and his wife Rosario Murillo for the "systematic violation of human rights" (Tico Times, 2024)

*Freedom of Expression and Association*

Human rights defenders, journalists, and critics are targets of death threats, assaults, intimidation, harassment, surveillance, online defamation campaigns, arbitrary detention, prosecution, deprivation of nationality, expulsion and denial of entry to Nicaragua (HRW, 2025). Between January and June, 26 journalists fled the country, the Inter-American Commission on Human Rights (IACHR) reported, bringing the total number of media workers who have fled Nicaragua since 2018 to 263. The government has also closed at least 58 media outlets since 2018, the Nicaraguan Platform of NGO Networks reported. Abusive legislation enabled many of the closures (HRW, 2025).

NicAR000045

The government has also shut down over 5,600 NGOs, including 1,500 closed in a single day in August. These represent roughly 80 percent of NGOs that operated in Nicaragua, according to the latest available figures from 2018 (HRW, 2025).

*Asylees, Refugees and Displaced People*

In September, the government expelled 135 political prisoners to Guatemala, stripping them of nationality and confiscating their assets, violating international law. Another 46 political opponents remained imprisoned, including some Indigenous leaders. Over 450 people have been deprived of Nicaraguan nationality since February 2023, and many have been left stateless (HRW, 2025).

In September 2024, the National Assembly, controlled by the ruling party, amended the Criminal Code to be able to prosecute in absentia people who are abroad but are accused of committing certain crimes in Nicaragua—a law that could open the door to targeting critics in exile, including those the government has expelled. The assembly also expanded judges' powers to seize assets from defendants and established criminal penalties for "anyone who promotes, requests, or facilitates economic, commercial, or financial sanctions against Nicaragua's institutions or government officials." (HRW, 2025).

As of July 2024, 345,800 Nicaraguans were seeking asylum abroad, often in Costa Rica, the United States, Panama, Spain, and Mexico.  About 30,000 people are recognized as refugees (HRW, 2025).  Nicaragua is no longer a member of the UN Human Rights Council after a UN report encouraging world leaders to address human rights violations by President Daniel Ortega's government (DemocracyNow, 2025).

*Economy, Employment, and Socioeconomic Status*

Despite being the largest country in Central America, Nicaragua is the second poorest country in the Americas after Haiti in terms of nominal GDP and GDP per capita (US ITA, 2024, IMF, 2025). The GDP grew by 4.6 percent in 2023, from 3.8 percent in 2022, driven by the growth in the services sector, particularly hotels, restaurants, and retail. Growth slowed to 3.6 percent in 2024, with the monthly economic activity index growing 1.7 percent in June 2024, due to reduced production in fishing, livestock, agriculture, and manufacturing. (World Bank, 2025)

Nicaragua has great potential for development but is prone to natural disasters making its reliance on agricultural economies challenging.  While trade openness has increased, Nicaragua's exports consist mainly of low-complexity products. In addition, the country is highly vulnerable to external shocks and natural hazards. Its growth potential is limited by low levels of human capital, infrastructure gaps, a volatile business environment, and quality of policy. In 2023, 26.1% of Nicaragua's GDP was from remittances (WBG, 2025). Between December 2024 and January, remittances in Nicaragua decreased from $484.4 million to $ 448.2 million (Trading Economics, 2025).

3

The overall employment rate reached 66.9% in the second half of 2023, close to pre-pandemic levels, due to sustained growth, lower inflation, and increased remittances. The employment rate for women (54.9% in June 2024) has increased in recent years but remains well below that for men (75.9%). Poverty (US$3.65/day 2017 PPP) is estimated to have declined to 12.5% in 2023 from 13.1%in 2022. In 2023, the unemployment rate in Nicaragua was 4.8% and the youth (ages 15-24) unemployment rate was 9.5% (US CIA, 2025).

*Environmental Conditions and Sustainability*

In 1998 Hurricane Mitch hit reached Nicaragua as a category 5 hurricane, which is the second strongest October hurricane on record.  Nicaragua experienced widespread heavy rain and severe flooding, resulting in approximately 2,500 dead, 885 missing, and $1.3-1.5 billion extensive damage to its transportation network, housing, medical, and educational facilities, water supply and sanitation facilities, and the agricultural sector from landslides and flooding which it is still rebuilding in 2025 (NOAA / NESDIS, 2023).

Nicaragua continues to suffer from the residual effects of Hurricane Mitch, and subsequent disasters have caused additional damage and added to the country's fragility. "In the last 20 years, Nicaragua has been hit by major, extreme weather events such as Hurricanes Mitch in 1998, Beta in 2005, Felix in 2007, and most recently by hurricanes Eta and Iota in November 2020 … The economic, social, housing, and infrastructure losses have been devastating for the region." In addition to hurricanes, Nicaragua has also been impacted by other hydrometeorological events and is also one of the countries in the Dry Corridor of Central America. These environmental shocks have affected conditions throughout Nicaragua resulting in deaths, damage to homes and infrastructure, and loss of crops throughout the years. In addition to the numerous environmental disasters following the 1998 hurricane,

The country's most recent natural disaster was Tropical Storm Sara in November 2024. In Nicaragua, there were up to 6 inches of rainfall that led to flooded streets and rivers as well as landslides. An estimated 5000 people were evacuated from their homes. It is estimated that about 1,800 homes were damaged. There were two reported direct fatalities from Tropical Storm Sara (Kelly, 2025).

Nicaragua has gone from having an energy crisis between 2005 and 2006 to having two geothermal power plants.  Located on the Pacific Ring of Fire, Nicaragua has a high geothermal potential due to the heat from its volcanoes (Reyes Susano, 2024).

*Safety and Security*

Nicaragua has a tier 3 rating for trafficking in persons, which is the lowest rating given by the U.S. Department of State, meaning that the country does not fully meet the minimum standards for elimination of trafficking and is not making significant efforts to do so (US CIA, 2025).  Women, children, sexual minorities, and migrants are particularly vulnerable to

4

exploitation through human trafficking. Traffickers often target people with the most economic need such as those living in rural regions. Human trafficking victims may be lured in by social media sites and subsequently find themselves in forced labor and sexual tourism (US Department of State, 2024).

5

NicAR000048

**References**

Amnesty International (2024) Nicaragua 2023.
https://www.amnesty.org/en/location/americas/central-america-and-the-caribbean/nicaragua/report-nicaragua/

DemocracyNow (2025, March 7). Nicaragua Is in the Grips of Another Dictatorship, Decades After Sandinista Revolution: Reed Brody.
https://www.democracynow.org/2025/3/7/nicaragua_is_in_the_grips_of

Human Rights Watch. (2025). World report 2025: Nicaragua events of 2024.
https://www.hrw.org/world-report/2025/country-chapters/nicaragua.

International Monetary Fund. (2025). Facilitating international bond market access in Nicaragua.
https://www.imf.org/external/np/ins/english/capacity_countries_mfs_nicaragua.htm.

Kelly, L.A. (2025 February 19). National Hurricane Center tropical cyclone report:  Tropical Storm Sara (AL192024). https://www.nhc.noaa.gov/data/tcr/AL192024_Sara.pdf.

Reyes Susano, N.A. (2024 February) Proceedings of the 49th Workshop on Geothermal Reservoir Engineering. Stanford University.
https://pangea.stanford.edu/ERE/db/GeoConf/papers/SGW/2024/Reyes.pdf.

Tico Times (2024, Dec 30). Nicaragua's Ortega Faces Arrest Warrant in Argentina for Crimes Against Humanity. https://ticotimes.net/2024/12/30/nicaraguas-ortega-faces-arrest-warrant-in-argentina-for-crimes-against-humanity

Trading Economics (2025). Nicaragua Remittances.
https://tradingeconomics.com/nicaragua/remittances.

United Nations Office of the High Commissioner for Human Rights (OHCHR). (2025). Nicaragua. https://www.ohchr.org/en/countries/nicaragua.

UN OHCHR. (2024 September). Human rights situation in Nicaragua: Report of the United Nations High Commissioner for Human Rights.
https://www.ohchr.org/en/documents/country-reports/ahrc5720-situation-human-rights-nicaragua-report-united-nations-high

UN OHCHR. (2025). Refugee Data Finder. https://www.unhcr.org/refugee-statistics/download/?v2url=42aac0

U.S. Central Intelligence Agency. (2025). The world factbook: Nicaragua.
https://www.cia.gov/the-world-factbook/countries/nicaragua/

NicAR000049

U.S. Congressional Research Service. (2025 January 14). U.S. foreign assistance to Latin America and the Caribbean: FY 2025 appropriations. https://www.congress.gov/crs-product/R48266.

U.S. Congressional Research Service (US CRS). (2024 April 26). Nicaragua. https://www.congress.gov/crs-product/IF12247.

US CRS. (2024 December). Nicaragua: In brief. https://www.congress.gov/crs_external_products/R/PDF/R48294/R48294.2.pdf.

US. Department of State. (2024).  2024 Trafficking in Persons Report: Nicaragua. https://www.state.gov/reports/2024-trafficking-in-persons-report/nicaragua/.

U.S. International Trade Administration (ITA). (2024 February 29). Nicaragua Country Commercial Guide. https://www.trade.gov/country-commercial-guides/nicaragua-market-overview.

US. National Oceanic and Atmospheric Administration (NOAA) / National Environmental Satellite, Data and Information Service (NESDIS). (2023 October 27). 25 years later: Looking back at the October monster named Mitch. https://www.nesdis.noaa.gov/news/25-years-later-looking-back-the-october-monster-named-mitch.

U.S. State Department / Bureau of Democracy, Human Rights, and Labor. (2023). Nicaragua 2023 Human rights. https://2021-2025.state.gov/reports/2023-country-reports-on-human-rights-practices/nicaragua/.

World Bank Group. (2023). Personal remittances received (% of GDP) – Nicaragua. https://data.worldbank.org/indicator/BX.TRF.PWKR.DT.GD.ZS?locations=NI.

World Bank Group. (2025). The World Bank in Nicaragua. https://www.worldbank.org/en/country/nicaragua/overview#:~:text=Nicaragua%20is%20the%20largest%20country,environment%2C%20and%20quality%20of%20policy.

7


participating in the voluntary Alternate Compliance Program (ACP) before issuance of a Certificate of Inspection.

*Burden Estimates:* The estimated burden has increased from 150 hours to 164 hours a year.

3. *Title:* Operational Measures for Existing Tank Vessels Without Double Hulls.

*OMB Control Number:* 1625–0083.
*Type of Request:* Extension.
*Affected Public:* Owners, operators and masters of certain tank vessels.
*Forms:* None.

*Abstract:* The information is needed to ensure compliance with U.S. regulations regarding operational measures for certain tank vessels while operating in the U.S. waters.

*Burden Estimates:* The estimated burden has decreased from 18,006 hours to 6,807.

Dated: June 30, 2005.

**Nathaniel S. Heiner,**

*Acting, Assistant Commandant for Command, Control, Communications, Computers and Information Technology.*

[FR Doc. 05–13385 Filed 7–6–05; 8:45 am]

**BILLING CODE 4910–15–P**

---

# DEPARTMENT OF HOMELAND SECURITY

## U.S. Citizenship and Immigration Services

[CIS No. 2359–05]

RIN 1615–ZA27

## Automatic Extension of Employment Authorization Documentation for Honduran and Nicaraguan TPS Beneficiaries

**AGENCY:** U.S. Citizenship and Immigration Services, DHS.

**ACTION:** Notice.

**SUMMARY:** On November 3, 2004, U.S. Citizenship and Immigration Services (USCIS) of the Department of Homeland Security (DHS) published two Notices in the **Federal Register** extending the designations of Honduras and Nicaragua for Temporary Protected Status (TPS) until July 5, 2006, and automatically extending employment authorization documents (EADs) for the beneficiaries of TPS for Honduras and Nicaragua for six months, from January 5, 2005 until July 5, 2005. Beneficiaries of TPS for Honduras and Nicaragua are required to re-register and obtain new EADs. However, because of the large number of beneficiaries for TPS for Nicaragua and Honduras, USCIS will not be able to process and re-issue new EADs for all such beneficiaries by the July 5, 2005

expiration date. Accordingly, USCIS has decided to extend the validity of EADs issued to Honduran or Nicaraguan nationals (or aliens having no nationality who last habitually resided in Honduras or Nicaragua) under the extension of the TPS designations for an additional 90 days, from July 5, 2005 until October 5, 2005. This Notice announces that extension and also explains how TPS beneficiaries and their employers may determine which EADs are automatically extended.

**DATES:** The extension of EADs is effective July 5, 2005.

**FOR FURTHER INFORMATION CONTACT:** Colleen Cook, Residence and Status Services, Office of Programs and Regulations Development, U.S. Citizenship and Immigration Services, Department of Homeland Security, 111 Massachusetts Avenue, NW., 3rd Floor, Washington, DC 20529, telephone (202) 514–4754.

**SUPPLEMENTARY INFORMATION:**

## Why Is USCIS Automatically Extending the Validity of EADS for Honduran and Nicaraguan TPS Beneficiaries?

Considering the large number of applications, it is likely that many re-registrants will receive their new EAD after the expiration date of their current EAD. In order to prevent a gap in employment authorization for qualified re-registrants, DHS is extending the validity of applicable EADs to October 5, 2005.

## Who Is Eligible To Receive an Automatic Extension of His or Her EAD?

To receive an automatic extension of his or her EAD, an individual must be a national of Honduras or Nicaragua (or an alien having no nationality who last habitually resided in Honduras or Nicaragua) who has applied for and received an EAD under the TPS designation of Honduras or Nicaragua. This automatic extension is limited to EADs bearing an expiration date of January 5, 2005, that were issued on either Form I–766, Employment Authorization Document, or Form I–688B, Employment Authorization Card. The EAD must also be either (1) a Form I–766 bearing the notation ''A–12'' or ''C–19'' on the face of the card under ''Category,'' or (2) a Form I–688B bearing the notation ''274a.12(a)(12)'' or ''274a.12(c)(19)'' on the face of the card under ''Provision of Law.''

## Must Qualified Individuals Apply for the Automatic Extension of Their TPS-Related EADs?

No, qualified individuals do not have to apply for this automatic employment

authorization extension to October 5, 2005.

## What Documents May a Qualified Individual Show to His or Her Employer as Proof of Employment Authorization and Identity When Completing Form I–9, Employment Eligibility Verification?

For completion of the Form I–9 at the time of hire or re-verification, qualified individuals who are receiving a three-month extension of their EADs by virtue of this **Federal Register** Notice may present to their employer a TPS-based EAD as proof of identity and employment authorization until October 5, 2005. To minimize confusion over this extension at the time of hire or re-verification, qualified individuals may also present to their employer a copy of this **Federal Register** Notice regarding the automatic extension of employment authorization documentation to October 5, 2005. In the alternative, any legally acceptable document or combination of documents listed in List A, List B, or List C of the Form I–9 may be presented as proof of identity and employment eligibility; it is the choice of the employee.

