BRETT A. SHUMATE
Assistant Attorney General
YAAKOV M. ROTH
Principal Deputy Assistant Attorney General
Civil Division
WILLIAM H. WEILAND
Acting Assistant Director
ERIC SNYDERMAN
ANNA DICHTER
LAUREN BRYANT
CATHERINE ROSS
AMANDA B. SAYLOR
JEFFREY M. HARTMAN
DANIEL CAPPELLETTI
SHELBY WADE
Trial Attorneys
U.S. Department of Justice, Civil Division
Office of Immigration Litigation
General Litigation and Appeals Section
P.O. Box 868, Ben Franklin Station
Washington, DC 20044

Attorneys for Defendants

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| NATIONAL TPS ALLIANCE, *et al.*, | Case No. 3:25-cv-5687 |
| Plaintiff, | |
| v. | |
| KRISTI NOEM, in her official capacity as Secretary of Homeland Security, *et al.*, | **DEFENDANTS' RESPONSE TO QUESTIONS FOR JULY 29, 2025 HEARING RE: PLAINTIFFS' MOTION TO POSTPONE** |
| Defendants. | Hon. Trina L. Thompson |

1

## I.    CONCESSIONS

**To both Parties**: Do the Parties agree that *Trump v. Casa, Inc.*, 145 S. Ct. 2540 (2025) was decided pursuant to the Supreme Court's emergency docket (i.e., the "shadow docket")?

*Trump v. Casa, Inc.* was brought pursuant to Rule 23 of the Rules of the Supreme Court and was decided after oral argument. The *CASA* decision is binding precedent on this Court and all other federal courts.

### a.    Do the parties agree that the Supreme Court's shadow docket involve issues that do not involve the merits of the underlying case?

No. No stay can be granted unless the movant is likely to prevail on the merits, and a Supreme Court stay grant likewise means that the Supreme Court determined that the movant was likely to prevail on the merits. In granting a stay of a lower court order, the Supreme Court necessarily addresses the underlying legal merits, whether the Court would likely grant certiorari, whether refusing to grant a stay would work "irreparable harm" against the party seeking the stay, the balance of the equities between the parties, whether the right to relief is "clear and indisputable," and whether the question is of "public importance." *Hollingsworth v. Perry*, 558 U.S. 183, 199, 130 S. Ct. 705, 715 (2010). In the context of the instant case, where Plaintiffs are seeking interim injunctive relief related to the termination of TPS, the Supreme Court's stay in a similar case is dispositive given that it is impossible to weigh the injunctive factors in this case differently than how the Supreme Court weighed those factors in NTPSA. *Noem v. Nat'l TPS Alliance*, No. 24A1059, 2025 WL 1427560 (S. Ct. May 19, 2025).

The Supreme Court just last week decided that it must weigh in on the practice of lower courts disregarding stay ruling in similar cases given the repeated practice of lower courts issuing broad injunctions in cases substantially similar to cases where the Court has granted a stay. The Court made clear that lower courts are not free to disregard its stay rulings. *Trump v. Boyle,* No. 25A11, 2025 WL

2056889 (July 23, 2025). The Court explained that "[a]lthough our interim orders are not conclusive as to the merits, they inform how a court should exercise its equitable discretion in like cases." *Id.* (referencing *Trump v. Wilcox*, 605 U.S. ___, 145 S. Ct. 1415 (2025)). In *Boyle*, the Court explained that the *Wilcox* stay "squarely controlled" in *Boyle*. *Id.* at *1. Because *Boyle* involved the removal of an officer from an agency that "exercises executive power in a similar manner" to the officer removed in *Wilcox*, the Court determined that *Boyle* "does not otherwise differ from *Wilcox* in any pertinent respect," so the Court's evaluation of the equities as favoring a stay in *Wilcox* compelled the same result in *Boyl*e. *Id.* The same is true here, where this Court must be cognizant of the stay issued by the Supreme Court and treat this similar case in the same way. *Noem v. Nat'l TPS Alliance*, No. 24A1059, 2025 WL 1427560 (S. Ct. May 19, 2025).

> **b.    Do the parties concede that the Supreme Court's orders on the shadow docket matters are issued after limited briefing and no oral argument?**

The Supreme Court's treatment of its cases where stays are sought varies. There is always briefing addressing the stay factors, but not always argument.[1] Regardless, as the Court recently emphasized in *Boyle*, the lower courts must treat similar cases in the same way when they are in a stay posture.

## II.    STANDARD FOR MOTION TO POSTPONE

**To both Parties: How, if any, does the standard for a motion to postpone pursuant to 5 U.S.C. § 705 differ from the standard for a preliminary injunction?**

The standards of review for relief under 5 U.S.C. § 705 and for preliminary injunctions are the same. *Immigrant Defs. L. Ctr.*, 2025 U.S. Dist. LEXIS 72707, 2025 WL 1172442, at *6 (cleaned up)

---

[1] For example, *Trump v. Casa, Inc.*, was supported by hundreds of pages of briefing by the parties and amici. Before rendering its binding opinion, the Supreme Court heard over two hours of argument on May 15, 2025.

1     ("[T]he factors considered in determining whether to postpone agency action pursuant to § 705

2     'substantially overlap with the *Winter* factors for a preliminary injunction.'"); *see also Colorado v EPA*,

3     989 F.3d 874, 883 (10th Cir. 2021) (stating that the preliminary injunction "factors also determine when

4     a court should grant a stay of agency action under section 705 of the APA"); *Cook Cnty. v Wolf*, 962 F.3d

5     208, 221 (7th Cir. 2020) (stating that the standard for a stay under § 705 is "the same" as the standard for

6     a preliminary injunction).

