Ahilan T. Arulanantham (SBN 237841)
arulanantham@law.ucla.edu
CENTER FOR IMMIGRATION LAW AND
POLICY, UCLA SCHOOL OF LAW
385 Charles E. Young Dr. East
Los Angeles, CA 90095
Telephone: (310) 825-1029

Emilou MacLean (SBN 319071)
emaclean@aclunc.org
Michelle (Minju) Y. Cho (SBN 321939)
mcho@aclunc.org
Amanda Young (SBN 359753)
ayoung@aclunc.org
ACLU FOUNDATION
OF NORTHERN CALIFORNIA
39 Drumm Street
San Francisco, CA 94111-4805
Telephone: (415) 621-2493
Facsimile: (415) 863-7832

Attorneys for Plaintiffs
*[Additional Counsel Listed on Next Page]*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| NATIONAL TPS ALLIANCE, et al., | Case No. 3:25-cv-05687-TLT |
| Plaintiffs, | |
| vs. | **PLAINTIFFS' RESPONSE TO (DKT. 60) QUESTIONS FOR JULY 29, 2025, HEARING RE: PLAINTIFFS' MOTION TO POSTPONE (DKT. 17)** |
| KRISTI NOEM, in her official capacity as Secretary of Homeland Security, UNITED STATES DEPARTMENT OF HOMELAND SECURITY, and UNITED STATES OF AMERICA, | |
| Defendants. | |

Additional Counsel for Plaintiffs

Jessica Karp Bansal (SBN 277347)
jessica@ndlon.org
Lauren Michel Wilfong (*Pro Hac Vice*)
lwilfong@ndlon.org
NATIONAL DAY LABORER
ORGANIZING NETWORK
1030 S. Arroyo Parkway, Suite 106
Pasadena, CA 91105
Telephone: (626) 214-5689

Eva L. Bitran (SBN 302081)
ebitran@aclusocal.org
ACLU FOUNDATION
OF SOUTHERN CALIFORNIA
1313 West 8th Street
Los Angeles, CA 90017
Telephone: (213) 977-5236

Erik Crew (*Pro Hac Vice*)
ecrew@haitianbridge.org
HAITIAN BRIDGE ALLIANCE
4560 Alvarado Canyon Road, 1H
San Diego, CA 92120
Telephone: (949) 603-7411

**INTRODUCTION**

Plaintiffs provide here their responses to the Court's questions in advance of argument. ECF 60. Plaintiffs have not answered questions directed only to Defendants.

## I.    RESPONSE TO CONCESSIONS

1.    <u>To both Parties</u>:  Do the Parties agree that *Trump v. Casa, Inc.*, 145 S.Ct. 2540 (2025) was decided pursuant to the Supreme Court's emergency docket (i.e., the "shadow docket")?

    a.    Do the parties agree that the Supreme Court's shadow docket involve issues that do not involve the merits of the underlying case?

    b.    Do the parties concede that the Supreme Court's orders on the shadow docket matters are issued after limited briefing and no oral argument?

<u>Answer</u>:

*Trump v. Casa*, 145 S. Ct. 2540 (2025) was issued on the Supreme Court's emergency docket. Like other shadow docket cases, *Casa* concerned issues not involving the merits. The merits of *Casa* concern birthright citizenship, whereas the Court's opinion concerns the availability of so-called universal injunctive relief in non-APA cases. However, unlike most Supreme Court orders on the shadow docket, *Casa* involved full briefing (albeit on an expedited schedule) and oral argument. Most importantly, *Casa* provided extensive *reasoning* for its decision. It therefore has precedential value.

Where the Supreme Court has written brief explanations for its orders, it has stated that those orders are entitled to some precedential weight, albeit less. *See, e.g.*, *Trump v. Wilcox*, 605 U.S.---, 145 S. Ct. 1415 (2025)) (providing several pages of explanation, including citation to and analysis of two cases, and clarifying the breadth of its ruling); *Trump v. Boyle*, 605 U.S. ---, 2025 WL 2056889 (July 23, 2025) (explaining that *Wilcox* controls for purposes of stay application). However, it has also been clear that such opinions are *not* entitled to the full precedential weight. *See Wilcox*, *supra*; *see also Merrill v. Milligan*, 142 S. Ct. 879 (2022) (Kavanaugh, J., concurring) ("To reiterate: the Court's stay order is not a decision on the merits").

1    Most important for present purposes, the recent TPS-related shadow docket order on which

2   Defendants principally rely— *Noem v. NTPSA*, No. 24A1059, 2025 WL 1427560 (S. Ct. May 19,

3   2025)—has *no reasoning*, and therefore is not precedent. It is not entitled to any weight from this

4   Court. Unlike *Casa*, the two paragraph order in NTPSA was handed down after extremely expedited

5   briefing and no oral argument. And unlike Wilcox, it contains *no reasoning* whatsoever. Therefore,

6   neither this Court nor any other can apply it.

7    In keeping with that reality, in recent years the Court has affirmed rulings after staying them

8   on the emergency docket, *see Allen v. Milligan*, 143 S. Ct. 1487, 1502-03 (2023), and it has reversed

9   rulings it declined to stay. *E.g., United States v. Texas*, 143 S. Ct. 51 (2022) (denying stay of district

10   court order halting Secretary's enforcement priorities guidance); 599 U.S. 670 (2023) (reversing that

11   same order).

12    Two further points concerning *Casa* warrant mention here. *First*, while *Casa* did limit the

13   availability of universal injunctions, it explicitly did not apply its rule to APA cases like this one.

14   *Casa*, 145 S. Ct. at 2554 n.10. As a result, after *Casa*, courts in APA cases have continued to strike

15   down agency action in general, rather than just as to the parties. *See, e.g., Refugee & Immigrant Ctr.*

16   *for Educ. & Legal Servs. v. Noem*, No. 25-306, 2025 WL 1825431, at *50-*51 (D.D.C. July 2, 2025)

17   (vacating new asylum policy universally after *Casa*); *Drs. for Am. v. Off. of Pers. Mgmt.*, No. 25-

18   322, 2025 WL 1836009, at *22 n.17 (D.D.C. July 3, 2025) ("as this is a case involving APA vacatur,

19   not a universal or national injunction, the Supreme Court's recent decision in [*Casa*] does not

20   apply"); *Haitian Evangelical Clergy Ass'n v. Trump*, No. 25-CV-1464 (BMC), 2025 WL 1808743, at

21   *6 (E.D.N.Y. July 1, 2025) (vacating partial vacatur of Haiti's TPS designation after *Casa* and

22   distinguishing *Casa* because case raised APA claims).

23    *Second*, even if *Casa* did apply here, the Ninth Circuit has since made clear that *Casa* did not

24   eliminate all universal injunctions; it just reinstituted a universal injunction against the birthright

25   citizenship Executive Order. *Washington v. Trump*, No. 25-807, 2025 WL 2061447, at *1 (9th Cir.

26   July 23, 2025).

27   **II.    RESPONSE TO STANDARD FOR MOTION TO POSTPONE**

28    1.    <u>To both Parties</u>:  How, if any, does the standard for a motion to postpone pursuant to

2

5 U.S.C. § 705 differ from the standard for a preliminary injunction?

    a.    Which "of the two variants" of the *Winter* standards should the Court apply when deciding Plaintiffs' instant motion? *See Alliance for the Wild Rockies v. Pena*, 865 F.3d 1211, 1217 (9th Cir. 2017); *cf. Starbucks Corp. v. McKinney*, 602 U.S. 339 (2024).

