1

2

3

4                    UNITED STATES DISTRICT COURT

5                   NORTHERN DISTRICT OF CALIFORNIA

6

7    NATIONAL TPS ALLIANCE, et al.,          Case No.  25-cv-05687-TLT

8                        Plaintiffs,

9            v.                              **ORDER GRANTING PLAINTIFFS'
                                             MOTION TO POSTPONE**
10   KRISTI NOEM, et al.,
                                             Re: ECF 17
11                       Defendants.

12

13        The freedom to live fearlessly, the opportunity of liberty, and the American dream.  That is

14   all Plaintiffs seek.  Instead, they are told to atone for their race, leave because of their names, and

15   purify their blood.  The Court disagrees.

16        Pending before the Court is Plaintiffs' motion to postpone effective date of agency action.

17   ECF 17.  Defendants filed an opposition on July 14, 2025.  ECF 45.  Plaintiffs filed a reply on July

18   18, 2025.  ECF 53.  The Court heard oral argument on July 29, 2025.

19        Having considered the parties' briefs, the relevant legal authority, oral argument, and for

20   the reasons below, the Court **GRANTS** the motion to postpone.  The Court orders that the TPS

21   terminations shall be postponed to preserve the status quo and until a hearing on the merits on

22   November 18, 2025.  Postponement will be subject to extension at the November 18, 2025

23   hearing.

24   **I.    BACKGROUND**

25        **A.    Plaintiffs and Nepal, Honduras, and Nicaragua TPS Holders**

26        The parties concede that each of the individually named Plaintiffs have not suffered any

27   felony or misdemeanor convictions.  None have violated the law, and each have maintained their

28   obligations parenting, working, and abiding by the rules imposed on them as TPS holders.  All

United States District Court
Northern District of California

Plaintiffs are legally present in the United States because of TPS.  *See* 8 U.S.C. § 1254a.

Plaintiffs S.K. and Sandhya Lama are Nepali TPS holders.  ECF 1 ("Compl.") ¶¶ 19–20.

Plaintiff S.K. is 33 years old, a native of Nepal, came to the United States in 2011 on a student visa to attend college, and has been a TPS holder since 2016.  ECF 17-7 ¶ 2.  S.K. has been a theater manager for almost 9 years to support herself and her family in Nepal.  *Id*. ¶¶ 4–5.  S.K. also volunteers in Oakland for an organization that provides a safe space for artists, musicians, and community members.  *Id*. ¶ 6.  Without TPS, S.K. would not be able to support herself financially, would be forced to abandon her plans of going back to school to study data science, and would be separated from her U.S. citizen fiancé.  *Id*. ¶¶ 9–11.

Plaintiff Lama is 43 years old, a native of Nepal, and has been in the United States since 2008.  ECF 17-6 ¶ 2.  She came to the United States in 2008 to study at a university in Virginia, received her master's degree in 2014, and has been a TPS holder since 2015.  *Id*. ¶¶ 2, 6.  She is a single mother of three U.S. citizen children, a sole provider, and is currently a CXO Multi Site Lead LC for Amazon.  *Id*. ¶¶ 2, 10–13.  If forced to return to Nepal, Lama's children would lose opportunities, and one of Lama's children would not be able to get medical treatment for her severe allergies.  *Id*. ¶ 15.  Returning to Nepal would also be dangerous because Lama's family has suffered persecution from the Maoist (communist) party in Nepal, including having their ancestral house bombed and brother being taken as hostage.  *Id*. ¶¶ 4, 16.

Plaintiffs Denis Molina, Johny Silva, Teofilo Martinez, and Patricia Carbajal are Honduran TPS holders.  Compl. ¶¶ 15–16, 21.

Plaintiff Molina is 49 years old, a native of Honduras, and has been in the United States since 1997.  ECF 17-2 ¶¶ 4–5.  He applied for and has maintained TPS since Hurricane Mitch hit Honduras.  *Id*. ¶ 5.  He has been a church pastor for over 22 years and works various jobs in construction and as a mechanic to support his family, which includes a wife and four children.  *Id*. ¶¶ 6–12. Two of his children, one aged 4 and another 22, have been diagnosed with autism and require special programs to support their development.  *Id*. ¶¶ 9, 13.  He is the sole breadwinner for his family.  *Id*. ¶ 12.  If TPS terminates, Molina fears that he will not be able to support his family in Honduras and, if his entire family relocates to Honduras, his children will lose the

support of special programs for their development.  *Id.* ¶¶ 12, 14.

Plaintiff Silva is 29 years old, a native of Honduras, and came to the United States when he was three-years old.  ECF 17-3 ¶ 2.  He was granted TPS after Hurricane Mitch.  *Id.* ¶ 4.  Silva is a Certified Nursing Assistant at Stanford Hospital and relies on his TPS for work authorization.  *Id.* ¶¶ 10, 13.  Without TPS, Silva and his son, approximately 9 years old and diagnosed with autism, will lose their health insurance.  *Id.* ¶ 13.  Silva will also lose his job, not be able to contribute to his family's rent, will have to abandon his dreams of becoming a nurse, and be separated from the rest of his family.  *Id.* ¶¶ 13–14, 16.

Plaintiff Martinez is 57 years, a native of Honduras, and has been on TPS since 1999.  ECF 17-8 ¶ 2.  He is a licensed soccer instructor, a licensed realtor, and owns a landscaping business. *Id.* ¶ 9.  He has also been volunteering with the Honduran Consulate for the last 7 years, is on the executive committee for NTPSA, and co-hosts a radio show for TPS holders.  *Id.*  Without TPS, Martinez would be separated from his partner of over 25 years, lose his job, and not be able to travel for his volunteer work with NTPSA.  *Id.* ¶¶ 15, 18.

Plaintiffs Elena Hernandez and O.C. are Nicaraguan TPS holders.  Compl. ¶¶ 17–18.

Plaintiff Hernandez is 67 years old, is a native of Nicaragua, came to the United States in 1996 because her family was targeted by the Nicaraguan government, and was granted TPS in 1999.  ECF 17-4 ¶ 3. Plaintiff Hernandez has worked at an aquatic plant nursery, cleaning company, and as a shop steward with TPS.  *Id.* ¶ 7.  Plaintiff Hernandez has asthma and a heart condition that requires daily medication.  *Id.* ¶ 9.  Without TPS, Plaintiff Hernandez would lose her health insurance and social security income even though she has paid into social security for more than 25 years.  *Id.* ¶¶ 9, 11.  She would lose her job, be separated from her family, have no way of supporting herself, and worries that her health will rapidly decline without continued access to healthcare.  *Id.* ¶¶ 10, 12, 14.  Given her family history and views, she may also face persecution in Nicaragua.  *Id.* ¶ 14

Plaintiff O.C. is 60 years old, a native of Nicaragua, and has lived in the United States since 1997.  ECF 17-5 ¶¶ 2–3. He came to the United States after being involuntarily conscripted into the military in Nicaragua at the age of 33.  *Id.* ¶ 4.  Since coming to the United States, O.C.

started a janitorial business and currently works for a company that prepares juices and salads for local restaurants.  *Id.* ¶ 5.  O.C. has diabetes and, without TPS, O.C. would lose his job and the health insurance that he relies on to stay healthy.  *Id.* ¶ 7.

Plaintiff National TPS Alliance ("NTPSA") is a non-profit with headquarters in Los Angeles, California.  Compl ¶ 11.  NTPSA provides immigration services and has over 1,000 Honduran, Nepali, and Nicaragua TPS holder members that would suffer harm if TPS was terminated, including: R.A., Rajbin Shrestha, G.M., M.A, Patricia Carbajal, J.M., A.C., and J.L.  Compl. ¶¶ 11–14, 138.

R.A. is 26 years old and a native of Nepal.  *Id.* ¶ 138(a).  She came to the Unites States in 2016 after applying for and receiving TPS.  ECF 17-9 ¶ 2.  R.A. has worked as a front-line worker at U.S. San Francisco hospital during the COVID pandemic, a patient navigator/clinical trial coordinator, and as a labor and delivery nurse.  *Id.* ¶¶ 6–9.  R.A. applied for an EB-3 green card for skilled workers in 2024 and her paperwork is still pending.  *Id.* ¶ 10.  If her TPS terminates, she would lose her job, and her green card application would be considered abandoned if she left the United States.  *Id.* ¶ 11.

Rajbin Shrestha is 47 years old, a native of Nepal, came to the United States in 1997, and has been on TPS since Nepal was designated in 2015.  ECF 17-11 ¶ 2.  Shrestha is an IT analyst, has three U.S. citizen children, aged 17, 16, and 6, and was able to buy a house in the United States.  *Id.* ¶¶ 9, 11.  Without TPS, Shrestha's family risks separation, and Shrestha will not be able to work and provide for his children and elderly parents.  *Id.* ¶¶ 13–14.

G.M. is 46 years old, a native of Honduras, and came the United States as a teenager.  Compl. ¶ 138(b).  He is a husband, father of two U.S. citizen children agreed 2 and 22, and a worker who pays his taxes.  *Id.*  If his TPS terminations, he will not be able to work to support his 2 year old daughter and worries that bringing her to Honduras would put her in danger.  *Id.*  He also fears for his safety in Honduras.  *Id.*

M.A is 75 years old, a native of Honduras, and is a grandmother to 13 U.S. citizen grandchildren.  Compl. ¶ 138(c).  She is retired after decades of working two jobs at time, cleaning homes, working at hotels, and caring for children and veterans.  *Id.*  G.M. also has several adult

United States District Court
Northern District of California

children with TPS.  *Id.*  If her and her children's TPS terminates, she fears for her and her children's safety in Honduras and fears for her grandchildren's safety if brought to Honduras.  *Id.*  M.A. fears separation from her grandchildren.  *Id.*

Patricia Carbajal is 46 years old, a citizen of Honduras, came to the United States when she was 18, and received TPS after the Honduras hurricane.  ECF 17-12 ¶¶ 2, 6.  Carbajal has worked as a nanny, worked in restaurants, and currently works in excavation and construction.  *Id.* ¶ 8.  She is a single mother and currently supports her elderly father in Honduras through remittances.  *Id.* ¶¶ 9, 11.  Without TPS, Carbajal will lose her work authorization and, as a single mother with a young daughter, fears the violence against women in Honduras.  *Id.* ¶¶14–15.

