Ahilan T. Arulanantham (SBN 237841)
arulanantham@law.ucla.edu
CENTER FOR IMMIGRATION LAW AND
POLICY, UCLA SCHOOL OF LAW
385 Charles E. Young Dr. East
Los Angeles, CA 90095
Telephone: (310) 825-1029

Emilou H. MacLean (SBN 319071)
emaclean@aclunc.org
Michelle (Minju) Y. Cho (SBN 321939)
mcho@aclunc.org
Amanda Young (SBN 359753)
ayoung@aclunc.org
ACLU FOUNDATION
OF NORTHERN CALIFORNIA
39 Drumm Street
San Francisco, CA 94111-4805
Telephone: (415) 621-2493
Facsimile: (415) 863-7832

Attorneys for Plaintiffs
*[Additional Counsel Listed on Next Page]*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| NATIONAL TPS ALLIANCE, DENIS MOLINA, JHONY SILVA, MARIA ELENA HERNANDEZ, O.C., SANDHYA LAMA, S.K., TEOFILO MARTINEZ, <br><br> *Plaintiffs*, <br><br> v. <br><br> KRISTI NOEM, in her official capacity as Secretary of Homeland Security, UNITED STATES DEPARTMENT OF HOMELAND SECURITY, and UNITED STATES OF AMERICA, <br><br> *Defendants*. | Case No. 3:25-cv-05687 <br><br> **PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR STAY PENDING APPEAL** |

Additional Counsel for Plaintiffs

Jessica Karp Bansal (SBN 277347)
jessica@ndlon.org
Lauren Michel Wilfong (*Pro Hac Vice*)
lwilfong@ndlon.org
NATIONAL DAY LABORER ORGANIZING NETWORK
1030 S. Arroyo Parkway, Suite 106
Pasadena, CA 91105
Telephone: (626) 214-5689

Eva L. Bitran (SBN 302081)
ebitran@aclusocal.org
.ACLU FOUNDATION
OF SOUTHERN CALIFORNIA
1313 West 8th Street
Los Angeles, CA 90017
Telephone: (213) 977-5236

Erik Crew (*Pro Hac Vice*)
ecrew@haitianbridge.org
HAITIAN BRIDGE ALLIANCE
4560 Alvarado Canyon Road, Suite 1H
San Diego, CA 92120
Telephone: (949) 603-7411

# TABLE OF CONTENTS

I.     INTRODUCTION ...........................................................................................1

II.    ARGUMENT ................................................................................................2

       A.    The Supreme Court's Unreasoned Shadow Docket Order in Another Case Does Not
             Support Granting a Stay in this Case. ...........................................................2

       B.    Defendants Have Not Made a Strong Showing of Likelihood of Success. ...................4

             1.    The Court Has Jurisdiction to Consider Plaintiffs' Claims. ............................4

             2.    Defendants Have Not Shown a Strong Likelihood of Prevailing on the
                   Merits Given the Strength of Plaintiffs' First APA Claim. ............................7

             3.    Defendants Have Not Shown a Strong Likelihood of Prevailing on the
                   Merits Given the Support for Plaintiffs' Second APA Claim............................9

             4.    Defendants Cannot Show a Strong Likelihood of Success Given the
                   Overwhelming Evidence of Discriminatory Animus. .....................................11

       C.    The Balance of Harms Strongly Favors Leaving the Court's Order in Place..............14

             1.    The Equities Weigh Overwhelmingly in Favor of Postponement. ...................14

             2.    Narrowing the Scope of the 705 Stay is Unwarranted and Unworkable .........18

III.   CONCLUSION.............................................................................................20

1
2

## TABLE OF AUTHORITIES

3

**Page(s)**

4

**Cases**

5
6

*Al Otro Lado v. Wolf,*
    952 F.3d 999 (9th Cir. 2020) ..................................................................14

7

*Ala. Ass'n of Realtors v. HHS,*
    594 U.S. 758 (2021)............................................................................16

8
9

*Allen v. Milligan,*
    599 U.S. 1 (2023)..............................................................................4

10

*Arthur v. Dunn,*
    580 U.S. 977 (2016)............................................................................3

11
12

*Ave. 6E Invs., LLC v. City of Yuma,*
    818 F.3d 493 (9th Cir. 2016) .........................................................11, 12

13
14

*Biden v. Missouri,*
    145 S. Ct. 109 (2024) .........................................................................15

15

*Biden v. Texas,*
    142 S. Ct. 926 (2021) .........................................................................15

16
17

*Bowen v. Mich. Acad. of Fam. Physicians,*
    476 U.S. 667 (1986)............................................................................14

18
19

*by Doe v. Garland,*
    109 F.4th 1188 (9th Cir. 2024) ...........................................................18

20

*CASA de Md., Inc. v. Trump,*
    355 F. Supp. 3d 307 (D. Md. 2018) ......................................................5

21
22

*CASA, Inc. v. Noem,*
    No. 25-1484-TDC, 2025 WL 1907378 (D. Md. July 10, 2025)....................4, 16

23
24

*Centro Presente v. DHS,*
    332 F. Supp. 3d 393 (D. Mass. 2018) ....................................................5

25

*Collins v. Thompson,*
    679 F.2d 168 (9th Cir. 1982) ...............................................................7

26
27

*DHS v. Regents of the Univ. of Cal.,*
    591 U.S. 1 (2020).........................................................................11, 13

28

iii

*Doe #1 v. Trump*,
 957 F.3d 1050 (9th Cir. 2020) ......................................................................15, 16

*Doe v. Becerra*,
 704 F. Supp. 3d 1006 (N.D. Cal. 2023) .................................................................18

*E. Bay Sanctuary Covenant v. Biden*,
 993 F.3d 640 (9th Cir. 2021) ...............................................................................17

*E. Bay Sanctuary Covenant v. Trump*,
 932 F.3d 742 (9th Cir. 2018) ...............................................................................15

*FDA v. Wages & White Lion Invs., L.L.C.*,
 145 S. Ct. 898 (2025)......................................................................................10, 11

*Fiallo v. Bell*,
 430 U.S. 787 (1977)...............................................................................................5

*Haitian Evangelical Clergy Ass'n v. Trump*,
 No. 25-CV-1464 (BMC), 2025 WL 1808743 (E.D.N.Y. July 1, 2025) ...................5

*Hamilton v. State Farm Fire & Cas. Co.*,
 270 F.3d 778 (9th Cir. 2001) ................................................................................3

*Hotel & Rest. Emps. Union, Loc. 25 v. Smith*,
 846 F.2d 1499 (D.C. Cir. 1988)............................................................................5

*Immigrant Defenders L. Ctr. v. Noem*,
 No. 25-2581, 2025 WL 2017247 (9th Cir. July 18, 2025)............................. *passim*

*Immigrant Defenders L. Ctr. v. Noem*,
 No. CV 20-9893 JGB (SHKx), 2025 WL 1172442 (C.D. Cal. Apr. 16 2025).......................19

*INS v. Legalization Assistance Project*,
 510 U.S. 1301 (1993)...........................................................................................16

*INS v. Yueh-Shaio Yang*,
 519 U.S. 26 (1996)...............................................................................................10

*Kucana v. Holder*,
 558 U.S. 233 (2010)...............................................................................................7

*Maryland v. King*,
 567 U.S. 1301 (2012)...........................................................................................16

