UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NATIONAL TPS ALLIANCE, et al., <br>     Plaintiffs, <br> v. <br> KRISTI NOEM, et al., <br>     Defendants. | Case No. 25-cv-05687-TLT <br><br> **ORDER DENYING DEFENDANTS' MOTION TO STAY** <br> Re: Dkt. No. 75 |

Defendants rely on recycled arguments to request that the Court stay its Order Granting Plaintiffs' Motion to Postpone. The Court has jurisdiction over Plaintiffs' claims, and Defendants fail to meet their burden in showing a strong likelihood of success on the merits.

Pending before the Court is Defendants' motion to stay the Court's Order Granting Plaintiffs' Motion to Postpone. ECF 75. Plaintiffs filed an opposition on August 7, 2025. ECF 82.

Having considered the parties' briefs, the relevant legal authority, and for the reasons below, the Court **DENIES** the motion to stay.

I.  **BACKGROUND**

The Court assumes the parties' familiarity with the factual background and only cites such background to the extent necessary for this Order.

On July 31, 2025, the Court granted Plaintiffs' motion to postpone the Secretary's TPS termination for Nepal, Honduras, and Nicaragua ("Postponement Order"). ECF 73. Absent postponement, TPS for Nepal was set to expire on August 5, 2025; TPS for Honduras and Nicaragua on September 8, 2025. *Id*. at 6. The Court held that Plaintiffs were likely to succeed in showing that the Secretary's TPS terminations was likely preordained, deviated from prior

practice without good reason, and motivated by racial animus. *Id*. at 25–30. Defendants conceded that "each of the individually named Plaintiffs have not suffered any felony or misdemeanor convictions" and conceded that Plaintiffs face irreparable harm absent relief. *Id*. at 1, 30–32.

On August 1, 2025, Defendants filed a motion to stay the Postponement Order. ECF 75. On August 7, 2025, Plaintiffs filed an opposition. ECF 82. An initial case management conference is scheduled for August 14, 2025, where the Court will discuss ways in which this case can be expedited. ECF 73 at 37. The Court reserved November 18, 2025 for the parties' next substantive motion hearing date. *Id*.

## II.   LEGAL STANDARD

"A stay is not a matter of right, even if irreparable injury might otherwise result." *Nken v. Holder*, 556 U.S. 418, 434 (2009) (quoting *Virginian R. Co.*, 272 U.S. 658, 672 (1926)). The party requesting a stay bears the burden of showing that the following factors support a stay:

> "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies."

*Nken*, 556 U.S. at 434 (quoting *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987)).

## III.   DISCUSSION

Defendants argue that (A) the Court lacks jurisdiction; (B) the balance of harms and public interest favors a stay pending appeal; and (C) the Court should narrow its stay.

### A.   The Court has Jurisdiction to Grant Plaintiffs Relief

Defendants argue that (i) the TPS statute bars plaintiffs' claims; (ii) Defendants are likely to prevail on Plaintiffs' first APA claim that the terminations were preordained; (iii) Defendants are likely to prevail on Plaintiffs' second APA claim that the terminations deviated from prior practice without good reason; and (iv) Defendants are likely to prevail on Plaintiffs' Fifth Amendment claim. ECF 75 at 3–11.

#### i.   The TPS Statute does not bar Plaintiffs' claims

Defendants argue that the TPS statute, Section 1254a(b)(5)(A), bars Plaintiffs' claims, the Court's footnotes are misplaced, Section 1252(a)(2)(B)(ii) precludes the Court's jurisdiction, and

2

allowing Plaintiffs' APA claims to proceed would allow litigants to simply rely on policy preferences for an APA claim. ECF 75 at 3–6. Plaintiffs argue that Defendants rely on the same arguments that the Court has already addressed in its Postponement Order, Defendants' "terminate-first, justify-later" policy does not warrant the Court's deference, and that Section 1252(a)(2)(B)(ii) does not preclude the Court's jurisdiction. ECF 82 at 4–7.

The Postponement Order addresses Defendants' arguments concerning interpretation of the TPS statute. ECF 73 at 15–17. Defendants fail to raise new argument or caselaw warranting reconsideration.

Here, Plaintiffs challenge the collateral decisions underlying the Secretary's TPS terminations, including "the collateral decision to end TPS for virtually every country that has it, apparently because she has interpreted the President's Executive Order on 'Invasion' to require that result." ECF 60 at 4; *see also* ECF 1 ¶¶ 3, 44–71. Although Defendants assert that no TPS termination would ever be barred because "all a litigant would need to do is allege that the Secretary's determinations were driven by an underlying policy preference," the Court here relied on the available evidentiary record[1] and applicable caselaw to determine that Plaintiffs will likely succeed on the merits of their APA and Fifth Amendment claims.

