1

2

3

4                        UNITED STATES DISTRICT COURT

5                      NORTHERN DISTRICT OF CALIFORNIA

6

7    NATIONAL TPS ALLIANCE, et al.,              Case No.  25-cv-05687-TLT

8                     Plaintiffs,

9            v.                                  **ORDER GRANTING MOTION FOR**
                                                 **CLASS CERTIFICATION**
10   KRISTI NOEM, et al.,
                                                 Re: Dkt. No. 89
11                    Defendants.

12

13        The focus of Temporary Protected Status ("TPS") is not the individual.  A TPS designation

14   belongs to the whole country; it reflects our government's judgement that the designated *country*

15   is safe for return.  Immigration and Nationality Act of 1990, Pub. L. No. 101-649, 8 U.S.C. §

16   1254a.  Yet, the termination of TPS can have a direct and punishing impact on the lives of those

17   living under its protection.

18        In the notice of termination of TPS for Nepal, the Secretary of the Department of

19   Homeland Security highlighted the improving fiscal conditions and disaster-resilient community

20   systems before concluding that "Nepal is able to handle adequately the return of its nationals."  90

21   Fed. Reg. 24151, 24152–53.  Recent events raise questions about what a review of the country's

22   conditions might reveal today.  ECF 117 at 4 n.3.

23        Thousands of Nepali nationals in the United States risk losing rights, losing income, losing

24   connections with loved ones, and losing freedom in this country because of the Secretary's

25   decision.  The same is true for thousands of Hondurans and thousands of Nicaraguans.

26        Before the Court is Plaintiffs' motion for class certification.  ECF 89.  Defendants filed an

27   opposition on August 25, 2025.  ECF 99.  Plaintiffs filed a reply on August 29, 2025.  ECF 106.

28   The Court heard argument on Plaintiffs' motion on September 16, 2025.  ECF 119.  Having

considered the parties' briefs, the relevant legal authority, and for the reasons below, the Court GRANTS Plaintiffs' motion.

## I.    BACKGROUND

### A.    Procedural History

The Court assumes the parties' familiarity with the factual background and only cites such background to the extent necessary for this Order.

On July 7, 2025, Plaintiffs filed a complaint alleging that Defendants' termination of TPS for Nepal, Honduras, and Nicaragua violate the Administrative Procedure Act and the Fifth Amendment.  ECF 1 ("Compl.") ¶¶ 154–165.  On July 8, 2025, Plaintiffs filed a motion to postpone effective date of administrative action.  ECF 17.  Defendants filed an opposition on July 14, 2025.  ECF 45.  Plaintiffs filed a reply on July 18, 2025.  ECF 53.

The Court heard oral argument on July 29, 2025, regarding Plaintiffs' motion to postpone.  ECF 65, 67.  Following oral argument, on July 31, 2025, the Court granted Plaintiffs motion to postpose.  ECF 73.  On August 1, 2025, Defendants timely appealed this order.  ECF 74.  On August 20, 2025, the Ninth Circuit granted Defendants motion for a stay of the order granting Plaintiffs motion to postpone pending their appeal but declined to stay the proceedings in this Court.  ECF 96.

On August 15, 2025, Plaintiffs filed a motion to certify three separate classes.  ECF 89.  Defendants filed an opposition on August 25, 2025.  ECF 99.  Plaintiffs filed a reply on August 29, 2025.  ECF 103.  The Court heard oral argument regarding Plaintiffs motion for class certification on September 16, 2025.  ECF 119.

### B.    Factual Background

#### i.    The TPS Statute

Congress established the Temporary Protected Status ("TPS") program in 1990 to provide humanitarian relief to foreign nationals within the United States who are unable to return to their country of origin due to potential threats to their personal safety from natural disaster, civil strife and armed conflict, or other extraordinary and temporary conditions.  8 U.S.C. § 1254a.  Pursuant to 8 U.S.C. § 1254a(a)(1), the Secretary of Homeland Security may designate a country for

Temporary Protected Status and grant nationals of that country protection from removal and work authorization in the United States for the period their home country is so designated. 8 U.S.C. § 1254a(a)(1)(B).

In designating a country for TPS the Secretary must engage in "consultation with appropriate agencies of the Government" and publish a "statement of the findings" and an estimate of the number of eligible foreign nationals. *Id.* § 1254a(b)(1).

Once a country is designated for TPS, nationals of that country can register for benefits during a registration. To establish eligibility for TPS, an applicant must demonstrate, among other things, that he or she is a national of the country designated for TPS, has been continuously physically present and resided in the United States since the effective date of designation, and is otherwise admissible as an immigrant. 8 U.S.C. § 1254a(c)(2)(A); 8 C.F.R. §§ 244.2, 244.3(a), 1244.3(a). The government can deny an applicant TPS based on the applicant's criminal history. 8 U.S.C. § 1254a(c)(2)(A)–(B); 8 C.F.R. § 244.3(c). TPS applicants must also pay all fees associated with applying for TPS. *Id.* at § 1254a(c)(1)(B).

Periodically, the Secretary "shall review the conditions in the foreign state . . . for which a designation is in effect under this subsection and shall determine whether the conditions for such designation under this subsection continue to be met." *Id.* at § 1254a(b)(3). If the Secretary finds that the conditions are no longer met, she "shall terminate the designation by publishing notice in the Federal Register of the determination." *Id.*

Termination is not effective "earlier than 60 days after the date the notice is published or, if later, the expiration of the most recent previous extension." *Id.* The Secretary may extend the designation "for an additional period of 6 months (or, in the discretion of the [Secretary], a period of 12 or 18 months)" if the conditions giving rise to the TPS designation persist. *Id.*

### ii.    History of TPS for Nepal, Honduras, and Nicaragua

On June 24, 2015, the Secretary designated Nepal for TPS for a period of 18 months due to a breakdown of living conditions resulting from a 7.8 magnitude earthquake. 80 Fed. Reg. 36,346 (June 24, 2015). The earthquake impacted about one-third of the country's population and damaged approximately 750,000 homes. *Id.* In 2016, TPS was extended for an additional 18

United States District Court
Northern District of California

1   months because of sustained strained infrastructure, civil unrest, and inadequacies in safe housing,

2   food, medicine, and education.  81 Fed. Reg. 74,470 (Oct. 26, 2016).  In 2018, TPS was extended

3   for several years due to legal challenges to the TPS termination for Nepal.  90 Fed. Reg. at 24,152.

4   In 2023, DHS reconsidered the 2018 decision to terminate TPS and extended TPS for recipients

5   from Nepal to June 24, 2025.  88 Fed. Reg. 40,317 (June 21, 2023).  On June 6, 2025, DHS

6   published notice in the Federal Register that TPS for Nepal would terminate on August 5, 2025.

7   90 Fed. Reg. at 21,512.

8         Hurricane Mitch hit Honduras in late October 1998, causing "widespread heavy rain and

9   severe flooding" in Honduras, Nicaragua, and other nearby countries that resulted in "thousands

10   dead or missing" and "tremendous property, infrastructure, and crop damage."  *25 Years Later:*

11   *Looking Back at the October Monster Named Mitch*, NOAA (Oct. 27, 2023).  In 1999, the

12   Attorney General designated Honduras for TPS for 18 months.  64 Fed. Reg. 524 (Jan. 5, 1999).

13   Over the next twenty years, TPS was repeatedly extended as DHS found continued "disruption in

14   living conditions."  79 Fed. Reg. 62170 (Oct. 16, 2014); 88 Fed. Reg. 40304 (Jun. 21, 2023).

15   DHS terminated TPS for Honduras in 2018.  83 Fed. Reg. 26,074 (June 5, 2018).  Legal

16   challenges to the termination of TPS for Honduras resulted in extension of TPS for several years.

17   90 Fed. Reg. at 30,090.  In 2023, DHS reconsidered the 2018 decision to terminate TPS and

18   extended TPS for Honduras through July 5, 2025.  88 Fed. Reg. at 40,304 (June 21, 2023).  On

19   July 8, 2025, DHS published notice in the Federal Register that TPS for Honduras would be

20   terminated effective September 8, 2025.  90 Fed. Reg. at 30,091.

21         Nicaragua was similarly hit by Hurricane Mitch and designated for TPS in 1999.  *See* 64

22   Fed. Reg. 526 (Jan. 5, 1999); 88 Fed. Reg. 40294 (Jun. 21, 2023).  TPS was extended for nearly

23   two decades due to recurrent weather events until terminated in 2017.  82 Fed. Reg. 59,636 (Dec.

