1  BRETT SHUMATE
   Assistant Attorney General
2  YAAKOV M. ROTH
   Deputy Assistant Attorney General
3  Civil Division
   WILLIAM H. WEILAND
4  Acting Assistant Director
   ERIC SNYDERMAN
5  ILANA KRAMER
   LORI MACKENZIE
6  SHELBY WADE
   LAUREN BRYANT
7  CATHERINE ROSS
   JEFFREY HARTMAN
8  DANIEL CAPPELLETTI
   Trial Attorneys
9  U.S. Department of Justice, Civil Division
   Office of Immigration Litigation
10 General Litigation and Appeals Section
   P.O. Box 868, Ben Franklin Station
11 Washington, DC 20044
   Attorneys for Defendants
12

13

14                  UNITED STATES DISTRICT COURT

15                NORTHERN DISTRICT OF CALIFORNIA

16                    SAN FRANCISCO DIVISION

17

18 NATIONAL TPS ALLIANCE, *et al.*,

19                 Plaintiffs,                    Case No. 3:25-cv-5687
            v.
20                                               **DEFENDANTS' MOTION FOR SUMMARY**
   KRISTI NOEM, in her official capacity as     **JUDGMENT**
21 Secretary of Homeland Security, *et al.*,
                                               Judge: Hon. Trina L. Thompson
22                 Defendants.                   Date:   November 18, 2025
                                               Time:   2:00 p.m.
23                                               Place: Courtroom 9, 19th Floor,
                                                        San Francisco U.S. Courthouse
24

25

26

27

28

Dated: October 14, 2025

Respectfully submitted,

BRETT SHUMATE
Assistant Attorney General

YAAKOV M. ROTH
Deputy Assistant Attorney General
Civil Division

WILLIAM H. WEILAND
Acting Assistant Director

ERIC SNYDERMAN
SHELBY WADE
LAUREN BRYANT
DANIEL CAPPELLETTI
ILANA KRAMER
LORI MACKENZIE
JEFFREY HARTMAN
Trial Attorneys

*/s/ Catherine Ross*
Catherine Ross
Trial Attorney
U.S. Department of Justice, Civil Division
Office of Immigration Litigation
General Litigation and Appeals Section
P.O. Box 868, Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 305-7082
Catherine.ross@usdoj.gov

*Attorneys for the Defendants*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ...........................................................................................1

BACKGROUND ..........................................................................................................2

    I.     STATUTORY BACKGROUND .......................................................................2

    II.    FACTUAL BACKGROUND ...........................................................................4

          A.     Nepal ...........................................................................................4

          B.     Honduras .......................................................................................5

          C.     Nicaragua .......................................................................................5

STANDARD OF REVIEW ...........................................................................................6

ARGUMENT ..............................................................................................................7

    I.     SECRETARY NOEM'S CHALLENGED ACTIONS ARE NOT
         REVIEWABLE UNDER THE ADMINISTRATIVE PROCEDURE ACT ......................7

          A.     Plaintiffs' Claims Are Unreviewable under the APA Because the TPS
               Statute Precludes Judicial Review ...........................................................7

          B.     Plaintiffs Claims are Unreviewable for Additional Reasons, Too.........................10

    II.    THE SECRETARY'S DETERMINATIONS DID NOT VIOLATE THE APA .............12

    III.   PLAINTIFFS' CONSTITUTIONAL CLAIMS FAIL AS A MATTER OF
         LAW ...............................................................................................18

CONCLUSION...........................................................................................................22

# TABLE OF AUTHORITIES

*Ali v. Fed. Bureau of Prisons*,
    552 U.S. 214 (2008) ................................................................................. 8

*Alvarez v. Dist. Dir. of U. S. INS*,
    539 F.2d 1220 (9th Cir. 1976) ............................................................... 19

*Bear Lake Watch, Inc. v. FERC*,
    324 F.3d 1071 (9th Cir. 2003) ................................................................. 7

*Booker v. Sec'y, Fla. Dep't of Corr.*,
    22 F.4th 954 (11th Cir. 2022) ............................................................... 17

*Chavez-Ramirez v. INS*,
    792 F.2d 932 (9th Cir. 1986) ................................................................. 13

*Dep't of Com. v. New York*,
    588 U.S. 752 (2019) ......................................................................... 16, 17

*DHS v. Regents of Univ. of Cal.*,
    591 U.S. 1 (2020) ....................................................................... 20, 21-22

*Fiallo v. Bell*,
    430 U.S. 787 (1977) ............................................................................. 20

*Fla. Power & Light Co. v. Lorion*,
    470 U.S. 729 (1985) ............................................................................... 6

*Galvan v. Press*,
    347 U.S. 522 (1954) ............................................................................. 19

*Garland v. Aleman Gonzalez*,
    596 U.S. 543 & n.5 (2022) ..................................................................... 8

*Harisiades v. Shaughnessy*,
    342 U.S. 580, 588-89 1952 .......................................................... 16-17, 19

*Jang v. Reno*,
    113 F.3d 1074 (9th Cir. 1997) ................................................................. 7

*Karimijinaki v. Holder*,
    579 F.3d 710 (6th Cir. 2009) ............................................................... 13

*Kleindienst v. Mandel*,
    408 U.S. 753 (1972) ............................................................................. 19

*Mathews v. Diaz*,
    426 U.S. 67 (1976) ............................................................................... 19

*Matter of Ferrante*, No. 23-55005,
    2023 WL 8449190 (9th Cir. Dec. 6, 2023) ....................................................... 1

*Moin v. Ashcroft*,
    335 F.3d 415 (5th Cir. 2003) ........................................................ 13, 14

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983) ..................................................................... 16

*Narenji v. Civiletti*,
    617 F.2d 745 (D.C. Cir. 1979) ......................................................... 22

*Nat'l TPS Alliance v. Noem*,
    150 F.4th 1000 (9th Cir. 2025) .......................................................... 9

*Nw. Motorcycle Ass'n v. U.S. Dep't Agric.*,
    18 F.3d 1468 (9th Cir. 1994) ............................................................ 6

*Occidental Eng'g Co. v. INS*,
    753 F.2d 766 (9th Cir. 1985) ................................................... 6, 14, 15

*Poursina v. USCIS*,
    936 F.3d 868 (9th Cir. 2019) .......................................................... 11

*Pac. Coast Fed'n of Fishermen's Ass'ns v. U.S. Bureau of Reclamation*,
    426 F.3d 1082 (9th Cir. 2005) ......................................................... 16

*Patel v. Garland*,
    596 U.S. 328 (2022) .................................................................... 8

*Pinnacle Armor, Inc. v. United States*,
    648 F.3d 708 (9th Cir. 2011) .......................................................... 10

*Ramos v. Wolf*,
    975 F.3d 872 (9th Cir. 2020) ................................................... 9, 12, 17

*Rancher Cattlemen Action Legal Fund United Stockgrowers of Am. v. United States Dep't of Agric.*,
    415 F.3d 1078 (9th Cir. 2005) .......................................................... 7

*Rank v. Nimmo*,
    677 F.2d 692 (9th Cir. 1982) .......................................................... 10

*Reno v. Am.-Arab Anti-Discrim. Comm.*,
    525 U.S. 471 (1999) .................................................................... 8

*Sanchez v. Mayorkas*,
    593 U.S. 409 (2021) .................................................................... 3

*Singh v. Reno*,
    113 F.3d 1512 (9th Cir. 1997) ............................................................................. 13

*Suburban Mortg. Assocs., Inc. v. U.S. Dep't of Hous. and Urban Dev.*,
    480 F.3d 1116 (Fed. Cir. 2007) ............................................................................. 8

*Tista v. Holder*,
    722 F.3d 1122 (9th Cir. 2013) ............................................................................. 21

*Trump v. Hawaii*,
    585 U.S. 667 (2018) ........................................................................... 18, 19, 20, 22

