1    Ahilan T. Arulanantham (SBN 237841)
     arulanantham@law.ucla.edu
2    CENTER FOR IMMIGRATION LAW AND
     POLICY, UCLA SCHOOL OF LAW
3    385 Charles E. Young Dr. East
     Los Angeles, CA 90095
4    Telephone: (310) 825-1029

5    Emilou H. MacLean (SBN 319071)
     emaclean@aclunc.org
6    Michelle (Minju) Y. Cho (SBN 321939)
     mcho@aclunc.org
7    Amanda Young (SBN 359753)
     ayoung@aclunc.org
8    ACLU FOUNDATION
     OF NORTHERN CALIFORNIA
9    39 Drumm Street
     San Francisco, CA 94111-4805
10   Telephone: (415) 621-2493

11   Attorneys for Plaintiffs
     *[Additional Counsel Listed on Next Page]*

12
                    UNITED STATES DISTRICT COURT
13
                  NORTHERN DISTRICT OF CALIFORNIA
14
                      SAN FRANCISCO DIVISION
15
     NATIONAL TPS ALLIANCE, DENIS           Case No. 3:25-cv-05687
16   MOLINA, JHONY SILVA, MARIA ELENA
     HERNANDEZ, O.C., SANDHYA LAMA,         **PLAINTIFFS' NOTICE OF MOTION AND**
17   S.K., TEOFILO MARTINEZ,                **MOTION FOR PARTIAL SUMMARY**
                                            **JUDGMENT; MEMORANDUM OF POINTS**
18              *Plaintiffs,*               **AND AUTHORITIES IN SUPPORT**
                                            **THEREOF**
19          v.
                                            Date:     November 18, 2025
20   KRISTI NOEM, in her official capacity as   Time:     2:00 p.m.
     Secretary of Homeland Security, UNITED    Place:    Courtroom 9
21   STATES DEPARTMENT OF HOMELAND
     SECURITY, and UNITED STATES OF          Complaint filed: July 7, 2025
22   AMERICA,

23              *Defendants.*

24

25

26

27

28

---

Additional Counsel for Plaintiffs

Jessica Karp Bansal (SBN 277347)
jessica@ndlon.org
Lauren Michel Wilfong (admitted *Pro Hac Vice*)
lwilfong@ndlon.org
NATIONAL DAY LABORER ORGANIZING NETWORK
1030 S. Arroyo Parkway, Suite 106
Pasadena, CA 91105
Telephone: (626) 214-5689

Eva L. Bitran (SBN 302081)
ebitran@aclusocal.org
ACLU FOUNDATION
OF SOUTHERN CALIFORNIA
1313 West 8th Street
Los Angeles, CA 90017
Telephone: (213) 977-5236

Erik Crew (admitted *Pro Hac Vice*)
ecrew@haitianbridge.org
HAITIAN BRIDGE ALLIANCE
4560 Alvarado Canyon Road, Suite 1H
San Diego, CA 92120
Telephone: (949) 603-7411

## NOTICE OF MOTION

PLEASE TAKE NOTICE THAT, on November 18, 2025 or as soon thereafter as this matter may be heard, before the Honorable Trina L. Thompson of the United States District Court for the Northern District of California, Plaintiffs move for partial summary judgment to set aside the terminations of TPS for Honduras, Nicaragua, and Nepal under 5 U.S.C. § 706. They also seek declaratory relief under 28 U.S.C. § 2201. This Motion is based upon this Notice of Motion and Motion; the accompanying Memorandum of Points and Authorities; the supporting declarations and evidence filed concurrently herewith; pleadings and filings in this case; any additional matter of which the Court may take judicial notice; and such further evidence or argument as may be presented before, at, or after the hearing. Unless otherwise specified, all citations in the Memorandum of Points and Authorities to an "Exhibit," "Exhibits," "Ex." or "Exs." refer to exhibits attached to the Declaration of Jessica Bansal.

Respectfully submitted,

NATIONAL DAY LABORER
ORGANIZING NETWORK

 /s/    *Jessica Karp Bansal*
Jessica Karp Bansal
Lauren Michel Wilfong (admitted *Pro Hac Vice*)

Emilou MacLean
Michelle (Minju) Y. Cho
Amanda Young
ACLU FOUNDATION
OF NORTHERN CALIFORNIA

Ahilan T. Arulanantham
CENTER FOR IMMIGRATION LAW
AND POLICY, UCLA SCHOOL OF LAW

Eva L. Bitran
Diana Sanchez
ACLU FOUNDATION
OF SOUTHERN CALIFORNIA

Erik Crew (admitted *Pro Hac Vice*)
HAITIAN BRIDGE ALLIANCE

Attorneys for Plaintiffs

PLAINTIFFS' NOTICE OF MOTION & MOTION FOR PARTIAL SUMMARY JUDGMENT
CASE NO. 3:25-CV-05687

# TABLE OF CONTENTS

**Page No.**

INTRODUCTION ...................................................................................................1

LEGAL STANDARD...............................................................................................1

BACKGROUND .....................................................................................................2

    A.    Congress's Statutory Scheme for TPS....................................................2

    B.    TPS Designations for Honduras, Nicaragua, and Nepal.......................4

    C.    Defendants' Project to End TPS and the Preordained Termination of TPS for Honduras, Nicaragua, and Nepal ...................................................5

    D.    The Effect of Defendants' TPS Terminations .............................................14

I.    The Terminations of TPS for Honduras, Nicaragua, and Nepal Violate the APA ................16

    A.    The Terminations Were Predetermined and Without Observance of Procedure Required by Law......................................................................................16

        1.    Defendants Made a Preordained Decision to Terminate TPS .........17

        2.    Defendants Did Not Base their Termination Decisions on Interagency Consultation or Country Conditions Review....................................18

    B.    The Terminations Were Contrary to Law and Arbitrary and Capricious Because They Did Not Take Into Account Intervening Conditions...........................20

CONCLUSION ............................................................................................24

# <u>JUNETABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Cal. Wilderness Coal. v. U.S. Dep't of Energy,*
    631 F.3d 1072 (9th Cir. 2011) ...................................................................................19

*Campanale & Sons, Inc. v. Evans,*
    311 F.3d 109 (1st Cir. 2002) ....................................................................................19

*Ctr. for Biological Diversity v. BLM,*
    141 F.4th 976 (9th Cir. 2025) ..................................................................................24

*Dep't of Com. v. New York,*
    588 U.S. 752 (2019) .................................................................................................17

*E. Bay Sanctuary Covenant v. Biden,*
    993 F.3d 640 (9th Cir. 2021) .....................................................................................2

*FDA v. Wages and White Lion Inv., LLC,*
    145 S. Ct. 898 (2025) ..............................................................................................24

*Leiva-Perez v. Holder,*
    640 F.3d 962 (9th Cir. 2011) .....................................................................................2

*Nat'l TPS All. v. Noem,*
    150 F.4th 1000 (9th Cir. 2025) ........................................................................2, 7, 24

*Nat'l TPS All. v. Noem,*
    No. 25-cv-1766, Dkt. 279 (N.D. Cal. Sept. 5, 2025) ............................................3, 7

*Organized Vill. of Kake v. USDA,*
    795 F.3d 956 (9th Cir. 2015) ...................................................................................24

*Ramos v. Nielsen,*
    336 F. Supp. 3d 1075 (N.D. Cal. 2018) ....................................................3, 4, 5, 23

*Ramos v. Nielsen,*
    709 F. Supp. 3d 871 (N.D. Cal. 2023) .....................................................................23

*Robinson v. Shell Oil Co.,*
    519 U.S. 337 (1997) .................................................................................................19

*Saget v. Trump,*
    375 F. Supp. 3d 280 (E.D.N.Y. 2019) ............................................................ *passim*

*Sierra Club v. Bosworth,*
    510 F.3d 1016 (9th Cir. 2007) ...................................................................................1

*Singh v. Berger,*
    56 F.4th 88 (D.C. Cir. 2022) ............................................................................2

*Sw. Airlines Co. v. FERC,*
    926 F.3d 851 (D.C. Cir. 2019) ........................................................................24

*Tummino v. Torti,*
    603 F. Supp. 2d 519 (E.D.N.Y. 2009) .............................................................17

**Statutes**

5 U.S.C. § 706 ..............................................................................................1, 2, 16

5 U.S.C. § 706(2)(A) ..........................................................................................22

5 U.S.C. § 706(2)(D) ..........................................................................................17

8 U.S.C. 1254a(b)(1) .............................................................................................3

8 U.S.C. 1254a(b)(1)(C) .....................................................................................20

8 U.S.C. § 1254a ...................................................................................................7

8 U.S.C. § 1254a(a)(1) ..........................................................................................2

8 U.S.C. § 1254a(b)(1)(B) ..................................................................................22

8 U.S.C. § 1254a(b)(1)(B)(ii) .............................................................................24

8 U.S.C. § 1254a(b)(3)(A) ..................................................................3, 17, 18, 22

8 U.S.C. § 1254a(c)(1)(iii) ....................................................................................2

8 U.S.C. § 1254a(c)(2)(B) .....................................................................................2

8 U.S.C. § 1254a(d)(4) ..........................................................................................2

28 U.S.C. § 2201 .................................................................................................16

INA section 244 .....................................................................................................7

