Exhibit 46

## Page 205

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------x
                              18-CV-1599(WFK)
PATRICK SAGET, ET AL.,
                              United States Courthouse
        Plaintiffs,           Brooklyn, New York

    -against-                 January 8, 2019
                              9:30 a.m.
UNITED STATES OF AMERICA, ET AL,

        Defendants.

---------------------------------x

TRANSCRIPT OF CIVIL CAUSE FOR BENCH TRIAL
BEFORE THE HONORABLE WILLIAM F. KUNTZ, II
UNITED STATES DISTRICT JUDGE

APPEARANCES:
Attorney for Plaintiffs: MAYER BROWN
                         71 South Wacker
                         Chicago, Illinois
                         BY: HOWARD ROIN, ESQ.
                             LINDA SHI, ESQ.
                             CHRISTOPHER KNIGHT, ESQ.

                         KURZBAN KURZBAN WEINGER TETZELI &
                         PRATT, P.A.
                         2650 SW 27th Avenue, Second Floor
                         Miami, Florida 33133
                         BY: IRA J. KURZBAN, ESQ.
                             KEVIN A. GREGG, ESQ.

Court Reporter:    Georgette K. Betts, RPR, FCRR, CCR
                   Phone: (718)804-2777
                   Fax:   (718)804-2795
                   Email: Georgetteb25@gmail.com

## Page 206

1
2   APPEARANCES: (Continued)
3   Attorney for Defendants:
4       UNITED STATES ATTORNEY'S OFFICE
        Eastern District of New York
5       271 Cadman Plaza East
        Brooklyn, New York 11201
6       BY: JOSEPH A. MARUTOLLO, AUSA
            JAMES R. CHO, AUSA
7
...
22  Court Reporter:    Georgette K. Betts, RPR, FCRR, CCR
                       Phone: (718)804-2777
23                     Fax:   (718)804-2795
                       Email: Georgetteb25@gmail.com
24
    Proceedings recorded by mechanical stenography. Transcript
25  produced by computer-aided transcription.

## Page 207

1       (In open court.)
2       THE COURTROOM DEPUTY: All rise.
3       The Honorable William F. Kuntz, II is now presiding.
4   Civil cause for the bench trial, Docket Number 18-CV-1559.
5   Saget, et al. versus Trump, et al.
6       Counsel, state your appearances for the record.
7       MR. KURZBAN: Ira Kurzban for the plaintiffs.
8       THE COURT: Would you spell your name, sir. State
9   your name and spell it.
10      MR. KURZBAN: I-R-A, first name. Last name,
11  Kurzban, K-U-R-Z-B-A-N.
12      THE COURT: Thank you. Ladies and gentlemen, as
13  well, you all may be seated as well. Thank you.
14      Counsel, please continue.
15      MR. GREGG: Kevin Gregg for plaintiffs, K-E-V-I-N,
16  G-R-E-G-G.
17      THE COURT: Thank you. You may be seated.
18      MR. KNIGHT: Christopher Knight for plaintiffs.
19  Christopher, C-H-R-I-S-T-O-P-H-E-R. Knight, K-N-I-G-H-T.
20      THE COURT: Thank you. Please be seated.
21      MS. SHI: Linda Shi for plaintiffs. L-I-N-D-A.
22  Last name Shi, S-H-I.
23      THE COURT: Thanks. Please be seated.
24      MR. ROIN: Good morning, Your Honor.
25  Howard Roin for plaintiffs, H-O-W-A-R-D, R-O-I-N.

