
Ahilan T. Arulanantham (SBN 237841)
arulanantham@law.ucla.edu
CENTER FOR IMMIGRATION LAW AND
POLICY, UCLA SCHOOL OF LAW
385 Charles E. Young Dr. East
Los Angeles, CA 90095
Telephone: (310) 825-1029

Emilou MacLean (SBN 319071)
emaclean@aclunc.org
Michelle (Minju) Y. Cho (SBN 321939)
mcho@aclunc.org
Amanda Young (SBN 359753)
ayoung@aclunc.org
ACLU FOUNDATION
OF NORTHERN CALIFORNIA
39 Drumm Street
San Francisco, CA 94111-4805
Telephone: (415) 621-2493
Facsimile: (415) 863-7832

Attorneys for Plaintiffs
*[Additional Counsel Listed on Next Page]*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| NATIONAL TPS ALLIANCE, DENIS MOLINA, JHONY SILVA, MARIA ELENA HERNANDEZ, O.C., SANDHYA LAMA, S.K., TEOFILO MARTINEZ,<br><br>Plaintiffs,<br><br>vs.<br><br>KRISTI NOEM, in her official capacity as Secretary of Homeland Security, UNITED STATES DEPARTMENT OF HOMELAND SECURITY, and UNITED STATES OF AMERICA,<br><br>Defendants. | Case No. 3:25-cv-05687-TLT<br><br>**DECLARATION OF EMILIA GARCIA IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>Assigned to: Hon. Trina L Thompson<br><br>Date: November 18, 2025<br>Time: 2:00 p.m.<br>Place: Courtroom 9<br><br>Complaint Filed: July 7, 2025 |

Additional Counsel for Plaintiffs

Jessica Karp Bansal (SBN 277347)
jessica@ndlon.org
Lauren Michel Wilfong (Admitted *Pro Hac Vice*)
lwilfong@ndlon.org
NATIONAL DAY LABORER ORGANIZING NETWORK
1030 S. Arroyo Parkway, Suite 106
Pasadena, CA 91105
Telephone: (626) 214-5689

Eva L. Bitrán (SBN 302081)
ebitran@aclusocal.org
Diana Sánchez
dianasanchez@aclusocal.org
ACLU FOUNDATION
OF SOUTHERN CALIFORNIA
1313 West 8th Street
Los Angeles, CA 90017
Telephone: (213) 977-5236

Erik Crew (Admitted *Pro Hac Vice*)
ecrew@haitianbridge.org
HAITIAN BRIDGE ALLIANCE
4560 Alvarado Canyon Road, Suite 1H
San Diego, CA 92120
Telephone: (949) 603-7411

**DECLARATION OF EMILIA GARCIA**

I, Emilia Garcia, declare:

1. I am over the age of eighteen, and I am competent to make this declaration. I provide this declaration based upon my personal knowledge. If called as a witness, I would and could competently testify to the facts stated herein.

2. I am an investigator at the American Civil Liberties Union Foundation of Northern California ("ACLU"). The ACLU is a nonprofit public interest law firm based in San Francisco, California, that provides free legal services.

3. I make this declaration based on my personal knowledge, review of data, and conversations and communications with individual TPS holders from Honduras and Nicaragua. I am submitting this declaration to provide information about the harms that have befallen Honduran and Nicaraguan TPS holders—including members of the National TPS Alliance (NTPSA)—due to the loss of status and benefits following the Ninth Circuit's decision to grant a stay of the district court's order postponing the terminations of TPS for Honduras and Nicaragua from entering into effect.

**SURVEY OF NTPSA MEMBERS**

4. NTPSA is a member-led organization whose mission is to defend the Temporary Protected Status (TPS) program and win a path to permanent residency for TPS holders. The NTPSA's membership currently includes approximately 3,300 Honduran TPS holders and 160 Nicaraguan TPS holders.

