Ahilan T. Arulanantham (SBN 237841)
arulanantham@law.ucla.edu
CENTER FOR IMMIGRATION LAW AND
POLICY, UCLA SCHOOL OF LAW
385 Charles E. Young Dr. East
Los Angeles, CA 90095
Telephone: (310) 825-1029

Emilou H. MacLean (SBN 319071)
emaclean@aclunc.org
Michelle (Minju) Y. Cho (SBN 321939)
mcho@aclunc.org
Amanda Young (SBN 359753)
ayoung@aclunc.org
ACLU FOUNDATION
OF NORTHERN CALIFORNIA
39 Drumm Street
San Francisco, CA 94111-4805
Telephone: (415) 621-2493

Attorneys for Plaintiffs
*[Additional Counsel Listed on Next Page]*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| NATIONAL TPS ALLIANCE, DENIS MOLINA, JHONY SILVA, MARIA ELENA HERNANDEZ, O.C., SANDHYA LAMA, S.K., TEOFILO MARTINEZ,<br><br>     *Plaintiffs*,<br><br>     v.<br><br>KRISTI NOEM, in her official capacity as Secretary of Homeland Security, UNITED STATES DEPARTMENT OF HOMELAND SECURITY, and UNITED STATES OF AMERICA,<br><br>     *Defendants*. | Case No. 3:25-cv-05687<br><br>**PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**<br><br>Date:     November 18, 2025<br>Time:     9:30 a.m.<br>Place:     Courtroom 9<br><br>Complaint filed: July 7, 2025 |

Additional Counsel for Plaintiffs

Jessica Karp Bansal (SBN 277347)
jessica@ndlon.org
Lauren Michel Wilfong (admitted *Pro Hac Vice*)
lwilfong@ndlon.org
NATIONAL DAY LABORER ORGANIZING NETWORK
1030 S. Arroyo Parkway, Suite 106
Pasadena, CA 91105
Telephone: (626) 214-5689

Eva L. Bitrán (SBN 302081)
ebitran@aclusocal.org
Diana Sánchez (SBN 338871)
dianasanchez@aclusocal.org
ACLU FOUNDATION
OF SOUTHERN CALIFORNIA
1313 West 8th Street
Los Angeles, CA 90017
Telephone: (213) 977-5236

Erik Crew (admitted *Pro Hac Vice*)
ecrew@haitianbridge.org
HAITIAN BRIDGE ALLIANCE
4560 Alvarado Canyon Road, Suite 1H
San Diego, CA 92120
Telephone: (949) 603-7411

## **<u>TABLE OF CONTENTS</u>**

INTRODUCTION ................................................................................................................1

BACKGROUND ...............................................................................................................1

      A.    Defendants Implemented a New Rule Limiting Review to Originating Conditions ................................................................................................1

      B.    Defendants Ceased Consultation with the State Department About Country Conditions ................................................................................................3

      C.    Defendants Focused on National Interest Considerations .....................................5

ARGUMENT .....................................................................................................................6

    I.    This Court Has Jurisdiction Over All of Plaintiffs' Claims.............................6

      A.    The TPS Statute Does Not Bar Plaintiffs' Claims ..................................6

      B.    No Other Statute Bars Plaintiffs' Claims ................................................9

    II.    The Terminations Violated the APA ......................................................10

      A.    The Terminations Were Predetermined and Without Observance of Procedure Required by Law........................................................................10

      B.    The Terminations Were Contrary to Law and Arbitrary and Capricious Because They Did Not Take Into Account Intervening Conditions .....................14

CONCLUSION.................................................................................................................15

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alcaraz v. INS,*
    384 F.3d 1150 (9th Cir. 2004) ...................................................................................9

*Am. Wild Horse Pres. Campaign v. Perdue,*
    873 F.3d 914 (D.C. Cir. 2017) ................................................................................15

*Amgen v. Smith*,
    357 F.3d 103 (D.C. Cir. 2004) .............................................................................8, 9

*Campanale & Sons, Inc., v. Evans,*
    311 F. 3d 109 (1st Cir. 2002) ..................................................................................13

*CASA de Md., Inc. v. Trump,*
    355 F. Supp. 3d 307 (D. Md. 2018) .........................................................................8

*CASA, Inc. v. Noem*,
    No. 25-1484-TDC, 2025 WL 1907378 (D. Md. July 10, 2025) .................................8

*Centro Presente v. DHS,*
    332 F. Supp. 3d 393 (D. Mass. 2018) .......................................................................8

*DCH Reg'l Med. Ctr. v. Azar*,
    925 F.3d 503 (D.C. Cir. 2019) ................................................................................9

*Dep't of Com. v. New York*,
    588 U.S. 752 (2019)...........................................................................................13, 14

*E. Bay Sanctuary Covenant v. Biden*,
    993 F.3d 640 (9th Cir. 2021) ...................................................................................7

*Immigrant Assistance Project of L.A. Cnty. Fed'n of Lab. (AFL-CIO) v. INS,*
    306 F.3d 842 (9th Cir. 2002) ...................................................................................8

*Immigrant Defs. L. Ctr. v. Noem,*
    145 F.4th 972 (9th Cir. 2025) .................................................................................10

*Lal v. INS,*
    255 F.3d 998 (9th Cir. 2001) .................................................................................15

*McNary v. Haitian Refugee Ctr.*,
    498 U.S. 479 (1991)..................................................................................................8

*Mendez-Gutierrez v. Ashcroft*,
    340 F.3d 865 (9th Cir. 2003) ...................................................................................9

*Nat'l TPS All. v. Noem*,
    150 F.4th 1000 (9th Cir. 2025) ................................................................7, 10, 13

*Nken v. Holder*,
    556 U.S. 418 (2009)................................................................................................7

*Nw. Env't Def. Ctr. v. Bonneville Power Admin.*,
    477 F.3d 668 (9th Cir. 2007) ...............................................................................15

