1

2

3

4                    UNITED STATES DISTRICT COURT

5                   NORTHERN DISTRICT OF CALIFORNIA

6

7     NATIONAL TPS ALLIANCE, et al.,          Case No.  25-cv-05687-TLT

8                      Plaintiffs,            **ORDER ON MOTION TO DISMISS;**
                                              **MOTION TO EXCLUDE EXPERT**
9              v.                             **TESTIMONY; MOTION FOR**
                                              **PARTIAL SUMMARY JUDGMENT;**
10    KRISTI NOEM, et al.,                     **MOTION FOR SUMMARY**
                                              **JUDGMENT**
11                     Defendants.
                                              Re: Dkt. Nos. 110, 142, 143, 144
12

13

14         Although today's times seem to be flooded with crises and emergencies—whether

15    speculative, genuine, or contrived—our Constitution remains an important protection from

16    unbridled power.  Unilateral power has never been American.  Nor has this country ignored the

17    importance of humanitarian relief.  Indeed, leaders around the world are often recognized for

18    defending human rights, protecting the vulnerable, and pursuing efforts that foster peace.  In

19    enacting the Temporary Protected Status statute, Congress codified the importance of

20    humanitarian relief for those within the United States who are unable to return to their country of

21    origin.  By complying with the Constitution and enforcing the purpose of the Temporary Protected

22    Status statute, this nation's economy becomes strengthened and our society united.

23         Before the Court is (1) Defendants' motion to dismiss; (2) Defendants' motion to exclude

24    the testimony of (i) Stacy Tolchin, (ii) Hannah Postel, (iii) Melanie Morten, (iv) Elliott Young, (v)

25    Tara Watson, (vi) Tom Wong, (vii) Dana Frank; (3) Plaintiffs' motion for partial summary

26    judgment; and (4) Defendants' motion for summary judgment.

27         This case was subject to several interruptions.  In August, the Court's decision on

28    Plaintiffs' motion to postpone was stayed by the Ninth Circuit, the parties' and the Court's

United States District Court
Northern District of California

resources were strained by a lapse in appropriations by Congress from October 1, 2025 to November 13, 2025, and the parties experienced a number of roadblocks in exchanging discovery. Nonetheless, the Court held a hearing, as scheduled, on the motions on November 18, 2025.  ECF 187.

This Order addresses each of the motions pending before the Court in five sections.

Section I discusses the factual and legal background, as well as the procedural history under which these motions arose.

Section II identifies and rejects Defendants' argument that this Court lacks jurisdiction.

Section III discusses the Court's decision to **DENY** Defendants' motion to dismiss.

Section IV explains the Courts' decision to **GRANT** Defendants' motion to exclude the expert testimony of (i) Stacy Tolchin, (ii) Hannah Postel, (iii) Melanie Morten, (iv) Tara Watson, (v) Tom Wong, (vi) Dana Frank; and the Court's decision to **DENY** Defendants' motion to exclude the testimony of Elliott Young.

Section V discusses the pending motions for summary judgment.  In Section IV, the Court provides the grounds for the Court's decision to **GRANT** Plaintiffs' motion for partial summary judgment on two of the claims raised under the Administrative Procedure Act ("APA"), and the grounds for the Court's decision to **DENY** Defendants' motion for summary judgment on Plaintiffs' APA claims and Equal Protection Claim.

## I.    BACKGROUND

### A.    Procedural History

On July 7, 2025, Plaintiffs filed the instant lawsuit asserting claims under the APA and the Due Process Clause of the Fifth Amendment.  ECF 1.  The following day, Plaintiffs filed a motion to postpone the effective date of the Department of Homeland Security's ("DHS") decision to terminate TPS for Honduras, Nepal, and Nicaragua.  ECF 17.  On July 14, 2025, Defendants filed an opposition to Plaintiffs' motion to postpone the effective date of DHS's decision.  ECF 45. Plaintiffs replied on July 18, 2025.  The Court held a hearing on Plaintiffs' motion on July 29, 2025.  ECF 71.

On July 31, 2025, the Court granted Plaintiffs' motion to postpone.  ECF 73.  On August

20, 2025, the Ninth Circuit granted Defendants' motion to stay this Court's order granting Plaintiffs' motion to postpone pending appeal. ECF 96. The Ninth Circuit, however, declined to stay the proceedings in this Court. *Id.*

On September 9, 2025, Defendants filed a motion to dismiss Plaintiffs' complaint. ECF 110. Plaintiffs timely opposed Defendants' motion to dismiss on September 23, 2025. ECF 121. Defendants replied on September 30, 2025. ECF 128.

On October 2, 2025, the Court granted Plaintiffs' motion to certify the following classes: the Honduras Class, the Nepal Class, and the Nicaragua Class. ECF 134.

On October 14, 2025, Defendants filed a motion for summary judgment and motion to exclude the testimony of seven of Plaintiffs' experts. ECF 142; ECF 143. On the same day, Plaintiffs filed a motion for partial summary judgment on two of Plaintiffs' APA claims and a motion to consider extra-record evidence in support of their motion for partial summary judgment. ECF 144; ECF 153.

Plaintiffs opposed Defendants' motion for summary judgment and motion to exclude expert testimony on October 28, 2025. ECF 167; ECF 168. Defendants opposed Plaintiffs' motion for partial summary judgment on the same day. ECF 166.

Defendants' filed replies in support of their pending motions on November 4, 2025. ECF 173; ECF 174. Plaintiffs filed a reply in support of their motion for partial summary judgment on November 4, 2025. ECF 175.

The Court held a hearing on Defendants' motion to dismiss, Defendants' motion to exclude expert testimony, Plaintiffs' motion to consider extra-record evidence, Plaintiffs' motion for partial summary judgment, and Defendants' motion for summary judgment on November 18, 2025. ECF 187.

**B.    Factual Background**

The Court adopts the facts as set forth in the Court's orders on Plaintiffs' motion to postpone and motion for class certification. The Court explains the record as necessary, and with the following facts as set forth below.

Since this nation's founding, federal courts have rejected the notion of unlimited and

United States District Court
Northern District of California

1  unfettered power.  The Court will not abandon this history.  Indeed, in codifying the

2  Administrative Procedures Act ("APA"), Congress "sets forth the procedures by which federal

3  agencies are accountable to the public and their actions subject to review by the courts."  *Dep't of*

4  *Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1, 16 (2020) (citing *Franklin v.*

5  *Massachusetts*, 505 U.S. 788, 796, (1992).  The statute requires agencies to engage in "reasoned

6  decisionmaking," *id* (citing *Michigan v. EPA*, 576 U.S. 743, 750 (2015) (internal quotation marks

7  omitted), and directs that agency actions be "set aside" if they are "arbitrary" or "capricious," 5

8  U.S.C. § 706(2)(A).  Today, the Court complies with the requirements of the APA.

9           **i.    The TPS Statute**

10        Congress established the Temporary Protected Status ("TPS") program in 1990 to provide

11  humanitarian relief to foreign nationals within the United States who are unable to return to their

12  country of origin due to potential threats to their personal safety from natural disaster, civil strife

13  and armed conflict, or other extraordinary and temporary conditions.  *Nat'l TPS All. v. Noem*, 150

14  F.4th 1000, 1010 (9th Cir. 2025); *see* 8 U.S.C. § 1254a.  The TPS statute was enacted to reflect the

15  practice of "every Administration since and including that of President Eisenhower" which was to

16  "permit[] one or more groups of otherwise deportable aliens to remain temporarily in the United

17  States out of concern that the forced repatriation of these individuals could endanger their lives or

18  safety."  H.R. Rep. 100-627, at 6 (1988).  Pursuant to 8 U.S.C. § 1254a(a)(1), the Secretary of

19  Homeland Security may designate a country for TPS and grant nationals of that country protection

20  from removal and work authorization in the United States for the period their home country is so

21  designated.  8 U.S.C. § 1254a(a)(1)(B).

22        In designating a country for TPS, the Secretary must engage in "consultation with

23  appropriate agencies of the Government" and publish a "statement of the findings" and an estimate

24  of the number of eligible foreign nationals.  *Id.* § 1254a(b)(1).

25        Once a country is designated for TPS, nationals of that country can register for benefits

26  during a registration.  To establish eligibility for TPS, an applicant must demonstrate, among other

27  things, that he or she is a national of the country designated for TPS, has been continuously

28  physically present and resided in the United States since the effective date of designation, and is

United States District Court
Northern District of California

4

United States District Court
Northern District of California

1    otherwise admissible as an immigrant.  8 U.S.C. § 1254a(c)(2)(A); 8 C.F.R. §§ 244.2, 244.3(a),

2    1244.3(a).  The government can deny an applicant TPS based on the applicant's criminal history.

3    8 U.S.C. § 1254a(c)(2)(A)–(B); 8 C.F.R. § 244.3(c).  TPS applicants must also pay all fees

4    associated with applying for TPS.  *Id.* at § 1254a(c)(1)(B).

5         Periodically, the Secretary "shall review the conditions in the foreign state . . . for which a

6    designation is in effect under this subsection and shall determine whether the conditions for such

7    designation under this subsection continue to be met."  *Id.* at § 1254a(b)(3).  If the Secretary finds

8    that the conditions are no longer met, she "shall terminate the designation by publishing notice in

9    the Federal Register of the determination."  *Id.*

10        Under the TPS statute, termination is not effective "earlier than 60 days after the date the

11   notice is published or, if later, the expiration of the most recent previous extension."  *Id.*  The

12   Secretary may extend the designation "for an additional period of 6 months (or, in the discretion of

13   the [Secretary], a period of 12 or 18 months)" if the conditions giving rise to the TPS designation

14   persist.  *Id.*

15        ## ii.    History of TPS for Nepal, Honduras, and Nicaragua

16        On June 24, 2015, the Secretary designated Nepal for TPS for a period of 18 months due to

17   a breakdown of living conditions resulting from a 7.8 magnitude earthquake.  80 Fed. Reg. 36,346

18   (June 24, 2015).  The earthquake impacted about one-third of the country's population and

19   damaged approximately 750,000 homes.  *Id.*  In 2016, TPS was extended for an additional 18

20   months because of sustained strained infrastructure, civil unrest, and inadequacies in safe housing,

21   food, medicine, and education.  81 Fed. Reg. 74,470 (Oct. 26, 2016).  In 2018, TPS was extended

22   for several years due to legal challenges to the TPS termination for Nepal.  90 Fed. Reg. at 24,152.

23   In 2023, DHS reconsidered the 2018 decision to terminate TPS and extended TPS for recipients

24   from Nepal to June 24, 2025.  88 Fed. Reg. 40,317 (June 21, 2023).  On June 6, 2025, DHS

25   published notice in the Federal Register that TPS for Nepal would terminate on August 5, 2025.

26   90 Fed. Reg. at 21,512.

27        Hurricane Mitch hit Honduras in late October 1998, causing "widespread heavy rain and

28   severe flooding" in Honduras, Nicaragua, and other nearby countries that resulted in "thousands

dead or missing" and "tremendous property, infrastructure, and crop damage." *25 Years Later: Looking Back at the October Monster Named Mitch*, NOAA (Oct. 27, 2023).  In 1999, the Attorney General designated Honduras for TPS for 18 months.  64 Fed. Reg. 524 (Jan. 5, 1999). Over the next twenty years, TPS was repeatedly extended as DHS found continued "disruption in living conditions."  79 Fed. Reg. 62170 (Oct. 16, 2014); 88 Fed. Reg. 40304 (Jun. 21, 2023). DHS terminated TPS for Honduras in 2018.  83 Fed. Reg. 26,074 (June 5, 2018).  Legal challenges to the termination of TPS for Honduras resulted in extension of TPS for several years. 90 Fed. Reg. at 30,090.  In 2023, DHS reconsidered the 2018 decision to terminate TPS and extended TPS for Honduras through July 5, 2025.  88 Fed. Reg. at 40,304 (June 21, 2023).  On July 8, 2025, DHS published notice in the Federal Register that TPS for Honduras would be terminated effective September 8, 2025.  90 Fed. Reg. at 30,091.

Nicaragua was similarly hit by Hurricane Mitch and designated for TPS in 1999.  *See* 64 Fed. Reg. 526 (Jan. 5, 1999); 88 Fed. Reg. 40294 (Jun. 21, 2023).  TPS was extended for nearly two decades due to recurrent weather events until terminated in 2017.  82 Fed. Reg. 59,636 (Dec. 15, 2017).  After the termination announcement, litigation resulted in the continued extension of TPS for Nicaragua for several years.  90 Fed. Reg. at 30,087.  In 2023, DHS extended TPS for Nicaragua through July 8, 2025.  88 Fed. Reg. at 40,294 (June 21, 2023).  On July 8, 2025, DHS published notice in the Federal Register that TPS for Nicaragua would terminate on September 8, 2025.  90 Fed. Reg. at 30,086.

### iii.    The Current Administration and TPS

On the first day of his second term, President Trump issued an executive order titled, "Protecting the American People Against Invasion" ("Invasion EO").  90 Fed. Reg. 8443 (Jan. 20, 2025).  The Invasion EO referenced to an "unprecedented flood of illegal immigration into the United States" and ordered the Secretary of State, Attorney General, and DHS Secretary to "rescind the policy decisions of the previous administration that led to the increased or continued presence of illegal aliens in the United States, and align any and all departmental activities with the policies set out by this order and the immigration laws."  *Id.* § 16.  This included "ensuring that designations of Temporary Protected Status are consistent with the provisions of section 244

of the INA (8 U.S.C. 1254a), and that such designations are appropriately limited in scope and made for only so long as may be necessary to fulfill the textual requirements of that statute." *Id.* § 16(b). The Invasion EO would be cited in later decisions vacating or terminating TPS designations. *See* 90 Fed. Reg. 30086 (July 8, 2025); 90 Fed. Reg. 30089 (July 8, 2025); 90 Fed. Reg. 24151 (Jun. 6, 2025). *See also* Compl. ¶ 57 (citing "President Trump's promise to rescind policies that were magnets for illegal immigration and inconsistent with the law" when vacating Haiti's TPS extension).

In a January 29, 2025 post on X, Secretary Noem announced that she would end a Biden order that allowed Venezuelans to stay in the country and "violate our laws." ECF 18-16. In a March 20, 2025 post on X, Secretary Noem associated "migration management" with "sav[ing] American lives and get[ting] criminals off our streets!" ECF 18-17.

At her confirmation hearing, Secretary Noem stated that "[TPS] has been abused and manipulated by the Biden Administration, and that will no longer be allowed. . . and these extensions going forward the way that they are. The program was intended to be temporary[.]." Compl. ¶¶ 61, 73. During a February 2, 2025 "Meet the Press" appearance, Secretary Noem stated that "The TPP [sic] program has been abused and it doesn't have integrity right now." Compl. ¶ 74. The Department of Homeland Security ("DHS") has stated that, by vacating or partially vacating TPS, it was "restoring integrity in our immigration system," and fulfilling "President Trump's promise to rescind policies that were magnets for illegal immigration and inconsistent with the law." Compl. ¶ 57.

