No. 26-199

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

———————————

KRISTI NOEM, *et al.*,

*Appellants,*

v.

NATIONAL TPS ALLIANCE, *et al.*,

*Appellees.*

———————————

On Appeal from the United States District Court
for the Northern District of California

———————————

## EMERGENCY MOTION PURSUANT TO CIRCUIT RULE 27-3
## APPELLANTS' MOTION FOR STAY PENDING APPEAL

(relief requested by January 30, 2026)

———————————

BRETT A. SHUMATE
*Assistant Attorney General*

YAAKOV M. ROTH
*Principal Deputy Assistant Attorney General*

DREW C. ENSIGN
*Deputy Assistant Attorney General*

RUTH ANN MUELLER
*Senior Litigation Counsel*

JEFFREY M. HARTMAN
*Trial Attorney*
Office of Immigration Litigation
Civil Division
U.S. Dep't of Justice
P.O. Box 878
Ben Franklin Station
Washington, D.C. 20044
Phone: (202) 532-4404
Jeffrey.M.Hartman@usdoj.gov

## **<u>TABLE OF CONTENTS</u>**

INTRODUCTION...................................................................................................... 1

BACKGROUND...................................................................................................... 4

ARGUMENT .......................................................................................................... 7

    I.     THE GOVERNMENT WILL SUCCEED ON THE MERITS ............ 7

          A.     Section 1254a Bars Judicial Review of Plaintiffs' Claims................ 7

          B.     The Government Is Likely to Prevail on the Merits of
                 Plaintiffs' APA Challenge to the Secretary's TPS Terminations.. 12

               1.     The Secretary Properly Focused on Whether the Conditions
                      Underlying the TPS Designations Continued to Exist......... 12
               2.     The Secretary's Consideration of Country Conditions Was
                      Not Arbitrary and Capricious ................................................. 15

    II.    THE EQUITABLE FACTORS FAVOR A STAY ................................ 21

CONCLUSION ..................................................................................................... 23

CERTIFICATE OF COMPLIANCE

EXHIBIT A - ECF 28, Plaintiffs' TPS Termination Chart (July 8, 2025)

EXHIBIT B - ECF 197, Partial Judgment Order (Dec. 31, 2025)

EXHIBIT C - ECF 134, Class Cert. Order (Oct. 2, 2025)

EXHIBIT D - ECF 192, Hearing Transcript (Nov. 18, 2025)

# <u>TABLE OF AUTHORITIES</u>
## <u>CASES</u>

*Amgen Inc. v. Smith,*
357 F.3d 103, 113 (D.C. Cir. 2004) ...................................................................8

*Arthur Andersen LLP v. Carlisle,*
556 U.S. 624 (2009) ...................................................................... 13

*Ascension Borgess Hosp. v. Becerra,*
557 F. Supp. 3d 122 (D.D.C. 2021) ................................................. 8

*Bazua-Cota v. Gonzales,*
466 F.3d 747 (9th Cir. 2006) .......................................................... 9

*BedRoc Ltd., LLC v. United States,*
541 U.S. 176 (2004) ...................................................................... 12

*Bldg. & Constr. Trades Dep't v. Allbaugh,*
295 F.3d 28 (D.C. Cir. 2002) ........................................................ 19

*Bouarfa v. Mayorkas,*
604 U.S. 6 (2024) ..................................................................... 8, 10

*CASA, Inc., et al. v. Kristi Noem, et al.,*
No. 25-1792, 2025 WL 2028397 (4th Cir. July 21, 2025)............................ 21

*DCH Reg'l Med. Ctr. v. Azar,*
925 F.3d 503 (D.C. Cir. 2019) ........................................................ 8

*Dep't of Commerce v. New York,*
588 U.S. 752 (2019) ............................................................ 3, 18, 19

*Fiallo v. Bell,*
430 U.S. 787 (1977) ...................................................................... 22

*Garland v. Ming Dai,*
593 U.S. 357 (2021) ................................................................ 15, 20

*Guido v. Mount Lemmon Fire Dist.,*
859 F.3d 1168 (9th Cir. 2017) ................................................... 13, 14

*INS v. Legalization Assistance Project,*
510 U.S. 1301 (1993) ................................................................ 21, 22

*In Re Svenhard's Swedish Bakery,*
154 F.4th 1100 (9th Cir. 2025) ................................................ 10, 14

*Jennings v. Rodriguez,*
538 U.S. 281 (2018)........................................................................ 10

*Little Sisters of the Poor v. Penn.,*
591 U.S. 657 (2020)........................................................................ 15

*Maryland v. King,*
567 U.S. 1301 (2012) ...................................................................... 21

*McNary v. Haitian Refugee Center, Inc.,*
498 U.S. 479 (1991)................................................................... 10, 11

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
463 U.S. 29 (1983)........................................................................... 16

*Myers v. United States,*
272 U.S. 52 (1926).......................................................................... 19

*Nat'l Sec. Archive v. CIA,*
752 F.3d 460 (D.C. Cir. 2014) ...................................................... 20

*Nat'l TPS Alliance v. Noem,*
150 F.4th 1000 (9th Cir. 2025) ............................................ 9, passim

*Nat'l TPS Alliance v. Noem,*
No. 25-4901 (9th Cir. Aug. 20, 2025) (unpub. order) .......... 2, passim

*New Jersey v. Bessent,*
149 F.4th 127 (2d Cir. 2025)......................................................... 16

*Nken v. Holder,*
556 U.S. 418 (2009)............................................................... 2, 21, 22

*Noem v. Nat'l TPS Alliance,*
145 S. Ct. 2728 (2025) ......................................................... 3, 21, 22

*Noem v. Nat'l TPS Alliance*,
  No. 25A326, 2025 WL 2812732 (2025) ...............................................................3, 4, 21

*Patel v. Garland*,
  596 U.S. 328 (2022)...........................................................................................7, 8, 10

*Proyecto San Pablo v. INS*,
  189 F.3d 1130, 1141 (9th Cir. 1999) ..................................................................... 9

*Ramos v. Wolf*,
  975 F.3d 872 (9th Cir. 2020)............................................................................ 2, passim

*Sagana v. Tenorio*,
  384 F.3d 731 (9th Cir. 2004)............................................................................... 22

*Sherley v. Sebelius*,
  689 F.3d 776 (D.C. Cir. 2012) ............................................................................ 19

*Skagit County Pub. Hosp. Dist. No. 2 v. Shalala*,
  80 F.3d 379 (9th Cir. 1996)................................................................................. 8

*Thakur v. Trump*,
  — F.4th —, 2025 WL 3760650 (9th Cir. 2025) ......................................................... 4

*Truck Insur. Exch. v. Kaiser Gypsum Co., Inc.*,
  602 U.S. 268 (2024)......................................................................................... 13

*Trump v. Boyle*,
  145 S. Ct. 2653 (2025) ..................................................................................... 4

*Trump v. Hawaii*,
585 U.S. 667 (2018).........................................................................................34

*U.S. Anesthesia Partners of Texas, P.A. v. U.S.P.H.S.*,
  126 F.4th 1057 (5th Cir. 2025) ........................................................................... 8

*United States v. Tohono O'odham Nation*,
  563 U.S. 307 (2011)........................................................................................7, 8

*Vermont Yankee v. NRDC*,
  345 U.S. 519 (1978)......................................................................................... 15

*Yale New Haven Hosp. v. Becerra,*
  56 F.4th 9 (2d Cir. 2022) ............................................................................................ 8

## STATUTES

5 U.S.C. § 705 ............................................................................................................. 3, 6

5 U.S.C. § 706 .............................................................................................................. 3

### The Immigration and Nationality Act of 1952, as amended:

8 U.S.C. § 1252(a)(5) ................................................................................................. 10

8 U.S.C. § 1254a(a) ..................................................................................................... 4

8 U.S.C. § 1254a(b)(1) ................................................................................................ 10

8 U.S.C. § 1254a(b)(1)(A) ...................................................................................4, 13, 14

8 U.S.C. § 1254a(b)(1)(B) ........................................................................................... 9

8 U.S.C. § 1254a(b)(1)(B)(i)-(iii) .........................................................................14, 15

8 U.S.C. § 1254a(b)(1)(C) ................................................................................... 10, passim

8 U.S.C. § 1254a(b)(2) ................................................................................................ 4

8 U.S.C. § 1254a(b)(2)(A) ........................................................................................... 10

8 U.S.C. § 1254a(b)(3)(A) ................................................................................... 1, passim

8 U.S.C. § 1254a(b)(3)(B) ................................................................................... 2, passim

8 U.S.C. § 1254a(b)(5) ................................................................................................ 7

8 U.S.C. § 1254a(b)(5)(A) ................................................................................... 1, passim

## RULES

Fed. R. Civ. P. 23(b)(2) ............................................................................................... 6

## <u>OTHER AUTHORITIES</u>

*Designation of Honduras Under Temporary Protected Status,*
  64 Fed. Reg. 524 (Jan. 5, 1999) ............................................................................ 5

*Designation of Nicaragua Under Temporary Protected Status,*
  64 Fed. Reg. 526 (Jan. 5, 1999) ............................................................................ 5

*Designation of Nepal Under Temporary Protected Status,*
80 Fed. Reg. 36,346 (June 24, 2015) ...................................................................... 5

*Reconsideration and Rescission of Termination of the Designation of Honduras for Temporary*
  *Protected Status; Extension of the Temporary Protected Status Designation for Honduras*
88 Fed. Reg. 40,304 (June 21, 2023) ...................................................................... 5

*Reconsideration and Rescission of Termination of the Designation of Nepal for Temporary Protected*
  *Status; Extension of the Temporary Protected Status Designation for Nepal*
  88 Fed. Reg. 40,317 (June 21, 2023) ………………………………...………….5

*Reconsideration and Rescission of Termination of the Designation of Nicaragua for Temporary*
  *Protected Status; Extension of the Temporary Protected Status Designation for Nicaragua*
88 Fed. Reg. 40,294 (June 21, 2023) ………………………………...…………….5

*Termination of the Designation of Nepal for Temporary Protected Status*
  90 Fed. Reg. 24,152 (June 6, 2025) …………………………………………6, 15

*Termination of the Designation of Nicaragua for Temporary Protected Status*
  90 Fed. Reg. 30,088 (July 8, 2025) …………………………………….........6, 15

*Termination of the Designation of Honduras for Temporary Protected Status*
  90 Fed. Reg. 30,091 (July 8, 2025) …………………………………...…6, 15

E.O. 14159, *Protecting the American People Against Invasion* (Jan. 20, 2025) ...................... 19

## <u>INTRODUCTION</u>

Temporary Protected Status (TPS) was designed to afford *temporary* protection to aliens from designated countries because, as relevant here, a natural disaster prevented their safe return. The conditions underlying the challenged TPS designations for Honduras and Nicaragua—damage caused by Hurricane Mitch in 1998—indisputably no longer exist. Nor do the conditions underlying Nepal's designation—damage from a 2015 earthquake. Former Secretary of State Blinken recommended that Nepal's TPS designation be terminated in 2024 because of demonstrably successful reconstruction efforts. After considering relevant country conditions evidence, the Secretary of Homeland Security appropriately terminated each TPS designation because none satisfied the statute's mandatory requirement for extension: that the "conditions for [the] designation" "continue[d] to be met." 8 U.S.C. §1254a(b)(3)(A).[1] For decades, Secretaries across administrations have terminated TPS designations in analogous circumstances when a country no longer meets the statutory conditions for designation. Ex. A, ECF 28 Plaintiffs' TPS Termination Chart (July 8, 2025).

The district court saw things differently. Perceiving TPS termination as tantamount to Chinese Exclusion or Japanese internment, the district court rewrote §1254a(b)(5)(A)'s jurisdictional bar to only apply to "the single act of deciding whether the country conditions continue to be met for the purpose of designating or terminating

---

[1] Unless noted, all statutory citations are to Title 8.

TPS." Ex. B, ECF 197, Partial Judgment at 13 (Dec. 31, 2025) ("Op."). From that flawed premise—one that this Court already concluded, unanimously, warranted a stay, ACMS No. 19, *Nat'l TPS Alliance v. Noem* (9th Cir. 25-4901)—the district court second-guessed and set aside the Secretary's TPS terminations, reasoning that they (1) did not adequately consider intervening country conditions evidence and (2) were the result of a preordained policy rather than the consideration of (intervening) country conditions following consultation. Both conclusions are erroneous, and this Court should again grant a stay pending appeal. *See Nken v. Holder*, 556 U.S. 418, 434 (2009).

Start with the government's strong likelihood of success on the merits. No court has jurisdiction to review the TPS terminations because Congress unequivocally made them unreviewable. §1254a(b)(5)(A). Indeed, this Court previously held that §1254a(b)(5)(A) bars Administrative Procedure Act (APA) challenges indistinguishable from the ones Plaintiffs advance here. *Ramos v. Wolf*, 975 F.3d 872, 892 (9th Cir. 2020), *vacated upon reh'g en banc*, 59 F.4th 1010, 1011 (9th Cir. 2023).[2]

Additionally, even if the termination were reviewable, the government is entitled to a stay because Plaintiffs' APA challenges will not endure appellate scrutiny. The statute does not require the Secretary to consider intervening country conditions evidence unrelated to the conditions that formed the basis for the designation. §§1254a(b)(3)(A), (b)(3)(B). Thus, contrary to the district court's rationale, the Secretary

---

[2] The government cites *Ramos* for its persuasiveness.

was not required to consider the impacts of the COVID pandemic, inflation rates, or travel advisories for U.S. citizens before terminating these years-and-decades-old disaster-related TPS designations. None of the district court's preferred factors had anything to do with the hurricane and earthquake that formed the basis of these designations and its judgment renders the review bar meaningless.

The district court also erred by concluding that the terminations were flawed because they accorded with the Secretary's policy views. That is no basis to invalidate an agency action. As the Supreme Court has explained: "a court may not set aside an agency's policymaking decision solely because it might have been influenced by political considerations or prompted by an Administration's priorities." *Dep't of Commerce v. New York*, 588 U.S. 752, 781 (2019). All that the statute requires is that the Secretary "consult[] with appropriate agencies" and evaluate whether the conditions for a TPS designation continue to exist. The Secretary did so here.

The equities also favor the government. This Court already concluded—after briefing and oral argument—that the Government is likely to prevail on the merits of Plaintiffs' APA challenges and that interference with the Secretary's TPS terminations irreparably injuries the government in *this* case. ACMS No. 19, *Nat'l TPS Alliance v. Noem*, No. 25-4901 (9th Cir.). And the Supreme Court twice stayed district court orders—issued first under 5 U.S.C. §705 and later under 5 U.S.C. §706—blocking the Secretary's termination of the 2023 designation for Venezuela for TPS. *Noem v. Nat'l TPS Alliance*, 145 S. Ct. 2728, 2728-29 (2025) (staying §705 order); *Noem v. Nat'l TPS*

3

*Alliance*, No. 25A326, 2025 WL 2812732, *1 (Oct. 3, 2025) (staying §706 order). The Supreme Court's stay orders involved substantially similar issues (the reviewability and lawfulness of a TPS termination), and this Court must follow those informative decisions to resolve this materially indistinguishable stay request. *See Trump v. Boyle*, 145 S. Ct. 2653, 2654 (2025); *Nat'l TPS Alliance*, 2025 WL 2812732, at *1 ("Although the posture of the case has changed, the parties' legal arguments and relative harms generally have not. The same result that we reached in May is appropriate here."); *see, e.g., Thakur v. Trump*, — F.4th —, 2025 WL 3760650, *5 (9th Cir. Dec. 23, 2025) ("We are mindful of the Supreme Court's decision . . . where the Court concluded that similar circumstances justified a stay.").

This Court should again grant a stay pending appeal.

## BACKGROUND

The Secretary may designate a country for TPS if, as relevant here, an earthquake, flood, drought, epidemic, or other environmental disaster "result[s] in a substantial, but temporary, disruption of living conditions in the area affected," and the country is "unable, temporarily, to handle adequately the return" of its nationals. §1254a(b)(1)(B). Aliens covered by a TPS designation may receive work authorization and cannot be removed while the designation is in effect. §1254a(a).

Designating a country for TPS is discretionary, and the Secretary must periodically review designations to determine whether the country continues to meet the statutory requirements. §1254a(b)(2), (b)(3)(A). If, as relevant here, the Secretary

4

determines that the foreign state "no longer continues to meet the conditions for designation," she "shall terminate the designation." §1254a(b)(3)(B).

The TPS statute limits judicial review. It provides: "There is no judicial review of any determination of the [Secretary] with respect to the designation, or termination or extension of a designation, of a foreign state under this subsection." §1254a(b)(5)(A).

In 2015, Nepal was designated for TPS when an earthquake resulted "in a substantial, but temporary, disruption of living conditions in the area affected" and "Nepal [had] officially requested designation for TPS." 80 Fed. Reg. 36,346 (June 24, 2015). That designation was extended until June 24, 2025. 88 Fed. Reg. 40,317 (June 21, 2023). Secretary Noem terminated Nepal's TPS designation, effective August 5, after determining that there is "substantial reconstruction from the earthquake's destruction such that there is no longer a disruption of living conditions" and "Nepal is able to handle adequately the return of its nationals." 90 Fed. Reg. 24,151 (June 6, 2025).

In 1999, Honduras and Nicaragua were designated for TPS when "the environmental disaster and substantial disruption of living conditions caused by Hurricane Mitch" rendered both countries "unable, temporarily, to handle adequately the return of [their] nationals." 64 Fed. Reg. 524 (Jan. 5, 1999); 64 Fed. Reg. 526 (Jan. 5, 1999). Most recently, those designations were extended until July 5, 2025. 88 Fed. Reg. 40,304 (June 21, 2023); 88 Fed. Reg. 40,294 (June 21, 2023).

Secretary Noem terminated both countries' TPS designations, effective September 8, because Hurricane Mitch "no longer cause[d] a substantial, but temporary,

disruption in living conditions in the area affected" and the countries were no longer temporarily unable to adequately handle their nationals' return. 90 Fed. Reg. 30,089-01 (July 8, 2025) (Honduras); 90 Fed. Reg. 30,086-01 (July 8, 2025) (Nicaragua).

The National TPS Alliance and seven individual plaintiffs challenged the Nepal, Nicaragua, and Honduras terminations under the APA and moved for a stay of agency action under 5 U.S.C. §705. ECF 1, 17. On July 31, 2025, the district court granted Plaintiffs' motion. ECF 73. The government filed an interlocutory appeal and secured a stay pending appeal. ACMS No. 19, *Nat'l TPS Alliance v. Noem* (9th Cir. 25-4901). That appeal was abated because the district court's order expired on November 18, 2025, and was not renewed.

On December 31, 2025, after certifying classes under Fed. R. Civ. P. 23(b)(2) representing aliens from each designated country, the district court entered partial final judgment on Plaintiffs' APA claims and set aside the Secretary's TPS terminations for Honduras, Nicaragua, and Nepal. Op.39-47, 52 (Dec. 31, 2025); Ex. C, ECF 134 Class Cert. Order (Oct. 2, 2025); Ex. D, ECF 192, Hearing Tr. (Nov. 18, 2025). The district court did not rule on Plaintiffs' constitutional claims.

The government advised the district court that it would seek relief in this Court if the district court did not rule on its stay motion by 5:00pm PST on January 14, 2026. ECF 199. That time passed without a ruling on the motion.

# ARGUMENT

## I.    THE GOVERNMENT WILL SUCCEED ON THE MERITS

### A.    Section 1254a Bars Judicial Review of Plaintiffs' Claims

The district court's order will not survive appeal and should be stayed. To begin, the district court erred in concluding that §1254a(b)(5)(A) permits Plaintiffs' APA claims. Op. 12-16. The TPS statute provides that "[t]here is no judicial review of any determination of the [Secretary] with respect to the designation, or termination or extension of a designation, of a foreign state" for TPS. §1254a(b)(5)(A). The statute thus makes clear that TPS termination determinations are unreviewable. And it at least precludes any arbitrary-and-capricious claim.

This judicial-review bar is broad. First, Congress prefaced "determination" with the modifier "any." §1254a(b)(5)(A). That modifier has an "expansive meaning." *Patel v. Garland*, 596 U.S. 328, 338 (2022) (cleaned up). The provision thus captures determinations "of whatever kind." *Id.* Second, the phrase "with respect to" has "a broadening effect," as it "ensur[es] that the scope of [the] provision covers not only its subject but also matters relating to that subject." *Id.* at 339. When Congress has stripped a court of jurisdiction "in respect to" certain claims, the Supreme Court has construed that as a "broad prohibition." *United States v. Tohono O'odham Nation*, 563 U.S. 307, 312 (2011). The TPS statute thus plainly commits to the Secretary's unreviewable authority any determinations relating to any TPS termination. *Id.* Indeed, the Supreme Court held that materially similar jurisdiction-stripping language in the Immigration and Nationality

Act was so expansive that it precluded judicial review of factual findings. *Patel*, 596 U.S. at 337-40 (statute barring review of "any judgment regarding the granting of relief" covers "any authoritative decision" on the matter); *see Bouarfa v. Mayorkas*, 604 U.S. 6, 19 (2024) (holding that INA provisions limiting judicial review provide "clear and convincing evidence of congressional intent to preclude judicial review").

At minimum, §1254a(b)(5)(A) bars the arbitrary-and-capricious claims on which the Court granted judgment for Plaintiffs. Op.39-43. "'[I]f a no-review provision shields particular types of administrative action, a court may not inquire whether a challenged agency decision is arbitrary, capricious, *or procedurally defective*.'" *Yale New Haven Hosp. v. Becerra*, 56 F.4th 9, 20 (2d Cir. 2022) (quoting *Amgen Inc. v. Smith*, 357 F.3d 103, 113 (D.C. Cir. 2004); *see Skagit Cnty. Pub. Hosp. Dist. No. 2 v. Shalala*, 80 F.3d 379, 386 (9th Cir. 1996) (preclusion provision applies when "procedure is challenged only in order to reverse the individual [unreviewable] decision"). To hold otherwise "would eviscerate the statutory bar, for almost any challenge to [a determination] could be recast as a challenge to its underlying methodology." *DCH Reg'l Med. Ctr. v. Azar*, 925 F.3d 503, 505-507 (D.C. Cir. 2019); *see Yale New Haven Hosp.,* 56 F.4th at 18 (agreeing with *DCH Reg'l Med. Ctr.*, 925 F.3d at 506-07); *Ascension Borgess Hosp. v. Becerra*, 557 F. Supp. 3d 122, 130 (D.D.C. 2021), *aff'd*, 61 F.4th 999 (D.C. Cir. 2023) (a challenged action is unreviewable if it is inextricably intertwined with an action undisputedly shielded from review); *see also U.S. Anesthesia Partners of Texas, P.A. v. U.S.P.H.S.*, 126 F.4th 1057, 1064 n.2 (5th Cir. 2025).

To that end, this Court has not allowed litigants to "recast" arguments about the alleged failure to "properly weigh" evidence into putative collateral claims to secure review of otherwise jurisdictionally unreviewable relief. *Bazua-Cota v. Gonzales*, 466 F.3d 747, 749 (9th Cir. 2006) (dismissing challenge to discretionary denial of adjustment of status). The TPS review bar is no different. The statute does not "set forth or define the conditions in the foreign state that the Secretary must consider in her periodic review, or how she should weight these conditions." *Ramos*, 975 F.3d at 891; §1254a(b)(3)(A). At minimum, then, "the TPS statute precludes review of non-constitutional claims that fundamentally attack the Secretary's specific TPS determinations, as well as the substance of her discretionary analysis in reaching those determinations." *Ramos*, 975 F.3d at 891; *see NTPSA v. Noem*, 150 F.4th 1000, 1017 (9th Cir. 2025) ("NTPSA I")(emphasizing "Congress's decision to explicitly carve out from judicial review the Secretary's decisions related to determination[s]... with respect to the designation, or termination or extension of a country for TPS") (quotations omitted)). Plaintiffs bring such a claim here when arguing, for example, that the Secretary's termination decision was contrary to law because it was "preordained." Op. 39. That claim, by definition, constitutes a challenge to the determination itself. *See, e.g., Proyecto San Pablo v. INS*, 189 F.3d 1130, 1141 (9th Cir. 1999) (the claim that a decision "was pretextual is no different from [an] argu[ment] that [the decision] was wrong").

In holding otherwise, the district court copied its previously stayed reasoning (ECF 78 at 15, 17) and concluded the phrase "any determination" limits the review bar

to "the single act of deciding whether the country conditions continue to be met for purposes of designating or terminating TPS." Op.13. That is irreconcilable with §1254a(b)(5)(A), which specifies what determinations the review bar covers: *any* determinations—that is, determinations "of whatever kind," *Patel*, 596 U.S. at 338—*with respect to* TPS terminations. *NTPSA I*, 150 F.4th at 1017. The district court also overlooked that the review bar plainly extends to decisions, such as the effective date or duration of a TPS extension, §1254a(b)(1), (b)(2)(A), or a national-interest finding, §1254a(b)(1)(C), that do not necessarily turn on country conditions. *See In Re Svenhard's Swedish Bakery*, 154 F.4th 1100, 1105 (9th Cir. 2025) (discussing the presumption that Congress does not "intend to make any portion of a statute superfluous"). Because the district court cannot "rewrite a statute as it pleases," its judgment will likely fail on appeal. *Jennings v. Rodriguez*, 538 U.S. 281, 298 (2018).

Further, the district court's analogy to *McNary v. Haitian Refugee Center, Inc.*, 498 U.S. 479 (1991), fails given that "the TPS statute … differs in both text and context" from the statute at issue there. *Ramos*, 975 F.3d at 890; Op.13. Moreover, *McNary* itself emphasized that Congress *could* bar judicial review of collateral challenges if it used more expansive language. 498 U.S. at 494. Congress did so here: barring any "statutory or nonstatutory" challenge to "*any determination* of the [Secretary] *with respect to* the determination, or *termination* or extension of a designation" of TPS. §§1252(a)(5), 1254a(b)(5)(A) (emphasis added); *see Bouarfa*, 604 U.S. at 19 (INA provisions limiting judicial review provide "clear and convincing evidence of congressional intent to

10

preclude judicial review"). And even if *McNary* were analogous to this statute, that would provide no support for Plaintiffs' claims, which—unlike the claims in *McNary*—do not challenge any collateral agency policy or practice. The *McNary* plaintiffs challenged the "interview process" the agency used to adjudicate applications, and their claims would not "have the effect of establishing their entitlement to" the benefit they sought. 498 U.S. at 487, 495. Plaintiffs here, by contrast, challenge the country-specific determinations and would obtain TPS if they succeeded.

*NTPSA I*, 150 F.4th at 1017, confirms that the district court violated the review bar. This Court reasoned that limited review of "[t]he extent of statutory authority granted to the Secretary" was available to determine whether she can reconsider a TPS extension, but it emphasized that it could only do so because that question "is not a 'determination … with respect to the designation, or termination or extension' of a country for TPS." *Id.* (quoting §1254a(b)(5)(A)). The Court also reiterated that "Congress has provided a means for the Secretary to account for changes in country conditions or political priorities: she can terminate TPS[.]" *Id.* at 1021; *see* §1254a(b)(3)(A)-(B). Because the Secretary exercised her authority to terminate these TPS designations, the district court lacked authority to review them. §1254a(b)(5)(A); *see NTPSA I*, 150 F.4th at 1017; *Ramos*, 975 F.3d at 892.

Finally, the district court's continued reliance on analogies to the Chinese Exclusion Act, Japanese internment, and cases addressing the plenary power of the Executive and Congress over immigration are misplaced because statutory

interpretation ordinarily "begins with the statutory text, and ends there as well if the text is unambiguous," and none of the cited authorities address the unequivocal jurisdiction-stripping language Congress enacted in §1254a(b)(5)(A). *BedRoc Ltd., LLC v. United States*, 541 U.S. 176, 183 (2004); Op. 14-15. Indeed, that the district court felt obliged to rely upon such incendiary historical analogies merely confirms the infirmity of its actual legal analysis.

In short, a stay should issue because §1254a(b)(5)(A) plainly precludes Plaintiffs' APA challenges to these TPS terminations.

## B.   The Government Is Likely to Prevail on the Merits of Plaintiffs' APA Challenge to the Secretary's TPS Terminations

The government will likely prevail on the underlying merits, too.

### 1.   The Secretary Properly Focused on Whether the Conditions Underlying the TPS Designations Continued to Exist

The Secretary's periodic review of TPS designations does not require consideration of intervening country conditions unrelated to the basis of the designation. Op.43-47. The TPS statute permits a TPS designation "when nationals of that country cannot return there safely due to armed conflict, natural disaster, or other 'extraordinary *and temporary* conditions[.]'" *NTPSA I*, 150 F.4th at 1010 (quoting §1254a(b)(1)(C) (emphasis added)). In considering whether to extend a TPS designation, the statute specifically requires the Secretary to "determine whether the conditions *for such designation* under this subsection *continue* to be met." §1254a(b)(3)(A) (emphasis added). The statute makes doubly clear what "designation" means by making

it a separate subsection and delineating the three grounds for TPS designations. §1254a(b)(1)(A)-(C).

Thus, the proper focus of the Secretary's periodic review of TPS designations to determine if they should be extended or terminated is whether the conditions that led to the TPS designation "continue", and not whether new, unrelated conditions have arisen. §1254a(b)(3)(A). "Nothing in the language of the TPS statute requires the Secretary to consider intervening events prior to terminating TPS, or to explain her failure to do so." *Ramos*, 975 F.3d at 893; *see* §1254a(b)(3)(A). The district court's *ipse dixit* conclusion that the Secretary is required to consider all country conditions in a country following a TPS designation, and related conclusion that the term "such designation" is ambiguous, are unlikely to survive appeal. Op.44-47; *see Guido v. Mount Lemmon Fire Dist.*, 859 F.3d 1168, 1173 (9th Cir. 2017) ("declaring that multiple reasonable interpretations exist does not make it so.").

Similarly, the district court's reliance on a "broader TPS designation" has no textual foundation, and its reliance on legislative history and policy concerns "cannot 'surmount the plain language of the statute.'" *Truck Insur. Exch. v. Kaiser Gypsum Co., Inc.*, 602 U.S. 268, 284 (2024) (quoting *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 629 (2009)); Op.44. The district court failed to recognize that, should subsequent events satisfy the statutory requirements for a TPS designation, that would be grounds for a new designation; it would not require an extension of a prior designation. Indeed, certain countries have previously been subject to *multiple*, simultaneous designations to

13

account for subsequent events that satisfy the statutory requirements for a TPS designation. *NTPSA I*, 150 F.4th at 1011-12 (discussing the 2023 *redesignation* of Venezuela for TPS); §1254a(b)(1)(B). In attempting to satisfy its policy preferences, the district court disregarded the statute's plain meaning. *See* §1254a(b)(3)(A); *Guido*, 859 F.3d at 1173.

Likewise, the district court's conclusion that the statute requires no link between the natural disaster underlying a TPS designation and the ability of a foreign country to handle its nationals' return, Op.46, overlooks §1254a(b)(1)(B)(i)-(iii)'s actual criteria for TPS designations and the statue's use of the additive conjunction "and" between the statutory criteria. All three bases for TPS designation include—in slightly different formulations tied to the underlying reason for designation—a requirement that the conditions prompting the designation make the designated country unable to handle the return of its nationals. §1254a(b)(1)(A)-(C). In effect, then, the district court invented an atextual fourth requirement for a TPS designation—whether there are reasons of any sort that would prevent the return of the country's nationals—and erroneously rendered multiple provisions of the statute superfluous. *See In Re Svenhard's Swedish Bakery*, 154 F.4th at 1105 (addressing superfluity).  And it is ultimately inconsistent with the statutory scheme given that the statute's main concern is a country's inability to handle the return of its nationals because of a particular condition.

A court may not impose "additional judge-made procedural requirements on agencies that Congress has not prescribed and the Constitution does not compel."

*Garland v. Ming Dai*, 593 U.S. 357, 365 (2021); *see also Little Sisters of the Poor v. Pennsylvania*, 591 U.S. 657, 677 (2020) (courts may not "add[] terms not found in the statute" or "impos[e] limits on an agency's discretion that are not supported by the text"). There is no ambiguity: nowhere does the TPS statute require the Secretary to consider unrelated intervening conditions or unrelated barriers to the return of the country's nationals. Because the district court ignored that principle, its interpretation of §1254a(b)(3)(A)'s periodic review provision will likely be reversed on appeal. *See Vermont Yankee v. NRDC*, 435 U.S. 519, 524 (1978) ("[T]his Court has for more than four decades emphasized that the formulation of procedures was basically to be left within the discretion of the agencies to which Congress had confided the responsibility for substantive judgments.").

### 2. The Secretary's Consideration of Country Conditions Was Not Arbitrary and Capricious

Nor were the terminations arbitrary and capricious. Consistent with the statute, Secretary Noem considered conditions in Nepal, Honduras, and Nicaragua, §1254a(b)(1)(B), and ultimately decided that termination of TPS for each country was warranted. 90 Fed. Reg. at 24,152 (Nepal); 90 Fed. Reg. at 30,088 (Nicaragua); 90 Fed. Reg. at 30,091 (Honduras). The Federal Register notices show that the Secretary, after consultation with appropriate government agencies, properly addressed and considered the statutory considerations in doing so. Those considerations are whether (1) an earthquake, flood, or other environmental disaster resulted in "a substantial, but

temporary, disruption of living conditions in the area affected"; (2) the foreign state is unable, temporarily, to handle adequately the return to the state of aliens who are nationals of the state; and (3) the foreign state has requested TPS designation. §1254a(b)(1)(B)(i)-(iii); *see New Jersey v. Bessent*, 149 F.4th 127, 152 (2d Cir. 2025) (agency need only have "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made") (internal quotation omitted). "The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

With respect to Nepal, the Secretary concluded that TPS termination was appropriate, a decade after the earthquake that prompted it, because the Nepali government reported that "88.36% of damaged households have been rebuilt" and had "disbanded" its reconstruction authority after "most impacted structures were rebuilt." 90 Fed. Reg. at 24,153. The Secretary additionally considered "improvements to [Nepal's] preparedness and response capacity," "disaster-resilient housing, infrastructure, and community systems," "economic growth" and increase of "purchasing power of lower income households," as well as the Nepali government's demonstrated capacity to accept aliens with final removal orders over the past five years. *Id.* The Secretary's determination was based on her consultation with appropriate governmental agencies and review of country conditions evidence, ECF 64 (Nepal

administrative record), and consistent with former Secretary of State Blinken's 2024 recommendation that Nepal's TPS designation be terminated in light of its reconstruction progress. ECF 64 at 571-79.

As for Nicaragua, the Secretary concluded that "notable improvements allow Nicaragua to adequately handle the return of its nationals." 90 Fed. Reg. at 30,088. The Secretary recognized that Hurricane Mitch in 1998 was "a sudden catastrophe that caused severe flooding and associated damage" but that the hurricane was no longer disrupting living conditions or preventing Nicaragua from accepting the return of its nationals a quarter century later. *Id.* Specifically, Nicaragua had improved its roads, school infrastructure, and access to healthcare; built a stable economy; and regularly accepted the return of its nationals over the preceding five years. *Id.* This determination was again based on the Secretary's consultation with appropriate governmental agencies and review of country conditions evidence. ECF 63 (Nicaragua administrative record).

Finally, the Secretary concluded that "the conditions supporting Honduras'" 1999 designation for TPS were no longer met because the "conditions resulting from Hurricane Mitch no longer cause a substantial, but temporary, disruption in living conditions" such that Honduras is "temporarily" unable to "adequately" handle the return of its nationals. 90 Fed. Reg. at 30,091. Specifically, over the intervening 26 years since Hurricane Mitch, the vast majority of Hondurans gained access to water, sanitation, and electricity and that, with international assistance, "Honduras has strengthened its disaster management capacity at the municipal and national levels[.]"

*Id.* Further, given Honduras's demonstrated acceptance of its nationals with final removal orders, the Secretary concluded the government could accept the return of its nationals. And, once again, the Secretary's determination was based on her consultation with appropriate governmental agencies and review of country conditions evidence. ECF 62 (administrative record for Honduras).

As such, the district court's conclusion that the Secretary's TPS terminations were "preordained" despite satisfying the unreviewable statutory factors is not a cognizable basis for relief under the APA. Op.39-43. Agency decisions that are guided by administration policy priorities—even if this were one—are not vulnerable to arbitrary-and-capricious invalidation solely for that reason. Just the opposite: The law is clear that "a court may not set aside an agency's policymaking decision solely because it may have been might have been influenced by political considerations or prompted by Administration priorities." *Dep't of Commerce*, 588 U.S. at 781. Instead, "[a] change in administration brought about by the people casting their votes is a perfectly reasonable basis for an executive agency's reappraisal of the costs and benefits of its programs." *Motor Vehicles*, 463 U.S. at 59 (Rehnquist, J., concurring in part). After all, "[i]t is expected—perhaps even critical to the functioning of government—for executive officials to conform their decisions to the administration's policies," *Ramos*, 975 F.3d at 897-98, especially for determinations regarding foreign country conditions and a country's ability to handle adequately the return of its nationals infused with sensitive judgment calls implicating foreign policy.

That a different administration may pursue different policy priorities is thus a feature of our constitutional structure, not a basis for invalidating agency decisions. "[T]he President's power necessarily encompasses 'general administrative control of those executing the laws,' throughout the Executive Branch of government, of which he is the head." *Bldg. & Constr. Trades Dep't v. Allbaugh*, 295 F.3d 28, 32 (D.C. Cir. 2002) (cleaned up) (quoting *Myers v. United States*, 272 U.S. 52, 164 (1926)). And, contrary to the district court's rationale, it is not unlawful to "implement the President's policy directives to the extent permitted by law." *Sherley v. Sebelius*, 689 F.3d 776, 784 (D.C. Cir. 2012); Op.40 (citing EO 14159). The government is likely to prevail on that aspect of the district court's reasoning on appeal. Op.40-41.

The preparation of decision memos for the Secretary by her staff, before her ultimate TPS determinations, is not unusual and does not render her TPS terminations arbitrary or capricious either. *See Dep't of Commerce*, 588 U.S. at 781 (political, foreign relations, and national security concerns routinely inform agency policymaking); Op.41. The TPS statute is designed to *automatically* extend in the absence of a determination "whether the conditions for such designation … continue to be met" at least 60 days before the end of the prior extension. §1254a(b)(3)(A). In contrast, the Secretary must provide written notice announcing a TPS termination. §1254a(b)(3)(B). There is thus nothing arbitrary and capricious or procedurally irregular about the Secretary's staff preparing pre-decisional drafts of decision memos for the Secretary's ultimate consideration—indeed, such work product is usually *encouraged* as part of the reasoned

19

decision process by protecting pre-decisional drafts from disclosure to promote "the candid and frank exchange of ideas in the agency's decisionmaking process." *Nat'l Sec. Archive v. CIA*, 752 F.3d 460, 463 (D.C. Cir. 2014).

Critically, there is no dispute that each administrative record contained country conditions evidence relevant to evaluating whether "the conditions for [each] designation … continue to be met," particularly where the relevant disasters occurred years or decades ago. §1254a(b)(3)(A); *see* ECF Nos. 62, 63, 64; *see, e.g.*, ECF 64 at 571-79 (Secretary Blinken's 2024 recommendation that TPS for Nepal be terminated). Indeed, tellingly, the district court never identified any country conditions traceable to the 1998 hurricane affecting Nicaragua and Honduras, or the 2015 earthquake affecting Nepal, that the Secretary overlooked. Op.39-43.

The district court's conclusion that the Secretary relied on "skewed data" flows entirely from the erroneous premise that intervening circumstances unrelated to the initial designation must be considered, a conclusion unmoored from the text and unlikely to survive appeal. Argument §II.A; *see Ming Dai*, 593 U.S. at 365 ("[A] reviewing court is generally not free to impose additional judge-made procedural requirements on agencies that Congress has not prescribed and the Constitution does not compel.") (cleaned up); Op.41. Relatedly, there is no requirement that the Secretary consult with the Secretary of State in particular, and the district court never explained why, let alone cited precedent holding, that consultation with other agencies that routinely address foreign policy matters was insufficient. §1254a(b)(3)(A) (requiring only "consultation

20

with appropriate agencies of the Government"); Op.41. Thus, even if review was available—it is not, *see* §1254a(b)(5)(A)—the government is likely to prevail on the merits of any APA challenge to the Secretary's TPS terminations.

## II.    THE EQUITABLE FACTORS FAVOR A STAY

The remaining factors favor a stay, too. *See Nken*, 556 U.S. at 435. Most fundamentally, as the Supreme Court necessarily concluded in an analogous case involving the termination of TPS for Venezuela, the Government and public share an interest in ensuring adherence to the process established by Congress, under which the Secretary has unreviewable authority over TPS designations. *Noem*, 145 S. Ct. at 2728-29 (staying §705 order); *Noem*, 2025 WL 2812732 at *1; *see Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) ("Any time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury."); *CASA, Inc., et al. v. Kristi Noem, et al.*, No. 25-1792, 2025 WL 2028397 (4th Cir. July 21, 2025) (denying relief under 5 U.S.C. §705). And this Court necessarily reached the same conclusion in this very case. ACMS No. 19, *Nat'l TPS Alliance v. Noem*, No. 25-4901 (9th Cir.) (staying §705 ruling).

Absent a stay, the district court's decision represents "an improper intrusion by a federal court into the workings of a coordinate branch of the Government." *INS v. Legalization Assistance Project*, 510 U.S. 1301, 1305-06 (1993) (O'Connor, J., in chambers). That is especially so because the harm here arises in an area that implicates "a fundamental sovereign attribute exercised by the Government's political departments[,]

largely immune from judicial control." *Dep't of State v. Munoz*, 602 U.S. 899, 907 (2024) (quoting *Trump v. Hawaii*, 585 U.S. 667, 702 (2018) and *Fiallo v. Bell*, 430 U.S. 787, 792 (1977)). Setting aside the TPS designations for Nepal, Honduras, and Nicaragua overrides the Secretary's considered judgment on a matter of foreign affairs and requires the United States to continue to permit tens of thousands of foreign nationals to remain within its borders, with work authorization and protection from removal or even initiation of removal proceedings, §1254a(a)(1)(A). *See Legalization Assistance Project*, 510 U.S. at 1306 (concluding that the equities favor the government where the challenged order "would delay the deportation of—and required the granting of interim work authorizations—to at least those aliens who are deportable and who could not seek relief on their own behalf"). That alone establishes the requisite irreparable harm.

Plaintiffs maintain that termination could lead to the loss of employment or health benefits, possible removal, and family separation following future removal proceedings. But the end of TPS's inherently *temporary* protection is not equivalent to a final removal order, and the loss of associated benefits is inherent in the temporary status Congress crafted. *See Sagana v. Tenorio*, 384 F.3d 731, 743 (9th Cir. 2004) (rejecting due-process challenge to temporary worker program). Moreover, "removal alone cannot constitute the requisite irreparable injury" to justify a stay. *Nken*, 556 U.S. at 435.

As the Supreme Court twice concluded, where a district court bars the Secretary from faithfully discharging her responsibilities to administer the TPS statute, the

equities favor the government, and this Court should issue a stay so that the Secretary's

TPS terminations remain in effect pending appeal. *NTPSA I*, 145 S. Ct. at 2728-29.

## <u>CONCLUSION</u>

The Court should again grant a stay pending appeal.

Dated: January 14, 2026                Respectfully submitted,

BRETT A. SHUMATE
*Assistant Attorney General*
Civil Division

YAAKOV M. ROTH
*Principal Deputy Assistant Attorney General*
Civil Division

DREW C. ENSIGN
*Deputy Assistant Attorney General*

RUTH ANN MUELLER
*Senior Litigation Counsel*

ERIC SNYDERMAN
CATHERINE ROSS
LAUREN BRYANT
LORI MACKENZIE
DANIEL CAPPELLETTI
ILANA KRAMER
SHELBY WADE
RACHEL P. BERMAN-VAPORIS
*Trial Attorneys*

/s/ Jeffrey M. Hartman
JEFFREY M. HARTMAN
*Trial Attorney*
U.S. Department of Justice, Civil Division
Office of Immigration Litigation
P.O. Box 868, Ben Franklin Stat.
 Washington, DC 20044
Tel: (202) 532-4404
Jeffrey.M.Hartman@usdoj.gov

24

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Federal Rule of Appellate Procedure 27(d), I certify that the attached motion: contains one-inch margins; uses double-spaced text except as otherwise permitted; is proportionally spaced using Garamond typeface; uses a typeface of 14 points; and contains 5,565 words, excluding any accompanying documents authorized by Rule 27(a)(2)(B). This pleading was scanned for viruses and malware by Microsoft Defender and determined to be free of malicious software.

<div style="margin-left:50%;">

/s/ Jeffrey M. Hartman
Jeffrey M. Hartman
*Trial Attorney*
Office of Immigration Litigation
U.S. Department of Justice, Civil Division
Office of Immigration Litigation
P.O. Box 868, Ben Franklin Stat.
Washington, DC 20044
Tel: (202) 532-4404
Jeffrey.M.Hartman@usdoj.gov

</div>

## CERTIFICATE OF SERVICE

I certify that on January 14, 2026, I electronically filed this brief with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the ACMS system. Appellees were served using the ACMS system.

/s/ Jeffrey M. Hartman
Jeffrey M. Hartman
*Trial Attorney*
Office of Immigration Litigation
U.S. Department of Justice, Civil Division
Office of Immigration Litigation
P.O. Box 868, Ben Franklin Stat.
Washington, DC 20044
Tel: (202) 532-4404
Jeffrey.M.Hartman@usdoj.gov

# **EXHIBIT A**

ECF 28, Plaintiffs' TPS Termination Chart (July 8, 2025)

# Appendix I

**TPS Terminations and Associated Orderly Transition Periods Prior to Current Trump Administration**

| | Country | Date of Initial Designation | Date of Publication of Termination Notice | Effective Date of Termination | Orderly Transition Period | Federal Register Citation |
|---|---|---|---|---|---|---|
| 1. | Kuwait | March 27, 1991 | Jan. 24, 1992 | March 27, 1992 | *None* | 57 Fed. Reg. 2930 (Jan. 24, 1992) |
| 2. | Lebanon | March 21, 1991 | Feb. 8, 1993 | April 9, 1993 | *None* | 58 Fed. Reg. 7582 (Feb. 8, 1993) |
| 3. | Rwanda | June 7, 1994 | June 19, 1997 | Dec. 6, 1997 | 6 months | 62 Fed. Reg. 33442 (June 19, 1997) |
| 4. | Liberia | March 27, 1991 | March 31, 1998 | Sept. 28, 1998 | 6 months | 63 Fed. Reg. 15437 (March 31, 1998) |
| 5. | Liberia | Sept. 29, 1998 | July 30, 1999 | Sept. 28, 1999 | *None* | 64 Fed. Reg. 41463 (July 30, 1999) |
| 6. | Guinea-Bissau | March 11, 1999 | March 20, 2000 | September 10, 2000 | 6 months (default extension under 8 U.S.C. § 1254a(b)(3)(C)) | 65 Fed. Reg. 15016 (Mar. 20, 2000) |
| 7. | Kosovo | June 8, 1999 | May 23, 2000 | December 8, 2000 | 6 months (default extension under 8 U.S.C. § 1254a(b)(3)(C)) | 65 Fed. Reg. 33356 (May 23, 2000) |
| 8. | Bosnia-Herzegovina | August 10, 1992 | August 30, 2000 | Feb. 10, 2001 | 6 months (default | 65 Fed. Reg. 52789 |

| | | | | | extension under 8 U.S.C. § 1254a(b)(3) (C)) | (Aug. 30, 2000) |
|---|---|---|---|---|---|---|
| 9. | Angola | March 29, 2000 | Jan. 27, 2003 | March 29, 2003 | *None* | 68 Fed. Reg. 3896 (Jan. 27, 2003) |
| 10. | Sierra Leone | Nov. 4, 1997 | Sept. 3, 2003 | May 3, 2004 | 6 months | 68 Fed. Reg. 52407 (Sept. 3, 2003) |
| 11. | Monserrat | August 28, 1997 | July 6, 2004 | Feb. 27, 2005 | 6 months | 69 Fed. Reg. 40642 (July 6, 2004) |
| 12. | Liberia | Oct. 1, 2002 | Sept. 20, 2006 | Oct. 1, 2007 | 12 months | 71 Fed. Reg. 55000 (Sept. 20, 2006) |
| 13. | Burundi | Nov. 4, 1997 | Oct. 29, 2007 | May 2, 2009 | 18 months | 72 Fed. Reg. 61172 (Oct. 29, 2007) |
| 14. | Guinea | Nov. 21, 2014 | Sept. 26, 2016 | May 21, 2017 | 6 months | 81 Fed. Reg. 66064 (Sept. 26, 2016) |
| 15. | Liberia | Nov. 21, 2014 | Sept. 26, 2016 | May 21, 2017 | 6 months | 81 Fed. Reg. 66059 (Sept. 26, 2016) |
| 16. | Sierra Leone | Nov. 21, 2014 | Sept. 26, 2016 | May 21, 2017 | 6 months | 81 Fed. Reg. 66054 (Sept. 26, 2016) |
| 17. | Sudan* | Nov. 4, 1997 | Oct. 11, 2017 | Nov. 2, 2018 | 12 months | 82 Fed. Reg. 47228 (Oct. 11, 2017) |
| 18. | Nicaragua* | Jan. 5, 1999 | Dec. 15, 2017 | Jan. 5, 2019 | 12 months | 82 Fed. Reg. 59636 (Dec. 15, 2017) |

| 19. | El Salvador* | March 9, 2001 | Jan. 18, 2018 | Sept. 9, 2019 | 18 months | 83 Fed. Reg. 2654 (Jan. 18, 2018) |
| 20. | Haiti* | Jan. 21, 2010 | Jan. 18, 2018 | July 22, 2019 | 18 months | 83 Fed. Reg. 2648 (July 18, 2018) |
| 21. | Nepal* | June 24, 2015 | May 22, 2018 | June 24, 2019 | 12 months | 83 Fed. Reg. 23705 (May 22, 2018) |
| 22. | Honduras* | Jan. 5, 1999 | June 5, 2018 | Jan. 5, 2020 | 18 months | 83 Fed. Reg. 26074 (June 5, 2018) |

\* Termination did not go into effect due to litigation. *See Ramos v. Nielsen*, 709 F. Supp. 3d 871, 876-80 (N.D. Cal. 2023) (describing procedural history).

# **EXHIBIT B**

ECF 197, Partial Judgment Order (Dec. 31, 2025)

1

2

3

4                          UNITED STATES DISTRICT COURT

5                       NORTHERN DISTRICT OF CALIFORNIA

6

7    NATIONAL TPS ALLIANCE, et al.,          Case No.  25-cv-05687-TLT

8                    Plaintiffs,             **ORDER ON MOTION TO DISMISS;**
                                             **MOTION TO EXCLUDE EXPERT**
9            v.                              **TESTIMONY; MOTION FOR**
                                             **PARTIAL SUMMARY JUDGMENT;**
10   KRISTI NOEM, et al.,                     **MOTION FOR SUMMARY**
                                             **JUDGMENT**
11                   Defendants.
                                             Re: Dkt. Nos. 110, 142, 143, 144
12

13

14          Although today's times seem to be flooded with crises and emergencies—whether

15   speculative, genuine, or contrived—our Constitution remains an important protection from

16   unbridled power.  Unilateral power has never been American.  Nor has this country ignored the

17   importance of humanitarian relief.  Indeed, leaders around the world are often recognized for

18   defending human rights, protecting the vulnerable, and pursuing efforts that foster peace.  In

19   enacting the Temporary Protected Status statute, Congress codified the importance of

20   humanitarian relief for those within the United States who are unable to return to their country of

21   origin.  By complying with the Constitution and enforcing the purpose of the Temporary Protected

22   Status statute, this nation's economy becomes strengthened and our society united.

23          Before the Court is (1) Defendants' motion to dismiss; (2) Defendants' motion to exclude

24   the testimony of (i) Stacy Tolchin, (ii) Hannah Postel, (iii) Melanie Morten, (iv) Elliott Young, (v)

25   Tara Watson, (vi) Tom Wong, (vii) Dana Frank; (3) Plaintiffs' motion for partial summary

26   judgment; and (4) Defendants' motion for summary judgment.

27          This case was subject to several interruptions.  In August, the Court's decision on

28   Plaintiffs' motion to postpone was stayed by the Ninth Circuit, the parties' and the Court's

resources were strained by a lapse in appropriations by Congress from October 1, 2025 to November 13, 2025, and the parties experienced a number of roadblocks in exchanging discovery. Nonetheless, the Court held a hearing, as scheduled, on the motions on November 18, 2025.  ECF 187.

This Order addresses each of the motions pending before the Court in five sections.

Section I discusses the factual and legal background, as well as the procedural history under which these motions arose.

Section II identifies and rejects Defendants' argument that this Court lacks jurisdiction.

Section III discusses the Court's decision to **DENY** Defendants' motion to dismiss.

Section IV explains the Courts' decision to **GRANT** Defendants' motion to exclude the expert testimony of (i) Stacy Tolchin, (ii) Hannah Postel, (iii) Melanie Morten, (iv) Tara Watson, (v) Tom Wong, (vi) Dana Frank; and the Court's decision to **DENY** Defendants' motion to exclude the testimony of Elliott Young.

Section V discusses the pending motions for summary judgment.  In Section IV, the Court provides the grounds for the Court's decision to **GRANT** Plaintiffs' motion for partial summary judgment on two of the claims raised under the Administrative Procedure Act ("APA"), and the grounds for the Court's decision to **DENY** Defendants' motion for summary judgment on Plaintiffs' APA claims and Equal Protection Claim.

I.     **BACKGROUND**

    A.     **Procedural History**

On July 7, 2025, Plaintiffs filed the instant lawsuit asserting claims under the APA and the Due Process Clause of the Fifth Amendment.  ECF 1.  The following day, Plaintiffs filed a motion to postpone the effective date of the Department of Homeland Security's ("DHS") decision to terminate TPS for Honduras, Nepal, and Nicaragua.  ECF 17.  On July 14, 2025, Defendants filed an opposition to Plaintiffs' motion to postpone the effective date of DHS's decision.  ECF 45. Plaintiffs replied on July 18, 2025.  The Court held a hearing on Plaintiffs' motion on July 29, 2025.  ECF 71.

On July 31, 2025, the Court granted Plaintiffs' motion to postpone.  ECF 73.  On August

20, 2025, the Ninth Circuit granted Defendants' motion to stay this Court's order granting Plaintiffs' motion to postpone pending appeal. ECF 96. The Ninth Circuit, however, declined to stay the proceedings in this Court. *Id.*

On September 9, 2025, Defendants filed a motion to dismiss Plaintiffs' complaint. ECF 110. Plaintiffs timely opposed Defendants' motion to dismiss on September 23, 2025. ECF 121. Defendants replied on September 30, 2025. ECF 128.

On October 2, 2025, the Court granted Plaintiffs' motion to certify the following classes: the Honduras Class, the Nepal Class, and the Nicaragua Class. ECF 134.

On October 14, 2025, Defendants filed a motion for summary judgment and motion to exclude the testimony of seven of Plaintiffs' experts. ECF 142; ECF 143. On the same day, Plaintiffs filed a motion for partial summary judgment on two of Plaintiffs' APA claims and a motion to consider extra-record evidence in support of their motion for partial summary judgment. ECF 144; ECF 153.

Plaintiffs opposed Defendants' motion for summary judgment and motion to exclude expert testimony on October 28, 2025. ECF 167; ECF 168. Defendants opposed Plaintiffs' motion for partial summary judgment on the same day. ECF 166.

Defendants' filed replies in support of their pending motions on November 4, 2025. ECF 173; ECF 174. Plaintiffs filed a reply in support of their motion for partial summary judgment on November 4, 2025. ECF 175.

The Court held a hearing on Defendants' motion to dismiss, Defendants' motion to exclude expert testimony, Plaintiffs' motion to consider extra-record evidence, Plaintiffs' motion for partial summary judgment, and Defendants' motion for summary judgment on November 18, 2025. ECF 187.

## B. Factual Background

The Court adopts the facts as set forth in the Court's orders on Plaintiffs' motion to postpone and motion for class certification. The Court explains the record as necessary, and with the following facts as set forth below.

Since this nation's founding, federal courts have rejected the notion of unlimited and

United States District Court
Northern District of California

1   unfettered power.  The Court will not abandon this history.  Indeed, in codifying the

2   Administrative Procedures Act ("APA"), Congress "sets forth the procedures by which federal

3   agencies are accountable to the public and their actions subject to review by the courts."  *Dep't of*

4   *Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1, 16 (2020) (citing *Franklin v.*

5   *Massachusetts*, 505 U.S. 788, 796, (1992).  The statute requires agencies to engage in "reasoned

6   decisionmaking," *id* (citing *Michigan v. EPA*, 576 U.S. 743, 750 (2015) (internal quotation marks

7   omitted), and directs that agency actions be "set aside" if they are "arbitrary" or "capricious," 5

8   U.S.C. § 706(2)(A).  Today, the Court complies with the requirements of the APA.

9   　　　　　　**i.    The TPS Statute**

10   　　　Congress established the Temporary Protected Status ("TPS") program in 1990 to provide

11   humanitarian relief to foreign nationals within the United States who are unable to return to their

12   country of origin due to potential threats to their personal safety from natural disaster, civil strife

13   and armed conflict, or other extraordinary and temporary conditions.  *Nat'l TPS All. v. Noem*, 150

14   F.4th 1000, 1010 (9th Cir. 2025); *see* 8 U.S.C. § 1254a.  The TPS statute was enacted to reflect the

15   practice of "every Administration since and including that of President Eisenhower" which was to

16   "permit[] one or more groups of otherwise deportable aliens to remain temporarily in the United

17   States out of concern that the forced repatriation of these individuals could endanger their lives or

18   safety."  H.R. Rep. 100-627, at 6 (1988).  Pursuant to 8 U.S.C. § 1254a(a)(1), the Secretary of

19   Homeland Security may designate a country for TPS and grant nationals of that country protection

20   from removal and work authorization in the United States for the period their home country is so

21   designated.  8 U.S.C. § 1254a(a)(1)(B).

22   　　　In designating a country for TPS, the Secretary must engage in "consultation with

23   appropriate agencies of the Government" and publish a "statement of the findings" and an estimate

24   of the number of eligible foreign nationals.  *Id.* § 1254a(b)(1).

25   　　　Once a country is designated for TPS, nationals of that country can register for benefits

26   during a registration.  To establish eligibility for TPS, an applicant must demonstrate, among other

27   things, that he or she is a national of the country designated for TPS, has been continuously

28   physically present and resided in the United States since the effective date of designation, and is

4

otherwise admissible as an immigrant.  8 U.S.C. § 1254a(c)(2)(A); 8 C.F.R. §§ 244.2, 244.3(a),

1244.3(a).  The government can deny an applicant TPS based on the applicant's criminal history.

8 U.S.C. § 1254a(c)(2)(A)–(B); 8 C.F.R. § 244.3(c).  TPS applicants must also pay all fees

associated with applying for TPS.  *Id.* at § 1254a(c)(1)(B).

Periodically, the Secretary "shall review the conditions in the foreign state . . . for which a

designation is in effect under this subsection and shall determine whether the conditions for such

designation under this subsection continue to be met."  *Id.* at § 1254a(b)(3).  If the Secretary finds

that the conditions are no longer met, she "shall terminate the designation by publishing notice in

the Federal Register of the determination."  *Id.*

Under the TPS statute, termination is not effective "earlier than 60 days after the date the

notice is published or, if later, the expiration of the most recent previous extension."  *Id.*  The

Secretary may extend the designation "for an additional period of 6 months (or, in the discretion of

the [Secretary], a period of 12 or 18 months)" if the conditions giving rise to the TPS designation

persist.  *Id.*

### ii.    History of TPS for Nepal, Honduras, and Nicaragua

On June 24, 2015, the Secretary designated Nepal for TPS for a period of 18 months due to

a breakdown of living conditions resulting from a 7.8 magnitude earthquake.  80 Fed. Reg. 36,346

(June 24, 2015).  The earthquake impacted about one-third of the country's population and

damaged approximately 750,000 homes.  *Id.*  In 2016, TPS was extended for an additional 18

months because of sustained strained infrastructure, civil unrest, and inadequacies in safe housing,

food, medicine, and education.  81 Fed. Reg. 74,470 (Oct. 26, 2016).  In 2018, TPS was extended

for several years due to legal challenges to the TPS termination for Nepal.  90 Fed. Reg. at 24,152.

In 2023, DHS reconsidered the 2018 decision to terminate TPS and extended TPS for recipients

from Nepal to June 24, 2025.  88 Fed. Reg. 40,317 (June 21, 2023).  On June 6, 2025, DHS

published notice in the Federal Register that TPS for Nepal would terminate on August 5, 2025.

90 Fed. Reg. at 21,512.

Hurricane Mitch hit Honduras in late October 1998, causing "widespread heavy rain and

severe flooding" in Honduras, Nicaragua, and other nearby countries that resulted in "thousands

United States District Court
Northern District of California

5

United States District Court
Northern District of California

dead or missing" and "tremendous property, infrastructure, and crop damage." *25 Years Later: Looking Back at the October Monster Named Mitch*, NOAA (Oct. 27, 2023). In 1999, the Attorney General designated Honduras for TPS for 18 months. 64 Fed. Reg. 524 (Jan. 5, 1999). Over the next twenty years, TPS was repeatedly extended as DHS found continued "disruption in living conditions." 79 Fed. Reg. 62170 (Oct. 16, 2014); 88 Fed. Reg. 40304 (Jun. 21, 2023). DHS terminated TPS for Honduras in 2018. 83 Fed. Reg. 26,074 (June 5, 2018). Legal challenges to the termination of TPS for Honduras resulted in extension of TPS for several years. 90 Fed. Reg. at 30,090. In 2023, DHS reconsidered the 2018 decision to terminate TPS and extended TPS for Honduras through July 5, 2025. 88 Fed. Reg. at 40,304 (June 21, 2023). On July 8, 2025, DHS published notice in the Federal Register that TPS for Honduras would be terminated effective September 8, 2025. 90 Fed. Reg. at 30,091.

Nicaragua was similarly hit by Hurricane Mitch and designated for TPS in 1999. *See* 64 Fed. Reg. 526 (Jan. 5, 1999); 88 Fed. Reg. 40294 (Jun. 21, 2023). TPS was extended for nearly two decades due to recurrent weather events until terminated in 2017. 82 Fed. Reg. 59,636 (Dec. 15, 2017). After the termination announcement, litigation resulted in the continued extension of TPS for Nicaragua for several years. 90 Fed. Reg. at 30,087. In 2023, DHS extended TPS for Nicaragua through July 8, 2025. 88 Fed. Reg. at 40,294 (June 21, 2023). On July 8, 2025, DHS published notice in the Federal Register that TPS for Nicaragua would terminate on September 8, 2025. 90 Fed. Reg. at 30,086.

### iii. The Current Administration and TPS

On the first day of his second term, President Trump issued an executive order titled, "Protecting the American People Against Invasion" ("Invasion EO"). 90 Fed. Reg. 8443 (Jan. 20, 2025). The Invasion EO referenced to an "unprecedented flood of illegal immigration into the United States" and ordered the Secretary of State, Attorney General, and DHS Secretary to "rescind the policy decisions of the previous administration that led to the increased or continued presence of illegal aliens in the United States, and align any and all departmental activities with the policies set out by this order and the immigration laws." *Id.* § 16. This included "ensuring that designations of Temporary Protected Status are consistent with the provisions of section 244

6

of the INA (8 U.S.C. 1254a), and that such designations are appropriately limited in scope and made for only so long as may be necessary to fulfill the textual requirements of that statute." *Id.* § 16(b). The Invasion EO would be cited in later decisions vacating or terminating TPS designations. *See* 90 Fed. Reg. 30086 (July 8, 2025); 90 Fed. Reg. 30089 (July 8, 2025); 90 Fed. Reg. 24151 (Jun. 6, 2025). *See also* Compl. ¶ 57 (citing "President Trump's promise to rescind policies that were magnets for illegal immigration and inconsistent with the law" when vacating Haiti's TPS extension).

In a January 29, 2025 post on X, Secretary Noem announced that she would end a Biden order that allowed Venezuelans to stay in the country and "violate our laws." ECF 18-16. In a March 20, 2025 post on X, Secretary Noem associated "migration management" with "sav[ing] American lives and get[ting] criminals off our streets!" ECF 18-17.

At her confirmation hearing, Secretary Noem stated that "[TPS] has been abused and manipulated by the Biden Administration, and that will no longer be allowed. . . and these extensions going forward the way that they are. The program was intended to be temporary[.]." Compl. ¶¶ 61, 73. During a February 2, 2025 "Meet the Press" appearance, Secretary Noem stated that "The TPP [sic] program has been abused and it doesn't have integrity right now." Compl. ¶ 74. The Department of Homeland Security ("DHS") has stated that, by vacating or partially vacating TPS, it was "restoring integrity in our immigration system," and fulfilling "President Trump's promise to rescind policies that were magnets for illegal immigration and inconsistent with the law." Compl. ¶ 57.

Other officials in this administration have vocalized their goal of terminating TPS. President Trump, in response to a question from a reporter about whether he would revoke a country's TPS status, stated, "You have to remove the people; you cannot destroy our country . . . In my opinion, it's not legal. . . . Absolutely I'd revoke [TPS]." Compl. ¶ 78; ECF 145-3. During the 2024 presidential campaign, then-vice-presidential candidate JD Vance stated "[w]e're going to stop doing mass grants of Temporary Protected Status." Compl. ¶ 80. He went on to call TPS designations a "magic amnesty wand" which he characterized as a "terrible indictment of [Vice President Kamala Harris's] amnesty policies." Compl. ¶ 81. Project 2025, "the 2025 Presidential

United States District Court
Northern District of California

7

1   Transition Project," a product of current and former political appointees of the president explicitly

2   called for the "[r]epeal [of] TPS designations." Compl. ¶ 84.

3       In a May 19, 2025, post on X, DHS equated TPS holders with "MS-13 gang members,"

4   "known terrorists," and "murderers." ECF 18-18. These statements are consistent with similar

5   statements by President Trump including one occurrence in which he stated that migrants were

6   "poisoning the blood of our country." ECF 18-20; *see also* ECF 18-23 (President Trump asking

7   why people "could not come from nice countries . . . like Denmark, Switzerland, and Norway");

8   *see* Compl. ¶ 98 (President Trump "How about allowing people to come to an open border . . .

9   many of them murdered far more than one person, and they're now happily living in the United

10  States. You know now a murderer, I believe this, it's in their genes. And we got a lot of bad genes

11  in our country right now."); *see also* ECF 18-15 at 7 (Secretary Noem describing immigration as

12  an "invasion happening on purpose . . . to remake the foundation of this country").

### iv.    The Termination Decision-Making Process

14      On April 7, 2025, DHS staff circulated copies of the TPS decision memos ("DM") for

15  Honduras and Nicaragua. ECF 176-22; ECF 145-31. The DMs terminating TPS for Honduras

16  and Nicaragua were drafted before receiving updated country conditions reports from the

17  Department of State. *See* ECF 176-22 at 3 ("[T]he DM is now ready to go . . . We did not receive

18  a recommendation from DOS. You are correct that DOS will not provide country conditions

19  anymore."); *see also* ECF 145-21 ("I wanted to check in on about COI for Nicaragua and

20  Honduras. We are currently prepping both DMs to circulate this week, but I am not sure we have

21  the COI from RRU. . .Do you have an ETA?"); *compare* ECF 145-31 (decision memos written by

22  April 7) *with* ECF 145-21 (DHS personnel acknowledging lack of country conditions information

23  on April 8).

24      In the case of Nepal, Defendants recognized they lacked "an updated DOS report," ECF

25  145-35, and downplayed the importance of the report because it supported their desired result:

26  "the recommendation was to terminate so we should move forward." ECF 176-20; *see* ECF 63;

27  ECF 64 (CAR indices for Nepal and Nicaragua, lacking any contemporaneous State Department

28  country conditions analysis or recommendation letter).

United States District Court
Northern District of California

United States District Court
Northern District of California

Moreover, in requesting country conditions reports for Honduras, Nicaragua, and Nepal, the DHS personnel requested revised reports that "only include[d] around 1 page of country conditions" and "[i]nclude[d] any improvements" without "mention environmental concerns or climate change." ECF 176-2. Researchers had their team "revise the reports for Nepal, Honduras, Nicaragua, and Haiti to make them consistent with [these] new guidelines." *Id*. DHS personnel also added a "national interest analysis" based on "data/analysis." ECF 176-33 at 6 ("OP&S is working on improving the TPS decision memos and we are adding a national interest analysis . . . . We are wanting to provide data/analysis in our TPS decision memo."); *id*. ("We'd like to request another analysis . . . [t]his time it's for Cameroon and Nepal."). However, as described by policy analysts, this "data" involved "[s]uch a LOW number of fraud" for Nepal that "[i]t's so laughable that it's even in the paper." ECF 176-33 at 2; *see id*. (showing 1 "Found Fraud" out of 12,859 total for Nepal). DHS personnel sought the "same type of data" analysts provided for Nepal, "but this time for Honduras and Nicaragua." ECF 176-34 at 5. After receiving this data, DHS personnel contemplated how to explain their TPS terminations: "The problem is if we sing the praises of Honduras (which we certainly do), then it calls into question why we're also terminating the program in Nicaragua, with its murderous, dictatorial regime. Which in turn might open us up to questions about why we're terminating for both countries when the conditions on the ground are so much better in Honduras." ECF 176-11.

DHS personnel were also instructed to narrow the scope of her review to the conditions that gave rise to the initial TPS designation. "[E]ndemic" issues like corruption were considered "outside the scope" of review. ECF 176-2. "Women's rights" and "environmental concerns" were similarly beyond the scope. *Id*. Instead, the focus was to be on the "improvements," and descriptions of the conditions related to the original designation. *Id*. This resulted in terminations that, *inter alia*, concluded that a "murderous dictatorial regime," ECF 176-11 at 1329_0012, was now safe, without even addressing the country's political situation. *See* 90 Fed. Reg. 30086 (Nicaragua Termination Notice). The termination notices fail to address food insecurity in Nepal, staggering crime in Honduras, or humanitarian crises in Nicaragua when describing the basis for terminating TPS. *See* Compl. ¶¶ 63, 66–69.

9

1        **v.    The Classes**

2        The Court certified the following classes:

3                **Honduras TPS Class:** All persons who have been granted TPS
                 pursuant to the TPS designation of Honduras and who have not been
4                granted lawful permanent residence.

5                **Nepal TPS Class:** All persons who have been granted TPS pursuant
                 to the TPS designation of Nepal and who have not been granted lawful
6                permanent residence

7                **Nicaragua TPS Class:** All persons who have been granted TPS
                 pursuant to the TPS designation of Nicaragua and who have not been
8                granted lawful permanent residence

9

10       ECF 134 at 6.  The following plaintiffs have been appointed as the Class Representatives:

11       **Plaintiff Denis Molina** is 49 years old, a native of Honduras, and has been in the United

12       States since 1997.  ECF 17-2 ¶¶ 4–5.  He applied for and has maintained TPS since Hurricane

13       Mitch hit Honduras.  *Id.* ¶ 5.  He has been a church pastor for over 22 years and works various

14       jobs in construction and as a mechanic to support his family, which includes a wife and four

15       children.  *Id.* ¶¶ 6–12.  Two of his children, one aged 4 and another 22, have been diagnosed with

16       autism and require special programs to support their development.  *Id.* ¶¶ 9, 13.  He is the sole

17       breadwinner for his family.  *Id.* ¶ 12.  If TPS terminates, Molina fears that he will not be able to

18       support his family in Honduras and, if his entire family relocates to Honduras, his children will

19       lose the support of special programs for their development.  *Id.* ¶¶ 12, 14.

20       **Plaintiff Johny Silva** is 29 years old, a native of Honduras, and came to the United States

21       when he was three-years old.  ECF 17-3 ¶ 2.  He was granted TPS after Hurricane Mitch.  *Id.* ¶ 4.

22       Silva is a Certified Nursing Assistant at Stanford Hospital and relies on his TPS for work

23       authorization.  *Id.* ¶¶ 10, 13.  Without TPS, Silva and his son, approximately 9 years old and

24       diagnosed with autism, will lose their health insurance.  *Id.* ¶ 13.  Silva will also lose his job, not

25       be able to contribute to his family's rent, will have to abandon his dreams of becoming a nurse,

26       and be separated from the rest of his family.  *Id.* ¶¶ 13–14, 16.

27        **Plaintiff Elena Hernandez** is 67 years old, a native of Nicaragua, came to the United

28       States in 1996 because her family was targeted by the Nicaraguan government, and was granted

United States District Court
Northern District of California

10

TPS in 1999. ECF 17-4 ¶ 3. Plaintiff Hernandez has worked at an aquatic plant nursery, cleaning company, and as a shop steward with TPS. *Id.* ¶ 7. Plaintiff Hernandez has asthma and a heart condition that requires daily medication. *Id.* ¶ 9. Without TPS, Plaintiff Hernandez would lose her health insurance and social security income even though she has paid into social security for more than 25 years. *Id.* ¶¶ 9, 11. She would lose her job, be separated from her family, have no way of supporting herself, and worries that her health will rapidly decline without continued access to healthcare. *Id.* ¶¶ 10, 12, 14. Given her family history and views, she may also face persecution in Nicaragua. *Id.* ¶ 14

**Plaintiff Sandhya Lama** is 43 years old, a native of Nepal, and has been in the United States since 2008. ECF 17-6 ¶ 2. She came to the United States in 2008 to study at a university in Virginia, received her master's degree in 2014, and has been a TPS holder since 2015. *Id.* ¶¶ 2, 6. She is a single mother of three U.S. citizen children, a sole provider, and is currently a CXO Multi Site Lead LC for Amazon. *Id.* ¶¶ 2, 10–13. If forced to return to Nepal, Lama's children would lose opportunities, and one of Lama's children would not be able to get medical treatment for her severe allergies. *Id.* ¶ 15. Returning to Nepal would also be dangerous because Lama's family has suffered persecution from the Maoist (communist) party in Nepal, including having their ancestral house bombed and brother being taken as hostage. *Id.* ¶¶ 4, 16.

**Plaintiff Teofilo Martinez** is 57 years, a native of Honduras, and has been on TPS since 1997. ECF 17-8 ¶ 2. He is a licensed soccer instructor, a licensed realtor, and owns a landscaping business. *Id.* ¶ 9. He has also been volunteering with the Honduran Consulate for the last 7 years, is on the executive committee for NTPSA, and co-hosts a radio show for TPS holders. *Id.* Without TPS, Martinez would be separated from his partner of over 25 years, lose his job, and not be able to travel for his volunteer work with NTPSA. *Id.* ¶¶ 15, 18.

## II.    JURISDICTION

Defendants raise four distinct challenges to the Court's exercise of jurisdiction over Plaintiffs' claims. ECF 110 at 2–3, 12. Defendants argue that (A) the TPS statute broadly prohibits judicial review of "any determination of the Secretary with respect to" TPS designations, terminations, or extensions, *id.* at 2; (B) 8 U.S.C. § 1252(f)(1) bars this Court from "enjoin[ing] or

United States District Court
Northern District of California

1     restrain[ing]" the Secretary from implementing her decisions, *id*; (C) 8 U.S.C. § 1252(a)(2)(B)(ii)

2     bars review of any "decision or action of … the Secretary of Homeland Security the authority for

3     which is specified under [the INA] to be in the discretion of … the Secretary …" such as the

4     Secretary's termination decisions, *id* at 12; and (D) the APA does not allow for review of agency

5     action, like the Secretary's decisions, that are committed to agency discretion by law. *Id* at 3. The

6     arguments in Defendants' motion to dismiss mirror those raised in their motion for summary

7     judgment. ECF 142 at 7–12. Defendants also previously raised most of these arguments in

8     opposition to Plaintiffs' motion to postpone, and in opposition to Plaintiffs' motion for class

9     certification. ECF 45 at 2; ECF 99 at 3. The Court addresses each of Defendants' jurisdictional

10    arguments as they relate to Defendants' motion to dismiss and motion for summary judgment

11    below.

12    **A.**     **8 U.S.C. § 1254a(b)(5)(A) Does Not Bar Review of Plaintiffs' Claims**

13       In Defendants' motion to dismiss and motion for summary judgment, Defendants argues

14    that 8 U.S.C. §1254a(b)(5)(A) strips federal courts of jurisdiction to review the Secretary's

15    terminations. ECF 110 at 10; ECF 142 at 1. Specifically, Defendants argue that "[t]here is no

16    judicial review of any determination of the [Secretary] with respect to the designation, or

17    termination or extension of a designation, of a foreign state" for TPS relief. ECF 110 at 9.

18    Defendants further argue that the word "any" carries an expansive meaning and encompasses the

19    Secretary's TPS decisions here. *Id.* at 9. Plaintiffs aver that Plaintiffs' challenges fall outside of

20    the jurisdictional bar articulated in §1254a(b)(5)(A) because Plaintiffs challenge the process by

21    which Defendants made the TPS decisions, rather than the substance of the Secretary's

22    conclusions. ECF 121 at 3.

23       8 U.S.C. §1254a(b)(5)(A) reads "[t]here is no judicial review of any determination of the

24    [Secretary] with respect to the designation, or termination of a designation, of a foreign state under

25    this subsection." Several federal courts, including this Court, have found jurisdiction exists over

26    claims where plaintiffs allege that the Secretary exceeded the scope of his or her authority in

27    deciding to terminate, or by the manner in which he or she decided to terminate, TPS

28

United States District Court
Northern District of California

designations.[1]

A full review of § 1254a supports a finding that the phrase "any determination" should be interpreted to mean the single act of deciding whether the country conditions continue to be met for the purposes of designating or terminating TPS. *See* 8 U.S.C. § 1254a(b)(3)(A) ("At least 60 days before end of the initial period of designation . . .the Attorney General . . . shall determine whether the conditions for such designation under this subsection continue to be met"); ("If the Attorney General determines under subparagraph (A) that a foreign state . . . no longer continues to meet the conditions for designation under paragraph (1), the Attorney General shall terminate the designation."). As the Supreme Court in *McNary v. Haitian Refugee Cent., Inc* explained, the words "a determination" describe "a single act rather than a group of decisions or a practice or procedure employed in making decisions" and do not include "general collateral challenges to unconstitutional practices and policies used by the agency" in determining whether to terminate TPS. 498 U.S. 479, 492 (1991).

Plaintiffs do not challenge the singular decisions that the Secretary reached for the TPS terminations at issue; Plaintiffs challenge the Secretary's decision-making and implementation process as an exercise of extra-legal power prohibited by the APA and federal constitution. Compl. ¶¶ 3–5. The caselaw above demonstrates that while federal district courts may be barred from reviewing a Secretary's discretionary decision to designate a country's TPS status, *Nat'l TPS*

---

[1] *See* ECF 73 at 20 ("[T]he Court finds that 8 U.S.C. § 1254a(b)(5) does not preclude the Court's jurisdiction over Plaintiffs' claims"); *Nat'l TPS All*, 150 F.4th at 1017 (9th Cir. Aug. 29, 2025) (finding that nothing in the statute precludes review of a Secretary's "conclusion as to the extent of her power under the TPS statute"); *CASA, Inc. v. Noem,* No. 25-cv-1484, 2025 WL 1907378, at *6 (D. Md. July 10, 2025) (finding plaintiffs' claim challenging the alleged policy or practice of making preordained determinations to terminate TPS designations in order to reduce the number of non-white immigrants in the United States not barred by § 1254a(b)(5)(A)); *Centro Presente v. Department of Homeland Security*, 332 F.Supp.3d 393 (D. Mass. 2018) (concluding that the plaintiffs' APA claim was not barred where it challenged, in relation to three separate countries' TPS determinations, an allegedly "new policy that TPS designation determination are to be made solely on the basis of whether the conditions that created the initial designation persist rather than a broader view of whether the country is safely able to accept returning nationals"); *Ramos v. Nielsen*, 321 F. Supp. 3d at 1092, 1099–1100, 1104 (N.D. Cal. 2018) (finding that a claim contesting the termination of the TPS designations for four countries was not barred by § 1254a(b)(5)(A) where the challenge was to the alleged adoption of a "new interpretation of the TPS statute" which based determinations on racial animus and "alleged disdain for non-white immigrants").

*All*, 150 F.4th at 1017, courts may review the process by which the Secretary reached that decision where plaintiffs allege that the Secretary's decision-making process constitutes an unlawful departure from the statute, past agency practice, or the constitution. *Id.* Plaintiffs' claims fall into the latter category of allegations for which this Court may exercise jurisdiction to review. *Id.*

Defendants' reach for unfettered authority in the immigration realm raise notable comparisons to arguments that were once made, but are now rejected today. Indeed, Congress and the Executive Branch must abide by the Constitution.

At the end of the nineteenth century, public sentiment toward many newcomers, particularly migrant laborers from China, grew bitter. Congress responded by enacting the Chinese Exclusion Act of 1882, ch. 126, 22 Stat. 58, which prohibited the entry of Chinese laborers to the United States. The Scott Act, ch. 1064, 25 Stat. 504, enacted in 1888, forbade reentry of Chinese laborers who had left after previously residing in this country. In some of its earliest cases, the Supreme Court recognized Congress's plenary power over immigration matters and affirmed Congress's ability to vest the exclusive authority to enforce its stated policy goals in the Executive Branch. *Ping v. U.S.*, 130 U.S. 581, 609 (1889) (holding that power to exclude foreign nationals is "incident of sovereignty belonging to the government of the United States," and Congress's determinations regarding whom to exclude are "conclusive upon the judiciary"); *Nishimura Ekiu v. United States*, 142 U.S. 651, 659–60, (1892) (noting that Congress may delegate authority to exclude foreign nationals to executive officers, in which case courts cannot second-guess decisions by those officers acting within delegated authority); *Lem Moon Sing v. United States*, 158 U.S. 538, 547 (1895) ("The power of congress to exclude aliens altogether from the United States, or to prescribe the terms and conditions upon which they may come to this country, and to have its declared policy in that regard enforced exclusively through executive officers, without judicial intervention, is settled.").

However, around the turn of the century, "the Court began to walk back the plenary power doctrine in significant ways." *California v. U.S. Dep't of Homeland Sec.*, 476 F. Supp. 3d 994, 1019 (N.D. Cal. 2020) (citing *Castro v. U.S. Dep't of Homeland Sec.*, 835 F.3d 422, 441 (3d Cir. 2016)). In *Kaoru Yamataya v. Fisher*, 189 U.S. 86 (1903), the Supreme Court limited Congress's

14

United States District Court
Northern District of California

power over immigration, noting that the power was qualified by basic constitutional considerations. *California v. U.S. Dep't of Homeland Sec.*, 476 F. Supp. 3d at 1019 (citing *Castro*, 835 F.3d at 442 (quoting Henry M. Hart, Jr., *The Power of Congress to Limit the Jurisdiction of Federal Courts: An Exercise in Dialectic*, 66 Harv. L. Rev. 1362, 1390 n.85 (1953)).  As the Court explained in *Landon v. Plasencia*, "once an alien gains admission to our country and begins to develop the ties that go with permanent residence his constitutional status changes accordingly. Our cases have frequently suggested that a continuously present resident alien is entitled to a fair hearing when threatened with deportation."  459 U.S. 21, 32 (1982).  The APA establishes a "basic presumption of judicial review [for] one 'suffering legal wrong because of agency action.'" *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1, 16 (2020).  Notably, the purpose of the jurisdictional providing sections of the APA was to permit a form of review for agency action related to immigration.  *See Shaughnessy v. Pedreiro*, 349 U.S. 48, 51 (1955) (noting "purpose" of the provisions of the APA which allow judicial review were "to remove obstacles to judicial review of agency action under subsequently enacted statutes like the 1952 Immigration Act").

Similar to shifting attitudes towards Chinese laborers, American sentiment towards the treatment of Japanese nationals and Japanese American citizens during the Second World War has evolved.  Although, in *Korematsu v. United States*, the Supreme Court once held that the "exclusion of those of Japanese origin [from the West Coast war area] was deemed necessary because of the presence of an unascertained number of disloyal members of the group, most of whom we have no doubt were loyal to this country," 323 U.S. 214, 218–19, (1944), the Supreme Court has since recognized that "*Korematsu* was gravely wrong the day it was decided, has been overruled in the court of history, and – to be clear – 'has no place in law under the Constitution,'" *Trump v. Hawaii*, 585 U.S. 667, 710 (2018).  While the Supreme Court in *Korematsu* affirmed an abhorrent wartime decision, it did not decline to hear the case on jurisdictional grounds.  *Id.* at 224.

Plaintiffs do not ask this Court to second-guess Congress's policy decisions, nor do Plaintiffs ask this Court to review the substance of the Secretary's discretionary exercise of

United States District Court
Northern District of California

authority.  Rather, Plaintiffs claim that the Secretary exceeded the authority that Congress

delegated to her, and §1254a(b)(5)(A) does not bar review of Plaintiffs' claims.  Accordingly, the

Court, finds that §1254a(b)(5)(A) does not strip the Court of jurisdiction over Plaintiffs' claims.

### B.  8 U.S.C. § 1252(f)(1) Does Not Prohibit the Court from Granting Plaintiffs' Requested Relief

Defendants argue that the form of relief sought by the Plaintiffs is barred by 8 U.S.C. §

1252(f)(1).  ECF 110 at 3.  Plaintiffs contend that the declaratory relief and order to set aside the

challenged terminations sought by Plaintiffs is proper under Section 706 of the APA and that

controlling Ninth Circuit precedent supports their position that § 1252(f)(1) does not bar such

relief.  ECF 121 at 8.

8 U.S.C. §1252(f)(1) provides in relevant part as follows:

> In general. Regardless of the nature of the action or claim or of the
> identity of the party or parties bringing the action, no court (other than
> the Supreme Court) shall have jurisdiction or authority to enjoin or
> restrain the operation of the provisions of part IV of this subchapter,
> as amended by the Illegal Immigration Reform and Immigrant
> Responsibility Act of 1996, other than with respect to the application
> of such provisions to an individual alien against whom proceedings
> under such chapter have been initiated.

The Ninth Circuit has held that "section 1252(f)(1) does not prohibit relief in the form of a

stay or postponement of agency action under the APA" and that a district court order that does

"enjoin or restrain" the Secretary's policy "is not barred by 1252(f)(1) if it affects only agency

actions that exceed the agency's statutory authority."  *Nat'l TPS All.*, 150 F.4th at 1018.  Instead,

1252(f)(1) only "limits the district court's authority to enjoin [an agency] from carrying out

legitimate [] orders."  *Id.*

Here, Plaintiffs allege that the Secretary acted outside of her statutory authority by

executing a preordained decision to terminate TPS designations, failing to abide by previous

practices with respect to notice of termination and the orderly transition period, and relying on

racial- and national-origin-based animus.  Compl. ¶¶ 3–5.  In Plaintiffs' motion for summary

judgment, Plaintiffs further allege that the Secretary's decision violates the APA because in

terminating TPS for Honduras, Nicaragua, and Nepal, the Secretary ignored intervening crisis as

required by 8 U.S.C. § 1254a(b)(3)(A).  ECF 144 at 21.  Injunctive or declaratory relief for

1    Plaintiffs' claims do not fall within the purview of those actions barred from court intervention

2    under §1252(f)(1) because Plaintiffs seek a court order enjoining "action that exceed[s] the

3    agency's statutory authority." *Nat'l TPS All.*, 150 F.4th at 1018; *see also Immigr. Defs. L. Ctr. V.*

4    *Noem*, 145 4th 972, 990 (9th Cir. 2025) (holding that 1252(f)(1) does not bar injunctive relief for

5    claims under the APA). Moreover, Defendants acknowledge binding precedent which rejects

6    Defendants argument that 1252(f)(1) bars declaratory relief. ECF 110 at 15 (acknowledging

7    *Rodriguez v. Hayes*, 591 F.3d 1105, 1119 (9th Cir. 2010)).

8            Accordingly, the Court finds that 8 U.S.C. §1252(f)(1) does not bar the Court from

9    revieing Plaintiffs' claims.

10           **C.    8 U.S.C. § 1252(a)(2)(B)(ii) Does Not Bar Review of Plaintiffs' APA Claim**

11           Defendants further argue that 8 U.S.C. § 1252(a)(2)(B)(ii) bars judicial review of the

12    Secretary's decision regarding any "orderly departure" period. ECF 110 at 12. Defendants argue

13    that 8 U.S.C. § 1252(a)(2)(B)(ii) "[t]here are no conditions that the Secretary must satisfy before"

14    she can exercise her authority and that "Congress has in no way prescribed how that discretion

15    must be exercised." ECF 110 at 12 (quoting *Bouarfa v. Mayorkas*, 604 U.S. 6, 13–15 (2024)).

16    Plaintiffs respond that the Secretary's decision to shorten the orderly transition period was neither

17    discretionary nor a form of relief, and that, as a result, the Secretary's action is not covered by §

18    1252(a)(2)(B)(ii)'s judicial bar. ECF 121 at 8.

19           Section 1252(a)(2)(B)(ii) bars judicial review of any "decision or action of … the

20    Secretary of Homeland Security the authority for which is specified under [the INA] to be in the

21    discretion of … the Secretary …" Section 1252(a)(2)(B) covers "orders denying discretionary

22    relief in individual cases," not "the type of challenges to the Secretary's regulations, orders,

23    policies, and directives" where plaintiffs "claim that the challenged policies violate the Equal

24    Protection guarantee of the federal constitution and the Administrative Procedure Act." *Nakka*,

25    111 F.4th at 999, 1015 (quoting *Make the Road N.Y. v. Wolf*, 962 F.3d 612, 628−31 (D.C. Cir.

26    2020) ("MTRNY")). Moreover, an agency must "display awareness" of, and "offer good reasons"

27    for, a departure from a "decades-old practice." *FDA v. Wages & White Lions Invs., L.L.C.*, 604

28    U.S. 542, 570 (2025).

United States District Court
Northern District of California

United States District Court
Northern District of California

The length of the "orderly transition" period, which DHS makes available to all TPS holders when a termination occurs, is not a form of discretionary relief from removal.  8 U.S.C. § 1254a(b)(3)(B).  At a minimum, the TPS statute provides a specific timeframe by which the Secretary must abide; that is, a termination of TPS "shall not be effective earlier than 60 days after the notice is published or, if later, the expiration of the most recent previous extension."  However, Plaintiffs demonstrate that the provision of at least a six-month "orderly transition" period is a longstanding past practice of the DHS.  ECF 28.  Unexplained departure from such a longstanding practice reflects an abuse of the agency's discretion where the practice has created "serious reliance interests."  *Wages & White Lions Invs., L.L.C.*, 604 U.S. at 567–68.  Under either the statutorily proscribed timeframe, or the timeframe Plaintiffs allege the agency adopted by past practice, the orderly transition period is not a decision left to the discretion of the Secretary.  *See Nat'l TPS All. v. Noem*, No. 25-cv-05687, 2025 WL 2684340, at *5 (N.D. Cal. Aug. 8, 2025) (finding "Defendants fail to show how 1252(a)(2)(B)(ii)'s mandate concerning discretionary relief applies to" Plaintiffs' claim that the Secretary's terminations and associated orderly transition periods violated the APA).

Accordingly, Plaintiffs' challenge to the agency's change in position regarding orderly transition periods is not a form of discretionary relief covered by Section 1252(a)(2)(B)(ii)'s jurisdictional bar.  8 U.S.C. § 1252(a)(2)(B)(ii) does not preclude this Court's jurisdiction over Plaintiffs' claims.

**D.    5 U.S.C. § 701(a)(2) Does Not Prohibit the Court from Reviewing Plaintiffs' Claims**

Defendants further argue that jurisdiction is barred by § 701(a)(2) of the APA, because the TPS statute commits the Secretary's determinations regarding TPS designations under § 1254a(b)(1) to the Secretary's informed, discretionary judgment.  ECF 110 at 11.

The full text of 5 U.S.C. § 701(a), which bars juridical review in some limited circumstances, reads:

> This chapter applies, according to the provisions thereof, except to the extent that –
> (1) statutes preclude judicial review; or
> (2) agency action is committed to agency discretion by law

18

1    The Supreme Court has stated that the APA provides that "[a] person suffering legal wrong

2    because of agency action, or adversely affected or aggrieved by agency action within the meaning

3    of a relevant statute, is entitled to judicial review thereof." *Abbott Laboratories v. Gardner*, 387

4    U.S. 136, 140 (1967). The Supreme Court has further held that, under § 701(a)(2), agency action

5    is not subject to judicial review "to the extent that" such action "is committed to agency discretion

6    by law." *Block v. Community Nutrition Institute*, 467 U.S. 340, 349 (1984). However, that

7    provision applies only in "rare instances" where a "statute is drawn so that a court would have no

8    meaningful standard against which to judge the agency's exercise of discretion." *Spencer Enters.,*

9    *Inc. v. United States*, 345 F.3d 683, 688 (9th Cir. 2003) (quoting *Heckler v. Chaney*, 470 U.S. 821,

10   830 (1985)).

11   Because courts in this district have recognized distinct applications of § 701(a)(2) to

12   constitutional and statutory claims, the Court addresses Defendants' fourth jurisdictional argument

13   as applied to (i) Plaintiffs' due process claim and (ii) Plaintiffs' APA claims.

14   **i.    § 701(a)(2) Does Not Apply to Plaintiffs' Equal Protection Claim**

15   As a preliminary matter, courts in this district have held that § 701(a)(2)'s jurisdictional

16   bar does not apply to claims that an agency acted outside its constitutional authority in executing a

17   decision. *See San Francisco Unified Sch. Dist. v. AmeriCorps*, 784 F. Supp. 3d 1280, 1290 (N.D.

18   Cal. 2025) (stating that, "absent clear congressional intent to preclude review of a constitutional

19   claim, § 701(a)(2) does not bar review of colorable constitutional claims arising from agency

20   actions 'committed to agency discretion by law'"); *see also Webster*, 486 U.S. at 601, 603 (stating

21   that "the language and structure of § 102(c) [of the National Security Act] indicate that Congress

22   meant to commit individual employee discharges to the Director's discretion, and that § 701(a)(2)

23   accordingly precludes judicial review of these decisions under the APA" and stating "[w]e do not

24   think § 102(c) may be read to exclude review of constitutional claims").

25   Here, § 701(a)(2) is inapplicable with respect to Plaintiffs' Equal Protection claims,

26   because that claim arises under the Fifth Amendment to the federal constitution. Accordingly,

27   § 701(a)(2) does not bar Plaintiffs' constitutional claim.

28   **ii.    § 701(a)(2) Does Not Bar Review of Plaintiffs' APA Claims**

United States District Court
Northern District of California

Defendants claim that the TPS statute commits the Secretary's determinations regarding TPS designations to the Secretary's informed, discretionary judgment, and that § 701(a)(2) of the APA precludes judicial review of agency action "committed to agency discretion by law." ECF 110 at 11. Plaintiffs argue that the TPS statute provides statutory requirements such that the decision-making process Plaintiffs' challenge is not discretionary. ECF 121 at 7.

The Ninth Circuit has held that § 701(a)(2) does not deprive court of jurisdiction when an agency policy provides "law to apply." *Alcaraz v. INS*, 384 F.3d 1150, 1161 (9th Cir. 2004); *see Mendez-Gutierrez v. Ashcroft*, 340 F.3d 865, 868 (9th Cir. 2003) (same). That is, § 701(a)(2) does not bar review if "regulations or agency practice provide a 'meaningful standard' by which this court may review its exercise of discretion." *Spencer Enters., Inc*., 345 F.3d at 688.

Here, 8 U.S.C. § 1254a(b)(3)(A) provides that, on periodic review, the Secretary, "after consultation with appropriate agencies of the Government, shall review the conditions in the foreign state . . . for which a designation is in effect under this subsection and shall determine whether the conditions for such designation continue to be met." If she determines conditions are not met, she "shall terminate" the designation. *Id*. § 1254a(b)(3)(B). If she "does not determine … that a foreign state … no longer meets the conditions for designation … the period of designation … is extended." *Id*. § 1254a(b)(3)(C). At least two events must occur for the Secretary's decision regarding a TPS designation to be compliant with the statute. First, the Secretary must make the decision "after consultation with appropriate agencies." *Id*. § 1254a(b)(3)(A). Second, the Secretary must "review the conditions in the foreign state." *Id*. Absent each of these processes, a Secretary's decisions regarding TPS designations are contrary to law. *Id*.

Thus, regarding Plaintiffs' APA claims, the Court finds that there is "law to apply" under the TPS statute, such that the process by which the Secretary decides to terminate a TPS designation is not an unreviewable exercise of authority. *Alcaraz v. INS*, 384 F.3d 1150, 1161 (9th Cir. 2004) (holding that 701(a)(2) did not deprive court of jurisdiction because agency policy provided "law to apply"). § 1254a(b)(3)(A) provides a "meaningful standard" against which the Court may measure the Secretary's conduct in considering Plaintiffs' APA claims challenging the

20

United States District Court
Northern District of California

1    Secretary's failure to conduct the country conditions review and consult with the appropriate

2    government agencies before reaching her termination decision.  *See* Compl. ¶ 156(a) (alleging that

3    Secretary's termination decisions "were not based on a review of country conditions, as required

4    by 8 U.S.C. § 1254a(b)(3)); *see Spencer Enters., Inc.*, 345 F.3d at 688.

5           Therefore, § 701(a)(2) is not a bar to judicial review of the claims asserted here.

6                                        * * *

7           Under these statutory provisions, ordinarily, federal district courts are barred from

8    reviewing a Secretary's discretionary decision to designate a country's TPS status, particularly

9    when doing so would enjoin or restrain the agency from performing its law enforcement function.

10   However, here, Plaintiffs claims that the Secretary acted outside of her statutory authority by

11   executing a preordained decision to terminate TPS designations without conducing an objective

12   review of the country condition, failing to abide by previous practices with respect to notice of

13   termination and the orderly transition period, and relying on racial- and national-origin-based

14   animus.  Compl. ¶¶ 3–5. Plaintiffs, therefore, raise challenges under the APA and federal

15   constitution that are not subject to the jurisdictional bars discussed in the statutes above.

16   Accordingly, the Court denies Defendants' motion to dismiss under Rule 12(b)(1) and rejects

17   Defendants' argument that the Court lacks jurisdiction in Defendants' motion for summary

18   judgment.

19   **III.    MOTION TO DISMISS UNDER RULE 12(B)(6)**

20        **A.    Legal Standard**

21           Federal Rule of Civil Procedure 8(a)(2) requires a complaint to include "a short and plain

22   statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  To

23   overcome a Rule 12(b)(6) motion to dismiss after the Supreme Court's decisions in *Ashcroft v.*

24   *Iqbal*, 556 U.S. 662 (2009), and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), a plaintiff's

25   "factual allegations [in the complaint] 'must . . . suggest that the claim has at least a plausible

26   chance of success.'"  *Levitt v. Yelp! Inc*., 765 F.3d 1123, 1135 (9th Cir. 2014).  The Court

27   "accept[s] factual allegations in the complaint as true and construe[s] the pleadings in the light

28   most favorable to the nonmoving party."  *Manzarek v. St. Paul Fire & Marine Ins. Co*., 519 F.3d

1025, 1031 (9th Cir. 2008). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. When assessing the sufficiency of a complaint under Rule 12(b)(6), if the Court considers materials outside of the pleadings, then the motion is converted into a motion for summary judgment. *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1002 (9th Cir. 2018).

### B. Plaintiffs' Complaint Sufficiently Alleges Facts to Surmount Defendants' Challenge Under Rule 12(b)(6)

Beyond their jurisdictional arguments, Defendants argue that Plaintiffs fail to state claims under the pleading standard required to survive a motion to dismiss. ECF 110 at 15. Plaintiffs argue that the complaint sufficiently alleges that the Secretary acted outside of her statutory authority by (i) executing a preordained decision to terminate TPS designations, (ii) ignoring intervening country conditions, (iii) failing to abide by previous practices with respect to notice of termination and the orderly transition period, and (iv) relying on racial-based and national-origin-based animus to survive Defendants' motion. ECF 121 at 9.

### i. Plaintiffs' Plausibly Allege that the Secretary's Termination Decision-making Process was Arbitrary and Capricious Under the APA.

Plaintiffs' first claim under the APA is that the Secretary failed to conduct an objective review of country conditions, as statutorily required, but instead executed a preordained decision to terminate TPS and searched for a rationale to support the decision. Compl. ¶ 3. Defendants argue that even a cursory inspection of the federal register notices announcing the terminations at issue here reveal that the Secretary engaged in proper decision making under the TPS statute. ECF 110 at 16; (citing *Nepal Termination*, 90 Fed. Reg. at 24,151; *Honduras Termination*, 90 Fed. Reg. at 30,089; *Nicaragua Termination*, 90 Fed. Reg. 30,087 (July 8, 2025)). Plaintiffs further argue that Plaintiffs present facts sufficient to render Plaintiffs' claim "plausible on its face." ECF 121 at 10.

The APA provides that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702. The APA also requires Courts to "hold

United States District Court
Northern District of California

unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(a). Moreover, "[c]ourts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority, as the APA requires." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412 (2024). 8 U.S.C. § 1254a(b)(3)(A) requires the Secretary to make a determination of a country's TPS designation "*after* consultation with appropriate agencies" and upon "review of the conditions in the foreign state." (emphasis added). Moreover, the Supreme Court has held that agencies must offer the true reason for a decision. *Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019) ("The reasoned explanation requirement of administrative law … is meant to ensure that agencies offer genuine justifications for important decisions, reasons that can be scrutinized by courts and the interested public. Accepting contrived reasons would defeat the purpose of the enterprise."). "[P]retextual" justifications cannot support an agency's decision. *Id.* at 780. TPS decisions that are "preordained" or based on "political influence," rather than country conditions, violate the APA. *See Saget*, 375 F. Supp. 3d at 345–46 (quoting 5 U.S.C. § 706(2)(A)).

Here, the complaint sufficiently alleges that officials in this administration, including the President himself, arguably had more than a policy preference which guided their review of the TPS program. On January 20, 2025, the day he took office, President Trump issued an Executive Order titled "Protecting the American People Against Invasion." Compl. ¶ 46. The "invasion" referenced in the order was the purported "unprecedented flood of illegal immigration into the United States." *Id.* The Invasion E.O. directed the DHS Secretary to "promptly take all appropriate action, consistent with law, to rescind the policy decisions of the previous administration that led to the increased or continued presence of illegal aliens in the United States," including by reviewing "designations of Temporary Protected Status." *Id.* At her confirmation hearing, Secretary Noem stated that "[TPS] has been abused and manipulated by the Biden Administration, and that will no longer be allowed. . . and these extensions going forward the way that they are. The program was intended to be temporary[.]." Compl. ¶¶ 61, 73. During a February 2, 2025 "Meet the Press" appearance, Secretary Noem stated that "The TPP [sic] program has been abused and it doesn't have integrity right now." Compl. ¶ 74. The Department

of Homeland Security ("DHS") has stated that, by vacating or partially vacating TPS, it was "restoring integrity in our immigration system," and fulfilling "President Trump's promise to rescind policies that were magnets for illegal immigration and inconsistent with the law."  Compl. ¶ 57.  Other officials in this administration have vocalized their goal of terminating TPS. President Trump, in response to a question from a reporter about whether he would revoke a country's TPS status, stated, "You have to remove the people; you cannot destroy our country . . . In my opinion, it's not legal. . . . Absolutely I'd revoke [TPS]."  Compl. ¶ 78.  During the 2024 presidential campaign, then-vice-presidential candidate JD Vance stated "[w]e're going to stop doing mass grants of Temporary Protected Status."  Compl. ¶ 80.  He went on to call TPS designations a "magic amnesty wand" which he characterized as a "terrible indictment of [Vice President Kamala Harris's] amnesty policies."  Compl. ¶ 81.  Project 2025, "the 2025 Presidential Transition Project," a product of current and former political appointees of the president explicitly called for the "[r]epeal [of] TPS designations."  Compl. ¶ 84.

With these statements, Plaintiffs plausibly allege that officials were intent on effectuating the goal of President Trump—namely, to end the purportedly broken TPS program.  Such a conclusion is a natural inference of the Defendants' statements.  At this stage of the litigation, taken together, and reading the facts alleged in Plaintiffs' complaint in a light most favorable to Plaintiffs, the Court finds that Plaintiffs have sufficiently demonstrated that the Secretary made the decisions to terminate TPS for Honduras, Nepal, and Nicaragua well before she considered conditions in any of those countries.  Compl. ¶ 45; *Manzarek*, 519 F.3d at 1031 (the court must "accept[s] factual allegations in the complaint as true and construe[s] the pleadings in the light most favorable to the nonmoving party").

Accordingly, the Court denies Defendants' motion to dismiss Plaintiffs' claim that the Secretary's decision was arbitrary and capricious because her decision was preordained and pretextual rather than based on an objective review of the country conditions as required by the TPS statute and the APA.

> ii.     **Plaintiffs' Plausibly Allege that the Secretary's Ignored Intervening Country Conditions in Violation of the TPS Statute.**

24

United States District Court
Northern District of California

1    Plaintiffs' second claim under the APA is that the Secretary failed to consider any country

2    conditions that were not directly related to the reason for the initial designation, thereby (1)

3    contravening the statutory mandate to base TPS decisions on a fulsome review of country

4    conditions and (2) arbitrarily breaking with past practice.  ECF 121 at 11 (citing Compl. ¶¶ 40−42,

5    63, 68−69, 156(a)−(b)).  Defendants argue that 8 U.S.C. § 1254a(b)(3)(A) imposes no requirement

6    on the Secretary to consider events or conditions beyond those which gave rise to the initial

7    designation when conducting a periodic review.  ECF 128 at 11.  Plaintiffs argue that the

8    complaint sufficiently alleges that the TPS statute requires review of intervening country

9    conditions and that the Secretary's review was inconsistent with mandate of the statute.  ECF 121

10   at 12.

11   The Secretary must review the conditions within foreign states designated for TPS

12   periodically to determine, based on her findings, whether the conditions for such designation

13   continue to exist.  8 U.S.C. § 1254a(b)(3)(A)–(C).  After conducting a review and consulting with

14   the appropriate government agencies, if the Secretary determines that the conditions for a TPS

15   designation no longer exist, she must terminate the designation.  8 U.S.C. § 1254a(b)(3)(B).  The

16   conditions for designation must be severe enough that "the foreign state is unable, temporarily, to

17   handle adequately the return to the state of aliens who are nationals of the state.  *Id.* §

18   1254a(b)(1)(B)(ii).  Moreover, the requirement to consult is not an empty obligation; rather, a

19   consultation required by a statute means that there must be a "meaningful exchange of

20   information."  *Cal. Wilderness Coalition v. U.S. DOE*, 631 F.3d 1072, 1086 (9th Cir. 2011); *see*

21   *also id.* at 1088 (characterizing a statutory requirement to consult as an "'affirmative duty'" and

22   stating that the consultation must be "meaningful").  *See Lands Council v. Powell*, 395 F.3d 1019,

23   1026 (9th Cir. 2005) ("An agency's action is arbitrary and capricious if the agency fails to

24   consider an important aspect of a problem, if the agency offers an explanation for the decision that

25   is contrary to the evidence, if the agency's decision is so implausible that it could not be ascribed

26   to a difference in view or be the product of agency expertise, or if the agency's decision is

27   contrary to the governing law.").

28   The complaint alleges that the Secretary's decision was not based on the statutorily

25

required country conditions review, but instead limited the analysis to focus on positive improvements.  ECF 110 ¶ 50.  Plaintiffs allege that the "new selective country conditions research system put in place for period reviews" ignored entire categories of conditions that have previously been considered.  *Id.* ¶ 63.  Plaintiffs also point to the termination notices failure to address food insecurity in Nepal, staggering crime in Honduras, or humanitarian crisis in Nicaragua when describing the basis for terminating TPS.  *See* Compl. ¶¶ 63, 66−69.  The Secretary's omissions and explicitly narrow scope of review break with past agency practice in which the DHS has considered wholistically, the country conditions when engaging in the periodic review process.  Compl. ¶¶ 40−42; *see also Saget*, 375 F. Supp. 3d at 350 ("[T]he DHS Secretary, DHS, and USCIS had a longstanding practice of considering all country conditions when undertaking the mandatory periodic review under the statute, regardless of their relation to the originating condition."); *Ramos*, 336 F. Supp. 3d at 1093 ("Intervening factors arising after a country's original TPS designation … were considered relevant to determining whether a country continued to meet the conditions for continuing TPS designation.").  These allegations sufficiently allege that the Secretary, in violation of the APA, broke from prior practice without explanation.  Compl. ¶¶ 40−42, 63, 66−69; *see also Organized Vill. of Kake v. USDA*, 795 F.3d 956, 966 (9th Cir. 2015) (when an agency breaks with a long-standing past practice, it must "display[] 'awareness that it is changing position'" and provide "good reasons" for the new policy) (quoting *Fox Television Stations, Inc*., 556 US at 515−16).

Accordingly, the Court denies Defendants' motion to dismiss Plaintiffs' claim that the Secretary's decision was arbitrary and capricious as contrary to the TPS statute and as an unexplained departure from past agency practice.

### iii. Plaintiffs' Plausibly Allege that the Secretary Unlawfully Deviated from Past Agency Practice in Setting a 60-Day Transition Period.

Plaintiffs' next APA claim is that the Secretary failed to provide at least six-month orderly transition period in an unacknowledged and unexplained deviation from historical practice.  Compl. ¶¶ 4, 160.  Defendants argue that the Secretary complied with the statutory default 60-day transition period which was consistent with past agency practice and that the DHS's past practice

26

United States District Court
Northern District of California

1    is insufficiently "firm" to trigger the change-in-position doctrine.  ECF 110 at 17–18.  Plaintiffs

2    respond that they have adequately alleged that, for the past two decades, the prevailing practice of

3    prior administrations was to provide at least 6 months after TPS termination date for holders to

4    transition, and that the departure from such a practice required acknowledgement and explanation.

5    ECF 121 at 10.

6         As discussed above, under the APA, an agency must "display awareness" of, and "offer

7    good reasons" for, a departure from a "decades-old practice."  *Wages & White Lions Invs., L.L.C.*,

8    604 U.S. at 570.  Under *Wages and White Lion's* long-standing change-in-position doctrine, an

9    agency's "consistent practice, whether adopted expressly in a holding or established impliedly

10   through repetition, sets the baseline from which future departures must be explained."  *Id.* at 583–

11   84.  "The change-in-position doctrine asks two questions."  *Wages and White Lions, LLC*, 604 U.S.

12   at 569 (2025).  "The first is whether an agency changed existing policy."  *Id.*  Once a change in

13   agency position is identified, the doctrine poses a second question: Did the agency "display

14   awareness that it is changing position" and offer "good reasons for the new policy"?  *Id.*

15        Here, the complaint sufficiently provides twenty-two years (of TPS's thirty-five-year

16   history) of DHS's practice of setting an orderly transition period of six to eighteen months after

17   the issuance of a TPS termination notice.  Compl. ¶ 31.  In contrast, the Honduras and Nicaragua

18   termination notices only provide that "[a] sixty-day orderly period of transition is consistent with

19   the precedent of previous TPS country terminations and makes clear that the United States is

20   committed to clarity and consistency."  *See* 90 Fed. Reg. 30091, 30088.  Because these notices fail

21   to acknowledge or explain the departure from the decades-long practice of providing at least a 6-

22   month transition period, the Court finds that Plaintiffs have plausibly raised a claim under the

23   APA.  *See Encino Motorcars*, 579 U.S. at 222 ("It follows that an '[u]nexplained inconsistency' in

24   agency policy is 'a reason for holding an interpretation to be an arbitrary and capricious change

25   from agency practice.'").  Regarding Nepal, the TPS termination notice simply stated that "there is

26   no longer an environmental disaster or other situation causing substantial, but temporary,

27   disruption of living conditions and that Nepal can adequately handle the return of its nationals, and

28   considering other relevant factors, the Secretary has determined that a 60-day transition period is

sufficient and in accord with Executive Order 14159." 90 Fed. Reg. 24153.  The Secretary's

footnote alluding to "certain other TPS designations were terminated without allowing for an

extended transition period," *id*. at n.24, was insufficient to acknowledge and explain the departure

from the twenty-two-year practice of providing at least a 6-month transition period.  *See Encino*

*Motorcars*, 579 U.S. at 222 ("[T]he Department offered barely any explanation.  A summary

discussion may suffice in other circumstances, but here—in particular because of decades of

industry reliance on the Department's prior policy—the explanation fell short of the agency's duty

to explain why it deemed it necessary to overrule its previous position.").

Accordingly, the Court denies Defendants' motion to dismiss Plaintiffs' claim that the

Secretary's decision was arbitrary and capricious as an unexplained departure from past agency

practice.

### iv.    Plaintiffs' Plausible Allege that the Secretary's Termination Decision was Motivated by Racial Animus.

Finally, the complaint alleges that the Secretary's decision violated the Equal Protection

component of the Fifth Amendment because her decision was motivated, at least in part, by

intentional race- and national-origin-based animus.  Compl. ¶¶ 5, 164.  Defendants argue that the

rational basis test set forth in *Trump v. Hawaii* should govern Plaintiffs' claim and that under the

*Trump v. Hawaii* standard, Plaintiffs fail to state a claim.  ECF 110 at 19.  Plaintiffs assert that (i)

Plaintiffs state a plausible; claim of impermissible animus under *Arlington Heights*; and (ii)

Plaintiffs state a plausible claim of impermissible animus under *Trump v. Hawaii*.  ECF 121 at 13.

#### a.  *Arlington Heights* Governs Plaintiffs' Constitutional Claim

Defendants argue that because Plaintiffs' assertions implicate immigration policy, the

Court may not look behind the facially legitimate reasons offered for the termination decisions as

set forth in *Trump v. Hawaii*.  ECF 110 at 19 (citing *Trump v. Hawaii*, 585 U.S. 667, 703–04

(2018).  Plaintiffs argue that *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp*., 429 U.S. 252

(1977) provides the governing legal standard for their Equal Protection claim because Plaintiffs

allege that the Secretary's decisions were motivate by racial animus.  ECF 121 at 13.

*Trump v. Hawaii* involved the initial entry of foreign nationals.  In *Trump v. Hawaii*, the

United States District Court
Northern District of California

United States District Court
Northern District of California

1  Supreme Court reviewed an Equal Protection claim challenging an executive order issued by

2  President trump restricting entry by foreign nationals from specified, majority-Muslim counties.

3  *Hawaii*, 585 U.S. at 673–77.  The Supreme Court applied rational basis review to this claim

4  because the subject matter of the case involved immigration and the area of national security.  *Id.*

5  at 703.  Unlike, *Hawaii*, the Secretary's TPS decisions here apply largely to foreign nationals who

6  are *already physically present* in the United States.  Foreign nationals who are physically present

7  in the United States may state a claim for violation of the Equal Protection component of the Fifth

8  Amendment.  *See Kwai Fun Wong v. United States*, 373 F.3d 952, 970–73 (9th Cir. 2004); *see*

9  *also Plyler v. Doe*, 457 U.S. 202, 210 (1982) ("Indeed, we have clearly held that the Fifth

10  Amendment protects aliens whose presence in this country is unlawful from invidious

11  discrimination by the Federal Government." (citing *Mathews*, 426 U.S. at 77)).

12        In contrast to *Trump v. Hawaii*, *Arlington Heights* involved the application of the Fifth

13  Amendment to individuals in the United States.  In *Arlington Heights*, a board of trustee's denial

14  of low and moderate-income housing was found to be motivated by racial discrimination.  429

15  U.S. at 258–59.  The Supreme Court held that a violation of the Fifth Amendment's Equal

16  Protection Clause requires "[p]roof of racially discriminatory intent or purpose" and that a plaintiff

17  need not "prove that the challenged action rested solely on racially discriminatory purposes." 429

18  U.S. at 265.  The Supreme Court recognized that a court's analysis into "whether invidious

19  discriminatory purpose was a motivating factor demands a sensitive inquiry into such

20  circumstantial and direct evidence of intent as may be available."  *Id.* at 266.

21        Here, because the Secretary's TPS terminations involves individuals already physically

22  present in the United States and because Plaintiffs allege that the Secretary's decisions were

23  motivated by racial animus, the Court applies the *Arlington Heights* standard.  Indeed, the

24  "application of the Arlington Heights framework is appropriate to evaluate whether plaintiffs

25  plead discriminatory animus." *La Clinica de la Raza v. Trump,* 706 F. Supp. 3d 903, 931 (N.D.

26  Cal. 2020)*; Adarand Constructors, Inc. v. Peña*, 515 U.S. 200, 227 (1995) ("[A]ll racial

27  classifications, imposed by whatever federal, state, or local governmental actor, must be analyzed

28  by a reviewing court under strict scrutiny."); *see also DHS v. Regents of Univ. of Cal.*, 591 U.S. 1,

United States District Court
Northern District of California

1  34-35 (2020) (applying the *Arington Heights* factors to plaintiffs' Equal Protection claim).

2  Plaintiffs specifically allege that the Secretary's Nepal, Honduras, and Nicaragua TPS

3  terminations were motivated by racial animus.  *See* Compl. ¶¶ 86– 94, 95–128, 156.  These

4  allegations implicate the Court's heightened scrutiny under *Arlington Heights*. *See Regents of the*

5  *Univ. of California*, 591 U.S. at 34 ("To plead animus, a plaintiff must raise a plausible inference

6  that an 'invidious discriminatory purpose was a motivating factor" in the relevant decision.'")

7  (quoting *Arlington Heights*, 429 U.S. at 266).  Therefore, the Court finds that the *Arlington*

8  *Heights* standard governs.

9  **b.  Plaintiffs Allege Sufficient Facts to State a Claim Under the Governing Standard in *Arlington Heights***

10

11  Defendants argue that, even under *Arlington Heights*, the Secretary's terminations were

12  consistent with the TPS statute because she made an informed judgment that the conditions for

13  designation under the statute were no longer met.  ECF 110 at 22.  Plaintiffs argue the complaint

14  sufficiently alleges animus toward similarly situated racial groups.  ECF 121 at 16–19.

15  "Under *Arlington Heights*, a plaintiff must 'simply produce direct or circumstantial

16  evidence demonstrating that a discriminatory reason more likely that not motivated' the defendant

17  and that the defendant's actions adversely affected the plaintiff in some way."  *Ave. 6E Invs., LLC*

18  *v. City of Yuma, Ariz*., 818 F.3d 493, 504 (9th Cir. 2016) (internal quotations omitted).  "A

19  plaintiff does not have to prove that the discriminatory purpose was the sole purpose of the

20  challenged action, but only that it was a 'motivating factor.'"  *Id.*  "The court analyzes whether a

21  discriminatory purpose motivated the defendant by examining the events leading up to the

22  challenged decision and the legislative history behind it, the defendant's departure from normal

23  procedures or substantive conclusions, and the historical background of the decision and whether

24  it creates a disparate impact."  *Id.*

25  Plaintiffs sufficiently allege a claim under the Fifth Amendment that Secretary Noem, and

26  other officials in this administration, held animus against immigrants covered by the TPS program.

27  In a January 29, 2025, post on X, Secretary Noem announced that she would end a Biden order

28  that allowed Venezuelans to stay in the country and "violate our laws."  Compl. ¶ 75 .  In a March

United States District Court
Northern District of California

20, 2025, post on X, Secretary Noem associated "migration management" with "sav[ing] American lives and get[ting] criminals off our streets!"  *Id.* ¶ 94.  In a May 19, 2025, post on X, DHS equated TPS holders with "MS-13 gang members," "known terrorists," and "murderers."  *Id.* ¶ 91.  These statements are consistent with similar statements by President Trump including one occurrence in which he stated that migrants were "poisoning the blood of our country."  *Id.* ¶ 97.  (President Trump asking why people "could not come from nice countries . . . like Denmark, Switzerland, and Norway"); *see id.* ¶ 98 (President Trump "How about allowing people to come to an open border . . . many of them murdered far more than one person, and they're now happily living in the United States.  You know now a murderer, I believe this, it's in their genes. And we got a lot of bad genes in our country right now."); *see also id.* ¶ 86 (Secretary Noem describing immigration as an "invasion happening on purpose . . . to remake the foundation of this country").

These statements reflect a stereotyping of the immigrants protected under the TPS program as criminal invaders and perpetuate the discriminatory belief that certain immigrant populations will replace the white population.  ECF 17-20 ¶ 19; *see Nat'l TPS All.*, 773 F. Supp. 3d at 860 ("Acting on the basis of a negative group stereotype and generalizing such stereotype to the entire group is the classic example of racism."); *Korematsu*, 323 U.S. 233, 235 (1944) (Murphy, J., dissenting) (characterizing the majority decision upholding the mass internment of Japanese Americans as falling into the "ugly abyss of racism"; noting that the "forced exclusion [of Japanese Americans] was the result in good measure of the erroneous assumption of racial guilt . . .").  Here, Plaintiffs' constitutional claim survives Defendants' motion to dismiss because the facts set forth in their complaint "raise a plausible inference that an 'invidious discriminatory purpose was a motivating factor'" for the Secretary's decisions.  *Regents*, 591 U.S. at 34 (quoting *Arlington Heights*, 429 U.S. at 266).  Defendants' argument that the Court should not consider the statements of officials other than the Secretary because they are irrelevant and concern the "discriminatory motive" of "different government official[s]" is unavailing as they provide circumstantial evidence of the Secretary's decision-making process.  *Arlington Heights,* 429 U.S. at 266−69 (considering statements by decisionmakers and other circumstantial evidence of discriminatory intent).

1    Accordingly, under *Arlington Heights*, the Court finds that Plaintiffs have stated a claim

2    upon which relief may be granted, and the Court denies Defendants' motion to dismiss for failure

3    to state a claim.

4          **c.  Plaintiffs Allege Sufficient Facts to State a Claim Under *Trump v. Hawaii***

5    Defendants argue that the Secretary's decisions are legally sufficient under *Trump v.*

6    *Hawaii*.  ECF 110 at 19.  Plaintiffs argue that, even under *Trump v. Hawaii*'s rational basis

7    standard, the Secretary's invocation of racist tropes reveal that her decision was not rationally

8    related to the stated goal.  ECF 121 at 15 (citing *Hawaii*, 585 U.S. at 704−05).

9    As discussed above, the Court finds that *Arlington Heights* applies to Plaintiffs' claims.

10   However, even if the Court evaluated the complaint under the standard articulated in *Trump v.*

11   *Hawaii,* the claims are still sufficient.

12   *Trump v. Hawaii* involved the President's proclamation that "placed entry restrictions on

13   the nationals of eight foreign states whose systems for managing and sharing information about

14   their nationals the President deemed inadequate."  585 U.S. at 677.  The Supreme Court limited

15   the Court's review of "any rule of constitutional law that would inhibit the flexibility of the

16   President to respond to changing world conditions."  585 U.S. at 704.  *Trump v. Hawaii*,

17   constrains the Court's "inquiry into matters of entry and national security," and Defendants fail to

18   explain how the Secretary's TPS terminations concern matters of entry and national security.  585

19   U.S. at 667.  *Trump v. Hawaii* concerned the exclusion of non-citizens from abroad, where the

20   government's immigration powers are at their greatest.  585 U.S. at 705 n.5 ("such a

21   circumscribed inquiry applies to any constitutional claim concerning the entry of foreign

22   nationals").  Although "[t]he President has vital power in the field of foreign affairs, so does

23   Congress, and the President does not have the authority to override immigration laws enacted by

24   Congress."  *Biden v. Texas*, 597 U.S. 785, 830 (2022) (Alito, J., dissenting).

25   Here, Plaintiffs sufficiently allege a claim under *Trump v. Hawaii* because decisions about

26   the rights afforded to TPS holders based on negative racial stereotypes is completely divorced

27   from any "facially legitimate and bona fide" reason.  *Hawaii*, 585 U.S. at 703; *see id.* at 706

28   (finding that agency action does not survive rational basis review if the Court cannot "discern a

United States District Court
Northern District of California

32

United States District Court
Northern District of California

relationship to legitimate state interests" or if the action is "inexplicable by anything but animus."). Instead, Congress enacted the TPS program to formalize humanitarian protections and offer relief to nonimmigrants from foreign states which are not able to adequately house is nationals. *See NTPSA I,* 150 F.4th at 1008. In light of this goal, the Secretary may not take steps that are contrary to the express or implied will of Congress or the mandates of the federal constitution. *Id.* (citing *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952)) ("[W]hen the President takes measures incompatible with the expressed or implied will of Congress, his power is at its lowest ebb, for then he can rely only upon his own constitutional powers minus any constitutional powers of Congress over the matter.").

Accordingly, under *Trump v. Hawaii* the Court finds that Plaintiffs have plausible stated a claim upon which relief may be granted, and the Court denies Defendants' motion to dismiss for failure to state a claim.

* * *

For the reasons stated above, the Court finds that Plaintiffs have alleged facts that, when read in favor of Plaintiffs, plausibly state claims under the APA and the federal constitution consistent with the pleading standard required by Rule 8(c). Accordingly, the Court denies Defendants' motion to dismiss under Rule 12(b)(6).

## IV.    MOTION TO EXCLUDE EXPERT TESTIMONY

Defendants seek to exclude the testimony of Elliott Young, Stacy Tolchin, Hannah Postel, Melanie Morten, Tara Watson, Tom Wong, and Dana Frank. ECF 143.

Federal Rule of Evidence 702 allows a qualified expert to testify "in the form of an opinion or otherwise" where:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

*Id.*

In determining whether the requirements of Rule 702 are met, Courts follow the approach

set forth in *Daubert v. Merrell Dow Pharms., Inc.*:

> [T]he trial judge must determine . . . whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue. This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue.

509 U.S. 579, 590 (1993). The "scientific knowledge" requirement concerns the reliability of an expert's opinion and can met by "[e]stablishing that an expert's proffered testimony grows out of pre-litigation research or that the expert's research has been subjected to peer review." *Daubert v. Merrell Dow Pharmaceuticals, Inc*., 43 F.3d 1311, 1318 (9th Cir. 1995); *see Kumho Tire Co*., *Ltd v. Carmichael*, 26 U.S. 137, 147 (1999) ("[T]he Rule applies its reliability standard to all 'scientific,' 'technical,' or 'other specialized' matters within its scope."). Rule 702's second requirement, that an expert will "assist the trier of fact to understand or determine a fact in issue," "means that the evidence will assist the trier of fact to understand or determine a fact in issue." *Cooper v. Brown*, 510 F.3d 870, 942 (9th Cir. 2007); *see Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010) ("The requirement that the opinion testimony assist the trier of fact goes primarily to relevance.") (internal quotation omitted).

### A.    Dr. Elliot Young's Testimony is Admissible under Rule 702

Defendants argue that Dr. Young's expert report and testimony should be excluded because he (1) is unreliable and (2) not relevant to the issues on summary judgment. ECF 143.

### 1.  Dr. Young's Expert Opinion is Reliable

Defendants argue that Dr. Young is not qualified to provide an expert opinion on TPS holders and the current country conditions in Honduras and Nicaragua because his report includes overly broad statistics, cites non-dispositive statutes, and does not provide evidentiary support or data on the number of individuals denied initial or renewal of TPS based on criminal activity. ECF 143 at 11–13. Defendants also argue that Dr. Young does not have experience in economics and is not an expert in country conditions in Honduras and Nicaragua. *Id*. at 12–13. Plaintiffs argue that Defendants "misconstrue[] the purpose of [Dr. Young's] testimony" and "Dr. Young's discussion of country conditions casts doubt on Defendants' motivations." ECF 168 at 12–13.

Expert opinions are "reliable if the knowledge underlying it has a reliable basis in the knowledge and experience of the relevant discipline." *City of Pomona v. SQM North America Corp.*, 750 F.3d 1036, 1044 (9th Cir. 2014). "The district court is not tasked with deciding whether the expert is right or wrong, just whether his testimony has substance such that it would be helpful to a jury." *Alaska Rent-A-Car, Inc. v. Avis Budget Group, Inc.*, 738 F.3d 960, 969–70 (9th Cir. 2013).

Here, Dr. Young relies on his personal and professional knowledge to conclude that "[t]he statements made by President Trump, DHS Secretary Noem, and other Trump administration officials about Central American migrants, including TPS holders, can be understood in the context of a long history of the use of similar statements about disfavored immigrant groups to justify restrictive immigration laws." ECF 168-6 ¶¶ 2–6; 47.

To the extent Defendants challenge Dr. Young's expertise, the Court finds that Dr. Young is qualified to opine on how the debate over TPS for Honduras and Nicaragua, and more broadly the debate over TPS generally, reflects the history of racism in immigration policy debates in the United States. As Plaintiffs concede, Dr. Young's opinions on country conditions provides context to the larger issue of Defendants' motivations for terminating TPS. ECF 168 at 12–13. Notably, Dr. Young is a Professor of History at Lewis & Clark College, where he has "taught Latin American and immigration history for more than 27 years, and was director of Latin American Studies for more than a decade." *Id.* ¶ 7. He has served as chair of the History department; director of Ethnic Studies; co-director of the Stanford Migration & Asylum Lab; co-author of the 2023 Honduras Country Conditions Bulletins; and is currently editing a 2025 Nicaragua Country Conditions Bulletin. *Id.*; *see Kumho Tire Co., Ltd v. Carmichael*, 526 U.S. 137, 150 (1999) ("[T]he relevant reliability concerns may focus upon personal knowledge or experience. As the Solicitor General points out, there are many different kinds of experts, and many different kinds of expertise."). Dr. Young has also authored articles that have appeared in scholarly journals, founded the Nicaragua Country Conditions Bulletin, and is the founder and director of the Migration Scholar Collaborative. ECF 168-6 ¶¶ 9, 12.

To the extent Defendants challenge Dr. Young's methodology, Defendants improperly

35

challenge the weight rather than the inadmissibility of Dr. Young's expert opinion. *See Alaska Rent-A-Car, Inc.*, 738 F.3d at 970 ("Avis challenges three aspects of the witness's testimony: using Alamo as the comparator, using the national rather than the Alaska market as a baseline, and extrapolating from the Juneau market to the entire Alaska market. . . . They all go to the weight of the testimony and its credibility, not its admissibility.").   Indeed, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 596 (1993).

Accordingly, the Court denies Defendants' motion to exclude Dr. Young's expert opinion to the extent Defendants argue that Dr. Young's expert opinion is unreliable.

### 2. Dr. Young's Expert Opinion is Relevant to the Issues on Summary Judgment

Defendants argue that Dr. Young's claim that he has always been found to be an expert by immigration courts is not dispositive to this Court's determination.  ECF 143 at 13. Defendants also argue that Dr. Young's testimony is irrelevant as to whether the Secretary lawfully exercised her authority to terminate TPS for Honduras and Nicaragua.  *Id.* at 18–19. Plaintiffs argue that Dr. Young's testimony provides historical context surrounding the Secretary's statements.  *See* ECF 168 at 9–12; ECF 184 at 3.

The Court agrees that Dr. Young's opinion on "how the debate over Temporary Protected Status (TPS) for Honduras and Nicaragua, and more broadly the debate over TPS generally, reflects the history of racism in immigration policy debates in the United States" is relevant to Plaintiffs' equal protection claim.  Defendants seek summary judgment on Plaintiffs' equal protection claim, arguing that Plaintiffs fail to show a discriminatory animus.  ECF 142 at 19–20. Plaintiffs argue that summary judgment is not warranted because a genuine issue of material fact precludes summary judgment.  ECF 167 at 20; *see id*. ("Defendants still argue Secretary Noem's statements and actions were non-discriminatory and that her termination decisions were based only on the statutorily required review of country conditions . . . while Plaintiffs contend— supported by extensive expert testimony and a growing record—that her statements and actions

36

reveal impermissible animus.").  Because the parties actively dispute whether the Secretary's statements were motivated by racial animus, Dr. Young's opinion on the topic of racial animus is relevant to the issues before this Court.  *See City of Pomona*, 750 F.3d at 1044 ("Expert opinion testimony is relevant if the knowledge underlying it has a valid connection to the pertinent inquiry.") (internal quotations omitted); *In re Viagra (Sildenafil Citrate) and Cialis (Tadalafil) Prod. Liab. Litig.*, 424 F. Supp. 3d 781, 789 (N.D. Cal. Jan. 13, 2020) ("[T]he expert testimony must 'fit' the question the jury must answer . . . This bar is cleared where the evidence 'logically advances a material aspect of the proposing party's case.'") (internal citations and quotations omitted).

Accordingly, the Court denies Defendants' motion to exclude Dr. Young's expert opinion to the extent Defendants argue that the opinion on how the debate over Temporary Protected Status (TPS) for Honduras and Nicaragua, and more broadly the debate over TPS generally, reflects the history of racism in immigration policy debates in the United States" is irrelevant to the Court's analysis.  However, as Plaintiffs concede, Dr. Young's expert opinion on the country conditions of Honduras and Nicaragua shall be limited to the extent Dr. Young opines on how "country conditions cast doubt on Defendants' motivations."  ECF 168 at 13.

### B. Plaintiffs Concede that the Court Need Not Consider Stacy Tolchin, Hannah Postel, Melanie Morten, Tara Watson, Tom Wong, and Dana Frank Expert Reports

During oral argument, Plaintiffs conceded that the Court need not consider the expert reports of Stacy Tolchin, Hannah Postel, Melanie Morten, Tara Watson, Tom Wong, and Dana Frank.  *See also* ECF 184 at 1 ("Plaintiffs are not relying on Dr. Wong's declaration for their summary judgment motion, and the Court does not need to consider his declaration to resolve the MSJ."); *id.* at 2 ("Plaintiffs do not contend this Court must analyze the consequences of terminating TPS to resolve the pending summary judgment motions.").

Accordingly, the Court grants Defendants' motion to exclude expert testimony to the extent Defendants seek to exclude the expert reports Stacy Tolchin, Hannah Postel, Melanie Morten, Tara Watson, Tom Wong, and Dana Frank.

## V.    MOTIONS FOR SUMMARY JUDGMENT

### A.    Legal Standard

Federal Rule of Civil Procedure 56 provides that a "court shall grant summary judgment [to a moving party] if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  An issue of fact is genuine only if there is sufficient evidence for a reasonable jury to find for the nonmoving party. *See Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248-49 (1986).  "The mere existence of a scintilla of evidence . . . will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Id.* at 252.  At the summary judgment stage, evidence must be viewed in the light most favorable to the nonmoving party and all justifiable inferences are to be drawn in the nonmovant's favor. *See id.* at 255.

Where a plaintiff moves for summary judgment on claims that it has brought (i.e., for which it has the burden of proof), it "must prove each element essential of the claims . . . by undisputed facts." *Cabo Distrib. Co. v. Brady*, 821 F. Supp. 601, 607 (N.D. Cal. 1992); *see also Fontenot v. Upjohn Co*., 780 F.2d 1190, 1194 (5th Cir. 1986) (stating that, "if the movant bears the burden of proof on an issue, either because he is the plaintiff or as a defendant he is asserting an affirmative defense, he must establish beyond peradventure all of the essential elements of the claim or defense to warrant judgment in his favor") (emphasis omitted).

Where a defendant moves for summary judgment based on a claim for which the plaintiff bears the burden of proof, the defendant need only point to the plaintiff's failure "to make a showing sufficient to establish the existence of an element essential to [the plaintiff's] case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

### B.    Discussion

Plaintiffs seek summary judgment on Plaintiffs' claims that Secretary's TPS termination decisions violate the APA because the Secretary (1) executed a preordained, political decision and (2) ignored intervening crisis as required by 8 U.S.C. § 1254a(b)(3)(A).  ECF 144 at 21. Defendants move for cross summary judgment on both claims raised by Plaintiffs, and additionally seek summary judgment on Plaintiffs' claims that the Secretary's decisions (1)

38

United States District Court
Northern District of California

violated the APA by providing only a 60-day orderly transition period, and (2) violated the constitution because the decisions were motivated by racially discriminatory intent or purpose. ECF 142 at 18.

### 1. The Secretary's Terminations of TPS for Honduras, Nicaragua, and Nepal Were Preordained and Not Based on Interagency Consultation or Country Conditions Review

Plaintiffs' first claim under the APA is that the Secretary did not comply with the TPS statute's requirement that TPS decisions be made after interagency consultation and an objective review of the country conditions. ECF 144 at 16. Plaintiffs argue that the Court should grant summary judgment on Plaintiffs' first APA claim because Defendants (a) made a preordained decision to terminate TPS and (b) did not base their termination decisions on interagency consultation or country conditions review. ECF 144 at 14–18. Defendants argue that summary judgment should be granted in Defendants' favor because Secretary's termination decisions were consistent with the TPS statute and based on a proper review of the necessary facts. ECF 142 at 12–18; ECF 166 at 6.

The APA provides that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702. "Courts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority, as the APA requires." *Loper Bright Enters*, 603 U.S. at 412. The APA also requires Courts to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(a). 8 U.S.C. § 1254a(b)(3)(A) requires the Secretary to make a determination of a country's TPS designation "*after* consultation with appropriate agencies" and upon "review of the conditions in the foreign state." Moreover, the Supreme Court has held that agencies must offer the true reason for a decision. "The reasoned explanation requirement of administrative law … is meant to ensure that agencies offer genuine justifications for important decisions, reasons that can be scrutinized by courts and the interested public. Accepting contrived reasons would defeat the purpose of the enterprise." *Dep't of Com.*, 588 U.S. at 785. TPS decisions that are "preordained" or based on

1   "political influence," rather than country conditions, violate the APA.  *See Saget*, 375 F. Supp. 3d

2   at 345–46 (quoting 5 U.S.C. § 706(2)(A)).

3         The Court agrees that the Secretary's Honduras, Nicaragua, and Nepal TPS termination

4   decisions were preordained.  Before reviewing any country conditions reports, the Secretary, at her

5   confirmation hearing, categorized TPS as a program that had "been abused and manipulated by the

6   Biden administration" at stated that the program "will no longer be allowed . . . these extensions

7   going forward the way that they are."  ECF 145-2 at 104.  After assuming her role as Secretary,

8   and during an interview with NewsNation, the Secretary promised that "when the president gives a

9   directive, the Department of Homeland Security will follow it and we're going to make sure that

10  those who come in under a program . . ."  ECF 145-6.  That directive was to terminate TPS.

11        Indeed, according to President Trump, "you have to remove the people . . .we cannot

12  destroy our country . . . . You have to remove the people, and you have to bring them back to their

13  own country. . . I'd revoke [TPS], and I'd bring them back to their country."  ECF 145-3 at 14–16;

14  *see also* ECF 145-4 at 2 (Vice President Vance stating, "[w]e're going to stop doing mass grants

15  of Temporary Protected Status.").  These sentiments were later etched into the Invasion EO, which

16  claimed an "unprecedented flood of illegal immigration into the United States" and ordered the

17  Secretary to "rescind the policy decisions of the previous administration that led to the increased

18  or continued presence of illegal aliens in the United States, and align any and all departmental

19  activities with the policies set out by this order and the immigration laws."  90 Fed. Reg. 8443.

20        The Secretary's statements after taking office further show a bias against TPS.  DHS stated

21  that, by vacating or partially vacating TPS, it was "restoring integrity in our immigration system

22  and ensuring that TPS remains temporary," and fulfilling "President Trump's promise to rescind

23  policies that were magnets for illegal immigration and inconsistent with the law."  ECF 145-4;

24  ECF 145-13.  DHS also issued a press release that said, "[f]or decades the TPS systems has been

25  exploited and abused." ECF 145-5.  According to DHS, a termination of TPS "is part of President

26  Trump's promise to rescind policies that were magnets for illegal immigration and inconsistent

27  with the law."  *Id.*  On May 19, 2025, less than a month before Nepal's TPS termination notice

28  was posted and approximately two months before Honduras and Nicaragua's TPS termination

United States District Court
Northern District of California

40

1  notices were posted, DHS posted on social media: "The Biden Administration exploited

2  Temporary Protected Status to let half a million poorly vetted migrants into this country – from

3  MS-13 gang members to known terrorists and murderers."  ECF 145-14.

4       The Secretary's decision-making processes further demonstrate that her termination

5  decisions were preordained.   Notably, for Honduras and Nicaragua, the Secretary drafted her

6  decision memos ("DM") terminating TPS *before* receiving updated country conditions reports

7  from the Department of State.  *See* ECF 176-22 at 3 ("[T]he DM is now ready to go . . . We did

8  not receive a recommendation from DOS. You are correct that DOS will not provide country

9  conditions anymore."); *see also* ECF 145-21 ("I wanted to check in on about COI for Nicaragua

10  and Honduras.  We are currently prepping both DMs to circulate this week, but I am not sure we

11  have the COI from RRU. . .Do you have an ETA?"); *compare* ECF 145-31 (decision memos

12  written by April 7) *with* ECF 145-21 (DHS personnel acknowledging lack of country conditions

13  information on April 8).  In the case of Nepal, Defendants recognized they lacked "an updated

14  DOS report," ECF 145-35, and downplayed the importance of the report because it supported their

15  desired result: "the recommendation was to terminate so we should move forward."  ECF 176-20;

16  *see* ECF 63; ECF 64 (CAR indices for Nepal and Nicaragua, lacking any contemporaneous State

17  Department country conditions analysis or recommendation letter).  The Secretary's failure to

18  consult with the Department of State before deciding whether to terminate TPS directly conflicts

19  with the TPS statute, which specifically requires that, when conducting a periodic review of a

20  designated country's conditions, that the Secretary reach her decision, "*after* consultation with

21  appropriate agencies of the Government."  8 U.S.C. § 1254a(b)(3)(A) (emphasis added).  Failure

22  to comply with the TPS statute violates the APA.  *See Lands Council*, 395 F.3d at 1026 ("An

23  agency's action is arbitrary and capricious . . . if the agency's decision is contrary to the governing

24  law.").

25       The record reflects that the Secretary relied on skewed data to terminate TPS for Honduras,

26  Nicaragua, and Nepal.  In requesting country conditions reports, DHS personnel requested revised

27  reports that "only include[d] around 1 page of country conditions" and "[i]nclude[d] any

28  improvements" without "mention[ing] environmental concerns or climate change."  ECF 176-2.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    Researchers had their team "revise the reports for Nepal, Honduras, Nicaragua, and Haiti to make

2    them consistent with [these] new guidelines." *Id.* DHS personnel also added a "national interest

3    analysis" based on "data/analysis."   ECF 176-33 at 6 ("OP&S is working on improving the TPS

4    decision memos and we are adding a national interest analysis . . . . We are wanting to provide

5    data/analysis in our TPS decision memo."); *id.* ("We'd like to request another analysis . . . [t]his

6    time it's for Cameroon and Nepal.").  However, as described by policy analysists, this "data"

7    involved "[s]uch a LOW number of fraud" for Nepal that "[i]t's so laughable that it's even in the

8    paper." ECF 176-33 at 2; *see id.* (showing 1 "Found Fraud" out of 12,859 total for Nepal).  DHS

9    personnel sought the "same type of data" analysts provided for Nepal, "but this time for

10   Honduras and Nicaragua." ECF 176-34 at 5.

11          After receiving this data, DHS personnel contemplated how to explain their TPS

12   terminations: "[t]he problem is if we sing the praises of Honduras (which we certainly do), then it

13   calls into question why we're also terminating the program in Nicaragua, with its murderous,

14   dictatorial regime.  Which in turn might open us up to questions about why we're terminating for

15   both countries when the conditions on the ground are so much better in Honduras." ECF 176-11.

16          Collectively, and in exercising its "independent judgment in deciding whether [the

17   Secretary] acted within [her] statutory authority," the Court finds that Plaintiffs have provided

18   sufficient evidence to demonstrate that the Secretary terminated TPS for Nepal, Honduras, and

19   Nicaragua based on a pre-ordained decision to limit TPS.  *See Loper Bright*, 603 U.S. at 412.  The

20   record specifically reflects that, before taking office, the Secretary made a pre-ordained decision to

21   end TPS and influenced the conditions review process to facilitate TPS terminations for Honduras,

22   Nicaragua, and Nepal.  *See Dep't of Commerce v. N.Y.*, 588 U.S. 752, 782–83 (2019) ("The

23   evidence showed that the Secretary was determined to reinstate a citizenship question from the

24   time he entered office; instructed his staff to make it happen; waited while Commerce officials

25   explored whether another agency would request census-based citizenship data; subsequently

26   contacted the Attorney General himself to ask if DOJ would make the request; and adopted the

27   Voting Rights Act rationale late in the process."); *Saget v. Trump*, 379 F. Supp. 3d 280, 347

28   (E.D.N.Y. 2019) ("Plaintiffs have proffered significant evidence showing Acting Secretary Duke,

42

1    DHS, USCIS, and the Department of State reverse engineered the TPS review process to achieve a

2    desired political outcome: the termination of Haiti's TPS. Such an outcome-determinative process

3    violates the mandatory periodic review process of the TPS statute.")

4        Accordingly, the Court grants Plaintiffs' motion for partial summary judgment on their

5    first APA claim that the Secretary's decision was arbitrary and capricious because her decision

6    was preordained and not based on an objective review of the country conditions, after consultation

7    with the appropriate interagency department, as required by the TPS statute and the APA. The

8    Court denies Defendants' motion for summary judgment to the extent that Defendants seek

9    summary judgment on Plaintiffs' first APA claim.

> ## 2. The Secretary's Terminations of TPS for Honduras, Nicaragua, and Nepal Were Contrary to Law for Failing to Take into Account Intervening Conditions

12    Plaintiffs argue that the Secretary failed to consider conditions beyond those related to the

13   crisis that triggered the TPS designation in assessing the countries improvements. ECF 144 at 20.

14   Defendants argue that the Secretary is limited to consideration of the conditions which gave rise to

15   the original TPS designation. ECF 142 at 13. Plaintiffs respond that the TPS statute and the

16   APA's change-in-position doctrine required the Secretary to provide a reason for ignoring

17   intervening country conditions. ECF 175 at 15.

18    8 U.S.C. § 1254a(b)(3)(A) provides that, on periodic review, the Secretary, "after

19   consultation with appropriate agencies of the Government, shall review the conditions in the

20   foreign state . . . for which a designation is in effect under this subsection and shall determine

21   whether the conditions for such designation continue to be met." If she determines the foreign

22   state "no longer continues to meet the conditions for designation," she "shall terminate" the

23   designation. *Id*. § 1254a(b)(3)(B). If she "does not determine … that a foreign state … no longer

24   meets the conditions for designation under paragraph (1), the period of designation of the foreign

25   state is extended." *Id*. § 1254a(b)(3)(C).

26    The parties dispute whether the language in § 1254a(b)(3)(A) which requires the Secretary,

27   in conducting a periodic review, to "determine whether the conditions for such designation . . .

28   continue to be met" requires the Secretary to consider factors beyond those which gave rise to the

43

1   initial designation.  *Compare* ECF 144 at 21 *with* ECF 166 at 17.  The Court, therefore, must

2   engage in statutory construction to resolve the parties' dispute.

3        Beginning with the language of the statute, the Court finds that the TPS statute's periodic

4   review provision, which requires the Secretary to "determine whether the conditions for *such*

5   designation . . . continue to be met," contains genuine ambiguity.  8 U.S.C. § 1254a(b)(3)(A)

6   (emphasis added); *compare* ECF 144 at 21 *with* ECF 166 at 17.  "A statute is ambiguous . . . if it is

7   subject to more than one reasonable interpretation."  *John v. United States*, 247 F.3d 1032, 1042

8   (9th Cir. 2001).  Here, the phrase "such designation" in 8 U.S.C. § 1254a(b)(3)(A) is subject to

9   more than one reasonable interpretation—whether the language refers to the initial designation or

10  to the broader TPS designation is not quickly discernable from the text itself.

11       The Court, therefore, must look to the statuary scheme and legislative purpose in

12  determining whether 8 U.S.C. § 1254a(b)(3)(A) requires the Secretary to consider factors beyond

13  that which gave rise to the initial designation when conducing a periodic review.  *See Hernandez*

14  *v. Williams, Zinman & Parham PC*, 829 F.3d 1068, 1073 (9th Cir. 2016) ("But if the plain

15  meaning of the statutory text remains unclear after consulting internal indicia of congressional

16  intent, we may then turn to extrinsic indicators, such as legislative history, to help resolve the

17  ambiguity.") (quotations and citations omitted); *King v. Burwell*, 576 U.S. 473, 492, (2015)

18  ("Given that the text is ambiguous, we must turn to the broader structure of the Act to determine

19  the meaning of [the provision at issue].").  The Court's "duty is to find that interpretation which

20  can most fairly be said to be imbedded in the statute, in the sense of being most harmonious with

21  its scheme and with the general purposes that Congress manifested."  *United States v. Sagg*, 125

22  F.3d 1294, 1295 (9th Cir. 1997).  Under *Loper Bright*, the Court "must exercise [its] independent

23  judgment in deciding whether an agency has acted within its statutory authority, as the APA

24  requires."  603 U.S. at 412. "Courts need not and under the [Administrative Procedure Act] may

25  not defer to an agency interpretation of the law simply because a statute is ambiguous.  *Id.* at 413.

26       In reviewing the statutory scheme and legislative purpose of the TPS statute, the Court

27  finds that interpreting "such designation" in 8 U.S.C. § 1254a(b)(3)(A) to mean the broader TPS

28  designation—not the initial designation—is most harmonious with the TPS scheme and general

United States District Court
Northern District of California

purpose of TPS.  "In enacting the TPS statute [in 1990], Congress designed a system of temporary status that was predictable, dependable, and insulated from electoral politics."  *Nat'l TPS All.*, 150 F.4th at 1008–1010.  Congress sought to replace "the Executive's prior ad hoc framework for providing relief to nationals of certain designated countries," which lacked transparency and clear criteria and was susceptible to "'the vagaries of our domestic politics.'"  *Id.* (quoting 135 Congr. Rec. H7501 (daily ed. Oct. 25, 1989)).  The TPS statute created a framework whereby the DHS Secretary may designate a foreign state for TPS when nationals of that state cannot return there safely.  *Id.* at 110.  Since the creation of the statute, DHS has "a longstanding practice of considering *all country conditions* when undertaking the mandatory periodic review under the statute, regardless of their relation to the originating condition."  *Saget*, 375 F. Supp. 3d at 350.  In fact, "[i]ntervening factors arising after a country's original TPS designation … were considered relevant to determining whether a country continued to meet the conditions for continuing TPS designation."  *Ramos*, 336 F. Supp. 3d at 1093.

Interpretation of 8 U.S.C. § 1254a(b)(3)(A) to mean the broader TPS designation is also consistent with the humanitarian purpose of the TPS Statute.  Congress committed its mission of humanitarian relief by creating TPS.  Since the mid-twentieth century, "every Administration since and including that of President Eisenhower has permitted one or more groups of otherwise deportable [foreign nationals] to remain temporarily in the United States out of concern that . . . forced repatriation . . .  could endanger their lives or safety."  H.R. Rep. No. 100-627, at 6 (1988).  Over the past three decades, this nation's leaders have chosen to pick up the mantle and protect those in need of aid.[2]

---

[2] The TPS program is described in the Humanitarian page of USCIS's website: "The Secretary of Homeland Security may designate a foreign country for TPS due to conditions in the country that temporarily prevent the country's nationals from returning safely, or in certain circumstances, where the country is unable to handle the return of its nationals adequately."  U.S. Citizenship and Immigration Services, Temporary Protected Status, https://www.uscis.gov/humanitarian/temporary-protected-status.
Scholars and courts across the country have noted the humanitarian purpose of the TPS program.  *See* Andrew I. Schoenholtz, *The Promise and Challenge of Humanitarian Protection in the United States: Making Temporary Protected Status Work as a Safe Haven*, 15 Nw. J. L. & Soc. Pol'y. 1, 5 (2019) (noting the "the purpose of TPS to provide temporary safety to those whose countries are in crisis"); *Sanchez v. Mayorkas*, 593 U.S. 409, 412 (2021) (noting that the TPS program "provides humanitarian relief to foreign nationals in the United States who come from specified

United States District Court
Northern District of California

United States District Court
Northern District of California

1    Defendants' interpretation of 8 U.S.C. § 1254a(b)(3)(A) to only include the initial

2    designation would grant the Secretary unfettered discretion to terminate TPS for a country in the

3    midst of destabilizing and destructive civil war so long as an historic flood for which an

4    antecedent TPS designation was made (even just months earlier) had dissipated.  The import of the

5    TPS statute—that is, providing humanitarian relief to nonimmigrants whose country cannot

6    adequately handle their return—would be entirely flouted if TPS holders are forced to return to a

7    country with no functioning government, no running water, dismantled infrastructure, and the like,

8    simply because flood water had dissipated.  Such a perplexing result is a natural consequence of

9    Defendants' interpretation of the TPS statute; and this Court need not "read the statute to usher in

10   such a bizarre and half-baked scheme."  *Kennedy v. Braidwood Mgmt., Inc.*, 606 U.S. 748, 787

11   (2025); *Lawson v. FMR LLC*, 571 U.S. 429, 471, (2014) (Sotomayor, J., dissenting)

12   ("[I]nterpretations of a statute which would produce absurd results are to be avoided if alternative

13   interpretations consistent with the legislative purpose are available.") (citing *Griffin v. Oceanic*

14   *Contractors, Inc.*, 458 U.S. 564, 575, (1982); *United States v. Lazarenko*, 624 F.3d 1247, 1251

15   (9th Cir. 2010) ("In other words, because a literal application of the plain text leads to absurd

16   results, the plain text does not control.")  The Court agrees with Plaintiffs that "[n]othing in the

17   statutory text ties the second criteria, regarding the country's ability to handle the return of its

18   nationals, to the disaster that triggered its initial designation."  ECF 144 at 21.  In exercising its

19   independent judgment, finds that Defendants' interpretation of the periodic review provision is

20   incongruent with the statute.

21   Notably, evidence produced in discovery reveals that Defendants explicitly decided to

22   narrow their consideration to factors which gave rise to the initial TPS designation.  Internal

23

24   _____

25   countries"); *Ramos v. Nielsen*, 321 F. Supp. 3d 1083, 1091 (N.D. Cal. 2018) ("TPS is . . . a
     humanitarian program."); *Nat'l TPS All. v. Noem*, 150 F.4th 1000, 1009 (9th Cir. 2025) (describing
     congressional debates in the late 1980s regarding "alternative mechanisms for granting
26   humanitarian relief to groups of non-U.S. citizens" which gave rise to the TPS program);
     *Solorzano v. Mayorkas*, 987 F.3d 392, 394 (5th Cir. 2021) ("Congress created Temporary
27   Protected Status in 1990 as a form of humanitarian relief."); *Guerrero v. Johnson*, 138 F. Supp. 3d
     754, 758 (E.D. La. 2015) ("Congress enacted the [TPS] statute with the humanitarian aim of
28   providing relief…").

emails show that DHS staff were directed to "[f]ocus on conditions described in the original

designation, and how they are/aren't the same now" and directed to exclude consideration of

environmental concerns and corruption. ECF 176-2. In requesting country conditions reports,

DHS personnel requested revised reports that "only include[d] around 1 page of country

conditions" and "[i]nclude[d] any improvements" without "mention[ing] environmental concerns

or climate change." ECF 176-2. Researchers had their team "revise the reports for Nepal,

Honduras, Nicaragua, and Haiti to make them consistent with [these] new guidelines." *Id.*

Defendants counter by pointing to the large amount of information the Secretary received when

making her decision. ECF 166 at 9. However, "the fact that [the Secretary] received information

regarding [country] conditions, does not prove she ultimately considered and relied on those

conditions in deciding to terminate TPS status." *Ramos*, 336 F. Supp. 3d at 1097. The notices

excluded any mention of "violence and crime in Honduras, weather events in Nicaragua," "the

effects of the COVID-19 pandemic," "inflation in Nepal," a "murderous, dictatorial regime" in

Nicaragua, the State Department Travel Advisory warnings for Honduras and Nicaragua, or the

effect of the Russian invasion of Ukraine on Nepal's agricultural capacity, despite the record

containing evidence of this information. ECF 175 at 12; ECF 176-11; ECF 176-8; ECF 145-9;

ECF 149-10; *see* 90 Fed. Reg. 30086; 90 Fed. Reg. 30089; 90 Fed. Reg. 24151.

Taken together, the Court finds that the Secretary improperly narrowed the scope of her

review of the conditions of the countries at issue in this litigation before making her termination

decision. The Secretary's narrowing was based on an erroneous reading of the TPS statute and

history of DHS practice. Accordingly, the Court finds that Plaintiffs are entitled to judgment as a

matter of law on their claim that the Secretary's termination decision was arbitrary and capricious

under the APA.

* * *

The Court finds that there are no genuine disputes of material fact with respect to

Plaintiffs' first two claims under the APA and that, based on the record before the Court, Plaintiffs

are entitled to judgment as a matter of law. The Court, therefore, grants Plaintiffs' motion for

partial summary judgment on both APA claims.

47

### 3. The Secretary's Terminations of TPS for Honduras, Nicaragua, and Nepal Inexplicably Departed from Prior Practice in Limiting the Orderly Transition Period.

Defendants argue that Plaintiffs fail to show that the Secretary's decision not to extend the orderly transition period beyond the statutory default of 60 days was arbitrary and capricious. ECF 142 at 18. Plaintiffs argue that the Secretary's decision to grant a 60-day transition period for Nepali, Honduran, and Nicaraguan TPS holders represented an unexplained departure from a decades-old agency practice in violation of the APA. ECF 167 at 19.

Analysis of this claim again raises the change-in-position doctrine whereby an agency's "consistent practice, whether adopted expressly in a holding or established impliedly through repetition, sets the baseline from which future departures must be explained." *Wages & White Lions Invs., L.L.C.*, 604 U.S. at 570; *see also Organized Vill. of Kake v. USDA*, 795 F.3d 956, 966 (9th Cir. 2015) (when an agency breaks with a long-standing past practice, it must "display[] 'awareness that it is changing position'" and provide "good reasons" for the new policy) (quoting *FCC v. Fox Television Stations, Inc*., 556 US 502, 515−16 (2009)).

As discussed above, Plaintiffs point to twenty-two years of DHS's practice of setting an orderly transition period of six to eighteen months after the issuance of a TPS termination notice. ECF 28. Defendants draw the Court's attention to two termination decisions in the thirty-five-year history of the TPS statute which has incorporated a 60-day transition period. *See Termination of Designation of Lebanon Under Temporary Protected Status Program*, 58 Fed. Reg. 7582 (Feb. 8, 1993) (60 days); *Termination of Designation of Angola Under the Temporary Protected Status Program*, 68 Fed. Reg. 3896-01, 3896 (Jan. 27, 2003) (60 days). However, given that the prevailing practice of prior administrations was to provide at least 6 months after the TPS termination date for holder to transition, the notices were required to—but failed to—acknowledge or explain the departure from the decades-long practice of providing at least a 6-month transition period under the APA. *See Encino Motorcars*, 579 U.S. at 222 ("It follows that an '[u]nexplained inconsistency' in agency policy is 'a reason for holding an interpretation to be an arbitrary and capricious change from agency practice.'").

Accordingly, the Court denies Defendants' motion for summary judgment on Plaintiffs'

claim that the Secretary violated the APA by departing from prior agency practice without explanation.

### 4. Genuine Issues of Material Fact Preclude Summary Judgment for Defendants on Plaintiffs' Equal Protection Claim

Defendants argue that they are entitled to summary judgment on Plaintiffs' constitutional claims because the Court cannot look beyond the facially legitimate reasons for the Secretary's decision about immigration policy to find racial animus. ECF 142 at 18. Plaintiffs argue that a genuine dispute as to whether the evidence shows that the challenged TPS decisions were motivated by racial animus which warrants denial of Defendants' motion for summary judgment. ECF 167 at 20.

Under the applicable analytical framework set forth in *Arlington Heights*, the Court finds that there is a genuine dispute of material fact as to whether the decisions to vacate and terminate were based on racial, ethnic, and/or national origin animus. Such animus can reasonably be shown from the statements made by Secretary Noem and/or President Trump alone. Here, Plaintiffs present a series of statements made by Defendants and officials in the current administration to support the Due Process claim as to all plaintiffs.

In a January 29, 2025, post on X, Secretary Noem announced that she would end a Biden order that allowed Venezuelans to stay in the country and "violate our laws." ECF 18-16. In a March 20, 2025, post on X, Secretary Noem associated "migration management" with "sav[ing] American lives and get[ting] criminals off our streets!" ECF 18-17. In a May 19, 2025, post on X, DHS equated TPS holders with "MS-13 gang members," "known terrorists," and "murderers." ECF 18-18. These statements are consistent with similar statements by President Trump including one occurrence in which he stated that migrants were "poisoning the blood of our country." ECF 18-20; *see also* ECF 18-23 (President Trump asking why people "could not come from nice countries . . . like Denmark, Switzerland, and Norway"); *see* Compl. ¶ 98 (President Trump "How about allowing people to come to an open border . . . many of them murdered far more than one person, and they're now happily living in the United States. You know now a murderer, I believe this, it's in their genes. And we got a lot of bad genes in our country right now."); *see also* ECF 18-15 at 7 (Secretary Noem describing immigration as an "invasion happening on purpose . . . to

49

1  remake the foundation of this country").

2  For each termination decision, Secretary Noem invoked President Trump's Invasion

3  Executive Order (E.O.) *See* 90 Fed. Reg. 24,151, 24,152 n.10 (June 6, 2025) (Nepal termination

4  notice, citing E.O. 14159, § 16(b)); 90 Fed. Reg. 30,086, 30,088 n.4 (July 8, 2025) (Nicaragua

5  termination notice, citing same); 90 Fed. Reg. 30,089, 30,091 n.10 (July 8, 2025) (Honduras

6  termination notice, citing same). The Secretary described President Trump's Invasion E.O. as

7  "directing" her to limit TPS designations, *id.*, because, in President Trump's view, TPS holders

8  (among others) were part of a "flood of illegal immigration" that "engaged in hostile activities"

9  and had "abused the generosity of the American people," "committing vile and heinous acts

10  against innocent Americans." 90 Fed. Reg. at 8443 § 1. The statements of the Secretary and other

11  officials in the administration which repeatedly characterize immigrants as invaders upsetting the

12  foundation of the country perpetuates the racist "replacement theory" which stands for the idea

13  that non-white immigrants will "replace" the white race and undermine the nation's "white"

14  foundation. ECF 17-20 ¶ 18. The President and Secretary's policies and policy goals—including

15  the decisions to terminate TPS—promote the debunked and racist "replacement theory." *Id.*

16  Plaintiffs have presented substantial evidence that the Secretary's termination decisions, which

17  rested on false and negative stereotypes entirely "divorced from any factual context," *Hawaii*, 585

18  U.S. at 705−06 (citation omitted), manifested discriminatory intent.

19  A fact is "material" if it "might affect the outcome of the suit under the governing law,"

20  and a dispute as to a material fact is "genuine" if there is sufficient evidence for a reasonable trier

21  of fact to decide in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

22  248 (1986). Based on the record before the Court, there is a genuine dispute of material fact about

23  whether the Secretary's decision was procedurally proper or influenced by racial animus. *Lui v.

24  DeJoy*, 129 F.4th 770, 780 (9th Cir. 2025) (fining a "genuine dispute of material fact" as to the

25  plaintiff's claim under Title VII of the Civil Rights Act where plaintiff provided sufficient

26  evidence to support her claim that the defendant's conduct was "motivated by racial animus" and

27  reversing the district court's summary judgment holding).

28  Accordingly, based on the record before the Court, Defendants are not entitled to summary

United States District Court
Northern District of California

50

1   judgment, and the Court denies Defendants' motion.

2   **VI.    CONCLUSION**

3          "The President is not above the law."  *Trump v. United States*, 603 U.S. 593, 642 (2024).

4   Neither are his cabinet officials.  The rule of law demands that when executive officials exceed

5   their authority, they must be held to account.  The Administrative Procedures Act ensures

6   government accountability by making agencies transparent, require public participation, setting

7   fair rulemaking standards, and allowing courts to review actions for legality and rationality.

8          Our laws should not favor the loud and powerful simply because of their positions.  Yet,

9   for too long, our laws have overlooked the quiet truths—truths carried in the margins, truths lived

10  but never spoken aloud.  It is the duty of every public servant entrusted with shaping a more just

11  society to bring those truths into the open, to translate lived experience into written protection.  It

12  means hearing the faintest whisper of injustice and refusing to let it fade.  It means honoring the

13  people who call this country home but have never been invited to speak in it.  It means finally

14  ensuring that the law speaks for them.

15         Having considered the parties' briefs, the relevant legal authority, and for the reasons

16  below, the Court **DENIES** Defendants' motion to dismiss; **GRANTS IN PART** and **DENIES IN**

17  **PART** Defendants' motion to exclude expert testimony; **GRANTS** Plaintiffs' motion for partial

18  summary judgment; **DENIES** Defendants' motion for summary judgment.

19         Specifically, the Court declares that the termination of TPS for Nepal on June 6, 2025, and

20  Honduras and Nicaragua on July 7, 2025, were unlawful under the APA.   Moreover, the Court

21  vacates the Secretary's termination decisions with respect to Honduras, Nepal, and Nicaragua.

22  *Corner Post, Inc. v. Bd. of Governors of Fed. Reserve Sys.*, 603 U.S. 799, 830–31 (2024)

23  (Kavanaugh, J., concurring) ("When a federal court concludes that an agency adjudicative order

24  [or any other agency action] is unlawful, the court must vacate that order.").

25         The Court directs entry of a final judgment under Rule 54(b) on the APA claims for which

26  the Court has granted summary judgment in favor of Plaintiffs.  *See* Fed. R. Civ. P. 54(b) ("When

27  an action presents more than one claim for relief . . . , the court may direct entry of a final

28  judgment as to one or more, but fewer than all, claims or parties only if the court expressly

United States District Court
Northern District of California

1  determines that there is no just reason for delay.").  The Clerk of the Court is directed to enter a

2  final judgment in favor of Plaintiffs on the APA claims raised in Plaintiffs' motion for partial

3  summary judgment related to (1) the termination of TPS for Honduras (2) the termination of TPS

4  for Nepal, and (3) the termination of TPS for Nicaragua.

5  As for the remaining claims – (4) the APA claim related to the orderly transition period for

6  Honduras, (5) the APA claim related to the orderly transition period for Nepal, (6) the APA claim

7  related to the orderly transition period for Nicaragua, (7) the Equal Protection claim related to the

8  Honduras TPS decisions, (8) the Equal Protection claim related to the Nepal TPS decisions and (9)

9  the Equal Protection claim related to the Nicaragua TPS decisions – the Court temporarily stays

10  continued litigation.

11  A temporary stay will help conserve judicial and litigant resources.  Further, a stay will

12  allow the appellate courts to adjudicate most of the statutory claims before the constitutional ones.

13  *Cf. Califano v. Yamasaki*, 442 U.S. 682, 692 (1979) (stating that "[a] court presented with both

14  statutory and constitutional grounds to support the relief requested usually should pass on the

15  statutory claim before considering the constitutional question").

16  This Order resolves ECF 110, 142, 143, 144, and 153.

17  IT IS SO ORDERED.

18  Dated: December 31, 2025

19  _____
   TRINA L. THOMPSON
20  United States District Judge

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

# **EXHIBIT C**

ECF 134, Class Cert. Order (Oct. 2, 2025)

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

NATIONAL TPS ALLIANCE, et al.,

          Plaintiffs,

    v.

KRISTI NOEM, et al.,

          Defendants.

Case No.  25-cv-05687-TLT

**ORDER GRANTING MOTION FOR CLASS CERTIFICATION**

Re: Dkt. No. 89

The focus of Temporary Protected Status ("TPS") is not the individual.  A TPS designation belongs to the whole country; it reflects our government's judgement that the designated *country* is safe for return.  Immigration and Nationality Act of 1990, Pub. L. No. 101-649, 8 U.S.C. § 1254a.  Yet, the termination of TPS can have a direct and punishing impact on the lives of those living under its protection.

In the notice of termination of TPS for Nepal, the Secretary of the Department of Homeland Security highlighted the improving fiscal conditions and disaster-resilient community systems before concluding that "Nepal is able to handle adequately the return of its nationals."  90 Fed. Reg. 24151, 24152–53.  Recent events raise questions about what a review of the country's conditions might reveal today.  ECF 117 at 4 n.3.

Thousands of Nepali nationals in the United States risk losing rights, losing income, losing connections with loved ones, and losing freedom in this country because of the Secretary's decision.  The same is true for thousands of Hondurans and thousands of Nicaraguans.

Before the Court is Plaintiffs' motion for class certification.  ECF 89.  Defendants filed an opposition on August 25, 2025.  ECF 99.  Plaintiffs filed a reply on August 29, 2025.  ECF 106.  The Court heard argument on Plaintiffs' motion on September 16, 2025.  ECF 119.  Having

considered the parties' briefs, the relevant legal authority, and for the reasons below, the Court GRANTS Plaintiffs' motion.

## I.    BACKGROUND

### A.    Procedural History

The Court assumes the parties' familiarity with the factual background and only cites such background to the extent necessary for this Order.

On July 7, 2025, Plaintiffs filed a complaint alleging that Defendants' termination of TPS for Nepal, Honduras, and Nicaragua violate the Administrative Procedure Act and the Fifth Amendment.  ECF 1 ("Compl.") ¶¶ 154–165.  On July 8, 2025, Plaintiffs filed a motion to postpone effective date of administrative action.  ECF 17.  Defendants filed an opposition on July 14, 2025.  ECF 45.  Plaintiffs filed a reply on July 18, 2025.  ECF 53.

The Court heard oral argument on July 29, 2025, regarding Plaintiffs' motion to postpone. ECF 65, 67.  Following oral argument, on July 31, 2025, the Court granted Plaintiffs motion to postpose.  ECF 73.  On August 1, 2025, Defendants timely appealed this order.  ECF 74.  On August 20, 2025, the Ninth Circuit granted Defendants motion for a stay of the order granting Plaintiffs motion to postpone pending their appeal but declined to stay the proceedings in this Court.  ECF 96.

On August 15, 2025, Plaintiffs filed a motion to certify three separate classes.  ECF 89. Defendants filed an opposition on August 25, 2025.  ECF 99.  Plaintiffs filed a reply on August 29, 2025.  ECF 103.  The Court heard oral argument regarding Plaintiffs motion for class certification on September 16, 2025.  ECF 119.

### B.    Factual Background

#### i.    The TPS Statute

Congress established the Temporary Protected Status ("TPS") program in 1990 to provide humanitarian relief to foreign nationals within the United States who are unable to return to their country of origin due to potential threats to their personal safety from natural disaster, civil strife and armed conflict, or other extraordinary and temporary conditions.  8 U.S.C. § 1254a.  Pursuant to 8 U.S.C. § 1254a(a)(1), the Secretary of Homeland Security may designate a country for

United States District Court
Northern District of California

2

1      Temporary Protected Status and grant nationals of that country protection from removal and work

2      authorization in the United States for the period their home country is so designated.  8 U.S.C. §

3      1254a(a)(1)(B).

4           In designating a country for TPS the Secretary must engage in "consultation with

5      appropriate agencies of the Government" and publish a "statement of the findings" and an estimate

6      of the number of eligible foreign nationals.  *Id.* § 1254a(b)(1).

7           Once a country is designated for TPS, nationals of that country can register for benefits

8      during a registration.  To establish eligibility for TPS, an applicant must demonstrate, among other

9      things, that he or she is a national of the country designated for TPS, has been continuously

10     physically present and resided in the United States since the effective date of designation, and is

11     otherwise admissible as an immigrant.  8 U.S.C. § 1254a(c)(2)(A); 8 C.F.R. §§ 244.2, 244.3(a),

12     1244.3(a).  The government can deny an applicant TPS based on the applicant's criminal history.

13     8 U.S.C. § 1254a(c)(2)(A)–(B); 8 C.F.R. § 244.3(c).  TPS applicants must also pay all fees

14     associated with applying for TPS.  *Id.* at § 1254a(c)(1)(B).

15          Periodically, the Secretary "shall review the conditions in the foreign state . . . for which a

16     designation is in effect under this subsection and shall determine whether the conditions for such

17     designation under this subsection continue to be met."  *Id.* at § 1254a(b)(3).  If the Secretary finds

18     that the conditions are no longer met, she "shall terminate the designation by publishing notice in

19     the Federal Register of the determination."  *Id.*

20          Termination is not effective "earlier than 60 days after the date the notice is published or, if

21     later, the expiration of the most recent previous extension."  *Id.*  The Secretary may extend the

22     designation "for an additional period of 6 months (or, in the discretion of the [Secretary], a period

23     of 12 or 18 months)" if the conditions giving rise to the TPS designation persist.  *Id.*

24          **ii.    History of TPS for Nepal, Honduras, and Nicaragua**

25          On June 24, 2015, the Secretary designated Nepal for TPS for a period of 18 months due to

26     a breakdown of living conditions resulting from a 7.8 magnitude earthquake.  80 Fed. Reg. 36,346

27     (June 24, 2015).  The earthquake impacted about one-third of the country's population and

28     damaged approximately 750,000 homes.  *Id.*  In 2016, TPS was extended for an additional 18

United States District Court
Northern District of California

months because of sustained strained infrastructure, civil unrest, and inadequacies in safe housing, food, medicine, and education.  81 Fed. Reg. 74,470 (Oct. 26, 2016).  In 2018, TPS was extended for several years due to legal challenges to the TPS termination for Nepal.  90 Fed. Reg. at 24,152.  In 2023, DHS reconsidered the 2018 decision to terminate TPS and extended TPS for recipients from Nepal to June 24, 2025.  88 Fed. Reg. 40,317 (June 21, 2023).  On June 6, 2025, DHS published notice in the Federal Register that TPS for Nepal would terminate on August 5, 2025.  90 Fed. Reg. at 21,512.

Hurricane Mitch hit Honduras in late October 1998, causing "widespread heavy rain and severe flooding" in Honduras, Nicaragua, and other nearby countries that resulted in "thousands dead or missing" and "tremendous property, infrastructure, and crop damage."  *25 Years Later: Looking Back at the October Monster Named Mitch*, NOAA (Oct. 27, 2023).  In 1999, the Attorney General designated Honduras for TPS for 18 months.  64 Fed. Reg. 524 (Jan. 5, 1999).  Over the next twenty years, TPS was repeatedly extended as DHS found continued "disruption in living conditions."  79 Fed. Reg. 62170 (Oct. 16, 2014); 88 Fed. Reg. 40304 (Jun. 21, 2023).  DHS terminated TPS for Honduras in 2018.  83 Fed. Reg. 26,074 (June 5, 2018).  Legal challenges to the termination of TPS for Honduras resulted in extension of TPS for several years.  90 Fed. Reg. at 30,090.  In 2023, DHS reconsidered the 2018 decision to terminate TPS and extended TPS for Honduras through July 5, 2025.  88 Fed. Reg. at 40,304 (June 21, 2023).  On July 8, 2025, DHS published notice in the Federal Register that TPS for Honduras would be terminated effective September 8, 2025.  90 Fed. Reg. at 30,091.

Nicaragua was similarly hit by Hurricane Mitch and designated for TPS in 1999.  *See* 64 Fed. Reg. 526 (Jan. 5, 1999); 88 Fed. Reg. 40294 (Jun. 21, 2023).  TPS was extended for nearly two decades due to recurrent weather events until terminated in 2017.  82 Fed. Reg. 59,636 (Dec. 15, 2017).  After the termination announcement, litigation resulted in the continued extension of TPS for Nicaragua for several years.  90 Fed. Reg. at 30,087.  In 2023, DHS extended TPS for Nicaragua through July 8, 2025.  88 Fed. Reg. at 40,294 (June 21, 2023).  On July 8, 2025, DHS published notice in the Federal Register that TPS for Nicaragua would terminate on September 8, 2025.  90 Fed. Reg. at 30,086.

### iii.    The Current Administration and TPS

On January 20, 2025, President Trump issued an executive order titled, "Protecting the American People Against Invasion" ("Invasion EO").  90 Fed. Reg. 8443 (Jan. 20, 2025).  The Invasion EO cited to an "unprecedented flood of illegal immigration into the  United States" and ordered the Secretary of State, Attorney General, and DHS Secretary to "rescind the policy decisions of the previous administration that led to the increased or continued presence of illegal aliens in the United States, and align any and all departmental activities with the policies set out by this order and the immigration laws."  *Id.* § 16.  This included "ensuring that designations of Temporary Protected Status are consistent with the provisions of section 244 of the INA (8 U.S.C. 1254a), and that such designations are appropriately limited in scope and made for only so long as may be necessary to fulfill the textual requirements of that statute."  *Id.* § 16(b).  The Invasion EO would be cited in later decisions vacating or terminating TPS designations.  *See* 90 Fed. Reg. 30086 (July 8, 2025); 90 Fed. Reg. 30089 (July 8, 2025); 90 Fed. Reg. 24151 (Jun. 6, 2025).  *See also* ECF 18-11 at 2 (citing "President Trump's promise to rescind policies that were magnets for illegal immigration and inconsistent with the law" when vacating Haiti's TPS extension).

On January 27, 2025, in an email exchange between DHS officials, Tony Pham wrote to Marc Rosenblum that "This is a project involving termination of TPS status and we need to tell the data story if can be."  ECF 18-5 at 2; *see also* ECF 18-6 at 4 (privilege log showing a document labeled for Venezuela TPS "termination" on January 26, 2025).  Tony Pham also requested information on "the inter-relationship between the Columbia [sic] Honduras Nicaragua Venezuela (CHNV) Parole Processes and TPS."  ECF 18-5 at 3.  The extension of Venezuela's TPS status was vacated several days later which marked the first time a TPS extension had ever been vacated.  90 Fed. Reg. 8805 (Feb. 3, 2025).  USCIS officials also communicated to "focus on any improvements" when evaluating country conditions.  ECF 18-7 at 2.  For example, a January 31, 2025, draft memo for the Secretary excluded food insecurity and political repression and human rights from the country conditions considered for Venezuela.  *See* ECF 18-9.

These actions were taken in the context of repeated rhetoric by administration officials that associated immigrants and TPS holders with criminal activity or other undesirable traits.  During

United States District Court
Northern District of California

Secretary Noem's confirmation hearing, Secretary Noem remarked that "the extension of over 600,000 Venezuelans as well is alarming when you look at what we've seen in different states, including Colorado with gangs doing damage and harming the individuals and the people that live there." ECF 18-14 at 28. She indicated that the extensions "will no longer be allowed." *Id.* In an earlier news interview, future Secretary Noem similarly referred to immigrants as "some of the most dangerous people in the world" and that other countries were "empty[ing] out their prisons, their mental institutions" and sending those individuals to the United States. ECF 18-15 at 7. Others in the current administration, in including the Vice President, had vowed to end TPS prior to taking office. ECF 18-19 at 3.

In a January 29, 2025 post on X, Secretary Noem announced that she would end a Biden order that allowed Venezuelans to stay in the country and "violate our laws." ECF 18-16 at 2. In a March 20, 2025 post on X, Secretary Noem associated "migration management" with "sav[ing] American lives and get[ting] criminals off our streets!" ECF 18-17 at 2. In a May 19, 2025 post on X, DHS equated TPS holders with "MS-13 gang members," "known terrorists," and "murderers." ECF 18- 18 at 2. These statements are consistent with similar statements by President Trump including one occurrence in which he stated that migrants were "poisoning the blood of our country." ECF 18- 20 at 9–10.

### iv. The Proposed Class

Plaintiffs seek certification of the following three classes:

1. **Honduras TPS Class**: All persons who have been granted TPS pursuant to the TPS designation of Honduras and who have not been granted lawful permanent residence.

2. **Nepal TPS Class**: All persons who have been granted TPS pursuant to the TPS designation of Nepal and who have not been granted lawful permanent residence

3. **Nicaragua TPS Class**: All persons who have been granted TPS pursuant to the TPS designation of Nicaragua and who have not been granted lawful permanent residence

ECF 89 at 3–4. The following plaintiffs have been identified as the proposed named representatives for the class ("Class Representatives"):

6

Plaintiff **Elena Hernandez** is 67 years old, a native of Nicaragua, came to the United States in 1996 because her family was targeted by the Nicaraguan government, and was granted TPS in 1999. ECF 17-4 ¶ 3. Plaintiff Hernandez has worked at an aquatic plant nursery, cleaning company, and as a shop steward with TPS. *Id.* ¶ 7. Plaintiff Hernandez has asthma and a heart condition that requires daily medication. *Id.* ¶ 9. Without TPS, Plaintiff Hernandez would lose her health insurance and social security income even though she has paid into social security for more than 25 years. *Id.* ¶¶ 9, 11. She would lose her job, be separated from her family, have no way of supporting herself, and worries that her health will rapidly decline without continued access to healthcare. *Id.* ¶¶ 10, 12, 14. Given her family history and views, she may also face persecution in Nicaragua. *Id.* ¶ 14

Plaintiff **Sandhya Lama** is 43 years old, a native of Nepal, and has been in the United States since 2008. ECF 17-6 ¶ 2. She came to the United States in 2008 to study at a university in Virginia, received her master's degree in 2014, and has been a TPS holder since 2015. *Id.* ¶¶ 2, 6. She is a single mother of three U.S. citizen children, a sole provider, and is currently a CXO Multi Site Lead LC for Amazon. *Id.* ¶¶ 2, 10–13. If forced to return to Nepal, Lama's children would lose opportunities, and one of Lama's children would not be able to get medical treatment for her severe allergies. *Id.* ¶ 15. Returning to Nepal would also be dangerous because Lama's family has suffered persecution from the Maoist (communist) party in Nepal, including having their ancestral house bombed and brother being taken as hostage. *Id.* ¶¶ 4, 16.

Plaintiff **Teofilo Martinez** is 57 years, a native of Honduras, and has been on TPS since 1997. ECF 17-8 ¶ 2. He is a licensed soccer instructor, a licensed realtor, and owns a landscaping business. *Id.* ¶ 9. He has also been volunteering with the Honduran Consulate for the last 7 years, is on the executive committee for NTPSA, and co-hosts a radio show for TPS holders. *Id.* Without TPS, Martinez would be separated from his partner of over 25 years, lose his job, and not be able to travel for his volunteer work with NTPSA. *Id.* ¶¶ 15, 18.

Plaintiff **Denis Molina** is 49 years old, a native of Honduras, and has been in the United States since 1997. ECF 17-2 ¶¶ 4–5. He applied for and has maintained TPS since Hurricane Mitch hit Honduras. *Id.* ¶ 5. He has been a church pastor for over 22 years and works various

jobs in construction and as a mechanic to support his family, which includes a wife and four children. *Id.* ¶¶ 6–12. Two of his children, one aged 4 and another 22, have been diagnosed with autism and require special programs to support their development. *Id.* ¶¶ 9, 13. He is the sole breadwinner for his family. *Id.* ¶ 12. If TPS terminates, Molina fears that he will not be able to support his family in Honduras and, if his entire family relocates to Honduras, his children will lose the support of special programs for their development. *Id.* ¶¶ 12, 14.

**Plaintiff Johny Silva** is 29 years old, a native of Honduras, and came to the United States when he was three-years old. ECF 17-3 ¶ 2. He was granted TPS after Hurricane Mitch. *Id.* ¶ 4. Silva is a Certified Nursing Assistant at Stanford Hospital and relies on his TPS for work authorization. *Id.* ¶¶ 10, 13. Without TPS, Silva and his son, approximately 9 years old and diagnosed with autism, will lose their health insurance. *Id.* ¶ 13. Silva will also lose his job, not be able to contribute to his family's rent, will have to abandon his dreams of becoming a nurse, and be separated from the rest of his family. *Id.* ¶¶ 13–14, 16.

## II.   LEGAL STANDARD

To certify a class, the Court must be "satisfied, after a rigorous analysis" that the plaintiffs have satisfied the requirements of Federal Rule of Civil Procedure 23 by a preponderance of the evidence. *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 664–65 (9th Cir. 2022) (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 161 (1982)). "Frequently that 'rigorous analysis' will entail some overlap with the merits of the plaintiff's underlying claim. That cannot be helped." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351 (2011).

Rule 23 consists of two parts. Fed. R. Civ. P. 23. First, Plaintiffs must satisfy all four requirements of Rule 23(a): "One or more members of a class may sue or be sued as representative parties on behalf of all members only if: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." *Olean*, 31 F.4th at 663; Fed. R. Civ. P. 23(a). Second, Plaintiffs must demonstrate through evidentiary proof that the class satisfies at least one of the three subsections under Rule 23(b). *Comcast Corp. v.*

United States District Court
Northern District of California

United States District Court
Northern District of California

Behrend, 569 U.S. 27, 33 (2013). Classes certified under Rule 23(b)(3) require that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

"Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage. Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013). For example, to determine whether a common question prerequisite is satisfied, "a district court is limited to resolving whether the evidence establishes that a common question is capable of classwide resolution, not whether the evidence in fact establishes that plaintiffs would win at trial." *Olean*, 31 F.4th at 666–67.

"Numerous district courts in this Circuit have long concluded that it is appropriate to consider evidence at the class certification stage that may ultimately be inadmissible." *Sali v. Corona Regional Medical Center*, 909 F.3d 996, 1004 n.2 (9th Cir. 2018). Evidentiary objections are, therefore, "not a proper basis to reject evidence submitted in support of class certification." Id. at 1004. Indeed, "on a motion for class certification, the court may consider evidence that may not be admissible at trial." *Circle Click Media LLC v. Regus Mgmt Group LLC*, No. 12-cv-4000, 2015 WL 6638929, at *8 (N.D. Cal. Oct. 30, 2015); *Keilholtz v. Lennox Hearth Prods., Inc.*, 268 F.R.D. 330, 337 n.3 (N.D. Cal. 2010) (same).

Rule 23(b)(2) requires that "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." In *Parsons v. Ryan*, the Ninth Circuit held that the requirement of a Rule 23(b)(2) class was "unquestionably satisfied" when class members sought uniform injunctive or declaratory relief applicable classwide. 754 F.3d 657, 688 (9th Cir. 2014). "Nothing in Rule 23 . . . limits the geographical scope of a class action that is brought in conformity with that Rule." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979).

United States District Court
Northern District of California

### III.   DISCUSSION

The parties find some common ground.  The Court starts there.  The parties agree that Plaintiffs' request to certify three separate classes in one motion is proper so long as there are common legal and factual questions applicable to all members of each class.  ECF 116 at 3; ECF 106 at 12.  Ninth Circuit precedent supports this conclusion.  *See Owino v. CoreCivic, Inc.* 60 F.4th 437, 450 (9th Cir. 2022) (affirming certification of three classes with no discussion of subclasses); *Wit v. United Behavioral Health* 79 F.4th 1068, 1089 (9th Cir. 2023) ("[T]he district court did not err in certifying three classes to pursue the fiduciary duty claim").  The parties also agree that nationwide class relief is not barred *in toto* under Supreme Court precedent.  ECF 99 at 17; ECF 89 at 11.  Moreover, Defendants do not dispute numerosity or adequacy.  *See generally* ECF 99.

The parties, however, disagree about (A) whether 8 U.S.C. §1254a(b)(5)(A) strips this Court of jurisdiction over Plaintiffs' claims, (B) whether Plaintiffs satisfy the requirements of Rule 23(a), (C) whether Plaintiffs' requested relief is proper under Rule 23(b)(2), and (D) whether certification of the three classes on a nationwide basis is appropriate in these circumstances.  ECF 89 at 1; ECF 99 at 9–10, 14.  The Court first addresses Defendants' argument regarding jurisdiction, then turns to the parties' arguments regarding Rule 23, Plaintiffs' requested relief, and, finally, the appropriateness of nationwide class certification.

### A.   8 U.S.C. §1254a(b)(5)(A) Does Not Strip the Court of Jurisdiction Over Plaintiffs' Claims

In the Defendants' opposition to Plaintiffs' motion, the Defendants argues that 8 U.S.C. §1254a(b)(5)(A) strips federal courts of jurisdiction to review the Secretary's terminations.  ECF 99 at 3 ("[8 U.S.C. §1254a(b)(5)(A)] makes TPS determinations unreviewable").  Plaintiffs note that numerous courts have rejected the argument jurisdictional argument presented by Defendants.  ECF 106 at 1.

8 U.S.C. §1254a(b)(5)(A) reads "[t]here is no judicial review of any determination of the [Secretary] with respect to the designation, or termination of a designation, of a foreign state under this subsection."

Several federal courts, including this Court, have asserted jurisdiction, despite the

United States District Court
Northern District of California

restrictive language above, over claims where plaintiffs allege that the Secretary exceeded the scope of his or her authority in deciding to terminate, or by the manner in which he or she decided to terminate, TPS designations. *See* ECF 73 at 20 ("[T]he Court finds that 8 U.S.C. § 1254a(b)(5) does not preclude the Court's jurisdiction over Plaintiffs' claims"); *Nat'l TPS All. v. Noem*, No. 25-2120, slip op. at 30 (9th Cir. Aug. 29, 2025) (finding that nothing in the statute precludes review of a Secretary's "conclusions as to the extent of her power under the TPS statute"); *CASA, Inc. v. Noem,* No. CV 25-1484-TDC, 2025 WL 1907378, at *6 (D. Md. July 10, 2025) (finding plaintiffs' claim challenging the alleged policy or practice of making preordained determinations to terminate TPS designations in order to reduce the number of non-white immigrants in the United States not barred by § 1254a(b)(5)(A)); *Centro Presente v. Department of Homeland Security,* 332 F.Supp.3d 393 (D. Mass. 2018) (concluding that the plaintiffs' APA claim was not barred where it challenged, in relation to three separate countries' TPS determinations, an allegedly "new policy that TPS designation determination are to be made solely on the basis of whether the conditions that created the initial designation persist rather than a broader view of whether the country is safely able to accept returning nationals"); *Ramos v. Nielsen*, 321 F. Supp. 3d at 1092, 1099–1100, 1104 (N.D. Cal. 2018) (finding that a claim contesting the termination of the TPS designations for four countries was not barred by § 1254a(b)(5)(A) where the challenge was to the alleged adoption of a "new interpretation of the TPS statute" which based determinations on racial animus and "alleged disdain for non-white immigrants").

This Court will not depart from the findings of its own prior ruling, the Ninth Circuit, nor its sister courts across the country who have considered the question and rejected Defendants' assertion that §1254a(b)(5)(A) bars review of Plaintiffs' claims.  Accordingly, this Court, again, finds that it has jurisdiction over these claims.

### B.    Plaintiffs Ability to Meet the Requirements of Rule 23(a)

Plaintiffs argue that they meet the requirements of Rule 23(a) because (i) the classes are sufficiently numerous; (ii) the Secretary's Nepal, Honduras, and Nicaragua TPS terminations raise common questions of law and fact; (iii) the named class representatives' injuries are typical of the putative class members; and (iv) the Class Representatives and Class Counsel adequately

United States District Court
Northern District of California

1  represent the proposed class members.  ECF 89 at 1.  Defendants argue that the classes, as defined,

2  are overboard and that certification is inappropriate because individual putative class members

3  will face different harms, or none at all, depending on their immigration background.  ECF 99 at

4  9–10.

### i.   Plaintiffs Proposed Classes Are Sufficiently Numerous

6  Plaintiffs argue that they represent thousands of foreign nationals from Honduras, Nepal,

7  and Nicaragua who will be impacted by the Secretary's termination decisions.  ECF 89 at 5–6.

8  Defendants do not contest numerosity.  *See generally* ECF 99.

9  Rule 23(a)(1) requires that "the class is so numerous that joinder of all members is

10  impracticable."  Fed. R. Civ. P. 23(a)(1).  The party seeking certification "do[es] not need to state

11  the exact number of potential class members, nor is a specific number of members required for

12  numerosity."  *In re Rubber Chems. Antitrust Litig.*, 232 F.R.D. 346, 350 (N.D. Cal. 2005).  Courts

13  in this district generally agree that numerosity is satisfied if the class includes "40 or more

14  members."  *Villalpando v. Exel Direct Inc.*, 303 F.R.D. 588, 605–06 (N.D. Cal. 2014*); see also In*

15  *re Facebook, Inc., PPC Adver. Litig.*, 282 F.R.D. 446, 452 (N.D. Cal. 2012) ("[C]ourts generally

16  find that the numerosity factor is satisfied if the class comprises 40 or more members, and will

17  find that it has not been satisfied when the class comprises 21 or fewer.").

18  Plaintiffs estimate that proposed Honduras TPS Class consists of approximately 72,000

19  national of Honduras who hold TPS minus approximately 21,000 who have lawful permanent

20  resident status.  ECF 89 at 5.  The Nicaragua TPS Class consists of approximately 4,000 nationals

21  of Nicaragua who hold TPS minus approximately 1,100 who have been granted lawful permanent

22  resident status.  *Id.*  The Nepal TPS Class consists of approximately 12,700 nationals of Nepal

23  who hold TPS minus 5,500 who have been granted lawful permanent resident status.  *Id.* at 6.

24  Moreover, the proposed classes each represent foreign nationals living in various states across the

25  country.  ECF 17-13 ¶ 12.  Many lack the financial resources to litigate these claims on an

26  individual basis.  ECF 17-16 ¶¶ 15, 21, 27.   Some, given their current immigration status, are

27  reluctant to engage with the justice system for fear of being targeted for deportation, detention, or

28  separation from their families.  *E.g.*, ECF 17-5 ¶ 10; ECF 17-9 ¶ 13; *see also* ECF 1 ¶¶ 131, 150.

United States District Court
Northern District of California

Defendants do not dispute numerosity. *See generally* ECF 99. The number of proposed class members and the circumstances surrounding each putative plaintiffs' capability, or lack thereof, to individually litigate the claims favor a finding that numerosity is satisfied. *Lopez-Venegas v. Johnson*, No. 13-cv-03972-JAK (PLAx), 2014 WL 12772087, at *6 (C.D. Cal. Aug. 28, 2014) (citation omitted) ("joinder of all plaintiffs is not feasible because of geographic factors, and because members of the class, who are by definition poor and disabled, do not have the economic means to pursue remedies on an individual basis").

Accordingly, the Court finds that Rule 23(a)(1)'s numerosity requirement is satisfied for each proposed class.

### ii. Plaintiffs Satisfy the Requirements of Commonality Under Rule 23(a)

Plaintiffs argue that (1) the terminations of TPS for Honduras, Nepal, and Nicaragua violated the APA because they were preordained decisions that were not based on an adequate review of the country conditions; (2) the 60-day wind down period violated the APA because the Secretary failed to acknowledge or explain her departure from agency's practice over the past two decades to provide at least a six-month orderly transition period before any termination takes effect; and (3) the terminations likely violated the Equal Protection component of the Fifth Amendment because they were motivated by racism. Compl. ¶¶ 3–5; *see also* ECF 89 at 1–2. Plaintiffs argue that these claims raise common questions of law and fact, rendering resolution of this litigation on a classwide basis appropriate. ECF 89 at 7–8. Defendants challenge Plaintiffs' ability to meet commonality on three grounds. First, they argue that the classes are overbroad because they include foreign nationals who do not currently qualify for TPS. ECF 99 at 9. Next, Defendants argue that some members of the class lack any injury as a result of the TPS termination and therefore lack standing. *Id*. Finally, Defendants argue that the constitutional claim would require individualized examinations of the class member's circumstances. *Id*. at 11. The Court addresses each argument in turn.

### a. Plaintiffs' Claims Raise Questions Common to the Class

Plaintiffs argue that their claims raise common questions of law and fact, rendering resolution of this litigation on a classwide basis appropriate. ECF 89 at 7–8. Defendants argue

1    that the Plaintiffs fail to demonstrate that all of the proposed class members stand to suffer the

2    same injury, if any, as a result of the Secretary's termination decisions.  ECF 99 at 9–10.

3           Rule 23(a)(2) requires that "there are questions of law or fact common to the class."  Fed.

4    R. Civ. P. (a)(2).  "A common contention need not be one that 'will be answered, on the merits, in

5    favor of the class.'  It only 'must be of such nature that it is capable of class-wide resolution.'"

6    *Alcantar v. Hobart Servs.*, 800 F.3d 1047, 1053 (9th Cir. 2015) (quoting *Amgen*, 568 U.S. at 459

7    and *Dukes*, 564 U.S. at 350).  At the center of this inquiry is "the capacity of a classwide

8    proceeding to generate common *answers* apt to drive the resolution of the litigation."  *Dukes*, 564

9    U.S. at 350.  "[C]ommonality is satisfied where the lawsuit challenges a system-wide practice or

10   policy that affects all of the putative class members."  *Gonzalez v. U.S. Immigr. & Customs Enf't*,

11   975 F.3d 788, 808 (9th Cir. 2020) (citation omitted).  This Court's inquiry requires an examination

12   of the Plaintiffs claims.  *Parsons v. Ryan*, 754 F.3d 657, 676 (9th Cir. 2014) ("[A]s in all class

13   actions, commonality cannot be determined without a precise understanding of the nature of the

14   underlying claims.")

15          Here, all putative class members allege a common injury from the unlawful termination of

16   TPS for their countries.  ECF 89 at 7.  In *Bautista-Perez v. Holder*, the court certified a class of

17   TPS applicants challenging the TPS registration fee they were required to pay as exceeding the

18   statutorily permissible amount.  No. C 07-cv-4192 TEH, 2009 WL 2031759, at *7 (N.D. Cal. July

19   9, 2009).  The court found that the class in *Bautista-Perez*, which sought declaratory and

20   injunctive relief, had sufficiently alleged "common subjection to the same challenged regulatory

21   scheme" and were unified by a "common question of law of whether the TPS applicants are

22   subject to fees that contravene the regulations."  *Id.*  Similarly, here, Plaintiffs argue that they are

23   subject to a common regulatory scheme, that is, the Secretary's allegedly unlawful decision-

24   making process.  ECF 89 at 7.  Indeed, "the TPS statute contemplates only a single binary

25   determination for each country's TPS designation."  *Nat'l TPS All.,* No. 25-2120, slip op. at 49.

26   Examination of  whether the Secretary exceeded her authority by terminating the TPS designations

27   for Nepal, Nicaragua, and Honduras will generate a classwide resolution because deprivation of

28   the protections provided by TPS effect "all of the class members or . . . none of them."  *Dukes*,

United States District Court
Northern District of California

14

564 U.S. at 360.

In *Ramos v. Nielsen*, the court found that Plaintiffs had plausible alleged a change in DHS practice or policy in excess of the Department's authority by decline to consider intervening disasters, conflicts, or other socio-economic problems when deciding to terminate a TPS designation.  321 F. Supp. 3d 1083, 1109 (N.D. Cal. 2018).  The *Ramos* court found that "'if [an agency] announces and follows—by rule or by settled course of adjudication—a *general policy* by which its exercise of discretion will be governed, an irrational departure from that policy (as opposed to an avowed alteration of it) could constitute action that must be overturned as 'arbitrary, capricious, [or] an abuse of discretion' within the meaning of the Administrative Procedure Act.'" *Ramos*, 321 F. Supp. 3d at 1109 (citing *California Trout v. F.E.R.C.*, 572 F.3d 1003, 1023 (9th Cir. 2009).  Plaintiffs claim that the Secretary's TPS terminations here represented "an unexplained and unacknowledged deviation from historical practice" in violation of the APA mirrors the claim in *Ramos*.  ECF 89 at 7.  Accordingly, the Court finds that Plaintiffs do, in fact, challenge "a system-wide practice or policy that affects all of the practice class members." *Gonzalez v. ICE*, 975 F.3d 788, 804 (9th Cir. 2020).

Furthermore, those who do ultimately qualify for TPS are protected from removal and granted work authorization.  *See* 8 U.S.C. § 1254a(a).  Courts have recognized the protection against deportation and loss of work authorization as legally cognizable injuries.  *See, e.g., Gonzalez v. ICE*, 975 F.3d 788, 804 (9th Cir. 2020); *INS v. Chadha*, 462 U.S. 919, 936 (1983); *Mansor v. USCIS*, 685 F. Supp. 3d 1000, 1013 (W.D. Wash. 2023).  Thus, TPS holders maintain legally cognizable interests in the rights afforded to them under the statute by virtue of holding the status.  *See* 8 U.S.C. § 1254a(a).

Plaintiffs, therefore, allege that a common injury results from the unlawful termination of their countries' TPS designations.  *Id.*  On these grounds alone the Court finds commonality is satisfied.  *Dukes*, 564 U.S. at 350.  However, the Court turns to the remaining arguments below.

### b.  Plaintiffs' Class Definition Is Not Overbroad

Defendants contend that the classes' overbreadth defeats commonality because the classes include individuals who would not currently qualify for TPS—such as foreign nationals who fail

United States District Court
Northern District of California

15

United States District Court
Northern District of California

1    to re-register, who are no longer in the United States, or are otherwise ineligible for TPS.  ECF 99

2    at 9.  Plaintiffs argue that those foreign nationals who were TPS holders but have voluntarily or

3    involuntarily relocated after the termination of TPS suffered a common injury—the loss of the

4    rights afforded by TPS including, loss of lawful presence in the United States and protection from

5    detention and deportation.  ECF 117 at 4.  Plaintiffs also argue that those foreign nationals who

6    fail to timely re-register for TPS maintain a legal interest in their country's TPS designation.  *Id.*

7         To qualify for TPS, an individual must meet certain criteria including having been

8    "continuously physically present in the United States since the effective date of the most recent

9    designation," he or she must have "continuously resided in the United States since such date as the

10   [Secretary] may designate."  8 U.S.C. § 1254a(c).  Those foreign nationals who resided outside of

11   the United States during the duration of their country's TPS designation would not have been a

12   TPS holder and are definitionally excluded from the classes.  8 U.S.C. § 1254a(c).  The same may

13   be said for those foreign nationals disqualified based on their criminal history.  *Id.*  The eligibility

14   requirements for TPS sufficiently limit the scope of the proposed classes to mitigate Defendants'

15   concerns.

16        Additionally, to qualify for TPS, a foreign national generally must timely register for TPS.

17   8 U.S.C. § 1254a(c).  However, foreign nationals who would otherwise qualify for TPS but fail to

18   timely register still have an available channel for receiving the benefits of TPS.  8 C.F.R. §

19   244.17(b).  Specifically, "USCIS may, for good cause, accept and approve an untimely [TPS]

20   registration request."  Because late registrants may still ultimately receive the benefits of TPS,

21   even those foreign nationals who fail to timely register for TPS retain a legal interest in the

22   continued TPS designation of their country.  8 C.F.R. § 244.17(b).  Defendants' argument that the

23   class includes unregistered, and therefore uninjured class members, does not square with the

24   language of § 244.17(b).

25        Accordingly, the Court finds that the classes are sufficiently tailored to capture only those

26   who are allegedly injured by the Secretary's termination.

27        **c.  Each Putative Class Member Has Standing**

28        Defendants next challenge the classes on the grounds that some TPS holders lack standing

16

to join the litigation because they do not face a concrete injury.  ECF 99 at 10.  Again, Plaintiffs

argue that each putative class member faces the uniform harm of losing TPS due to Defendants'

unlawful termination of their country's TPS designation.  ECF 106 at 7.

Even if the class contains uninjured members, a certified class is permitted to have a de

minimis number of members who are uninjured.  *Ruiz Torres*, 835 F. 3d at 1136-37; *See also DZ

Reserve v. Meta Platforms, Inc.*, 96 F.4th 1223, 1239-40 (9th Cir. 2024) ("'In a class action,

standing is satisfied if at least one named plaintiff meets the requirements.  In order to establish

standing for injunctive relief, 'a plaintiff must show that he is under threat of suffering 'injury in

fact' that is concrete and particularized; the threat must be actual and imminent, not conjectural or

hypothetical; it must be fairly traceable to the challenged action of the defendant; and it must be

likely that a favorable judicial decision will prevent or redress the injury.")  Moreover, "[b]ecause

the preponderance of the evidence standard applies at the class certification stage, standing at the

time of class certification must be established by a preponderance of the evidence." *DZ Reserve*,

96 F.4th at 1240.

Plaintiffs argue that each putative class member risks the loss of the legal rights afforded to

them under the TPS statute, an injury sufficient to confer standing.  ECF 106 at 5.  Moreover,

Plaintiffs argue that their harms are directly traceable to the Secretary's termination decisions, and

Plaintiffs seek injunctive or declaratory relief from this Court as redress.  ECF 89 at 12.

Defendants draw this Court's attention to individuals whose country was given a TPS designation

prior to the Secretary's termination but who now have some alternative form of immigration

relief—such as, asylum beneficiaries, U Visa holders, T Visa holders, Parole in Place

beneficiaries, Diversity Visa holders, and EB Visa holders.  ECF 99 at 10.  They also draw the

Court's attention to individuals who have other available pathways to adjust status—such as, an

adjustment of status application, a lawful permanent resident relative, Special Immigrant Juvenile

Status, or a Violence Against Women Act of 1994 self-petition.  *Id.*  They argue that these other

forms of and pathways for relief provide the same or similar protections—work authorization and

protections from deportation—such that some members of the proposed class are unaffected by

the termination of TPS.  *Id.* at 10–11. Defendants argue that "sweeping in uninjured class

17

United States District Court
Northern District of California

1    members" renders the proposed classes overboard and class certification inappropriate.  *Id.*

2    However, Defendants arguments fall short for two reasons.  First, as Defendants

3    acknowledge, under Ninth Circuit precedent, this Court may appropriately certify a class which

4    contains some uninjured members so long as there is no "*great number of members* who for some

5    reason could not have been harmed by the defendant's allegedly unlawful conduct *Ruiz Torres v.*

6    *Mercer Canyons Inc.*, 835 F. 3d 1125, 1136-37 (9th Cir. 2016) (emphasis added); *see also Olean*,

7    31 F.4th at 669.

8    Defendants' argument that other forms of immigration relief or pathways for relief disrupts

9    commonality is also unavailing.  TPS offers protection independent of and distinct from those

10   forms of immigration relief identified by the Defendants.  *See* 8 U.S.C. § 1254a(a)(5).  In fact, the

11   TPS statute contemplates that a TPS holder might simultaneously receive benefits from other

12   forms of immigration status.  *Id.*  ("Nothing in this section shall be construed as authorizing the

13   Attorney General to deny temporary protected status to an alien based on the alien's immigration

14   status or to require any alien, as a condition of being granted such status, either to relinquish

15   nonimmigrant or other status the alien may have or to execute any waiver of other rights under this

16   chapter. The granting of temporary protected status under this section shall not be considered to be

17   inconsistent with the granting of nonimmigrant status under this chapter.").  The statute clearly

18   permits foreign nationals to hold TPS while holding another form of lawful nonimmigrant status.

19   *Id.*  To read another provision of the TPS statute as foreclosing this possibility would render §

20   1254a(a)(5) meaningless.  The Court rejects Defendants' interpretation of the TPS statute.  *Cooper*

21   *Indus., Inc. v. Aviall Servs. Inc.,* 543 U.S. 157, 167 (2004) (declining to read a statute in a manner

22   that would render part of it "entirely superfluous.").  Therefore, foreign nationals with TPS

23   protection have an independent, cognizable interest in TPS separate and apart from other forms of

24   immigration relief that may otherwise be available to them.  8 U.S.C. § 1254a(a)(5).  Other

25   available pathways for immigration relief does not defeat commonality for Plaintiffs' claims.  *Id.*

26   Accordingly, the Court finds that each putative class member has standing to sue for the

27   claims brought by the classes.

28

18

United States District Court
Northern District of California

### d. Plaintiffs' Due Process Claim Raises Common Questions of Law and Fact

Finally, Defendants argue that the Due Process Clause is a "flexible concept" and requires individualized examination of each foreign national's circumstances to render the appropriate relief. ECF 99 at 11. Plaintiffs argue that the Due Process clause bars the government from acting out of animus towards anyone present in the United States which includes all class members at the time of the challenged terminations. ECF 106 at 6.

In *Mansor v. USCIS*, the court rejected Defendants' argument that the proposed class could not satisfy commonality because resolution of common legal questions—including a claim under the Due Process Clause of the Fifth Amendment—required an individualized assessment of a person's prima facie eligibility for TPS. *See Mansor v. United States Citizenship & Immigr. Servs.*, 345 F.R.D. 193, 204 (W.D. Wash. 2023). The court found that Defendants' argument seemingly sought to impose Rule 23's implied "ascertainability" requirement that class members can be readily identified using clear and objective, rather than subjective criteria. *Id.* (citing *Xavier v. Philip Morris USA, Inc.*, 787 F. Supp. 2d 1075, 1089 (N.D. Cal. 2011). However, as the court noted, courts in the Ninth Circuit have concluded that the implied ascertainability requirement does not apply to Rule 23(b)(2) classes. *Id.* (citing *In re Yahoo Mail Litig.*, 308 F.R.D. 577, 596-98 (N.D. Cal. 2015); *Campbell v. Facebook, Inc.*, 315 F.R.D. 250, 259 (N.D. Cal. 2016); *Al Otro Lado, Inc. v. McAleenan*, 423 F. Supp. 3d 848, 872-73 (S.D. Cal. 2019). Similarly, here, Plaintiffs properly seek relief on a classwide basis for their Due Process claim. *Mansor*, 345 F.R.D. at 209.

To support their Due Process argument, Defendants refer this Court to legal authority analyzing the flexible standard for procedural due process. *Mathews v. Eldridge*, 424 U.S. 319, 321 (1976); *Jennings v. Rodriguez*, 583 U.S. at 314. Plaintiffs' claims arise under the equal protection component, not procedural component, of the due process clause. Compl. ¶ 163. Moreover, like Plaintiffs claims under the APA, Plaintiffs allegation that the Secretary's TPS terminations were motivated by improper animus raises a question common to all class members who definitionally share an origin outside of the United States. *Dukes*, 564 U.S. at 360.

Further, the facts favor granting class certification because Plaintiffs present evidence that

United States District Court
Northern District of California

is common to the class as a whole in support of their Due Process claim.  *Amgen*, 568 U.S. at 467 (finding that because an issue could "be proved through evidence common to the class" it was a "common question" for purposes of class certification).  Here, Plaintiffs present a series of statements made by Defendants and officials in the current administration to support the Due Process claim as to all plaintiffs.  *See, e.g.,* ECF 18- 20 at 9–10 (President Trump stating migrants were "poisoning the blood of our country."); *see also* ECF 18-23 (President Trump asking why people "could not come from nice countries . . . like Denmark, Switzerland, and Norway"); *see also* ECF 18-15 at 7:14–15 (Secretary Noem describing immigration as an "invasion happening on purpose . . . to remake the foundation of this country"); *see also* ECF 18-17 at 2 (Secretary Noem associated "migration management" with "sav[ing] American lives and get[ting] criminals off our streets!"); *see also* ECF 18-15 at 7 (Secretary Noem referring to immigrants as "some of the most dangerous people in the world" and claiming that other countries were "empty[ing] out their prisons, their mental institutions" and sending those individuals to the United States); *see also* ECF 18- 18 at 2 (DHS equating TPS holders with "MS-13 gang members," "known terrorists," and "murderers.").

Plaintiffs Due Process claim raises a common question for Rule 23 purposes and relies on evidence common to the class.  Accordingly, the Court finds that Plaintiffs Due Process claim does not defeat commonality.  *Amgen*, 568 U.S. at 467 (finding the use of evidence common to the class favors granting class certification).

### e.  Plaintiffs Satisfy Rule 23(a)(2)

The Court finds that the putative class members have a legal interest in the protections offered by TPS, the unlawful termination of which constitutes a uniform injury shared by each class member.  8 U.S.C. § 1254a(a).  Moreover, Plaintiffs constitutional claims raise common questions, rely on common evidence, and allege conduct which applies commonly to all class members.  *Dukes*, 564 U.S. at 350.  As such, Plaintiffs satisfy the commonality requirement of Rule 23(a).

//

### iii. The Class Representatives' Injuries are Typical of The Injuries Experienced by the Class

Plaintiffs contend that the Class Representatives and the putative class members each share a common injury in the unlawful termination of TPS itself. ECF 89; ECF 106. Defendants argue that Plaintiffs have not met the typicality requirement because each individual plaintiff faces different consequences from the termination of the TPS designation. ECF 99 at 12.

Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). The "test of typicality is whether other members have the same or similar injury, whether the action is based on conduct, which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992) (internal citation and quotations omitted). A plaintiff's claims are considered typical if they are "reasonably co-extensive with those of absent class members; they need not be substantially identical." *Castillo v. Bank of Am., NA*, 980 F.3d 723, 729. A plaintiff may not be typical if she is "subject to unique defenses which threaten to become the focus of the litigation." *Hanon*, 976 F.2d at 508. However, "[d]iffering factual scenarios resulting in a claim of the same nature as other class members does not defeat typicality." *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 985 n. 9 (9th Cir. 2011).

The Class Representatives in this case each alleged the same harm from the termination of TPS, namely the loss of those legal rights granted by the statute. ECF 89 at 2. Plaintiff Maria Elena Hernandez has been in the United States since 1996. ECF 17-4 ¶¶ 2, 4. She is a Nicaraguan who has held TPS for 26 years and risks the loss of her job, loss of social security, loss of health benefits, detention and deportation because of the Secretary's termination decision. *Id.* ¶¶ 10–17. Plaintiff Sandhya Lama has been in the United States since 2008. ECF 17-6 ¶ 2. She is a Nepali who has held TPS for 10 years and risks detention, deportation, separation from her three U.S. citizen children, and political persecution from the Nepali government because of the Secretary's termination decision. *Id.* ¶¶ 2–16. Plaintiff Teofilo Martinez has been in the United States since 1997. ECF 17-8 ¶¶ 2, 5. He is a Honduran TPS holder who risks the loss of his job, his realtor license, his driver's license, separation from his life partner, detention, and deportation because of

United States District Court
Northern District of California

United States District Court
Northern District of California

the Secretary's termination decision. *Id.* ¶¶ 2–18.  Plaintiff Denis Molina has been in the United States since 1997.  ECF 17-2 ¶¶ 2, 5.  He is a Honduran TPS holder who risks the loss of his job, the ability to support his four U.S. citizen children—two of whom have special needs—detention, and deportation because of the Secretary's termination decision. *Id.* ¶¶ 2–11.  Plaintiff Johny Silva has been in the United States since 1999.  ECF 17-3 ¶¶ 1–2.  He is a Honduran who has had TPS for almost his entire life and risks the loss of his job, separation from his family, loss of the ability to care for his young U.S. citizen child with special needs, detention, and deportation because of the Secretary's termination decision. *Id.* ¶¶ 2–16.

Defendants argue that Plaintiffs fail to satisfy typicality for two reasons.  Similar to their argument regarding commonality, Defendants argue that the termination of TPS results in unique injuries for each proposed class member and that the varying immigration statuses of the proposed class members necessarily means that some will not face any injury.  ECF 99 at 12.  Defendants argue they may raise a unique defense based on lack of Article III standing against those plaintiffs, rendering class certification inappropriate.  *Id.*  And as discussed above, the Court finds that each class member does face the same harm of loss of TPS.  8 U.S.C. § 1254a(a).  Moreover, as discussed above, whether some have other forms of immigration relief available to them presently, or in the future, is tangential to the benefits afforded to them by TPS itself.  8 U.S.C. § 1254a(c).

Because each putative class member is uniformly subject to the allegedly unlawful termination of TPS, the Court finds that the Class Representatives are similarly situated to the absent class member.

### iv.  The Class Representatives and Class Counsel Will Fairly and Adequately Represent the Classes' Interests

#### a.  Class Representatives Will Adequately Represent the Classes

Plaintiffs argue that the Class Representatives will fairly and adequately protect class interests because their interests are not likely to conflict with the interests of the class members.  ECF 89 at 9.  Defendants do not dispute the adequacy requirement.  *See generally* ECF 99.

22

Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4).  The adequacy requirement has two components: "(1) whether there are conflicts within the class; and (2) whether plaintiffs and counsel will vigorously fulfill their duties to the class." *Amey v. Cinemark USA Inc.*, No. 13-CV-05669-WHO, 2018 WL 3956326, at *6 (N.D. Cal. Aug. 17, 2018) (citing *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 985 (9th Cir. 2011)).  The adequacy depends on "the qualifications of counsel for the representatives, an absence of antagonism, a sharing of interests between representatives and absentees, and the unlikelihood that the suit is collusive." *Walter v. Reno*, 145 F.3d 1032, 1046 (9th Cir. 1998).  The Court may find that Plaintiffs satisfy the adequacy requirement where the Class Representatives have a "shared interest" or "mutual goal" with the proposed class members. *Nightingale v. USCIC*, 333 F.R.D. 449, 462 (N.D. Cal. 2019).

Here, the Class Representatives do not seek damages or any other forms of relief that are unique to them or which would not apply to absent class members.  ECF 89 at 10.  All class members seek a declaration that Defendants' terminations of TPS for the three countries are unlawful, an order setting aside, postposing and staying the TPS terminations, and an injunction enjoining and restraining Defendants from enforcing the TPS terminations.  *Id.* at 9.  Because the Plaintiffs seek the same relief for all class members for the same alleged misconduct, the interests of the Class Representatives and absent class members are substantially identical.  *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 120 (9th Cir. 1998).

Thus, the Court finds the Plaintiffs have demonstrated that the Class Representatives will adequately represent absent class members in the litigation.  *Id.*  Defendants do not challenge adequacy.  *See generally* ECF 99.

### b.  Class Counsel Will Adequacy Represent the Classes

Plaintiffs argue that Class Counsel is well qualified to represent the class members and will vigorously do so because their interests are not likely to conflict with the interests of the class

United States District Court
Northern District of California

members.  ECF 89 at 9.  Defendants do not dispute the adequacy requirement.  *See generally* ECF 99.

"[A] court that certifies a class must appoint class counsel."  Fed. R. Civ. P. 23(g)(1).  When appointing class counsel, courts consider: "(i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class."  *Id.* at 23(g)(1)(A)(i)–(iv).

The proposed Class Counsel includes Ahilan Arulanantham, Emilou MacLean, Eva Bitrán, Michelle (Minju) Y. Cho, Diana Sánchez, Amanda Young, Jessica Karp Bansal, and Erik Crew.  ECF 89 at 10–11.  The proposed Class Counsel have, collectively, decades of experience in class action lawsuits and other litigation involving civil rights and immigration law.  *Id.*  The organization represented by these attorneys include the Center for Immigration Law and Policy at the UCLA School of LAW, the ACLU Foundation of Northern California, the ACLU Foundation of Southern California, the National Day Laborer Organizing Network, and the Haitian Bridge Alliance.  *Id.*  These nonprofit, nonpartisan, and educational institutions have been involved in complex civil litigation, specifically in the context of immigration law, for decades.  *Id.*

Ahilan Arulanantham is an attorney, Professor from Practice, and Faculty Co-Director of the Center for Immigration Law and Policy at the UCLA School of Law.  Arulanantham Decl. ¶ 1.  Mr. Arulanantham has extensive experience litigating civil rights cases for immigrants, serving as lead or co-lead counsel in a number of complex immigration cases.  *Id.* ¶ 5.  He also has served as a resource for other non-profit and pro bono attorneys involved in complex immigration litigation for many years.  *Id.* ¶ 7

Emilou MacLean is an attorney at the ACLU Foundation of Northern California (ACLU-NC) and the ACLU Foundation of Southern California (ACLU-SC).  MacLean Decl. ¶ 5.  Ms. MacLean has served as lead counsel for dozens of civil rights class actions and has extensive experience litigating immigrants' including in the context of TPS.  *Id.* ¶ 6–14.

United States District Court
Northern District of California

1    Eva Bitrán is Director of Immigrants' Rights and a staff attorney at ACLU-SC. *Id.* ¶ 8.

2    Mr. Bitrán has years of experience litigating complex civil cases for immigrants' rights. *Id.* She

3    has spent much of her legal career representing immigrant litigants in federal class actions, serving

4    as class counsel in some. *Id.* ¶ 9.

5    Michelle (Minju) Y. Cho is a Senior Staff Attorney at ACLU-NC and an experienced

6    immigrants' rights litigator. *Id.* ¶ 10. She has served as, or is currently serving as, co-class

7    counsel for certified, or provisionally certified, class litigation involving complex immigration

8    matters. *Id.* ¶ 11.

9    Diana Sánchez is a staff attorney at ACLU-SC with notable experience on immigrants'

10    rights issues and in complex civil litigation, including immigration enforcement, civil rights and

11    liberties, and related statutory and regulatory rights. *Id.* ¶¶ 12–13.

12    Amanda Young is an attorney at ACLU-NC serving as co-counsel on several complex civil

13    rights cases. *Id.* ¶ 14.

14    Jessica Karp Bansal is an attorney at the National Day Laborer Organizing Network

15    (NDLON), an organization dedicated to advancing the rights of immigrants and low-wage workers

16    in the United States. Bansal Decl. ¶ 4. Ms. Bansal has spent her legal career working on

17    immigrants' rights cases, obtaining substantial experience litigating cases involving immigrants'

18    rights—including in the TPS contact. *Id.* ¶ 6–8.

19    Erik Crew is an attorney at the Haitian Bridge Alliance (HBA), a grassroots and

20    community-based nonprofit organization that provides migrants and immigrants with

21    humanitarian legal and social services, and advocates for fair and humane immigration policies.

22    Crew Decl. ¶ 4. HBA has been involved in litigation regarding immigrants' rights since 2020. *Id.*

23    ¶¶ 6–7.

24    Accordingly, pursuant to Federal Rule of Civil Procedure 23(g)(1)(A), the Court finds that:

25    (1) Plaintiffs' counsel have diligently identified and investigated potential claims in this litigation;

26    (2) counsel have sufficient experience in pursuing class cases; (3) counsel have demonstrated an

27    adequate understanding of the applicable law; and (4) counsel have the necessary resources to

28    fully represent the class throughout this litigation and are committed to dedicating those resources

United States District Court
Northern District of California

1    to this case.

2           The Court finds that the Rule 23(g) factors particularly weigh in favor of appointing Mr.

3    Arulanantham of the Center for Immigration Law and Policy at the UCLA School of Law as lead

4    counsel for Plaintiffs.  Mr. Arulanantham's years of service as a pro bono attorney for complex

5    immigration litigation and his role as an educator who teaches immigration law speaks to his

6    experience, his knowledge of the issues, and his commitment to fully and adequately represent the

7    interests of the Plaintiffs.   This Court finds Class Counsel will vigorously fulfil their duties to the

8    class in this litigation.  Moreover, with no reason to doubt that the Center for Immigration Law

9    and Policy at the UCLA School of Law have the necessary resources to devote to representing the

10   classes, the Court finds that Ahilan Arulanantham satisfies the criteria to serve as lead counsel.

11   Accordingly, the Court finds that the Class Representatives and Class Counsel satisfy the

12   adequacy requirement of Rule 23.

13          **C.      The Relief Plaintiffs Seek Is Proper Under Rule 23(b)(2)**

14          Plaintiffs argue that they meet the requirements for class certification under Rule 23(b)(2)

15   because Defendants engaged in a preordained and racially motivated effort to terminate TPS

16   without regard to statutory requirements or past practice.  ECF 106 at 9.  Defendants argue that

17   certification of a Rule 23(b)(2) class is inappropriate because the relief Plaintiffs seek is barred by

18   8 U.S.C. § 1252(f)(1) and by Rule 23 itself.  ECF 99 at 14.

19          Rule 23(b)(2) requires that "the party opposing the class has acted or refused to act on

20   grounds that apply generally to the class, so that final injunctive relief or corresponding

21   declaratory relief is appropriate respecting the class as a whole."  When class members seek

22   uniform injunctive or declaratory relief applicable classwide, the requirement of a Rule 23(b)(2)

23   class is "unquestionably satisfied."  *Parsons*, 754 F.3d at 688.

24          Defendants argue that certification of a Rule 23(b)(2) class is improper because each

25   individual class member would be entitled to a different injunction or declaratory judgment, if any,

26   because they all face different injuries, and some face no injury at all.  ECF 99 at 14.  However,

27   for the reasons discussed above, this argument is misplaced.  The Secretary's terminations impact

28   the rights and benefits afforded to all TPS holders uniformly.  8 U.S.C. § 1254a.  Here, final

United States District Court
Northern District of California

injunctive relief would be appropriate to address the rights of the whole group.  *Parsons*, 754 F.3d at 688 ("[Rule 23(b)(2) requirements are unquestionably satisfied when members of a putative class seek uniform injunctive or declaratory relief from policies or practices that are generally applicable to the class as a whole.").

### i.   Plaintiffs Requested Relief Is Not Barred by 8 U.S.C. § 1252(f)(1)

Although Defendants argue that the form of relief sought by the Plaintiffs is barred by 8 U.S.C. § 1252(f)(1) and by Rule 23 itself, the Ninth Circuit flatly rejected Defendants' argument in litigation running parallel to this one brought by the National TPS Alliance challenging the Secretary's termination of TPS for Venezuela.  *Nat'l TPS All.*, No. 25-2120, slip op. at 30.  There, the Ninth Circuit held that "section 1252(f)(1) does not prohibit relief in the form of a stay or postponement of agency action under the APA" and that a district court order that does "enjoin or restrain" the Secretary's policy "is not barred by 1252(f)(1) if it affects only agency actions that exceed the agency's statutory authority."  *Id.*  Instead, 1252(f)(1) only "limits the district court's authority to enjoin [an agency] from carrying out legitimate [] orders."  *Id.*  Plaintiffs here allege that the Secretary acted outside of her statutory authority by executing a preordained decision to terminate TPS designations, failing to abide by previous practices with respect to notice of termination, and relying on racial- and national-origin-based animus.  ECF 89 at 1.  Therefore, injunctive or declaratory relief from such actions do not fall within the restrictive language of 1252(f)(1).  *Nat'l TPS All.*, No. 25-2120, slip op. at 30; *see also Immigr. Defs. L. Ctr. V. Noem*, 145 4th 972, 990 (9th Cir. 2025) (holding that 1252(f)(1) does not bar injunctive relief for claims under the APA).  Moreover, Defendants acknowledge binding precedent which rejects Defendants' argument that 1252(f)(1) bars declaratory relief.  ECF 99 at 16 (citing *Rodriguez v. Hayes*, 591 F.3d 1105, 1119 (9th Cir. 2010)).

### ii.   Plaintiffs' Rule 23(b)(2) Classes May Seek Vacatur

Finally, Defendant argues that a Rule 23(b)(2) class cannot be certified where plaintiffs seek relief in a form other than "final injunctive relief or corresponding declaratory relief."  ECF 99 at 17–18.  The exclusion of vacatur from the enumerated forms of relief under Rule 23(b)(2), Defendants argue, removes the possibility that Plaintiffs may seek vacatur of the TPS terminations

1     under 5 U.S.C. § 706 as a Rule 23(b)(2) class. *Id.*

2          However, courts have routinely certified Rule 23(b)(2) classes seeking vacatur relief under

3     the APA. *See, e.g., Scholl v. Mnuchin*, 494 F. Supp. 3d 661, 692 (N.D. Cal. 2020) (certifying a

4     Rule 23(b)(2) class and vacating a federal action); *Thakur v. Trump*, No. 25-CV-04737-RFL, 2025

5     WL 1734471, at *31 (N.D. Cal. June 23, 2025); *Kidd v. Mayorkas*, 734 F.Supp.3d 967, 976, 987

6     (C.D. Cal. May 15, 2024); *Refugee & Immigr. Ctr. for Educ. & Legal Servs. v. Noem*, No. CV 25-

7     306 (RDM), 2025 WL 1825431, at *49, 51 (D.D.C. July 2, 2025) (certifying Rule 23(b)(2) class,

8     vacating federal guidance, and entering declaratory judgment*); O.A. v. Trump*, 404 F. Supp. 3d

9     109, 118 (D.D.C. 2019) (certifying a (b)(2) class and vacating a federal action*); L.V.M. v. Lloyd*,

10    318 F. Supp. 3d 601, 621 (S.D.N.Y. 2018).

11         This Court finds that certification of the three classes seeking injunctive relief is proper

12    under Rule 23(b)(2) and is not prohibited by 8 U.S.C. § 1252(f)(1).

13    **D.     Certifying Nationwide Classes is Proper**

14         Lastly, Defendants caution the Court against certifying a nationwide class here considering

15    the Supreme Court's recent ruling in *Trump v. CASA, Inc.,* 145 S. Ct. 2540, 2555 (2025). ECF 99

16    at 17. Defendants argue that certification of a nationwide class ought not be an attempt to end-run

17    the recent prohibition on universal injunctions. ECF 99 at 17. They argue that the legal questions

18    presented in this case would be better served by percolation in other judicial districts as parties

19    litigate this issue across the country. *Id.* at 18. "At a minimum," Defendants argue, "the class

20    should be limited to this judicial district." *Id.* Plaintiffs argue that nationwide relief is necessary

21    because the putative class members are geographically dispersed nationwide and some lack

22    financial resources to litigate individually. ECF 106 at 12.

23         As noted above, the parties agree that nationwide classes are appropriate in some

24    circumstances. ECF 99 at 17; ECF 89 at 11. The concurring opinions of Justices Alito and

25    Kavanaugh in *Trump v. CASA, Inc* affirm as much. *See CASA, Inc.,* 145 S. Ct. at 2566 (Alito, J.,

26    concurring) ("Of course, Rule 23 may permit the certification of nationwide classes[.]"); *Id.* at

27    2569 (Kavanaugh, J., concurring) (observing district courts may "grant or deny the functional

28    equivalent of a universal injunction—for example, by granting or denying a preliminary injunction

United States District Court
Northern District of California

to a putative nationwide class under Rule 23(b)(2)"); *see also Califano*, 442 U.S. at 702 ("Nothing in Rule 23 . . . limits the geographical scope of a class action that is brought in conformity with that Rule.").  Furthermore, precedent in this Circuit approve of nationwide classes in appropriate immigration contexts.  *See Garcia v. Johnson*, No. 14-CV-01775-YGR, 2014 WL 6657591, at *15–16 (N.D. Cal. Nov. 21, 2014); *see aslo Perez–Funez v. Dist. Dir., I.N.S.*, 611 F. Supp. 990, 1000, 1005 (C.D. Cal. 1984).

Regarding Defendants' concern about the opportunity for litigants in other judicial districts to raise the issues presented in this case, recently, even within the past few months, several cases addressing nearly identical claims based on the termination of TPS for Haiti, Afghanistan, Cameroon and El Salvador have been brought before courts in Maryland, in New York, and in Massachusetts.  *CASA, Inc. v. Noem,* No. CV 25-1484-TDC, 2025 WL 1907378, at *6 (D. Md. July 10, 2025); *Haitian Evangelical Clergy Ass'n v. Trump*, No. 25-CV-1464 (BMC), 2025 WL 1808743, at *1 (E.D.N.Y. July 1, 2025); *Centro Presente v. Department of Homeland Security,* 332 F.Supp.3d 393 (D. Mass. 2018). Thus, foreign nationals are litigating these issues in other districts, and those district courts are drawing the same conclusions.

Where appropriate, resolution of a class wide complaint will inevitably have nationwide consequences.  The "procedural protections" provided by the requirements of Rule 23 keep federal courts from stepping outside of the traditional role of the judiciary when granting "relief that benefits parties and nonparties alike."  *CASA, Inc.,* 145 S. Ct. at 2556.

## IV.   CONCLUSION

This Court finds the Plaintiffs have satisfied all the requirements of Rule 23(a) and Rule 23(b)(2).  Accordingly, this Court GRANTS Plaintiffs motion to certify the Honduras TPS Class, the Nepal TPS Class, and the Nicaragua TPS Class.

//

//

//

//

//

29

The Court appoints Ahilan Arulanantham, Emilou MacLean, Eva Bitrán, Michelle (Minju) Y. Cho, Diana Sánchez, Amanda Young, Jessica Karp Bansal, and Erik Crew as Class counsel.

This order resolved ECF 89.

IT IS SO ORDERED.

Dated: October 2, 2025

TRINA L. THOMPSON
United States District Judge

## **EXHIBIT D**

ECF 192, Hearing Tr. (Nov. 18, 2025)

Pages 1 - 102

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Trina L. Thompson, Judge


NATIONAL TPS ALLIANCE, et al,      )
                                   )
                   Plaintiffs,     )
                                   )
          vs.                      )    **NO. 3:25-cv-05687-TLT**
                                   )
KRISTI NOEM, et al,                )
                                   )
                   Defendants.     )
_____     )


                              San Francisco, California
                              Tuesday, November 18, 2025

                    **TRANSCRIPT OF MOTION HEARING**

**APPEARANCES:**

For the Plaintiffs:

                    NATIONAL DAY LABORER ORGANIZING NETWORK
                    1030 S. Arroyo Parkway, Suite 106
                    Pasadena, CA 91105
          BY:    **JESSICA KARP BANSAL, ATTORNEY AT LAW**

                    ACLU OF NORTHERN CALIFORNIA
                    39 Drumm Street
                    San Francisco, CA 94111
          BY:    **EMILOU MACLEAN, ATTORNEY AT LAW**




REPORTED REMOTELY BY:   Andrea Bluedorn, RMR, CRR
                        Official United States Reporter

1   **APPEARANCES:**      (CONTINUED)

2   For the Plaintiffs:

3                       HAITIAN BRIDGE ALLIANCE
                        4560 Alvarado Canyon Rd, Ste H
                        San Diego, CA 92120

4               BY:  **ERIK MATTHEW CREW, ATTORNEY AT LAW**

5

6   For the Defendants:

                        DOJ-CIV
                        Office of Immigration Litigation

7                       P.O. Box 868
                        Ben Franklin Station

8                       Washington, DC 20044

                BY:  **WILLIAM WEILAND, ATTORNEY AT LAW**

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**Tuesday, November 18, 2025**                                    **10:31 a.m.**

                        P R O C E E D I N G S

                            ---o0o---

         **COURTROOM DEPUTY:**  Now calling case number

25-CV-05687, National TPS Alliance, et al, versus Noem, et al.

         Counsel, would you please come forward to the podium

and state your appearances, beginning with the plaintiffs.

         **MS. BANSAL:**  Good morning, Your Honor.  Jessica Bansal

for the plaintiffs.

         **THE COURT:**  Good morning.

         **MS. MACLEAN:**  Good morning, Your Honor.  Emilou

MacLean also for the plaintiffs.

         **THE COURT:**  Good morning.

         **MR. CREW:**  Good morning, Your Honor.  Eric Crew for

the plaintiffs.

         **THE COURT:**  Thank you.  Good morning.

         **MR. WEILAND:**  Good morning, Your Honor.  Will Weiland

for the Government.

         **THE COURT:**  Good morning.  Always a pleasure to see

each of you.

         All right.  My apologies that the questions for

today's hearing were not posted last night.  I had hoped that

you'd have a little time for reflection on some of the

questions.  But what I want you to focus on also is the time

constraints that we have.

1          Our court reporter is remote, and we want to make sure

2     that we adhere to the time constraints so that all matters can

3     be heard.  I provided you with questions so that we can spend

4     this time going through the things that are most important to

5     the Court in making its final ruling.

6          We will start with the motion to dismiss.  This is

7     somewhat of an odd procedural posture where we have a motion to

8     dismiss and a motion for summary judgment on the same day.

9          I would strongly encourage you to clarify why we're in

10    this procedural posture, and why the Court should not consider

11    the motion to dismiss as additional filing for a motion for

12    summary judgment.

13         So we've broken things down in terms of what I believe

14    the parties are asking the Court to review.  And we'll start

15    with the motion to dismiss.

16         Those who are addressing the motion to dismiss should

17    come forward.

18         In framing the issue, and keeping in mind that the

19    Ninth Circuit, when they stayed this matter for their purposes,

20    they allowed this Court to continue on with its proceedings,

21    but it stayed the Court's decision on the postponement.

22         You should also address what impact that has had, if

23    any, and procedurally how that impacts the posture of this

24    case.

25         In reading the Ninth Circuit's decision, it was clear

1    to this Court that it was not prohibiting the Court from moving

2    forward in terms of analyzing the merits of the case, but only

3    indicating that the Court's postponement was stayed.  That did

4    not render a decision on the merits in any way.  If you believe

5    to the contrary, you should definitely make your record in that

6    regard.

7            So that means that basically we're almost starting

8    anew in terms of this record.

9            So from what I can glean from the motion to dismiss,

10   we're once again revisiting jurisdiction and whether this Court

11   has jurisdiction to hear this matter, and then, secondly, with

12   regard to the motion to dismiss, whether the plaintiffs have

13   stated a claim upon which relief can be granted.

14           It is the posture of the Government that this Court

15   does not have jurisdiction, and that the Court does not have

16   jurisdiction pursuant to the following:  8 USC 1254, and

17   sequence 1252, nor under 5 USC 701(a)(2).  This presumes that

18   there is unfettered, unreviewable, absolute discretion of the

19   Secretary that almost gives rise to having more power than

20   perhaps the Executive head of the U.S., in that nothing can be

21   reviewed by way of this statutory language.

22           That gave me pause when we had the first go around of

23   these proceedings as to whether that is, in fact, true, and

24   whether the statutory language is absolutely clear in that

25   regard or whether it's a matter of interpretation.

1          As you know, things have changed over time.  At one

2     point, we had to adhere to the Chevron doctrine and give full

3     deference to agencies.  And that has evolved.

4          You have to determine and argue whether that impacts

5     this Court's decision and whether we're back in the land of

6     *Skidmore*, whether we are based on *Relentless* and *Loper Bright*

7     now in a space where it's somewhat unique after 40 years of law

8     that the Court has to pause and determine what its role is.

9          So I'm giving you kind of the broad scope of things.

10          It is the motion of the Government in terms of the

11     motion to dismiss.  Please be sure that you address the

12     questions that are in the Court's document.  And keep in mind,

13     I have read everything you've given me.

14          So in that regard, those of you who see the puffiness

15     in my eyes and the fact that I probably haven't slept in three

16     days is reflective of the academic exercise you provided.

17          With that in mind, please be sure, so my record is

18     clear and so I'm clear, since I'm taking this under submission,

19     which exhibits you are relying upon for each of your arguments.

20     So when you're asking the Court to take and to consider certain

21     factual information -- and this will pertain more to the motion

22     for summary judgment.  In the motion to dismiss, the Court is

23     looking at the four corners of the complaint.

24          And I note that there was a request that the Court go

25     beyond that.  But if it -- if you're asking me to go beyond,

1    you have to specifically identify what it is you want me to

2    consider.  If it's a matter of judicial notice, or if it's a

3    matter of incorporation by reference, let's get our rules.

4    FRCP201 does not mean that I can take judicial notice of

5    everything, particularly if there's hearsay.

6          Judicial notice was a concept -- for example, the sun

7    rises here and it sets there and that it was raining on a day

8    and we all got wet.  Something that is unconverted.  But when

9    you're asking me to take into consideration documents or other

10   things, you have to be very clear on this record what it is,

11   what's the purpose, and what you're asking me to take judicial

12   notice or incorporate by reference, to what extent.

13         And then I have to analyze it to see whether I have

14   that full record.  Do I have it in context?  And does it

15   contain information that would not survive a hearsay objection

16   or otherwise.

17         So with that, counsel for the Government, you may

18   begin.

19         **MR. WEILAND:**  Thank you.

20         **THE COURT:**  Thank you.  We're focused solely on the

21   motion to dismiss at this stage.

22         **MR. WEILAND.**  Yes, Your Honor.

23         And I won't belabor much of what has been already

24   briefed in full in our written pleadings, but I will address

25   the Court's question, I believe it's the first question this

1   morning, with regards to jurisdiction.  Because you're correct,

2   Your Honor, we have addressed this before Your Honor.  This is

3   very similar to the arguments we made -- very similar to the

4   arguments that were made on the postponement motion.

5          This case begins and ends with the jurisdictional

6   analysis and for the many statutes and reasons that Your Honor

7   noted in its question.

8          First, the Government asserts that the TPS statute

9   itself, 8 USC Section 1254a, specifically precludes judicial

10  review with regards to any determination with respect to a

11  designation termination or extension.

12         That's a very expansive -- as Your Honor noted, that

13  is a very expansive judicial review bar specifically written

14  into the statute by Congress.  And it's meant to preserve the

15  near unfettered discretion of the Executive to exercise foreign

16  and immigration policy.

17      **THE COURT:**  All right.  You said "the near

18  unfettered."  So can you explain that modifier?

19         And when you say "any," are you also -- are you also

20  proffering that there are no exceptions or no other mechanism

21  by which the Court has authority to review a decision,

22  procedurally or otherwise?

23      **MR. WEILAND:**  I apologize, Your Honor, it is

24  unfettered.  It is unfettered review.

25         This is solely the discretion of the Secretary and the

1    Executive.  That's what Congress wrote in its exercise about

2    the political branchs' powers over immigration.

3           **THE COURT:**  And the statute says "solely"?

4           **MR. WEILAND:**  It does not.  It says "any."  The

5    statute --

6           (Court reporter interrupts for clarification.)

7           **THE COURT:**  Thank you.  For our court reporter, I'm

8    trying to assist by making sure I repeat the comment, because I

9    can tell that there was perhaps some audio challenge.

10          So when you say "solely," and I ask whether this is in

11   the statute -- and keep in mind you're asking me to participate

12   in statutory interpretation, so I have to really look at the

13   letter of the statute and whether this interpretation means

14   that there are no circumstances from your -- from the

15   Government's perspective that missteps procedural error, animus

16   or anything that gives one pause or raises a red flag, does not

17   allow the Court to examine that based on the wording of the

18   statute.

19          **MR. WEILAND:**  That's correct, Your Honor.

20          And I apologize if I was not speaking into the

21   microphone.

22          This statute itself says, There is no judicial review

23   of any determination of the Attorney General, now the Secretary

24   of Homeland Security, with respect to the designation or

25   termination or extension of a designation of a foreign state

1    under this subsection.  That is very clear and stark language.

2    No judicial review of any determination with respect to the

3    designation, termination or extension of a designation.

4         And in this case, plaintiffs are challenging a

5    determination to terminate the designations for three

6    countries; Honduras, Nicaragua, and Nepal.

7         **THE COURT:**  All right.  If that is true, can you

8    explain why Congress provided some guidance on the procedure

9    for termination, the necessity to review with justice partners

10   and agency partners, to get their recommendation to look at the

11   conditions of a particular country to see whether they're in a

12   position to receive their nationals and other criteria, if it

13   is totally unfettered and unreviewable.

14        **MR. WEILAND:**  Because the -- Congress was providing

15   guidance but not an opportunity for this Court to intercede in

16   that determination.

17        It's quite clear that the political branches view this

18   as an area of law that is solely within their sphere.  This is

19   foreign relations.  This is immigration policy.  And Congress

20   is making that clear, that this is not for judicial review.

21        **THE COURT:**  And the binding authority, by way of case

22   law from the United States Supreme Court, as well as our Ninth

23   Circuit.  And then how do you address those cases in which the

24   Court has found that the Court has jurisdiction to hear these

25   matters?

1          **MR. WEILAND:**  I would say nothing specifically on

2    point with regards to 8 USC 1254a, Your Honor.  I don't believe

3    the Supreme Court has spoken to the judicial review bar in this

4    statute.  It certainly has spoken to similar judicial review

5    bar similarly worded, judicial review bars that we believe are

6    persuasive, potentially binding on the Court, but not --

7          **THE COURT:**  Potentially binding.

8          **MR. WEILAND:**  They're certainly strongly persuasive,

9    Your Honor, but they are not specific to this statute.  So, no,

10   they would not be absolutely binding on the Court.

11         **THE COURT:**  All right.  Because I have to make sure

12   that I'm adhering to the rule of law and that I'm guided by

13   binding authority in making my ultimate decision.

14         **MR. WEILAND:**  Yes, Your Honor.

15         With regards to the previous cases that have found

16   jurisdiction, there is substantial ongoing review.  In the

17   current administration, there are cases that are on appeal to

18   the Ninth Circuit, that you're aware of.  And those cases have

19   in some fashion progressed at least to the Supreme Court for a

20   stay of District Court rulings.  But they remain active.

21         So there's no binding precedent out of those on this

22   particular question.

23         **THE COURT:**  And when there's a stay, is that a

24   decision on the merits, or is that just a pause to allow for

25   things to go through the litigation course and determine

1  whether there's a body of cases that guide the Court in making

2  its ultimate decision?

3          **MR. WEILAND:**  It has been the Government's

4  understanding that the stay pertaining to the orders

5  specifically addressed in the motions that the Supreme Court,

6  that is the postponement orders.  We have not interpreted -- or

7  the defendants have not interpreted that as precluding this

8  Court from going forward.  Indeed, it appears that the

9  expectation is that it continues to move forward, which is why

10  defendants filed this motion to dismiss in accordance with the

11  timelines under the Federal Rules.

12          **THE COURT:**  All right.  If this Court were to find

13  that it does have jurisdiction moving to the next prong -- and

14  feel free to go back to the jurisdictional issue if you feel

15  that I'm moving too fast.  If I were to find that I do have

16  jurisdiction to hear this case, please give me your best

17  argument as to why the Court should dismiss this matter based

18  on the plaintiffs' failure to state a claim upon which relief

19  can be granted.

20          That is your other basis.  Is that correct?

21          **MR. WEILAND:**  Yes, Your Honor.  Specifically with

22  regards to the equal protection claim, the due process claim

23  under the Fifth Amendment.

24          **THE COURT:**  All right.  And if you're going to cite to

25  the equal protection claim and the due process claim, I would

1   strongly encourage you to recite the standard under Arlington

2   and the standard under *Trump versus Hawaii*, if that is what

3   you're relying on to make your argument.

4           You may continue.

5           **MR. WEILAND:**  Thank you, Your Honor.

6           I do want to address just one aspect of Your Honor's

7   last question before this one with regards to any binding

8   authority.

9           **THE COURT:**  All right.

10          **MR. WEILAND:**  Defendants do point to the Ninth

11  Circuit's panel opinion in the *Ramos* case, although not binding

12  because the decision was vacated pursuant to rehearing en banc

13  that didn't occur.  We do -- the defendants do assert that it

14  is persuasive in that it specifically stated that the TPS

15  statute precludes the review of nonconstitutional claims that

16  fundamentally attack the Secretary's specific TPS

17  determinations, as well as the substance of her discretionary

18  analysis in reaching those determinations.

19          Foreclosing judicial review conforms with the

20  statutory screen that does not dictate any substantive

21  guidelines or restrictions on the matter by which the Secretary

22  may reach her determinations, and does not set forth or define

23  the determination of foreign state the Secretary must consider

24  or how she should weigh these considerations.

25          We think -- the defendants assert that is not --

```
1   although not binding on this Court by virtue of having been

2   vacated, extraordinarily persuasive.

3            THE COURT:  All right.  Let's tease that out a little

4   bit.

5            In Ramos, is it your position that that precludes any

6   and all review by this Court if the Court were persuaded by the

7   Ninth Circuit vacating the Ramos decision?

8            MR. WEILAND:  I'm sorry, I may not be following the

9   thread of your question.

10           THE COURT:  What is your position in terms of what

11  Ramos prohibits this Court from doing and whether there are any

12  carve outs.

13           MR. WEILAND:  Yes, Your Honor.  It was speaking --

14  that was speaking to the nonconstitutional claims, the APA

15  claims specifically.  I do -- the Ramos court did find that it

16  could review the constitutional claims, and then went on to

17  find that the plaintiffs had not -- in that case had stated a

18  sufficient claim under 12(b)(6).

19           THE COURT:  All right.  So do you agree as the law

20  stands now, at a very minimum, the Court can review

21  constitutional claims?

22           MR. WEILAND:  I cannot agree with it.  My client does

23  not agree with that, Your Honor.  To the extent that the Ramos

24  case said that, there is a real question of whether or not that

25  was correct.
```

1          **THE COURT:**  All right.  Are there -- is there any

2    binding authority that says that I cannot consider the

3    constitutional claims?

4          **MR. WEILAND:**  No, Your Honor, there is no binding --

5          **THE COURT:**  All right.  Thank you.

6          My apologies for the interruption.  You may proceed.

7          **MR. WEILAND:**  No, Your Honor.  With regards to failure

8    to state a claim upon which relief can be granted, I believe

9    this also goes towards defendants' argument on 8 USC

10   1252(f)(1), which precludes the Court from entering classwide

11   injunctive relief or relief that will enjoin or restrain, is

12   the operative language, the operation of this statute.  And

13   this one is clearly covered by that bar.

14         And so it applies not only to the jurisdictional

15   analysis of this Court, but also to whether or not under the

16   equal protection claim that this Court even has the authority

17   to provide the plaintiffs with the relief they seek.

18   Particularly in the context of -- that they're now being a

19   certified class, that that statute is even more in play, for

20   lack of a better term.

21         Your Honor, may I grab that water from my --

22         **THE COURT:**  Yes.

23         **MR. WEILAND:**  Thank you.

24         **THE COURT:**  And I apologize, because I'm sitting here

25   drinking my water and didn't invite both counsel to grab a cup

 1    of water.

 2              **MR. WEILAND:**  Thank you, Your Honor.

 3              **THE COURT:**  You're welcome.

 4              **MR. WEILAND:**  And then also with regards to the

 5    failure to state a claim upon which relief can be granted, the

 6    defendants also assert that under the APA, matters that are

 7    designated as being within the province of the sole -- of the

 8    discretion of the Secretary are beyond the province of APA

 9    review, as noted in Your Honor's questions to the parties this

10    morning.

11              That -- the APA -- this is the Government's 5 USC

12    701(a) argument that the chapter applies except for agency

13    action committed to agency discretion by law.

14              Defendants assert that 8 USC 1254a provides unfettered

15    discretion to the Secretary here.

16              **THE COURT:**  All right.  If you can move onto the

17    constitutional argument.  If the Court were to disagree with

18    you on that particular point, can you indicate the standard of

19    review that you're asking the Court to consider, and then the

20    standard of review -- and specifically indicate what that

21    standard is, and then the standard of review that's being

22    requested by the plaintiff.  And then, finally, whether *Loper*

23    *Bright* or *Relentless* has any impact on this Court's procedure.

24              **MR. WEILAND:**  Yes, Your Honor.  If I may have a moment

25    to get to my notes.

1          **THE COURT:**  Certainly.  You have five minutes

2     remaining.

3          **MR. WEILAND:**  Yes, Your Honor.

4          So the Government's position is that the standard that

5     applies to the equal protection claim is the rational basis

6     review, as noted in *Trump v. Hawaii*.  Also, the Government in

7     its pleading or its briefing here cited to *Fiallo v. Bell* and

8     *Shaughnessy v. Mezei,* M-E-Z-E-I.  I believe that's how you

9     pronounce it.  I could be incorrect.

10          All of which support the Government's position that

11     the rational basis review governs here in the immigration

12     policy context, foreign policy context that's involved in

13     determinations about the state of a country.

14          And, therefore, under that standard, it's just whether

15     or not a legitimate -- a facially legitimate purpose is

16     articulated in the decision.

17          And here, this is -- I think this is the only real

18     instance where the Government has asked this Court to take any

19     notice of anything that may have not been attached to the --

20     that's the Federal Register Notices for the decisions

21     themselves.

22          **THE COURT:**  All right.  And the Federal Register

23     Notices are referred to in the briefing as FRNs, is that

24     correct?

25          **MR. WEILAND:**  That's correct, Your Honor.

```
 1              Do you need me to provide those citations?

 2         THE COURT:  No, I'm just making sure for our court

 3    reporter that I'm making a clear record.

 4         MR. WEILAND:  Thank you, Your Honor.  I appreciate

 5    that.

 6              And so under that standard, the Government's position

 7    is that the facially legitimate and bona fide reasons were

 8    articulated in the Register Notices in the decisions

 9    themselves.  And I apologize if I'm speaking too quickly for

10    the court reporter.  And therefore, they ask that a rational

11    basis test that the Supreme Court has recognized is appropriate

12    to these kind of challenges.

13              Further, defendants rely upon the *Regents* decision

14    which applied the *Arlington Heights* standard without requiring

15    it, and finding that the claims made in that case, which are

16    nearly identical to the type of claims made in this case, were

17    not sufficient to state a claim under the equal protection

18    clause.

19         THE COURT:  And what is the *Arlington* standard, if you

20    had to succinctly articulate on the record?  And how does it

21    differ from rational basis review?

22         MR. WEILAND:  As I understand it, Your Honor -- and I

23    will refer to our pleadings.  But *Arlington Heights* standard is

24    whether or not the terminations were motivated in substantial

25    -- in part by racial animus.
```

1          **THE COURT:**  All right.  Thank you.

2          All right.  So this allows me to kind of clearly

3     identify those areas in which the Government feels that the

4     plaintiff fell short and that their complaint is implausible.

5          And I'm going to turn over to plaintiffs very shortly.

6          And that is, plaintiffs' claims under the APA is that

7     it was not based on objective review of country conditions,

8     that it ignored country conditions unrelated to the initial

9     designation.  And their argument is that the Secretary should

10    have looked beyond what originally was the designation, but

11    what the current condition is of the country and whether they

12    can receive their nationals.

13         And then, finally, that they departed -- that the

14    Secretary departed from past practice of six months' transition

15    period.  And there is some implication -- and I do need to make

16    the -- to get the parties to make anything that's implicit

17    explicit.  And that is, that the past practice was one that was

18    vetted through all of the legal partners, justice partners or

19    agency partners, and that there has been a tradition of a

20    six-month wind down, and in some regard, 100 on -- strike that

21    18-month wind down.

22         And, finally, that the equal protection clause was

23    violated because the decision was tainted by animus towards

24    nonwhite immigrants, or succinctly motivated by racial animus.

25         Did you have any last comment as it relates to the

1    motion to dismiss that you feel that you may have overlooked?

2    And then I would like you to surrender the podium to defense

3    counsel or -- strike that, to the plaintiff.

4         MR. WEILAND:  Yes, Your Honor, just to go well back,

5    you also asked me to address *Loper Bright*.

6         THE COURT:  Yes.

7         MR. WEILAND:  And we would simply assert defendants

8    did not rely on *Chevron* in this case.  We don't believe it

9    plays a role in this Court's review.

10        THE COURT:  All right.  So from your perspective,

11   *Chevron* is irrelevant because *Chevron* implies that there's some

12   defense that the Court is supposed to give to the agency, where

13   as here, deference is not an issue since it's your position

14   that the Secretary has unfettered discretion, non-reviewable by

15   a court, nobody can review that decision under any

16   circumstances, mistake or otherwise?

17        MR. WEILAND:  Just the political branches.  Yes, Your

18   Honor.

19        THE COURT:  Okay.  Thank you.

20        Counsel, for the plaintiff, I think we've clearly

21   defined all areas.  Do not overlook a single question that I've

22   asked defense counsel.  I hope you were following along,

23   because those questions are what I call the rub.  That's where

24   I'm going to be spending most of my academic time after today.

25        MS. BANSAL:  Thank you, Your Honor.

1          And with the Court's permission, I'll be addressing

2    defendants' 12(b)(1) motion to dismiss for lack of

3    jurisdiction, and the 12(b)(6) to dismiss for the APA claims --

4    pardon me, the APA orderly transition and predetermination

5    failure to review claim.  And my co-counsel will address the

6    12(b)(6) motion to dismiss the equal protection challenge, and

7    then the statutory interpretation question about original

8    conditions.

9          **THE COURT:**  All right.  So that means 15 minutes

10   shared apart.  I'm going to rely on you to keep up with your

11   time.  If you go into your colleague's time, keep in mind that

12   you're shortening their discussion.

13         **MS. BANSAL:**  Thank you, Your Honor.

14         And I'll start with the Court's first question

15   regarding jurisdiction.

16         As the Court identified, defendants have identified

17   four different statutes that they say preclude all or some of

18   plaintiffs' claims.

19         First, I think, starting with 1254a(b)(5)(A), the TPS

20   statute jurisdiction stripping provision.  The Court asks if we

21   agree that bars the Court from reviewing the decision to

22   designate or terminate.

23         I think it's important just to first distinguish that

24   the statute gives the Secretary more discretion about an

25   initial designation than about an extension or termination

```
 1   because it uses the word "may."  The Secretary may designate a
 2   country if she finds conditions are met.  But once the country
 3   is designated -- and the Ninth Circuit says this in the
 4   National TPS Alliance case where there are reviewing the
 5   jurisdiction stripping provision of the statute just from
 6   August -- once a country is designated, the statute is then --
 7   changes.  The Secretary shall terminate if she finds conditions
 8   are no longer met, and the designation is extended unless she
 9   makes that determination.
10        With respect to these countries at issue here, that
11   means unless the Secretary determines that it is -- Honduras,
12   Nicaragua, Nepal can adequately handle the return of their
13   nationals, by statute, the designation is extended.
14        THE COURT:  All right.  So you require something
15   proactive on the part of the Secretary.  If the Secretary
16   exercises no discretion, what is the bottom line in terms of
17   the extension?  How long does the extension automatically go?
18        MS. BANSAL:  So absent an affirmative decision by the
19   Secretary, automatic extension of six months.
20        Back to -- I think it's important, and the Court has
21   already noted this with respect to 1254a(b)(5)(A), three times
22   in the postponement order, the order denying the stay, and most
23   recently the class certification order.  That provision used
24   the word "determination."  It doesn't say "decision," it says
25   "determination."
```

1    The statute itself uses that term repeatedly -- eight

2 times, I think -- always in the context of the Secretary's

3 determination about whether conditions in the country satisfy

4 the criteria for TPS.  So that provision stripping by its own

5 terms is very focused on that determination.  So we're not here

6 asking the Court to say or to analyze, was the Secretary right

7 that it's safe to go back to Honduras.  That's her

8 determination about country conditions.

9    But that does not include, as this Court previously

10 found, and as the Supreme Court found in *McNary*, interpreting

11 that same word in the immigration context in a jurisdiction

12 stripping provision, determination doesn't encompass the

13 policies and practices that underlie the decision.  And I think

14 that's the key reason why defendants' argument about

15 jurisdiction under the TPS statute is just wrong.

16    **THE COURT:**  All right.  If the Court is not allowed to

17 review the policy practices, procedural adherence, what in your

18 opinion is the pitfall?  What is the outcome of that?  What is

19 the risk of that?

20    **MS. BANSAL:**  I mean, the risk would be that you have

21 this statute that Congress wrote explicitly.  And again, this

22 court analyzed the purpose of the statute, and so did the Ninth

23 Circuit, to constrain executive discretion.  And this statute

24 that sets forth explicit guidance about how the Secretary is

25 supposed to make these decisions that affect tens of thousands

1  of refugees in this country, they would become essentially

2  unenforceable.

3          That would be the implication of defendants' argument.

4          **THE COURT:**  And what is the pitfall of having absolute

5  authority?

6          **MS. BANSAL:**  It puts you right back in the situation

7  Congress was trying to fix when it created the TPS statute,

8  where you just have unconstrained discretion, you have

9  arbitrary decisions, you have people who don't know how long

10  will they be able to stay, will they have to go back before

11  it's safe.  But that's the exact situation Congress was trying

12  to fix when it created this statute.

13          **THE COURT:**  And when you are pointing the Court to

14  that, are you reflective of any objective information that

15  supports that position?

16          For example, you're referring me to what the

17  Congressional intent was.  Where are you getting that language

18  or synopsis?

19          **MS. BANSAL:**  So the Ninth Circuit's decision, Your

20  Honor, in a different National TPS Alliance case about Haiti

21  and Venezuela from August analyzes the legislative history of

22  the TPS statute.  And these conclusions that I am sharing are

23  the conclusions of the Ninth Circuit in that opinion.

24          **THE COURT:**  And that's binding authority on this

25  Court?

1          **MS. BANSAL:**  Yes, Your Honor.

2          **THE COURT:**  My apologies for interrupting.  You may

3    proceed.

4          **MS. BANSAL:**  I want to address briefly the vacated

5    *Ramos* opinion, Your Honor, because defendants rely heavily on

6    that.

7          Procedurally what happened there is the District Court

8    found that the terminations of TPS during the first Trump

9    administration were -- likely violated the APA, and enjoined

10   them.  In a divided decision, two to one, with a dissent, the

11   Ninth Circuit held that there wasn't jurisdiction over that

12   particular APA claim, but there was over the constitutional

13   claim.  But then, Your Honor, the full Ninth Circuit voted to

14   rehear that case en banc, which means the full Ninth Circuit

15   either thought that that decision conflicted with precedent, or

16   that it was such an important issue that it really needed to be

17   decided by the full.

18         So the defendants try and -- they cite cases from the

19   Ninth Circuit where the Court will look to a vacated opinion as

20   persuasive.  Those are distinguishable, because those vacated

21   opinions were vacated for mootness, not because the full Ninth

22   Circuit looked at them and said, hey, we want to redo this

23   ourself.

24         If anything, that vacated Ninth Circuit *Ramos* opinion

25   suggests the majority of the Ninth Circuit did not agree with

1    some or all of the panel's analysis in that case.

2          I want to address also, Your Honor, the other three

3    statutes, because the Government also relies on Section

4    701(a)(2) of the APA, which precludes review over, quote,

5    agency action committed to agency discretion by law.

6          I think the key case interpreting that provision, Your

7    Honor, is *Spencer versus United States*, which we cite in our

8    brief.  It explains that that provision applies in the rare

9    instance where there is no law to apply.  And it also explains

10   that law to apply can come from two places; it can come from

11   the text of the statute itself, or it can from past practice.

12   An agency past practice, consistent past practice itself,

13   creates law to apply.  That's the whole basis of the change in

14   position cases that are all decided under the Administrative

15   Procedure Act.

16          So plaintiffs' first claim, as the Court recognized,

17   and that the Secretary didn't comply with the mandatory

18   statutory requirement to consult with agencies, other

19   appropriate agencies, and review country conditions.  There's

20   no discretion.  The statute says "shall."  It's not

21   discretionary.

22          **THE COURT:**  Which agencies were omitted, if any?

23          **MS. BANSAL:**  The State Department, Your Honor.

24          **THE COURT:**  All right.

25          **MS. BANSAL:**  Plaintiffs' second claim, Your Honor,

1    that the agency adopted a new wrong interpretation of the

2    statute and refused to consider any conditions besides the

3    original crisis, there's also law to apply there, Your Honor.

4    That law comes from two places, it comes from the statute

5    itself, the language of the statute, which says, the

6    designation is extended unless the country is no longer unable

7    to handle the return of its nationals.  That's a standard this

8    Court can apply.  And it also comes from past practice.

9         We allege decades.  And the two other district courts

10   that looked at this during the first Trump administration found

11   decades of past practice of considering all conditions when

12   deciding whether people can be safely returned to a country.

13        Our orderly transition claim, Your Honor, again,

14   there's law to apply.  Again, it comes from the agency's past

15   practice.

16        The third statute that defendants argue precludes

17   jurisdiction is 1252(a)(2)(B)(ii).  And this is the provision

18   that bars review of decisions if the authority for that

19   decision is specified to be in the discretion of the Secretary.

20        Defendants make this argument only with respect to

21   plaintiffs' orderly transition claim, Your Honor, the claim

22   that it violated the APA for defendants to depart from their

23   past practice of providing at least six months' transition

24   period.

25        This argument is wrong for the reasons that the Court

1    noted in your order denying defendants' stay motion.  That's at

2    page 7 of docket 87.

3            That provision, 1252(a)(2)(B)(ii), it deals with

4    denials of discretionary relief.  An orderly transition period

5    is not a form of discretionary relief for removal.  That

6    provision, Your Honor, under the Ninth Circuit's decision in

7    *Nakka*, also doesn't bar collateral challenges like a change in

8    position from past practice.

9            The last statute the Government argues bars the

10   Court's jurisdiction, Your Honor, is 1252(f).  That's the

11   provision that restricts the Court from enjoining or

12   restraining the operation of certain provisions of the INA.

13           For the purposes of the motion to dismiss, Your Honor,

14   I think the Court can resolve that challenge just by the fact

15   that defendants concede the Court has jurisdiction to issue a

16   declaratory judgment.  They make that concession at page 15 of

17   their motion, docket 110.

18           At the motion to dismiss stage, really, that's

19   sufficient to deny the motion to dismiss.  There's some relief

20   that this Court can grant.

21           The Ninth Circuit, under controlling Ninth Circuit

22   authority, in immigrant offenders has also said that 1252(f)(1)

23   does not preclude relief under the APA.  And so that's why in

24   our motion for summary judgment that is relief we're seeking

25   from the Court.  But, again, the Court doesn't have to get

1    there on the motion to dismiss.

2              One last point, Your Honor, on the 12(b)(6), and then

3    I'll turn it over to my co-counsel.  To the extent that

4    defendants are arguing plaintiffs have failed to state a claim

5    that the decision violated the APA because the Secretary failed

6    to consult with the State Department or review conditions and

7    instead just made a preordained political decision, I think

8    defendants are just arguing what the allegations in the

9    complaint -- plaintiffs' allegation is the Secretary decided to

10   terminate before doing any consultation or review.  There's no

11   way to argue that that is consistent with the statute.

12             Defendants say, well, that's not what happened.  But

13   that's not an appropriate argument on a motion to dismiss.

14   We'll explain at the summary judgment stage why the undisputed

15   facts support granting summary judgment in that claim.

16             But as to the motion to dismiss, the defendants just

17   take issue with the allegations.  But, of course, the Court

18   takes the allegations as true.  And again, the allegation is

19   that the Secretary made a preordained political decision to

20   terminate for these countries because the program itself she

21   says is inconsistent with the president's objectives, and that

22   she didn't do the consultation or review.  That clearly

23   violates the statute.

24             As to the orderly transition claim, again, to the

25   extent, Your Honor, that defendants are arguing not just that

1   the Court lacks jurisdiction, but also that we failed to state

2   a claim, that's wrong because, again, the allegations are taken

3   as true.  There's no dispute that for 20 years the agency has

4   always given at least six months.

5       Defendants argue that's not a sufficiently firm

6   practice, because sometimes it was six, sometimes it was 12,

7   sometimes it was 18.  But our point is it was always at least

8   six.  That's what we've alleged.  And they have to explain why

9   it wasn't at least that.

10      They rely on the *Wages versus White Lion* Supreme Court

11  case to suggest that this practice wasn't sufficiently firm,

12  but that case is not about agency practice, it's about informal

13  guidance, and it's fact specific.  There's nothing in *White*

14  *Lion* that changes the rule.  But a consistent agency practice

15  creates a standard, and the agency has to explain a subsequent

16  deviation from that standard.

17      **THE COURT:**  Let me go back to a question -- and this

18  might be a question of curiosity.

19      You indicated that if I were to -- if I were to accept

20  the Government's position, or even in terms of how this

21  decision process would be reviewed, can you explain how the

22  Executive Branch would get involved in changing the outcome --

23  for example, let's say the Executive Branch, upon reviewing all

24  of these decisions and there's a meeting, I don't know, and the

25  president says, you know what, this was not humane, this was

1    not humanitarian, does the Executive Branch come in and say,

2    okay, we're changing this?  Or is this still the unfettered,

3    absolute discretion of the Secretary?

4        MS. BANSAL:  That's an interest question, Your Honor.

5    The way I understand defendants' position, they -- is that the

6    absolute discretion is vested in the Secretary herself.

7        THE COURT:  More power than the Executive Branch,

8    meaning the president?

9        MS. BANSAL:  Than the president, that's my

10   understanding of their position, Your Honor.

11       THE COURT:  So my question still turns on its head a

12   little bit.  If the president found that any one of these

13   countries was not really ready and decided that they were --

14   that he was going to intervene, or someone in the Executive

15   Branch was going to intervene, what does that look like?  What

16   does that process look like?  And is that addressed in the

17   statute -- or is the statute vague in that regard?

18       MS. BANSAL:  I think the only way in which the statute

19   directly addresses the involvement of agencies other than the

20   Department of Homeland Security -- and it uses the word

21   "agencies," but it's a consultation requirement.  So the

22   secretary must consult with appropriate agencies, which has

23   always been interpreted to mean the State Department, because

24   they're uniquely positioned to provide information about

25   country conditions.

1          **THE COURT:**  All right.  And then are you surrendering

2     the *Loper Bright* query to your colleague?

3          **MS. BANSAL:**  I will say, Your Honor, defendants have

4     said they're not relying on that.

5          Our -- we think that case is relevant insofar as it

6     makes clear that it's this Court's job to interpret the

7     statute, and it need not give deference to the agency's

8     interpretation.

9          **THE COURT:**  And is that an invitation for the Court to

10    apply *Skidmore* and its progeny?  Just a question.

11         But I'll let you surrender it to your colleague.

12         **MS. BANSAL:**  Thank you, Your Honor.

13         **THE COURT:**  Good morning, Counsel.

14         **MS. MACLEAN:**  Good morning, Your Honor.

15         In connection with defendants' motion to dismiss, I'm

16    going to address plaintiffs' constitutional claim, as well as

17    plaintiffs' statutory interpretation claim, the claim the

18    defendants violated the APA by refusing to consider intervening

19    conditions and, in fact, contending that to do so is

20    statutorily prohibited.

21         Plaintiffs' statutory APA claim was pled in the

22    complaint, but plaintiffs did not move on this in our 705

23    motion.  So I may address that in some more depth here.  And

24    defendants' motion to dismiss as to this claim fails.

25         This is the exact illegal practice that defendants

```
1    employed during the first Trump administration, to terminate
2    TPS for these three countries.  Actions that were rescinded
3    subsequent to that in 2023.
4            THE COURT:  Rescinded by whom?
5            MS. MACLEAN:  By the Secretary at the time, the
6    subsequent Secretary, after the vacatur of -- after the Ninth
7    Circuit en banc vacated the panel decision in *Ramos*.  And then
8    asserted that the case was moot in *Ramos* as a result of the
9    rescissions of the terminations and the issuance of new
10   extensions at the time.
11           Both of the Courts --
12           THE COURT:  Let me ask one question.  Does this case
13   qualify for new extensions?
14           MS. MACLEAN:  Right now, Your Honor, there are
15   terminations for these three countries.  So there is -- the
16   agency had an opportunity to do a periodic review.  The case --
17   plaintiffs in this case challenged the process that the agency
18   employed to issue the terminations in this case.  So there's
19   not a live designation that can be extended.
20           THE COURT:  All right.  So there's no do-over?
21           MS. MACLEAN:  There's not a do-over at this stage.
22   However, if Your Honor finds the terminations were illegal,
23   that would open up the possibility that the agency could render
24   new decisions in a periodic review process, whether they're
25   extensions or terminations, that would comply with the agency's
```

  1   obligations pursuant to the statute and pursuant to the

  2   Constitution.

  3         **THE COURT:**  All right.  And with the Secretary's

  4   unfettered discretion per statute, the Secretary could also

  5   rescind her own decision.

  6         **MS. MACLEAN:**  Plaintiffs contest that the Secretary

  7   has unfettered discretion.  As Your Honor identified in the 705

  8   order, and as the Ninth Circuit made clear in the August order

  9   in NTPSA 1 --

 10         **THE COURT:**  I'm understanding that, but I'm borrowing

 11   from the Government's argument.  And, you know, assuming

 12   arguendo that the Government were correct, would the Secretary

 13   be able to rescind her own decision?

 14         All right.  I'll let you think about that and you can

 15   proceed with the argument you prepared.

 16         **MS. MACLEAN:**  All right.  Okay.  So to explain clearly

 17   what the statutory interpretation claim is, this is the claim

 18   that was at issue in *Ramos* and *Saget*, which are the two

 19   decisions that directly looked at challenges to the TPS

 20   terminations on this ground during the first Trump

 21   administration.  Then and now, defendants limited their review

 22   of country conditions to only conditions that were directly

 23   related to the original reason for the country's TPS

 24   designation.

 25         So, for instance, if a country was designated on

1    account of a natural disaster, like an earthquake or a

2    hurricane, like we have here, defendants will ignore a

3    subsequent war, rampant violence, or a descent into

4    authoritarianism, even if these country conditions make a

5    country unable to handle the return of its nationals.

6         And importantly, defendants concede this point.  They

7    concede they considered only the conditions related to the

8    original reason for the TPS designation during the periodic

9    reviews, and they contend, in fact, that the statute forbids

10   the consideration of new developments in a country during a

11   periodic review.

12        That's in the motion to dismiss their summary judgment

13   motion, and their reply in the support of the summary judgment

14   motion.  So docket 110 at 16, docket 142 at 12 to 13, docket

15   166 at 7 to 8, and docket 173 at 7 to 8.

16        **THE COURT:**  And what conditions, by statute, is the

17   Court -- is the Secretary to look at at this stage?  Is it

18   ongoing war, armed conflict, natural disaster, other

19   extraordinary conditions that prevent the safe return of the

20   country's national?  And then if that is the criteria, how do

21   you describe other extraordinary conditions that prevent safe

22   return of the country's national?

23        **MS. MACLEAN:**  The Secretary -- in this context, the

24   Secretary -- we don't take the position that the Secretary

25   needs to reevaluate the -- whether extension is warranted based

1    on the criteria of -- that exist in (b)(1)(B)(i) -- sorry.

2    (B)(1) --

3            **THE COURT:**  And I'll tell you why I listed those is

4    because you're saying for the designation that's what has to be

5    considered.  What has to be considered at the termination

6    stage?  What are the factors that the statute requires, such as

7    consulting with the other agencies, objective review of the

8    country's conditions, and where do we have departures?

9            **MS. MACLEAN:**  So what the provisions that I was

10   intending to reference were (b)(1)(A) and (b)(1)(C), which are

11   armed conflict and extraordinary and temporary conditions.

12   Plaintiffs don't contend that the Secretary needs to evaluate

13   whether a designation should be extended on those grounds, but

14   specifically to the statute -- that the Secretary is obligated

15   under 1254a(b)(3)(A) and a(b)(1)(B) to evaluate whether a

16   foreign state is unable temporarily to handle adequately the

17   return of its nationals.  That is a required factor that the

18   Secretary must consider when a country has been designated on

19   account of a natural disaster.

20           And there's nothing that is within that provision that

21   requires the Secretary to evaluate whether the country is

22   unable -- able or unable to handle adequately the return of the

23   state -- to the return to the state of nationals from that

24   state, of TPS holders from that state.  There's nothing that

25   ties that or limits the consideration of that to only

conditions that are related to the original reason for the
designation.  And, in fact, the consistent historical practice
has been over decades of the implementation of the TPS statute
that secretaries have looked to both conditions that are
related to the original reason for designation and conditions
that are unrelated to the original reason for the designation.

**THE COURT:**  Because I want to be really clear that we
are real clear on the record, that we're not going back to the
determination evaluation, that we're looking at three things.
And if it's more than these three things, please share that
with me, because I want to be very focused.  I want to make
sure that these criteria don't bleed into each other and,
therefore, looks as though we're examining something that's
above and beyond my authority.

Are you specifically looking at the fact, from your
perspective, that it was not based on objective review of
country conditions, and then if there are exhibits that you
think support that or attached to your complaint, because this
is at the complaint stage, ignoring country conditions
unrelated to initial designation, factual allegations in the
complaint, and departure from practice of six-month transition
period.  And then, finally, motivated by discriminatory animus.

So please be sure to identify those things in the
complaint that correspond to that so that we're real clear
about what we are looking at for the motion to dismiss and what

1    we're not looking at.

2          MS. MACLEAN:  For the motion to dismiss, there are

3    three APA claims, two of which we've moved for summary judgment

4    on.  And there is the constitutional claim.

5          The three APA claims are related to the objective

6    review of country conditions and proper consultation and

7    whether there's predetermination by the agency.  And my

8    co-counsel addressed that issue.

9          My co-counsel also addressed the second APA claim

10   which is related to the orderly transition period.

11         And the third APA claim that I'm addressing, which is

12   the second APA claim that plaintiffs have moved on in our

13   summary judgment motion, is this claim --

14         THE COURT:  Don't talk about the summary judgment

15   motion.  We want to keep everything very crisp and clear as it

16   relates to the motion to dismiss.

17         MS. MACLEAN:  Absolutely.

18         This is an APA claim that we had not previously moved

19   on in our 705 motion.  And it's a claim that has essentially

20   two components.  And it's challenging the Secretary's refusal

21   to consider country conditions unless they were directly tied

22   to the original reason for the designation.

23         So the Secretary essentially closed her eyes and

24   demanded that all of the subordinates close their eyes to what

25   was going on in the country, if it was not seemed to be

1    directly related to the earthquake or hurricane that prompted

2    the designation.  And our argument is that that is, first of

3    all, based on an erroneous statute interpretation.  There's

4    nothing in the statute that limits the Secretary's

5    consideration of country conditions to only conditions that are

6    tied to the original reason for the designation.

7            The position of defendants is that that is prohibited.

8    There is nothing in the statute that prohibits that.

9            **THE COURT:**  And then the factual allegations within

10   your complaint to support that position can be found at?

11           **MS. MACLEAN:**  I can pull up the direct cites when I go

12   back to my seat, but there's not -- that -- that can be based

13   on an analysis of the language of the statute, coupled with --

14   thank you -- with paragraphs 40 to 42, 63, 68 to 69, 156A to B.

15   And that is on page 11 of the motion to dismiss.

16           **THE COURT:**  Thank you.

17           **MS. MACLEAN:**  Of our opposition to the motion to

18   dismiss.

19           So the second portion of this argument related to

20   defendants' position that they are prohibited from considering

21   intervening conditions is that it is arbitrary and capricious

22   in violation of the APA, because it constitutes an unexplained

23   departure from consistent past practice, which was to consider

24   country conditions broadly during periodic reviews.

25           The position that the defendants take here is that

they -- that the change in position doctrine doesn't apply, and
that there was no past practice.

This is the exact practice that was considered in two
cases, the only two cases to look at this issue during the
first Trump administration, *Ramos* and *Saget*, where the Courts
in those cases both determined that Courts have jurisdiction to
review deviations and practice in the way Secretary's conduct
TPS periodic reviews, that there was a consistent past
practice, that DHS consistently over decades considered
intervening conditions in their periodic reviews, that the
unexplained break from this past practice implicated the change
in position doctrine, and that the change in position doctrine
was violated because of the agency's lack of recognition and
good explanation as to why they were changing practice.

THE COURT:  All right.  Anything further?

You've run out of time, but I would like the last
category to be addressed, and that's the equal protection
claim, which standard applies, and your definition of the
standard for *Arlington*.

You have one minute.

MS. MACLEAN:  Yes.  I can do that very briefly, Your
Honor.

And essentially because Your Honor addressed this in
the 705 order.

THE COURT:  I understand, but I'm asking for you to

1    make your record.

2         **MS. MACLEAN:**  Yes.  The defendants seek essentially to

3    revive the arguments that they made before.  The rational basis

4    review is inapplicable here for the reasons that Your Honor

5    identifies before, as well as for the reasons that every single

6    court to look at TPS challenges and equal protection claims and

7    TPS challenges found, including the --

8         **THE COURT:**  The *Arlington* standard is?

9         **MS. MACLEAN:**  The *Arlington Heights* standard considers

10   whether racial discrimination was a motivating factor in the

11   agency action.  And under *Arlington Heights*, the agency can

12   consider -- or, sorry, the Court conducting the judicial review

13   can consider not just what's in the four corners of the

14   agency's explanation, but also historical background,

15   departures from normal sequence, and other factors, which are,

16   as Your Honor identified in the 705 order, more than enough to

17   defeat defendants' motion to dismiss in this case.

18        **THE COURT:**  All right.  And then if the Court were to

19   apply the rational basis standard, would it still survive?

20        **MS. MACLEAN:**  Yes, Your Honor.  As Your Honor already

21   identified, although I will briefly address here, the -- in

22   the -- Your Honor already identified this in the 705 order, but

23   defendants' actions can't survive rational basis review where

24   plaintiffs demonstrate from the face of the challenge decisions

25   with a consideration also of relevant extrinsic evidence that

 1    the Secretary's actions aren't rationally related to the stated

 2    goals.  And the allegations and evidence here is sufficient to

 3    survive rational basis review, including notably, because all

 4    of the decisions cite to the President's invasion executive

 5    order, which invoked the great replacement myth describing TPS

 6    holders as part of a flood of illegal immigration engaged in

 7    hostile activities and committing vile and heinous acts, even

 8    though there is no rational relation to the facts of the TPS

 9    population.

10          **THE COURT:**  Thank you.

11          **MS. MACLEAN:**  Thank you, Your Honor.

12          **THE COURT:**  All right.  Thank you.

13          At this time the Court is going to be in recess for 15

14    minutes.  We were going to reconvene at 10:45.  We'll now

15    reconvene at 10:50.  Thank you.

16          **COURTROOM DEPUTY:**  Court is in recess.

17          (Recess taken.)

18          **THE COURT:**  Thank you.  You may be seated.

19          All right, Counsel, at this time, we will be

20    addressing the Daubert motion as well as the motion for summary

21    judgment.

22          And to give some guidance and so that we're not being

23    too repetitious -- and again, keep in mind, the Court has read

24    everything.  And when you're referring to a prior decision,

25    just indicate docket number and perhaps page number that you're

1  referring to.  That will make your record clear.

2          And if there's any level of review, that also makes it

3  clear for the Court of Appeals when they're looking through

4  this record.  Because, keep in mind, they won't have our docket

5  in its entirety.  They will be very focused, should they have

6  to review this matter, on what was actually moved into the

7  record.

8          So now we'll start with the Daubert motion.  And I

9  will indicate to you, I do find that Elliot Young is a witness

10  that would assist the Court, and that the information would be

11  relevant.

12          As to the others, you should, if you're proffering

13  them, give an argument as to why the Court should consider that

14  witness and relevant as to which issue.

15          The next area is the motion to consider extra record

16  evidence, public statements of the Secretary, the President,

17  and the Department of Homeland Security that reveal motivations

18  that the Secretary's decision, which did not match the agency's

19  rationales, that should be identified by docket number, as well

20  as exhibit number, if any.  Documents regarding decision making

21  for the challenged agency actions and other TPS terminations

22  during this period, meaning from January 2025 to the present,

23  please, once again, refer to the exhibit number or docket

24  number and page.

25          Documents and explanatory testimony related to other

 1    TPS decisions prior to the current administration to

 2    demonstrate the agency's long standing practices, and I presume

 3    that goes back two administrations presumptively.

 4            And also think about the timeline.  Please use dates

 5    as to when decisions were made, when emails were sent, and

 6    whether it corresponds in any way to the ultimate decision.

 7            So those two things we'll start off with first, and

 8    then we'll go in the motion for summary judgment after taking a

 9    pause in the argument.

10            Once again, if you're going to refer to something that

11    I've already decided, just indicate ECF number and page number.

12    If you're referring to an exhibit, be very clear.  Because what

13    I notice is we might have Exhibit 50, but then it will be

14    145-52 is the actual exhibit.  So try to be clear so we know

15    what we're referring to.

16            My preamble or questions are not part of your time.

17    So we are starting prompt at 11:00 with the moving party for

18    partial summary judgment as it relates to the Daubert and

19    consideration of extra record evidence.  And then we'll go to

20    the other portions after we address Daubert and motions to

21    consider extra record evidence, starting with the plaintiff.

22            **MS. MACLEAN:**  Thank you, Your Honor.

23            Plaintiffs are not relying on the expert declarations

24    for plaintiffs' summary judgment motion.  Plaintiffs, as Your

25    Honor identified, have relied on Professor Young's testimony on

1    racism in immigration history in defense against the

2    defendants' summary judgment motion.

3            For this reason, plaintiffs contend that the motion to

4    strike the expert declarations is improper, premature at this

5    stage it, may be relevant at some point in the future if the

6    expert declarations are relied on at some later stage of this

7    litigation.

8            **THE COURT:**  And that stage would be?

9            **MS. MACLEAN:**  Potentially at trial related to equal

10   protection.  It may come up -- it may be relevant if there's

11   stayed litigation that is forthcoming.  But those would be the

12   two primary ways that the other expert declarations would be

13   relevant.

14           **THE COURT:**  All right.

15           **MS. MACLEAN:**  Defendants' arguments lack merit as

16   well.  They misstate the purpose of the testimony or the

17   qualifications of the experts, and suggest that the experts are

18   providing testimony to second guess the Secretary's analysis,

19   which is false.

20           The expert reports are related to harms from the TPS

21   terminations for individual countries or the economic impact of

22   the termination, the terminations of TPS, and irrelevant data

23   there as well.

24           The one exception obviously, as Your Honor identified,

25   was Professor Young's declaration, which addresses racism in

1    immigration history.

2           With regard to extra record evidence, the parties

3    recognize that judicial review in APA cases is typically

4    limited to the administrative record, but there are

5    well-recognized exceptions that are elaborated by the Ninth

6    Circuit in *Lands Council*, which plaintiffs identify in our

7    motion.  And plaintiffs easily meet the recognized exceptions

8    -- two of the recognized exceptions here, and ask the Court to

9    exercise discretion to look beyond the administrative record to

10   consider three limited categories of extra-record evidence.

11          The first is documents related to the process that the

12   agency relied on to make these particular challenge decisions.

13   That's the limited extra-record discovery that Magistrate Judge

14   Kim ordered and which plaintiffs have introduced into the

15   record in connection with our summary judgment motion.

16          Second --

17   **THE COURT:**  And the identification of that is ECF?

18   **MS. MACLEAN:**  We would -- we are happy to supplement

19   the record and provide that afterwards, but it is -- I can

20   provide that in a moment, and we can -- we're also happy to

21   produce a supplement that lists those as well, because some of

22   the documents were produced very late.

23          It is essentially -- you know, I think most of the

24   documents that were introduced on reply, or all of the

25   documents that were produced in connection with plaintiffs'

1    reply and a number of the documents that were identified in

2    connection with plaintiffs' motion, I believe that that is

3    identified in our motion for extra-record evidence.  But to the

4    extent that it's not and it would help the Court, plaintiffs

5    are amenable to providing, you know, today or tomorrow a

6    category observation of which documents fall into which

7    category.

8         **THE COURT:**  And that's beyond ECF153 at 2, so you're

9    indicating that there are some additional.

10        You mentioned three exceptions, so I just wanted to

11   make sure our record is clear, because one who is not familiar

12   with this case may not have a full understanding.

13        So the exceptions are?

14        **MS. MACLEAN:**  I'll mention the exceptions in a moment,

15   but if I may just make sure the record is clear with regard to

16   the three categories of records.

17        One is documents related to the agency's

18   decision-making process for these decisions.

19        The second is documents and explanatory testimony

20   related to past agency practice.

21        And the third is public statements of Secretary Noem

22   and other government actors.

23        And to respond to Your Honor's specific question about

24   the exceptions, the two specific *Lands Council* exceptions that

25   plaintiffs rely on to seek the inclusion of extra-record

1   evidence beyond the administrative record are where the Court

2   finds bad faith or improper behavior, something that Magistrate

3   Judge Kim already found in ordering the production of the --

4        **THE COURT:**  I understand.  Just the categories,

5   please.

6        **MS. MACLEAN:**  And the second is where extra-record

7   evidence is necessary to determine whether an agency failed to

8   consider adequately all relevant factors or explain its

9   decision.

10       And as *Lands Council* -- as the Ninth Circuit

11  identified in *Lands Council*, extra-record evidence in APA cases

12  can be necessary to help plug holes in the administrative

13  record.  And this is exactly the type of case where

14  extra-record evidence is necessary.  These exceptions exist

15  where the administrative record doesn't tell the whole story,

16  because the administrative record doesn't explain what the

17  reasons were because, for instance, the -- the explanation is

18  pretextual or the Court needs additional context that is beyond

19  the administrative record.

20       And this is precisely the case where the Court needs

21  to look to how the agency made decisions in the past.  That

22  would, by definition, not exist within the administrative

23  record.  And it's the reason that that second exception is

24  necessary.

25       And defendants' arguments against inclusion of

1    anything beyond the administrative record requires this Court

2    to essentially assume the truth of their position, that their

3    statements in the Federal Register Notice provide a complete

4    and accurate account and followed a typical process.

5         The reason that there is -- there was limited

6    discovery in this case was because that was clearly not true,

7    or there was sufficient evidence that that was not true at an

8    early stage of this litigation, and the discovery has merely

9    confirmed that.  And --

10        **THE COURT:**  One of the questions I wanted to ask --

11   and sorry for interrupting -- on the motion to consider

12   extra-record evidence, was there any controversy that the

13   Government object to any of this evidence being considered for

14   the motion for summary judgment, either for your partial motion

15   or for the Government's motion?

16        **MS. MACLEAN:**  The Government's -- I'll let the

17   Government address that, but the Government has opposed the

18   motion for extra-record evidence in this case.

19        **THE COURT:**  In its entirety or in part?

20        **MS. MACLEAN:**  I will let the Government identify

21   whether there's any distinctions.  My understanding is that

22   they have not broken it down in their motion as to certain

23   exhibits and -- you know, some exhibits and not other exhibits.

24   But they have in their opposition challenged the three

25   different categories and --

1          **THE COURT:**  I guess I'll try one other way.  Are there

2     any areas in which you both agree that these are documents or

3     information that the Court can consider that's considered

4     extra-record evidence?

5          **MS. MACLEAN:**  Unfortunately, I don't think so.  I

6     think the Government's position, although my friend on the

7     other side can correct me if this is wrong, is that this case

8     should be decided based entirely on the administrative record.

9     And I believe that that is obviously not the case, that there's

10    reasons why this Court needs to look to administrative -- to

11    extra-record evidence.

12         And that some of the claims cannot be decided without

13    the consideration of extra-record evidence.  There's a

14    requirement to look to what past agency practice had been.

15         **THE COURT:**  All right.  And those are your final words

16    on Daubert and motion to consider extra-record evidence?

17         **MS. MACLEAN:**  Yes, Your Honor.

18         **THE COURT:**  All right.  Thank you.

19         Counsel for the Government, your position.

20         **MR. WEILAND:**  Yes, Your Honor.  Thank you.

21         I will begin with the extra-record evidence, because I

22    believe the Daubert motion is part and parcel of that as well.

23         Counsel is correct, it is the Government's assertion

24    that this case will be decided, to the extent the Court can

25    review it at all, on the administrative record.  And that's why

1  the Government's motion for summary judgment relies entirely on

2  the administrative record and nothing else.

3          Other than that, I have nothing to add to our pleading

4  at docket 156, as far as our objections to this Court's

5  consideration of extra-record discovery in this case.

6          **THE COURT:**  All right.  And with regards to the

7  questions that were posed by the Court, none of those questions

8  in any way impact this part of the proceeding, is that correct,

9  that went unanswered?

10          **MR. WEILAND:**  If I may have a real quick opportunity

11  to review, Your Honor.

12          **THE COURT:**  And then we will move to the substance of

13  the partial summary judgment motion proffered by the plaintiff,

14  and then we will end with the defendants' motion.

15          **MR. WEILAND:**  Thank you, Your Honor.  I presume you

16  are referring both to your questions this morning and the

17  questions you had previously provided last week?

18          **THE COURT:**  Correct.

19          **MR. WEILAND:**  No, I don't believe they have any import

20  on this.  As I understand, Your Honor asked the question about

21  whether not the consideration of extrinsic evidence might

22  convert a motion to dismiss into a motion for summary judgment

23  under Rule 56.

24          The Government in its motion to dismiss did not rely

25  on anything other than the FRN, which we believe is intrinsic

1    to the complaint, intrinsic to the issues.  So I don't believe

2    that anything in that would convert the motion to dismiss into

3    a motion for summary judgment.  And, therefore, the

4    extra-record evidence motion I don't believe plays any role in

5    that, if that was Your Honor's question.

6            **THE COURT:**  Yes.  Thank you.

7            **MR. WEILAND:**  And then with regard to the Daubert

8    motion, a lot of this has been clarified by plaintiffs'

9    response to Your Honor's questions about the extent to which

10   they are asking this Court to consider this evidence now at

11   this procedural posture motion for summary judgment, as opposed

12   to some potential later proceeding.

13           But I will summarize for the Court that the

14   Government's two primary objections distill down to, one, that

15   the proffered testimony is not on topics that are relevant to

16   the decision before the Court or upon which the Court needs

17   assistance.

18           In particular, we don't believe the Court needs

19   assistance from an immigration lawyer to understand law.

20           We don't think that the economic effects are relevant.

21   And I should say, the defendants don't think that the economic

22   effects on the countries at issue, or the United States, are

23   relevant to this Court's determination.  The Court cannot

24   substitute its judgment for that of the Secretary.

25           **THE COURT:**  And from your perspective, which, if any,

1    of the experts are being proffered at this stage?  And amongst

2    the experts that are being proffered at this stage, what

3    objections do you have, if any?

4         MR. WEILAND:  I believe, if I understand plaintiffs'

5    assertions, the only one they are asking this Court to consider

6    is Mr. Young.

7         THE COURT:  Professor Young.

8         And your position with regards to the Court

9    considering Professor Young's opinions?

10        MR. WEILAND:  Well, one, Your Honor, there are a

11   couple of issues with Professor Young's proffered report.  One,

12   we think it doesn't add anything to this Court's robust

13   understanding of the history of immigration and race in this

14   country.  That issue, defendants would assert, is not even real

15   relevant to whether or not this decision was tainted by animus

16   in any way, the history of immigration in the United States,

17   which we think the Court already readily grasps.

18        He also goes beyond his proffered proposed expertise.

19   It's not entirely clear, the reports are provided, but they

20   don't delineate exactly what subject matter this person is

21   being offered as an expert in.  It just says basically their

22   qualifications in their curriculum vitae and what they're going

23   to provide -- what they think.  And his opinions go beyond what

24   his proffered testimony appeared to be, which is a history of

25   the immigration and racism in the United States.

1        **THE COURT:**  Okay.  So under the Federal Rules of

2   Evidence 702, your primary objection is not to his

3   qualifications, but as to whether his report is relevant or --

4   in its entirety or in part, and whether the scope should be

5   limited if the Court were to consider it in any capacity, but

6   that it's not assisting the Court in any way and, therefore,

7   not relevant.

8        **MR. WEILAND:**  That is a significant aspect of the

9   Government's objections.  We have other objections.  Not

10  debating that Professor Young has an expansive curriculum

11  vitae, but, in some instances, he's offering opinions that

12  aren't supported by that -- the opinions about the country

13  conditions of Honduras, for example, and Nicaragua, we don't

14  believe are supported by his background or his expertise.

15       His immigration court experience, which is embodied in

16  his report, is simply not relevant to this determination that

17  this Court has to make about the Secretary's decision with

18  regard to TPS.  Asylum claims in immigration court are

19  completely different, completely different standard, completely

20  different process.

21       **THE COURT:**  So you would invite clarity from the

22  opposition, not as to his qualifications, but as to the scope.

23  And then to be able to address your objections more clearly in

24  terms of the proffered report.

25       But based on the report, if the Court were to accept

1  him as an expert in the field, and that his information would

2  be relevant, what would be your invitation to the Court in

3  terms of the scope?

4          MR. WEILAND:  I think the scope -- and this is perhaps

5  a segue into the -- into maybe the next objection that the

6  Government has.  It's not really applying -- it's not clear --

7  and clarity is, I think, required here.  The Government is used

8  to an expert being identified as having a field of expertise

9  that is relevant to the case, their qualifications supporting

10  that field of expertise, and then a demonstration that they're

11  reviewing the evidence in the case and applying to that

12  particular -- to that evidence an analysis that can be reviewed

13  and determined whether or not it's reliable enough for this

14  Court to determine.

15          Here, we have a report that essentially has Professor

16  Young opining about his own perceptions of history and the

17  determinations in this case.

18          And to the reason I said earlier, I believe this

19  Daubert motion is coexistent with the extra-record discovery

20  motion as it appears to be an attempt to bootstrap into the

21  record evidence that simply wasn't before the decisionmaker.

22  He makes references to all number of matters in his report that

23  aren't in the record.

24          And so there is significant question as to what it is

25  specifically he's opining on, what basis for his opinion he is

1    -- what -- from the evidence in this case, what his basis for

2    making that opinion is, and how he reached that conclusion such

3    that it can be tested by the Court.

4         **THE COURT:**  And I'm just trying to be very clear,

5    because the ultimate decision rests with the Court.  The clear

6    basis of your objection to Professor Elliot Young's report,

7    thus far what I'm hearing, is that you submit on his

8    qualifications, but you find that his information is not

9    relevant to these proceedings, there's no evidence that he

10   reviewed the evidence in these proceedings, and, therefore, his

11   opinion may not be reliable in that the Court should consider

12   it in terms of the partial motion for summary judgment?

13        **MR. WEILAND:**  Yes, Your Honor.  These are all the

14   reasons why we believe it's not helpful to the Court.  It is a

15   matter of discretion, but they have failed to hit the wick as

16   to Federal Rule of Evidence 702.

17        **THE COURT:**  Okay.  Did I overlook any basis of your

18   objection?

19        **MR. WEILAND:**  If I may have a moment, Your Honor, to

20   make sure I covered everything.

21        No, Your Honor, I think you fairly summarized our

22   objections.

23        **THE COURT:**  Okay.  Thank you.

24        Thank you, Counsel.

25        We're now going to turn to the partial motion for

1    summary judgment filed by the plaintiff, and get arguments on

2    both sides, and then we will conclude with the defendants'

3    motion for summary judgment.

4         I recognize that some of these arguments will be

5    duplicate.  Please do not repeat anything that's said in this

6    part of the argument as it relates to defendants' motion.  You

7    can just indicate this argument has already been proffered.

8         You may proceed.

9         **MS. BANSAL:**  Thank you.  Your Honor.

10        And with the Court's permission, so plaintiffs have

11   moved for summary judgment on two APA claims.  I'll address the

12   predetermination failure to review and consult claim.  And my

13   co-counsel, Ms. MacLean, will address the incorrect statutory

14   interpretation, failure to consider conditions other than the

15   original crisis claim.

16        As this Court identified in the second question given

17   to the parties this morning, the record before the Court shows

18   numerous public statements, undisputed public statements,

19   indicating that defendants, before reviewing any country

20   conditions or consulting with other agencies, made a

21   politicized decision to end TPS across the board as

22   inconsistent with the presidents' immigration policies, and

23   because TPS holders, in their view, were, quote, illegal

24   criminal invaders.

25        That evidence, Your Honor, is in your motion Exhibits

1, 2, 3, 4, 5, and 14, are the specific exhibits we would call

the Court's attention to on that claim.  And they show both the

statements and the fact that the TPS termination decisions of

this administration are explained as part of the

administration's promise to revoke TPS, to end policies that,

quote, unquote, encourage -- are magnets for illegal

immigration.

      **THE COURT:**  Are the dates of these statements relevant

to the Court's analysis?

      **MS. BANSAL:**  The dates of all of those statements,

Your Honor, are before the country conditions review and

consultation is conducted.  And I'll go through the dates as I

talk now about the discovery, as the evidence that's been

produced in discovery, which introduces in the record further

undisputed evidence about the timing and the failure to comply

with statutory consultation and review requirements.

      **THE COURT:**  And then also point the Court to anything

that indicates that there was an intention to revoke TPS or to

repeal TPS.

      **MS. BANSAL:**  Yes, Your Honor.

      So that is in Exhibit 1 to plaintiffs' motion, which

is Secretary Noem's confirmation testimony, where she said that

extensions, you know, going forward will no longer be allowed

as they have.

      Exhibits 2 and 3 to the motion are promises from

President Trump and Vice President Vance, they were made during

the campaign, but promises to revoke TPS.  Then, subsequently,

there's the Invasion Executive Order, which Secretary Noem

interprets as, you know, enacting that promise.  And she

reads -- this is motions 4 and 5 -- as the directive to

terminate TPS.  Motions 4 and 5 are statements about the first

terminations of this administration for Haiti and Venezuela.

          And then motion Exhibit 14 is a tweet from Secretary

Noem in March in which he says that migration from Honduras is

essentially about protecting American lives.  And insinuates

that migrants from Honduras are criminals.  That's motion

Exhibit 14.

          So all of this was before the Court before discovery.

          **THE COURT:**  And you mention criminals.  Are any of the

individuals who have temporary protective status, objectively,

are any of them criminals or is that a category that would

exclude them or make them immediately ineligible?

          **MS. BANSAL:**  It would make them ineligible, Your

Honor.  You cannot receive TPS if you've been convicted of a

single felony or more than two misdemeanors, or if you're in

any way a threat to the national security of this country.

Those are disqualifying.  So this population by this definition

has already been vetted and, you know, is far, far from a

threat to this country.

          The discovery since this Court issued docket 73 ruling

 1    on the postponement motion, again, has further proven this

 2    claim.

 3          And so the undisputed facts show, Your Honor, that

 4    there was a decision made that didn't comply with the statutory

 5    requirements.

 6          The relevant requirements for this claim are in

 7    subsection (b)(3)(A) of the TPS statute.  It sets forth what

 8    the Ninth Circuit described as mandatory procedures.

 9          First, the Department of Homeland Security has to

10    consult with other agencies.  No dispute that that includes the

11    State Department.  They're uniquely positioned to provide

12    information about country conditions.

13          After that consultation, they have to review country

14    conditions.  Then make a determination if conditions in the

15    country meet the TPS criteria, publish the basis for that

16    decision.

17          And overlaying all of this, Your Honor, of course, is

18    the APA's requirement for reasoned decision making.  So, in

19    this context, it means that the country conditions review has

20    to be objective, and it has to be focused on the statutorily

21    relevant factors, does the country meet the criteria for TPS.

22          As to consultation, we draw the Court's attention to

23    Exhibit 1 to plaintiffs' reply.  So normally step one in the

24    process is consult with the Department of State, find out about

25    country conditions on the ground.  Discovery shows that part of

1    the process has been entirely eviscerated.

2          Reply Exhibit 1 says, quote, DOS will not provide

3    country conditions anymore.  Instead of providing any

4    information about country conditions, the new practice is to

5    provide a cursory letter, one, maybe two pages, at the very end

6    of the process that is focused on national interest, not

7    country conditions.

8          **THE COURT:**  So when you say at the very end of the

9    process, this is before or after a decision is made?

10         **MS. BANSAL:**  This is the way it's described in

11   Exhibit 1, Your Honor.

12         So the agency prepares a decision memo for the

13   secretary, which basically explains if the country meets the

14   criteria for TPS or not.  They're now just leaving a

15   placeholder in that memo for whatever the Secretary of State

16   says, and that is going to be inserted right before the

17   Secretary signs.  That is how they describe it in Exhibit 1.

18         The undisputed facts we think show that the decision

19   was made well before that time.  For example, Your Honor, with

20   respect to Honduras, again, they're supposed to consult before

21   making a decision.  Exhibit 35 to plaintiffs' motion is the

22   only input the Department of Homeland Security received about

23   the Honduras TPS designation.

24         It comes after -- it comes on April 8th, which is

25   after they've already drafted a decision memo for termination.

1    They drafted that decision memo on April 7th.  That's in

2    Exhibit 30 to plaintiffs' motion.

3           The State Department recommendation has got one

4    conclusory statement.  Honduras has recovered from the

5    hurricane.  It doesn't explain the basis for that.

6           The entirety of the letter is focused on a

7    recommendation to terminate, as contrary to national interest,

8    because, quote, the TPS designation of Honduras, excuse me,

9    quote, facilitates and encourages mass migration by causing

10   76,000 Hondurans to stay in this country.

11          That doesn't satisfy the statute for two reasons, Your

12   Honor.  One, it comes after the decision is made.  We see that

13   from the drafted decision memo, and all of the public

14   statements and actions by defendants that indicate a decision

15   made before that time.

16          Two, it doesn't concern country conditions.  The

17   statute says, TPS is extended unless you find that country can

18   now handle the return of its nationals.  That requires an

19   examination of country conditions, and the letter says nothing

20   about country conditions.

21          As to Nicaragua and Nepal, Your Honor, again, with

22   respect to consultation.  So the question here is, did they

23   consult before they made their decision?

24          There is nothing in the record from the current State

25   Department with respect to either country, Your Honor.  The

only information from the State Department about Nicaragua and
Nepal is information from the prior administration, it's five
months old in the case of Nicaragua, it's four months old in
the case of Nepal, the country conditions memo.  This is dated
December of 2019.

         And defendants themselves, Your Honor, in May of this
year, Secretary Noem in a published decision in the context of
TPS for a different country, South Sudan --

         **THE COURT:**  One moment.  I need to interrupt for a
quick second.  And it won't cost your time.  So I'm going to
ask my courtroom deputy to hold it.

         I am very accustomed from having been in state court
that there are distractions that can happen.  Please keep in
mind you are not to have your phones recording.  You're not to
be taking photographs.  You're not to post anything on the
internet.  We have to adhere to the record.

         Every time there is someone who is either texting or
sending messages or taking pictures -- I have kids.  I have
eyes behind my head.  I'm always able to see you.  And so
there's been at least two distractions already.

         What you're telegraphing to me is that you don't want
me to hear this part of the argument.  That's what you're
doing.  Because if my attention is now towards the audience
instead of the person speaking, I'm not taking notes.  I am
paying attention to the movement in the audience.

1          Please, we want you here, it's an open hearing, and

2     the public is invited always.  But if it gets to a point where

3     I'm not able to focus on the most important decision I need to

4     make today because I have to monitor the movement of an

5     audience, I'm going to pause.

6          And so please be respectful to the parties that are

7     before the Court.  They have worked very hard to be prepared

8     for today's hearing, and I want to give them that courtesy.  So

9     keep that in mind.

10         And so from this point forward -- the courtroom

11    security officers have been very polite, but if they have to

12    take your phones -- today I'm wearing blue, maybe I'll look for

13    a blue phone, but if they have to take your phone, it's because

14    the distraction was not the first time, the second time, it was

15    finally enough for my attention to be drawn to the audience.

16         So please be respectful.  Let us continue to conduct

17    this hearing in a way where I can give it my undivided

18    attention.  So I really appreciate that courtesy.

19         All right.  Counsel, you may resume.  My apologies.

20         **MS. BANSAL:**  No.  Thank you, Your Honor.

21         So as to Nicaragua and Nepal, the issue with the

22    consultation, again, is they've made the decision before and

23    they have only stale information.  The whole purpose of the

24    periodic review is to find out if the country still meets the

25    criteria.

1          The agency itself has recognized that stale

2    information is insufficient to make an informed decision.

3    That's in, Your Honor, Exhibit 25 to plaintiffs' reply, where

4    the agency explains that in May of this year, just a month

5    before the Nepal situation, just two months before Nicaragua

6    and Honduras, DHS failed to make any decision about TPS for

7    South Sudan because all they had was a four-month-old input

8    from the State Department.

9          In the context of South Sudan, they say that's too

10   stale, I can't make an informed decision.  But for Nicaragua

11   and Nepal, they just go ahead and make a decision despite that

12   stale information.

13         That violates the statute, Your Honor, because that's

14   not the consultation the statute requires.  The statute

15   requires consultation with the State Department about current

16   country conditions.  And it's another undisputed fact, Your

17   Honor, that goes to predetermination, because it suggests that

18   the consultation really doesn't matter, they've already made

19   their decision.

20         In the context of Nepal, they say -- and this is

21   Exhibit 27 to our motion -- when they finally realize they have

22   a recommendation from the State Department, they say, well,

23   that recommendation was to terminate, so we should move

24   forward.

25         The clear implication is if the recommendation had

1    been to extend, they would have sought an updated

2    recommendation because it wasn't consistent with their desire

3    to end.  So again, it's an additional undisputed fact, Your

4    Honor, that goes to predetermination.

5            With respect to the review -- so there's two things

6    the Secretary has to do before she makes a decision.  She has

7    to consult, and then she has to review country conditions.

8            We know now she's not getting country conditions

9    information from the State Department.  We also now know that

10   the country conditions review process within DHS is sharply

11   limited and it's slanted for termination.  That's in Exhibit 1

12   to plaintiffs' reply, which is new guidance to DHS about their

13   country conditions review.  They only got one page of country

14   conditions.

15           They should include any improvements, and then there's

16   a list of off limits topics.  Don't talk about corruption,

17   environmental concerns, climate, women's rights they're not

18   sure if they can talk about.

19           So they have sharply constrained -- they have nothing

20   from the State Department, and they've sharply restrained their

21   own review.

22           On top of that, Your Honor, again, as the Court

23   identified in the second question, for Honduras and Nicaragua

24   they've written decision memos for termination before they even

25   have research.  So this is at motion 30, shows that the

1    decision memos were drafted for termination on April 7th.

2    Exhibit 19 to our motion shows that they did not get any

3    country conditions information from Nicaragua until April 10th.

4    So how have they written this decision memo?

5         The defendants make an analogy, they say, well, you

6    know, this is like a court writing an opinion before its heard

7    argument and then adding things from the argument.  That's not

8    an apt analogy, Your Honor, because this is a fact question.

9    This is as if the Court wrote down what a witness says before

10   the witness spoke.

11        To take an analogy from a different context, you know,

12   you imagine a contractor who has to inspect a building and see

13   it's safe.  He's written the inspection report before he went

14   into the building.  That is evidence of predetermination.  How

15   could you come to a conclusion before you have any information?

16   Only if you've already made up your mind.

17        As to Nepal, Your Honor, I think the most important

18   evidence on the country conditions review is at Exhibit 27 to

19   our motion and Exhibit 27 to our reply.  Those two together

20   show that as of March 11th, the understanding within DHS is

21   that they would be terminating TPS for Nepal.  But they didn't

22   get the country conditions research until March 18.

23        And defendants' only response to all of this, Your

24   Honor, is to point to the certified administrative record and

25   they say, well, there's State Department input in there,

1    there's country conditions input in there.

2         Two reasons why that doesn't prove what defendants

3    think it does.

4         First, that State Department input doesn't satisfy the

5    statute, for the reasons that we've explained, they got it

6    after they made the decision.  And it's not about country

7    conditions for Honduras.  It's totally stale for Nicaragua and

8    Nepal.  So it's not current.  The statute requires a periodic

9    review of what's happening in the country now.

10        As to the country conditions information, Your Honor,

11   I think the District Court analysis in Ramos and *Saget* are very

12   instructive on this point.  So those are cases where there was

13   a similar record in which you have country conditions

14   information in the administrative record that suggests, you

15   know, all of these conditions are making it unsafe to go back

16   to the country.  But final decision, the Federal Register

17   Notice doesn't mention them.

18        And the Court in Ramos says, look, the fact that it's

19   in the record, she received it at some point after she made her

20   decision, maybe it doesn't mean the Secretary considered it and

21   relied on it, right?  You have to look at the decision.

22        And the Court in *Saget* says, the omission of these

23   obvious negative conditions from the final decision, you know,

24   the Court's not saying was the secretary right or wrong to say

25   it was safe, but the omission of this information is -- shows

1   that she sidestepped the review process.

2           It's particularly relevant here with Nicaragua and

3   Honduras, that that country conditions review information, this

4   is Exhibit 29 to plaintiffs' motion for Honduras, and Exhibit

5   48 to plaintiffs' motion for Nicaragua, it proves Honduras is

6   unsafe because of violence in that country.  And it concludes

7   that Honduras is unsafe because there's a humanitarian crisis.

8           Neither is even addressed in the Federal Register

9   Notice, and that omission, that undisputed omission, shows --

10  supports plaintiffs' predetermination claim.

11          To go back very briefly to that contractor analogy,

12  Your Honor, it says if you then find out that the contractor

13  drafted the inspection report before he stepped foot in the

14  building, and the report doesn't say anything about the gaping

15  hole in the lobby, that's evidence that no inspection was

16  actually done.

17          So in sum, Your Honor, we have undisputed public

18  statements and actions showing a commitment to terminate before

19  consultation and review, undisputed that we have draft

20  termination notices before consultation and review, they've

21  done entirely away with the State Department review process,

22  they have a slanted DHS review, and they have glaring omissions

23  in the decision that indicates sidestep of the review process.

24          **THE COURT:**  Thank you.

25          **MS. BANSAL:**  My co-counsel will address our second APA

 1   claim, Your Honor.

 2        **THE COURT:**  Keep in mind the Court will be -- how much

 3   time do we have?

 4        I know, they're using up all of their time.

 5        All right.  Counsel, you may proceed.  Keep in mind

 6   there's still the motion for summary judgment.  Not to rush

 7   anyone, but the Court will have a hard stop at the time that I

 8   indicated, because we have other proceedings this afternoon.

 9        You may begin.

10        **MS. MACLEAN:**  Thank you, Your Honor.

11        As addressed earlier, our second APA claim is -- for

12   purposes of our summary judgment motion is the defendants

13   misinterpreted the TPS statute and broke with past practice by

14   refusing to consider country conditions if they determined that

15   they were unrelated to the original crisis.  The undisputed

16   record now proves this.

17        Plaintiffs prevail on summary judgment that

18   defendants' refusal to consider intervening conditions during a

19   periodic review is based on a misinterpretation of the statute.

20   Nothing in the statute forbids the Secretary for considering

21   intervening conditions, for the reasons that were discussed

22   earlier today.

23        There's also now undisputed evidence that this refusal

24   to consider intervening conditions is arbitrary and capricious,

25   as it constitutes an unexplained deviation from practice past.

1          Defendants say, effectively, that nothing changed.

2    That there never had been a consideration of intervening

3    conditions or conditions that were unrelated to the original

4    reason for the designation.

5          This is similar to what the agency said in American

6    Wild Horse Preservation Campaign, the case out of the DC

7    Circuit, where the DC Circuit identified that the change in

8    agency practice could be ascertained from a review of the

9    history of agency action.  And that is clearly true here as

10   well, as the only two directly on point cases, *Ramos* and *Saget*

11   from the first Trump administration found, there was a past

12   practice of considering intervening conditions during the

13   periodic review process demonstrated over decades of the TPS

14   statute being implemented.

15         Defendants in their brief ignore these cases.  They

16   also ignore the undisputed evidence, which confirms this

17   consistent and long-standing practice, including decades of

18   Federal Register Notices, past decision memos, and testimony

19   from a former agency head.

20         When the agency previously tried to conduct

21   impermissibly limited country conditions review in 2017 and

22   2018, arguing at that time as well that they were not permitted

23   to consider country conditions that were not related to the

24   original reason for the designation, DHS later rescinded those

25   terminations as they did not adequately consider country

1    conditions.  And then the agency extended TPS for each of these

2    countries based on a more appropriate country conditions

3    analysis consistent with the statute, which considered not just

4    country conditions related to the original reason for the

5    designation, but also other country conditions.

6         So, for instance, in those 2023 extensions, the last

7    extensions prior to the terminations that Secretary Noem

8    implemented and that are being challenged here, with regard to

9    Honduras, the Secretary considered subsequent environmental

10   disasters, violence, and social and political concerns.

11        With regard to Nicaragua, the Secretary at that time

12   in 2023 considered political instability and the humanitarian

13   crisis in Nicaragua.

14        And with regard to Nepal, the Secretary considered,

15   for instance, macro economic shocks and the effects of the

16   Russian Ukraine war.

17        The defendants' principal response to this undisputed

18   evidence of clear, consistent, uninterrupted past practice, is

19   to cherry-pick four examples of old Federal Register Notices

20   that they claim to be based on originating conditions only.

21   But these fall flat for the reasons that are addressed in more

22   detail in plaintiffs' reply at pages 17 through 18.

23        In some cases, they actually confirm plaintiffs'

24   contention that the past practice had been to consider country

25   conditions.  For instance, because the Secretary in some of

1    those instances looked to intervening country conditions and

2    still decided to terminate, which is not inconsistent with

3    plaintiffs' position.  And, at a minimum, they failed to

4    provide any counter to the undisputed evidence of this past

5    practice, and in some cases really provide no meaningful

6    information for this Court at all, for the reasons that we

7    addressed in our filings.

8          While defendants in their filings dispute that there

9    ever was a past practice of considering intervening country

10   conditions, internally from the discovery, defendants have

11   conceded that the periodic reviews deviated from, quote,

12   typical agency practice.

13         Three examples are in Exhibits 1, 3, and 14 to

14   plaintiffs' reply.  In Exhibit 14, the USCIS Office of Policy

15   and Strategy Chief, the office that is responsible for

16   preparing the decision memos that provide the substantive

17   considerations for the Secretary and the recommendation,

18   identified that, quote, typically DHS and DOS considered an

19   array of country conditions, but they are now, quote, very

20   focused on country conditions research that pertains directly

21   to the original reason for the country's TPS designation,

22   identifying a clear deviation from past practice.

23         Also in Exhibits 1 and 3 to the reply are evidence

24   that the agency crafted new guidelines to make clear the change

25   for the analysts who were preparing both the decision memo and

1    the country conditions report, the two central documents that

2    are the basis -- or purportedly intended to be the basis for

3    the Secretary's decision making.  Those guidelines expressly

4    instructed the analyst to avoid a comprehensive country

5    conditions analysis and focus only on the conditions in the

6    original designation, as my co-counsel shared.

7           And just, briefly, to close, here, the agency is -- or

8    defendants' other argument here is the change in position

9    doctrine doesn't apply here.  And that's something that we

10   addressed in part in -- earlier today.  The change in position

11   doctrine clearly applies, as both of the courts to consider

12   this previously held.  And as other courts have held also

13   outside of the TPS context where an agency changes a position

14   that is consistently practiced by the agency, whether or not it

15   is elaborated in formal rule or regulation, that implicates the

16   change in position doctrine.

17          We identify cases where this is true, both from the

18   Ninth Circuit and from the DC Circuit.  *Bonneville Power*, which

19   concerned decades old fishing -- fishery funding practices out

20   of the Ninth Circuit.  And from the DC Circuit, *Southwest

21   Airlines,* which concerned the way that an agency used data in

22   rate-making decisions, not elaborated in any formal rule or

23   regulation.  And *American Wild Horse Preservation Campaign*,

24   which concerned longstanding land management practices.

25          In *Southwest Airlines,* the DC Circuit recognized that

1    a consistent practice, whether adopted expressly in a holding

2    or established impliedly through repetition, sets the baseline

3    from which future departures must be explained.

4          And here, there's no explanation, because there's not

5    even a recognition of the change.  There's a denial of a change

6    in agency practice, where they don't even satisfy the first

7    criterion of displaying awareness of a changed position.  They

8    cannot satisfy the change in position doctrine.

9          Thank you, Your Honor.

10          **THE COURT:**  Thank you.

11          How much time is reserved, Robert?  Ten minutes.

12          All right.  So plaintiff has reserved ten minutes for

13    response to the Government.

14          Counsel for the Government, if you can address the

15    issues brought forth by plaintiff.  And my questions were, were

16    there any concessions, areas of which you both agree.  And you

17    will start with addressing their partial motion for summary

18    judgment, and then you will go straight into your motion for

19    summary judgment.

20          Also, the documents that you would like the Court to

21    focus on with regards to your motion, counsel indicates that

22    there was predetermination, omissions in the process, and that

23    it was arbitrary and capricious, and that the Secretary

24    deviated from past -- from uninterrupted past practice.

25          If I omitted anything, counsel will be able to

1    readdress those issues in their response to your argument.

2          Finally, with regards to the audience, we've given

3    warnings.  If phones go off -- all phones should be off.  We

4    hear anything audible, you will be asked to leave the courtroom

5    and you may not come back in.

6          All right.  Counsel, you may proceed.

7          **MR. WEILAND:**  Thank you, Your Honor.

8          I will attempt to be as efficient as possible.

9          Obviously the Government incorporates its prior

10   argument on the Court's jurisdiction and sees no reason to add

11   to those here.

12         **THE COURT:**  Thank you.

13         **MR. WEILAND:**  With response to the plaintiffs' motion,

14   the biggest issue that plaintiffs have is that they are

15   misinterpreting the statute, and they are misunderstanding what

16   the Government's position is.

17         The statute does not mandate any particular form of

18   consultation.  It does not mandate that it come in any

19   particular letter or template.  It merely says, and

20   generically, that consultation should occur.

21         And they misunderstand -- and I will address their

22   second argument first, because it informs their first.  Is they

23   misinterpret the requirement for a periodic review here.

24         8 USC Section 1254a -- I apologize if I was too far

25   from the microphone -- requires in paragraph 3 of subparagraph

1    (b) that the Court -- or that the Secretary review the

2    intervening -- review whether or not the criteria of paragraph

3    1 continued -- for a designation continued to be met.

4         So it internally refers back to paragraph 1, which is

5    designations.  And paragraph 1 states, as pertinent here, in

6    subsection (b), that the designation is conditioned on whether

7    or not there has been an earthquake, flood, drought, epidemic,

8    or other environmental disaster resulting in substantial, but

9    temporary, disruption of living conditions.

10        Two, whether the foreign state is unable to

11   temporarily to handle the -- adequately handle the return of

12   its aliens -- or of its nationals, I'm sorry.  And -- and that

13   is an important conjunction -- whether the foreign state has

14   requested designation.

15        Plaintiffs' motion asks this Court to determine that

16   the Secretary should not consider this inclusive list.  This is

17   three criteria that have to be met and -- in the periodic

18   review.  And if the Secretary finds that any one of those

19   criteria are not met, the basis for designation, then she shall

20   terminate.  That's what -- the direction that Congress has

21   given.

22        And in order to avoid this conclusion -- because it is

23   quite clear that after 30 years Honduras and Nicaragua are no

24   longer substantially affected by the effects of Hurricane

25   Mitch.  That is not -- that is not a reasonable interpretation

1  of temporary, nearly 30 years on.

2          And both countries do accept return of their nationals

3  quite regularly where they are removed from the United States

4  in other proceedings.

5          And what defendant -- or plaintiffs' motion is asking

6  this Court to do is find that the Secretary, contrary to the

7  plain language of the statute governing periodic review, is to

8  consider this as a generic designation of some type, either

9  under subsection (b)(1)(A), which is the armed conflict

10  criteria for designation, or (B)(1)(C), an extraordinary and

11  temporary conditions in the state unrelated to the basis for

12  designation.

13          The only requirement in the statute is that the

14  Secretary conduct her review of the basis for designation.  It

15  does not say that she is required to redesignate the nations at

16  issue under some other basis.  And that is essentially what

17  plaintiffs are asking this Court to do in their motion for

18  summary judgment.  They are asking this Court to determine that

19  some other basis for designation is applicable, and that by

20  virtue of the Secretary not having found those particular

21  criteria, that she somehow violated the language of the

22  statute.

23          That's it.  That's all the statute requires.  It

24  doesn't require that the State Department's letter comes in any

25  format.

1          And previous letters had included substantial

2     information on the country conditions.  And those are actually

3     included in the administrative record.

4          Plaintiffs fault the agency for considering Secretary

5     Blinken's letter, which has a pretty robust articulation of how

6     the nation of Nepal has recovered from the earthquake that

7     affected it, and actually ceased rebuilding its reconstruction

8     efforts because they didn't need to build anymore.

9          There's nothing inappropriate about the Secretary

10    considering those prior inputs.  There's nothing inappropriate

11    about the Secretary considering other inputs.  And the

12    direction that her staff gave was to comply with the criteria

13    as required in the statute.  And that has been what -- and this

14    gets back to the pretext.  That has been what Secretary Noem

15    has been saying the President's Executive Order directs from

16    the very start, to take a hard look at the statute, at the

17    designations, and determine whether or not they continue to

18    comply with the textual requirements and the intent of

19    Congress, that this be temporary protection, temporary safe

20    harbor based on the reasons the countries were designated in

21    the first place.

22          And there is nothing untoward about her saying she was

23    going to do that, and her acknowledging that the President of

24    the United States directed her to do that.

25          There's also nothing inappropriate about her staff

1    working the problem.  This is one of the reasons the deliberate

2    of process privilege exists, so that they can have these

3    conversations.  And plaintiffs' motion includes within it

4    several references to statements of individuals who are

5    preparing these documents that indicates that there was some,

6    perhaps, discussion occurring as they prepared the package for

7    the Secretary's review.

8         But the reality is, that is just how government works.

9    They prepare the package for the Secretary's review.

10        And we don't think it's an inapt analogy to say that

11   based on the input or -- from the Secretary -- or I think we

12   might have drawn an allusion to a court perhaps having an idea

13   where they might be going before they go into a hearing.

14   Nothing about that imputes that the Court is not completely

15   open minded about the --

16        **THE COURT:**  I think one of the points that was brought

17   to my attention was that memos were received after the

18   Secretary had made her decision and, therefore, was not part of

19   the deliberative process, but something to support the decision

20   after the fact.

21        What is your position on those -- on that implication?

22        **MR. WEILAND:**  I would submit that's not the only way

23   that consultation occurs.

24        In their reply brief, plaintiffs make significant --

25   point out, I think it's Exhibit 17, that there was some

1    discussion that occurred, I believe it's dated April 25th,

2    before the Secretary's decision with regards to Nicaragua,

3    between the secretarial release between their staffs about

4    whether or not the -- Secretary Rubio was going to make a

5    recommendation to terminate or not.  That reflects consultation

6    that shows that the staffs are interacting prior to the

7    decision being signed, I believe on May 5th is the final date.

8              THE COURT:  I guess my question, was that meaningful?

9              MR. WEILAND:  Your Honor, I don't think this Court can

10   assess what's meaningful in this context.  That's one of the

11   reasons that the Congress has said this is not subject to

12   judicial review.  What standard would this Court be able to

13   apply to determine what should or should not be considered and

14   or what the decision should or should not be?

15             THE COURT:  Okay.  So in terms of the predetermination

16   argument, if someone just was sent an email, that's sufficient.

17   And then if they provide their input after the fact, that's not

18   reviewable, and that's not circumstantial evidence of any

19   predetermination?  Is that the position you're taking?

20             MR. WEILAND:  The position the Government is taking is

21   that there is no particular requirement in the statute that the

22   consultation occur in any particular format or means or mode,

23   and that --

24             THE COURT:  Or timing?  The timing is what I'm most

25   concerned about, not necessarily the mode, not necessarily

1    whether it's by email, in person, on the phone, but the timing.

2    Does the timing have to take place prior to the decision?

3        MR. WEILAND:  Your Honor, I think the statute requires

4    the Secretary consult before making the decision.  So I believe

5    that answers your question as to timing.

6        But the decisions were made after receiving the input.

7    The letter with regards to Nicaragua, I believe, was received

8    after the decision had been signed, but again, the Government

9    points to the Exhibit 17 in plaintiffs' own reply that shows

10   that there were discussions ongoing at the staff level at

11   least, and inferences that both the secretaries needed to have

12   a personal discussion about the matter.

13       And so I believe in the other instances the letters

14   were received before the decision was signed.  So the timing

15   requirements of the statute were satisfied.

16       THE COURT:  All right.  No more interruptions.

17       And just make sure that the questions on page 2

18   through 5, that you're satisfied that those have been

19   adequately answered.  But I'm going to give you the remainder

20   of your time without interruption.

21       MR. WEILAND:  Your Honor, I welcome the questions.

22       Two through 5.

23       Yes, Your Honor, with regards to question 2A, the

24   Government doesn't believe that the *Department of Commerce*

25   factual scenario fits this construct.  The *Commerce* case was

1    different.  The *Commerce* case involved -- I'm sorry.

2           **THE COURT:**  So you didn't want me to hear that.  Go

3    ahead.

4           **MR. WEILAND:**  I lost my train of thought.

5           All right.  I think I have it.

6           The *Department of Commerce* case --

7           May I proceed, Your Honor?

8           **THE COURT:**  Yes.  I'm just asking everybody to please

9    turn your phones off.  If you need to leave, that's fine.  Or

10   if you need to check your phones, you can step out.  But please

11   leave your phones off.  Thank you.

12          **MR. WEILAND:**  I think the *Department of Commerce* case

13   is instructive in a couple ways, Your Honor.

14          First, that case involved the sensus question, as I

15   understand it.  And in that case, the sole reason that the

16   Secretary of Commerce gave for including the citizenship

17   question in the sensus was that because -- his letter indicated

18   he had been asked by the Department of Justice to include the

19   question.  When it turned out that his staff had actually gone

20   to the Department of Justice to ask them to ask the Secretary

21   to include that question.  So -- and that was not made clear in

22   any way.

23          So in that context it was pretextual in the sense that

24   the assertion was that he was only doing it for a reason

25   because he was asked, but the reality is he had asked for it to

1    be asked of him.

2         That is completely different than what has been --

3    what the records show in this case, which is the Secretary has

4    been completely forthright, to include in her confirmation

5    hearing, that they are going to take a hard look at the purpose

6    and intent and language of the TPS statute, and ensure that it

7    continues to be -- or at least return to its intent, which is

8    that it provides temporary safe harbor in the wake of war,

9    environmental disaster, or an extraordinary temporary

10   circumstance.

11        THE COURT:  Now, plaintiff implies and in some places

12   explicitly state that there was a predetermination before all

13   of this that TPS was either going to be revoked or repealed.

14        Your position on that invitation by the plaintiff for

15   me to consider?

16        MR. WEILAND:  I think that's a bit too far.  I think

17   the evidence shows that there's a predetermination to take a

18   hard look at it.  There's nothing improper by that.  And in

19   fact, that has been the public pronouncements of the agency.

20        THE COURT:  As a categorical statement, can you

21   categorically say that before these determinations were made

22   there's nothing that's in writing that says that TPS was going

23   to be repealed or revoked from this administration or from any

24   of the executive departments, based on the record I have?

25        MR. WEILAND:  I can't.  And you're catching me out a

1    little bit here with my depth of knowledge on the extra-record

2    discovery here, Your Honor.  I can't categorically --

3         THE COURT:  Well, I'm --

4         MR. WEILAND:  --categorically say that.

5         THE COURT:  Categorically with the things that I do

6    have --

7         MR. WEILAND:  Sure.

8         THE COURT:  And the amount of documents I have

9    reviewed, are you comfortable in categorically saying there's

10   nothing in these documents that have been proffered in this

11   record, not even looking at anything extraneous, that supports

12   a position that there was a predetermination to either repeal

13   or revoke TPS before these decisions were being made?

14        MR. WEILAND:  I can say that my client's position is

15   that that was not the case.  That's as far as I can do, Your

16   Honor.

17        THE COURT:  All right.

18        MR. WEILAND:  The -- and this -- to get to my second

19   point about the *Department of Commerce*, this is exactly what

20   the Supreme Court said is all right.  They said that it -- a

21   new administration arriving in with its policy preferences, its

22   policy positions, can't -- you know, there's nothing

23   inappropriate about them making decisions like that.

24        And so for the staff to recognize that this

25   administration is coming in with a different policy view, and

1    working with an understanding of what their boss may be

2    thinking, is completely appropriate.

3          **THE COURT:**  Well, I'm only looking at it through the

4    lens of the predetermination argument.  That's the lens I'm

5    examining that particular reference.

6          **MR. WEILAND:**  Yes, Your Honor.

7          **THE COURT:**  Because I think that was the area in which

8    plaintiff invited me to take a look.

9          **MR. WEILAND:**  Yes, Your Honor.

10         And I -- I think the predetermination argument is an

11   outgrowth of the pretext found in *Department of Commerce*.  And

12   defendants' position is that's an extension that is not

13   appropriate.  The pretext in *Department of Commerce* was a very

14   unique sets of facts.  And this gets to Justice Thomas's

15   dissent that would have found that even a pretext would not fit

16   under an APA review because, one, it is not embodied in the

17   statute.  And two, it become becomes a door which plaintiffs

18   can challenge through extra-record discovery, the staff work,

19   in picking on the communications the staff is having, can

20   assert that somehow the decision is inappropriate or arbitrary

21   and capricious.

22         And the Government goes back to the standard of review

23   here for the APA, is whether or not, based on the record there

24   is a bona fide reason for the decision.  And that -- in that

25   regard, defendants assert the Federal Register Notices provide

1    that entirely.  The certified administrative records were

2    provided to this Court.  To the extent the Court conducts any

3    review, or can conduct any review, it should be based on that

4    record identified.

5          And if the record supports the decision, then it is --

6    the decision is reasonable.  If the record doesn't support the

7    decision, then that would be an instance where the Court can

8    say, this is arbitrary and capricious, your record doesn't

9    support what you found.

10         But here it is the Government's assertion that the

11   records do support the determinations here.  The countries have

12   recovered from the basis -- from the natural disasters that

13   provided the basis for the designations.  And the Secretary's

14   decision is in alignment with the statute.

15         I will just review your other questions real quickly,

16   Your Honor.

17         **THE COURT:**  And then I think the last reference was to

18   the confirmation hearing, which if I recall in reading that,

19   talked about transparency, integrity of the Government, not

20   pursuing categorically certain individuals.  And I'm doing this

21   from memory, so I may be misapplying some of this.  But I want

22   to make sure that I'm looking at this through the lens of

23   predetermination and pretext, and making sure that I'm also

24   thinking about the omission argument, that basically something

25   was side stepped.  And then those are your concluding remarks

1    and then we'll take our break at 12:15.

2        **MR. WEILAND:**  Yes, Your Honor.

3        With regard to omission -- and this is the departure

4    from pattern or practice, the Government would assert that the

5    rules and the cases that plaintiffs cite to you have to do with

6    formal rulemaking.  This is not a determination that exists in

7    a formal rulemaking environment.  This is strictly -- there is

8    no published -- requirement to publish how the process will

9    work.  It is the Secretary's determination and her decision.

10        And if you look at the history of these designations,

11    the Federal Register Notices have changed over the years

12    significantly, some of them, I believe, even in the context of

13    these initial designations from the hurricane that occurred in

14    1998 were quite brief, maybe one or two paragraphs at most.

15    They've become more robust.  But nothing requires the Secretary

16    to do anything other than what the statute specifically says,

17    and that is to require -- to review the basis for the

18    designation in the first instance.

19        I think the -- you wanted me to address the remainder

20    of the Government's motion for summary judgment?

21        **THE COURT:**  Yes.  Anything that has not been argued or

22    discussed.

23        **MR. WEILAND:**  Yes, Your Honor.

24        And I think the only thing to add, I believe the two

25    areas -- most significant areas from the departure from past

1    practice on the cool-down period.  Again, the Government would

2    assert there is no statutory requirement other than the 60

3    days, that is what controls.  There is no published procedure

4    or process that the secretaries follow.  And it is -- the

5    language of the statute is quite expansive as far as the

6    Secretary's discretion in that regard.

7         And then, finally, with regard to the equal protection

8    claim, again, most of this is the same with regard to what we

9    argued this morning with regard to the motion to dismiss.

10   There is a rational basis for the decision, facially legitimate

11   in the decision.  And following the rationale basis review, the

12   Court should -- in our mind, we think the plaintiffs failed to

13   establish it in their pleading, such that it's subject to

14   dismissal.

15        But even at this stage, if the Court thinks it

16   survives a motion to dismiss, the record shows that it is

17   facially legitimate, and the judgment should be found for the

18   Government on it.

19        **THE COURT:**  All right.  Just to make sure that we

20   flush out all issues before we take our break, so that when

21   plaintiff returns, it's your position that review -- that their

22   argument about ignoring country conditions unrelated to initial

23   designation, that the review must be meaningful, that that's

24   going beyond the statute, in your argument.  That the APA claim

25   departure from the past practice of six months' transition

period, that 20 years of agency practice is enough to establish

a pattern.  But it's your position that new administration can

make a change.

        And then, finally, we've previously discussed *Trump*

*versus Hawaii* or the *Arlington Heights,* and could a reasonable

factfinder find that there was racial animus or that it was

motivated by racial animus.

        Do you feel that you adequately addressed all of those

issues as it relates to the motions for summary judgment?

        **MR. WEILAND:**  There -- you said quite a bit there,

Your Honor, and I'm sorry.

        **THE COURT:**  I have a checklist.

        **MR. WEILAND:**  I'm trying to keep up.  My apologies.

        With regard to the change in practice, I don't believe

the defendants have ever conceded that there is a practice that

is established at all.  That it is completely unfettered

discretionary determination that has varied greatly over the

entirety of the Temporary Protected Status program since the

existence of this statute.

        So -- but, yes, defendants do assert that because of

that there is no departure from practice.

        With regards to the equal protection claim, yes,

defendants assert it's a rationale basis review.  And then

based on the decision itself and the record, it is facially

legitimate and bona fide reason subject that it would survive

1    any due process challenge in the amendment.

2         And I'm sorry, I forgot your first point, Your Honor.

3         **THE COURT:**  I think that was all of it, but we're

4    going to take a break, and allow you to review your notes as

5    well as the Court's prior questions, written questions, to see

6    if there's any omissions.

7         When we return, plaintiff will resume the podium and

8    then we will conclude the proceedings.

9         I ask that all of you look at those questions as well

10   as the request that the Court made at the end of the list of

11   questions to make sure you meet and confer during this time, so

12   as we move forward, dates are properly set through our

13   courtroom deputy.

14        Thank you.

15        Robert, recess.

16   **COURTROOM DEPUTY:**  Thank you.  Court is in recess.

17        (Recess taken.)

18   **THE COURT:**  All right.  Counsel for the plaintiff, and

19   I also provided counsel with my final question in writing,

20   because I want to make sure that you understand the import of

21   my question and to please address it.

22        Counsel for the plaintiff.

23        And we will have a hard stop at 1:00, but you have ten

24   minutes each I think.  Is that right?  Ten minutes.  Thank you.

25        **MS. MACLEAN:**  Good afternoon, Your Honor.  And with

1    respect to the specific question, plaintiffs' position is that

2    the statute is clear that the agency must consider the factors

3    that are elaborated in 1254a(b)(1)(B) and there is agreement

4    amongst the parties that that is what must be considered at the

5    time of a periodic review.

6         The difference in opinion is whether in the context of

7    where a country has been designated on account of a natural

8    disaster whether 1254a -- sorry, let me make sure I got the

9    right number -- whether the (b)(1)(B)(ii) factor, that the

10   foreign state is unable temporarily to handle adequately the

11   return to the state of aliens who are nationals of the state,

12   whether that needs to be tied expressly and exclusively to

13   country conditions that are directly related to the original

14   reason for the designation.

15        Under *Loper Bright*, the Court need not defer to the

16   agency's interpretation, even if there is ambiguity.  We

17   contend, of course, that there is no ambiguity.  The Supreme

18   Court recognized the Court exercises independent judgment.

19   *Skidmore* and its progeny allow for consideration of agency

20   interpretations to the extent that they are persuasive.

21        With regard to this question of whether that provision

22   that the foreign state is unable temporarily to handle

23   adequately the return to the State of aliens who are nationals

24   of the state consider intervening conditions or must be limited

25   to only the original reason for the designation. The agency has

1    actually offered no analysis of any deviation from past

2    practice so there's nothing to defer to the agency on -- the

3    agency's position is that there is no deviation from past

4    practice, this is the way this has always been.  So in this

5    context, we believe this can be analyzed through an analysis of

6    the statute and consideration of decades of past practice, and,

7    obviously, how courts have looked to that in the past.

8        On -- and just to clarify in response to one of the

9    points that defendants were -- made -- defendants asserted that

10   essentially plaintiffs are asking for this court to identify

11   that the Secretary can consider the factors in -- related to

12   the armed conflict or extraordinary and temporary

13   circumstances, that is not what plaintiffs are asking and not

14   what plaintiffs are saying that the statute requires.  The

15   statute requires during the periodic review process that the

16   Secretary consider in the context of a country that has been

17   designated on the basis of a natural disaster consider the

18   factors in (b)(i), (ii), and (iii).

19       (b)(i) is that there was a natural disaster.  That is

20   obviously true for all of these cases, for all of these

21   countries.  (b)(iii) is that the foreign state officially

22   requested the designation.  That's obviously true for all of

23   these countries.

24       And the only question that is new and relevant and

25   needs to be reconsidered at the stage of the periodic review

1    process is whether the foreign state is unable temporarily to

2    handle adequately the return to the state of aliens who are

3    nationals of the state and that is where there is a dispute as

4    to whether the Secretary can consider intervening conditions

5    that are not related to the original reason for the

6    designation.

7          The defendants' position is that the Secretary may not

8    consider that, and that, in the plaintiffs', view is

9    inconsistent with the clear, express language of the statute,

10   and also the decades of historical practice.  Defendants

11   continue to assert, as they did in their filings, that the

12   change in position doctrine can only apply to formal

13   rulemaking.

14         And there is a myriad of cases both from the Ninth

15   Circuit and the DC Circuit, as well as language from the

16   Supreme Court which we addressed in our briefing and I talked

17   about earlier that made clear that that is not -- that that is

18   not the case and changed practices that do not include an

19   explanation for the change and a good reason for the change

20   also implicate the change in position doctrine.

21         And I will -- I will actually briefly, in one moment,

22   mention the -- our response on the equal protection claims and

23   then defer to my colleague.

24         Defendants can't prevail on their summary judgment

25   with respect to plaintiffs' constitutional claims.  As a

 1    general matter, equal protection claims are typically resolved

 2    at trial.  And as the Ninth Circuit has recognized in *Chang*, a

 3    plaintiff need produce very little evidence to survive summary

 4    judgment.  This is clearly not the kind of case that can be

 5    resolved so expeditiously for the reasons that Your Honor

 6    identified in the 705 Motion where you cataloged -- Your Honor

 7    cataloged racist tropes and dehumanizing generalizations, which

 8    underlie the termination decisions.

 9         Defendants present no new evidence or arguments here,

10    and, in fact, developments and discovery have only strengthened

11    our claim, revealing countless procedural departures, which

12    we've discussed here and in our filings.  Discovery also shows,

13    as my colleague mentioned, that defendants sought out

14    irrelevant and discriminatory information to support

15    termination on the ground that TPS holders were a public safety

16    or national security risk, even though as my co-counsel

17    identified, that is inconsistent with the obligations of the

18    TPS statute.

19         Those -- the evidence in -- of the discovery of

20    defendants seeking out irrelevant discriminatory information is

21    in -- available in our reply pages 5 through 6 and Exhibits 14

22    -- 32 through 34 and 36.  And, lastly, that defendants have

23    continued to spread baseless and racist stereotypes about TPS

24    Holders generally and this specific population.  In particular,

25    in response to Your Honor's 705 order, defendants described in

 1   a public press release immediately after, TPS as a program that

 2   allows unvetted aliens to remain in the United States.

 3          And, quote, has been exploited to allow criminal

 4   aliens to come to our country and terrorize American Citizens.

 5   That was directly in relation to this Court's 705 order and

 6   directly related to this particular population.  As my

 7   co-counsel identified, TPS holders are vetted consistently in

 8   order to maintain their eligibility.

 9          And just one minor correction in the record, that it

10   is more than -- a single misdemeanor disqualifies an individual

11   from TPS, either at the time of the initial designation, or if

12   they maintain -- or their initial registration or at any

13   subsequent time.

14          And with that, I will pass to my colleague.

15          MS. BANSAL:  Just very briefly, Your Honor, two

16   points.

17          With respect to our predetermination failure to review

18   consult claim, defense counsel suggests that plaintiffs are

19   requiring some specific form of consultation.  Not so, Your

20   Honor.

21          The statute requires that the consultation be three

22   things; happen before the decision, so it uses the word

23   after -- after consulting, the Secretary has to decide.

24          That it be current.  This whole periodic review is

25   about finding current country conditions information.

1          And that it be about country conditions.

2          So before the decision, current information, about

3     country conditions, that is all -- that is what plaintiffs say

4     the Secretary failed to obtain in this -- with respect to the

5     challenge determinations.

6          We would draw the Court's attention, in addition to

7     the statutory language, to the *California Wildness* Ninth

8     Circuit opinion cited in our briefs which talks about statutory

9     consultation requirements and how they need to be meaningful

10    and reasoned consultation.

11         The last point, Your Honor, the Court had asked the

12    parties to address the appropriate relief, and plaintiffs

13    responded to the Court's question, we are asking for two forms

14    of relief here.  A set aside under Section 706 under the APA,

15    and that's mandated by the text of the APA which holds -- says

16    that a reviewing court shall hold unlawful and set aside agency

17    action as applicable here.  It's without observance of

18    procedure required by law.

19         They didn't consult and they didn't review.  And it's

20    not in accordance with law.  It's based on an incorrect

21    interpretation of the TPS statute, and it's arbitrary and

22    capricious under the change in position doctrine.  So the text

23    of that APA mandates, the set aside, and the Ninth Circuit

24    recently confirmed in National TPS Alliance, the September

25    Ninth Circuit decision, that an APA set aside is really the

1    only appropriate form of relief in a TPS case like this one.

2            The second form of relief that plaintiffs request, and

3    this is in addition to the set aside, Your Honor, is a

4    declaratory judgment under 28 U.S.C. 2201, and the text of that

5    statute makes clear that declaratory relief is appropriate,

6    quote, whether or not further relief is or could be sought.  So

7    the Court can enter both a set aside and a declaratory

8    judgment, Your Honor.

9            **THE COURT:**  And the declaratory judgment you're

10   requesting is?

11           **MS. BANSAL:**  A judgment that the challenge

12   terminations violated the APA because they didn't observe

13   procedure required by law -- the same substantive errors but

14   would result in both the set aside and a declaration that the

15   agency decisions violated the APA and the constitution --

16   sorry, not the constitution, our summary judgment motion.

17           **THE COURT:**  All right.  Don't leave the mic yet.

18           I asked that the parties meet and confer to give me a

19   suggested date and schedule for all future dates, to also let

20   me know whether there are any other related cases pending that

21   may have an impact on this court or pending in this same realm

22   of cases and the status of the review in the Ninth Circuit.

23           **MS. BANSAL:**  Yes, Your Honor.  And so we conferred

24   with defense counsel and proposed two dates in January for a

25   potential case management conference; that was the 15th and

1   January 22nd.

2          Regarding related cases, Your Honor, the plaintiffs

3   had previously filed a notice of all of the cases challenging

4   TPS terminations that we're aware of.  I don't believe that

5   there have been any changes since that time.  I know there's no

6   other cases challenging the termination of TPS for Honduras,

7   Nicaragua, or Nepal.

8          And then with respect to the Ninth Circuit

9   proceedings, there is a pending Ninth Circuit -- oh, pardon me.

10  My co-counsel reminded me that there is a new case challenging

11  the TPS termination for Syria, which occurred only recently so

12  that happened after we filed our related case notice.

13         With regard to Ninth Circuit proceedings, there's a

14  pending appeal of the District Court summary judgment order in

15  the Haiti Venezuela case that I think will be set for argument

16  the second week of January, the Ninth Circuit had indicated,

17  and then there's of course the pending appeal of this Court's

18  postponement order, which defendants have filed their opening

19  brief and we have received the briefing deadlines, but a

20  hearing date hasn't been set for that case.

21         **THE COURT:**  All right.  So the Court will, based on

22  that recitation, will reserve January 22nd at 2:00 p.m. by

23  video conference for case management conference, and at that

24  time, a full schedule should be proposed by the parties based

25  on the Court's ultimate decision, if needed.  All right.

1          **MS. BANSAL:**  Thank you, Your Honor.

2          **THE COURT:**  Thank you.  Anything further, counsel?

3          **MR. WEILAND:**  Your Honor, just to address the question

4    you had sent out, with regards to the impact of *Loper Bright* on

5    the APA, defendants would assert that -- Government isn't

6    asserting Chevron deference here but the APA standard has not

7    been changed by *Loper Bright,* and so we would direct the

8    Court's attention to our articulation of the standard of review

9    in ECF 142, which I believe carefully lays out the deference

10   that is embedded within the administrative procedure.

11         So while *Loper Bright* speaks to Chevron, it doesn't

12   speak to the APA.  And then we have previously -- it's been a

13   while since I've read West Virginia, but we have previously

14   asserted in our briefing that the -- in other briefing the

15   major question doctrine in West Virginia versus the EPA is

16   irrelevant here where the Congress plainly meant to confer

17   power to the agency as asserted, and we think that's clear that

18   the Secretary's exercising the authority that Congress gave

19   her, so the major question doctrine does not apply.

20         And I concur with my co-counsel's summary of the --

21   this is the only case addressing Honduras, Nicaragua, Nepal,

22   and the status of the appeal of Your Honor's prior postponement

23   order under 5 U.S.C. 705.

24         **THE COURT:**  All right.  Do you have a best guess as to

25   when, perhaps, there would be oral argument on that issue or at

1   least the finality of all briefing?

2           **MR. WEILAND:**  It has been on a relatively accelerated

3   pace so I don't have a best guess but it is moving quickly.  I

4   believe our reply brief is due soon and I would expect the

5   Court to set argument not long after.

6           **THE COURT:**  Well, soon is --

7           **MR. WEILAND:**  That's the best I can do, Your Honor.

8           **THE COURT:**  I did ask for the best guess.

9           All right.  If there's nothing further by either

10  party, this matter will continue to January 22nd for case

11  management conference with a joint case management statement

12  due one week prior to that date, I believe that would be

13  January 15th.  And the Court takes each of these matters under

14  submission as indicated.

15          I did try to give some indication of each of my

16  potential rulings tentatively.  The motion to dismiss will be

17  denied, but I will have to state all grounds in a written order

18  tentatively.  The Court finds Professor Elliot Young to have

19  information that would be relevant to the Court, but now the

20  Court will go through the exercise of the scope by which that

21  expert's report can be considered.

22          The motion to consider extra-record evidence, ECF 153,

23  at page 2, is what the Court is primarily focused upon.

24          As to the motion for summary judgment, once again, all

25  matters are being taken under submission, but I think that

1  gives you some guideposts in terms of where the Court's

2  decision is leaning, but I want to take into consideration all

3  arguments that were made today and to make sure that I review

4  any citations that I had not reviewed previously and that you

5  give me some grace on all of the reading that I have done

6  because I may need to go back to a few pages, so thank you.

7          **COURTROOM DEPUTY:**  Thank you.  That concludes this

8  matter and court is now adjourned.

9              (Proceedings adjourned at 12:53 p.m.)

10                    ---o0o---

11

12

13              **CERTIFICATE OF REPORTER**

14          I certify that the foregoing is a correct transcript

15  from the record of proceedings in the above-entitled matter.

16

17  DATE:  Friday, November 28, 2025.

18

19

20

21

22                    _Andrea K Bluedorn_
                                                    _____
23                    Andrea K. Bluedorn, RMR, CRR
                      Official United States Reporter

24

25