BRETT A. SHUMATE
Assistant Attorney General
Civil Division
CATHERINE M. RENO
Assistant Director
RUTH ANN MUELLER
Senior Litigation Counsel
JEFFREY HARTMAN
DANIEL CAPPELLETTI
MIA S. BONADIES
ALINA SALGADO
LAUREN BRYANT
Trial Attorneys
U.S. Department of Justice, Civil Division
Office of Immigration Litigation
General Litigation and Appeals Section
P.O. Box 868, Ben Franklin Station
Washington, DC 20044

*Attorneys for Defendants*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| NATIONAL TPS ALLIANCE, *et al*.,<br><br>Plaintiffs,<br><br>v.<br><br>MARKWAYNE MULLIN, in his official capacity as Secretary of Homeland Security, *et al*.,<br><br>Defendants. | Case No. 3:25-cv-05687-TLT<br><br>**DEFENDANTS' REPLY IN SUPPORT OF MOTION FOR JUDGMENT ON THE PLEADINGS**<br><br>Date: January 12, 2027<br>Time: 2 p.m.<br>Location: Courtroom 9 |

Dated: October 23, 2026

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General

CATHERINE M. RENO
Assistant Director

RUTH ANN MUELLER
Senior Litigation Counsel

JEFFREY HARTMAN
DANIEL CAPPELLETTI
MIA S. BONADIES
ALINA SALGADO
Trial Attorneys

*<u>/s/ Lauren Bryant</u>*
LAUREN BRYANT
Trial Attorney
U.S. Department of Justice, Civil Division
Office of Immigration Litigation
P.O. Box 868 Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 305-0134
Lauren.E.Bryant@usdoj.gov

*Attorneys for the Defendants*

# CONTENTS

INTRODUCTION ........ 1

ARGUMENT ........ 1

I. The TPS Statute Bars Plaintiffs' Claims. ........ 1

II. Plaintiffs' Equal Protection Claim Fails as a Matter of Law. ........ 4

CONCLUSION ........ 13

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Trump v. Hawaii,*
585 U.S. 667 (2018) .......... 4

*Agency for Int'l Dev. v. All. for Open Society Int'l, Inc.*,
591 U.S. 430 (2020) .......... 2

*Village of Arlington Heights v. Metropolitan Housing Development Corp.*,
429 U.S. 252 (1977) .......... 5, 8, 9

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .......... 5, 6, 9

*Aung Doe*,
2026 WL 2279577 .......... 10

*Avalos v. Sessions*,
703 F. App'x 572 (9th Cir. 2017) .......... 3

*Fiallo v. Bell*,
430 U.S. 787 (1977) .......... 4

*Gebhardt v. Nielsen*,
879 F.3d 980 (9th Cir. 2018) .......... 2

*Godecke v. Kinetic Concepts, Inc.*,
937 F.3d 1201 (9th Cir. 2019) .......... 1, 12

*Guerrero-Lasprilla v. Barr*,
589 U.S. 221 (2020) .......... 2

*In re Gilead Sciences Sec. Lit.*,
536 F.3d 1049 (9th Cir. 2008) .......... 9, 12

*Mathews v. Diaz*,
426 U.S. 67 (1976) .......... 4

*McNary v. Haitian Refugee Center, Inc.*,
498 U.S. 479 (1991) .......... 3

*Miller v. Gammie*,
335 F.3d 889 (9th Cir. 2003) .......... 3

*Miot v. Trump*,
818 F. Supp. 3d 126 (D.D.C. 2026) .......... 11

*Mullin v. Doe*,
609 U.S. 324 (2026) .......... 1, 2, 3, 6, 7, 10, 11, 12

*Nat'l TPS Alliance v. Noem*,
No. 26-199 (9th Cir. July 14, 2026) .......... 2

*Noor Doe*,
2026 WL 3003682 .......... 10

*Pers. Adm'r of Mass. v. Feeney*,
442 U.S. 256 (1979) .......... 8

*Ramos v. Wolf*,
975 F.3d 872 (9th Cir. 2020) .......... 7, 11

*Regents of the Univ. of Cal.*,
591 U.S. 1 (2020) .......... 5, 6, 7

*Sprewell v. Golden State Warriors*,
266 F.3d 979 (9th Cir. 2001) .......... 9

*Staub v. Proctor Hosp.*,
562 U.S. 411 (2011) .......... 7

*Thoung v. United States*,
913 F.3d 999 (10th Cir. 2019) .......... 3

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007) .......... 6

*United States v. Carrilo-Lopez*,
68 F.4th 1133 (9th Cir. 2023) .......... 8
*Wilkinson v. Garland*,
601 U.S. 209 (2024) .......... 3