## How May Employers Determine Whether an EAD Has Been Automatically Extended Through October 5, 2005 and Is Therefore Acceptable for Completion of the Form I–9?

For purposes of verifying identity and employment eligibility or re-verifying employment eligibility on the Form I–9 until October 5, 2005, employers of Honduran and Nicaraguan TPS beneficiaries whose EADs have been automatically extended by this Notice must accept such EAD if presented. An EAD that has been automatically extended by this notice to October 5, 2005 will actually contain an expiration date of January 5, 2005, and must be either (1) a Form I–766 bearing the notation ''A–12'' or ''C–19'' on the face of the card under ''Category,'' or (2) a Form I–688B bearing the notation ''274a.12(a)(12)'' or ''274a.12(c)(19)'' on the face of the card under ''Provision of Law.'' New EADs or extension stickers showing the October 5, 2005 expiration date will not be issued. Employers should not request proof of Honduran or Nicaraguan citizenship. Employers presented with an EAD that has been extended pursuant to this **Federal Register** Notice, if it appears to be genuine and appears to relate to the employee, should accept the EAD as a valid ''List A'' document and should not ask for additional Form I–9 documentation. This action by USCIS

through this **Federal Register** Notice does not affect the right of an employee to present any legally acceptable document as proof of identity and eligibility for employment.

Employers are reminded that the laws prohibiting unfair immigration-related employment practices remain in full force. For questions, employers may call the USCIS Office of Business Liaison Employer Hotline at 1–800–357–2099 to speak to a USCIS representative. Also, employers may call the U.S. Department of Justice Office of Special Counsel for Immigration Related Unfair Employment Practices (OSC) Employer Hotline at 1–800–255–8155 or 1–800–362–2735 (TDD). Employees or applicants may call the OSC Employee Hotline at 1–800–255–7688 or 1–800–237–2515 (TDD) for information regarding the automatic extension. Additional information is available on the OSC Web site at *http:// www.usdoj.gov/crt/osc/index.html*.

Dated: July 1, 2005.

**Michael Petrucelli,**
*Acting Director, U.S. Citizenship and Immigration Services.*

[FR Doc. 05–13401 Filed 7–1–05; 4:06 pm]

**BILLING CODE 4410–10–P**

---

## DEPARTMENT OF THE INTERIOR

### Fish and Wildlife Service

### Endangered and Threatened Wildlife and Plants; Initiation of a 5-Year Review of Black-Footed Ferret (*Mustela nigripes*) and Pallid Sturgeon (*Scaphirhynchus albus*)

**AGENCY:** Fish and Wildlife Service, Interior.

**ACTION:** Notice.

**SUMMARY:** The U.S. Fish and Wildlife Service (Service) announces a 5-year review of black-footed ferret (*Mustela nigripes*) and pallid sturgeon (*Scaphirhynchus albus*) under section 4(c)(2)(A) of the Endangered Species Act of 1973 (ESA). A 5-year review is a periodic process conducted to ensure that the listing classification of a species is accurate. A 5-year review is based on the best scientific and commercial data available at the time of the review; therefore, we are requesting submission of any such information on black-footed ferret and pallid sturgeon that has become available since their original listings as endangered species. Based on the results of this 5-year review, we will make the requisite findings under section 4(c)(2)(B) of the ESA.

**DATES:** To allow us adequate time to conduct our reviews on the statuses of

each of these species, we must receive your information no later than September 6, 2005. However, we will continue to accept new information about any listed species at any time.

**ADDRESSES:** Submit information on black-footed ferret to Pete Gober, South Dakota Field Office, U.S. Fish and Wildlife Service, 420 S. Garfield Avenue, Suite 400, Pierre, South Dakota 57501. Submit information on pallid sturgeon to George Jordan, U.S. Fish and Wildlife Service, 2900 4th Avenue North, Room 301, Billings, Montana 59101. Information received in response to this notice and review will be available for public inspection, by appointment, during normal business hours, at the above addresses.

**FOR FURTHER INFORMATION CONTACT:** Black-footed ferret—Pete Gober, South Dakota Field Office Supervisor, at (605) 224–8693, extension 24. Pallid sturgeon—George Jordan, Pallid Sturgeon Recovery Coordinator, at (406) 247–7365.

**SUPPLEMENTARY INFORMATION:** Under the ESA (16 U.S.C. 1531 *et seq.*), the Service maintains a list of endangered and threatened wildlife and plant species at 50 CFR 17.11 (for animals) and 17.12 (for plants). Section 4(c)(2)(A) of the ESA requires that we conduct a review of listed species at least once every 5 years. Then, based on such reviews, under section 4(c)(2)(B), we determine whether or not any species should be removed from the List (delisted), or reclassified from endangered to threatened or from threatened to endangered. Delisting a species must be supported by the best scientific and commercial data available and considered only if such data substantiate that the species is neither endangered nor threatened for one or more of the following reasons—(1) the species is considered extinct; (2) the species is considered to be recovered; and/or (3) the original data available when the species was listed, or the interpretation of such data, were in error. Any change in Federal classification would require a separate rulemaking process. The regulations in 50 CFR 424.21 require that we publish a notice in the **Federal Register** announcing those species currently under active review. This notice announces our active review of the Black-footed ferret and Pallid sturgeon, both of which are currently listed as endangered. We request submission of any new information on the black-footed ferret or the pallid sturgeon, or both, that has become available since their original listings as endangered

species in 1967 (32 FR 4001) and 1990 (55 FR 36641), respectively.

**Public Solicitation of New Information**

To ensure that the 5-year review is complete and based on the best available scientific and commercial information, we are soliciting new information from the public, concerned governmental agencies, Tribes, the scientific community, industry, environmental entities, and any other interested parties concerning the status of black-footed ferret and pallid sturgeon.

The 5-year review considers the best scientific and commercial data and all new information that has become available since the listing determination or most recent status review of each species. Categories of requested information include—(A) species biology, including but not limited to population trends, distribution, abundance, demographics, and genetics; (B) habitat conditions, including but not limited to amount, distribution, and suitability; (C) conservation measures that have been implemented that benefit the species; (D) threat status and trends; and (E) other new information, data, or corrections, including but not limited to taxonomic or nomenclatural changes, identification of erroneous information contained in the List, and improved analytical methods.

If you wish to provide information for one or both of these species for 5-year review, you may submit your comments and materials regarding black-footed ferret to Pete Gober, South Dakota Field Office Supervisor (*see* **ADDRESSES** section); or your comments and materials regarding pallid sturgeon to George Jordan, Pallid Sturgeon Recovery Coordinator (*see* **ADDRESSES** section). Our practice is to make comments, including names and home addresses of respondents, available for public review during regular business hours. Respondents may request that we withhold a respondent's identity, as allowable by law. If you wish us to withhold your name or address, you must state this request prominently at the beginning of your comment. However, we will not consider anonymous comments. To the extent consistent with applicable law, we will make all submissions from organizations or businesses, and from individuals identifying themselves as representatives or officials of organizations or businesses, available for public inspection in their entirety. Comments and materials received will be available for public inspection, by appointment, during normal business hours (*see* **ADDRESSES** section).

NicAR000052

pursuant to 21 U.S.C. 823 and 28 CFR 0.100 and 0.104, the Deputy Assistant Administrator, Office of Diversion Control, hereby orders that the application submitted by the above firm for registration as a bulk manufacturer of the basic class of controlled substance listed above is granted.

Dated: June 19, 2001.

**Laura M. Nagel,**

*Deputy Assistant Administrator, Office of Diversion Control, Drug Enforcement Administration.*

[FR Doc. 01–16681 Filed 7–2–01; 8:45 am]

**BILLING CODE 4410–09–M**

## DEPARTMENT OF JUSTICE

### Immigration and Naturalization Service

**[INS No. 2148–01; AG Order No.]**

**RIN 1115—AE26**

### Automatic Extension of Work Authorization for Hondurans and Nicaraguans Under Temporary Protected Status Program

**AGENCY:** Immigration and Naturalization Service, Justice.

**ACTION:** Notice.

**SUMMARY:** On May 8, 2001, the Immigration and Naturalization Service (Service) published notices in the **Federal Register** extending the designation of Honduras and Nicaragua under the Temporary Protected Status (TPS) Program until July 5, 2002. The extension for TPS allows eligible nationals of Honduras and Nicaragua to re-register for TPS and extend employment authorization. The Service is aware that may re-registrants will not receive their new employment authorization documents (EADs) until after their current EADs expire on July 5, 2001. Accordingly, this notice extends until December 5, 2001, the validity of EADs that were issued to Honduran or Nicaraguan nationals (or aliens having no nationality who last habitually resided in Honduras or Nicaragua) that are set to expire on July 5, 2001, under the extension of the TPS program. To be eligible for this automatic extension of employment authorization, an individual must be a national of Honduras or Nicaragua (or an alien having no nationality who last habitually resided in Honduras or Nicaragua) who currently holds an EAD that expires on July 5, 2001 and that was issued in conjunction with the TPS program for Honduras or Nicaragua. This automatic extension is limited to EADs bearing date of July 5, 2001 and the notation:

• "A–12" or "C–19" on the face of the card under "Category" for EADs issued on Form I–766; or, "274A.12(A)(12)" or "274A.12(C)(19)" on the face of the card under "Provision of Law" for EADs issued on Form I–688B.

**DATES:** This notice is effective July 3, 2001.

**FOR FURTHER INFORMATION CONTACT:** Michael Biggs, Office of Adjudications, Immigration and Naturalization Service, Room 3214, 425 I Street, NW., Washington, DC 20536, telephone (202) 514–4754.

**SUPPLEMENTARY INFORMATION:**

### Why Is the Service Automatically Extending the Expiration Date of EADs From July 5, 2001 to December 5, 2001?

Considering both the number of applications that the Service anticipates it will receive for extension, Service processing capabilities, and given the short timeframe provided by statute for the decision to extend the Attorney General's designation of Honduras and Nicaragua under the TPS program, it is likely that many re-registrants will receive their new EAD after the expiration date of their current EAD. Unless an extension of the expiration date of their EAD is provided, re-registrants may experience a gap in employment authorization and be barred from working. Therefore, to afford the Service sufficient processing time or to ensure that re-registrants will be able to maintain their employment authorization until they receive a new EAD in connection with their re-registration for the new period of TPS, the Service through this notice, is extending the validity of applicable EADs to December 5, 2001.

### Who Is Eligible To Receive an Automatic Extension of Employment Authorization?

To be eligible for an automatic extension of employment authorization, an individual must be a national of Honduras or Nicaragua (or an alien having no nationality who last habitually resided in Honduras or Nicaragua) who previously applied for an received an EAD under the initial January 5, 1999, designation of Honduras or Nicaragua for TPS. This automatic extension is limited to EADs bearing an expiration date of July 5, 2001, and the notation:

• "A–12" or "C–19" on the face of the card under "Category" for EADs issued on Form I–766; or,

• "274A.12(A)(12)" or "274A.12(C)(19)" on the face of the card under "Provision of Law" for EADs issued on Form I–688B.

### Does a Qualified Individual Have To Apply to the Service for the Automatic Extension to December 5, 2001, of His or Her TPS-related EAD?

No, the extension of the validity of the previously issued EADS to December 5, 2001, is automatic and there is no fee. However, qualified individuals must re-register by August 6, 2001, in order to be eligible for a new EAD that is valid until July 5, 2002.

### What Documents Can a Qualified Individual Show to His or Her Employer as Proof of Employment Authorization and Identify When Completing the Employment Eligibility Verification Form (Form I–9)?

For completion of the Form I–9 at the time of hire or re-verification, qualified individuals who have received an extension of employment authorization by virtue of this **Federal Register** notice may present to their employer a TPS-related EAD as proof of valid employment authorization and identity until December 5, 2001. To minimize confusion over this extension at the time of hire or re-verification, qualified individuals may also present to their employer a copy of this **Federal Register** notice regarding the extension of employment authorization to December 5, 2001. In the alternative to presenting a TPS-related EAD, any legally acceptable document or combination of documents listed in List A, List B, or List C of the Form I–9 may be presented as proof of identity and employment eligibility; it is the choice of the employee.

### How Can Employers Determine Which EADs That Have Been Automatically Extended Through December 5, 2001, Are Acceptable for Completion of the Form I–9?

For purposes of verifying identity and employment eligibility or re-verifying employment eligibility on the Form I–9 until December 5, 2001, employers of TPS Honduran or Nicaraguan nationals (or aliens having no nationality who last habitually resided in Honduras or Nicaragua) whose employment authorization has been automatically extended by this notice must accept an EAD that contains an expiration date of July 5, 2001, and that bears that notation:

• "A–12" or "C–19" on the face of the card under "Category" for EADs issued on Form I–766; or,

• "274A.12(A) (12)" or "274A.12(c) (19)" on the face of the card under "Provision of Law" for EADs issued on Form I–688B.

New EADs or extension stickers showing the December 5, 2001,

expiration date will not be issued. Employers should not request proof of Honduran or Nicaraguan citizenship. Employers presented with an EAD that has been extended by this **Federal Register** notice and that appears to be genuine and to relate to the employee should accept the document as a valid List A document and should not ask for additional Form I–9 documentation. This action by the Service through this **Federal Register** notice does not affect the right of an employee to present any legally acceptable document as proof of identity and eligibility for employment. Employers are reminded that the laws prohibiting unfair immigration-related employment practices remain in full force.

Employers may call the Service's Office of Business Liaison Employer Hotline at 1–800–357–2099 to speak to a Service representative about this Notice. Employers can also call the Office of Special Counsel for Immigration Related Unfair Employment Practices (OSC) Employer Hotline at 1–800–255–8155. Employees or applicants can call the OSC Employee Hotline at 1–800–255–7688 about the automatic extension.

**Does This Notice Affect Any Other Portion of the May 8, 2001, Federal Register Notices Extending TPS Designation for Honduras and Nicaragua Until July 5, 2002?**

No, all other TPS requirements contained in the May 8, 2001, **Federal Register** notices at 66 FR 23269 and 66 FR 23271, respectively, are accurate and remain in effect.

Dated: June 28, 2001.

**Kevin D. Rooney,**
*Commissioner.*

[FR Doc. 01–16745 Filed 6–29–01; 8:45 am]

**BILLING CODE 4410–01–M**

---

# DEPARTMENT OF LABOR

## Occupational Safety and Health Administration

**[Docket No. NRTL2–92]**

## Canadian Standards Association, Renewal and Expansion of Recognition

**AGENCY:** Occupational Safety and Health Administration (OSHA), Labor.

**ACTION:** Notice.

**SUMMARY:** This notice announces the Agency's final decision on: (1) the application of the Canadian Standards Association (CSA) for renewal of its recognition as a Nationally Recognized

Testing Laboratory under 29 CFR 1910.7, and (2) the application of the Canadian Standards Association for expansion of its recognition to use additional standards.

**EFFECTIVE DATE:** The renewal becomes effective on July 3, 2001 and will be valid until July 3, 2006, unless terminated or modified prior to that date, in accordance with 29 CFR 1910.7.