7                **a.      Which "of the two variants" of the *Winter* standards should the Court apply**

8                **when deciding Plaintiffs' instant motion? *See Alliance for the Wild Rockies v. Pena*,**

9                **865 F.3d 1211, 1217 (9th Cir. 2017); *cf. Starbucks Corp. v. McKinney*, 602 U.S. 339**

10                **(2024).**

11         The government's position is that Plaintiffs must show the traditional *Winter* factors: which

12     include a likelihood of success on the merits, a likelihood of suffering irreparable harm in the absence of

13     preliminary relief, that the balance of equities tips in their favor, and that an injunction is in the public

14     interest. *Winter v. NRDC*, 555 U.S. 7, 20 (2008). The Ninth Circuit has in the past applied a "sliding scale"

15     when considering motions for injunctive relief. Either way, the difference is not dispositive, as in *NTPSA*

16     *I* the Supreme Court has already weighed in on a substantially similar question to that posed to the Court

17     here and necessarily concluded that the Government was likely to succeed on the merits, and that the

18     balance of harms favored giving effect to the termination during the pendency of the litigation. *Noem v.*

19     *Nat'l TPS Alliance*, No. 24A1059, 2025 WL 1427560 (S. Ct. May 19, 2025).

20   **III.    JURISDICTION**

21         <u>**To both Parties**</u>**: What is the statutory purpose of TPS? In answering this question, please**

22         **provide appropriate sources of legislative history.**

23

24

1      In 1990, Congress created the Temporary Protected Status (TPS) program to provide, on a

2    discretionary basis, temporary status to aliens who cannot safely return in the short-term to their home

3    nation because of a natural disaster, armed conflict, or other "extraordinary and temporary conditions in

4    the foreign state." 8 U.S.C. § 1254a(b); *see also* H.R. Rep. 101-955 at 127 (1990)) (Conf. Rep. on S. 358,

5    Immigration Act of 1990) (explanation by Conference Committee members on the purpose of the House

6    Amendment creating a non-country specific form of temporary protected status). Congress intended for

7    the Executive Branch's determinations about the eligibility of countries for TPS designation, or the

8    termination or extension of these determinations to be judicially unreviewable. *See* 8 U.S.C. §

9    1254a(b)(5)(A).

10      The statute enacted by Congress clearly intends for each country's designation for TPS to have a

11    temporal limitation, as indicated by the statutory limit of 18 months on any designation or extension. *See*

12    8 U.S.C. § 1254a(b)(2)(B); (b)(3)(C). Likewise, the statute requires the Secretary to review current country

13    conditions at least 60 days prior to the expiration of its designation for TPS. *See* 8 U.S.C. § 1254a(b)(3)(A).

14    Just as the statute sets limits on each designation or extension of TPS for a designated country, it also

15    requires that individual aliens meet certain criteria to warrant the Secretary's exercise of discretion to grant

16    their individual benefits. *See* 8 U.S.C. § 1254a(c)(1)(A); (a)(1)(A) (Secretary "may grant" TPS to an

17    individual applicant, "and shall not remove the alien" while the status is in effect).

18      The main proponents of the House Amendment[2] incorporating TPS into the Immigration Act of

19    1990 intended to create a "comprehensive statutory scheme" by which the Executive Branch could make

20    decisions about temporary protection of "someone whose country is in turmoil" to remain in the United

21

22    _____

[2] This summary only discusses legislative history from the U.S. House because Senate versions of the
23    Immigration Act of 1990 did not contain companion legislation. The U.S. House proposal for a non-
country-specific Temporary Protected Status authority was developed over several Congresses and
appeared in the Immigration Act in a final Amendment in the Nature of a Substitute. *See* H.R. Rep. No.
24    101-955, at 127 (1990) (Conf. Rep. on S. 358, Immigration Act of 1990) (statutory history).

States in a manner where "the rights and responsibilities of the individuals involved would be clear." 101 Cong. Rec. 25833 (1989) (Floor Statement by Congressman Morrison on H.R. 45, Chinese and Central American Temporary Protected Status Act of 1989).[3] Congress intended to create "guidelines" for the conditions where it would be appropriate for the Executive Branch to exercise its inherent non-enforcement discretion under the Immigration and Nationality Act (INA), under "extended voluntary departure." *Id*. Proponents explained that TPS would create a legal framework for protecting a class of nationals of a designated country separate from the Refugee Act framework intended to protect those who would "individually be subject to persecution[.]" *Id* at 25844; *see also* 101 Cong. Rec. 25835 (Floor Statement by Congresswoman Pelosi) (contrasting TPS with Extended Voluntary Departure).[4]

Proponents of the TPS statute intended to "eliminate the need for Congress to act on national-specific safe haven bills" by clarifying where the Executive should exercise its authority.[5] 101 Cong. Rec. 25831 (Floor Statement by Congressman Moakley on H. Res. 273). Several proponents referenced the existing authority of the Executive Branch to decide how and when to provide temporary protection to non-citizens present in the United States. *See, e.g.*, 101 Cong. Rec. 25838 (Statement of Congressman Frank)[6] ("the administration, had it wanted to, could have done more to accommodate some of these people …" and that TPS represented "the right of Congress… to look at these situations, … and say,

---

[3] Congressman Morrison was the Chairman of the House Judiciary Committee's Subcommittee on Immigration, and one of the members of the Conference Committee on the Immigration Act of 1990. H.R. Rep. No. 101-955, at 135 (1990) (Conf. Rep. on S. 358, Immigration Act of 1990). Morrison was also a cosponsor of H.R.4300, the House companion bill to S.358, the Immigration Act of 1990.