Answer:

In general, judges of this Court have stated the standard for granting a motion to postpone under Section 705 is the same as for granting a preliminary injunction. *See, e.g.*, *Immigrant Legal Res. Ctr. v. Wolf*, 491 F. Supp. 3d 520, 528–29 (N.D. Cal. 2020) (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). Plaintiffs can prevail under *either* of the two variants of *Winter*. As *Peña* held, "[a] party seeking a preliminary injunction must meet *one of two* variants of the same standard." 865 F.3d at 1217. Here, Plaintiffs have established both a likelihood of success on the merits and the balance of hardships in their favor, and mere "serious questions" on the merits coupled with a balance of hardships tips strongly in their favor. In particular, if Defendants were permitted to terminate Plaintiffs' TPS status while this case is pending, Plaintiffs would suffer catastrophic harms—including mass loss of employment and healthcare, with thousands of TPS holders also subject to detention, deportation, and attendant family separation. If this Court ultimately concludes that the termination orders are illegal, much of that harm would be impossible to repair. *See* Dkt. 17 at 22–24.

## III.    RESPONSE TO JURISDICTION

    1.    To both Parties:  What is the statutory purpose of TPS? In answering this question, please provide citations to appropriate sources of legislative history.

Answer:

The statutory purpose of TPS is to ensure that decisions about nationality-based humanitarian relief are based on "identifiable conditions" rather than "the vagaries of our domestic politics." 101 Cong. Rec. H25811, 25838 (daily ed. Oct. 25, 1989) (statement of Rep. Sander Levine) (debating Central American Studies and Temporary Relief Act of 1989, immediate precursor to the TPS statute). The TPS statute was enacted in 1990 to replace the "ad hoc, haphazard ... procedures" that

3

governed Extended Voluntary Departure, the precursor to TPS. *Id.* at 25837 (statement of Rep. Richardson). Congress specifically intended TPS to provide beneficiaries with certainty about "what [their] rights are, how the [government] determines what countries merit [protective] status [and] how long they will be able to stay." *Id.*

The legislative history of the TPS statute is described at greater length in an amicus brief recently submitted at the Supreme Court by immigration law scholars in support of Plaintiffs in *Noem v. NTPSA*, *supra*, *available at* https://www.supremecourt.gov/docket/docketfiles/html/public/24a1059.html.

   2.   <u>To Plaintiffs</u>:  What, if any, collateral decisions underlie the Secretary's determination to terminate TPS?

<u>Answer</u>:

Any given TPS termination involves numerous collateral decisions. For example, the Secretary must make a legal conclusion that the statute authorizes a new TPS decision (whether extension or termination) at this time, *see* 8 U.S.C. § 1254a(b)(1); must direct her subordinates to engage in a country conditions review as the statute requires, 8 U.S.C. § 1254a(b)(3); must decide to follow statutorily-mandated consultation requirements, *id.*, and so forth. These are not themselves "determinations" under the statute, but instead collateral practices that precede the actual determination.

In this case, the Secretary made the collateral decision *to end TPS* for virtually every country that has it, apparently because she has interpreted the President's Executive Order on "Invasion" to require that result. *See* 90 Fed. Reg. 24151–54 (Jun. 6, 2025) (citing the Invasion E.O. in Nepal termination notice); 90 Fed. Reg. 30089–92 (Jul. 8, 2025)  (same for Honduras); 90 Fed. Reg. 30086–89 (Jul. 8, 2025) (same for Nicaragua). Her interpretation was also informed by the fact that President Trump promised to "revoke" TPS if elected.[1] *See also* Dkt. 18-19 (Vice President Vance making same promise).

---

[1] Damita Menezes & Ali Bradley, Trump on Springfield Haitian Migrants: 'They Have to Be Removed,' NEWSNATION (Oct. 2, 2024) at approx. 12:00, available at https://www.newsnationnow.com/politics/2024-election/trump-springfield-haitian-migrants-removed/; Maggie Astor, Trump Says He Would Try Again to Revoke Haitian Immigrants'

4

1    Relatedly, DHS has chosen not to engage in meaningful country conditions review at all, and

2    instead simply to ignore those country conditions that contradict the pre-determined decision to end

3    TPS. *See* Dkt. 17 at 7−13 (describing how Secretary Noem ignored country conditions or failed to

4    address entire categories of conditions when terminating TPS for Venezuela, Haiti, Afghanistan,

5    Cameroon, Nepal, Honduras, and Nicaragua).

6          3.    <u>To Plaintiffs</u>:  Please explain whether the Supreme Court's interpretation of "any

7                  judgment" in *Patel v. Garland*, 596 U.S. 328 (2022) is binding on the Court's

8                  jurisdiction. In answering this question, please provide citations to binding and

9                  persuasive caselaw.

10    <u>Answer</u>:

11    *Patel* does not control the outcome of the jurisdictional analysis as to any of the claims in this

12    case for two reasons, and does not control as to Plaintiffs' second APA claim and their constitutional

13    claim for still further reasons.

14    First, *Patel* does not support Defendants' position here because it barred review of factual

15    claims, not legal ones. *Compare Wilkinson v. Garland*, 601 U.S. 209, 221 (2024) (construing the

16    same statute at issue in *Patel* as not barring review of legal claims). Even before *Loper-Bright*,

17    federal courts had been particularly disinclined to give agencies unreviewable authority to decide

18    legal claims. *See infra* Section V (discussing *Loper-Bright* and related cases). Here, Defendants

19    argue this Court has no jurisdiction to review Plaintiffs' *legal* claims under the APA and the

20    Constitution.

21    *Second*, *Patel* does not undermine jurisdiction as to any of Plaintiffs' claims because the

22    statute in *Patel* referred to any "judgment," whereas the statute at issue here refers to any

23    "determination." 8 U.S.C. § 1254a(b)(5)(B). This matters because the Supreme Court and Ninth

24    Circuit have treated the word "determination" in immigration jurisdictional statutes as a term of art

25    with a narrow meaning. *See McNary v. Haitian Refugee Ctr., Inc.*, 498 U.S. 479, 492 (1991) (bar on

26    review of "determinations" did not cover collateral challenges); *Immigrant Assistance Project of*

27    _____

28    Protections, N.Y. TIMES (Oct. 3, 2024), https://www.nytimes.com/2024/10/03/us/politics/trump-haitian-immigrants-legal-status.html (President Trump promising to "revoke" TPS).

1   *AFL-CIO v. INS*, 306 F.3d 842, 862-63 (9th Cir. 2002) ("*IAP*") (same). Congress legislated against

2   the backdrop of these rulings when it wrote the jurisdictional statute at issue in *Patel*, along with

3   other broader jurisdictional provisions in the immigration code that were enacted after the TPS

4   statute at issue here. *See, e.g.*, 8 U.S.C. § 1252(a)(2)(B) ("any judgment … or any other decision or

5   action"); § 1252(b)(9) (channeling review of "all questions of law or fact"). But it left the TPS

6   statute—Section 1254a(b)(5)(A)—untouched. Thus, under these controlling cases, "determination"

7   in the TPS statute does not refer to collateral procedural or legal decisions, or to "judgments" that

8   underlie any given termination decision, but instead only to the "determination" that a country is or

9   is not safe to accept back its nationals.