J.M. is 57 years old, a native of Honduras, and has been in the United States for the past 27 years.  Compl. ¶ 138(e).  He originally received a scholarship to study fashion in the United States, returned to Honduras after he completed the program, but returned to the United States after facing discrimination as a gay man in Honduras.  *Id.*  He went to college and worked for clothing companies and a fashion designer.  *Id.*  He recently lost his job due to stress from losing TPS and has not been able to find work because his work authorization is set to expire with his TPS.  *Id.*  He is no longer able to provide for housing and now receives Medicaid for his daily diabetes medication.  *Id.*  He fears returning to Honduras because of his age and sexual orientation.  *Id.*

A.C. is 54 years old, is a native of Honduras, has been in the United States since 1997, and has been a TPS holder since 1999.  ECF 17-10 ¶ 2.  A.C. has worked in gardening, metal work, in the offshore drilling industry, in construction, and is currently a shift leader in the ship repair industry. *Id.* ¶¶ 5–6.  After Hurricane Katrina in 2005, A.C. helped clean up and rebuild New Orleans.  *Id.* ¶ 6.  During the Covid-19 pandemic, A.C. was an essential worker for a company that constructed barges for the transportation of petroleum.  *Id.* ¶ 6.  Without TPS, A.C. would lose his ability to work, and not be able to take and pass a pilot exam after investing approximately $35,000 in pilot training.  *Id.* ¶ 9.

J.L. is 60 years old, a native of Nicaragua, and has lived in the United States for almost 30 years.  Compl. ¶ 138(f).  For the past 20 years, J.L. has worked as a manufacturing technician in a semiconductor factor.  *Id.*  He has a pacemaker and takes daily medication to manage for heart

1   failure.  *Id.*  Without TPS, he would lose his job, his driver's license, and access to healthcare.  *Id.*

2   He worries that he would not receive adequate medical care and face political persecution in

3   Nicaragua.  *Id.*

4       Defendants are the Secretary of Homeland Security Kristi Noem, the United States

5   Department of Homeland Security ("DHS"), and the United States of America.  Compl. ¶¶ 22 –

6   24.  The termination notices imposed in connection with this proceeding began on June 6, 2025.

7   On June 6, 2025, the Secretary published a federal registrar notice that terminated TPS for Nepal

8   effective August 5, 2025.  *See* 90 Fed. Reg. 24151–54.  On July 8, 2025, the Secretary published

9   federal registrar notices that terminated TPS for Honduras and Nicaragua effective September 8,

10  2025.  *See* 90 Fed. Reg. 30089–92; 90 Fed. Reg. 30086–89.

11      **B.    Procedural History**

12      On July 7, 2025, Plaintiffs filed a complaint alleging that Defendants' termination of TPS

13  for Nepal, Honduras, and Nicaragua violate the Administrative Procedure Act and the Fifth

14  Amendment.  ECF 1 ("Compl.") ¶¶ 154–165.

15      On July 8, 2025, Plaintiffs filed a motion to postpone effective date of administrative

16  action.  ECF 17.  Defendants filed an opposition on July 14, 2025.  ECF 45.  Plaintiffs filed a reply

17  on July 18, 2025.  ECF 53.

18      On July 24, 2025, the Court denied Immigration Reform Law Institute's motion for leave

19  to file amicus brief.  ECF 58.  The Court, however, granted Amici States' motion for leave to file a

20  proposed brief.  ECF 59.  On July 28, 2025, the Court granted Amici City and Counties' motion

21  for leave to file an amici brief.  ECF 66.  Defendants also filed Administrative Records for Nepal

22  Honduras, and Nicaragua terminations on July 28, 2025.  ECF 62–64.

23      The parties provided responses to the Court's questions regarding Plaintiffs' motion to

24  postpone.  ECF 65, 67.  The Court heard oral argument on July 29, 2025.

25  **II.    LEGAL STANDARDS GOVERNING PLAINTIFFS' MOTION TO POSTPONE**

26      "The factors considered in determining whether to postpone agency action pursuant to §

27  705 substantially overlap with the *Winter* factors for a preliminary injunction."  *Immigrant*

28  *Defenders Law Center et al., v. Noem et al.*, No. 25-2581, 2025 WL 2080742, at *7 (9th Cir. July

United States District Court
Northern District of California

6

18, 2025).  "There is substantial overlap . . . not because the two are one and the same, but because similar concerns arise whenever a court order may allow or disallow anticipated action before the legality of that action has been conclusively determined."  *Nken v. Holder*, 556 U.S. 418, 434 (2009).  The Court's review of Plaintiffs' motion to postpone is, therefore, guided by the following *Winter* standards:

> Under the original Winter standard, a party must show "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." Under the "sliding scale" variant of the Winter standard, "if a plaintiff can only show that there are 'serious questions going to the merits'—a lesser showing than likelihood of success on the merits—then a preliminary injunction may still issue if the 'balance of hardships tips *sharply* in the plaintiff's favor,' and the other two Winter factors are satisfied.

*Immigrant Defenders*, 2025 WL 2080742, at *8.

Ultimately, whether to postpone is "an exercise of judicial discretion," and "[t]he propriety of its issue is dependent upon the circumstances of the particular case."  *Nken*, 556 U.S. at 433 (internal citation omitted).  Plaintiffs bear "the burden of showing that the circumstances justify an exercise of that discretion."  *Id*. at 433–34.

### III.    DISCUSSION OF TPS AND RELEVANT HISTORY

The Court begins with a discussion of (A) the TPS statute; (B) the Congressional intent of TPS; (C) the history of TPS for Nepal, Honduras, and Nicaragua; (D) the current Trump administration's history with TPS; and (E) the Secretary's TPS terminations for Nepal, Honduras, and Nicaragua.

### A.    The TPS Statute

Temporary Protected Status ("TPS") was created by the Immigration Act of 1990 ("Immigration Act"),  Pub. L. No. 101-649, 104 Stat. 4978, and provides blanket relief to nationals of countries based on specific country conditions findings.  8 U.S.C. § 1254a.

Pursuant to 8 U.S.C. § 1254a, the Secretary of Homeland Security may designate a country for TPS if she finds that:

(A) … there is an ongoing armed conflict within the state and, due to

7

such conflict, requiring the return of aliens who are nationals of that state to that state (or to the part of the state) would pose a serious threat to their personal safety;

(B) …

(i) there has been an earthquake, flood, drought, epidemic, or other environmental disaster in the state resulting in a substantial, but temporary, disruption of living conditions in the area affected,

(ii) the foreign state is unable, temporarily, to handle adequately the return to the state of aliens who are nationals of the state, and

(iii) the foreign state officially has requested designation under this subparagraph; or

(C) … there exist extraordinary and temporary conditions in the foreign state that prevent aliens who are nationals of the state from returning to the state in safety, unless the [Secretary] finds that permitting the aliens to remain temporarily in the United States is contrary to the national interest of the United States.

8 U.S.C. § 1254a(b)(1).

In addition to making country conditions findings, the Secretary must follow other procedures such as engaging in "consultation with appropriate agencies of the Government" and publishing a "statement of the findings" and an estimate of the number of eligible foreign nationals. 8 U.S.C. § 1254a(b)(1). Periodically, the Secretary "shall review the conditions in the foreign state . . . for which a designation is in effect under this subsection and shall determine whether the conditions for such designation under this subsection continue to be met." *Id.* at § 1254a(b)(3). If the Secretary finds that the conditions are no longer met, she "shall terminate the designation by publishing notice in the Federal Register of the determination." *Id.* Termination is not effective "earlier than 60 days after the date the notice is published or, if later, the expiration of the most recent previous extension." *Id.* If the conditions are still met, the Secretary may extend the designation "for an additional period of 6 months (or, in the discretion of the [Secretary], a period of 12 or 18 months)." *Id.*

To qualify for TPS, an individual must meet certain criteria including having been "continuously physically present in the United States since the effective date of the most recent designation," he or she must have "continuously resided in the United States since such date as the [Secretary] may designate," he or she must timely register for TPS, and he or she must not have a disqualifying criminal record. *Id.* at § 1254a(c). An individual who has been convicted of any felony or 2 or more misdemeanors in the United States does not qualify for TPS. *Id.* at §

1254a(c)(2)(B).  Those who qualify for TPS are protected from removal and are granted work authorization.  *Id*. at § 1254a(a).  TPS applicants must also pay all fees associated with applying for TPS.  *Id*. at § 1254a(c)(1)(B).

## B.    Congressional Intent of TPS

The Immigration Act created TPS in the context of Congress' concern for the United States' obligations under the United Nations Protocol Relating to the Status of Refugees.  H.R. Rep. No. 101-244, at 7 (1989).  Under the protocol, the United States committed itself to not return individuals to countries where they face threats to life or freedom because of persecution on the basis of race, religion, nationality, or other factors.  *Id*.  This principle of "nonrefoulment" is now recognized as binding as a rule of customary international law.  *See* JILL H. WILSON, *supra* at 1–2.

Another key factor motivating Congress at the time of the passage of TPS was the shortcomings of the Extended Voluntary Departure program ("EVD").  H.R. Rep. No. 101-244, at 7–8 (1989).  EVD allowed the Executive to use its discretion to grant administrative stays of removal for nationals of designated countries.  *See* WILSON, *supra* at 4.  In the late 1980s, congressional dissatisfaction with EVD grew for two main reasons.  First, members of Congress were unhappy with the wide discretion EVD gave to the executive and the arguably arbitrary standards for which EVD designation could be withheld.  *See* H.R. Rep. No. 101-244, at 8 (1989) (expressing "disappointment" at the executive's failure to provide relief to nationals of certain countries such that "legislation has become necessary").  Members of Congress lamented the lack of regulation of EVD.  *See* H.R. Rep. No. 101-245, at 11–12 (1989); 135 Cong. Rec. H7501 (daily ed. Oct. 25, 1989) (statement of Rep. Bill Richardson) (emphasizing the need "to establish an orderly, systematic procedure for providing temporary protected status . . . because we need to replace the current ad hoc, haphazard regulations and procedures that exist today."); 135 Cong. Rec. H7501 (daily ed. Oct. 25, 1989) (statement of Rep. Sander Levine) (supporting a bill that "will standardize the procedure for granting temporary stays of deportation. Refugees, spawned by the sad and tragic forces of warfare, should not be subject to the vagaries of our domestic politics as well.").  Second, members of Congress viewed the purported legal basis of EVD with

1    skepticism.  *See* H.R. Rep. No. 101-245, at 11–12 (1989) ("This provision, which constitutes the

2    sole statutory authority upon which EVD is based, clearly does not directly authorize deferring the

3    deportation of an entire nationality of aliens.").  Thus, Congress created TPS and provided the

4    Executive with a clear statutory basis and guidance.  8 U.S.C. § 1254a.

5        **C.    History of TPS for Nepal, Honduras, and Nicaragua**

6        Nepal was designated for TPS in June 2015 after a 7.8 magnitude earthquake struck only

7    50 miles from Nepal's densely populated capital of Kathmandu.  80 Fed. Reg. 36346 (Jun. 24,

8    2015).  The earthquake impacted about one-third of the country's population and damaged

9    approximately 750,000 homes.  *Id.*  Nepal's TPS designation was later extended because of

10   sustained strained infrastructure, civil unrest, and inadequacies in safe housing, food, medicine,

11   and education.  81 Fed. Reg. 74470 (Oct. 26, 2016).