*N. Cal. Power Agency v. Grace Geothermal Corp.*,
 469 U.S. 1306 (1984)...........................................................................................15

*Nakka v. USCIS*,
 111 F.4th 995 (9th Cir. 2024) ...............................................................................7

*Nat'l TPS All. v. Noem*,
    773 F. Supp. 3d 807 (N.D. Cal. 2025) ........................................................... 5, 7, 12

*Nken v. Holder*,
    556 U.S. 418 (2009) ................................................................................... 3, 14

*Noem v. Nat'l TPS Alliance*,
    No. 24A1059, 2025 WL 1427560 (U.S. May 19, 2025) ...................................... 2

*Patel v. Garland*,
    596 U.S. 328 (2022) ........................................................................................ 5

*Perez Perez v. Wolf*,
    943 F.3d 853 (9th Cir. 2019) .......................................................................... 7

*Ramos v. Nielsen*,
    321 F. Supp. 3d 1083 (N.D. Cal. 2018) ........................................................... 6

*Ramos v. Nielsen*,
    336 F. Supp. 3d 1075 (N.D. Cal. 2018) ................................................ 8, 9, 10, 18

*Ramos v. Wolf*,
    975 F.3d 872 (9th Cir. 2020) ............................................................... *passim*

*Saget v. Trump*,
    345 F. Supp. 3d 287 (E.D.N.Y. 2018) ............................................................ 5

*Saget v. Trump*,
    375 F. Supp. 3d 280 (E.D.N.Y. 2019) ............................................................ 8

*Trump v. Boyle*,
    606 U.S. ---, 2025 WL 2056889 (July 23, 2025) .............................................. 4

*Trump v. CASA, Inc.*,
    145 S. Ct. 2540 (2025) ................................................................................. 19

*Trump v. Hawaii*,
    585 U.S. 667 (2018) ................................................................................. 2, 11

*Trump v. Wilcox*,
    145 S. Ct. 1415 (2025) ................................................................................... 4

*United States v. Texas*,
    143 S. Ct. 51 (2022) ...................................................................................... 15

*Vasquez Perdomo v. Noem*,
    No. 25-4312, 2025 WL 2181709 (9th Cir. Aug. 1, 2025) ................................... 19

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
    429 U.S. 252 (1977) ........................................................................... 2, 11, 13

*Washington v. Trump*,
   No. 25-807, 2025 WL 2061447 (9th Cir. July 23, 2025)........................................................17

**Statutes**

5 U.S.C. § 705.................................................................................................2, 12, 18, 19

8 U.S.C. § 1252(a)(2)(B) .........................................................................................................7

8 U.S.C. § 1254a(b)(1)...........................................................................................................17

8 U.S.C. § 1254a(b)(3)........................................................................................................6, 17

8 U.S.C. § 1254a(b)(3)(A) ......................................................................................................7

8 U.S.C. § 1254a(b)(5)(A) ...................................................................................................5, 6

8 U.S.C. § 1254a(c)(2)...........................................................................................................12

8 U.S.C. § 1254a(c)(2)(B) ......................................................................................................15

8 U.S.C. § 1254a(g) ................................................................................................................6

8 U.S.C. § l254a(c)(3)........................................................................................................12, 15

**Other Authorities**

8 C.F.R. § 244.14 ....................................................................................................................15

90 Fed. Reg. 8443 at 8443 ....................................................................................................13

90 Fed. Reg. 8805 (Feb. 3, 2025) ........................................................................................3

90 Fed. Reg. 9040 (Feb. 5, 2025) ........................................................................................3

90 Fed. Reg. 30086 (Jul. 8, 2025)......................................................................................8, 9

90 Fed. Reg. 30089 (Jul. 8, 2025).......................................................................................8

90 Fed. Reg. 30089 ................................................................................................................9

90 FR 24152.............................................................................................................................13

90 FR 30088.............................................................................................................................13

90 FR 30091.............................................................................................................................14

DHS Form G-28, *available at* https://www.uscis.gov/g-28 ..........................................20

DOJ Form EOIR-28, *available at* https://www.justice.gov/eoir/file/639746/dl...........20

1

## I.    INTRODUCTION

2      Defendants have imposed an artificial deadline on the Court and Plaintiffs to respond to a

3 motion to stay that lacks legal or factual merit and should be denied. Defendants cannot satisfy any

4 of the criteria required to grant a stay. They want to upend the status quo and expose 60,000

5 immigrants who have been lawfully residing in this country for at least a decade and, in most cases,

6 more than 26 years, to job loss, detention, and deportation pending a final decision on the merits of

7 this litigation. And they ask for such relief in a setting where the Court has identified disturbing,

8 robust, and unrebutted evidence of unlawful and unconstitutional misconduct. If an immediate stay

9 were granted, the full extent of the harm could never be undone. In contrast, Defendants identify no

10 concrete harm that will arise if Honduran, Nepali, and Nicaraguan TPS holders are permitted to live

11 and work in this country for a few more months while this case proceeds on a compressed schedule

12 to final judgment. Nor could Defendants possibly explain how permitting individuals who already

13 have lived and worked here for at least a decade result in irreparable harm to the U.S.

14      Defendants' primary argument is that the Supreme Court's shadow docket order in a case

15 that Defendants previously characterized as wholly "distinguishable" from this one mandate's entry

16 of a stay here. *See* Opp. to Admin. Mot. to Relate, Dkt. 266, *Ramos*, Case No. 3:18-cv-01554-EMC

17 (N.D. Cal. Jul 8, 2025). Not so. The Supreme Court's order provides no reasoning on which this

18 Court could base a stay decision. The legal claims and the equities in this case also are distinct from

19 those before the Supreme Court in *NTPSA I* in important respects that bear on the supposed

20 justification for a stay. Significantly, unlike *NTPSA I*, where the termination for Venezuela allegedly

21 rested on national interests, this case concerns immigrants who have been living lawfully in this

22 country for over a decade; the Secretary has not asserted (and cannot credibly assert) that their

23 continued presence presents an immediate threat to the national interest.

24      Defendants also fail to make the required "strong showing" that they could prevail on the

25 merits. This Court's well-reasoned opinion makes clear a host of reasons why, even on the record

26 presently available, they cannot prevail. In asserting otherwise, Defendants ignore this Court's

27 detailed findings, mischaracterize Plaintiffs' positions, and disregard unrebutted record evidence.

28

1

Plaintiffs' APA claims rest on black-letter law requiring agencies to follow governing statutes and acknowledge and explain departures from long-standing practice. The relief granted here is no different than in innumerable APA cases decided by courts across the U.S. for decades. And a wealth of evidence substantiates Plaintiffs' Equal Protection claim, surpassing the test set by *Arlington Heights*, which both the Supreme Court and the Ninth Circuit have confirmed supplies the correct standard in this setting, as well as the higher threshold set by *Trump v. Hawaii*.

Finally, the Court should reject Defendants' attempt to limit the scope of the ruling to named Plaintiffs as unwarranted and unworkable. This Court's order simply postpones the effective dates of agency action, which is distinct from the relief at issue in *Immigrant Defenders v. Noem,* which the district court granted to "preserve status and rights" under Section 705. And even if *Immigrant Defenders* could apply to the type of Section 705 relief issued in this case, this Court correctly held that universal relief is necessary in this instance to provide complete relief to Plaintiffs. Indeed, Defendants still fail to demonstrate (much less guarantee) that a workable and reliable system exists to assure the rights of even the named plaintiffs. Limiting relief to members of NTPSA is unworkable, would present tremendous administrative burdens for NTPSA, and would infringe on the First Amendment rights of NTPSA and its members.