Defendants also mischaracterize the Postponement Order. The Court's footnotes addressed Plaintiffs' argument that "granting unfettered discretion over TPS terminations would allow the President to give or take TPS away from some country whenever he feels like it or for the purpose of trade negotiations" and recognized that Plaintiffs face the United States' shifting immigration policies. ECF 73 at 18 n.1–2. There is truth and logic in this history. *See Student Fair Admissions, Inc. v. President and Fellows of Harvard College*, 600 U.S 181, 386 (2023) ("[A] page of history is worth a volume of logic.") (Jackson, K., dissenting) (quoting *New York Trust Co. v. Eisner*, 256 U.S. 345, 349 (1921)). Indeed, the test of time may reveal patterns of justice, injustice, and consequence.

For the benefit of the parties, the Court provides the below context and direct quotation to

---

[1] Defendants have since filed several errata to the administrative record. *See* ECF 77–79.

the footnotes.

In sharing Plaintiffs' concern that "barring all judicial review would allow the President to grant or deny TPS as a lever for his negotiations with countries," the Court did "not forget that this country has bartered with human lives." ECF 73 at 17–18. The Court's footnote provided:

> During oral argument, Plaintiffs argued that granting unfettered discretion over TPS terminations would allow the President to give or take TPS away from some country whenever he feels like it or for the purpose of trade negotiations. The Court recognizes that the United States has a long history of transporting individuals against their will, to places unfamiliar to them, and for the purposes of trade. For example, the United States was an active participant in the transatlantic slave trade which uprooted individuals in Africa and brought them to this continent. The emancipation of slaves saw the same pattern, but in reverse. Many whites were uncomfortable with the idea of free non-white people in their communities, even if they had lived in the United States for generations. *See* OUSMANE K. POWER-GREENE, AGAINST WIND AND TIDE: THE AFRICAN STRUGGLE AGAINST THE COLONIZATION MOVEMENT (2014). Plaintiffs' allegations echo these same traditions. Plaintiffs allege that "Secretary Noem, President Trump, and members of the Trump campaign and administration have consistently used racist invective to describe their TPS decisions involving immigrants from non-white, non-European countries, including those involving the countries at issue here." Compl. ¶ 5.
>
> Plaintiffs also allege that "TPS holders are facing the imminent loss of legal status, and as a result, are already being forced to make the impossible choice whether to return to a country in crisis, remain in the United States without lawful immigration status, or uproot themselves again to try to find refuge in some third country." Compl. ¶ 130. Indeed, Plaintiffs here face violence and threats to their health if deported including Patricia Carbajal who fears sexual violence against herself and her daughter in Honduras, Maria Elena Hernandez who relies on U.S. insurance and medical care to treat her heart condition, or O.C. who will no longer be able to obtain the diabetes medication she needs to survive if TPS is terminated. *See* ECF 17-4, 17-5, 17-12.
>
> America has seen this pattern before. Many freed slaves were sent to countries to which they had no connection whatsoever. These efforts made "free blacks fearful of a mass deportation across the Atlantic Ocean reminiscent of the Middle Passage." POWER-GREENE, *supra* at 17 (describing resistance to white plans to send freed blacks to Liberia). Some states, such as Virginia, passed laws demanding freed slaves to leave. Eric Burn, *A Manumission in the Mountains: Slavery*

> *and the African Colonization Movement in Southwestern Virginia*, 33 APPALACHIAN J. 164, 171 (2006). In other cases, slaveowners made freedom conditional on leaving the United States. Mark J. Fleszar, *"My Laborers in Haiti Are Not Slaves": Proslavery Fictions and a Black Colonization Experiment on the Northern Coast, 1835-1846*, 26 J. SOC. HIST. 478, 478 (1993) (describing a Florida slaveowner requiring removal to Haiti as a condition for freedom). National Geographic has referred to this period of forced removal in U.S. history as "a racist initiative to remove as many free Black people as possible from American soil." Enrique Vaquerizo, *Were there sinister motives behind founding Liberia?*, NATIONAL GEOGRAPHIC (Jun. 18, 2025). The results of this endeavor were devastating and one study found that removal to Liberia resulted in the "highest mortality rates in accurately recorded human history." Antonio McDaniel, *Extreme Mortality in Nineteenth-Century Africa: The Case of Liberian Immigrants*, 29 Demography 581, 581 (Nov. 1992).