24   15, 2017).  After the termination announcement, litigation resulted in the continued extension of

25   TPS for Nicaragua for several years.  90 Fed. Reg. at 30,087.  In 2023, DHS extended TPS for

26   Nicaragua through July 8, 2025.  88 Fed. Reg. at 40,294 (June 21, 2023).  On July 8, 2025, DHS

27   published notice in the Federal Register that TPS for Nicaragua would terminate on September 8,

28   2025.  90 Fed. Reg. at 30,086.

### iii.    The Current Administration and TPS

On January 20, 2025, President Trump issued an executive order titled, "Protecting the American People Against Invasion" ("Invasion EO").  90 Fed. Reg. 8443 (Jan. 20, 2025).  The Invasion EO cited to an "unprecedented flood of illegal immigration into the  United States" and ordered the Secretary of State, Attorney General, and DHS Secretary to "rescind the policy decisions of the previous administration that led to the increased or continued presence of illegal aliens in the United States, and align any and all departmental activities with the policies set out by this order and the immigration laws." *Id.* § 16.  This included "ensuring that designations of Temporary Protected Status are consistent with the provisions of section 244 of the INA (8 U.S.C. 1254a), and that such designations are appropriately limited in scope and made for only so long as may be necessary to fulfill the textual requirements of that statute." *Id.* § 16(b).  The Invasion EO would be cited in later decisions vacating or terminating TPS designations.  *See* 90 Fed. Reg. 30086 (July 8, 2025); 90 Fed. Reg. 30089 (July 8, 2025); 90 Fed. Reg. 24151 (Jun. 6, 2025).  *See also* ECF 18-11 at 2 (citing "President Trump's promise to rescind policies that were magnets for illegal immigration and inconsistent with the law" when vacating Haiti's TPS extension).

On January 27, 2025, in an email exchange between DHS officials, Tony Pham wrote to Marc Rosenblum that "This is a project involving termination of TPS status and we need to tell the data story if can be."  ECF 18-5 at 2; *see also* ECF 18-6 at 4 (privilege log showing a document labeled for Venezuela TPS "termination" on January 26, 2025.  Tony Pham also requested information on "the inter-relationship between the Columbia [sic] Honduras Nicaragua Venezuela (CHNV) Parole Processes and TPS."  ECF 18-5 at 3.  The extension of Venezuela's TPS status was vacated several days later which marked the first time a TPS extension had ever been vacated.  90 Fed. Reg. 8805 (Feb. 3, 2025).  USCIS officials also communicated to "focus on any improvements" when evaluating country conditions.  ECF 18-7 at 2.  For example, a January 31, 2025, draft memo for the Secretary excluded food insecurity and political repression and human rights from the country conditions considered for Venezuela.  *See* ECF 18-9.

These actions were taken in the context of repeated rhetoric by administration officials that associated immigrants and TPS holders with criminal activity or other undesirable traits.  During

Secretary Noem's confirmation hearing, Secretary Noem remarked that "the extension of over 600,000 Venezuelans as well is alarming when you look at what we've seen in different states, including Colorado with gangs doing damage and harming the individuals and the people that live there." ECF 18-14 at 28. She indicated that the extensions "will no longer be allowed." *Id.* In an earlier news interview, future Secretary Noem similarly referred to immigrants as "some of the most dangerous people in the world" and that other countries were "empty[ing] out their prisons, their mental institutions" and sending those individuals to the United States. ECF 18-15 at 7. Others in the current administration, in including the Vice President, had vowed to end TPS prior to taking office. ECF 18-19 at 3.

In a January 29, 2025 post on X, Secretary Noem announced that she would end a Biden order that allowed Venezuelans to stay in the country and "violate our laws." ECF 18-16 at 2. In a March 20, 2025 post on X, Secretary Noem associated "migration management" with "sav[ing] American lives and get[ting] criminals off our streets!" ECF 18-17 at 2. In a May 19, 2025 post on X, DHS equated TPS holders with "MS-13 gang members," "known terrorists," and "murderers." ECF 18- 18 at 2. These statements are consistent with similar statements by President Trump including one occurrence in which he stated that migrants were "poisoning the blood of our country." ECF 18- 20 at 9–10.

### iv.   The Proposed Class

Plaintiffs seek certification of the following three classes:

1. **Honduras TPS Class**: All persons who have been granted TPS pursuant to the TPS designation of Honduras and who have not been granted lawful permanent residence.

2. **Nepal TPS Class**: All persons who have been granted TPS pursuant to the TPS designation of Nepal and who have not been granted lawful permanent residence

3. **Nicaragua TPS Class**: All persons who have been granted TPS pursuant to the TPS designation of Nicaragua and who have not been granted lawful permanent residence

ECF 89 at 3–4. The following plaintiffs have been identified as the proposed named representatives for the class ("Class Representatives"):

United States District Court
Northern District of California

1      **Plaintiff Elena Hernandez** is 67 years old, a native of Nicaragua, came to the United

2   States in 1996 because her family was targeted by the Nicaraguan government, and was granted

3   TPS in 1999. ECF 17-4 ¶ 3. Plaintiff Hernandez has worked at an aquatic plant nursery, cleaning

4   company, and as a shop steward with TPS. *Id.* ¶ 7. Plaintiff Hernandez has asthma and a heart

5   condition that requires daily medication. *Id.* ¶ 9. Without TPS, Plaintiff Hernandez would lose

6   her health insurance and social security income even though she has paid into social security for

7   more than 25 years. *Id.* ¶¶ 9, 11. She would lose her job, be separated from her family, have no

8   way of supporting herself, and worries that her health will rapidly decline without continued

9   access to healthcare. *Id.* ¶¶ 10, 12, 14. Given her family history and views, she may also face

10   persecution in Nicaragua. *Id.* ¶ 14

11      **Plaintiff Sandhya Lama** is 43 years old, a native of Nepal, and has been in the United

12   States since 2008. ECF 17-6 ¶ 2. She came to the United States in 2008 to study at a university in

13   Virginia, received her master's degree in 2014, and has been a TPS holder since 2015. *Id.* ¶¶ 2, 6.

14   She is a single mother of three U.S. citizen children, a sole provider, and is currently a CXO Multi

15   Site Lead LC for Amazon. *Id.* ¶¶ 2, 10–13. If forced to return to Nepal, Lama's children would

16   lose opportunities, and one of Lama's children would not be able to get medical treatment for her

17   severe allergies. *Id.* ¶ 15. Returning to Nepal would also be dangerous because Lama's family

18   has suffered persecution from the Maoist (communist) party in Nepal, including having their

19   ancestral house bombed and brother being taken as hostage. *Id.* ¶¶ 4, 16.

20      **Plaintiff Teofilo Martinez** is 57 years, a native of Honduras, and has been on TPS since

21   1997. ECF 17-8 ¶ 2. He is a licensed soccer instructor, a licensed realtor, and owns a landscaping

22   business. *Id.* ¶ 9. He has also been volunteering with the Honduran Consulate for the last 7 years,

23   is on the executive committee for NTPSA, and co-hosts a radio show for TPS holders. *Id.*

24   Without TPS, Martinez would be separated from his partner of over 25 years, lose his job, and not

25   be able to travel for his volunteer work with NTPSA. *Id.* ¶¶ 15, 18.

26      **Plaintiff Denis Molina** is 49 years old, a native of Honduras, and has been in the United

27   States since 1997. ECF 17-2 ¶¶ 4–5. He applied for and has maintained TPS since Hurricane

28   Mitch hit Honduras. *Id.* ¶ 5. He has been a church pastor for over 22 years and works various

1  jobs in construction and as a mechanic to support his family, which includes a wife and four

2  children. *Id.* ¶¶ 6–12. Two of his children, one aged 4 and another 22, have been diagnosed with

3  autism and require special programs to support their development. *Id.* ¶¶ 9, 13. He is the sole

4  breadwinner for his family. *Id.* ¶ 12. If TPS terminates, Molina fears that he will not be able to

5  support his family in Honduras and, if his entire family relocates to Honduras, his children will

6  lose the support of special programs for their development. *Id.* ¶¶ 12, 14.

7      **Plaintiff Johny Silva** is 29 years old, a native of Honduras, and came to the United States

8  when he was three-years old. ECF 17-3 ¶ 2. He was granted TPS after Hurricane Mitch. *Id.* ¶ 4.