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
    429 U.S. 252 (1977) ............................................................................................. 20

*Water Auth.v. Jewell*,
    747 F.3d 581 (9th Cir. 2014) ................................................................................. 7

*Webster v. Doe*,
    486 U.S. 592 (1988) ............................................................................................. 10

*Zhu v. Gonzales*,
    411 F.3d 292 (D.C.Cir. 2005) ............................................................................. 10

## STATUTES

5 U.S.C. § 701 ...................................................................................... 1, 2, 7, 10

5 U.S.C. § 704 ................................................................................................. 6

5 U.S.C. § 706 ................................................................................................. 6

8 U.S.C. § 1101 ............................................................................................. 13

8 U.S.C. § 1252 ................................................................................. 2, 11, 12

8 U.S.C. § 1254a .................................................................................... *passim*

## RULES

Fed. R. of Evid. 201 ....................................................................................... 1

Federal Rule 56 .............................................................................................. 2

## REGULATIONS

58 Fed. Reg. 7582 (Feb. 8, 1993) ........................................................ 1, 10, 18

64 Fed. Reg. 526 (Jan. 5, 1999) .................................................................. 5, 6

68 Fed. Reg. 3896 (Jan. 27, 2003) .............................................................. 10

69 Fed. Reg. 40,642 (July 6, 2004) ............................................................... 1

72 Fed. Reg. 61172 (Oct. 29, 2007) ............................................................ 10

80 Fed. Reg. 36,346 (June 24, 2015) ..................................................... 4

81 Fed. Reg. 66,064 (Sept. 26, 2016) .................................................. 1, 10

81 Fed. Reg. 74,470 (Oct. 26, 2016) ..................................................... 4, 5

82 Fed. Reg. 59,630 (Dec. 15, 2017) ..................................................... 21

85 Fed. Reg. 79208 (Dec. 9, 2020) ..................................................... 10

**PRELIMINARY STATEMENT**

Secretary Noem's determinations to terminate the TPS designations for Nepal, Nicaragua, and Honduras were a lawful and valid exercise of the Secretary's statutory authority. The purpose of TPS is to provide *temporary* relief from removal to certain aliens who are in the United States when their country of nationality experiences armed conflict, natural disaster, or other extraordinary and temporary conditions and who are thus temporarily unable to return home safely, or whose country is temporarily unable to handle the return of its nationals. 8 U.S.C. § 1254a(b)(1). The TPS statute vests the Secretary with broad discretion over TPS designations, and when the Secretary determines that a country no longer meets the conditions for designation, the statute requires her to terminate it, 8 U.S.C. § 1254a(b)(3)(B), as Secretaries have done in nearly every administration since TPS was created.[1,2] Plaintiffs move for partial summary judgment, alleging that the Secretary's terminations of the TPS designations for Nepal, Nicaragua, and Honduras were unlawful, and seek to set aside these actions under the Administrative Procedure Act. Plaintiffs are not entitled to partial summary judgment for several reasons.

First, Plaintiffs' claims are not reviewable, under the APA or otherwise, because Congress has explicitly barred judicial review of TPS determinations. Congress could hardly be clearer here: "There is *no* judicial review of *any* determination of the [Secretary] with respect to the designation, or termination or extension of a [TPS] designation, of a foreign state under this subsection." 8 U.S.C. § 1254a(b)(5)(A) (emphasis added). Each of the Secretary's challenged decisions is a "determination" relating to "the termination…of a designation" under 8 U.S.C. § 1254a; *see also* 5 U.S.C. § 701(a)(1) (precluding review

---

[1] Pursuant to Fed. R. of Evid. 201(b), Defendants ask the Court to take judicial notice of the Federal Register Notices cited throughout the brief. *See Matter of Ferrante*, No. 23-55005, 2023 WL 8449198, at *1 (9th Cir. Dec. 6, 2023) (holding that "a court may take judicial notice of matters of public record.") (citing *Lee v. City of Los Angeles*, 250 F.3d 668, 689 (9th Cir. 2001))..

[2] *See, e.g., Termination of Designation of Lebanon Under Temporary Protected Status Program*, 58 Fed. Reg. 7582 (Feb. 8, 1993); *Termination of the Designation of Montserrat Under the Temporary Protected Status Program*, 69 Fed. Reg. 40,642 (July 6, 2004); *Six-Month Extension of Temporary Protected Status Benefits for Orderly Transition Before Termination of Guinea's Designation for Temporary Protected Status*, 81 Fed. Reg. 66,064 (Sept. 26, 2016).

under the APA "to the extent" that other "statutes preclude judicial review."). Second, the APA does not allow for review of agency action that is committed to agency discretion by law. 5 U.S.C. § 701(a)(2). Third, Plaintiffs' claims are also foreclosed by another section of the Immigration and Nationality Act (INA)—8 U.S.C. § 1252(f)(1)—which bars district courts from "enjoin[ing] or restrain[ing]" the operation of certain provisions of the INA. Fourth, to the extent Plaintiffs are challenging the Secretary's discretionary decision not to invoke her "option" to allow for an extended period of TPS-related document validity under 8 U.S.C. § 1254a(d)(3), judicial review also is precluded by 8 U.S.C. § 1252(a)(2)(B)(ii) and 5 U.S.C. § 701(a)(2). Fifth, even if judicial review were available, Plaintiffs' claim fail on the merits. Plaintiffs have not shown that the determinations they challenge were contrary to law or "arbitrary and capricious." Rather, as the record reflects, these determinations were consistent with the TPS statute and were based on Secretary Noem's determination that those countries no longer met the required conditions for TPS designation, in accordance with 8 U.S.C. § 1254a(b)(3)(A) and (B). For these reasons, the Court should deny Plaintiff's Motion and enter summary judgment in favor of Defendants.

## BACKGROUND

### I.    STATUTORY BACKGROUND

The Immigration Act of 1990 established a program for providing temporary shelter in the United States on a discretionary basis for aliens from designated countries experiencing ongoing armed conflict, environmental disaster, or "extraordinary and temporary conditions" that temporarily prevent the aliens' safe return or, in the case of environmental disasters, temporarily render the country unable to handle adequately the return of its nationals. Pub. L. No. 101-649, 104 Stat. 4978. The statute authorizes the Secretary of Homeland Security, "after consultation with appropriate agencies of the Government," to designate countries for "Temporary [P]rotected [S]tatus," only if she finds that (in pertinent part):

****

(B) … there has been an earthquake, flood, drought, epidemic, or other environmental disaster in the state resulting in a substantial, but temporary, disruption of living conditions in the area affected [such that] the foreign state is unable, temporarily, to handle adequately the return to the state of aliens who are nationals of the state[.]

8 U.S.C. § 1254a(b)(1). Temporary Protected Status, as the name suggests, was thus always meant to be a temporary solution for exigent circumstances. *See* Black's Law Dictionary, 2024 (defining temporary as "[l]asting for a time only; existing or continuing for a limited time; transitory."). Congress set the upper limit for an initial TPS designation, and any extension thereof, as "not to exceed eighteen months." 8 U.S.C. § 1254a(b)(2), (3)(C). The disruption in living conditions must be both "substantial" and "temporary," and any inability to adequately handle the return of nationals likewise must be temporar[y]." *Id*. § 1254a(b)(1)(A).

When the Secretary designates a country for TPS, eligible aliens who are granted TPS may not be removed from the United States and are authorized to work for the duration of the country's TPS designation, so long as they remain in valid temporary protected status. 8 U.S.C. § 1254a(a), (c); *see Sanchez v. Mayorkas*, 593 U.S. 409, 412 (2021). Initial designations, and any extensions thereof, may not exceed eighteen months. *Id*. § 1254a(b)(2), (3)(C). The Secretary must consult with appropriate agencies and review each designation before it ends to determine whether the conditions for the country's designation continue to be met. *Id.* § 1254a(b)(3)(A).  If the Secretary finds that the foreign state "no longer continues to meet the conditions for designation," she "shall terminate the designation" by publishing notice in the Federal Register of the determination and the basis for the termination. *Id.* § 1254a(b)(3)(B). If the Secretary "does not determine" that the foreign state "no longer meets the conditions for designation," then "the period of designation of the foreign state is extended for an additional period of 6 months (or, in the discretion of the [Secretary], a period of 12 or 18 months)." *Id.* § 1254a(b)(3)(C).