**Other Authorities**

64 Fed. Reg. 524 (Jan. 5, 1999) ...........................................................................4

64 Fed. Reg. 526 (Jan. 5, 1999) ...........................................................................4

68 Fed. Reg. 23,744 (May 5, 2003) ......................................................................5

75 Fed. Reg. 24,734 (May 5, 2010) ................................................................5, 23

iii

75 Fed. Reg. 24,737 (May 5, 2010) ..................................................................5

76 Fed. Reg. 68,493 (Nov. 4, 2011) .................................................................5

80 Fed. Reg. 36,346 (June 24, 2015) ................................................................5

81 Fed. Reg. 30,325 (May 16, 2016) ..............................................................23

81 Fed. Reg. 74,470 (Oct. 26, 2016) ................................................................5

88 Fed. Reg. 40,294 (June 21, 2023) ............................................................6, 8

88 Fed. Reg. 40,304 (June 21, 2023) ............................................................6, 8

88 Fed. Reg. 40,317 (June 21, 2023) ......................................................6, 8, 23

88 Fed. Reg. 65,728 (Sept. 25, 2023) ...............................................................8

88 Fed. Reg. 69,945 (Oct. 10, 2023) ................................................................8

90 Fed. Reg. 19,217 (May 6, 2025) ..................................................................7

90 Fed. Reg. 20,309 (May 13, 2025) .............................................................7, 8

90 Fed. Reg. 23,697 (June 4, 2025) ..............................................................7, 8

90 Fed. Reg. 24,151 (June 6, 2025) ........................................................7, 14, 25

90 Fed. Reg. 28,760 (July 1, 2025) ..................................................................7

90 Fed. Reg. 30,086 (July 8, 2025) ........................................................7, 8, 25

90 Fed. Reg. 30,089 (July 8, 2025) ...............................................7, 8 14, 15, 25

90 Fed. Reg. 30,092 (July 8, 2025) ................................................................14

90 Fed. Reg. 43,225 (Sept. 8, 2025) .................................................................7

90 Fed. Reg. 45,398 (Sept. 22, 2025) ...............................................................7

90 Fed. Reg. 8443 (Jan. 29, 2025) ..........................................................6, 7, 17

90 Fed. Reg. 9040 (Feb. 5, 2025) ....................................................................7

90 Fed. Reg. 24153 (June 6, 2025) ...................................................................8

GAO, *Temporary Protected Status: Steps Taken to Inform and Communicate
      Secretary of Homeland Security's Decisions* (Apr. 2020) .................................3, 18

1

# **INTRODUCTION**

2       The decisions challenged in this action upended the lives of over 60,000 long-term lawful

3   residents of this country. Publicly available evidence, together with newly obtained discovery, leave

4   no doubt that Defendants' decisions to terminate Temporary Protected Status (TPS) for Honduras,

5   Nicaragua, and Nepal were not based on inter-agency consultation and an objective review of

6   country conditions as Congress required and as has long been standard agency practice. Instead,

7   Defendants decided to terminate TPS *before* consulting with the State Department or reviewing

8   country conditions. They then cherry-picked facts to support their preordained conclusion. In

9   addition, they relied on an incorrect interpretation of the TPS statute that also deviated from past

10   agency practice by refusing to take into account any conditions that were not directly related to the

11   crisis that triggered the country's original TPS designation.

12       Congress designed the TPS program to ensure that decisions about humanitarian protections

13   would be based on an objective analysis of country conditions rather than the whims of our domestic

14   politics. Defendants' termination decisions violate the express terms of the statute and contravene

15   congressional intent. This Court should grant Plaintiffs' motion, set aside the challenged

16   terminations, and grant declaratory relief because there is no genuine dispute of material fact as to

17   whether these decisions violate the Administrative Procedure Act: they do.

18   # **LEGAL STANDARD**

19       Summary judgment is appropriate when there is no genuine issue of material fact and the

20   moving party is entitled to judgment as a matter of law. *Sierra Club v. Bosworth*, 510 F.3d 1016,

21   1022 (9th Cir. 2007). Pursuant to Section 706 of the Administrative Procedure Act (APA), a court

22   "shall" "hold unlawful and set aside agency action" found to be, among other things, "(A) arbitrary,

23   capricious, an abuse of discretion, or otherwise not in accordance with law;" "(C) in excess of

24   statutory jurisdiction, authority, or limitations, or short of statutory right;" or "(D) without

25   observance of procedure required by law." 5 U.S.C. § 706.

26       The Ninth Circuit stayed this Court's order postponing the effective date of the challenged

27   terminations, but that order does not set the legal standard for purposes of this motion. The stay

28   order provided no reasoning and thus created no law. Even if it had, "a predictive analysis" in

1

1    connection with granting a stay "should not, and does not, forever decide the merits of the parties'

2    claims." *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 661 (9th Cir. 2021). Otherwise, a

3    hurried "pre-adjudication adjudication would defeat the purpose of a stay, which is to give the

4    reviewing court the time to 'act responsibly,' rather than doling out 'justice on the fly.'" *Leiva-Perez*

5    *v. Holder*, 640 F.3d 962, 967 (9th Cir. 2011) (quoting *Nken v. Holder*, 556 U.S. 418, 427 (2009));

6    *see also, e.g.*, *Singh v. Berger*, 56 F.4th 88, 109 (D.C. Cir. 2022) (explaining that even an express

7    finding as to likelihood of success when granting a stay "in no way prejudges" a party's "ability

8    going forward to" advocate "on the merits before the district court"). Moreover, two of the legal

9    issues on which Plaintiffs had to prevail in their Section 705 motion—concerning the balance of

10   equities and the scope of relief—are not at issue in this distinct Section 706 motion for partial

11   summary judgment.

## BACKGROUND

### A.    Congress's Statutory Scheme for TPS

14        "In enacting the TPS statute [in 1990], Congress designed a system of temporary status that

15   was predictable, dependable, and insulated from electoral politics." *Nat'l TPS All. v. Noem*, 150

16   F.4th 1000, 1008–1010 (9th Cir. 2025). Congress sought to fix "the Executive's prior ad hoc

17   framework for providing relief to nationals of certain designated countries," which lacked

18   transparency and clear criteria and was susceptible to "'the vagaries of our domestic politics.'" *Id.*

19   (quoting 135 Congr. Rec. H7501 (daily ed. Oct. 25, 1989)). With TPS, Congress "provided a new

20   statutory basis for the temporary protection of certain nationals of foreign countries, now with

21   explicit guidelines, specific procedural steps, and time limitations." *Id.*

22        To qualify for TPS, applicants must be "admissible" under certain provisions of U.S.

23   immigration law and not either "convicted of any felony or 2 or more misdemeanors" or a danger to

24   U.S. security. 8 U.S.C. § 1254a(c)(1)(iii), (c)(2)(B). While a country is designated for TPS, qualified

25   beneficiaries receive work authorization and protection from detention and removal, 8 U.S.C.

26   § 1254a(a)(1), (d)(4), regardless of whether they meet the requirements for asylum or other

27   immigration relief. *Id.* § 1254a(b)(1).

28        Consistent with Congress's goal of replacing the old, ad hoc system for humanitarian

2

immigration protection, a clear statutory framework governs TPS decisionmaking. Pursuant to the statute, the Secretary has substantial discretion as to initial TPS designations. By law, the Secretary "may designate" a country for TPS based on armed conflict, environmental disaster, or other extraordinary conditions. 8 U.S.C. § 1254a(b)(1). So long as she determines certain conditions exist, she may choose whether and when to designate a country.

In contrast, the statute strictly limits the Secretary's discretion after designation, with clear rules governing the process for conducting a periodic review and mandatory criteria for deciding whether to extend or terminate. *Id.* § 1254a(b)(3). "[A]t least 60 days before [the] end" of any "period of designation," the Secretary "shall" conduct a "periodic review" to determine whether designation remains warranted. *Id*. During the periodic review, the Secretary must "consult[]with appropriate agencies" and "review the conditions in the foreign state" to "determine whether the conditions for such designation . . . continue to be met." *Id.* § 1254a(b)(3)(A). Unless the Secretary determines that a country no longer meets the conditions for designation, its designation "is extended." *Id.* § 1254a(b)(3)(C).