## Page 208

1       THE COURT: Thank you, counsel. Please be seated.
2       MR. MARUTOLLO: Good morning, Your Honor.
3       Joseph Marutollo for the defendants, President
4   Donald Trump, United States of America, Department of Homeland
5   Security, Secretary Nielsen and Acting Secretary Grady.
6       THE COURT: Thank you.
7       MR. CHO: Good morning.
8       James Cho with the U.S. Attorney's Office.
9       THE COURT: Thank you.
10      MS. WATZ: Jessica Watz, paralegal specialist, U.S.
11  Attorney's Office.
12      THE COURT: Thank you.
13      MR. KIRSCHNER: Adam Kirschner, Department of
14  Justice. Adam, K-I-R-S-C-H-N-E-R.
15      THE COURT: Thank you.
16      MS. SHAH: Liza Shah with the Department of Homeland
17  Security.
18      THE COURT: I'm sorry. Could you keep your voice
19  up. I lost that.
20      MS. SHAH: Liza Shah with the Department of Homeland
21  Security. Good morning.
22      THE COURT: Thank you.
23      MS. VUONG: Sarah Vuong for the Department of
24  Homeland Security.
25      THE COURT: Thank you.

Page 209

1      MS. VUONG: Sarah Vuong, V-U-O-N-G.
2      MS. AFANEH: Tahani Afaneh for the Department of
3  Homeland Security.
4      THE COURT: Thank you, please be seated.
5      All right. Thank you all for your patience. We're
6  still on the plaintiffs' case, please call your next witness.
7      MR. KURZBAN: Thank you, Your Honor.
8      May it please the Court. My name is Ira Kurzban and
9  our first witness, Your Honor, is Director Leon Rodriguez and
10 Mr. Rodriguez, can you please come up.
11     THE COURT: Please come forward and be sworn by the
12 Courtroom Deputy, sir. Please raise your right hand.
13     MR. KURZBAN: His name, for the record, Your Honor,
14 is spelled L-E-O-N, Rodriguez, R-O-D-R-I-G-U-E-Z. He's the
15 former Director to the United States Citizenship and
16 Immigration Services.
17     THE COURT: Thank you.
18     Please be seated, sir. When you reach the top step,
19 I'm going to ask you to maneuver this microphone right in
20 front of you. See it's live.
21     Just state your name again and spell it clearly for
22 the court reporter. It's like doing a sound check in a studio
23 and then counsel will inquire. So.
24     THE WITNESS: My name is Leon, L-E-O-N, Rodriguez,
25 R-O-D-R-I-G-U-E-Z.

Page 210

1      THE COURT: Thank you, you may inquire, counsel.
2      MR. KURZBAN: Thank you, Your Honor.
3      (Witness sworn.)
4  LEON RODRIGUEZ, called as a witness, having been first duly
5  sworn/affirmed, was examined and testified as follows:
6  DIRECT EXAMINATION
7  BY MR. KURZBAN:
8  Q   Director Rodriguez, what is your current employment?
9  A   I am a partner at the law firm of Seyfarth Shaw. That's
10 S-E-Y-F-A-R-T-H, and Shaw, S-H-A-W.
11 Q   And prior to your current employment, where were you
12 employed?
13 A   I was -- from 2014 to 2017, I was the Director of United
14 States Citizenship and Immigration Services in the Department
15 of Homeland Security.
16 Q   And how many years did you hold that position?
17 A   For approximately two and a half years.
18 Q   And were you involved in government service prior to that
19 position?
20 A   I was. I held a number of government service positions
21 actually beginning here in the Brooklyn District Attorney's
22 Office in 1988.
23 Q   Could you go through your government service, please.
24 A   Sure. I started as an assistant district attorney in the
25 Kings County District Attorney's Office in 1988. I served