5. From October 2 to October 10, 2025, NTPSA conducted an informal survey of its Honduran and Nicaraguan TPS holder members. The purpose of the survey was to assess the impact of the termination of TPS for Honduras and Nicaragua on NTPSA's members. This declaration provides information about the results of that survey, which I personally reviewed and analyzed, as well as the stories of individual TPS holders based on information which was personally communicated to me by the TPS holders themselves.

6. Within 24 hours of disseminating the survey, more than 400 NTPSA members and former TPS holders from Honduras and Nicaragua had responded. In one week—between October 2 and October 10, 2025—480 Honduran and 44 Nicaraguan TPS holders responded. Respondents

came from 36 states plus the District of Columbia, with the most respondents coming from Texas (115 respondents) and Florida (96 respondents).

**Homeownership**

7. Nearly half (47%) of respondents reported that they own their own home.

**Family**

8. The median respondents' household size was three people, with 45% of respondents reporting a household size of four or more people. Half of the respondents reported that they had at least one minor child at home, with 27% reporting two or more minor dependents. 96% of these minor dependents are U.S. citizens.

9. Nearly a quarter (23%) of respondents reported that their families contain children with special educational or medical needs. These special needs included autism (21 respondents), medical issues such as sickle cell anemia and diabetes (16 respondents), mental disorders (five respondents), and other learning disabilities (13 respondents).

**Loss of Income**

10. Respondents described severe economic impacts due to the termination of TPS. Overall, 94% of Nicaraguan and Honduran TPS respondents reported being actively employed prior to termination. Prior to termination, 55% of these employed respondents earned at least $50,000 annually. But since termination, these respondents' income has fallen sharply. Nearly half (47%) of these respondents report no income whatsoever post-termination, with large majorities now facing a household income of under $25,000 a year. Overall, 74% of these respondents reported a substantial income loss, meaning that they lost 25% to 100% of their pre-termination income.

*Reported Income Losses Post-Termination by Respondents Who Did Not Own a Business*

| Pre-Termination Annual Income ↓ | Post-Termination Annual Income | | | | |
|---|---|---|---|---|---|
| | No Income | Under $25k | $25k-$50k | $50k-$100k | Over $100k |
| Annual Income Less than $25k | 58% | 37% | 5% | 0% | 0% |

| | | | | | |
|---|---|---|---|---|---|
| Annual Income Between $25k-$50k | 53% | 23% | 23% | 2% | 0% |
| Annual Income Between $50k-$100k | 41% | 17% | 21% | 20% | 1% |
| Annual Income Over $100k | 31% | 11% | 23% | 23% | 11% |
| All Non Business Owners Pre-Termination | 47% | 21% | 21% | 11% | 1% |

11. These economic effects of the termination of TPS have severely harmed Honduran and Nicaraguan families with children. Following termination, many households with children have little to no income, with 44% reporting no income whatsoever and a further 18% reporting an income of under $25,000 per year. In other words, following termination, 63% of respondent families of three or more are now under the federal poverty line, set for 2025 at $26,650 for a family of three. Prior to termination, only 6% of respondent families of three or more were under the federal poverty line.

12. Three-quarters (75%) of the families who reported that their children have special educational or medical needs (such as autism, diabetes, and learning disabilities) are now below the federal poverty line.

**Harm to Small Businesses**

13. Twenty percent of respondents reported that, prior to the termination of TPS, they owned their own business, working in varied fields ranging from real estate investing to house remodeling to the creation of business clothing apparel. Of these respondents, 29% reported that they had to wholly close their business after termination, with another 59% reporting that they had sustained serious negative impacts to their business since termination. These serious impacts included respondents who had to sell their business to a family member or place it in a blind trust; respondents who reported that they no longer could obtain new customers; and respondents who reported that, because they could not drive, they could not work at all.

14. Termination has caused these business-owners to face severe economic impacts. Before termination, 55% of Honduran and Nicaraguan TPS business-owners made at least $50,000 per year, with 30% reporting an income of over $100,000 per each year. Since termination, 65% report that they make $25,000 or less, with 38% reporting that they have no income whatsoever. Overall, 80% of business-owners reported a complete or substantial loss of income post-termination. These losses impact not only themselves and their families, but their employees as well.