*Ramos v. Nielsen*,
    321 F. Supp. 3d 1083 (N.D. Cal. 2018) ..........................................................8, 14

*Ramos v. Nielsen*,
    336 F. Supp. 3d 1075 (N.D. Cal. 2018) .......................................................6, 12, 15

*Ramos v. Wolf*,
    59 F.4th 1010 (9th Cir. 2023) ................................................................................7

*Ramos v. Wolf*,
    975 F.3d 872 (9th Cir. 2020) .................................................................................7

*Reno v. Cath. Soc. Servs., Inc.*,
    509 U.S. 43 (1993)................................................................................................8

*Robbins v. Reagan*,
    780 F.2d 37 (D.C. Cir. 1985) ..............................................................................15

*Saget v. Trump*,
    375 F. Supp. 3d 280 (E.D.N.Y. 2019) ...........................................................6, 8, 15

*Sheikh v. DHS*,
    685 F. Supp. 2d 1076 (C.D. Cal. 2009) ................................................................9

*Singh v. Berger*,
    56 F.4th 88 (D.C. Cir. 2022)..................................................................................7

*Skagit Cnty. Pub. Hosp. Dist. No. 2 v. Shalala*,
    80 F.3d 379 (9th Cir. 1996) ..................................................................................9

*Sw.t Airlines v. FERC*,
    926 F.3d 851 (D.C. Cir. 2019)............................................................................15

*Spencer Enters., Inc. v. United States*,
    345 F.3d 683 (9th Cir. 2003) ................................................................................9

*Tummino v. Torti*,
    603 F. Supp. 2d 519 (E.D.N.Y. 2009) ................................................................11

iii

**Statutes**

5 U.S.C. § 701(a)(2) ..................................................................................................9

8 U.S.C. § 1252 .......................................................................................................10

8 U.S.C. § 1254a .............................................................................................2, 6, 8, 9

28 U.S.C. § 2201 .....................................................................................................15

**Other Authorities**

90 Fed. Reg. 19217 (May 6, 2025) ........................................................................5, 13

90 Fed. Reg. 30086 .................................................................................................12

Fed. R. App. P. 40 ....................................................................................................7

PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT
CASE NO. 3:25-CV-05687

## INTRODUCTION

Defendants rehash a litany of meritless jurisdictional arguments already rejected by this Court and the Ninth Circuit, but fail to rebut Plaintiffs' powerful evidence that Defendants' decisions to terminate TPS for Honduras, Nicaragua, and Nepal violated the APA and the TPS statute. Defendants' only response to evidence that the challenged termination decisions were made *before* statutorily required consultation and country conditions review is that the administrative record includes State Department recommendations and a country conditions report. But the Nicaragua and Nepal recommendations in the administrative record are stale, so—by Defendants' own admission— cannot support "informed" TPS decisions. And the Honduras recommendation fails to satisfy the statute because it is not based on country conditions. Further, internal communications show Defendants reviewed the country conditions reports in the administrative record only *after* drafting termination decisions; their public actions and statements confirm their decisions to terminate were made well before considering country conditions. As to Plaintiffs' claim that Defendants adopted an incorrect interpretation of the TPS statute and broke with past practice by refusing to consider intervening country conditions, Defendants protest that they never had such a practice, but do not address the voluminous evidence of it, including TPS decisions from the prior administration, testimony from the prior agency head, and two district court decisions expressly describing it. New evidence obtained since Plaintiffs filed their motion further strengthens both their claims. Because the challenged terminations were unlawful, this Court should grant Plaintiffs' motion.

## BACKGROUND

### A. Defendants Implemented a New Rule Limiting Review to Originating Conditions

New evidence[1] confirms that early in President Trump's administration, Defendants adopted a contrived reading of the TPS statute to justify terminating TPS for countries facing on-going crisis: they would limit the focus of their inquiry to whether the *original* reason for the TPS designation of a country justified the continuation of TPS. This was inconsistent with both the process for prior TPS decisionmaking, Dkt. 144 at 4, and the statutory obligation to review country conditions during

---

[1] Defendants agreed Plaintiffs may rely on new discovery in this brief. *See* Dkt. 141.

1    any TPS periodic review. 8 U.S.C. § 1254a(b)(3)(A).

2        Historically, the Secretary's TPS decisions have been informed by objective country

3    conditions analyses provided by USCIS's Refugee, Asylum, and International Operations (RAIO)

4    Directorate and the State Department. Dkt. 144 at 3-4. These country conditions analyses provide the

5    foundation for USCIS Decision Memos, which give an evidence-based recommendation to the

6    Secretary to extend or terminate a TPS designation for a particular country. *Id.*

7        Under the new process, Defendants provided clear "guidelines" for those drafting USCIS

8    Decision Memos to *avoid* a comprehensive country conditions analysis: "Focus on conditions

9    described in the original designation, and how they are/aren't the same now" and "[i]nclude any

10   improvements" but ignore "[i]ssues like 'corruption' that are more endemic rather than temporary"

11   and are now deemed "outside the scope" of the Secretary's review. Ex. 1 at 1692-93. *See also* Dkt.

12   144 at 20, 23-24 (seeking "improvements"); Ex. 2 at 2523, 2523_1, 2524 (same); Ex. 15 at 2452_1

13   (same). Those drafting RAIO Country Conditions Memos received the same instruction: the "focus"

14   of the country conditions analysis should be the original reason for the designation. Ex. 3

15   ("Nicaragua was initially designated for TPS on January 5, 1999 … based on environmental disaster

16   grounds….As a result, the focus of this TPS COI paper should be on environmental conditions for

17   Nicaragua and whether there are any continuing effects from Hurricane Mitch, similar to how the

18   Nepal TPS COI paper is framed."). USCIS OP&S even constructed a new type of memo, expressly

19   focused on a comparison of the initial conditions of designation and the current effects of those

20   conditions; and statutorily irrelevant factors such as "fraud or vetting problem statistic[s]." Exs. 4-8.