Other officials in this administration have vocalized their goal of terminating TPS. President Trump, in response to a question from a reporter about whether he would revoke a country's TPS status, stated, "You have to remove the people; you cannot destroy our country . . . In my opinion, it's not legal. . . . Absolutely I'd revoke [TPS]." Compl. ¶ 78; ECF 145-3. During the 2024 presidential campaign, then-vice-presidential candidate JD Vance stated "[w]e're going to stop doing mass grants of Temporary Protected Status." Compl. ¶ 80. He went on to call TPS designations a "magic amnesty wand" which he characterized as a "terrible indictment of [Vice President Kamala Harris's] amnesty policies." Compl. ¶ 81. Project 2025, "the 2025 Presidential

1    Transition Project," a product of current and former political appointees of the president explicitly

2    called for the "[r]epeal [of] TPS designations."  Compl. ¶ 84.

3        In a May 19, 2025, post on X, DHS equated TPS holders with "MS-13 gang members,"

4    "known terrorists," and "murderers."  ECF 18-18.  These statements are consistent with similar

5    statements by President Trump including one occurrence in which he stated that migrants were

6    "poisoning the blood of our country."  ECF 18-20; *see also* ECF 18-23 (President Trump asking

7    why people "could not come from nice countries . . . like Denmark, Switzerland, and Norway");

8    *see* Compl. ¶ 98 (President Trump "How about allowing people to come to an open border . . .

9    many of them murdered far more than one person, and they're now happily living in the United

10   States.  You know now a murderer, I believe this, it's in their genes. And we got a lot of bad genes

11   in our country right now."); *see also* ECF 18-15 at 7 (Secretary Noem describing immigration as

12   an "invasion happening on purpose . . . to remake the foundation of this country").

13       **iv.    The Termination Decision-Making Process**

14       On April 7, 2025, DHS staff circulated copies of the TPS decision memos ("DM") for

15   Honduras and Nicaragua.  ECF 176-22; ECF 145-31.  The DMs terminating TPS for Honduras

16   and Nicaragua were drafted before receiving updated country conditions reports from the

17   Department of State.  *See* ECF 176-22 at 3 ("[T]he DM is now ready to go . . . We did not receive

18   a recommendation from DOS. You are correct that DOS will not provide country conditions

19   anymore."); *see also* ECF 145-21 ("I wanted to check in on about COI for Nicaragua and

20   Honduras.  We are currently prepping both DMs to circulate this week, but I am not sure we have

21   the COI from RRU. . .Do you have an ETA?"); *compare* ECF 145-31 (decision memos written by

22   April 7) *with* ECF 145-21 (DHS personnel acknowledging lack of country conditions information

23   on April 8).

24       In the case of Nepal, Defendants recognized they lacked "an updated DOS report," ECF

25   145-35, and downplayed the importance of the report because it supported their desired result:

26   "the recommendation was to terminate so we should move forward."  ECF 176-20; *see* ECF 63;

27   ECF 64 (CAR indices for Nepal and Nicaragua, lacking any contemporaneous State Department

28   country conditions analysis or recommendation letter).

United States District Court
Northern District of California

Moreover, in requesting country conditions reports for Honduras, Nicaragua, and Nepal, the DHS personnel requested revised reports that "only include[d] around 1 page of country conditions" and "[i]nclude[d] any improvements" without "mention environmental concerns or climate change." ECF 176-2. Researchers had their team "revise the reports for Nepal, Honduras, Nicaragua, and Haiti to make them consistent with [these] new guidelines." *Id*. DHS personnel also added a "national interest analysis" based on "data/analysis." ECF 176-33 at 6 ("OP&S is working on improving the TPS decision memos and we are adding a national interest analysis . . . . We are wanting to provide data/analysis in our TPS decision memo."); *id*. ("We'd like to request another analysis . . . [t]his time it's for Cameroon and Nepal."). However, as described by policy analysts, this "data" involved "[s]uch a LOW number of fraud" for Nepal that "[i]t's so laughable that it's even in the paper." ECF 176-33 at 2; *see id*. (showing 1 "Found Fraud" out of 12,859 total for Nepal). DHS personnel sought the "same type of data" analysts provided for Nepal, "but this time for Honduras and Nicaragua." ECF 176-34 at 5. After receiving this data, DHS personnel contemplated how to explain their TPS terminations: "The problem is if we sing the praises of Honduras (which we certainly do), then it calls into question why we're also terminating the program in Nicaragua, with its murderous, dictatorial regime. Which in turn might open us up to questions about why we're terminating for both countries when the conditions on the ground are so much better in Honduras." ECF 176-11.

DHS personnel were also instructed to narrow the scope of her review to the conditions that gave rise to the initial TPS designation. "[E]ndemic" issues like corruption were considered "outside the scope" of review. ECF 176-2. "Women's rights" and "environmental concerns" were similarly beyond the scope. *Id*. Instead, the focus was to be on the "improvements," and descriptions of the conditions related to the original designation. *Id*. This resulted in terminations that, *inter alia*, concluded that a "murderous dictatorial regime," ECF 176-11 at 1329_0012, was now safe, without even addressing the country's political situation. *See* 90 Fed. Reg. 30086 (Nicaragua Termination Notice). The termination notices fail to address food insecurity in Nepal, staggering crime in Honduras, or humanitarian crises in Nicaragua when describing the basis for terminating TPS. *See* Compl. ¶¶ 63, 66–69.

United States District Court
Northern District of California

###### v.    The Classes

The Court certified the following classes:

> **Honduras TPS Class:** All persons who have been granted TPS pursuant to the TPS designation of Honduras and who have not been granted lawful permanent residence.
>
> **Nepal TPS Class:** All persons who have been granted TPS pursuant to the TPS designation of Nepal and who have not been granted lawful permanent residence
>
> **Nicaragua TPS Class:** All persons who have been granted TPS pursuant to the TPS designation of Nicaragua and who have not been granted lawful permanent residence

ECF 134 at 6.  The following plaintiffs have been appointed as the Class Representatives:

**Plaintiff Denis Molina** is 49 years old, a native of Honduras, and has been in the United States since 1997.  ECF 17-2 ¶¶ 4–5.  He applied for and has maintained TPS since Hurricane Mitch hit Honduras.  *Id.* ¶ 5.  He has been a church pastor for over 22 years and works various jobs in construction and as a mechanic to support his family, which includes a wife and four children.  *Id.* ¶¶ 6–12.  Two of his children, one aged 4 and another 22, have been diagnosed with autism and require special programs to support their development.  *Id.* ¶¶ 9, 13.  He is the sole breadwinner for his family.  *Id.* ¶ 12.  If TPS terminates, Molina fears that he will not be able to support his family in Honduras and, if his entire family relocates to Honduras, his children will lose the support of special programs for their development.  *Id.* ¶¶ 12, 14.

**Plaintiff Johny Silva** is 29 years old, a native of Honduras, and came to the United States when he was three-years old.  ECF 17-3 ¶ 2.  He was granted TPS after Hurricane Mitch.  *Id.* ¶ 4.  Silva is a Certified Nursing Assistant at Stanford Hospital and relies on his TPS for work authorization.  *Id.* ¶¶ 10, 13.  Without TPS, Silva and his son, approximately 9 years old and diagnosed with autism, will lose their health insurance.  *Id.* ¶ 13.  Silva will also lose his job, not be able to contribute to his family's rent, will have to abandon his dreams of becoming a nurse, and be separated from the rest of his family.  *Id.* ¶¶ 13–14, 16.

**Plaintiff Elena Hernandez** is 67 years old, a native of Nicaragua, came to the United States in 1996 because her family was targeted by the Nicaraguan government, and was granted

TPS in 1999. ECF 17-4 ¶ 3. Plaintiff Hernandez has worked at an aquatic plant nursery, cleaning company, and as a shop steward with TPS. *Id.* ¶ 7. Plaintiff Hernandez has asthma and a heart condition that requires daily medication. *Id.* ¶ 9. Without TPS, Plaintiff Hernandez would lose her health insurance and social security income even though she has paid into social security for more than 25 years. *Id.* ¶¶ 9, 11. She would lose her job, be separated from her family, have no way of supporting herself, and worries that her health will rapidly decline without continued access to healthcare. *Id.* ¶¶ 10, 12, 14. Given her family history and views, she may also face persecution in Nicaragua. *Id.* ¶ 14

**Plaintiff Sandhya Lama** is 43 years old, a native of Nepal, and has been in the United States since 2008. ECF 17-6 ¶ 2. She came to the United States in 2008 to study at a university in Virginia, received her master's degree in 2014, and has been a TPS holder since 2015. *Id.* ¶¶ 2, 6. She is a single mother of three U.S. citizen children, a sole provider, and is currently a CXO Multi Site Lead LC for Amazon. *Id.* ¶¶ 2, 10–13. If forced to return to Nepal, Lama's children would lose opportunities, and one of Lama's children would not be able to get medical treatment for her severe allergies. *Id.* ¶ 15. Returning to Nepal would also be dangerous because Lama's family has suffered persecution from the Maoist (communist) party in Nepal, including having their ancestral house bombed and brother being taken as hostage. *Id.* ¶¶ 4, 16.

**Plaintiff Teofilo Martinez** is 57 years, a native of Honduras, and has been on TPS since 1997. ECF 17-8 ¶ 2. He is a licensed soccer instructor, a licensed realtor, and owns a landscaping business. *Id.* ¶ 9. He has also been volunteering with the Honduran Consulate for the last 7 years, is on the executive committee for NTPSA, and co-hosts a radio show for TPS holders. *Id.* Without TPS, Martinez would be separated from his partner of over 25 years, lose his job, and not be able to travel for his volunteer work with NTPSA. *Id.* ¶¶ 15, 18.

## II.    JURISDICTION

Defendants raise four distinct challenges to the Court's exercise of jurisdiction over Plaintiffs' claims. ECF 110 at 2–3, 12. Defendants argue that (A) the TPS statute broadly prohibits judicial review of "any determination of the Secretary with respect to" TPS designations, terminations, or extensions, *id.* at 2; (B) 8 U.S.C. § 1252(f)(1) bars this Court from "enjoin[ing] or

United States District Court
Northern District of California

restrain[ing]" the Secretary from implementing her decisions, *id*; (C) 8 U.S.C. § 1252(a)(2)(B)(ii)

bars review of any "decision or action of … the Secretary of Homeland Security the authority for

which is specified under [the INA] to be in the discretion of … the Secretary …" such as the

Secretary's termination decisions, *id* at 12; and (D) the APA does not allow for review of agency

action, like the Secretary's decisions, that are committed to agency discretion by law. *Id* at 3. The

arguments in Defendants' motion to dismiss mirror those raised in their motion for summary

judgment. ECF 142 at 7–12. Defendants also previously raised most of these arguments in

opposition to Plaintiffs' motion to postpone, and in opposition to Plaintiffs' motion for class

certification. ECF 45 at 2; ECF 99 at 3. The Court addresses each of Defendants' jurisdictional

arguments as they relate to Defendants' motion to dismiss and motion for summary judgment

below.

### A.    8 U.S.C. § 1254a(b)(5)(A) Does Not Bar Review of Plaintiffs' Claims

In Defendants' motion to dismiss and motion for summary judgment, Defendants argues

that 8 U.S.C. §1254a(b)(5)(A) strips federal courts of jurisdiction to review the Secretary's

terminations. ECF 110 at 10; ECF 142 at 1. Specifically, Defendants argue that "[t]here is no

judicial review of any determination of the [Secretary] with respect to the designation, or

termination or extension of a designation, of a foreign state" for TPS relief. ECF 110 at 9.

Defendants further argue that the word "any" carries an expansive meaning and encompasses the

Secretary's TPS decisions here. *Id.* at 9. Plaintiffs aver that Plaintiffs' challenges fall outside of

the jurisdictional bar articulated in §1254a(b)(5)(A) because Plaintiffs challenge the process by

which Defendants made the TPS decisions, rather than the substance of the Secretary's

conclusions. ECF 121 at 3.

8 U.S.C. §1254a(b)(5)(A) reads "[t]here is no judicial review of any determination of the

[Secretary] with respect to the designation, or termination of a designation, of a foreign state under

this subsection." Several federal courts, including this Court, have found jurisdiction exists over

claims where plaintiffs allege that the Secretary exceeded the scope of his or her authority in

deciding to terminate, or by the manner in which he or she decided to terminate, TPS

United States District Court
Northern District of California

designations.[1]

A full review of § 1254a supports a finding that the phrase "any determination" should be interpreted to mean the single act of deciding whether the country conditions continue to be met for the purposes of designating or terminating TPS.  *See* 8 U.S.C. § 1254a(b)(3)(A) ("At least 60 days before end of the initial period of designation . . .the Attorney General . . . shall determine whether the conditions for such designation under this subsection continue to be met"); ("If the Attorney General determines under subparagraph (A) that a foreign state . . . no longer continues to meet the conditions for designation under paragraph (1), the Attorney General shall terminate the designation.").  As the Supreme Court in *McNary v. Haitian Refugee Cent., Inc* explained, the words "a determination" describe "a single act rather than a group of decisions or a practice or procedure employed in making decisions" and do not include "general collateral challenges to unconstitutional practices and policies used by the agency" in determining whether to terminate TPS. 498 U.S. 479, 492 (1991).

Plaintiffs do not challenge the singular decisions that the Secretary reached for the TPS terminations at issue; Plaintiffs challenge the Secretary's decision-making and implementation process as an exercise of extra-legal power prohibited by the APA and federal constitution. Compl. ¶¶ 3–5. The caselaw above demonstrates that while federal district courts may be barred from reviewing a Secretary's discretionary decision to designate a country's TPS status, *Nat'l TPS*

---

[1] *See* ECF 73 at 20 ("[T]he Court finds that 8 U.S.C. § 1254a(b)(5) does not preclude the Court's jurisdiction over Plaintiffs' claims"); *Nat'l TPS All*, 150 F.4th at 1017 (9th Cir. Aug. 29, 2025) (finding that nothing in the statute precludes review of a Secretary's "conclusion as to the extent of her power under the TPS statute"); *CASA, Inc. v. Noem,* No. 25-cv-1484, 2025 WL 1907378, at *6 (D. Md. July 10, 2025) (finding plaintiffs' claim challenging the alleged policy or practice of making preordained determinations to terminate TPS designations in order to reduce the number of non-white immigrants in the United States not barred by § 1254a(b)(5)(A)); *Centro Presente v. Department of Homeland Security*, 332 F.Supp.3d 393 (D. Mass. 2018) (concluding that the plaintiffs' APA claim was not barred where it challenged, in relation to three separate countries' TPS determinations, an allegedly "new policy that TPS designation determination are to be made solely on the basis of whether the conditions that created the initial designation persist rather than a broader view of whether the country is safely able to accept returning nationals"); *Ramos v. Nielsen*, 321 F. Supp. 3d at 1092, 1099–1100, 1104 (N.D. Cal. 2018) (finding that a claim contesting the termination of the TPS designations for four countries was not barred by § 1254a(b)(5)(A) where the challenge was to the alleged adoption of a "new interpretation of the TPS statute" which based determinations on racial animus and "alleged disdain for non-white immigrants").