**Statutes**

8 U.S.C. §1252(a)(5) .......... 3
8 U.S.C. § 1252(a)(2)(D) .......... 3
8 U.S.C. § 1252(b)(9) .......... 3
8 U.S.C. § 1254a .......... 2
8 U.S.C. § 1254a(b) .......... 8
8 U.S.C. § 1254a(b)(2), (3)(C) .......... 4
8 U.S.C. § 1254a(b)(3)(A) .......... 5
8 U.S.C. § 1254a(b)(3)(B) .......... 8
8 U.S.C. § 1254a(b)(5)(A) .......... 2, 3, 4
8 U.S.C. § 1254a(b)(5)(B) .......... 3
REAL ID Act of 2005, Pub. L. No. 109-13, §106, 119 Stat. 231, 310-11 .......... 3


**Rules**

Fed. R. Civ. P. 12(c), (h)(3) .......... 3


**Regulations**

*Deferred Enforced Departure for Certain Venezuelans*,
86 Fed. Reg. 6,845 (Jan. 25, 2021) .......... 11
*Foreign Terrorist Organization Designations*,
90 Fed. Reg. 10,030 (Feb. 20, 2025) .......... 9
*Honduras Termination*,
90 Fed. Reg. 30,089 (July 8, 2025) .......... 8
*Nepal Termination*,
90 Fed. Reg. 24,151 (June 6, 2025) .......... 8

*Nicaragua Termination*,
90 Fed. Reg. 30,086 (July 8, 2025) ........................................................................................ 8

**Other Authorities**

*Designating Cartels and Other Foreign Organizations as Foreign Terrorist Organizations and Specially Designated Global Terrorists*,
Exec. Order No. 14157 ........................................................................................................ 9

## INTRODUCTION

Despite their assertions to the contrary, Plaintiffs' response demonstrates that their remaining claims are barred from judicial review and, even assuming jurisdiction, Plaintiffs have failed to state a claim that the Secretary's determinations to end Temporary Protected Status ("TPS") for Nepal, Honduras, and Nicaragua, violated their constitutional rights. Accordingly, Defendants are entitled to judgment on the pleadings. *See* ECF No. 249.

As a preliminary matter, the judicial review bar applies to both constitutional claims and statutory claims. While the Supreme Court reserved this question on constitutional claims, constitutional claims plainly fall within the text of the provision, which applies just as squarely to constitutional as nonconstitutional claims. *Mullin v. Doe*, 609 U.S. 324, 351-52 (2026) (Thomas, J., concurring).

Assuming reviewability, even under a heightened standard, the Court should dismiss Plaintiffs' constitutional claims because their claims of discriminatory animus rest entirely on public statements of the former Secretary and the President that are remote in time from the challenged TPS determinations, made in unrelated contexts, and which the Supreme Court already found in *Doe* are unlikely to successfully support a materially identical equal protection claim.

For these reasons, the Court should enter judgment in favor of Defendants.

## ARGUMENT

Plaintiffs' opposition fails to articulate both a cognizable legal theory and sufficient facts to allege a cognizable claim. *See Godecke v. Kinetic Concepts, Inc.*, 937 F.3d 1201, 1208 (9th Cir. 2019). Thus, Plaintiffs' equal protection pleadings cannot survive the Motion for Judgment on the Pleadings, and this Court should enter judgment for Defendants as a matter of law.

### I. The TPS Statute Bars Plaintiffs' Claims.

Plaintiffs ask this Court to set aside the termination of TPS designations for Nepal, Honduras, and Nicaragua because they were "motivated, at least in part, by intentional discrimination based on race, ethnicity, or national origin." ECF No. 229-1 ¶ 188 ("Amended Complaint"). Plaintiffs thus seek precisely

what Congress barred: "judicial review of" the Secretary's determination "with respect to the . . . termination . . . of a designation . . . of a foreign state." *Doe*, 609 U.S. at 351 (Thomas, J., concurring).