**FOR FURTHER INFORMATION CONTACT:** Bernard Pasquet, Office of Technical Programs and Coordination Activities, NRTL Program, Occupational Safety and Health Administration, U.S. Department of Labor, 200 Constitution Avenue, NW, Room N3653, Washington, D.C. 20210, or phone (202) 693–2110.

**SUPPLEMENTARY INFORMATION:**

### Notice of Final Application

The Occupational Safety and Health Administration (OSHA) hereby gives notice of the renewal and expansion of recognition of the Canadian Standards Association (CSA) as a Nationally Recognized Testing Laboratory (NRTL). CSA's expansion request covers the use of additional test standards. The NRTL's scope of recognition may be found in OSHA's informational web page for the NRTL (http://www.osha-slc.gov/dts/otpca/nrtl/csa.html).

OSHA recognition of an NRTL signifies that the organization has met the legal requirements in Section 1910.7 of Title 29, Code of Federal Regulations (29 CFR 1910.7). Recognition is an acknowledgment that the organization can perform independent safety testing and certification of the specific products covered within its scope of recognition and is not a delegation or grant of government authority. As a result of recognition, employers may use products "properly certified" by the NRTL to meet OSHA standards that require testing and certification.

The Agency processes applications by an NRTL for initial recognition or for expansion or renewal of this recognition following requirements in Appendix A to 29 CFR 1910.7. This appendix requires that the Agency publish two notices in the **Federal Register** in processing an application. In the first notice, OSHA announces the application and provides its preliminary finding and, in the second notice, the Agency provides its final decision on the application. These notices set forth the NRTL's scope of recognition or modifications of that scope.

CSA originated in 1919 as the Canadian Engineering Standards Association (CESA), which was changed in 1944 to the present name. In 1940, CSA began to test and certify products.

CSA received its recognition as an NRTL on December 24, 1992 (see 57 FR 61452), for a period of five years ending December 24, 1997. Appendix A to 29 CFR 1910.7 stipulates that the period of recognition of an NRTL is five years and that an NRTL may renew its recognition by applying not less than nine months, nor more than one year, before the expiration date of its current recognition. CSA submitted its renewal request on March 20, 1997 (see Exhibit 26A), within the time allotted, and CSA retains its recognition pending OSHA's final decision in this renewal process.

In July 1997, CSA acquired additional testing facilities from the American Gas Association (AGA). OSHA had recognized AGA operation of these facilities for NRTL status in 1990 (June 7, 1990, 55 FR 23312). OSHA was in the process of renewing its recognition of these facilities when CSA acquired them. Although OSHA was generally aware that CSA had made this acquisition, CSA did not officially inform OSHA until March 1999 as to how it wanted to treat these sites within its NRTL operations. The NRTL Program staff withheld action on CSA's renewal request until it received this information.

CSA has submitted a request, dated June 16, 1999 (see Exhibit 26B), to expand its recognition as an NRTL to include 195 additional test standards. The NRTL Program staff has determined that 51 of the 195 standards are not "appropriate test standards," within the meaning of 29 CFR 1910.7(c). The staff makes such determinations in processing expansion requests from any NRTL. Therefore, OSHA is approving 144 test standards for the expansion, which are listed below in the section on expansion.

OSHA published the required notice in the **Federal Register** on March 16, 2001, (66 FR 15281) to announce CSA's renewal and expansion requests. This notice included a preliminary finding that CSA could meet the requirements in 29 CFR 1910.7 for renewal and expansion of its recognition and invited public comment by April 2, 2001. OSHA received no comments concerning this notice.

In processing CSA's requests, OSHA performed on-site reviews of CSA's facilities listed below. NRTL Program staff recommended the renewal and expansion of CSA's recognition in the on-site review report (see Exhibit 27).

The following is a chronology of the other **Federal Register** notices published by OSHA concerning CSA's recognition, all of which have involved an expansion of recognition for additional sites, standards, or programs:


# DEPARTMENT OF HOMELAND SECURITY

## U.S. Customs and Border Protection

[CBP Dec. 21–13]

## Determination That Maintenance of Finding of March 29, 2021, Pertaining to Certain Disposable Gloves Produced in Malaysia, Is No Longer Necessary

**AGENCY:** U.S. Customs and Border Protection, Department of Homeland Security.

**ACTION:** Determination that merchandise is no longer subject to 19 U.S.C. 1307.

**SUMMARY:** On March 29, 2021, U.S. Customs and Border Protection (CBP), with the approval of the Secretary of Homeland Security, issued a Finding that certain disposable gloves, were mined, produced, or manufactured in Malaysia by Top Glove Corporation Bhd with the use of convict, forced, or indentured labor, and were being, or were likely to be, imported into the United States. CBP has now determined, based upon additional information, that such merchandise is no longer being, or is likely to be, imported into the United States in violation of section 307 of the Tariff Act of 1930, as amended.

**DATES:** This determination applies to any merchandise described in this notice that is imported on or after September 10, 2021.

**FOR FURTHER INFORMATION CONTACT:** Juan M. Estrella, Chief, Operations Branch, Forced Labor Division, Trade Remedy Law Enforcement Directorate, Office of Trade, (202) 325–6087 or *forcedlabor@ cbp.dhs.gov.*

**SUPPLEMENTARY INFORMATION:**

## I. Background

Pursuant to section 307 of the Tariff Act of 1930, as amended (19 U.S.C. 1307), "[a]ll goods, wares, articles, and merchandise mined, produced, or manufactured wholly or in part in any foreign country by convict labor or/and forced labor or/and indentured labor under penal sanctions shall not be entitled to entry at any of the ports of the United States, and the importation thereof is hereby prohibited." Under this section, "forced labor" includes "all work or service which is exacted from any person under the menace of any penalty for its nonperformance and for which the worker does not offer himself voluntarily" and includes forced or indentured child labor.

The CBP regulations promulgated under the authority of 19 U.S.C. 1307 are found at sections 12.42 through

12.45 of title 19, Code of Federal Regulations (CFR) (19 CFR 12.42–12.45). Among other things, these regulations allow any person outside of CBP to communicate his or her belief that a certain "class of merchandise . . . is being, or is likely to be, imported into the United States [in violation of 19 U.S.C. 1307]." 19 CFR 12.42(a), (b). Upon receiving such information, the Commissioner "will cause such investigation to be made as appears to be warranted by the circumstances . . . ." 19 CFR 12.42(d). CBP also has the authority to self-initiate an investigation. 19 CFR 12.42(a). If the Commissioner of CBP finds that the information available "reasonably but not conclusively indicates that merchandise within the purview of section 307 is being, or is likely to be, imported," the Commissioner will order port directors to "withhold release of any such merchandise pending [further] instructions." 19 CFR 12.42(e). After issuance of such a withhold release order, the covered merchandise will be detained by CBP for an admissibility determination and will be excluded unless the importer demonstrates that the merchandise was not made using labor in violation of 19 U.S.C. 1307. 19 CFR 12.43–12.44. The importer may also export the merchandise. 19 CFR 12.44(a).

These regulations also set forth the procedure for the Commissioner of CBP to issue a Finding when it is determined that the merchandise is subject to the provisions of 19 U.S.C. 1307. Pursuant to 19 CFR 12.42(f), if the Commissioner of CBP determines that merchandise within the purview of 19 U.S.C. 1307 is being, or is likely to be, imported into the United States, the Commissioner of CBP will, with the approval of the Secretary of the Department of Homeland Security (DHS), publish a Finding to that effect in the *Customs Bulletin* and in the **Federal Register**.[1] Under the authority of 19 CFR 12.44(b), CBP may seize and forfeit imported merchandise covered by a Finding.

On July 15, 2020, CBP issued a withhold release order on "disposable gloves" reasonably indicated to be

manufactured by forced labor in Malaysia by Top Glove Corporation Bhd (Top Glove). Through its investigation, CBP determined that there was sufficient information to support a Finding that Top Glove was manufacturing disposable gloves with forced labor and that such merchandise was likely being imported into the United States. Pursuant to 19 CFR 12.42(f), CBP issued a Finding to that effect in the **Federal Register** on March 29, 2021 (86 FR 16380).[2]

Since that time, Top Glove has provided additional information to CBP, which CBP believes establishes by satisfactory evidence that the subject disposable gloves are no longer mined, produced, or manufactured in any part with forced labor. 19 CFR 12.42(g).

## II. Determination

Pursuant to 19 U.S.C. 1307 and 19 CFR 12.42(g), it is hereby determined that the articles described below are no longer being mined, produced, or manufactured wholly or in part with the use of convict, forced, or indentured labor by Top Glove in Malaysia.

The subject articles are disposable gloves classified under Harmonized Tariff Schedule of the United States (HTSUS) subheadings 3926.20.1020, 4015.11.0150, 4015.19.0510, 4015.19.0550, 4015.19.1010, 4015.19.1050, and 4015.19.5000, which are mined, produced, or manufactured by Top Glove in Malaysia.

Dated: September 3, 2021.

**AnnMarie R. Highsmith,**
*Executive Assistant Commissioner, Office of Trade.*

[FR Doc. 2021–19535 Filed 9–9–21; 8:45 am]

**BILLING CODE 9111–14–P**

# DEPARTMENT OF HOMELAND SECURITY

## U.S. Citizenship and Immigration Services

[CIS No. 2676–21; DHS Docket No. USCIS– 2019–0020]

RIN 1615–ZB83

## Continuation of Documentation for Beneficiaries of Temporary Protected Status Designations for El Salvador, Haiti, Nicaragua, Sudan, Honduras, and Nepal

**AGENCY:** U.S. Citizenship and Immigration Services, Department of Homeland Security.

---

[1] Although the regulation states that the Secretary of the Treasury must approve the issuance of a Finding, the Secretary of the Treasury delegated this authority to the Secretary of Homeland Security in Treasury Order No. 100–16 (68 FR 28322). In Delegation Order 7010.3, Section II.A.3, the Secretary of Homeland Security delegated the authority to issue a Finding to the Commissioner of CBP, with the approval of the Secretary of Homeland Security. The Commissioner of CBP, in turn, delegated the authority to make a Finding regarding prohibited goods under 19 U.S.C. 1307 to the Executive Assistant Commissioner, Office of Trade.

[2] The Finding was also published in the *Customs Bulletin and Decisions* (Vol. 55, No. 14, p. 13) on April 14, 2021.

**ACTION:** Notice of Continuation of Temporary Protected Status and related documentation for Certain TPS beneficiaries.

**SUMMARY:** Through this notice, the Department of Homeland Security (DHS) announces actions to ensure its continued compliance with the preliminary injunction orders of the U.S. District Court for the Northern District of California in *Ramos, et al.* v. *Nielsen, et. al.,* No. 18–cv–01554 (N.D. Cal. Oct. 3, 2018) (''*Ramos*'') and the U.S. District Court for the Eastern District of New York in *Saget, et. al.,* v. *Trump, et. al.,* No. 18–cv–1599 (E.D.N.Y. Apr. 11, 2019) (''*Saget*''), and with the order of the U.S. District Court for the Northern District of California to stay proceedings in *Bhattarai* v. *Nielsen,* No. 19–cv–00731 (N.D. Cal. Mar. 12, 2019) (''*Bhattarai*''). Beneficiaries under the Temporary Protected Status (TPS) designations for El Salvador, Nicaragua, Sudan, Honduras, and Nepal will retain their TPS while the preliminary injunction in *Ramos* and the *Bhattarai* orders remain in effect, provided that their TPS is not withdrawn because of individual ineligibility. Beneficiaries under the TPS designation for Haiti will retain their TPS while either of the preliminary injunctions in *Ramos* or *Saget* remain in effect, provided that their TPS is not withdrawn because of individual ineligibility''). However, on August 3, 2021, DHS issued a new designation for Haiti TPS, and in order to secure TPS pursuant to the new Haiti designation, eligible individuals must apply before the close of the registration period on Feb. 3, 2023. Eligible individuals are strongly encouraged to apply at the earliest practicable date, to ensure that their TPS continues beyond the court-ordered extensions and without any gaps in status. See Designation of Haiti for Temporary Protected Status. In addition, eligible individuals who do not register for the new TPS designation during the registration period, may be prohibited from filing a late initial registration during any subsequent extension of the designation if they do not meet certain conditions. This notice further provides information on the automatic extension of the validity of TPS-related Employment Authorization Documents (EADs); Notices of Action (Forms I–797); and Arrival/Departure Records (Forms I–94), (collectively ''TPS-related documentation''); for those beneficiaries under the TPS designations for El Salvador, Haiti, Nicaragua, Sudan, Honduras, and Nepal.

**DATES:** DHS is automatically extending the validity of TPS-related

documentation for beneficiaries under the TPS designations for El Salvador, Haiti, Nicaragua, Sudan, Honduras, and Nepal through December 31, 2022, from the current expiration date of October 4, 2021.

**FOR FURTHER INFORMATION CONTACT:**

☐ You may contact Andria Strano, Acting Chief, Humanitarian Affairs Division, Office of Policy and Strategy, U.S. Citizenship and Immigration Services, U.S. Department of Homeland Security, by mail at 5900 Capital Gateway Dr, Camp Springs, MD 20529–2140; or by phone at 800–375–5283.

☐ For further information on TPS, please visit the USCIS TPS web page at *www.uscis.gov/tps.*

☐ If you have additional questions about TPS, please visit *uscis.gov/tools.* Our online virtual assistant, Emma, can answer many of your questions and point you to additional information on our website. If you are unable to find your answers there, you may also call our U.S. Citizenship and Immigration Services (USCIS) Contact Center at 800–375–5283 (TTY 800–767–1833).

☐ Applicants seeking information about the status of their individual cases may check Case Status Online, available on the USCIS website at *www.uscis.gov,* or visit the USCIS Contact Center at *uscis.gov/contactcenter.*

☐ Further information will also be available at local USCIS offices upon publication of this notice.

**SUPPLEMENTARY INFORMATION:**

**Table of Abbreviations**

BIA—Board of Immigration Appeals
CFR—Code of Federal Regulations
DHS—U.S. Department of Homeland Security
EAD—Employment Authorization Document
EOIR—Executive Office for Immigration Review
FNC—Final Nonconfirmation
Form I–765—Application for Employment Authorization
Form I–797—Notice of Action
Form I–821—Application for Temporary Protected Status
Form I–9—Employment Eligibility Verification
Form I–912—Request for Fee Waiver
Form I–94—Arrival/Departure Record
Government—U.S. Government
IER—U.S. Department of Justice, Civil Rights Division, Immigrant and Employee Rights Section
INA—Immigration and Nationality Act
SAVE—USCIS Systematic Alien Verification for Entitlements Program
Secretary—Secretary of Homeland Security
TNC—Tentative Nonconfirmation
TPS—Temporary Protected Status
TTY—Text Telephone
USCIS—U.S. Citizenship and Immigration Services

**Background on TPS**

• TPS is a temporary immigration status granted to eligible nationals of a country designated for TPS under the Immigration and Nationality Act (INA) or to eligible persons without nationality who last habitually resided in the designated country.