[4] Congresswoman Pelosi was the sponsor of a bill to provide TPS for certain Chinese nationals which was merged into the non-country specific TPS bill.

[5] Congressman Moakley was one of the House members of the Conference Committee on the Immigration Act of 1990. H.R. Rep. No. 101-955, at 136 (1990). Moakley was also the proponent of the Amendment that created the House version of the non-country specific TPS bill, and a member of the House Judiciary and Rules Committees which advanced the Immigration Act.

[6] Congressman Frank was one of the House members of the Conference Committee on the Immigration Act of 1990. H.R. Rep. No. 101-955, at 136 (1990). Frank was also a member of the House Judiciary Committee which favorably reported predecessor bills. *Id*.

'[h]ere is a whole category that we want to take care of …"). In this spirit, the final TPS provisions of the Immigration Act of 1990 incorporated a measure initially proposed by Congresswoman Pelosi which demonstrated Congress' intent not to repudiate the Executive's inherent authority to exercise prosecutorial discretion under the INA and the President's Constitutional power to control entry. *See* Immigration Act of 1990, Pub. L. No. 101-649 § 302(c), 104 Stat. 4978, 5036 (codified at 8 U.S.C. § 1254a note) ("No Effect on Executive Order 12711 … relating to policy implementation with respect to nationals of the People's Republic of China[.]"); *see also* Exec. Order No. 12,711 (Apr. 11, 1990) (citing "the authority vested in me as President by the Constitution and laws … including 8 U.S.C. § 1101-1557 …").

Proponents of the TPS statute also acknowledged that unlike the Refugee Act, TPS would "actually set a time limit on [beneficiaries'] continued presence in the United States and to have their names, and to know their addresses by the registration provisions, so that as the period expires, we can then take the necessary steps to send these individuals home." 101 Cong. Rec. 25845 (Floor Statement by Congressman Morrison).

## IV.    SCOPE OF RELIEF

1.    <u>**To both Parties**</u>**: Plaintiffs seek to postpone the Secretary's TPS terminations for Honduras, Nepal, and Nicaragua. Would limiting relief, if granted, to only the named plaintiffs be practical?**

This Court must apply the test set out in *CASA, Inc.* in considering the scope of any relief. *See Trump v. CASA, Inc.*, 606 U.S. ---, 2025 WL 1773631 (June 27, 2025); *see also Gill v. Whitford*, 585 U.S. 48, 73 (2018). The test is not based on what is most practical or simple, but whether relief can be fashioned to remedy the Plaintiffs' injuries. Relief can readily be limited to the named individual plaintiffs. In the case of the associational plaintiff, NTPSA, relief can readily be limited to bona fide members of the association at the time they filed their complaint, information that should be readily available to NTPSA.

*Immigrant Defenders Law Center. v. Noem*, No. 25-2581, 2025 WL 2017247, *15 (9th Cir. July 18, 2025); *Log Cabin Republicans v. U.S.*, 716 F. Supp. 2d 884, 892 (C.D. Cal. Oct. 12, 2010) ("A plaintiff who has established standing must retain his or her 'personal stake' in the litigation throughout the proceedings."); *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 570 n.5 (1993) (plurality opinion) ("[S]tanding is to be determined as of the commencement of suit."). *See* Complaint para. 11-13 (alleging that NTPSA is a "member-led organization" and individuals "can become. . . members either by joining a local NTPSA committee or by submitted an individual membership application" and explaining that NTPSA has "300 Honduran TPS holder members," "900 Nepali members" and "25 Nicaraguan. . . members"). The text of 5 U.S.C. § 705 confirms that relief must be limited to those suffering harm from the agency action — it specifies that administrative action may be postponed "to the extent necessary to prevent irreparable injury." And APA relief is subject to the jurisdictional limits of the Judiciary Act, which was the statute applied in *CASA*. *See* Complaint para. 7 ("This court has jurisdiction under 28 U.S.C. 1331").

As such, a granting of universal relief by the court would circumvent the requirement to limit relief to the parties. *See CASA*, 2025 WL 177631, at *7 (recognizing that requests for relief that extend beyond the parties are inconsistent with the "party-specific principles" that "permeate the Court's understanding of equity."). Further, Plaintiffs have not raised class claims, and they have not moved to certify a class under Rule 23; additionally, they have not attempted to explain *why* they would be entitled to this overall, overextended relief.

    **2.**   **To both Parties: 5 U.S.C. § 706 requires the Court to "review the whole record" in determining whether an agency acted arbitrary, capricious, or otherwise not in accordance with the law. Are there any other records that the Court must consider before ruling on Plaintiffs' motion to postpone?**

Congress made plain that Secretary's determinations are unreviewable. See 8 U.S.C. §

1254a(B)(5)(A) ("There is no judicial review of any determination of the [Secretary] with respect to the designation, or termination or extension of a designation, of a foreign state"). Because this Court lacks jurisdiction to grant Plaintiffs the relief they seek, this matter should be dismissed under Rule 12(b)(1), and it is not appropriate for this Court to assess an administrative record.

If the Court proceeds past the review bar, this matter is brought under the APA and review would be based on the administrative record before the agency when it made its decision. *See Thompson v. U.S. Dept. of Labor*, 885 F.2d 551, 555-556 (9th Cir. 1989); *see Lands Council v. Powell*, 395 F.3d 1019, 1029 (9th Cir.2005) ("The task of the reviewing court is to apply the appropriate APA standard of review to the agency decision based on the record the agency presents to the court.")