10      That conclusion is confirmed by the fact that *this* statute, unlike the statute in *Patel*, uses the

11  words "determine" and "determination" throughout subsection (b), and in each case clearly refers to

12  the Secretary's assessment of country conditions in deciding whether to designate, terminate, or

13  extend TPS. See 8 U.S.C. § 1254a(b)(3)(A) (during periodic review process, Secretary must

14  "*determine* whether the conditions for … designation … continue to be met" and publish "*such

15  determination* (including the basis for *the determination*, and, in the case of *an affirmative

16  determination*, the period of extension of designation ….") (emphases added). *See also* 8 U.S.C.

17  § 1254a(b)(3)(B) (referring to "*the determination*" that a country no longer meets conditions for

18  designation); 8 U.S.C. § 1254a(b)(3)(C) (mandating extension if Secretary "does not *determine*" that

19  country no longer meets conditions for designation). *See also* 8 U.S.C. § 1254a(d)(3) (referring to

20  "the *determination*" that country conditions require termination).

21      *Patel*, in contrast, construed a statute limiting review of any "judgment," a term which has no

22  comparable body of caselaw interpreting it narrowly and which the statute does not use in the narrow

23  way that the TPS statute uses "determination."

24      Finally, *Patel* is irrelevant to the Court's jurisdiction as to Plaintiffs' second APA claim for

25  the additional reason that that claim challenges the Secretary's decision-making regarding the wind-

26  down period, and the statutory authority concerning the duration of the wind-down period is in

27  subsection (d). This matters because the jurisdiction-stripping provision on which Defendants rely

28  only bars review of claims as to subsection (b). *See* 8 U.S.C. § 1254(a)(B)(5) (stripping review of

6

1   some claims "under this subsection", which refers to subsection (b), not (d)). Similarly, *Patel* does

2   not apply to Plaintiffs' constitutional claim because Mr. Patel did not raise a constitutional claim,

3   and neither *Patel* nor any other Supreme Court case has ever found a jurisdiction-stripping statute

4   clear enough to bar review of constitutional claims.

5   **IV.    RESPONSE TO SCOPE OF RELIEF**

6       1.    <u>To both Parties</u>:  Plaintiffs seek to postpone the Secretary's TPS terminations for

7             Honduras, Nepal, and Nicaragua. Would limiting relief, if granted, to only the named

8             plaintiffs be practical?

9   <u>Answer</u>:

10      No, limiting relief to the named plaintiffs would not be practical for three reasons. *First*, the

11  "named plaintiffs" here include the lead plaintiff, the National TPS Alliance ("NTPSA"), which has

12  thousands of TPS holder members dispersed throughout the country.[2] Defendants have not explained

13  how they would timely verify membership status so as to afford relief—which includes protection

14  from detention and deportation—to only those individuals. For instance, for Defendants to ensure

15  relief to NTPSA members, all individual ICE officers engaged in enforcement actions would need to

16  confirm that a TPS holder is *not* a member of NTPSA prior to any detention or deportation. Any

17  mechanism that might be introduced to seek to do so would be burdensome, prone to error, and

18  likely to result in innumerable violations of the Court's order if the scope of relief were limited as

19  Defendants suggest. *Second*, "complete relief" in this context would also require employers to honor

20  Plaintiffs' TPS-related work authorization documents,[3] and state and local government officials

21  nationwide to honor TPS documents for purposes of driver's licenses, health insurance, and other

22  benefits.[4] It would not be practical to require all such entities to verify any given individual's

23  membership status, particularly because the NTPSA does not purport to issue secure identification

24  documents to its members and NTPSA members do not purport to carry any proof of membership

25  _____

26  [2] Dkt. 17-13 (Decl. of Jose Palma at ¶ 12).
    [3] Dkt. 17-13 ¶ 31; Dkt. 17-3 ¶¶ 8-11; Dkt. 17-2 ¶ ; Dkt. 17-12 ¶¶ 8, 11; Dkt. 17-7 ¶¶ 2, 4-5, 7; Dkt.
27  17-6 ¶¶ 2, 8-10; Dkt. 17-5 ¶¶ 5, 7; Dkt. 17-8 ¶ 13; Dkt. 17-10 ¶¶ 10-11; Dkt. 17-9 ¶ 11.
    [4] Dkt. 17- 4 ¶ 12; Dkt. 17-13 ¶ 31(e); Dkt. 17-19, ¶ 23; Dkt. 17-8 ¶ 14; Dkt. 17-10 ¶ 10; Dkt. 17-3 ¶
28  13

with them at all times. *Third*, the relief Plaintiffs seek is a "postponement" of the TPS terminations under Section 705 of the Administrative Procedure Act. As noted above, courts have not limited such relief only to the named parties. *See supra* Section I (citing, inter alia, *Refugee & Immigrant Ctr. for Educ. & Legal Servs.*, 2025 WL 1825431, at *50-*51. Plaintiffs are not aware of any case in which a formal agency action was postponed only as to the parties.

    2.   <u>To both Parties</u>:  5 U.S.C. § 706 requires the Court to "review the whole record" in determining whether an agency acted arbitrary, capricious, or otherwise not in accordance with the law.

        a.   Are there any other records that the Court must consider before ruling on Plaintiffs' motion to postpone?

<u>Answer</u>:

Unlike Section 706, 5 U.S.C. § 705 does not require the Court to review the administrative record before granting relief. It is explicitly designed to permit courts to "postpone" agency action to provide interim relief where "necessary to prevent irreparable injury." 5 U.S.C. § 705. At times, preventing irreparable injury requires issuing relief before the full administrative record may be produced or reviewed. *Cf. De Leon v. I.N.S.*, 115 F.3d 643, 644 (9th Cir. 1997) (providing for automatic stay of removal upon filing of motion for stay); Ninth Cir. Gen. Order 6.4(c) (describing process to seek stay of removal and explaining that removal is stayed immediately upon filing a motion for stay, while the administrative record is not filed until 35 days from filing the petition for review).

Nonetheless, Defendants have now produced the CAR to Plaintiffs pursuant to this Court's order, Dkt. 47. However, Defendants did not file the CAR  with the Court until today, following Plaintiffs' request that they do so. Dkts. 62-64. The CAR is not previously addressed in Plaintiffs' briefing in support of their Postponement Motion given that Defendants did not provide it until after briefing was complete. Nor have Defendants relied on any documents from the CAR to oppose Plaintiffs' motion for postponement, despite the fact that Defendants had sole control over the CAR while the motion was being briefed.

1    To the extent the Court wishes to consider it, the CAR provides additional support for

2  Plaintiffs' argument that Defendants' termination decisions were predetermined and not based on the

3  requisite country conditions analysis. For instance, the USCIS country conditions analysis for

4  Nicaragua, which typically provides the foundation for the periodic review of country conditions,

5  describes severe and worsening government repression in Nicaragua. Nicaragua AR 000021-000036

6  & 000044-000050 ("'The rule of law collapsed [in 2018]"; Nicaragua has "become 'a police state'

7  and the country's 'political, social and human rights crisis' continu[es] 'to deepen'" and "the human

8  rights situation in the country had 'dramatically worsened'"; and Nicaraguans "face[] persecution,

9  forced exile, and economic retaliation"). But the Federal Register notice terminating Nicaragua's

10  TPS status makes no mention of these facts, and instead focuses only on infrastructure, tourism,

11  technological innovation, and "macroeconomic fundamentals." 90 Fed. Reg. 30086. Similarly, the

12  USCIS country conditions analysis for Honduras describes staggering levels of violence in the

13  country, as well as corruption, human rights abuses, extortion, and a government-declared State of

14  Emergency. Honduras AR 000008-000022 & 000028-000036. None of these are even mentioned in

15  the Federal Register notice terminating Honduras' TPS designation, which focuses only on

16  environmental issues, reconstruction, infrastructure, and tourism. 90 Fed. Reg. 30089.