12       Hurricane Mitch hit Honduras in late October 1998, causing "widespread heavy rain and

13   severe flooding" in Honduras, Nicaragua, and other nearby countries that resulted in "thousands

14   dead or missing" and "tremendous property, infrastructure, and crop damage."  *25 Years Later:*

15   *Looking Back at the October Monster Named Mitch*, NOAA (Oct. 27, 2023).  Mitch was the

16   second strongest October hurricane on record and the eighth strongest Atlantic hurricane.  *Id.*

17       In response to the devastation of Hurricane Mitch, on January 5, 1999, the Attorney

18   General designated Honduras for TPS.  64 Fed. Reg. 524 (Jan. 5, 1999).  Over the next two

19   decades, both Republican and Democratic administrations found that the conditions which

20   warranted the initial TPS designation persisted.  *See* WILSON, *supra* at 11.  Moreover, DHS also

21   found a "series of environmental events that have significantly impeded economic development

22   and recovery, compounding the disruption in living conditions caused by Hurricane Mitch."  79

23   Fed. Reg. 62170 (Oct. 16, 2014); 88 Fed. Reg. 40304 (Jun. 21, 2023).  These conditions included

24   drought, a tropical storm, a coffee-destroying fungus, flooding, an earthquake, and others.  *Id.*

25       Nicaragua was similarly hit by Hurricane Mitch and designated for TPS.  *See* 64 Fed. Reg.

26   526 (Jan. 5, 1999); 88 Fed. Reg. 40294 (Jun. 21, 2023) ("The devastation of Hurricane Mitch

27   affected nearly 868,000 people.  Landslides and floods destroyed entire villages and caused

28   extensive damages to the transportation network, housing, medical and educational facilities,

United States District Court
Northern District of California

10

United States District Court
Northern District of California

1    water supply and sanitation facilities, and the agricultural sector.").  Nicaragua's TPS status was

2    extended multiple times across Democratic and Republican administrations due to "recurrent"

3    extreme weather events.  88 Fed. Reg. 40294 (Jun. 21, 2023).  Nicaragua was also found to be the

4    fourth most affected country in the world by extreme weather events from 1996 to 2015.  *Id.*

5         The Trump administration first attempted to terminate the TPS designations for Nepal,

6    Honduras, and Nicaragua during the President Trump's first term.  WILSON, *supra* at 12, 19.  At

7    around the same time, the first Trump administration also attempted to terminate TPS for El

8    Salvador, Haiti, and Sudan.  *See* WILSON, *supra*.  These termination efforts were ultimately stalled

9    by federal courts across the United States.  *See Ramos v. Nielsen*, 336 F. Supp. 3d 1075, 1098

10   (N.D. Cal. 2018), vacated and remanded sub nom, *Ramos v. Wolf*, 975 F.3d 872 (9th Cir. 2020),

11   reh'g en banc granted, opinion vacated, 59 F.4th 1010 (9th Cir. 2023); *Saget v. Trump*, 375 F.

12   Supp. 3d 280 (E.D.N.Y. 2019).  The subsequent Biden administration rescinded the TPS

13   terminations and extended designations.  *See, e.g.*, 88 Fed. Reg. 40304 (Jun. 21, 2023); 88 Fed.

14   Reg. 40294 (Jun. 21, 2023).

15       **D.    The Current Administration and TPS**

16        On the day President Trump took office for his second administration, President Trump

17   issued an executive order titled, "protecting the American People Against Invasion" ("Invasion

18   EO").  90 Fed. Reg. 8443 (Jan. 20, 2025).  The Invasion EO cited to an "unprecedented flood of

19   illegal immigration into the United States" and stated the following about those in the United

20   States:

21            Many of these aliens unlawfully within the United States present
             significant threats to national security and public safety, committing
22            vile and heinous acts against innocent Americans. Others are engaged
             in hostile activities, including espionage, economic espionage, and
23            preparations for terror-related activities. Many have abused the
             generosity of the American people, and their presence in the United
24            States has cost taxpayers billions of dollars at the Federal, State, and
             local levels.

25   *Id*. at § 1.  The Invasion EO ordered the Secretary of State, Attorney General, and DHS Secretary

26   to "rescind the policy decisions of the previous administration that led to the increased or

27   continued presence of illegal aliens in the United States, and align any and all departmental

28

11

activities with the policies set out by this order and the immigration laws." *Id*. § 16.  This included "ensuring that designations of Temporary Protected Status are consistent with the provisions of section 244 of the INA (8 U.S.C. 1254a), and that such designations are appropriately limited in scope and made for only so long as may be necessary to fulfill the textual requirements of that statute." *Id*. § 16(b).

The Invasion EO would be cited in later decisions vacating or terminating TPS designations.  *See* 90 Fed. Reg. 30086 (July 8, 2025); 90 Fed. Reg. 30089 (July 8, 2025); 90 Fed. Reg. 24151 (Jun. 6, 2025).  *See also* ECF 18-11 at 2 (citing "President Trump's promise to rescind policies that were magnets for illegal immigration and inconsistent with the law" when vacating Haiti's TPS extension).  On January 27, 2025, in an email exchange between DHS officials, Tony Pham wrote to Marc Rosenblum that "This is a project involving termination of TPS status and we need to tell the data story if can be."  ECF 18-5 at 2.  *See also* ECF 18-6 at 4 (privilege log showing a document labeled for Venezuela TPS "termination" on January 26, 2025).  Tony Pham also requested information on "the inter-relationship between the Columbia [sic] Honduras Nicaragua Venezuela (CHNV) Parole Processes and TPS."  ECF 18-5 at 3.  The extension of Venezuela's TPS status was vacated several days later which marked the first time a TPS extension had ever been vacated.  90 Fed. Reg. 8805 (Feb. 3, 2025).  USCIS officials also communicated to "focus on any improvements" when evaluating country conditions.  ECF 18-7 at 2.  For example, a January 31, 2025 draft memo for the Secretary excluded food insecurity and political repression and human rights from the country conditions considered for Venezuela.  *See* ECF 18-9.

These actions were taken in the context of repeated rhetoric by administration officials that associated immigrants and TPS holders with criminal activity or other undesirable traits.  During Secretary Noem's confirmation hearing, Secretary Noem remarked that "the extension of over 600,000 Venezuelans as well is alarming when you look at what we've seen in different states, including Colorado with gangs doing damage and harming the individuals and the people that live there."  ECF 18-14 at 28.  She indicated that the extensions "will no longer be allowed."  *Id*.  In an earlier news interview, future Secretary Noem similarly referred to immigrants as "some of the

12

most dangerous people in the world" and that other countries were "empty[ing] out their prisons, their mental institutions" and sending those individuals to the United States. ECF 18-15 at 7. In a January 29, 2025 post on X, Secretary Noem announced that she would end a Biden order that allowed Venezuelans to stay in the country and "violate our laws." ECF 18-16 at 2. In a March 20, 2025 post on X, Secretary Noem associated "migration management" with "sav[ing] American lives and get[ting] criminals off our streets!" ECF 18-17 at 2. In a May 19, 2025 post on X, DHS equated TPS holders with "MS-13 gang members," "known terrorists," and "murderers." ECF 18-18 at 2. These statements are consistent with similar statements by President Trump including one occurrence in which he stated that migrants were "poisoning the blood of our country." ECF 18-20 at 9–10.

### E. Secretary Noem's TPS Terminations for Nepal, Honduras, and Nicaragua

Following a vacatur of Venezuela's TPS and a string of TPS terminations for Afghanistan, Cameroon, and Haiti, Secretary Noem terminated TPS for Nepal on June 6, 2025. 90 Fed. Reg. 24151 (Jun. 6, 2025). The terminations for Honduras and Nicaragua came one month later on July 8, 2025. 90 Fed. Reg. 30086 (July 8, 2025); 90 Fed. Reg. 30089 (July 8, 2025). All three termination notices cite the Invasion EO. *See* 90 Fed. Reg. 24151 (Jun. 6, 2025); 90 Fed. Reg. 30089 (July 8, 2025); 88 Fed. Reg. 40304 (Jun. 21, 2023).

The Nepal termination notice focuses on the recovery efforts following the 2015 earthquake. *See* 90 Fed. Reg. 24151 (Jun. 6, 2025). The notice asserts that there have been improvements in environmental disaster preparedness as well as substantial reconstruction following the earthquake's destruction. *Id.* The notice concedes that "Nepal has continued to experience subsequent regional environmental events, including flooding and landslides" and that "Nepal remains one of the poorest countries in the world" but nevertheless finds that modest economic growth (two percent) and reconstruction efforts support a termination of Nepal's TPS designation. *Id.* The notice does not mention rising inflation, the effect of the Russian invasion of Ukraine on Nepal's agricultural capacity, or the "triple threat of global economic effects, dire environmental shocks, and the lingering impacts of the COVID–19 pandemic," which were previously cited in the 2023 extension of Nepal's TPS status. 88 Fed. Reg. 40317 (Jun. 21, 2023).

1    The termination notice for Honduras emphasizes that the destruction of Hurricane Mitch

2  has largely been overcome, and that Honduras is "now a popular tourism and real estate

3  investment destination." 90 Fed. Reg. 30089 (July 8, 2025). The notice also cites new

4  infrastructure projects, foreign direct investment, and a Trump era program designed to support

5  the huge numbers of migrants Honduras expects the administration to deport. *Id*. Unlike previous

6  iterations of DHS notices on Honduras, the Honduras notice does not mention political violence or

7  crime. *See* 90 Fed. Reg. 30089 (July 8, 2025); 88 Fed. Reg. 40304 (Jun. 21, 2023). There is also

8  no mention of drought, tropical storms, coffee-destroying fungi, flooding, or earthquakes, all of

9  which had served as bases for extensions. *Id*.

10    The Nicaragua termination notice similarly notes that the devastation associated with

11  Hurricane Mitch no longer persists. 90 Fed. Reg. 30086 (July 8, 2025). The notice asserts that

12  Nicaragua "is now a growing tourism, ecotourism, agriculture, and renewable energy leader." *Id*.

13  The notice also cites improvements in infrastructure, education, health, and agriculture. *Id*. The

14  notice makes no mention of the recurrent weather events that previous extension notices had

15  highlighted. *See id*. For example, the notice does not mention Hurricane Julia, which flooded 800

16  homes in Nicaragua in October 2022, or Tropical Storm Bonnie, which that flooded 300 homes

17  just three months prior to Hurricane Julia. 88 Fed. Reg. 40294 (Jun. 21, 2023). The new notice

18  also omits the anti-democratic human rights violations and the humanitarian crisis which has led

19  to 108,000 people fleeing the country. *Id*.