For all of these reasons, no valid ground exists for demanding that the Court set aside its entire docket, and every other litigant, to rule on a stay motion with only one day to consider this opposition. In any event, Defendants' motion should be denied.

## II.    ARGUMENT

### A.    The Supreme Court's Unreasoned Shadow Docket Order in Another Case Does Not Support Granting a Stay in this Case.

Defendants err in asserting that the Supreme Court's unexplained stay order in *Noem v. Nat'l TPS Alliance ("NTPSA I"),* No. 24A1059, 2025 WL 1427560 (May 19, 2025), establishes they are likely to prevail on the merits of an appeal in this case or that the balance of equities favors the government. Mot. at 1–3.

*First*, *NTPSA I* and this case ("*NTPSA II*") involve distinct legal claims and equities. Indeed,

1  in opposing Plaintiffs' motion to relate the two cases, Defendants insisted that "[t]he TPS decisions

2  at issue are distinguishable" as "*NTPSA II* involves different TPS country designations, … a

3  different administrative record, and … factual allegations unique to the 2025 decisions made

4  regarding TPS for Nicaragua, Nepal, and Honduras." Opp. to Admin. Mot. to Relate, Dkt. 266,

5  *Ramos*, Case No. 3:18-cv-01554-EMC (N.D. Cal. Jul 8, 2025) (arguing that *NTPSA I* and *NTPSA II*

6  "do not concern substantially the same parties, property, transaction, or event"). Having succeeded

7  in preventing this case from being deemed related to *NTPSA I*, Defendants cannot now argue that a

8  shadow docket ruling in *NTPSA I* controls here. *Hamilton v. State Farm Fire & Cas. Co.*, 270 F.3d

9  778, 782 (9th Cir. 2001) ("Judicial estoppel … precludes a party from gaining an advantage by

10  asserting one position, and then later seeking an advantage by taking a clearly inconsistent

11  position.")

12      *Second*, the *NTPSA I* order stayed by the Supreme Court concerned the Secretary's authority

13  to vacate a prior TPS extension for a group of Venezuelan immigrants present for less than two years

14  in some cases, and whose continued presence the Secretary asserted endangered the national interest.

15  *See* 90 Fed. Reg. 8805 (Feb. 3, 2025) (vacatur of Venezuela's TPS); 90 Fed. Reg. 9040 (Feb. 5,

16  2025) (termination of Venezuela's TPS). Vacatur authority is not at issue here, nor has the Secretary

17  asserted as part of the termination decisions at issue that the continued presence of Honduran,

18  Nicaraguan, and Nepali TPS holders who have lived and worked lawfully in this country for at least

19  a decade, and in most instances over a quarter century, endangers the national interest.

20      *Third*, the Supreme Court did not necessarily determine in *NTPSA I* that the government was

21  likely to succeed on the merits or that the balance of equities favoured the government. Mot. at 1.

22  The Supreme Court's broad discretion to grant stays is merely "guided" by "consideration" of

23  traditional factors. *See Nken v. Holder*, 556 U.S. 418, 434 (2009). Equitable principles are inherently

24  flexible. The Supreme Court is not required to consider each traditional equitable factor or to weigh

25  each factor in the same manner in each case. There also is no rule that a majority of the justices must

26  agree on which factors or issues presented warrant granting a stay. *See, e.g., Arthur v. Dunn*, 580

27  U.S. 977 (2016) (statement of Roberts, C.J.) (voting to grant stay to "afford [the four other justices

28

1    who voted to grant] the opportunity to more fully consider the suitability of this case for review"").

2    Notably, the Supreme Court has affirmed rulings after staying them (including in recent years). *See*

3    *Allen v. Milligan*, 599 U.S. 1, 16-17 (2023).

4        *Fourth*, and finally, the Supreme Court's decision in *Trump v. Boyle,* 606 U.S. ---, 2025 WL

5    2056889 (July 23, 2025) does not justify a stay here. *Boyle* treated another shadow docket order—

6    *Trump v. Wilcox*, 145 S. Ct. 1415 (2025)—as "control[ling]" for purposes of a similar request for

7    interim relief, even as it acknowledged that the *Wilcox* order was "not conclusive as to the merits,"

8    and only "inform[ative]" for purposes of the "exercise [of] equitable discretion in like cases." *Boyle*,

9    2025 WL 2056889, at *1. A fundamental difference between the order in *Wilcox* and the order in

10    *NTPSA I* is that *Wilcox* contained two pages of substantive reasoning as to why specific, equitable

11    factors warranted a stay as to a specific type of relief—namely, whether federal employees could

12    insist on the right to continued employment or, instead, would need to wait to see if they were

13    entitled to receive lost wages upon being reinstated. In contrast, the stay order in *NTPSA I* provided

14    no analysis of any kind—concerning the merits or any specific equitable factors. *Boyle* quoted

15    *Wilcox's* reasoning; there is no such reasoning for this Court to consider or follow from *NTPSA I.*

16    And, unlike *Boyle* and *Wilcox*, where federal employees could be made whole for lost wages,

17    wrongful removal and loss of employment will cause irreparable harm to Plaintiffs and their families

18    that could never be redressed financially.

19        **B.        Defendants Have Not Made a Strong Showing of Likelihood of Success.**

20        Defendants acknowledge they must make a "*strong showing* that [they are] likely to succeed

21    on the merits" to warrant a stay, yet fail to do so. Mot. at 1 (quoting *Nken*, 556 U.S. at 434 (emphasis

22    added).

23        **1.        The Court Has Jurisdiction to Consider Plaintiffs' Claims.**

24        Defendants offer nothing new to suggest they are likely to prevail on their argument that

25    Section 1254a(b)(5) bars Plaintiffs' claims. Defendants are advancing a position rejected by **every**

26    district court to consider it; by definition, this argument cannot have a strong likelihood of success.

27    *See CASA, Inc. v. Noem*, No. 25-1484-TDC, 2025 WL 1907378, at *10 (D. Md. July 10, 2025)

28

("[C]laims . . . challenging a general policy or practice to terminate TPS designations on a preordained basis in order to reduce the number of non-white immigrants in the United States . . . are not barred by § 1254a(b)(5)(A)"); *Haitian Evangelical Clergy Ass'n v. Trump*, No. 25-CV-1464 (BMC), 2025 WL 1808743, at *6 (E.D.N.Y. July 1, 2025) (finding "no indication that § 1254a(b)(5)(A) applies to the review of procedures followed in making TPS decisions"); *Nat'l TPS All. v. Noem*, 773 F. Supp. 3d 807, 830 (N.D. Cal. 2025) (Section 1254a(b)(5) "does not apply to, e.g., a pattern or practice that is "collateral to and distinct from the specific [country] TPS decisions and their underlying rationale"); *Centro Presente v. DHS*, 332 F. Supp. 3d 393, 406–09 (D. Mass. 2018) (finding jurisdiction over claim that TPS decisions were "made on the basis of an improperly narrow record"); *Saget v. Trump*, 345 F. Supp. 3d 287, 294–96 (E.D.N.Y. 2018) ("it is clear from context that the judicial review provision in the TPS statute refers to an individual designation, termination, or extension of a designation with respect to a particular country, not to Defendants' determination practices or adoption of general policies or practices employed in making such determinations"); *CASA de Md., Inc. v. Trump*, 355 F. Supp. 3d 307, 320–21 (D. Md. 2018) (finding jurisdiction to review challenge to "a process the Secretary abandoned without proper explanation on the record).