*Id*. at 18. The Court declined to "shut its eyes to the country's shifting attitudes towards immigrants":

> Acceptance of immigrants has ebbed and flowed over the centuries of U.S. history. In the late 1700s, immigration was largely unregulated except that naturalization as a path to citizenship was explicitly limited to "free white persons" in one of the first laws adopted in the nascent nation. *See* Naturalization Act of 1790, ch. 3, § 1, 1 Stat. 103, 103–04 (repealed 1795). During this period, large numbers of African slaves were also brought into the country against their will. As the United States industrialized in the late 19th century, large numbers of immigrants from southern and eastern Europe and other places flowed into the country. *Immigration to the United States, 1851–1900*, LIBRARY OF CONGRESS (2025). In reaction to this, the government excluded some non-white immigrants, most notably through the Chinese Exclusion Act which was upheld by the Supreme Court in a case which set the foundation for plenary power over immigration. *See* 22 Stat. 58 (1882); *Chae Chan Ping v. United States*, 130 U.S. 581 (1889). *See also Fong Yue Ting v. United States*, 149 U.S. 698 (1893). The United States also limited Japanese immigration in the Gentlemen's Agreement of 1907.
>
> Plaintiffs here face similar tides. For example, Plaintiff O.C. started his own small business, R.A. helped treat children with brain cancer, and Plaintiff Silva helps heart patients at Stanford Hospital, a kind of opportunity that would be unattainable in Honduras. ECF 17-3; ECF 17-5; 17-9. Plaintiffs have been in the United States for decades and contributing to the American system. Still, they face exclusion in the name of the President's Invasion EO.

*Id*. at 18–19, n.2.

Accordingly, as discussed in the Postponement Order, the Court finds that it has

jurisdiction and the TPS Statute does not bar Plaintiffs' claims.

### ii. Defendants have not made a strong showing that they will prevail on Plaintiffs' First APA claim that the terminations were preordained

Defendants argue that the Secretary considered the country conditions for Nepal, Honduras, and Nicaragua, the TPS terminations cannot be set aside solely based on the administration's priorities, and the Secretary is not required to discuss every piece of evidence considered. ECF 75 at 7–9. Plaintiffs argue that Defendants mischaracterize Plaintiffs' claims, ignore the Postponement Order and record in this case, and fail to make a strong showing that the Secretary's TPS terminations were based on the county conditions reports. ECF 82 at 7–9.

The Postponement Order addresses Defendants' arguments concerning Plaintiffs' first APA claim that the TPS terminations were preordained. ECF 73 at 21–22. Defendants fail to raise new argument or caselaw warranting the reconsideration.

As discussed in the Postponement Order, Plaintiffs will likely succeed in showing that the Secretary's terminations were based on a preordained decision to end TPS rather than a review of country conditions for Nepal, Honduras, and Nicaragua: "at the Secretary's confirmation hearing—before the Secretary reviewed any country conditions reports—the Secretary said that TPS extensions will not be allowed to "go[] forward the way that they are . . . the Secretary also commented that TPS 'was abused, exploited, and politicized" and 'an immigration scheme[] that make[s] Americans less safe.'" *Id*. Defendants fail to explain how these statements, in addition to the Secretary's history of systematically attempting to limit TPS and the Invasion EO's references to TPS holders as "illegal," contributing to an "invasion, being a "significant threat to national security and public safety," and "commit[ting] vile and heinous acts against innocent Americans" are not evidence that that the TPS terminations were preordained. Again, as explained in the Postponement Order, Defendants conceded that the individual Plaintiffs here have not committed any criminal violations. ECF 73 at 1. Although TPS holders are not citizens, TPS holders are not illegally in the United States. 8 U.S.C. § 1254a. "Their presence is not a crime." *Id*. at 28. "TPS holders already live in the United States and have contributed billions to the economy by legally working in jobs, paying taxes, and paying contributions into MediCare and Social Security." *Id*.

1   The majority of TPS holders are in the workforce and "contribute $10.3 billion per year and pay

2   $2.2 billion annually in federal and state taxes." *Id*. at 32–33.

3   Accordingly, Defendants have not made a strong showing that they will prevail on the

4   merits of Plaintiffs' APA challenge to the Secretary's TPS terminations.