9  Silva is a Certified Nursing Assistant at Stanford Hospital and relies on his TPS for work

10  authorization. *Id.* ¶¶ 10, 13. Without TPS, Silva and his son, approximately 9 years old and

11  diagnosed with autism, will lose their health insurance. *Id.* ¶ 13. Silva will also lose his job, not

12  be able to contribute to his family's rent, will have to abandon his dreams of becoming a nurse,

13  and be separated from the rest of his family. *Id.* ¶¶ 13–14, 16.

14  ## II.    LEGAL STANDARD

15      To certify a class, the Court must be "satisfied, after a rigorous analysis" that the plaintiffs

16  have satisfied the requirements of Federal Rule of Civil Procedure 23 by a preponderance of the

17  evidence. *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 664–65

18  (9th Cir. 2022) (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 161 (1982)). "Frequently

19  that 'rigorous analysis' will entail some overlap with the merits of the plaintiff's underlying claim.

20  That cannot be helped." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351 (2011).

21      Rule 23 consists of two parts. Fed. R. Civ. P. 23. First, Plaintiffs must satisfy all four

22  requirements of Rule 23(a): "One or more members of a class may sue or be sued as representative

23  parties on behalf of all members only if: (1) the class is so numerous that joinder of all members is

24  impracticable; (2) there are questions of law or fact common to the class; (3) the claims or

25  defenses of the representative parties are typical of the claims or defenses of the class; and (4) the

26  representative parties will fairly and adequately protect the interests of the class." *Olean*, 31 F.4th

27  at 663; Fed. R. Civ. P. 23(a). Second, Plaintiffs must demonstrate through evidentiary proof that

28  the class satisfies at least one of the three subsections under Rule 23(b). *Comcast Corp. v.*

United States District Court
Northern District of California

1    Behrend, 569 U.S. 27, 33 (2013).  Classes certified under Rule 23(b)(3) require that "questions of

2    law or fact common to class members predominate over any questions affecting only individual

3    members, and that a class action is superior to other available methods for fairly and efficiently

4    adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).

5         "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the

6    certification stage.  Merits questions may be considered to the extent—but only to the extent—that

7    they are relevant to determining whether the Rule 23 prerequisites for class certification are

8    satisfied." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013).  For example,

9    to determine whether a common question prerequisite is satisfied, "a district court is limited to

10   resolving whether the evidence establishes that a common question is capable of classwide

11   resolution, not whether the evidence in fact establishes that plaintiffs would win at trial." *Olean*,

12   31 F.4th at 666–67.

13        "Numerous district courts in this Circuit have long concluded that it is appropriate to

14   consider evidence at the class certification stage that may ultimately be inadmissible." *Sali v.*

15   *Corona Regional Medical Center*, 909 F.3d 996, 1004 n.2 (9th Cir. 2018).  Evidentiary objections

16   are, therefore, "not a proper basis to reject evidence submitted in support of class certification."

17   Id. at 1004.  Indeed, "on a motion for class certification, the court may consider evidence that may

18   not be admissible at trial." *Circle Click Media LLC v. Regus Mgmt Group LLC*, No. 12-cv-4000,

19   2015 WL 6638929, at *8 (N.D. Cal. Oct. 30, 2015); *Keilholtz v. Lennox Hearth Prods., Inc.*, 268

20   F.R.D. 330, 337 n.3 (N.D. Cal. 2010) (same).

21        Rule 23(b)(2) requires that "the party opposing the class has acted or refused to act on

22   grounds that apply generally to the class, so that final injunctive relief or corresponding

23   declaratory relief is appropriate respecting the class as a whole."  In *Parsons v. Ryan*, the Ninth

24   Circuit held that the requirement of a Rule 23(b)(2) class was "unquestionably satisfied" when

25   class members sought uniform injunctive or declaratory relief applicable classwide.  754 F.3d 657,

26   688 (9th Cir. 2014).  "Nothing in Rule 23 . . . limits the geographical scope of a class action that is

27   brought in conformity with that Rule." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979).

28

United States District Court
Northern District of California

### III.    DISCUSSION

The parties find some common ground.  The Court starts there.  The parties agree that Plaintiffs' request to certify three separate classes in one motion is proper so long as there are common legal and factual questions applicable to all members of each class.  ECF 116 at 3; ECF 106 at 12.  Ninth Circuit precedent supports this conclusion.  *See Owino v. CoreCivic, Inc*. 60 F.4th 437, 450 (9th Cir. 2022) (affirming certification of three classes with no discussion of subclasses); *Wit v. United Behavioral Health* 79 F.4th 1068, 1089 (9th Cir. 2023) ("[T]he district court did not err in certifying three classes to pursue the fiduciary duty claim").  The parties also agree that nationwide class relief is not barred *in toto* under Supreme Court precedent.  ECF 99 at 17; ECF 89 at 11.  Moreover, Defendants do not dispute numerosity or adequacy.  *See generally* ECF 99.

The parties, however, disagree about (A) whether 8 U.S.C. §1254a(b)(5)(A) strips this Court of jurisdiction over Plaintiffs' claims, (B) whether Plaintiffs satisfy the requirements of Rule 23(a), (C) whether Plaintiffs' requested relief is proper under Rule 23(b)(2), and (D) whether certification of the three classes on a nationwide basis is appropriate in these circumstances.  ECF 89 at 1; ECF 99 at 9–10, 14.  The Court first addresses Defendants' argument regarding jurisdiction, then turns to the parties' arguments regarding Rule 23, Plaintiffs' requested relief, and, finally, the appropriateness of nationwide class certification.

### A.    8 U.S.C. §1254a(b)(5)(A) Does Not Strip the Court of Jurisdiction Over Plaintiffs' Claims

In the Defendants' opposition to Plaintiffs' motion, the Defendants argues that 8 U.S.C. §1254a(b)(5)(A) strips federal courts of jurisdiction to review the Secretary's terminations.  ECF 99 at 3 ("[8 U.S.C. §1254a(b)(5)(A)] makes TPS determinations unreviewable").  Plaintiffs note that numerous courts have rejected the argument jurisdictional argument presented by Defendants.  ECF 106 at 1.

8 U.S.C. §1254a(b)(5)(A) reads "[t]here is no judicial review of any determination of the [Secretary] with respect to the designation, or termination of a designation, of a foreign state under this subsection."

Several federal courts, including this Court, have asserted jurisdiction, despite the

restrictive language above, over claims where plaintiffs allege that the Secretary exceeded the scope of his or her authority in deciding to terminate, or by the manner in which he or she decided to terminate, TPS designations. *See* ECF 73 at 20 ("[T]he Court finds that 8 U.S.C. § 1254a(b)(5) does not preclude the Court's jurisdiction over Plaintiffs' claims"); *Nat'l TPS All. v. Noem*, No. 25-2120, slip op. at 30 (9th Cir. Aug. 29, 2025) (finding that nothing in the statute precludes review of a Secretary's "conclusions as to the extent of her power under the TPS statute"); *CASA, Inc. v. Noem,* No. CV 25-1484-TDC, 2025 WL 1907378, at *6 (D. Md. July 10, 2025) (finding plaintiffs' claim challenging the alleged policy or practice of making preordained determinations to terminate TPS designations in order to reduce the number of non-white immigrants in the United States not barred by § 1254a(b)(5)(A)); *Centro Presente v. Department of Homeland Security,* 332 F.Supp.3d 393 (D. Mass. 2018) (concluding that the plaintiffs' APA claim was not barred where it challenged, in relation to three separate countries' TPS determinations, an allegedly "new policy that TPS designation determination are to be made solely on the basis of whether the conditions that created the initial designation persist rather than a broader view of whether the country is safely able to accept returning nationals"); *Ramos v. Nielsen*, 321 F. Supp. 3d at 1092, 1099–1100, 1104 (N.D. Cal. 2018) (finding that a claim contesting the termination of the TPS designations for four countries was not barred by § 1254a(b)(5)(A) where the challenge was to the alleged adoption of a "new interpretation of the TPS statute" which based determinations on racial animus and "alleged disdain for non-white immigrants").

This Court will not depart from the findings of its own prior ruling, the Ninth Circuit, nor its sister courts across the country who have considered the question and rejected Defendants' assertion that §1254a(b)(5)(A) bars review of Plaintiffs' claims.  Accordingly, this Court, again, finds that it has jurisdiction over these claims.

### B.    Plaintiffs Ability to Meet the Requirements of Rule 23(a)

Plaintiffs argue that they meet the requirements of Rule 23(a) because (i) the classes are sufficiently numerous; (ii) the Secretary's Nepal, Honduras, and Nicaragua TPS terminations raise common questions of law and fact; (iii) the named class representatives' injuries are typical of the putative class members; and (iv) the Class Representatives and Class Counsel adequately

represent the proposed class members.  ECF 89 at 1.  Defendants argue that the classes, as defined, are overboard and that certification is inappropriate because individual putative class members will face different harms, or none at all, depending on their immigration background.  ECF 99 at 9–10.