Finally, the statute unreviewable any determination relating to TPS designations, including terminations. "There is no judicial review of any determination of the [Secretary] with respect to the designation, or termination or extension of a designation, of a foreign state under this subsection." *Id.* § 1254a(b)(5)(A).

## II.    FACTUAL BACKGROUND

### A.    Nepal

On June 24, 2015, the Secretary designated Nepal for TPS for a period of 18 months due to "substantial, but temporary, disruption of living conditions" resulting from an earthquake.[3] TPS was extended for an additional 18 months on October 26, 2016.[4] In 2018, DHS announced the termination of TPS for Nepal. *See* ECF No. 64-5 at 0103-0104. However, litigation resulted in the continued extension of TPS documentation for TPS recipients from Nepal for several years. *See* ECF No. 64-1 at 0030-0040; ECF No. 64-2 at 0041-0056; ECF No. 64-3 at 0057-0070. In 2023, DHS reconsidered the 2018 decision to terminate TPS and again extended the designation of Nepal for TPS, "beginning on December 25, 2023, and ending on June 24, 2025." ECF No. 64-5 at 0091-0102.

On June 6, 2025, DHS published notice in the Federal Register that TPS for Nepal would be terminated effective on August 5, 2025. *See* ECF No. 64-1 at 0001. As the Federal Register Notice (FRN) explained, Secretary Noem considered whether there continues to be a substantial, but temporary, disruption of living conditions in Nepal as a result of the earthquake and whether Nepal remains temporarily unable to adequately handle the return of Nepalese nationals. *Id.* at 0002. The Secretary highlighted notable improvements to disaster preparedness and response, including the construction of disaster-resilient housing, infrastructure, and community systems. *Id.* at 0003-0004. The Secretary considered Nepal's significant reconstruction efforts, including statistics demonstrating that 88.36% of houses destroyed by the earthquake and 81.43% of damaged health facilities had been rebuilt. *Id.* As a result, the Secretary determined that "there is no longer a disruption of living conditions and Nepal is able to handle adequately the return of its nationals." *Id.* at 0003. Finally, the Secretary considered Nepal's improving fiscal conditions. *Id.*

---

[3] *Designation of Nepal for [TPS]*, 80 Fed. Reg. 36,346 (June 24, 2015).

[4] *Extension of the Designation of Nepal for [TPS]*, 81 Fed. Reg. 74,470 (Oct. 26, 2016).

### B.     Honduras

In 1999, the Attorney General designated Honduras for TPS for 18 months due to "environmental disaster and substantial disruption of living conditions caused by Hurricane Mitch." *See* ECF No. 62-1 at 0078-0080. TPS was repeatedly extended for nearly twenty years until 2018, when DHS terminated it. ECF No. 62-1 at 0109-0112. After the 2018 termination announcement, litigation resulted in the continued extension of TPS documentation for Honduran TPS recipients for several years. *See* ECF No. 62-1 at 002. In 2023, DHS reconsidered the 2018 decision to terminate TPS and extended TPS for Honduras through July 5, 2025. ECF No. 62-1 at 0097-0108. On July 8, 2025, DHS published notice in the Federal Register that TPS for Honduras would be terminated effective September 8, 2025. ECF No. 62-1 at 0001-0004. As explained in the FRN, Secretary Noem "determined the conditions supporting Honduras' January 5, 1999, designation for TPS on the basis of environmental disaster due to Hurricane Mitch are no longer met." *Id.* As the FRN stated, "the conditions resulting from Hurricane Mitch no longer cause a 'substantial,' but temporary, disruption in living conditions in the area affected,' and Honduras is no longer 'unable, temporarily, to handle adequately the return of its nationals.'" *Id.* (quoting 8 U.S.C. § 1254a(b)(1)(A). The Secretary noted improvements to access to basic water sources, sanitation, and electricity, as well as strengthened disaster management capacity. *Id.* Further, significant hurricane recovery has transformed Honduras into a popular destination for tourists and real estate investors. *Id.* The Secretary observed that assistance from the World Bank has improved emergency response and post-disaster reconstruction efforts and that new projects are transforming Honduras's infrastructure and creating new jobs. *Id.*

### C.     Nicaragua

In 1999, the Attorney General designated Nicaragua for TPS for 18 months after an environmental disaster substantially disrupted living conditions, rendering Nicaragua temporarily unable to handle adequately the return of its nationals. *Designation of Nicaragua Under [TPS]*, 64 Fed. Reg. 526 (Jan. 5, 1999); ECF No. 63-2 at 0083-0086. TPS was extended for nearly two decades until 2017, when DHS terminated it. ECF No. 63-7 at 0174-0180. After the termination announcement, litigation resulted in the continued extension of TPS documentation for TPS recipients from Nicaragua for several years. *See* ECF

1   No. 63-1 at 0002. In 2023, DHS reconsidered the 2018 decision to terminate TPS, resulting in another

2   extension of TPS for recipients from Nicaragua through July 8, 2025. ECF No. 63-6 at 0163-0165. On

3   July 8, 2025, DHS published notice in the Federal Register that TPS for Nicaragua would be terminated

4   effective on September 8, 2025. ECF 63-1 at 0001-0004. As explained in the FRN, Secretary Noem, after

5   consulting with the appropriate U.S. government agencies and reviewing country conditions information,

6   determined that "the conditions supporting Nicaragua's January 5, 1999 designation for TPS on the basis

7   of environmental disaster due to Hurricane Mitch are no longer met." *Id*. at 0003. Secretary Noem found

8   Nicaragua has made significant progress in recovering from the hurricane's destruction, including

9   improvements to infrastructure, road and bridge construction, schools, and healthcare access. *Id*. Secretary

10  Noem noted growth in Nicaragua's tourism, ecotourism, agriculture, and renewable energy industries and

11  advances in farming and agriculture technology. *Id*. The FRN also identifies improvements in housing

12  and food security, as well as restoration of the healthcare sector. *Id*. Finally, Secretary Noem observed

13  that Nicaragua's macroeconomic structure has stabilized, with a record high foreign reserve, sustainable

14  debt load, and well-capitalized banking structure. *Id*.

15                                          **STANDARD OF REVIEW**

16          The APA permits judicial review of a "final agency action for which there is no other adequate

17  remedy in court." 5 U.S.C. § 704. Courts may set aside the underlying agency decision if only it is

18  "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* § 706(2)(A).

19  Thus, a Court does not determine whether there is any genuine dispute of material fact, as it would in

20  ruling on an ordinary summary judgment motion. *See Occidental Eng'g Co. v.INS*, 753 F.2d 766, 769 (9th

21  Cir. 1985); *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985). Instead, summary judgment

22  serves as a mechanism for deciding, as a matter of law, whether the agency action passes muster under

23  the APA. *Nw. Motorcycle Ass'n v. U.S. Dep't Agric*., 18 F.3d 1468, 1471-72 (9th Cir. 1994); *Occidental

24  Eng'g*, 753 F.2d at 769-70. Accordingly, the Court reviews the evidence included in the administrative

25  record to determine whether, as a matter of law, the evidence permitted the agency to make the decision

26  it did. *Id*. Although the Court's review of the evidence is to be "searching and careful," it is "not

27

28

1    empowered to substitute [its] judgment for that of the agency." *Rancher Cattlemen Action Legal Fund*

2    *United Stockgrowers of Am. v. USDA*, 415 F.3d 1078, 1103 (9th Cir. 2005*); see also San Luis & Delta -*

3    *Mendota Water Author. v. Jewell,* 747 F.3d 581, 602-03 (9th Cir. 2014) (the Court "do[es] not review the

4    record "to determine the correctness or wisdom of the agency's decision." (quotation marks omitted)).