During a typical periodic review of a TPS designation, the USCIS Refugee, Asylum and International Operations Directorate (RAIO) prepares a country conditions report. *See Ramos v. Nielsen*, 336 F. Supp. 3d 1075, 1082 (N.D. Cal. 2018) (describing process); *Saget v. Trump*, 375 F. Supp. 3d 280, 298–301 (E.D.N.Y. 2019) (same); *Nat'l TPS All. v. Noem*, No. 25-cv-1766, Dkt. 279 at 7–10 (N.D. Cal. Sept. 5, 2025) (same).[1] The State Department also provides a country conditions report (relying on input from the relevant regional bureaus) along with a recommendation on whether to extend or terminate the TPS designation. *See, e.g.*, Ex. 40 (2024 State Department country conditions report for Nicaragua); Ex. 50 at DPP_00003882–DPP_00003884 (State Department Country Conditions for Nicaragua in 2015) *and* Ex. 51 at DPP_00005425–DPP_00005431 (same for El Salvador in 2016) *with* Ex. 35 (2025 State Department recommendation letter for Honduras lacking any accompanying country conditions report). Then, the USCIS Office of Policy & Strategy (OP&S) prepares a Decision Memo—a detailed and

---

[1] *See also* GAO, *Temporary Protected Status: Steps Taken to Inform and Communicate Secretary of Homeland Security's Decisions*, 16–18, 27 (Apr. 2020) ("GAO Report").

substantiated recommendation from USCIS to DHS—based on the RAIO country conditions report, the State Department recommendation and country conditions report, and information from other DHS and USCIS components. The OP&S Chief reviews and approves the Decision Memo before presenting it to the USCIS Director who sends a final, signed Decision Memo to the DHS Secretary, along with the State Department's recommendation. The Secretary makes a final decision informed by the recommendation in the USCIS Decision Memo and consultation within DHS and with other agencies. She then signs a written memorandum or notice documenting the decision. Finally, DHS publishes the decision in the Federal Register.

During the periodic review, DHS has historically considered the full range of conditions impacting a country, rather than limiting its review to conditions related to the crisis that triggered initial designation. *See Saget*, 375 F. Supp. 3d at 350 ("The DHS Secretary, DHS, and USCIS had a longstanding practice of considering all country conditions when undertaking the mandatory periodic review under the statute, regardless of their relation to the originating condition."). "Intervening factors arising after a country's original TPS designation … were considered relevant to determining whether a country continued to meet the conditions for continuing TPS designation." *Ramos*, 336 F. Supp. 3d at 1093. *See also* Ex. 46 (testimony of former USCIS Director Leon Rodriguez); Ex. 52 (Declaration of Mr. Rodriguez); Ex. 50 at DPP_00003865–DPP_00003869 (2016 Nicaragua Decision Memo recommending extension based on "Hurricane Mitch *and subsequent environmental disasters*"); Ex. 51 at DPP_00005404–DPP_00005408 (2016 El Salvador Decision Memo recommending extension based on "a series of earthquakes in 2001 *and subsequent environmental disasters*" (emphasis added)).

### B. TPS Designations for Honduras, Nicaragua, and Nepal

Honduras and Nicaragua were originally designated for TPS on January 5, 1999 by Attorney General Janet Reno after Hurricane Mitch killed thousands of people, crippled infrastructure, and caused massive economic damage. 64 Fed. Reg. 524 (Jan. 5, 1999) (Honduras); 64 Fed. Reg. 526 (Jan. 5, 1999) (Nicaragua). Each country's designation was subsequently extended over a dozen times based on their slow recovery from the devastating hurricane as well as other social, economic environmental, and infrastructural challenges that were not related to the hurricane. For instance,

decisions to extend TPS for Honduras cited environmental disasters that occurred after Hurricane Mitch, 68 Fed. Reg. 23,744 (May 5, 2003), a "deteriorating economy," and a "political crisis" that "significantly reduc[ed] economic activity." 75 Fed. Reg. 24,734, 24,735 (May 5, 2010). Extensions for Nicaragua cited factors such as "chronic poverty," 75 Fed. Reg. 24,737, 24,738 (May 5, 2010), and problems of governance and "political tension." 76 Fed. Reg. 68,493, 68,495 (Nov. 4, 2011).

Nepal was first designated for TPS by Secretary Jeh Johnson on June 24, 2015, after a 7.8 magnitude earthquake and a number of significant aftershocks struck the country, killing nearly 9,000 people, injuring more than 20,000 people, displacing millions, and destroying or significantly damaging over 750,000 homes. 80 Fed. Reg. 36,346 (June 24, 2015). On October 26, 2016, DHS extended Nepal's designation for eighteen months. 81 Fed. Reg. 74,470 (Oct. 26, 2016). The extension took into account a variety of factors and conditions that arose subsequent to the original designation—many of which were unrelated to the earthquakes, including civil unrest, the obstruction of crossings at the Nepal-India border, and inadequate sanitation. *Id.*

C.    **Defendants' Project to End TPS and the Preordained Termination of TPS for Honduras, Nicaragua, and Nepal**

Between 2017 and 2018, during the first Trump administration, DHS announced terminations of TPS designations for six countries, including Honduras, Nicaragua, and Nepal. Litigation and congressional investigations subsequently revealed the termination decisions were not based on an objective review of country conditions—as required by statute and consistent with the past practice over numerous administrations, both Democratic and Republican—but rather were part of a "predetermined presidential agenda to end TPS." *Ramos*, 336 F. Supp. 3d at 1094–1099. To facilitate termination, the first Trump administration adopted a new interpretation of the TPS statute. On that approach, periodic review was limited to assessing a country's recovery from the specific crisis that triggered its initial designation, while ignoring other conditions. The two district courts to consider the legality of this approach found that it constituted an unexplained break with past practice and therefore violated the APA. *Id.* at 1092–97 ("DHS made a deliberate choice to base the TPS decision solely on whether the originating conditions or conditions directly related thereto persisted, regardless of other current conditions no matter how bad, and that this was a clear

1  departure from prior administration practice."); *Saget*, 375 F. Supp. 3d at 351–61. The resulting

2  court orders prevented the terminations from going into effect.

3        On June 21, 2023, during the Biden administration, DHS rescinded the TPS terminations for

4  Honduras, Nicaragua, and Nepal and extended each country's designation. The rescission decisions

5  extensively critiqued the flawed country conditions analysis in the termination decisions. *See* 88 Fed.

6  Reg. 40,304 (June 21, 2023) (Honduras); 88 Fed. Reg. 40,294 (June 21, 2023) (Nicaragua); 88 Fed.

7  Reg. 40,317 (June 21, 2023) (Nepal). The extensions were based on a variety of conditions,

8  including conditions that were unrelated to the crises that had precipitated the original designations.

9  *See* 88 Fed. Reg. 40,304 (extending TPS for Honduras based in part on "more recent environmental

10  disasters," "violence and social and political concerns"); 88 Fed. Reg. 40,294 (extending TPS for

11  Nicaragua and finding "political instability and a humanitarian crisis … continue to render the

12  country temporarily unable to adequately handle the return of its nationals"); 88 Fed. Reg. 40,317

13  (extending TPS for Nepal and taking into account subsequent earthquakes, droughts, floods, and

14  impacts of Russia's war on Ukraine).

15        After taking office, the second Trump administration quickly resumed its efforts to end TPS,

16  notwithstanding the statute's mandate that designations be extended unless the country no longer

17  meets the conditions for designation. Defendants publicly announced their intent to end the TPS

18  program wholesale. At Secretary Noem's confirmation hearing—"before [she] reviewed any country

19  conditions reports," Dkt. 73 at 21—she testified that TPS extensions will not be allowed to "go[]

20  forward the way that they are." Ex. 1 at 104:3–105:2. Her testimony was consistent with President

21  Trump and Vice President Vance's promise during their campaign to "revoke" TPS. Ex. 2 at 14:18–

22  16:7.

23        Once in office, President Trump operationalized his TPS policy via Executive Order 14159,

24  titled, "Protecting the American People Against Invasion." 90 Fed. Reg. 8443 (Jan. 29, 2025)

25  ("Invasion E.O."). The Invasion EO states that "[m]any" non-citizens who are unlawfully present in

26  this country pose "significant threats to national security and public safety" and are "committing vile

27  and heinous acts against innocent Americans." *Id.* § 1. To address this, the Invasion E.O. directs the

28  Secretary of State, Attorney General, and DHS Secretary to "rescind the policy decisions of the

previous administration that led to the increased or continued presence of illegal aliens in the United States, and align any and all departmental activities with the policies set out by this order and the immigration laws." *Id.* § 16. This includes "ensuring that designations of Temporary Protected Status are consistent with the provisions of section 244 of the INA (8 U.S.C. § 1254a), and that such designations are appropriately limited in scope and made for only so long as may be necessary to fulfill the textual requirements of that statute." *Id.* § 16(b).