Page 211

1  there until 1994.
2      During two years of that time, '91 to '93, I was
3  also a Special Assistant U.S. Attorney in the Eastern District
4  of New York here.
5      Then in 1994 I became a trial attorney in the Civil
6  Rights Division Criminal Section at the U.S. Department of
7  Justice. I served there from 1994 to 1997.
8      In 1997, I became an Assistant United States
9  Attorney in the Western District of Pennsylvania.
10     In 1998, I became the chief of the White Collar
11 Crime Section.
12     Then in 1999, I became the First Assistant United
13 States Attorney in Pittsburgh, and served in that capacity
14 until 2001.
15     I joined the law firm of Ober, Kaler, Grimes &
16 Shriver, and was a partner there from 2001 to 2007, in their
17 Washington, D.C. office.
18     In 2007, I was appointed as the county attorney for
19 Montgomery County, Maryland. I was also known, I guess, as a
20 county solicitor, and I served in that capacity from 2007 to
21 2010.
22     January 2010, at that time I became the Chief of
23 Staff and Deputy Assistant Attorney General for the Civil
24 Rights Division at the Department of Justice. I served there
25 for approximately 18 months, at which time I was appointed as

Page 212

1  the Director of the Office for Civil Rights at the U.S.
2  Department of Health and Human Services.
3      And I was there until 2014 when I joined the
4  Department of Homeland Security.
5  Q   And in the Department of Homeland Security at USCIS, I
6  assume you had a good deal of experience and knowledge about
7  immigration matters; is that correct?
8  A   That is correct. With the U.S. Citizenship and
9  Immigration Services is the immigration benefited adjudicating
10 agency. So every immigration benefit is in some way
11 adjudicated through USCIS. Therefore, in that job and
12 actually through a number of my prior positions, I gained
13 extensive experience in immigration matters.
14 Q   And can you explain to the Court what your
15 responsibilities were as the director of USCIS?
16 A   I was responsible for all aspects of the agency's
17 operations, which included overseeing domestic adjudications,
18 naturalizations, refugee and asylum operations, humanitarian
19 operations, including, obviously, temporary protected status.
20 Overseeing the E-Verify and I9 systems. But also providing
21 advice to the Secretary of Homeland Security and to the
22 President on immigration matters.
23 Q   Did it also include overseeing benefit applications such
24 as H-2A and H-2B applications?
25 A   Yes, it did. Yes, it did. Although I should clarify

Page 213

1  that with those benefits, as with other benefits, we had
2  coordinate responsibilities with other cabinet departments
3  such as the Department of State and Department of Labor, but I
4  did oversee USCIS's operations with respect to those benefits.
5  Q   And H-2As involve temporary visas for agricultural
6  workers, correct?
7  A   That is correct.
8  Q   And H-2Bs involve temporary visas for non-agricultural
9  workers?
10 A   That is correct.
11 Q   Have you ever been an expert or designated as an expert
12 witness in immigration matters prior?
13 A   I have served as a consulting expert. I've never been
14 designated or qualified as an expert in a courtroom
15 proceeding. But I have served as a consulting expert
16 previously.
17 Q   In immigration matters?
18 A   That is correct, specific to the EB-5 Immigrant Investor
19 Program.
20 Q   And as you said as part of your responsibility, you
21 became familiar with temporary protected status?
22 A   That is correct. During my service as director, we had a
23 small number of new temporary protected status designations
24 and even a larger number of decisions about extensions and/or
25 terminations of existing temporary protected status grants.

Page 214

1  Q   And can you explain to the Court what temporary protected
2  status is?
3  A   Temporary protected status essentially amounts to the
4  suspension of deportation, and in most cases also the
5  extension of employment authorization for nationals of a
6  country who are in the United States, where that country has
7  been designated by the Secretary of Homeland Security as
8  qualifying for designation under temporary protected status
9  which means either that there has been some sort of a war, or
10 military event, or some sort of a civil disorder in that
11 country; that there has been a natural disaster such as a
12 hurricane or earthquake; or there are otherwise what are
13 labeled in the statute extraordinary and temporary conditions
14 in that country. And in each case, and I'm paraphrasing and
15 merging the three bases here, but in each case, essentially,
16 either the nationals of that country are unable to safely
17 return. There needs to be a finding that they are unable to
18 safely return to the country, and/or that the country is
19 unable to reabsorb its nationals who are abroad.
20 Q   When you say reabsorb, does that, in some sense, depend
21 on the numbers of peoples involved?
22 A   Naturally. You know, when you think about what's needed
23 for people to return to their country, there are a number of
24 conditions of public safety, national security, healthcare,
25 housing, education. There is a pretty long list. Conditions