*Reported Income Losses Post-Termination by Respondent Business Owners*

| Pre-Termination Annual Income ↓ | Post-Termination Annual Income | | | | |
|---|---|---|---|---|---|
| | No Income | Under $25k | $25k-$50k | $50k-$100k | Over $100k |
| Annual Income Less than $25k | 60% | 20% | 0% | 0% | 20% |
| Annual Income Between $25k-$50k | 23% | 65% | 12% | 0% | 0% |
| Annual Income Between $50k-$100k | 45% | 14% | 21% | 14% | 5% |
| Annual Income Over $100k | 35% | 13% | 10% | 23% | 19% |
| All Pre-Termination Business Owners | 38% | 27% | 14% | 13% | 9% |

**Health Risks**

15. More than a third (38%) of respondents also reported that they themselves have medical conditions that require ongoing treatment, such as diabetes (48 respondents) and high blood pressure (50 respondents). Some reported more severe medical conditions, such as cancer, HIV, and congestive heart failure. Since termination, however, 69% of respondents have lost their healthcare coverage, including 79% of those who reported medical conditions requiring ongoing treatment. 36% of respondents reported that they lost both their income and their health insurance, leaving these respondents with no way to pay for ongoing healthcare costs.

**Psychological Harm**

16. Respondents reported severe mental health struggles following termination. Nearly all (94%) of respondents reported at least some mental health effects from termination, with 74% reporting either severe or significant impacts to their mental health. These symptoms included

increased anxiety (76% of respondents), increased depression (63%), fear of going outside (84%), lack of motivation (62%), difficulty concentrating (57%), and trouble sleeping (79%). 85% of respondents reported experiencing at least two of these symptoms.

**In Their Own Words**

17. The survey conducted by NTPSA concluded by asking respondents whether there was any additional information that they would like to share. These are some of the responses submitted by NTPSA members:

    a. "I lost my job, my healthcare insurance, and my driver's license. I am terrified to leave my house, and I have no income and no way to find new work."

    b. "Desperate looking for work. They already gave me an eviction order, I have nowhere to go and I have no resources to eat."

    c. "I came to this country over 30 years ago. I'm retired and about to lose my monthly pension and my Medicare insurance."

    d. "I don't have money to pay my rent this month 😭"

    e. "I lost my city job only 6 months away from being fully vested … I sacrifice[d] working nights holidays and weekends to achieve a high seniority in the city to just lose it all from one day to the next."

    f. "I can't return because I care for my 75-year-old parents, who have conditions that require constant medical attention. They are citizens."

    g. "It was devastating to lose my job and health insurance overnight. I'm very worried about my antiretroviral medications!"

    h. "Although I trust that God does not abandon us, I have panic attacks at night."

    i. "As the head of a family, it is really difficult to see years of effort slip away from us. As a family this affects us deeply!!"

    j. "Our fear is real and the uncertainty is immense."

## INDIVIDUAL ACCOUNTS

**N.Q., Father of Four and Industrial Equipment Operator from Texas**

18.     N.Q. is a 36-year-old father of four U.S. citizen children, aged 16, 15, 10, and 8 months. He is married to a U.S. citizen. Born in Honduras, N.Q. was brought to the United States by his mother when he was about 8 years old. Over time, his mother shared her reasons for fleeing Honduras: Forced into marriage at the age of 14, she suffered physical and sexual abuse for years. Her daughters were raped by N.Q.'s father, a violent man who had killed several people. Now, as an adult and father himself, N.Q. understands his mother's desperation to shield her children from the violence they faced in Honduras.

19.     Prior to losing TPS, N.Q. was the sole breadwinner for his family, working as an industrial equipment operator. He and his wife own their home, which they purchased in 2024. Overnight, the family lost their only source of income when N.Q. lost his job due to the termination of TPS. Trying to make ends meet, his wife went back to work and N.Q. now stays home with their baby, but her earnings will not cover the family's expenses. "We're about $3,000 short this month," says N.Q. with concern. The family is considering renting out their home and moving to a small apartment to save money. His U.S. citizen wife is applying for food stamps and other public assistance for herself and their children.