21   *See also* Dkt. 145-30 (Honduras memo: "Comparison of Country Conditions between Initial and

22   Latest."). *See* Ex. 9 (describing Decision Memos informed by "in-house OP&S research").

23       By focusing exclusively on the original environmental disaster and emphasizing

24   "improvements"—while ignoring other serious problems even though they had been analyzed in

25   prior TPS decisions for these countries—Defendants were more easily able to justify their

26   preordained termination decisions. Mtn. at 12-14. *See also* Ex. 11 at 1014-2 (Honduras termination

27   based on conclusion that "the catastrophic flooding and damage resulting from Hurricane Mitch no

28   longer constitutes a 'substantial, but temporary, disruption in living conditions"); Ex. 12 at 1017-2

1   (Nicaragua termination based on conclusion that "Nicaragua has made significant progress in

2   recovering from the hurricane's destruction").

3          Defendants publicly presented the termination decisions as "tied directly to … the original

4   environmental disaster." Ex. 10 at 1329_13. However, Defendants never acknowledged that they had

5   crafted a new rule that deviated radically from past practice. On the contrary, they sought to

6   recharacterize past decisions as consistent with their new approach, describing the prior extensions

7   as entirely based on the originating conditions, even though there was no factual basis for that

8   assertion. *See, e.g.*, Ex. 13 at 3126_2 ("It's more accurate to say that Honduras has been periodically

9   extended on the statutory basis of environmental disaster...."). While publicly denying any change,

10  internally Defendants recognized their new approach as a deviation from past practice, remarking

11  that "[t]ypically [the Department of State] and [the USCIS International and Refugee Affairs

12  Division] provide country conditions," but that now "the Department is very focused on research

13  that pertains directly to the original reason for a country's TPS designation, and the ability for the

14  U.S. to successfully return aliens to that country." Ex. 14 at 1522_3 (Feb. 28: seeking "[s]pecific

15  updated country conditions related to the reason for the original designation").

16         The results were absurd, as even Defendants recognized. For example, the agency public

17  relations team struggled to determine how to explain the termination of Nicaragua, which they

18  acknowledged was run by a "murderous, dictatorial regime." Ex. 10 at 1329_0012.

19  **B. Defendants Ceased Consultation with the State Department About Country Conditions**

20         The certified administrative record (CAR) already demonstrated that the Secretary did not

21  consider a contemporaneous country conditions analysis from the State Department for any of the

22  challenged terminations; she also never received a current recommendation from the State

23  Department for either Nicaragua or Nepal. Dkt. 144 at 9-11, 18-19 (citing CARs). New evidence

24  reveals Defendants made the challenged termination decisions without considering contemporaneous

25  country conditions analyses and recommendations from the State Department, despite Defendants'

26  recognition that the statute requires as much.

27         Defendants never received a contemporaneous State Department recommendation for

28  Nicaragua. Exs. 9, 16, 17, 31, 21 at 1504_3 (seeking State Department Nicaragua recommendation

3

letter and country conditions analysis); Ex. 18 at 1399 ("we anticipate receiving the updated DOS letter soon"). New evidence reveals that the absence of a TPS recommendation for Nicaragua from Secretary Rubio is because he *opposed* the termination. Ex. 17 ("The issue here is that Secretary Rubio did not concur with the TPS termination for Nicaragua."). There is, however, no evidence in the CAR that he provided any input, or that Secretary Noem considered—or even knew about—the State Department's continued opposition to Nicaragua's TPS termination.[2] Dkt. 63.

With regard to Nepal, Defendants failed to obtain a contemporaneous State Department country conditions review and instead relied on a stale State Department recommendation to terminate from the prior administration. Ex. 19 (Mar. 11: "Ah so this wasn't issued under this Administration (I guess there was just a delay in transmission???)"). Nor did Defendants ever receive an updated State Department recommendation. Ex. 20 (asking whether State Department will "update or reissue [the prior administration's] report under Rubio's signature").

Of the three countries at issue, Defendants only received an updated State Department recommendation for Honduras, and even that came only after the Decision Memo was drafted. Dkt. 144 at 11; Ex. 21 at 1504_1 (Apr. 8: "Re: Honduras, the DM is now ready to go to the FO…We did not receive a recommendation from DOS." (emphasis omitted)). In a marked deviation from historical practice, the State Department's recommendation to terminate TPS for Honduras was based only on national interest. Dkt. 144 at 11 & 18-19. DHS staff, summarizing Secretary Rubio's letter, remarked on the change: "The letter does not provide country-specific information beyond stating that Honduras has recovered from the disruption in living conditions that resulted from Hurricane Mitch in 1999, nor does it go through the Q&A format of letters of the past. Rather, it provides a reminder of Sec. Rubio's Jan. 22, 2025 foreign policy statement that says DOS will no longer undertake actions that facilitate or encourage mass migration." Ex. 22. The State Department informally shared a similar national interest assessment for Nicaragua and other countries. *See, e.g.*, Ex. 24 at 3048 ("It seems to me and to others at State that permitting the aliens from [Honduras, Haiti and Nicaragua] temporarily in the United States is contrary to the national interest of the

---

[2] USCIS staff had wrongly expected Secretary Rubio to recommend *termination* for Nicaragua. Ex. 23 at 1873_1 (draft Decision Memo with "placeholder" for termination recommendation).

1    United States? Is that everyone else's sense too at this point?"); Ex. 28 (draft State Department

2    recommendation letter for TPS Nicaragua—substantively identical to the final Honduras letter, Dkt.

3    145-36—which was never signed). *See also* Ex. 29 (draft Cameroon recommendation focusing on

4    national interest).