United States District Court
Northern District of California

1    *All*, 150 F.4th at 1017, courts may review the process by which the Secretary reached that decision

2    where plaintiffs allege that the Secretary's decision-making process constitutes an unlawful

3    departure from the statute, past agency practice, or the constitution. *Id.* Plaintiffs' claims fall into

4    the latter category of allegations for which this Court may exercise jurisdiction to review. *Id.*

5        Defendants' reach for unfettered authority in the immigration realm raise notable

6    comparisons to arguments that were once made, but are now rejected today. Indeed, Congress and

7    the Executive Branch must abide by the Constitution.

8        At the end of the nineteenth century, public sentiment toward many newcomers,

9    particularly migrant laborers from China, grew bitter. Congress responded by enacting the

10   Chinese Exclusion Act of 1882, ch. 126, 22 Stat. 58, which prohibited the entry of Chinese

11   laborers to the United States. The Scott Act, ch. 1064, 25 Stat. 504, enacted in 1888, forbade

12   reentry of Chinese laborers who had left after previously residing in this country. In some of its

13   earliest cases, the Supreme Court recognized Congress's plenary power over immigration matters

14   and affirmed Congress's ability to vest the exclusive authority to enforce its stated policy goals in

15   the Executive Branch. *Ping v. U.S.*, 130 U.S. 581, 609 (1889) (holding that power to exclude

16   foreign nationals is "incident of sovereignty belonging to the government of the United States,"

17   and Congress's determinations regarding whom to exclude are "conclusive upon the judiciary");

18   *Nishimura Ekiu v. United States*, 142 U.S. 651, 659–60, (1892) (noting that Congress may

19   delegate authority to exclude foreign nationals to executive officers, in which case courts cannot

20   second-guess decisions by those officers acting within delegated authority); *Lem Moon Sing v.*

21   *United States*, 158 U.S. 538, 547 (1895) ("The power of congress to exclude aliens altogether

22   from the United States, or to prescribe the terms and conditions upon which they may come to this

23   country, and to have its declared policy in that regard enforced exclusively through executive

24   officers, without judicial intervention, is settled.").

25       However, around the turn of the century, "the Court began to walk back the plenary power

26   doctrine in significant ways." *California v. U.S. Dep't of Homeland Sec.*, 476 F. Supp. 3d 994,

27   1019 (N.D. Cal. 2020) (citing *Castro v. U.S. Dep't of Homeland Sec.,* 835 F.3d 422, 441 (3d Cir.

28   2016)). In *Kaoru Yamataya v. Fisher*, 189 U.S. 86 (1903), the Supreme Court limited Congress's

14

1    power over immigration, noting that the power was qualified by basic constitutional

2    considerations. *California v. U.S. Dep't of Homeland Sec.*, 476 F. Supp. 3d at 1019 (citing *Castro*,

3    835 F.3d at 442 (quoting Henry M. Hart, Jr., *The Power of Congress to Limit the Jurisdiction of*

4    *Federal Courts: An Exercise in Dialectic*, 66 Harv. L. Rev. 1362, 1390 n.85 (1953)).  As the Court

5    explained in *Landon v. Plasencia*, "once an alien gains admission to our country and begins to

6    develop the ties that go with permanent residence his constitutional status changes accordingly.

7    Our cases have frequently suggested that a continuously present resident alien is entitled to a fair

8    hearing when threatened with deportation."  459 U.S. 21, 32 (1982).  The APA establishes a

9    "basic presumption of judicial review [for] one 'suffering legal wrong because of agency action.'"

10   *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1, 16 (2020).  Notably, the

11   purpose of the jurisdictional providing sections of the APA was to permit a form of review for

12   agency action related to immigration.  *See Shaughnessy v. Pedreiro*, 349 U.S. 48, 51 (1955)

13   (noting "purpose" of the provisions of the APA which allow judicial review were "to remove

14   obstacles to judicial review of agency action under subsequently enacted statutes like the 1952

15   Immigration Act").

16          Similar to shifting attitudes towards Chinese laborers, American sentiment towards the

17   treatment of Japanese nationals and Japanese American citizens during the Second World War has

18   evolved.  Although, in *Korematsu v. United States*, the Supreme Court once held that the

19   "exclusion of those of Japanese origin [from the West Coast war area] was deemed necessary

20   because of the presence of an unascertained number of disloyal members of the group, most of

21   whom we have no doubt were loyal to this country," 323 U.S. 214, 218–19, (1944), the Supreme

22   Court has since recognized that "*Korematsu* was gravely wrong the day it was decided, has been

23   overruled in the court of history, and – to be clear – 'has no place in law under the Constitution,'"

24   *Trump v. Hawaii*, 585 U.S. 667, 710 (2018).  While the Supreme Court in *Korematsu* affirmed an

25   abhorrent wartime decision, it did not decline to hear the case on jurisdictional grounds.  *Id.* at

26   224.

27          Plaintiffs do not ask this Court to second-guess Congress's policy decisions, nor do

28   Plaintiffs ask this Court to review the substance of the Secretary's discretionary exercise of

authority.  Rather, Plaintiffs claim that the Secretary exceeded the authority that Congress delegated to her, and §1254a(b)(5)(A) does not bar review of Plaintiffs' claims.  Accordingly, the Court, finds that §1254a(b)(5)(A) does not strip the Court of jurisdiction over Plaintiffs' claims.

### B.    8 U.S.C. § 1252(f)(1) Does Not Prohibit the Court from Granting Plaintiffs' Requested Relief

Defendants argue that the form of relief sought by the Plaintiffs is barred by 8 U.S.C. § 1252(f)(1).  ECF 110 at 3.  Plaintiffs contend that the declaratory relief and order to set aside the challenged terminations sought by Plaintiffs is proper under Section 706 of the APA and that controlling Ninth Circuit precedent supports their position that § 1252(f)(1) does not bar such relief.  ECF 121 at 8.

8 U.S.C. §1252(f)(1) provides in relevant part as follows:

> In general. Regardless of the nature of the action or claim or of the identity of the party or parties bringing the action, no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of the provisions of part IV of this subchapter, as amended by the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, other than with respect to the application of such provisions to an individual alien against whom proceedings under such chapter have been initiated.

The Ninth Circuit has held that "section 1252(f)(1) does not prohibit relief in the form of a stay or postponement of agency action under the APA" and that a district court order that does "enjoin or restrain" the Secretary's policy "is not barred by 1252(f)(1) if it affects only agency actions that exceed the agency's statutory authority." *Nat'l TPS All*., 150 F.4th at 1018.  Instead, 1252(f)(1) only "limits the district court's authority to enjoin [an agency] from carrying out legitimate [] orders." *Id.*

Here, Plaintiffs allege that the Secretary acted outside of her statutory authority by executing a preordained decision to terminate TPS designations, failing to abide by previous practices with respect to notice of termination and the orderly transition period, and relying on racial- and national-origin-based animus.  Compl. ¶¶ 3–5. In Plaintiffs' motion for summary judgment, Plaintiffs further allege that the Secretary's decision violates the APA because in terminating TPS for Honduras, Nicaragua, and Nepal, the Secretary ignored intervening crisis as required by 8 U.S.C. § 1254a(b)(3)(A).  ECF 144 at 21.  Injunctive or declaratory relief for

16

1  Plaintiffs' claims do not fall within the purview of those actions barred from court intervention

2  under §1252(f)(1) because Plaintiffs seek a court order enjoining "action that exceed[s] the

3  agency's statutory authority." *Nat'l TPS All.*, 150 F.4th at 1018; *see also Immigr. Defs. L. Ctr. V.*

4  *Noem*, 145 4th 972, 990 (9th Cir. 2025) (holding that 1252(f)(1) does not bar injunctive relief for

5  claims under the APA).  Moreover, Defendants acknowledge binding precedent which rejects

6  Defendants argument that 1252(f)(1) bars declaratory relief.  ECF 110 at 15 (acknowledging

7  *Rodriguez v. Hayes*, 591 F.3d 1105, 1119 (9th Cir. 2010)).

8       Accordingly, the Court finds that 8 U.S.C. §1252(f)(1) does not bar the Court from

9  reviewing Plaintiffs' claims.

10  ### C.    8 U.S.C. § 1252(a)(2)(B)(ii) Does Not Bar Review of Plaintiffs' APA Claim

11       Defendants further argue that 8 U.S.C. § 1252(a)(2)(B)(ii) bars judicial review of the

12  Secretary's decision regarding any "orderly departure" period.  ECF 110 at 12.  Defendants argue

13  that 8 U.S.C. § 1252(a)(2)(B)(ii) "[t]here are no conditions that the Secretary must satisfy before"

14  she can exercise her authority and that "Congress has in no way prescribed how that discretion

15  must be exercised."  ECF 110 at 12 (quoting *Bouarfa v. Mayorkas*, 604 U.S. 6, 13–15 (2024)).

16  Plaintiffs respond that the Secretary's decision to shorten the orderly transition period was neither

17  discretionary nor a form of relief, and that, as a result, the Secretary's action is not covered by §

18  1252(a)(2)(B)(ii)'s judicial bar.  ECF 121 at 8.

19       Section 1252(a)(2)(B)(ii) bars judicial review of any "decision or action of … the

20  Secretary of Homeland Security the authority for which is specified under [the INA] to be in the

21  discretion of … the Secretary …"  Section 1252(a)(2)(B) covers "orders denying discretionary

22  relief in individual cases," not "the type of challenges to the Secretary's regulations, orders,

23  policies, and directives" where plaintiffs "claim that the challenged policies violate the Equal

24  Protection guarantee of the federal constitution and the Administrative Procedure Act."  *Nakka*,

25  111 F.4th at 999, 1015 (quoting *Make the Road N.Y. v. Wolf*, 962 F.3d 612, 628−31 (D.C. Cir.

26  2020) ("MTRNY")).  Moreover, an agency must "display awareness" of, and "offer good reasons"

27  for, a departure from a "decades-old practice."  *FDA v. Wages & White Lions Invs., L.L.C.*, 604

28  U.S. 542, 570 (2025).

United States District Court
Northern District of California

17

1    The length of the "orderly transition" period, which DHS makes available to all TPS

2    holders when a termination occurs, is not a form of discretionary relief from removal.  8 U.S.C. §

3    1254a(b)(3)(B).  At a minimum, the TPS statute provides a specific timeframe by which the

4    Secretary must abide; that is, a termination of TPS "shall not be effective earlier than 60 days after

5    the notice is published or, if later, the expiration of the most recent previous extension."  However,

6    Plaintiffs demonstrate that the provision of at least a six-month "orderly transition" period is a

7    longstanding past practice of the DHS.  ECF 28.  Unexplained departure from such a longstanding

8    practice reflects an abuse of the agency's discretion where the practice has created "serious

9    reliance interests."  *Wages & White Lions Invs., L.L.C.*, 604 U.S. at 567–68.  Under either the

10   statutorily proscribed timeframe, or the timeframe Plaintiffs allege the agency adopted by past

11   practice, the orderly transition period is not a decision left to the discretion of the Secretary.  *See*

12   *Nat'l TPS All. v. Noem*, No. 25-cv-05687, 2025 WL 2684340, at *5 (N.D. Cal. Aug. 8, 2025)

13   (finding "Defendants fail to show how 1252(a)(2)(B)(ii)'s mandate concerning discretionary relief

14   applies to" Plaintiffs' claim that the Secretary's terminations and associated orderly transition

15   periods violated the APA).

16   Accordingly, Plaintiffs' challenge to the agency's change in position regarding orderly

17   transition periods is not a form of discretionary relief covered by Section 1252(a)(2)(B)(ii)'s

18   jurisdictional bar.  8 U.S.C. § 1252(a)(2)(B)(ii) does not preclude this Court's jurisdiction over

19   Plaintiffs' claims.

20   **D.    5 U.S.C. § 701(a)(2) Does Not Prohibit the Court from Reviewing Plaintiffs'
         Claims**

21

22   Defendants further argue that jurisdiction is barred by § 701(a)(2) of the APA, because the

23   TPS statute commits the Secretary's determinations regarding TPS designations under

24   § 1254a(b)(1) to the Secretary's informed, discretionary judgment.  ECF 110 at 11.

25   The full text of 5 U.S.C. § 701(a), which bars juridical review in some limited

26   circumstances, reads:

27               This chapter applies, according to the provisions thereof, except to the
                 extent that –
28                   (1) statutes preclude judicial review; or
                     (2) agency action is committed to agency discretion by law

The Supreme Court has stated that the APA provides that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." *Abbott Laboratories v. Gardner*, 387 U.S. 136, 140 (1967). The Supreme Court has further held that, under § 701(a)(2), agency action is not subject to judicial review "to the extent that" such action "is committed to agency discretion by law." *Block v. Community Nutrition Institute*, 467 U.S. 340, 349 (1984). However, that provision applies only in "rare instances" where a "statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Spencer Enters., Inc. v. United States*, 345 F.3d 683, 688 (9th Cir. 2003) (quoting *Heckler v. Chaney*, 470 U.S. 821, 830 (1985)).

Because courts in this district have recognized distinct applications of § 701(a)(2) to constitutional and statutory claims, the Court addresses Defendants' fourth jurisdictional argument as applied to (i) Plaintiffs' due process claim and (ii) Plaintiffs' APA claims.

### i.    § 701(a)(2) Does Not Apply to Plaintiffs' Equal Protection Claim

As a preliminary matter, courts in this district have held that § 701(a)(2)'s jurisdictional bar does not apply to claims that an agency acted outside its constitutional authority in executing a decision. *See San Francisco Unified Sch. Dist. v. AmeriCorps*, 784 F. Supp. 3d 1280, 1290 (N.D. Cal. 2025) (stating that, "absent clear congressional intent to preclude review of a constitutional claim, § 701(a)(2) does not bar review of colorable constitutional claims arising from agency actions 'committed to agency discretion by law'"); *see also Webster*, 486 U.S. at 601, 603 (stating that "the language and structure of § 102(c) [of the National Security Act] indicate that Congress meant to commit individual employee discharges to the Director's discretion, and that § 701(a)(2) accordingly precludes judicial review of these decisions under the APA" and stating "[w]e do not think § 102(c) may be read to exclude review of constitutional claims").

Here, § 701(a)(2) is inapplicable with respect to Plaintiffs' Equal Protection claims, because that claim arises under the Fifth Amendment to the federal constitution. Accordingly, § 701(a)(2) does not bar Plaintiffs' constitutional claim.