As Justice Thomas explained in his concurrence, Congress's intent to preclude judicial review is clear, as the language "no judicial review" is unambiguous. *Id.*; *see* 8 U.S.C. § 1254a(b)(5)(A); *Doe*, 609 U.S. at 345 ("Sometimes Congress decides that the political process is the proper forum" to resolve any disputes or misuse). Moreover, "nothing in the Constitution prohibits Congress from [barring all judicial review, including constitutional claims] so, courts are obliged to simply 'give[e] effect to [§ 1254a's] ordinary meaning.'" *Id.* (Thomas, J. dissenting) (quoting *Guerrero-Lasprilla v. Barr*, 589 U.S. 221, 244 (2020)).

Beyond citing cases that preceded *Doe* and three non-binding district court decisions, Plaintiffs offer no account of why Congress would forbid review of all statutory challenges to the TPS statute but would permit aliens to bring constitutional challenges to the Secretary's designation of *foreign countries* for TPS. Opp. at 2-4. In doing so, they overlook that "[t]he Constitution . . . does not require that courts be able to hear all constitutional claims." *Doe*, 609 U.S. at 354 (Thomas, J., concurring); *cf. Agency for Int'l Dev. v. All. for Open Society Int'l, Inc.*, 591 U.S. 430 (2020) ("the Court has not allowed foreign citizens outside the United States . . . to assert rights under the U.S. Constitution. If the rule were otherwise, actions by the American military, intelligence, and law enforcement personal against foreign organizations or foreign citizens in foreign countries would be constrained by the foreign citizen's purported rights under the U.S. Constitution."). Cases, such as *Gebhardt v. Nielsen*, 879 F.3d 980, 988 (9th Cir. 2018), that *assumed* that courts could review constitutional claims because no "colorable" ones were even presented do not support Plaintiffs' assertion of jurisdiction. *See Doe*, 609 U.S. at 346 (declining to decide "whether the TPS statute meets [the] clear-statement rule" because the asserted "constitutional claim is unlikely to succeed on the merits"); Opp. at 3.

Furthermore, while Plaintiffs assert that the decision in *Doe* does nothing to upset the Court's prior holdings, they overlook that this Court's judgment was "vacated and remanded" for further proceedings consistent with *Doe*. Dkt. 44, *Nat'l TPS Alliance v. Noem*, No. 26-199 (9th Cir. July 14, 2026) (order)

(capitalization altered); *contra* Opp. at 2 n.2. It goes without saying that this Court is "bound by the later and controlling authority," including *Doe*. *Miller v. Gammie*, 335 F.3d 889, 893 (9th Cir. 2003) (en banc). Thus, the breadth of § 1254a(b)(5)(A)'s review bar, as interpreted by the Supreme Court, cannot be overlooked. In *Doe*, the Supreme Court held that the judicial review bar forecloses non-constitutional claims of all kinds, whether procedural or substantive, to an antecedent decision or the ultimate termination decision itself, even if the decision is erroneous. 609 U.S. 324 at 337–45. "This text is clear, and its plain meaning is very broad." *Id.* at 339. "The statutory text does not distinguish statutory and constitutional claims; it bars all "'judicial review.'" *Id.* at 351 (Thomas, J., concurring). "Therefore, for the same reasons that their statutory claims are barred, their constitutional claim is also barred[.]" *Id.* at 352.

Finally, Plaintiffs characterize Defendant's reliance on 8 U.S.C. § 1252(b)(9) as a procedural defect. Opp. at 11. However, the Court must dismiss any complaint over which it lacks subject-matter jurisdiction. Fed. R. Civ. P. 12(c), (h)(3). As a response to the Supreme Court's decision in *McNary v. Haitian Refugee Center, Inc.*, 498 U.S. 479, 494 (1991) (observing that, had Congress intended for the limited review provisions of INA § 210(e) to encompass challenges to INS procedures and practices, it could have broadened the statutory language to include "all causes…arising under any of the provisions" of the program or by "referring to review on all questions of law and fact[.]") (internal quotations omitted), Congress carefully crafted the statutory language of § 1252(b)(9) to ensure that *only* those who become subject to removal proceedings may obtain review of decisions that ultimately will be the basis of their removal. That is doubly clear because the REAL ID Act of 2005, Pub. L. No. 109-13, §106, 119 Stat. 231, 310-11, defined "judicial review" throughout chapter 12 of the Immigration and Nationality Act, to foreclose habeas corpus review and "review pursuant to any other provision of law (statutory or nonstatutory)." 8 U.S.C. §1252(a)(5); *see Thoung v. United States*, 913 F.3d 999, 1005 (10th Cir. 2019). Thus, to the extent judicial review is available, Congress channeled it through the petition for review process. *See Wilkinson v. Garland*, 601 U.S. 209, 217–22 (2024) (recognizing that 8 U.S.C. § 1252(a)(2)(D) restores jurisdiction to review constitutional claims in a petition for review); 8 U.S.C.