• During the TPS designation period, TPS beneficiaries are eligible to remain in the United States, may not be removed, and are authorized to obtain EADs so long as they continue to meet the requirements of TPS.

• TPS beneficiaries may travel abroad temporarily with the prior consent of DHS.

• The granting of TPS does not result in or lead to lawful permanent resident status.

• To qualify for TPS, beneficiaries must meet the eligibility standards at INA section 244(c)(1)–(2), 8 U.S.C. 1254a(c)(1)–(2).

• When the Secretary of Homeland Security (the Secretary) terminates a country's TPS designation, beneficiaries return to one of the following:

○ The same immigration status or category that they maintained before TPS, if any (unless that status or category has since expired or been terminated); or

○ Any other lawfully obtained immigration status or category they received while registered for TPS, as long as it is still valid on the date TPS terminates.

**Purpose of This Action**

This notice ensures DHS's continued compliance with various court orders issued by the federal district courts in the *Ramos, Bhattarai,* and *Saget* lawsuits that require DHS to maintain the TPS designations for El Salvador, Haiti, Sudan, Nicaragua, Honduras, and Nepal, as well as the TPS and TPS-related documentation for eligible affected beneficiaries.[1] The U.S. Court of Appeals for the Ninth Circuit vacated the district court's preliminary injunction in *Ramos* on September 14, 2020, holding that the plaintiffs' claims under the Administrative Procedures

---

[1] *See Ramos, et al.* v. *Nielsen, et. al.,* No. 18–cv–01554 (N.D. Cal. Oct. 3, 2018) (district court granted preliminary injunction against terminations of TPS for El Salvador, Haiti, Sudan, and Nicaragua) (''*Ramos*''); *Saget, et. al.* v. *Trump, et. al.,* No. 18–cv–1599 (E.D.N.Y. Apr. 11, 2019) (district court granted preliminary injunction against termination of TPS for Haiti) (''*Saget*''); and *Bhattarai, et al.* v. *Nielsen, et al.,* No. 19–cv–00731 (N.D. Cal. Mar. 12, 2019) (district court stayed proceedings pending *Ramos* appeal decided and approved parties' stipulation for continued TPS and issuance of TPS-related documentation to eligible, affected beneficiaries of TPS for Honduras and Nepal during the stay and pendency of the appeal) (''*Bhattarai*'').

NicAR000056

Act were not subject to judicial review. However, the appellate order is not currently effective because the Ninth Circuit has not issued its "mandate" to the federal district court to carry out the order, as the plaintiffs' petition for rehearing en banc remains pending.[2] Therefore, the *Ramos* preliminary injunction remains in effect. In addition, the order of the district court in *Bhattarai* staying proceedings and approving the parties' stipulated agreement to continue TPS and TPS-related documentation for eligible beneficiaries from Nepal and Honduras remains in effect. The *Saget* district court order prohibiting the termination of TPS for Haiti also remains in effect while the decision is on appeal to the U.S. Court of Appeals for the Second Circuit. Affected TPS beneficiaries from the six countries will retain their status, provided they continue to meet all the individual requirements for TPS eligibility described in INA section 244(c) and 8 CFR 244. As necessary, DHS will publish future information in the **Federal Register** to ensure its compliance with any relevant court orders that may be issued after the date of this notice.

DHS initially published notices to ensure its compliance with the *Ramos* preliminary injunction on October 31, 2018 and March 1, 2019, and the *Bhattarai* order to stay proceedings on May 10, 2019. *See* 83 FR 54764; 84 FR 7103; and 84 FR 20647. The Department later published a notice to ensure its continued compliance with the combined orders in *Ramos, Bhattarai,* and *Saget* on November 4, 2019. That notice automatically extended certain TPS and TPS-related documentation through January 4, 2021 for all eligible TPS beneficiaries covered by the courts' orders. *See* 84 FR 59403. The Department last published a notice to ensure its continued compliance with these combined court orders on December 9, 2020. That notice again automatically extended certain TPS and TPS-related documentation through October 4, 2021 for all eligible TPS beneficiaries covered by the courts' orders. *See* 85 FR 79208. Through this **Federal Register** notice, DHS announces actions to ensure its continued compliance with the district court orders in these three lawsuits while those orders remain in effect.

The TPS designations for El Salvador, Nicaragua, and Sudan will remain in effect, as required by the *Ramos* district court order, so long as the preliminary injunction remains in effect. The 2011

TPS designation for Haiti will remain in effect, as required by the preliminary injunction orders in both *Ramos* and *Saget,* so long as either of those preliminary injunctions remain in effect. The TPS designations for Honduras and Nepal will remain in effect so long as the *Bhattarai* order staying proceedings and approving the parties' stipulated agreements continues in effect. Affected TPS beneficiaries under the TPS designations for El Salvador, Haiti, Nicaragua, Sudan, Honduras, and Nepal will retain their TPS and their TPS-related documentation will continue to be valid in accordance with the specific orders that affect the TPS designations regarding their individual countries, provided that the affected beneficiaries continue to meet all the individual requirements for TPS. *See* INA section 244(c)(3). *See also* 8 CFR 244.14. DHS will not terminate TPS for any of the affected countries pending final disposition of the *Ramos* appeal, including through any additional appellate channels in which relief may be sought, or by other orders of the court. Following consideration of current country conditions, the Secretary has already newly designated Haiti for TPS for eighteen months, allowing individuals covered by the *Ramos* and *Saget* injunctions as well as other eligible individuals to register for and maintain TPS through February 3, 2023.

DHS is further announcing that it is automatically extending, through December 31, 2022, the validity of certain TPS-related documentation, as specified in this notice, for beneficiaries under the TPS designations for El Salvador, Haiti, Nicaragua, Sudan, Honduras, and Nepal provided that the affected beneficiaries remain individually eligible for TPS.

## Automatic Extension of EADs Issued Under the TPS Designations for El Salvador, Haiti, Nicaragua, Sudan, Honduras, and Nepal

Through this **Federal Register** notice, DHS automatically extends the validity of EADs listed in Table 1 below issued to beneficiaries under the TPS designations for El Salvador, Haiti, Nicaragua, Sudan, Honduras, and Nepal. Such beneficiaries may show their EADs to employers to demonstrate they have employment authorization and may choose to also show employers this **Federal Register** notice to explain that their TPS-Related Documentation has been automatically extended through December 31, 2022. This notice explains how TPS beneficiaries, their employers, and benefit-granting

agencies may determine which EADs are automatically extended and how this affects the Form I–9, Employment Eligibility Verification; E-Verify; and USCIS Systematic Alien Verification for Entitlements (SAVE) processes. Additionally, a beneficiary under the TPS designation for any of these countries who has applied for a new EAD but who has not yet received his or her new EAD is covered by this automatic extension, provided that the EAD he or she possesses contains one of the expiration dates listed in Table 1 below.

### TABLE 1—AFFECTED EADs

| If an EAD has a category code of A–12 or C–19 and an expiration date of: | Then the validity of the EAD is extended through: |
| --- | --- |
| 07/22/2017 | 12/31/2022 |
| 11/02/2017 | 12/31/2022 |
| 01/05/2018 | 12/31/2022 |
| 01/22/2018 | 12/31/2022 |
| 03/09/2018 | 12/31/2022 |
| 06/24/2018 | 12/31/2022 |
| 07/05/2018 | 12/31/2022 |
| 11/02/2018 | 12/31/2022 |
| 01/05/2019 | 12/31/2022 |
| 04/02/2019 | 12/31/2022 |
| 06/24/2019 | 12/31/2022 |
| 07/22/2019 | 12/31/2022 |
| 09/09/2019 | 12/31/2022 |
| 01/02/2020 | 12/31/2022 |
| 01/05/2020 | 12/31/2022 |
| 03/24/2020 | 12/31/2022 |
| 01/04/2021 | 12/31/2022 |
| 10/04/2021 | 12/31/2022 |

## Automatic Extension of Forms I–94 and Forms I–797

Also through this **Federal Register** notice, DHS automatically extends the validity periods of the Forms I–94 and Forms I–797 listed in Table 2 below previously issued to beneficiaries under the TPS designations for El Salvador, Haiti, Nicaragua, Sudan, Honduras, and Nepal. These extensions apply only if the TPS beneficiary properly filed for re-registration during either the most recent DHS-announced registration period for their country, or any applicable previous DHS-announced re-registration periods for the beneficiary's country,[3] or has a re-registration

---

[2] *See Ramos, et al.,* v. *Wolf, et al.,* No. 18–16981 (9th Cir., September 14, 2020).

[3] El Salvador: July 8–Sept. 6, 2016, or Jan. 18–Mar. 19, 2018;

  Haiti: Aug. 25–Oct. 26, 2015, May 24–July 24, 2017, or Jan. 18–Mar. 19, 2018;

  Honduras: May 16–July 16, 2016; Dec. 15, 2017–Feb. 13, 2018 or June 5–Aug. 6, 2018;

  Nepal: Oct. 26–Dec. 27, 2016 or May 22–July 23, 2018;

  Nicaragua: May 16–July 15, 2016 or Dec. 15, 2017–Feb. 13, 2018;

  Sudan: Jan. 25–March 25, 2016 or Oct. 11, 2017–Dec. 11, 2017.

application that remains pending. This notice does not extend the validity periods of Forms I–94 or Forms I–797 for any TPS beneficiary who failed to file for TPS re-registration during one of the applicable previous DHS-announced re-registration periods, or for whom a re-registration request has been denied. In addition, the extensions do not apply for any beneficiary from whom TPS has been withdrawn.

TABLE 2—AFFECTED FORMS I–94 AND I–797 [4]

| Country | Beginning date of validity: | End date of validity: | Validity of forms I–94 and I–797 extended through: |
|---|---|---|---|
| El Salvador | Sept. 10, 2016 | Mar. 9, 2018 | 12/31/2022 |
| | Mar. 10, 2018 | Sept. 9, 2019 | 12/31/2022 |
| | Sept. 10, 2019 | Oct. 4, 2021 | 12/31/2022 |
| Haiti | Jan. 23, 2016 | July 22, 2017 | 12/31/2022 |
| | July 23, 2017 | Jan. 22, 2018 | 12/31/2022 |
| | Jan. 23, 2018 | July 22, 2019 | 12/31/2022 |
| | July 23, 2019 | Oct. 4, 2021 | 12/31/2022 |
| Honduras | July 6, 2016 | Jan. 5, 2018 | 12/31/2022 |
| | Jan. 6, 2018 | July 5, 2018 | 12/31/2022 |
| | July 6, 2018 | Jan. 5, 2020 | 12/31/2022 |
| | Jan. 6, 2020 | Oct. 4, 2021 | 12/31/2022 |
| Nepal | Dec. 25, 2016 | June 24, 2018 | 12/31/2022 |
| | June 25, 2018 | June 24, 2019 | 12/31/2022 |
| | June 25, 2019 | Oct. 4, 2021 | 12/31/2022 |
| Nicaragua | July 6, 2016 | Jan. 5, 2018 | 12/31/2022 |
| | Jan. 6, 2018 | Jan. 5, 2019 | 12/31/2022 |
| | Jan. 6, 2019 | Oct. 4, 2021 | 12/31/2022 |
| Sudan | May 3, 2016 | Nov. 2, 2017 | 12/31/2022 |
| | Nov. 3, 2017 | Nov. 2, 2018 | 12/31/2022 |
| | Nov. 3, 2018 | Oct. 4, 2021 | 12/31/2022 |

**Application Procedures**

Current beneficiaries covered by the court orders that continue the TPS designations for El Salvador, Haiti, Honduras, Nepal, Nicaragua, and Sudan do not need to pay a fee or file any application, including Application for Employment Authorization (Form I–765), to maintain their TPS benefits through December 31, 2022 under this notice, provided that they have properly re-registered for TPS during either the most recent DHS-announced registration period for their country, or any applicable previous re-registration period described in Footnote 3. However, in order to secure TPS pursuant to the new Haiti designation, eligible individuals must apply before the close of the registration period on Feb. 3, 2023. Eligible individuals for the new TPS Haiti designation are strongly encouraged to apply at the earliest practicable date, to ensure that their TPS continues beyond the court-ordered extensions and without any gaps in status.

In addition, eligible individuals who do not register for the new TPS

designation during the registration period, may be prohibited from filing a late initial registration during any subsequent extension of the designation if they do not meet certain conditions. See 8 CFR 244.2(f)(2).

TPS beneficiaries who have failed to re-register properly for TPS during any of these re-registration periods may still file an Application for Temporary Protected Status (Form I–821), but must demonstrate "good cause" for failing to register, as required by law. See INA section 244(c)(3)(C) (TPS beneficiary's failure to register without good cause in form and manner specified by DHS is ground for TPS withdrawal); 8 CFR 244.17(b) and Form I–821 instructions.[5]

Any currently eligible beneficiary who does not presently have a pending EAD application under the TPS designations for El Salvador, Haiti, Nicaragua, Sudan, Honduras or Nepal may file Form I–765 with appropriate fee in order to obtain a new EAD with a printed expiration date of December 31, 2022.

**Possible Future Actions**

In order to comply with statutory requirements for TPS while the district courts' orders or any superseding court order concerning the beneficiaries under the TPS designations for El Salvador, Haiti, Nicaragua, Sudan, Honduras, and Nepal remain in effect, DHS may require these beneficiaries to re-register and will announce the re-registration procedures in a future **Federal Register** notice. DHS has the authority to conduct TPS re-registration in accordance with INA section 244(c)(3)(C) and 8 CFR 244.17. Through the re-registration process, which is generally conducted every twelve to eighteen months while a country is designated for TPS, USCIS determines whether each TPS beneficiary is continuing to maintain individual eligibility for TPS, including but not limited to, the requirements related to disqualifying criminal or security issues. See id.; INA section 244(c)(2); 8 CFR 244.2, 244.3, and 244.4 (describing individual TPS eligibility requirements, including mandatory criminal and security bars).

The Secretary has already newly designated Haiti for TPS for eighteen months through February 3, 2023. 86 FR 41863. Eligible Haitian nationals (and individuals having no nationality who last habitually resided in Haiti) who wish to receive or continue their existing TPS through that date are

---

[4] Your Forms I–94 and I–797 may show a different beginning date of validity than those listed here if you were a late initial filer (LIF) at the time because the forms would have the date of approval of your LIF application for TPS. As long as they bear an end date of validity listed in this chart, then they are automatically extended by this Notice.

[5] An applicant for TPS Haiti who applies under the procedures announced in the Notice regarding the new TPS designation of Haiti at 86 FR 41863 (Aug. 3, 2021) is an initial applicant and does not have to demonstrate "good cause" for failing to re-register under prior TPS Haiti designations.

encouraged to submit their applications for TPS by following the instructions in the **Federal Register** notice, Designation of Haiti for Temporary Protected Status, at 86 FR 41863. Failure to submit an application under the new designation of Haiti, however, does not affect the continuation of the validity of the TPS and TPS documents through December 31, 2022 as described in this notice.