3.  **To both Parties:** Please address how, if at all, *Immigrant Defenders Law Center v. Noem*, No. 25-2581, 2025 WL 2017247 (9th Cir. July 18, 2025) applies to this case.

*Immigrant Defenders Law Center. v. Noem*, is binding precedent that applies to this matter. In that matter, the Ninth Circuit held that it has jurisdiction over an appeal of a § 705 stay that prevented the Executive from enacting its preferred immigration policy via a statute enacted by Congress. 2025 WL 2017247, *6–*7. Significantly, the Ninth Circuit narrowed the stay to apply *only* to the named parties in light of the Supreme Court's recent decision in *Trump v. CASA, Inc.*, 606 U.S. ---, 2025 WL 1773631, *10–11 (June 27, 2025). *Imm. Def. Law Cntr.*, 2025 WL 2017247, at *15.

The Ninth Circuit's analysis regarding the permissible scope of relief under § 705 in *Immigrant Defenders Law Center. v. Noem* is relevant to the instant matter. First, the Ninth Circuit concluded that *Trump v. CASA, Inc.'s* holding about the permissible scope of equitable relief is "informative here because the factors used to determine whether to issue a § 705 stay […] are the same equitable factors" that govern preliminary injunctions. *Imm. Def. Law Cntr*, 2025 WL 2017247, at *14. Consequently, the court found that the Supreme Court's decision in *Trump v. CASA, Inc.* provided "useful guidance for crafting interim

equitable relief" in *Immigrant Defenders Law Center v. Noem*, and as such, "the question is not whether an injunction offers comp[l]ete relief to *everyone* potentially affected by an allegedly unlawful act; it is whether an injunction will offer complete relief *to the plaintiffs before the court*." *Id.* (emphasis in original). The Ninth Circuit concluded that limiting the district court's order instituting a nationwide stay of the 2025 reimplementation of Remain in Mexico pursuant to § 705 of the APA to the named defendant's "current and future clients is the more equitable approach[.]" 2025 WL 2017247, at *15. The decision thus strongly supports limiting any grant of relief to the named parties.

## V.    APA CLAIMS

1. **To both parties: Discuss whether *Loper-Bright*, 603 U.S. 369 (2024) *and progeny* affect the Court's analysis of Plaintiffs' APA claims?**

   a.    **If so, why and to what extent?** Please see Defendants' response below.

   b.    **If not, why not?**

*Loper Bright* has no bearing on this case. In *Loper Bright*, the Supreme Court overruled the *Chevron* doctrine, holding that, going forward, "courts need not and under the APA may not defer to an agency interpretation of the law simply because a statute is ambiguous." 144 S. Ct. at 2273. This case does not involve any claim to *Chevron* deference. Rather, Plaintiffs challenge the agency's factfinding, which the APA explicitly states must receive deferential review by courts. 5 U.S.C. § 706(2). Indeed, *Loper Bright* reiterated this principle in contrasting the standard courts apply in answering legal questions to the standard it applies in evaluating factual questions.

> And [] [the APA] prescribes no deferential standard for courts to employ in answering those legal questions. That omission is telling, because Section 706 *does* mandate that judicial review of agency policymaking and factfinding be deferential. See § 706(2)(A) (agency action to be set aside if "arbitrary, capricious, [or] an abuse of discretion"); § 706(2)(E) (agency factfinding in formal proceedings to be set aside if "unsupported by substantial evidence").")

1    *Loper Bright*, 144 S. Ct. at 2261. Thus, *Loper Bright* made pellucid that the APA standard of review

2    remains "highly deferential." *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 378 (1989); see also *Fed.*

3    *Commc'ns Comm'n v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021) ("Judicial review under that

4    standard is deferential, and a court may not substitute its own policy judgment for that of the agency.").

5    Further, where the agency has relied on "relevant evidence [such that] a reasonable mind might accept as

6    adequate to support a conclusion," its decision is supported by "substantial evidence." *Bear Lake Watch,*

7    *Inc. v. FERC*, 324 F.3d 1071, 1076 (9th Cir.2003). Even "[i]f the evidence is susceptible of more than one

8    rational interpretation, [the court] must uphold [the agency's] findings." *Id*.

9    **2. To both Parties: Secretary Noem has terminated the TPS designations for Venezuela,**

10    **Haiti, Honduras, Nicaragua, Nepal, Afghanistan and Cameroon between February 5,**

11    **2025, to July 8, 2025, a span of 6 months.** *See* **90 Fed. Reg. 9040; 90 Fed. Reg. 28,760; 90**

12    **Fed. Reg. 30,089; 90 Fed. Reg. 30,086; 90 Fed. Reg. 24,15; 90 Fed. Reg. 20,309; 90 Fed.**

13    **Reg. 23,697.**

14    **a. Should all of these terminations factor into the Court's analysis of whether the**

15    **termination decisions were preordained in violation of APA, why or why not?**

16    Congress has made plain that this Court should not review individual TPS determinations. If this

17    Court nonetheless reviews them, each decision is reviewed separately, based on the administrative record

18    for each separate decision.