17    Finally, with respect to the Court's question about the consideration of other evidence. It is of

18  course appropriate for the Court to consider the extra-record evidence Plaintiffs submitted in support

19  of their postponement motion with respect to the balance of hardships and other equitable factors.

20  Even as to the merits, courts reviewing agency action are entitled to consider extra-record evidence

21  where (1) Plaintiffs have made "a showing of bad faith" or (2) "admission is necessary to determine

22  'whether the agency has considered all relevant factors and has explained its decision[.]'" *Lands*

23  *Council v. Powell*, 395 F.3d 1019, 1030 (9th Cir. 2005); *NTPSA v. Noem* ("*NTPSA I*"), Case No.

24  3:25-cv-01766-EMC, Dkt. 129 (May 2, 2025) (holding consideration of extra-record evidence

25  appropriate given evidence that challenged decisions were pretextual or made in bad faith). The

26  Supreme Court has also confirmed that a district court appropriately considered extra-record

27  evidence where an agency's explanation for its action was pretextual. It found that the extra-record

28  evidence showed that the agency's explanations were "incongruent with what the record reveals

9

1    about the agency's priorities and decisionmaking process." *See Dep't of Commerce v. New York*, 588

2    U.S. 752, 781, 783-85 (2019). The same is true here.

3        3.    <u>To both Parties</u>:  Please address how, if at all, *Immigrant Defenders Law Center v.*

4            *Noem*, No. 25-2581, 2025 WL 2017247 (9th Cir. July 18, 2025) applies to this case.

5    <u>Answer</u>:

6        *ImmDef* is relevant to this case in three respects. *First*, it holds that the jurisdictional

7    limitation set forth at 8 U.S.C. § 1252(f)(1) does not bar relief under the Administrative Procedure

8    Act, thus foreclosing one of Defendants' jurisdictional objections in this case. *Compare Immigrant*

9    *Defs. L. Ctr. v. Noem*, No. 25-2581, 2025 WL 2017247, at *9-*10 (9th Cir. July 18, 2025); *with* Dkt.

10   45 at 11-13 (arguing the opposite).

11       *Second*, *ImmDef* conclusively rejects one of Defendants' key assertions relating to irreparable

12   harm: "the Executive Branch's desire to enact a policy is *not* sufficient to satisfy the irreparable

13   harm prong." 2025 WL 2017247 at *5 (emphasis added). *ImmDef* nonetheless found the government

14   had made some, "scant" showing of harm in significant part because "Remain in Mexico is a policy

15   that requires negotiation with a foreign sovereign." *Id*. No record evidence suggests such

16   negotiations are implicated here.

17       *Third*, Plaintiffs' acknowledge that *ImmDef* narrowed a district court's grant of

18   administrative relief under Section 705 to the named Plaintiff in that case. *ImmDef* recognized that

19   this narrowing was not dictated by *Casa*, which "explicitly declined to extend its holding to the APA

20   context." 2025 WL 2017247, at *14.

21       *ImmDef*'s reasoning does not support narrowing the relief requested here. The district court

22   action here is "postponement" under 5 U.S.C. § 705, whereas *ImmDef* involved not just the stay of

23   an agency action, but also "a stay of Remain in Mexico's reimplementation," which the district court

24   granted to "preserve status and rights" under Section 705. 2025 WL 2017247 at *5-*6. The

25   principles justifying limits on equitable relief applicable in *ImmDef* are not applicable here, where

26   Plaintiffs ask this Court only to "postpone" the effective date of agency action, without requiring the

27   agency to take any affirmative steps. Indeed, it makes little sense to "postpone" agency action only

28   as to some people and not others.

1

## V.    RESPONSE TO APA CLAIMS

2    1.    <u>To both parties</u>:  Discuss whether *Loper-Bright*, 603 U.S. 369 (2024) *and progeny*

3    affect the Court's analysis of Plaintiffs' APA claims?

4        a.    If so, why and to what extent?

5        b.    If not, why not?

6        c.    In answering this question, please provide citations to binding and persuasive

7        caselaw.

8    <u>Answer</u>:

9

10    *Loper-Bright* and related recent cases should affect this Court's analysis—both as to

11    jurisdiction and as to the merits—because those cases establish significant limitations on

12    administrative agencies' power vis-à-vis courts. *Loper-Bright* holds that, under the APA, "agency

13    interpretations of statutes—like agency interpretations of the Constitution—are *not* entitled to

14    deference" by courts. *Id*. at 392. Of course *Loper-Bright* recognizes that the APA contains an

15    exception for statutes that limit judicial review, and Defendants argue here that 8 U.S.C. §

16    1254a(b)(5)(A) is one such statute. However, *Loper-Bright* situates that provision of the APA

17    against a longstanding history in which courts deferred to agency *factual* determinations, but not to

18    *legal* conclusions. *Id.* at 389 (describing history of pre-APA judicial deference doctrine, and

19    concluding that "[s]uch deferential review, though, was cabined to factbound determinations"). That

20    approach coheres with Plaintiffs' view here, which is that the jurisdiction stripping provision on

21    which Defendants rely bars review of the "factbound" determination whether a country is safe to

22    accept the return of its nationals, but not *legal* claims that allow courts to constrain agencies that

23    violate the APA's constraints, including the constraints against bad-faith, irrational, and unexplained

24    decision-making. *See generally* Pls' Mot. to Postpone, Dkt. 17, at 13–15.

25        Finally, with respect to cases related to *Loper-Bright*, the principles demanding judicial

26    independence from agency rule have particular force where an agency seeks unreviewable authority

27    to decide issues of "deep 'economic and political significance.'" *Loper-Bright*, 603 U.S. at 405

28    (citing *King v. Burwell*, 576 U.S. 473, 486 (2015)). Where such "major questions" are at issue,

1  courts expect "Congress to delegate such authority 'expressly' if at all, for 'extraordinary grants of

2  regulatory authority are rarely accomplished through 'modest words,' 'vague terms,' or 'subtle

3  devices.'" *Id.* (citing *West Virginia v. EPA*, 597 U.S. 697, 723 (2022)) (cleaned up). The TPS statute

4  obviously involves issues of such significance, as the Secretary here seeks unreviewable authority to

5  strip the most fundamental of liberties—the right to live and work here rather than being imprisoned

6  and banished—from tens of thousands of people, all with the stroke of a pen. For these reasons,

7  *Loper-Bright* and its progeny counsel strongly against adopting Defendants' position.

8        2.   <u>To both Parties</u>:  Secretary Noem has terminated the TPS designations for Venezuela,

9        Haiti, Honduras, Nicaragua, Nepal, Afghanistan and Cameroon between February 5,

10        2025, to July 8, 2025, a span of 6 months. *See* 90 Fed. Reg. 9040; 90 Fed. Reg.

11        28,760; 90 Fed. Reg. 30,089; 90 Fed. Reg. 30,086; 90 Fed. Reg. 24,15; 90 Fed. Reg.

12        20,309; 90 Fed. Reg. 23,697.