20  **IV.    ANALYSIS OF PLAINTIFFS' MOTION TO POSTPONE**

21    Plaintiffs argue that the Court should postpone the Secretary's Nepal, Honduras, and

22  Nicaragua TPS terminations because (A) the Court has jurisdiction to grant relief; (B) Plaintiffs

23  are likely to succeed on the merits of their APA claims; (C) Plaintiffs are likely to succeed on the

24  merits of the Fifth Amendment claim; (D) Plaintiffs will suffer irreparable harm; (E) the balance

25  of harms and public interest weigh in favor of a stay; and (F) Plaintiffs seek proper relief. ECF 17.

26    **A.    The Court has Jurisdiction to Review Plaintiffs' Claims**

27    Defendants argue that (i) 8 U.S.C. §1254a(b)(5) and (ii) 8 U.S.C. § 1252(f) strip the Court

28  of jurisdiction. ECF 45 at 8–13.

United States District Court
Northern District of California

### i.  8 U.S.C. § 1254a(b)(5) does not strip the Court of jurisdiction

Defendants argue 8 U.S.C. § 1254a(b)(5) prohibits judicial review of "any determination" by the Secretary "with respect to" TPS terminations.  ECF 45 at 8–11.  Plaintiffs argue that the Court may still consider decisions that are collateral to the Secretary's TPS terminations.  ECF 53 at 1–4.

8 U.S.C. §1254a(b)(5) states "[t]here is no judicial review of any determination of the Attorney General with respect to the designation, or termination or extension of a designation, of a foreign state under this subsection."

The Court "begin[s] with the language of the statute." *Wilderness Soc'y v. U.S. Fish & Wildlife Serv.*, 353 F.3d 1051, 1060 (9th Cir. 2003).  The Supreme Court has interpreted the words "a determination" to describe "*a single act* rather than a group of decisions or a practice or procedure employed in making decisions."  *McNary v. Haitian Refugee Cent., Inc*, 498 U.S 479, 492 (1991) (emphasis added); *see also Reno v. Catholic Social Services, Inc.*, 509 U.S. 43, 56 (1993) ("We said that 'the reference to 'a determination' describes a single act rather than a group of decisions or a practice or procedure employed in making decisions.").  Although the words "any" and "with respect to" in § 1254a(b)(5) arguably broaden the meaning of "determination," the operative word remains "determination."  *See Bare v. Barr*, 975 F.3d 952, 967 (9th Cir. 2020) ("The statute governing asylum, 8 U.S.C. § 1158, provides that an alien 'may apply for asylum,' . . . and that the DHS Secretary or Attorney General 'may grant asylum to an alien who has applied,' . . . The operative word in the statute is 'grant.'").  The Court therefore focuses on the word "determination"; "any" and "with respect to" are not dispositive of the Court's interpretation.  *See Small v. United States*, 544 U.S. 385, 388 (2005) ("The word 'any' considered alone cannot answer this question . . . we must look beyond that word itself.").

A review of the rest of § 1254a supports that "any determination" should be interpreted to mean the single act of deciding whether the country conditions continue to be met for the purposes of designating or terminating TPS.  *See* 8 U.S.C. § 1254a(b)(3)(A) ("At least 60 days before end of the initial period of designation . . .the Attorney General . . . shall determine whether the conditions for such designation under this subsection continue to be met"); ("If the Attorney

1   General determines under subparagraph (A) that a foreign state . . . no longer continues to meet the

2   conditions for designation under paragraph (1), the Attorney General shall terminate the

3   designation.").  As *McNary* explained, this single act does not include "general collateral

4   challenges to unconstitutional practices and policies used by the agency" in determining whether

5   to terminate TPS.  498 U.S. at 492.

6          Defendants' citation to *Patel v. Garland*, 596 U.S. 328 (2022) is not dispositive.  *Patel*

7   involved interpretation of the words "any judgment" in the context of a petitioner's request for a

8   federal court to review the "factual determinations" underlying an immigration court's denial of

9   discretionary relief.  596 U.S. at 335–36.  These factual determinations included "whether [a

10  petitioner] testified credibly and whether [a petitioner] had subjectively intended to misrepresent

11  himself as a citizen."  *Id.* at 335.  In contrast, here, the words "any determination" is in the context

12  of Plaintiffs' legal—not factual—claims that the Secretary erred in terminating TPS protections

13  for Nepal, Honduras, and Nicaragua under the APA and the Fifth Amendment.  "The APA thus

14  codifies for agency cases the unremarkable, yet elemental proposition reflected by judicial practice

15  dating back to *Marbury*: that courts decide legal questions by applying their own judgment."

16  *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 391–92 (2024).  The APA "specifies that

17  courts, not agencies, will decide '*all* relevant questions of *law*' arising on review of agency action

18  . . . even those involving ambiguous laws—and set aside any such action inconsistent with the law

19  as they interpret it."  *Id.* at 392 (emphasis added).  *Patel*'s holding that courts lack jurisdiction to

20  review any judgments that underlie immigration courts' factual findings is therefore

21  distinguishable from Plaintiffs' statutory and constitutional challenges to the Secretary's TPS

22  terminations.  The Court, for example, need not determine whether there is an "ongoing conflict"

23  posing a serious threat to safety or an "earthquake, flood, drought, epidemic, or other

24  environmental disaster" in Honduras, Nepal, or Nicaragua to evaluate Plaintiffs' APA or Fifth

25  Amendment claims.  8 U.S.C. § 1254a(b).

26          *Patel* also does not preclude this Court's jurisdiction because *Patel* involved interpretation

27  of the word "judgment," whereas this case involves interpretation of the word "determination."  In

28  *Patel*, the Supreme Court interpreted the word "judgment" to broadly mean "any authoritative

United States District Court
Northern District of California

16

decision" concerning factual determinations and recognized "Congress' choice to reduce procedural protections in the context of discretionary relief." 596 U.S. at 337–38, 346. However, here, Congress passed the TPS statute out of a need to limit and guide the Executive's discretion in granting stays of deportation. *See* H.R. Rep. No. 101-244, at 8 (1989) (expressing "disappointment" at the executive's failure to provide relief to nationals of certain countries such that "legislation has become necessary"). Members of Congress lamented the lack of regulation of EVD. *See* H.R. Rep. No. 101-245, at 11–12 (1989); 135 Cong. Rec. H7501 (daily ed. Oct. 25, 1989) (statement of Rep. Bill Richardson) (emphasizing the need "to establish an orderly, systematic procedure for providing temporary protected status . . . because we need to replace the current ad hoc, haphazard regulations and procedures that exist today."); 135 Cong. Rec. H7501 (daily ed. Oct. 25, 1989) (statement of Rep. Sander Levine) (supporting a bill that "will standardize the procedure for granting temporary stays of deportation. Refugees, spawned by the sad and tragic forces of warfare, should not be subject to the vagaries of our domestic politics as well."). Congress' intent guides the Court's interpretation of "any determination" and, given that the Supreme Court has interpreted "determination" to refer to a single act, the Court finds that Defendants fail to provide sufficient justification to broaden the meaning of "determination." *See City of Los Angeles v. Barr*, 941 F.3d 931, 940 (9th Cir. 2019) ("In every case, 'it is the intent of Congress that is the ultimate touchstone.'") (quoting *Arizona v. United States*, 567 U.S. 387, 453 (2012))*; Allen v. Milas*, 896 F.3d 1094, 1103 (9th Cir. 2018) ("The presumption of judicial reviewability is so strong that only upon a showing of 'clear and convincing evidence of a contrary legislative intent should the courts restrict access to judicial review.") (internal quotation omitted).

During oral argument, Defendant explained that the government seeks to preclude judicial review of all factual *and* legal determinations under the TPS statute. Defendants were also notably silent regarding Plaintiffs' argument that barring all judicial review would allow the President to grant or deny TPS as a lever for his negotiations with countries, and without concern for the express guidelines that Congress requires in the TPS statute. The Court shares this concern and

does not forget that this country has bartered with human lives.[1]  Nor does the Court shut its eyes

to the country's shifting attitudes towards immigrants.[2]

---

[1]     During oral argument, Plaintiffs argued that granting unfettered discretion over TPS terminations would allow the President to give or take TPS away from some country whenever he feels like it or for the purpose of trade negotiations.  The Court recognizes that the United States has a long history of transporting individuals against their will, to places unfamiliar to them, and for the purposes of trade.  For example, the United States was an active participant in the transatlantic slave trade which uprooted individuals in Africa and brought them to this continent. The emancipation of slaves saw the same pattern, but in reverse.  Many whites were uncomfortable with the idea of free non-white people in their communities, even if they had lived in the United States for generations.  *See* OUSMANE K. POWER-GREENE, AGAINST WIND AND TIDE: THE AFRICAN STRUGGLE AGAINST THE COLONIZATION MOVEMENT (2014).  Plaintiffs' allegations echo these same traditions.  Plaintiffs allege that "Secretary Noem, President Trump, and members of the Trump campaign and administration have consistently used racist invective to describe their TPS decisions involving immigrants from non-white, non-European countries, including those involving the countries at issue here."  Compl. ¶ 5.

Plaintiffs also allege that "TPS holders are facing the imminent loss of legal status, and as a result, are already being forced to make the impossible choice whether to return to a country in crisis, remain in the United States without lawful immigration status, or uproot themselves again to try to find refuge in some third country."  Compl. ¶ 130.  Indeed, Plaintiffs here face violence and threats to their health if deported including Patricia Carbajal who fears sexual violence against herself and her daughter in Honduras, Maria Elena Hernandez who relies on U.S. insurance and medical care to treat her heart condition, or O.C. who will no longer be able to obtain the diabetes medication she needs to survive if TPS is terminated.  *See* ECF 17-4, 17-5, 17-12.

America has seen this pattern before.  Many freed slaves were sent to countries to which they had no connection whatsoever.  These efforts made "free blacks fearful of a mass deportation across the Atlantic Ocean reminiscent of the Middle Passage."  POWER-GREENE, *supra* at 17 (describing resistance to white plans to send freed blacks to Liberia).  Some states, such as Virginia, passed laws demanding freed slaves to leave.  Eric Burn, *A Manumission in the Mountains: Slavery and the African Colonization Movement in Southwestern Virginia*, 33 APPALACHIAN J. 164, 171 (2006).  In other cases, slaveowners made freedom conditional on leaving the United States.  Mark J. Fleszar, *"My Laborers in Haiti Are Not Slaves": Proslavery Fictions and a Black Colonization Experiment on the Northern Coast, 1835-1846*, 26 J. SOC. HIST. 478, 478 (1993) (describing a Florida slaveowner requiring removal to Haiti as a condition for freedom).  National Geographic has referred to this period of forced removal in U.S. history as "a racist initiative to remove as many free Black people as possible from American soil."  Enrique Vaquerizo, *Were there sinister motives behind founding Liberia?*, NATIONAL GEOGRAPHIC (Jun. 18, 2025).  The results of this endeavor were devastating and one study found that removal to Liberia resulted in the "highest mortality rates in accurately recorded human history."  Antonio McDaniel, *Extreme Mortality in Nineteenth-Century Africa: The Case of Liberian Immigrants*, 29 Demography 581, 581 (Nov. 1992).