This Court correctly rejected the government's argument that *Patel v. Garland*, 596 U.S. 328 (2022) alters this analysis. Order at 16–17. Nor do *Fiallo v. Bell*, 430 U.S. 787 (1977), or *Hotel & Rest. Emps. Union, Loc. 25 v. Smith*, 846 F.2d 1499 (D.C. Cir. 1988) support adopting Defendants' position in the face of an unbroken line of decisions upholding jurisdiction. Mot. at 4. Defendants suggest *Fiallo* stands for the remarkable principle that TPS decisions should be treated as "immune from judicial control" because they fall within the provenance of the government's political departments. Mot. at 4 (quoting *Fiallo*, 430 U.S. at 792). Such a reading would defeat the purpose of the TPS statute, which Congress enacted to *constrain* executive discretion. Order at 9–11. *Hotel & Rest. Emps. Union, Loc. 25*, similarly provides Defendants no support; it suggested that courts would have lacked jurisdiction to review decisions under the prior EVD program precisely *because* "Congress has not seen fit to limit the agency's discretion" to grant or terminate EVD, 846 F.2d at

1510 (Separate Opinion of Mikva, J.), whereas the TPS statute *eliminated* the EVD program and imposed limits on the agency's discretion to terminate TPS. *See* 8 U.S.C. § 1254a(g) ("Except as otherwise specifically provided, this section shall constitute the exclusive authority of the Attorney General under law to permit aliens who are or may become otherwise deportable or have been paroled into the United States to remain in the United States temporarily because of their particular nationality or region of foreign state of nationality."); *id.* 1254a(b)(3)(C) (providing that TPS designation "is extended" unless Secretary concludes conditions for designation are no longer met).

In addition, contrary to Defendants' contention, adopting a policy to terminate-first, justify-later does not reflect a permissible "policy preference" that traditionally receives judicial deference. Mot. at 5. Rather, such a practice not only violates traditional APA jurisprudence, it also violates the express dictates of the TPS statute, which mandates that the Secretary "shall" make TPS decisions based on a review of country conditions, and provides that a designation "is extended" unless the Secretary affirmatively finds that conditions are no longer met. 8 U.S.C. § 1254a(b)(3). Even the vacated panel decision in *Ramos* held that Section 1254a(b)(5)(A) does not bar review of a claim that DHS's action violates the dictates of the TPS statute itself. *See Ramos v. Wolf*, 975 F.3d 872, 895 (9th Cir. 2020), *reh'g en banc granted, opinion vacated*, 59 F.4th 1010 (9th Cir. 2023) ("[A] claim that an agency has adopted an erroneous interpretation of a governing statute would be reviewable under *McNary*.").

Similarly, Plaintiffs have shown that Defendants arbitrarily departed from more than two decades of past practice by declining to grant any orderly transition period. Defendants fail to explain how these decisions, made pursuant to **Subsection (d)** of the TPS statute, could possibly be subject to the TPS statute's judicial review bar, which applies only to determinations under **Subsection (b)** of the statute. 8 U.S.C. § 1254a(b)(5)(A) (limiting review of determinations "under this subsection"—i.e., subsection (b)). Even if this particular claim did concern a determination under Subsection (b)—which it does not—deviations from long-standing administrative practice present "a general procedural issue…, not an individual determination," so this Court would still have jurisdiction. *Ramos v. Nielsen*, 321 F. Supp. 3d 1083, 1104 (N.D. Cal. 2018).

1      Finally, Defendants assert—for the first time, and in passing—that Section 1252(a)(2)(B)(ii)

2   precludes jurisdiction over Plaintiffs' APA claim over deviations from past practice. Mot. at 10. This

3   belated and half-hearted argument is unlikely to prevail for numerous reasons, including because

4   Subsection (d) of the TPS statute does not "use[] the word 'discretion' or any synonym," *Perez*

5   *Perez v. Wolf*, 943 F.3d 853, 867 (9th Cir. 2019) and an orderly transition period is not a form of

6   "relief." *See Nakka v. USCIS*, 111 F.4th 995, 1004 (9th Cir. 2024) (explaining that Section

7   1252(a)(2)(B) should be interpreted with reference to its heading, "which refers to '[d]enials of

8   discretionary relief'") (quoting 8 U.S.C. § 1252(a)(2)(B)). *See also Kucana v. Holder*, 558 U.S. 233,

9   246 (2010) (interpreting Section 1252(a)(2)(B)(ii)).

10          **2.      Defendants Have Not Shown a Strong Likelihood of Prevailing on the**
11                   **Merits Given the Strength of Plaintiffs' First APA Claim.**

12      This Court correctly found that the terminations of TPS for Honduras, Nepal, and Nicaragua

13   "were based on a preordained determination to end the TPS program, rather than an objective review

14   of country conditions." Order at 21. That violates the TPS statute, which requires TPS decisions to

15   be preceded by, and based on, a review of country conditions. 8 U.S.C. § 1254a(b)(3)(A) (requiring

16   that Secretary "shall review the conditions in the foreign state" and "shall determine whether the

17   conditions for [TPS] designation under this subsection continue to be met"). Defendants now

18   mischaracterize Plaintiffs' position, ignore this Court's findings, and disregard the record.

19      Defendants cannot establish a likelihood of prevailing when, under the governing standard of

20   review, they must prove that this Court's factual findings amount to clear error. *Collins v.*

21   *Thompson*, 679 F.2d 168, 170 (9th Cir. 1982). Defendants' public statements, coupled with manifest

22   irregularities in the Federal Register notices and a pattern of irregularities across *all* recent TPS

23   decisions, buttress this Court's findings. Secretary Noem announced her intention to end TPS

24   extensions *before* conducting a single country conditions review. Dkt. 18-14 at 104:20–21. She made

25   clear that her termination decisions were made at the direction of the President, Dkt. 44-2, who had

26   promised during his campaign to "revoke" TPS, Dkt. 54-1, and who, on his first day in office,

27   directed the Secretary to "rescind" TPS decisions that were not "align[ed] with" policies set out in

28

7

his Executive Order, "Protecting the American People Against Invasion." 90 Fed. Reg. 8443, 8446

(Jan. 29, 2025). The Secretary's subordinates subsequently revised country conditions analyses to

delete entire categories of country conditions that did not support the Secretary's preordained

termination decision. *Compare* Dkt. 18-8 (Jan. 9, 2025 Decision Memo for Venezuela) (concluding

Venezuela continues to meet conditions for TPS designation, and considering, *inter alia*, political

repression, human rights, and food security) *with* Dkt. 18-9 (Jan. 31, 2025 Decision Memo for

Venezuela) (concluding three weeks later that Venezuela no longer meets conditions for TPS

designation, without discussing political repression, human rights, or food security).[1]

The sham country conditions review process employed by Defendants in this instance

resulted in termination decisions that repeatedly concluded TPS beneficiaries could safely live in

countries the State Department has warned are too dangerous for travel—without even *addressing*

the conditions that led to the State Department's warnings. *Compare* Dkt. 54-3 (advising

reconsideration of travel to Honduras "due to crime") *with* 90 Fed. Reg. 30089 (Jul. 8, 2025) (ending

TPS for Honduras without considering crime); Dkt. 54-5 (advising reconsideration of travel to

Nicaragua "due to arbitrary enforcement of laws, the risk of wrongful detention, and limited

healthcare availability") *with* 90 Fed. Reg. 30086 (Jul. 8, 2025) (ending TPS for Nicaragua without

considering those conditions). The challenged termination decisions also fail to address broad

categories of conditions on which the agency's prior TPS extensions rested, further establishing that

Secretary Noem circumvented the normal country conditions review process in violation of the APA

and in service of racial animus. Order at 22. *See Saget v. Trump*, 375 F. Supp. 3d 280 (E.D.N.Y.