### iii. Defendants have not made a strong showing that they will prevail on Plaintiffs' Second APA claim that the terminations deviated from practice without good reason

Defendants argue that the Secretary has unfettered discretion to extend a termination's transition period, the Secretary's discretion is unreviewable, and there has been no hard-and-fast commitment by DHS to a specific post-termination period. ECF 75 at 9–10. Plaintiffs argue that Defendants have consistently provided at least a six-month transition period. ECF 82 at 9–10.

The Postponement Order addresses Defendants' arguments concerning the Secretary's discretion and DHS's previous practices concerning termination periods. *See* ECF 73 at 23–25. Defendants fail to raise new argument or caselaw warranting the reconsideration.

Notably, Defendants fail to address Plaintiffs' evidence regarding the prior administrations providing at least 6 months after the TPS termination date for holders to transition. *See* ECF 28 (appendix regarding "TPS Terminations and Associated Orderly Transition Periods Prior to Current Trump Administration"). To the extent Defendants argue that the Court lacks jurisdiction under 8 U.S.C. § 1252(a)(2)(B)(ii), Defendants fail to show how 1252(a)(2)(B)(ii)'s mandate concerning discretionary relief applies to this case. *See Nakka v. USCIS*, 111 F.4th 995, 1004 (9th Cir. 2024) ("We disagree with the Government that the 'plain language of the statute and the rationale of *Patel*' compel the conclusion that § 1252(a)(2)(B)(i) strips federal courts of jurisdiction over Plaintiffs' claims.").

Accordingly, the Court finds that Defendants fail to make a strong showing that they will prevail on the merits of Plaintiffs' second APA claim that the terminations deviated from practice without good reason.

### iv. Defendants have not made a strong showing that they will prevail on the merits on Plaintiffs' Fifth Amendment Claims

Defendants argue that Plaintiffs' Fifth Amendment claim is likely to fail because Plaintiffs

cherry-picked the Secretary's statements out of context. ECF 75 at 10–11.  Plaintiffs argue that there is a plausible basis to infer that an invidious discriminatory purpose was a motivating factor, the Secretary's statements reflect an animus against immigrants and TPS generally, DHS recently issued a statement that further demonstrates animus, and Plaintiffs are likely to succeed on the merits of their Fifth Amendment claim.   ECF 82 at 10–14.

The Postponement Order addresses Defendants' Fifth Amendment arguments concerning the Secretary's statements and the political climate.  *See* ECF 73 at 25–30.  Defendants fail to raise new argument or caselaw warranting the reconsideration.

The Postponement Order explains why Plaintiffs will likely succeed on the merits of their Fifth Amendment claim under both *Arlington Heights* and *Trump v. Hawaii*.  *Id*. at 27–30. The Court's finding of racial animus is further supported by Defendants' August 1, 2025 press release, which provided "some examples of criminal aliens who exploited the TPS program" and stated "TPS has been abused as a *de facto* amnesty program to allow unvetted aliens to remain in the U.S. indefinitely." ECF 82-1.  These statements contain odious undertones that are both contrary to the Defendants' concession that the Plaintiff TPS holders here have not suffered any felony or misdemeanor.  The statements further categorize all TPS holders as criminals based on the acts of a few.  This insidious assumption perpetuates racial animus and is an example of stereotyping.  *See* ECF 73 at 28–29.  As explained in the Postponement Order, those that have been convicted of a felony or 2 or more misdemeanors will not hold TPS and are therefore not representative of TPS holders as a whole.  *See* ECF 73 at 8 (citing 8 U.S.C. § 1254a(c)(2)(B)).

Accordingly, the Court finds that Defendants will likely not prevail on the merits on Plaintiffs' Fifth Amendment claim.

\*     \*     \*

In the Postponement Order, the Court analyzed the plain language, congressional intent, and precedent interpreting the TPS statute and held that the Court has jurisdiction over Plaintiffs' claims.  Based on the strength of Plaintiffs' arguments and evidentiary support, the Court then found that the record demonstrates that Plaintiffs will likely succeed on the merits of their APA and Fifth Amendment claims.  Defendants conceded that Plaintiffs suffered no criminal record and

8

agreed that Plaintiffs would suffer harm. Defendants also do not dispute the Court's findings concerning the Secretary's statements, and Defendants do not meaningfully challenge the Court's finding that Plaintiffs will likely succeed on the merits on their APA and Fifth Amendment claims. Therefore, the Court finds that Defendants' recycled arguments fail to provide a strong showing that either the Court lacks jurisdiction or Defendants will likely succeed on the merits.