### i.    Plaintiffs Proposed Classes Are Sufficiently Numerous

Plaintiffs argue that they represent thousands of foreign nationals from Honduras, Nepal, and Nicaragua who will be impacted by the Secretary's termination decisions.  ECF 89 at 5–6.  Defendants do not contest numerosity.  *See generally* ECF 99.

Rule 23(a)(1) requires that "the class is so numerous that joinder of all members is impracticable."  Fed. R. Civ. P. 23(a)(1).  The party seeking certification "do[es] not need to state the exact number of potential class members, nor is a specific number of members required for numerosity."  *In re Rubber Chems. Antitrust Litig.*, 232 F.R.D. 346, 350 (N.D. Cal. 2005).  Courts in this district generally agree that numerosity is satisfied if the class includes "40 or more members."  *Villalpando v. Exel Direct Inc.*, 303 F.R.D. 588, 605–06 (N.D. Cal. 2014*); see also In re Facebook, Inc., PPC Adver. Litig.*, 282 F.R.D. 446, 452 (N.D. Cal. 2012) ("[C]ourts generally find that the numerosity factor is satisfied if the class comprises 40 or more members, and will find that it has not been satisfied when the class comprises 21 or fewer.").

Plaintiffs estimate that proposed Honduras TPS Class consists of approximately 72,000 national of Honduras who hold TPS minus approximately 21,000 who have lawful permanent resident status.  ECF 89 at 5.  The Nicaragua TPS Class consists of approximately 4,000 nationals of Nicaragua who hold TPS minus approximately 1,100 who have been granted lawful permanent resident status.  *Id.*  The Nepal TPS Class consists of approximately 12,700 nationals of Nepal who hold TPS minus 5,500 who have been granted lawful permanent resident status.  *Id.* at 6.  Moreover, the proposed classes each represent foreign nationals living in various states across the country.  ECF 17-13 ¶ 12.  Many lack the financial resources to litigate these claims on an individual basis.  ECF 17-16 ¶¶ 15, 21, 27.   Some, given their current immigration status, are reluctant to engage with the justice system for fear of being targeted for deportation, detention, or separation from their families.  *E.g.*, ECF 17-5 ¶ 10; ECF 17-9 ¶ 13; *see also* ECF 1 ¶¶ 131, 150.

1    Defendants do not dispute numerosity.  *See generally* ECF 99.  The number of proposed class

2    members and the circumstances surrounding each putative plaintiffs' capability, or lack thereof, to

3    individually litigate the claims favor a finding that numerosity is satisfied.  *Lopez-Venegas v.*

4    *Johnson,* No. 13-cv-03972-JAK (PLAx), 2014 WL 12772087, at *6 (C.D. Cal. Aug. 28, 2014)

5    (citation omitted) ("joinder of all plaintiffs is not feasible because of geographic factors, and

6    because members of the class, who are by definition poor and disabled, do not have the economic

7    means to pursue remedies on an individual basis").

8           Accordingly, the Court finds that Rule 23(a)(1)'s numerosity requirement is satisfied for

9    each proposed class.

10           **ii.    Plaintiffs Satisfy the Requirements of Commonality Under Rule 23(a)**

11           Plaintiffs argue that (1) the terminations of TPS for Honduras, Nepal, and Nicaragua

12   violated the APA because they were preordained decisions that were not based on an adequate

13   review of the country conditions; (2) the 60-day wind down period violated the APA because the

14   Secretary failed to acknowledge or explain her departure from agency's practice over the past two

15   decades to provide at least a six-month orderly transition period before any termination takes

16   effect; and (3) the terminations likely violated the Equal Protection component of the Fifth

17   Amendment because they were motivated by racism.  Compl. ¶¶ 3–5; *see also* ECF 89 at 1–2.

18   Plaintiffs argue that these claims raise common questions of law and fact, rendering resolution of

19   this litigation on a classwide basis appropriate.  ECF 89 at 7–8.  Defendants challenge Plaintiffs'

20   ability to meet commonality on three grounds.  First, they argue that the classes are overbroad

21   because they include foreign nationals who do not currently qualify for TPS.  ECF 99 at 9.  Next,

22   Defendants argue that some members of the class lack any injury as a result of the TPS

23   termination and therefore lack standing.  *Id*.  Finally, Defendants argue that the constitutional

24   claim would require individualized examinations of the class member's circumstances.  *Id*. at 11.

25   The Court addresses each argument in turn.

26           **a.  Plaintiffs' Claims Raise Questions Common to the Class**

27           Plaintiffs argue that their claims raise common questions of law and fact, rendering

28   resolution of this litigation on a classwide basis appropriate.  ECF 89 at 7–8.  Defendants argue

1   that the Plaintiffs fail to demonstrate that all of the proposed class members stand to suffer the

2   same injury, if any, as a result of the Secretary's termination decisions.  ECF 99 at 9–10.

3        Rule 23(a)(2) requires that "there are questions of law or fact common to the class."  Fed.

4   R. Civ. P. (a)(2).  "A common contention need not be one that 'will be answered, on the merits, in

5   favor of the class.'  It only 'must be of such nature that it is capable of class-wide resolution.'"

6   *Alcantar v. Hobart Servs.*, 800 F.3d 1047, 1053 (9th Cir. 2015) (quoting *Amgen*, 568 U.S. at 459

7   and *Dukes*, 564 U.S. at 350).  At the center of this inquiry is "the capacity of a classwide

8   proceeding to generate common *answers* apt to drive the resolution of the litigation."  *Dukes*, 564

9   U.S. at 350.  "[C]ommonality is satisfied where the lawsuit challenges a system-wide practice or

10  policy that affects all of the putative class members."  *Gonzalez v. U.S. Immigr. & Customs Enf't*,

11  975 F.3d 788, 808 (9th Cir. 2020) (citation omitted).  This Court's inquiry requires an examination

12  of the Plaintiffs claims.  *Parsons v. Ryan*, 754 F.3d 657, 676 (9th Cir. 2014) ("[A]s in all class

13  actions, commonality cannot be determined without a precise understanding of the nature of the

14  underlying claims.")

15       Here, all putative class members allege a common injury from the unlawful termination of

16  TPS for their countries.  ECF 89 at 7.  In *Bautista-Perez v. Holder*, the court certified a class of

17  TPS applicants challenging the TPS registration fee they were required to pay as exceeding the

18  statutorily permissible amount.  No. C 07-cv-4192 TEH, 2009 WL 2031759, at *7 (N.D. Cal. July

19  9, 2009).  The court found that the class in *Bautista-Perez*, which sought declaratory and

20  injunctive relief, had sufficiently alleged "common subjection to the same challenged regulatory

21  scheme" and were unified by a "common question of law of whether the TPS applicants are

22  subject to fees that contravene the regulations."  *Id.*  Similarly, here, Plaintiffs argue that they are

23  subject to a common regulatory scheme, that is, the Secretary's allegedly unlawful decision-

24  making process.  ECF 89 at 7.  Indeed, "the TPS statute contemplates only a single binary

25  determination for each country's TPS designation."  *Nat'l TPS All.,* No. 25-2120, slip op. at 49.

26  Examination of  whether the Secretary exceeded her authority by terminating the TPS designations

27  for Nepal, Nicaragua, and Honduras will generate a classwide resolution because deprivation of

28  the protections provided by TPS effect "all of the class members or . . . none of them."  *Dukes*,

United States District Court
Northern District of California

1    564 U.S. at 360.

2         In *Ramos v. Nielsen*, the court found that Plaintiffs had plausible alleged a change in DHS

3    practice or policy in excess of the Department's authority by decline to consider intervening

4    disasters, conflicts, or other socio-economic problems when deciding to terminate a TPS

5    designation.  321 F. Supp. 3d 1083, 1109 (N.D. Cal. 2018).  The *Ramos* court found that "'if [an

6    agency] announces and follows—by rule or by settled course of adjudication—a *general policy* by

7    which its exercise of discretion will be governed, an irrational departure from that policy (as

8    opposed to an avowed alteration of it) could constitute action that must be overturned as 'arbitrary,

9    capricious, [or] an abuse of discretion' within the meaning of the Administrative Procedure Act.'"