5    "[The court's] review is especially deferential in the context of immigration policy." *Jang v. Reno*, 113

6    F.3d 1074, 1077 (9th Cir. 1997). As a result, even if the evidence is susceptible of more than one rational

7    interpretation, the Court must "uphold the agency's findings*." Bear Lake Watch, Inc. v. FERC*, 324 F.3d

8    1071, 1076 (9th Cir.2003).

**ARGUMENT**

10   I.    **SECRETARY NOEM'S CHALLENGED ACTIONS ARE NOT REVIEWABLE**
      **UNDER THE ADMINISTRATIVE PROCEDURE ACT**

11

12        A.    **Plaintiffs' Claims Are Unreviewable under the APA Because the TPS Statute**
                **Precludes Judicial Review**

13        As a threshold matter, Defendants recognize that this Court concluded that it has jurisdiction to

14   review the Secretary's terminations under the APA notwithstanding the jurisdictional bar at 8 U.S.C.

15   § 1254a(b)(5)(A). ECF No. 73 at 14-20. Defendants respectfully maintain that this Court lacks

16   jurisdiction over Plaintiffs' claims, consistent with the Ninth Circuit's stay of the Court's decision

17   granting interim relief and the Supreme Court's two stays of district court decisions purporting to review

18   similar claims. ACMS No. 19, *National TPS Alliance v. Noem,* No. 25-4901 (9th Cir. Aug. 20, 2025).

19   Under the APA, judicial review is not available "to the extent that…statutes preclude judicial review."

20   5 1254U.S.C. § 701(a)(1). The TPS statute precludes review here in the plainest possible language:

21   "There is no judicial review of any determination of the [Secretary] *with respect to* the designation, or

22   termination or extension of a designation, of a foreign state" for TPS. 8 U.S.C. § 1254a(b)(5)(A)

23   (emphasis added). This provision bars all of Plaintiffs' claims in this Court, whether statutory or

24   constitutional, each of which challenges the Secretary's termination decisions. *Id.*; *see* H.R. Rep. No.

25   101-245, at 14 (1989) ("Moreover, none of the [Secretary's] decisions with regard to granting, extending,

26

27

28

1  or terminating TPS will be subject to judicial review"). Several features of 8 U.S.C. § 1254a(B)(5)(A)

2  reflect Congress' intent that the statute sweep broadly. First, in describing which "determinations" should

3  be shielded from judicial review, Congress chose the word "any," which the Supreme Court has long

4  recognized as having an "expansive meaning." *Patel v. Garland*, 596 U.S. 328, 337-40 (2022) (statute

5  barring review of "any judgment regarding the granting of relief" covers "any authoritative decision" on

6  the matter). The provision thus captures determinations of whatever kind." *Id*. (quoting Webster's Third

7  International Dictionary 97 (1993)); *see Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 219 (2008) (same).

8  Indeed, Congress has enacted many limits on courts' authority to intervene in Executive Branch decision-

9  making. *See, e.g.*, *Reno v. Am.-Arab Anti-Discrim. Comm.*, 525 U.S. 471, 486 (1999) (collecting such

10  limits, and observing that "*many* provisions of IIRIRA are aimed at protecting the Executive's discretion

11  from the courts—indeed, that can fairly be said to be the theme of the legislation"). These limitations

12  operate, by Congress's design, to channel or foreclose even claims that courts might find meritorious if

13  they were reviewable; indeed, that is precisely when they have teeth. That is not an absurd result; it is

14  precisely what Congress set out to do. *See, e.g.*, *Garland v. Aleman Gonzalez*, 596 U.S. 543, 554 & n.5

15  (2022) (explaining that it would be "unusual" for such a bar to foreclose review or relief only when a

16  claim "already independently fails on the merits").

17       A decision to terminate a TPS designation is at the core of the jurisdictional statute's broad sweep.

18  Indeed, the Secretary's determinations are "determination[s] with respect to the termination" of the TPS

19  designations for Nepal, Honduras, and Nicaragua. *See* ECF No.64-1 at 0001-0004; ECF No. 62-1 at 0001-

20  0004; ECF No. 63-1 at 0001-0004. Therefore, they are precluded from judicial review under the TPS

21  statute. ECF No. 110 at 8-10. Plaintiffs attempt to obfuscate Section 1254a's clear meaning by arguing

22  that they are challenging the factors and criteria that Secretary Noem used in making the determinations,

23  including the effective dates of the terminations. *See* ECF No. 1 ("Compl."). The Court should reject

24  Plaintiffs' attempt to "artfully recast" their claims to circumvent barriers to the Court's review. *Suburban*

25  *Mortg. Assocs., Inc. v. U.S. Dep't of Hous. and Urban Dev.*, 480 F.3d 1116, 1124 (Fed. Cir. 2007). *Id.* ¶

26  160. Because the Secretary's determinations to terminate TPS for Nicaragua, Honduras, and Nepal were

27

28

clearly determinations "with respect to" the TPS extension or termination, this Court lacks jurisdiction to review them. *See Ramos*, 975 F.3d 872, 889 (9th Cir. 2020) (this bar "preclude[s] direct review of the Secretary's country-specific TPS determinations"), *vacated on reh'r en banc*, 59 F.4th 1010, 1011 (9th Cir. 2023)). Review of those determinations, including their orderly transition period, *is* a review of the determinations and is barred under the statute.

The Ninth Circuit's recent decision in *National TPS Alliance v. Noem*, 150 F.4th 1000, 1017 (9th Cir. 2025) (*NTPSA I*), to the extent it controls, only confirms that § 1254a(b)(5)(A) bars Plaintiffs' challenges to these TPS terminations. *NTPSA I* concluded that courts may review "[t]he extent of statutory authority granted to the Secretary" to determine if she has inherent authority to reconsider a TPS extension, and it emphasized that courts may do so only because that question "is not 'a determination . . . with respect to the designation, or termination or extension' of a country for TPS. *NTPSA I*, 150 F.4th at 1017 (quoting § 1254a(b)(5)(A)).

There is no question about the Secretary's statutory authority here, however. Plaintiffs present no such claim, and, as the Ninth Circuit agreed, "Congress has provided a means for the Secretary to account for changes in country conditions or political priorities: she can terminate TPS[.]" *Id*. at 1021; *see* § 1254a(b)(3)(A)-(B). That is the authority the Secretary exercised. But instead of challenging the Secretary's authority, or even challenging any aspect of the Secretary's decisions that could fairly be described as collateral to the TPS terminations, Plaintiffs challenge the evidence and reasoning the Secretary relied upon to reach her decision to terminate TPS for Honduras, Nepal, and Nicaragua. *See* ECF No. 1. Those considerations cannot be characterized as deficiencies in the Secretary's statutory authority: The TPS statute does not "set forth or define the 'conditions in the foreign state' that the Secretary must consider in her periodic review, or how she should weigh these conditions." *Ramos*, 975 F.3d at 892 (citing § 1254a(b)(1)). The Ninth Circuit has thus correctly concluded that those types of legal challenges, such as that the Secretary failed to consider "intervening events in the TPS terminations at issue," are unreviewable because they "fundamentally attack[] the Secretary's specific TPS determinations[.]" *Ramos*, 975 F.3d at 895. The review bar in "§ 1254a(b)(5)(A) makes clear that the

1    Secretary's discretion to consider and weigh various conditions in a foreign country in reaching her TPS

2    determinations is not only broad, but unreviewable." *Ramos*, 975 F.3d at 895.