Secretary Noem has interpreted the Invasion E.O. as a directive to "rescind" TPS designations generally. *See, e.g.*, Ex. 4. Nine days after President Trump issued the Invasion E.O., she issued the first TPS termination of her tenure. In an unprecedented decision, she purported to "vacate" the prior Secretary's extension of TPS for Venezuela—the first rescission of an extension in the program's 35-year history—and then terminated Venezuela's designation. *Nat'l TPS All.*, No. 25-cv-1766, Dkt. 279 at 1–2, 12–15. She explained her decisions as follows: "When the president gives a directive, the Department of Homeland Security will follow it …. [W]e are getting direction on how this [TPS] works from the direction of the president of the United States. And he is pausing the program to re-evaluate." Ex. 5 at 4–5. Secretary Noem went on to terminate TPS for over 1.5 million people from eight countries: Venezuela, Afghanistan, Cameroon, Nepal, Haiti, Honduras, Nicaragua, and Syria.[2] Her termination decisions repeatedly concluded that TPS holders could safely return to live in countries the State Department deems too dangerous to even visit. Ex. 6 (warning against travel to Afghanistan); Ex. 7 (warning against travel to Venezuela); Ex. 8 (advising reconsideration of travel to Honduras); Ex. 9 (advising reconsideration of travel to Nicaragua); Ex. 10 (warning against travel to Syria).

---

[2] *See* 90 Fed. Reg. 9040 (Feb. 5, 2025) (Venezuela, 2023 Designation); 90 Fed. Reg. 20,309 (May 13, 2025) (Afghanistan); 90 Fed. Reg. 23,697 (June 4, 2025) (Cameroon); 90 Fed. Reg. 24,151 (June 6, 2025) (Nepal); 90 Fed. Reg. 28,760 (Jul. 1, 2025) (Haiti); 90 Fed. Reg. 30,086 (July 8, 2025) (Nicaragua); 90 Fed. Reg. 30,089 (July 8, 2025) (Honduras); 90 Fed. Reg. 43,225 (Sept. 8, 2025) (Venezuela, 2021 Designation); 90 Fed. Reg. 45,398 (Sept. 22, 2025) (Syria). The only TPS-designated country that has come up for review during Secretary Noem's tenure that has not been terminated is South Sudan. Secretary Noem failed to make any decision regarding South Sudan's designation before the statutory timeline. 90 Fed. Reg. 19,217 (May 6, 2025). As a result, its designation was automatically extended for six months. However, the notice automatically extending TPS for South Sudan presumed an imminent termination: "During this period, beneficiaries are encouraged to prepare for their return to South Sudan[.]" *Id.* at 19,217. There are only approximately 200 South Sudanese TPS holders. *Id.* at 19,218.

1    Defendants have described these TPS terminations as "part of President Trump's promise to

2    rescind policies that were magnets for illegal immigration and inconsistent with the law." Ex. 4. In

3    their view, TPS designations compromise the "integrity" of "our immigration system." Ex. 11 (DHS

4    press release stating that terminating TPS for Afghanistan "is a key part of restoring integrity in our

5    immigration system"); Ex. 12 (DHS press release stating that terminating TPS for Nicaragua

6    "restores integrity in our immigration system"). Secretary Noem has equated TPS holders with "MS-

7    13 gang members," "known terrorists," and "murderers." Ex. 13. *See also* Ex. 14 (associating

8    Honduran "migration management" with "sav[ing] American lives and get[ting] criminals off our

9    streets!").

10    Defendants' TPS termination decisions consistently omit any mention of conditions that had

11    formed the basis for prior TPS extensions for the country at issue. *Compare* 88 Fed. Reg. 40,304

12    (June 21, 2023) (considering widespread "political violence" and "staggering levels of crime" in

13    Honduras) *with* 90 Fed. Reg. 30,089 (July 8, 2025) (making no mention of political violence or

14    crime in Honduras); 88 Fed. Reg. 40,294 (June 21, 2023) (considering "political instability and a

15    humanitarian crisis" in Nicaragua) *with* 90 Fed. Reg. 30,086 (July 8, 2025) (failing even to mention

16    political stability or humanitarian situation in Nicaragua); 88 Fed. Reg. 40,317 (June 21, 2023)

17    (considering food insecurity and lack of access to sanitation in Nepal) *with* 90 Fed. Reg. 24153 (June

18    6, 2025) (not considering food security or access to sanitation in Nepal); 88 Fed. Reg. 69,945 (Oct.

19    10, 2023) (considering human rights abuses, food insecurity, a cholera epidemic, and ongoing mass

20    displacement in Cameroon) *with* 90 Fed. Reg. 23,697 (June 4, 2025) (entirely ignoring human rights,

21    food security, infectious diseases, or displacement in Cameroon); 88 Fed. Reg. 65,728 (Sept. 25,

22    2023) (considering "worsening" human rights "crisis," "unprecedented deterioration of women's

23    rights," and "sexual violence against women and girls [that] occurs regularly" in Afghanistan) *with*

24    90 Fed. Reg. 20,309 (May 13, 2025) (making no mention of human rights or rights of women and

25    girls in Afghanistan). Even where the prior extension decision was made only a few weeks before

26    Defendants' termination—as was true in the case of Venezuela—Defendants ignored conditions that

27    agency decisionmakers had previously deemed relevant, even where they had served as the basis for

28    the prior extension. *Compare also* Ex. 15 (Jan. 9, 2025 Decision Memo for Venezuela) (concluding

8

Venezuela continues to meet conditions for TPS designation, and considering, inter alia, political repression, human rights, and food security) *with* Ex. 16 (Jan. 31, 2025 Decision Memo for Venezuela) (concluding Venezuela no longer meets conditions for TPS designation, without discussing political repression, human rights, or food security).

Discovery has confirmed that Defendants did not engage in the statutorily-required inter-agency consultation or country conditions review before deciding to terminate TPS for Honduras, Nicaragua, and Nepal.[3] Instead, TPS subject matter experts drafted TPS Decision Memos recommending termination *before* reviewing USCIS country conditions reports. As of April 7, OP&S had already "written [Decision Memos] for termination." Ex. 30 (April 7 email). They sought country conditions reports from the RAIO Research Unit only *after* that date. Ex. 19 (April 8 email from OP&S identifying that OP&S is lacking country conditions/country of origin information ("COI") from RRU for Honduras and Nicaragua, even though OP&S "drafted decision memos for both countries"). *See also* Ex. 20 (April 8 email from OP&S requesting country conditions/country of origin information for Nicaragua and Honduras from RAIO Research Unit ("RRU")). The RAIO Research Unit had sent the Honduras country conditions memo before April 7, but the TPS subject matter experts had apparently not reviewed it. *See id.* RAIO sent the Nicaragua country conditions memo on April 10, after the Nicaragua Decision Memo had already been drafted with a recommendation "for termination." Ex. 30; Ex. 42 (Nicaragua country conditions report dated April 10, 2025); Ex. 43 at NTPSA2_00002439–NTPSA2_00002441 (Honduras country conditions report finalized on March 21, 2025 and Nicaragua country conditions report finalized April 10, 2025); Ex. 44 (Nicaragua country conditions report only submitted the afternoon of April 10, 2025).

DHS also decided to terminate TPS for Honduras, Nicaragua, and Nepal without receiving contemporaneous State Department country conditions memoranda or—in the case of Nicaragua and Nepal—even contemporaneous State Department recommendations regarding each country. Dkt. 63 (Nicaragua CAR index with no record of any letter from Secretary Rubio related to Nicaragua); Dkt.

---

[3] Defendants have withheld hundreds of documents which are currently subject to a discovery dispute. Dkts. 129, 130. The parties have stipulated that Plaintiffs may introduce any late-produced documents along with their reply brief if the Court orders production after the date by which Plaintiffs could incorporate them into this motion. Dkt. 141.

64 (same for Nepal). DHS senior personnel as well as USCIS' TPS subject matter experts recognized that the usual State Department recommendation and country conditions report that forms part of the periodic review was lacking. They actively, and repeatedly, sought an analysis and recommendation from the State Department, without success. Ex. 30 (April 7: noting that the TPS periodic review for Honduras and Nicaragua lacked updated State Department recommendation letters and country conditions memoranda); Ex. 31(April 8: "Can you check with State on Honduras and Nicaragua?"); Ex. 41 (April 8, after receipt of State Department letter regarding Honduras: "any update on Nicaragua?"); Ex. 53 (April 3, 4 and 7: DHS senior counselor repeatedly requesting TPS consultation letters for Nicaragua and Honduras from State Department); Ex. 54 (April 10: "we have a State rec for Nicaragua from 2024, not 2025"). When they submitted the final TPS "package" to DHS for the Secretary's decision, without the Nicaragua State Department recommendation, they presumed that the State Department recommendation would be incorporated into the Secretary's review; it was neither drafted nor considered. Ex. 37 (April 24: "Please find attached the Honduras and Nicaragua decision memo packages for DO review. I believe you have (or will have) the DOS letters to add to the respective packages."); Ex. 36 (April 24: acknowledging that the State Department has not provided an updated recommendation on Nicaragua's designation); Ex. 33 (April 24: DHS expressing concern that they did not receive a letter from the State Department about Nicaragua close to the May 6 deadline for the decision); Dkt. 63 (CAR index with no record of any letter from Secretary Rubio related to Nicaragua ever provided).