Page 215

1  that need to be met in order for those individuals to be able
2  to safely return to the country.
3  Q   Now, the fact that the government of the United States
4  may grant temporary protected status to nationals of a
5  particular country, does that mean that the government cannot
6  deport other people from the same country?
7  A   No, it doesn't mean that at all. In fact, it is not
8  uncommon that you will have one segment of the population,
9  foreign nationals from a particular country that is protected
10 from deportation under temporary protected status, and have
11 another, usually either later arriving or criminally involved
12 population from that same country who is not protected from
13 deportation.
14     TPS does not necessarily amount to a protection from
15 deportation, and from the consequence of return to the home
16 country for every single foreign national who is in the United
17 States.
18 Q   And temporary protected status typically has a cut-off
19 date; is that right?
20 A   It does. Basically you have two dates that you'll
21 usually enter into on a temporary protected status notice.
22     First of all, you'll have essentially a last date of
23 entry. In order to qualify for TPS, you need to have been in
24 the United States by a certain date designated in the TPS
25 Federal Register notice. Oftentimes, also there will be a

Page 216

1  length of presence in the United States; a year, two years.
2  Just speaking hypothetically, you'll have a length of presence
3  in the United States which will also be a qualification in
4  that Federal Register notice in order to -- for those foreign
5  nationals to qualify for TPS.
6  Q   And, Director Rodriguez, when you served as the director,
7  did you ever make or recommend any TPS -- strike that.
8      Were you ever involved in the TPS process?
9  A   I was involved, roughly during my time as director,
10 somewhere between 12 and 15 TPS decisions came through my
11 office. And when I say decisions, it's basically my decision
12 as to what I recommend to the Secretary of Homeland Security
13 for the decision that he will actually make. The decision is
14 actually vested by statute with the Secretary of Homeland
15 Security.
16     Those decisions could be original designations.
17 They could be redesignations, meaning that -- generally,
18 meaning that the last date of entry was actually advanced to a
19 later date. They could be extensions. In other words,
20 affording another period of temporary protected status to the
21 nationals of a particular country, or termination, determining
22 that the conditions for temporary protected status no longer
23 apply to a particular country and terminating temporary
24 protected status on that basis.
25 Q   And during your tenure as the director, you did make

Page 249

1  really talking about not necessarily one single event and the
2  consequences of that single event, but it's talking about a
3  multiplicity, a potential multiplicity of conditions that may
4  exist and that are, as the status says, extraordinary and
5  temporary in nature. Temporary meaning not only necessary of
6  brief duration in time, although it can mean that, but also
7  meaning not permanent and not -- not necessarily durable.
8  Conditions that, in fact, can be reversed. But really that
9  prong needs to be read all together because those need to be
10  extraordinary and temporary conditions that prevent nationals
11  of that country from returning to the country in safety, which
12  means significant threat to life or health.
13  Q  And that section -- I would like you to also look at --
14      THE COURT: Before you go on, let me ask you this
15  question, because it is obviously central to this case:
16  Obviously there are conditions in Haiti that were problematic
17  before the earthquake, correct?
18      THE WITNESS: That's correct.
19      THE COURT: So what is the interplay between the
20  conditions that occurred at the time of the earthquake and
21  after compared to the conditions that existed and had existed
22  in Haiti for many years? Help the Court by explaining how the
23  statute is supposed to work and how this designation is
24  supposed to work given the fact that this was not the
25  initiation of problems in Haiti. What was your understanding