20.     N.Q. is afraid to even go outside because he is terrified of being arrested by ICE agents who roam the streets looking for undocumented people. "Honestly, I used to feel proud of being a TPS holder, because we are hard-working and law-abiding," says N.Q. "It is heartbreaking that now we are being treated like criminals."

**H.R., Payroll Specialist and Caregiver from Florida**

21.     H.R. is 35 years old and lives in Florida. She was born in Honduras but came to the United States when she was just 9 months old. She has no memory of Honduras and has never been back to her country of birth.

22.     H.R. is the primary caregiver for her disabled U.S. citizen mother, who suffers from chronic, debilitating medical conditions. In 2025, her mother suffered a stroke, which further affected her mobility. Her mother requires assistance with all of her daily activities, including

1  cooking, bathing, and getting dressed. H.R. drives her mother to all of her medical appointments,
2  and she manages her mother's care and medication. H.R. works for a payroll company and is the
3  sole financial provider for herself and her disabled mother.

4  23.  Without TPS, H.R. is now living in fear. She avoids leaving the house because she is
5  afraid that she might be detained by ICE. She abandoned her gym routine and now pays for her
6  groceries to be delivered rather than risk going to the store. "My biggest fear is what will happen to
7  my mother if I am detained or deported," she says.

**J.M., a Member of the Deaf Community, Father of Three, and Forklift Operator from New Jersey**

10  24.  J.M. is 38 years old and lives in New Jersey. He was born in Honduras and there, as
11  an infant, he contracted meningitis. In 1988, at the age of two, J.M. was brought to the United States
12  to seek treatment for his illness.

13  25.  J.M. survived, but his hearing was permanently impaired due to meningitis. A
14  member of the deaf community, his first language was American Sign Language. He does not speak
15  Spanish. J.M. grew up in the U.S. and graduated from high school.

16  26.  J.M. is the father of three U.S. citizen children: a 16-year-old daughter, and twin 15-
17  year-olds. His partner is a U.S. citizen. He works as a forklift operator for the National Tree
18  Company, a position he has held for nearly 8 years. He relies on the income he earns at his job, as
19  well as his employer-sponsored health insurance to support his family.

20  27.  The termination of TPS has caused J.M. significant distress and anxiety about his
21  uncertain future. He cannot return to Honduras, where he does not speak the language and cannot
22  communicate. "I have worked so hard to build my life here," says J.M., "I can't leave my kids."

**M.Q., Father of Two and Oil and Gas Industry Professional from Texas**

24  28.  M.Q. lives in Texas and is 38 years old. He was 6 years old when he came to the
25  United States from Honduras. He is the father of two U.S. citizen daughters, who are in tenth and
26  second grades. His younger daughter suffers from a thyroid problem. She takes daily medication and
27  has monthly medical appointments to monitor her health.

28

29. M.Q. is married to a U.S. citizen. They have been married for over 10 years, but M.Q. still has no straightforward path to permanent residence due to the fact that he lacked proper documentation at the time he was brought to the United States as a young child. The family owns a home, and two cars which are both under M.Q.'s name. Since 2014, M.Q. has worked in the oil and gas industry, most recently in a supervisory role. M.Q. was earning a good salary of about $100,000 annually, which comfortably supported his family of four.

30. However, the family's stability was shattered in September 2025, when TPS was terminated. M.Q.'s employer immediately put him on an unpaid leave. His U.S. citizen wife is now the only one working, but she earns only around $30,000 which is not enough for their family of four. For the time being, they are living off of her income and their savings. Once their savings run out, they will no longer be able to make their mortgage and car payments.

31. The family lost their health insurance when M.Q. lost his job. They are now paying out of pocket for their daughter's thyroid medication, as well as medication that M.Q.'s wife takes for depression and anxiety. In November, M.Q. will lose his drivers license. "I try to hide it from my daughters, but I am really scared," says M.Q.