5            Although Defendants did not consider contemporaneous State Department input for the

6    challenged terminations, new evidence confirms Defendants recognized the TPS statute required

7    them to, as had long been standard practice. *See, e.g.*, Ex. 23 at 1873_7 (draft Nicaragua Decision

8    Memo recognizing the DOS recommendation as "part of the interagency consultation requirement").

9    Defendants even provided as justification for the automatic extension of TPS for South Sudan—the

10   one country which Defendants have not yet terminated when it came up for a periodic review—that

11   the Secretary did not make a timely decision "due to stale country conditions/recommendation from

12   [the State Department]." Ex. 25 at 3080; *see also* 90 Fed. Reg. 19217, 19217-18 (May 6, 2025). In

13   that case, the State Department's analysis was from four months prior, which the Secretary deemed

14   insufficiently contemporaneous to meet her statutory obligations. 90 Fed. Reg. at 19217-18.

15           Despite this recognized statutory obligation, under the new administration Defendants no

16   longer received *any* country conditions analysis from the State Department. Ex. 27 at 2342 (March

17   19: "[G]oing forward, State will no longer submit detailed [country of origin] reports for TPS

18   decision-making, but will continue to submit the cover memo from SecState with their

19   recommendation..."); Ex. 21 at 1504_3 ("general understanding is DOS is no longer providing

20   country conditions and that the 1 pg. letter may not arrive until the end of the process right before S1

21   needs to sign."). Instead, they received only a letter with a conclusory recommendation, if they

22   received anything at all. Ex. 26 at 1524 (State Department advised "[t]hey are going to provide a

23   letter instead of country conditions."). Even where State Department input was forthcoming,

24   Defendants did not wait on it before making their TPS decisions. Ex. 30 at 266 & 268 (stating, as to

25   Cameroon termination decision: "the DOS updated guidance came in *after* S1 made her decision, so

26   we did not and are not including that in the AR b/c S1 did not have that input officially to consider").

27   **C. Defendants Focused on National Interest Considerations**

28           New documents also reveal Defendants sought evidence to justify termination on national

interest grounds. Specifically, they sought data that TPS holders had been identified as a public safety risk, or subject to fraud or national security investigations. Ex. 14 at 1522_3 (seeking, i.e., "[a]ny fraud or vetting problem statistic for aliens from a TPS designated country"); Ex. 32 at 1775_4 ("OP&S is working on improving the TPS decision memos and we are adding a national interest analysis."); *id.* (seeking fraud and national security data for Nepal); Ex. 33 at 1672_0003 (same for Honduras and Nicaragua); Ex. 36 at 1498 (inserting "national security stats" into Nepal Decision Memo). This had not historically been part of the periodic review. They also sought the number of noncitizens from TPS-designated countries in ICE custody. Ex. 34. Even though by definition TPS holders cannot be in ICE detention, 8 U.S.C. § 1254a(d)(4), Defendants asserted that this data "will assist USCIS and DHS in evaluating TPS-designated countries[.]" Ex. 34. During the first Trump administration, Defendants considered similar statutorily irrelevant factors—specifically whether "Haitian TPS beneficiaries had been convicted of crimes or were on public or private relief." *Ramos v. Nielsen*, 336 F. Supp. 3d 1075, 1104-05 (N.D. Cal. 2018); *see also Saget v. Trump*, 375 F. Supp. 3d 280, 343 (E.D.N.Y. 2019) (DHS "look[ed] for criminality data and welfare data regarding Haitian TPS recipients … to provide further ammunition for terminating TPS for Haiti, contrary to prior practices of not considering such data"). The ultimate results of this research, in connection with the recent periodic reviews, were deemed "laughable" by TPS subject matter experts—*i.e.*, 1 of 12,858 Nepali TPS holders with a fraud finding. Ex. 32 at 1775_1; *id.* at 1775 ("Such a LOW number of fraud found" "I know. It's so laughable that it's even in the paper.").

## ARGUMENT

## I.    THIS COURT HAS JURISDICTION OVER ALL OF PLAINTIFFS' CLAIMS

### A.  The TPS Statute Does Not Bar Plaintiffs' Claims

For the reasons described in this Court's prior orders, Dkts. 73 at 15-20, 87 at 2-6, 134 at 10-11, the TPS statute's jurisdiction stripping provision, 8 U.S.C. § 1254a(b)(5)(A), does not bar Plaintiffs' claims. *See also* Dkt. 121 at 3-9. Defendants' recycled arguments have no more merit now than they did when this Court rejected them on three prior occasions.

The Supreme Court's stays in a different TPS case do not alter this analysis. Dkt. 166 at 3. Neither of the stay orders interpret the TPS statute's jurisdiction-stripping provision or otherwise

provide any reasoned explanation. Even if they did, "a predictive analysis" in connection with a stay "should not, and does not, forever decide the merits of the parties' claims." *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 661 (9th Cir. 2021); *see also Nken v. Holder*, 556 U.S. 418, 432 (2009) ("The whole idea [of a stay] is to hold the matter under review in abeyance because the appellate court lacks sufficient time to decide the merits."); *Singh v. Berger*, 56 F.4th 88, 109 (D.C. Cir. 2022) (likelihood of success finding when granting a stay "in no way prejudges" a party's "ability going forward to" advocate "on the merits before the district court").

Defendants assert the vacated Ninth Circuit opinion in *Ramos v. Wolf*, 975 F.3d 872 (9th Cir. 2020), should be treated as "persuasive," but cite as their only support a case discussing the precedential value of opinions vacated *due to mootness*. Dkt. 166 at 3 n.1 (citing *DHX, Inc. v. Allianz AGF MAT, Ltd*., 425 F.3d 1169 (9th Cir. 2005)). The *Ramos* opinion was vacated because a majority of Ninth Circuit judges *voted to rehear the case en banc*, indicating disagreement with the panel's decision. *Ramos v. Wolf*, 59 F.4th 1010, 1011 (9th Cir. 2023) (mem.); *see also* Fed. R. App. P. 40 (standard for en banc rehearing). If anything, *Ramos* suggests a majority of the Ninth Circuit *disagreed* with some or all of the panel's conclusions, including its conclusion that the TPS statute barred Plaintiffs' claims. That is particularly likely given that Judge Christen's persuasive dissent argued there was jurisdiction. *Ramos*, 975 F.3d at 906 (Christen, J., dissenting).