### ii.    § 701(a)(2) Does Not Bar Review of Plaintiffs' APA Claims

1    Defendants claim that the TPS statute commits the Secretary's determinations regarding

2    TPS designations to the Secretary's informed, discretionary judgment, and that § 701(a)(2) of the

3    APA precludes judicial review of agency action "committed to agency discretion by law."  ECF

4    110 at 11.  Plaintiffs argue that the TPS statute provides statutory requirements such that the

5    decision-making process Plaintiffs' challenge is not discretionary.  ECF 121 at 7.

6    The Ninth Circuit has held that § 701(a)(2) does not deprive court of jurisdiction when an

7    agency policy provides "law to apply."  *Alcaraz v. INS*, 384 F.3d 1150, 1161 (9th Cir. 2004); *see*

8    *Mendez-Gutierrez v. Ashcroft*, 340 F.3d 865, 868 (9th Cir. 2003) (same).  That is, § 701(a)(2) does

9    not bar review if "regulations or agency practice provide a 'meaningful standard' by which this

10   court may review its exercise of discretion."  *Spencer Enters., Inc*., 345 F.3d at 688.

11   Here, 8 U.S.C. § 1254a(b)(3)(A) provides that, on periodic review, the Secretary, "after

12   consultation with appropriate agencies of the Government, shall review the conditions in the

13   foreign state . . . for which a designation is in effect under this subsection and shall determine

14   whether the conditions for such designation continue to be met."  If she determines conditions are

15   not met, she "shall terminate" the designation.  *Id*. § 1254a(b)(3)(B).  If she "does not determine

16   … that a foreign state … no longer meets the conditions for designation … the period of

17   designation … is extended."  *Id*. § 1254a(b)(3)(C).  At least two events must occur for the

18   Secretary's decision regarding a TPS designation to be compliant with the statute.  First, the

19   Secretary must make the decision "after consultation with appropriate agencies."  *Id*. §

20   1254a(b)(3)(A).  Second, the Secretary must "review the conditions in the foreign state."  *Id*.

21   Absent each of these processes, a Secretary's decisions regarding TPS designations are contrary to

22   law.  *Id*.

23   Thus, regarding Plaintiffs' APA claims, the Court finds that there is "law to apply" under

24   the TPS statute, such that the process by which the Secretary decides to terminate a TPS

25   designation is not an unreviewable exercise of authority.  *Alcaraz v. INS*, 384 F.3d 1150, 1161 (9th

26   Cir. 2004) (holding that 701(a)(2) did not deprive court of jurisdiction because agency policy

27   provided "law to apply").  § 1254a(b)(3)(A) provides a "meaningful standard" against which the

28   Court may measure the Secretary's conduct in considering Plaintiffs' APA claims challenging the

1    Secretary's failure to conduct the country conditions review and consult with the appropriate

2    government agencies before reaching her termination decision.  *See* Compl. ¶ 156(a) (alleging that

3    Secretary's termination decisions "were not based on a review of country conditions, as required

4    by 8 U.S.C. § 1254a(b)(3)); *see Spencer Enters., Inc*., 345 F.3d at 688.

5            Therefore, § 701(a)(2) is not a bar to judicial review of the claims asserted here.

6                                              * * *

7            Under these statutory provisions, ordinarily, federal district courts are barred from

8    reviewing a Secretary's discretionary decision to designate a country's TPS status, particularly

9    when doing so would enjoin or restrain the agency from performing its law enforcement function.

10    However, here, Plaintiffs claims that the Secretary acted outside of her statutory authority by

11    executing a preordained decision to terminate TPS designations without conducing an objective

12    review of the country condition, failing to abide by previous practices with respect to notice of

13    termination and the orderly transition period, and relying on racial- and national-origin-based

14    animus.  Compl. ¶¶ 3–5. Plaintiffs, therefore, raise challenges under the APA and federal

15    constitution that are not subject to the jurisdictional bars discussed in the statutes above.

16    Accordingly, the Court denies Defendants' motion to dismiss under Rule 12(b)(1) and rejects

17    Defendants' argument that the Court lacks jurisdiction in Defendants' motion for summary

18    judgment.

19    **III.    MOTION TO DISMISS UNDER RULE 12(B)(6)**

20         **A.    Legal Standard**

21            Federal Rule of Civil Procedure 8(a)(2) requires a complaint to include "a short and plain

22    statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  To

23    overcome a Rule 12(b)(6) motion to dismiss after the Supreme Court's decisions in *Ashcroft v.*

24    *Iqbal*, 556 U.S. 662 (2009), and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), a plaintiff's

25    "factual allegations [in the complaint] 'must . . . suggest that the claim has at least a plausible

26    chance of success.'"  *Levitt v. Yelp! Inc*., 765 F.3d 1123, 1135 (9th Cir. 2014).  The Court

27    "accept[s] factual allegations in the complaint as true and construe[s] the pleadings in the light

28    most favorable to the nonmoving party."  *Manzarek v. St. Paul Fire & Marine Ins. Co*., 519 F.3d

United States District Court
Northern District of California

1025, 1031 (9th Cir. 2008). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. When assessing the sufficiency of a complaint under Rule 12(b)(6), if the Court considers materials outside of the pleadings, then the motion is converted into a motion for summary judgment. *Khoja v. Orexigen Therapeutics, Inc*., 899 F.3d 988, 1002 (9th Cir. 2018).

**B.    Plaintiffs' Complaint Sufficiently Alleges Facts to Surmount Defendants' Challenge Under Rule 12(b)(6)**

Beyond their jurisdictional arguments, Defendants argue that Plaintiffs fail to state claims under the pleading standard required to survive a motion to dismiss. ECF 110 at 15. Plaintiffs argue that the complaint sufficiently alleges that the Secretary acted outside of her statutory authority by (i) executing a preordained decision to terminate TPS designations, (ii) ignoring intervening country conditions, (iii) failing to abide by previous practices with respect to notice of termination and the orderly transition period, and (iv) relying on racial-based and national-origin-based animus to survive Defendants' motion. ECF 121 at 9.

**i.    Plaintiffs' Plausibly Allege that the Secretary's Termination Decision-making Process was Arbitrary and Capricious Under the APA.**

Plaintiffs' first claim under the APA is that the Secretary failed to conduct an objective review of country conditions, as statutorily required, but instead executed a preordained decision to terminate TPS and searched for a rationale to support the decision. Compl. ¶ 3. Defendants argue that even a cursory inspection of the federal register notices announcing the terminations at issue here reveal that the Secretary engaged in proper decision making under the TPS statute. ECF 110 at 16; (citing *Nepal Termination*, 90 Fed. Reg. at 24,151; *Honduras Termination*, 90 Fed. Reg. at 30,089; *Nicaragua Termination*, 90 Fed. Reg. 30,087 (July 8, 2025)). Plaintiffs further argue that Plaintiffs present facts sufficient to render Plaintiffs' claim "plausible on its face." ECF 121 at 10.

The APA provides that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702. The APA also requires Courts to "hold

United States District Court
Northern District of California

unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(a). Moreover, "[c]ourts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority, as the APA requires." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412 (2024). 8 U.S.C. § 1254a(b)(3)(A) requires the Secretary to make a determination of a country's TPS designation "*after* consultation with appropriate agencies" and upon "review of the conditions in the foreign state." (emphasis added). Moreover, the Supreme Court has held that agencies must offer the true reason for a decision. *Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019) ("The reasoned explanation requirement of administrative law … is meant to ensure that agencies offer genuine justifications for important decisions, reasons that can be scrutinized by courts and the interested public. Accepting contrived reasons would defeat the purpose of the enterprise."). "[P]retextual" justifications cannot support an agency's decision. *Id.* at 780. TPS decisions that are "preordained" or based on "political influence," rather than country conditions, violate the APA. *See Saget*, 375 F. Supp. 3d at 345–46 (quoting 5 U.S.C. § 706(2)(A)).

Here, the complaint sufficiently alleges that officials in this administration, including the President himself, arguably had more than a policy preference which guided their review of the TPS program. On January 20, 2025, the day he took office, President Trump issued an Executive Order titled "Protecting the American People Against Invasion." Compl. ¶ 46. The "invasion" referenced in the order was the purported "unprecedented flood of illegal immigration into the United States." *Id.* The Invasion E.O. directed the DHS Secretary to "promptly take all appropriate action, consistent with law, to rescind the policy decisions of the previous administration that led to the increased or continued presence of illegal aliens in the United States," including by reviewing "designations of Temporary Protected Status." *Id.* At her confirmation hearing, Secretary Noem stated that "[TPS] has been abused and manipulated by the Biden Administration, and that will no longer be allowed. . . and these extensions going forward the way that they are. The program was intended to be temporary[.]." Compl. ¶¶ 61, 73. During a February 2, 2025 "Meet the Press" appearance, Secretary Noem stated that "The TPP [sic] program has been abused and it doesn't have integrity right now." Compl. ¶ 74. The Department

23

of Homeland Security ("DHS") has stated that, by vacating or partially vacating TPS, it was "restoring integrity in our immigration system," and fulfilling "President Trump's promise to rescind policies that were magnets for illegal immigration and inconsistent with the law."  Compl. ¶ 57.  Other officials in this administration have vocalized their goal of terminating TPS. President Trump, in response to a question from a reporter about whether he would revoke a country's TPS status, stated, "You have to remove the people; you cannot destroy our country . . . In my opinion, it's not legal. . . . Absolutely I'd revoke [TPS]."  Compl. ¶ 78.  During the 2024 presidential campaign, then-vice-presidential candidate JD Vance stated "[w]e're going to stop doing mass grants of Temporary Protected Status."  Compl. ¶ 80.  He went on to call TPS designations a "magic amnesty wand" which he characterized as a "terrible indictment of [Vice President Kamala Harris's] amnesty policies."  Compl. ¶ 81.  Project 2025, "the 2025 Presidential Transition Project," a product of current and former political appointees of the president explicitly called for the "[r]epeal [of] TPS designations."  Compl. ¶ 84.

With these statements, Plaintiffs plausibly allege that officials were intent on effectuating the goal of President Trump—namely, to end the purportedly broken TPS program.  Such a conclusion is a natural inference of the Defendants' statements.  At this stage of the litigation, taken together, and reading the facts alleged in Plaintiffs' complaint in a light most favorable to Plaintiffs, the Court finds that Plaintiffs have sufficiently demonstrated that the Secretary made the decisions to terminate TPS for Honduras, Nepal, and Nicaragua well before she considered conditions in any of those countries.  Compl. ¶ 45; *Manzarek*, 519 F.3d at 1031 (the court must "accept[s] factual allegations in the complaint as true and construe[s] the pleadings in the light most favorable to the nonmoving party").

Accordingly, the Court denies Defendants' motion to dismiss Plaintiffs' claim that the Secretary's decision was arbitrary and capricious because her decision was preordained and pretextual rather than based on an objective review of the country conditions as required by the TPS statute and the APA.

ii.    **Plaintiffs' Plausibly Allege that the Secretary's Ignored Intervening Country Conditions in Violation of the TPS Statute.**

1    Plaintiffs' second claim under the APA is that the Secretary failed to consider any country

2    conditions that were not directly related to the reason for the initial designation, thereby (1)

3    contravening the statutory mandate to base TPS decisions on a fulsome review of country

4    conditions and (2) arbitrarily breaking with past practice.  ECF 121 at 11 (citing Compl. ¶¶ 40−42,

5    63, 68−69, 156(a)−(b)).  Defendants argue that 8 U.S.C. § 1254a(b)(3)(A) imposes no requirement

6    on the Secretary to consider events or conditions beyond those which gave rise to the initial

7    designation when conducting a periodic review.  ECF 128 at 11.  Plaintiffs argue that the

8    complaint sufficiently alleges that the TPS statute requires review of intervening country

9    conditions and that the Secretary's review was inconsistent with mandate of the statute.  ECF 121

10    at 12.

11    The Secretary must review the conditions within foreign states designated for TPS

12    periodically to determine, based on her findings, whether the conditions for such designation

13    continue to exist.  8 U.S.C. § 1254a(b)(3)(A)–(C).  After conducting a review and consulting with

14    the appropriate government agencies, if the Secretary determines that the conditions for a TPS

15    designation no longer exist, she must terminate the designation.  8 U.S.C. § 1254a(b)(3)(B).  The

16    conditions for designation must be severe enough that "the foreign state is unable, temporarily, to

17    handle adequately the return to the state of aliens who are nationals of the state.  *Id.* §

18    1254a(b)(1)(B)(ii).  Moreover, the requirement to consult is not an empty obligation; rather, a

19    consultation required by a statute means that there must be a "meaningful exchange of

20    information."  *Cal. Wilderness Coalition v. U.S. DOE*, 631 F.3d 1072, 1086 (9th Cir. 2011); *see*

21    *also id*. at 1088 (characterizing a statutory requirement to consult as an "'affirmative duty'" and

22    stating that the consultation must be "meaningful").  *See Lands Council v. Powell*, 395 F.3d 1019,

23    1026 (9th Cir. 2005) ("An agency's action is arbitrary and capricious if the agency fails to

24    consider an important aspect of a problem, if the agency offers an explanation for the decision that

25    is contrary to the evidence, if the agency's decision is so implausible that it could not be ascribed

26    to a difference in view or be the product of agency expertise, or if the agency's decision is

27    contrary to the governing law.").

28    The complaint alleges that the Secretary's decision was not based on the statutorily

United States District Court
Northern District of California

1    required country conditions review, but instead limited the analysis to focus on positive

2    improvements.  ECF 110 ¶ 50.  Plaintiffs allege that the "new selective country conditions

3    research system put in place for period reviews" ignored entire categories of conditions that have

4    previously been considered.  *Id.* ¶ 63.  Plaintiffs also point to the termination notices failure to

5    address food insecurity in Nepal, staggering crime in Honduras, or humanitarian crisis in

6    Nicaragua when describing the basis for terminating TPS.  *See* Compl. ¶¶ 63, 66−69.  The

7    Secretary's omissions and explicitly narrow scope of review break with past agency practice in

8    which the DHS has considered wholistically, the country conditions when engaging in the periodic

9    review process.  Compl. ¶¶ 40−42; *see also Saget*, 375 F. Supp. 3d at 350 ("[T]he DHS Secretary,

10   DHS, and USCIS had a longstanding practice of considering all country conditions when

11   undertaking the mandatory periodic review under the statute, regardless of their relation to the

12   originating condition."); *Ramos*, 336 F. Supp. 3d at 1093 ("Intervening factors arising after a

13   country's original TPS designation … were considered relevant to determining whether a country

14   continued to meet the conditions for continuing TPS designation.").  These allegations sufficiently

15   allege that the Secretary, in violation of the APA, broke from prior practice without explanation.

16   Compl. ¶¶ 40−42, 63, 66−69; *see also Organized Vill. of Kake v. USDA*, 795 F.3d 956, 966 (9th

17   Cir. 2015) (when an agency breaks with a long-standing past practice, it must "display[]

18   'awareness that it is changing position'" and provide "good reasons" for the new policy) (quoting

19   *Fox Television Stations, Inc*., 556 US at 515−16).