§ 1254a(b)(5)(B) (administrative review); *see, e.g.*, *Avalos v. Sessions*, 703 F. App'x 572, 573 (9th Cir. 2017) (granting petition and "remand[ing] Avalos' TPS claim to the agency for further proceedings"). Thus, Plaintiffs are wrong to say that reading Section 1254a(b)(5)(A) to cover constitutional claims would "entirely foreclose review of a colorable constitutional claim." Opp. at 11.

In sum, Section 1254a(b)(5)(A) evinces Congress's clear intent to foreclose judicial review of both statutory and constitutional claims in federal district courts and this Court should enter judgment for the Defendants.

## II. Plaintiffs' Equal Protection Claim Fails as a Matter of Law.

Assuming this claim is not covered by the judicial-review bar discussed above, Plaintiffs demand "exacting scrutiny." ECF No. 229-1 (Am. Compl.) ¶ 187. But *Trump v. Hawaii* prescribes rational-basis review for constitutional challenges to Executive immigration policy: such measures stand so long as they are "plausibly related" to legitimate objectives, in deference to judgments that "implicate relations with foreign powers" and involve "classifications defined in the light of changing political and economic circumstances." 585 U.S. 667, 702, 704–05 (2018). A country-conditions termination is the paradigm of such a judgment, and nationality-based classifications in the immigration laws receive rational-basis review in any event. *Mathews v. Diaz*, 426 U.S. 67, 79–80 (1976) (applying rational basis review).

Categorical distinctions based on nationality are permitted in immigration law, as are many other forms of line-drawing. *See Fiallo v. Bell*, 430 U.S. 787, 793 (1977) (rejecting an equal protection challenge to a sex-based immigration policy and recognizing a "need for special judicial deference to congressional policy choices in the immigration context"). Plaintiffs contend that the decisions to terminate TPS for Honduras, Nepal, and Nicaragua were rooted entirely in false stereotypes and divorced from factual context. Opp. at 12. Defendants categorically deny that any racial, ethnic, or national-origin animus motivated any TPS determination. Notwithstanding, it is no secret that the program was always meant, by its very title, to be temporary and was not designed to be perpetual. The temporary nature of the statute is intrinsically interwoven with the decision to terminate TPS designations—indeed, the statute designates an outer limit for both the designation and extension of TPS for a given country. 8 U.S.C. § 1254a(b)(2),

(3)(C). The statute also requires the Secretary to undertake a periodic review of a TPS designation at least 60 days before its end date to determine whether the requisite conditions for designation continue to be met. 8 U.S.C. § 1254a(b)(3)(A). The country-conditions considerations, coupled with the national-interest balancing that was undertaken here, are plausibly related to enforcing the program's temporary nature, allow for greater immigration enforcement, and are intricately tied to foreign-policy objectives with respect to the countries at issue. Accordingly, the Secretary's determinations easily pass rational basis review.

Even applying *Arlington Height's* heightened scrutiny standard, Plaintiffs' equal protection claim still fails to state a claim. The Amended Complaint's assertion that the termination cannot be explained except by animus is a textbook conclusory pleading and should be rejected. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to …[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements[.]"). The cited statements are largely "remote in time and made in unrelated contexts," and thus "do not qualify as 'contemporary statements' probative of the decision at issue." *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 35 (2020) (citing *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 268 (1977)).