The Government has appealed both the *Ramos* and *Saget* preliminary injunctions. The U.S. Court of Appeals for the Ninth Circuit ruled for the Government and vacated the *Ramos* preliminary injunction on September 14, 2020. However, the preliminary injunction remains in effect because the appellate court has not issued its directive (*i.e.*, the mandate) to the district court to implement the panel's decision due to the pendency of the plaintiffs' petition for rehearing en banc. Should the Government ultimately prevail in its challenge to the *Ramos* preliminary injunction, and absent any further change in the TPS designations for Nicaragua, Sudan, Honduras, and Nepal, the Secretary's determination to terminate TPS for those countries would take effect no earlier than 120 days from the issuance of any appellate mandate to the district court. Absent any further change in the TPS designation for El Salvador, the Secretary's determination to terminate TPS for that country will take effect no earlier than 365 days from the issuance of any appellate mandate to the *Ramos* district court. DHS provides this additional time for El Salvador TPS beneficiaries in part because there are almost 100,000 more such beneficiaries than in the combined TPS beneficiary populations of all the other five countries covered by this notice.[6] The additional period of 245 days beyond 120 days would permit an orderly transition for beneficiaries of TPS from El Salvador as they return to their homeland. If the Government prevails in its appeals, DHS will also continue to monitor the circumstances of the affected beneficiaries under the other five TPS country designations covered by this notice. *See* INA section 244(d)(3).

To the extent that a **Federal Register** notice has automatically extended TPS-related documentation beyond 120 days from the issuance of any appellate mandate to the District Court, DHS reserves the right to issue a subsequent **Federal Register** notice announcing an expiration date for the documentation

that corresponds to the last day of the 120-day period for Sudan, Nicaragua, Honduras, and Nepal. Should the Government move to vacate the *Bhattarai* order to stay proceedings in light of an appellate decision affirming the preliminary injunction in *Ramos* that suggests a basis on which to distinguish the determinations to terminate the TPS designations for Honduras and Nepal from the TPS terminations at issue in *Ramos*, TPS will remain in effect for Honduras and Nepal for at least 180 days following an order of the District Court vacating the stay in proceedings.

The Secretary has announced a new 18-month designation of Haiti for TPS, which continues through February 3, 2023. Application procedures for TPS under this new Haiti designation, including for individuals who currently have TPS pursuant to the court orders, are provided in the notice published at 86 FR 41863.

**Additional Notes**

Nothing in this notice affects DHS's ongoing authority to determine on a case-by-case basis whether a TPS beneficiary continues to meet the eligibility requirements for TPS described in INA section 244(c) and the implementing regulations in part 244 of Title 8 of the Code of Federal Regulations.

Notice of Compliance with the "Order Enjoining the Implementation and Enforcement of Determinations to Terminate the TPS Designations for El Salvador, Haiti, Nicaragua, and Sudan" in *Ramos,* the "Order Enjoining the Implementation of Enforcement of Determination to Terminate the TPS Designation of Haiti" in *Saget,* and the "Order to Stay Proceedings and Agreement to Stay the Determinations to Terminate the TPS Designations for Honduras and Nepal" in *Bhattarai*

The previously announced determinations to terminate the existing designations of TPS for El Salvador, Nicaragua, and Sudan[7] will not be implemented or enforced unless and until the district court's order in *Ramos* is reversed and that reversal becomes final. The previously announced determination to terminate the 2011 designation of TPS for Haiti will not be implemented or enforced unless and until the district court's order in *Saget* is reversed and the reversal becomes

final.[8] As required by the order to stay proceedings in *Bhattarai,* DHS will not implement or enforce the previously announced determinations to terminate the existing TPS designations for Honduras and Nepal[9] unless and until the district court's order in *Ramos* enjoining implementation and enforcement of the determinations to terminate the TPS designations for El Salvador, Haiti, Nicaragua, and Sudan is reversed and that reversal becomes final for some or all of the affected countries, or by other order of the court. Any termination of TPS-related documentation for beneficiaries under the TPS designations for Nicaragua, Sudan, Honduras, and Nepal will go into effect no earlier than 120 days, and no earlier than 365 days for beneficiaries under the TPS designation for El Salvador, following the issuance of any mandate to the district court, as described in the "Possible Future Action" section of this **Federal Register** notice.[10]

In further compliance with the still-valid district court orders, DHS is publishing this notice automatically extending the validity of the TPS-related documentation specified in the Supplementary Information section of this notice through December 31, 2022, for eligible beneficiaries under the TPS designations for El Salvador, Haiti, Nicaragua, Sudan, Honduras, and Nepal. DHS will continue to issue notices that will automatically extend TPS-related documentation for all affected beneficiaries under the TPS designations for El Salvador, Nicaragua, Sudan, Honduras and Nepal, so long as the *Ramos* preliminary injunction and *Bhattarai* order to stay proceedings remain in place; for Haiti as long as the *Ramos* or *Saget* preliminary injunctions remain in place; or by other order of the court. However, should compliance with the *Ramos, Bhattarai,* and/or *Saget* court orders remain necessary, DHS may announce periodic re-registration procedures for eligible TPS beneficiaries in accordance with the INA and DHS

---

[6] As of December 31, 2019, the number of TPS beneficiaries covered under the affected designations were: El Salvador 247,412; Haiti 55,218; Nicaragua 4,409; Sudan 771; Honduras 79,290; Nepal 14,549.

[7] *See* Termination of the Designation of El Salvador for Temporary Protected Status, 83 FR 2654 (Jan. 18, 2018); Termination of the Designation of Nicaragua for Temporary Protected Status, 82 FR 59636 (Dec. 15, 2017); Termination of the Designation of Sudan for Temporary Protected Status, 82 FR 47228 (Oct. 11, 2017).

[8] *See* Termination of the Designation of Haiti for Temporary Protected Status, 83 FR 2648 (Jan. 18, 2018).

[9] *See* Termination of the Designation of Honduras for Temporary Protected Status, 83 FR 26074 (June 5, 2018); Termination of the Designation of Nepal for Temporary Protected Status, 83 FR 23705 (May 22, 2018).

[10] An additional provision in the *Bhattarai* Order to Stay Proceedings states that if the preliminary injunction in *Ramos* is upheld, but the Government moves to vacate the *Bhattarai* Order based on reasons for distinguishing the terminations of TPS for Honduras and Nepal from those under the injunction in *Ramos*, TPS will remain in effect for Honduras and Nepal for at least 180 days following an order of the District Court vacating its stay of proceedings order.

regulations. DHS further continues its commitment to a transition period, as described above.

All TPS beneficiaries must continue to maintain their TPS eligibility by meeting the requirements for TPS in INA section 244(c) and 8 CFR part 244. DHS will continue to adjudicate any pending TPS re-registration and pending late initial applications for affected beneficiaries under the TPS designations for El Salvador, Nicaragua, Sudan, Honduras, and Nepal. Nationals of Haiti (and individuals having no nationality who last habitually resided in Haiti) are encouraged to apply under the new designation for Haiti announced at 86 FR 41863.[11] DHS will also continue to make appropriate individual TPS withdrawal decisions in accordance with existing procedures if an individual no longer maintains TPS eligibility. DHS will take appropriate steps to continue its compliance with the orders, and with all statutory requirements.

**Alejandro N. Mayorkas,**
*Secretary, U.S. Department of Homeland Security.*

## Approved Documentation To Demonstrate Continuation of Lawful Status and TPS-Related Employment Authorization

• Documentation automatically extended through this **Federal Register** notice dated September 10, 2021.
  ○ Certain TPS-related documentation, including EADs, of affected beneficiaries under the TPS designations for El Salvador, Haiti, Nicaragua, Sudan, Honduras, and Nepal, that are automatically extended through this **Federal Register** notice through December 31, 2022.
  ○ Regardless of their country of birth, a beneficiary granted TPS under the

designation for El Salvador, Haiti, Nicaragua, Sudan, Honduras, or Nepal may show his or her EAD that has been automatically extended to his or her employer to demonstrate identity and continued TPS-related employment eligibility to meet Employment Eligibility Verification (Form I–9) requirements. A beneficiary granted TPS under a designation for one of these countries may also choose to show an employer this **Federal Register** notice, which explains that his or her EAD has been automatically extended.
  ○ As evidence of his or her lawful status, a TPS beneficiary may show his or her EAD that has been automatically extended, or Form I–94, or Form I–797, along with a copy of this **Federal Register** notice, to law enforcement, federal, state, and local government agencies, and private entities.
  • Unexpired EAD.
  • Alternatively, such a TPS beneficiary may choose to show other acceptable documents that are evidence of identity and employment eligibility as described in the instructions to Form I–9.

*Am I eligible to receive an automatic extension of my current EAD using this* **Federal Register** *notice?*

Yes. Provided that you currently have a TPS-related EAD with the specified expiration dates below, this notice automatically extends your EAD as stated in Table 3 below.

### TABLE 3—AFFECTED EADs

| If your EAD has category code of A–12 or C–19 and an expiration date of: | Then this **Federal Register** notice extends your EAD through: |
| --- | --- |
| 07/22/2017 ..................... | 12/31/2022 |
| 11/02/2017 ..................... | 12/31/2022 |
| 01/05/2018 ..................... | 12/31/2022 |
| 01/22/2018 ..................... | 12/31/2022 |
| 03/09/2018 ..................... | 12/31/2022 |
| 06/24/2018 ..................... | 12/31/2022 |
| 07/05/2018 ..................... | 12/31/2022 |
| 11/02/2018 ..................... | 12/31/2022 |
| 01/05/2019 ..................... | 12/31/2022 |
| 04/02/2019 ..................... | 12/31/2022 |
| 06/24/2019 ..................... | 12/31/2022 |
| 07/22/2019 ..................... | 12/31/2022 |
| 09/09/2019 ..................... | 12/31/2022 |
| 01/02/2020 ..................... | 12/31/2022 |
| 01/05/2020 ..................... | 12/31/2022 |
| 03/24/2020 ..................... | 12/31/2022 |
| 01/04/2021 ..................... | 12/31/2022 |

### TABLE 3—AFFECTED EADs— Continued

| If your EAD has category code of A–12 or C–19 and an expiration date of: | Then this **Federal Register** notice extends your EAD through: |
| --- | --- |
| 10/04/2021 ..................... | 12/31/2022 |

*When hired, what documentation may I show to my employer as evidence of employment authorization and identity when completing Form I–9?*

You can find the Lists of Acceptable Documents on the third page of Form I–9 as well as the Acceptable Documents web page at *www.uscis.gov/i-9-central/ acceptable-documents*. Employers must complete Form I–9 to verify the identity and employment authorization of all new employees. Within three days of hire, employees must present acceptable documents to their employers as evidence of identity and employment authorization to satisfy Form I–9 requirements.

You may present any documentation from List A (which provides evidence of both your identity and employment authorization) or documentation from List B (which provides evidence of your identity) together with documentation from List C (which provides evidence of your employment authorization), or you may present an acceptable receipt as described in the Form I–9 instructions. Employers may not reject a document based on a future expiration date. You can find additional information about Form I–9 on the I–9 Central web page at *www.uscis.gov/I-9Central*.

An EAD is an acceptable document under List A. See the section "How do my employer and I complete Form I–9 using my automatically extended employment authorization for a new job?" of this **Federal Register** notice for further information. If your EAD has one of the expiration dates in Table 4 and states A–12 or C–19 under Category, it has been extended automatically by virtue of this **Federal Register** notice, and you may choose to present it to your employer as proof of identity and employment eligibility for Form I–9 through December 31, 2022, unless your TPS has been withdrawn or your request for TPS has been denied.

---

[11] As noted above, the Department of Homeland Security (DHS) announced that the Secretary of Homeland Security (Secretary) has newly designated Haiti for TPS for eighteen months, effective August 3, 2021 through February 3, 2023. This designation allows eligible Haitian nationals (and individuals having no nationality who last habitually resided in Haiti) who have continuously resided in the United States since July 29, 2021, and who have been continuously physically present in the United States since August 3, 2021 to apply for TPS. TPS beneficiaries whose TPS has been continued pursuant to court orders, as described in 85 FR 79208 (Dec. 9, 2020), should newly apply for TPS following the instructions in **Federal Register** Notice Designation of Haiti for Temporary Protected Status at 86 FR 41863.

NicAR000060

TABLE 4—AFFECTED EADs AND FORM I–9

| If your EAD has category code of A–12 or C–19 and an expiration date of: | Enter this date in Section 1 of Form I–9: | Your employer must reverify your employment authorization by: |
|---|---|---|
| 07/22/2017 | 12/31/2022 | 01/01/2023 |
| 11/02/2017 | 12/31/2022 | 01/01/2023 |
| 01/05/2018 | 12/31/2022 | 01/01/2023 |
| 01/22/2018 | 12/31/2022 | 01/01/2023 |
| 03/09/2018 | 12/31/2022 | 01/01/2023 |
| 06/24/2018 | 12/31/2022 | 01/01/2023 |
| 07/05/2018 | 12/31/2022 | 01/01/2023 |
| 11/02/2018 | 12/31/2022 | 01/01/2023 |
| 01/05/2019 | 12/31/2022 | 01/01/2023 |
| 04/02/2019 | 12/31/2022 | 01/01/2023 |
| 06/24/2019 | 12/31/2022 | 01/01/2023 |
| 07/22/2019 | 12/31/2022 | 01/01/2023 |
| 09/09/2019 | 12/31/2022 | 01/01/2023 |
| 01/02/2020 | 12/31/2022 | 01/01/2023 |
| 01/05/2020 | 12/31/2022 | 01/01/2023 |
| 03/24/2020 | 12/31/2022 | 01/01/2023 |
| 01/04/2021 | 12/31/2022 | 01/01/2023 |
| 10/04/2021 | 12/31/2022 | 01/01/2023 |

*What documentation may I present to my employer for Form I–9 if I am already employed but my current TPS-related EAD is set to expire?*

Even though your EAD has been automatically extended, your employer is required by law to ask you about your continued employment authorization. Your employer may need to re-inspect your automatically extended EAD to check the Card Expires date and Category code if your employer did not keep a copy of your EAD when you initially presented it. Once your employer has reviewed the Card Expires date and Category code, your employer should update the EAD expiration date in Section 2 of Form I–9. *See* the section, ''What updates should my current employer make to Form I–9 if my EAD has been automatically extended?'' of this **Federal Register** notice for further information. You may show this **Federal Register** notice to your employer to explain what to do for Form I–9 and to show that your EAD has been automatically extended through December 31, 2022 as indicated in the above chart, but you are not required to do so.

The last day of the automatic extension for your EAD is December 31, 2022. On or before your start work on January 1, 2023, your employer is required by law to reverify your employment authorization in Section 3 of Form I–9. By that time, you must present any document from List A or any document from List C on Form I–9, Lists of Acceptable Documents, or an acceptable List A or List C receipt described in the Form I–9 instructions to reverify employment authorization.

Your employer may not specify which List A or List C document you must present and cannot reject an acceptable receipt.