19    The Secretary did indeed acknowledge considering, among other things, the Administration's

20    immigration policy prerogatives – that is not the same as pretextual decision making. "It is hardly improper

21    for an agency head to come into office with policy preferences and ideas, discuss them with affected

22    parties, sound out other agencies for support, and work with staff attorneys to substantiate the legal basis

23    for a preferred policy." *Dep't of Commerce v. New York*, 588 U.S. 752, 783 (2019). As the Supreme Court

24

has explained, "a court may not set aside an agency's policymaking decision solely because it may have been influenced by political considerations or prompted by an Administration's priorities…. Such decisions are routinely informed by unstated considerations of politics, the legislative process, public relations, interest groups, foreign relations, and national security concerns (among others)." *Id.* at 782; *see Ramos v. Wolf*, 975 F.3d 872, 897-98 (9th Cir. 2020), *vacated*, 59 F.4th 1010, 1011 (9th Cir. 2023) ("It is expected—perhaps even critical to the functioning of government—for executive officials to conform their decisions to the administration's policies."). Furthermore, "[b]ecause decisions in these matters may implicate "relations with foreign powers," or involve "classifications defined in the light of changing political and economic circumstances," such judgments "are frequently of a character more appropriate to either the Legislature or the Executive." *Hawaii,* 585 U.S. at 702, citing *Mathews* v. *Diaz*, 426 U. S. 67, 81, 96 S. Ct. 1883, 48 L. Ed. 2d 478 (1976).

Finally, although no decision regarding other countries TPS designation is relevant to the designations at issue here, to the extent this question contemplates otherwise, it is worth noting that Secretary Noem did not terminate TPS designation for South Sudan when it was set to expire on May 3, 2025. *Extension of South Sudan Designation for Temporary Protected Status*, 90 Fed. Reg. At 19,217. Instead, the TPS designation for South Sudan was allowed to auto-extend for 6 months until November 3, 2025. *Id.*

    **3.**  **To Defendants: Did the Secretary find that the country conditions for all seven of these countries (Venezuela, Haiti, Honduras, Nicaragua, Nepal, Afghanistan, and Cameroon) simultaneously improved between the last extension and current termination?**

Defendants' position is that 8 U.S.C. § 1254a(b)(5)(A) renders the Secretary's TPS termination determinations unreviewable. Because this Court lacks jurisdiction to grant Plaintiffs the relief they seek, it need not reach this question. However, each decision is based upon its own record and is evaluated

based upon that record. The Secretary has full authority to make an assessment of current conditions in each of these countries, and that does not imply that they changed "simultaneously," only that as of this year, the TPS standards are not met for any of these countries. Accordingly, Secretary Noem found, based on her review of the country conditions that the country conditions for each TPS designation no longer continued to be met. *See e.g.* ECF Nos. 62, 63, 64.[7]

4.  **To both Parties:** **What process did the Secretary use to determine Honduras, Nepal, and Nicaragua no longer meet any of these statutory criteria that originally justified their designations? How was this process different from prior administrations?**

The Secretary analyzed the country conditions and statutory requirements, as well as consulted with the appropriate government agencies, such as the U.S. Department of State, for each decision. This process is no different than what prior Secretaries have done.

5.  **To both Parties:** **How does the Secretary's TPS terminations and 60-day transition period align or conflict with the statutory purpose of TPS?**

The Secretary's 60-day transition period is fully consistent with the TPS statute. Congress reflected its view that a 60-day transitional period fits within the statutory purpose of TPS by legislating that such a wind down period is permissible. 8 U.S.C. § 1254a(b)(3)(B) (termination "shall not be effective earlier than 60 days after the date the notice is published or, if later, the expiration of the most recent previous extension").

6.  **To both Parties:** **The Nepal termination states that "there is no longer an environmental disaster or other situation causing substantial, but temporary, disruption of living**

---

[7] *See also Termination of the October 3, 2023 Designation of Venezuela for [TPS]*, 90 Fed. Reg. 9,040, 9,042 (Feb. 5, 2025). *Termination of Designation of Haiti for [TPS]*, 90 Fed. Reg. 28760, 28,763 (July 1, 2025]; *Termination of the Designation of Afghanistan for [TPS]*, 90 Fed. Reg. 20,309, 20,309 (May 13, 2025); *Termination of the Designation of Cameroon for [TPS]*, 90 Fed Reg. 23697 (June 4, 2025).

conditions and that Nepal can adequately handle the return of its nationals, and considering other relevant factors, the Secretary has determined that a 60-day transition period is sufficient and in accord with Executive Order 14159." 90 Fed. Reg. 24153. The Secretary "recognize[d] that certain previous TPS terminations allowed for an extended transition" and that "certain other TPS designations were terminated without allowing for an extended transition period." *Id*. at n. 24.

  a.    Explain whether this termination notice is sufficient or insufficient under the change-in-position doctrine? *See FDA v. Wages and White Lions*, LLC, 145 S. Ct. 898, 918 (2025).

Defendants' position is that 8 U.S.C. § 1254a(b)(5)(A) renders the Secretary's TPS termination determinations unreviewable and because this Court lacks jurisdiction to grant Plaintiffs the relief they seek, it need not reach this question. Regardless, the Nepal termination notice is sufficient under the change-in-position doctrine. The change-in-position doctrine asks two questions: (1) whether an agency changed existing policy; and (2) whether the agency displayed awareness of the change and offered "good reasons" for the new policy. *FDA v. Wages and White Lion Invs., L.L.C.*, 145 S. Ct. 898, 901 (2025).

To the extent the policy change being considered is the Secretary's decision to terminate TPS, this decision is not a "change-in-position" but rather the Secretary conducting the statutorily required review to determine if the conditions still exist. The TPS statute requires the Secretary to review all designations at least 60 days prior to termination. 8 U.S.C. § 1254a(3)(A). This "periodic review" is required to determine "whether the conditions for such designation under this subsection continue to be met." The Secretary has not changed existing policy where she completes the statutorily-required task, as Secretaries have done time and time again.