13            a.   Should all of these terminations factor into the Court's analysis of whether the

14               termination decisions were preordained in violation of APA, why or why not?

15        Yes, all of these terminations should factor into the Court's analysis. Plaintiffs allege

16  Defendants have adopted a general policy to terminate TPS across the board, ignoring any country

17  conditions that contradict their predetermined decision to do so, and have applied that policy to

18  terminate TPS for the countries at issue in this litigation. Each of Secretary Noem's individual

19  termination decisions provides relevant evidence of the challenged policy; considered collectively,

20  the terminations provide overwhelming evidence that the Secretary's decisions are a product of

21  unlawful predetermination, and that the reasons given in each individual termination notice are

22  pretext.

23        *First*, each termination decision relies on the Invasion E.O.; the decisions themselves, along

24  with Secretary Noem's public explanations for the decisions, show she understands the Invasion

25  E.O. as a blanket directive to "rescind" existing TPS designations because they promote the

26  "presence of illegal aliens" and are not "align[ed] with the policies set out by [the Order] and the

27  immigration laws." 90 Fed. Reg. 8443, 8446 (Jan. 29, 2025). *See* Dkt. 44-2 (Secretary Noem

28  explaining her decision to terminate TPS for Venezuela nine days after issuance of the Invasion

1   E.O.: "When the president gives a directive, the Department of Homeland Security will follow it ….

2   [W]e are getting direction on how this [TPS] works from the direction of the president of the United

3   States. And he is pausing the program to re-evaluate."); Dkt. 18-11 (DHS press release describing

4   partial vacatur of Haiti's TPS designation as "part of President Trump's promise to rescind policies

5   that were magnets for illegal immigration and inconsistent with the law"); Dkt. 18-24 (DHS press

6   release stating that terminating TPS for Afghanistan "is a key part of restoring integrity in our

7   immigration system"); Dkt. 54-2 (DHS press release stating that terminating TPS for Nicaragua

8   "restores integrity in our immigration system").

9          *Second*, the termination decisions show it is Secretary Noem's practice to consider a much

10   narrower range of country conditions than prior Secretaries, illustrating that she has circumvented

11   the normal country conditions review process. *See Saget v. Trump*, 375 F. Supp. 3d 280 (E.D.N.Y.

12   2019) (finding omission of certain country conditions information was "evidence [the previous DHS

13   Secretary] sidestepped the review process required by the TPS statute" when terminating TPS for

14   Haiti during the first Trump Administration). *Compare* 88 Fed. Reg. 40304 (June 21, 2023)

15   (considering widespread "political violence" and "staggering levels of crime" in Honduras) *with* 90

16   Fed. Reg. 30089 (Jul. 8, 2025) (making no mention of political violence or crime in Honduras); 88

17   Fed. Reg. 40294 (June 21, 2023) (considering "political instability and a humanitarian crisis" in

18   Nicaragua) *with* 90 Fed. Reg. 30086 (failing even to mention political stability or humanitarian

19   situation in Nicaragua); 88 Fed. Reg. 40317 (June 21, 2023) (considering food insecurity and lack of

20   access to sanitation in Nepal) *with* 90 Fed. Reg. 24153 (not considering food security or access to

21   sanitation in Nepal); 88 Fed. Reg. 69945 (Oct. 10, 2023) (considering human rights abuses, food

22   insecurity, a cholera epidemic, and ongoing mass displacement in Cameroon) *with* 90 Fed. Reg.

23   23697 (entirely ignoring human rights, food security, infectious diseases, or displacement in

24   Cameroon); 88 Fed. Reg. 65728 (Sept. 25, 2023) (considering "worsening" human rights "crisis,"

25   "unprecedented deterioration of women's rights," and "sexual violence against women and girls

26   [that] occurs regularly" in Afghanistan) *with* 90 Fed. Reg. 20309 (May 13, 2025) (making no

27   mention of human rights or rights of women and girls in Afghanistan). *Compare also* Dkt. 18-8 (Jan.

28   9, 2025 Decision Memo for Venezuela) (concluding Venezuela continues to meet conditions for TPS

designation, and considering, *inter alia*, political repression, human rights, and food security) *with* Dkt. 18-9 (Jan. 31, 2025 Decision Memo for Venezuela) (concluding Venezuela no longer meets conditions for TPS designation, without discussing political repression, human rights, or food security).

*Third*, the termination decisions fail to address conditions that led the State Department to deem travel to the country unsafe, showing it is Secretary Noem's practice to make TPS decisions without considering conditions highly relevant to safety. *Compare* Dkt. 54-3 (advising reconsideration of travel to Honduras "due to crime" *with* 90 Fed. Reg. 30089 (ending TPS for Honduras without considering crime); Dkt. 54-5 (advising reconsideration of travel to Nicaragua "due to arbitrary enforcement of laws, the risk of wrongful detention, and limited healthcare availability") *with* 90 Fed. Reg. 30086 (Jul. 8, 2025) (ending TPS for Nicaragua without considering those conditions); Dkt. 18-12 (warning against travel to Afghanistan "due to civil unrest, crime, terrorism, risk of wrongful detention, kidnapping, and limited health facilities) *with* 90 Fed. Reg. 20309 (ending TPS for Afghanistan without considering civil unrest, crime, risk of wrongful detention, kidnapping, and limited health facilities); Dkt. 54-5 (warning against travel to Venezuela "due to the high risk of wrongful detentions, terrorism, kidnapping, the arbitrary enforcement of local laws, crime, civil unrest, poor health infrastructure) *with* 90 Fed. Reg. 9040 (Feb. 5, 2025) (ending TPS for Venezuela and concluding nationals can "safely return[]" without considering those conditions).

Thus, while this case is about TPS for Honduras, Nepal, and Nicaragua, the Court can and should look to the other TPS terminations issued under this Administration as evidence that Defendants have adopted a general policy to terminate TPS regardless of country conditions, which Plaintiffs allege they have applied to the three countries directly at issue here.

3.    <u>To Defendants</u>:  Did the Secretary find that the country conditions for all seven of these countries (Venezuela, Haiti, Honduras, Nicaragua, Nepal, Afghanistan, and Cameroon) simultaneously improved between the last extension and current termination?

4.    <u>To both Parties</u>:  What process did the Secretary use to determine Honduras, Nepal,

14

and Nicaragua no longer meet any of these statutory criteria that originally justified their designations? How was this process different from prior administrations?

Secretary Noem did not use any legitimate process to determine Honduras, Nepal, and Nicaragua no longer meet the statutory criteria for TPS. Instead, she decided to terminate based on her interpretation of the Invasion E.O. as a directive to end all TPS designations. Her subordinates then selectively identified country conditions evidence that supported the Secretary's preordained decision to terminate, while ignoring any evidence that contradicted it, in order to draft pretextual Federal Register Notices describing the terminations as based on improvements in country conditions.

This process was profoundly different from the process utilized in prior administrations (other than the first Trump Administration). With the sole exception of the decisions of the first Trump administration (which were enjoined by two federal courts and never entered into effect, *see Ramos v. Nielsen*, 709 F. Supp. 3d 871, 878 (N.D. Cal. 2023), TPS decision-making under prior administrations of both parties always involved first an objective country conditions review that considered *all* conditions relevant to whether nationals could return in safety, and then a decision whether to extend or terminate based on that review. *See Ramos v. Nielsen*, 336 F. Supp. 3d 1075, 1093 (N.D. Cal. 2018) (explaining that USCIS typically considered a wide range of conditions to determine whether a country continued to meet the criteria for TPS designation); *Saget,* 375 F. Supp. 3d at 356 (same). *See also Ramos v. Nielsen*, 709 F. Supp. 3d at 884 (finding that DHS returned to its typical practice following the first Trump Administration). That TPS decision-making always included these steps is unsurprising, because the statute plainly requires it.