[2]     Acceptance of immigrants has ebbed and flowed over the centuries of U.S. history.  In the late 1700s, immigration was largely unregulated except that naturalization as a path to citizenship was explicitly limited to "free white persons" in one of the first laws adopted in the nascent nation. *See* Naturalization Act of 1790, ch. 3, § 1, 1 Stat. 103, 103–04 (repealed 1795).  During this

18

However, Congress has not delegated Defendants' requested "[e]xtraordinary grant[] of regulatory authority" by using "any" in the TPS statute. *West Virginia v. EPA*, 597 U.S. 697, 723 (2022); *see also Nixon v. Missouri Municipal League*, 541 U.S. 125, 132, (2004) ("'any' means different things depending upon the setting") (cleaned up). "Extraordinary grants of regulatory authority are rarely accomplished through modest words, vague terms, or subtle devices . . . Nor does Congress typically use oblique or elliptical language to empower an agency to make a radical or fundamental change to a statutory scheme." *West Virginia*, at 723. (cleaned up). "Enabling legislation is generally not an 'open book' to which the agency [may] add pages and change the plot line." *Id*.

The Court, therefore, declines Defendants' invitation to rely on § 1254a(b)(5)'s use of "any" to both ignore Supreme Court precedent interpreting the word "determination" and ignore Congress' intent. *See Catholic Social Services*, 509 U.S. at 64 ("[W]e avoided an interpretation of 8 U.S.C. § 1160(e) . . . that would have amounted to 'the practical equivalent of a total denial of judicial review of generic constitutional and statutory claims,' . . . so here we avoid an interpretation of § 1255a(f)(1) that would bar front-desked applicants from ever obtaining judicial review of the regulations that rendered them ineligible for legalization."); *United States v. Lazarenko*, 624 F.3d 1247, 1251 (9th Cir. 2010) ("In other words, because a literal application of the plain text leads to absurd results, the plain text does not control.").

_____

period, large numbers of African slaves were also brought into the country against their will.  As the United States industrialized in the late 19th century, large numbers of immigrants from southern and eastern Europe and other places flowed into the country.  *Immigration to the United States, 1851-1900*, LIBRARY OF CONGRESS (2025).  In reaction to this, the government excluded some non-white immigrants, most notably through the Chinese Exclusion Act which was upheld by the Supreme Court in a case which set the foundation for plenary power over immigration. *See* 22 Stat. 58 (1882); *Chae Chan Ping v. United States*, 130 U.S. 581 (1889). *See also Fong Yue Ting v. United States*, 149 U.S. 698 (1893). The United States also limited Japanese immigration in the Gentlemen's Agreement of 1907.

Plaintiffs here face similar tides.  For example, Plaintiff O.C. started his own small business, R.A. helped treat children with brain cancer, and Plaintiff Silva helps heart patients at Stanford Hospital, a kind of opportunity that would be unattainable in Honduras. ECF 17-3; ECF 17-5; 17-9.  Plaintiffs have been in the United States for decades and contributing to the American system.  Still, they face exclusion in the name of the President's Invasion EO.

1    Accordingly, the Court finds that 8 U.S.C. § 1254a(b)(5) does not preclude the Court's

2  jurisdiction over Plaintiffs' claims.

3          **ii.   8 U.S.C. § 1252(f)(1) does not strip the Court of jurisdiction.**

4    Defendants argue that section 1252(f)(1) applies to the TPS statute and eliminates lower

5  courts' authority to issue orders enjoining or restraining implementation TPS.  ECF 45 at 11–12.

6  Plaintiffs argue that 1252(f)(1) only applies to injunctions and APA relief is not functionally the

7  same as an injunction.  ECF 53 at 5.

8    8 U.S.C. 1252(f)(1) states:

9          Regardless of the nature of the action or claim or of the identity of the
         party or parties bringing the action, no court (other than the Supreme
10         Court) shall have jurisdiction or authority to enjoin or restrain the
         operation of the provisions of part IV of this subchapter, as amended
11         by the Illegal Immigration Reform and Immigrant Responsibility Act
         of 1996, other than with respect to the application of such provisions
12         to an individual alien against whom proceedings under such part have
         been initiated.

13    The Court finds that 1252(f)(1)'s reference to "enjoin or restrain" does not strip the Court

14  of jurisdiction.  Here, Plaintiffs seek relief under the APA, which allows the Court to "issue all

15  necessary and appropriate process to postpone the effective date of an agency action or to preserve

16  status or rights pending conclusion of the review proceedings."  5 U.S.C. § 705.  Plaintiffs' request

17  for APA relief warrants a "presumption favoring judicial review."  *Sackett v. EPA*, 566 U.S. 120,

18  128 (2012).  Moreover, both the Ninth Circuit and Fifth Circuit have "rejected the argument that

19  "§ 1252(f)(1) bars relief under the APA."  *Immigrant Defenders*, 2025 WL 2017247, at *10.

20  Indeed, in *Nken,* the Supreme Court distinguished that a stay "simply suspend[s] judicial alteration

21  of the status quo" while an injunction "directs the conduct of a party, and does so with the backing

22  of [the Court's] full coercive powers."  *Nken v. Holder*, 556 U.S. 418, 428–29 (2009).  A

23  postponement here would only preserve the status quo.

24    Accordingly, the Court finds that 8 U.S.C. § 1252(f)(1) does not strip the Court of

25  jurisdiction.

26      **B.    Plaintiffs will Likely Succeed on the Merits of the Administrative Procedure Act
           Claims**

27

28    Plaintiffs argue that their APA claims, involving Defendants' alleged preordained

United States District Court
Northern District of California

decisions and deviation from TPS prior practice and history, are likely to succeed on the merits.
ECF 17 at 15–19.

### i. First APA Claim: Plaintiffs have shown that the Secretary's TPS terminations were likely preordained decisions and not based on country conditions

Plaintiffs' first APA claim alleges that the Nepal, Honduras, and Nicaragua TPS terminations violate the APA because the terminations were preordained and therefore not based on an objective review of county conditions. ECF 1 at 152–57; ECF 17 at 15–17. Plaintiffs argue that the TPS terminations explicitly cite the invasion EO and improperly terminated TPS based on positive improvements, rather than review of the initial natural disasters that affected the countries. ECF 17 at 16–17. Defendants argue that it is not improper for an agency to come into office with a policy preference. ECF 45 at 13. Defendants further argue that the Secretary's terminations follow the TPS statute's requirements, which include review of the country conditions. *Id*. at 13–14.

The APA provides that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702. "Courts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority, as the APA requires." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412 (2024). The APA also requires Courts to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(a). "On such conditions as may be required and to the extent necessary to prevent irreparable injury, the reviewing court . . . may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings." 5 U.S.C. § 705.

Here, Plaintiffs provide sufficient evidence to demonstrate that the Secretary's TPS Nepal, Honduras, and Nicaragua terminations were based on a preordained determination to end the TPS program, rather than an objective review of the country conditions. Indeed, at the Secretary's confirmation hearing—before the Secretary reviewed any country conditions reports—the

1   Secretary said that TPS extensions will not be allowed to "go[] forward the way that they are."

2   ECF 18-14 at 104:20–21.  Before terminating TPS for Nepal, Honduras, and Nicaragua, the

3   Secretary also commented that TPS "was abused, exploited, and politicized" and "an immigration

4   scheme[] that make[s] Americans less safe." ECF 44-2.  Moreover, the TPS terminations

5   explicitly cite to President Trump's Invasion EO, which implied that those with TPS were

6   "illegal," contributed to an "invasion" and "significant threat to national security and public

7   safety," and "commit[ed] vile and heinous acts against innocent Americans."  The Secretary

8   admitted to following the Invasion EO as the President's directive.  *See* ECF 44-2 ("[W]hen the

9   president gives a directive, the Department of Homeland Security will follow it.").

10          In addition to the Secretary's statements, the Secretary has a history of systematically

11   attempting to limit TPS.  *See* 90 Fed. Reg. 8805 (Venezuela); 90 Fed. Reg. 28760 (Haiti); 90 Fed.

12   Reg. 20309 (Afghanistan); 90 Fed. Reg. 23697 (Cameroon).  The Secretary's Nepal, Honduras,

13   and Nicaragua TPS terminations also did not include a discussion of data that was previously

14   deemed relevant for prior TPS determinations.  *See Northwest Envt'l. Def. Ctr. v. Bonneville*

15   *Power Admin*., 477 F.3d 668, 687 (9th Cir. 2007) ("[T]he agency must examine the relevant data

16   and articulate a satisfactory explanation for its action including a "rational connection between the

17   facts found and the choice made.") (quoting *Motor Vehicle Mfgs. Ass'n v. State Farm Mutual*

18   *Auto. Ins. Co*., 463 U.S. 29, 43 (1983)).  For example, the Secretary's Nepal TPS termination did

19   not mention inflation, the effect of the Russian invasion of Ukraine on Nepal's agricultural

20   capacity, or the effects of the COVID–19 pandemic.  *Compare* 90 Fed. Reg. 24151 *with* 88 Fed.

21   Reg. 40317.  The Honduras TPS termination did not mention political violence or crime.

22   *Compare See* 90 Fed. Reg. 30089 *with* 88 Fed. Reg. 40304.  Likewise, the Nicaragua TPS

23   termination ignored recurrent weather events, such as Hurricane Julia and Tropical Storm Bonnie.

24   *Compare* 90 Fed. Reg. 30086 *with* 88 Fed. Reg. 40294.

25          Exercising its "independent judgment in deciding whether [the Secretary] acted within

26   [her] statutory authority," the Court finds that Plaintiffs have provided sufficient evidence to

27   demonstrate a likelihood that the Secretary terminated TPS for Nepal, Honduras, and Nicaragua

28   based on a pre-ordained decision to limit TPS.  *See Loper Bright Enterprises v. Raimondo*, 603

United States District Court
Northern District of California

U.S. 369, 412 (2024).

Accordingly, the Court finds that Plaintiffs will likely succeed on the merits of their first APA claim.