2019) (finding omission of certain country conditions information was "evidence [the previous DHS

Secretary] sidestepped the review process required by the TPS statute" when terminating TPS for

Haiti during the first Trump Administration).

Defendants assert that Secretary Noem *did* consider the State Department's travel advisories

because they are included in the CAR. Mot. at 8–9. But the fact that travel advisories can be found in

---

[1] The Decision Memo "contains USCIS's recommendation on what to do about the TPS designation." *Ramos*, 336 F. Supp. 3d at 1082. *See* Dkts. 77-2, 78-2, 79-2 (largely redacted Decision Memos for Honduras, Nicaragua, and Nepal).

the CAR in no way proves that Secretary Noem considered them. *See Ramos v. Nielsen*, 336 F.

Supp. 3d 1075, 1097 (N.D. Cal. 2018) ("the fact that [the Acting Secretary] received information

regarding current conditions, does not prove she ultimately considered and relied on those conditions

in deciding to terminate TPS status. The substantial record recited above strongly suggests she did

not."). Indeed, the CAR contains USCIS country conditions reports, which typically provide the

foundation for the periodic review of country conditions. *See id.* at 1082 (describing typical periodic

review process). But here, the termination notices simply disregard the crisis conditions catalogued

in those reports. *Compare, e.g.*, Nicaragua AR 000021-000036 & 000044-000050 ("'The rule of law

collapsed [in 2018]"; Nicaragua has "become 'a police state' and the country's 'political, social and

human rights crisis' continu[es] 'to deepen'"; "the human rights situation in the country had

'dramatically worsened'"; and Nicaraguans "face[] persecution, forced exile, and economic

retaliation") *with* 90 Fed. Reg. 30086 (Jul. 8, 2025) (terminating Nicaragua's TPS status without

addressing any of these facts); Honduras AR 000008-000022 & 000028-000036 (describing

staggering levels of violence in the country, as well as corruption, human rights abuses, extortion,

and a government-declared State of Emergency) *with* 90 Fed. Reg. 30089 (terminating Honduras'

TPS designation without addressing these facts).

In sum, Plaintiffs do not seek relief on the ground that the Secretary exercised poor judgment

when weighing available country conditions evidence. Mot. at 9. Rather, Plaintiffs have shown, and

this Court has found, that the Secretary made decisions *before* considering country conditions

evidence, and then failed or refused to consider available country conditions if it did not support her

preordained decisions to terminate. Such conduct clearly violates the TPS statute and bedrock APA

principles. Defendants thus cannot establish a strong likelihood of prevailing.

### 3. Defendants Have Not Shown a Strong Likelihood of Prevailing on the Merits Given the Support for Plaintiffs' Second APA Claim.

This Court also correctly found that Defendants violated the APA by departing from their

long-standing past practice of providing at least a six-month orderly transition period for TPS

terminations. Order at 23–25. Despite multiple opportunities, Defendants still neither acknowledge

nor provide grounds for the departure that would conform with the requirements of the APA. *Id.*

Defendants assert that the Secretary's choice to provide the statutory minimum 60-day notice period prior to stripping lawful status from immigrants who have been living lawfully in this country for 26 years (Honduras and Nicaragua) or 10 years (Nepal) "cannot be arbitrary-and-capricious" because the TPS statute permits it. Mot. at 9–10. But, as this Court correctly held, even where an "agency's discretion is unfettered at the outset, if it announces and follows—by rule or settled course of adjudication—a general policy by which its exercise of discretion will be governed, an irrational departure from that policy (as opposed to an avowed alteration of it) could constitute action that must be overturned." *INS v. Yueh-Shaio Yang*, 519 U.S. 26, 32 (1996); Order at 23; *see also Ramos*, 336 F. Supp. 3d at 1090 (explaining that change-in-position doctrine "is not limited to formal rules or official policies. It applies to practices implied from the agency conduct.").

In their stay motion, Defendants for the first time dispute the existence of any relevant prior practice. Mot. at 10 & n.23. Defendants have waived this argument. Order at 23 ("Defendants do not meaningful[ly] dispute this practice in their opposition"). Defendants also are wrong. Over the last 22 years, Defendants have consistently provided at least a six-month, and more commonly a twelve- or eighteen-month, orderly transition period when ending TPS designations. Dkt. 28. Defendants cite four prior terminations with no orderly transition period, but each occurred *more than 22 years ago*; each also terminated designations that had been in place for less than three years, so they have no bearing on the practice with respect to TPS designations that have lasted for at least a decade. *Compare* Mot. 10 n.4 *with* Dkt. 28.[2] *Id.*

Finally, the Supreme Court's recent decision in *FDA v. Wages & White Lion Invs., L.L.C.*, 145 S. Ct. 898 (2025), did not alter the longstanding change-in-position doctrine under the APA. Mot. at 10. *White Lion* simply held that FDA orders denying premarket tobacco product applications

---

[2] Defendants also assert that three prior terminations provided a few weeks less than six-months' notice, because those termination decisions were published late. Mot. at 10 n. 4. In fact, this is true for only two terminations, each of which occurred 25 years ago. *See* Dkt. 28 (termination of TPS for Guinea-Bissau announced March 20, 2000 and effective September 10, 2000 and termination of TPS for Bosnia-Herzogovina announced August 30, 2000 and effective February 10, 2001). Neither negates Defendants' unbroken practice over the past two decades of providing at least a six-month orderly transition period.

1  were "sufficiently consistent" with earlier "voluminous and discursive" informal agency guidance in

2  public videos, presentations, and other informal documents—i.e., that there had been no change in

3  position at all. 145 S. Ct. at 910, 919. That is not the case here. Defendants have clearly departed

4  from a prior unbroken practice for 22 years of providing at least a six-month orderly transition

5  period when terminating TPS.