### B.     Defendants Fail to Show that the Balance of Harm Strongly Favors a Stay Pending Appeal

Defendants argue that the balance of harms and public interest favor a stay because the government and public share an interest in ensuring adherence with the process established by Congress, declining a stay would intrude into the workings of the branch of Government, TPS is inherently temporary, noncitizens do not have a constitutional right to live with their family, Plaintiffs can pursue alternative immigration relief, and the Supreme Court stayed a district court's § 705 stay of Secretary Noem's termination of Venezuela's TPS designation. ECF 75 at 9–13. Plaintiffs argue that they would suffer harm if the Court stayed its Postponement Order, Defendants failed to show irreparable injury given that the Court placed this case on an expedited schedule, and Defendants would not suffer irreparable harm from pausing agency action. ECF 82 at 14–18.

The Postponement Order addresses Defendants' arguments concerning the balance of harms and the public interest. ECF 73 at 30–34. Defendants' motion to stay again fails to identify the exact foreign policy or national interest at stake. *See id.* at 34. Defendants' harm is further minimized given that the Court will expedite the case schedule.

### C.     Postponement is Required for Complete Relief

Defendants argue that the Court should narrow the stay to individual Plaintiffs because Plaintiffs can be easily identifiable, any practical difficulties do not warrant equitable relief, and there is no basis for relief based on the "speculative possibility" that the Court could vacate the Secretary's terminations under 5 U.S.C. 706(2)(A). ECF 75 at 13–14. Plaintiffs argue that limiting the TPS terminations to the individual Plaintiffs would result in errors and requiring Plaintiff NTPS to share its membership list would raise additional issues with the First

9

Amendment. ECF 82 at 19–20.

The Postponement Order addresses Defendants' arguments concerning the scope of relief, *Trump v. Casa*, and *Immigrant Defenders Law Center*. *See* ECF 73 at 34–37. Defendants fail to raise new argument or caselaw requiring reconsideration of the Court the Court to reconsider the scope of relief. The facts here show that that Plaintiffs would not be able to obtain complete relief absent postponement of the TPS terminations:

> Although Defendants assert that USCIS could issue individual notices that continue the benefits for named Plaintiffs under TPS, Defendants fail to offer how Defendants would coordinate with Plaintiffs' employers, the states and cities of counties in which Plaintiffs reside, hospitals, ICE, and local law enforcement to ensure that Plaintiffs are not subject to removal or otherwise detained after the TPS terminations go into effect. Any error in coordination or communication would result in a direct violation of the TPS statute.

ECF 73 at 36. *See Vasquez Perdomo v. Noem*, No. 25-4312, 2025 WL 2181709, at *21 (9th Cir. Aug. 1, 2025) ("How would a federal agent who is about to detain a person whose identity is not known, based on some combination of the person's ethnicity, language, location, and occupation, discern in advance whether that person is on the list of individuals that agents are enjoined from stopping?").

To the extent Defendants seek to compel Plaintiff NTPS to provide a list of its members, such a requirement is likely unconstitutional and therefore not practical. *See Crowe v. Oregon State Bar*, 989 F.3d 714, 729 (9th Cir. 2021) ("[L]ike the 'freedom of belief,' freedom from compelled association 'is no incidental or secondary aspect of the First Amendment's protections.'") (internal quotation omitted); *Vasquez Perdomo v. Noem*, No. 25-4312, 2025 WL 2181709 at *22 ("The inadequacy of a list-of-protected-people injunction is multiplied because the list would have to include all of the members of the plaintiff associations . . . Requiring organizations to share membership lists with Defendants could raise additional constitutional problems regarding the freedom of association and privacy.").

The postponement does not enjoin or otherwise limit the Secretary's ability to terminate TPS incompliance with the TPS statute and APA. Indeed, "[t]he Secretary remains free to terminate TPS status for any country pursuant to the statutorily prescribed procedures Congress

has enacted." *Haitian Evangelical Clergy association v. Trump*, No. 25-cv-1464, 2025 WL 1808743, at *11 (E.D.N.Y. July 1, 2025).

Accordingly, the Court finds that postponement of the TPS terminations for Nepal, Honduras, and Nicaragua is required to afford Plaintiffs complete relief.

## IV. CONCLUSION

For the reasons stated above, the Court **DENIES** Defendants' motion to stay. An initial case management conference is scheduled for August 14, 2025. November 18, 2025 is reserved for the parties' next substantive motion hearing date.

IT IS SO ORDERED.

Dated: August 8, 2025

_____
TRINA L. THOMPSON
United States District Judge

11