10   *Ramos*, 321 F. Supp. 3d at 1109 (citing *California Trout v. F.E.R.C.*, 572 F.3d 1003, 1023 (9th

11   Cir. 2009).  Plaintiffs claim that the Secretary's TPS terminations here represented "an

12   unexplained and unacknowledged deviation from historical practice" in violation of the APA

13   mirrors the claim in *Ramos*.  ECF 89 at 7.  Accordingly, the Court finds that Plaintiffs do, in fact,

14   challenge "a system-wide practice or policy that affects all of the practice class members."

15   *Gonzalez v. ICE*, 975 F.3d 788, 804 (9th Cir. 2020).

16        Furthermore, those who do ultimately qualify for TPS are protected from removal and

17   granted work authorization.  *See* 8 U.S.C. § 1254a(a).  Courts have recognized the protection

18   against deportation and loss of work authorization as legally cognizable injuries.  *See, e.g.,*

19   *Gonzalez v. ICE*, 975 F.3d 788, 804 (9th Cir. 2020); *INS v. Chadha*, 462 U.S. 919, 936 (1983);

20   *Mansor v. USCIS*, 685 F. Supp. 3d 1000, 1013 (W.D. Wash. 2023).  Thus, TPS holders maintain

21   legally cognizable interests in the rights afforded to them under the statute by virtue of holding the

22   status.  *See* 8 U.S.C. § 1254a(a).

23        Plaintiffs, therefore, allege that a common injury results from the unlawful termination of

24   their countries' TPS designations.  *Id.*  On these grounds alone the Court finds commonality is

25   satisfied.  *Dukes*, 564 U.S. at 350.  However, the Court turns to the remaining arguments below.

26        **b.  Plaintiffs' Class Definition Is Not Overbroad**

27        Defendants contend that the classes' overbreadth defeats commonality because the classes

28   include individuals who would not currently qualify for TPS—such as foreign nationals who fail

*United States District Court*
*Northern District of California*

United States District Court
Northern District of California

1    to re-register, who are no longer in the United States, or are otherwise ineligible for TPS.  ECF 99

2    at 9.  Plaintiffs argue that those foreign nationals who were TPS holders but have voluntarily or

3    involuntarily relocated after the termination of TPS suffered a common injury—the loss of the

4    rights afforded by TPS including, loss of lawful presence in the United States and protection from

5    detention and deportation.  ECF 117 at 4.  Plaintiffs also argue that those foreign nationals who

6    fail to timely re-register for TPS maintain a legal interest in their country's TPS designation.  *Id.*

7           To qualify for TPS, an individual must meet certain criteria including having been

8    "continuously physically present in the United States since the effective date of the most recent

9    designation," he or she must have "continuously resided in the United States since such date as the

10   [Secretary] may designate."  8 U.S.C. § 1254a(c).  Those foreign nationals who resided outside of

11   the United States during the duration of their country's TPS designation would not have been a

12   TPS holder and are definitionally excluded from the classes.  8 U.S.C. § 1254a(c).  The same may

13   be said for those foreign nationals disqualified based on their criminal history.  *Id.*  The eligibility

14   requirements for TPS sufficiently limit the scope of the proposed classes to mitigate Defendants'

15   concerns.

16          Additionally, to qualify for TPS, a foreign national generally must timely register for TPS.

17   8 U.S.C. § 1254a(c).  However, foreign nationals who would otherwise qualify for TPS but fail to

18   timely register still have an available channel for receiving the benefits of TPS.  8 C.F.R. §

19   244.17(b).  Specifically, "USCIS may, for good cause, accept and approve an untimely [TPS]

20   registration request."  Because late registrants may still ultimately receive the benefits of TPS,

21   even those foreign nationals who fail to timely register for TPS retain a legal interest in the

22   continued TPS designation of their country.  8 C.F.R. § 244.17(b).  Defendants' argument that the

23   class includes unregistered, and therefore uninjured class members, does not square with the

24   language of § 244.17(b).

25          Accordingly, the Court finds that the classes are sufficiently tailored to capture only those

26   who are allegedly injured by the Secretary's termination.

27                      **c.  Each Putative Class Member Has Standing**

28          Defendants next challenge the classes on the grounds that some TPS holders lack standing

1    to join the litigation because they do not face a concrete injury.  ECF 99 at 10.  Again, Plaintiffs

2    argue that each putative class member faces the uniform harm of losing TPS due to Defendants'

3    unlawful termination of their country's TPS designation.  ECF 106 at 7.

4         Even if the class contains uninjured members, a certified class is permitted to have a de

5    minimis number of members who are uninjured.  *Ruiz Torres*, 835 F. 3d at 1136-37; *See also DZ*

6    *Reserve v. Meta Platforms, Inc.*, 96 F.4th 1223, 1239-40 (9th Cir. 2024) ("'In a class action,

7    standing is satisfied if at least one named plaintiff meets the requirements.  In order to establish

8    standing for injunctive relief, 'a plaintiff must show that he is under threat of suffering 'injury in

9    fact' that is concrete and particularized; the threat must be actual and imminent, not conjectural or

10    hypothetical; it must be fairly traceable to the challenged action of the defendant; and it must be

11    likely that a favorable judicial decision will prevent or redress the injury.")  Moreover, "[b]ecause

12    the preponderance of the evidence standard applies at the class certification stage, standing at the

13    time of class certification must be established by a preponderance of the evidence." *DZ Reserve*,

14    96 F.4th at 1240.

15         Plaintiffs argue that each putative class member risks the loss of the legal rights afforded to

16    them under the TPS statute, an injury sufficient to confer standing.  ECF 106 at 5.  Moreover,

17    Plaintiffs argue that their harms are directly traceable to the Secretary's termination decisions, and

18    Plaintiffs seek injunctive or declaratory relief from this Court as redress.  ECF 89 at 12.

19    Defendants draw this Court's attention to individuals whose country was given a TPS designation

20    prior to the Secretary's termination but who now have some alternative form of immigration

21    relief—such as, asylum beneficiaries, U Visa holders, T Visa holders, Parole in Place

22    beneficiaries, Diversity Visa holders, and EB Visa holders.  ECF 99 at 10.  They also draw the

23    Court's attention to individuals who have other available pathways to adjust status—such as, an

24    adjustment of status application, a lawful permanent resident relative, Special Immigrant Juvenile

25    Status, or a Violence Against Women Act of 1994 self-petition.  *Id.*  They argue that these other

26    forms of and pathways for relief provide the same or similar protections—work authorization and

27    protections from deportation—such that some members of the proposed class are unaffected by

28    the termination of TPS.  *Id.* at 10–11. Defendants argue that "sweeping in uninjured class

United States District Court
Northern District of California

17

1    members" renders the proposed classes overboard and class certification inappropriate.  *Id.*

2         However, Defendants arguments fall short for two reasons.  First, as Defendants

3    acknowledge, under Ninth Circuit precedent, this Court may appropriately certify a class which

4    contains some uninjured members so long as there is no "*great number of members* who for some

5    reason could not have been harmed by the defendant's allegedly unlawful conduct *Ruiz Torres v.*

6    *Mercer Canyons Inc.*, 835 F. 3d 1125, 1136-37 (9th Cir. 2016) (emphasis added); *see also Olean*,

7    31 F.4th at 669.

8         Defendants' argument that other forms of immigration relief or pathways for relief disrupts

9    commonality is also unavailing.  TPS offers protection independent of and distinct from those

10   forms of immigration relief identified by the Defendants.  *See* 8 U.S.C. § 1254a(a)(5).  In fact, the

11   TPS statute contemplates that a TPS holder might simultaneously receive benefits from other

12   forms of immigration status.  *Id.*  ("Nothing in this section shall be construed as authorizing the

13   Attorney General to deny temporary protected status to an alien based on the alien's immigration

14   status or to require any alien, as a condition of being granted such status, either to relinquish

15   nonimmigrant or other status the alien may have or to execute any waiver of other rights under this

16   chapter. The granting of temporary protected status under this section shall not be considered to be

17   inconsistent with the granting of nonimmigrant status under this chapter.").  The statute clearly

18   permits foreign nationals to hold TPS while holding another form of lawful nonimmigrant status.

19   *Id.*  To read another provision of the TPS statute as foreclosing this possibility would render §

20   1254a(a)(5) meaningless.  The Court rejects Defendants' interpretation of the TPS statute.  *Cooper*

21   *Indus., Inc. v. Aviall Servs. Inc.,* 543 U.S. 157, 167 (2004) (declining to read a statute in a manner

22   that would render part of it "entirely superfluous.").  Therefore, foreign nationals with TPS

23   protection have an independent, cognizable interest in TPS separate and apart from other forms of

24   immigration relief that may otherwise be available to them.  8 U.S.C. § 1254a(a)(5).  Other

25   available pathways for immigration relief does not defeat commonality for Plaintiffs' claims.  *Id.*

26        Accordingly, the Court finds that each putative class member has standing to sue for the

27   claims brought by the classes.