3         Because judicial review is foreclosed by § 1254a(b)(5)(A), Plaintiffs' claims are barred under the

4    APA, and Defendants are entitled to summary judgment on these claims.

5         **B.    Plaintiffs' Claims Are Unreviewable for Additional Reasons**

6         As explained in Defendants' motion to dismiss, there are other barriers to this Court's review of

7    Plaintiffs' claims as well. ECF No. 110 at 11-15 ("Def. Mot."). First, the APA precludes review where

8    the agency action is "committed to agency discretion by law." 5 U.S.C. § 701(a)(2). The Ninth Circuit

9    has held that this judicial review bar applies in those "rare instances where statutes are drawn in such

10   broad terms… thereby leaving the court with no meaningful standard against which to judge the agency's

11   exercise of discretion." *Pinnacle Armor, Inc. v. United States*, 648 F.3d 708, 719 (9th Cir. 2011); *see also*

12   *Zhu v. Gonzales*, 411 F.3d 292, 295 (D.C. Cir. 2005); *Webster v. Doe*, 486 U.S. 592, 600 (1988). The

13   Secretary's decision whether to invoke the "option" under 8 U.S.C. § 1254a(d)(3) to afford TPS recipients

14   an "orderly departure" period beyond the statutory default of 60 days is committed to the Secretary's

15   discretion. *See Rank v. Nimmo*, 677 F.2d 692, 699 (9th Cir. 1982) (statute giving the VA Administrator

16   the "option" to make specific payments made "clear that Congress intended to vest the widest discretion

17   possible in the Administrator."). Plaintiffs attempt to limit the Secretary's discretion by referring to past

18   agency practice, claiming that the Secretary impermissibly departed from agency practice of providing at

19   least a six-month transition period. But the statute provides that the Secretary is free to choose the

20   transition period, at her "option," as she "determines to be appropriate" based on the circumstances of

21   each designated country and termination. 8 U.S.C. § 1254a(d)(3).

22        Even if past agency practice did limit the Secretary's discretion, contrary to the statute, no past

23   agency practice would make the Secretary's choice of transition periods reviewable in this challenge. Prior

24   TPS terminations have allowed for orderly transition periods of varying lengths, dispelling Plaintiffs'

25

26

27

28                        DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
                                      No. 3:25-cv-5687-TLT
                                              10

premise that there is a uniform agency practice.[5] Plaintiffs attempt to gerrymander an agency practice by cabining the frame of reference to the "last twenty years," Compl. ¶ 4—even though the TPS program has been in practice for approximately thirty-five years—and choosing a level of generality—six or more months—that masks the substantial variation in transition periods. That is just a tell that there is *no* uniform agency practice. Plaintiffs thus fail to point to any meaningful standard, either in the statute or agency regulations or practices, that could cabin the Secretary's discretion to set the transition period, at her "option," to the length she "determines to be appropriate."

Another statute, 8 U.S.C. § 1252(a)(2)(B)(ii), also independently bars Plaintiffs' claims. The Ninth Circuit has interpreted this provision to preclude federal courts "from reviewing certain decisions 'the authority for which is specified…to be in the discretion of the Attorney General or the Secretary of Homeland Security.'" *Poursina v. USCIS*, 936 F.3d 868, 870 (9th Cir. 2019) (emphasis added); *see* 8 U.S.C. § 1252(a)(2)(B)(ii). In reviewing this provision, the Ninth Circuit held that, "[b]y its own terms, such provision refers not to 'discretionary decisions'…but to acts the authority for which is specified under the INA to be discretionary." *Poursina*, 936 F.3d. at 871 (quoting *Spencer Enters., Inc. v. United States*, 345 F.3d 683, 689 (9th Cir. 2003). The statutory language in § 1254a(d)(3) exudes deference to the Secretary. *See Bouarfa v. Mayorkas*, 604 U.S. 6, 13-15 (2024) (holding that 8 U.S.C. § 1252a(2)(B)(ii) applies where, as here, the INA uses terms that "exude[ ] deference," "Congress has in no way prescribed how that discretion must be exercised," and "[t]here are no conditions that the Secretary must satisfy before" she can exercise her authority).

---

[5] *Termination of Designation of Lebanon Under Temporary Protected Status Program*, 58 Fed. Reg. 7582 (Feb. 8, 1993) (60 days); *Termination of Designation of Angola Under the Temporary Protected Status Program*, 68 Fed. Reg. 3896-01, 3896 (Jan. 27, 2003) (60 days); *Six-Month Extension of Temporary Protected Status Benefits for Orderly Transition Before Termination of Guinea's Designation for Temporary Protected Status*, 81 Fed. Reg. 66,064-01, 66,065, 66,066 (Sept. 26, 2016) (six months); *Continuation of Documentation for Beneficiaries of Temporary Protected Status Designations for El Salvador, Haiti, Nicaragua, Sudan, Honduras, and Nepal*, 85 Fed. Reg. 79208 (Dec. 9, 2020) (9 months); *Termination of the Designation of Burundi for [TPS]; Automatic Extension of Employment Authorization Documentation for Burundi TPS eneficiaries.*, 72 Fed. Reg. 61172 (Oct. 29, 2007) (18 months).

1    Finally, Plaintiffs' request that the Court "set aside" the Secretary's determinations, *see* Compl.

2    ¶ 154, cannot be squared with 8 U.S.C. § 1252(f)(1), which bars district courts and courts of appeals

3    from entering an order that "enjoin[s] or restrain[s]" the operation of the statutory provisions Section

4    1252(f)(1) covers, including § 1254a. *See* Def. Mot. at 13. Moreover, while recognizing that the Ninth

5    Circuit has held otherwise, the government maintains the view—and preserves the argument—that

6    Section 1252(f)(1) also bars declaratory relief. *See* Def. Mot. at 15.

7    **II.    THE SECRETARY'S DETERMINATIONS DID NOT VIOLATE THE APA**

8    The Secretary's determinations were entirely consistent with the procedural requirements laid out

9    in the TPS statute. The Secretary must review the conditions within foreign states designated for TPS

10   periodically to determine, based on her findings, whether the conditions for such designation continue to

11   exist. 8 U.S.C. § 1254a(b)(3)(A)-(C). After conducting a review and consulting with the appropriate

12   government agencies, if the Secretary determines that the conditions for a TPS designation no longer exist,

13   she *must* terminate the designation. 8 U.S.C. § 1254a(b)(3)(B). The evidence provided conclusively

14   demonstrates that the Secretary took the steps required by the TPS statute in her decisions to terminate

15   TPS for Nepal, Nicaragua, and Honduras. The fact that Plaintiffs disagree with the Secretary's

16   determinations does not render them unlawful.

17   Congress provided the Secretary "undoubtedly broad" authority to "make TPS determinations"

18   and ensure the continued designation of a country complies with the law. *Ramos*, 975 F.3d at 890.  In

19   exercising this statutory authority, Secretary Noem timely reviewed the country conditions for Nepal,

20   Nicaragua, and Honduras prior to the expiration of their existing TPS designations. ECF No. 64; ECF No.

21   63; ECF No. 62. The statute ties these countries' TPS designations to specific events—*i.e.*, "an earthquake,

22   flood, drought, epidemic, [or] … other environmental disaster." 8 U.S.C. § 1254a(b)(1)(B). Section 1254a

23   emphasizes that the conditions that give rise to the TPS designation must be "substantial" and

24   "temporary." *See Id.* § 1254a(b)(1)(B)(i) (the Secretary may designate a country for TPS if she finds,

25   among other things, that an environmental disaster causes a "substantial, but temporary, disruption of

26

27

28

living conditions"). They must also be substantial enough that "the foreign state is unable, temporarily, to handle adequately the return to the state of aliens who are nationals of the state. *Id*. § 1254a(b)(1)(B)(ii). Thus, when the statute mandates that the Secretary periodically evaluate whether "the conditions for [a country's TPS] designation … continue to be met," *id*. § 1254a(b)(3)(A), it follows that the Secretary is to evaluate whether the "temporary" conditions caused by the event that gave rise to the TPS designation continue to exist to such an extent that the foreign state is "*unable, temporarily, to handle adequately* the return" of its nationals. [6]

Here, the record reflects that Secretary Noem thoroughly reviewed the country conditions and consulted with the appropriate Government agencies in determining that the conditions supporting Nepal's June 24, 2015, designation for TPS on the basis of the earthquake are no longer met. ECF No. 64-1 at 0001. In reviewing country conditions, Secretary Noem considered prior TPS determinations for Nepal, ECF No. 64 at 0038-0075, U.S. Department of State's Country Reports on Human Rights in Nepal in 2021 and 2022, ECF No. 64-6 at 0125-0208, reports from the World Bank Group, ECF No. 64-12 at 1353-1411, and the March 10, 2025 country considerations report from U.S. Citizenship and Immigration Services, ECF No. 64-1 at 0015-0025.