For Nicaragua and Nepal, no State Department input was ever forthcoming—the *only* State Department input in the record consists of dated assessments from the prior administration. Defendants repeatedly tried to obtain new State Department input on Nicaragua, which Secretary of State Blinken had recommended extending and redesignating based on ongoing effects of Hurricane Mitch as well as other, unrelated conditions. Ex. 47. *See also* Ex. 40 (detailed 12-page country conditions analysis justifying the recommendation). In contrast, Defendants were content to "move forward" on Nepal without seeking an updated State Department recommendation because Secretary Blinken's recommendation had been to terminate, Ex. 32, which was consistent with the Trump Administration's desired end result. Ex. 27 (March 11: OP&S Chief noting that there was no State

Department letter regarding Nepal from this administration but "the recommendation was to terminate so we should move forward"). USCIS senior personnel nonetheless still recognized that a contemporaneous State Department letter is typically part of the TPS periodic review and was lacking for Nepal. Ex. 34 (April 2: "Thus far, we don't have an updated DOS report, but the report DOS sent in January under the prior administration recommended termination w/ an 18-month delayed effective date.").

Honduras was the sole country for which the State Department provided an updated recommendation letter, but that letter was itself a very sharp break with past practice. Ex. 35. Secretary of State Rubio recommended termination of TPS for Honduras on the ground that the country's designation is "'contrary to national interest of the United States'…because it encourages and facilitates mass migration" and "does not champion core American interests or put America and American citizens first." *Id*. The only reference in Secretary Rubio's letter to country conditions in Honduras was a single sentence: "Honduras has recovered sufficiently from the temporary disruption in living conditions that resulted from the environmental disaster caused by Hurricane Mitch in 1999 such that Honduras can adequately handle the return of its nationals." *Id*.

In addition, the final Decision Memos for Honduras, Nicaragua, and Nepal addressed only country conditions related to the *original* reason for the country's TPS designation. Each Decision Memo explicitly stated that the country must "continue[] to experience an environmental disaster" in order to warrant extension:

> Honduras's TPS designation is based upon an environmental disaster provision in the TPS statute. That provision requires a determination that (1) Honduras continues to experience an environmental disaster; (2) the disaster is causing a substantial, but temporary, disruption in the affected area; (3) Honduras is unable, temporarily, to adequately handle the return of its nationals; and (4) Honduras officially requested a TPS designation.

Ex. 55 at NTPSA2-0000011 (Honduras); Ex. 45 at NTPSA2-00000123 (same for Nicaragua); Ex. 18 at NTPSA2-0000028–29 (same for Nepal). The agency then recommended termination for each country on the ground that the *original natural disaster* no longer causes a substantial disruption of living conditions which prevents the country from being able to "handle adequately the return of its nationals." Ex. 55 at NTPSA2-0000011–12 ("the conditions *resulting from Hurricane Mitch* no

11

1   longer cause a substantial, but temporary, disruption of living conditions in the area affected, and

2   Honduras is no longer temporarily unable to handle adequately the return of its nationals. Honduras

3   has made significant progress recovering from the hurricane's destruction and is now a popular

4   tourism and real estate investment destination.") (emphasis added); Ex. 45 at NTPSA2-00000123

5   ("the conditions *resulting from Hurricane Mitch* no longer cause a substantial, but temporary,

6   disruption of living conditions, and Nicaragua is able to handle adequately the return of its

7   nationals") (emphasis added); Ex. 18 at NTPSA2-0000028–29 ("the impacts of *the 2015 earthquake*

8   that were the basis for the initial 2015 TPS designation no longer prevent Nepal's nationals from

9   returning in safety") (emphasis added).

10          Even where prior TPS extensions—and Defendants' own country conditions analysis and

11  other direct evidence—identified *other* country conditions relevant to whether TPS holders could

12  safely return, the agency ignored these conditions unless they were tied to the original reason for the

13  country's designation. For instance, the career officials who prepared the USCIS country conditions

14  memo for Honduras discussed widespread violence in the country, including political violence, as

15  well as issues related to rampant corruption, a dengue outbreak, and severe poverty and inequality.

16  Ex. 28 ("Honduras remained 'the most violent country in Central America,'" and was categorized by

17  the State Department as a Level 3 or 4 travel country—recommending that Americans "Reconsider

18  Travel" to the country and "Do not travel" to specific regions). USCIS experts also compared

19  country conditions at different time points and expressly noted that, as of May 1, 2025, "Honduras is

20  not considered safe for returning nationals, especially those vulnerable to gang violence, political

21  persecution, or economic hardship." Ex. 29 at NTPSA2_00000095. Honduras' Foreign Minister also

22  wrote a letter urging extension of TPS for Honduras as "[a] sudden and massive return of TPS

23  beneficiaries could not be accommodated," "would place a significant burden on Honduras's

24  economic and social infrastructure," and could serve as "a tool for national destablilization." Ex. 26.

25  However, the officials who drafted the Decision Memo did not even mention any of these country

26  conditions referenced by the country conditions experts or the Honduran Foreign Minister, let alone

27  address them; the Decision Memo recommended termination solely because Hurricane Mitch no

28  longer caused a disruption in living conditions. Ex. 55 at NTPSA2-0000011–12.

1    Likewise, the career officials who prepared the USCIS country conditions memo for

2  Nicaragua discussed at length the country's descent into authoritarianism, rampant human rights

3  violations, extreme persecution, and widespread poverty. Ex. 42 at NICAR000021–22 ("'The rule of

4  law collapsed [in 2018]'" and by 2024 Nicaragua had become "'a police state' and the country's

5  'political, social and human rights crisis' continu[es] 'to deepen'" and, according to a 2025 report,

6  "no independent institutes remain, opposition voices are silenced, and the population … faces

7  persecution, forced exile, and economic retaliation.'"). For Nicaragua, as for Honduras, USCIS

8  compared country conditions at different time points and expressly stated, as of May 1, 2025, that

9  "political instability and a humanitarian crisis [] continue to render the country temporarily

10  inadequate to handle the return of its nationals." Ex. 48 at NicAR0000044. But this conclusion, and

11  the detailed analysis on which it was based, was ignored by the officials who drafted the final

12  Decision Memo. The Decision Memo quickly concluded that the conditions resulting from

13  Hurricane Mitch no longer disrupted the ability of nationals to safely return, citing some evidence of

14  tourism, visa requests by Nicaraguans in the United States, and ongoing deportations while making

15  no mention of the massive problems described in the detailed country conditions report. Ex. 45.

16  Even the Decision Memo's conclusion that there were no continuing effects from Hurricane Mitch

17  conflicted with the agency's country conditions research, which in fact identified that "several

18  sectors … remained severely impacted" by Hurricane Mitch and information "regarding any

19  potentially ongoing impacts" of Hurricane Mitch was otherwise unavailable due to the on-going

20  crisis in Nicaragua. Ex. 48 at NicAR000044–45; Ex. 42 at NicAR0000021.

21    As to Nepal, the career experts who prepared the RAIO country conditions report noted that a

22  2023 earthquake and 2024 flash floods had "led to disruptions in water systems"; "inadequate

23  sanitation, with increased cases of waterborne diseases"; and food insecurity. Ex. 21. But, in a

24  familiar pattern, the USCIS Decision Memo ignored these findings and instead focused exclusively

25  on the "impacts of the 2015 earthquake" that had been the original basis for Nepal's designation. Ex.

26  18.

27    The Honduras, Nicaragua, and Nepal terminations were being "track[ed]" by the White

28  House. Ex. 25. Senior officials moved urgently to finalize them, seeing it as "an Administration

priority." Ex. 24 (Nepal); Ex. 23 (Nicaragua); Ex. 17 (Honduras described as "an Administration priority," but "Honduras" mistakenly described as "Haiti").

Secretary Noem signed the Decision Document terminating TPS for Nepal on April 23, 2025. Ex. 18 at NTPSA2-000000033. The agency announced the decision 43 days later, on June 5, and published the Federal Register notice on June 6, granting only 60 days for Nepali TPS holders to transition out of TPS status after a decade with TPS. 90 Fed. Reg. at 24,154 (June 6, 2025) (Nepal designation set to expire on August 5, 2025).