Page 250

1  as to the relationship?
2      Do you understand the question?
3      THE WITNESS: Yes, I do.
4      THE COURT: Okay. That is essentially what we are
5  trying to get to. So let's have some testimony about that.
6      THE WITNESS: Sure. Thank you, Your Honor.
7      THE COURT: Go ahead.
8      THE WITNESS: As I applied and interpreted this
9  statute in this particular prong as director, the
10  extraordinary and temporary conditions are a combination of
11  conditions that exist at the particular point in time when the
12  adjudication is occurring, which could be either the original
13  designation or the subsequent decision as to extension,
14  redesignation, or determination.
15      THE COURT: How does that relate --
16      THE WITNESS: It's --
17      THE COURT: How does that relate to the traditional
18  problems and challenges that Haiti was facing? Because one of
19  the issues that I have to resolve is whether or not the
20  definition of temporary protected status given the earthquake
21  was the deal with the immediate aftershock, no pun intended,
22  of the earthquake and what happened; or was it to deal with a
23  broader constellation of issues, many of which had occurred
24  prior to this earthquake?
25      So try to help the Court --

Page 251

1      THE WITNESS: Yes.
2      THE COURT: -- as an expert with your understanding
3  as the administrator who was there.
4      Do you understand the question?
5      THE WITNESS: Yes.
6      THE COURT: Okay. Would you address that?
7      THE WITNESS: They necessarily incorporate
8  conditions that may have pre-existed the event that --
9      THE COURT: That may have or did?
10     THE WITNESS: That did pre-exist.
11     THE COURT: Go ahead.
12     THE WITNESS: Did pre-exist. May have coexisted,
13  meaning in the case of an earthquake, conditions that were not
14  necessarily caused by the earthquake. And conditions that
15  subsequently existed, when you are talking about a decision
16  about extension or redesignation.
17     THE COURT: Such as the cholera that was supposedly
18  largely exacerbated and introduced by the U.N. troops; is that
19  a --
20     THE WITNESS: That is the perfect example,
21  Your Honor.
22     THE COURT: Okay.
23     Okay. Let's go on. All right. There is no jury
24  here. We are trying to get the testimony from this expert.
25     MR. KURZBAN: Yes.

Page 252

1      THE COURT: The Government is going to be able to
2  cross-examine. Let's focus on the issues that --
3      MR. KURZBAN: Okay. Thank you.
4      THE COURT: Go ahead.
5  BY MR. KURZBAN:
6  Q  In terms of the extraordinary and temporary conditions,
7  as the judge just mentioned, does that include conditions that
8  are untethered from the event that initiated the TPS
9  designation?
10 A  Yes. And exactly the point I was trying to make to
11 the -- to the judge, that they could be conditions that, in
12 fact, occurred before or occurred long after whatever it was
13 that initially triggered the decision to designate a country
14 for temporary protected status under this prong.
15 Q  Okay. And does it also include intervening factors?
16 A  Absolutely, it could. And so one -- one great example of
17 that that's cited in my report is the recitation in one of the
18 Nicaragua TPS -- or the Nicaraguan TPS extension that I signed
19 where it talked in terms of a number of intervening climate
20 events, weather events, that, in fact, made the company -- or
21 I'm sorry, not company -- the country, Nicaragua in that case,
22 unable to reabsorb it's nationals effectively.
23 Q  Okay. And so let's take -- I believe you may be talking
24 about Salvador or one of the Central American countries in
25 this case?

Page 253

1  A  Nicaragua in this case.
2  Q  Nicaragua?
3  A  Yes.
4  Q  How long has the TPS designation gone on in Nicaragua, do
5  you know?
6  A  I -- I don't.  It's -- I think it's over 15 years.  I
7  couldn't -- as I sit here, I couldn't tell you exactly how
8  long it was.
9  Q  Okay.  And the original -- the extension of Nicaragua's
10 TPS was related to intervening events?
11 A  As time went on with Nicaragua, with El Salvador other
12 intervening events became part of the analysis as to whether
13 to extend TPS in those cases.
14 Q  And that was your understanding of how the statute should
15 be designated with respect to --
16 A  That was and continues to be -- that was my understanding
17 as director and continues to be my understanding of how the
18 statute operates.
19 Q  Okay.
20     MR. KURZBAN:  Your Honor, I would like to move -- I
21 don't know if it's necessary, but move Plaintiffs' Exhibit 1
22 into evidence.
23     THE COURT:  Is there any objection to Plaintiffs' 1?
24     MR. MARUTOLLO:  No, Your Honor.
25     THE COURT:  It is admitted.