**M.S., Communications Specialist and Mother of Four from Texas**

32. M.S. came to the United States from Honduras in 1994 at the age of 9. She joined her mother in Texas, and attended elementary school, high school and college in the United States. She has a business administration degree. For the last 10 years, she has worked as a communications specialist for the City of Dallas and the Mayor's Office.

33. M.S. is a single mother of four children, all U.S. citizens. Her two oldest children are adults; one is a college graduate, and the other is studying to become a nurse. She has a 15-year-old son and a 5-year-old son, who was recently diagnosed with autism. She financially supports her four children, as well as her severely disabled brother in Honduras.

34. M.S. is a domestic violence survivor. Also, in 2023, her mother was struck and killed by a drunk driver. In response to these traumatic life experiences, M.S. has become actively involved with both the Dallas Domestic Violence Task Force and her local chapter of Mothers Against Drunk Driving.

8

35. The loss of TPS has been deeply destabilizing for M.S. and her family. She doesn't know what is next.

**J.M., Commercial Truck Driver and Father of Two from Texas**

36. J.M is a citizen of Honduras and TPS holder who has lived in the United States since February 1992. He is 51 years old and resides in Fort Worth, Texas. He received TPS in 1999 and maintained his status for 26 years. He is married and has two children aged 6 and 13, both of whom were born in the United States. His oldest son was born with a congenital heart defect that requires medical monitoring. He and his wife purchased their first home in 2020. J.M. has been a commercial truck driver for many years, and he currently owns his own truck. However, the validity of his commercial driver's license is contingent on his valid employment authorization, and he will be unable to renew his driver's license when it expires next month.

37. Now, without TPS and valid work authorization, he is deeply worried about how he will continue to pay his mortgage and cover his family's basic necessities. The fear of losing everything he has worked for weighs heavily on him and his family. His fear is heightened because his older son requires extra care due to his congenital birth defect, and J.M. fears being away from him and not being able to provide him with the medical care he needs to survive. Without steady income or health insurance, J.M. does not know how he will afford his son's medications, transportation to medical appointments, or emergency care if complications arise.

38. J.M.'s sons are in 8th and 1st grade. His older son loves robotics, and he wants to be an engineer when he grows up. His younger son wants to be a doctor. J.M.'s dream is to be there for his children when they need him, and to see them grow up and pursue their education and their dreams. "The thought of not being able to be there for my children is devastating. I feel like I am living a nightmare," says J.M.

**Nerly Avila Cruz, Educator and Custodial Grandparent from California**

39. Nerly Avila Cruz is a citizen of Honduras and TPS holder who has lived in the United States since 1994. She is 49 years old and lives in California. She has sole legal custody of her 8-year-old U.S. citizen grandson who has been diagnosed with attention deficient hyperactivity

disorder (ADHD). She has cared for him since he was a 3 month old baby. He knows that Nerly is his grandmother, but he calls her "mama."

40. Nerly has always worked in education. She is a certified early childhood educator. For 11 years, Nerly worked for a California school district as a substitute teacher and a teacher's assistant. More recently, she was working as a preschool teacher in a private school. However, when her work permit expired in July, she was told that she could no longer work. Without income, her bills are piling up, and she is worried that she may need to declare bankruptcy. She is desperate and does not know what she will do.

41. Without the protection of TPS, Nerly is afraid that she will not be able to care for her grandson, who has no other family members who can take him in. Her biggest fear is that that she will be detained or deported and that her grandson will go into the custody of Child Protective Servies.

42. Anxious and depressed, Nerly remarks, "I have given the best years of my life to this country, paying taxes and following all of the laws. Now I'm left with nothing."

**C.P., Construction Worker and Single Father from Texas**

43. C.P. is a citizen of Honduras and TPS holder who has lived in the United States since 1998. He is 45 years old and lives in Houston, Texas. Prior to losing TPS, he was a construction worker and had health insurance through work. On September 8, 2025, he was let go from his job due to the termination of TPS.