Nor does the Ninth Circuit's decision in *National TPS Alliance v. Noem*, 150 F.4th 1000, 1017 (9th Cir. 2025) ("*NTPSA I*"), support Defendants. To the contrary, *NTPSA I* reaffirmed that the jurisdiction-stripping provision does *not* foreclose all judicial review of TPS-related decisions. *Id.* at 1017–1018 (considering "the plain text of the statute, its legislative history, and the strong presumption that the scope of agency authority is reviewable" to find judicial review preserved).

Ultimately, Defendants' jurisdictional arguments are premised on a misrepresentation of Plaintiffs' claims. Dkt. 166 at 4 (claiming that Plaintiffs "never pinpoint any statutory criteria that the Secretary supposedly overlooked"). Plaintiffs' first APA claim challenges the Secretary's failure to comply with the *statutory requirement* that TPS decisions be based on interagency consultation and a review of country conditions, rather than a preordained decision to end the program's protections. Dkt. 144 at 16-20. Plaintiffs' second APA claim challenges the Secretary's decision to

7

disregard intervening conditions arising after the crisis that triggered initial designation, in an arbitrary and unexplained break from past agency practice. Dkt. 144 at 20-24. These are both challenges to the collateral process by which the Secretary reached her TPS decisions, not challenges to her underlying "determination" about country conditions itself. 8 U.S.C. § 1254a(b)(5)(A). Numerous district courts in TPS cases have found jurisdiction to review materially identical claims. *See CASA, Inc. v. Noem*, No. 25-1484-TDC, 2025 WL 1907378, at *10 (D. Md. July 10, 2025) (review of pre-determination claim not barred by Section 1254(b)(5)); *Saget*, 375 F. Supp. 3d at 329-33, 345-53 (same); *Ramos v. Nielsen*, 321 F. Supp. 3d 1083, 1101-04 (N.D. Cal. 2018) (review of claim that TPS decisions arbitrarily broke with past practice by refusing to consider intervening conditions not barred by Section 1254a(b)(5)); *Centro Presente v. DHS*, 332 F. Supp. 3d 393, 406-09 (D. Mass. 2018) (same); *Saget*, 375 F. Supp. 3d at 354-59 (same); *CASA de Md., Inc. v. Trump*, 355 F. Supp. 3d 307, 320-21, 328 (D. Md. 2018) (same).

As those cases recognize, the provision on which Defendants rely bars review only of certain "determinations" under the TPS statute, and the Supreme Court has construed that term narrowly in the immigration context so as to preserve review over challenges to decisionmaking processes, including challenges authorized by the Administrative Procedure Act. *See McNary v. Haitian Refugee Ctr.*, 498 U.S. 479, 491-92 (1991) (collateral due process challenge reviewable); *Reno v. Cath. Soc. Servs., Inc.*, 509 U.S. 43, 56-58 (1993) ("*CSS*") (same, as applied to statutory interpretation claim). The Ninth Circuit has repeatedly relied on those cases as well. *See, e.g.*, *Immigrant Assistance Project of L.A. Cnty. Fed'n of Lab. (AFL-CIO) v. INS*, 306 F.3d 842, 862-63 (9th Cir. 2002) ("*IAP*") (same, as to claim about proof requirements). Defendants ignore these cases and instead rely on cases interpreting statutes about Medicare. Dkt. 166 at 3-5 (citing *Amgen v. Smith*, 357 F.3d 103 (D.C. Cir. 2004), *DCH Reg'l Med. Ctr. v. Azar*, 925 F.3d 503 (D.C. Cir. 2019), and *Skagit Cnty. Pub. Hosp. Dist. No. 2 v. Shalala*, 80 F.3d 379, 386 (9th Cir. 1996)). Those cases are inapposite because they do not interpret the word "determination" in the context of a statute regulating jurisdiction over immigration. Moreover, the jurisdiction stripping provision at issue in *Amgen* explicitly precluded review over not only payment "adjustments" but also "[t]he development of the [payment] classification system" itself; it is thus unsurprising that the court held

8

1  it lacked authority to review the manner in which the agency made a payment adjustment decision.

2  357 F.3d at 111. *DCH Regional Medical Center* is similarly distinguishable. The court there

3  recognized that it might have had authority to review the manner by which the agency calculated

4  payments if the regulatory scheme had provided a general rule for calculating payments that was

5  applied to individual hospitals. *Id.* at 506. The TPS statute does provide a general rule for making

6  country conditions determinations that is applied to individual country decisions, so *DCH* provides

7  little guidance. Defendants also cite *Skagit County Public Hospital District No. 2 v. Shalala*, but that

8  case held that a challenge to the process the agency used to arrive at its decision was generally

9  reviewable, but had been mooted by a change in the process. 80 F.3d at 386.

10      Judicial review is not foreclosed by § 1254a(b)(5)(A).

11  **B.  No Other Statute Bars Plaintiffs' Claims**

12      Defendants briefly assert 5 U.S.C. § 701(a)(2), which limits review of agency action

13  "committed to agency discretion by law," deprives this Court of jurisdiction to review the

14  Secretary's country conditions determinations. Dkt. 166 at 5. But Plaintiffs do not challenge the

15  Secretary's country conditions determinations. As described above, Plaintiffs' first APA claim

16  challenges the Secretary's failure to comply with statutorily required procedures. Dkt. 144 at 16-20.