20        Accordingly, the Court denies Defendants' motion to dismiss Plaintiffs' claim that the

21   Secretary's decision was arbitrary and capricious as contrary to the TPS statute and as an

22   unexplained departure from past agency practice.

23        ### iii.    Plaintiffs' Plausibly Allege that the Secretary Unlawfully Deviated from Past Agency Practice in Setting a 60-Day Transition Period.

24        Plaintiffs' next APA claim is that the Secretary failed to provide at least six-month orderly

25   transition period in an unacknowledged and unexplained deviation from historical practice.

26   Compl. ¶¶ 4, 160.  Defendants argue that the Secretary complied with the statutory default 60-day

27   transition period which was consistent with past agency practice and that the DHS's past practice

28

1    is insufficiently "firm" to trigger the change-in-position doctrine.  ECF 110 at 17–18.  Plaintiffs

2    respond that they have adequately alleged that, for the past two decades, the prevailing practice of

3    prior administrations was to provide at least 6 months after TPS termination date for holders to

4    transition, and that the departure from such a practice required acknowledgement and explanation.

5    ECF 121 at 10.

6         As discussed above, under the APA, an agency must "display awareness" of, and "offer

7    good reasons" for, a departure from a "decades-old practice."  *Wages & White Lions Invs., L.L.C.*,

8    604 U.S. at 570.  Under *Wages and White Lion's* long-standing change-in-position doctrine, an

9    agency's "consistent practice, whether adopted expressly in a holding or established impliedly

10   through repetition, sets the baseline from which future departures must be explained."  *Id.* at 583–

11   84.  "The change-in-position doctrine asks two questions."  *Wages and White Lions, LLC*, 604 U.S.

12   at 569 (2025).  "The first is whether an agency changed existing policy."  *Id*.  Once a change in

13   agency position is identified, the doctrine poses a second question: Did the agency "display

14   awareness that it is changing position" and offer "good reasons for the new policy"?  *Id*.

15        Here, the complaint sufficiently provides twenty-two years (of TPS's thirty-five-year

16   history) of DHS's practice of setting an orderly transition period of six to eighteen months after

17   the issuance of a TPS termination notice.  Compl. ¶ 31.  In contrast, the Honduras and Nicaragua

18   termination notices only provide that "[a] sixty-day orderly period of transition is consistent with

19   the precedent of previous TPS country terminations and makes clear that the United States is

20   committed to clarity and consistency."  *See* 90 Fed. Reg. 30091, 30088.  Because these notices fail

21   to acknowledge or explain the departure from the decades-long practice of providing at least a 6-

22   month transition period, the Court finds that Plaintiffs have plausibly raised a claim under the

23   APA.  *See Encino Motorcars*, 579 U.S. at 222 ("It follows that an '[u]nexplained inconsistency' in

24   agency policy is 'a reason for holding an interpretation to be an arbitrary and capricious change

25   from agency practice.'").  Regarding Nepal, the TPS termination notice simply stated that "there is

26   no longer an environmental disaster or other situation causing substantial, but temporary,

27   disruption of living conditions and that Nepal can adequately handle the return of its nationals, and

28   considering other relevant factors, the Secretary has determined that a 60-day transition period is

27

sufficient and in accord with Executive Order 14159." 90 Fed. Reg. 24153.  The Secretary's footnote alluding to "certain other TPS designations were terminated without allowing for an extended transition period," *id*. at n.24, was insufficient to acknowledge and explain the departure from the twenty-two-year practice of providing at least a 6-month transition period.  *See Enicino Motorcars*, 579 U.S. at 222 ("[T]he Department offered barely any explanation.  A summary discussion may suffice in other circumstances, but here—in particular because of decades of industry reliance on the Department's prior policy—the explanation fell short of the agency's duty to explain why it deemed it necessary to overrule its previous position.").

Accordingly, the Court denies Defendants' motion to dismiss Plaintiffs' claim that the Secretary's decision was arbitrary and capricious as an unexplained departure from past agency practice.

### iv.    Plaintiffs' Plausible Allege that the Secretary's Termination Decision was Motivated by Racial Animus.

Finally, the complaint alleges that the Secretary's decision violated the Equal Protection component of the Fifth Amendment because her decision was motivated, at least in part, by intentional race- and national-origin-based animus.  Compl. ¶¶ 5, 164.  Defendants argue that the rational basis test set forth in *Trump v. Hawaii* should govern Plaintiffs' claim and that under the *Trump v. Hawaii* standard, Plaintiffs fail to state a claim.  ECF 110 at 19.  Plaintiffs assert that (i) Plaintiffs state a plausible; claim of impermissible animus under *Arlington Heights*; and (ii) Plaintiffs state a plausible claim of impermissible animus under *Trump v. Hawaii*.  ECF 121 at 13.

### a.    *Arlington Heights* Governs Plaintiffs' Constitutional Claim

Defendants argue that because Plaintiffs' assertions implicate immigration policy, the Court may not look behind the facially legitimate reasons offered for the termination decisions as set forth in *Trump v. Hawaii*.  ECF 110 at 19 (citing *Trump v. Hawaii*, 585 U.S. 667, 703–04 (2018).  Plaintiffs argue that *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp*., 429 U.S. 252 (1977) provides the governing legal standard for their Equal Protection claim because Plaintiffs allege that the Secretary's decisions were motivate by racial animus.  ECF 121 at 13.

*Trump v. Hawaii* involved the initial entry of foreign nationals.  In *Trump v. Hawaii*, the

Supreme Court reviewed an Equal Protection claim challenging an executive order issued by President trump restricting entry by foreign nationals from specified, majority-Muslim counties. *Hawaii*, 585 U.S. at 673–77.  The Supreme Court applied rational basis review to this claim because the subject matter of the case involved immigration and the area of national security.  *Id.* at 703.  Unlike, *Hawaii*, the Secretary's TPS decisions here apply largely to foreign nationals who are *already physically present* in the United States.  Foreign nationals who are physically present in the United States may state a claim for violation of the Equal Protection component of the Fifth Amendment.  *See Kwai Fun Wong v. United States*, 373 F.3d 952, 970–73 (9th Cir. 2004); *see also Plyler v. Doe*, 457 U.S. 202, 210 (1982) ("Indeed, we have clearly held that the Fifth Amendment protects aliens whose presence in this country is unlawful from invidious discrimination by the Federal Government." (citing *Mathews*, 426 U.S. at 77)).

In contrast to *Trump v. Hawaii*, *Arlington Heights* involved the application of the Fifth Amendment to individuals in the United States.  In *Arlington Heights*, a board of trustee's denial of low and moderate-income housing was found to be motivated by racial discrimination.  429 U.S. at 258–59.  The Supreme Court held that a violation of the Fifth Amendment's Equal Protection Clause requires "[p]roof of racially discriminatory intent or purpose" and that a plaintiff need not "prove that the challenged action rested solely on racially discriminatory purposes."  429 U.S. at 265.  The Supreme Court recognized that a court's analysis into "whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available."  *Id.* at 266.

Here, because the Secretary's TPS terminations involves individuals already physically present in the United States and because Plaintiffs allege that the Secretary's decisions were motivated by racial animus, the Court applies the *Arlington Heights* standard.  Indeed, the "application of the Arlington Heights framework is appropriate to evaluate whether plaintiffs plead discriminatory animus." *La Clinica de la Raza v. Trump,* 706 F. Supp. 3d 903, 931 (N.D. Cal. 2020)*; Adarand Constructors, Inc. v. Peña*, 515 U.S. 200, 227 (1995) ("[A]ll racial classifications, imposed by whatever federal, state, or local governmental actor, must be analyzed by a reviewing court under strict scrutiny."); *see also DHS v. Regents of Univ. of Cal.*, 591 U.S. 1,

34-35 (2020) (applying the *Arington Heights* factors to plaintiffs' Equal Protection claim). Plaintiffs specifically allege that the Secretary's Nepal, Honduras, and Nicaragua TPS terminations were motivated by racial animus. *See* Compl. ¶¶ 86– 94, 95–128, 156. These allegations implicate the Court's heightened scrutiny under *Arlington Heights*. *See Regents of the Univ. of California*, 591 U.S. at 34 ("To plead animus, a plaintiff must raise a plausible inference that an 'invidious discriminatory purpose was a motivating factor' in the relevant decision.'") (quoting *Arlington Heights*, 429 U.S. at 266). Therefore, the Court finds that the *Arlington Heights* standard governs.

### b. Plaintiffs Allege Sufficient Facts to State a Claim Under the Governing Standard in *Arlington Heights*

Defendants argue that, even under *Arlington Heights*, the Secretary's terminations were consistent with the TPS statute because she made an informed judgment that the conditions for designation under the statute were no longer met. ECF 110 at 22. Plaintiffs argue the complaint sufficiently alleges animus toward similarly situated racial groups. ECF 121 at 16–19.

"Under *Arlington Heights*, a plaintiff must 'simply produce direct or circumstantial evidence demonstrating that a discriminatory reason more likely that not motivated' the defendant and that the defendant's actions adversely affected the plaintiff in some way." *Ave. 6E Invs., LLC v. City of Yuma, Ariz.*, 818 F.3d 493, 504 (9th Cir. 2016) (internal quotations omitted). "A plaintiff does not have to prove that the discriminatory purpose was the sole purpose of the challenged action, but only that it was a 'motivating factor.'" *Id.* "The court analyzes whether a discriminatory purpose motivated the defendant by examining the events leading up to the challenged decision and the legislative history behind it, the defendant's departure from normal procedures or substantive conclusions, and the historical background of the decision and whether it creates a disparate impact." *Id.*

Plaintiffs sufficiently allege a claim under the Fifth Amendment that Secretary Noem, and other officials in this administration, held animus against immigrants covered by the TPS program. In a January 29, 2025, post on X, Secretary Noem announced that she would end a Biden order that allowed Venezuelans to stay in the country and "violate our laws." Compl. ¶ 75 . In a March

1    20, 2025, post on X, Secretary Noem associated "migration management" with "sav[ing]

2    American lives and get[ting] criminals off our streets!" *Id.* ¶ 94.  In a May 19, 2025, post on X,

3    DHS equated TPS holders with "MS-13 gang members," "known terrorists," and "murderers." *Id.*

4    ¶ 91.  These statements are consistent with similar statements by President Trump including one

5    occurrence in which he stated that migrants were "poisoning the blood of our country." *Id*. ¶ 97.

6    (President Trump asking why people "could not come from nice countries . . . like Denmark,

7    Switzerland, and Norway"); *see id*. ¶ 98 (President Trump "How about allowing people to come to

8    an open border . . . many of them murdered far more than one person, and they're now happily

9    living in the United States.  You know now a murderer, I believe this, it's in their genes. And we

10   got a lot of bad genes in our country right now."); *see also id*. ¶ 86 (Secretary Noem describing

11   immigration as an "invasion happening on purpose . . . to remake the foundation of this country").

12         These statements reflect a stereotyping of the immigrants protected under the TPS program

13   as criminal invaders and perpetuate the discriminatory belief that certain immigrant populations

14   will replace the white population.  ECF 17-20 ¶ 19; *see Nat'l TPS All*., 773 F. Supp. 3d at 860

15   ("Acting on the basis of a negative group stereotype and generalizing such stereotype to the entire

16   group is the classic example of racism."); *Korematsu*, 323 U.S. 233, 235 (1944) (Murphy, J.,

17   dissenting) (characterizing the majority decision upholding the mass internment of Japanese

18   Americans as falling into the "ugly abyss of racism"; noting that the "forced exclusion [of

19   Japanese Americans] was the result in good measure of the erroneous assumption of racial guilt . .

20   ."). Here, Plaintiffs' constitutional claim survives Defendants' motion to dismiss because the facts

21   set forth in their complaint "raise a plausible inference that an 'invidious discriminatory purpose

22   was a motivating factor'" for the Secretary's decisions.  *Regents*, 591 U.S. at 34 (quoting

23   *Arlington Heights*, 429 U.S. at 266).  Defendants' argument that the Court should not consider the

24   statements of officials other than the Secretary because they are irrelevant and concern the

25   "discriminatory motive" of "different government official[s]" is unavailing as they provide

26   circumstantial evidence of the Secretary's decision-making process.  *Arlington Heights,* 429 U.S.

27   at 266–69 (considering statements by decisionmakers and other circumstantial evidence of

28   discriminatory intent).

United States District Court
Northern District of California

1    Accordingly, under *Arlington Heights*, the Court finds that Plaintiffs have stated a claim

2  upon which relief may be granted, and the Court denies Defendants' motion to dismiss for failure

3  to state a claim.

4    **c.  Plaintiffs Allege Sufficient Facts to State a Claim Under *Trump v. Hawaii***

5    Defendants argue that the Secretary's decisions are legally sufficient under *Trump v.*

6  *Hawaii*.  ECF 110 at 19.  Plaintiffs argue that, even under *Trump v. Hawaii*'s rational basis

7  standard, the Secretary's invocation of racist tropes reveal that her decision was not rationally

8  related to the stated goal.  ECF 121 at 15 (citing *Hawaii*, 585 U.S. at 704−05).

9    As discussed above, the Court finds that *Arlington Heights* applies to Plaintiffs' claims.

10  However, even if the Court evaluated the complaint under the standard articulated in *Trump v.*

11  *Hawaii,* the claims are still sufficient.

12    *Trump v. Hawaii* involved the President's proclamation that "placed entry restrictions on

13  the nationals of eight foreign states whose systems for managing and sharing information about

14  their nationals the President deemed inadequate."  585 U.S. at 677.  The Supreme Court limited

15  the Court's review of "any rule of constitutional law that would inhibit the flexibility of the

16  President to respond to changing world conditions."  585 U.S. at 704.  *Trump v. Hawaii*,

17  constrains the Court's "inquiry into matters of entry and national security," and Defendants fail to

18  explain how the Secretary's TPS terminations concern matters of entry and national security.  585

19  U.S. at 667.  *Trump v. Hawaii* concerned the exclusion of non-citizens from abroad, where the

20  government's immigration powers are at their greatest.  585 U.S. at 705 n.5 ("such a

21  circumscribed inquiry applies to any constitutional claim concerning the entry of foreign

22  nationals").  Although "[t]he President has vital power in the field of foreign affairs, so does

23  Congress, and the President does not have the authority to override immigration laws enacted by

24  Congress."  *Biden v. Texas*, 597 U.S. 785, 830 (2022) (Alito, J., dissenting).

25    Here, Plaintiffs sufficiently allege a claim under *Trump v. Hawaii* because decisions about

26  the rights afforded to TPS holders based on negative racial stereotypes is completely divorced

27  from any "facially legitimate and bona fide" reason.  *Hawaii*, 585 U.S. at 703; *see id.* at 706

28  (finding that agency action does not survive rational basis review if the Court cannot "discern a

32

relationship to legitimate state interests" or if the action is "inexplicable by anything but animus."). Instead, Congress enacted the TPS program to formalize humanitarian protections and offer relief to nonimmigrants from foreign states which are not able to adequately house is nationals. *See NTPSA I,* 150 F.4th at 1008. In light of this goal, the Secretary may not take steps that are contrary to the express or implied will of Congress or the mandates of the federal constitution. *Id*. (citing *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952)) ("[W]hen the President takes measures incompatible with the expressed or implied will of Congress, his power is at its lowest ebb, for then he can rely only upon his own constitutional powers minus any constitutional powers of Congress over the matter.").