In *Iqbal*, the plaintiffs challenged the government's post-September 11 arrest and detainment of thousands of Arab Muslim men who were designated persons of "high interest" based on their race, religion, and/or national origin, alleging that the policy was a violation of their First and Fifth Amendment rights. *Iqbal*, 556 U.S. at 667–68. There, the Supreme Court dismissed the plaintiffs' claims, finding that the plaintiffs failed to plausibly establish that the policy's purpose was to designate individuals for detention based solely on race, religion, or national origin. *Id.* at 681. The Court posited that, since the September 11 attacks were perpetrated by Arab Muslims, "it should come as no surprise that a legitimate policy directing law enforcement to arrest and detain individuals because of their suspected link to the attacks would produce a disparate, incidental impact on Arab Muslims, even though the purpose of the policy was to target neither Arabs nor Muslims." *Id.* at 682. "As between that 'obvious alternative

explanation' for the arrests…and the purposeful, invidious discrimination [plaintiffs] asks us to infer, discrimination is not a plausible conclusion." *Id*.

Here, Plaintiffs similarly fail to state a plausible equal protection claim of race discrimination and instead rely on the same types of statements that the Supreme Court explained "fail to raise a plausible inference" that challenged government action "was motivated by animus." *Regents of the Univ. of Cal.*, 591 U.S. at 35. Unable to point to *any* comments by former Secretary Noem specifically discussing the years-and-decades-old natural disaster related TPS designations for Honduras, Nepal, or Nicaragua, Plaintiffs instead turn to generalized, unrelated, and misconstrued statements by the President and "Trump Surrogates," none of which mention Honduras, Nepal, or Nicaragua. Am. Compl. ¶¶105-47. Plaintiffs cannot show that the former Secretary's TPS determinations were "motivated, at least in part, by intentional discrimination based on race, ethnicity, or national origin," *Id.* ¶ 189, particularly through statements taken out of context and without direct links to the former Secretary's determinations. *See Regents of the Univ. of Cal.*, 591 U.S. at 35 (explaining that disparate impact, unusual recission history, and pre- and post-election statements failed "to raise a plausible inference that the recission was motivated by animus").

Contrary to their assertions, Opp. at 7, Plaintiffs' allegations are no more plausible than the allegations or evidence in *Doe*, where the Supreme Court examined materially similar statements by the President and former Secretary and found that none were "overtly racial, and in substance all expressed policy views that could rest on race-neutral justifications." 609 U.S. at 348. In that case, the Court held that the termination of every case designation that came up for review—13 countries with racially diverse populations, including Honduras, Nepal, and Nicaragua—supplied "a strong, race-neutral explanation" and that respondents were "unlikely to prove that race was a motivating factor" in the Secretary's decision-making. *Id*. at 350. At the pleading stage, the same pattern (as echoed in the Amended Complaint) is an "obvious alternative explanation" defeating plausibility. *See Iqbal*, 556 U.S. at 682. The Honduras, Nepal, and Nicaragua related allegations here are weaker still, as the statements at issue principally concern *other* countries. Am. Compl. ¶¶ 92–147; *see Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 567 (2007) (rejecting

argument that "parallel conduct was strongly suggestive of conspiracy" because there was "an obvious alternative explanation" stemming from a statute's prior authorization of monopolies among telecommunication providers). Indeed, Plaintiffs seem to concede the pattern has nonracial exceptions, such as how as of July 2026 "four countries have active, unsuspended TPS designations: El Salvador, Lebanon, Sudan, and Ukraine." *See* Am. Compl. ¶ 142 & n.99.

The only statement referring specifically to any one of the three at-issue countries in the Amended Complaint is that during President Trump's first term, while preparing for a meeting with the Prime Minister of India, he "deliberately 'mispronounced' Nepal as 'nipple[.]'" *Id.* at ¶ 126. At the outset, Presidential statements do not establish animus by the Secretary, who is the actual decisionmaker for TPS designations. *See Staub v. Proctor Hosp.*, 562 U.S. 411, 418 (2011); *see also Ramos v. Wolf*, 975 F.3d 872, 897 (9th Cir. 2020) (doubting "cat's paw" transposition to TPS terminations), *reh'g en banc granted, opinion vacated*, 59 F. 4th 1010 (9th Cir. 2023). A contrary rule would invite intrusion into privileged Executive deliberations. This statement is even more benign than the four categories of statements discussed in *Doe*: (1) "associat[ing] these immigrants with crime and other social ills[];…express[ing] great displeasure with TPS[;]…broadly denigrat[ing] the countries for which TPS designations have been granted[;]…[a]nd…misalign[ing] [immigrants] who have come to the United States." *See* 609 U.S. at 347.