*Can I obtain a new EAD?*

Yes, if you remain eligible for TPS and apply for a new EAD, you can obtain a new EAD. However, you do not need to apply for a new EAD in order to benefit from this automatic extension. If you are a beneficiary under the TPS designations for El Salvador, Haiti, Nicaragua, Sudan, Honduras, or Nepal and want to obtain a new EAD valid through December 31, 2022, then you must file Form I–765 and pay the associated fee (or obtain a fee waiver). If you do not want a new EAD, you do not have to file Form I–765 or pay the Form I–765 fee. If you do not want to request a new EAD now, you may file Form I–765 at a later date and pay the fee (or request a fee waiver), provided that you still have TPS or a pending TPS application.

If you are unable to pay the application fee and/or biometric services fee, you may request a fee waiver by submitting a Request for Fee Waiver (Form I–912). For more information on the application forms and fees for TPS, please visit the USCIS TPS web page at *www.uscis.gov/tps*.

If you have a Form I–821 and/or Form I–765 application that is still pending under the TPS designations for El Salvador, Haiti, Nicaragua, Sudan, Honduras, or Nepal, then you should not file either application again. If your pending Form I–821 is approved, you will be issued Forms I–797 and I–94 through December 31, 2022. Similarly, if you have a pending TPS-related Form

I–765 that is approved, your new EAD will be valid through December 31, 2022. Your TPS itself continues as long as the preliminary injunction impacting your country's TPS designation remains in effect and in accordance with any relevant future **Federal Register** notices that DHS may issue respecting your country's TPS designation, or until your TPS is finally withdrawn for individual ineligibility under INA section 244(c), or the applicable TPS designation is terminated as discussed in the ''Possible Future Action'' section of this **Federal Register** notice.

*Can my employer require that I provide any other documentation to prove my status, such as proof of my citizenship from El Salvador, Haiti, Nicaragua, Sudan, Honduras, or Nepal?*

No. When completing Form I–9, including reverifying employment authorization, employers must accept any documentation that appears on the Form I–9 Lists of Acceptable Documents that reasonably appears to be genuine and that relates to you, or an acceptable List A, List B, or List C receipt. Employers need not reverify List B identity documents. Therefore, employers may not request proof of citizenship or proof of re-registration for TPS when completing Form I–9 for new hires or reverifying the employment authorization of current employees. If you present an EAD that has been automatically extended, employers should accept it as a valid List A document, so long as the EAD reasonably appears to be genuine and relates to the employee. Refer to the ''Note to Employees'' section of this **Federal Register** notice for important

information about your rights if your employer rejects lawful documentation, requires additional documentation, or otherwise discriminates against you based on your citizenship or immigration status, or your national origin.

*How do my employer and I complete Form I–9 using my automatically extended employment authorization for a new job?*

See Table 4 in the question "When hired, what documentation may I show to my employer as evidence of employment authorization and identity when completing Form I–9?" to determine if your EAD has been automatically extended.

1. For Section 1, you should:
a. Check "An alien authorized to work until" and enter December 31, 2022, as the expiration date; and
b. Enter your USCIS number or A-Number where indicated. (Your EAD or other document from DHS will have your USCIS number or A-Number printed on it; the USCIS number is the same as your A-Number without the A prefix).

2. For Section 2, employers should:
a. Determine if your EAD has been automatically extended by using Table 4 in the question "When hired, what documentation may I show to my employer as evidence of employment authorization and identity when completing Form I–9?"
b. Write in the document title;
c. Enter the issuing authority;
d. Provide the document number; and
e. Write December 31, 2022, as the expiration date.

On or before the start of work on January 1, 2023, employers must reverify the employee's employment authorization in Section 3 of Form I–9.

*What updates should my current employer make to Form I–9 if my employment authorization has been automatically extended?*

If you presented a TPS-related EAD that was valid when you first started your job and your EAD has now been automatically extended, your employer may need to re-inspect your current EAD if they do not have a copy of the EAD on file. See Table 4 in the question "When hired, what documentation may I show to my employer as evidence of employment authorization and identity when completing Form I–9?" to determine if your EAD has been automatically extended.

If your employer determines that your EAD has been automatically extended, your employer should update Section 2 of your previously completed Form I–9 as follows:

a. Write EAD EXT and December 31, 2022, as the last day of the automatic extension in the Additional Information field; and
b. Initial and date the correction.

**Note:** This is not considered a reverification. Employers should not complete Section 3 until either this notice's automatic extension of EADs has ended, or the employee presents a new document to show continued employment authorization, whichever is sooner. By January 1, 2023, when the employee's automatically extended EAD has expired, employers are required by law to reverify the employee's employment authorization in Section 3.

*If I am an employer enrolled in E-Verify, how do I verify a new employee whose EAD has been automatically extended?*

Employers may create a case in E-Verify for a new employee by entering the number from the Document Number field on Form I–9 into the document number field in E-Verify. Employers should enter December 31, 2022, as the expiration date for EADs that have been automatically extended under this **Federal Register** notice.

*If I am an employer enrolled in E-Verify, what do I do when I receive a "Work Authorization Documents Expiration" alert for an automatically extended EAD?*

E-Verify has automated the verification process for TPS-related EADs that are automatically extended. If you have employees who provided a TPS-related EAD when they first started working for you, you will receive a "Work Authorization Documents Expiring" case alert when the auto-extension period for this EAD is about to expire. On or before this employee starts work on January 1, 2023, you must reverify his or her employment authorization in Section 3 of Form I–9. Employers may not use E-Verify for reverification.

*If I already have TPS for Haiti, do I need to apply under the new TPS designation for Haiti?*

TPS beneficiaries under the Haiti designation whose TPS has been continued pursuant to court orders, and as described in this notice, are strongly encouraged to apply for TPS before the close of the registration period on Feb. 3, 2023, following the instructions in the August 3, 2021 **Federal Register** notice regarding the new Designation of Haiti for Temporary Protected Status at 86 FR 41863. Eligible individuals are strongly encouraged to apply at the earliest practicable date, to ensure that their TPS continues beyond the court-ordered extensions and without any

gaps in status. Eligible individuals who do not register for the new TPS designation during the registration period may be prohibited from filing a late initial registration during any subsequent extension of the designation if they do not meet certain conditions. See 8 CFR 244.2(f)(2).

If you are found eligible for TPS under the new Haiti designation, your TPS will continue through February 3, 2023, even if the current court orders in *Ramos* and *Saget* that continue TPS are no longer in effect.

**Note to All Employers**

Employers are reminded that the laws requiring proper employment eligibility verification and prohibiting unfair immigration-related employment practices remain in full force. This **Federal Register** notice does not supersede or in any way limit applicable employment verification rules and policy guidance, including those rules setting forth reverification requirements. For general questions about the employment eligibility verification process, employers may call USCIS at 888–464–4218 (TTY 877–875–6028) or email USCIS at *I9Central@uscis.dhs.gov.* USCIS accepts calls and emails in English and many other languages. For questions about avoiding discrimination during the employment eligibility verification process (Form I–9 and E-Verify), employers may call the U.S. Department of Justice's Civil Rights Division, Immigrant and Employee Rights Section (IER) Employer Hotline at 800–255–8155 (TTY 800–237–2515). IER offers language interpretation in numerous languages. Employers may also email IER at *IER@usdoj.gov.*

**Note to Employees**

For general questions about the employment eligibility verification process, employees may call USCIS at 888–897–7781 (TTY 877–875–6028) or email USCIS at *I-9Central@uscis.dhs.gov.* USCIS accepts calls in English, Spanish, and many other languages. Employees or applicants may also call the IER Worker Hotline at 800–255–7688 (TTY 800–237–2515) for information regarding employment discrimination based upon citizenship, immigration status, or national origin, including discrimination related to Form I–9 and E-Verify. The IER Worker Hotline provides language interpretation in numerous languages.

To comply with the law, employers must accept any document or combination of documents from the Lists of Acceptable Documents if the documentation reasonably appears to be genuine and to relate to the employee,

NicAR000062

or an acceptable List A, List B, or List C receipt as described in the Form I–9 instructions. Employers may not require extra or additional documentation beyond what is required for Form I–9 completion. Further, employers participating in E-Verify who receive an E-Verify case result of "Tentative Nonconfirmation" (TNC) must promptly inform employees of the TNC and give such employees an opportunity to contest the TNC. A TNC case result means that the information entered into E-Verify from an employee's Form I–9 differs from records available to DHS.

Employers may not terminate, suspend, delay training, withhold or lower pay, or take any other adverse action against an employee because of the TNC while the case is still pending with E-Verify. A Final Nonconfirmation (FNC) case result is received when E-Verify cannot verify an employee's employment eligibility. An employer may terminate employment based on a case result of FNC. Work-authorized employees who receive an FNC may call USCIS for assistance at 888–897–7781 (TTY 877–875–6028). For more information about E-Verify-related discrimination or to report an employer for discrimination in the E-Verify process based on citizenship, immigration status, or national origin, contact IER's Worker Hotline at 800–255–7688 (TTY 800–237–2515). Additional information about proper nondiscriminatory Form I–9 and E-Verify procedures is available on the IER website at *www.justice.gov/ier* and on the USCIS and E-Verify websites at *www.uscis.gov/i-9-central* and *www.e-verify.gov*.

**Note Regarding Federal, State, and Local Government Agencies (Such as Departments of Motor Vehicles)**

For Federal purposes, TPS beneficiaries presenting an automatically extended EAD as referenced in this **Federal Register** notice do not need to show any other document, such as an I–797C Notice of Action receipt notice or this **Federal Register** notice, to prove that they qualify for this extension. However, while federal government agencies must follow the guidelines laid out by the federal government, state and local government agencies establish their own rules and guidelines when granting certain benefits. Each state may have different laws, requirements, and determinations about what documents you need to provide to prove eligibility for certain benefits. Whether you are applying for a federal, state, or local government benefit, you may need to provide the government agency with

documents that show you are a TPS beneficiary, show you are authorized to work based on TPS or other status, and/or that may be used by DHS to determine whether you have TPS or other immigration status. Examples of such documents are:

• Your current EAD;
• Your automatically extended EAD with a TPS category code of A–12 or C–19 and an expiration date shown in Table 3 in the question "Am I eligible to receive an automatic extension of my current EAD using this **Federal Register** notice?"; or
• Your Form I–94, Arrival/Departure Record or I–797 as shown in Table 2.

Check with the government agency regarding which document(s) the agency will accept.

Some benefit-granting agencies use the USCIS Systematic Alien Verification for Entitlements Program (SAVE) program to confirm the current immigration status of applicants for public benefits. While SAVE can verify when an individual has TPS, each agency's procedures govern whether they will accept an unexpired EAD, Form I–797, or Form I–94, Arrival/Departure Record. If an agency accepts the type of TPS-related document you are presenting, such as an EAD, the agency should accept your automatically extended TPS-related document, regardless of your country of birth. It may assist the agency if you:

a. Present the agency with a copy of this **Federal Register** notice showing the extension of TPS-related documentation, in addition to your most recent TPS-related document with your A-Number, USCIS number or Form I–94 number;

b. Explain that SAVE will be able to verify the continuation of your TPS using this information; and

c. Ask the agency to initiate a SAVE query with your information and follow through with additional verification steps, if necessary, to receive a final SAVE response verifying your TPS and TPS-related benefits.

You can also ask the agency to look for SAVE notices or contact SAVE if they have any questions about your immigration status or automatic extension of TPS-related documentation. In most cases, SAVE provides an automated electronic response to benefit-granting agencies within seconds, but, occasionally, verification can be delayed.

You can check the status of your SAVE verification by using CaseCheck at *save.uscis.gov/casecheck/*. CaseCheck is a free service that lets you follow the progress of your SAVE verification case

using your date of birth and one immigration identifier number (A-Number, USCIS number, or Form I–94 number) or Verification Case Number). If an agency has denied your application based solely or in part on a SAVE response, the agency must offer you the opportunity to appeal the decision in accordance with the agency's procedures. If the agency has received and acted upon or will act upon a SAVE verification case and you do not believe the SAVE response is correct, the SAVE website, *http://www.uscis.gov/save, has* information on how to correct or update your immigration record, make an appointment, or submit a written request to correct records.

[FR Doc. 2021–19617 Filed 9–9–21; 8:45 am]

BILLING CODE 9111–97–P

# DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT

**[Docket No. FR–6276–N–01]**

## Rental Assistance Demonstration: Post-Conversion Replacement of Units Under a PBV Housing Assistance Payment Contract

**AGENCY:** Office of the Assistant Secretary for Housing-Federal Housing Commissioner and Office of the Assistant Secretary for Public and Indian Housing, HUD.

**ACTION:** Notice.

**SUMMARY:** This notice establishes the process by which assisted units under a Project Based Voucher (PBV) Section 8 Housing Assistance Payment (HAP) contract originally executed through a conversion under the Rental Assistance Demonstration (RAD) can be replaced in the event that the original units would be unavailable for occupancy due to a proposed demolition and reconstruction of the units, as a result of natural disaster, or other causes.

**DATES:** This notice is effective on September 10, 2021.

**ADDRESSES:** Interested persons are invited to submit questions or comments electronically to *rad@hud.gov*.

**FOR FURTHER INFORMATION CONTACT:** To assure a timely response, please direct requests for further information electronically to the email address *rad@hud.gov*. Written requests may also be directed to the following address: Office of Housing—Office of Recapitalization, Department of Housing and Urban Development, 451 7th Street SW, Room 6230, Washington, DC 20410. The Office of Recapitalization phone number is (202) 708–0001.


most expensive and substantive part of the finished pump assembly. We found that it imparted the "very essence" of the pump assembly, as it turned the impeller and moved the fluid through the pump.

The question presented is whether the contactless IC is substantially transformed when it is assembled together with the other components. We note that in NFC technology, an NFC chip and an antenna are combined to transmit information across short distances. In this case, the driver's serial ID number is transmitted to the NFC reader for tracking purposes. Therefore, the NFC chip is central to the function of the finished NFC fob.

Similar to the shoe upper in *Uniroyal,* the ribbon in *Grafton Spools,* and the electric motor in HQ H303864, we find that the NFC chip constitutes the "very essence" of the finished NFC fob. After the chip is assembled into the finished fob, its use remains unchanged. Therefore, we find that the country of origin of the NFC fob will be the country where the NFC chip is produced. In most cases, the country of origin will be Taiwan, but when the Ultralight C— contactless ticket IC is unavailable from Taiwan, then the country of origin of the NFC fob will be where the chip is sourced, which in this case is either Thailand or Singapore.

**Holding**

The country of origin of the three telematics devices, the satellite devices, and the NFC reader for purposes of U.S. Government procurement is Canada.

The country of origin of the NFC keyring fob for purposes of U.S. Government procurement is the country of origin of the contactless IC, which is usually Taiwan. However, if the contactless IC is sourced from Thailand or Singapore, then the country of origin for procurement would be Thailand or Singapore as the case may be.