To the extent the policy change being considered is the Secretary's decision to establish a 60-day

1    period for orderly transition, Secretary Noem did not depart from existing policy. 8 U.S.C. §

2    1254a(b)(3)(B) states that termination "shall not be effective earlier than 60 days after the date the notice

3    is published or, if later, the expiration of the most recent previous extension." Thus, the 60-day transition

4    designated for Nepal's TPS termination comports with existing statutory requirements. *See* 8 U.S.C. §

5    1254a(b)(3)(B). The Secretary also acknowledged that even though "certain previous TPS terminations

6    allowed for an extended transition," other TPS designations have been terminated without allowing for an

7    extended transition period (citing the termination of TPS for Angola in 2003 and the termination of TPS

8    for Lebanon in 1993). 90 Fed. Reg. 24,153. The transition period the Secretary determined was appropriate

9    here is consistent with the period Congress deemed sufficient to provide TPS recipients with notice that

10   their designations would end, 8 U.S.C. § 1254a(b)(3)(B) and with past practice.

11          Even if the 60-day transition period could be deemed a change in policy, Secretary Noem offered

12   "good reasons" for her decision in this regard. Nepal was first granted TPS for an 18-month period

13   beginning on June 24, 2015, based on: (1) "substantial, but temporary, disruption of living conditions"

14   resulting from an earthquake, 8 U.S.C. § 1254a(b)(1)(B)(i); and (2) Nepal's inability to "handle adequately

15   the return of aliens who are nationals of Nepal," 8 U.S.C. § 1254a(b)(1)(B)(ii). *Designation of Nepal for

16   [TPS]*, 80 Fed. Reg. 36,346 (June 24, 2015). TPS was extended for an additional 18 months on October

17   26, 2016. *Extension of the Designation of Nepal for [TPS]*, 81 Fed. Reg. 74,470 (Oct. 26, 2016). Although

18   DHS announced the termination of TPS for Nepal in 2018, litigation resulted in the continued extension

19   of TPS documentation for TPS recipients from Nepal for several years. *See Nepal Termination*, 90 Fed.

20   Reg. at 24,152. When former DHS Secretary Mayorkas rescinded the 2018 termination and extended

21   Nepal's TPS from December 25, 2023, through June 24, 2025, *Reconsideration and Rescission of

22   Termination of the Designation of Nepal for [TPS]; Extension of the [TPS] Designation for Nepal*, 88

23   Fed. Reg. 40,317, 40,317 (June 21, 2023), he noted that shockwaves from the earthquake had ended

24

around 2017. *Id*. He also acknowledged that some progress had been made toward rebuilding infrastructure damaged in the earthquake, but that subsequent, unrelated environmental issues such as landsides and political unrest had since hindered rebuilding efforts and continued to displace many earthquake survivors. *Id*. In this vein, Secretary Mayorkas determined that TPS for Nepal should be extended for the same reasons it was granted in the first place—i.e., pursuant to 8 U.S.C. § 1254a(b)(1)(B)(i) and (ii). By contrast, Secretary Noem has determined that "there is no longer an environmental disaster or other situation causing substantial, but temporary, disruption of living conditions and that Nepal can adequately handle the return of its nationals." 90 Fed. Reg. 24,153. This, coupled with the Administration's immigration policy prerogatives outlined in Executive Order 14,159, were cited by Secretary Noem in support of her finding that a 60-day transition period for Nepal's TPS termination is sufficient. *Id*.

> **b.    If so, why and to what extent?** Please see above.

## VI.    FIFTH AMENDMENT

> **1.    <u>To Defendants</u>: TPS holders are currently in the country.**

> **a.    Please explain how TPS concerns matters of entry and national security pursuant to *Trump v. Hawaii*, 585 U.S. 585 U.S. 667 (2018). *See* ECF 45 at 16. In answering this question, please provide citations to binding and persuasive caselaw.**

The Supreme Court's holding and review standard in *Trump v. Hawaii*, 585 U.S. 667 (2018) applies fully to this case. That deferential standard is based on the Supreme Court's case in *Mathews v. Diaz*, where rational basis review was applied to "categories of aliens who have been admitted in order to make a humane response to a national catastrophe" and the Court made plain that this "dictate[d] a narrow standard of review." 426 U.S. 67, 83 (1976). The Supreme Court in *Hawaii* applied the *Mathews* test in the national security context regarding the entry of aliens, but *Mathews* makes plain that this standard

applies to the treatment of aliens within the United States. *Hawaii* thus cited *Mathews* for the point that "[b]ecause decisions in these matters may implicate 'relations with foreign powers,' or involve 'classifications… defined in the light of changing political and economic circumstances,' such judgments 'are frequently of a character more appropriate to either the Legislature or the Executive' . . . and our inquiry into the matters of entry and national security is highly constrained." 585 U.S. at 703-04 (quoting *Mathews v. Diaz*, 426 U.S. 67, 81-82 (1976); *see id*. at 704 (citing *Mathews* to explain that "the upshot of [its] cases in this context is clear: 'Any rule of constitutional law that would inhibit the flexibility' of the President 'to respond to changing world conditions should be adopted only with the greatest caution'").