5.    <u>To both Parties</u>: How does the Secretary's TPS terminations and 60-day transition period align or conflict with the statutory purpose of TPS?

<u>Answer</u>:

The Secretary's TPS terminations conflict with the statutory purpose of TPS in three ways. *First*, they were not based on an objective review of country conditions as the TPS statute requires. *See* 8 U.S.C. § 1254a(b)(3)(A). The statute was designed to give people who have fled countries in crisis the secure knowledge that the United States would allow them to remain here until

15

our government determined that their country was safe. The terminations challenged here violate that basic purpose.

*Second*, although DHS press releases described the terminations of TPS for Nicaragua and Honduras as necessary given the temporary nature of the TPS program (a reason notably *not* included in the Federal Register termination notices), Dkt. 18-31; 54-2, the TPS statute does *not* limit the number of extensions a country may receive. To the contrary, once a country is designated for TPS, the statute *requires* that the designation remain in place until conditions for designation are no longer satisfied without any temporal limitation. 8 U.S.C. § 1254a(b)(3)(C). TPS is of course "temporary"— the protections it grants are not permanent, designations are subject to periodic review, and protections must be ended once conditions in the country improve to the extent that nationals can return in safety. But the TPS statute does *not* suggest that designations over a certain length are somehow unlawful. To the contrary, Congress understood when establishing the TPS program that country crises may endure for long periods: under the predecessor EVD program, Lebanon had been designated for protection for over 15 years. Dkt. 18-28 at 26. What Congress did sharply limit, however, was the Executive's discretion to end a TPS designation: Congress established *extension* as the *default* absent an affirmative finding, based on an objective country conditions analysis, that the country no longer meets the conditions for designation.

*Third*, the Secretary's 60-day transition period—requiring people who have lived here for *26 years* to leave in *two months*—conflicts with Congress's intent that TPS provide beneficiaries with certainty regarding the length of their stay. *See* 101 Cong. Rec. H25811, 25837 (daily ed. Oct. 25, 1989) (statement of Rep. Richardson) (debating Central American Studies and Temporary Relief Act of 1989, immediate precursor to the TPS statute). Over the 35-year history of the TPS program, DHS has *always* provided at least a six-month orderly transition period when terminating a TPS designation that was in place for three years or more. Dkt. 28. TPS beneficiaries have a reliance interest in that practice, which Defendants have violated by providing only a 60-day transition without acknowledging or explaining the change.

6.    To both Parties:  The Nepal termination states that "there is no longer an environmental disaster or other situation causing substantial, but temporary,

16

disruption of living conditions and that Nepal can adequately handle the return of its nationals, and considering other relevant factors, the Secretary has determined that a 60-day transition period is sufficient and in accord with Executive Order 14159." 90 Fed. Reg. 24153.  The Secretary "recognize[d] that certain previous TPS terminations allowed for an extended transition" and that "certain other TPS designations were terminated without allowing for an extended transition period." *Id*. at n. 24.

    a.    Explain whether this termination notice is sufficient or insufficient under the change-in-position doctrine? *See FDA v. Wages and White Lions*, LLC, 145 S. Ct. 898, 918 (2025).

    b.    If so, why and to what extent?

    c.    If not, why not?

    d.    In answering this question, please provide citations to binding and persuasive caselaw.

<u>Answer</u>:

The Nepal termination notice is insufficient under the change-in-position doctrine for two reasons. *First*, it fails to acknowledge the existence of the agency's practice over the last two decades (prior to the current Administration) to provide at least a six-month orderly transition period when terminating a TPS designation of *any* length, or its even longer standing practice over the entire 35-year history of the TPS program to provide at least a six-month orderly transition period when terminating a TPS designation that has been in effect for more than three years. *See FDA v. Wages and White Lion*, 145 S.Ct. at 918 (change-in-position doctrine requires that agency "'display awareness that it *is* changing position'") (quoting *FCC v. Fox*, 556 U.S. 505, 515 (2009); Dkt. 28 (chart of prior terminations and orderly transition periods). Secretary Noem's "recogni[tion]" that "certain previous TPS terminations allowed for an extended transition" while "certain other[s]" did not is *not* an acknowledgement of the agency's past practice, but a denial that the agency had any specific practice at all. *See Am. Wild Horses Preservation Campaign v. Perdue*, 873 F.3d 914, 926 (D.C. Cir. 2017) (holding agency failed to sufficiently acknowledge change in practice when it abandoned 20-year-long practice of treating plot of land as part of wild horse territory by describing

17

that practice as mere administrative error).

*Second*, Secretary Noem failed to offer "'good reasons for the new policy.'" *Wages and White Lion*, 145 S.Ct. at 918 (quoting *Fox*, 556 U.S. at 515). All but one of the reasons she provided for selecting a 60-day transition period would have applied equally to every prior termination in the program's history. 90 Fed. Reg. 24151 at 24153 (Jun. 6, 2025) (stating that TPS designations are time limited, expiration dates are noticed in advance, terminations cannot take effect earlier than 60 days after they are noticed, and Nepal no longer meets conditions for designation). As such, they do not constitute "good reasons" for the agency's *change* in position. *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 223 (2016) (holding agency failed to provide good reasons for policy change where it merely described the statute and stated conclusorily that the new policy was "reasonable" and "appropriate").

The one exception is Secretary Noem's conclusion that "a 60-day transition period is … in accord with Executive Order 14159." 90 Fed. Reg. 24151 at 24153. This reason is new, but it is not "good," because denying an orderly transition period does not reduce the "presence of illegal aliens in the United States," 90 Fed. Reg. 8443, 8446 (Jan. 29, 2025) —if anything, it increases the undocumented population by de-documenting lawfully present immigrants before they have time to get their affairs in order. *See Nw. Env't Def. Ctr. v. Bonneville Power Admin.*, 477 F.3d 668, 682-91 (9th Cir. 2007) (holding agency failed to provide good reason for change in practice where it based its decision on mistaken understanding of language in a congressional committee report).

## VI.    RESPONSE TO FIFTH AMENDMENT

1.    <u>To Defendants</u>:  TPS holders are currently in the country.

      a.    Please explain how TPS concerns matters of entry and national security pursuant to *Trump v. Hawaii*, 585 U.S. 585 U.S. 667 (2018). See ECF 45 at 16.

            i.    In answering this question, please provide citations to binding and persuasive caselaw.

      b.    Please explain why TPS holders are a security concern when Plaintiffs have been in the country for a significant amount of time.  *See* ECF 17-2 ¶¶ 4–5;

ECF 17-3 ¶ 2; ECF 17-4 ¶ 3; ECF 17-5 ¶ 3; ECF 17-6 ¶ 2; ECF 17-7 ¶ 2; ECF
17-8 ¶ 2; ECF 17-9 ¶ 2; ECF 17-10 ¶ 2; ECF 17-11 ¶ 2; ECF 17-12 ¶¶ 2, 6.