### ii. Second APA Claim: Plaintiffs have shown that the Secretary's TPS terminations deviated from prior practice without good reason

Plaintiffs' second APA claim alleges that the TPS terminations violate the APA because the terminations broke from past practice concerning orderly transition periods without explanation. *See* ECF 1 at 158–161; ECF 17 at 17–19. Plaintiffs argue that the prior practice for ending TPS protections that had been in place for longer than 3 years was to provide no less than six-months to transition, but here the Secretary only gave 60 days without an explanation for the change. ECF 17 at 17. Defendants argue that the TPS statute gives the Secretary the authority to terminate TPS protections with a 60-day timeline. ECF 45 at 15.

"The change-in-position doctrine asks two questions." *FDA v. Wages and White Lions*, LLC, 145 S. Ct. 898, 918 (2025). "The first is whether an agency changed existing policy." *Id*. Once a change in agency position is identified, the doctrine poses a second question: Did the agency "display awareness that it *is* changing position" and offer "good reasons for the new policy"? *Id*.

Regarding the first question, Plaintiffs have provided sufficient evidence demonstrating that, for the past twenty-two years, since January 27, 2003, the prevailing practice of prior administrations was to provide at least 6 months after the TPS termination date for holders to transition. *See* ECF 28. Defendants do not meaningful dispute this practice in their opposition. *See* ECF 45 at 15–16. Given this prior practice of providing a six-month transition after termination, the Court finds that the Honduran, Nepal, and Nicaragua TPS Terminations change existing policy by only providing a 60-day transition. *See INS v. Yueh-Shaio Yang*, 519 U.S. 26, 32 (1996) ("Though the agency's discretion is unfettered at the outset, if it announces and follows—by rule or by settled course of adjudication—a general policy by which its exercise of discretion will be governed, an irrational departure from that policy (as opposed to an avowed alteration of it) could constitute action that must be overturned . . .").

Turning to the second question of whether the Secretary displayed an awareness of the change and offered "good reasons" for the new policy, the Court must ask whether the Secretary was "cognizant that longstanding policies may have 'engendered serious reliance interests that must be taken into account.'" *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 212 (2016) (quoting *F.C.C.*, 556 U.S. at 515). Here, the Honduras and Nicaragua termination notices only provide that "[a] sixty-day orderly period of transition is consistent with the precedent of previous TPS country terminations and makes clear that the United States is committed to clarity and consistency." *See* 90 Fed. Reg. 30091, 30088. Because these notices fail to explain how a 60-day transition period is consistent with the agency's twenty-two year practice of providing at least a 6 month transition period, the Court finds that Plaintiffs will likely succeed on the merits of their second ADA claim as to Honduras and Nicaragua. *See Encino Motorcars*, 579 U.S. at 222 ("It follows that an '[u]nexplained inconsistency' in agency policy is 'a reason for holding an interpretation to be an arbitrary and capricious change from agency practice.'") (internal citation omitted).

Regarding Nepal, the Nepal termination notice states that "there is no longer an environmental disaster or other situation causing substantial, but temporary, disruption of living conditions and that Nepal can adequately handle the return of its nationals, and considering other relevant factors, the Secretary has determined that a 60-day transition period is sufficient and in accord with Executive Order 14159." 90 Fed. Reg. 24153. In a footnote, the Secretary "recognized that certain previous TPS terminations allowed for an extended transition" but said that "certain other TPS designations were terminated without allowing for an extended transition period." *Id*. at n. 24. The Court finds that the Secretary's footnote alluding to "certain other TPS designations [being] terminated without allowing for an extended transition period" failed to acknowledge the twenty-two year practice of providing at least a 6 month transition period and did not provide sufficient explanation for departure. *See Encino Motorcars*, 579 U.S. at 222 ("[T]he Department offered barely any explanation. A summary discussion may suffice in other circumstances, but here—in particular because of decades of industry reliance on the Department's prior policy—the explanation fell short of the agency's duty to explain why it

United States District Court
Northern District of California

1  deemed it necessary to overrule its previous position."); *Dep't. of Homeland Sec.et al., v. Regents*

2  *of the University of California et al.*, 591 U.S. 1, 30 (2020) ("[T]he rescission memorandum

3  contains no discussion of forbearance or the option of retaining forbearance without benefits.

4  Duke 'entirely failed to consider [that] important aspect of the problem.' That omission alone

5  renders Acting Secretary Duke's decision arbitrary and capricious.  But it is not the only

6  defect.  Duke also failed to address whether there was 'legitimate reliance' on the DACA

7  Memorandum.").

8       Accordingly, the Court finds that Plaintiffs will likely succeed on the merits of their second

9  APA claim.

10      **C.    Plaintiffs will Likely Succeed on the Merits of their Fifth Amendment Claims**

11      The Fifth Amendment states that "No person shall. . . be deprived of life, liberty, or

12  property, without due process of law; nor shall private property be taken for public use, without

13  just compensation."  U.S. CONST. amend V.

14      Plaintiffs argue that they are likely to succeed in showing that Defendants violated the

15  equal protection process clause of the Fifth Amendment.  ECF 19–22.  Plaintiffs assert that (i)

16  *Arlington Heights*' standard of racial animus applies to Plaintiffs' Fifth Amendment claims; (ii)

17  Plaintiffs will likely succeed in showing racial animus under *Arlington Heights*; and (iii) Plaintiffs

18  would still likely succeed in showing animus under *Trump v. Hawaii.  Id.*

19         **i.    *Arlington Heights'* Standard Applies to Plaintiffs' Claims**

20      Plaintiffs argue that the Court should apply strict scrutiny under *Vill. of Arlington Heights

21  v. Metro. Hous. Dev. Corp.*, 429 U.S. 252 (1977) when reviewing Plaintiffs' Fifth Amendment

22  claim.  ECF 17 at 19–20.  Defendants argue that the Court should apply the rational basis test

23  under *Hawaii v. Trump*, 585 U.S. 667 (2018) because *Hawaii* applies to any law that would inhibit

24  the flexibility of the President to respond to changing world conditions.  ECF 45 at 16.

25      *Arlington Heights* involved claims that a board of trustee's denial of law and moderate-

26  income housing was motivated by racial discrimination.  429 U.S. at 258–59.  The Supreme Court

27  held that a violation of the Fifth Amendment's Equal Protection Clause requires "[p]roof of

28  racially discriminatory intent or purpose" and that a plaintiff need not "prove that the challenged

United States District Court
Northern District of California

25

action rested solely on racially discriminatory purposes." 429 U.S. at 265. The Supreme Court recognized that a court's analysis into "whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Id*. at 266.

*Trump v. Hawaii*, in contrast, involved the President's proclamation that "placed entry restrictions on the nationals of eight foreign states whose systems for managing and sharing information about their nationals the President deemed inadequate." 585 U.S. at 677. The Supreme Court limited the Court's review of "any rule of constitutional law that would inhibit the flexibility of the President to respond to changing world conditions." 585 U.S. at 704.

The Court finds that *Arlington Heights* applies to Plaintiffs' claims. *Arlington Heights* governs claims of racial animus and Plaintiffs specifically allege that the Secretary's Nepal, Honduras, and Nicaragua TPS terminations were motivated by racial animus. *See* Compl. ¶¶ 86–94, 156; *see also id*. ¶¶ 95–128. *See Dep't of Homeland Security v. Regents of the Univ. of California*, 591 U.S. 1, 34 (2020) ("To plead animus, a plaintiff must raise a plausible inference that an 'invidious discriminatory purpose was a motivating factor" in the relevant decision.'") (quoting *Arlington Heights*, 429 U.S. at 266 ); *Adarand Constructors, Inc. v. Peña*, 515 U.S. 200, 227 (1995) ("[A]ll racial classifications, imposed by whatever federal, state, or local governmental actor, must be analyzed by a reviewing court under strict scrutiny."). Defendants' reliance on *Mathews v. Diaz*, 426 U.S. 67, 83 (1976), is inapposite because *Matthews* involved whether Congress may condition medical insurance participation based on a five-year period and admission for permanent residence. 426 U.S. at 69–71. The case concerned whether Congress may classify noncitizens based on class; there was no allegation of racial animus. *Id*. at 79–80.

Although *Trump v. Hawaii*, 585 U.S. 667 (2018) constrains the Court's "inquiry into matters of entry and national security," Defendants fail to explain how the Secretary's TPS terminations concern matters of entry and national security. Unlike the proclamation in *Trump v. Hawaii*, which explained that "certain entry restrictions were necessary to prevent the entry of those foreign nationals about whom the United States Government lacks sufficient information; elicit improved identity-management and information-sharing protocols and practices from foreign

1    governments . . . [and] the restrictions would most likely to encourage cooperation while

2    protecting the United States until such time as improvements occur," 585 U.S. at 679 (cleaned up),

3    Defendants here rely on a blanket assertion that TPS impacts matters of foreign relations.  As the

4    Court explained above, simply existing in the United States with TPS is not a crime.  Plaintiff TPS

5    holders are already located in the country and would not qualify for TPS if convicted of any felony

6    or 2 or more misdemeanors in the United States.  8 U.S.C. § 1254a(c)(2).

7        Accordingly, the Court applies the strict scrutiny standard under *Arlington Heights* to

8    Plaintiffs' equal protection claims.

9        ii.    **Plaintiffs are likely to succeed on showing that the Secretary's termination
10               of TPS for Nepal, Honduras, and Nicaragua were motivated by racial
               animus**

11        Plaintiffs argue the Secretary's statements, specific sequence of events, historical

12    background of the Secretary's decisions, and the disparate impact demonstrate racial animus.  ECF

13    17 at 20–22.  Defendants argue that Plaintiffs cannot establish racial animus because the Ninth

14    Circuit has already rejected Plaintiffs' arguments in *Ramos*, Plaintiffs fail to provide a direct link

15    between their evidence and the Secretary's decision, Plaintiffs rely on statement by President

16    Trump and not the Secretary, the Secretary's terminations were based on evidence, and the

17    Secretary has spoken in favor of immigration policy that focuses on America's economy and

18    security interests.  ECF 45 at 18–20.

19        "Under *Arlington Heights*, a plaintiff must 'simply produce direct or circumstantial

20    evidence demonstrating that a discriminatory reason more likely that not motivated' the defendant

21    and that the defendant's actions adversely affected the plaintiff in some way."  *Ave. 6E Invs., LLC*

22    *v. City of Yuma, Ariz.*, 818 F.3d 493, 504 (9th Cir. 2016) (internal quotations omitted).  "A

23    plaintiff does not have to prove that the discriminatory purpose was the sole purpose of the

24    challenged action, but only that it was a 'motivating factor.'"  *Id*.  "The court analyzes whether a

25    discriminatory purpose motivated the defendant by examining the events leading up to the

26    challenged decision and the legislative history behind it, the defendant's departure from normal

27    procedures or substantive conclusions, and the historical background of the decision and whether

28    it creates a disparate impact."  *Id*.