6           **4.    Defendants Cannot Show a Strong Likelihood of Success Given the
                    Overwhelming Evidence of Discriminatory Animus.**
7

8           Plaintiffs are likely to succeed on their Fifth Amendment claim. *First*, Plaintiffs' animus

9  claim survives so long as there is a plausible basis to infer an invidious discriminatory purpose was a

10 motivating factor. *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 34 (2020) (plurality) ("To plead

11 animus, a plaintiff must raise a plausible inference that an 'invidious discriminatory purpose was a

12 motivating factor' in the relevant decision" (quoting *Vill. of Arlington Heights v. Metro. Hous. Dev.*

13 *Corp.*, 429 U.S. 252, 266 (1977))). This Court faithfully applied that standard. Order at 26. Likewise,

14 all the judges on the Ninth Circuit panel for the vacated *Ramos* opinion recognized that, in light of

15 *Regents*, an equal protection claim pleading animus must be reviewed under *Arlington Heights* and

16 not the deferential standard of review in *Trump v. Hawaii*, 585 U.S. 667, 704-05 (2018). *Ramos*, 975

17 F.3d at 896 (maj. op.), 926 (Christen, J., dissenting). Moreover, the claims here, brought by lawfully

18 present noncitizens who have lived continuously in the U.S. for at least a decade, are distinguishable

19 from *Hawaii*, which considered claims by noncitizens who were seeking entry from outside the U.S.,

20 and who challenged the exercise of *presidential* power where there was "persuasive evidence" that

21 "national security concerns" existed. *Hawaii*, 585 U.S. at 706. As this Court correctly recognized,

22 none of those factors are present here. Order at 26–27.

23          Under *Arlington Heights*, Plaintiffs are likely to succeed in showing that "a discriminatory

24 purpose has been a motivating factor" in the termination decisions at issue. *Arlington Heights*, 429

25 U.S. at 265–66; *Ave. 6E Invs., LLC v. City of Yuma*, 818 F.3d 493, 504 (9th Cir. 2016) ("Plaintiffs

26 need "not … prove that the discriminatory purpose was the sole purpose of the challenged action").

27 Plaintiffs easily clear this bar. Secretary Noem has made statement after statement betraying animus

28

                                                    11

against immigrants generally and TPS holders specifically.[3] Order at 28. For example, she has suggested the prior administration "exploited" TPS to allow hundreds of thousands of "gang members" and "terrorists and murderers" to enter the U.S., even though it is undisputed that the TPS holders here have been lawfully present in the U.S. since at least 2015, and many for decades longer; and, by statute, they cannot have criminal records more serious than a single misdemeanor. ECF 18-18.

Incredibly, Defendants have supplied further proof of racial animus by spreading yet more lies to defend their racist policy *after* this Court granted the § 705 motion at issue. DHS issued a statement claiming TPS "allow[s] unvetted aliens to remain in [the] U.S." has "been exploited to allow criminal aliens to come to our country and terrorize American citizens." *See* Ex. 1. TPS's careful statutory scheme, however, requires regular, repeated "vetting" of TPS beneficiaries and provides relief only to individuals who are already present in the U.S. *See also, e.g.,* ECF 18-18 (describing TPS holders as "poorly vetted migrants"). Courts have recognized that these and other statements stereotyping TPS holders as dangerous, threatening, and undesirable despite overwhelming evidence to the contrary, ECF 17-15, 17-18, 17-20, echo shameful traditions of racism against immigrants and, thus, constitute concrete proof of animus. *See Ave. 6E Invs.*, 818 F.3d at 505. DHS's statement further published the full names and photographs of five individuals who it claims "exploited the TPS program," along with their alleged convictions. Ex. 1.

Even assuming Defendants can identify a handful of TPS holders who engaged in criminal conduct, the appropriate response would be to revoke TPS *for those individuals*, as *required* by the TPS statute, *see* 8 U.S.C. §§ 1254a(c)(2)-(3)—not to terminate TPS for tens of thousands of others who have committed no crimes. "Acting on the basis of a negative group stereotype and generalizing such stereotype to the entire group is a classic example of racism." *Nat'l TPS All.*, 773 F. Supp. 3d at 860. As the Court correctly recognized, the sweeping stereotypes advanced here to justify

---

[3] Defendants suggest these statements are "cherry-picked" and "taken out of context." Mot. at 10-11. No court has accepted either of those as valid excuses to disregard unabashed racist invective made in public fora, not in jest, in passing, in informal settings. This Court should not be the first, particularly when none of the speakers has ever disavowed their racist invective. To the contrary, they repeat and seek to magnify the harm caused by such racist invective.

1    terminations reflect President Trump's innumerable racist statements against immigrants and TPS

2    holders, all of which are also relevant. *See Arlington Heights*, 429 U.S. at 267-68 ("historical

3    background" and "events leading up to the challenged decision" are factors "in determining whether

4    racially discriminatory intent existed"); Order 29 (recounting statements). For similar reasons, the

5    Court properly took into account the "Protecting the American People Against Invasion" Executive

6    Order, which was issued the day President Trump took office and directed the DHS Secretary to

7    review TPS because, in President Trump's view, TPS holders (among others) were part of a "flood

8    of illegal immigration" that "engaged in hostile activities" and had "abused the generosity of the

9    American people," "committing vile and heinous acts against innocent Americans." 90 Fed. Reg.

10   8443 at 8443.

11        Even if one were to discount certain statements by President Trump and his coterie as

12   blustering in service of political theater, the premises for these terminations and multiple public

13   statements attacking TPS and TPS holders reveal irrational and factually baseless assumptions. TPS

14   holders are lawfully present, have high rates of earned income, contribute billions to the economy,

15   and cannot have serious criminal histories. Order at 28. Nevertheless, Secretary Noem stated that her

16   decisions to end TPS designations were motivated by "the president's heart and desire," and that

17   "when the president gives a directive, the Department of Homeland Security will follow it,"

18   explicitly linking the termination decisions to the President's animus against TPS holders. ECF 44-2.

19   This case is therefore unlike *Ramos*, where there was "*no* evidence linking the President's animus to

20   the TPS terminations," and Defendants' reliance on that case to discount the President's racist

21   statements is misplaced. *Ramos*, 975 F.3d at 897 (emphasis added). *Regents* is similarly

22   distinguishable because there, unlike here, the record contained no discriminatory statements by the

23   key decisionmakers and statements by President Trump in the record were not "contemporary."

24   *Regents*, 591 U.S. at 35.

25        Even if *Hawaii*'s deferential standard applies, which it does not, the Court correctly

26   concluded Plaintiffs are likely to succeed. Each termination decision at issue plainly relies on the

27   "Invasion" Executive Order to support the Secretary's determination. *See* 90 FR 24152 n.10; 90 FR

28

13

1    30088 n.4; 90 FR 30091 n.10. And for the reasons explained above, this reliance is evidence of the

2    lack of a rational basis for the termination decisions. Further, as the Court recognized, nothing in the

3    record supports a rational connection between the challenged terminations and the government's

4    "national-security interests" or "the TPS program's objectives." Mot. at 10; *see* Order at 30.

5        Lastly, Defendants suggest in passing that federal courts may lack jurisdiction to review even

6    constitutional claims. Mot. at 10. They are incorrect. *See Bowen v. Mich. Acad. of Fam. Physicians*,

7    476 U.S. 667, 680-81 (1986) (rejecting "extreme" position interpreting statute to foreclose

8    constitutional claims).

9        **C.    The Balance of Harms Strongly Favors Leaving the Court's Order in Place.**

10           **1.    The Equities Weigh Overwhelmingly in Favor of Postponement.**

11       The Court correctly held that the balance of harms strongly favors postponement of the

12   termination orders at issue. Order at 32–34. The government has not contended, and does not now

13   contend, that it will suffer any injury aside from the constraint inherent whenever a court steps in to

14   stop an agency from engaging in unlawful and unconstitutional misconduct. In contrast, granting

15   Defendants' Motion would trigger catastrophic harm for Plaintiffs. A stay would strip work

16   authorization from 60,000 long-term residents, expose them to detention and deportation to unsafe

17   countries, shatter their families and communities, and trigger economic losses nationwide. The

18   resulting harms would be irreparable even if Plaintiffs ultimately prevail. For some of the TPS

19   holders protected by the postponement order, a stay could in practice moot out their claims as they

20   may have no ability to return to the U.S. No final judgment could undo such harms. *Nken*, 556 U.S.