28

### d.  Plaintiffs' Due Process Claim Raises Common Questions of Law and Fact

Finally, Defendants argue that the Due Process Clause is a "flexible concept" and requires individualized examination of each foreign national's circumstances to render the appropriate relief.  ECF 99 at 11.  Plaintiffs argue that the Due Process clause bars the government from acting out of animus towards anyone present in the United States which includes all class members at the time of the challenged terminations.  ECF 106 at 6.

In *Mansor v. USCIS*, the court rejected Defendants' argument that the proposed class could not satisfy commonality because resolution of common legal questions—including a claim under the Due Process Clause of the Fifth Amendment—required an individualized assessment of a person's prima facie eligibility for TPS.  *See Mansor v. United States Citizenship & Immigr. Servs.*, 345 F.R.D. 193, 204 (W.D. Wash. 2023).  The court found that Defendants' argument seemingly sought to impose Rule 23's implied "ascertainability" requirement that class members can be readily identified using clear and objective, rather than subjective criteria.  *Id.* (citing *Xavier v. Philip Morris USA, Inc*., 787 F. Supp. 2d 1075, 1089 (N.D. Cal. 2011).  However, as the court noted, courts in the Ninth Circuit have concluded that the implied ascertainability requirement does not apply to Rule 23(b)(2) classes.  *Id.* (citing *In re Yahoo Mail Litig*., 308 F.R.D. 577, 596-98 (N.D. Cal. 2015); *Campbell v. Facebook, Inc*., 315 F.R.D. 250, 259 (N.D. Cal. 2016); *Al Otro Lado, Inc. v. McAleenan*, 423 F. Supp. 3d 848, 872-73 (S.D. Cal. 2019).  Similarly, here, Plaintiffs properly seek relief on a classwide basis for their Due Process claim.  *Mansor,* 345 F.R.D. at 209.

To support their Due Process argument, Defendants refer this Court to legal authority analyzing the flexible standard for procedural due process.  *Mathews v. Eldridge*, 424 U.S. 319, 321 (1976); *Jennings v. Rodriguez*, 583 U.S. at 314.  Plaintiffs' claims arise under the equal protection component, not procedural component, of the due process clause.  Compl. ¶ 163.  Moreover, like Plaintiffs claims under the APA, Plaintiffs allegation that the Secretary's TPS terminations were motivated by improper animus raises a question common to all class members who definitionally share an origin outside of the United States.  *Dukes*, 564 U.S. at 360.

Further, the facts favor granting class certification because Plaintiffs present evidence that

is common to the class as a whole in support of their Due Process claim.  *Amgen*, 568 U.S. at 467 (finding that because an issue could "be proved through evidence common to the class" it was a "common question" for purposes of class certification).  Here, Plaintiffs present a series of statements made by Defendants and officials in the current administration to support the Due Process claim as to all plaintiffs.  *See, e.g.,* ECF 18- 20 at 9–10 (President Trump stating migrants were "poisoning the blood of our country."); *see also* ECF 18-23 (President Trump asking why people "could not come from nice countries . . . like Denmark, Switzerland, and Norway"); *see also* ECF 18-15 at 7:14–15 (Secretary Noem describing immigration as an "invasion happening on purpose . . . to remake the foundation of this country"); *see also* ECF 18-17 at 2 (Secretary Noem associated "migration management" with "sav[ing] American lives and get[ting] criminals off our streets!"); *see also* ECF 18-15 at 7 (Secretary Noem referring to immigrants as "some of the most dangerous people in the world" and claiming that other countries were "empty[ing] out their prisons, their mental institutions" and sending those individuals to the United States); *see also* ECF 18- 18 at 2 (DHS equating TPS holders with "MS-13 gang members," "known terrorists," and "murderers.").

Plaintiffs Due Process claim raises a common question for Rule 23 purposes and relies on evidence common to the class.  Accordingly, the Court finds that Plaintiffs Due Process claim does not defeat commonality.  *Amgen*, 568 U.S. at 467 (finding the use of evidence common to the class favors granting class certification).

### e. Plaintiffs Satisfy Rule 23(a)(2)

The Court finds that the putative class members have a legal interest in the protections offered by TPS, the unlawful termination of which constitutes a uniform injury shared by each class member.  8 U.S.C. § 1254a(a).  Moreover, Plaintiffs constitutional claims raise common questions, rely on common evidence, and allege conduct which applies commonly to all class members.  *Dukes*, 564 U.S. at 350.  As such, Plaintiffs satisfy the commonality requirement of Rule 23(a).

//

### iii.    The Class Representatives' Injuries are Typical of The Injuries Experienced by the Class

Plaintiffs contend that the Class Representatives and the putative class members each share a common injury in the unlawful termination of TPS itself.  ECF 89; ECF 106.  Defendants argue that Plaintiffs have not met the typicality requirement because each individual plaintiff faces different consequences from the termination of the TPS designation.  ECF 99 at 12.

Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3).  The "test of typicality is whether other members have the same or similar injury, whether the action is based on conduct, which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992) (internal citation and quotations omitted).  A plaintiff's claims are considered typical if they are "reasonably co-extensive with those of absent class members; they need not be substantially identical." *Castillo v. Bank of Am., NA*, 980 F.3d 723, 729.  A plaintiff may not be typical if she is "subject to unique defenses which threaten to become the focus of the litigation." *Hanon*, 976 F.2d at 508.  However, "[d]iffering factual scenarios resulting in a claim of the same nature as other class members does not defeat typicality." *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 985 n. 9 (9th Cir. 2011).

The Class Representatives in this case each alleged the same harm from the termination of TPS, namely the loss of those legal rights granted by the statute.  ECF 89 at 2.  Plaintiff Maria Elena Hernandez has been in the United States since 1996.  ECF 17-4 ¶¶ 2, 4.  She is a Nicaraguan who has held TPS for 26 years and risks the loss of her job, loss of social security, loss of health benefits, detention and deportation because of the Secretary's termination decision.  *Id.* ¶¶ 10–17.  Plaintiff Sandhya Lama has been in the United States since 2008.  ECF 17-6 ¶ 2.  She is a Nepali who has held TPS for 10 years and risks detention, deportation, separation from her three U.S. citizen children, and political persecution from the Nepali government because of the Secretary's termination decision.  *Id.* ¶¶ 2–16.  Plaintiff Teofilo Martinez has been in the United States since 1997.  ECF 17-8 ¶¶ 2, 5.  He is a Honduran TPS holder who risks the loss of his job, his realtor license, his driver's license, separation from his life partner, detention, and deportation because of

United States District Court
Northern District of California

United States District Court
Northern District of California

the Secretary's termination decision.  *Id.* ¶¶ 2–18.  Plaintiff Denis Molina has been in the United States since 1997.  ECF 17-2 ¶¶ 2, 5.  He is a Honduran TPS holder who risks the loss of his job, the ability to support his four U.S. citizen children—two of whom have special needs—detention, and deportation because of the Secretary's termination decision.  *Id.* ¶¶ 2–11.  Plaintiff Johny Silva has been in the United States since 1999.  ECF 17-3 ¶¶ 1–2.  He is a Honduran who has had TPS for almost his entire life and risks the loss of his job, separation from his family, loss of the ability to care for his young U.S. citizen child with special needs, detention, and deportation because of the Secretary's termination decision.  *Id.* ¶¶ 2–16.

Defendants argue that Plaintiffs fail to satisfy typicality for two reasons.  Similar to their argument regarding commonality, Defendants argue that the termination of TPS results in unique injuries for each proposed class member and that the varying immigration statuses of the proposed class members necessarily means that some will not face any injury.  ECF 99 at 12.  Defendants argue they may raise a unique defense based on lack of Article III standing against those plaintiffs, rendering class certification inappropriate.  *Id.*  And as discussed above, the Court finds that each class member does face the same harm of loss of TPS.  8 U.S.C. § 1254a(a).  Moreover, as discussed above, whether some have other forms of immigration relief available to them presently, or in the future, is tangential to the benefits afforded to them by TPS itself.  8 U.S.C. § 1254a(c).

Because each putative class member is uniformly subject to the allegedly unlawful termination of TPS, the Court finds that the Class Representatives are similarly situated to the absent class member.