Based on these findings, Secretary Noem identified that there were "notable improvements in environmental disaster preparedness" and "substantial reconstruction from the earthquake's destruction." *Id*. at 0003 (*citing* Government of Nepal Ministry of Home Affairs, Nepal Disaster Report, September

---

[6] In construing "temporary" as used in another INA provision, 8 U.S.C. § 1101(a)(27)(A) ("temporary visit abroad"), this Court has appropriately rejected the tautological definition of the term as an antonym of permanent. *Singh v. Reno*, 113 F.3d 1512, 1514 (9th Cir. 1997) ("'Temporary' in this context is not merely an antonym of 'permanent.'"); *Chavez-Ramirez v. INS*, 792 F.2d 932, 936 (9th Cir. 1986) (holding that "the phrase 'temporary visit abroad' does not include within it all visits abroad that are simply "not permanent"); *id*. ("If a permanent resident left the United States on a visit that would not end for twenty years, the visit would not be permanent but it hardly could be considered temporary either. If Congress had intended to allow permanent residents to reenter the United States and retain their status after 'all visits abroad that are not permanent' it could have done so. Congress chose instead to use the word 'temporary,' and we believe the usage contemplates a return within a relatively short period of time."); *accord Karimijinaki v. Holder*, 579 F.3d 710, 715 (6th Cir. 2009); *Moin v. Ashcroft*, 335 F.3d 415, 419 (5th Cir. 2003).

2024.); *see also* ECF No. 64-9 at 0648-0731. Additionally, consistent with the USCIS's country considerations report, ECF No. 64-1 at 00015-0025, Secretary Noem noted an improvement in the "living conditions" in Nepal, acknowledging progress in areas such as economic growth, infrastructure and community systems, which the Secretary determined created a "safer and more stable environment" for returnees. ECF No. 64-1 at 0003. As such, Secretary Noem properly determined that there was no longer a disruption of living conditions and Nepal can adequately handle the return of its nationals. *Id*.

The evidence also demonstrates that Secretary Noem consulted with the appropriate government agencies in making these determinations, such as reviewing the U.S. Department of State's report to former Secretary Mayorkas, which supported the termination of TPS for Nepal based on environmental disaster. ECF No. 64-1 at 0006-0007. This Recommendation from former Secretary Blinken noted that "[w]hile some aspects of the situation in Nepal remain challenging…conditions in Nepal resulting from the 2015 earthquake no longer are causing a substantial disruption to living conditions," which is attributed to the "recovery effects by the Government of Nepal and the international community." *Id*. at 0008-0009. The Department of State also explained that the current conditions in Nepal are "broadly similar to what they were prior to the 2015 earthquake." *Id*. at 0011. For these reasons, the Department of State determined that it "does not recommend that the Nepal TPS designation be extended." *Id*. at 0014. The record provides that Secretary Noem conducted an in-depth review of the country conditions and consulted with the appropriate government agencies in finding that Nepal's TPS designation should be terminated. Because the evidence within the record "permitted the Secretary to make the decision she did," this determination was lawful under the APA. *See Occidental Eng'g Co.*, 753 F.2d at 769.

Additionally, Secretary Noem found that the conditions supporting Honduras' and Nicaragua's January 5, 1999, designations for TPS due to Hurricane Mitch are no longer met, noting that there have been "significant changes" in the quarter century following Hurricane Mitch's destruction. ECF No. 62-1 at 0001-0004; ECF No. 63-1 at 0001-004. In assessing the country conditions for Honduras, the record shows that Secretary Noem reports from USCIS, such as an analysis country of origin information, ECF No. 62 at 0008-0020, and comparisons of country conditions between the initial TPS designation in 1999

through July 5, 2025." ECF No. 62-1 at 0028-0036. She also considered evidence such as previous TPS determinations involving Honduras, *id.* at 0037-0077, country reports from the U.S. Department of State, *id.* at 0262-00321, and World Reports on Honduras for 2024 and 2025 from the Human Rights Watch. ECF No. 62-2 at 0527-0545. In her termination notice, Secretary Noem considered improvements in the country's "livability, sustainability, and capacity," noting that over 90% of Honduras have access to a basic water source and electricity, and over 80% can access basic sanitation. ECF No. 62-1 at 0003. She further acknowledged the Honduran government's "Brother, Come Home" plan, which was enacted in January 2025 to support Hondurans deported from the United States by providing resources such as monetary and food support, as well as access to employment programs. *Id.*; *see also* 62-1 at 0020 (USCIS report noting that President Castro signed a law to "boost government help for communities and individual victims of internal displacement."). As provided in the record, Secretary Noem also consulted with the U.S. Department of State by reviewing the recommendation from Secretary Rubio, which stated that "Honduras has recovered sufficiently from the temporary disruption of living conditions that resulted from…Hurricane Mitch." ECF No. 62-1 at 0006-0007.

Similarly, in assessing the country conditions in Nicaragua, Secretary Noem noted "significant progress" in its recovery from the hurricane's destruction and acknowledged that it is now "a growing tourism, ecotourism, agriculture, and renewable energy leader." ECF No. 63-1 at 0002. She explained that there have been improvements on infrastructure and investment projects, which have helped with "housing food insecurity, and restoring the health sector." *Id.* at 0003. She further articulated that "Nicaragua continues to show stable macroeconomic fundamentals," ECF No. 63-1 at 0003, which is consistent with the USCIS's Report on Country Conditions. ECF No. 63-1 at 0034. And while Secretary Noem reviewed the 2024 U.S. Department of State recommendation to former Secretary Mayorkas, ECF No. 63-1 at 0018-0020, Secretary Noem determined that, based on her findings, the "conditions resulting from Hurricane Mitch no longer cause a substantial, but temporary disruption in living conditions," and Nicaragua can "adequately handle the return of its nationals." *Id.*

Consistent with the statutory guidelines, Secretary Noem reasonably determined that, for reasons above, Nicaragua, Honduras, and Nepal "no longer continue to meet the conditions for [TPS] under 8 U.S.C. § 1254a(b)(1)(B)." ECF No. 63-1; ECF No. 62-1; ECF No. 64-1. For each of these determinations, it is clear that the Secretary "considered the pertinent evidence, examined the relevant factors and articulated a satisfactory explanation for" her action. *Pac. Coast Fe'n of Fishermen's Ass'ns v. U.S. Bureau of Reclamation*, 426 F.3d 1082, 1091 (9th Cir. 2005); S*ee Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (agency action should be set aside only "if the agency relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise"). Therefore, these Terminations should be upheld.