Secretary Noem signed the Decision Documents terminating TPS for Honduras and Nicaragua on May 5, 2025. Ex. 55 at NTPSA2-0000016 (Honduras); Ex. 45 at NTPSA2_00001127 (Nicaragua). The agency announced the decisions 63 days later, on July 7, 2025—two days after the end date of the prior designation. 90 Fed. Reg. 30,092 (July 8, 2025) (Honduras designation set to expire on July 5, 2025); 90 Fed. Reg. 30,089 (July 8, 2025) (same for Nicaragua). The agency published the Federal Register notices terminating TPS for Honduras and Nicaragua on July 8, granting only 60 days for Honduran and Nicaraguan TPS holders to transition out of TPS status after 26 years with TPS. *Id.*

### D.    The Effect of Defendants' TPS Terminations

The termination of TPS for Honduran, Nicaraguan, and Nepali TPS holders has been devastating. All have lived in the United States for at least 26 years (in the case of Honduras and Nicaragua) or at least a decade (in the case of Nepal). They have built families, homes, and lives here; have had stable employment and in some cases built businesses and employed workers; and have been active community members. Garcia Dec. ¶¶ 7, 13; Shahi Dec. ¶¶ 9, 13. Many have minor U.S. citizen children who depend on them, and who have only ever lived in the United States. Garcia Dec. ¶ 8 (half of Honduran and Nicaraguan TPS holders in a survey had at least one child at home and more than a quarter had two or more minor dependents); Shahi Dec. ¶ 9 (one-third of Nepali survey respondents had at least one U.S. citizen child).[4]

---

[4] The National TPS Alliance (NTPSA) and United for TPS Nepal (UTPSN), an organization founded to support Nepali TPS holders, conducted voluntary surveys of their members to understand the effect of the termination of TPS on the Honduran, Nicaraguan and Nepali TPS community.

Stability, employment, health care, and security has been ripped from TPS holders and their families overnight. *Id.* Honduran, Nicaraguan, and Nepali TPS holders have reported losing employment, having to sell businesses, being unable to pay rent and mortgage payments, losing essential medical care and specialized educational services for their children, and suffering depression, anxiety, fear, and "terror." *See generally* Garcia Dec. & Shahi Dec.

Large numbers of Honduran, Nicaraguan, and Nepali TPS holders have lost all of their regular income almost immediately following the termination of TPS. Garcia Dec. ¶¶ 10, 19, 29–30 (nearly half of Honduran and Nicaraguan TPS holders from whom Garcia collected data); Shahi Dec. ¶¶ 11, 28 (60 percent of Nepalis). Small business owners have had to abandon businesses. Garcia Dec. ¶¶ 13–14, 50–51; Shahi Dec. ¶ 13. The economic hardships have severely affected TPS holders as well as U.S. citizen and lawful permanent resident family members who depend on them. *See, e.g.*, Garcia Dec. ¶¶ 22, 39–41 (caregiver unable to support disabled U.S. citizen mother; another unable to support custodial grandchild); P.C. Dec. ¶ 6; S.F. Dec. ¶¶ 16–18, 20 (high school age daughter working to cover family expenses); Miralda Dec. ¶¶ 2–3 (15-year-old with severe birth defects no longer able to access essential treatments due to his father's loss of TPS); A.Q. Dec. ¶¶ 4–5 (TPS holder unable to provide expenses for U.S. citizen elderly mother and younger brother).

Many Honduran, Nicaraguan, and Nepali former TPS holders have lost their health insurance as a result of the TPS termination; and as a result, they and their dependents no longer have access to essential health care, leading some to already forgo essential treatment. Garcia Dec. ¶¶ 15, 28, 52–53, 55, 61–63; Shahi Dec. ¶¶ 14–16, 30, 33, 38, 56, 60; Miralda Dec. ¶ 5; P.C. Dec. ¶¶ 9, 14 (autistic son unable to receive essential therapies); S.F. Dec. ¶¶ 2, 10–13 (breast cancer survivor unable to access treatment); S.P. Dec. ¶¶ 1, 8–10, 12–13 (one-year-old U.S. citizen daughter with birth defect deprived of essential health care).

Honduran, Nicaraguan, and Nepali TPS holders have been "immobilized by fear"—afraid to drive, go outside, pick up their children, or go to the store for fear of being detained or deported. Garcia Dec. ¶¶ 16–17, 20, 23, 56, 59; Shahi Dec. ¶¶ 17–20, 25, 34, 39, 57, 61; P.C. Dec. ¶ 8; S.F.

Garcia Dec. ¶ 6 (522 Honduran and Nicaraguan TPS holder survey respondents); Shahi Dec. ¶ 6 (212 Nepali TPS holder survey respondents).

1  Dec. ¶¶ 19, 21; Miralda Dec. ¶¶ 7–8; S.P. Dec. ¶ 15. There are also TPS holders who have lost their

2  pathway to permanent legal status because it is contingent on their maintaining lawful immigration

3  status, which they no longer have. *See, e.g.*, Shahi Dec. ¶¶ 29, 45, 56; S.P. Dec. ¶ 14.

4  **I.     The Terminations of TPS for Honduras, Nicaragua, and Nepal Violate the APA**

5         The challenged terminations violate the APA for two separate, independent reasons. First, the

6  Secretary did not comply with the TPS statute's requirement that TPS decisions be based on inter-

7  agency consultation and an objective review of country conditions; instead, she based her decisions

8  on a preordained, political decision to terminate TPS designations across the board. Second, the

9  Secretary failed to consider the full range of conditions bearing on whether the country could

10  adequately handle the return of its nationals in violation of the TPS statute, in an unexplained break

11  with past practice. Each of these violations independently requires this Court to "hold unlawful and

12  set aside" the challenged terminations, 5 U.S.C. § 706, the declare them unlawful. 28 U.S.C. § 2201.

13         **A.     The Terminations Were Predetermined and Without Observance of Procedure
              Required by Law**

14

15         The TPS statute requires that TPS decisions be made after and based on "consultation with

16  appropriate agencies" and a "review [of] the conditions in the foreign state." 8 U.S.C.

17  § 1254a(b)(3)(A). TPS decisions that are "preordained" or based on "political influence," rather than

18  country conditions, violate the APA. *See Saget*, 375 F. Supp. 3d at 345–46 (quoting 5 U.S.C.

19  § 706(2)(A)). "[P]retextual" justifications cannot save such decisions. *Id.* "The reasoned explanation

20  requirement of administrative law … is meant to ensure that agencies offer genuine justifications for

21  important decisions, reasons that can be scrutinized by courts and the interested public. Accepting

22  contrived reasons would defeat the purpose of the enterprise." *Dep't of Com. v. New York*, 588 U.S.

23  752, 785 (2019). *See also Tummino v. Torti*, 603 F. Supp. 2d 519, 544 (E.D.N.Y. 2009) (where

24  "political pressure was intended to and did cause the agency's action to be influenced by factors not

25  relevant under the controlling statute," reviewing courts must set aside the action in question)

26  (quoting *Town of Orangetown v. Ruckelshaus*, 740 F.2d 185, 188 (2d Cir. 1984)).

27         This Court already found that Defendants likely did not comply with the TPS statute when

28  terminating TPS for Honduras, Nicaragua and Nepal: "[T]he Secretary's TPS Nepal, Honduras, and

16

Nicaragua terminations were based on a preordained determination to end the TPS program, rather than an objective review of the country conditions." Dkt. 73 at 21. Discovery has confirmed this Court's prediction was correct. Accordingly, the challenged terminations must be set aside. *See* 5 U.S.C. § 706(2)(D) ("The reviewing court shall . . . hold unlawful and set aside agency action … found to be … without observance of procedure required by law").

### 1.    *Defendants Made a Preordained Decision to Terminate TPS*

Defendants' public statements regarding TPS and TPS holders; indiscriminate termination of TPS for all countries, no matter how unsafe; and massive irregularities in Federal Register notices announcing terminations evince the preordained nature of this administration's TPS decisions. *See* Background, *supra*. *See also* Dkt. 73 at 20–23. Secretary Noem's own explanations for her TPS terminations show she understands the Invasion E.O, in the context of President Trump and Vice President Vance's campaign promises to 'revoke" TPS, Ex. 2 at 14:18–16:7, Ex. 3, as a directive to "rescind" TPS designations because they purportedly promote the "presence of illegal aliens" and are not "align[ed] … with the policies set out by [the Order] and the immigration laws." 90 Fed. Reg. 8443, 8446 (Jan. 29, 2025). *See* Background *supra* (citing Exs. 5, 11, 12, in which Defendants described TPS terminations as necessary to follow President Trump's directives and restore "integrity" to the immigration system). In order to justify the preordained decision to terminate TPS, Defendants' termination notices have consistently ignored entire categories of conditions relevant to whether TPS remains warranted. *See* Dkt. 73 at 22; Background, *supra* (comparing this administration's termination decisions with TPS decisions of prior administrations and State Department country conditions assessments in the context of travel advisories; and comparing country conditions memos drafted to inform the TPS periodic review process with Decision Memos recommending termination, ignoring the extensive country conditions analyses prepared by agency experts). Defendants' atypical decisions show they have "sidestepped the review process required by the TPS statute." *See also Saget*, 375 F. Supp. 3d at 349–53 (finding omission of certain country conditions information was evidence DHS Secretary failed to follow statutory process when terminating TPS for Haiti during the first Trump Administration).

### 2. Defendants Did Not Base their Termination Decisions on Interagency Consultation or Country Conditions Review

Discovery has confirmed that Defendants failed to comply with the TPS statute's procedural requirements: they did not consult with "appropriate agencies" or review country conditions before deciding to terminate TPS for Honduras, Nicaragua, and Nepal. 8 U.S.C. § 1254a(b)(3)(A) ("the [Secretary], *after* consultation with appropriate agencies of the Government, shall review the conditions in the foreign state . . . and shall determine whether the conditions for [TPS] designation continue to be met") (emphasis added).