Page 254

1     (Plaintiff Exhibit 1, was received in evidence.)
2  BY MR. KURZBAN:
3  Q  I would like to ask you, what is your understanding of
4  the term "food insecurity"?
5  A  Food insecurity is defined as the condition with respect
6  to a particular individual where that individual is not
7  assured a supply of food adequate for the preservation of life
8  and health.
9  Q  And why is that important as to whether or not people can
10 return safely to the country?
11 A  Well, if the -- the -- the key issue is safety.  If the
12 individuals when they return won't have access to enough food
13 to survive or to maintain any acceptable level of health, then
14 that would clearly be a -- a threat to safety.
15 Q  All right.  And I would like to ask you with respect to
16 gender violence, do you understand what gender violence is in
17 the context of TPS?
18 A  Yes.  Gender violence can mean sexual assault.  It can
19 mean domestic assault, basically any gender-based violence,
20 both the levels at which such violence occur and the ability
21 of law enforcement authorities within a particular country to
22 effectively address that violence and any other kind of
23 violence, incidentally, is a very relevant factor for TPS
24 consideration.  And I want to underscore one that very well
25 could post -- after coming to existence after whatever was the

Page 255

1  event that initially gave rise to the TPS grant.
2  Q  Okay.  And at the time you extended TPS or recommended an
3  extension of TPS for Haitians, did you consider issues of food
4  security and gender violence?
5  A  I considered a -- a broad range of issues, including food
6  security, gender violence, stability of the Government,
7  education, health care.  I considered a broad range of
8  considerations as is typical based on the information that's
9  in that RAIO Country Conditions Report.
10 Q  With respect to crime rates of holders of TPS or their
11 use of federal benefit, in your time as director did you ever
12 consider the crime rates of TPS holders when making a
13 recommendation regarding TPS?
14 A  Their crime rates?  I'm assuming you're meaning their
15 crime rates --
16 Q  General crime.
17 A  -- in the US?
18     THE COURT:  Don't talk over each other.
19     Hang on.  Put the question again.
20     MR. KURZBAN:  I'm sorry.
21     THE COURT:  Go ahead.
22 Q  In your time as director, did you ever consider crime
23 rates in the United States of TPS holders as a factor to
24 determine whether or not TPS should be extended or terminated?
25 A  No.  In fact, by definition, you do not qualify to

Page 256

1  receive TPS in the first place if you are a convicted
2  criminal, either in the United States or in another country,
3  if we have records that show that you were convicted in
4  another country.  And if you are convicted while you were on
5  TPS, your TPS would ordinarily be suspended -- terminated,
6  rather, based on that conviction.
7      THE COURT:  Let me ask you this hypothetical
8  question:  Suppose TPS protection was extended to Country X
9  and 20,000 people from Country X come into the United States,
10 and then five years later you look and 20,000 people have
11 committed felonies and now you are trying to decide whether or
12 not to extend the TPS.  Would that have an impact on the
13 thinking as to whether or not Country X should or should have
14 an extension or redesignation of TPS, the fact that
15 100 percent -- this is a hypothetical question -- of the
16 people that came in under TPS were convicted felons, would
17 that have an impact or not in this hypothetical?
18     THE WITNESS:  In the hypothetical?  In the
19 hypothetical --
20     THE COURT:  I'm giving you a hypothetical.
21     THE WITNESS:  -- which I --
22     THE COURT:  In a pure hypothetical view as an
23 expert -- as a testifying expert you get questions like this.
24 Okay?
25     Hypothetically, Country X five years later, all 100

13 (Pages 253 to 256)