44. C.P. is a single father to a U.S. citizen son who was born with a rare congenital heart defect that requires ongoing medical monitoring and specialized care. At birth, doctors told C.P. that his son was not expected to live past the age of six. Three surgeries, numerous treatments, and countless medical appointments later, his son is now 10 years old. Nonetheless, C.P.'s son requires intensive monitoring and ongoing medical care. He takes medication daily and sees a doctor every two months. It is likely that he will need another surgery at age 12 and, as he gets older, the surgeries may become more frequent and riskier.

45. C.P.'s son relies on his father for significant emotional support as well. C.P.'s son becomes easily overwhelmed and panics in a crowded or noisy environment, which is dangerous for his heart condition.

46. C.P. shares custody of his son. However, in July 2025, the boy's mother had emergency, lifesaving surgery and has not been able to physically provide care for their son because of her health condition. While his son's mother recovers, C.P. has become his son's sole caretaker. But without a job and health insurance, he does not know how he will cover rent, car payments, car insurance, gas, groceries, and other necessities.

47. C.P. is also worried about what will happen to his son if C.P. is detained by immigration officials. Managing his son's medical and emotional needs demands constant attention, flexibility, and financial stability—needs that are nearly impossible to meet without TPS and valid work authorization.

48. Since TPS was terminated, C.P. has struggled to sleep at night and had to start taking medication to help him sleep.

**J.R., Georgia Small Business Owner**

49. J.R. is a citizen of Honduras and TPS holder who has lived in the United States since 1992. He is 60 years old and lives near Atlanta, Georgia with his wife, also a TPS holder. Earlier in life, J.R. and his wife hoped to have children, but, as he puts it, "that was not in God's plan." Without U.S. citizen children or parents, the couple has no obvious avenue to seek permanent residence, despite both having resided in the United States legally for more than 30 years.

50. Since he has been in the United States, J.R. has worked in trucking. At first, he drove a truck for FedEx. He saved up money and later purchased his own truck. In 2018, he achieved his dream of opening his own trucking business. He owns 15 trucks and has about 25 employees. J.R. has worked very hard to get to where he is, and he and his wife were looking forward to a comfortable retirement.

51. However, with the loss of TPS, J.R. can no longer operate his business. In order to maintain his business, he must have a valid commercial driver's license. However, because that class of license requires valid work authorization, J.R. will no longer be able to renew his license. Faced

with having to close his business and fire his employees, J.R. decided to instead sign over the business he has worked so hard to establish to a friend. This was a difficult decision for J.R., who prides himself on his work ethic and self-reliance, and has been proud of the business that he created and grew.

52.     J.R has serious medical issues requiring consistent care. He is HIV-positive, and, in 2016, he suffered a life-altering accident at work in which he lost his right leg. He now wears a prosthesis, which requires daily care and hygiene to prevent irritation, sores, and infection. This routine care is all the more important for J.R. due to his HIV-positive status, which impairs his immune system. He takes medication daily to manage the virus and prevent its progression. It is critical that he takes his medication consistently and without interruption to maintain his health and prevent serious complications. He also has to go to the doctor every six months to manage his conditions.

53.     Without the TPS status which afforded him stable work authorization and income that comfortably provided for his significant medical needs, J.R. does not know how he will go on. He fears that without stable healthcare and support, adhering to his treatment regime will become extremely challenging and put his health at a significant risk of serious complications or even death.

**F.C., Florida Caretaker and Widow of U.S. Military Veteran**

54.     F.C. is a citizen of Honduras and TPS holder who has lived in the United States since 1994. She is 77 years old and lives in Miami, Florida. F.C. works as a caretaker and takes three buses to get to work. In 2002, she married a U.S. citizen and former military veteran but was unable to adjust her status because her husband died in 2004.

55.     F.C. has depended on Medicare and Medicaid and her deceased husband's retirement to survive. Since April 2025, however, she has not had healthcare due to her loss of TPS. She has thyroid issues that required her to have a biopsy. She has to have regular follow-up medical appointments but she now lacks healthcare and is forced to pay out of pocket. Recently, she paid out of pocket: $150 for an appointment, $200 for an ultrasound, and $150 to review the ultrasound results. She knows that she will not be able to sustain healthcare costs out of pocket for much longer. She also suffers from high blood pressure and takes medication. Her medication costs her about $90

a month. Adding to those medical conditions, she also has cataracts that impact her vision but she cannot schedule surgery because she lacks healthcare and will not be able to pay for the costs of the surgery out of pocket.