17  Compliance with those procedures is not discretionary, so Section 701(a)(2) does not apply. *See* 8

18  U.S.C. § 1254a(b)(3)(A) ("*after* consultation with appropriate agencies," Secretary "*shall* review the

19  conditions" in the country) (emphases added). Plaintiffs' second APA claim challenges the

20  Secretary's decision to disregard intervening country conditions as an arbitrary and unexplained

21  break from past agency practice. Dkt. 144 at 20-24. Section 701(a)(2) does not bar this claim either,

22  because "agency practice provide[s] a meaningful standard by which this court may review its

23  exercise of discretion." *Spencer Enters., Inc. v. United States*, 345 F.3d 683, 688 (9th Cir. 2003)

24  (internal quotation marks and citation omitted); *see Alcaraz v. INS*, 384 F.3d 1150, 1161 (9th Cir.

25  2004) (holding 701(a)(2) did not bar review because agency policy provided "law to apply");

26  *Mendez-Gutierrez v. Ashcroft*, 340 F.3d 865, 868 (9th Cir. 2003) (same); *Sheikh v. DHS*, 685 F.

27  Supp. 2d 1076, 1091 (C.D. Cal. 2009) (holding that agency's practice of relying on "the same set of

28  factors ... to adjudicate … petitions for many years" created law to apply and precluded application

9

1   of 701(a)(2)). Indeed, as this Court has recognized, an agency's "settled course" of decision-making

2   can itself create "a general policy by which its exercise of discretion will be governed." Dkt. 73 at 23

3   (quoting *INS v. Yueh-Shaio Yang*, 519 U.S. 26, 32 (1996)).

4          Defendants also assert 8 U.S.C. § 1252(a)(2)(B)(ii) bars Plaintiffs' challenge to the length of

5   the orderly transition period, Dkt. 166 at 10-11, but Plaintiffs do not seek summary judgment on that

6   claim and Defendants' argument is meritless. *See* Dkt. 121 at 6-8. Finally, Defendants rehash their

7   argument that 8 U.S.C. § 1252(f)(1) bars relief under Section 706 of the APA. Dkt. 166 at 6. The

8   Ninth Circuit and this Court have held otherwise. *See Immigrant Defs. L. Ctr. v. Noem*, 145 F.4th

9   972, 989-90 (9th Cir. 2025) (holding that Section 1252(f)(1) does not limit relief under the APA);

10  *Nat'l TPS All.*, 150 F.4th at 1018 ("[S]ection 1252(f)(1) does not prohibit relief in the form of a stay

11  or postponement of agency action under the APA."); Dkt. 73 at 20.

12  **II.   THE TERMINATIONS VIOLATED THE APA**

13        **A.  The Terminations Were Predetermined and Without Observance of Procedure**

14             **Required by Law**

15         New discovery confirms that Defendants' termination decisions were preordained and

16  political, and did not comply with the TPS statute's consultation and review requirements. First,

17  Defendants themselves recognized their TPS decisions were impossible to explain based on country

18  conditions. In discussing how to publicize the Honduras and Nicaragua terminations, DHS personnel

19  resisted pressure to highlight supposedly improved conditions in Honduras out of concern that

20  focusing on country conditions would "call[] into question why we're also terminating the program

21  in Nicaragua, with its murderous dictatorial regime." Ex. 10 at 1329_12. Ultimately, DHS's press

22  release described the termination of Nicaragua's TPS status as necessary to "restore[] integrity in our

23  immigration system and ensure[] that TPS remains temporary." Dkt. 145-13. In other words, the

24  decision was about antipathy to the TPS program, rather than any assessment that it would be safe

25  for Nicaraguans to return. *See also* Dkt. 144 at 7-8 (discussing Defendants' public statements

26  describing TPS terminations as part of President Trump's directive to end TPS generally).

27         Second, Defendants added a "national interest analysis" to *all* their TPS decisions—including

28  those challenged here—even though this is not a relevant factor for assessing whether designation

remained warranted. Ex. 32 at 1775_4. *See also* Dkt. 144 at 19 n.6 (national interest not relevant to extension of TPS designation based on environmental disaster). Defendants' new national interest focus confirms that "political pressure was intended to and did cause the agency's action to be influenced by factors not relevant under the controlling statute." *Tummino v. Torti*, 603 F. Supp. 2d 519, 544 (E.D.N.Y. 2009) (setting aside the action in question) (quoting *Town of Orangetown v. Ruckelshaus*, 740 F.2d 185, 188 (2d Cir. 1984)); *see also* Dkt. 144 at 19 (State Department recommended terminating TPS for Honduras as contrary to national interest); Ex. 24 (State Department opining, in communications with DHS senior leadership, that "permitting the aliens from [Honduras, Haiti and Nicaragua] temporarily in the United States is contrary to the national interest of the United States"). Defendants' national interest "analysis" consisted of reviewing databases to identify whether any TPS applicants had a "National Security, Fraud, or Public Safety Record." Ex. 32 at 1775_1. The number of hits was so "low," career personnel found it "laughable" that it was a focus of the agency's review. *Id.* at 1775.

Third, in March, the State Department simply stopped providing country conditions reports to inform TPS decisions. Ex. 27 at 2342. This left DHS with only stale reports for Nicaragua and Nepal, and no report for Honduras at all. *See* Dkt. 62 (Honduras CAR index) (listing State Department recommendation letter but no country conditions report); Dkt. 63 (Nicaragua CAR index), ¶ 3 (listing State Department report and recommendation dated Nov. 19, 2024); Dkt. 64 (Nepal CAR index), ¶ 3 (listing State Department report and recommendation dated Jan. 16, 2025).

Defendants have no response to this or the other voluminous evidence of predetermination and procedural irregularity. Instead, they rely entirely on the certified administrative record, arguing it shows the Secretary reviewed county conditions and consulted with the State Department *before* making her decision. Dkt. 166 at 7-10. To the contrary, the CAR shows neither.