Accordingly, under *Trump v. Hawaii* the Court finds that Plaintiffs have plausible stated a claim upon which relief may be granted, and the Court denies Defendants' motion to dismiss for failure to state a claim.

* * *

For the reasons stated above, the Court finds that Plaintiffs have alleged facts that, when read in favor of Plaintiffs, plausibly state claims under the APA and the federal constitution consistent with the pleading standard required by Rule 8(c). Accordingly, the Court denies Defendants' motion to dismiss under Rule 12(b)(6).

## IV.     MOTION TO EXCLUDE EXPERT TESTIMONY

Defendants seek to exclude the testimony of Elliott Young, Stacy Tolchin, Hannah Postel, Melanie Morten, Tara Watson, Tom Wong, and Dana Frank. ECF 143.

Federal Rule of Evidence 702 allows a qualified expert to testify "in the form of an opinion or otherwise" where:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

*Id.*

In determining whether the requirements of Rule 702 are met, Courts follow the approach

set forth in *Daubert v. Merrell Dow Pharms., Inc.*:

> [T]he trial judge must determine . . . whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue. This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue.

509 U.S. 579, 590 (1993).  The "scientific knowledge" requirement concerns the reliability of an expert's opinion and can met by "[e]stablishing that an expert's proffered testimony grows out of pre-litigation research or that the expert's research has been subjected to peer review."  *Daubert v. Merrell Dow Pharmaceuticals, Inc*., 43 F.3d 1311, 1318 (9th Cir. 1995); *see Kumho Tire Co*., *Ltd v. Carmichael*, 26 U.S. 137, 147 (1999) ("[T]he Rule applies its reliability standard to all 'scientific,' 'technical,' or 'other specialized' matters within its scope.").  Rule 702's second requirement, that an expert will "assist the trier of fact to understand or determine a fact in issue," "means that the evidence will assist the trier of fact to understand or determine a fact in issue." *Cooper v. Brown*, 510 F.3d 870, 942 (9th Cir. 2007); *see Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010) ("The requirement that the opinion testimony assist the trier of fact goes primarily to relevance.") (internal quotation omitted).

## A.    Dr. Elliot Young's Testimony is Admissible under Rule 702

Defendants argue that Dr. Young's expert report and testimony should be excluded because he (1) is unreliable and (2) not relevant to the issues on summary judgment.  ECF 143.

### 1. Dr. Young's Expert Opinion is Reliable

Defendants argue that Dr. Young is not qualified to provide an expert opinion on TPS holders and the current country conditions in Honduras and Nicaragua because his report includes overly broad statistics, cites non-dispositive statutes, and does not provide evidentiary support or data on the number of individuals denied initial or renewal of TPS based on criminal activity. ECF 143 at 11–13.  Defendants also argue that Dr. Young does not have experience in economics and is not an expert in country conditions in Honduras and Nicaragua.  *Id*. at 12–13.  Plaintiffs argue that Defendants "misconstrue[] the purpose of [Dr. Young's] testimony" and "Dr. Young's discussion of country conditions casts doubt on Defendants' motivations."  ECF 168 at12–13.

United States District Court
Northern District of California

United States District Court
Northern District of California

Expert opinions are "reliable if the knowledge underlying it has a reliable basis in the knowledge and experience of the relevant discipline." *City of Pomona v. SQM North America Corp.*, 750 F.3d 1036, 1044 (9th Cir. 2014). "The district court is not tasked with deciding whether the expert is right or wrong, just whether his testimony has substance such that it would be helpful to a jury." *Alaska Rent-A-Car, Inc. v. Avis Budget Group, Inc.*, 738 F.3d 960, 969–70 (9th Cir. 2013).

Here, Dr. Young relies on his personal and professional knowledge to conclude that "[t]he statements made by President Trump, DHS Secretary Noem, and other Trump administration officials about Central American migrants, including TPS holders, can be understood in the context of a long history of the use of similar statements about disfavored immigrant groups to justify restrictive immigration laws." ECF 168-6 ¶¶ 2–6; 47.

To the extent Defendants challenge Dr. Young's expertise, the Court finds that Dr. Young is qualified to opine on how the debate over TPS for Honduras and Nicaragua, and more broadly the debate over TPS generally, reflects the history of racism in immigration policy debates in the United States. As Plaintiffs concede, Dr. Young's opinions on country conditions provides context to the larger issue of Defendants' motivations for terminating TPS. ECF 168 at 12–13. Notably, Dr. Young is a Professor of History at Lewis & Clark College, where he has "taught Latin American and immigration history for more than 27 years, and was director of Latin American Studies for more than a decade." *Id.* ¶ 7. He has served as chair of the History department; director of Ethnic Studies; co-director of the Stanford Migration & Asylum Lab; co-author of the 2023 Honduras Country Conditions Bulletins; and is currently editing a 2025 Nicaragua Country Conditions Bulletin. *Id.*; *see Kumho Tire Co., Ltd v. Carmichael*, 526 U.S. 137, 150 (1999) ("[T]he relevant reliability concerns may focus upon personal knowledge or experience. As the Solicitor General points out, there are many different kinds of experts, and many different kinds of expertise."). Dr. Young has also authored articles that have appeared in scholarly journals, founded the Nicaragua Country Conditions Bulletin, and is the founder and director of the Migration Scholar Collaborative. ECF 168-6 ¶¶ 9, 12.

To the extent Defendants challenge Dr. Young's methodology, Defendants improperly

35

United States District Court
Northern District of California

challenge the weight rather than the inadmissibility of Dr. Young's expert opinion.  *See Alaska Rent-A-Car, Inc.*, 738 F.3d at 970 ("Avis challenges three aspects of the witness's testimony: using Alamo as the comparator, using the national rather than the Alaska market as a baseline, and extrapolating from the Juneau market to the entire Alaska market. . . . They all go to the weight of the testimony and its credibility, not its admissibility.").   Indeed, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert v. Merrell Dow Pharmaceuticals, Inc*., 509 U.S. 579, 596 (1993).

Accordingly, the Court denies Defendants' motion to exclude Dr. Young's expert opinion to the extent Defendants argue that Dr. Young's expert opinion is unreliable.

### 2. Dr. Young's Expert Opinion is Relevant to the Issues on Summary Judgment

Defendants argue that Dr. Young's claim that he has always been found to be an expert by immigration courts is not dispositive to this Court's determination.  ECF 143 at 13. Defendants also argue that Dr. Young's testimony is irrelevant as to whether the Secretary lawfully exercised her authority to terminate TPS for Honduras and Nicaragua.  *Id*. at 18–19. Plaintiffs argue that Dr. Young's testimony provides historical context surrounding the Secretary's statements.  *See* ECF 168 at 9–12; ECF 184 at 3.

The Court agrees that Dr. Young's opinion on "how the debate over Temporary Protected Status (TPS) for Honduras and Nicaragua, and more broadly the debate over TPS generally, reflects the history of racism in immigration policy debates in the United States" is relevant to Plaintiffs' equal protection claim.  Defendants seek summary judgment on Plaintiffs' equal protection claim, arguing that Plaintiffs fail to show a discriminatory animus.  ECF 142 at 19–20. Plaintiffs argue that summary judgment is not warranted because a genuine issue of material fact precludes summary judgment.  ECF 167 at 20; *see id*. ("Defendants still argue Secretary Noem's statements and actions were non-discriminatory and that her termination decisions were based only on the statutorily required review of country conditions . . . while Plaintiffs contend— supported by extensive expert testimony and a growing record—that her statements and actions

36

reveal impermissible animus.").  Because the parties actively dispute whether the Secretary's statements were motivated by racial animus, Dr. Young's opinion on the topic of racial animus is relevant to the issues before this Court.  *See City of Pomona*, 750 F.3d at 1044 ("Expert opinion testimony is relevant if the knowledge underlying it has a valid connection to the pertinent inquiry.") (internal quotations omitted); *In re Viagra (Sildenafil Citrate) and Cialis (Tadalafil) Prod. Liab. Litig.*, 424 F. Supp. 3d 781, 789 (N.D. Cal. Jan. 13, 2020) ("[T]he expert testimony must 'fit' the question the jury must answer . . . This bar is cleared where the evidence 'logically advances a material aspect of the proposing party's case.'") (internal citations and quotations omitted).

Accordingly, the Court denies Defendants' motion to exclude Dr. Young's expert opinion to the extent Defendants argue that the opinion on how the debate over Temporary Protected Status (TPS) for Honduras and Nicaragua, and more broadly the debate over TPS generally, reflects the history of racism in immigration policy debates in the United States" is irrelevant to the Court's analysis.  However, as Plaintiffs concede, Dr. Young's expert opinion on the country conditions of Honduras and Nicaragua shall be limited to the extent Dr. Young opines on how "country conditions cast doubt on Defendants' motivations."  ECF 168 at 13.

### B.    Plaintiffs Concede that the Court Need Not Consider Stacy Tolchin, Hannah Postel, Melanie Morten, Tara Watson, Tom Wong, and Dana Frank Expert Reports

During oral argument, Plaintiffs conceded that the Court need not consider the expert reports of Stacy Tolchin, Hannah Postel, Melanie Morten, Tara Watson, Tom Wong, and Dana Frank.  *See also* ECF 184 at 1 ("Plaintiffs are not relying on Dr. Wong's declaration for their summary judgment motion, and the Court does not need to consider his declaration to resolve the MSJ."); *id.* at 2 ("Plaintiffs do not contend this Court must analyze the consequences of terminating TPS to resolve the pending summary judgment motions.").

Accordingly, the Court grants Defendants' motion to exclude expert testimony to the extent Defendants seek to exclude the expert reports Stacy Tolchin, Hannah Postel, Melanie Morten, Tara Watson, Tom Wong, and Dana Frank.

United States District Court
Northern District of California

1    **V.    MOTIONS FOR SUMMARY JUDGMENT**

2         **A.    Legal Standard**

3         Federal Rule of Civil Procedure 56 provides that a "court shall grant summary judgment

4    [to a moving party] if the movant shows that there is no genuine dispute as to any material fact and

5    the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  An issue of fact is

6    genuine only if there is sufficient evidence for a reasonable jury to find for the nonmoving party.

7    *See Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248-49 (1986).  "The mere existence of a

8    scintilla of evidence . . . will be insufficient; there must be evidence on which the jury could

9    reasonably find for the [nonmoving party]." *Id.* at 252.  At the summary judgment stage, evidence

10    must be viewed in the light most favorable to the nonmoving party and all justifiable inferences

11    are to be drawn in the nonmovant's favor.  *See id.* at 255.

12         Where a plaintiff moves for summary judgment on claims that it has brought (i.e., for

13    which it has the burden of proof), it "must prove each element essential of the claims . . . by

14    undisputed facts." *Cabo Distrib. Co. v. Brady*, 821 F. Supp. 601, 607 (N.D. Cal. 1992); *see also*

15    *Fontenot v. Upjohn Co*., 780 F.2d 1190, 1194 (5th Cir. 1986) (stating that, "if the movant bears

16    the burden of proof on an issue, either because he is the plaintiff or as a defendant he is asserting

17    an affirmative defense, he must establish beyond peradventure all of the essential elements of the

18    claim or defense to warrant judgment in his favor") (emphasis omitted).

19         Where a defendant moves for summary judgment based on a claim for which the plaintiff

20    bears the burden of proof, the defendant need only point to the plaintiff's failure "to make a

21    showing sufficient to establish the existence of an element essential to [the plaintiff's] case."

22    *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

23         **B.    Discussion**

24         Plaintiffs seek summary judgment on Plaintiffs' claims that Secretary's TPS termination

25    decisions violate the APA because the Secretary (1) executed a preordained, political decision and

26    (2) ignored intervening crisis as required by 8 U.S.C. § 1254a(b)(3)(A).  ECF 144 at 21.

27    Defendants move for cross summary judgment on both claims raised by Plaintiffs, and

28    additionally seek summary judgment on Plaintiffs' claims that the Secretary's decisions (1)

United States District Court
Northern District of California

violated the APA by providing only a 60-day orderly transition period, and (2) violated the
constitution because the decisions were motivated by racially discriminatory intent or purpose.
ECF 142 at 18.

### 1. The Secretary's Terminations of TPS for Honduras, Nicaragua, and Nepal Were Preordained and Not Based on Interagency Consultation or Country Conditions Review

Plaintiffs' first claim under the APA is that the Secretary did not comply with the TPS
statute's requirement that TPS decisions be made after interagency consultation and an objective
review of the country conditions. ECF 144 at 16. Plaintiffs argue that the Court should grant
summary judgment on Plaintiffs' first APA claim because Defendants (a) made a preordained
decision to terminate TPS and (b) did not base their termination decisions on interagency
consultation or country conditions review. ECF 144 at 14–18. Defendants argue that summary
judgment should be granted in Defendants' favor because Secretary's termination decisions were
consistent with the TPS statute and based on a proper review of the necessary facts. ECF 142 at
12–18; ECF 166 at 6.

The APA provides that "[a] person suffering legal wrong because of agency action, or
adversely affected or aggrieved by agency action within the meaning of a relevant statute, is
entitled to judicial review thereof." 5 U.S.C. § 702. "Courts must exercise their independent
judgment in deciding whether an agency has acted within its statutory authority, as the APA
requires." *Loper Bright Enters*, 603 U.S. at 412. The APA also requires Courts to "hold unlawful
and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an
abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(a). 8 U.S.C. §
1254a(b)(3)(A) requires the Secretary to make a determination of a country's TPS designation
"*after* consultation with appropriate agencies" and upon "review of the conditions in the foreign
state." Moreover, the Supreme Court has held that agencies must offer the true reason for a
decision. "The reasoned explanation requirement of administrative law … is meant to ensure that
agencies offer genuine justifications for important decisions, reasons that can be scrutinized by
courts and the interested public. Accepting contrived reasons would defeat the purpose of the
enterprise." *Dep't of Com.*, 588 U.S. at 785. TPS decisions that are "preordained" or based on

1    "political influence," rather than country conditions, violate the APA.  *See Saget*, 375 F. Supp. 3d

2    at 345–46 (quoting 5 U.S.C. § 706(2)(A)).