Plaintiffs' asserted disparate-impact theory based on the President's "shithole countries" statement is also unavailing, Opp. at 10; Am. Compl. ¶¶ 119, 120, 138. *See Doe*, 609 U.S. at 347 (finding that "statements broadly denigrat[ing] the countries for which TPS designations have been granted—including Haiti—portraying them as hellish places in which to live…[were] not overtly racial, and in substance…expressed policy views that could rest on race-neutral justifications."). Nearly every country ever designated for TPS has a majority non-white population; therefore, by Plaintiffs' logic, "virtually any generally applicable immigration policy could be challenged on equal protection grounds." *Regents*, 591 U.S. at 34; *see also Ramos*, 975 F.3d at 898. Indeed, Plaintiffs' own theory in this litigation—that the former Secretary made a "preordained decision" to end TPS—supplies a "strong, race-neutral explanation" for the terminations. *Doe*, 609 U.S. at 329; Am. Compl. ¶ 3. The Supreme Court further

observed that the affected countries are a racially diverse group covering different continents. *Doe*, 609 U.S. at 349. "Viewing all the relevant evidence," the Supreme Court held the plaintiffs "unlikely to prove that race was a motivating factor." *Id.* at 2140. The same conclusion follows here, where Plaintiffs rely on the same statements and the same "non-white nations" inference. Am. Compl. ¶ 188.

Furthermore, Plaintiffs fail to state an equal protection claim under the Fifth Amendment because the former Secretary's determinations were consistent with the TPS statute, including its emphasis on the temporariness of the protection afforded and its assignment of responsibility for determining whether, in the Secretary's informed judgment, the conditions for a designation under the statute continue to be met. *See* 8 U.S.C. § 1254a(b)(3)(B). To warrant such heightened scrutiny, [p]roof of . . . discriminatory intent or purpose is required." *Arlington Heights*, 429 U.S. at 264–65. Thus, a neutral law that has a disproportionately adverse impact upon a particular class is only unconstitutional under the equal protection clause if "that impact can be traced to a discriminatory purpose." *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 272 (1979).

Former Secretary Noem provided reasoned, facially sufficient explanations for her determinations. The former Secretary reviewed the current conditions in Honduras, Nepal, and Nicaragua to determine whether there continued to be a substantial disruption of living conditions from years-and-decades-old natural disasters that rendered the respective countries unable to handle the return of their nationals, in accordance with 8 U.S.C. § 1254a(b). The Federal Register Notices published for each country outlined positive improvements in the countries' conditions that informed the former Secretary's decision to terminate TPS for each country and explained why these countries were able to safely handle the return of their nationals. *Honduras Termination*, 90 Fed. Reg. 30,089, 30,091 (July 8, 2025); *Nepal Termination*, 90 Fed. Reg. 24,151, 24,152 (June 6, 2025); *Nicaragua Termination*, 90 Fed. Reg. 30,086 30,086 (July 8, 2025). Plaintiffs ignore these stated justifications altogether, and instead cherry-pick external statements, social media posts, and media appearances from the former Secretary to infer an overarching, racially discriminatory motive with respect to TPS terminations as a whole. Am. Compl. ¶¶ 92–104. Plaintiffs thus fail to state a claim because "[a] court may not infer discriminatory motive based solely on evidence of a

disproportionate impact except in rare cases where 'a clear pattern, unexplainable on grounds other than race, emerges from the effect of the state action.'" *United States v. Carrilo-Lopez*, 68 F.4th 1133, 1141 (9th Cir. 2023) (rejecting equal protection challenge to illegal reentry statute) (quoting *Arlington Heights*, 429 U.S. at 266)).