Notice of this final determination will be given in the **Federal Register**, as required by 19 CFR 177.29. Any party-at-interest other than the party which requested this final determination may request, pursuant to 19 CFR 177.31, that CBP reexamine the matter anew and issue a new final determination. Pursuant to 19 CFR 177.30, any party-at-interest may, within 30 days of publication of the **Federal Register** Notice referenced above, seek judicial review of this final determination before the Court of International Trade.

Sincerely,

Alice A. Kipel,

Executive Director Regulations & Rulings, Office of Trade.

[FR Doc. 2020–27022 Filed 12–8–20; 8:45 am]

**BILLING CODE 9111–14–P**

---

**DEPARTMENT OF HOMELAND SECURITY**

**U.S. Citizenship and Immigration Services**

**[CIS No. 2676–20; DHS Docket No. USCIS–2019–0020]**

**RIN 1615–ZB83**

**Continuation of Documentation for Beneficiaries of Temporary Protected Status Designations for El Salvador, Haiti, Nicaragua, Sudan, Honduras, and Nepal**

**AGENCY:** U.S. Citizenship and Immigration Services, Department of Homeland Security.

**ACTION:** Notice.

**SUMMARY:** Through this notice, the Department of Homeland Security (DHS) announces actions to ensure its continued compliance with the preliminary injunction orders of the U.S. District Court for the Northern District of California in *Ramos, et al.* v. *Nielsen, et. al.,* No. 18–cv–01554 (N.D. Cal. Oct. 3, 2018) ("*Ramos*") and the U.S. District Court for the Eastern District of New York in *Saget, et. al.,* v. *Trump, et. al.,* No. 18–cv–1599 (E.D.N.Y. Apr. 11, 2019) ("*Saget*"), and with the order of the U.S. District Court for the Northern District of California to stay proceedings in *Bhattarai* v. *Nielsen,* No. 19–cv–00731 (N.D. Cal. Mar. 12, 2019) ("*Bhattarai*"). A panel of the U.S. Court of Appeals for the Ninth Circuit vacated the injunction in *Ramos* on September 14, 2020. However, because the appellate court has not issued its directive to the district court to make that ruling effective, the injunction remains in place at this time. *See Ramos, et al.,* v. *Wolf, et al.,* No. 18–16981 (9th Cir., September 14, 2020). Beneficiaries under the Temporary Protected Status (TPS) designations for El Salvador, Nicaragua, Sudan, Honduras, and Nepal will retain their TPS while the preliminary injunction in *Ramos* and the *Bhattarai* order remain in effect, provided that an alien's TPS is not withdrawn because of individual ineligibility. Beneficiaries under the TPS designation for Haiti will retain their TPS while either of the preliminary injunctions in *Ramos* or *Saget* remain in effect, provided that an alien's TPS is not withdrawn because of individual ineligibility. This notice further provides information on the

automatic extension of the validity of TPS-related Employment Authorization Documents (EADs); Notices of Action (Forms I–797); and Arrival/Departure Records (Forms I–94), (collectively "TPS-related documentation"); for those beneficiaries under the TPS designations for El Salvador, Haiti, Nicaragua, Sudan, Honduras, and Nepal.

**DATES:** DHS is automatically extending the validity of TPS-related documentation for beneficiaries under the TPS designations for El Salvador, Haiti, Nicaragua, Sudan, Honduras, and Nepal for nine months through October 4, 2021, from the current expiration date of January 4, 2021.

**FOR FURTHER INFORMATION CONTACT:**

• You may contact Maureen Dunn, Chief, Humanitarian Affairs Division, Office of Policy and Strategy, U.S. Citizenship and Immigration Services, U.S. Department of Homeland Security, by mail at 5900 Capital Gateway Dr, Camp Springs, MD 20529–2140; or by phone at 800–375–5283.

• For further information on TPS, please visit the USCIS TPS web page at *www.uscis.gov/tps.*

• If you have additional questions about TPS, please visit *uscis.gov/tools.* Our online virtual assistant, Emma, can answer many of your questions and point you to additional information on our website. If you are unable to find your answers there, you may also call our U.S. Citizenship and Immigration Services (USCIS) Contact Center at 800–375–5283 (TTY 800–767–1833).

• Applicants seeking information about the status of their individual cases may check Case Status Online, available on the USCIS website at *www.uscis.gov,* or visit the USCIS Contact Center at *uscis.gov/contactcenter.*

• Further information will also be available at local USCIS offices upon publication of this notice.

**SUPPLEMENTARY INFORMATION:**

**Table of Abbreviations**

CFR—Code of Federal Regulations
DHS—U.S. Department of Homeland Security
EAD—Employment Authorization Document
EOIR—Executive Office for Immigration Review
FNC—Final Nonconfirmation
Form I–765—Application for Employment Authorization
Form I–797—Notice of Action
Form I–821—Application for Temporary Protected Status
Form I–9—Employment Eligibility Verification
Form I–912—Request for Fee Waiver
Form I–94—Arrival/Departure Record
Government—U.S. Government
INA—Immigration and Nationality Act

IER—U.S. Department of Justice, Civil Rights Division, Immigrant and Employee Rights Section
SAVE—USCIS Systematic Alien Verification for Entitlements Program
Secretary—Secretary of Homeland Security
TNC—Tentative Nonconfirmation
TPS—Temporary Protected Status
TTY—Text Telephone
USCIS—U.S. Citizenship and Immigration Services

**Background on TPS**

• TPS is a temporary immigration status granted to eligible nationals of a country designated for TPS under the Immigration and Nationality Act (INA) or to eligible persons without nationality who last habitually resided in the designated country.

• During the TPS designation period, TPS beneficiaries are eligible to remain in the United States, may not be removed, and are authorized to obtain EADs so long as they continue to meet the requirements of TPS.

• TPS beneficiaries may travel abroad temporarily with the prior consent of DHS.

• The granting of TPS does not result in or lead to lawful permanent resident status.

• To qualify for TPS, beneficiaries must meet the eligibility standards at INA section 244(c)(1)–(2), 8 U.S.C. 1254a(c)(1)–(2).

• When the Secretary of Homeland Security (the Secretary) terminates a country's TPS designation, beneficiaries return to one of the following:

○ The same immigration status or category that they maintained before TPS, if any (unless that status or category has since expired or been terminated); or

○ Any other lawfully obtained immigration status or category they received while registered for TPS, as long as it is still valid on the date TPS terminates.

**Purpose of this Action**

This notice ensures DHS's continued compliance with various court orders issued by the federal district courts in the *Ramos, Bhattarai,* and *Saget* lawsuits that require DHS to maintain the TPS designations for El Salvador, Haiti, Sudan, Nicaragua, Honduras, and Nepal, as well as the TPS and TPS-related documentation for eligible affected beneficiaries.[1] The U.S. Court

of Appeals for the Ninth Circuit vacated the district court's preliminary injunction in *Ramos* on September 14, 2020, holding that the decision to designate, extend, or terminate TPS is not subject to judicial review. However, the appellate order is not currently effective because the Ninth Circuit has not issued any directive to carry out the order to the federal district court.[2] Therefore, the *Ramos* preliminary injunction remains in effect. In addition, the order of the district court in *Bhattarai* staying proceedings and approving the parties' stipulated agreement to continue TPS and TPS-related documentation for eligible beneficiaries from Nepal and Honduras remains in effect. The *Saget* district court's order prohibiting the termination of TPS for Haiti also remains in effect while the decision is on appeal to the U.S. Court of Appeals for the Second Circuit. Affected TPS beneficiaries from the six countries will retain their status, provided they continue to meet all the individual requirements for TPS eligibility described in INA section 244(c) and 8 CFR 244. As necessary, DHS will publish future information in the **Federal Register** to ensure its compliance with any relevant court orders that may be issued after the date of this notice.

DHS has initially published notices to ensure its compliance with the *Ramos* preliminary injunction on October 31, 2018 and March 1, 2019, and the *Bhattarai* order to stay proceedings on May 10, 2019. *See* 83 FR 54764; 84 FR 7103; and 84 FR 20647. The Department last published a notice to ensure its continued compliance with the combined orders in *Ramos, Bhattarai,* and *Saget* on November 4, 2019. That notice automatically extended certain TPS and TPS-related documentation through January 4, 2021 for all eligible TPS beneficiaries covered by the courts' orders. *See* 84 FR 59403. Through this **Federal Register** notice, DHS announces actions to ensure its continued compliance with the district court orders in these three lawsuits while those orders remain in effect.

The TPS designations for El Salvador, Nicaragua, and Sudan will remain in effect, as required by the *Ramos* district court order, so long as the preliminary injunction remains in effect. The TPS

designation for Haiti will remain in effect, as required by the preliminary injunction orders in both *Ramos* and *Saget,* so long as either of those preliminary injunctions remain in effect. The TPS designations for Honduras and Nepal will remain in effect so long as the *Bhattarai* order staying proceedings and approving the parties' stipulated agreements continues in effect. Affected TPS beneficiaries under the TPS designations for El Salvador, Nicaragua, Sudan, Haiti, Honduras, and Nepal will retain their TPS and their TPS-related documentation will continue to be valid in accordance with the specific orders that affect the TPS designations regarding their individual countries, provided that the affected beneficiaries continue to meet all the individual requirements for TPS. *See* INA section 244(c)(3). *See also* 8 CFR 244.14. DHS will not terminate TPS for any of the affected countries pending final disposition of the *Ramos* appeal, or for Haiti pending both *Ramos* and *Saget* appeals, including through any additional appellate channels in which relief may be sought, or by other orders of the court.

DHS is further announcing it is automatically extending, through October 4, 2021, the validity of certain TPS-related documentation, as specified in this notice, for beneficiaries under the TPS designations for El Salvador, Haiti, Nicaragua, Sudan, Honduras, and Nepal provided that the affected beneficiaries remain individually eligible for TPS.

**Automatic Extension of EADs Issued Under the TPS designations for El Salvador, Haiti, Nicaragua, Sudan, Honduras, and Nepal**

Through this **Federal Register** notice, DHS automatically extends the validity of EADs listed in Table 1 below issued to beneficiaries under the TPS designations for El Salvador, Haiti, Nicaragua, Sudan, Honduras, and Nepal. Such aliens may show their EAD to employers to demonstrate they have employment authorization and may wish to also show employers this **Federal Register** notice to explain that their TPS-Related Documentation has been automatically extended through October 4, 2021. This Notice explains how TPS beneficiaries, their employers, and benefit-granting agencies may determine which EADs are automatically extended and how this affects the Form I–9, Employment Eligibility Verification, E-Verify, and USCIS Systematic Alien Verification for Entitlements (SAVE) processes. Additionally, a beneficiary under the

---

[1] *See Ramos, et al.* v. *Nielsen, et. al.,* No. 18–cv–01554 (N.D. Cal. Oct. 3, 2018) (district court granted preliminary injunction against terminations of TPS for El Salvador, Haiti, Sudan, and Nicaragua) ("*Ramos*"); *Saget, et. al.,* v. *Trump, et. al.,* No. 18–cv–1599 (E.D.N.Y. Apr. 11, 2019) (district court granted preliminary injunction against termination of TPS for Haiti) ("*Saget*"); and *Bhattarai, et al.* v.

*Nielsen, et al.,* No. 19–cv–00731 (N.D. Cal. Mar. 12, 2019) (district court stayed proceedings until *Ramos* appeal decided and approved parties' stipulation for continued TPS and issuance of TPS-related documentation to eligible, affected beneficiaries of TPS for Honduras and Nepal during the stay and pendency of the appeal) ("*Bhattarai*").

[2] *See Ramos, et al.,* v. *Wolf, et al.,* No. 18–16981 (9th Cir., September 14, 2020).

NicAR000065

TPS designation for any of these countries who has applied for a new EAD but who has not yet received his or her new EAD is covered by this automatic extension, provided that the EAD he or she possesses contains one of the expiration dates listed in Table 1 below.

#### TABLE 1—AFFECTED EADs

| If an EAD has a category code of A–12 or C–19 and an expiration date of: | Then the validity of the EAD is extended through: |
|---|---|
| 07/22/2017 | 10/04/2021 |
| 11/02/2017 | 10/04/2021 |
| 01/05/2018 | 10/04/2021 |
| 01/22/2018 | 10/04/2021 |
| 03/09/2018 | 10/04/2021 |
| 06/24/2018 | 10/04/2021 |
| 07/05/2018 | 10/04/2021 |
| 11/02/2018 | 10/04/2021 |
| 01/05/2019 | 10/04/2021 |

#### TABLE 1—AFFECTED EADs— Continued

| If an EAD has a category code of A–12 or C–19 and an expiration date of: | Then the validity of the EAD is extended through: |
|---|---|
| 04/02/2019 | 10/04/2021 |
| 06/24/2019 | 10/04/2021 |
| 07/22/2019 | 10/04/2021 |
| 09/09/2019 | 10/04/2021 |
| 01/02/2020 | 10/04/2021 |
| 01/05/2020 | 10/04/2021 |
| 03/24/2020 | 10/04/2021 |
| 01/04/2021 | 10/04/2021 |

#### Automatic Extension of Forms I–94 and Forms I–797

Also through this **Federal Register** notice, DHS automatically extends the validity periods of the Forms I–94 and Forms I–797 listed in Table 2 below previously issued to beneficiaries under the TPS designations for El Salvador, Haiti, Nicaragua, Sudan, Honduras, and Nepal. These extensions apply only if the TPS beneficiary properly filed for re-registration during either the most recent DHS-announced registration period for their country, or any applicable previous DHS-announced re-registration periods for the alien's country,[3] or has a re-registration application that remains pending. This notice does not extend the validity periods of Forms I–94 or Forms I–797 for any TPS beneficiary who failed to file for TPS re-registration during one of the applicable previous DHS-announced re-registration periods, or for whom a re-registration request has been finally denied. In addition, the extensions do not apply for any beneficiary from whom TPS has been withdrawn.

#### TABLE 2—AFFECTED FORMS I–94 AND I–797 [4]

| Country | Beginning date of validity: | End date of validity: | Validity of forms I–94 and I–797 extended through: |
|---|---|---|---|
| El Salvador | Sept. 10, 2016 | Mar. 9, 2018 | 10/04/2021 |
| | Mar. 10, 2018 | Sept. 9, 2019 | 10/04/2021 |
| Haiti | Jan. 23, 2016 | July 22, 2017 | 10/04/2021 |
| | July 23, 2017 | Jan. 22, 2018 | 10/04/2021 |
| | Jan. 23, 2018 | July 22, 2019 | 10/04/2021 |
| Honduras | July 6, 2016 | Jan. 5, 2018 | 10/04/2021 |
| | Jan. 6, 2018 | July 5, 2018 | 10/04/2021 |
| | July 6, 2018 | Jan. 5, 2020 | 10/04/2021 |
| Nepal | Dec. 25, 2016 | June 24, 2018 | 10/04/2021 |
| | June 25, 2018 | June 24, 2019 | 10/04/2021 |
| Nicaragua | July 6, 2016 | Jan. 5, 2018 | 10/04/2021 |
| | Jan. 6, 2018 | Jan. 5, 2019 | 10/04/2021 |
| Sudan | May 3, 2016 | Nov. 2, 2017 | 10/04/2021 |
| | Nov. 3, 2017 | Nov. 2, 2018 | 10/04/2021 |

#### Application Procedures

Current beneficiaries under the TPS designations for El Salvador, Haiti, Honduras, Nepal, Nicaragua, and Sudan do not need to pay a fee or file any application, including Application for Employment Authorization (Form I–765), to maintain their TPS benefits through October 4, 2021, provided that they have properly re-registered for TPS during either the most recent DHS-announced registration period for their country, or any applicable previous re-registration period described in Footnote 3.