Secretary Noem's termination determinations appropriately align with administration immigration policies related to Government objectives of border security and foreign policy. In enacting the TPS statute, Congress provided for the availability of a temporary status to aliens who cannot safely return to their home countries because of, *inter alia*, the impact of natural disasters or extraordinary and temporary conditions in those countries. Secretary Noem's termination decisions are "plausibly related" to the Government's border security, foreign relations interests, and the objectives of the TPS program. *Hawaii*, 585 U.S. at 704-05; *see also United States R.R. Retirement Bd. v. Fritz*, 449 U.S. 166, 179 (1980). TPS decisions involve unique country-specific determinations that both "implicate relations with foreign powers" and "involve classifications defined in the light of changing political and economic circumstances," *Hawaii*, 585 U.S. at 703, precisely the situation in which the Supreme Court has repeatedly applied rational-basis review. *See id*; *Fiallo v. Bell*, 430 U.S. 787, 799 (1977). Secretary Noem determined that the conditions that prompted the TPS designation of Nepal, Honduras, and Nicaragua were no longer present. *Honduras Termination*, 90 Fed. Reg. at 30,091; *Nicaragua Termination*, 90 Fed. Reg. at 30,088; *Nepal Termination*, 90 Fed. Reg. at 24,152-53.

Decisions regarding the "relationship between the United States and our alien visitors has been

committed to the political branches of the Federal Government. Since decision in these matters may implicate our relations with foreign powers, and since a wide variety of classifications must be defined in light of changing political and economic circumstances, such decisions are frequently of a character more appropriate to either the Legislature or the Executive than to the Judiciary." *Mathews*, 426 U.S. at 81-82 (noting that the Cuban parolee plaintiffs had been admitted in order to make a "humane response to a natural catastrophe or international political situation" and that the "reasons that preclude review of political questions also dictate a narrow standard of review of decisions made by the Congress or the President in the area of immigration and naturalization"). The Supreme Court in *Hawaii* did not limit the applicability of this narrow standard of review to cases involving issues of national security. Rather, it made clear that rational basis review is appropriate in "admission and immigration cases" even when they do not necessarily "overlap with 'the area of national security.'" 585 U.S. at 704 (quoting *Kerry v. Din*, 576 U.S. 86, 104 (2015)). The Court recognized, however, that this narrow standard of review "has particular force" when there is overlap, due to concerns for the separation of powers and courts' "lack of competence" on questions of national security. *Id.*

APA cases are decided on the record of the particular case. 5 U.S.C. § 706(2) (providing that the reviewing court is to evaluate agency action by "review[ing] the whole record or those partis of it cited by a party"). While § 1254a(b)(5)(A) eliminates this Court's jurisdiction to review any APA claim regarding TPS terminations, individual determinations may or may not "overlap with the area of national security." Regardless, cases such as *Hawaii*, *Mathews*, and *Fiallo* support applying a rational-basis review in the specific context of these TPS determinations. *See Hawaii*, 585 U.S. at 703 (nothing that rational-basis review will apply "across different contexts and constitutional claims").

> **b.      Please explain why TPS holders are a security concern when Plaintiffs have been in the country for a significant amount of time.** *See* **ECF 17-2 ¶¶ 4–5; ECF 17-3**

¶ 2; ECF 17-4 ¶ 3; ECF 17-5 ¶ 3; ECF 17-6 ¶ 2; ECF 17-7 ¶ 2; ECF 17-8 ¶ 2; ECF 17-9 ¶ 2; ECF 17-10 ¶ 2; ECF 17-11 ¶ 2; ECF 17-12 ¶¶ 2, 6.

Secretary Noem terminated TPS for Nepal, Honduras, and Nicaragua based upon a finding that the conditions that prompted the TPS designation of Nepal, Honduras, and Nicaragua were no longer present. *Honduras Termination*, 90 Fed. Reg. at 30,091; *Nicaragua Termination*, 90 Fed. Reg. at 30,088; *Nepal Termination*, 90 Fed. Reg. at 24,152-53. Secretary Noem's determinations are fully consistent with Congress's goal of providing TPS to eligible aliens until the Secretary determines that the conditions for the country's TPS designation no longer prevent the nationals of the designated country from returning. The three designations at issue in this case were predicated on natural disasters that occurred in 1999 (for Honduras and Nicaragua) and 2015 (for Nepal). Secretary Noem determined that since then, these countries have recovered to the extent that it is no longer impossible for aliens now present within the United States to safely return to their countries of national origin.

Indeed, not all TPS beneficiaries are security concerns. However, aliens can be a security concern and be present in the United States. The last four years saw a dramatic influx in the number of aliens entering the country. With the significant increase in those entering, agencies have been strained in their vetting processes. For example, in her July 1, 2025, Termination of the Designation of Haiti for Temporary Protected Status, Secretary Noem referenced Proclamation 10888 "Guaranteeing the states Protection Against Invasion," in which President Trump emphasized that "in a high-volume boarder environment – particularly when the system is overwhelmed – this screening process can become ineffective. Limited access to critical information and significant processing delays hinder the ability of federal officials to reliably assess the criminal histories or national security threats posed by aliens attempting to enter the U.S. illegally. As a result, public safety and national security risks are significantly heightened in such conditions." *Termination of the Designation of Haiti for Temporary Protected Status,* 90 Fed. Reg. 28760,

28762-63 (July 1, 2025).

      **2.** <u>**To both parties**</u>**: The Court must consider whether the political climate leading to the TPS terminations supports a finding of animus.** ***Mi Familia Vota v. Fontes***, **129 F.4th 691, 728 (9th Cir. 2025).**

            **a.**       **Please explain how the political climate may or may not support a finding of animus**.

      In *Mi Familia Vota v. Fontes*, 129 F.4th 691, 728 (9th Cir. 2025), the Ninth Circuit reviewed whether an Arizona state statute complied with the Voting Rights Act and the Equal Protection Clause of the 14th Amendment. 129 F.4th 691, 728 (2025). In doing so, the court stated that under the standard articulated in *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 439 U.S. 252 (1977), it was appropriate to consider the political climate when determining whether the totality of the circumstances supports an inference of discriminatory intent. However, the issues present in *Mi Familia* are wholly distinct from those regarding TPS determinations. Critically, the court in *Mi Familia* did not have to square with the Supreme Court's holding in *Hawaii* or the deferential standard of constitutional review that applies in immigration matters.