2.    <u>To both parties</u>:  The Court must consider whether the political climate leading to the
TPS terminations supports a finding of animus.  *Mi Familia Vota v. Fontes*, 129 F.4th
691, 728 (9th Cir. 2025).

a.    Please explain how the political climate may or may not support a finding of
animus.

<u>Answer</u>:

The "political climate" overwhelmingly supports a finding of animus here; indeed the
evidence dwarfs the evidence in *Mi Familia Vota* and other cases in which the Ninth Circuit has
found substantial evidence of racial animus. *See, e.g.*, *Ave. 6E Invs., LLC v. City of Yuma*, 818 F.3d
493, 496-97, 505-07, 509 (9th Cir. 2016) (reversing dismissal of claim that neighbors' animus
motivated city's decision to deny rezoning application for higher-density development, citing as
evidence: (a) "public hearings filled with what a reasonable jury could interpret to be racially tinged
code words" such as references to Hispanics having "large households"; (b) the city "overriding the
unanimous vote of the planning commission"; and (c) the fact that this had been the first denial of a
rezoning request in three years).

The Ninth Circuit in *Mi Familia Vota* relied primarily on two pieces of evidence: the fact that
the Arizona Legislature found no evidence of voter fraud but nonetheless enacted legislation to
address this non-existent problem; and the fact that a key advocacy organization working to enact
the legislation referred to "illegals" in its advocacy materials, which is a racist and derogatory term
often conflated with Latinos. The Ninth Circuit found these facts sufficient to reverse the district
court for failing to recognize this evidence of discriminary motive. As to the first, it found "the
Legislature's insistence on pressing forward with the Voting Laws despite its own audit revealing no
voter fraud is circumstantial evidence demonstrating that a discriminatory reason more likely than
not motivated the Legislature in enacting the Voting Laws." *Mi Familia Vota*, 129 F.4th at 726
(internal quotation omitted). And as to the second, it found "the term 'illegals' can evidence racial
animus for members of the Latino community in Arizona." *Id.*

19

1    While Plaintiffs would only have to show a comparable amount of evidence to prevail under

2    *Mi Familia Vota*, in fact the record is replete with far more extensive evidence of the same kind.

3    Most important, both President Trump and Secretary Noem have drenched the political environment

4    with the racist myth that immigrants coming here are "invaders" bent on "replacing" the white

5    majority of the United States—an idea taken directly from white supremacist ideology that dates

6    back more than a century. The record contains the expert testimony of Professor Elliott Young, a

7    historian of immigration law, who has provided a detailed account of President Trump's and

8    Secretary Noem's racist statements in the immigration context. *See* Dkt. 17-20 ¶¶ 17-28. Professor

9    Young has also explained how the "invasion" rhetoric as well as numerous other statements Trump

10    and Noem have made directly echo white supremacist anti-immigrant ideology that has long been

11    part of this Nation's history. *See id.* ¶¶ 10-21. Defendants have not meaningfully contested

12    Plaintiffs' expert evidence, including the expert conclusion that the invocation of a fear of

13    "invasion" in this context is an expression of racial animus. *See id.*; *see also* Dkt. 18-15 at 7:12-15

14    (Noem stating in March 2024 that "we know for a fact that ... the [Biden] White House has this

15    invasion happening on purpose, and it is to remake the foundation of this country"), Dkt. 18-22 at

16    16-18 (describing use of "invasion" as a "code word" used to advance the "contagion" narrative that

17    "Racial/Ethnic Minorities spread something harmful within communities, institutions, or other

18    societal domains").

19    Thus, while Plaintiffs would be entitled to prevail even if they had only as much evidence as

20    the plaintiffs in *Mi Familia Vota*, in fact they have *far* more. Plaintiffs have presented unrebutted

21    *direct* evidence that a racist ideology influenced the decisions challenged here—because it is

22    actually cited in the decisions' reference to an "Invasion." Indeed, in the Executive Order declaring

23    the "Invasion," the President called for "limiting" the use of TPS as one measure needed to repel the

24    "Invasion."[5] Secretary Noem then cited that same Executive Order as part of her justification for

25

26    ─────────────────────
    [5] Section 16(b) of the Executive Order specifically calls for limiting TPS. *See* Donald Trump,
    "Protecting the American People Against Invasion," Executive Order, Jan. 20, 2025, Sec. 16(b),
27    https://www.whitehouse.gov/presidential-actions/2025/01/protecting-the-american-people-against-
    invasion.
28

each of the terminations at issue here. *See supra* at 4.  In the Secretary's view, her TPS terminations are part of a broader effort to change "the TPS system" to carry out "President Trump's promise to rescind policies" conflicting with his racist immigration agenda. Dkt. 18-11 (DHS press release explaining that the agency is "returning integrity to the TPS system" through actions such as the Haiti TPS vacatur, noting that "Secretary Noem similarly rescinded the previous administration's Venezuela TPS extension").

Of course, under the *Arlington Heights* standard applied in *Mi Familia Vota*, this Court can look not just to the termination orders themselves, but also to the "totality of the circumstances" in assessing discriminatory intent. *Mi Familia Vota*, 129 F.4th 691 at 725. As such, it is relevant that President Trump has spent *years* directly expressing racial animus against immigrants from the countries at issue here, as well as other non-white, non-European immigrants, repeating lies at least as outrageous as the voter fraud lie at the heart of *Mi Familia Vota*. During the first Trump Administration, the President rejected a bipartisan deal that would have led to permanent residence for TPS holders, calling them "people from shithole countries," and asking why we could not have more people from "countries like Norway." *See* Dkt. 17-20 ¶ 24; *see also* Dkt. 18-23 at 3 (President Trump's 2024 remarks doubling down on his distinction between "nice countries" "like Denmark" and "unbelievable places and countries"). He also repeatedly referred to Central American immigrants as "animals," and repeatedly told a parable comparing immigrants to snakes that will kill innocent people. Dkt. 17-20 at ¶¶ 23, 25, 26.[6] More recently, he has repeatedly suggested—based on no evidence and contrary to the express statutory terms—that TPS holders commit crimes, thus connecting them to his lie that immigrants in general commit more crimes, have more mental health problems, and thus "poison[] the blood" of the country. *id.* at ¶¶ 20-22; *see also id.* ¶ 26 (discussing Trump asserting repeatedly that Haitian TPS holders eat dogs and cats (and claiming that "all"

---

[6] A partial history of the President's racist statements against TPS holders was recounted by this Court in *Ramos v. Nielsen*, 336 F. Supp. 3d 1075, 1098, 1100-01 (N.D. Cal. 2018); and more recently in *NTPSA v. Noem*, 773 F. Supp. 3d 807, 855-64 (N.D. Cal. 2025). For an even more comprehensive account of Trump's anti-immigrant racist statements as of approximately 2019, *see* Amicus Br. of Anti-Defamation League *et al.*, *Ramos v. Nielsen*, No. 18-16981 Dkt. 31 (9th Cir. Feb. 7, 2019).

21

1    Haitians have AIDS)). Again, Professor Young's uncontested declaration shows that all of these

2    statements derive their meaning from longstanding anti-immigrant racist tropes. *Id.* at ¶¶ 10-17.