United States District Court
Northern District of California

Plaintiffs' direct and circumstantial evidence cannot be ignored. Secretary Noem has described immigration as an "invasion happening on purpose . . . to remake the foundation of this country." ECF 18-15 at 7:14–15. Moreover, at her confirmation hearing, on January 15, 2025, Secretary Noem stated that TPS "has been abused and manipulated by the Biden administration." ECF 18-14 at 104:18–19. Before reviewing any country conditions reports, Secretary Noem also stated that TPS "will no longer be allowed . . . extensions going forward the way that they are," *id.* at 104:19–21, and commented that TPS was "an immigration scheme[] that make[s] Americans less safe," ECF 44-2. When describing what was "seen in different states," the Secretary stated that there were "gangs doing damage and harming the individuals and the people that live there." *Id.* at 104:24–25; 105:1–2. After meeting with the Honduran Minister of Foreign Affairs, the Secretary described the need for "migration management" and "reparation flights." ECF 18-17. Her agency broadly described individuals with TPS as "poorly vetted migrants" that included "MS-13 gang members to known terrorists and murderers." ECF 18-18.

These statements reflect the Secretary's animus against immigrants and the TPS program even though individuals with TPS hold lawful status—a protected status that was expressly conferred by Congress with the purpose of providing humanitarian relief. *See* 8 U.S.C. § 1254a(c); H.R. 101-244 at 8; H.R. 101-245 at 11–12. Their presence is not a crime. Rather, TPS holders already live in the United States and have contributed billions to the economy by legally working in jobs, paying taxes, and paying contributions into MediCare and Social Security. ECF 17-15 (Postel Decl.); 17-18 (Morten Decl.). By stereotyping the TPS program and immigrants as invaders that are criminal, and by highlighting the need for migration management, Secretary Noem's statements perpetuate the discriminatory belief that certain immigrant populations will replace the white population. *See* ECF 17-20 (Young Decl.). Although the Secretary's statements "may appear innocent or only mildly offensive to one who is not a member of the targeted group," the statements are "in reality . . . intolerably abusive or threatening when understood from the perspective of a plaintiff who is a member of the targeted group." *McGinest v. GTE Service Corp.*, 360 F.3d 1103, 1116 (9th Cir. 2004); *see also Mi Familia*, 129 F.4th at 727 ("[T]he term 'illegals' can evidence racial animus for members of the Latino community in Arizona). Indeed,

code words may demonstrate discriminatory intent. *Ave. 6E Invs*, 818 F.3d at 504.

The political climate surrounding the Secretary's comments on immigrants further supports the likelihood of racial animus. *See Mi Familia*, 129 F.4th at 728 (courts should consider "the political climate leading to" the challenged action). President Trump campaigned with a message that migrants were "poisoning the blood of our country." ECF 18-20 at 8–9. The President has also asked why people "could not come from nice countries . . . like Denmark, Switzerland, and Norway." ECF 18-23. Vice President Vance has also stated, "What Donald Trump has proposed doing is we're going to stop doing mass parole. We're going to stop doing mass grants of Temporary Protected Status." ECF 18-19 at 2. Moreover, on January 20, 2025, the day President Trump took office, President Trump issued the Invasion EO, which connected TPS with an "invasion" and "illegal" and painted "aliens" as presenting "significant threats to national security and public safety, committing vile and heinous acts against innocent Americans." *See* Invasion EO (titled "Protecting the American People Against Invasion" and requiring review of TPS). After these statements were made, Secretary Noem admitted that "when the president gives a directive, the Department of Homeland Security will follow it." ECF 44-2. Indeed, the Secretary also cited the Invasion EO in her Nepal, Honduras, and Nicaragua TPS terminations. *See* 90 Fed. Reg. 30089–91; 90 Fed. Reg. 24151–53; 90 Fed. Reg. 30088.

In totality, Plaintiffs have produced sufficient evidence demonstrating racial and discriminatory animus in support of their Fifth Amendment claim. Color is neither a poison nor a crime.

Therefore, Plaintiffs have provided sufficient evidence to establish that Plaintiffs will likely succeed on the merits of their Fifth Amendment claim. The Court declines Defendants' request to ignore the evidence described above based on a vacated Ninth Circuit precedent.

### iii.    Even under the rational basis standard, Plaintiffs will likely succeed on the merits of their Fifth Amendment Claim

Given the strength of the evidence, Plaintiffs' Fifth Amendment claim would also likely succeed on the merits even if the Court applied the rational basis test. Defendants argue that the Secretary's termination decisions were plausibly related to the Government's border security,

1    foreign relations interests, and the objectives of the TPS program but fail to explain how TPS

2    holders impact border security and foreign relations interests.  Although "[t]he President has vital

3    power in the field of foreign affairs, so does Congress, and the President does not have the

4    authority to override immigration laws enacted by Congress."  *Biden v. Texas*, 597 U.S. 785, 830

5    (2022) (Alito, S., dissenting).  "[W]hen the President takes measures incompatible with the

6    expressed or implied will of Congress, his power is at its lowest ebb, for then he can rely only

7    upon his own constitutional powers minus any constitutional powers of Congress over the matter."

8    *Id.* (citing *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952)).

9        Accordingly, even under the rational basis standard, the Court finds that Plaintiffs will

10   likely succeed on the merits of their Fifth Amendment claim.

11       **D.    Plaintiffs will Suffer Irreparable Injury Absent Postponement**

12       Plaintiffs argue that TPS holders will suffer irreparable harm absent relief.  ECF 17 at 22 –

13   23.  During oral argument, Defendants conceded that Plaintiffs will suffer harm but argued that

14   TPS is temporary in nature and Plaintiffs could have obtained citizenship status.

15       Plaintiffs must show that they will suffer irreparable harm absent relief.  *See Porretti v.

16   Dzurenda*, 11 F.4th 1037, 1050 (9th Cir. 2021) (citing *Winter*, 555 U.S. at 20).  "If a plaintiff

17   bringing such a claim shows he is likely to prevail on the merits, that showing will almost always

18   demonstrate he is suffering irreparable harm as well."  *Baird v. Bonta*, 81 F.4th 1036, 1042 (9th

19   Cir. 2023) (cleaned up).

20       As discussed above, the Court finds that the Plaintiff will likely succeed on the merits of

21   their APA and Fifth Amendment claims.  Plaintiffs will suffer irreparable harm if the TPS

22   termination proceeds.  First, the loss of work authorization will be devastating to TPS holders, as

23   TPS holders will no longer be able to provide food or housing for their families.  *See Landon v.

24   Plasencia*, 459 U.S. 21, 34 (1982) ("Plasencia's interest here is, without question, a weighty one.

25   She stands to lose the right to stay and live and work in this land of freedom.") (internal quotations

26   omitted); *see also* ECF 17-18 ("41% of TPS holders owned homes."); ECF 17-15 ("Nearly one-

27   quarter (22%) of Honduran TPS households have mortgages").  The loss of employment is also

28   likely to lead to the loss of health insurance for TPS holders and their dependents.  Such a loss

United States District Court
Northern District of California

would be life threatening to Plaintiffs like Maria Elena Hernandez who relies on insurance to manage her heart condition and O.C. who suffers from diabetes. *See* ECF 17-4; ECF 17-5. Health insurance also provides benefits to Plaintiffs' children some of whom are U.S. citizens and suffer from conditions that need constant management. *See* ECF 17-3.

Families also face the prospect of separation. Indeed, "[t]he right to live with and not be separated from one's immediate family is a right that ranks high among the interests of the individual." *Ching v. Mayorkas*, 725 F.3d 1149, 1157 (9th Cir. 2013) (cleaned up). Plaintiff Jhony Silva, for example, will be forced to decide whether to bring his autistic son to Honduras, where his son will not be able to receive the care he needs, or leave his son behind in the United States. *See* ECF 17-3. Plaintiff Patricia Carbajal will need to decide whether to leave her daughter behind in the United States or bring her to Honduras where Plaintiff and her daughter are likely to face sexual violence. *See* ECF 17-12. The approximate 41,627 children that risk being left behind in the United States may grow up without their parents or be forced into foster care. *See* ECF 17-16. "These are substantial injuries and even irreparable harms." *Washington v. Trump*, 847 F.3d 1151, 1169 (9th Cir. 2017).

Moreover, TPS holders, some of whom have been legally present in the United States for more than two decades, will lose their drivers' licenses, lose their ability to pursue educational and career opportunities, and face deportation. *See* ECF 17-3 (declaration of Plaintiff who was brought to the United States when he was three years old); ECF 17-7; 17-9. Those who leave may be barred from legal permanence residence even if they currently qualify for them. *See* ECF 17-15 ("If TPS holders who entered the U.S. without inspection choose to leave upon termination, they may be subject to a ten-year bar on re-entry, even if they are otherwise eligible for legal permanent residence pathways."). Those that are deported also risk being send to third-countries where they have no ties. *See* ECF 17-19 ¶ 20. Even if Plaintiffs are not deported, those that remain will become undocumented, unable to work in the formal economy, and unable to get an education. ECF 17-6.

Defendants' arguments are not convincing. Defendants do not contest the aforementioned harms that Plaintiffs stand to face if the termination goes forward, *see* ECF 45 at 20–22, and

1   conceded during oral argument that Plaintiffs would suffer harm.  Although Defendants argue that

2   Plaintiffs could obtain lawful status, "pathways to lawful status are rare for individuals who

3   arrived in the last several years" and "if a TPS holder's TPS ends and they fall out of lawful status,

4   then they will not be eligible to change status to a different non-immigrant status."  ECF 17-19 ¶

5   21.

6       Accordingly, the Court finds Plaintiffs will suffer irreparable harm absent postponement of

7   Nepal, Honduras, and Nicaragua TPS terminations.

8       **E.     The Balance of Harms and Public Interest Weigh in Favor of Postponement**

9       Plaintiffs argue that the balance of equities and public interest weigh in favor of granting

10  relief.  ECF 17 at 25.  Defendants argue that a delay in the Secretary's decisions undermines

11  United States foreign policy and national interest, and that the public has an interest in ensuring

12  that the process established by Congress is followed.  ECF 45 at 23–24.  Defendants also argue

13  that the Supreme Court's recent stay in *Noem v. Nat. TPS Alliance et al.,* No. 24A1059, 2025 WL

14  1427560 (May 19, 2025) ("NTPSA I") shows the strength of Defendants' position.  *Id*. at 23.

15      When the government is the opposing party, the balancing of the "harm to the opposing

16  party and weighing the public interest" merge.  *Nken v. Holder*, 556 U.S. 418, 435 (2009).  The

17  Ninth Circuit "has consistently balanced the public interest on the side of the plaintiffs against the

18  public interest on the side of the government to determine where the public interest lies."  *Index*

19  *Newspapers LLC v. United States Marshals Serv.*, 977 F.3d 817, 838 (9th Cir. 2020).