21   at 436.

22       Defendants cannot show "irreparable injury is the more probable or likely outcome" during

23   the pendency of appeal, as required to justify emergency relief. *Al Otro Lado v. Wolf*, 952 F.3d 999,

24   1007 (9th Cir. 2020). That is particularly true here, where the Court has set an expedited schedule for

25   consideration of the ultimate relief, with a hearing scheduled in three months. If the Court denies a

26   stay now, but the government prevails in three months, Plaintiffs would have retained TPS for a few

27   more months during expedited litigation. In this posture, the government must show it faces

28

1    irreparable harm from waiting to secure possible relief through the course of appellate review. *See N.*

2    *Cal. Power Agency v. Grace Geothermal Corp.*, 469 U.S. 1306, 1308 (1984) (Rehnquist, J.)

3    (denying stay despite finding error in district court order because "such an exercise should be

4    reserved for the unusual case").

5          Here, the government has offered no evidence that a delay of even a few months will cause

6    any irreparable harm. Defendants have introduced no evidence, and made no assertions, that

7    allowing long-term TPS holders to remain in the United States for three more months while the case

8    proceeds would cause any harm to the economy or public safety. Nor does the government dispute in

9    the record that these TPS holders have repeatedly been vetted by the U.S. government, at each

10   extension over a period of years; and that existing law permits the government to withdraw TPS

11   from individuals who become ineligible due to criminal history or security threat. 8 U.S.C.

12   § 1254a(c)(2)(B) (rendering ineligible for TPS individuals with disqualifying criminal convictions or

13   who are "a danger to the security of the United States"); 8 U.S.C. § l254a(c)(3) (withdrawal of TPS

14   required for ineligible individuals); 8 C.F.R. § 244.14 (withdrawal process).

15         The only theoretical harm Defendants assert is the short-term restraint the Court's order

16   imposes on their implementation of unlawful and unconstitutional decisions. Mot. at 11. But, as the

17   Ninth Circuit recently affirmed, "[i]t is well established that the mere existence of the Executive

18   Branch's desire to enact a policy is not sufficient to satisfy the irreparable harm prong." *ImmDef*,

19   2025 WL 2017247, at *5. Like other litigants, the "Government may pursue and vindicate its

20   [institutional injury] interests in the full course of this litigation." *E. Bay Sanctuary Covenant v.*

21   *Trump*, 932 F.3d 742, 778 (9th Cir. 2018) (cleaned up). Otherwise, "no act of . . . the executive

22   branch could be the subject" of interim relief. *Doe #1 v. Trump*, 957 F.3d 1050, 1059 (9th Cir.

23   2020). Courts have rejected the extreme view advanced by Defendants that courts must avoid

24   upsetting agency action, no matter how flagrant or egregious it may be under the law, with the

25   Supreme Court likewise denying stay requests in similar circumstances. *See, e.g.*, *Biden v. Texas*,

26   142 S. Ct. 926 (2021) (agency policy governing border processing); *United States v. Texas*, 143 S.

27   Ct. 51 (2022) (Secretary's enforcement priorities guidance); *cf. Biden v. Missouri*, 145 S. Ct. 109

28

(2024) (mem.) (student loan program); *Ala. Ass'n of Realtors v. HHS*, 594 U.S. 758, 759 (2021) (lifting stay for eviction moratorium).

Defendants suggest TPS decisions arise "in an area that implicates 'a fundamental sovereign attribute exercised by the Government's political department,'" but that ignores that the TPS statute exists to constrain agency action, and that TPS decisions are delegated to the Secretary, not the President. Mot. at 11 (*quoting Fiallo*, 430 U.S. at 792). The TPS statute *eliminated* unfettered discretion over humanitarian programs. *Ramos*, 975 F.3d at 890 (TPS "curb[s] and control[s] the executive's previously unconstrained discretion"). Defendants' temporary inability to exercise authority under their contested statutory interpretation does not constitute irreparable injury. *Doe #1*, 957 F.3d at 1059. While the Ninth Circuit found harm to the government in *ImmDef*, that was because *ImmDef* concerned a policy that requires "time and labor-intensive" "negotiation with a foreign sovereign." *Id.* TPS does not.

None of the authorities on which the government relies counsel otherwise.[4] One from over thirty years ago, *INS v. Legalization Assistance Project*, 510 U.S. 1301, 1305–06 (1993) (O'Connor, J., in chambers), concluded the balance of harms weighed in the government's favor in part because an order did not "prevent[] those aliens ... possibly eligible for relief ... from suing in their own right." Here, however, Defendants effectively seek to defeat the claims of TPS holders by removing them from the country, or depriving them of any financial ability to remain in the U.S., during the pendency of the litigation. Defendants also cite *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers), but that case concerned "an ongoing and concrete harm to Maryland's law enforcement and public safety interests"; here, despite the public rhetoric, the challenged decisions lack any factual grounding in law enforcement or public safety and Defendants do not contend otherwise.

Defendants contend, and Plaintiffs agree, that "the Government and public share an interest in ensuring adherence to the process established by Congress." Mot. at 11. Where the parties

---

[4] Defendants cite *CASA, Inc.*, 2025 WL 1773631, at *14 as a case "declining to stay a TPS termination." Mot. at 11. *CASA* concerns a challenge to the President's birthright citizenship executive order.

disagree is whether Defendants should be allowed to run rampant over Congressional constraints and the APA when Defendants (a) lack strong legal arguments, and (b) cannot adduce an iota of evidence of harm. As this Court properly concluded, Defendants' actions likely violate the APA and the Constitution, Order at 20–30, which means the government and public share an interest in enforcing a stay. Staying illegal conduct prevents, rather than permits, irreparable harm. *Washington v. Trump*, No. 25-807, 2025 WL 2061447, at *16 (9th Cir. July 23, 2025) ("Because … the Executive Branch does not have a legitimate interest in violating the Constitution, the Executive Branch has not shown that either the public interest or the balance of equities tips in its favor."). No injury arises where courts protect "the public['s] interest in ensuring that the [laws] are not imperiled by executive fiat.'" *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 679, 681 (9th Cir. 2021) (cleaned up).

Plaintiffs, by contrast, would suffer significant and irreversible injury from a stay. Order at 30–32. Defendants do not disagree. *Id.* ("Defendants conceded that Plaintiffs will suffer harm"); Mot. at 12 (recognizing Plaintiffs' loss of employment and health benefits, possible removal and family separation absent a stay).[5] The government contends only that the harms that Plaintiffs will suffer are "inherent" in the statutory scheme. Mot. at 12. This misrepresents the statutory scheme, which can provided extended periods of protection if conditions warrant, and which expressly limits executive discretion to terminate TPS. The "temporal" limit in the statutory regime refers to the time-limited period of each individual period of designation. Nothing in the statutory regime limits repeat extensions of nationality-based humanitarian relief, which have long been granted. ECF 17 at 2 (nationality-based humanitarian relief in some cases lasted many years even prior to the TPS statute). And the statute compels TPS extensions if the conditions warrant. *Compare* 8 U.S.C. § 1254a(b)(1) (the Secretary "*may* designate any foreign state" if certain conditions are met) *with id.* at § 1254a(b)(3) (the Secretary "*shall* terminate the designation" if the foreign state "no longer continues to meet the conditions for designation" and otherwise "the period of designation … is extended"). Further, "the shortening of [] time in the United States and acceleration of [] removal . . .