### iv.    The Class Representatives and Class Counsel Will Fairly and Adequately Represent the Classes' Interests

#### a.    Class Representatives Will Adequately Represent the Classes

Plaintiffs argue that the Class Representatives will fairly and adequately protect class interests because their interests are not likely to conflict with the interests of the class members.  ECF 89 at 9.  Defendants do not dispute the adequacy requirement.  *See generally* ECF 99.

Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4).  The adequacy requirement has two components: "(1) whether there are conflicts within the class; and (2) whether plaintiffs and counsel will vigorously fulfill their duties to the class." *Amey v. Cinemark USA Inc.*, No. 13-CV-05669-WHO, 2018 WL 3956326, at *6 (N.D. Cal. Aug. 17, 2018) (citing *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 985 (9th Cir. 2011)).  The adequacy depends on "the qualifications of counsel for the representatives, an absence of antagonism, a sharing of interests between representatives and absentees, and the unlikelihood that the suit is collusive." *Walter v. Reno*, 145 F.3d 1032, 1046 (9th Cir. 1998).  The Court may find that Plaintiffs satisfy the adequacy requirement where the Class Representatives have a "shared interest" or "mutual goal" with the proposed class members. *Nightingale v. USCIC*, 333 F.R.D. 449, 462 (N.D. Cal. 2019).

Here, the Class Representatives do not seek damages or any other forms of relief that are unique to them or which would not apply to absent class members.  ECF 89 at 10.  All class members seek a declaration that Defendants' terminations of TPS for the three countries are unlawful, an order setting aside, postposing and staying the TPS terminations, and an injunction enjoining and restraining Defendants from enforcing the TPS terminations.  *Id.* at 9.  Because the Plaintiffs seek the same relief for all class members for the same alleged misconduct, the interests of the Class Representatives and absent class members are substantially identical.  *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 120 (9th Cir. 1998).

Thus, the Court finds the Plaintiffs have demonstrated that the Class Representatives will adequately represent absent class members in the litigation.  *Id.*  Defendants do not challenge adequacy.  *See generally* ECF 99.

### b.  Class Counsel Will Adequacy Represent the Classes

Plaintiffs argue that Class Counsel is well qualified to represent the class members and will vigorously do so because their interests are not likely to conflict with the interests of the class

23

members.  ECF 89 at 9.  Defendants do not dispute the adequacy requirement.  *See generally* ECF 99.

"[A] court that certifies a class must appoint class counsel."  Fed. R. Civ. P. 23(g)(1).  When appointing class counsel, courts consider: "(i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class."  *Id*. at 23(g)(1)(A)(i)–(iv).

The proposed Class Counsel includes Ahilan Arulanantham, Emilou MacLean, Eva Bitrán, Michelle (Minju) Y. Cho, Diana Sánchez, Amanda Young, Jessica Karp Bansal, and Erik Crew.  ECF 89 at 10–11.  The proposed Class Counsel have, collectively, decades of experience in class action lawsuits and other litigation involving civil rights and immigration law.  *Id.*  The organization represented by these attorneys include the Center for Immigration Law and Policy at the UCLA School of LAW, the ACLU Foundation of Northern California, the ACLU Foundation of Southern California, the National Day Laborer Organizing Network, and the Haitian Bridge Alliance.  *Id.*  These nonprofit, nonpartisan, and educational institutions have been involved in complex civil litigation, specifically in the context of immigration law, for decades.  *Id.*

Ahilan Arulanantham is an attorney, Professor from Practice, and Faculty Co-Director of the Center for Immigration Law and Policy at the UCLA School of Law.  Arulanantham Decl. ¶ 1.  Mr. Arulanantham has extensive experience litigating civil rights cases for immigrants, serving as lead or co-lead counsel in a number of complex immigration cases.  *Id.* ¶ 5.  He also has served as a resource for other non-profit and pro bono attorneys involved in complex immigration litigation for many years.  *Id*. ¶ 7

Emilou MacLean is an attorney at the ACLU Foundation of Northern California (ACLU-NC) and the ACLU Foundation of Southern California (ACLU-SC).  MacLean Decl. ¶ 5.  Ms. MacLean has served as lead counsel for dozens of civil rights class actions and has extensive experience litigating immigrants' including in the context of TPS.  *Id.* ¶ 6–14.

United States District Court
Northern District of California

1       Eva Bitrán is Director of Immigrants' Rights and a staff attorney at ACLU-SC. *Id.* ¶ 8.

2 Mr. Bitrán has years of experience litigating complex civil cases for immigrants' rights. *Id.* She

3 has spent much of her legal career representing immigrant litigants in federal class actions, serving

4 as class counsel in some. *Id.* ¶ 9.

5       Michelle (Minju) Y. Cho is a Senior Staff Attorney at ACLU-NC and an experienced

6 immigrants' rights litigator. *Id.* ¶ 10. She has served as, or is currently serving as, co-class

7 counsel for certified, or provisionally certified, class litigation involving complex immigration

8 matters. *Id.* ¶ 11.

9       Diana Sánchez is a staff attorney at ACLU-SC with notable experience on immigrants'

10 rights issues and in complex civil litigation, including immigration enforcement, civil rights and

11 liberties, and related statutory and regulatory rights. *Id.* ¶¶ 12–13.

12       Amanda Young is an attorney at ACLU-NC serving as co-counsel on several complex civil

13 rights cases. *Id.* ¶ 14.

14       Jessica Karp Bansal is an attorney at the National Day Laborer Organizing Network

15 (NDLON), an organization dedicated to advancing the rights of immigrants and low-wage workers

16 in the United States. Bansal Decl. ¶ 4. Ms. Bansal has spent her legal career working on

17 immigrants' rights cases, obtaining substantial experience litigating cases involving immigrants'

18 rights—including in the TPS contact. *Id.* ¶ 6–8.

19       Erik Crew is an attorney at the Haitian Bridge Alliance (HBA), a grassroots and

20 community-based nonprofit organization that provides migrants and immigrants with

21 humanitarian legal and social services, and advocates for fair and humane immigration policies.

22 Crew Decl. ¶ 4. HBA has been involved in litigation regarding immigrants' rights since 2020. *Id.*

23 ¶¶ 6–7.

24       Accordingly, pursuant to Federal Rule of Civil Procedure 23(g)(1)(A), the Court finds that:

25 (1) Plaintiffs' counsel have diligently identified and investigated potential claims in this litigation;

26 (2) counsel have sufficient experience in pursuing class cases; (3) counsel have demonstrated an

27 adequate understanding of the applicable law; and (4) counsel have the necessary resources to

28 fully represent the class throughout this litigation and are committed to dedicating those resources

to this case.

The Court finds that the Rule 23(g) factors particularly weigh in favor of appointing Mr. Arulanantham of the Center for Immigration Law and Policy at the UCLA School of Law as lead counsel for Plaintiffs.  Mr. Arulanantham's years of service as a pro bono attorney for complex immigration litigation and his role as an educator who teaches immigration law speaks to his experience, his knowledge of the issues, and his commitment to fully and adequately represent the interests of the Plaintiffs.   This Court finds Class Counsel will vigorously fulfil their duties to the class in this litigation.  Moreover, with no reason to doubt that the Center for Immigration Law and Policy at the UCLA School of Law have the necessary resources to devote to representing the classes, the Court finds that Ahilan Arulanantham satisfies the criteria to serve as lead counsel. Accordingly, the Court finds that the Class Representatives and Class Counsel satisfy the adequacy requirement of Rule 23.

## C.    The Relief Plaintiffs Seek Is Proper Under Rule 23(b)(2)

Plaintiffs argue that they meet the requirements for class certification under Rule 23(b)(2) because Defendants engaged in a preordained and racially motivated effort to terminate TPS without regard to statutory requirements or past practice.  ECF 106 at 9.  Defendants argue that certification of a Rule 23(b)(2) class is inappropriate because the relief Plaintiffs seek is barred by 8 U.S.C. § 1252(f)(1) and by Rule 23 itself.  ECF 99 at 14.

Rule 23(b)(2) requires that "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."  When class members seek uniform injunctive or declaratory relief applicable classwide, the requirement of a Rule 23(b)(2) class is "unquestionably satisfied."  *Parsons*, 754 F.3d at 688.