Secretary Noem also appropriately considered the President's directive to "ensur[e] that designations of Temporary Protected Status are consistent with the provisions of section 244 of the INA (8 U.S.C. 1254a), and that such designations are appropriately limited in scope and made for only so long as may be necessary to fulfill the textual requirements of that statute." *See* ECF No. 64-1, 0002 (*citing* E.O. 14156, Protecting the American People Against Invasion, sec. 16 (b), 90 FR 8443, 8446 (Jan. 20, 2025; published Jan. 29, 2025). Indeed, the Supreme Court has found that it is "hardly improper for an agency head to come into office with policy preferences and ideas, discuss them with affected parties, sound out other agencies for support, and work with staff attorneys to substantiate the legal basis for a preferred policy." *Dep't of Com. v. New York*, 588 U.S. 752, 783 (2019).

Additionally, the Secretary's TPS determinations here require her to make sensitive assessments affecting United States foreign policy by assessing whether the country remains temporarily unable to handle adequately the return of its nationals. *See Harisiades v. Shaughnessy*, 342 U.S. 580, 588-89 1952) ("[A]ny policy toward aliens is vitally and intricately interwoven with contemporaneous policies in

regard to the conduct of foreign relations [and] the war power."). Whether, for example, a country's ability to handle the return of its nationals is "adequate" is a determination uniquely reserved to the Secretary.[7]

While Secretary Noem acknowledged that she considered the Administration's immigration policy prerogatives, and the evidence provided also demonstrates that she evaluated country conditions in Nepal, Honduras, and Nicaragua, *see* ECF No. 64-1; ECF No. 62-1; ECF No. 63-1, and consulted with appropriate Government agencies, *see* ECF No. 64-1 at 0006-0014; *see* ECF No. 62-1 at 0006-0007; and ECF No. 63-1 at 0006-0020, considerations which are required under the TPS statute. As such, the terminations complied with the statutorily authorized criteria and should be upheld under the APA. *See Dep't of Com.*, 588 U.S. at 782 ("[A] court may not set aside an agency's policymaking decision solely because it may have been influenced by political considerations or prompted by an Administration's priorities …. Such decisions are routinely informed by unstated considerations of politics, the legislative process, public relations, interest groups, foreign relations, and national security concerns (among others)); *see also Ramos*, 975 F.3d at 897-98 ("It is expected—perhaps even critical to the functioning of government—for executive officials to conform their decisions to the administration's policies.").

Lastly, the TPS statute provides that a termination "shall not be effective earlier than 60 days after the notice is published or, if later, the expiration of the most recent previous extension." 8 U.S.C. § 1254a(b)(3)(B). Here, Nepal's Termination Notice was published in the Federal Register on June 6, 2025, with an effective date of August 5, 2025, and the Termination Notices for Honduras and Nicaragua were published in the Federal Register on July 8, 2025, with an effective date of September 8, 2025, each comporting with the statutory 60-day timeline. In her termination determinations, the Secretary acknowledged that the TPS statute provides her with the "option," to allow for an extended "orderly

---

[7] Certain "[d]ictionaries define 'adequate' as 'sufficient for a specific need or requirement,' Adequate, Merriam-Webster's Collegiate Dictionary, or as either: (1) '[f]ully satisfying what is required; quite sufficient, suitable, or acceptable in quality or quantity'; or (2) '[s]atisfactory, but worthy of no stronger praise or recommendation; barely reaching an acceptable standard; just good enough,' Adequate, Oxford English Dictionary (3d ed. 2011)." *Booker v. Sec'y, Fla. Dep't of Corr.*, 22 F.4th 954, 961 (11th Cir. 2022) (Lagoa, J., specially concurring) (URL citation omitted).

transition period" beyond the statutory timeline, "as the [Secretary] determines to be appropriate" 8 U.S.C. § 1254a(d)(3), but determined that "a 60-day transition period is sufficient." She further noted that the sixty-day transition period is consistent with the precedent of previous country terminations and in accord with U.S. national interests. *See* ECF No.64-1 at 003; ECF No. 62-1 at 003; ECF No. 63-1 at 0003; *see also* 64-1 0003 n.24 (acknowledging that previous TPS designations terminated without allowing for a transition period beyond the 60-day period, citing Angola and Lebanon decisions, 68 Fed. Reg. 3,896 (Jan. 27, 2003); 58 Fed. Reg. 7,582 (Feb. 8, 1993)). The Secretary's decision not to invoke the option to extend the 60-day transition period beyond what is required was a valid exercise of her unfettered discretion and, therefore, her termination determinations were in full compliance with the TPS statute and the APA.

The termination decisions are the result of a careful analysis undertaken by a Cabinet official in consultation with other Cabinet officials and their agencies, the upshot of which was that the conditions giving rise to the country's TPS designation no longer persisted. Plaintiffs have not—and cannot—point to any flaw within her reasoning, nor can they demonstrate that these terminations were contrary to the statutory guidelines. Therefore, Plaintiffs APA claims fail, and Defendants are entitled to judgment on those claims.

### III.    PLAINTIFFS' CONSTITUTIONAL CLAIMS FAIL AS A MATTER OF LAW

Defendants are entitled to summary judgment on Plaintiffs' constitutional claims, too. Plaintiffs allege that the TPS terminations for Honduras, Nepal, and Nicaragua "were motivated in part by a racially discriminatory intent or purpose." Compl. ¶¶ 162-165. The Supreme Court has made it clear that where, as here, a decision is based on immigration policy, courts cannot look behind facially legitimate actions to hunt for illicit purposes. *See Hawaii*, 585 U.S. at 703-04. The deferential standard set out in *Trump v. Hawaii* applies here, and the Secretary's decisions easily pass muster under it. "'Any rule of constitutional law that would inhibit the flexibility' of the President 'to respond to changing world conditions should be adopted only with the greatest caution,' and [the Court's] inquiry into matters of entry and national security is highly constrained." *Id.* at 704 (quoting *Mathews v. Diaz*, 426 U.S. 67, 81-82 (1976)).

The Supreme Court "ha[s] long recognized the power to expel or exclude aliens as a fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control[.]" *Fiallo v. Bell*, 430 U.S.787, 792 (1977). Because decisions in these matters implicate "relations with foreign powers" and involve "classifications … defined in the light of changing political and economic circumstances," such judgments "are frequently of a character more appropriate to either the Legislature or the Executive." *Mathews*, 426 U.S. at 81; *see also Galvan v. Press*, 347 U.S. 522, 531 (1954) ("Policies pertaining to the entry of aliens and their right to remain here are peculiarly concerned with the political conduct of government"). Decisions by the political branches about which classes of aliens to exclude or expel will generally be upheld against constitutional challenges so long as they satisfy deferential rational-basis review. *Hawaii*, 585 U.S. at 704-05; *see also Kleindienst v. Mandel*, 408 U.S. 753, 769-70 (1972) (judicial review of "[p]olicies pertaining to the entry of aliens and their right to remain here" is limited to whether the Executive gave a "facially legitimate and bona fide" reason for action); *Mathews*, 426 U.S. at 82 (a "narrow standard of review" applies to "decisions made by Congress or the President in the area of immigration and naturalization"); *Harisiades v. Shaughnessy*, 342 U.S. 580, 588-89 (1952). Indeed, "ordinary rational basis review is the appropriate standard in the immigration context." *Ledezma-Cosino v. Sessions*, 857 F.3d 1042, 1049 (9th Cir. 2017) (en banc), cert. denied, 138 S. Ct. 643, (2018); *Hernandez-Mancilla v. Holder*, 633 F.3d 1182, 1185 (9th Cir. 2011) ("We review equal protection challenges to federal immigration laws under the rational basis standard. . . ." (citation omitted)); *Alvarez v. Dist. Dir. of U. S. Immigration & Naturalization Serv.*, 539 F.2d 1220, 1224 (9th Cir. 1976) ("[I]t is clear that classifications made under the immigration laws need only be supported by some rational basis to fulfill equal protection guarantees." (citation omitted)).