For decades, DHS's standard practice has been to consult with the State Department on TPS decisions. "Because of its vast network of foreign service officers," the State Department "is in a position to report effectively on local country conditions." *Saget*, 375 F. Supp. 3d at 298. *See also* GAO Report at 8, 16, 18–19; Ex. 43 at 3–4 (stating that State Department typically sends country conditions recommendations to OP&S, which shares it with RAIO). The purpose of consultation is to inform the Secretary's assessment of whether the country conditions at the time of the periodic review warrant termination or extension. Thus, consultation must be contemporaneous and must concern country conditions. *See Cal. Wilderness Coal. v. U.S. Dep't of Energy*, 631 F.3d 1072, 1088 (9th Cir. 2011) (collecting cases defining agency consultation requirements and noting the consultation is an "affirmative duty," that must be "meaningful" and occur before making a decision); *Campanale & Sons, Inc. v. Evans*, 311 F.3d 109, 11920 (1st Cir. 2002) (holding letters were insufficient to establish that agency complied with statutory consultation requirement); *see generally Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997) (plain meaning of statutory language determined by reference to the specific context in which the language is used and the broader context of the statute as a whole).

In past practice, the State Department has provided DHS with two contemporaneous documents to inform the Secretary's country conditions assessment: (1) a country conditions memo, and (2) a recommendation letter. *See* Background, *supra*. Here, the State Department failed to provide either for Nicaragua and Nepal. *See* Dkts. 63, 64 (CAR indices for Nepal and Nicaragua, lacking any contemporaneous State Department country conditions analysis or recommendation

18

letter); Background, *supra* (USCIS and DHS personnel unsuccessfully seeking contemporaneous State Department country conditions analyses and recommendations for Nicaragua and Nepal).[5] For Honduras, Secretary Rubio provided a letter recommending termination, but the State Department did not provide a country conditions memo and Secretary Rubio's recommendation was *not* based on country conditions. Dkt. 62 (CAR index for Honduras, with no updated State Department country conditions memo); Ex. 35. Instead, Secretary Rubio focused on whether Honduras's designation was in the U.S. national interest.[6] *Id.* The only reference in Secretary Rubio's letter to country conditions in Honduras was a single, conclusory sentence: "Honduras has recovered sufficiently from the temporary disruption in living conditions that resulted from the environmental disaster caused by Hurricane Mitch in 1999 such that Honduras can adequately handle the return of its nationals." *Id.* Further, Secretary Rubio's letter was received only *after* USCIS had already drafted a decision memo "for termination." *Compare* Ex. 30 (April 7 email: OP&S had already "written [Decision Memos] for termination") *with* Ex. 35 (April 8 recommendation from Secretary Rubio).

In addition to failing to consult with the State Department, Defendants failed to base their TPS decisions on an analysis of country conditions. In the case of Nicaragua and Honduras, the termination Decision Memos were drafted before the country conditions memos were even reviewed. *Compare* Ex. 30 (April 7 email: OP&S had already "written [Decision Memos] for termination") *with* Ex. 20 (April 8 email from OP&S requesting country conditions/country of origin information ("COI") for Nicaragua and Honduras from RAIO Research Unit ("RRU") as they were "currently prepping both [Decision Memos]"); Ex. 19 (April 8 email from OP&S identifying that OP&S is lacking COI from RRU for Honduras and Nicaragua, even though OP&S "drafted decision memos for both countries") *and* Ex. 42 (Nicaragua country conditions report dated April 10, 2025).

---

[5] In the case of Nepal, although Defendants recognized it was abnormal to proceed without "an updated DOS report," Ex. 34, they brushed the irregularity aside because the dated report supported their desired result: "the recommendation was to terminate so we should move forward." Ex. 27.

[6] The TPS statute makes national interest relevant only in deciding whether to designate a country based on extraordinary or temporary conditions, not when deciding whether to extend or terminate a designation based on environmental disaster. *Compare* 8 U.S.C. 1254a(b)(1)(C) (addressing national interest in context of designations based on extraordinary and temporary conditions) *with id.* 1254a(b)(1)(B) (not addressing national interest in context of designations based on environmental disaster).

1    Indeed, by the time country conditions experts concluded on May 1, 2025 that it was unsafe for TPS

2    holders to return to Honduras or Nicaragua, the Decision Memos had already been written to

3    recommend termination. Ex. 30; Ex. 48 ("political instability and a humanitarian crisis [] continue to

4    render [Nicaragua] temporarily inadequate to handle the return of its nationals"); Ex. 29 at

5    NTPSA2_00000095 ("Honduras is not considered safe for returning nationals, especially those

6    vulnerable to gang violence, political persecution, or economic hardship.").

7         For all three countries, Defendants drafted recommendations for termination and then cherry-

8    picked select "improvements" from the country conditions analyses provided by agency experts to

9    support the preordained decisions. This is apparent from a comparison between the comprehensive

10   country conditions analyses prepared by career experts and the pared-down Decision Memo

11   ultimately signed by the Secretary. *Compare* Exs. 28 & 29 (Honduras country conditions analyses)

12   *with* Ex. 55 (Honduras Decision Memo with discussion only of "[i]mprovements" in country

13   conditions and ignoring most of the country conditions discussed in the agency's analysis). *Compare*

14   Exs. 42 & 48 (Nicaragua country conditions analyses) *with* Ex. 45 (Nicaragua Decision Memo with

15   discussion only of "[i]mprovements" in country conditions and ignoring most of the country

16   conditions discussed in the agency's analysis). *Compare* Ex. 21 (Nepal country conditions analysis)

17   *with* Ex. 18 (Nepal Decision Memo with discussion only of "[i]mprovements" in country conditions

18   and ignoring most of the country conditions discussed in the agency's analysis). For example, the

19   Honduras country conditions memo includes sections on "political considerations," "violence,"

20   "attacks on human rights defenders," and "health concerns." Ex. 28. In contrast, the Honduras

21   Decision memo has only one heading for country conditions, labeled "improvements," which

22   addresses none of those categories. Ex. 55. Defendants' decision to use the country conditions

23   analyses as a source from which to cherry-pick evidence to support the preordained termination

24   decisions they already made, rather than as a basis for their decisions, violated the TPS statute.

25        **B.    The Terminations Were Contrary to Law and Arbitrary and Capricious
               Because They Did Not Take Into Account Intervening Conditions**

26

27        In terminating TPS for Honduras, Nicaragua, and Nepal, Defendants also incorrectly

28   interpreted the TPS statute to prohibit consideration of conditions unrelated to the crisis that

1    triggered the country's initial designation. This narrow interpretation of the statute made it easier for

2    Defendants to justify their preordained termination decisions. As to Honduras and Nicaragua,

3    Defendants' termination decisions addressed only whether the country "continues to experience" the

4    impacts of Hurricane Mitch, Ex. 45 (Nicaragua), Ex. 55 (Honduras), and, as to Nepal, the

5    termination decision addressed only whether the country "continues to experience" the impacts of

6    the 2015 earthquake. Ex. 18. Defendants ignored intervening crises, no matter how serious. *See*

7    Background, *supra*. This approach both: (1) contravened the TPS statute and (2) arbitrarily broke

8    with past practice without acknowledgment or explanation. As a result, the terminations must be set

9    aside. *See* 5 U.S.C. § 706(2)(A) ("The reviewing court shall . . . hold unlawful and set aside agency

10   action . . . found to be . . . arbitrary, capricious . . . or otherwise not in accordance with law").

11        Under the TPS statute, Secretary Noem was required to extend TPS for Honduras, Nicaragua,

12   and Nepal unless she found the country "no longer continues to meet the conditions for designation,"

13   8 U.S.C. § 1254a(b)(3)(A), i.e*.,* that:

14        (i)    there has been an earthquake, flood, drought, epidemic, or other environmental

15               disaster in the state resulting in a substantial, but temporary, disruption of living

16               conditions in the area affected,

17        (ii)   the foreign state is unable, temporarily, to handle adequately the return to the state of

18               aliens who are nationals of the state, and

19        (iii)  the foreign state officially has requested designation  . . . .

20   8 U.S.C. § 1254a(b)(1)(B).