56. F.C. is no longer receiving her husband's retirement payments. She was also receiving Social Security payments, and those have been discontinued. Now, F.C. doesn't know how she will get by. "With TPS, I never felt afraid, but now I am scared to go out on the street," says F.C.

**H.P., Quality Control Inspector and Father of Three from Texas**

57. H.P. is a citizen of Honduras and TPS holder who has lived in the United States since 1992. He is 62 years old and lives in Houston, Texas. He has three U.S. citizen children, aged 33, 27, and 21, all of whom attended college thanks to the financial and emotional support of H.P. His youngest son recently enlisted in the U.S. Navy. H.P. has spent his life prioritizing his children—providing for them financially and supporting their education.

58. Prior to the termination of TPS, H.P. was working in what he describes as his dream job: a quality control inspector for piping systems in the oil industry. It took him many years of hard work to reach that position. On average, he earned $1,200 a week. However, he abruptly had to stop working in September 2025 after he lost his work authorization because of the termination of Honduras' TPS designation.

59. H.P. suffers from a chronic pulmonary disease caused by years of factory work and smoking. He manages his disease with two inhalers, antibiotics, and other medication. He had not had any flareups in the last two years but became immediately sick after he lost TPS this year. The loss of his TPS and work authorization has caused H.P. such severe anxiety that he has been having thoughts of suicide. The anxiety increased when the bills started to roll in when he no longer had work to pay the bills. He has isolated himself and isn't talking to anyone because he's scared to leave his house.

**Y.C., Florida Mother, Cancer-Survivor and LGBTQ Community Member**

60. Y.C. is a citizen of Nicaragua and TPS holder who has lived in the United States since 1996. She is 51 years old and lives in Florida. She has one U.S. citizen son who is 9 years old and

who she pays to attend private school. She identifies as a gay woman and came to the United States to be free from persecution for her sexual orientation.

61. She has suffered from numerous health issues, including thyroid cancer, tumors, anemia, and Bell's Palsy—a medical condition that has caused her face to droop from one side. Approximately 12 years ago, she was diagnosed with thyroid cancer and underwent surgery to remove her thyroid. A few years later she underwent surgery again because doctors found two tumors in her breast. She became pregnant and had a still birth in May 2014. In September 2014, she had surgery to remove a tumor in her uterus. She became pregnant a second time in 2015 and, within a month of giving birth to her son in 2016, she suffered from Bell's Palsy. All of these conditions require Y.C. to have access to healthcare for ongoing treatments, follow-ups, and evaluations. For her thyroid issues, she takes daily medication. She also requires about 30 injections to her face every three months to restore the balance to her face because of the Bell's Palsy. For her anemia, she takes medication to elevate her iron levels. And she also has to go to the doctor every six months to ensure that her cancer does not return. All these medical appointments and treatments are only possible because, prior to losing her TPS status, she had access to healthcare.

62. Now, without TPS status, she has lost her healthcare and does not know what she will do to pay for her essential medical care. Each appointment with a specialist would cost her $300-$400 out of pocket—an amount she cannot afford, especially because she also lost her job when she lost her TPS.

63. Her life has been turned upside down due to the TPS termination. For about 23 years, she worked as a supervisor at a golf course but was going to lose her healthcare benefits so she retired from that job and started a new job working for Amazon. While Amazon did not provide healthcare, she paid for her own healthcare through the exchange available from the Affordable Care Act. She no longer qualifies for subsidized healthcare through the exchange. Now, without a job or healthcare, she is worried about her health and financial wellbeing.

1  I declare under penalty of perjury that the foregoing is true and correct, and that this
2  declaration was executed at Loomis, California, this 13th day of October, 2025.

*[Signature]*
Emilia Garcia