***As to country conditions***, the record shows Defendants did not review the country conditions reports in the CAR until *after* drafting the termination decision memos on which the Secretary relied. *See* Dkt. 144 at 5-14. Defendants respond that the timing of a draft is not dispositive of when a decision was made. Dkt. 166 at 13. But the substance of the drafts confirms Defendants intended to terminate regardless of conditions. In any event, Plaintiffs do not rely solely on the drafts to establish

11

1   the timing of the Secretary's termination decisions. Rather, as described in Plaintiffs' motion and

2   this Court's prior order, Defendants' public statements and actions also "demonstrate that the

3   Secretary's TPS Nepal, Honduras, and Nicaragua terminations were based on a preordained

4   determination to end the TPS program, rather than an objective review of the country conditions."

5   Dkt. 73 at 21. *See also* Dkt. 144 at 16-20. The draft dates simply confirm it.

6       Defendants point to country conditions reports in the CAR as evidence that Secretary Noem

7   considered "large amounts of country conditions evidence." Dkt. 166 at 9. But "the fact that [the

8   Secretary] *received* information regarding [country] conditions, does not prove she ultimately

9   considered and relied on those conditions in deciding to terminate TPS status." *Ramos*, 336 F. Supp.

10  3d at 1097. Indeed, the evidence shows she did not: the Decision Memos and Federal Register

11  Notices conspicuously *exclude* any mention of, e.g., "violence and crime in Honduras, weather

12  events in Nicaragua" or "the effects of the COVID-19 pandemic" and "inflation in Nepal." Dkt. 166

13  at 9 (arguing the Secretary considered those conditions). *See* Dkt. 144 at 23-24. That those issues are

14  addressed in the CAR is not dispositive; what matters is whether the Secretary considered them in

15  making her decisions. Her own explanations for her decisions show she did not.

16      Next, Defendants accuse Plaintiffs of failing to "pinpoint" exactly what country conditions

17  they disregarded. Dkt. 166 at 9. While Plaintiffs do not challenge the Secretary's failure to consider

18  any one specific condition, both Plaintiffs and this Court have extensively catalogued *categories* of

19  conditions Defendants ignored. *See* Dkt. 144 at 7-8; Dkt. 73 at 22. New discovery confirms this

20  narrow focus. "[E]ndemic" issues like corruption were to be disregarded. Ex. 1 at 1693. "Women's

21  rights" and "environmental concerns" were off limits. *Id.* "[I]mprovements," on the other hand, were

22  to be highlighted. *Id. See also* Dkt. 18-7. This resulted in terminations that, *inter alia*, concluded that

23  a "murderous dictatorial regime," Ex. 10 at 1329_0012, was now safe, without even *addressing* the

24  country's political situation. *See* 90 Fed. Reg. 30086 (Nicaragua Termination Notice).

25      ***As to consultation***, Defendants' reliance on the CAR to show the Secretary consulted with

26  the State Department before making her termination decisions is similarly unavailing. The dated

27  reports Defendants rely on, Dkt. 166 at 11-12, cannot satisfy the statutory consultation requirement,

28  which mandates *contemporaneous* consultation about country conditions. *See* Dkt. 144 at 18.

12

Contrary to Defendants' assertion, Plaintiffs do not argue that the statute's consultation requirement can be satisfied only by specific types of documents. Dkt. 166 at 12. Rather, Plaintiffs argue only that consultation must be current, i.e., occur shortly before the decision, and must address country conditions. Defendants themselves have recognized as much. In May (just one month before the Nepal termination and two months before the Honduras and Nicaragua terminations), the Secretary announced in the Federal Register that she had been "*unable to make an informed determination* on South Sudan's designation by the . . . statutory deadline" because she "only had a *non-current record from Department of State* that was signed November 6, 2024, approximately four months prior to when [she] needed to make a decision." 90 Fed. Reg. at 19217-18 (emphases added). Given Defendants' own acknowledgement that it is not possible to make an "informed determination" based on stale records, *id.*, there can be no justification for their decisions to terminate TPS for Honduras, Nicaragua, and Nepal based on absent (for Honduras) or similarly stale (for Nicaragua and Nepal) information.[3] *See* Ex. 23 at 1873_7 (recognizing the DOS recommendation as "part of the interagency consultation requirement"). USCIS's citations to even more outdated State Department reports prepared for the public rather than as part of the TPS review process do not rectify its failure to consult contemporaneously about country conditions. Dkt. 166 at 11. *See Campanale & Sons, Inc., v. Evans*, 311 F. 3d 109, 119-20 (1st Cir. 2002) (consultation requirement not satisfied by taking public comment).

Finally, Defendants cite *Department of Commerce v. New York*, 588 U.S. 752, 781 (2019), for the proposition that a court may not set aside agency action simply because it was influenced by administration priorities.[4] Dkt. 166 at 10. But the record here establishes much more than a policy preference. It shows Defendants disregarded statutorily required procedures to arrive at a preordained, political outcome and then justified their decision with cherry-picked facts and

---

[3] The automatic South Sudan extension does not undercut evidence Defendants have made a preordained decision to end TPS generally. South Sudan is an outlier: only 200 individuals hold TPS under its designation. Further, Defendants have advised South Sudanese TPS holders "to prepare for their return to South Sudan," foreshadowing imminent termination. 90 Fed. Reg. at 19217.

[4] Defendants assert TPS decisions can be based directly on vague notions of "national interest" and "immigration policies," Dkt. 166 at 14, but Congress set forth specific statutory factors for TPS decisions to *protect* immigrants against "the vagaries of our domestic politics." *See Nat'l TPS All.*, 150 F.4th at 1008 (quoting 135 Cong. Rec. H7501 (daily ed. Oct. 25, 1989)).

13

1    "contrived reasons." *Dep't of Com.*, 588 U.S. at 785. The government *lost* the *Department of*

2    *Commerce* case because our system "demand[s] something better." *Id.*

3    **B. The Terminations Were Contrary to Law and Arbitrary and Capricious Because**

4    **They Did Not Take Into Account Intervening Conditions**

5    New discovery also leaves no question that the challenged termination decisions considered

6    only each country's recovery from the original crisis, ignoring other conditions, no matter how dire.