3         The Court agrees that the Secretary's Honduras, Nicaragua, and Nepal TPS termination

4    decisions were preordained.  Before reviewing any country conditions reports, the Secretary, at her

5    confirmation hearing, categorized TPS as a program that had "been abused and manipulated by the

6    Biden administration" at stated that the program "will no longer be allowed . . . these extensions

7    going forward the way that they are." ECF 145-2 at 104.  After assuming her role as Secretary,

8    and during an interview with NewsNation, the Secretary promised that "when the president gives a

9    directive, the Department of Homeland Security will follow it and we're going to make sure that

10   those who come in under a program . . ." ECF 145-6.  That directive was to terminate TPS.

11        Indeed, according to President Trump, "you have to remove the people . . .we cannot

12   destroy our country . . . . You have to remove the people, and you have to bring them back to their

13   own country. . . I'd revoke [TPS], and I'd bring them back to their country."  ECF 145-3 at 14–16;

14   *see also* ECF 145-4 at 2 (Vice President Vance stating, "[w]e're going to stop doing mass grants

15   of Temporary Protected Status.").  These sentiments were later etched into the Invasion EO, which

16   claimed an "unprecedented flood of illegal immigration into the United States" and ordered the

17   Secretary to "rescind the policy decisions of the previous administration that led to the increased

18   or continued presence of illegal aliens in the United States, and align any and all departmental

19   activities with the policies set out by this order and the immigration laws."  90 Fed. Reg. 8443.

20        The Secretary's statements after taking office further show a bias against TPS.  DHS stated

21   that, by vacating or partially vacating TPS, it was "restoring integrity in our immigration system

22   and ensuring that TPS remains temporary," and fulfilling "President Trump's promise to rescind

23   policies that were magnets for illegal immigration and inconsistent with the law."  ECF 145-4;

24   ECF 145-13.  DHS also issued a press release that said, "[f]or decades the TPS systems has been

25   exploited and abused." ECF 145-5.  According to DHS, a termination of TPS "is part of President

26   Trump's promise to rescind policies that were magnets for illegal immigration and inconsistent

27   with the law."  *Id.*  On May 19, 2025, less than a month before Nepal's TPS termination notice

28   was posted and approximately two months before Honduras and Nicaragua's TPS termination

United States District Court
Northern District of California

40

1    notices were posted, DHS posted on social media: "The Biden Administration exploited

2    Temporary Protected Status to let half a million poorly vetted migrants into this country – from

3    MS-13 gang members to known terrorists and murderers."  ECF 145-14.

4        The Secretary's decision-making processes further demonstrate that her termination

5    decisions were preordained.   Notably, for Honduras and Nicaragua, the Secretary drafted her

6    decision memos ("DM") terminating TPS *before* receiving updated country conditions reports

7    from the Department of State.  *See* ECF 176-22 at 3 ("[T]he DM is now ready to go . . . We did

8    not receive a recommendation from DOS. You are correct that DOS will not provide country

9    conditions anymore."); *see also* ECF 145-21 ("I wanted to check in on about COI for Nicaragua

10   and Honduras.  We are currently prepping both DMs to circulate this week, but I am not sure we

11   have the COI from RRU. . .Do you have an ETA?"); *compare* ECF 145-31 (decision memos

12   written by April 7) *with* ECF 145-21 (DHS personnel acknowledging lack of country conditions

13   information on April 8).  In the case of Nepal, Defendants recognized they lacked "an updated

14   DOS report," ECF 145-35, and downplayed the importance of the report because it supported their

15   desired result: "the recommendation was to terminate so we should move forward."  ECF 176-20;

16   *see* ECF 63; ECF 64 (CAR indices for Nepal and Nicaragua, lacking any contemporaneous State

17   Department country conditions analysis or recommendation letter).  The Secretary's failure to

18   consult with the Department of State before deciding whether to terminate TPS directly conflicts

19   with the TPS statute, which specifically requires that, when conducting a periodic review of a

20   designated country's conditions, that the Secretary reach her decision, "*after* consultation with

21   appropriate agencies of the Government."  8 U.S.C. § 1254a(b)(3)(A) (emphasis added).  Failure

22   to comply with the TPS statute violates the APA.  *See Lands Council*, 395 F.3d at 1026 ("An

23   agency's action is arbitrary and capricious . . . if the agency's decision is contrary to the governing

24   law.").

25       The record reflects that the Secretary relied on skewed data to terminate TPS for Honduras,

26   Nicaragua, and Nepal.  In requesting country conditions reports, DHS personnel requested revised

27   reports that "only include[d] around 1 page of country conditions" and "[i]nclude[d] any

28   improvements" without "mention[ing] environmental concerns or climate change."  ECF 176-2.

41

United States District Court
Northern District of California

1    Researchers had their team "revise the reports for Nepal, Honduras, Nicaragua, and Haiti to make

2    them consistent with [these] new guidelines." *Id*. DHS personnel also added a "national interest

3    analysis" based on "data/analysis."   ECF 176-33 at 6 ("OP&S is working on improving the TPS

4    decision memos and we are adding a national interest analysis . . . . We are wanting to provide

5    data/analysis in our TPS decision memo."); *id*. ("We'd like to request another analysis . . . [t]his

6    time it's for Cameroon and Nepal").  However, as described by policy analysists, this "data"

7    involved "[s]uch a LOW number of fraud" for Nepal that "[i]t's so laughable that it's even in the

8    paper." ECF 176-33 at 2; *see id*. (showing 1 "Found Fraud" out of 12,859 total for Nepal).  DHS

9    personnel sought the "same type of data" analysts provided for Nepal, "but this time for

10   Honduras and Nicaragua." ECF 176-34 at 5.

11       After receiving this data, DHS personnel contemplated how to explain their TPS

12   terminations: "[t]he problem is if we sing the praises of Honduras (which we certainly do), then it

13   calls into question why we're also terminating the program in Nicaragua, with its murderous,

14   dictatorial regime.  Which in turn might open us up to questions about why we're terminating for

15   both countries when the conditions on the ground are so much better in Honduras." ECF 176-11.

16       Collectively, and in exercising its "independent judgment in deciding whether [the

17   Secretary] acted within [her] statutory authority," the Court finds that Plaintiffs have provided

18   sufficient evidence to demonstrate that the Secretary terminated TPS for Nepal, Honduras, and

19   Nicaragua based on a pre-ordained decision to limit TPS.  *See Loper Bright*, 603 U.S. at 412.  The

20   record specifically reflects that, before taking office, the Secretary made a pre-ordained decision to

21   end TPS and influenced the conditions review process to facilitate TPS terminations for Honduras,

22   Nicaragua, and Nepal.  *See Dep't of Commerce v. N.Y*., 588 U.S. 752, 782–83 (2019) ("The

23   evidence showed that the Secretary was determined to reinstate a citizenship question from the

24   time he entered office; instructed his staff to make it happen; waited while Commerce officials

25   explored whether another agency would request census-based citizenship data; subsequently

26   contacted the Attorney General himself to ask if DOJ would make the request; and adopted the

27   Voting Rights Act rationale late in the process."); *Saget v. Trump*, 379 F. Supp. 3d 280, 347

28   (E.D.N.Y. 2019) ("Plaintiffs have proffered significant evidence showing Acting Secretary Duke,

1    DHS, USCIS, and the Department of State reverse engineered the TPS review process to achieve a

2    desired political outcome: the termination of Haiti's TPS.  Such an outcome-determinative process

3    violates the mandatory periodic review process of the TPS statute.")

4         Accordingly, the Court grants Plaintiffs' motion for partial summary judgment on their

5    first APA claim that the Secretary's decision was arbitrary and capricious because her decision

6    was preordained and not based on an objective review of the country conditions, after consultation

7    with the appropriate interagency department, as required by the TPS statute and the APA.  The

8    Court denies Defendants' motion for summary judgment to the extent that Defendants seek

9    summary judgment on Plaintiffs' first APA claim.

### 2.  The Secretary's Terminations of TPS for Honduras, Nicaragua, and Nepal Were Contrary to Law for Failing to Take into Account Intervening Conditions

12        Plaintiffs argue that the Secretary failed to consider conditions beyond those related to the

13   crisis that triggered the TPS designation in assessing the countries improvements.  ECF 144 at 20.

14   Defendants argue that the Secretary is limited to consideration of the conditions which gave rise to

15   the original TPS designation.  ECF 142 at 13.  Plaintiffs respond that the TPS statute and the

16   APA's change-in-position doctrine required the Secretary to provide a reason for ignoring

17   intervening country conditions.  ECF 175 at 15.

18        8 U.S.C. § 1254a(b)(3)(A) provides that, on periodic review, the Secretary, "after

19   consultation with appropriate agencies of the Government, shall review the conditions in the

20   foreign state . . . for which a designation is in effect under this subsection and shall determine

21   whether the conditions for such designation continue to be met."  If she determines the foreign

22   state "no longer continues to meet the conditions for designation," she "shall terminate" the

23   designation.  *Id*. § 1254a(b)(3)(B).  If she "does not determine … that a foreign state … no longer

24   meets the conditions for designation under paragraph (1), the period of designation of the foreign

25   state is extended."  *Id*. § 1254a(b)(3)(C).

26        The parties dispute whether the language in § 1254a(b)(3)(A) which requires the Secretary,

27   in conducting a periodic review, to "determine whether the conditions for such designation . . .

28   continue to be met" requires the Secretary to consider factors beyond those which gave rise to the

United States District Court
Northern District of California

initial designation.  *Compare* ECF 144 at 21 *with* ECF 166 at 17.  The Court, therefore, must

engage in statutory construction to resolve the parties' dispute.

Beginning with the language of the statute, the Court finds that the TPS statute's periodic

review provision, which requires the Secretary to "determine whether the conditions for *such*

designation . . . continue to be met," contains genuine ambiguity.  8 U.S.C. § 1254a(b)(3)(A)

(emphasis added); *compare* ECF 144 at 21 *with* ECF 166 at 17.  "A statute is ambiguous . . . if it is

subject to more than one reasonable interpretation."  *John v. United States*, 247 F.3d 1032, 1042

(9th Cir. 2001).  Here, the phrase "such designation" in 8 U.S.C. § 1254a(b)(3)(A) is subject to

more than one reasonable interpretation—whether the language refers to the initial designation or

to the broader TPS designation is not quickly discernable from the text itself.

The Court, therefore, must look to the statuary scheme and legislative purpose in

determining whether 8 U.S.C. § 1254a(b)(3)(A) requires the Secretary to consider factors beyond

that which gave rise to the initial designation when conducing a periodic review.  *See Hernandez*

*v. Williams, Zinman & Parham PC*, 829 F.3d 1068, 1073 (9th Cir. 2016) ("But if the plain

meaning of the statutory text remains unclear after consulting internal indicia of congressional

intent, we may then turn to extrinsic indicators, such as legislative history, to help resolve the

ambiguity.") (quotations and citations omitted); *King v. Burwell*, 576 U.S. 473, 492, (2015)

("Given that the text is ambiguous, we must turn to the broader structure of the Act to determine

the meaning of [the provision at issue].").  The Court's "duty is to find that interpretation which

can most fairly be said to be imbedded in the statute, in the sense of being most harmonious with

its scheme and with the general purposes that Congress manifested."  *United States v. Sagg*, 125

F.3d 1294, 1295 (9th Cir. 1997).  Under *Loper Bright*, the Court "must exercise [its] independent

judgment in deciding whether an agency has acted within its statutory authority, as the APA

requires."  603 U.S. at 412. "Courts need not and under the [Administrative Procedure Act] may

not defer to an agency interpretation of the law simply because a statute is ambiguous.  *Id.* at 413.

In reviewing the statutory scheme and legislative purpose of the TPS statute, the Court

finds that interpreting "such designation" in 8 U.S.C. § 1254a(b)(3)(A) to mean the broader TPS

designation—not the initial designation—is most harmonious with the TPS scheme and general

1    purpose of TPS.  "In enacting the TPS statute [in 1990], Congress designed a system of temporary

2    status that was predictable, dependable, and insulated from electoral politics."  *Nat'l TPS All.*, 150

3    F.4th at 1008–1010.  Congress sought to replace "the Executive's prior ad hoc framework for

4    providing relief to nationals of certain designated countries," which lacked transparency and clear

5    criteria and was susceptible to "'the vagaries of our domestic politics.'"  *Id.* (quoting 135 Congr.

6    Rec. H7501 (daily ed. Oct. 25, 1989)).  The TPS statute created a framework whereby the DHS

7    Secretary may designate a foreign state for TPS when nationals of that state cannot return there

8    safely.  *Id.* at 110.  Since the creation of the statute, DHS has "a longstanding practice of

9    considering *all country conditions* when undertaking the mandatory periodic review under the

10   statute, regardless of their relation to the originating condition."  *Saget*, 375 F. Supp. 3d at 350.  In

11   fact, "[i]ntervening factors arising after a country's original TPS designation … were considered

12   relevant to determining whether a country continued to meet the conditions for continuing TPS

13   designation."  *Ramos*, 336 F. Supp. 3d at 1093.

14       Interpretation of 8 U.S.C. § 1254a(b)(3)(A) to mean the broader TPS designation is also

15   consistent with the humanitarian purpose of the TPS Statute.  Congress committed its mission of

16   humanitarian relief by creating TPS.  Since the mid-twentieth century, "every Administration

17   since and including that of President Eisenhower has permitted one or more groups of otherwise

18   deportable [foreign nationals] to remain temporarily in the United States out of concern that . . .

19   forced repatriation . . .  could endanger their lives or safety."  H.R. Rep. No. 100-627, at 6 (1988).

20   Over the past three decades, this nation's leaders have chosen to pick up the mantle and protect

21   those in need of aid.[2]

22   _____

23   [2] The TPS program is described in the Humanitarian page of USCIS's website: "The Secretary of
     Homeland Security may designate a foreign country for TPS due to conditions in the country that

24   temporarily prevent the country's nationals from returning safely, or in certain circumstances,
     where the country is unable to handle the return of its nationals adequately."  U.S. Citizenship and

25   Immigration Services, Temporary Protected Status,
     https://www.uscis.gov/humanitarian/temporary-protected-status.

26   Scholars and courts across the country have noted the humanitarian purpose of the TPS program.
     *See* Andrew I. Schoenholtz, *The Promise and Challenge of Humanitarian Protection in the United*

27   *States: Making Temporary Protected Status Work as a Safe Haven*, 15 Nw. J. L. & Soc. Pol'y. 1, 5
     (2019) (noting the "the purpose of TPS to provide temporary safety to those whose countries are

28   in crisis"); *Sanchez v. Mayorkas*, 593 U.S. 409, 412 (2021) (noting that the TPS program
     "provides humanitarian relief to foreign nationals in the United States who come from specified

United States District Court
Northern District of California

Defendants' interpretation of 8 U.S.C. § 1254a(b)(3)(A) to only include the initial designation would grant the Secretary unfettered discretion to terminate TPS for a country in the midst of destabilizing and destructive civil war so long as an historic flood for which an antecedent TPS designation was made (even just months earlier) had dissipated. The import of the TPS statute—that is, providing humanitarian relief to nonimmigrants whose country cannot adequately handle their return—would be entirely flouted if TPS holders are forced to return to a country with no functioning government, no running water, dismantled infrastructure, and the like, simply because flood water had dissipated. Such a perplexing result is a natural consequence of Defendants' interpretation of the TPS statute; and this Court need not "read the statute to usher in such a bizarre and half-baked scheme." *Kennedy v. Braidwood Mgmt., Inc.*, 606 U.S. 748, 787 (2025); *Lawson v. FMR LLC*, 571 U.S. 429, 471, (2014) (Sotomayor, J., dissenting) ("[I]nterpretations of a statute which would produce absurd results are to be avoided if alternative interpretations consistent with the legislative purpose are available.") (citing *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 575, (1982); *United States v. Lazarenko*, 624 F.3d 1247, 1251 (9th Cir. 2010) ("In other words, because a literal application of the plain text leads to absurd results, the plain text does not control.") The Court agrees with Plaintiffs that "[n]othing in the statutory text ties the second criteria, regarding the country's ability to handle the return of its nationals, to the disaster that triggered its initial designation." ECF 144 at 21. In exercising its independent judgment, finds that Defendants' interpretation of the periodic review provision is incongruent with the statute.