Moreover, Plaintiffs take former Secretary Noem's statements out of context and mischaracterize them as supposedly portraying "non-white, non-European immigrants" as "dirt bags." Am. Compl. ¶ 95. But this "court need not . . . accept as true allegations that contradict matters properly subject to judicial notice or by exhibit" nor is it "required to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Sciences Sec. Lit.*, 536 F.3d 1049, 1055 (9th Cir. 2008) (citation and quotation omitted). Just so here. The relied upon quotes are a gross mischaracterization of a snippet of the Secretary's interview, because during the interview the former Secretary explained that she had been in New York City to help arrest a ringleader of Tren de Aragua and it was these violent gang members—"dirtbags"—that the people wanted removed from their communities. *Id.* ¶ 95 n.37. Plaintiffs dubiously urge the Court to find that the former Secretary's "dirtbag" comment was meant to apply to all non-white, non-European immigrants, when she was clearly addressing members of Tren de Aragua specifically—a group that the President has designated as a foreign terrorist organization. *See Designating Cartels and Other Foreign Organizations as Foreign Terrorist Organizations and Specially Designated Global Terrorists*, Exec. Order No. 14157, 90 Fed. Reg. 8,439 (Jan. 29, 2025); *see also Foreign Terrorist Organization Designations*, 90 Fed. Reg. 10,030 (Feb. 20, 2025) (State Department designation). Plaintiffs similarly excise the word "criminal" from Secretary Noem's statement summarizing her meeting with the Honduran Minister of Foreign Affairs about how the United States and Honduras can "best work together" on a range of immigration and nationality security issues. Am. Compl. ¶ 100; Opp. at 10. Statements in a complaint that rely on distortion do not provide sufficient "factual content to nudge [a] claim of purposeful discrimination across the line from conceivable to plausible." *Iqbal*, 556 U.S. at 683; *see Sprewell v. Golden State Warriors*, 266 F.3d 979,

990 (9th Cir. 2001) ("we are not required to accept as true conclusory allegations which are contradicted by documents referred to in the complaint"); *contra* Opp. at 9.

Further, while Plaintiffs' claim that "this case rests on a distinct factual record from the one before the Court in *Dahlia Doe*," Opp. at 14, they fail to meaningfully distinguish the cases. Instead, Plaintiffs point to a "social media post that post-dates the *Miot* decision reviewed in *Dahlia Doe*," namely a February 9, 2026, tweet from Secretary Noem that "Temporary Protected Status was abused to allow violent terrorists, criminals, and national security threats into our nation." Am. Compl. ¶ 103. Not only is this statement cumulative of other similar statements Plaintiffs cite but is also race-neutral. *Cf. Doe*, 609 U.S.at 350 n.7 (rejecting request to dismiss writ of certiorari as improvidently granted because "newly discovered evidence" was "cumulative of other evidence in the record"). And despite Plaintiffs' pending bid to reopen discovery, the factual record in this case *has* been fully developed. *See* Opp. at 14 (citing *Noor Doe*, 2026 WL 3003682, at *3–4; *Aung Doe*, 2026 WL 2279577, at *11 for the proposition that Plaintiffs may be able to succeed on the merits after they uncover additional evidence). As detailed in Defendants' Opposition to Plaintiffs' Motion to Reopen Discovery, Plaintiffs have already had a robust opportunity to conduct discovery concerning their equal protection claim. ECF No. 248 at 12-16. Indeed, during discovery, Plaintiffs opposed Defendants' Motion for Summary Judgment and proffered the following "evidence of discriminatory animus": "Defendants have described TPS as a program which 'allow[s] unvetted aliens to remain in [the] U.S.' and which has 'been exploited to allow criminal aliens to come to our country and terrorize American citizens.'" ECF No. 167 at (citing ECF No. 82-1). Ultimately, despite having the opportunity to amend their complaint with additional evidence uncovered following the *completion* of discovery, Plaintiffs still fail to allege anything that does not fall under the same categories of evidence (if not the very same statements) the Supreme Court held were not "overtly racial, and in substance all expressed policy views that could rest on race-neutral justifications." *Doe*, 609 U.S. at 348.