TPS beneficiaries who have failed to re-register properly for TPS during any of these re-registration periods may still file an Application for Temporary Protected Status (Form I–821), but must demonstrate ''good cause'' for failing to re-register on time, as required by law. See INA section 244(c)(3)(C) (TPS beneficiary's failure to register without good cause in form and manner specified by DHS is ground for TPS withdrawal); 8 CFR 244.17(b) and Form I–821 instructions.

Any currently eligible beneficiary who does not presently have a pending EAD application under the TPS designations for El Salvador, Haiti, Honduras, Nepal, Nicaragua, or Sudan may file Form I–765 with appropriate fee.

#### Possible Future Actions

In order to comply with statutory requirements for TPS while the district courts' orders or any superseding court order concerning the beneficiaries under the TPS designations for El Salvador, Haiti, Honduras, Nepal, Nicaragua, and Sudan are pending, DHS anticipates requiring these beneficiaries to re-register and will announce the re-registration procedures in a future **Federal Register** notice. DHS has the authority to conduct TPS re-registration in accordance with section 244(c)(3)(C) of the INA and 8 CFR 244.17. Through the re-registration process, which is generally conducted every 12 to 18 months while a country is designated

---

[3] El Salvador: July 8–Sept. 6, 2016, or Jan. 18–Mar. 19, 2018; Haiti: Aug. 25–Oct. 26, 2015, May 24–July 24, 2017, or Jan. 18–Mar. 19, 2018; Honduras: May 16–July 16, 2016; Dec. 15, 2017–Feb. 13, 2018 or June 5–Aug. 6, 2018; Nepal: Oct. 26–Dec. 27, 2016 or May 22–July 23, 2018;

Nicaragua: May 16–July 15, 2016 or Dec. 15, 2017–Feb. 13, 2018; Sudan: Jan. 25–March 25, 2016 or Oct. 11, 2017–Dec. 11, 2017.

[4] Your Forms I–94 and I–797 may show a different beginning date of validity than those listed

here if you were a late initial filer (LIF) at the time because the forms would have the date of approval of your LIF application for TPS. As long as they bear an end date of validity listed in this chart, then they are automatically extended by this Notice.

NicAR000066

for TPS, USCIS determines whether each TPS beneficiary is continuing to maintain individual eligibility for TPS, including but not limited to, the requirements related to disqualifying criminal or security issues. See id.; INA, section 244(c)(2); 8 CFR 244.2, 244.3, and 244.4 (describing individual TPS eligibility requirements, including mandatory criminal and security bars).

The Government has appealed both the *Ramos* and *Saget* preliminary injunctions. A 3-judge panel of the U.S. Court of Appeals for the Ninth Circuit ruled for the Government and vacated the *Ramos* preliminary injunction on September 14, 2020. However, the preliminary injunction remains in effect because the appellate court has not issued its directive (*i.e.*, the mandate) to the district court to implement the panel's decision. Should the Government ultimately prevail in its challenge to the *Ramos* preliminary injunction, the Secretary's determination to terminate TPS for Nicaragua, Sudan, Honduras, and Nepal will take effect no earlier than 120 days from the issuance of any appellate mandate to the district court. The Secretary's determination to terminate TPS for El Salvador will take effect no earlier than 365 days from the issuance of any appellate mandate to the *Ramos* district court. DHS provides this additional time for El Salvador TPS beneficiaries in part because there are almost 100,000 more such beneficiaries than in the combined TPS beneficiary populations of all the other five countries covered by this notice.[5] The additional period of 245 days beyond 120 days permits an orderly transition for beneficiaries of TPS from El Salvador as they return to their homeland. If the Government prevails in its appeals, DHS will also continue to monitor the circumstances of the affected beneficiaries under the other five TPS country designations covered by this notice. *See* INA, 244(d)(3).

TPS for beneficiaries under Haiti's designation may continue pursuant to the *Saget* preliminary injunction. However, should the Government prevail in its challenges to both the *Ramos* preliminary injunction and the *Saget* preliminary injunction, the Secretary's determination to terminate TPS for Haiti will take effect no earlier than 120 days from the issuance of the later of the two appellate mandates to the District Court. To the extent that a **Federal Register** notice has

automatically extended TPS-related documentation beyond 120 days from the issuance of any appellate mandate to the District Court, DHS reserves the right to issue a subsequent **Federal Register** notice announcing an expiration date for the documentation that corresponds to the last day of the 120-day period. Should the Government move to vacate the *Bhattarai* order to stay proceedings in light of an appellate decision affirming the preliminary injunction in *Ramos* that suggests a basis on which to distinguish the determinations to terminate the TPS designations for Honduras and Nepal from the TPS terminations at issue in *Ramos*, TPS will remain in effect for Honduras and Nepal for at least 180 days following an order of the District Court vacating the stay in proceedings.

**Additional Notes**

Nothing in this notice affects DHS's ongoing authority to determine on a case-by-case basis whether a TPS beneficiary continues to meet the eligibility requirements for TPS described in section 244(c) of the INA and the implementing regulations in part 244 of Title 8 of the Code of Federal Regulations.

**Notice of Compliance With the "Order Enjoining the Implementation and Enforcement of Determinations To Terminate the TPS Designations for El Salvador, Haiti, Nicaragua, and Sudan" in *Ramos*, the "Order Enjoining the Implementation of Enforcement of Determination To Terminate the TPS Designation of Haiti" in *Saget*, and the "Order To Stay Proceedings and Agreement To Stay the Determinations To Terminate the TPS Designations for Honduras and Nepal" in *Bhattarai***

The previously announced determinations to terminate the existing designations of TPS for El Salvador, Nicaragua, and Sudan[6] will not be implemented or enforced unless and until the district court's order in *Ramos* is reversed and that reversal becomes final. The previously announced determination to terminate the existing designation of TPS for Haiti will not be implemented or enforced unless and until the district court's orders in *Ramos* and *Saget* are reversed and those reversals become final.[7] As required by

the order to stay proceedings in *Bhattarai*, DHS will not implement or enforce the previously announced determinations to terminate the existing TPS designations for Honduras and Nepal[8] unless and until the district court's order in *Ramos* enjoining implementation and enforcement of the determinations to terminate the TPS designations for El Salvador, Haiti, Nicaragua, and Sudan is reversed and that reversal becomes final for some or all of the affected countries, or by other order of the court. Any termination of TPS-related documentation for beneficiaries under the TPS designations for Haiti, Nicaragua, Sudan, Honduras, and Nepal will go into effect no earlier than 120 days, and no earlier than 365 days for beneficiaries under the TPS designation for El Salvador, following the issuance of any mandate to the district court, as described in the "Possible Future Action" section of this **Federal Register** notice.[9]

In further compliance with the still-valid district court orders, DHS is publishing this notice automatically extending the validity of the TPS-related documentation specified in the Supplementary Information section of this notice through October 4, 2021, for eligible beneficiaries under the TPS designations for El Salvador, Haiti, Nicaragua, Sudan, Honduras, and Nepal. DHS will continue to issue notices that will automatically extend TPS-related documentation for all affected beneficiaries under the TPS designations for El Salvador, Honduras, Nicaragua, Nepal, and Sudan, so long as the Ramos preliminary injunction and Bhattarai order to stay proceedings remain in place; for Haiti so long as either the Ramos or Saget preliminary injunctions remain in place; or by other order of the court. However, should compliance with the Ramos, Bhattarai, and/or Saget court orders remain necessary, DHS may announce periodic re-registration procedures for eligible TPS beneficiaries in accordance with the INA and DHS regulations. DHS

---

[5] As of December 31, 2019, the number of TPS beneficiaries covered under the affected designations were: El Salvador 247,412; Haiti 55,218; Nicaragua 4,409; Sudan 771; Honduras 79,290; Nepal 14,549.

[6] *See* Termination of the Designation of El Salvador for Temporary Protected Status, 83 FR 2654 (Jan. 18, 2018); Termination of the Designation of Nicaragua for Temporary Protected Status, 82 FR 59636 (Dec. 15, 2017); Termination of the Designation of Sudan for Temporary Protected Status, 82 FR 47228 (Oct. 11, 2017).

[7] *See* Termination of the Designation of Haiti for Temporary Protected Status, 83 FR 2648 (Jan. 18, 2018).

[8] *See* Termination of the Designation of Honduras for Temporary Protected Status, 83 FR 26074 (June 5, 2018); Termination of the Designation of Nepal for Temporary Protected Status, 83 FR 23705 (May 22, 2018).

[9] An additional provision in the *Bhattarai* Order to Stay Proceedings states that if the preliminary injunction in *Ramos* is upheld, but the Government moves to vacate the *Bhattarai* Order based on reasons for distinguishing the terminations of TPS for Honduras and Nepal from those under the injunction in *Ramos*, TPS will remain in effect for Honduras and Nepal for at least 180 days following an order of the District Court vacating its stay of proceedings order.

further continues its commitment to a transition period, as described above.

All TPS beneficiaries must continue to maintain their TPS eligibility by meeting the requirements for TPS in INA section 244(c) and 8 CFR part 244. DHS will continue to adjudicate any pending TPS re-registration and pending late initial applications for affected beneficiaries under the TPS designations for El Salvador, Haiti, Honduras, Nicaragua, Nepal, and Sudan, and continue to make appropriate individual TPS withdrawal decisions in accordance with existing procedures if an alien no longer maintains TPS eligibility. DHS will take appropriate steps to continue its compliance with the orders, and with all statutory requirements.

The Acting Secretary of Homeland Security, Chad F. Wolf, having reviewed and approved this document, has delegated the authority to electronically sign this document to Ian Brekke, who is the Deputy General Counsel for DHS, for purposes of publication in the **Federal Register**.

**Ian Brekke,**
*Deputy General Counsel, U.S. Department of Homeland Security.*

**Approved Forms To Demonstrate Continuation of Lawful Status and TPS-Related Employment Authorization**

- This **Federal Register** notice dated December 9, 2020
  ○ Through operation of this notice, certain TPS-related documentation, including EADs, of affected beneficiaries under the TPS designations for El Salvador, Haiti, Honduras, Nepal, Nicaragua, and Sudan are automatically extended through October 4, 2021.
  ○ A beneficiary granted TPS under the designation for El Salvador, Haiti, Honduras, Nepal, Nicaragua, or Sudan may show his or her EAD that has been automatically extended to his or her employer to demonstrate identity and continued TPS-related employment eligibility to meet Employment Eligibility Verification (Form I–9) requirements. A beneficiary granted TPS under a designation for one of these countries may also wish to show an employer this **Federal Register** notice, which explains that his or her EAD has been automatically extended.
  ○ Alternatively, such a TPS beneficiary may choose to show other acceptable documents that are evidence of identity and employment eligibility as described in the instructions to Form I–9.
  ○ Finally, such a TPS beneficiary may show a copy of this **Federal Register** notice, along with his or her EAD that has been automatically extended, or Form I–94, or Form I–797, as evidence of his or her lawful status, to law enforcement, Federal, state, and local government agencies, and private entities.

- Employment Authorization Document (EAD)

**Am I eligible to receive an automatic extension of my current EAD using this Federal Register notice?**

Yes. Provided that you currently have a TPS-related EAD with the specified expiration dates below, this notice automatically extends your EAD as stated in Table 3 below.

### TABLE 3—AFFECTED EADs

| If your EAD has category code of A–12 or C–19 and an expiration date of: | Then this **Federal Register** notice extends your EAD through: |
|---|---|
| 07/22/2017 | 10/04/2021 |
| 11/02/2017 | 10/04/2021 |
| 01/05/2018 | 10/04/2021 |
| 01/22/2018 | 10/04/2021 |
| 03/09/2018 | 10/04/2021 |
| 06/24/2018 | 10/04/2021 |
| 07/05/2018 | 10/04/2021 |
| 11/02/2018 | 10/04/2021 |
| 01/05/2019 | 10/04/2021 |
| 04/02/2019 | 10/04/2021 |
| 06/24/2019 | 10/04/2021 |
| 07/22/2019 | 10/04/2021 |
| 09/09/2019 | 10/04/2021 |
| 01/02/2020 | 10/04/2021 |
| 01/05/2020 | 10/04/2021 |
| 03/24/2020 | 10/04/2021 |
| 01/04/2021 | 10/04/2021 |

**When hired, what documentation may I show to my employer as evidence of employment authorization and identity when completing Form I–9?**

You can find the Lists of Acceptable Documents on the third page of Form I–9 as well as the Acceptable Documents web page at *www.uscis.gov/i-9-central/acceptable-documents*. Employers must complete Form I–9 to verify the identity and employment authorization of all new employees. Within 3 days of hire, employees must present acceptable documents to their employers as evidence of identity and employment authorization to satisfy Form I–9 requirements.

You may present any document from List A (which provides evidence of both your identity and employment authorization) or one document from List B (which provides evidence of your identity) together with one document from List C (which provides evidence of your employment authorization), or you may present an acceptable receipt as described in the Form I–9 instructions. Employers may not reject a document based on a future expiration date. You can find additional information about Form I–9 on the I–9 Central web page at *www.uscis.gov/I-9Central*.

An EAD is an acceptable document under List A. See the section "How do my employer and I complete Form I–9 using my automatically extended employment authorization for a new job?" of this **Federal Register** notice for further information. If you present your EAD with one of the expiration dates specified below, you may also provide your employer with a copy of this **Federal Register** notice, which explains that your EAD has been automatically extended for a temporary period of time, through October 4, 2021, as follows:

### TABLE 4—AFFECTED EADs AND FORM I–9

| You may show your EAD to complete Form I–9 if your EAD has category code of A–12 or C–19 and bears an expiration date of: | Enter this date in Section 1 of Form I–9: | Your employer must reverify your employment authorization by: |
|---|---|---|
| 07/22/2017 | 10/04/2021 | 10/05/2021 |
| 11/02/2017 | 10/04/2021 | 10/05/2021 |
| 01/05/2018 | 10/04/2021 | 10/05/2021 |
| 01/22/2018 | 10/04/2021 | 10/05/2021 |
| 03/09/2018 | 10/04/2021 | 10/05/2021 |
| 06/24/2018 | 10/04/2021 | 10/05/2021 |
| 07/05/2018 | 10/04/2021 | 10/05/2021 |
| 11/02/2018 | 10/04/2021 | 10/05/2021 |
| 01/05/2019 | 10/04/2021 | 10/05/2021 |
| 04/02/2019 | 10/04/2021 | 10/05/2021 |

NicAR000068