      In *Mi Familia*, the plaintiffs challenged two Arizona laws regulating voter registration. In evaluating whether the laws were enacted with discriminatory intent, the court turned to the non-exhaustive list of factors laid out in *Arlington Heights*: "(1) historical background, (2) the relevant legislative history, (3) the sequence of events leading up to the enactment, including departures from the normal legislative process, and (4) whether the law has a disparate impact on a specific racial group." 129 F.4th at 724 (citing 429 U.S. at 266-68). When considering "totality of circumstances" under the *Arlington Heights* test, the court in *Mi Familia* looked to the "political climate" in Arizona leading to the enactment of the voting laws.

1    *Hawaii* forbids the same approach here. In *Hawaii*, the Supreme Court considered a series of

2    statements by the President and his advisers "casting doubt on the official objective of the [at issue]

3    Proclamation." *Hawaii*, 585 U.S. at 699-700. The Supreme Court found that, unlike the conventional

4    Establishment Clause claim, *Hawaii* involved a national security directive regulating the entry of aliens

5    abroad. *Id.* at 702; *see also Harisiades v. Shaughnessy*, 342 U.S. 580, 588–589 (1952) ("[A]ny policy

6    toward aliens is vitally and intricately interwoven with contemporaneous policies in regard to the conduct

7    of foreign relations [and] the war power"). Therefore, the Court had to consider not only the statements

8    of the President, but also the authority of the Presidency itself. *Hawaii*, 585 U.S. at 702.

9        In its analysis, as discussed above, the Court noted that for more than a century, it has "recognized

10    that the admission and exclusion of foreign nationals is a 'fundamental sovereign attribute exercised by

11    the Government's political departments largely immune from judicial control.'" *Id.* (quoting *Fiallo v. Bell*,

12    430 U.S. 787, at 792). As such, the Court limited its review to whether the Executive gave a "facially

13    legitimate and bona fide" reason for its action. *Id.* at 703. On that basis, and despite these statements, the

14    Court affirmed the President's authority to issue the proclamation recognizing the Proclamation was

15    expressly premised on legitimate purposes and that it could not be said that it was impossible to "discern

16    a relationship to legitimate state interests" or that the policy was "inexplicable by anything but anything

17    but animus." *Id.* at 706.

18        Because the determinations at issue here involve the continued designation of foreign nations, the

19    consideration of the ambiguously defined "political climate" in this context merely buttresses the Supreme

20    Court's conclusion that such determinations are best left to the political branches. *See id.* at 702. If

21    "extrinsic statements" *by the President* are generally out of bounds, *id.*, the same must be true in spades

22    for the "political climate" writ large.

23

24

VII.    **IRREPARABLE HARM**

1. **To Defendants**: **Several TPS holders are currently in the process of getting permanent relief.** *See* **ECF 17-7; 17-13.**

    a.    **How long is the process for permanent relief?**

Historical average processing times for applications filed between FY-2020 and May 31, 2025, may be found here: https://egov.uscis.gov/processing-times/historic-pt (last visited July 27, 2025).

2. **To Defendants**: **How long are those subject to deportation detained?**

    a.    **What is the minimum, average, and maximum amount of time in detention before deportation?**

Detention in pending immigration proceedings is governed by the statutory standards set forth in 8 U.S.C. §§ 1225 and 1226. The length of those proceedings will depend on many factors, and the immigration courts prioritize proceedings where the individual is detained. The termination of TPS for a country does not automatically make an alien removable, or subject to detention. TPS merely prevents the removal of a TPS beneficiary. If a former TPS beneficiary is placed in removal proceeds, the alien will need to demonstrate their eligibility to remain in the United States on another basis – for example, a claim for asylum – should they choose to not return to their country of national origin.

Once subject to a final removal order, an alien may be detained for as little as one day to effectuate removal and may be detained in excess of 180 days for the purpose of removal where there is a significant likelihood of removal in the reasonably foreseeable future. *See* 8 U.S.C. § 1231(a)(2); *Zadvydas v. Davis*, 533 U.S. 678 (2001).

Dated: July 28, 2025

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General

YAAKOV M. ROTH
Principal Deputy Assistant Attorney General
Civil Division

WILLIAM H. WEILAND
Senior Litigation Counsel

ERIC SNYDERMAN
ANNA DICHTER
LAUREN BRYANT
CATHERINE ROSS
JEFFREY M. HARTMAN
C. FRED SHEFFIELD
AMANDA SAYLOR
DANIEL CAPPELLETTI
SHELBY WADE
Trial Attorneys

*/s/ Daniel M. Cappelletti*
DANIEL M. CAPPELLETTI (DC 1672879)
Trial Attorney
U.S. Department of Justice, Civil Division
Office of Immigration Litigation
General Litigation and Appeals Section
P.O. Box 868, Ben Franklin Station
Washington, DC 20044
Tel: (202) 353-2999
daniel.cappelletti@usdoj.gov

*Attorneys for the Defendants*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

## **CERTIFICATE OF SERVICE**

I hereby certify that on July 28, 2025, I caused the foregoing to be electronically filed with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to all counsel of record.

/s/ Daniel M. Cappelletti
Daniel M. Cappelletti