3        Secretary Noem—the formal decisionmaker in this case—has repeated many of these same

4    lies and racist tropes targeting not only specific nationalities, but non-white, non-European TPS

5    holders generally. Among other things, she has described irregular immigration across the U.S.-

6    Mexico border as an "invasion happening on purpose … to remake the foundation of this country,"

7    echoing the racist "replacement theory." Dkt. 18-15 at 7:13-15; Dkt. 18-26 ("The 'Great

8    Replacement' Theory, Explained"; *see also* Dkt. 17-20 ¶ 18 (discussing replacement theory). She

9    has conflated Honduran TPS holders with criminals and terrorists, and repeated the age-old lie that

10   other countries emptied their prisons and mental health institutions to send people here (reinforcing

11   the "poisoning the blood" of the country narrative). Dkt. 17-20 ¶ 25 n.35; ¶ 26 n.36; Dkt. 18-17

12   (March 2025 Noem tweet framing Honduran "migration management" as a means to "save

13   American lives and get criminals off our streets!"); Dkt. 18-18 (May 2025 DHS tweet: "The Biden

14   Administration exploited Temporary Protected Status to let half a million poorly vetted migrants into

15   this country—from MS-13 gang members to known terrorists and murderers."). "Acting on the basis

16   of a negative group stereotype and generalizing such stereotype to the entire group is the classic

17   example of racism." *NTPSA v. Noem*, 773 F. Supp. 3d at 860; Dkt. 17-20. ¶¶ 27-28 (expert finding

18   that "[t]he statements made by Trump and Noem are fundamentally similar to those utilized by racist

19   immigration restrictionists in prior eras").[7]

20       Thus, all of this evidence supports Plaintiffs' basic theory, which is that the terminations here

21   and other TPS decisions were motivated by Trump and Noem's racism against non-white, non-

22   European immigrants. *See, e.g.*, *Ramos*, 336 F. Supp. 3d at 1098, 1100 (concluding after extensive

23   discovery that Trump "has expressed animus against non-white, non-European immigrants" and,

24   _____

25       [7] The list described above and in Professor Young's declaration is nowhere close to a
     comprehensive account of the evidence of discriminatory animus that President Trump and Secretary
26   Noem have expressed against TPS holders and non-white immigrants more generally—both direct
     and circumstantial. For a more detailed discussion focused on Venezuelan TPS holders, *see NTPSA*
27   *v. Noem*, 773 F. Supp. 3d at 855-64. For a comparable account focused on Haitian TPS holders, *see*
     *HECA v. Noem*, No. 25-cv-1464, Dkt. 1 (Complaint) ¶¶ 66-101 (E.D.N.Y. March 14, 2025).

28

1  through surrogates in the White House, sought to influence DHS decision-makers); *supra* at 4

2  (Honduras, Nicaragua, and Nepal TPS decisions citing Invasion E.O.); *Saget v. Trump*, 375 F. Supp.

3  3d 280, 374 (E.D.N.Y. 2019) ("[T]here is both direct and circumstantial evidence a discriminatory

4  purpose of removing non-white immigrants from the United States was a motivating factor behind

5  the decision to terminate TPS for Haiti.").

6  **VII.    RESPONSE TO IRREPARABLE HARM**

7        1.    <u>To Defendants</u>:  Several TPS holders are currently in the process of getting

8              permanent relief.  *See* ECF 17-7; 17-13.

9              a.    How long is the process for permanent relief?

10       2.    <u>To Defendants</u>:  How long are those subject to deportation detained?

11             a.    What is the minimum, average, and maximum amount of time in detention

12                   before deportation?

13       3.    <u>To Plaintiffs</u>:  Several TPS holders are reliant on health insurance for essential health

14             care.

15             a.    How would moving to another country harm access to healthcare?

16  <u>Answer</u>:

17       Plaintiff Maria Elena Hernandez is 67 years old and lives with asthma and a heart condition

18  that require daily medication for her survival. Dkt. 17-4 ¶¶ 9, 10, 12. She worries that if she were

19  forced to move to Nicaragua, her health would rapidly decline, because her access to health care

20  would be extremely limited. *Id.* ¶ 12. Plaintiff O.C. is 60 years old, diabetic, and relies on medication

21  to stay healthy. Dkt. 17-5 ¶ 7. He, too, worries that he would not be able to receive the medical care

22  he needs if he were forced to return to Nicaragua. *Id.* Plaintiffs' fears are substantiated by the State

23  Department's warning that travelers should reconsider travel to Nicaragua due to "limited healthcare

24  availability." Dkt. 54-4.

25       Several Plaintiffs also fear that their children's access to healthcare would be negatively

26  impacted if they were forced to return to their countries of origin. Plaintiff Sandhya Lama's 16-year-

27  old U.S. citizen daughter has severe allergies and relies on specialized medical treatment she has

28  been able to receive in the U.S., but would not be able to receive in Nepal. Dkt. 17-6 ¶ 15. *See also*

23

U.S. Department of State, Nepal Travel Advisory, available at

https://travel.state.gov/content/travel/en/international-travel/International-Travel-Country-

Information-Pages/Nepal.html ("Medical care outside the Kathmandu valley may be limited and not

up to U.S. standards. Medical facilities can lack resources."). Plaintiff Jhony Silva's eight-year-old

U.S. citizen son, who has been diagnosed with autism, depends on Mr. Silva's job at Stanford

Hospital for his access to healthcare. Dkt. 17-3 ¶¶ 9, 13. Mr. Silva worries that, if he lost his TPS—

and along with it, his job and health insurance—and were forced to return to Honduras, his son's

health would decline. *Id.* ¶ 16. Two of Plaintiff Denis Molina's sons have also been diagnosed with

autism. Dkt. 17-2 ¶¶ 9, 14. Mr. Molina is deeply concerned about their health if they were forced to

return to Honduras. *Id.*

Finally, NTPSA member J.M. has diabetes and currently receives access to healthcare

through his job. Dkt. 17-13 ¶ 31a. He fears that his diabetes would quickly worsen if he lost his job

and, with it, his access to healthcare. *Id.* Returning to Honduras would dramatically impact his

access to healthcare, as the U.S. Embassy in Honduras reports that medical care is "not up to U.S.

standards anywhere in Honduras." *See* U.S. Embassy in Honduras, Medical Assistance, May 21,

2024, *available at* https://hn.usembassy.gov/medical-assistance/.

## CONCLUSION

For the reasons described herein, and in Plaintiffs' briefing in support of their Motion to

Postpone, this Court should postpone the effective date of the challenged decisions pending a final

decision in this case.

Date:  July 28, 2025                                    Respectfully submitted,

                                                       ACLU FOUNDATION
                                                       OF NORTHERN CALIFORNIA

                                                        /s/ *Emilou MacLean*
                                                       Emilou MacLean
                                                       Michelle (Minju) Y. Cho
                                                       Amanda Young

                                                       Ahilan T. Arulanantham
                                                       CENTER FOR IMMIGRATION LAW AND
                                                       POLICY, UCLA SCHOOL OF LAW

24

Eva L. Bitran
ACLU FOUNDATION
OF SOUTHERN CALIFORNIA

Jessica Karp Bansal
Lauren Michel Wilfong (*Pro Hac Vice*)
NATIONAL DAY LABORER
ORGANIZING NETWORK

Erik Crew (*Pro Hac Vice*)
HAITIAN BRIDGE ALLIANCE

*Attorneys for Plaintiffs*

1
2
3
4

## CERTIFICATE OF SERVICE

I hereby certify that on July 28, 2025, I caused the foregoing to be electronically filed with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to all counsel of record.

ACLU FOUNDATION
OF NORTHERN CALIFORNIA

/s/ *Emilou MacLean*
Emilou MacLean