20      The Court finds that the public has an interest in postponing the TPS terminations.

21      First, the economy will suffer if TPS holders are forced to leave the country.  *See All. for*

22  *the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1138 (9th Cir. 2011) ("The effect on the health of the

23  local economy is a proper consideration in the public interest analysis.").  Termination of TPS for

24  Nepal, Honduras, and Nicaragua will result in a $1.4 billion loss to the United States economy.

25  ECF 52-1 at 9.  Given that the vast majority of TPS holders are in the work force, loss of TPS will

26  depress economic activity.  *See* ECF 17-16; 61-1 at 11 ("Approximately 87% of TPS holders in

27  the United States participate in the labor force, a substantially higher rate than the U.S. labor force

28  participation rate overall (about 62%)").  This will result in reductions in tax revenue and Social

United States District Court
Northern District of California

United States District Court
Northern District of California

1    Security and Medicare contributions for the United States.  ECF 52-1.  A recent study based on

2    census data found that TPS holders contribute $10.3 billion per year and pay $2.2 billion annually

3    in federal and state taxes.  ECF 17-18; *see also* ECF 61-1 ("TPS holders contributed $170.5

4    million to state and local taxes in California, $126 million in New York, and $13.8 million in

5    Illinois.").  Termination of TPS for Honduras alone will result in a loss of $73 million in Social

6    Security contributions and $17 million in Medicare contributions.  ECF 17-16.  Similarly,

7    termination of TPS for Nepal will result in a loss of $28 million in Social Security contributions

8    and $6.7 million in Medicare contributions, and termination of TPS for Nicaragua will result in a

9    loss of $4 million in Social Security contributions and $968,301 in Medicare contributions.  *Id.*

10        Not only will the government bring in less tax revenue if these TPS terminations go

11    forward, but it will also have to expend more money to enforce the termination.  ECF 17-18.

12    Deportation costs could amount to $863 million.  *Id.*  Moreover, because TPS holders would lose

13    their employer-based health insurance by losing TPS, the cost of public health care will increase

14    by increasing the proportion of immigrants on public health care and thereby increasing public

15    expenditures on emergency care provided to uninsured patients.  *See* ECF 52-1; *see also* 61-1 at

16    17 – 18 ("A rise in the rate of uninsurance means a greater share of the burden of paying for health

17    care will be shifted to local governments and communities.").

18        Second, postponing the TPS terminations will maintain families.  *See* ECF 52-1 at 5. *See*

19    *Solis-Espinoza v. Gonzales*, 401 F.3d 1090, 1094 (9th Cir. 2005) ("Public policy supports

20    recognition and maintenance of a family unit.  The Immigration and Nationality Act ("INA") was

21    intended to keep families together.  It should be construed in favor of family units and the

22    acceptance of responsibility by family members.").

23        Third, termination of TPS would reduce public safety by reducing the amount of

24    individuals, here TPS holders, who would otherwise report a crime or cooperate with law

25    enforcement.  ECF 52 at 15; *see also* ECF 61-1 ("It is well-documented that undocumented

26    immigrants are less likely to report crimes, including violent crimes, when they fear police contact

27    will bring adverse immigration consequences.").

28        Fourth, termination of TPS would harm communities by reducing contributions to housing

wealth and property tax revenue. *See* ECF 61-1 at 10 ("TPS homeowners contribute at least $19 billion in housing value nationally, adding to their communities' housing wealth and property tax revenues, an important source of funding for amici"). Communities also risk losing TPS holders who would otherwise volunteer in community organizations, committees, or community groups. ECF 61-1 at 10–11; *see also id*. at 11 ("30% of TPS holders are actively involved in their communities, through neighborhood organizations, their children's schools, church, work organizations or events, sports teams, and other activities.").

Finally, the public has an interest in both preventing TPS holders from being wrongfully removed and in the Executive Branch's compliance with the APA. *See East Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 678 (9th Cir. 2021) ("[T]he public interest is served by compliance with the APA.") (quoting *California v. Azar*, 911 F.3d 558, 582 (9th Cir. 2018)); *Nken*, 556 U.S. at 436 ("Of course there is a public interest in preventing aliens from being wrongfully removed, particularly to countries where they are likely to face substantial harm.").

Although Defendants argue that a delay in the Secretary's decisions would undermine United States foreign policy and national interests, Defendants have failed to identify the exact foreign policy or national interest at stake. Defendants' citation to the Supreme Court's stay in *NTPSA I* is also not binding because the Supreme Court granted a stay in *NTPSA I* on the Supreme Court's shadow docket. *NTPSA I* lacks reasoning to support the stay and the claims in *NTPSA I* are distinguishable from Plaintiffs' claims in the instant case. *NTPSA I* was brought in the context of a vacatur rather than, as here, a determination to terminate TPS. The Plaintiffs here have also been in the county for more than 10 years.

Accordingly, the Court finds that the balance of harms and the public's interest weighs in favor of granting Plaintiffs' motion to postpone.

### F. Postponement of Agency Action is Proper Scope of Relief

Defendants argue that Plaintiffs impermissibly seek a universal injunction in violation of the Supreme Court recently held are unlawful under *Trump v. Casa*. ECF 45 at 24–25. Plaintiffs argue that the Court may grant relief because the APA explicitly permits courts to "issue all necessary and appropriate process to postpone the effective dat*e* of an agency action." 5 U.S.C. §

705.  ECF 53 at 15.

Here, Plaintiffs' requested relief, to postpone the Honduran, Nepal, and Nicaragua TPS terminations, is properly within the scope of the APA.  Although Defendants argue that the Supreme Court's recent decision in *Trump v. Casa* precludes a postponement or stay, *Trump v. Casa* involved universal injunctions and explicitly did not "resolve the distinct question of whether the Administrative Procedure Act authorizes federal courts to vacate federal agency action." 2025 WL 1773631, *8 n. 10.  *Trump v. Casa* is also factually distinguishable from the facts of the instant case because *Trump v. Casa* involved from the President's executive order.  *Id.* at *4 ("The plaintiffs—individuals, organizations, and States—sought to enjoin the implementation and enforcement of President Trump's Executive Order No. 14160.").  In comparison, Plaintiffs here seek relief from an agency action—not an action by the president.

Plaintiffs' requested relief is also expressly authorized by the text of the APA.  The APA grants the Court with the authority to "issue all necessary and appropriate process to postpone the effective date of an *agency action* or to preserve status or rights pending conclusion of the review proceedings." 5 U.S.C. § 705 (emphasis added), and "further *requires* courts to 'hold *unlawful and set aside* agency action, findings, and conclusions found to be . . . not in accordance with law,'" *Loper Bright*, 603 U.S. at 391 (quoting 5 U.S.C. § 706).  The Court's authority to grant relief against agency actions is therefore rooted in the statute's legislative history, which indicates that the Court must serve "'as a check upon administrators whose zeal might otherwise have carried them to excesses not contemplated in legislation creating their offices.'" *Loper Bright*, 603 U.S. at 391 (quoting *Morton Salt*, 338 U.S. 632, 644 (1950)).  Setting aside an agency action is the standard remedy for APA cases.  *See* 5 U.S.C. § 706(2)(A) ("The reviewing court shall . . . set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]").

*Immigrant Defenders Law Center ("ImmDef") et al., v. Noem et al.*, No. 25-2581, 2025 WL 2017247 (9th Cir. July 18, 2025) does not require the Court to limit postponement to the individual named Plaintiffs.  There, *ImmDef*, an organizational plaintiff, sought relief against the government's reimplementation of Migrant Protection Protocols ("MPP") because

reimplementation would impair ImmDef's ability to represent their clients.  2025 WL 2017247 at

*6–8.  The Ninth Circuit "limit[ed] the district court's § 705 Stay order to exempting ImmDef's

[current and future] clients from [Migrant Protection Protocols] MPP."  *Id*. at *14 (internal

quotations omitted).  In contrast, here, individual Plaintiffs seek relief from the Secretary's TPS

termination decisions and the standard remedy for these actions is to set aside an agency's action if

the action is found to be unlawful.  *See* 5 U.S.C. § 706(2)(A) ("The reviewing court shall ... *set*

*aside* agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of

discretion, or otherwise not in accordance with law[.]") (emphasis added).

        Moreover, unlike the *Immigrant Defenders* stay order, which enjoined the government

from reimplementing MPP, an order here would only postpone the Secretary's TPS terminations

until the next step of the litigation.  A postponement would also not enjoin the Secretary from

making further TPS determinations.  *See Postpone*, BLACK'S LAW DICTIONARY ("To put off to a

later time; to change the date or time for (a planned event or action) to a later one.") (12th ed.

2024).  "The Secretary remains free to terminate TPS status for any country pursuant to the

statutorily prescribed procedures Congress has enacted."  *See Haitian Evangelical Clergy*

*association v. Trump*, No. 25-cv-1464, 2025 WL 1808743, at *11 (E.D.N.Y. July 1, 2025).  As

Plaintiffs conceded during oral argument, the postponement will ultimately end if the Court later

finds that Plaintiffs fail to meet the standard for vacatur under summary judgment.  *See Ohio v.*

*EPA*, 603 U.S. 279, 290 (2024) ("Stay applications are nothing new.  They seek a form of interim

relief perhaps as old as the judicial system of the nation.") (internal quotations omitted).

        Finally, limiting postponement to the individual Plaintiffs here would be impractical.

Although Defendants assert that USCIS could issue individual notices that continue the benefits

for named Plaintiffs under TPS, Defendants fail to offer how Defendants would coordinate with

Plaintiffs' employers, the states and cities of counties in which Plaintiffs reside, hospitals, ICE,

and local law enforcement to ensure that Plaintiffs are not subject to removal or otherwise

detained after the TPS terminations go into effect.  Any error in coordination or communication

would result in a direct violation of the TPS statute.  *See* 8 U.S.C. 1254a(d)(4) ("An alien provided

temporary protected status under this section shall not be detained by the Attorney General on the

basis of the alien's immigration status in the United States.").

Accordingly, the Court finds the scope of Plaintiffs' relief, requesting a postponement or stay of Nepal, Honduras, and Nicaragua TPS terminations, proper.

## V.    CONCLUSION

For the foregoing reasons, Plaintiffs' motion to postpone is **GRANTED**.  5 U.S.C. § 705.

The matter is set for an initial case management conference on August 14, 2025.

No later than August 7, 2025, the parties shall file a joint case management conference statement addressing (1) whether Defendants intend to appeal this Court's Order and (2) ways in which this case can be expedited.

The Court reserves November 18, 2025 for hearing.

This Order resolves ECF 17.

**IT IS SO ORDERED.**

Dated: July 31, 2025

TRINA L. THOMPSON
United States District Judge