---

[5] Plaintiffs do not only challenge removal alone, *see* Mot. at 12, but the loss of legal status, employment authorization, and related benefits.

1    may constitute irreparable injury." *Ramos*, 336 F. Supp. 3d at 1087; *see also Doe v. Becerra*, 704 F.

2    Supp. 3d 1006, 1017 (N.D. Cal. 2023), *abrogated on other grounds by Doe v. Garland*, 109 F.4th

3    1188 (9th Cir. 2024) (explaining that even limited extensions of time at liberty in the U.S. may affect

4    family ties, employment, and educational opportunities).

5        Defendants next suggest that Plaintiffs are at fault for "declining to pursue alternative relief,"

6    and even contend that Plaintiffs should not be allowed to argue irreparable harm. Mot. at 12. This is

7    a novel argument, and not one that the Court should countenance. Defendants cannot seriously

8    contend that the government should be free to violate the law and the Constitution so long as

9    individuals *might* be able to pursue an entirely separate form of relief that *might* insulate them from

10   the government's misconduct due to protections afforded under a different legal regime, assuming

11   individuals *might* be able to secure that relief before Defendants carry out this unlawful scheme.

12   That makes a mockery of equitable principles. Moreover, the undisputed record evidence shows

13   "only a small minority" of Honduran, Nepali and Nicaraguan TPS holders would actually be able to

14   pursue other status, and many "would *not* be protected to the same degree by any other statute." ECF

15   17-19 ¶ 11.[6] Plaintiffs, who are all long-term residents, would have pursued more lasting and secure

16   relief if they could have. *See, e.g.*, ECF 17-3 ¶¶ 2, 4-5 (Plaintiff Jhony Silva's parents, who had been

17   TPS holders, were able to and did adjust status and are now lawful permanent residents; Jhony was

18   unable to adjust status despite living in the United States since he was a toddler). The Court thus can

19   and should consider the irreparable harm that these decisions would work on Plaintiffs.

20       **2.    Narrowing the Scope of the 705 Stay is Unwarranted and Unworkable**

21       Defendants also argue that this Court should narrow the stay to just named Plaintiffs and

22   members of the National TPS Alliance. Mot. at 13–14. This Court already rejected that argument,

23   Defendants have not provided any basis to seek reconsideration, and they are unlikely to prevail on it

24   on appeal. Order at 34–37.

25       *First*, as this Court correctly held, *ImmDef*, 2025 WL 2017247 is distinguishable. This case

26   involves "postponement" under 5 U.S.C. § 705, whereas *ImmDef* involved not just a stay of agency

27   _____

     [6] Moreover, the government has taken the position that it may remove individuals who have gained
28   other forms of relief—such as withholding of removal—to third countries. ECF 17-19 ¶ 20.

1  action, but also "a stay of Remain in Mexico's reimplementation," which the district court granted to

2  "preserve status and rights" under Section 705. *Id.* at *5-*6; *see also ImmDef v. Noem*, No. CV 20-

3  9893 JGB (SHKx), 2025 WL 1172442, at *6 (C.D. Cal. Apr. 16 2025) ("ImmDef moves this Court

4  for emergency relief to stay Defendants' reimplementation of MPP"); *25 ("the Court GRANTS

5  ImmDef's application"). The remedy at issue in *ImmDef* was thus more akin to the type of equitable

6  relief addressed in *Trump v. CASA, Inc*., 145 S. Ct. 2540 (2025) than the relief under the more

7  limited postponement order here.

8       *Second*, as this Court correctly held, even if *ImmDef* did apply, universal relief would still be

9  appropriate in this case because it is necessary to provide NTPSA members with complete relief.

10  Order at 36. Defendants' proposal that USCIS somehow issue individual notices to NTPSA

11  members would inevitably result in errors that would lead to unlawful detention and deportation. *Id.*

12  As NTPSA Co-Coordinator Jose Palma further explains, such errors are particularly likely because

13  NTPSA does not maintain information about its members' home addresses, nor does it maintain

14  members' social security numbers, A numbers, TPS application numbers, or any other identifying

15  information necessary to match its more than 5,000 TPS holder members from Honduras, Nepal and

16  Nicaragua with Defendants' internal databases. Declaration of Jose Palma ¶¶ 14, 21. Further, even

17  assuming a workable system of providing individualized notices could eventually be developed, it

18  would entail administrative burdens on NTPSA—an organization with limited resources, that is

19  powered mostly by member volunteers, *id.* ¶¶ 6–8—and would take time to put in place—time that

20  NTPSA members do not have, because every day without TPS protection is a day they are unable to

21  work to support themselves and their families, and are subject to detention and deportation. *Id.* ¶ 22.

22       Finally, as the Ninth Circuit recently recognized in an opinion post-dating *ImmDef*,

23  "[r]equiring organizations to share membership lists with Defendants could raise additional

24  constitutional problems regarding the freedom of association and privacy." *Vasquez Perdomo v.*

25  *Noem*, No. 25-4312, 2025 WL 2181709, at * 22 (9th Cir. Aug. 1, 2025) (citing *Nat'l Ass'n for*

26  *Advancement of Colored People v. State of Ala. ex rel. Patterson*, 357 U.S. 449 (1958)). NTPSA has

27  every reason to fear that turning over a list of its members to the government "would completely

28

undermine our members' confidence and trust in us, and it would also violate our commitment to their privacy." Palma Decl. ¶ 20. These weighty First Amendment concerns were not present in *ImmDef*, in which relief was limited to the organization's *clients* rather than its members—a different proposition entirely, particularly given that *ImmDef* attorneys are already required to enter notices of appearances informing the government of their representation of each individual client.[7]

## III.    CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court deny Defendants' Motion to Stay in its entirety.

Date: August 7, 2025                                        Respectfully submitted,

NATIONAL DAY LABORER ORGANIZING
NETWORK
 */s/Jessica Karp Bansal*
 Jessica Karp Bansal
Lauren Michel Wilfong (*Pro Hac Vice*)

Emilou MacLean
Michelle (Minju) Y. Cho
Amanda Young
ACLU FOUNDATION
OF NORTHERN CALIFORNIA

Ahilan T. Arulanantham
CENTER FOR IMMIGRATION LAW AND
POLICY, UCLA SCHOOL OF LAW

Eva L. Bitran
Diana Sanchez
ACLU FOUNDATION
OF SOUTHERN CALIFORNIA

Erik Crew (*Pro Hac Vice*)
HAITIAN BRIDGE ALLIANCE

Attorneys for Plaintiffs

---

[7] *See, e.g.* DHS Form G-28, *available at* https://www.uscis.gov/g-28; DOJ Form EOIR-28, *available at* https://www.justice.gov/eoir/file/639746/dl.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on August 7, 2025, I caused the foregoing to be electronically filed with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to all counsel of record.

NATIONAL DAY LABORER ORGANIZING NETWORK

*/s/ Jessica Karp Bansal*
Jessica Karp Bansal