Defendants argue that certification of a Rule 23(b)(2) class is improper because each individual class member would be entitled to a different injunction or declaratory judgment, if any, because they all face different injuries, and some face no injury at all.  ECF 99 at 14.  However, for the reasons discussed above, this argument is misplaced.  The Secretary's terminations impact the rights and benefits afforded to all TPS holders uniformly.  8 U.S.C. § 1254a.  Here, final

1   injunctive relief would be appropriate to address the rights of the whole group.  *Parsons*, 754 F.3d

2   at 688 ("[Rule 23(b)(2) requirements are unquestionably satisfied when members of a putative

3   class seek uniform injunctive or declaratory relief from policies or practices that are generally

4   applicable to the class as a whole.").

### i.    Plaintiffs Requested Relief Is Not Barred by 8 U.S.C. § 1252(f)(1)

6       Although Defendants argue that the form of relief sought by the Plaintiffs is barred by 8

7   U.S.C. § 1252(f)(1) and by Rule 23 itself, the Ninth Circuit flatly rejected Defendants' argument

8   in litigation running parallel to this one brought by the National TPS Alliance challenging the

9   Secretary's termination of TPS for Venezuela.  *Nat'l TPS All.*, No. 25-2120, slip op. at 30.  There,

10  the Ninth Circuit held that "section 1252(f)(1) does not prohibit relief in the form of a stay or

11  postponement of agency action under the APA" and that a district court order that does "enjoin or

12  restrain" the Secretary's policy "is not barred by 1252(f)(1) if it affects only agency actions that

13  exceed the agency's statutory authority."  *Id.*  Instead, 1252(f)(1) only "limits the district court's

14  authority to enjoin [an agency] from carrying out legitimate [] orders."  *Id.*  Plaintiffs here allege

15  that the Secretary acted outside of her statutory authority by executing a preordained decision to

16  terminate TPS designations, failing to abide by previous practices with respect to notice of

17  termination, and relying on racial- and national-origin-based animus.  ECF 89 at 1.  Therefore,

18  injunctive or declaratory relief from such actions do not fall within the restrictive language of

19  1252(f)(1).  *Nat'l TPS All.*, No. 25-2120, slip op. at 30; *see also Immigr. Defs. L. Ctr. V. Noem*,

20  145 4th 972, 990 (9th Cir. 2025) (holding that 1252(f)(1) does not bar injunctive relief for claims

21  under the APA).  Moreover, Defendants acknowledge binding precedent which rejects Defendants

22  argument that 1252(f)(1) bars declaratory relief.  ECF 99 at 16 (citing *Rodriguez v. Hayes*, 591

23  F.3d 1105, 1119 (9th Cir. 2010)).

### ii.    Plaintiffs' Rule 23(b)(2) Classes May Seek Vacatur

25      Finally, Defendant argues that a Rule 23(b)(2) class cannot be certified where plaintiffs

26  seek relief in a form other than "final injunctive relief or corresponding declaratory relief."  ECF

27  99 at 17–18.  The exclusion of vacatur from the enumerated forms of relief under Rule 23(b)(2),

28  Defendants argue, removes the possibility that Plaintiffs may seek vacatur of the TPS terminations

1   under 5 U.S.C. § 706 as a Rule 23(b)(2) class.  *Id.*

2        However, courts have routinely certified Rule 23(b)(2) classes seeking vacatur relief under

3   the APA.  *See, e.g., Scholl v. Mnuchin*, 494 F. Supp. 3d 661, 692 (N.D. Cal. 2020) (certifying a

4   Rule 23(b)(2) class and vacating a federal action); *Thakur v. Trump*, No. 25-CV-04737-RFL, 2025

5   WL 1734471, at *31 (N.D. Cal. June 23, 2025); *Kidd v. Mayorkas*, 734 F.Supp.3d 967, 976, 987

6   (C.D. Cal. May 15, 2024); *Refugee & Immigr. Ctr. for Educ. & Legal Servs. v. Noem*, No. CV 25-

7   306 (RDM), 2025 WL 1825431, at *49, 51 (D.D.C. July 2, 2025) (certifying Rule 23(b)(2) class,

8   vacating federal guidance, and entering declaratory judgment*); O.A. v. Trump*, 404 F. Supp. 3d

9   109, 118 (D.D.C. 2019) (certifying a (b)(2) class and vacating a federal action*); L.V.M. v. Lloyd*,

10  318 F. Supp. 3d 601, 621 (S.D.N.Y. 2018).

11        This Court finds that certification of the three classes seeking injunctive relief is proper

12  under Rule 23(b)(2) and is not prohibited by 8 U.S.C. § 1252(f)(1).

13        **D.    Certifying Nationwide Classes is Proper**

14        Lastly, Defendants caution the Court against certifying a nationwide class here considering

15  the Supreme Court's recent ruling in *Trump v. CASA, Inc.,* 145 S. Ct. 2540, 2555 (2025).  ECF 99

16  at 17.  Defendants argue that certification of a nationwide class ought not be an attempt to end-run

17  the recent prohibition on universal injunctions.  ECF 99 at 17.  They argue that the legal questions

18  presented in this case would be better served by percolation in other judicial districts as parties

19  litigate this issue across the country.  *Id.* at 18.  "At a minimum," Defendants argue, "the class

20  should be limited to this judicial district."  *Id.*  Plaintiffs argue that nationwide relief is necessary

21  because the putative class members are geographically dispersed nationwide and some lack

22  financial resources to litigate individually.  ECF 106 at 12.

23        As noted above, the parties agree that nationwide classes are appropriate in some

24  circumstances.  ECF 99 at 17; ECF 89 at 11.  The concurring opinions of Justices Alito and

25  Kavanaugh in *Trump v. CASA, Inc* affirm as much.  *See CASA, Inc.,* 145 S. Ct. at 2566 (Alito, J.,

26  concurring) ("Of course, Rule 23 may permit the certification of nationwide classes[.]"); *Id.* at

27  2569 (Kavanaugh, J., concurring) (observing district courts may "grant or deny the functional

28  equivalent of a universal injunction—for example, by granting or denying a preliminary injunction

1    to a putative nationwide class under Rule 23(b)(2)"); *see also Califano*, 442 U.S. at 702 ("Nothing

2    in Rule 23 . . . limits the geographical scope of a class action that is brought in conformity with

3    that Rule.").  Furthermore, precedent in this Circuit approve of nationwide classes in appropriate

4    immigration contexts.  *See Garcia v. Johnson*, No. 14-CV-01775-YGR, 2014 WL 6657591, at

5    *15–16 (N.D. Cal. Nov. 21, 2014); *see aslo Perez–Funez v. Dist. Dir., I.N.S.*, 611 F. Supp. 990,

6    1000, 1005 (C.D. Cal. 1984).

7    　　　　Regarding Defendants' concern about the opportunity for litigants in other judicial districts

8    to raise the issues presented in this case, recently, even within the past few months, several cases

9    addressing nearly identical claims based on the termination of TPS for Haiti, Afghanistan,

10    Cameroon and El Salvador have been brought before courts in Maryland, in New York, and in

11    Massachusetts.  *CASA, Inc. v. Noem,* No. CV 25-1484-TDC, 2025 WL 1907378, at *6 (D. Md.

12    July 10, 2025); *Haitian Evangelical Clergy Ass'n v. Trump*, No. 25-CV-1464 (BMC), 2025 WL

13    1808743, at *1 (E.D.N.Y. July 1, 2025); *Centro Presente v. Department of Homeland Security,*

14    332 F.Supp.3d 393 (D. Mass. 2018). Thus, foreign nationals are litigating these issues in other

15    districts, and those district courts are drawing the same conclusions.

16    　　　　Where appropriate, resolution of a class wide complaint will inevitably have nationwide

17    consequences.  The "procedural protections" provided by the requirements of Rule 23 keep federal

18    courts from stepping outside of the traditional role of the judiciary when granting "relief that

19    benefits parties and nonparties alike."  *CASA, Inc.,* 145 S. Ct. at 2556.

20    **IV.    CONCLUSION**

21    　　　　This Court finds the Plaintiffs have satisfied all the requirements of Rule 23(a) and Rule

22    23(b)(2).  Accordingly, this Court GRANTS Plaintiffs motion to certify the Honduras TPS Class,

23    the Nepal TPS Class, and the Nicaragua TPS Class.

24    //

25    //

26    //

27    //

28    //

1

2          The Court appoints Ahilan Arulanantham, Emilou MacLean, Eva Bitrán, Michelle

3   (Minju) Y. Cho, Diana Sánchez, Amanda Young, Jessica Karp Bansal, and Erik Crew as Class

4   counsel.

5       This order resolved ECF 89.

6          IT IS SO ORDERED.

7   Dated: October 2, 2025

8                                                            _____
                                                             TRINA L. THOMPSON
9                                                            United States District Judge