The holdings in *Hawaii*, *Mandel*, and *Fiallo* support the application of rational basis review in this case. In addition to reviewing country conditions and consulting with appropriate government agencies, the Secretary's determinations appropriately considered whether the foreign states were temporarily unable to handle adequately the return of their nationals. Such an official determination about a foreign country is replete with sensitive foreign policy considerations that affect the United States' "relations with

foreign powers" and "which involve classifications defined in the light of changing political and economic circumstances," *Hawaii*, 585 U.S. at 702. As such, this is precisely the situation in which the Supreme Court has repeatedly applied rational-basis review. *See id.*; *see also Fiallo*, 430 U.S. at 799.

Even under the higher standard Plaintiffs invoke, [8] Compl. ¶ 163, their Equal Protection claim still fails. Plaintiffs cannot show as a matter of law that the Secretary's TPS determinations were "motivated by animus or discriminatory intent based on race, national origin, and ethnicity," Compl. ¶ 164, through statements taken out of context and without direct links to the Secretary's determinations. *See DHS v. Regents of Univ. of Cal.*, 591 U.S. 1, 34-35 (2020) (explaining that disparate impact, unusual recission history, and pre- and post-election statements failed "to raise a plausible inference that the recission was motivated by animus").

Here, Plaintiffs fail to show discriminatory animus. Secretary Noem, like previous TPS decision-makers, considered the conditions in the countries at the time the TPS decisions were made after consulting with the relevant government agencies. This process led to Secretary Noem's well-explained and thorough decision that these countries at issue no longer qualified for TPS. As discussed above, in the Federal Register Notices, Secretary Noem identified data, unchallenged by the Plaintiffs, to show that the country conditions for Honduras, Nicaragua, and Nepal have significantly improved conditions since those countries were originally designated for TPS. *See* ECF No. 63-1; ECF No. 62-1; ECF No. 64-1. Secretary Noem duly considered prior TPS determinations, country conditions reports from USCIS, and recommendations from the Department of State in assessing whether the conditions giving rise to the designations continued to be met. *See* ECF No. 64-1 at 0006-0014; see ECF No. 62-1 at 0006-0007; and ECF No. 63-1 at 0006-0020. Thus, the record reflects that Secretary Noem duly considered the ability of all three countries to adequately handle the return of its nationals. Plaintiffs may disagree with these

---

[8] *See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265-66 (1977).

conclusions but have not—and cannot—"negate every conceivable basis which might support" the challenged TPS terminations. *Tista v. Holder*, 722 F.3d 1122, 1126-27 (9th Cir. 2013) (quotation omitted).

Plaintiffs ignore these stated justifications, and instead cherry-pick external statements, social media posts, and media appearances from the Secretary to infer an overarching discriminatory motive with respect to TPS terminations as a whole. Compl. ¶¶ 86-94.  Unable to point to any comments by Secretary Noem specifically discussing Honduras, Nicaragua, or Nepal, Plaintiffs instead  repackage statements made by President Trump during his first campaign for President to make the sweeping inference that he harbors racist views against all "non-white non-Europeans" that must automatically infect any immigration action taken during his Administration. But previous history belies this grossly false and unsupported assertion. *See* Compl. ¶¶ 85-128. For example, during President Trump's first term in 2017, then-Acting Secretary Duke did not terminate TPS for Honduras, but in fact she extended it. *Extension of the Designation of Honduras for Temporary Protected Status*, 82 Fed. Reg. 59,630-02 (Dec. 15, 2017). Likewise, she extended TPS for South Sudan around the same time she terminated it for Sudan. Plaintiffs ignore these and other facts rebutting their claim that Secretary Noem was not exercising her own judgment and discretion when making the TPS determinations at issue in this case. Relying entirely upon this "cat's paw" theory, Plaintiffs fail to show how such statements or prior conduct can be connected or extended to the determinations at issue here. Moreover, all of the statements—similar to those challenged and rejected in *Hawaii*—were "remote in time and made in unrelated contexts" and therefore "do not qualify as 'contemporary statements' probative of the decision at issue." *Regents of the Univ. of Cal.*, 591 U.S. at 35 (opinion of Roberts, C.J.) (quoting *Arlington Heights*, 429 U.S. at 268); *Hawaii*, 585 U.S. at 35 ("The Executive's evaluation of the underlying facts is entitled to appropriate weight, particularly in the context of litigation involving "sensitive and weighty interests of national security and foreign affairs.").

TPS determinations generally turn on, among other criteria, an assessment of whether a country's conditions are such that nationals of the country are temporarily unable to safely return or whether the country is temporarily unable to adequately handle the return of its nationals. 8 U.S.C. § 1254a(b)(1). They do not rest on an assessment of the particular characteristics of individual foreign nationals or groups of such individuals. And, Plaintiffs have failed to meet their burden to prove that Secretary Noem's thorough explanations set forth in the Federal Register were based on anything other than the statutory criteria. *Narenji v. Civiletti*, 617 F.2d 745, 748 (D.C. Cir. 1979) ("For reasons long recognized as valid, the responsibility for regulating the relationship between the United States and our alien visitors has been committed to the political branches of the Federal Government." (citation omitted)). In sum, the Secretary's TPS terminations for Honduras, Nicaragua, and Nepal were a reasonable exercise of her discretionary authority, and thee is woefully insufficient proof that the Secretary made her TPS decisions in any way due to a discriminatory motive. As such, Plaintiffs' equal protection claim must fail as a matter of law.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court enter summary judgment in Defendants' favor.

Dated: October 14, 2025

Respectfully Submitted,

BRETT SHUMATE
Assistant Attorney General

YAAKOV M. ROTH
Principal Deputy Assistant Attorney General

WILLIAM H. WEILAND
Acting Assistant Director

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
No. 3:25-cv-5687-TLT
22

LAUREN BRYANT
CATHERINE ROSS
ERIC SNYDERMAN
JEFFREY HARTMAN
SHLEBY WADE
DANIEL CAPPELLETTI
ILANA KRAMER
LORI MACKENZIE
Trial Attorneys

*s/  Catherine Ross*
CATHERINE ROSS
Trial Attorney
U.S. Department of Justice, Civil Division
Office of Immigration Litigation
P.O. Box 868 Ben Franklin Station
Washington, D.C. 20044

*Counsel for Defendants*

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
No. 3:25-cv-5687-TLT
23

BRETT SHUMATE
Assistant Attorney General
YAAKOV M. ROTH
Principal Deputy Assistant Attorney General
Civil Division
WILLIAM H. WEILAND
Acting Assistant Director
ERIC SNYDERMAN
ILANA KRAMER
LORI MACKENZIE
SHELBY WADE
LAUREN BRYANT
CATHERINE ROSS
JEFFREY HARTMAN
DANIEL CAPPELLETTI
Trial Attorneys
U.S. Department of Justice, Civil Division
Office of Immigration Litigation
General Litigation and Appeals Section
P.O. Box 868, Ben Franklin Station
Washington, DC 20044
Attorneys for Defendants

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| NATIONAL TPS ALLIANCE, *et al.*,<br><br>        Plaintiff,<br>    v.<br><br>KRISTI NOEM, in her official capacity as Secretary of Homeland Security, *et al.*,<br><br>        Defendants. | Case No. 3:25-cv-5687<br><br><br>PROPOSED ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT |

PROPOSED ORDER GRANTING DEFS.' MOTION FOR SUMMARY JUDGMENT
No. 3:25-cv-5687

1

**PROPOSED ORDER**

2          Before the Court is Defendants' Motion for Summary Judgment, pursuant to Federal Rule 56(f).

3    ECF _____. Having reviewed the motion and considered the arguments counsel, IT IS HEREBY

4    ORDERED that Defendants' Motion for Summary Judgment is GRANTED.

5    Issued this _____ day of _____, 2025.

6

7                                                                    _____

8                                                                    Trina L. Thompson
                                                                     United States District Court Judge

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28   PROPOSED ORDER GRANTING DEFS.' MOTION FOR SUMMARY JUDGMENT
     No. 3:25-cv-5687