21        Nothing in the statutory text ties the second criteria, regarding the country's ability to handle

22   the return of its nationals, to the disaster that triggered its initial designation. And doing so makes no

23   sense. Under Defendants' interpretation, when an agency considers whether to extend a TPS

24   extension, it can consider the disaster that triggered TPS originally—for example, a hurricane—but

25   cannot consider any subsequent crises—like a more recent hurricane. There is no reason to believe

26   Congress intended such a bizarre result.

27        Even if the TPS statute were ambiguous as to whether assessment of a country's ability to

28   handle the return of its nationals should be based solely on conditions related to the initial disaster or

1    should instead take into account a fuller range of conditions, the agency's longstanding past practice

2    has been to take the latter approach. *See* Background, *supra. See also Ramos*, 336 F. Supp. 3d at

3    1093 ("Intervening factors arising after a country's original TPS designation … were considered

4    relevant to determining whether a country continued to meet the conditions for continuing TPS

5    designation."); *Saget*, 375 F. Supp. 3d at 350 ("The DHS Secretary, DHS, and USCIS had a

6    longstanding practice of considering all country conditions when undertaking the mandatory

7    periodic review under the statute, regardless of their relation to the originating condition."). This is

8    evident in prior decisions as to the three countries at issue here. *See, e.g.*, 81 Fed. Reg. 30,325 (May

9    16, 2016) (extending TPS for Nicaragua based in part on "subsequent disasters" that have

10   "significantly compromised Nicaragua's ability to adequately handle the return of its nationals"); 75

11   Fed. Reg. 24,734 (May 5, 2010) (extending TPS for Honduras in part because "political crisis

12   exacerbated the effects of the global economic downturn" leaving the country "ill-equipped to

13   handle adequately the return of Hondurans in the United States who are TPS beneficiaries"); 88 Fed.

14   Reg. 40,317 (June 21, 2023) (extending TPS for Nepal in part because "more recent environmental

15   disasters" and "associated macroeconomic shocks" "render Nepal temporarily unable to handle the

16   return of those granted TPS").

17        The only exception to the agency's fulsome country conditions review was during the first

18   Trump administration when "DHS made a deliberate choice to base the TPS decision solely on

19   whether the originating conditions or conditions directly related thereto persisted, regardless of other

20   current conditions no matter how bad," apparently "in order to implement and justify a pre-ordained

21   result." *Ramos*, 336 F. Supp. 3d at 1097–98. But a judge of this Court found this precise practice

22   unlawful. *See id. See also Saget*, 375 F. Supp. 3d at 351–61 (same result in case brought in Eastern

23   District of New York). The termination decisions never took effect as a result of litigation, and DHS

24   subsequently returned to its prior practice. *Ramos v. Nielsen*, 709 F. Supp. 3d 871, 884 (N.D. Cal.

25   2023) (finding that, during the Biden administration, DHS "considered intervening conditions … in

26   making its TPS determinations (contrary to the Trump administration considering only originating

27   conditions)"). Indeed, DHS itself has explicitly acknowledged that TPS decisions made in 2023 were

28   based on factors other than the crisis that precipitated a country's initial designation. *See* Ex. 29

1   (explaining that "reasons for" Honduras's 2023 extension included "violence and social and political
2   concerns"); Ex 48 (2023 extension based on: "Ongoing significant natural disasters and a resulting
3   humanitarian crisis, Environmental challenges, Political instability").

4          Any departure from DHS's longstanding past practice of considering the full range of
5   country conditions must comply with the APA's change-in-position doctrine. That doctrine requires
6   an agency to "display[] awareness that it is changing position" and provide "good reasons" for a
7   break with past practice. *Organized Vill. of Kake v. USDA*, 795 F.3d 956, 966 (9th Cir.
8   2015) (quoting *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515–16 (2009)). *See also FDA v.*
9   *Wages and White Lion Inv., LLC*, 145 S. Ct. 898, 918 (2025) (describing "change-in-position
10  doctrine"); *Ctr. for Biological Diversity v. BLM*, 141 F.4th 976, 999 (9th Cir. 2025) (agency violated
11  APA by failing to explain "change[]d course"); *Sw. Airlines Co. v. FERC*, 926 F.3d 851, 858 (D.C.
12  Cir. 2019) (agency's "consistent practice, whether adopted expressly in a holding or established
13  impliedly through repetition, sets the baseline from which future departures must be explained").

14         In sum, both the explicit language of the TPS statute and longstanding agency practice make
15  clear that *all* country conditions should have been considered in assessing whether Honduras, Nepal,
16  and Nicaragua are "unable, temporarily, to handle adequately the return to the state of aliens who are
17  nationals of the state." 8 U.S.C. § 1254a(b)(1)(B)(ii). But they were not.

18         As of May 1, 2025, USCIS country conditions research showed neither Honduras nor
19  Nicaragua were capable of handling the return of TPS holders. In Nicaragua, "political instability
20  and a humanitarian crisis … continue to render [Nicaragua] temporarily inadequate to handle the
21  return of its nationals." Ex. 48 ("political instability and a humanitarian crisis [] continue to render
22  the country temporarily unable to handle the return of its nationals"). As to Honduras, the country "is
23  not considered safe for returning nationals, especially those vulnerable to gang violence, political
24  persecution, or economic hardship" due largely to "violence and social and political concerns." Ex.
25  29 at NTPSA2_00000095 ("Honduras is not considered safe for returning nationals, especially those
26  vulnerable to gang violence, political persecution, or economic hardship."). Defendants' ultimate
27  decision to terminate TPS for Honduras and Nicaragua was made possible only by their decision to
28  ignore the myriad crises plaguing each country as not sufficiently related to Hurricane Mitch. *See*

Ex. 55 (Honduras Decision Memo) *and* Ex. 45 (Nicaragua Decision Memo) (considering only whether country had recovered from Hurricane Mitch, without addressing other crises); Ex. 35 (State Department recommended termination of Honduras's TPS because "Honduras has recovered sufficiently from the temporary disruption in living conditions that resulted from the environmental disaster caused by Hurricane Mitch in 1999"). *See also* 90 Fed. Reg. 30,089 at 30,091 (July 8, 2025) (Honduras termination decision finding "Honduras is no longer ''unable, temporarily, to handle adequately the return of its nationals'" because it "has made significant progress recovering from the hurricane's devastation") (quoting 8 U.S.C. § 1254a(b)(1)(B); 90 Fed. Reg. 30,086 (July 8, 2025) (Nicaragua termination decision finding "notable improvements … allow Nicaragua to adequately handle the return of its nationals" because of progress recovering from the hurricane).

With respect to Nepal, Defendants took an equally narrow approach, terminating because "the impacts of the 2015 earthquake that were the basis for the initial 2015 TPS designation no longer prevent Nepal's nationals from returning in safety." Ex. 18 at NTPSA2-0000029. Defendants declined to consider conditions that were not directly related to the 2015 earthquake, including subsequent earthquakes and flash floods that "le[ft] many without reliable access to clean water" and "impacted Nepal's food security." Dkt. 64-1 at 19-21.

Defendants' termination decisions based solely on whether a country had recovered from the crisis that triggered its initial designation violated the plain text of the TPS statute. It was also arbitrary and capricious under the APA's change-in-position doctrine, because Defendants neither acknowledged nor explained the change. 90 Fed. Reg. 24,151 (June 6, 2025) (terminating TPS for Nepal based on recovery from initial disaster, without acknowledging or explaining changed approach); 90 Fed. Reg. 30,086 (July 8, 2025) (same for Nicaragua); 90 Fed. Reg. 30,089 (July 8, 2025) (same for Honduras). As a result, the challenged terminations must be set aside.

## CONCLUSION

Because there is no genuine issue of material fact that the challenged termination decisions violated the APA, this Court should grant Plaintiffs' motion for partial summary judgment and set aside the terminations of TPS for Honduras, Nicaragua, and Nepal. For the same reasons, it should declare the termination decisions unlawful under 28 U.S.C. § 2201.

1

2     Date: October 14, 2025                          Respectfully submitted,

3                                                     NATIONAL DAY LABORER ORGANIZING
                                                      NETWORK
4
                                                      */s/  Jessica Karp Bansal*
5                                                     Jessica Karp Bansal
                                                      Lauren Michel Wilfong (admitted *Pro Hac*
6                                                     *Vice*)

7                                                     Emilou MacLean
                                                      Michelle (Minju) Y. Cho
8                                                     Amanda Young
                                                      ACLU FOUNDATION
9                                                     OF NORTHERN CALIFORNIA

10                                                    Ahilan T. Arulanantham
                                                      CENTER FOR IMMIGRATION LAW AND
11                                                    POLICY, UCLA SCHOOL OF LAW

12                                                    Eva L. Bitran
                                                      Diana Sanchez
13                                                    ACLU FOUNDATION
                                                      OF SOUTHERN CALIFORNIA
14
                                                      Erik Crew (admitted *Pro Hac Vice*)
15                                                    HAITIAN BRIDGE ALLIANCE

16                                                    Attorneys for Plaintiffs

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFFS' NOTICE OF MOTION & MOTION FOR PARTIAL SUMMARY JUDGMENT
CASE NO. 3:25-CV-05687

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## **CERTIFICATE OF SERVICE**

I hereby certify that on October 14, 2025, I caused the foregoing to be electronically filed with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to all counsel of record.

NATIONAL DAY LABORER ORGANIZING NETWORK

*/s/ Jessica Karp Bansal*
Jessica Karp Bansal