7    This violated both the TPS statute and the APA change-in-position doctrine. Dkt. 144 at 20-24.

8    Defendants' internal communications describe their new approach explicitly. The "new

9    guidelines" were to "[f]ocus on conditions described in the original designation." Ex. 1 at 1692-93.

10    *See also supra at* 1-3. Defendants do not contest Plaintiffs' description of their approach, but dispute

11    that they had a prior practice of considering intervening conditions. Dkt. 166 at 16. However, even a

12    cursory review of the prior administration's TPS decisions show that they extensively considered

13    intervening conditions. *See* Dkt. 144 at 6, 22 (discussing prior administration's decisions).

14    Defendants also fail to address the two prior district court decisions explicitly finding such a

15    practice, the trial testimony of former USICS Director Leon Rodriguez describing it, and the prior

16    agency decisions reflecting it. Dkt. 144 at 4, 22; Dkt. 145-47; 145-53.

17    To support their fanciful claim that DHS has never considered intervening country

18    conditions, Defendants cite 20-plus-year-old Federal Register Notices they contend mention only

19    original conditions, but they (obviously) cannot establish anything about the agency's recent past

20    practice. Dkt. 166 at 17. As a general matter, Federal Register Notices at that time contained almost

21    no explanation and therefore shed no insight into agency reasoning. Other notices cited by

22    Defendants involve countries designated for brief periods, during which there simply may not have

23    been any relevant intervening conditions. *Id.* (Guinea). Finally, some of the notices they cite did

24    describe intervening conditions, but authorized termination anyway. *Id.* (Angola, Kosovo). But

25    Plaintiffs' argument is not that any ongoing problems foreclose termination, but instead just that they

26    have to be *considered*, and those notices confirm that "under the prior practice, intervening events

27    were at least considered." *Ramos*, 321 F. Supp. 3d at 1116.

28

1      Defendants also assert that a break with an "informal" past practice does not trigger the

2  change-in-position doctrine. Dkt. 166 at 16. But the "good reason" requirement "is not limited to

3  officially promulgated regulations." *Robbins v. Reagan*, 780 F.2d 37, 45-49 (D.C. Cir. 1985). It

4  applies to changes manifested in decisions, informal guidance, and practices. *Id.* (reviewing whether

5  agency provided adequate explanation for reversing commitment to homeless shelter); *Lal v. INS*,

6  255 F.3d 998, 1006-07 (9th Cir. 2001) ("By changing its settled practice … the BIA acted

7  impermissibly and committed an arbitrary and capricious act."); *Nw. Env't Def. Ctr. v. Bonneville*

8  *Power Admin.*, 477 F.3d 668, 687-88 (9th Cir. 2007) (departure from decades-old funding practice);

9  *Am. Wild Horse Pres. Campaign v. Perdue*, 873 F.3d 914, 923-24 (D.C. Cir. 2017) (departure from

10 longstanding land management practice). Defendants' attempt to distinguish *Southwest Airlines v.*

11 *FERC*, 926 F.3d 851 (D.C. Cir. 2019), falls flat. Dkt. 166 at 16. Defendants' "repeated use[]" of

12 intervening conditions in the past is indistinguishable from the FERC's "repeate[d] use" of certain

13 types of data in its rate-making decisions. Both establish a "consistent practice" that "sets the

14 baseline from which future departures must be explained." *Sw. Airlines Co.,* 926 F.3d at 858.

15     Indeed, a court in this district previously held that the *exact practice* at issue here gave rise to

16 an obligation under the APA to acknowledge and provide a good reason for changing course and

17 refusing to consider intervening conditions. *Ramos*, 336 F. Supp. 3d at 1089-98; *see also Saget*, 375

18 F. Supp. 3d at 350-53 (same). Plaintiffs cited both *Ramos* and *Saget* numerous times in their motion,

19 Dkt. 144, so Defendants' assertion that Plaintiffs "identify no case that has ever divined an agency

20 policy from such an informal, unspoken past conduct" is demonstrably false. Dkt. 166 at 16.

21     Finally, Defendants argue that, even if there were a change in position, the Secretary

22 provided "good reasons to support the terminations." Dkt. 166 at 17. This misses the point. The

23 Secretary was required to provide good reasons *for her decision to depart from prior agency*

24 *practice*. There is no dispute that she neither acknowledged nor explained that decision.

25                          <u>**CONCLUSION**</u>

26     For the reasons above and in Plaintiffs' motion, the Court should set aside the challenged

27 terminations under Section 706 of the APA and declare them unlawful under 28 U.S.C. § 2201.

28

Date: November 4, 2025

Respectfully submitted,
ACLU FOUNDATION
OF NORTHERN CALIFORNIA

/s/ Emilou MacLean

Emilou MacLean
Michelle (Minju) Y. Cho
Amanda Young
ACLU FOUNDATION
OF NORTHERN CALIFORNIA

Ahilan T. Arulanantham
CENTER FOR IMMIGRATION LAW AND
POLICY, UCLA SCHOOL OF LAW

Jessica Karp Bansal
Lauren Michel Wilfong (admitted *Pro Hac Vice*)
NATIONAL DAY LABORER ORGANIZING
NETWORK

Eva L. Bitrán
Diana Sanchez
ACLU FOUNDATION
OF SOUTHERN CALIFORNIA

Erik Crew (admitted *Pro Hac Vice*)
HAITIAN BRIDGE ALLIANCE

Attorneys for Plaintiffs

1

## <u>CERTIFICATE OF SERVICE</u>

2

   I hereby certify that on November 4, 2025, I caused the foregoing to be electronically filed

3

with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing

4

(NEF) to all counsel of record.

5

6

        ACLU FOUNDATION
        OF NORTHERN CALIFORNIA

7

        */s/  Emilou MacLean*

8

        Emilou MacLean

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT
CASE NO. 3:25-CV-05687