Notably, evidence produced in discovery reveals that Defendants explicitly decided to narrow their consideration to factors which gave rise to the initial TPS designation. Internal

---

countries"); *Ramos v. Nielsen*, 321 F. Supp. 3d 1083, 1091 (N.D. Cal. 2018) ("TPS is . . . a humanitarian program."); *Nat'l TPS All. v. Noem*, 150 F.4th 1000, 1009 (9th Cir. 2025) (describing congressional debates in the late 1980s regarding "alternative mechanisms for granting humanitarian relief to groups of non-U.S. citizens" which gave rise to the TPS program); *Solorzano v. Mayorkas*, 987 F.3d 392, 394 (5th Cir. 2021) ("Congress created Temporary Protected Status in 1990 as a form of humanitarian relief."); *Guerrero v. Johnson*, 138 F. Supp. 3d 754, 758 (E.D. La. 2015) ("Congress enacted the [TPS] statute with the humanitarian aim of providing relief…").

1    emails show that DHS staff were directed to "[f]ocus on conditions described in the original

2    designation, and how they are/aren't the same now" and directed to exclude consideration of

3    environmental concerns and corruption.  ECF 176-2.  In requesting country conditions reports,

4    DHS personnel requested revised reports that "only include[d] around 1 page of country

5    conditions" and "[i]nclude[d] any improvements" without "mention[ing] environmental concerns

6    or climate change."  ECF 176-2.  Researchers had their team "revise the reports for Nepal,

7    Honduras, Nicaragua, and Haiti to make them consistent with [these] new guidelines."  *Id.*

8    Defendants counter by pointing to the large amount of information the Secretary received when

9    making her decision.  ECF 166 at 9.  However, "the fact that [the Secretary] received information

10   regarding [country] conditions, does not prove she ultimately considered and relied on those

11   conditions in deciding to terminate TPS status."  *Ramos*, 336 F. Supp. 3d at 1097.  The notices

12   excluded any mention of "violence and crime in Honduras, weather events in Nicaragua," "the

13   effects of the COVID-19 pandemic," "inflation in Nepal," a "murderous, dictatorial regime" in

14   Nicaragua, the State Department Travel Advisory warnings for Honduras and Nicaragua, or the

15   effect of the Russian invasion of Ukraine on Nepal's agricultural capacity, despite the record

16   containing evidence of this information.  ECF 175 at 12; ECF 176-11; ECF 176-8; ECF 145-9;

17   ECF 149-10; *see* 90 Fed. Reg. 30086; 90 Fed. Reg. 30089; 90 Fed. Reg. 24151.

18          Taken together, the Court finds that the Secretary improperly narrowed the scope of her

19   review of the conditions of the countries at issue in this litigation before making her termination

20   decision.  The Secretary's narrowing was based on an erroneous reading of the TPS statute and

21   history of DHS practice.  Accordingly, the Court finds that Plaintiffs are entitled to judgment as a

22   matter of law on their claim that the Secretary's termination decision was arbitrary and capricious

23   under the APA.

24                                        * * *

25          The Court finds that there are no genuine disputes of material fact with respect to

26   Plaintiffs' first two claims under the APA and that, based on the record before the Court, Plaintiffs

27   are entitled to judgment as a matter of law.  The Court, therefore, grants Plaintiffs' motion for

28   partial summary judgment on both APA claims.

### 3. The Secretary's Terminations of TPS for Honduras, Nicaragua, and Nepal Inexplicably Departed from Prior Practice in Limiting the Orderly Transition Period.

Defendants argue that Plaintiffs fail to show that the Secretary's decision not to extend the orderly transition period beyond the statutory default of 60 days was arbitrary and capricious. ECF 142 at 18. Plaintiffs argue that the Secretary's decision to grant a 60-day transition period for Nepali, Honduran, and Nicaraguan TPS holders represented an unexplained departure from a decades-old agency practice in violation of the APA. ECF 167 at 19.

Analysis of this claim again raises the change-in-position doctrine whereby an agency's "consistent practice, whether adopted expressly in a holding or established impliedly through repetition, sets the baseline from which future departures must be explained." *Wages & White Lions Invs., L.L.C.*, 604 U.S. at 570; *see also Organized Vill. of Kake v. USDA*, 795 F.3d 956, 966 (9th Cir. 2015) (when an agency breaks with a long-standing past practice, it must "display[] 'awareness that it is changing position'" and provide "good reasons" for the new policy) (quoting *FCC v. Fox Television Stations, Inc.*, 556 US 502, 515−16 (2009)).

As discussed above, Plaintiffs point to twenty-two years of DHS's practice of setting an orderly transition period of six to eighteen months after the issuance of a TPS termination notice. ECF 28. Defendants draw the Court's attention to two termination decisions in the thirty-five-year history of the TPS statute which has incorporated a 60-day transition period. *See Termination of Designation of Lebanon Under Temporary Protected Status Program*, 58 Fed. Reg. 7582 (Feb. 8, 1993) (60 days); *Termination of Designation of Angola Under the Temporary Protected Status Program*, 68 Fed. Reg. 3896-01, 3896 (Jan. 27, 2003) (60 days). However, given that the prevailing practice of prior administrations was to provide at least 6 months after the TPS termination date for holder to transition, the notices were required to—but failed to—acknowledge or explain the departure from the decades-long practice of providing at least a 6-month transition period under the APA. *See Encino Motorcars*, 579 U.S. at 222 ("It follows that an '[u]nexplained inconsistency' in agency policy is 'a reason for holding an interpretation to be an arbitrary and capricious change from agency practice.'").

Accordingly, the Court denies Defendants' motion for summary judgment on Plaintiffs'

United States District Court
Northern District of California

1   claim that the Secretary violated the APA by departing from prior agency practice without

2   explanation.

3       **4.  Genuine Issues of Material Fact Preclude Summary Judgment for Defendants on Plaintiffs' Equal Protection Claim**

4          Defendants argue that they are entitled to summary judgment on Plaintiffs' constitutional

5   claims because the Court cannot look beyond the facially legitimate reasons for the Secretary's

6   decision about immigration policy to find racial animus.  ECF 142 at 18.  Plaintiffs argue that a

7   genuine dispute as to whether the evidence shows that the challenged TPS decisions were

8   motivated by racial animus which warrants denial of Defendants' motion for summary judgment.

9   ECF 167 at 20.

10         Under the applicable analytical framework set forth in *Arlington Heights*, the Court finds

11  that there is a genuine dispute of material fact as to whether the decisions to vacate and terminate

12  were based on racial, ethnic, and/or national origin animus.  Such animus can reasonably be shown

13  from the statements made by Secretary Noem and/or President Trump alone.  Here, Plaintiffs

14  present a series of statements made by Defendants and officials in the current administration to

15  support the Due Process claim as to all plaintiffs.

16         In a January 29, 2025, post on X, Secretary Noem announced that she would end a Biden

17  order that allowed Venezuelans to stay in the country and "violate our laws."  ECF 18-16.  In a

18  March 20, 2025, post on X, Secretary Noem associated "migration management" with "sav[ing]

19  American lives and get[ting] criminals off our streets!"  ECF 18-17.  In a May 19, 2025, post on

20  X, DHS equated TPS holders with "MS-13 gang members," "known terrorists," and "murderers."

21  ECF 18-18.  These statements are consistent with similar statements by President Trump including

22  one occurrence in which he stated that migrants were "poisoning the blood of our country."  ECF

23  18-20; *see also* ECF 18-23 (President Trump asking why people "could not come from nice

24  countries . . . like Denmark, Switzerland, and Norway"); *see* Compl. ¶ 98 (President Trump "How

25  about allowing people to come to an open border . . . many of them murdered far more than one

26  person, and they're now happily living in the United States.  You know now a murderer, I believe

27  this, it's in their genes. And we got a lot of bad genes in our country right now."); *see also* ECF

28  18-15 at 7 (Secretary Noem describing immigration as an "invasion happening on purpose . . . to

remake the foundation of this country").

For each termination decision, Secretary Noem invoked President Trump's Invasion Executive Order (E.O.) *See* 90 Fed. Reg. 24,151, 24,152 n.10 (June 6, 2025) (Nepal termination notice, citing E.O. 14159, § 16(b)); 90 Fed. Reg. 30,086, 30,088 n.4 (July 8, 2025) (Nicaragua termination notice, citing same); 90 Fed. Reg. 30,089, 30,091 n.10 (July 8, 2025) (Honduras termination notice, citing same). The Secretary described President Trump's Invasion E.O. as "directing" her to limit TPS designations, *id.*, because, in President Trump's view, TPS holders (among others) were part of a "flood of illegal immigration" that "engaged in hostile activities" and had "abused the generosity of the American people," "committing vile and heinous acts against innocent Americans." 90 Fed. Reg. at 8443 § 1. The statements of the Secretary and other officials in the administration which repeatedly characterize immigrants as invaders upsetting the foundation of the country perpetuates the racist "replacement theory" which stands for the idea that non-white immigrants will "replace" the white race and undermine the nation's "white" foundation. ECF 17-20 ¶ 18. The President and Secretary's policies and policy goals—including the decisions to terminate TPS—promote the debunked and racist "replacement theory." *Id.* Plaintiffs have presented substantial evidence that the Secretary's termination decisions, which rested on false and negative stereotypes entirely "divorced from any factual context," *Hawaii*, 585 U.S. at 705−06 (citation omitted), manifested discriminatory intent.

A fact is "material" if it "might affect the outcome of the suit under the governing law," and a dispute as to a material fact is "genuine" if there is sufficient evidence for a reasonable trier of fact to decide in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Based on the record before the Court, there is a genuine dispute of material fact about whether the Secretary's decision was procedurally proper or influenced by racial animus. *Lui v. DeJoy*, 129 F.4th 770, 780 (9th Cir. 2025) (fining a "genuine dispute of material fact" as to the plaintiff's claim under Title VII of the Civil Rights Act where plaintiff provided sufficient evidence to support her claim that the defendant's conduct was "motivated by racial animus" and reversing the district court's summary judgment holding).

Accordingly, based on the record before the Court, Defendants are not entitled to summary

United States District Court
Northern District of California

1    judgment, and the Court denies Defendants' motion.

2    **VI.    CONCLUSION**

3    "The President is not above the law." *Trump v. United States*, 603 U.S. 593, 642 (2024).

4    Neither are his cabinet officials.  The rule of law demands that when executive officials exceed

5    their authority, they must be held to account.  The Administrative Procedures Act ensures

6    government accountability by making agencies transparent, require public participation, setting

7    fair rulemaking standards, and allowing courts to review actions for legality and rationality.

8    Our laws should not favor the loud and powerful simply because of their positions.  Yet,

9    for too long, our laws have overlooked the quiet truths—truths carried in the margins, truths lived

10   but never spoken aloud.  It is the duty of every public servant entrusted with shaping a more just

11   society to bring those truths into the open, to translate lived experience into written protection.  It

12   means hearing the faintest whisper of injustice and refusing to let it fade.  It means honoring the

13   people who call this country home but have never been invited to speak in it.  It means finally

14   ensuring that the law speaks for them.

15   Having considered the parties' briefs, the relevant legal authority, and for the reasons

16   below, the Court **DENIES** Defendants' motion to dismiss; **GRANTS IN PART** and **DENIES IN**

17   **PART** Defendants' motion to exclude expert testimony; **GRANTS** Plaintiffs' motion for partial

18   summary judgment; **DENIES** Defendants' motion for summary judgment.

19   Specifically, the Court declares that the termination of TPS for Nepal on June 6, 2025, and

20   Honduras and Nicaragua on July 7, 2025, were unlawful under the APA.   Moreover, the Court

21   vacates the Secretary's termination decisions with respect to Honduras, Nepal, and Nicaragua.

22   *Corner Post, Inc. v. Bd. of Governors of Fed. Reserve Sys.*, 603 U.S. 799, 830–31 (2024)

23   (Kavanaugh, J., concurring) ("When a federal court concludes that an agency adjudicative order

24   [or any other agency action] is unlawful, the court must vacate that order.").

25   The Court directs entry of a final judgment under Rule 54(b) on the APA claims for which

26   the Court has granted summary judgment in favor of Plaintiffs.  *See* Fed. R. Civ. P. 54(b) ("When

27   an action presents more than one claim for relief . . . , the court may direct entry of a final

28   judgment as to one or more, but fewer than all, claims or parties only if the court expressly

1    determines that there is no just reason for delay.").  The Clerk of the Court is directed to enter a

2    final judgment in favor of Plaintiffs on the APA claims raised in Plaintiffs' motion for partial

3    summary judgment related to (1) the termination of TPS for Honduras (2) the termination of TPS

4    for Nepal, and (3) the termination of TPS for Nicaragua.

5         As for the remaining claims – (4) the APA claim related to the orderly transition period for

6    Honduras, (5) the APA claim related to the orderly transition period for Nepal, (6) the APA claim

7    related to the orderly transition period for Nicaragua, (7) the Equal Protection claim related to the

8    Honduras TPS decisions, (8) the Equal Protection claim related to the Nepal TPS decisions and (9)

9    the Equal Protection claim related to the Nicaragua TPS decisions – the Court temporarily stays

10   continued litigation.

11        A temporary stay will help conserve judicial and litigant resources.  Further, a stay will

12   allow the appellate courts to adjudicate most of the statutory claims before the constitutional ones.

13   *Cf. Califano v. Yamasaki*, 442 U.S. 682, 692 (1979) (stating that "[a] court presented with both

14   statutory and constitutional grounds to support the relief requested usually should pass on the

15   statutory claim before considering the constitutional question").

16        This Order resolves ECF 110, 142, 143, 144, and 153.

17        IT IS SO ORDERED.

18   Dated: December 31, 2025

19                                                   _____
                                                     TRINA L. THOMPSON
20                                                   United States District Judge

21

22

23

24

25

26

27

28

United States District Court
Northern District of California