In particular, Plaintiffs' rely on these same statements referring to immigration as an "invasion," claiming that immigrants and TPS holders are "violat[ing] our laws," "destroying the towns," "remak[ing] the foundation of this country," "criminals, gang members and terrorists" "dirt bags," "poisoning the blood

of our country," "snakes" and "animals," have "bad genes," are coming from "jails and mental institutions from other countries," are "eating the dogs," "eating the cats," and referring to countries designated for TPS as "shithole countries," while calling Denmark, Switzerland, and Norway "nice countries." Am. Compl. ¶¶ 50, 81-98, 109-121; *see Doe*, 609 U.S. at 366-67 (Kagan, J., dissenting) (discussing alleged evidence of racial animus and explaining that the Supreme Court could only reverse if the district court's findings were not "plausible"). Plaintiffs also point President Trump's "Executive Order to protect white South Africans" as evidence that "his administration strongly prefers white and European immigrants over those perceived as non-white or non-European." *Id.* ¶ 128. The record in *Miot*, which the Supreme Court considered, is materially indistinguishable. In the district court's Memorandum Opinion finding that plaintiffs were likely to succeed under *Arlington Heights*, the court cites statements about Haitian TPS holders being "illegal immigrants," who are "poisoning the blood" of this country" and complaining that immigration is an "invasion," creating a "dumping ground," that is "destroying our country." *Miot v. Trump*, 818 F. Supp. 3d 126, 177-181 (D.D.C. 2026). The court further cited statements describing immigrants as "not people," "snakes," and "garbage," who have "bad genes" and are "eating the pets," while preferring immigrants from "nice," predominantly white, countries over "shithole countries" and giving priority to white South African immigrants. *Id.* The Supreme Court flatly rejected reliance on those statements in the context of an equal protection claim. *Doe*, 609 U.S. at 348 ("None of the cited statements by either the President or the Secretary was overtly racial, and in substance all expressed policy views that could rest on race-neutral justifications.").

Plaintiffs' theory that the President and former Secretary harbor wide-reaching animus against non-white, non-European immigrants, based on selective quotes stretching into the past, does not square with reality, including past actions by the President. For example, during the first Trump Administration, the Secretary extended TPS designations for four other "non-white, non-European" countries, finding that the statutory criteria continued to be satisfied. *Ramos*, 975 F.3d at 898. In addition, during the first administration, the President deferred removal of certain Venezuelans. *See Deferred Enforced Departure for Certain Venezuelans*, 86 Fed. Reg. 6,845, 6,845 (Jan. 25, 2021). Each of those actions cannot be

squared with Plaintiffs' contention that the President has consistently harbored discriminatory animus, and that former Secretary Noem must therefore share it.

In sum, none of the evidence alleged in the operative complaint is sufficient to state a claim that the former Secretary's TPS determinations were motivated by racial animus, particularly when viewed against the Supreme Court's ruling in *Doe*. Plaintiffs' additional allegation to their equal protection claim after *Doe* that "Defendants' purported opposition to the TPS program is not race-neutral," is merely conclusory and still fails to meet the burden to state a plausible claim as it relies on unwarranted deductions of facts. Am. Compl. ¶ 188; *see Godecke*, 937 F.3d at 1208; *In re Gilead Scis. Secs. Litig.*, 536 F.3d at 1055 (holding that courts do not "accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences"). As the Supreme Court has concluded, the Administration's opposition to how the TPS statute was being interpreted and implemented especially with respect to long-standing designations, *see Doe*, 609 U.S. at 332 (observing that "[a]lthough designed to afford 'temporary' relief, TPS designations in practice have often lasted for decades," citing, e.g., Nicaragua and Honduras), constitutes a strong, race-neutral explanation which prevents Plaintiffs from succeeding on their equal protection claim. Accordingly, Plaintiffs have failed to plausibly allege an equal protection violation, and Defendants are entitled to judgment as a matter of law.

## CONCLUSION

For the foregoing reasons, this Court should grant Defendants' motion for judgment on the pleadings.

Dated: October 23, 2026

Respectfully Submitted,

BRETT SHUMATE
Assistant Attorney General

CATHERINE M. RENO
Assistant Director

RUTH ANN MUELLER
Senior Litigation Counsel

JEFFREY HARTMAN
DANIEL CAPPELLETTI
ALINA SALGADO
MIA S. BONADIES
Trial Attorneys

*/s/ Lauren Bryant*
LAUREN BRYANT
Trial Attorney
U.S. Department of Justice, Civil Division
Office of Immigration Litigation
P.O. Box 868 Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 305-0134
Lauren.E.Bryant@usdoj.gov

*Counsel for Defendants*